*EXHIBIT A*

| | |
|---|---|
| Sarah E. Siskind (Admitted Pro Hac Vice) | Daniel J. Mulligan (SBN 103129) |
| Charles Barnhill (Admitted Pro Hac Vice) | Thomas A. Jenkins (SBN 92213) |
| William P. Dixon (Admitted Pro Hac Vice) | **JENKINS & MULLIGAN** |
| Elizabeth J. Eberle (Admitted Pro Hac Vice) | 660 Market Street, 3rd Floor |
| **MINER, BARNHILL & GALLAND, P.C.** | San Francisco, California 94104 |
| 44 East Mifflin Street, Suite 803 | Telephone: (415) 982-8500 |
| Madison, Wisconsin 53703 | *Attorneys for the Blunt and Ross Plaintiffs* |
| Telephone: (608) 255-5200 | |
| *Co-Lead Counsel and Attorneys for the ACORN* | Arthur W. Lazear (SBN 83603) |
| *Plaintiffs, Attorneys for the Bell Plaintiffs and* | **HOFFMAN & LAZEAR** |
| *Co-Counsel for the Sullivan Plaintiffs* | 180 Grand Avenue, Suite 1550 |
| | Oakland, California 94612 |
| Joseph W. Cotchett, Jr. (SBN 36324) | Telephone: (510) 763-5700 |
| Niall P. McCarthy (SBN160175) | *Attorneys for ACORN Plaintiffs* |
| Laura Schlichtmann (SBN 169699) | |
| **COTCHETT, PITRE, SIMON & McCARTHY** | Gilmur R. Murray (SBN 111856) |
| San Francisco Airport Office Center | Derek G. Howard (SBN 118082) |
| 840 Malcolm Road, Suite 200 | **MURRAY & HOWARD, LLP** |
| Burlingame, California 94010 | 436 14th Street, Suite 1413 |
| Telephone: (650) 697-6000 | Oakland, California 94612 |
| *Co-Lead Counsel and Attorneys for the* | Telephone: (510) 444-2660 |
| *Leigh and Vega Plaintiffs* | *Liaison Counsel and Attorneys for the* |
| | *Leigh and Vega Plaintiffs* |
| Gary Klein (Admitted Pro Hac Vice) | |
| John Roddy (Admitted Pro Hac Vice) | |
| **GRANT, KLEIN & RODDY** | |
| 727 Atlantic Avenue, 2nd Floor | |
| Boston, Massachusetts 02111 | |
| Telephone: (617) 357-5500 | |
| *Attorneys for the Masterson, Sullivan* | |
| *and Cross Plaintiffs* | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE:

HOUSEHOLD LENDING LITIGATION

Case No. C02-1240 CW (and related cases C02-2529, C02-4646, C02-4867, C02-5520 and C03-0368)
**CLASS ACTION**

**DECLARATION OF DR. MICHAEL A. STEGMAN CONCERNING VALUE OF SETTLEMENT TO CLASS MEMBERS**

I, Michael A. Stegman, declare:

1. I hold the Duncan MacRae'09 and Rebecca Kyle MacRae Professor of Public Policy, Planning, and Business Chair at the University of North Carolina at Chapel Hill, where I also serve as Chairman of the Department of Public Policy, and Director of the Center for Community

DECLARATION OF MICHAEL STEGMAN
CONCERNING VALUE OF SETTLEMENT TO CLASS MEMBERS

Case No. C-02-1240 CW
(and related cases)

REDACTED AS CONFIDENTIAL AT DEFENSE COUNSEL'S REQUEST
OVER THE STRENUOUS OBJECTIONS OF CLASS COUNSEL

Capitalism in the Kenan-Flagler Business School, Frank Hawkins Kenan Institute of Private Enterprise. In 1993, President Bill Clinton nominated me, and the U.S. Senate confirmed my appointment to be Assistant Secretary for Policy Development and Research (PD&R) at the U.S. Department of Housing and Urban Development, a position I held until June 30, 1997. During my term, I also served as Acting Chief of Staff at HUD from November 1996 through April 1997.

