IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| | (Centralized before The Honorable Marvin E. Aspen) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

**DEFENDANT AMERIQUEST MORTGAGE COMPANY'S RESPONSE TO
PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF
MOTION FOR PROVISIONAL CERTIFICATION OF RESCISSION CLASS**

## I. INTRODUCTION

Defendant Ameriquest Mortgage Company ("Ameriquest") hereby submits this Response to plaintiffs' Notice of Supplemental Authority in Support of Motion for Provisional Certification of Rescission Class ("Notice").[1] By the Notice, plaintiffs ask this Court to consider an unpublished slip opinion from the district court in Massachusetts in the action entitled *McKenna, et al. v. First Horizon Home Loan Corp.*, C.A. No. 04-10370-RCL. In the opinion, the district court accepted a magistrate judge's recommendation to certify a class action purportedly seeking rescission and statutory damages based on defendant's purported violation of the Truth in Lending Act, 15 U.S.C. Section 1601, *et seq.* ("TILA"). [*See* Order on Motion for Class Certification (attached to Notice).]

Plaintiffs' reliance on *McKenna* is misplaced. To begin with, as an unpublished opinion from another federal district, *McKenna* has no precendential force in this action. *First Graphics, Inc. v. M.E.P. CAD, Inc.*, No. 00 C 2524, 2001 WL 755138, at *1 (N.D. Ill. June 29, 2001).

---

[1] At the outset, it should be noted that this Court ordered plaintiffs to file any and all reply papers in support of their Motion for Provisional Certification of Rescission Class ("Motion") by March 1, 2006. [Docket No. 53.] Ameriquest thus objects to plaintiffs' supplement to their Motion after the Court's deadline without seeking leave of court.

In addition, the holding in *McKenna* is entirely contrary to the unanimous authority in this District and the overwhelming weight of authority nationwide rejecting certification of class actions seeking actual rescission or a declaration as to rescission rights under TILA. *See, e.g., James v. Home Const. Co. of Mobile, Inc.*, 621 F.2d 727, 730-31 (5th Cir. 1980); *Gibbons v. Interbank Funding Group*, 208 F.R.D. 278, 285-86 (N.D. Cal. 2002); *Jefferson v. Security Pac. Fin. Servs.*, 161 F.R.D. 63, 69 (N.D. Ill. 1995); *Nelson v. United Credit Plan, Inc.*, 77 F.R.D. 54, 58 (E.D. La. 1977); *Murry v. America's Mortg. Banc, Inc.*, No. 03 C 5811, 03 C 6186, 2005 WL 1323364, at *10-11 (N.D. Ill. May 5, 2005).[2]

Furthermore, as demonstrated in Ameriquest's Opposition to plaintiffs' Motion, several sound reasons support the above-cited holdings, including the clear Congressional intent to prohibit class-wide rescission claims under TILA. Specifically, Section 1635(b) of TILA—which governs rescission—does not provide for class actions. Conversely, Section 1640—which governs damages—was amended by Congress in 1974 to expressly include class actions and to cap damage recovery. Pub. L. 93-495, 88 Stat. 1500 (amending § 1640(a)(2)). Courts in this and other districts have held that "Congress' failure to amend Section 1635(b) in 1974 evidences a Congressional intent to treat rescission as a purely personal remedy, which is not subject to class action." *Murry*, 2005 WL 1323364, at *10 (*citing Jefferson*, 161 F.R.D. at 68; internal quotation marks omitted). *Accord Gibbons*, 208 F.R.D. at 285.

In *McKenna*, however, the district court interpreted the 1974 amendments to TILA as evidence that Congress intended only to limit the damages recoverable in class actions thereunder, and that Congress did not perceive class action rescission claims to pose the same threat to the credit industry as class-wide damages claims. [Order on Motion for Class Certification, at 4-5.] The *McKenna* court's reasoning, however, is belied by the legislative history the court relied on to reach its conclusion, which makes it clear that—consistent with the

---

[2] A detailed analysis of these cases is set forth in Ameriquest's Opposition to plaintiffs' Motion. And, as detailed therein, *Latham v. Residential Loan Centers of America, Inc.*, No. 03 C 7094, 2004 WL 1093315 (N.D. Ill. May 6, 2004), and *Hickey v. Great Western Mortgage Corporation*, 158 F.R.D. 603 (N.D. Ill. 1994)—the only two cases cited by plaintiffs from this District—do not hold to the contrary. *Latham* involved a motion to dismiss and the court specifically held that it did "not certify a class at this time" and, "[s]hould Latham move to certify a class under Rule 23, Latham will need to satisfy all of the requirements of Rule 23." 2004 WL 1093315, at *3. In *Hickey*, the court later decertified the class. *See Hickey v. Great Western Mortg. Corp.*, No. 94 C 3638, 1995 WL 121534 (N.D. Ill. Mar. 17, 1995).

position taken by courts in this District—Congress did not amend Section 1640 only to limit the damages recoverable in class actions.

The legislative history underlying the 1974 amendments evidences that Congress believed there was an ambiguity in existing case law at that time as to whether class actions seeking relief other than actual damages could be maintained under TILA. S. Rep. 93-278 at 14-15 (1973).[3] Congress thus amended Section 1640 of TILA to clarify this ambiguity—i.e., to delineate when class actions could be maintained under TILA. *Id.* As stated by the Committee on Banking, Housing and Urban Affairs ("Committee") in Senate Report No. 93-278:

> Since [*Ratner v. Chemical Bank New York Trust Co.*, 54 F.R.D. 412 (S.D. N.Y. 1972)],[4] the courts denied 21 Truth in Lending suits class action status while affirming only one and in that case only after the plaintiffs amended their complaint to sue only for actual damages.
>
> *           *           *
>
> [T]he Committee considered a proposal to leave the present law unchanged. This approach was advocated by the finance company industry on the theory that class action suits under Truth in Lending other than for actual damages were inappropriate, were not specifically authorized by the Truth in Lending Act, and would be ultimately held to be illegal per se by the courts.
>
> This approach was not approved by the Committee. ***The Committee believes the present ambiguities and uncertainties with respect to class action suits under Truth in Lending should be clarified***. Moreover, the Committee agrees with the Federal Reserve Board that "potential class action liability is an important encouragement to the voluntary compliance which is so necessary to insure nationwide adherence to uniform disclosure" and that ***such remedies should not be restricted to actual damages***. As the Committee pointed out in its report on similar legislation last year, "Most Truth in Lending violations do not involve actual damages and . . . some meaningful penalty provisions are therefore needed to insure compliance."

*Id.* (emphasis added).

Based on the foregoing, Congress amended Section 1640 in 1974 to clarify that class actions seeking actual ***and statutory damages*** could be maintained under TILA, so long as there was a cap on the total damages. Pub. L. 93-495. Congress, however, did not amend, nor has it

---

[3] For the Court's convenience, a copy of Senate Report 93-278 is attached hereto as Exhibit 1.

[4] In 1974, there was no cap on the amount of statutory damages in a class action brought under TILA. Based on this fact, the district court in *Ratner* held that a TILA claim seeking statutory damages was improper because the aggregate potential liability presented the spectre of a "horrendous, possibly annihilating punishment" for a mere "technical violation." 54 F.R.D at 416.

amended, Section 1635 to specifically authorize class actions. Under general principles of statutory construction, Congress's failure to "clarify" that class actions could be maintained under Section 1635 can lead to only one reasonable conclusion—that Congress did not want to authorize class actions seeking rescission as part of its attempt to "clarify" when actions seeking relief other than actual damages may be maintained under TILA.[5] *See, e.g., Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 453 (2002) ("[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Moreover, and consistent with this District's position, there is nothing to support a finding that Congress did not perceive that rescission poses the same economic threat to the credit industry as class action damages. Of course, the aggregate liability for class-wide rescission claims too can be ruinous to a financial institution and present the spectre of a "horrendous, possibly annihilating punishment" for a mere "technical violation." *Ratner*, 54 F.R.D at 416. Indeed, many courts have cited this fact in support of denying certification of rescission claims under TILA. *See, e.g., Jefferson*, 161 F.R.D. at 70 ("A declaratory judgment permitting classwide rescission . . . would turn Section 1635(b) into a penal provision, a result certainly never explicitly authorized by Congress.").

In sum, the only reasonable interpretation of the 1974 Congressional amendments to TILA is—consistent with this District's position—that Congress intended to clarify that claims for statutory damages could proceed on a class basis. However, there is no evidence—in the 1974 amendments or since then—that Congress intended to clarify that claims seeking rescission (whether declaratory or not) could proceed on a class basis. In fact, as demonstrated herein, Congress's intent appears to be entirely to the contrary. *See* Pub. L. 96-212 (discussed in footnote 3, *supra*); Pub. L. 93-495; S. Rep. No. 93-278; *see also Nelson v. United Credit Plan, Inc.*, 77 F.R.D. 54, 58 (E.D. La. 1978) (noting that the lack of Congressional intent to permit

---

[5] This interpretation of Congress's 1974 amendments to TILA is further supported by the fact that, in 1980, Congress amended Section 1635 to give courts equitable authority to tailor the rescission steps to meet the needs of each borrower and creditor. *See* Pub. L. 96-212, 94 Stat. 175, 176. "[T]he 1980 amendment is an indication that rescission is a personal, rather than a class, remedy." *Murry*, 2005 WL 1323364, at *10. *Accord Gibbons*, 208 F.R.D. at 285.

class actions seeking rescission under TILA "is not surprising in light of the obvious conflict among the interests of parties seeking rescission relief from a credit institution of limited solvency").

For the foregoing reasons, Ameriquest respectfully requests that the Court reject *McKenna*, and deny the Class Certification and Injunction Motions in their entirety.

DATED: April 10, 2006                          Respectfully submitted,

                                  By: /s/  Bernard E. LeSage
                                      *Attorneys for Defendants Ameriquest*
                                      *Mortgage Company, Ameriquest Capital*
                                      *Corporation, Argent Mortgage Company and*
                                      *Town and Country Credit Corporation*

                                  Bernard E. LeSage (California Bar No. 61870)
                                  Sarah K. Andrus (California Bar No. 174323)
                                  BUCHALTER NEMER
                                  A Professional Corporation
                                  1000 Wilshire Boulevard, Suite 1500
                                  Los Angeles, California 90017-2457
                                  Telephone: (213) 891-0700
                                  Facsimile: (213) 896-0400

# Exhibit 1

# Calendar No. 262

| 93d Congress | SENATE | Report |
|---|---|---|
| *1st Session* | | No. 93-278 |

## TRUTH IN LENDING ACT AMENDMENTS

---

June 28 (legislative day, June 25), 1973.—Ordered to be printed

---

Mr. Proxmire, from the Committee on Banking, Housing and Urban Affairs, submitted the following

# REPORT

together with

## INDIVIDUAL VIEWS

[To accompany S. 2101]

The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (S. 2101) to amend the Truth in Lending Act to protect consumers against inaccurate and unfair billing practices, and for other purposes, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

### Purpose of the Legislation

The purpose of the legislation is threefold. Title I prohibits unfair credit billing practices; Title II improves the administration of the Truth in Lending Act; and Title III prohibits discrimination in consumer credit transactions on account of sex or marital status.

### Title I—Fair Credit Billing

Title I of the legislation is termed The Fair Credit Billing Act. It is designed to help consumers resolve credit billing disputes in a fair and timely manner and to prohibit certain other practices arising out of the use of credit cards or revolving charge accounts. As reported by the Committee, the proposed Fair Credit Billing Act has the following key objectives:

    1. *Resolution of billing errors.*—The legislation seeks to establish a system for insuring that billing disputes or inquiries are resolved in a fair and timely manner. This objective is achieved through the following substantive provisions:

**(1)**

Creditors are required to acknowledge customer billing inquiries within 30 days and to resolve those inquiries within 90 days. An inquiry is resolved by either correcting the customer's bill or explaining why the original bill is correct.

Creditors cannot send dunning letters, threaten the consumer with an adverse credit report, or take other action to collect a disputed amount or report such amount as delinquent until the creditor has complied with the requirements for resolving billing inquiries.

If a customer continues to dispute a bill after receiving the creditor's explanation, the creditor may not report the disputed amount as delinquent to a credit reporting agency unless the creditor so notifies the customer and tells the credit reporting agency the amount is in dispute.

Creditors must report any subsequent resolution of a disputed amount to any credit reporting agency which was first notified of the dispute.

Creditors who fail to comply with the foregoing requirements forfeit the amount in dispute up to $50 whether or not the bill was in error.

Creditors must indicate on their monthly bills an address for handling billing disputes and disclose twice yearly the customer's right to have these disputes resolved as provided in the bill.

2. *Regulation of other billing practices.*—In addition to establishing a system for resolving billing disputes, the legislation seeks to prohibit other unfair billing practices with respect to revolving or open-end credit accounts. The substantive provisions are as follows:

Creditors cannot impose a finance charge on a revolving credit account unless the customer's statement is mailed at least 14 days prior to the date by which payment must be received. An exception is provided if a creditor fails to meet the 14-day requirement as a result of an act of God or other circumstance beyond the creditor's control.

Creditors cannot impose a finance charge on revolving credit accounts if the customer's payment is received before the due date.

Creditors must promptly credit a customer's revolving charge account for any excess payment or refund the amount of the excess if requested.

Merchants honoring credit cards issued by banks or other third parties must promptly notify the card issuer of any return of merchandise or similar adjustment.

