# Appendix B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOSEPH A. MIKOWSKI and )
PATRICIA J. MIKOWSKI, )
    Plaintiffs, )
AMERIQUEST MORTGAGE COMPANY, ) NO.: 2:05-CV-411
AMERIQUEST MORTGAGE SECURITIES, )
INC., AMC MORTGAGE SERVICES, INC., )
and DOES 1-5, )
    Defendants. )

The deposition of: ERICKA CHITWOOD.

DATE: Monday, April 3, 2006.

TIME: 1:55 p.m.

PLACE: Ramada Inn
      4151 Calumet Avenue
      Hammond, Indiana 46320

Called as a witness by the Defendant, pursuant to Notice of Deposition as to date, place and time, and in accordance with the Rules of Trial Procedure, as reported by MICHELLE A. WHITAKER, RPR, Associate Reporter.

MARILYN M. JONES & ASSOCIATES, LTD.
1416 Franklin Street
Michigan City, Indiana 46360

## Page 2

APPEARANCES:

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
BY: ALEXANDER H. BURKE
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603
(312) 739-4200

Appearing on behalf of the plaintiffs

VARGA, BERGER, LEDSKY, HAYES & CASEY
BY: JONATHAN N. LEDSKY
Santa Fe Building
224 South Michigan Avenue, Suite 350
Chicago, Illinois 60604-2507
(312) 341-9400
Appearing on behalf of the defendants
INDIANA TITLE NETWORK COMPANY
BY: DOUGLAS R. KVACHKOFF
325 N. Main
Crown Point, Indiana 46307
(219) 662-8200
Appearing on behalf of the deponent

EXHIBITS:

A - Loan package, 158-page document
B - Documents from Indiana Title Network Company, 87-page document
C - Blank loan documents, 81-page document

---o0o---

## Page 3

Monday, April 3, 2006 --
   (All parties present in the conference
   room at or about 1:55 p.m. Witness
   sworn.)
ERICKA CHITWOOD
Having first been duly sworn, then testified as follows:
DIRECT EXAMINATION
BY MR. BURKE:
 Q. Hi.
 A. Hi.
 Q. My name is Alex Burke, and I represent the plaintiff in a case called "Mikowski versus Ameriquest." You're here for a deposition today pursuant to a subpoena. Have you ever given a deposition before?
 A. Yes, I have, but nothing work-related like this.
 Q. What generally -- just what kind of case -- what kind of issues were involved in that deposition?
 A. It was a case for, like, an individual. It wasn't nothing to do with, like, corporations or anything like that. It was an individual case.
 Q. Like a car accident or something like that?
 A. It was -- I don't know what -- I don't know

## Page 4

what you would have really called it. Like a civil case really.
 Q. Okay.
 A. I don't know. It was like an individual against another individual. I was just, like, a witness.
 Q. And for the record, could you state and spell your name, please.
 A. Ericka Chitwood, E-r-i-c-k-a, C-h-i-t-w-o-o-d.
 Q. And where do you work, Miss Chitwood?
 A. For Indiana Title Network.
 Q. How long have you worked there?
 A. This will be my third year.
 Q. Where did you work before Indiana Title Network?
 A. Various places. I was a real estate agent for McColly, which is a real estate company in Northwest Indiana.
 Q. What did you do for them?
 A. Real estate salesperson.
 Q. So, you showed houses or --
 A. Yeah.
 Q. -- condos, that sort of thing?
 A. Yeah.

## Page 5

 Q. Before that job, what did you do?
 A. I waitressed at -- just restaurants, yeah.
 Q. What's the highest level of education that you've obtained?
 A. I graduated high school. So, I had twelve years. And then three years of college.
 Q. When did you -- when was the last year you were in college?
 A. Junior year. Junior year.
 Q. And that was 19 . . .?
 A. Two thousand, I believe.
 Q. And after college, did you start waitressing or did you go to work?
 A. Well, I waitressed while I was in college, and then I -- I was an agent for McColly after that. And then I've been with Indiana Title since.
 Q. What do you do for Indiana Title Network Company?
 A. I'm a closing agent, closing officer.
 Q. What did you do when you started there?
 A. What you call an escrow tech. Just help -- help the closing officers get packages out, learn how to use the computer system, things of that such.
 Q. Was it a promotion to go from escrow tech to closing agent?

2 (Pages 2 to 5)

Marilyn H. Jones & Associates, Ltd.    Computer-Assisted Reporters & Videographers    1-800-810-4077
f1107bc0-cf7a-11da-b2f9-0002a5e32b28

Page 6

1   A. Well, it was in the same field; I just moved
2 up to where I could -- after escrow technician, moved
3 up to actually performing closings and things of that
4 such, handling files of that such.
5   Q. When did that happen?
6   A. Well, kind of in the first year. I did
7 escrow tech for maybe six months or so. I'm not
8 really sure when I took on my first closing. I can't
9 recollect the time I took on my first closing. But
10 basically you -- you're -- it's the same -- same
11 field; you just actually perform the closings. I
12 don't know when I took on my first one. I sat in
13 with various closings.
14   Q. How many closings do you do per week now?
15   A. Myself?
16   Q. Uh-huh.
17   A. I'd say four a day, so -- sometimes more. I
18 mean, it just depends on what -- what time of year it
19 is. I mean, it varies. You know, sometimes we might
20 not -- I might not have any a day. Sometimes I could
21 have ten a day. But I would average it out about
22 four -- four a day.
23   Q. And were things busier or less busy in 2005?
24   A. In 2005?
25   Q. Yeah. Last year.

