# EXHIBIT 8

RECEIVED

MAY - 3 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOHN DOUGHERTY and )
GERALDINE POMILIO DOUGHERTY, )
　 )　 No. 0 6 C 2 4 5 2
Plaintiffs, )
　 )　 JUDGE ANDERSEN
vs. )
　 )　 MAGISTRATE JUDGE MASON
AMERIQUEST MORTGAGE COMPANY, )
AMC MORTGAGE SERVICES, INC. )
and DEUTSCHE BANK NATIONAL TRUST )　 JURY TRIAL DEMAND
COMPANY, )
　 )
Defendants. )

## COMPLAINT

### INTRODUCTION

1.　Plaintiffs John Dougherty and Geraldine Pomilio Dougherty charge defendants with violation of the Truth in Lending Act through failure to honor a valid rescission request in violation of 15 U.S.C. § 1635. Plaintiffs also charge defendant Ameriquest with violation of Pennsylvania law.

### JURISDICTION AND VENUE

2.　This Court has jurisdiction pursuant to Title 28 of the United States Code, Sections 1331 and 1337 because plaintiffs' claim under the Truth in Lending Act arises under federal law. This Court has supplemental jurisdiction over plaintiffs' claim under state law pursuant to the Judicial Improvements Act of 1990, Pub.L.No. 101-650, 104 Stat. 5089, 28 U.S.C. § 1367.

3.　Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because the defendants do business in this district. Also, the Judicial Panel on Multi-District Litigation has issued an order centralizing predatory lending litigation against Ameriquest in this district before Judge Aspen.

## PARTIES

4.     Defendant Ameriquest Mortgage Company is a leading sub-prime mortgage lender. The company's main offices are in Orange, California, but it does business in this district. Defendant AMC Mortgage Services, Inc. services Ameriquest mortgages and has the right to receive payments thereunder and does business in this district. Defendant Deutsche Bank National Trust Company is the owner of plaintiffs' mortgage and also does business in this district.

5.     Plaintiffs John Dougherty and his wife Geraldine Pomilio Dougherty are residents of Pennsylvania.

## BACKGROUND

6.     John Dougherty is in the business of financing personal injury settlements. Geraldine Pomilio Dougherty used to work in customer service and is now retired. They own a home in Alden, Pennsylvania where they live with their son, who is a student.

7.     In or about early April of 2004, John Dougherty received a telephone call from a man named Chris DePhillipo who worked for Ameriquest. Mr. DePhillipo told Mr. Dougherty that Ameriquest could give him a better deal on his home mortgage. A number of telephone conversations ensued. Mr. DePhillipo promised Mr. Dougherty a fixed rate mortgage at 5.5% with closing costs of around $6,200 to $6,300.

8.     On April 13, 2004, Ameriquest prepared a Good Faith Estimate, which estimated closing costs at $4,719.00, and a preliminary Truth in Lending Disclosure Statement, which estimated the APR at 3.616%.

9.     The closing took place at around 1:00 p.m. on April 15, 2004 at a title company office. Two or three representatives of Ameriquest were there but Chris DePhillipo was not present. The Ameriquest representatives started pushing documents in front of Mr. and Mrs. Dougherty and telling them to sign.

10.     The loan documents were not consistent with Ameriquest's earlier representations. For example, Mr. Dougherty had been promised a fixed rate loan whereas the loan papers called

2

for an adjustable rate loan. The APR was 6.294% as compared to 3.616% in the preliminary TILA disclosure. The settlement charges were $11,392.01 as compared to $4,719.00 in the Good Faith Estimate and the $6,200 to $6,300 that Chris DePhillipo had promised.

11. Mr. Dougherty told the Ameriquest representatives that this wasn't the deal that we had made. The Ameriquest representatives said that this could all be straightened out with Chris later and that Mr. Dougherty should just sign the documents and straighten it out later. Mr. Dougherty asked how it could be straightened out later and one of the Ameriquest representatives said that there was a cancellation period.

12. Mrs. Dougherty is the type of person who believes in being nice and avoiding conflict. She believed the Ameriquest representatives when they said that it could be straightened out later. She felt that her husband was becoming upset. She wanted to calm him down. She said they should just sign the papers. Mr. Dougherty acquiesced.