2. I am an elected Fellow of the Urban Land Institute, a past member of Freddie Mac's Affordable Housing Advisory Council, and serve on the boards of the Initiative for a Competitive Inner City directed by Harvard Business School Professor Michael Porter; One Economy Corporation, a non-profit dedicated to the elimination of the digital divide; and the advisory committee of The Brooking Institution's Center on Urban and Metropolitan Policy. I have served as a consultant to HUD, the U.S. Treasury Department, the Community Development Financial Institutions Fund (CDFI), the U.S. General Accounting Office, and Lehman Brothers, and am currently a consultant to the Fannie Mae Foundation.

3. I have also written extensively, and published on a wide range of housing and community development and financial services issues. My most recent books include *Savings and the Poor: The Hidden Benefits of Electronic Banking,* (Brookings Institution Press, 1999; *State and Local Affordable Housing Programs: A Rich Tapestry* (The Urban Land Institute, 1999). Among other papers of mine to be published over the next several months is one whose working title is *The Impacts of North Carolina's Predatory Lending Law* (forthcoming in the Journal, *Housing Policy Debate,* published by the Fannie Mae Foundation).

4. My curriculum vita is attached to this declaration as Exhibit 1.

5. I have reviewed the settlement agreement and data concerning the benefits of the settlement in the form of sworn declarations by various employees of Household. I understand that some of the data I have reviewed has been designated as confidential by Household. Due to these confidentiality designations, where indicated, I have supplied additional information to Plaintiffs' counsel about my calculations in the form of a separate document that Plaintiffs' counsel may make available if so required by the Court.

- 2 -

DECLARATION OF MICHAEL A. STEGMAN   Case No. C-02-1240 CW

6. My general opinion, given my background on policy issues related to housing, including the risks and consequences of sub-prime lending, is that the settlement benefits to the class are of very substantial value. The settlement greatly reduces the risk of foreclosures by Household on class members and provides an opportunity for those who are able to pay on time to reduce the costs of their loans. In addition, there are other quantifiable and nonquantifiable benefits of the settlement to class members including cash benefits, the right to cancel expensive credit insurance products, and valuable practice changes as discussed more fully below.

7. I value the economic benefits of the settlement as follows:

*Cash Payments – Loans Originated on or after January 1, 1998 and before January 1, 1999*

8. Based on data supplied by Household and the settlement administrator, there are 27,811 class members eligible for $750 payments because their loans were originated or processed in California, Massachusetts or Washington on or after January 1, 1998 and before January 1, 1999.

9. If all such class members filed claims, the value of this benefit is $20,858,250.

10. Based on information available to me, I estimate that 50% of the class members eligible for this benefit will file a claim. To reach this estimate, I assume first that a small portion of the eligible group refinanced their loans with Household during the class period for the settlement between the state Attorneys General and Household (the "AG settlement") and then accepted benefits from their state Attorney General. By accepting benefit from the AG settlement, those class members released their claims and are not eligible for this benefit in the settlement under review here. I assume as well that not every class member will file a claim. Since the accounts involved are more than five years old, I assume that some of the eligible borrowers will no longer be living at the mailing address in Household's records and so will not receive claims forms. I also assume that some borrowers will neglect to file claims or will choose not to file. Finally, I understand that a small number of class members have opted out and therefore cannot take benefits under the settlement. On the other hand, I note that more than 80% of Household customers eligible for cash benefits under the AG settlement accepted such benefits. I thus consider a 50% claims rate to be a conservative estimate.

- 3 -

11. Applying an estimated 50% claims rate to this benefit, its presumptive value to class members is $10,429,125.

12. Based on data supplied by Household and the settlement administrator, there are 24,146 class members eligible for $500 payments because their loans were originated or processed in Pennsylvania, New Jersey, Minnesota, Maine or Michigan on or after January 1, 1998 and before January 1, 1999.