3. *Anti-competitive practices.*—The legislation also seeks to prohibit certain anti-competitive practices between credit card issuers and retail merchants who participate in the credit card plan. The substantive provisions are as follows:

Credit card issuers cannot prohibit merchants who honor the card from offering a discount to cash customers.

Credit card issuers cannot require merchants to maintain deposits or purchase other services as a condition for participating in the credit card plan.

4. *Rights of credit card customers.*—The legislation also seeks to strengthen the legal rights of customers who use credit cards issued by banks or other third parties. The substantive provisions are as follows:

Banks or other financial institutions which issue credit cards cannot offset an unpaid credit card bill against a customer's checking or savings account unless a court order has been obtained.

A customer who purchases defective merchandise with a credit card issued by a bank or other third party can withhold payment and assert the same legal claims and defenses against the card issuer that he has against the merchant which sold the merchandise, provided the transaction exceeded $50 and occurred in the same state where the customer lives or within 100 miles of his residence.

## TITLE II—AMENDMENTS TO THE TRUTH IN LENDING ACT

Title II contains a series of largely technical amendments designed to improve the administration of The Truth in Lending Act. Most of these amendments were recommended by the Federal Reserve Board or the National Commission on Consumer Finance and are described in the section-by-section summary included with this report.

The most significant provision under Title II limits a creditor's maximum liability in a class action suit brought under Truth in Lending to $100,000 or 1% of the creditor's net worth, whichever is the lesser. These limitations apply to violations of Chapter Two (Disclosure), Chapter Four (Billing Practices) and Chapter Five (Discrimination); however, they do not limit the amount of actual damages (if any) which can be recovered in a class action suit.

## TITLE III—EQUAL CREDIT OPPORTUNITY

Title III is termed The Equal Credit Opportunity Act and prohibits any creditor from discriminating against any person on account of sex or marital status in granting or denying credit. The prohibition against discrimination applies to all credit transactions, whether for consumer, business, or other purposes and includes cash loans, installment sales, mortgage loans and the opening or closing of a revolving charge account. The prohibition against discrimination also covers the imposition of more restrictive terms and conditions on a prospective credit transaction as well as the approval or denial of credit.

The prohibition against discrimination would be enforced through the procedures established in The Truth in Lending Act. The Federal Reserve Board is empowered to issue rules and regulations to carry out the purposes of Title III. Federal bank regulatory agencies would enforce compliance with the law and these regulations on the part of financial institutions subject to their jurisdiction, while compliance by all other creditors would be enforced by the FTC. These agencies are empowered to use their existing enforcement authorities such as the issuance of cease and desist orders to achieve compliance with the antidiscrimination provisions of Title III. In addition, injured par-

ties can bring civil actions in the Federal courts against any creditor who discriminates on account of sex or marital status in violation of Title III or the regulations thereunder.

## History of the Legislation

On February 20, 1973 Senator Proxmire introduced S. 914 to prohibit unfair credit billing practices and amend the disclosure provisions of Truth in Lending. An alternative bill, S. 1630, was introduced on April 18 by Senators Sparkman and Brock. In addition, separate bills to prohibit discrimination on account of marital status were introduced by Senator Williams on February 15 (S. 867) and by Senator Brock on April 17 (S. 1605).

Hearings on S. 914 and S. 1630 were held by the Subcommittee on Consumer Credit on May 21 through May 24. The Subcommittee met on June 19 and 20 and recommended a revised bill to the full Committee, incorporating provisions from both S. 914 and S. 1630. The full Committee met on June 27, and after amending the revised bill recommended by the Subcommittee, the Committee added a new Title III to incorporate the substance of S. 867 and S. 1605. All of these provisions were included in a clean bill, S. 2101, as reported by the Committee.

## Need for Legislation: Title I—Fair Credit Billing

The need for Fair Credit Billing legislation is brought on by the rapid increase in revolving or open-end credit plans which bill consumers on a monthly basis for their purchases during the preceding month. Many creditors operating open-end credit plans have computerized their billing and collection systems to the point where an individual consumer with a particular problem is finding it increasingly difficult to obtain a relevant response to his inquiries. Also, because of the rising cost of credit, many retailers have converted from the traditional 30-day charge account to a revolving charge account where the consumer is charged for credit if he does not pay in full within the traditional 30-day period. In other cases, credit cards issued by banks or other third parties have altered the legal nature of the more traditional two-party credit transaction involving only a merchant and a consumer. All of these developments in the credit industry have brought benefits to the consuming public. But there have also been problems which the Fair Credit Billing legislation is designed to remedy.

Credit cards have been one of the fastest growing forms of consumer credit. While credit cards were once an exclusive instrument of the rich, they are now used by every segment of society. A recent study by the Institute for Social Research of the University of Michigan shows that 35 million families, or roughly one-half of all families, use at least one credit card. More surprising, the study also revealed that 20% of families with incomes under $5,000 use at least one credit card. More than 17 million families use three or more cards and about 6 million families use nine or more cards.

The study also showed that 25 million families use cards issued by retail merchants; 25 million families use gasoline company credit

cards; 12 million families use bank credit cards; and 9 million families retail merchants; 24 million families use gasoline company credit cards; and 9 million families use so-called travel and entertainment cards. Families who use credit cards make credit card purchases of $26 billion a year, or about $750 per family. Federal Reserve Board figures indicate that by the end of 1972, American consumers owed $30 billion on their open-end credit accounts of all types or roughly $400 per family. For the average family, credit cards, charge accounts, and monthly bill paying have become a way of life.

### Resolving Billing Errors

Numerous complaints have been received by Members of Congress from consumers using credit cards who have had difficulty in resolving errors appearing on their monthly credit statements. The Federal Trade Commission has received nearly 2,000 complaints in this area. Similar complaints have been received by consumer protection agencies throughout the country. A survey taken by the Minneapolis Tribune shows that one out of every three consumers have been involved in at least one billing error problem.

Most consumer complaints about billing errors involve a common pattern. In a typical case, the consumer might discover a billing error on one of his monthly charge accounts or credit card statements. Or he might need further information about a particular item appearing on his statement. He writes to the creditor but receives no satisfactory response. In the meantime, he receives a series of computer written dunning letters. These letters may threaten the consumer with a bad credit rating or other legal action unless the amount in dispute is paid.

After literally months or years of carrying on correspondence with a computer, many consumers give up in frustration and pay the disputed amount even though they feel they do not owe such amounts. Some eventually resolve the dispute through sheer persistence although it may take many months or even years of patient letter writing. Some are able to get their billing problems corrected by writing to the president of the company or to their Congressman or Senator. A few hire attorneys to press their claim. One consumer witness testifying last year told of spending $150 in legal fees to get a $22 billing error corrected.

The bill requires that upon being notified of a billing error, the creditor must acknowledge the notification in 30 days and take positive action to resolve the error within two complete billing periods, but in no event later than 90 days. An error is resolved either by making appropriate corrections in the consumer's account or by explaining why the original amount billed was correct. In the latter case, the creditor is required to investigate the error and provide the consumer with copies of the transaction in question if requested. The requirement for an investigation is intended to preclude a creditor from making an automatic form letter response without actually looking into each billing inquiry.

While the creditor is investigating a billing inquiry, he is prohibited from reporting to a credit bureau that the amount in dispute is delinquent. He also is barred from taking action to collect the amount in dispute including threatening the consumer with an adverse credit

report. Many consumers are now intimidated into paying an unjust bill because of these questionable collection tactics.

If a consumer still disputes the accuracy of a bill after it has been explained to him in accordance with the law, the creditor can begin his normal collection activity; however, if he reports the amount as delinquent to a credit bureau, he must indicate the amount that is in dispute and must notify the consumer that the amount was reported as delinquent and must give the consumer the name and address of the credit bureau involved.

Any creditor who fails to meet these requirements forfeits the amount in dispute up to a maximum of $50 whether or not the amount billed actually was in error. The amount subject to forfeiture is limited to the billing error alleged by the consumer as opposed to the amount of the entire bill or any portion thereof not in dispute. For example, if the consumer is billed $40 for an item and if he claims the correct amount is $30, the creditor forfeits the difference of $10 if he fails to comply with the Fair Credit Billing Act even if the correct amount is $40.

Creditors are also required to inform consumers of their rights under the Fair Credit Billing Act at least twice a year and disclose an address for receiving billing inquiries on or with their monthly billing statements.

All of these provisions are designed to establish a fair and equitable system for the resolution of billing disputes. They are fair to the consumer and workable to the credit industry. They have been carefully reviewed last year and this year by the Committee and were adopted unanimously. Most of the requirements are already being met by responsible creditors and there is no reason why all creditors cannot or should not meet those same standards.

### The Shrinking Billing Period

One typical consumer complaint involves the so-called shrinking billing period where a creditor mails his monthly statement so late that a consumer has only a few days to make payment in order to avoid a finance charge. Most credit card plans require payment within 25 to 30 days from the end of the previous billing period. However, the actual time remaining before payment is due can be considerably shortened if a creditor is late in sending out his bills. The FTC has received nearly 500 letters from consumers who have complained about the shrinking billing period. In one example, a consumer could not have avoided a finance charge even if he sent his payment back on the same day he received his bill.

There may be legitimate reasons for delays in mailing billing statements. Nonetheless, the charge has been made that some creditors may be tempted to decrease the time available for payment after a bill is received as a method for increasing finance charge revenue. It is inevitable that more customers will fail to pay on time as the time available for payment is decreased. Some are simply too busy or may be away on travel. Others are paid twice a month and may be unable to pay their credit card bills until their next pay check is received.

The bill deals with this problem by requiring creditors to mail their billing statements at least 14 days before a payment must be made to

avoid a finance charge. If a creditor fails to provide 14 days for payment, he is prohibited from collecting any finance charges on the amounts billed for that period, unless the failure was due to an act of God or other circumstances beyond the control of the creditor, such as a natural disaster or strike. The Committee rejected a proposal to include mechanical failures to this list of exceptions on the grounds that such failures may not always be beyond the reasonable control of the creditor.

## PROMPT CREDITING OF PAYMENTS

Another billing complaint by consumers involves a failure to credit payments on the day they are received. A delay in crediting by the creditor can cost the consumer money. Many revolving credit plans require payment within 30 days to avoid a finance charge. If a consumer pays on the 30th day, he may still be hit with a finance charge if the creditor fails to credit the payment on the day it was actually received. This is obviously unfair to the consumer who has no control over the length of time it takes a creditor to post the payment to his books. Delays in crediting payments can also increase finance charges under average daily balance plans where the size of the finance charge varies with the amount of daily credit outstanding.

The bill would remedy this problem by requiring the prompt crediting of finance charges by creditors in accordance with regulations issued by the Federal Reserve Board. Some flexibility is needed, because of the wide variety of billing systems. However, the regulations must prevent a creditor from imposing a finance charge if the customer's payment is received on or before the due date.

## CREDITING EXCESS PAYMENTS

While not a frequent complaint, some consumers have encountered difficulty in having excess payments refunded or credited to their account. The hearing record of last year contains a case of a consumer who was unable to obtain a cash refund for a $100 overpayment to an oil heating company at the end of the winter heating period. Instead, the account was credited so that the only way of getting the excess payment returned was to make additional oil purchases the following fall. In the meantime, the creditor had the use of the consumer's money until the additional oil purchases were made.

Most credit grantors will promptly credit excess payments to a customer's account or make a cash refund if requested. The bill requires all creditors to adhere to these standards.

### PROMPT NOTIFICATION OF RETURNS

Another consumer complaint is that creditors sometimes fail to notify a card issuer when merchandise has been returned. For example, a consumer might use his bank credit card to purchase an item from a particular store. If he returns the item, the store does not always notify the bank of the credit to be entered in the customer's account. The bank proceeds to bill the customer for the item as though it were a valid purchase. The consumer must then take the time and trou-

ble to explain the situation to the bank in order to get his account properly adjusted. Airlines in particular have tended to be late in notifying credit card companies of a return of airline tickets, thereby causing numerous billing disputes. In other cases, the only way a consumer can get his money back is by making an equivalent purchase from the same store—something he may not be willing to do.

The bill would solve this problem by requiring creditors to promptly notify third-party credit card issuers of merchandise returns or other credits. The card issuer, in turn, would be required to promptly credit the consumer's account. Consumers would also be free to exchange merchandise without a credit if they so desired. These requirements should also help to cut down on the number of billing disputes.

### DISCOUNTS FOR CASH BUYERS

Another problem arising out of the use of bank or travel and entertainment credit cards is the restriction on merchants from offering a cash discount to customers who prefer to use cash instead of a credit card. The typical bank-merchant agreement forbids a merchant from offering a discount to cash buyers. Although this provision may not be enforced and some merchants do offer cash discounts in spite of the agreement other merchants may feel compelled to comply with the agreement and thus refrain from offering cash discounts. The FTC has indicated that such agreements raise serious antitrust questions.

Under a typical three-party credit card plan, the merchant honoring a credit card sends a copy of each sales draft to the card issuer and receives payment at a discount which usually runs from 3 to 5 percent. This discount compensates the card issuer for the expense involved in operating the credit card plan. The merchant might be willing to offer a similar discount to his customer in return for paying cash but he is precluded by the terms of his agreement with the card issuer.

The bill would provide some relief to cash customers possible by prohibiting agreements between card issuers and merchants which forbid the merchant to offer a discount to cash customers. The legislation does not require merchants to offer discounts to cash buyers, but it does give them the option of offering a discount if they so desire.