Page 7

1   A. About the same. They're around the same,
2 yeah.
3   Q. Where is your office?
4   A. In Crown Point. 325 North Main Street, Crown
5 Point.
6   Q. How many people are in that office?
7   A. Now I think we have thirteen. Is there
8 thirteen people there? Yeah.
9   Q. How 'bout a year ago?
10   A. Oh, maybe -- maybe more. There's been people
11 that come in and out, like on maternity, things of
12 that. So, I would -- there was probably, like, at
13 least fifteen, sixteen employees there.
14   Q. So, generally the same number of people?
15   A. Correct.
16   Q. What sort of training did you receive to
17 become a closer?
18   A. Sat in with various closings, learned how to
19 explain the documents, review the documents, learn
20 how to answer the questions customers might ask,
21 learn how to use our computer system, things of that
22 such. Just learning the basic aspects of the field.
23   Q. What sort of questions do you get?
24   A. Questions? Interest rates. What's -- you
25 know, what's a HUD statement, settlement statement.

Page 8

1 Things of that -- you know, just various -- various
2 things that happen during a closing.
3   Q. What is a HUD statement?
4   A. Settlement statement. Shows the loan amount,
5 settlement costs, what we're paying out of the loan,
6 borrowers' names, lenders' names.
7   Q. And what is a truth-in-lending statement?
8   A. The truth-in-lending statement is the truth
9 in lending; shows the APR rate, the finance charge,
10 the amount that you financed, total number of
11 payments that you see in the boxes. Shows how many
12 payments over the year. Sometimes -- most of the
13 time they show if there's a prepayment penalty or
14 not, things of that such, in truth in lending.
15   Q. Did you receive any other -- any training
16 other than on-the-job training? Any specialized
17 training or training targeted towards anything?
18     Did you go through any training -- formal
19 training other than on-the-job training?
20   A. Like go to classes?
21   Q. Yes.
22   A. No.
23   Q. How much of the business at Indiana Title
24 Network -- Company Network -- Is it Indiana Title
25 Company Network?

Page 9

1   A. Indiana Title Network Company.
2   Q. Sorry about that. How much of your business
3 is Ameriquest loans?
4   A. Now, none. They are no longer a client with
5 us.
6   Q. When did that happen?
7   A. Huh?
8   Q. When did they stop working with you guys?
9   A. Last year, 2005. I'm not recollecting an
10 exact date.
11   Q. Do you know why it stopped?
12   A. They -- I'm not real -- they supposedly went
13 to an in-house title company. That's what I heard.
14   Q. Last year or until you stopped working with
15 Ameriquest, how many closings -- what percentage of
16 the closings that you did were Ameriquest closings?
17   A. That I did personally?
18   Q. Uh-huh.
19   A. I did most of 'em. I did a lot of Ameriquest
20 closings. So, I did probably fifty percent.
21   Q. So, roughly maybe twice a day you'd do an
22 Ameriquest closing?
23   A. Twice a day, three times. Depends on how
24 busy they were, how many closings they had that day.
25 You could do two up to four -- four a day.

3 (Pages 6 to 9)

Page 10

1  Q. You ever do more than four closings in a day?
2  A. Yeah. Yes, I've done more than four closings
3  in a day.
4  Q. What's the most that you've done?
5  A. Possibly six. I mean, it depends. It could
6  be a purchase; it could be a refinance. Possibly
7  six, yeah.
8  Q. Are refinances easier than purchases?
9  A. Yes.
10  Q. Why?
11  A. Because there's only one borrower in the
12  transaction; you're not dealing with sellers. Less
13  time.
14  Q. So, tell me how a closing works.
15  A. How a closing works?
16  Q. Yeah. What do you do?
17  A. What do I do? We receive closing
18  instructions from a lender. We prepare a settlement
19  statement. Get the approval from the lender on that
20  settlement statement with their instructions. We get
21  the packages from the lenders. Perform the closing,
22  explain the documents, have them sign. We notarize
23  as well.
24       And depending on the lender, we -- we either
25  get the packages out or the lender gets -- we just

Page 11

1  send the complete package back to them. And we
2  disburse after -- during funding.
3  Q. Who prepares the documents for the
4  transaction?
5  A. We prepare the settlement statement. The
6  lender prepares the actual closing -- the loan
7  package. The loan documents we call the "loan
8  package."
9  Q. How do you receive the loan package from the
10  lender?
11  A. Some lenders send it through an overnight
12  courier. Some send them through e-mail. Some we
13  pick up from the lender themselves.
14  Q. How 'bout Ameriquest? How did that work?
15  A. We used to pick up the packages from them
16  themselves.
17  Q. Does Ameriquest have an office near Crown
18  Point?
19  A. They did, yeah. At the time we were doing
20  closings for them, they had an office in
21  Merrillville, which is the next town over from Crown
22  Point.
23  Q. Did you do that personally, generally, or was
24  there somebody who went over to the Ameriquest office
25  and picked up the documents?