13. After they returned home from the closing, Mr. Dougherty tried to call Chris DePhillipo but the Ameriquest office was closed. Mr. Dougherty called Chris the next morning. Mr. Dougherty said that he wanted to cancel. Chris said it's a good deal and asked what was wrong. Mr. Dougherty said that it was an adjustable rate loan when Chris had promised a fixed rate. Chris said he thought it was going to be a fixed rate. Mr. Dougherty began to complain about the high settlement costs and then said that he was going to exercise his right to cancel by mailing in one of the cancellation forms. After hanging up, Mr. Dougherty signed one of the One Week Cancellation forms provided at the closing and mailed it to Ameriquest.

14. Chris called Mr. Dougherty the next morning. They argued for about half an hour. Mrs. Dougherty also participated in the call. Mr. Dougherty repeatedly said that he wanted to cancel. Chris kept arguing with him not to cancel, saying that he had already signed the papers and that it was a good deal. Chris said that he would send them a check for a little over a thousand dollars (which may have been for money owed anyway). Mr. Dougherty said that he really wasn't interested and that he wanted to cancel.

15. Mr. Dougherty felt that he needed to get Chris's approval for cancellation and that

3

Chris was just not going along with the cancellation request. Mrs. Dougherty had a similar feeling. She was sick of the situation and wanted it to end. She did not want any more hassle. She also felt that her husband was becoming upset and wanted to calm him down. Participating in the telephone conversation, she said that they should just go through with the remortgage. Mr. Dougherty said that he would, but that it was against his better judgment and that he wasn't happy with it. Mrs. Dougherty thanked Chris for his help.

16.     Mr. Dougherty had already mailed the One Week Cancellation form to Ameriquest. He never signed any document withdrawing his written cancellation request. Nevertheless, Ameriquest ignored it.

## COUNT ONE -- TRUTH IN LENDING ACT

17.     Plaintiffs incorporate paragraphs one through sixteen above.

18.     Ameriquest's disclosures to plaintiffs did not comply with the requirements of the Truth in Lending Act. To understand how the disclosures were defective, some background is helpful.

## REGULATORY FRAMEWORK

19.     The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et. seq. requires the clear, fair, conspicuous and accurate disclosure of the costs and terms of credit. The statute's purpose is to protect consumers from inaccurate and unfair credit practices, and to assure a meaningful disclosure of credit terms so that the consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit.

20.     Accordingly, the Board of Governors of the Federal Reserve System promulgated Regulation Z to implement the TILA. 12 C.F.R. § 226.1(a). A creditor is required by Regulation Z to make certain disclosures to the consumer, "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Regulation Z sets out certain guidelines for creditors to follow when disclosing the amount financed, the finance charge, and the annual percentage rate to the consumer and demands that these disclosures be accurate. 12 C.F.R. § § 226.18, 226.22, 226.5.

4

21.    Regulation Z also requires that "disclosures shall reflect the terms of the legal obligation between the parties" 12 C.F.R. § 226.17(c)(1) and that the creditor accurately disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g)(1).

22.    The Truth in Lending Act confers additional rights on home owners who refinance their mortgages with a new lender. In order to give these borrowers an opportunity to reflect on their other TILA disclosures and to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three business days after receiving their final TILA disclosures or three business days of receiving notice of their right to rescind, whichever is later. More specifically, the statute provides that:

> Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.

15 U.S.C. § 1635(a).

23.    To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction. More specifically, the statute provides:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

15 U.S.C. § 1635(b).

24.     To ensure that home owner borrowers are aware of these rights, the statute

requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately.

More specifically, the statute provides:

> The creditor shall clearly and conspicuously disclose, in accordance with
> regulations of the Board, to any obligor in a transaction subject to this section the
> rights of the obligor under this section. The creditor shall also provide, in
> accordance with regulations of the Board, appropriate forms for the obligor to
> exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

25.     Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in

Lending Act, amplifies the statutory requirements. Subject to exceptions not here pertinent, the

regulation provides:

> In a credit transaction in which a security interest is or will be retained or acquired
> in a consumer's principal dwelling, each consumer whose ownership interest is or
> will be subject to the security interest shall have the right to rescind the
> transaction ....

12 C.F.R. § 226.23(a)(1).

26     The regulation goes on to require that the creditor "deliver" to "each consumer

entitled to rescind" two copies of a document that "clearly and conspicuously disclose" the

consumer's rescission rights. See 12 C.F.R. § 226.23(b)(1)

27.     More specifically, the regulation provides:

> In a transaction subject to rescission, a creditor shall deliver two copies of
> the notice of the right to rescind to each consumer entitled to rescind (one copy to
> each if the notice is delivered by electronic communication as provided in
> § 226.36(b)). The notice shall be on a separate document that identifies the
> transaction and shall clearly and conspicuously disclose the following:
>
>> (i) The retention or acquisition of a security interest in the
>> consumer's principal dwelling.
>>
>> (ii) The consumer's right to rescind the transaction.
>>
>> (iii) How to exercise the right to rescind, with a form for that

6

purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1).