13. If all such class members filed claims, the value of this benefit is $12,073,000.

14. Applying an estimated 50% claims rate to this benefit, its presumptive value to class members is $6,036,500.

15. The total potential value of cash payments to class members whose loans were originated or processed in 1998 is $32,931,250. The likely actual value of the benefit to class members is $16,465,625.

*Cash Payments – Former Borrowers Whose Loans Were Originated or Processed On or After January 1, 1999 and On or Before December 24, 2003.*

16. Based on data supplied by Household and the settlement administrator, there are 449,441 class members eligible for $500 payments because their loans were originated or processed on or after January 1, 1999 and on or before December 24, 2003 and such loans were repaid or otherwise terminated or before December 24, 2003. Based on data supplied by Household and the settlement administrator, approximately 69% of such class members are rendered ineligible for this benefit because they released their claims in the AG Settlement. This means that approximately 139,327 class members are eligible to claim this benefit.

17. Most of the group of class members who are eligible for this benefit were not eligible for benefits in the AG settlement and therefore had no opportunity to make claims under that settlement. This is because their loans were generated outside the class period for the AG settlement.

18. If all eligible class members filed claims, the value of this benefit to this group of class members is $69,663,500.

-4-

19. Again, I assume that the best estimate of the number of eligible class members who will file claims is about 50%. Because the claims rate for benefits in the AG settlement was 81%, I consider this a conservative estimate.

20. Applying an estimated 50% claims rate to this benefit for this group, its presumptive value to class members is $34,831,750.

*Cash Payments – Borrowers Whose Loans Were Processed But Not Originated On or After January 1, 1999 and On or Before December 24, 2003.*

21. Based on data supplied by Household and the settlement administrator, there are 24,931 class members eligible for $500 payments because their loans were processed but not originated on or after January 1, 1999 and on or before December 24, 2003.

22. If all such class members filed claims, the value of this benefit would be $12,465,500.

23. For the reasons discussed in paragraph 10--with the modification that there is reason to believe that the more recent vintage of these loans suggest that fewer mailing addresses will be incorrect --and because these class members were not eligible for a benefit under the AG settlement, I estimate that 60% of class members eligible for this benefit will file a claim. Applying an estimated 60% claims rate to this benefit, its presumptive value to class members is $7,479,300.

*Summary of Value of Cash Benefits*

24. The total potential value of cash benefits to class members under the settlement is $115,060,105. Based on conservative assumptions concerning the likely claims rate, the estimated real value of the cash benefits under the settlement is $58,776,675.

*Foreclosure Avoidance Program ("FAP")*

25. I have reviewed the provisions of the Foreclosure Avoidance Program ("FAP") negotiated by the parties. All class members are eligible for this benefit.

26. In my opinion, the FAP benefits all class members in a substantial way. The FAP is available to all class members in the event that they have financial problems. The program therefore acts as a safety net to protect class members from the loss of their residences to

- 5 -

DECLARATION OF MICHAEL A. STEGMAN                                    Case No. C-02-1240 CW

foreclosure. The FAP is, in effect, an insurance policy to protect against the most potentially catastrophic consequence of a sub-prime home mortgage.

27. The value of the FAP to class member exceeds the obviously quantifiable $72,000,000 in interest (and late payment penalty) forgiveness that is its key element. The formula for counting relief against the $72,000,000 cap for the FAP therefore understates the benefits of the FAP benefit to class members.

28. The value of future interest payments to be waived for class members is accurately calculated and easily calculable based on the formula negotiated by the parties.

29. The value of retroactive late payment penalties to be waived for class members is also accurately calculated and easily calculable based on the formula negotiated by the parties.