In order to facilitate the offering of cash discounts, the legislation also exempts such transactions from the disclosure provisions of the Truth in Lending Act provided the discount does not exceed 5 percent and its availability is disclosed and offered to all prospective buyers. The Federal Reserve Board has already exempted transactions involving discounts of 5 percent or less from the annual percentage rate disclosure requirements of the Truth in Lending Act. However, the other disclosure requirements of truth in lending currently apply including the disclosure of the cash price and the amount of finance charge. These additional requirements may have the unfortunate effect of discouraging cash discounts and accordingly they are waived by the legislation.

### PROHIBITION OF TIE-IN ARRANGEMENTS

A related provision of the legislation prohibits credit card issuers from requiring that merchants maintain deposits or purchase other services as a condition for participating in a credit card plan. Hear-

ings held by the House Select Committee on Small Business in 1970 revealed that some bank-merchant agreements required the merchant to open a deposit account with the issuing bank in order to join the credit card plan. These agreements raise serious antitrust questions and should be prohibited.

## PROHIBITION OF OFFSETS

Another consumer complaint arises from the common practice of offsetting a credit card debt against funds held in a consumer's checking or savings account. Funds in these accounts can be attached without any recourse to the courts and in spite of any valid legal defense the cardholder may have against the bank. Banks which issue cards and also have the cardholder's funds on deposit may thus obtain a unique leverage over the consumer. Other creditors would have to apply to a court before being permitted to attach funds in a borrowers' deposit account.

The bill would prohibit any card issuer from offsetting a card holder's debt against his deposit account without obtaining a court order. An exception is provided in the case of those credit card plans where the cardholder agrees to permit the bank to periodically pay the cardholder's credit card indebtedness by deducting the appropriate amount from the cardholder's checking or other deposit account. In such cases, the authorization for the periodic deductions must be in writing and the cardholder must be given 10 days to rescind a deduction pertaining to any disputed item. It is expected that the regulations of the Board will specify the form or manner by which the cardholder is informed of his right to rescind any deduction pertaining to a disputed item.

## LEGAL DEFENSES OF CARD HOLDERS

Another serious problem for consumers arises out of the growing use of three-party credit card transactions involving the consumer, a merchant and a card issuer—generally a bank. Under the typical three-party credit card arrangement, the card holder agrees to pay the card issuer regardless of any claims or defenses he, the card holder, may have against the merchant.

These so-called waiver of defense clauses in credit card agreements prevent the card holder from asserting any legitimate claim or defense against the card issuer. The legal ability of the card issuer to enforce payment regardless of the card holder's claims or defenses is analogous to a creditor purchasing an installment contract under the so-called holder in due course doctrine. In both cases, the consumer must continue his payments even though he has a legitimate claim or defense against the merchant who sold him the defective merchandise.

The three-party credit card transaction may be contrasted with a typical two-party credit card transaction involving only the consumer and a merchant who has his own credit card plan. Under a two-party credit card transaction, a consumer purchasing defective merchandise with a credit card issued by a merchant has some leverage to force the merchant to stand behind his product. The consumer can simply withhold payment from the merchant until the defective merchandise is repaired or replaced. If the merchant sues to collect, the consumer can

raise as a defense the fact that the merchandise was defective. If the court agrees the consumer has a legitimate defense, the consumer is not required to pay. Knowing this in advance, a merchant is unlikely to sue if he thinks the consumer has a legitimate defense. The consumer has thus used his leverage as a credit customer to enforce his legal rights.

Under a three-party credit card transaction, the consumer's leverage disappears. If he buys defective merchandise with a bank credit card, he must continue payments to the bank while seeking restitution from the merchant who already has been paid by the bank. If the merchant refuses to repair or replace the defective goods, the consumer can only obtain relief by taking the merchant to court. The legal burden has thus been shifted from the merchant to the consumer. Because of the time and trouble involved in bringing a legal action and the consumer's general unfamiliarity with legal processes, together with the possibility that the merchant may have gone out of business or may employ dilatory tactics, it is likely that some consumers will end up paying unjust bills under three-party credit card transactions.

Bank credit card plans have grown sharply in the last few years and are expected to grow rapidly in the years ahead. To some extent, bank credit card transactions have simply replaced transactions formerly handled by cash or check. But bank credit card transactions have also replaced the more traditional two-party credit transactions. Accordingly, the legal rights of consumers have been and will be gradually eroded as three-party credit card transactions replace two-party credit transactions.

In order to remedy this problem, the bill subjects third-party credit card issuers to all claims (other than tort claims) and defenses arising out of a credit card transaction provided: (1) a good faith attempt has been made by the card holder to obtain satisfaction from the merchant; (2) the amount of the transaction exceeded $50; and (3) the transaction occurred within the cardholder's state of residence or within 100 miles of his residence, whichever is greater. When these conditions are met, a consumer can withhold payment for shoddy merchandise purchased with a bank credit card or similar third-party card and assert his legal claims or defenses against the card issuer in any subsequent legal action.

One of the persistent arguments raised by the banking industry was that subjecting banks to all card holder claims or defenses might impede the ready acceptability of bank credit cards and the subsequent development of the electronic funds transfer system. Bank credit cards are used as a substitute for cash as well as credit and banking witnesses argued that the ability of bank credit cards to substitute for cash transactions would be impaired if banks were subject to all card holder claims or defenses regardless of the size of the transaction. Accordingly, the Committee recommends excluding transactions of $50 or less from card holder claims and defenses on the assumption that transactions under this amount are more likely to be essentially cash transactions while transactions above $50 are more likely to be essentially credit transactions. A similar $50 exclusion is contained in several state laws on the same subject.

In addition to an exclusion based on the size of the transaction, the Committee recommends a geographic limitation on the right of card holders to assert claims or defenses against card issuers. Under the

11

bill reported by the Committee, a card holder can assert a claim or defense against a card issuer only if the transaction occurred in the same state in which the card holder resided or within 100 miles of his residence, whichever is greater. The purpose of this geographic limitation is to avoid the possibility of impairing the nationwide acceptability of third-party credit cards. During the hearings, it was argued that a merchant may be reluctant to honor an out-of-state bank credit card if the card holder has the legal right to withhold payment from the bank and the bank, in turn, has the legal right to charge the disputed item back to the merchant as banks now have under the terms of bank credit card plans. Under these circumstances, it was argued that the merchant would have difficulty in collecting from a recalcitrant card holder who refused to pay a legitimate debt and who might live thousands of miles from the merchant's place of business. Because of these potential difficulties, it was argued that some merchants would refuse to honor out-of-state credit cards issued by banks or other third parties, if the issuer were subject to all card holder claims and defenses. In order to prevent this possibility, the Committee recommends the aforementioned geographic restrictions on the ability of card holders to assert claims or defenses against card issuers.

The $50 limitation and the geographic limitation are not applicable in cases where the card issuer and merchant are the same person or are closely affiliated. For example, card issuers frequently participate with third-party sellers in soliciting business from the card issuer's list of card holders. Often the solicitation is included in the card issuer's monthly billing statement. Under these arrangements, the card issuer has a substantial degree of control over the seller. Accordingly, the bill reported by the Committee would permit card holders to assert claims or defenses against the card issuer regardless of the size of the transaction or where it occurred when the issuer and seller were closely affiliated.

Although the bill permits a card holder to assert claims or defenses against a card issuer with respect to any transaction in which the card is used as a method of payment or extension of credit, it is not the Committee's intent to cover cash advances obtained with a credit card when the advance is obtained from the card issuer and is unrelated to any specific transaction. In such cases, the cash advance is obviously a general purpose loan and the card issuer should not be made subject to any claims or defenses arising out of the card holder's use of the proceeds of such loan.

## DELETED PROVISIONS

S. 914, as introduced, contained provisions which would have prohibited creditors from imposing retroactive finance charges against any balances outstanding in a customer's account prior to the time when payment is due to avoid a finance charge and prohibited minimum finance charges on revolving charge accounts, except where imposed on all accounts to recover billing expenses. The Consumer Credit Subcommittee voted to retain the prohibition of minimum finance charges and substituted for the section regarding retroactive finance charges a new section governing the computation of finance charges. The full Committee voted not to include either of these pro-

visions in the bill ordered reported. Because of the controversial nature of these provisions and the lengthy consideration given by the Subcommittee and full Committee to these issues, the Committee decisions are discussed in this separate section of the Report.

### COMPUTATION OF FINANCE CHARGES

The Committee turned down two proposals which would have regulated the method of computing finance charges on open end consumer credit plans.

The first proposal limited any creditor who operates an open end consumer credit plan under the terms of which the obligor has the option of avoiding the finance charge by paying his outstanding balance to the use of the adjusted balance method of computing finance charges. The second proposal, which was contained in the Subcommittee's recommendations being considered by the Committee, permitted the use of both the adjusted and average daily balance methods of computing finance charges. Neither proposal permitted the use of the previous balance method of computing finance charges.

Both of these proposals making illegal the use of the previous balance method of computing finance charges were turned down by the Committee.

The previous balance method is a method of computation under which the outstanding balance in the obligor's account at the beginning of the billing cycle is used exclusively as the balance to which the periodic rate or rates are applied. It is the simplest method of computing finance charges and the one used by many small retail firms offering open end credit. The majority of the Committee were concerned over the impact that outlawing the previous method would have on the small business firms which used this method. In addition, as the majority saw it, this was a piecemeal approach to Federal rate regulation. The amount of finance charge is dependent upon both the periodic rate set under State usury laws and the balance method of computation. The Committee felt that it would not be appropriate at this time for the Federal government to intervene into this area of rate regulation which has been the exclusive prerogative of the States. The method of applying rates should be determined by the States as it is now in conjunction with all of the other factors considered when establishing usury or rate statutes.

### PROHIBITION OF MINIMUM FINANCE CHARGES

Another provision deleted by the Committee from the Subcommittee's recommendations would have prohibited creditors from imposing a minimum finance on any consumer account unless such charge is imposed uniformly on all acounts to recover billing costs.

Testimony before the Subcommittee indicated that the minimum finance charges are important to the small retailer who must recover the cost of providing the service of billing customers each month. There are fixed costs which are not covered by $1\frac{1}{2}\%$ on balances of $10.00 or $15.00. The minimum finance charges, as a result of Truth in Lending, generally do not exceed 50¢. The retail witnesses felt that customers would not react favorably to the requirement in the provision that

finance charges be imposed in the month of purchase as this would deprive them of the free period now available under most open end consumer credit plans.

The majority were concerned that the elimination of the minimum finance charge would force small retailers to abandon their open end credit plans and go over to bank credit cards. Availability of credit to low and moderate income consumers could be curtailed. In addition, as some members of the Committee saw it, the Federal Truth in Lending Act simply is not the place for this form of rate regulation. It should be left up to the States to decide where the minimum finance charge makes economic sense, as they are now doing.

## Need for Legislation: Title II—Amendments to the Truth in Lending Act

Title II contains a series of largely technical amendments designed to improve the administration of The Truth in Lending Act. Most of these amendments were recommended by the Federal Reserve Board in its 1972 annual report on Truth in Lending or by the National Commission on Consumer Finance in its final report entitled *Consumer Credit in the United States* issued on December 31, 1972. These amendments are described in the section-by-section analysis included elsewhere in this report. At this point in the report, the Committee wishes to discuss only two of these amendments—one relating to good faith compliance and the other to civil liability.

### Good Faith Compliance

One of the concerns of creditors who have attempted to comply in good faith with the requirements of Truth in Lending is that, although they have followed the Board's regulations, a court may conclude that the Board's resolution is invalid and that different disclosures or procedures are mandated by the Truth in Lending Act itself. In such a case a creditor can be held liable in a civil action even though he complied with the Board's regulations.

The Truth in Lending Act is highly technical and the Committee does not believe a creditor should be forced to choose between the Board's construction of the Act and the creditor's own assessment of how a court may interpret the Act. Accordingly, the Committee recommends an amendment to Truth in Lending requested by the Board which would relieve a creditor of any civil liability under Truth in Lending for any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board. In order to confer immunity from civil liability, the rule, regulation, or interpretation thereof must be approved by the Board itself and not merely by the staff of the Board. This amendment is contained under section 206 of Title II.

The Committee is also mindful of the uncertainty of many creditors as to whether their particular disclosure form and related procedures are in compliance with Truth in Lending and the Board's regulations. The Committee expects the Board to use its new authority under Section 206 to reduce the burden of complying with Truth in Lending. One method for accomplishing this objective would be for the Board to pub-

lish standard disclosure forms, which if adhered to, would be deemed by the Board to be in compliance with the Truth in Lending Act and the Board's regulations. In addition to removing many uncertainties and preventing hyper-technical litigation, this approach has the added advantage of encouraging standardized disclosure formats, thereby enabling consumers to become more aware of the information disclosed.

### CIVIL LIABILITY

Section 130 of the Truth in Lending Act permits consumers to bring civil actions in the Federal courts against any creditor who fails to disclose the information required by the Act or the regulations thereunder. Since it is difficult to prove any actual monetary damage arising out of a disclosure violation, the Act provides that a consumer bringing a successful action is entitled to collect court costs and reasonable attorney's fees plus twice the amount finance charge but not less than $100 nor more than $1,000.

A problem has arisen in applying these minimum liability provisions in class action suits involving millions of consumers. If each member of the class is entitled to a minimum award of $100, a creditor's liability can be enormous. For example, if a large national department store chain with 10 million customers fails to include a required item of information on its monthly billing statement, it can be subject to a minimum liability of $1 billion in a class action suit.