Page 12

1  A. Well, if I did the closing, I'd pick it up
2  personally. Usually the closer will go pick up the
3  package from them themselves and go -- sometimes it
4  was at a customer's home. We did mobile closings and
5  then a lot -- most of the closings were performed at
6  Ameriquest's office themselves.
7  Q. So, you probably went to -- over to
8  Ameriquest almost every day?
9  A. Yeah. Yeah, we did a lot.
10       (Reporter marked Exhibits A and B.)
11  Q. I've handed you what's been marked as
12  Exhibit B.
13  A. Okay.
14  Q. Can you flip through that and tell me if any
15  of it looks familiar.
16  A. Our actual insurance policy, title
17  commitment. These are documents from our company.
18  Q. Pardon me?
19  A. These would be documents from our company
20  here. Our title commitment we prepare to show who's
21  vested, the proposed insured, taxes.
22  Q. Can you tell for what loan it was?
23  A. For what loan policy? For the loan amount?
24  Q. Or whose loan. Who the borrower is.
25  A. Oh, yes. It shows here Joseph A. and

Page 13

1  Patricia J. Mikowski. Is it M-i-k -- Mikowski. I'm
2  not sure how to pronounce it.
3  Q. That was good.
4  A. Husband and wife. Shows the legal
5  description here. Shows our items here, things that
6  we require; warranty deed, vesting, shows our key
7  number for the taxes -- shows the taxes that are due.
8  Q. Now, these are documents that were produced
9  pursuant to the same subpoena that asked you to come
10  here to talk to me today by Indiana Title Network
11  Company.
12  A. Uh-huh.
13  Q. I notice there are -- Or would you look
14  through them -- just fan through them.
15  A. Okay.
16  Q. You might notice -- and you can tell me if
17  I'm wrong -- there are no truth-in-lending documents?
18  A. Oh, these are documents on our files from --
19  that were submitted from our company?
20  Q. That's right.
21  A. This particular lender, Ameriquest, kept most
22  of the packages. What we kept on file -- what they
23  sent back to us would be the original mortgage, our
24  settlement statement, the HUD statement from the
25  loan, and then they should -- probably our docs, such

Page 14

1  as affidavits, surveys, recorded -- these are items
2  -- our search notes, things of that such.
3      So, we never kept copies -- we never received
4  those back from the lender themselves 'cause after
5  the closing we would give the package back to the
6  lender.
7   Q. So, can you tell me the chronology of what
8  happens to the documents from when you pick them up
9  to when you give them back to Ameriquest, however
10 that happens.
11  A. The chronology?
12  Q. So, what happens -- You told us earlier that
13 you go over to Ameriquest in the morning and you pick
14 up the documents for the closings of that day.
15  A. Not in the morning.
16  Q. Oh, no?
17  A. We would go when -- when the closing was
18 ready, they'd call us and say when we have a closing
19 scheduled, and we would go pick up -- it wouldn't be
20 in the morning. We would pick it up prior to the
21 closing itself.
22  Q. How long prior to the closing?
23  A. Depends on where it was at. If it was at
24 the -- if it was at their office, we would have it
25 there ready to go directly and start the closing

Page 15

1  after that. If it was at a home or somewhere -- a
2  meeting place for the closing, we'd pick it up
3  however long it would take to get from Ameriquest to
4  the closing.
5   Q. What about -- So, does that answer the
6  question what about if the closing was at ITN,
7  Indiana Title Network?
8   A. Oh, if it was at -- Yeah, we'd pick it up
9  from their office and bring it back to our office and
10 perform the closing.
11  Q. Do you remember what happened this day with
12 the Mikowskis' loan, how that worked?
13  A. No, I don't recollect this closing -- not
14 this particular closing.
15  Q. I've handed you what's been marked as
16 Exhibit A. Can you just browse through those
17 documents?
18  A. (Witness complies.) It's a loan package.
19  Q. For the Mikowski loan?
20  A. I believe their name is on here. Mikowski,
21 yes.
22  Q. Can you turn, please, to page -- you see
23 there are numbers on the bottom right-hand --
24  A. Yes.
25  Q. Page three.

Page 16

1   A. Okay.
2   Q. On the bottom of page three, there's a whole
3  bunch of -- on the left-hand side, a whole bunch of
4  numbers?
5   A. Yes.
6   Q. Do you know what those are?
7   A. These numbers right here?
8   Q. Yes.
9   A. No, I'm not aware of what those are.
10  Q. How 'bout the -- on the right-hand side,
11 there's like a -- looks like a date and a time just
12 above the A0003?
13  A. Yes.
14  Q. Do you know what that corresponds with?
15  A. Looks like the closing -- the date that maybe
16 the package was printed. Let me refer to the -- the
17 day of the loan. March 2nd -- looks like they were
18 printed the 2nd -- March 2nd. Looks like a time.
19 I'm not sure with military time or how that works.
20  Q. Were those numbers there when you --
21 generally when you picked up loan packages from
22 Ameriquest?
23  A. Those numbers? I -- to be honest with you,
24 I've never -- never paid any attention to those
25 numbers.

Page 17

1   Q. So, at a closing, can you tell me generally
2  when you sit down with the borrower at a closing how
3  it works. Would you give the borrower the -- you
4  know, the closing package and say "sign it"? Or
5  how --
6   A. No.
7   Q. -- how does that happen?
8   A. I would explain the documents as we were
9  going through, go over everything with them; how we
10 explain everything. Do not -- I really don't get too
11 much in detail with the mortgage. That's somewhere
12 beyond my -- my expertise.
13     I go over the settlement statement. Go over
14 everything with them as I go through the package.
15 Just as we go through, "This is your note, this is
16 your interest rate, your payment, when your first
17 payment's due" and so on and explain the rest of the
18 documents that way.
19  Q. And then after the borrower has signed all
20 the documents, then what happens?
21  A. After they've signed all the documents, I
22 hand it back to -- with Ameriquest I hand it back to
23 the -- back to Ameriquest.
24  Q. So, would Ameriquest have a representative
25 there?