28.     Paragraph (d) goes on to explain the effects of rescission.  Subparagraph (d)(1) provides:

> When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

12 C.F.R. § 226.23(d)(1).

29.     Subparagraph (d)(2) states:

> Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

12 C.F.R. § 226.23(d)(2).

## DEFECTIVE DISCLOSURES

30.     Ameriquest's rescission disclosures to plaintiff were defective in a number of respects.  First, the federal Notice of Right to Cancel forms delivered to plaintiffs did not disclose when the rescission period expired, in violation of 12 C.F.R. § 226.23.  Also, the transaction was not consummated on April 15, 2004 because Ameriquest representatives told plaintiffs that critical issues could be straightened out later.  Therefore, even if a date for expiration of the cancellation period had been filled in on the copies delivered to plaintiffs, that date would have been wrong because it would have been calculated using the wrong consummation date.

31.     Second, it was misleading for Ameriquest to give plaintiffs a One Week Cancellation form when Ameriquest did not treat that document as legally binding and acted as though it was simply an invitation for further negotiation and discussion.  By inducing plaintiffs

to rely on the One Week Cancellation form, rather than on the federal Notice of Right to Cancel form prescribed by the Federal Reserve Board and Regulation Z, Ameriquest misled plaintiffs as to their rescission rights.

32.     Third, Ameriquest contradicted, overshadowed and nullified its material TILA disclosures by misleading plaintiffs as to their closing costs and as to whether they were getting a fixed rate loan, and by telling plaintiffs that they could talk to Chris after the closing to straighten out the problems.

33.     Under the Truth in Lending Act, if the rescission disclosures or material TILA disclosures are deficient, then the rescission period is extended for up to three years. See 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first").

34.     Ameriquest's rescission and material TILA disclosures were defective. Accordingly, plaintiffs sent a rescission notice to Ameriquest, AMC Mortgage Services and to Deutsche Bank National Trust Company, the current owner of their mortgage on March 29, 2006.

35.     Within twenty days of receiving the rescission notice, defendants should have released their security interest in plaintiffs' home and paid back to plaintiffs any money or property that plaintiffs have paid to them in connection with the loan. See 12 C.F.R. § 226.23(d)(2). Defendants have not done either.

36.     Defendants' failure to honor the rescission request is a violation of the Truth in Lending Act. Plaintiffs are entitled to rescission plus statutory damages and other relief.

### COUNT TWO -- VIOLATION OF ILLINOIS LAW

37.     Plaintiffs incorporate paragraphs one through thirty-six above.

38.     In connection with trade or commerce, Ameriquest made false and misleading statements to plaintiffs intending to induce reliance. More specifically, Ameriquest engaged in a bait and switch by baiting plaintiff into the mortgage transaction by offering a relatively

favorable set of terms and then switching at the closing to more expensive terms.

39.     It was also false and misleading for the Ameriquest representatives at the closing to tell plaintiffs that the changed terms could be straightened out later when, in fact, it was Ameriquest's plan to do whatever it could to keep the deal.

40.     Ameriquest's false and misleading statements to plaintiffs violated plaintiffs' rights under Pennsylvania statutory and common law.

41.     Ameriquest's false and misleading statements deceived plaintiffs and proximately caused them injury.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court grant judgment against defendants as follows:

a.     canceling defendants' security interest in plaintiffs' home and ordering defendants to provide plaintiffs with the money to which plaintiffs are entitled to under 12 C.F.R. § 226.23(d)(2);

b.     awarding plaintiffs actual damages proximately caused by defendants' failure to comply with 12 C.F.R. § 226.23(d)(2);

c.     awarding appropriate statutory damages;

d.     ordering defendants to pay costs, penalties, and attorneys fees;

e.     awarding plaintiffs actual and punitive damages;

f.     granting such other relief as the Court deems just and proper.

Respectfully submitted by:

Counsel for the Plaintiffs

Daniel Harris, Esq.
Anthony Valach, Esq.
The Law Offices of Daniel Harris
150 N. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 960-1802

9