30. In connection with permanent interest rate reductions made on modified loans, the parties have chosen to use Household's cost of funds in evaluating how much to charge to the FAP. This significantly understates the benefit to class members associated with such rate reductions, because the cost to the class member of interest payments, absent forgiveness, would virtually always be greater than the interest due at Household's cost of funds. This is because there is significant spread between the rate at which Household can borrow and the rate at which it can lend.

31. Based on data supplied by Household, it is my understanding that Household granted 2,866 applications for FAP relief between October 1, 2003 and February 29, 2004 (a five month period) and provided $14,367,917 in benefits under the FAP formula.

32. To date, the accepted applications have resulted in an average of $5,013.23 in avoided interest and late charges. This rate at which funds are being spent leaves little doubt that the entire amount of available FAP relief will be provided to class members over a five year period.

33. If I assume that granted applications will continue to yield the same amount of benefits over the course of the program, I can estimate that 14,362 applications for FAP benefits will ultimately be granted before the $72,000,000 in program funds are exhausted.

34. In addition to the $72,000,000 countable under the FAP formula, there is another significant quantifiable benefit of the FAP to class members that is not included in the formula.

- 6 -

35. When a FAP applicant qualifies for prospective temporary interest rate forgiveness, Household is also required to defer the entire amount of any interest arrears and accumulated late fees until the end of the term of the loan. There is a "time value of money" benefit to class members associated with the right to defer substantial overdue interest. By agreement of the parties, this "time value of money" is not counted toward the $72,000,000 in benefits available under the FAP.

36. Household has provided a confidential study of its delinquent accounts, and from this study, I calculate that the average benefit of interest deferrals and late payment fees based on the time value of money, measured conservatively, is $1,394.79 per delinquent account.

37. Based on an assumption that $72,000,000 in FAP relief will include interest deferral for approximately 14,362 class members, the total additional benefit based on the "time value of money" is $20,031,974.

38. The quantifiable benefit of the FAP is thus $72,000,000 plus $20,031,974, for a total of $92,031,974.

39. In addition there are several non-quantifiable economic benefits to class members associated with the FAP.

40. Most foreclosures result in significant lost equity to the homeowner involved. This is because of attorney's fees and other costs associated with foreclosure and because foreclosure sales rarely bring full market value for the property involved. [See, for example, L. Cordell, and A.C. Cutts, *Innovative Servicing Technology: Smart Enough to Sustain Homeownership Gains?*, paper prepared for presentation at the American Real Estate and Urban Economics Association Meetings, Washington, DC, January 4, 2003; C. A. Capone, Jr., and A. Metz, *Mortgage Default and Default Resolutions: Their Impact on Communities*, paper prepared for presentation at the Federal Reserve Bank of Chicago Conference on sustainable Community Development, March 27, 2003]. Although the benefits of this preservation of home equity cannot be accurately quantified, it adds significant value to class members.

41. There are also emotional and other non-economic benefits to avoiding foreclosure. Falling behind in mortgage payments, knowing that accumulated interest arrears and late fees are

- 7 -

DECLARATION OF MICHAEL A. STEGMAN                                               Case No. C-02-1240 CW

1 accumulating to the point that default may result in the loss of one's home, either through
2 foreclosure or other means, exacts an enormous emotional and financial toll on the homeowner
3 [See, for example, Michael Moss and Andrew Jacobs, Blue Skies and Green Yards, All Lost in Red
4 Ink, *New York Times*, April 11, 2004, and the follow-on article, Andrew Jacobs, Trying to Hang On
5 in the Poconos, From Before Dawn to Way Past Dusk, New York Times, April 12, 2004].

6     42. Additionally, the FAP provides a "short sale" alternative to class members who do not
7 qualify for interest rate reductions or other relief. A short sale is a sale, controlled by the
8 homeowner, under which the owner maximizes the sale price of the property. In exchange
9 Household will forgive any deficiency if the sale price does not make Household whole. Again,
10 this benefit cannot be accurately quantified, but it adds significant value to class members.