The leading case in construing the applicability of the minimum liability provisions under section 130 to class action suits is *Ratner* v. *Chemical Bank New York Trust Co.* [54 F.R.D. 412, 416 (S.D.N.Y. 1972)]. In the Ratner case, Judge Frankel decided that the action by one cardholder would not lie as a class action, stating that, "The allowance of thousands of minimum recoveries like plaintiff's would carry to an absurd and stultifying extreme the specific and essentially inconsistent remedy Congress prescribed as the means of private enforcement." In refusing to maintain the Ratner case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, the court also emphasized that it was only deciding the applicable case at hand and was not ruling on the defendant's more sweeping contentions that no class actions were authorized under section 130 of the Truth in Lending Act.

Prior to the Ratner decision on February 14, 1972, the courts affirmed 8 Truth in Lending suits as class actions while denying class action status to 3. Since the Ratner case, the courts denied 21 Truth in Lending suits class action status while affirming only one and in that case, only after the plaintiffs amended their complaint to sue only for actual damages. Despite this record, many creditors fear a future court may still certify a Truth in Lending suit for class action status and subject the creditor involved to a potentially staggering penalty. At the same time, it is clear that consumers have not obtained much relief because of the court's reluctance to impose the unreasonably large minimum penalties provided for under section 130.

The purpose of the civil penalties section under Truth in Lending was to provide creditors with a meaningful incentive to comply with the law without relying upon an extensive new bureaucracy. However, the Committee feels this objective can be achieved without subjecting creditors to enormous penalities for violations which do not

15

involve actual damages and may be of a technical nature. Putting a reasonable limit on a creditor's maximum class action liability would seem to be in the best interests of both creditors and consumers.

In reviewing alternative solutions to the problem, the Committee considered a proposal to leave the present law unchanged. This approach was advocated by the finance company industry on the theory that class action suits under Truth in Lending other than for actual damages were inappropriate, were not specifically authorized by The Truth in Lending Act, and would be ultimately held to be illegal per se by the courts.

This approach was not approved by the Committee. The Committee believes the present ambiguities and uncertainties with respect to class action suits under Truth in Lending should be clarified. Moreover, the Committee agrees with the Federal Reserve Board that "potential class action liability is an important encouragement to the voluntary compliance which is so necessary to insure nationwide adherence to uniform disclosure" and that such remedies should not be restricted to actual damages. As the Committee pointed out in its report on similar legislation last year, "Most Truth in Lending violations do not involve actual damages and . . . some meaningful penalty provisions are therefore needed to insure compliance."

Accordingly, the Committee again decided to place an aggregate limitation on a creditor's class action liability for violations not involving actual damages. These limitations are applied to violations of Chapter 2 (Disclosure), Chapter 4 (Credit Billing) and Chapter 5 (Discrimination). As recommended by the Committee, consumers can bring individual or class actions against creditors who violate these chapters and recover actual damages plus court costs and reasonable attorney fees. In addition, in an individual action, a plaintiff is entitled to recover twice the applicable finance charge but not less than $100 nor more than $1,000. In a class action the members of the class are entitled to recover such additional sums as the court may allow, but not more than $100,000 or 1% of the creditor's net worth, whichever is the lesser. The Committee believes a maximum class action liability of $100,000 is sufficient to deter potential violations and achieve widespread compliance.

In assessing the additional sums awarded to the members of a class action suit, the courts are instructed to consider, among other factors, the amount of any actual damages awarded, the frequency and persistence of the creditor's violations, the resources of the creditor, the number of persons adversely affected, and the extent to which the violation was intentional.

While the Committee expects the court will award higher sums to the extent found appropriate after considering the pertinent factors, including those listed above, a court does not have to find a violation was intentional in order to assess a meaningful penalty upon a creditor to induce compliance with the legislation.

The Committee also decided to apply these new provisions to pending lawsuits which have not been finally decided. While the Committee would ordinarily be hesitant to amend provisions involved in pending court cases, it feels that some clarification is needed to avoid excessive judgments not intended by the original Truth in Lending Act. Moreover, there is precedent for this approach in the case of the Bank

Merger Act Amendments of 1966 where similar relief was provided and recognized as valid by the courts; (*U.S.* v. *Third National Bank in Nashville*, 390 U.S. 171 (1968)). The authority of Congress to provide such relief for pending cases has also been recognized by the courts in *Hamm* v. *City of Rock Hill*, 379 U.S. 306, 312–317 (1964), involving the Civil Rights Act of 1964, and *149 Madison Avenue Corp.* v. *Asselta*, 331 U.S. 199 (1947); modified in 331 U.S. 795; 79 F. Supp. 413 (S.D. N.Y. 1948), involving the Portal to Portal Act.

The Committee amended bill also provides that a consumer may not recover damages (other than actual damages) by right of offset unless the consumer was a party to a court action in which the liability was determined. This provision is intended to prevent consumers from simply deducting from their obligation to a creditor the minimum $100 award, which is provided for in individual actions, without being a party to an action in which such a liability is determined by a court. However, nothing in this section prevents a series of individual civil actions to recover $100 in the case of any violation.

## Need for Legislation: Title III—Equal Credit Opportunity

The Committee has recommended Title III to remedy the problem of widespread discrimination on the basis of sex and marital status in the granting of credit to women. The unavailablity of credit to women was documented during hearings held by the National Commission on Consumer Finance in May, 1972 (dealing primarily with consumer credit) and again in hearings held by the Federal Deposit Insurance Corporation (dealing with mortgages and other bank credit practices) in December, 1972. The hundreds of personal individual complaints established a clear pattern of discrimination across the country and on an institutionalized level.

The discriminatory acts documented by the Commission were summarized as follows:

    1. Single women have more trouble obtaining credit, especially mortgage credit, than single men.

    2. Creditors generally require a woman who has credit to reapply for credit when she marries, usually in her husband's name. Similar reapplication is not asked of men when they marry.

    3. Creditors are often unwilling to extend credit to a married woman in her own name.

    4. Women who are divorced or widowed have trouble reestablishing credit. Women who are separated have a particularly difficult time since their accounts may still be in the husband's name.

    5. Creditors are often unwilling to count the wife's income when a married couple applies for credit.

The following are examples of practices constituting discrimination on the basis of sex or marital status if applied to an applicant who is otherwise creditworthy by virtue of willingness and ability to repay any obligations. Each discriminatory act may be applicable to consumer credit of any type, e.g., credit cards, credit accounts, secured or unsecured loans, mortgage loans, etc.:

    1. Holding women and men to different standards in determining creditworthiness, e.g., minimum salary level (without regard

to individual obligations), length of employment, length of residence, etc.

2. Requiring a newly married woman whose creditworthiness has otherwise remained the same to reapply for credit as a new applicant. (A name change should merely require execution of a new signature on a truth-in-lending disclosure statement.)

3. Refusing to extend credit to a married woman in her own name, even though she would be deemed creditworthy if unmarried.

4. Refusing to count a wife's income when a married couple applies for credit, including jointly held credit cards or accounts, secured or unsecured loans, and mortgage loans. This practice includes but is not limited to arbitrary discounting of a wife's income.

5. Refusing to extend credit to a newly separated or divorced woman solely because of her change in marital status.

6. Arbitrary refusal to consider alimony and child support as a valid source of income where such source is subject to verification.

7. Applying stricter standards in the case of married applicants where the wife rather than the husband is the primary family supporter.

8. Requesting or using information about birth control practices in evaluating any credit application.

9. Requesting or using information concerning the creditworthiness of a spouse where an otherwise creditworthy married person applies for credit as an individual.

10. Refusing to issue separate accounts to married persons where each would be creditworthy if unmarried.

11. Considering as "dependents" spouses who are employed and not actually dependent on the applicant.

12. Use of credit scoring systems that apply different values depending on sex or marital status.

13. Altering an individual's credit rating on the basis of the credit rating of the spouse.

Women have encountered a variety of problems in obtaining credit. Women with history of employment have been denied credit without their husbands' signatures, even though they had substantial earnings. Women have been denied credit when employed although their unemployed student husbands could obtain credit. When seeking to obtain information about mortgage loans, single women have faced situations where no pertinent information concerning length of employment, length of residence, income, or age were asked, but they were flatly informed that mortgage loans were not granted to single persons without cosigners. In one case, a woman in her forties who as head of her household wanted to buy a house for herself and her children and could not get a mortgage without the signature of her 70 year old father, who was living on a pension.

In addition to evidence from individual women, several studies have been conducted to document discrimination on a systematic basis. A study conducted by the St. Paul, Minnesota, Department of Human Rights was directed at precisely this question. A man and a woman with identical qualifications applied for a $600 loan to finance a used

car without the signature of the other spouse. Each applicant was 24 years old, earning $12,000 as a research analyst, and the spouse was in school. Eleven of the 23 banks visited by the woman either strictly required the husband's signature or stated that it was their preference, although they would accept an application and possibly make an exception to the general policy. When the same 11 banks— plus two additional banks that would make no commitment to the female applicant—were visited by the male interviewer, six said they would prefer both signatures but would make an exception for him; only one insisted on both signatures; and six told the male interviewer that he, as a married man, could obtain the loan without his wife's signature.

Based on these responses, the St. Paul Department of Human Rights estimated overall that approximately 39 percent of the banks interviewed revealed discrepancies in the loan policies stated to males and females.

It is this kind of discrimination, not the right of banks to insure their loans, that the Committee is trying to overcome through the proposed legislation.

### PROVISIONS OF TITLE III

Title III as agreed to without objection:

    1. Prohibits discrimination based on sex or martial status in connection with any consumer credit transaction;

    2. Prohibits discrimination based on sex or marital status in extensions of credit for commercial purposes;

    3. Incorporates the civil liability provisions of the "Truth in Lending Act Amendments of 1973" (Sec. 130).

In order to provide guidance in the enforcement of this Act, the Board of Governors of the Federal Reserve System is empowered and shall promulgate regulations consistent with the purposes of this Act. Such regulations shall define the legal obligations of creditors and card issuers pursuant to the provisions of this Act. However, the absence of such regulations shall in no way minimize the effectiveness of this Title.

The Committee was in full agreement on the general principles as set forth in the amendment. Certain areas of necessary definition and clarification are discussed below.

### DEFINITION OF DISCRIMINATION UNDER THIS ACT

The Committee recognizes that credit should be granted only to creditworthy individuals: valid and reasonable criteria used to determine creditworthiness must be determined by the members of the credit industry who bear the risk of extending credit. However, without defining creditworthiness and subject to the section of this report entitled "Relation of This Act to Current State Law," the Committee believes that credit applications should be treated individually and without regard to the sex or marital status of the applicant. When a person has independent sources of income and would be deemed creditworthy *but for* his or her sex or marital status, the Committee finds that this person should have equal access to the benefits of full participation in the credit economy.

The concept of creditworthiness as applied to women has too often been obscured by irrelevant questions and outmoded customs and beliefs. Women are viewed, improperly, as temporary members of the paid labor force. Working women are not a small minority: the 1970 census shows that 44% of women of working age are in the labor force. Yet the number of women employed outside the home is irrelevant; the Committee believes that discrimination on the basis of sex or marital status must be prohibited even if such protection would apply to a small minority of persons. All people with independent incomes must be assured equal access to the credit economy.

The Committee is not questioning the industry's need to establish valid and reasonable credit criteria. The question to which the Committee is addressing itself is discrimination in the extension of such credit on account of sex or marital status.

The evaluation of credit applications is by nature a discriminatory process whereby the creditor must determine the expendable income or assets of the individual in light of his or her fixed or anticipated obligations. This type of discrimination is rational and merely involves the application of ordinary credit criteria. However, when a creditor fails to apply ordinary criteria merely because an applicant is a woman, or a person has experienced a change in marital status, or an applicant is denied credit merely because of characteristics resulting from sex or marital status, but unrelated to creditworthiness, then that discrimination has no rational basis and must be prohibited by law. Discrimination in the extension of credit occurs when a credit applicant is not evaluated pursuant to a creditor's ordinary credit criteria, but is judged—and frequently denied credit—not individually, but because of membership in a class.

If a credit application raises questions about ability and willingness to pay, a denial of credit reflects a decision based on credit criteria and would not constitute discrimination under this Act. If an applicant does not have and control his or her *own* income or assets which can clearly be used as a source of repayment, denial of credit would be based on proper credit criteria and the concept of discrimination would be inapplicable.

## DISCRIMINATION ON THE BASIS OF MARITAL STATUS

The Committee recognizes that there is a subtle line of distinction between discrimination on the basis of sex and discrimination on the basis of marital status. It is important to realize that discrimination on the basis of marital status has operated not only to the detriment of women, but to that of their husbands and children—and to the detriment of the family unit as a whole. For example, the failure or refusal to consider a working wife's income in computing mortgage loan eligibility often denies a family access to adequate housing.

The *fact* of marriage is often irrelevant; what ought to be relevant is the number of dependents and fixed costs of the applicant, or, the net amount of a person's expendable income. There has been an invalid presumption that a wife is always dependent on a husband, and that in mortgae credit, for example, this dependency and any subsequent children would affect the wife's income more than the husband's. When

a married man applies for a mortgage loan based on his income alone, the creditor evaluates his eligibility without regard to the possibility of children even though he is the primary supporter of the family and presumably will have to support those children.