5 (Pages 14 to 17)

Marilyn M. Jones & Associates, Ltd.      Computer-Assisted Reporters & Videographers

f1107bc0-cf7a-11da-b2f9-0002a5e32b28

Page 18

1  A. During the closing?
2  Q. At the closing?
3  A. Very, very seldom was someone there during
4  the closing. The loan officers usually sat outside.
5  If I needed to call them back in with any questions
6  with the loan, they'd come in. But other than that,
7  no. I -- usually nobody was in there. It was just
8  myself performing the closing, and the borrowers
9  themselves.
10 Q. Did you ever make photocopies of the closing
11 package?
12 A. No. No. Ameriquest would make copies for
13 us.
14 Q. Who makes copies for the borrowers?
15 A. Ameriquest.
16 Q. Are you familiar with the borrower's right to
17 cancel?
18 A. Yes.
19 Q. What does that mean?
20 A. It's the given time from the time that they
21 sign to the time that the loan funds. Right of
22 rescission, right to cancel the loan if they want to,
23 right of reviewing the documents and making sure
24 they're comfortable with the loan before they follow
25 through with it.

Page 19

1  Q. And how long a period do they have to cancel?
2  A. Ameriquest has seven days.
3  Q. Did you close this loan? Can you tell from
4  looking at these documents?
5  A. Yes, I notarized. I did close this loan. I
6  don't recollect it completely, but I do see my
7  signature. So, yes, I did close this loan.
8  Q. I'm gonna give you one more set of documents.
9      (Reporter marked Exhibit C.)
10 Q. Can you take a minute and look through it.
11 A. Oh, okay. Okay.
12 Q. What is -- What have I handed to you that's
13 marked as Exhibit C?
14 A. A blank copy of loan documents.
15 Q. Is that set of documents similar to the set
16 that you would pick up from Ameriquest before you
17 closed a loan?
18 A. Yeah, it's similar.
19 Q. Was that yes?
20 A. Yes.
21     MR. LEDSKY: I just want to object --
22 A. Oh, well --
23     MR. LEDSKY: I'll just object for the
24     record, and that is, she's answered the
25     question, I believe, generally that this is

Page 20

1  a set of loan documents. I don't believe
2  you've asked her to go through each
3  individual document and compare whether or
4  not all the documents that she would
5  normally find in a loan package are here or
6  not.
7      But I think her answer is generally
8  this is a loan package.
9      MR. BURKE: The answer is --
10     MR. LEDSKY: Given the questions that
11 you've asked her.
12     MR. BURKE: The answer is what it is.
13 Q. Could you turn to -- Well, let's look at the
14 first page.
15 A. Okay.
16 Q. What is this document?
17 A. This is what you call an acknowledgement of
18 your final loan terms; the original loan terms
19 requested and the final loan terms that are going
20 along with the loan itself. Going over the
21 settlement charges, the loan amount, amount financed,
22 initial interest rate and final interest rate.
23 Q. Do you see where it says "original loan terms
24 requested" and then on the right it says "final loan
25 terms"?

Page 21

1  A. Original loan terms requested, yes.
2  Q. What do those two boxes represent?
3  A. An adjustable rate loan. Are you talking
4  about what's x'd?
5  Q. No. It appears that the -- it appears to me
6  at least that the loan terms changed from what was
7  requested originally --
8  A. Yes.
9  Q. -- to what finally happened?
10 A. Yes.
11 Q. Is that true?
12 A. Yes.
13 Q. How did it change?
14 A. The amount that was financed is higher than
15 the amount that was financed originally. Settlement
16 charges are slightly higher. Loan amount appears to
17 be the same. APR rates are different. 360 month --
18 the term and interest rate had changed.
19 Q. Why did it change?
20 A. I don't do the loans. I'm not real sure how
21 to calculate the math. Maybe something came through
22 that they needed a higher interest rate -- that they
23 got a higher interest rate on this loan from
24 originally when they maybe first spoke.
25 Q. Is this document filled out when you --

Page 22

1  generally when you pick it up from Ameriquest?
2  A. Yes.
3  Q. Do you ever receive orders from Ameriquest,
4  after you pick up the package, to change the terms of
5  the loan?
6  A. Never.
7  Q. Do you know if the borrower before they see
8  this at their closing is ever notified of the change
9  in terms?
10 A. No, I do not know.
11 Q. Can you turn to page 23.
12 A. (Witness complies.)
13 Q. What is this document?
14 A. This is the instructions from -- excuse me.
15 I just want to pull this up and make sure. This is
16 the instructions from Ameriquest. Shows what we use
17 to prepare our HUD statement.
18 Q. Can you look at line 802, please.
19 A. Okay.
20 Q. Where it says "loan due amount 2.995"?
21 A. Yes.
22 Q. What does that represent?
23 A. Points.
24 Q. What's a point?
25 A. Point, what they pay Ameriquest to -- to get