12 *Fresh Start Program*

13     43. The settlement includes a $3,000,000 "Fresh Start" loan pool available to borrowers
14 who lost their homes to foreclosure. This loan pool will allow foreclosed borrowers to obtain funds
15 to purchase new homes on favorable credit terms. Credit history related to Household's
16 foreclosure will not be considered.

17     44. I am told that the interest rate governing loans in the program will be 6.5%. One
18 difficulty of quantifying this benefit is that many of the eligible class members would not otherwise
19 be able to qualify for a home purchase loan on any terms. This program will be their only
20 opportunity, in the near term, to buy a new home. Another difficulty is that I have no basis to
21 calculate how many individuals who have suffered recent foreclosures are in an economic position
22 to buy a new home even at favorable rates.

23     45. However, by way of example, I will assume that a borrower who receives an $80,000
24 loan to buy a new home from the fresh start loan pool at 6.5% annually over thirty years would
25 otherwise have been restricted to a sub-prime loan at 10% annually for the same funds.

26     46. Monthly payments on the fresh start loan would be $505.65. Monthly payments on the
27 alternative subprime loan would be $702.05, producing a monthly saving to the class member of
28 $196.40. Over 360 months, the undiscounted monthly interest savings associated with the fresh

- 8 -

DECLARATION OF MICHAEL A. STEGMAN      Case No. C-02-1240 CW

1  start loan would be $70,704.00. Considering both the time value of money, and a ten year average
2  mortgage life, the discounted present value of the interest savings would be around $16,188 per
3  class member.
4      47. Though I consider this program a substantial benefit, I have not included the potential
5  interest rate savings in quantifying the economic benefit of the settlement.

*Good Payment Interest Rate Reductions*

    48. The settlement includes a provision under which class members will be eligible for cash payments or a reduction in interest rate if they make 12 consecutive timely payments. For the purposes of the program, "timely" is defined as within 30 days of the due date.

    49. Borrowers will be eligible for a $500 cash payment if their loans are in the bottom 50% of class members' accounts sorted by annual percentage rate and if they have made 12 consecutive on-time payments as of the effective date of settlement. A borrower must make a claim for this benefit.

    50. I have not included this benefit of the settlement in my calculation of the value of the settlement, because I do not have sufficient information to calculate or estimate the number of individuals who will have made 12 consecutive timely payments previous to the effective date of the settlement.

    51. Borrowers will be eligible for irrevocable interest rate reductions of .25% if their loans are in the top 50% of class members' accounts sorted by annual percentage rate and if they have made 12 consecutive on-time payments as of the effective date of the settlement. Eligible borrowers will then be entitled to an additional irrevocable .25% interest rate reduction for each future period of 12 consecutive on-time payments up to a maximum of 12 such reductions (3%). No claim is required for this benefit.

    52. I have not included this benefit of the settlement in my calculation of the value of the settlement, because I do not have sufficient information to calculate or estimate the number of individuals who will have made 12 consecutive timely payments previous to the effective date of

- 9 -

DECLARATION OF MICHAEL A. STEGMAN            Case No. C-02-1240 CW

1  the settlement. I also am not able to calculate or estimate the likelihood of future periods of on-
2  time payments.

3      53. I consider the potential benefit of the interest rate reductions to be substantial on an
4  individual basis. For example a borrower with a $40,000 loan amortized over 120 months at an
5  interest rate of 13% will save $7.90 per month on their loan by lowering the rate to 12.75%. (I note
6  that a 13% interest rate loan is consistent with loans in the top half of Household's portfolio sorted
7  by APR.) Over the life of the loan, savings could be as much as $853.20, or $651.13, on a present
8  value basis, using Household's 8 percent cost of capital. (Actual savings will depend on the
9  remaining term when the benefit is implemented.) If the rate is lowered to 10% by additional
10  periods of 12 consecutive on-time payments, monthly payments will be more than $120 less than
11  the original contract payments, and the savings to the class member, taking account of the time
12  value of money, would be almost $10,000 over the 120 months of the loan.