In assessing a person's creditworthiness, nothing in this Title prevents a creditor from taking into account any expected changes in the applicant's future income. For example, consideration may be given on an individual basis as to whether pregnancy will result in reduced income or additional expenses for the family. However, a creditor may not reject a person for credit on the basis of arbitrary assumptions such as that working wives will necessarily undergo a reduction in income due to a pregnancy.

### RELATION OF THIS ACT TO CURRENT STATE LAW

The Committee recognizes that, because of the laws of certain States, creditors or card issuers may deem certain women less creditworthy than other women or than men in otherwise similar circumstances. For example, under the laws of Louisiana, the earnings of a married woman, subject to certain exceptions, are deemed part of the community of acquets (assets) and gains that is managed by the husband; and, except under certain circumstances, a married woman may not subject such earnings to the claims of creditors. It is not the purpose of this Title to require any creditor or card issuer to extend credit to any person when such person is not deemed creditworthy. Nor can we condone or allow the continuation of discrimination against any person on the basis of sex or marital status.

The Board of Governors of the Federal Reserve System shall promulgate regulations to insure non-discriminatory extension of credit in the context of our Federal system that gives recognition to each State's system of law.

### SUMMARY

The Committee strongly recommends that Title III, S. 2101 be adopted as reported. The Committee spelled out the recommendations in this report with regard to questions which may arise. The congressional intent is clear: credit is an ordinary incident of financial transactions in our current society; any discrimination in the availability and extension of credit on the basis of sex or marital status is intolerable whether it be discrimination by creditors based on sex or marital status, or State laws that indirectly impede equal opportunity to credit.

## Section-by-Section Summary

*Title 1. Fair Credit Billing.*—This title adds a new Credit Billing chapter 4 to the Truth in Lending Act and makes related amendments to the disclosure and other provisions of the Truth in Lending Act.

*Sec. 101. Short title.*—Title I is cited as the "Fair Credit Billing Act."

*Sec. 102. Declaration of purpose.*—This section amends the declaration of purpose section of the Truth in Lending Act (TILA) by adding an additional purpose, namely "to protect the consumer against inaccurate and unfair credit billing and credit card practices." The existing statement of purpose speaks only of credit cost disclosure. The amendment thus broadens the Federal Reserve Board's authority under Sec. 105 of the TILA which authorizes the Board to issue regulations to carry out the purposes of the TILA, thereby enabling the Board to prescribe regulations implementing the Fair Credit Billing provisions contained in this title.

*Sec. 103. Definitions of creditor and open-end credit plan.*—This section amends the definition of creditors subject to the TILA to include creditors who issue credit cards or extend credit payable in 4 or more installments whether or not a finance charge is imposed. The present TILA only applies to creditors who impose a finance charge. The definition of open-end credit plan is also expanded to include plans involving the issuance of a credit card whether or not a finance charge is imposed.

*Sec. 104. Disclosure of fair credit billing rights.*—This section amends the TILA by requiring creditors to disclose the consumer's right to have billing errors resolved as provided under Sec. 161 of Chapter 4, the creditor's responsibilities under Sec. 162 of Chapter 4, and the consumer's rights to assert claims and defenses against a third party card issuer as provided under Sec. 170 of Chapter 4. A complete disclosure of the rights and responsibilities of consumers and creditors would be required when an account is opened and semi-annually thereafter to all active accounts. The Board is directed to prescribe the format of such disclosures to ensure accuracy and ready compliance.

*Sec. 105. Disclosure of billing contract.*—This section requires open-end creditors to disclose on or with their periodic billing statements an address for handling customer billing inquiries.

*Sec. 106. Billing practices.*—This section adds a new chapter 4 entitled "Credit Billing" to the TILA. The substantive provisions of chapter 4 are described under the succeeding section headings.

*Sec. 161. Correction of billing errors.*—This section requires creditors to resolve billing errors in a prescribed manner and within a specified time period or otherwise forfeit the amount claimed to be in

(21)

error subject to a maximum forfeiture of $50. In order to obtain these rights, the consumer must—

(1) make written notification of an alleged error within 60 days after receiving the bill;

(2) make such notification separate from the return payment stub if the creditor so requires;

(3) send the notice to the required address as disclosed on the creditor's periodic statement;

(4) enable the creditor to identify the consumer's name and account number (if any);

(5) indicate the amount of the billing error; and

(6) identify why he believes the bill contains an error.

If the consumer fulfills these requirements, the creditors must—

(1) acknowledge the notification within 30 days unless the error is resolved within that period;

(2) refrain from collecting the disputed amount until the error is resolved except that a creditor may continue to bill a disputed amount provided he indicates the consumer does not have to pay such amount until the error is resolved; and

(3) resolve the error within 2 complete billing cycles after receiving the consumer's notice (not to exceed 90 days). An error is resolved by—

(a) correcting the bill by the amount claimed to be in error by the consumer;

(b) correcting the bill by a different amount with an explanation of the change and providing documentary evidence if requested; or

(c) explaining or clarifying why the original bill was correct after investigating and providing documentary evidence if requested. The requirement to investigate each billing inquiry is intended to preclude pro forma replies which simply assert the amount billed is correct.

A billing error is defined as any of the following—

(1) an extension of credit not made, or made in a different amount;

(2) an extension of credit for which the consumer requests additional clarification including documentary evidence thereof;

(3) a bill for undelivered or unaccepted goods or services when delayed delivery was not agreed to by the consumer;

(4) failure to reflect payments or credits;

(5) a computation or similar error; or

(6) any other error prescribed in the Federal Reserve Board's regulations.

A creditor has no further responsibility under this section if he meets the foregoing requirements and the customer makes substantially the same allegation with respect to the same alleged error.

*Sec. 162. Regulation of credit reports.*—This section prescribes a creditor's credit reporting responsibilities after being notified of a billing error. Upon receiving such a notice, a creditor cannot report or threaten to report a disputed amount as delinquent until the error has been resolved as prescribed under Sec. 161.

If a creditor so resolves an error and receives further written notification that the amount is still in dispute, he cannot report the amount

as delinquent unless he so notifies the consumer and gives him the name and address of the credit reporting agency and indicates to such agency that the amount is in dispute. If a creditor reports a disputed amount as indicated above, he must also report any final resolution of the dispute. Creditors who violate this section also forfeit the right to collect the amount in dispute up to $50.

*Sec. 163. Length of billing period.*—This section prohibits a creditor from imposing a finance charge on an open-end credit account unless the creditor's billing statement is mailed at least 14 days prior to the time when payment must be received to avoid a finance charge. An exception to the 14-day requirement is provided if the creditor's failure is due to an act of God, war, natural disaster, strike, or other excusable or justifiable cause as determined under regulations of the Board.

*Sec. 164. Prompt crediting of payments.*—This section requires the prompt posting of payments into an open-end credit account in accordance with Board regulations. Such regulations shall prevent a finance charge from being imposed if the payment is received prior to the due date in the amount, manner and location indicated by the creditor.

*Sec. 165. Crediting excess payments.*—This section requires creditors to promptly credit excess payments in an open-end credit account or to refund the excess if requested.

*Sec. 166. Prompt notification of returns.*—This section requires merchants to promptly notify a third-party card issuer of any returns or similar adjustments made to a card holder's account.

*Sec. 167. Use of cash discounts.*—This section prohibits contractual arrangements between credit card issuers and merchants whereby the merchant is forbidden to offer a cash discount to cash customers.

Any cash discount of 5 percent or less is exempted from all Truth in Lending disclosure requirements if its availability is disclosed and it is offered to all customers. (The Federal Reserve Board has administratively exempted such discounts from the annual percentage rate disclosure requirements.)

*Sec. 168. Prohibition of tie-in services.*—This section prohibits credit card issuers from requiring merchants to open deposit accounts or purchase other services as a condition for participating in the credit card plan.

*Sec. 169. Prohibition of offsets.*—This section prohibits a credit card issuer from offsetting a card holder's debt against funds maintained on deposit with the issuer unless a court order is obtained. This section does not apply to credit card plans whereby the card holder authorizes the card issuer to periodically deduct all or a specified portion of his credit card debt from his deposit account provided the card holder is given a 10-day opportunity to rescind any such deduction with respect to any disputed item. The authorization must also be in writing except that existing accounts need only be notified of this section's provisions by the card issuer.

*Sec. 170. Rights of credit card customers.*—This section subjects credit card issuers to all claims (other than tort) or defenses arising out of any credit card transaction provided (1) the card holder made a good faith attempt to obtain satisfaction from the merchant honoring the card; (2) the transaction exceeded $50; and (3) the transaction

occurred in the same State as the card holder's residence or within a 100-mile radius of the card holder's residence, whichever is greater. The claim or defense is limited to the amount of credit outstanding at the time the card issuer or merchant is first notified of the claim or defense. The geographic and dollar amount restrictions on a card holder's ability to assert claims or defenses against a card issuer do not apply when the card issuer and seller are the same person or are closely affiliated.

*Sec. 171. Relation to State laws.*—This section provides that a creditor must comply with State laws on billing practices unless the State law is inconsistent with the Federal law and then only to the extent of the inconsistency. The Board is empowered to determine whether such inconsistencies exist. In making these determinations, the Board is directed not to construe any provision of State law as inconsistent with the Federal law if the State provision gives greater protection to the consumer. The Board is also directed to exempt any state from the Federal law if it enacts a substantially similar law with adequate provisions for enforcement.

*Sec. 107. Conforming amendments.*—This section adds several technical conforming amendments to the TILA.

*Sec. 108. Effective date.*—This section provides that Title I takes effect 1 year after its enactment.

*Title II—Amendments to the Truth in Lending Act.*—This title contains a number of amendments designed to improve the administration of the Truth in Lending Act. Those amendments recommended by the Federal Reserve Board in its 1972 annual report are designated (FRB) while those additional amendments recommended in the report of the National Commission on Consumer Finance are designated (NCCF).

*Sec. 201. Advertising; more-than-four-installment rule.*—This section requires creditors who make no finance charge to disclose clearly and conspicuously in their advertising that the cost of credit is included in the price of the item being sold. (NCCF)

*Sec. 202. Agricultural credit exemption.*—This section exempts real property agricultural credit transaction in excess of $25,000 from the TILA. (FRB)

*Sec. 203. Administrative enforcement.*—This section removes the ICC from enforcement responsibilities under the TILA and adds the Farm Credit Administration with respect to the agricultural credit institutions under its supervision. (FRB)

*Sec. 204. Liens arising by operation of State law.*—This section includes liens arising by operation of State law including mechanics and materialman's liens under the 3-day rescission provisions of Sec. 125 of the TILA. Under Sec. 125, a consumer has 3 days to rescind a credit transaction involving a security interest (other than a first lien to finance the acquisition of a dwelling) in any real property used or expected to be used as his residence. Any such security interest becomes void if a consumer exercises his rescission rights.

The Board's regulations specifically included liens arising by operation of State law as subject to the rescission provisions. The Board's authority to issue such a regulation has been declared invalid by one court and upheld by another. The amendment thus clarifies the Board's authority. (FRB)

*Sec. 205. Time limit for right of rescission.*—This amendment provides that a consumer's right of rescission under Sec. 125 of the TILA expires in 3 years after the date the transaction was consummated or when the property is sold (whichever is sooner), notwithstanding any failure by the creditor to comply with the TILA. The existing law permits a consumer to rescind within three days following the consummation of the transaction or the delivery of the required disclosures under TILA, *whichever is later*. (FRB)

*Sec. 206. Good faith compliance.*—This section exempts creditors from civil liability under the TILA for any action done or omitted in good faith in conformity with any rule, regulation or interpretation of the Board. (FRB)

*Sec. 207. Liability for multiple disclosures.*—This section clarifies the civil liability provisions under the TILA (Sec. 130) under which a consumer is entitled to a minimum recovery of $100. The amendment specifies a consumer is not entitled to collect $100 for each failure which is part of a multiple failure to disclose essentially the same information; for example, where an omission occurs in a series of periodic billing statements. Under the amendment, such multiple failures are treated as a single failure for the purpose of assessing the $100 minimum liability. (FRB)

*Sec. 208. Civil Liability.*—This section amends the civil penalty provisions contained in section 130 of the TILA and expands their coverage to include violations of Chapter 4 (Credit Billing) as well as Chapter 2 (Disclosure). By separate reference, the penalties provided under this amendment are also made applicable to violations of Chapter 5 (Discrimination).

Under Sec. 130, as amended by this section, consumers can bring civil actions against creditors who violate the disclosure, credit billing or discrimination provisions of the Act. Consumers are entitled to recover actual damages, court costs, reasonable attorney fees and such additional amounts as provided in the Act or allowed by the court. In the case of an individual action, a consumer is entitled to recover twice the applicable finance charge but not less than $100 nor more than $1,000. In the case of a class action, the members of the class can recover such additional amounts as the court may allow but not more than the lesser of $100,000 or 1% of the creditor's net worth. (These limitations do not apply to the amount of any actual damages which can be awarded in a class action suit under the Act.)

In assessing the additional amounts to be allowed to the members of a class action suit, the courts are directed to consider the amount of any actual damages awarded, the frequency and persistence of violations by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the violation was intentional.

This amendment to Sec. 130 also prohibits card holders from offsetting a creditor's potential liability (other than for actual damages) against funds owing the creditor unless the card holder was a party to a successful civil action to enforce such liability.