Page 23

1  the loan. They buy -- I believe they buy down their
2  points.
3  Q. So, they buy down their interest rate by
4  paying cash up front?
5  A. I believe that's how you would call it.
6  Q. Can you turn to page 25.
7  A. (Witness complies.)
8  Q. What is this document?
9  A. This is the rescission document. The notice
10 of right to cancel.
11 Q. And what do you do with this document at the
12 closing generally?
13 A. I explain to the customer that this is the
14 document that goes over how they have the right to
15 cancel the loan. It gives them the seven days to
16 cancel the loan if they'd like to. And if they would
17 like to cancel a loan, they could do so.
18 Q. Do you generally enter a date on the enter
19 document sign date?
20 A. I have never done that.
21 Q. Would it surprise you to know that this
22 Exhibit C is the package of documents that the
23 Mikowskis walked away from the closing with?
24     MR. LEDSKY: I'm gonna object as to
25 form.

Page 24

1      MR. KVACHKOFF: Do you want her to
2  answer or not answer?
3      MR. LEDSKY: She can answer. I just
4  -- all right.
5  A. Would it --
6      MR. LEDSKY: Don't know -- don't know
7  what the question meant.
8  A. Would you repeat it?
9  Q. What documents does a borrower usually walk
10 out of ITN with after a closing of a refinance?
11 A. A copy of the -- a copy of the loan package
12 unsigned.
13 Q. Unsigned?
14 A. Yes.
15 Q. So, this would be -- typically at a closing,
16 this is the documents that the borrower would go home
17 with?
18 A. Yes.
19     MR. LEDSKY: I'm gonna object as to
20 form.
21     Do you mean generically or just with
22 Document 25, just for the record, Alex?
23     MR. BURKE: I mean -- Well, let's ask
24 for Document 25.
25 Q. Is this how the Document 25 would look

Page 25

1  typically as a borrower takes it home with them?
2      MR. KVACHKOFF: Objection. And the
3  reason for my objection is that -- that you
4  need to specify as to whether you're talking
5  about Ameriquest or you're talking about
6  other lenders.
7  Q. An Ameriquest loan.
8  A. Yes.
9  Q. How 'bout other lenders?
10 A. Other lenders, the final date to cancel could
11 possibly be -- could possibly be in there. They
12 could be filled in.
13     MR. BURKE: I need a short break.
14    (Brief recess taken.)
15     MR. BURKE: I have no other questions.
16     MR. LEDSKY: I have some questions.
17 CROSS EXAMINATION
18 BY MR. LEDSKY:
19 Q. You said there were at least three different
20 places where you would close a loan, from my review
21 of your testimony; at Ameriquest offices, at a
22 borrower's home or other meeting place, and at
23 Indiana Title Network; is that correct?
24 A. Correct.
25 Q. I'm just gonna ask you questions about

Marilyn M. Jones & Associates, Ltd.    Computer-Assisted Reporters & Videographers    1-888-810-4077
f1107bc0-cf7a-11da-b2f9-0002a5e32b28

Page 26

1  Ameriquest. Do you close loans at all three types of
2  places for Ameriquest?
3  A. Yes, I have.
4  Q. Okay. Let's talk about loans that you
5  close -- First of all, looking through any of the
6  documents, either Exhibits A, B or C, can you tell
7  where this loan closed, whether it closed at
8  Ameriquest, at Indiana Title Network, or at the
9  borrower's home or other meeting place?
10 A. No.
11 Q. Okay. Let's say the loan closed at Indiana
12 Title Network.
13 A. Okay.
14 Q. You said you would go to Ameriquest and pick
15 up the package; is that correct?
16 A. Correct.
17 Q. Okay. What would they physically give you?
18 A. The loan package and then a envelope with
19 copies for the borrower.
20 Q. So, you'd get two different packages?
21 A. Yes. Well --
22 Q. Is that correct?
23 A. Yes. Well, two -- yeah. I don't -- it's not
24 two different -- I'm not real sure that what's
25 different --

Page 27

1  Q. Well, were they -- I'm sorry.
2      MR. BURKE: I'd object to you
3      interrupting her answering.
4  Q. Go ahead. I'm sorry.
5  A. Well, they would be -- yeah, two sets of
6  documents.
7  Q. Okay.
8  A. Two sets of packages.
9  Q. Okay. You said two sets of documents. Would
10 they be in two different envelopes? What would they
11 come in?
12 A. They would come in two -- yeah. Well, there
13 would be an envelope, and then there'd be one set on
14 top -- one to sign, one to give to the borrowers.
15 Q. So, one would be outside of an envelope and
16 one would be inside an envelope?
17 A. Yes.
18 Q. Okay. What -- Which set would be inside the
19 envelope?
20 A. Copies for the borrower.
21 Q. Okay. Would you receive -- and we're talking
22 about loans you close at Indiana Title Network, okay,
23 at your office. Would you ever examine what was
24 inside that envelope for the borrower?
25 A. No.

Page 28

1  Q. Okay. Let's say you were closing a loan at
2  the borrower's house or other meeting place. Again,
3  you said you would go to Ameriquest and pick up the
4  package; is that correct?
5  A. Yes.
6  Q. And what would you receive?
7  A. What would I receive? The loan -- loan
8  documents and an envelope with copies for the
9  borrower.
10 Q. Okay. So, similarly -- similar to your
11 answer from when you close a loan at Indiana
12 Network --
13 A. Okay.
14 Q. -- Title Network?
15 A. Okay.
16 Q. Is that correct?
17 A. Similar?
18 Q. Similar. That is, you'd get documents
19 outside an envelope and documents inside an envelope?
20 A. Are you talking about just all loans or just
21 this --
22 Q. The Ameriquest loans that you're closing at a
23 borrower's house or other meeting place. How would
24 you -- what would you physically receive from
25 Ameriquest?