*Credit Insurance Cancellation*

15      54. ▮▮▮▮ class members are eligible to cancel a credit insurance policy in force and to
16  receive a rebate of any unearned premium.

17      55. Single premium credit insurance has been a longstanding problem in the sub-prime
18  lending market and is considered to be a very poor bargain for the customer. [See, for example,
19  Jodie Bernstein, Home Equity Lending Abuses in the Subprime Mortgage Industry, prepared
20  statement of the Federal Trade Commission before the Senate Special Committee on Aging, March
21  16, 1998.]. Indeed, under pressure from the lawsuits and the state Attorneys General, Household
22  agreed to terminate sale of its single premium credit insurance product during 2001.

23      56. The value of this benefit to class members is difficult to calculate. It is difficult to
24  determine how many class members will cancel. It is also difficult to determine the actual value of
25  the policies at issue in order to offset such amounts against the benefit associated with the refund of
26  unearned premiums.

27      57. I conclude that the opportunity to cancel credit insurance policies is an additional
28  benefit of the settlement to class members that is not readily quantifiable.

- 10 -

DECLARATION OF MICHAEL A. STEGMAN      Case No. C-02-1240 CW

*Reduction in Maximum Prepayment Penalty Term to Two Years*

58. In the settlement, Household agreed to reduce the maximum prepayment penalty period for its loans to two years. All class members with prepayment penalty terms of more than two years are eligible to benefit from this practice change.

59. I understand that this is a practice change that was also included in Household's settlement with various state Attorneys General.

60. In 2001, Household collected $████████████ in prepayment penalties imposed more than 24 months after the date of the loan on which the prepayment penalty was charged.

61. Averaging these aggregate prepayment penalties across all open loans in 2001, produces revenue of $154.85 per loan. Had Household not ended the practice of charging such penalties, this figure can be used to approximate the total value to class members in 2004 and 2005, of this practice change.

62. If Household had the same number of open loans in 2004 and 2005, as it did in 2001, and the same percentage of open loans were to have extended prepayment penalties, I would expect Household to collect approximately the same amount in aggregate prepayment penalties for loans whose penalties extend more than 24 months as was collected in 2001. However, because the number of open loans in Household's portfolio changes from year to year, I used confidential information about the size of Household's loan portfolio over time to estimate the likely number of open loans in 2004 and 2005. I estimate that Household would have collected about $33,521,618 in 2004, and a like amount in 2005 in extended prepayment penalties, which totals $67,043,237 for the two years.

63. Although there are likely to be additional avoided prepayment penalties for class members in years subsequent to 2005, I am not including those benefits in my estimate of settlement benefits to the class because I cannot calculate the percentage of such avoided prepayment penalties that would be attributed to class members' accounts.

64. I thus consider $67,043,237 to be a conservative estimate of the benefit of this practice change to class members. Plaintiffs counsel has asked me not to include this amount in my calculation of the benefits of the settlement, because they consider these avoided prepayment penalties to have been jointly achieved with the state Attorneys General.

*Elimination of Points and Fees Upon Refinancing Of Loans If the Interest Rate is Not Reduced by At Least One Half of One Percent.*

65. In the settlement, Household agreed to eliminate all points and fees upon refinancing its loans for existing customers if the interest rate in the refinanced loan is not reduced by at least one half of one percent, except to the extent of any new money advanced. This is a change to Household's former practices. All class members are eligible to benefit from this practice change if they refinance.

66. I understand that, on a historical basis, between ▮▮▮ percent of Household's existing customers refinance and obtain another Household loan.

67. I have not attempted to quantify this benefit because its value will depend on whether interest rates on sub-prime consumer mortgage loans trend up or down. If interest rates trend upwards, as is likely, this will be a substantial benefit to class members who refinance.