The liability ceilings established under this amendment as well as the immunities under Sec. 207 (good faith compliance) and Sec. 208 (liability for multiple disclosure) are made applicable to violations oc-

curring prior to enactment, provided the creditor's liability has not been finally determined by a court prior to such date.

*Sec. 209. Full statement of closing costs.*—This section requires that all closing costs incident to a transaction and payable by the consumer be disclosed prior to the actual consummation of that transaction. In the case of real property transactions, the disclosure of all such closing costs must be made by the creditor at the time he makes a loan commitment. In the case of all other transactions, such disclosure must be made prior to the time when any downpayment is made. The Committee intends that *all* closing costs payable by the consumer should be disclosed whether or not a particular item of cost is incident to the credit aspect of the transaction. These include, but are not limited to, charges for application fees, credit reports, surveys, title examination, title insurance, attorney fees, origination fees, preparation of documents, closing fees, recording fees, transfer taxes, prepaid interest, taxes, or insurance, and loan discounts.

The Board is authorized to write regulations permitting creditors to disclose an estimate of any closing cost when he does not have the exact information at the time of disclosure. (NCCF)

*Sec. 210.—Business use of credit cards.*—This section clarifies the authority of the Board to apply the provisions of Sections 132, 133 and 134 to credit cards used for business purposes. These provisions prohibit the sending of unsolicited credit cards and limit a card holder's liability for a lost or stolen card to $50. The Board has already issued a regulation to this effect and this section is intended to clarify the Board's authority to issue such regulation. (FRB)

*Sec. 211. Identification of transaction.*—This section requires open-end creditors to include on their monthly billing statements a brief identification of each transaction sufficient to enable the customer to identify the transaction or relate it to copies of sales vouchers previously furnished. Such identification need not be repeated in subsequent billing statements on balances which have been carried over. The present law does not require such identification on the monthly billing statement if a sales voucher was furnished at the time of the sale. (FRB)

*Sec. 212. Exemption for State lending agencies.*—This section exempts State lending agencies from the 3-day recission provisions of Sec. 125 of the TILA. Under these provisions, a consumer is given 3 days to rescind any credit transaction (other than a purchase money mortgage) involving a security interest on his home.

*Sec. 213. Liability of assignees.*—This section permits consumers to sue the purchaser of an installment loan or contract or similar instrument for a violation of Truth in Lending if the violation is apparent on the face of the instrument.

*Sec. 214. Credit card fraud.*—This section increases the criminal penalties for the fraudulent use of credit cards. The present law (Sec. 134 of the TILA) makes it a Federal crime to obtain goods or services in excess of $5,000 through the fraudulent use of a credit card in a transaction affection interstate or foreign commerce. Violators are subject to a $10,000 fine or a 5-year prison term or both.

The amendment applies a $10,000 fine or a 10-year prison term to the following acts—

(*a*) obtaining or attempting or conspiring to obtain with a fraudulent credit card in a transaction affecting interstate commerce anything with a value aggregating $1,000 or more in one year;

(*b*) transporting or attempting or conspiring to transport fraudulent credit cards in interstate or foreign commerce;

(*c*) using any instrumentality of interstate or foreign commerce to sell or transport a fraudulent credit card;

(*d*) receiving, concealing, using or transporting anything (except transportation tickets) obtained through a fraudulent credit card and having a value aggregating $1,000 or more within any one year and which moved in or is part of or which constitutes interstate or foreign commerce;

(*e*) receiving, concealing, using, selling or transporting in interstate or foreign commerce transportation tickets for interstate or foreign commerce aggregating $500 or more in any one year and obtained through a fraudulent credit card; or

(*f*) furnishing anything in a transaction affecting interstate or foreign commerce with an aggregate value of $1,000 or more in any one year when obtained through a fraudulent credit card.

All violations must be knowing. A fraudulent credit card involves one which is counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained.

*Sec. 215. Grace period for consumers.*—This section permits open-end creditors to indicate that payment by a certain day must be made to avoid a finance charge without disclosing that no finance charge will actually be imposed if the payment is received after such date but before the opening of the next billing period.

*Sec. 216. Effective date.*—This section provides that Title II takes effect upon enactment except for sections 209 (Full statement of closing costs) and 211 (Identification of transaction) which is to be in effect one year after enactment.

*Title III—Equal Credit Opportunity.*—This title adds a new Chapter 5 to The Truth in Lending Act to prohibit discrimination on account of sex or marital status.

*Sec. 301. Short title.*—This section provides that Title III may be cited as the Equal Credit Opportunity Act.

*Sec. 302. Discrimination.*—This section adds a new Chapter 5 containing new sections 181 and 182 to The Truth in Lending Act.

*Sec. 181. Prohibited discrimination.*—This section prohibits discrimination by creditors or card issuers in any credit transaction on account of sex or marital status. The prohibition applies to all credit transactions including the approval, denial, renewal, continuation, or revocation of any open-end consumer credit account. The prohibition against discrimination applies to approvals or denials of credit or to the establishment of the terms thereof. These provisions also apply to certain transactions exempted under section 104 of the TILA including business credit transactions, transactions in brokerage accounts, transactions in excess of $25,000 and transactions under public utility tariffs.

*Sec. 182. Civil liability.*—This section extends the civil liability provisions under section 130 of the TILA (as amended by section 208 of

Title II of The Truth in Lending Act amendments of 1973) to violations of sec. 181.

*Sec. 303. Effective date.*—This section provides that Title III takes effect in 60 days following its enactment.

## Cordon Rule

In the opinion of the committee, it is necessary to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate in order to expedite the business of the Senate in connection with this report.

## Additional Views of Messrs. Proxmire and Hathaway

We support the bill reported by the Committee, but only with considerable reluctance and primarily for the purpose of getting the bill before the full Senate for further consideration. The legislation provides consumers with important new protections, but two key provisions were stricken from the bill in Committee by one- and two-vote margins. One provision would have regulated the manner in which creditors compute their finance charges on revolving charge accounts. The second would have prohibited minimum finance charges on these accounts. In addition, the Committee has drastically weakened the civil liability provisions under Truth in Lending in direct opposition to the recommendations by the Federal Reserve Board. We believe these three deficiences render S. 2101 a marginal consumer protection bill notwithstanding the provisions for resolving billing disputes, for restricting the application of the holder-in-due course doctrine on credit card transactions, and for prohibiting discrimination based on sex or marital status. We hope the bill can be strengthened on the floor in order to obtain the strong and enthusiastic support of consumer groups. Without strong consumer group support, it is likely that the bill will die in the House of Representatives, a fate which befell a similarly weakened bill passed last year by the Senate (S. 652).

### COMPUTATION OF FINANCE CHARGE ON REVOLVING CREDIT ACCOUNTS

Any consumer who tries to compare the amount of interest charged on his revolving charge accounts is likely to arrive at the erroneous impression that all creditors charge the same amount of interest. Practically every creditor tells the customer he is being charged at the rate of 1½% a month or 18% a year on the *unpaid balance* in his account after 30 days. Therefore all plans are the same—right? Wrong!

The hooker lies in the term "unpaid balance". Just what is the unpaid balance against which the 1½% rate is applied? This term is not defined in any state or Federal statute. As a result, the creditor is free to use his own definition. This do-it-yourself system of finance charge computation has resulted in a welter of billing systems whose only purpose seems to be to earn more finance charge revenue for the creditor and whose only effect is to leave the consumer utterly confused.

There are five different billing systems presently in use and without legislation the number is threatening to increase. A person must be a trained mathematician to understand how these systems really operate. The following example will try to illustrate how these five systems work with respect to a hypothetical account involving only two purchases and two payments during a 3-month period. In reality, the amount of activity in each account is likely to be far more compli-

cated than the example given below. However, even this simple example illustrates how the amount of finance charge can vary depending on which billing system the creditor decides to use.

TABLE I.—ILLUSTRATION OF DIFFERENT BILLING SYSTEMS

| Dates | Transaction | Amount | Ending balance | Previous balance | Adjusted balance | Average daily balance Including current debits | Average daily balance Excluding current debits |
|---|---|---|---|---|---|---|---|
| May 1 | Previous balance | 0 | | | | | |
| May 25 | Purchase | 100 | | | | | |
| May 31 | Ending balance | 100 | | | | | |
| | Finance charge | | $1.50 | 0 | 0 | 0 | 0 |
| June 1 | Previous balance | 100 | | | | | |
| June 10 | Purchase | 100 | | | | | |
| June 25 | Payment | 50 | | | | | |
| June 30 | Ending balance | 150 | | | | | |
| | Finance charge | | $2.25 | $1.50 | $0.75 | $2.38 | $1.38 |
| July 1 | Previous balance | 150 | | | | | |
| July 15 | Payment | 150 | | | | | |
| July 31 | Ending balance | 0 | | | | | |
| | Finance charge | | 0 | 0 | 0 | 0 | 0 |
| | Total finance charges | | 3.75 | 1.50 | .75 | 2.38 | 1.38 |

The amount of finance charge under 5 billing systems at 1½ percent on the "unpaid balance"

## COMPUTATION OF FINANCE CHARGE

Ending balance: 1½ percent of ending balance.

Previous balance: 1½ percent of previous balance unless paid in full within 30 days.

Adjusted balance: 1½ percent of previous balance less current payments.

Average daily balance including current debits: 1½ percent of average daily balance including current purchases unless previous balance is zero or is paid in full within 30 days.

Average daily balance excluding current debits: 1½ percent of average daily balance excluding current purchases unless previous balance is zero or is paid in full within 30 days.

As the above example shows, the amount of finance can vary from $0.75 to $3.75 for the same pattern of purchases and payments even though all plans charge the standard 1½ percent per month on the "unpaid balance." The most expensive system for the consumer is the ending balance system followed by the average daily balance system (including current debits) and the previous balance system. The most favorable plan for the consumer is the adjusted balance system.

We believe the objectives of the Truth in Lending Act are frustrated when creditors can disclose the same percentage rate while actual finance charges can vary by as much as 5 to 1 or more depending upon the computation system used by the creditor. Because of the creditor's ability to choose his own computation method, consumers are unable to shop wisely for credit by comparing the cost of each revolving credit plan. Even when these computation methods are disclosed, as required by Truth in Lending, the average consumer is still unable to decipher the complex legal language often used by the creditor or to understand how the various methods actually work.

For example, a poll in California asked consumers how their finance charges were figured on their revolving charge accounts. Despite the disclosures provided by Truth in Lending, 80 percent of consumers either didn't know or gave the wrong answer.

We believe there should be only one method for computing finance charges on revolving charge accounts and that method should be the adjusted balance method. It is fair, easy to understand, and can be used by all creditors. In fact, it is the system which many consumers think is being used even though the creditor may use a more costly system. This system is used by some retailers including the J. C. Penney Company. It is also used by most oil companies credit card plans and by nearly one-half of bank credit card plans. The adjusted balance system was also used by Sears, Roebuck on their employee accounts, although their customers were on the previous balance system, (Sears has since converted all accounts to an average daily balance system).

Under the adjusted balance system, the consumer receives full credit for all partial payments and is not charged a finance charge until the end of the so-called free period. For example, if he has a balance due of $100 and is given 30 days to pay and if he makes a partial payment of $50, he is charged only on the remaining balance of $50. By way of contrast, under the previous balance system, the finance charge is levied against the full $100 balance even though half of it has already been paid. Creditors who use the previous balance system thus charge the consumer interest on money he has already repaid.

This same element of retroactivity can be found in the two average daily balance plans described in the preceding table. Under either plan, the consumer is charged for amounts owing prior to the time when payment must be received to avoid a finance charge. For example, during the June billing cycle the consumer started the month with an unpaid balance of $100. Under the terms of the two average daily balance plans, he has 30 days to pay in full in order to avoid a finance charge. However, in the example given, the consumer made a partial payment of $50 on June 25. Accordingly, he was assessed a retroactive finance charge against the $100 balance in his account from June 1 to June 25.

We believe retroactive billing systems are unfair, deceptive and discriminatory. They are unfair because they charge interest on money already repaid. They are deceptive because consumers simply do not understand the nature of a retroactive billing system and cling to the logical but erroneous belief that they will not be charged interest on money they have already repaid. They are discriminatory because they deny the full 30-day free credit period to those customers who cannot afford to pay in full while extending the full 30 days of free credit to those who can afford to pay in full. For example, in the preceding table, the customer made a purchase of $100 on May 25 and a partial payment of $50 on June 25. Under the previous balance system and the two average daily balance systems, he was charged for credit as of June 1 and thus received only 6 days of free credit from May 26 to May 31. On the other hand, a customer paying in full on the same date would pay no finance charge and would thus receive 31 days of

free credit from May 25 to June 25. We believe that if a creditor offers a free grace period, it should be offered equally to all credit customers and should not be reduced if a customer elects to pay his balance in more than one installment.

In addition to retroactivity, there is another serious inequity in some of the billing systems currently in use. This involves charging interest for current purchases if a customer has failed to pay his previous balance in full. For example, under one variety of the average daily balance system the consumer is charged interest from the day he makes a purchase if he has not paid his previous balance in full. This is true even if he subsequently pays his entire balance in full during the next month. The consumer is thus denied any free credit period on current month purchases by virtue of his decision to extend his payments on his purchases during the preceding month. This inequity is illustrated in the preceding table where the consumer made a $100 purchase on June 10. Under the first average daily balance plan which includes current purchases, the consumer paid a finance charge on this purchase for the last 20 days in June in which it was outstanding even though he paid his bill in full within the next 30 days.