Page 29

1  A. The loan package and a copy package for the
2  borrower.
3  Q. Okay. And the loan package, would that be
4  inside an envelope or outside an envelope?
5  A. Outside of an envelope possibly. Yeah. I
6  mean, I'm assuming that they're both the same because
7  they're both blank.
8  Q. I know. But my question then is: The
9  documents inside the envelope are the documents for
10 the borrower; is that correct?
11 A. Correct. Correct.
12 Q. Would you ever look at the copy package of
13 documents inside the envelope?
14 A. No.
15 Q. Okay. The third situation you described was
16 where you close the loan at Ameriquest itself; is
17 that correct?
18 A. Yes.
19 Q. Okay. What would they give you when you were
20 gonna close a loan at Ameriquest?
21 A. The same thing. Copies -- copies for the
22 borrower and then copies for me to have signed from
23 the borrower.
24 Q. And would the borrower's copies come in an
25 envelope?

Marilyn M. Jones & Associates, Ltd.    Computer-Assisted Reporters & Videographers    1-888-810-4077

f1107bc0-cf7a-11da-b2f9-0002a5e32b28

Page 30

1  A. Yes.
2  Q. Okay. Did you ever look at the documents
3  inside the envelope?
4  A. No.
5  Q. Would you turn to what's been marked as
6  Exhibit A.
7  A. (Witness complies.)
8  Q. Can you turn to page A29 within Exhibit A.
9  A. (Witness complies.)
10 Q. This is the notice of right to cancel; is
11 that correct?
12 A. Yes, it is.
13 Q. You see there's handwriting within the block
14 that says "enter document sign date." Do you see
15 that?
16 A. Yes.
17 Q. Is that your handwriting?
18 A. It could be. I'm not sure.
19 Q. There's a handwritten date in the box that
20 says "enter final date to cancel."
21 A. Okay.
22 Q. Is that your handwriting?
23 A. I -- I'm not sure.
24 Q. On the bottom of the document, there are two
25 signatures over the lines Joseph A. Mikowski and

Page 31

1  Patricia J. Mikowski.
2  A. Okay.
3  Q. Are either of those your signatures?
4  A. No.
5  Q. Okay. There are handwritten dates next to
6  those two signatures. Are either of those
7  handwritten dates in your handwriting?
8  A. I don't -- No.
9  Q. I'm sorry. I didn't understand your answer.
10 A. No, I don't -- No.
11 Q. You don't believe so?
12 A. No.
13     MR. BURKE: I don't think that that
14     was the testimony. That was a leading
15     question. I think that answer was "I don't
16     know."
17 A. No, I don't believe -- no. I'm not sure what
18 my -- I don't have handwriting for me here, and I
19 don't have handwriting there.
20     MR. BURKE: So, what is your answer to
21     the question?
22 Q. I'm sorry. I didn't understand it either, to
23 be quite honest. I'd asked for the handwritten dates
24 next to the two signatures at the bottom. Is that
25 your handwriting?

Page 32

1  A. No.
2  Q. Is this one of the documents, that is, the
3  notice of right to cancel -- notice of right to
4  cancel one of the documents --
5  A. Yes.
6  Q. -- that you review with borrowers at the
7  closing?
8  A. Yes.
9  Q. Okay. And when you review the document with
10 the borrowers at the closing, are these dates --
11 these handwritten dates in those boxes?
12 A. Yes.
13 Q. The bottom of the notice of right to cancel,
14 you see in the capital letters it says "Lender Copy"?
15 A. Yes.
16 Q. Okay. Do you know if there are copies of the
17 notice of right to cancel that have something on them
18 that says something other than "lender copy"?
19 A. I don't -- I don't believe I have paid
20 attention. I haven't just -- I don't know -- I've
21 never really paid attention to "lender copy" or
22 anything like that.
23 Q. Okay. For an Ameriquest loan, have you ever
24 prepared the copy package to give to the borrower
25 after the loan closing?

Page 33

1  A. I'm sorry?
2  Q. For an Ameriquest loan, have you ever
3  prepared the copy package to give to the borrower or
4  borrowers after the loan closing?
5     MR. KVACHKOFF: Objection.
6     Foundation.
7  Q. You can answer my question.
8     MR. KVACHKOFF: Go ahead.
9  A. Like, have I prepared it? Like, made copies
10 for them?
11 Q. Yes.
12 A. No. I mean, I can recollect maybe one time
13 I've stuck it through the copier for them or they've
14 picked -- I picked it up or something. I don't -- I
15 don't remember preparing anything. They prepare the
16 loan documents themselves. I'm not sure what
17 you're --
18 Q. Okay. Let me rephrase my question. If you
19 don't -- Maybe I should start over. If I ever ask
20 you a question that you don't understand --
21 A. Okay.
22 Q. -- before you answer it, please let me know
23 you don't understand it --
24 A. Okay.
25 Q. -- and I'll try to rephrase it so you do