*Other Practice Changes*

68. There are other practice changes in the settlement that have potential economic value to class members. These include:

   a. *Limiting the loan-to-value ratios on all loans to 105.2%.* This will help prevent borrowers from being locked into high rate loans that they cannot refinance due to a negative equity position. It may also help prevent very high interest rate mortgage loans justified by inadequate security.

- 12 -

DECLARATION OF MICHAEL A. STEGMAN                                      Case No. C-02-1240 CW

b. *Elimination of the use of "live checks" as a solicitation lead for secured loans.* This will help prevent mortgage loans grounded in refinance of very high rate unsecured loans.

c. *Protections against refinancing subsidized (below-market) loans.* This will help protect borrowers who are able to borrow money at a low-rate from being forced to repay it at a higher rate as a condition of qualification for a sub-prime loan.

d. *Provisions barring sale of debt cancellation or debt suspension products.* These are very costly products that are economically disadvantageous to consumers.

e. *Elimination of compensation to sales employees for the sale of credit insurance.* This will eliminate economic incentives for employees to aggressively sell products of limited benefit to consumers.

f. *Reporting of positive payment histories to credit reporting agencies; agreement not to dispute borrowers' separate statements regarding the reasons for delinquencies; reporting of borrowers in the FAP program as current on their accounts.* These changes will allow some Household borrowers to repair their credit, lower their credit scores and thereby qualify for lower rate loans.

g. *Clarification of billing statements.* Required clarifications will help borrowers avoid a potential negative consequence of calculating interest on a "monthly simple interest" basis – that is the possibility that additional interest will accrue on a daily basis if payments are not received by their due date.

69. These practice changes will benefit both class members and future Household borrowers. In a few cases, such as the protection against refinancing subsidized (below market) loans, the practice change only benefits class members if they choose to refinance or otherwise obtain a new or additional Household loan.

- 13 -

DECLARATION OF MICHAEL A. STEGMAN   Case No. C-02-1240 CW

70. For various reasons, I cannot quantify the economic benefit of these changes to class members and have not included any value for these benefits in my valuation of the settlement.

*ACORN's Financial Literacy Program*

71. I have reviewed the business plan for ACORN's Financial Literacy Program. That program appears to include substantial elements designed to benefit class members exclusively. These include targeted assistance to class members to help them qualify for the FAP as well as efforts to help class members obtain other benefits from this settlement and the AG settlement. None of the programs involved are limited to ACORN's members.

72. The balance of the program relief is aimed at persons similarly situated to class members in order to help them avoid the pitfalls of sub-prime mortgage lending. This includes financial literacy training, one-on-one counseling, and direct advocacy with Household on behalf of clients to help those clients qualify for the best loan available. I consider these programs in the nature of *cy pres* relief – directed generally at that segment of the population who are most vulnerable to conduct similar to that charged in the cases consolidated here.

73. Because it is not clear how much of ACORN's literacy program will benefit class members, I have not included this benefit in my calculation of the overall value of the settlement.

*Summary: Total Economic Benefit of the Settlement*

74. Excluding the benefit to class members of quantifiable practice changes, my calculation of the total economic value of this settlement to class members is $150,808,649. This includes only benefits described in paragraphs 24 and 38 above.

75. There are other substantial non-quantifiable benefits of this settlement, as discussed above, that I have not included in this calculation. Many of these benefits, such as the provision for Good Payment Rewards and for the cancellation of credit insurance have obvious economic value that cannot readily be quantified.

1  I declare under penalty of perjury under the laws of the United States of America
2  that this document is true and correct and that it was executed on April 18, 2004, at

3

4  *[signature]*

5  Michael A. Stegman, Ph.D
   MacRae Professor of Public Policy, Planning, and
6  Business
   Chairman, Department of Public Policy
7  Director, Center for Community Capitalism
   Kenan Institute of Private Enterprise
8  Campus Box 3435
   University of North Carolina
9  Chapel Hill, NC 27599-3435
   Phone: 919.962.6849
10 Fax: 919.962.5824
   stegman@email.unc.edu
11 www.ccc.unc.edu