As can be seen on the preceding table, the finance charge resulting from this variety of average daily balance system is actually higher than the previous balance system. This fact was confirmed in an empirical study of 865 revolving charge accounts during a 12-month period in which the effective annual yield on the average daily balance system (including current debits) was discovered to be slightly higher than the previous balance system. The results of this study are disclosed in the following table:

TABLE II.—*Effective Annual Yield on Five Different Billing Methods*

| Billing method: | Effective annual yield (percent) |
|---|---|
| Ending balance | 18.886 |
| Previous balance | 15.928 |
| Adjusted balance | 14.045 |
| Average daily balance (including current debits) | 15.997 |
| Average daily balance (excluding current debits) | 15.135 |

Source: Testimony of Prof. E. Ray McAlister based on data taken from 12-month account histories on 865 accounts chosen at random.

The average daily balance method (including current debits) is used by one of the Nation's largest retailers, Montgomery Ward, in six States where the previous balance system has been abolished by law. Thus, the simple abolition of the previous balance system, which has been hailed as a great victory for consumers, has actually resulted in higher finance charges on the part of at least one large creditor.

Of all the systems in use, the most inequitable and least favorable to the consumer is the ending balance system. This system imposes a finance charge on the closing balance in a customer's account without giving the consumer an option to avoid a finance charge by paying in full within the next 30 days. A finance charge is already imposed when the consumer receives his bill. The only way to avoid a finance charge is to pay the amount outstanding before the creditor mails his billing statements. Because of these obvious inequities, the ending balance is not widely used, although it might be used with more frequency if only the previous balance system were abolished.

The original version of S. 914 prohibited retroactive billing methods and required the use of the adjusted balance method by all creditors. This position was defeated in Committee by a vote of 10 to 5. The Committee also turned down by a vote of 8 to 7 a proposal to require either the adjusted balance method or the average daily balance method (excluding current debits)—the two systems most favorable to consumers. As a result of the Committee's action, creditors can continue to perpetuate confusion in billing methods.

We believe the arguments against Federal regulation of billing methods are ill-founded. For example, it has been argued that the Federal government should not stifle innovation and free enterprise by requiring only one billing computation method. This argument ignores the fact that we have imposed standardization in many other fields when necessary to avoid confusion, including standard weights and measures. The only purpose behind the proliferation in billing methods is to raise the creditor's yield. The consumer receives no benefit from different billing systems—only higher finance charges.

Another argument is that some of the higher cost billing methods including the previous balance system are used by smaller retailers who need the extra revenue to stay in business or remain competitive. However, expert testimony before the Committee revealed that a retailer's total revenues would decline by about two-tenths of 1 percent as a result of changing from the previous balance system to the adjusted balance system. Even if the entire loss in finance charge revenue were added to prices, there is no reason to assume a retailer would suddenly become less competitive, particularly since most large retailers including Sears and Montgomery Ward would be compelled to make similar changes in their billing systems. Six States have already abolished the previous balance system and there is no evidence that small retailers have gone out of business or have been adversely affected in those states.

Another variety of the small business argument is the allegation that small retailers are unable to make the computations required by the adjusted balance system. This argument is an absurdity. The adjusted balance system simply requires a creditor to deduct a customer's payment from his previous balance before applying the monthly finance charge. If a retailer can now multiply a customer's previous balance by 1½% to determine the finance charge, it is no more difficult to subtract one figure from another before multiplying. In actuality the adjusted balance system is an easy, simple to use method available to all creditors, large or small, and does not require the use of computers or other complicated machinery.

Still another argument is that creditors need flexibility in billing systems to make up for an inadequate rate ceiling. It is alleged that the rate ceiling in many States is too low to permit a retailer to break even on his credit operation and that a mandatory requirement to use the adjusted balance system would make a bad situation worse. This argument actually makes the strongest possible case for Federal regulation of billing systems. If rate ceilings are too low on revolving credit, retailers should appeal directly to the state legislatures for relief. By changing his billing method, a creditor can achieve a de facto increase in the effective rate he charges for revolving credit without legislative approval or consumer knowledge. Whatever may be the proper

rate ceiling for revolving charge accounts, a creditor should not be permitted to alter that ceiling by changing his billing method. This type of subterfuge has no place in our credit system.

## MINIMUM FINANCE CHARGES

Another vital provision approved by the Consumer Credit Subcommittee but deleted by the full Committee by a 9 to 7 vote would have prohibited minimum finance charges on revolving charge accounts.

A minimum finance charge of up to 50 cents is imposed by some creditors on their revolving charge account customers whenever the application of the standard 1½ percent monthly rate would produce a lower charge. For example, if the unpaid balance is $40, the creditor will apply the standard 1½ percent rate, thus producing a finance charge of 60 cents. But if the balance is only $30, a 1½ percent finance charge will yield only 45 cents. In such cases, the creditor imposes a flat 50-cent charge.

The truth in lending law effectively limits minimum finance charges to 50 cents by requiring that the corresponding annual percentage be disclosed on minimum finance charges above 50 cents. Because of the computational difficulties involved in annualizing a flat monthly fee on standardized billing forms where the amount of credit and corresponding rate vary from month to month, creditors have generally not imposed minimum finance charges in excess of 50 cents.

Thus the Congress has already taken action to limit minimum charges to 50 cents. The remaining question is whether minimum charges are justified at all. Nine States have already prohibited minimum charges entirely. No evidence has been presented to suggest that the credit industry has been unduly disrupted in these States because of the abolition of minimum finance charges.

The main argument against minimum finance charges is that they tend to operate as a tax on low-income customers. They are primarily imposed on customers who do not pay their account in full within the 30-day grace period and whose unpaid balances are so low that a minimum finance charge applies rather than the traditional monthly charge of 1½ percent—18 percent a year. Balances below $33.33 fall in this category. For example, a minimum finance charge of 50 cents on a $10 balance is equivalent to a charge of 55 percent a month or 60 percent a year.

Those who are most likely to have small unpaid balances are low-income consumers who cannot afford to pay their entire bill even though the amount may be modest by middle class standards. Minimum finance charges are thus a device for charging lower income customers a higher rate of interest.

One of the arguments used to justify the retention of minimum finance charges is that they compensate the creditor for the bookkeeping work involved in sending out monthly statements. This argument might be valid, if a flat minimum charge were imposed on all monthly accounts, regardless of size and manner of payment. It costs just as much to mail out a monthly statement to a rich customer living in the suburbs as to a welfare mother living in a ghetto. However, very few creditors impose a flat minimum charge on all accounts. The minimum charge is a selective charge which hits the poor far more than it hits the rich.

Another argument advanced to justify minimum charges is that they are needed as an incentive to induce the payment of small balances by recalcitrant consumers. According to this argument, a consumer might ignore repeated bills for small amounts such as $5 even if the amount is increased by a 1½ percent finance charge each month. A 1½ percent finance charge on a $5 balance amounts to only 7 cents, which is not much of a penalty on those who tend to be neglectful of their bills.

The provision stricken by Committee was carefully drafted to permit minimum finance charges in justifiable circumstances. Minimum finance charges would be permitted first if they were in the nature of a service charge imposed on all monthly accounts regardless of size or manner of payment; and second, where the customer has not made any payment into his account for 2 successive months. The first exception would permit creditors to impose a flat monthly charge on all their accounts as a method for recovering billing expenses provided such charges were otherwise authorized by State law. The second exception would permit creditors to use the minimum charge essentially as a collection tool. These two exceptions meet some of the specific criticisms raised by the credit industry last year when a similar provision was deleted from S. 652.

Despite these concessions, members of the Committee were beseiged with communications from the credit industry pleading for a retention of minimum finance charges. For example, Committee members received a letter from Montgomery Ward, one of the nation's largest retailers, arguing that a prohibition on minimum finance charges will put small retailers out of business. One must commend this public spirited and seemingly disinterested concern for the welfare of small business. However, it should also be pointed out that Wards is a principal user of minimum finance charges and imposes them in every State where it is legally possible to do so.

Expert testimony before the Committee revealed that the revenues from minimum finance charges are less than three one-hundredths of 1 percent of total revenue. Thus it is ludicrous to talk about anyone going out of business. The credit industry has not produced one shred of evidence to prove that retailers have been adversely affected in the States where minimum finance charges are not permitted.

The Committee action will unfortunately permit the continuation of minimum finance charges which often result in usurious rates of interest being charged to low income customers.

## CIVIL LIABILITY

We support the need for placing a reasonable upper limit on a creditor's class action liability under Truth in Lending. However, we believe the specific limits recommended by the Committee are too low and will not provide a meaningful deterrent against potential violations. The Committee, by a 6 to 5 vote, drastically weakened the limits specifically recommended by the Federal Reserve Board. Under the Board's recommendations, a creditor's maximum class action liability (in addition to actual damages) would be set at $50,000 or 1% of net worth, whichever is greater. The Committee reversed this concept and set the limit at $100,000 or 1% of net worth, whichever is the lesser.

Under the Federal Reserve Board's recommendation, the nation's largest banks would face a maximum class action liability of as much

as \$17 million for the most serious and persistent violations of Truth in Lending. Under the Committee's version, the maximum liability would be \$100,000 which is less than 1% of the maximum liability recommended by the Board. We might have supported a motion to reduce the maximum liability recommended by the Board. But cutting the Board's figure back by over 99% strikes us as somewhat unreasonable.

It should be emphasized that the maximum liability established under the bill as reported is a maximum and that in many cases the award will be considerably less than the maximum. The courts are directed to apply specific criteria in determining the amount to be awarded in a successful class action suit. In order to assess the maximum penalty of \$100,000 under Sec. 208 of S. 2101, a court must consider among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional. Thus the court has ample discretion and indeed direction from the Congress to award an amount considerably less than the maximum when the circumstances so warrant.

Given this framework, a maximum penalty of \$100,000 simply does not give the courts enough flexibility to work out a schedule of penalties tailored to fit the seriousness of the violation. As a result, some courts may mechanically apply the maximum \$100,000 or 1% penalty in all cases regardless of the criteria listed in the Act.

A penalty of \$100,000 may be inadequate to deter a willful and serious violation by a large creditor where the cost of compliance might exceed \$100,000. On the other hand, a penalty of \$100,000 may be too great for a minor violation. The formula recommended by the Federal Reserve Board and included in S. 914 would have given the courts more flexibility to deal with each individual case.

The views of the Federal Reserve Board on civil liability as contained in their 1972 annual report on Truth in Lending are reprinted below.

## "CLASS ACTIONS AND CIVIL LIABILITY; CLASS ACTION LIABILITY LIMIT

"The trend of the cases is away from allowing class actions for the enforcement of Truth in Lending. Very likely, this trend is an outgrowth of judicial concern over the possible magnitude of recovery by a large class, given the statutory minimum of \$100 per person. While the Board shares this concern about possible liability, which might in some cases run into millions of dollars and may be disproportionate to any conceivable injury sustained by consumers, it also believes that potential class action liability is an important encouragement to the voluntary compliance which is so necessary to insure nationwide adherence to uniform disclosure. Consequently, it believes that any inquiry into the justification for class actions should not be restricted to whether the possible liability in such suits exceeds the actual damages incurred by the class members. Equally important, in the Board's view, is the prophylactic effect of the threat of class action

exposure. That threat elevates a possible Truth in Lending lawsuit from the ineffective "nuisance" category to the type of suit which has enough sting in it to insure that management will strive with diligence to achieve compliance.

"While the Board believes that this class action vehicle in some form should be preserved for appropriate Truth in Lending suits, it is conscious of the difficulty of formulating an equitable rule which will preserve its effectiveness without, at the same time, exposing legitimate business to unwarranted claims in frivolous lawsuits. In the Board's view, the best way to meet this problem is to set an upper limit on the aggregate amount of possible class action recovery (the greater of $50,000 or 1 percent of net worth is suggested in the Board's recommended amendment), while, at the same time, giving the courts the authority to set the amount of actual recovery within this limit in light of the circumstances of the particular case—for example, the severity of the violation and the size of the offender."

WILLIAM PROXMIRE.
WILLIAM HATHAWAY.

# BLANK PAGE

## Supplemental Views of Messrs. Tower, Bennett, and Brock

The Truth in Lending Act amendments of 1973 as reported by the Committee on Banking, Housing, and Urban Affairs will strengthen the Truth in Lending Act by adding a new chapter to protect consumers against unfair billing practices, increase the criminal penalties for the fraudulent use of credit cards, and prohibit creditors from discriminating on account of sex or marital status. Both the full Committee and Consumer Credit Subcommittee spent a considerable length of time deliberating the bill and the full Committee has now reported a reasonable measure which is deserving of the support of the Senate without major modification.

There were several controversial provisions in S. 914 as originally introduced by Senator Proxmire which were modified or deleted by the full Committee. Since these issues again may be debated on the Senate floor, we will treat each in these supplemental views.

### Method of Computing Finance Charges

S. 914 as originally introduced prohibited creditors from imposing retroactive finance charges against any balances outstanding in a customer's account prior to the time when payment is due to avoid a finance charge. The apparent purpose of this original section was to prohibit the use of the previous balance method of computing finance charges as well as the average daily balance method when it involves a free period.