Page 34

1 understand.
2  A. Okay.
3  Q. So that when you answer my question, both you
4 and I will understand each other and Mr. Burke will
5 understand us as well.
6  A. Okay. Okay.
7  Q. Okay. You said in response to some of my
8 other questions that Ameriquest would give you a
9 envelope full of documents --
10  A. Yes.
11  Q. -- that you're supposed to hand to the
12 borrowers --
13  A. Yes.
14  Q. -- at the end of the loan closing; right?
15  A. Yes.
16  Q. Okay. My question is: Have you yourself
17 ever made copies of the closing documents to hand to
18 a borrower after the loan closing involving
19 Ameriquest?
20  A. No.
21  Q. If you could turn to page A134 of Exhibit A.
22 It's near the end.
23  A. Oh, okay. Okay.
24  Q. It's a document entitled "Closing Agent
25 Affidavit."

Page 35

1  A. Yes.
2  Q. Is that your signature on the bottom of the
3 page?
4  A. Yes, it is.
5  Q. Okay. And middle of the page, there's a
6 handwritten person's name. Is that your handwriting?
7  A. Yes, that is.
8  Q. And to the right of your -- of that
9 handwritten name, there's a handwritten date. Is
10 that your handwriting?
11  A. Yes, that is.
12  Q. Did you read this affidavit before you signed
13 it?
14  A. Do I read this affidavit?
15  Q. Do you recall if you read this affidavit
16 before you signed it?
17  A. If I read it to the borrower or read it to
18 myself?
19  Q. Read it to yourself.
20  A. I don't read it to myself. I sign it. It's
21 a document that just states -- we give to the lender
22 that we've done everything properly.
23  Q. Okay. Are you familiar with this document?
24  A. Yes.
25  Q. Okay.

Page 36

1  A. I've seen them before.
2  Q. So, when you signed it, you know what's
3 stated in this document?
4  A. Yes.
5  Q. If you could turn to 1 -- I'm sorry -- A126
6 within Exhibit A. I'm gonna ask you questions about
7 A126 through A130.
8  A. Okay.
9  Q. This is a document entitled "Closing
10 Instructions," and it's a five-page document. Are
11 you familiar with this document?
12  A. Yes.
13  Q. Okay. And on page A130, is that your
14 signature?
15  A. Yes, it is.
16  Q. And is that your handwritten date below your
17 signature?
18  A. It must be.
19  Q. Do you generally read this document before
20 you sign them?
21  A. No.
22  Q. Are you familiar with it?
23  A. Yes, I'm familiar with it, but I --
24  Q. You've seen it so many times you don't have
25 to read it before you sign it. Is that what you're

Page 37

1 saying?
2  A. Yeah, I'm familiar with what -- I mean, what
3 it is, it's closing instructions.
4         MR. BURKE: I object to the form of
5     that question because it was a leading
6     question.
7         MR. LEDSKY: I've got no further
8     questions.
9         MR. KVACHKOFF: I have a clarifying
10    question for both of you. I don't know if
11    you want me to go through it or not.
12        MR. BURKE: Let me look over my notes
13    to see if I have any redirect for a second.
14        I don't.
15 CROSS EXAMINATION
16 BY MR. KVACHKOFF:
17  Q. Okay. Just for clarification purposes, I
18 want you to look at Exhibit One (sic), page A5. I'm
19 sorry. A6.
20        MR. BURKE: Are we on the record?
21        MR. KVACHKOFF: I'm sorry. I hope so.
22  Q. I apologize. Look at page A7, Ericka. You
23 have that in front of you? You see where the
24 property's located?
25  A. Yes.

Marilyn M. Jones & Associates, Ltd.    Computer-Assisted Reporters & Videographers    1-888-810-4077

f1107bc0-cf7a-11da-b2f9-0002a5e32b28

Page 38

1  Q. Okay. Now, turn to page A19. And you're
2  looking at your notary now; right?
3  A. Yes.
4  Q. Based on that note and where the property's
5  located, can you tell me if you closed this loan in
6  the borrower's home?
7  A. Looks like it would have been LaPorte. I
8  would have -- I believe -- I believe I would have
9  notarized in LaPorte County.
10  Q. If you were, in fact, in LaPorte County when
11  you closed it?
12  A. Yes, if I was in LaPorte County.
13  Q. So, were you in LaPorte County when you
14  closed this or were you in Lake County?
15  A. I don't remember where I was at when -- I
16  mean, this shows that I was in Lake County.
17  MR. KVACHKOFF: Nothing further.
18  REDIRECT EXAMINATION
19  BY MR. BURKE:
20  Q. So, what does that tell us about where the
21  loan closed, if anything?
22  MR. LEDSKY: Well, let me -- I think
23  it's my turn, so let me just -- let me
24  follow up. Okay?
25

Page 39

1  RECROSS EXAMINATION
2  BY MR. LEDSKY:
3  Q. Since we're not from Indiana, that's --
4  that's our -- our ignorance is coming through here.
5  Okay. Indiana Title Network Company, your office is
6  in Crown Point, Indiana; is that correct?
7  A. Yes.
8  Q. In 2005 it was there as well?
9  A. Yes.
10  Q. What county was it in?
11  A. Lake.
12  Q. Lake. Okay. And the Ameriquest office in
13  Merrillville, Indiana, what county is that in?
14  A. That is in Lake County.
15  Q. Okay. And looking at A7, the borrower's
16  address I believe is in LaPorte, Indiana?
17  A. Yes.
18  Q. On 1206 Rumley -- I may be mispronouncing
19  that -- Rumley, LaPorte, Indiana. What county is
20  LaPorte, Indiana, in?
21  A. LaPorte. It's LaPorte County.
22  Q. Okay. And so in response to Mr. Kvachkoff's
23  question, is it your custom and practice to put on
24  your notary page the county in which you're having
25  the loan closing?