The Subcommittee accepted Senator Proxmire's substitute language which would limit a creditor who operates an open end consumer credit plan with a free period to the use of either the adjusted balance or the average daily balance method of assessing a finance charge. The new provision then narrowly defined adjusted balance and average daily balance to exclude all billing methods other than the methods used by two major retailers and bank credit card issuers. The full Committee deleted the entire section governing the computation of finance charges.

The retail witnesses before the Subcommittee testified that the challenged methods embodying a no-finance-charge-option are not discriminatory but operate in an equitable and even-handed manner, encourage prompt payment, and provide all customers with the identical opportunity to avoid finance charges.

They pointed out that revolving credit with a no-finance-charge-option evolved by combining certain features of the 30-day charge account with features of installment credit. Under the 30-day charge account, which traces its origin back to the open-book credit extended by merchants in agrarian times, customers were not required to pay a separate finance charge but were to make full payment upon receipt of each bill. Credit was not offered for an extended period of time on such accounts.

(39)

Installment credit, also in use for many decades, typically related to a single item of merchandise. The payment was to be made in fixed periodic installments over an extended period of time, and the total to be paid included a precomputed finance charge based upon the original amount owing at the time of sale. Under installment credit, a customer who pays the total amount due before the time required for payment is given a partial refund of the precomputed finance charge. With respect to partial payments, on the other hand, if a customer chooses to make payment in an amount greater or at a time earlier than required, no portion of the finance charge is refunded.

Not surprisingly, this distinction between the treatment of full and partial payments was carried forward from installment credit to revolving credit, which was developed in response to consumer demand. Revolving credit avoided the necessity for a separate contract and separate payment for each purchase. Initially, finance charges on many revolving credit plans were computed on the closing balance method, described earlier. This method paralleled the manner in which finance charges were assessed on installment credit in that finance charges commenced from the time credit was extended. However, the closing balance method did not embody the 30-day charge account feature which customers demanded (namely a time period within which full payment may be made without charge). As a result, the previous balance method was conceived.

The retail witnesses maintained that this method is more favorable to consumers than 30-day credit, installment credit, and revolving credit under the closing balance method. Only the previous balance method (and, with the advent of computers, average daily balance methods with a no-finance-charge-option) combines the favorable features of these other approaches to credit granting. The 30-day account fails to provide the consumer with the opportunity for extended payment terms. Installment credit, while providing extended payment terms, fails to offer the consumer a no-finance-charge-option and requires a separate contract and separate payments for each purchase. The closing balance method eliminates the need for separate contracts and separate payments, but it fails to offer the consumer a no-finance-charge-option.

Moreover, charges to credit customers under the previous balance method are lower than charges under the closing balance method or, typically, installment credit. Notwithstanding these advantages the previous balance method produces credit revenues which approach the level necessary to cover credit costs. The adjusted balance method, while providing the favorable features of the previous balance method to credit customers, discriminates against cash customers since it produces credit revenues substantially below retailers' credit costs. Cash customers are forced to subsidize the credit operation.

Small retailers fear that Federal intervention to proscribe the previous balance method could have the effect of—

Forcing them to eliminate their credit operations and to adopt bank credit card plans.

Place them at a competitive disadvantage with the large retail chains who will continue their credit plans to attract customers.

Cause the cash customer to subsidize the credit customer.

And, finally eliminate credit opportunities for lower income consumers.

Our primary reason for opposing these proposals for Federal intervention in the process of determining finance charges is because this is an area which has been reserved for the States. The method of applying rates is part of rate regulation presently determined by State law. Forty-one States and the District of Columbia have established statutory rate limitations on open end credit. In every case, methods of applying rates are also included, and the method of applying the rate is directly and inherently related to the rates which are established. It would be inappropriate to single out this one element of determining finance charges for Federal resolution. Rather, the method of applying rates should be determined by the States as it now is in conjunction with all of the other factors considered when establishing usury or rate statutes.

### PROHIBITION OF MINIMUM FINANCE CHARGES

Another provision deleted by the Committee would have prohibited in open end credit plans the imposition of a minimum finance charge, except where the charge was a uniform charge designed to recover billing costs or a uniform delinquency charge. The provision would effectively prevent a creditor from charging a minimum finance charge on small extensions of credit for which the finance charge would not recover the administrative costs of making the extension of credit unless he also assessed such charges against those larger credit extensions even though the finance charge applicable to them is sufficient to recover administrative costs.

Much the same arguments advanced for prohibiting the previous balance method are made against the minimum finance charge. The proponents say that the charge is unfair in that it results in an astronomical annual percentage rate and it places a burden on the poor who have small balances.

The retailers testified that the minimum finance charges are necessary to help defray the costs of operating a revolving credit system and to encourage prompt payment of relatively small balances. They point out that minimum finance charges, as a result of Truth in Lending, generally do not exceed 50 cents. According to the retailers, these charges do not operate against the poor. The charges are uniformly applied to balances which are modest (below $33.00, assuming a 1½-percent rate) and within the reach of virtually all customers. The differences in the charge between the minimum amount and the amount which might have been computed by applying a periodic rate is generally insignificant. For example, on a balance of $28 the computation of the finance charge, based on a periodic rate of 1½%, is 42¢. The difference from the 50¢ minimum is 8¢ which is the cost of postage, while the remaining 42¢ will barely cover the mechanical process of billing, plus the payroll, supplies, and other costs incurred in producing a statement.

At the present time, finance charges are regulated by State law. States differ in their pattern of regulation. In one instance, a State may allow a lower rate of finance charge to be imposed but may allow a minimum charge. Another State may allow a higher rate of finance charge and prohibit a minimum charge. Many States have, in fact, either restricted or prohibited such charges. If, however, the

Federal Government were to make a minimum charge illegal, it would supersede State law and apply to all States and would not take into consideration the differences which now exist in the States in their regulation of finance charges.

## CIVIL LIABILITY

One of the more complex issues faced by the Committee dealt with civil liability and class action suits. The full Committee had before it the following three alternatives:

Not to have any provision relating to civil liability in the bill.

The second alternative contained in S. 914 as revised would add a new civil liability section to the Truth in Lending Act which among other things places a maximum of $50,000 or 1 percent of net worth, whichever is greater, on class action liability.

The third alternative contained in the Sparkman-Brock bill, S. 1630, is identical to section 209 of the revised Proxmire bill except the limitation on class actions is placed at $100,000 with no net worth limitation.

In enacting the Truth in Lending Act, Congress provided for criminal liability for certain violations and distributed administrative enforcement authority among several Federal agencies. In addition, private litigation was intended to be a primary mechanism for inducing compliance. Thus Congress supplied specific remedies for the private enforcement of the Act including multiple damages of twice the amount of the finance charge in connection with the transaction, minimum damages of $100, and reasonable attorney's fees as determined by the court. The inclusion of these inducements for private enforcement has given rise to several problems, the most pressing of which is the application of the civil penalty provision in a class suit.

Perhaps due in part to the legislative silence regarding the use of the class action vehicle in a Truth in Lending violation, defendants in several class action suits have argued that the maintenance of a Truth in Lending class action is per se improper. Although a number of courts have specifically declined to certify particular Truth in Lending suits as class actions because such suits failed to satisfy certain requirements of Rule 23 of the Federal Rules of Civil Procedure, no decision has held class actions to be per se improper under the Act. It thus becomes necessary to make a case by case examination to determine whether a particular suit may properly be maintained as a class action under Rule 23 which must be complied with before class action can be maintained.

The court in *Ratner* v. *Chemical Bank of New York Trust Company* (54 F.R.D. 412 (S.D.N.Y. 1972)) was the first to analyze specifically the question of the propriety of a class action to recover on behalf of each member the minimum statutory amount provided in the Act. The defendant in the *Ratner* case argued that the incentive of class action benefits was unnecessary because the Act provides for the recovery of a minimum $100 penalty and the payment of costs and reasonable attorney's fees, and that to allow the recovery of the $100 statutory penalty for each class member would result in horrendous and annihilating punishment unrelated to any actual damages suffered by members of the purported class or to any benefits realized by the defendant,

for what was at most a technical and debatable violation of the Act. The court found the defendant's arguments persuasive and concluded that the certification of the *Ratner* action as a class action would have been inconsistent with the specific remedy provided by Congress. With at least twenty-one district court decisions following the *Ratner* logic in refusing to certify Truth in Lending class actions, the trend has been away from allowing class actions to enforce compliance with the Act.

In light of this background, the consumer groups have urged Congress to take action that would clearly authorize class action suits without limitation. The retailers and bankers testified that they do not want to take a chance on a potential liability that could be catastrophic for even the largest firms. They urged the Committee to place a dollar limitation on civil recovery. On the other hand, the consumer finance industry feels that the courts are fashioning a reasonable rule governing class action suits and at this time want no congressional intervention.

The Committee adopted the civil liability section in S. 914 after limiting class action recovery to $100,000 or 1 per centum of the net worth of the creditor, whichever is the lesser. This is a reasonable approach in that it places a sufficient deterrent on large firms without placing in jeopardy the survival of small firms.

JOHN TOWER.
WALLACE BENNETT.
BILL BROCK.

**BLANK PAGE**

**(44)**

# Individual Views of Mr. Tower

## Good Faith Compliance

The reported bill attempts to deal in Section 206 of Title II with the problem of relieving creditors of liability under the Truth-in-Lending Act in situations involving good faith compliance with the apparent requirements of the Act and regulations. However, the language of the bill does not cover all of the types of situations where good faith compliance should relieve the creditor from liability. I proposed additional language for the Committee's consideration which would cover virtually all meritorious cases, and the Committee referred the language to the Federal Reserve Board for comment, with the understanding I will offer my amendment later on the floor during Senate consideration of the bill.

The present language of Section 206 appears hereafter in normal print, while my proposed amendment would add the portion in italics:

> No provision of this section or section 112 imposing any liability shall apply to any act done or omitted in good faith (1) in conformity with *the Act, or with* any rule, regulation, or interpretation thereof by the Board, *or (2) in conformity with any reasonable interpretation of a significant ambiguity in, or significant conflict between, said Act, rules, regulations, or interpretations,* notwithstanding that after such act or omission has occurred, such *Act,* rule, regulation, or interpretation is amended, rescinded, or determined by judicial or other authority to be invalid for any reason. Any act done *or omitted in conformity with the standards and conditions set forth in the preceding sentence shall not subject the creditor to liability under State law where State requirements conflict with those of Federal law.*

The present language of Section 206 deals with the problem of compliance with apparent requirements of the regulations and interpretations of the Federal Reserve Board and of the other enforcing agencies, when a later court decision finds that the Act or regulation or interpretation was invalid. This is a desirable provision, but it does not cover the following, related good faith compliance situations:

### 1. More Than One Reasonable Course of Compliance Behavior

Frequently a creditor finds himself in a situation where an ambiguous provision of the Act, a regulation, or an interpretation, or a conflict between two or more such provisions, leaves him several reasonable alternative courses of action to take. The problem is that taking one specific course may cause the creditor to violate

one or more of the other requirements, when looked at from another reasonable viewpoint. The court may prefer one of the other reasonable viewpoints, and its judicial interpretation can therefore lay liability at the door of the creditor even though he attempted in good faith to comply as best he could in an ambiguous situation.

Therefore, the amendment would add the language that any acts done in good faith in conformity with "any reasonable interpretation of a significant ambiguity in, or significant conflict between, said Act, rules, regulations, or interpretations . . ." will not subject the creditor to liability. This language would simply allow a court to recognize that there may be two or more methods of good faith compliance in the face of ambiguous or conflicting requirements. It would therefore allow creditors to go on about their business in good faith compliance with the apparent requirements of the law, knowing that unresolved ambiguities and conflicts will be resolved by eventual regulatory or judicial action and not by class action liability for the private parties involved. If the present language is not so amended, there will continue to be numerous mere "difference-of-opinion" suits filed, which do not serve any public policy objective, add costs to the credit extension process which are passed along to borrowers, and add to the already heavy burden of the courts. This amendment would resolve those unintended side effects of the present Act and of the Section 206 language in the bill.

### 2. CONFLICTING FEDERAL AND STATE REQUIREMENTS

Situations have developed where creditors are faced with a conflicting, or ambiguous, relation between Federal requirements and state requirements, which leave creditors open to liability in one or the other jurisdiction, no matter which course of action is taken. This is obviously an unintended and undesirable side effect of the Truth-in-Lending Act which needs to be resolved clearly in the statute. Where the Federal law speaks to the same area as the State law, the creditor is subject to both laws, and there is a conflict or ambiguity that prevents the creditor from complying with both requirements at the same time, the amendment would simply hold him harmless from State law liability if he has complied with the Federal requirements. This would not impair the "greater" State law clause elsewhere in the Act, which seeks to allow for State requirements that go beyond Truth-in-Lending Act standards, where the "greater" State law does not actually require violation of Federal requirements.

It has been suggested that the problem of State conflicts can be resolved elsewhere in the Act by authorizing the Federal Reserve Board to reconcile such conflicts through regulation. Even if this were a mandate to the Board, however, it could not hope to find all latent ambiguities in and conflicts between the various State laws and the Federal law, nor foresee all credit developments and arrangements which might bring about such ambiguities and conflicts in the future. These

problems should not be resolved by leaving private parties subject to Federal or State class action liability; they should be statutorily resolved as an entire class, in the Federal law. It is desirable to instruct the Board to try to reconcile as many problems between State and Federal law as possible, but the remaining unresolved regulatory problems should not be laid at the doorstep of private parties—with the ultimate unnecessary costs to the creditor, the borrower, and the court system.

JOHN TOWER.

○