Page 40

1  A. Yes.
2  Q. Okay. So, the fact that looking at A19 it
3  says Lake County, one could -- should conclude that
4  you didn't close the loan at the borrower's home?
5  A. Correct.
6  Q. But that you closed it in Lake County
7  somewhere?
8  A. Yes.
9  Q. Which would coincide with either the
10  Ameriquest office or the Indiana Title Network
11  office?
12  A. Yes.
13  Q. Okay.
14  A. Or maybe a place --
15  Q. Or like a meeting place?
16  A. Yes.
17  Q. But not the borrower's home?
18  A. Yes.
19  MR. LEDSKY: I've got nothing further.
20  MR. BURKE: I think we're done.
21  COURT REPORTER: Are you going to be
22  needing this transcribed?
23  MR. BURKE: Yes, transcribe it. Can
24  you do one of those e-mail things. And I
25  don't need exhibits.

Page 41

1  COURT REPORTER: You don't want them
2  attached?
3  MR. BURKE: No.
4  MR. LEDSKY: I'll take a copy.
5  COURT REPORTER: Would you like it
6  full-sized or condensed?
7  MR. LEDSKY: I'll take what Alex got.
8  What did he get?
9  COURT REPORTER: E-mail transcript.
10  MR. LEDSKY: I don't need that. I'll
11  just take a standard copy. Can I get the
12  mini and the standard for the same price?
13  COURT REPORTER: Sure.
14  MR. BURKE: Dang. Then I'll also have
15  a mini.
16  (Deposition concluded at 2:40 p.m.)
17  ---oOo---

Page 42

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOSEPH A. MIKOWSKI and )
PATRICIA J. MIKOWSKI, )
Plaintiffs, )
AMERIQUEST MORTGAGE COMPANY, ) NO.: 2:05-CV-411
AMERIQUEST MORTGAGE SECURITIES, )
INC., AMC MORTGAGE SERVICES, INC.,)
and DOES 1-5, )
Defendants. )

DEPONENT'S CERTIFICATE

I, Ericka Chitwood, do hereby certify that I have read my deposition consisting of 41 pages, and that it is a complete transcription of my deposition;

Any corrections to my deposition are reflected on the attached errata sheet(s). There are ___ errata sheet(s) attached;

Dated this ___ day of ___, 2006.

_____
ERICKA CHITWOOD

Subscribed and sworn to before me this ___ day of ___, 2006.

_____
Notary Public
County of Residence:
My commission expires:

Page 43

STATE OF INDIANA )
                 )SS:
COUNTY OF LAPORTE )

COURT REPORTER'S CERTIFICATE

I, Michelle A. Whitaker, and duly authorized to administer such oath, do hereby certify that on the 3rd day of April, 2006, at Ramada Inn, 4141 Calumet Avenue, Hammond, Indiana, commencing at or about the hour of 1:55 p.m., there appeared before me Ericka Chitwood, who was thereupon first duly sworn by me to testify the truth, the whole truth and nothing but the truth during the taking of her deposition;

I further certify that I reported said deposition proceedings by the means of machine shorthand and that I have transcribed my original shorthand notes through the use of computer-aided transcription into the typewritten form and that the foregoing and attached pages or parts of pages numbered inclusively one through 41 comprise a true, correct, complete and accurate transcript of said deposition proceedings;

I further certify that present during the taking of the deposition were the following attorneys: Alexander H. Burke; Jonathan N. Ledsky; Douglas R. Kvachkoff;

Page 44

I further certify that I am not employed by, nor am I related to, any of the parties herein, nor their attorneys.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 16th day of April, 2006.

_____
MICHELLE A. WHITAKER, RPR
ASSOCIATE REPORTER

---o0o---

THIS CERTIFICATE APPLIES ONLY TO THE ORIGINAL TRANSCRIPT HEREOF AND DOES NOT APPLY TO ANY XEROX COPIES MADE OF THIS TRANSCRIPT.

# Appendix C

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

BORROWER(S): JOSEPH A MIKOWSKI

ADDRESS: 1206 RUMELY ST
CITY/STATE/ZIP: LAPORTE, IN 46350

PROPERTY: 1206 RUMELY
LA PORTE, IN 46350

DATE: March 2, 2005
LOAN NO.: 0110926862 - 5570
TYPE: ADJUSTABLE RATE

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is [ENTER DOCUMENT SIGNING DATE]

or

2. The date you received your Truth in Lending disclosures; or

3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN: FUNDING
PHONE: (714)634-3494
FAX: (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of [ENTER FINAL DATE TO CANCEL]

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____
SIGNATURE                                             DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

BORROWER/OWNER JOSEPH A MIKOWSKI      Date      BORROWER/OWNER PATRICIA J MIKOWSKI      Date

BORROWER/OWNER      Date      BORROWER/OWNER      Date

654-NRC (Rev 11/03)

**LENDER COPY**

03/02/2005 12:58:32 PM
Mikowski  25