# Exhibit 1

FILED
J N
MAY 1 1 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

CAMILLE J. GBUREK,

Plaintiff,

v.

AMERIQUEST MORTGAGE

Defendant.

JURY DEMANDED

06CV2637
Judge KENNELLY
Mag. SCHENKIER

**COMPLAINT**

**MATTERS COMMON TO MULTIPLE CLAIMS**

**INTRODUCTION**

1. Plaintiff, Camille J. Gburek, brings this action against mortgage lender Ameriquest Mortgage to secure redress from predatory and fraudulent lending practices. Plaintiff seeks to rescind a residential mortgage loan for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

**JURISDICTION**

2. This Court has jurisdiction under 28 U.S.C. §1331 (general federal question), 15 U.S.C. §1640 (TILA) and 28 U.S.C. §1367 (supplemental jurisdiction). Venue in this District is proper because defendants transact business here.

**PARTIES**

3. Plaintiff, Camille J. Gburek, is a sixty four year old woman who resides alone in her home in Park Ridge Illinois.

4. Defendant Ameriquest Mortgage Company ("Ameriquest") is a national

lender located in California. Its registered agent is National Registered Agents Inc. located at 200 W. Adams, Chicago, Illinois.

5. Ameriquest is a creditor as defined in TILA and implementing Federal Reserve Board Regulation Z.

**FACTS RELATING TO PLAINTIFF'S AUGUST 7, 2002 LOAN**

6. On August 7,2002, plaintiff obtained a $290,000 refinance loan from Ameriquest.

7. The loan had an interest rate of 8.650% fixed at two years that went up .25% on the change date. The loan also contained a two year prepayment penalty.

8. In connection with the August 7, 2002 transaction, plaintiff paid a 1.5% origination fee to her mortgage broker that equaled $4,350.00.

9. In addition, Ameriquest paid her mortgage broker a 2% Yield Spread Premium equaling $5,800.00.

10. The Notice of Right to Cancel that plaintiff was furnished was incomplete.

**FACTS RELATING TO PLAINTIFF'S JUNE 19, 2003 LOAN**

11. On June 19, 2003, plaintiff again refinanced with Ameriquest.

12. Despite the impending Ameriquest pre-payment penalty expiration, Ameriquest recommended that plaintiff refinance her loan for a two year fixed interest rate at 8.850% that increased by 6% at the first change date.

13. The new loan also contained a three year prepayment penalty despite being a fixed rate for only two years.

14. As a result of refinancing before the expiration of the pre-payment penalty,

Ameriquest charged plaintiff a $50,945.63 pre-payment penalty.

15. Ameriquest also paid itself a 4.191% discount fee equaling $14,626.59 as well as other lender fees equaling $1,285.00.

16. Even though, Ameriquest just received over $66,000.00 for a simple refinance, it continued to solicit plaintiff for additional refinances. Plaintiff has over six refinance packages for Ameriquest in 2003 and the beginning of 2004. Ameriquest's affiliates also solicited plaintiff to refinance her loan. As a result of the constant pressure to refinance, plaintiff was refinanced in February 9, 2004 with an affiliate of Ameriquest. As a result of this refinance, plaintiff was forced to pay Ameriquest about $25,000.00 for a second pre-payment penalty. The refinance with Argent is the subject of a separate lawsuit.

17. The notice of the right to cancel provided by Ameriquest were incomplete.

18. Ameriquest also provided a notice of a right to cancel for one week.

**COUNT I- TILA RESCISSION**

19. Plaintiff incorporates ¶¶1-18. This claim is against Ameriquest.

20. Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. §1635, and implementing Federal Reserve Board Regulation Z, 12 C.F.R. §226.23.

21. Section 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions**

**described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

**(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) Exempt transactions. The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the**

**consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

22. Because Ameriquest failed to comply with Section 226.23 , plaintiff has a continuing right to rescind.

23. Plaintiff has given notice of her election to rescind.

24. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against Ameriquest Mortgage Company for:

a. Rescission of the 2003 Ameriquest loan

b. Statutory damages for the disclosure violation

c. Attorney's fees, litigation expenses and costs.

d. Such other or further relief as the Court deems appropriate.

**COUNT II – CONSUMER FRAUD ACT CLAIM**

25. Plaintiff incorporates ¶¶1-18. This claim is against Ameriquest.

26. Defendant Ameriquest engaged in unfair and deceptive acts and practices, in violation of §§2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 as it is an unfair practice to encourage multiple refinances to generate unconscionable transaction fees and multiple pre-payment penalties.

27. Section 2 of the Consumer Fraud Act provides:

> **Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].**

28. Defendant engaged in such unfair and deceptive acts and practices in the course of trade and commerce in financial services.

29. Defendant intended that plaintiff rely on the undisclosed facts, by signing a note and mortgage at an excessive rate and unfair terms.

30. Plaintiff did so rely, and were damaged.

31. The conduct of defendant was deliberately oppressive, corrupt and dishonest.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendant for:

a. Compensatory and punitive damages;

b. Attorney's fees, litigation expenses and costs.

c. Such other or further relief, including rescission as the Court deems appropriate.

Respectfully submitted,
Plaintiff

By: ______________________
Her Attorney

Keith J. Keogh
Elizabeth Monkus
Law Offices of Keith J. Keogh, Ltd.
227 W. Monroe St., Ste. 2000
Chicago, Illinois 60606
312.726.1092 (office)
312.726.1093 (fax)
Keith@KeoghLaw.com

**JURY DEMAND**
Plaintiff demands trial by jury.

______________________

# Exhibit 2

FILED
J N
MAY 11 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

CAMILLE J. GBUREK,

Plaintiff,

v.

ARGENT MORTGAGE, WMC MORTGAGE GRAND MORTGAGE, RESIDENTIAL PLUS MORTGAGE CORP., ABRAHAM BEDDAOUI JPMORGAN CHASE BANK, N.A., FV-1 INC. MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,

Defendants.

JURY DEMANDED

06CV2639
Judge CASTILLO
Mag. BROWN

## COMPLAINT

## MATTERS COMMON TO MULTIPLE CLAIMS

## INTRODUCTION

1. Plaintiff, Camille J. Gburek, brings this action against mortgage lenders Argent Mortgage, WMC Mortgage, and mortgage brokers, Grand Mortgage, Residential Plus Mortgage Corp. and Abraham Beddaoui to secure redress from predatory and fraudulent lending practices. Plaintiff seeks to rescind three residential mortgage loans for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226 and have named JPMorgan Chase Bank N.A., MERS and FV1-Inc. as these companies own or have an interest in the loans.

## JURISDICTION

2. This Court has jurisdiction under 28 U.S.C. §1331 (general federal question), 15 U.S.C. §1640 (TILA) and 28 U.S.C. §1367 (supplemental jurisdiction). Venue in this District is proper because defendants transact business here.

**PARTIES**

3. Plaintiff, Camille J. Gburek, is a sixty four year old women who resides alone in her home in Park Ridge Illinois.

4. Defendant Argent Mortgage ("Argent") is an affiliate of Ameriquest Mortgage Company and is a national lender located in California. Its registered agent is National Registered Agents Inc. located at 200 W. Adams, Chicago, Illinois.

5. Argent is a creditor as defined in TILA and implementing Federal Reserve Board Regulation Z.

6. Defendant WMC Mortgage Corp. ("WMCt") is a national lender located in California. Its registered agent is Prentice Hall Corporation located at 33 N. LaSalle St., Chicago, Illinois.

7. WMC is a creditor as defined in TILA and implementing Federal Reserve Board Regulation Z.

8. Defendant Grand Mortgage is located in Oak Brook Terrace, Illinois. It is engaged in the business of a mortgage broker and conducts business in Illinois.

9. Defendant Residential Plus Mortgage Corp. is located in Des Plaines, Illinois. It is engaged in the business of a mortgage broker and conducts business in Illinois.

10. Defendant Abraham Beddaoui is the president of Residential Plus Mortgage Corp. and was personally involved in the transactions that plaintiff is complaining of herein.

11. JPMorgan Chase Bank N.A., Mortgage Electronic Systems (MERS) and FV1-Inc. have an interest in the loans that plaintiff is seeking to rescind. As such, they are necessary parties to this action.

**FACTS RELATING TO PLAINTIFF'S PREVIOUS AMERIQUEST LOANS**

12. Plaintiff has been the victim of predatory lending and inappropriate refinances that benefitted the lenders and mortgage brokers at the great expense to her.

13. For example, plaintiff refinanced with Ameriquest on August 7,2002 and again June 19, 2003. For the June 19, 2003 loan, Ameriquest charged plaintiff a $50,945.63 pre-payment penalty to refinance its own loan. Ameriquest also paid itself a 4.191% discount fee equaling $14,626.59 as well as other lender fees equaling $1,285.00 for a loan with a two year fixed interest rate at 8.850% that increased by 6% at the first change date. The loan included a three year pre-payment penalty.

14. Even though, Ameriquest received over $66,000.00 for a simple refinance, it continued to solicit plaintiff for additional refinances. Plaintiff has over six refinance packages for Ameriquest in 2003 and the beginning of 2004. Ameriquest's affiliates also solicited plaintiff to refinance her loan. As a result of the constant pressure to refinance, plaintiff was refinanced in February 9, 2004 with an affiliate of Ameriquest, Argent. As a result of this refinance, plaintiff was forced to pay Ameriquest about $25,000.00 for a second pre-payment penalty. The refinance with Argent is at issue in this lawsuit.

15. Plaintiff has filed a separate lawsuit regarding the Ameriquest loans.

**FACTS RELATING TO PLAINTIFF'S ARGENT FEBRUARY 9, 2004 LOAN**

16. On February 9, 2004, plaintiff obtained a $408,000 refinance loan from Argent. The loan was arranged on plaintiff's behalf by Grand Mortgage acting as plaintiff's mortgage broker.

17. The loan had an interest rate of 8.350% fixed at two years that increased an

additional 4.5% on the change date.

18. In connection with the February 9, 2004 transaction, plaintiff paid Grand Mortgage a $8,910.00 broker fee.

19. In addition, Grand Mortgage also received a Yield Spread Premium in the amount of $4,080.00. A yield spread premium is a payment by a lender to the borrower's mortgage broker that represents compensation for unnecessarily increasing the borrower's interest rate. The lender establishes a base or "par" interest rate, at which it will make or purchase a loan from a class of borrower, and informs mortgage brokers such of the "par" rate by means of "rate sheets" faxed or e-mailed to the brokers on a regular basis. If the broker induces the borrower to sign loan papers at a higher rate, the lender pays a "yield spread premium" linked to the increase in the rate. The formula for paying the "yield spread premium" is also in the rate sheets.

20. The effect of the "yield spread premium" on the amount that the borrower pays is very substantial. For example, the .5% yield spread premium paid in this case typically "purchases" a 0.5 to 1% increase in the interest rate. The effect of increasing the rate 1% on a 30-year mortgage is to increase the finance charge per $100 of amount financed by more than $20.

21. Plaintiff did not understand the effect of the yield spread premium. No lay borrower would understand it without being given the relevant numbers, set forth above. Any borrower who did understand it would not agree to it.

22. Plaintiff was entitled to have her federally-related mortgage transaction closed without incurring charges that were duplicative or for which no or only nominal services were performed, or that merely represent payment for the referral of business.

23. The total compensation received by the broker for the February 9, 2004, loan

was unreasonable.

24. In addition, the Notice of Right to Cancel that plaintiff was furnished was incomplete. Plaintiff sent Argent a request for rescission along with the blank notice of right to cancel, but Argent refused to rescind the loan. Argent has asserted that its copy of the right to cancel is filled in and signed. Argent has not asserted that it provided plaintiff with complete copies.

**FACTS RELATING TO PLAINTIFF'S SEPTEMBER 13, 2005 LOANS**

25. On September 13, 2005, plaintiff refinanced with WMC Mortgage Corporation and used the broker services of Residential Plus Mortgage Corp and Abraham Beddaoui.

26. The loan was arranged on plaintiff's behalf by Residential Plus Mortgage Corp and Abraham Beddaoui acting as plaintiff's mortgage broker.

27. The loan was split into two loans. One loan was for $488,000.00 and one was for $75,000.00. The loans closed simultaneously.

28. The loan for $488,000.00 was a two year fixed rate at 6.99% that increased an additional 3.693% on the first change date.

29. The loan for $75,000.00 was a fifteen year balloon note at 10.99%.

30. In connection with the September 13, 2005 loans, plaintiff paid Residential Plus Mortgage Corp and Abraham Beddaoui $3,290.00 broker fee.

31. In addition, Residential Plus Mortgage Corp and Abraham Beddaoui also received a Yield Spread Premium in the amount of $4,880.00. A yield spread premium is a payment by a lender to the borrower's mortgage broker that represents compensation for unnecessarily increasing the borrower's interest rate. The lender establishes a base or "par" interest rate, at which it will make or purchase a loan from a class of borrower, and informs mortgage brokers such of the

"par" rate by means of "rate sheets" faxed or e-mailed to the brokers on a regular basis. If the broker induces the borrower to sign loan papers at a higher rate, the lender pays a "yield spread premium" linked to the increase in the rate. The formula for paying the "yield spread premium" is also in the rate sheets.

32. The effect of the "yield spread premium" on the amount that the borrower pays is very substantial. For example, the .5% yield spread premium paid in this case typically "purchases" a 0.5 to 1% increase in the interest rate. The effect of increasing the rate 1% on a 30-year mortgage is to increase the finance charge per $100 of amount financed by more than $20.

33. Plaintiff did not understand the effect of the yield spread premium. No lay borrower would understand it without being given the relevant numbers, set forth above. Any borrower who did understand it would not agree to it.

34. Plaintiff was entitled to have her federally-related mortgage transaction closed without incurring charges that were duplicative or for which no or only nominal services were performed, or that merely represent payment for the referral of business.

35. The total compensation received by the broker for the February 9, 2004, loan was unreasonable.

36. In addition, the Notice of Right to Cancel that plaintiff was furnished was incomplete.

**COUNT I- TILA- RESCISSION OF THE FEBRUARY 9, 2004 LOAN**

37. Plaintiff incorporates ¶¶1-36. This claim is against Argent.

38. Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to

cancel provided by TILA, 15 U.S.C. §1635, and implementing Federal Reserve Board Regulation

Z, 12 C.F.R. §226.23.

     39.    Section 226.23 provides:

**(a) Consumer's right to rescind.**

    **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

    **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

    **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**

    **(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

    **(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

    **(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

40. Because plaintiff was furnished a notice of right to cancel that was incomplete, she has a continuing right to rescind.

41. Plaintiff has given notice of her election to rescind.

42. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against Argent Mortgage Company for:

a. Rescission of the February 9, 2004 loan.

b. Statutory damages for failing to rescind and the disclosure violation.

c. Attorney's fees, litigation expenses and costs.

d. Such other or further relief as the Court deems appropriate.

**COUNT II – CONSUMER FRAUD ACT CLAIM**

43. Plaintiff incorporates ¶¶1-36. This claim is against Argent and Grand Mortgage

44. Defendants Argent and Grand Mortgage engaged in unfair and deceptive acts and practices, in violation of §§2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 by:

a. Receiving and paying, respectively, money for the referral of business, in violation of § 8 of the Real Estate Settlement Procedures Act, 12 U.S.C. §2607.

b. In appropriately, attempting to alter the fiduciary nature of the broker-borrower relationship.

45. Defendants also failed to disclose the following material facts to plaintiff:

a. That plaintiff would have to pay $25,000 as a pre-payment penalty to Argent's affiliate.

c. That the broker, was receiving money from Argent for the purpose of increasing plaintiff's interest rate;

d. The percentage increase in plaintiffs' interest rate;

e. The dollar amount that the increase would cost plaintiff, on a monthly and life-of-the-loan basis;

46. Section 2 of the Consumer Fraud Act provides:

**Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment,**

> **suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].**

47. Defendants engaged in such unfair and deceptive acts and practices in the course of trade and commerce in financial services.

48. Defendants intended that plaintiff rely on the undisclosed facts, by signing a note and mortgage at an excessive rate.

49. Plaintiff did so rely, and were damaged.

50. The amounts Grand Mortgage received in connection with the transaction was in excess of reasonable compensation for services provided.

51. The conduct of defendants was deliberately oppressive, corrupt and dishonest.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a. Compensatory and punitive damages;

b. Attorney's fees, litigation expenses and costs.

c. Such other or further relief as the Court deems appropriate.

**COUNT III -- BREACH OF FIDUCIARY DUTY**

52. Plaintiff incorporates ¶¶1-36. This claim is against Grand Mortgage.

53. Plaintiff granted to Grand Mortgage the exclusive right to negotiate a mortgage loan on her behalf.

54. Consequently, Grand Mortgage was the broker and agent of Plaintiff.

55. Grand Mortgage had a fiduciary duty to:

a. Provide Plaintiff full and complete disclosure of all material facts relating to the transaction. That Plaintiff's mortgage broker was receiving money from the other party to the transaction, linked to an increase in Plaintiff's rate, and the pecuniary impact of the payment, were material facts.

b. Provide Plaintiff with fair and honest treatment.

c. Avoid taking payments that violated the Real Estate Settlement Procedures Act, 12 U.S.C. §2607.

56. In violation of such duties, Grand Mortgage accepted a yield spread premium from Argent tied to an increase in Plaintiff's interest rate, without making full and complete disclosure and failed to inform plaintiff of the pre-payment penalties.

57. As a result, Plaintiff was overcharged for real estate settlement services, was deprived of the loyal and faithful services of Plaintiff's broker/ agent, and was damaged.

58. The amounts Grand Mortgage received in connection with the transaction were in excess of reasonable compensation for services provided, and included compensation for bringing Argent a borrower induced to pay an excessive rate.

59. The conduct of Grand Mortgage was deliberately oppressive, corrupt and dishonest.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Grand Mortgage for:

a. Compensatory and punitive damages;

b. For attorney's fees, litigation expenses and costs.

c For such other or further relief as the Court deems appropriate.

**COUNT IV- TILA- RESCISSION OF THE SEPTEMBER 13, 2005 LOANS**

60. Plaintiff incorporates ¶¶1-36. This claim is against WMC Mortgage, JPMorgan Chase Bank N.A., MERS and FV1-Inc.

61. Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. §1635, and implementing Federal Reserve Board Regulation Z, 12 C.F.R. §226.23.

62. Section 226.23 provides:

**(a) Consumer's right to rescind.**

> **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**
>
> **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**
>
> **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

63. Because plaintiff was furnished a notice of right to cancel that was incomplete, she has a continuing right to rescind.

64. Plaintiff has given notice of her election to rescind.

65. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against WMC Mortgage, JPMorgan Chase Bank N.A., MERS and FV1-Inc. for:

a. Rescission of both of the September 9, 2005 loans.

b. Statutory damages for the refusal to rescind and disclosure violation.

c. Attorney's fees, litigation expenses and costs.

d. Such other or further relief as the Court deems appropriate.

**COUNT V – CONSUMER FRAUD ACT CLAIM**

66. Plaintiff incorporates ¶¶1-28. This claim is against WMC Mortgage, Residential Plus and Abraham Beddaoui.

67. Defendant WMC Mortgage, Residential Plus and Abraham Beddaoui engaged in unfair and deceptive acts and practices, in violation of §§2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 by:

68. Receiving and paying, respectively, money for the referral of business, in violation of § 8 of the Real Estate Settlement Procedures Act, 12 U.S.C. §2607.

69. In appropriately, attempting to alter the fiduciary nature of the broker-borrower relationship; and

70. Failing to disclose the following material facts to plaintiff:

a. That plaintiff's income could not support the repayment of the loans;

b. That the broker, was receiving money from Argent for the purpose of increasing plaintiff's interest rate;

c. The percentage increase in plaintiffs' interest rate;

d. The dollar amount that the increase would cost plaintiff, on a monthly

and life-of-the-loan basis;

71. Section 2 of the Consumer Fraud Act provides:

> **Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].**

72. Defendants engaged in such unfair and deceptive acts and practices in the course of trade and commerce in financial services.

73. Defendants intended that plaintiff rely on the undisclosed facts, by signing a note and mortgage at an excessive rate.

74. Plaintiff did so rely, and were damaged. In fact, plaintiff could not afford to make a single payment and is presently in foreclosure.

75. The amounts Residential Plus and Abraham Beddaoui received in connection with the transaction were in excess of reasonable compensation for services provided.

76. The conduct of defendants was deliberately oppressive, corrupt and dishonest.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a. Compensatory and punitive damages;

b. Attorney's fees, litigation expenses and costs.

c. Such other or further relief as the Court deems appropriate.

**COUNT VI -- BREACH OF FIDUCIARY DUTY**

77. Plaintiff incorporates ¶¶1-28. This claim is against Residential Plus and Abraham Beddaoui.

78. Plaintiff granted to Residential Plus and Abraham Beddaoui the exclusive right to negotiate a mortgage loan on her behalf.

79. Consequently, Residential Plus and Abraham Beddaoui were the broker and agent of Plaintiff.

80. Residential Plus and Abraham Beddaoui had a fiduciary duty to:

a. Provide Plaintiff full and complete disclosure of all material facts relating to the transaction. That Plaintiff's mortgage broker was receiving money from the other party to the transaction, linked to an increase in Plaintiff's rate, and the pecuniary impact of the payment, were material facts.

b. Provide Plaintiff with fair and honest treatment.

c. Avoid taking payments that violated the Real Estate Settlement Procedures Act, 12 U.S.C. §2607.

81. In violation of such duties, Residential Plus and Abraham Beddaoui accepted a yield spread premium from Argent tied to an increase in Plaintiff's interest rate, without making full and complete disclosure and failed to inform plaintiff of the pre-payment penalties.

82. As a result, Plaintiff was overcharged for real estate settlement services, was deprived of the loyal and faithful services of Plaintiff's broker/ agent, and was damaged.

83. The amounts Residential Plus and Abraham Beddaoui received in connection

with the transaction were in excess of reasonable compensation for services provided, and included compensation for bringing WMC Mortgage a borrower induced to pay an excessive rate.

84. The conduct of Residential Plus and Abraham Beddaoui were deliberately oppressive, corrupt and dishonest.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Residential Plus and Abraham Beddaoui for:

a. Compensatory and punitive damages;

b. For attorney's fees, litigation expenses and costs.

c For such other or further relief as the Court deems appropriate.

Respectfully submitted,
Plaintiff

By: ____________________
Her Attorney

Keith J. Keogh
Elizabeth Monkus
Law Offices of Keith J. Keogh, Ltd.
227 W. Monroe St., Ste. 2000
Chicago, Illinois 60606
312.726.1092 (office)
312.726.1093 (fax)
Keith@KeoghLaw.com

**JURY DEMAND**

Plaintiff demands trial by jury.

____________________

# Exhibit 3

RECEIVED

MAY 2 4 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH S. ROCCO and NANCY ROCCO, )
Plaintiffs, )
v. )
AMERIQUEST MORTGAGE COMPANY, AMERIQUEST MORTGAGE SECURITIES, INC., AMC MORTGAGE SERVICES, INC., and DOES 1-5, )
Defendants. )

JUDGE DER-YEGHIAYAN

MAGISTRATE JUDGE GERALDINE SOAT BROWN

JURY DEMANDED

06C 2897

**COMPLAINT**

**INTRODUCTION**

1. Plaintiffs Joseph S. Rocco and Nancy Rocco bring this action against a "subprime" mortgage lender and its affiliates to rescind a mortgage for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226, and for violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), 1367 (supplemental jurisdiction), and 15 U.S.C. §1640 (TILA). Defendants transact business in the District and are deemed to reside here.

**PARTIES**

3. Plaintiffs Joseph S. Rocco and Nancy Rocco are husband and wife and jointly own and reside in a home at 421 North Braintree, Schaumburg, IL 60194.

4. Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

5. Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

6. Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

7. Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

8. During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period. Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States. During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

9. Defendant AMC Mortgage Services, Inc. is a foreign corporation which does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

10. Defendant AMC Mortgage Services, Inc., an affiliate of Ameriquest Mortgage Company, services loans originated by Ameriquest Mortgage Company, and claims an

interest in such loans, including the right to receive payments thereunder. It is joined as a necessary party.

11. Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Illinois. It holds legal title to loans originated by Ameriquest Mortgage Company. It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

## FACTS RELATING TO PLAINTIFFS

12. Prior to January 27, 2005, Ameriquest solicited plaintiffs for a loan. Plaintiffs gave Ameriquest information to complete a loan application.

13. Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

14. In connection with the loan, prior to January 27, 2005, Ameriquest had one of its own employees, Jim Mahoney, perform an appraisal on the Roccos' home.

15. Twice an Ameriquest closer came to plaintiffs' home to have plaintiffs sign closing documents, only to cancel the closing before it got underway because of problems with the closing documents.

16. On the third attempt, an Ameriquest employee (not a closing agent) closed the loan in plaintiffs' home on January 27, 2005. Ameriquest rushed plaintiffs through the closing.

17. In the days immediately following the closing, three different Ameriquest representatives returned to plaintiffs' home six times in all, each time to have plaintiffs sign a document that, they explained, had not been signed at closing.

18. The following are documents relating to the loan:

a. A note, Exhibit A;

b. A mortgage, Exhibit B;

c. A settlement statement, Exhibit C;

d. A Truth in Lending disclosure statement, Exhibit D;

e. The three-day notice of right to cancel required by the Federal Reserve Board, Exhibit E;

f. A purported "one week" notice of right to cancel used solely by Ameriquest and related companies, Exhibit F.

19. As shown on Exhibit A, Ameriquest gave plaintiffs an adjustable interest rate. While the initial rate is 5.9% for three years, in March, 2007, the rate will start increasing and can switch immediately to as high as 7.9%. Thereafter, in each year it can rise by as much as 1.0%. The rate can go as high as 11.9%.

20. At the last possible moment, i.e., at closing, Ameriquest switched plaintiffs from a fixed interest rate to an adjustable interest rate, as shown by the documents attached in Exhibit G.

21. Plaintiffs accepted the adjustable interest rate to take advantage of the lower, temporary rate with the intent that they would refinance before the rate started adjusting upwards.

22. In April, 2005, plaintiffs attempted to refinance out of their Ameriquest loan. However, when they applied for refinancing, they learned for the first time that Ameriquest had significantly and artificially inflated the appraised value of their home above the actual

market value.

23. Because plaintiffs' loan-to-value ratio on the prospective refinance exceeded the acceptable ratio for underwriting, they were denied credit.

24. When they learned that Ameriquest had inflated the appraised value of their home, plaintiffs called Ameriquest to complain that they were denied credit because of it and to ask Ameriquest to do something to correct the situation. An Ameriquest representative told plaintiffs "not to worry about it," "who cares," and "we will refinance you again."

25. Subsequently, plaintiffs applied for refinancing with two other lenders. Both denied their applications due to Ameriquest's over-appraised value.

26. By means of the inflated appraisal, Ameriquest has trapped plaintiffs in an adjustable rate loan with no foreseeable means of escape.

27. Plaintiffs were later directed to make payments to AMC Mortgage Services, Inc.

28. On information and belief, Ameriquest Mortgage Securities, Inc. owns plaintiffs' loan.

29. In the event Ameriquest Mortgage Securities, Inc. does not own plaintiffs' loan (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

## COUNT I - TILA

30. Plaintiffs incorporate ¶¶ 1-29. This claim is against all parties.

31. Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to

the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

> (a) <u>Consumer's right to rescind.</u>
>
> **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**
>
> **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**
>
> **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**
>
> **(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**
>
> (b) <u>Notice of right to rescind.</u> **In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**
>
> **(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**
>
> **(2) The consumer's right to rescind the transaction.**

> **(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**
>
> **(4) The effects of rescission, as described in paragraph (d) of this section.**
>
> **(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

> **(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**
>
> **(2) A credit plan in which a state agency is a creditor.**

32. In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiffs' right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the reasons stated below.

33. On information and belief, as a result of the extended closing process, the notices of right to cancel were not delivered on the date of consummation.

34. None of the notices of right to cancel furnished to plaintiffs were completed. See Exhibit E.

35. The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

36. Furthermore, the "one week" cancellation notice is misleading, as the

period given is actually only six days long.

37. Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

38. Notice of rescission has been given to defendants. A copy is attached as Exhibit H.

39. The loan has not been rescinded.

40. Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

41. 15 U.S.C. §1635(g) provides:

> **Additional relief**
>
> **In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b. Statutory damages for the underlying disclosure violation;

c. If appropriate, statutory damages for failure to rescind;

d. If appropriate, actual damages;

e. a judgment declaring what obligation if any plaintiffs have toward each defendant, taking into account the challenge for plaintiffs' tender due to the inflated

appraised value;

f. Attorney's fees, litigation expenses and costs.

g. Such other or further relief as the Court deems appropriate.

## COUNT II - ILLINOIS CONSUMER FRAUD ACT

42. Plaintiffs incorporate ¶¶ 1-29. This claim is against Ameriquest.

43. Ameriquest violated §2 of the Consumer Fraud Act, 815 ILCS 505/2, by unfairly and deceptively (1) misrepresenting to plaintiffs the market value of their residential property; (2) concealing the fact, by means of the artificially inflated appraisal, that plaintiffs were getting a loan with an extremely high loan-to-value ratio; and (3) switching plaintiffs at the last moment from a fixed to an adjustable rate loan.

44. Defendants engaged in such conduct in the course of trade and commerce.

45. Defendants intended that plaintiffs rely on their misrepresentations. Ameriquest inflated plaintiffs' appraisal for the purpose of inducing plaintiffs to enter into the transaction.

46. Plaintiffs did in fact rely on Ameriquest's misrepresentations. They would not have taken out the loan if they had known that it was based on an inflated appraisal or that, because of the appraised value, they were borrowing at an extremely high loan-to-value ratio.

47. Plaintiffs were damaged as a result of Ameriquest's deception, in that (1) they were charged and paid excess points and fees and interest stemming from the inflated value and principal; (2) and they have attempted to but have been prevented from refinancing out of the adjustable-rate loan; (3) the combination of the inflated appraisal and the last moment switch from a fixed to an adjustable interest rate has trapped plaintiffs in an expensive loan.

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a. A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b. Statutory damages for the underlying disclosure violations;

c. If appropriate, statutory damages for failure to rescind;

d. Attorney's fees, litigation expenses and costs.

e. Such other or further relief as the Court deems appropriate.

Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

Daniel A. Edelman

T:\16775\Pleading\Complaint_Pleading.WPD

# EXHIBIT A

Loan Number: 0106137409 - 7453

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| January 27, 2005 | Orange | CA |
|---|---|---|
| Date | City | State |

421 North Braintree, Schaumburg, IL 60194
Property Address

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ **274,500.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **5.900 %**. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on **April 1, 2005** .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, **March 1, 2035** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at: **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,628.16**. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of, **March, 2007** and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **four and one-quarter** percentage point(s) **(4.250%)** to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials: ____ ____ ____ ____

Loan Number: 0106137409 - 7453

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.900** % or less than **5.900%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000%**) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **11.900** % or less than **5.900** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section without incurring a prepayment charge. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(B) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

0000010613740903005590302

Initials: ____ ____ ____ ____

01/27/2005 2:42:04 PM

Loan Number: 0106137409 - 7453

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | |
|---|---|
| _______________ (Seal)<br>Borrower Joseph S Rocco | _______________ (Seal)<br>Borrower Nancy Rocco |
| _______________ (Seal)<br>Borrower | _______________ (Seal)<br>Borrower |

000001061374090300590303

# EXHIBIT B

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Ameriquest Mortgage Company
Prepared By:

Rochelle Ners
10 N. Martingale Road, Suite
400,Schaumburg, IL 60173

[Space Above This Line For Recording Data]

# MORTGAGE

DEFINITIONS

3.

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated January 27, 2005 , together with all Riders to this document.
**(B) "Borrower"** is Joseph S RoccoNancy Rocco, And His Wife, in joint tenancy.

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

Lender's address is 1100 Town and Country Road, Suite 200 Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated January 27, 2005. The Note states that Borrower owes Lender two hundred seventy-four thousand five hundred and 00/100 Dollars (U.S. $ 274,500.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 1, 2035.
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County [Type of Recording Jurisdiction] of COOK [Name of Recording Jurisdiction]:

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 07-16-304-014 which currently has the address of 421 North Braintree [Street] Schaumburg [City], Illinois 60194 [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver,

Initials: ________

0106137409 - 7453

01/27/2005 2:42:04

Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Initials: ___________

0106137409 - 7453

01/27/2005 2:42:04

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials: ____________

0106137409-7453

01/27/2005 2:42:04

000001061374090301261607

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

0106137409-7453

01/27/2005 2:42:04

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any

Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: ___________

0106137409 - 7453

01/27/2005 2:42:04

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Initials: ________

0106137409-7453

01/27/2005 2:42:04

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________________ (Seal)
Joseph S Rocco -Borrower

_______________________ (Seal)
Nancy Rocco -Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
ROCCO -Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

**STATE OF ILLINOIS,** **County ss:**

I, ____________________________________ a Notary Public in and for said county and in said state, hereby certify that

________________________________________

________________________________________

________________________________________

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal of this .

My Commission Expires:

________________________________

Notary Public

BORROWER NAME:

LOAN NUMBER: 0106137409 - 7453

# LEGAL DESCRIPTION

000001061374090301261616

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 27th day of January , 2005 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

421 North Braintree, Schaumburg, IL 60194
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of **5.900 %**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of March, 2007 , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

Initials_____________

Loan Number: 0106137409 - 7453

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **four and one-quarter** percentage points ( **4.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.900% or less than 5.900%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %)** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 11.900)% or less than 5.900)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_______________

Loan Number: 0106137409 - 7453

000001061374090302150302

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | |
|---|---|
| _______________ (Seal)<br>Borrower Joseph S Rocco | _______________ (Seal)<br>Borrower Nancy Rocco |
| _______________ (Seal)<br>Borrower ROCCO | _______________ (Seal)<br>Borrower |

Loan Number: 0106137409 - 7453

# EXHIBIT C

OMB NO. 2502-0265

A.

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

# SETTLEMENT STATEMENT

B. TYPE OF LOAN:

1.[ ] FHA 2.[ ] FmHA 3.[X] CONV. UNINS. 4.[ ] VA 5.[ ] CONV. INS.

6. FILE NUMBER: TTC05-00248

7. LOAN NUMBER: 0106137409

8. MORTGAGE INS CASE NUMBER:

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1.0 3/98 (TTC05-00248.PFD/TTC05-00248/15)

D. NAME AND ADDRESS OF BORROWER:

JOSEPH S. ROCCO and
NANCY ROCCO
421 N BRAINTREE DR
SCHAUMBURG ,IL

E. NAME AND ADDRESS OF SELLER:

F. NAME AND ADDRESS OF LENDER:

AMERIQUEST MORTGAGE COMPANY
10 N. MARTINGALE ROAD
SCHAUMBURG, IL 60173

G. PROPERTY LOCATION:

421 N BRAINTREE DR
SCHAUMBURG, IL 60194
COOK County, Illinois

H. SETTLEMENT AGENT:

Tristar Title, LLC

PLACE OF SETTLEMENT

1301 W 22nd St Ste 101
Oak Brook, Illinois 60523

I. SETTLEMENT DATE:

January 27, 2005

Disburse:02/03/05

| J. SUMMARY OF BORROWER'S TRANSACTION | |
|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | |
| 101. Contract Sales Price | |
| 102. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 60,997.86 |
| 104. MORTGAGE PAYOFF to PRINCIPAL RESIDENTIAL MC | 84,345.44 |
| 105. | |
| *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes to | |
| 107. County Taxes to | |
| 108. Assessments to | |
| 109. | |
| 110. | |
| 111. | |
| 112. | |
| *120. GROSS AMOUNT DUE FROM BORROWER* | 145,343.30 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | |
| 201. Deposit or earnest money | |
| 202. Principal Amount of New Loan(s) | 274,500.00 |
| 203. Existing loan(s) taken subject to | |
| 204. | |
| 205. | |
| 206. | |
| 207. | |
| 208. | |
| 209. | |
| *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes to | |
| 211. County Taxes to | |
| 212. Assessments to | |
| 213. | |
| 214. | |
| 215. | |
| 216. | |
| 217. | |
| 218. | |
| 219. | |
| *220. TOTAL PAID BY/FOR BORROWER* | 274,500.00 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 145,343.30 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 274,500.00) |
| *303. CASH ( FROM ) ( X TO ) BORROWER* | 129,156.70 |

| K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|
| **400. GROSS AMOUNT DUE TO SELLER:** | |
| 401. Contract Sales Price | |
| 402. Personal Property | |
| 403. | |
| 404. | |
| 405. | |
| *Adjustments For Items Paid By Seller in advance* | |
| 406. City/Town Taxes to | |
| 407. County Taxes to | |
| 408. Assessments to | |
| 409. | |
| 410. | |
| 411. | |
| 412. | |
| *420. GROSS AMOUNT DUE TO SELLER* | |
| **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 501. Excess Deposit (See Instructions) | |
| 502. Settlement Charges to Seller (Line 1400) | |
| 503. Existing loan(s) taken subject to | |
| 504. Payoff of first Mortgage | |
| 505. Payoff of second Mortgage | |
| 506. | |
| 507. | |
| 508. | |
| 509. | |
| *Adjustments For Items Unpaid By Seller* | |
| 510. City/Town Taxes to | |
| 511. County Taxes to | |
| 512. Assessments to | |
| 513. | |
| 514. | |
| 515. | |
| 516. | |
| 517. | |
| 518. | |
| 519. | |
| *520. TOTAL REDUCTION AMOUNT DUE SELLER* | |
| **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 601. Gross Amount Due To Seller (Line 420) | |
| 602. Less Reductions Due Seller (Line 520) | ( |
| *603. CASH ( TO ) ( FROM ) SELLER* | 0.[illegible] |

## L. SETTLEMENT CHARGES

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL COMMISSION Based on Price $ @ 6.0000 % | | |
| *Division of Commission (line 700) as Follows:* | | |
| 701. $ to | | |
| 702. $ to | | |
| 703. Commission Paid at Settlement | | |
| 704. to | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee % to | | |
| 802. Loan Discount 0.8500 % to AMERIQUEST MORTGAGE COMPANY | 2,333.25 | |
| 803. Appraisal Fee to AMERIQUEST MORTGAGE COMPANY | 350.00 | |
| 804. TAX SERVICE FEE to AMERIQUEST MORTGAGE COMPANY | 70.00 | |
| 805. FLOOD CERT. FEE to AMERIQUEST MORTGAGE COMPANY | 9.00 | |
| 806. PROCESSING FEE to AMERIQUEST MORTGAGE COMPANY | 626.00 | |
| 807. ADMIN FEE to AMERIQUEST MORTGAGE COMPANY | 239.00 | |
| 808. APPLICATION FEE to AMERIQUEST MORTGAGE COMPANY | 360.00 | |
| 809. | | |
| 810. | | |
| 811. | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest From 02/03/05 to 03/01/05 @ $ 44.370000/day ( 26 days %) | 1,153.62 | |
| 902. Mortgage Insurance Premium for months to | | |
| 903. Hazard Insurance Premium for 1.0 years to | | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard Insurance months @ $ per month | | |
| 1002. Mortgage Insurance months @ $ per month | | |
| 1003. City/Town Taxes months @ $ per month | | |
| 1004. County Taxes months @ $ per month | | |
| 1005. Assessments months @ $ per month | | |
| 1006. months @ $ per month | | |
| 1007. months @ $ per month | | |
| 1008. months @ $ per month | | |
| **1100. TITLE CHARGES** | | |
| 1101. Settlement or Closing Fee to Tristar Title, LLC | 100.00 | |
| 1102. Abstract or Title Search to | | |
| 1103. Title Examination to | | |
| 1104. Title Insurance Binder to | | |
| 1105. Document Preparation to | | |
| 1106. Notary Fees to | | |
| 1107. Attorney's Fees to | | |
| *(includes above item numbers: )* | | |
| 1108. Title Insurance to Ticor Title Insurance Company | 1,403.00 | |
| *(includes above item numbers: )* | | |
| 1109. Lender's Coverage $ 274,500.00 | | |
| 1110. Owner's Coverage $ | | |
| 1111. STATE POLICY FEE to Tristar Title, LLC | 3.00 | |
| 1112. | | |
| 1113. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ 62.50; Releases $ | 62.50 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | |
| 1203. State Tax/Stamps: Revenue Stamps ; Mortgage | | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey to | | |
| 1302. Pest Inspection to | | |
| 1303. | | |
| 1304. | | |
| 1305. See addit'l disb. exhibit to | 54,288.49 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | 60,997.86 | |

Certified to be a true copy.

# EXHIBIT D

# TRUTH-IN-LENDING DISCLOSURE STATEMENT

## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary [X] Final

LENDER: Ameriquest Mortgage Company
10 N. Martingale Road, Suite 400
Schaumburg, IL 60173

Broker License:

Borrowers: Joseph S Rocco Nancy Rocco

Type of Loan: ADJUSTABLE RATE
Date: January 27, 2005

Address: 421 North Braintree
City/State/Zip: Schaumburg,IL 60194

Loan Number: 0106137409 - 7453

Property: 421 North Braintree, Schaumburg, IL 60194

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.041 % | $ 387,884.80 | $ 269,259.13 | $ 657,143.93 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,628.16 | 04/01/2005 | | | |
| 335 | $1,839.51 | 04/01/2007 | | | |
| 1 | $1,832.24 | 03/01/2035 | | | |

**VARIABLE RATE FEATURE:**
[X] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 421 North Braintree, Schaumburg, IL 60194

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original terms. [ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:** You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:** If a payment is late, you will be charged 5.000% of the overdue payment .

**PREPAYMENT:** If you pay off your loan early, you
[ ] may [X] will not have to pay a penalty.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower Joseph S Rocco Date    Borrower Nancy Rocco Date

Borrower Date    Borrower Date

ROCCO

TIL1 (Rev. 7/01) 000001061374090305750101

BORROWER COPY

01/27/2005 2:42:04 PM

# TRUTH-IN-LENDING DISCLOSURE STATEMENT

(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary [X] Final

LENDER: Ameriquest Mortgage Company
10 N. Martingale Road, Suite 400
Schaumburg, IL 60173

Broker License:

Borrowers: Joseph S Rocco Nancy Rocco

Type of Loan: ADJUSTABLE RATE
Date: January 27, 2005

Address: 421 North Braintree
City/State/Zip: Schaumburg, IL 60194

Loan Number: 0106137409 - 7453

Property: 421 North Braintree, Schaumburg, IL 60194

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.041 % | $ 387,884.80 | $ 269,259.13 | $ 657,143.93 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,628.16 | 04/01/2005 | | | |
| 335 | $1,839.51 | 04/01/2007 | | | |
| 1 | $1,832.24 | 03/01/2035 | | | |

**VARIABLE RATE FEATURE:**
[X] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 421 North Braintree, Schaumburg, IL 60194

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original terms. [ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:** You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:** If a payment is late, you will be charged 5.000% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you [ ] may [X] will not have to pay a penalty.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower Joseph S Rocco Date

Borrower Nancy Rocco Date

Borrower Date

Borrower Date

ROCCO

TIL1 (Rev. 7/01) 000001061374090305750101

ORIGINAL COPY

01/27/2005 2:42:04 PM

# EXHIBIT E

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: January 27, 2005
LOAN NO.: 0106137409 - 7453
TYPE: ADJUSTABLE RATE

BORROWER(S): Joseph S Rocco Nancy Rocco

ADDRESS: 421 North Braintree
CITY/STATE/ZIP: Schaumburg,IL 60194

PROPERTY: 421 North Braintree
Schaumburg, IL 60194

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is ENTER DOCUMENT SIGNING DATE ____________ ;

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of ENTER FINAL DATE TO CANCEL ____________

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

____________ SIGNATURE ____________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

____________ BORROWER/OWNER Joseph S Rocco Date ____________ BORROWER/OWNER Nancy Rocco Date

____________ BORROWER/OWNER ROCCO Date ____________ BORROWER/OWNER Date

1064-NRC (Rev 11/03)

000001061374090400050101

**LENDER COPY**

01/27/2005 2:42:04 PM

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: January 27, 2005
LOAN NO.: 0106137409 - 7453
TYPE: ADJUSTABLE RATE

BORROWER(S): Joseph S Rocco Nancy Rocco

ADDRESS: 421 North Braintree
CITY/STATE/ZIP: Schaumburg,IL 60194

PROPERTY: 421 North Braintree
Schaumburg, IL 60194

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is ENTER DOCUMENT SIGNING DATE ______________ ;

   or
2. The date you received your Truth in Lending disclosures;
   or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of ENTER FINAL DATE TO CANCEL ______________

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

______________________ SIGNATURE ______________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

______________________ BORROWER/OWNER Joseph S Rocco Date

______________________ BORROWER/OWNER Nancy Rocco Date

______________________ BORROWER/OWNER ROCCO Date

______________________ BORROWER/OWNER Date

1064-NRC (Rev 11/03)

000001061374090400050101

**BORROWER COPY**

01/27/2005 2:42:04 PM

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: January 27, 2005
LOAN NO.: 0106137409 - 7453
TYPE: ADJUSTABLE RATE

BORROWER(S): Joseph S Rocco    Nancy Rocco

ADDRESS: 421 North Braintree
CITY/STATE/ZIP: Schaumburg,IL 60194

PROPERTY: 421 North Braintree
Schaumburg, IL 60194

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is [ENTER DOCUMENT SIGNING DATE] ;

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of [ENTER FINAL DATE TO CANCEL]

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

SIGNATURE    DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

BORROWER/OWNER Joseph S Rocco    Date

BORROWER/OWNER Nancy Rocco    Date

BORROWER/OWNER ROCCO    Date

BORROWER/OWNER    Date

1064-NRC (Rev 11/03)

000001061374090400050101

**BORROWER COPY**

01/27/2005 2:42:04 PM

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: January 27, 2005
LOAN NO.: 0106137409 - 7453
TYPE: ADJUSTABLE RATE

BORROWER(S): Joseph S Rocco Nancy Rocco

ADDRESS: 421 North Braintree
CITY/STATE/ZIP: Schaumburg,IL 60194

PROPERTY: 421 North Braintree
Schaumburg, IL 60194

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is [ENTER DOCUMENT SIGNING DATE ______________ ] ;

   or

2. The date you received your Truth in Lending disclosures;

   or

3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of [ENTER FINAL DATE TO CANCEL ______________ ]

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

______________________________ ______________________
SIGNATURE DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

______________________________ Date ______________________________ Date
BORROWER/OWNER Joseph S Rocco BORROWER/OWNER Nancy Rocco

______________________________ Date ______________________________ Date
BORROWER/OWNER ROCCO BORROWER/OWNER

1064-NRC (Rev 11/03)

000001061374090400050101

**BORROWER COPY**

01/27/2005 2:42:04 PM

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: January 27, 2005
LOAN NO.: 0106137409 - 7453
TYPE: ADJUSTABLE RATE

BORROWER(S): Joseph S Rocco Nancy Rocco

ADDRESS: 421 North Braintree
CITY/STATE/ZIP: Schaumburg,IL 60194

PROPERTY: 421 North Braintree
Schaumburg, IL 60194

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is [ENTER DOCUMENT SIGNING DATE ______________] ;

   or
2. The date you received your Truth in Lending disclosures;

   or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of [ENTER FINAL DATE TO CANCEL ______________]

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

______________________________ SIGNATURE ______________________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

BORROWER/OWNER Joseph S Rocco Date BORROWER/OWNER Nancy Rocco Date

BORROWER/OWNER ROCCO Date BORROWER/OWNER Date

1064-NRC (Rev 11/03)  000001061374090400050101

**BORROWER COPY**

01/27/2005 2:42:04 PM

# EXHIBIT F

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0106137409 - 7453
Date: January 27, 2005

Borrower(s): Joseph S Rocco
Nancy Rocco

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you**. No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

Borrower/Owner Joseph S Rocco — Date

Borrower/Owner Nancy Rocco — Date

Borrower/Owner ROCCO — Date

Borrower/Owner — Date

## REQUEST TO CANCEL

**I/We want to cancel loan # ________________.**

Borrower/Owner Signature — Date

00000106137409040422010 1

01/27/2005 2:42:04 PM

850 (10/00)

**BORROWER COPY**

# EXHIBIT G

# Ameriquest Mortgage Company

January 25, 2005

Joseph S Rocco
421 North Braintree Drive
Schaumburg,IL 60194

Loan Number: 0106137409 - 7453

## NOTICE OF LOAN PRODUCT CHANGE

Dear Ameriquest Mortgage Company Applicant:

Your loan product changed from a **fixed rate loan program** to an **adjustable loan program.** This notice is provided to you to ensure that you understand the change in product.

Enclosed you will find a new disclosure that sets forth the terms of your final loan product.

If you have any questions regarding this program change, please contact your Loan Officer for clarification.

000001061374090405570101

RSPA LTR2 (2/00)

Ameriquest Mortgage Company
10 N. Martingale Road, Suite 400
Schaumburg, IL 60173

# BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

Joseph S Rocco
Nancy Rocco

421 North Braintree
Schaumburg,IL 60194

Date: January 27, 2005

Notice: [X] Delivered [ ] Mailed

Loan Number: 0106137409 - 7453

Description of Credit Request:

[X] 1st Trust Deed/Mortgage [ ] 2nd Trust Deed/Mortgage

[ ] Other:

Property Address: 421 North Braintree
Schaumburg, IL 60194 County of COOK

## TYPE OF TRANSACTION:

[ ] Purchase [X] Refinance Other

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS: |
|---|---|
| [X] Fixed Rate Loan [ ] Adjustable Rate Loan | [ ] Fixed Rate Loan [X] Adjustable Rate Loan |
| Amount Financed: $ 264,934.82 | Amount Financed: $ 269,259.13 * |
| Settlement Charges: $ 10,675.18 (Includes all Prepaid Finance Charges) | Settlement Charges: $ 6,709.87 * (Includes all Prepaid Finance Charges) |
| Loan Amount: $ 274,935.00 | Loan Amount: $ 274,500.00 |
| Annual Percentage Rate: 8.064 % | Annual Percentage Rate: 7.041 %* |
| Term: 360 | Term: 360 |
| Initial Interest Rate: 7.700 % | Initial Interest Rate: 5.900 % |
| Margin: 0.000 % | Margin: 4.250 % |
| Prepayment Penalty: [ ] YES [X] NO | Prepayment Penalty: [ ] YES [X] NO |

Borrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based exclusively on information, statements, and representations (all material facts) which have been provided by the borrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change prior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. Borrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may require new loan documents to be executed by the borrower(s).

Borrower Joseph S Rocco Date

Borrower Nancy Rocco Date

# GOOD FAITH ESTIMATE

Loan Number 0106137409 - 7453
Lender: Ameriquest Mortgage Company

Address: 10 N. Martingale Road, Suite 400
Schaumburg, IL 60173
Applicant(s): Joseph S Rocco Nancy Rocco

Property Address: 421 North Braintree Drive
Schaumburg, IL 60194

Sales Price: 0.00
Base Loan Amount: 268,200.00
Total Loan Amount: 268,200.00
Type of Loan: ADJUSTABLE RATE
Date Prepared: January 25, 2005
Rate: 5.900 % Term: 360 Months
Broker:

**The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less.** Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A Settlement Statement that you will be receiving at settlement. The HUD-1 or HUD-1A Settlement Statement will show you the actual cost for items paid at settlement. **The loan terms and fees may change based on the information gathered during the underwriting and loan approval process or as a result of negotiations between you and the Lender.**

**"L" designates those costs to be paid outside of closing by Lender. "S" designates those costs to be paid by Seller * Paid Outside of Closing**

| 800 ITEMS PAYABLE IN CONNECTION WITH LOAN: | | 1100 TITLE CHARGES: | |
|---|---|---|---|
| 801 Loan Origination Fee ( %) | | 1101 Settlement or Closing Fee $90.00 to $350.00 | $100.00 |
| 802 Loan Discount Fee ( 0.500 %) | $1,341.00 | 1102 Abstract or Title Search to | |
| 803 Appraisal/Property Valuation | | 1103 Title Examination | |
| 804 Credit Report $ to $ | | 1104 Title Insurance Binder | |
| 805 Lender's Inspection Fee | | 1105 Document Preparation Fee | |
| 806 Mortgage Insurance Application Fee | | 1106 Notary Fees | |
| 807 Assumption Fee | | 1107 Attorney Fees | |
| 808 Yield Spread Premium to Broker | | 1108 Title Insurance $1,395.00 to $1,785.00 | $1,469.00 |
| 809 | | 1109 | |
| 810 Tax Related Service Fee | $70.00 | 1110 | |
| 811 Flood Search Fee | $9.00 | 1111 Settlement/Disbursement Fee | |
| 812 Lender's Processing Fee | $628.00 | 1112 Escrow Fee | |
| 813 Admin to Ameriquest Mortgage | $239.00 | | |
| 814 Doc Prep Fee to | | | |
| 815 Credit Report Fee paid to Broker | | | |
| 816 Origination Fee to broker ( %) | | 1200 GOVERNMENT RECORDING AND TRANSFER CHARGES: | |
| 817 Application Fee to Ameriquest | $360.00 | 1201 Recording Fees: | |
| 818 Underwriting Fee to Broker | | 1202 City/County Tax/Stamps: | |
| 819 Service Provider Fee to | | 1203 | |
| 820 Processing Fee to Broker | | 1204 | |
| 821 Underwriting Fee to Lender | | 1205 | |
| 900 ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | | |
| 901 Interest for 28 days @ $43.35 per day | $1,213.80 | | |
| 902 Mortgage Ins Premium | | | |
| 903 Hazard Ins. Premium | | | |
| 904 Flood Ins. Premium | | 1300 ADDITIONAL SETTLEMENT CHARGES: | |
| 1000 RESERVES DEPOSITED WITH LENDER: | | 1301 Demand | |
| 1001 Haz Ins Prem months @ $ | | 1302 Pest Inspection | |
| 1002 Mortgage Ins months @ $ | | 1303 Survey | |
| 1003 Earthquake Ins months @ $ | | 1304 Staff Appraiser Fee | $350.00 |
| 1004 Cnty Prop Taxes months @ $ | | 1305 Reconveyance Fee | |
| 1005 Annual Assmts months @ $ | | 1306 | |
| 1006 Flood Ins months @ $ | | 1307 Apprsl/Prop Val Fee to | |
| 1007 Windstorm Ins months @ $ | | 1308 Courier Fee | |
| 1008 | | TOTAL ESTIMATED SETTLEMENT CHARGES | $5,777.80 |
| TOTAL ESTIMATED FUNDS NEEDED TO CLOSE: | | TOTAL SETTLEMENT CHARGES PAID BY LENDER | $0.00 |
| Down payment | | TOTAL ESTIMATED MONTHLY PAYMENT | |
| Est. Closing Costs | $4,564.00 | Principal & Interest | $1,590.80 |
| Est. Prepaid Items/Reserves | $1,213.80 | Real Estate Taxes | |
| OTHER POC Borrower | $0.00 | Flood & Hazard Insurance | |
| TOTAL EST. FUNDS NEEDED TO CLOSE | $5,777.80 | Mortgage Insurance | |
| TOTAL FEES PAID BY LENDER | $0.00 | TOTAL MONTHLY PAYMENT | $1,590.80 |

THIS SECTION TO BE COMPLETED BY LENDER ONLY IF A PARTICULAR PROVIDER OF SERVICE IS REQUIRED. Use of the particular provider is required and the estimate is based on charges of the provider. If a particular provider is not mentioned, a provider will be required from a lender approved list.

| ITEM NAME OF PROVIDER | ADDRESS OF PROVIDER | TELEPHONE | NATURE OF RELATIONSHIP |
|---|---|---|---|
| 803 Appraisal Repeated Use | | | Unaffiliated/Repeated Use |
| 804 Credit Repeated Use | | | Unaffiliated/Repeated Use |
| 810 Fidelity National Tax Service | 468 N. Rosemead Blvd., Pasadena, CA 91107 | 800-969-9724 | Unaffiliated/Used 100%/Tax |
| 811 First American Flood Data Service | 11902 Burnet Rd, Ste 200, Austin, TX 78758 | 800-447-1772 | Unaffiliated/Used 100%/Flood |
| 1101 Closing Agent Repeated Use | | | Unaffiliated/Repeated Use |
| 1108 TRISTAR TITLE, LLC | 1301 WEST 22ND STREET, SUITE 101 OAK BROOK IL 60523 | (630)954-4000 | Unaffiliated/Repeated Use |

**These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the Lender will take a first lien on the property.** The undersigned acknowledges receipt of the booklet "Settlement Costs", and the Consumer Handbook on ARM Mortgages, if applicable.

Applicant Joseph S Rocco Date

Applicant Nancy Rocco Date

Applicant Date

Applicant Date

GFE (Rev. 7/03)

000001061374090405100101

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[X] Preliminary [ ] Final

LENDER: Ameriquest Mortgage Company
10 N. Martingale Road, Suite 400
Schaumburg, IL 60173

Broker License:

Borrowers: Joseph S Rocco

Type of Loan: FIXED RATE
Date: January 6, 2005

Address:
City/State/Zip:

Loan Number: 0106137409 - 7453

Property: 421 North Braintree Drive, Schaumburg, IL 60194

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| (e) 8.064 % | $ 440,725.85 (e) | $ 264,934.82 (e) | $ 705,660.67 (e) |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | (e) $1,960.18 | 03/01/2005 | | | |
| 1 | (e) $1,956.05 | 02/01/2035 | | | |

**VARIABLE RATE FEATURE:**
[ ] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 421 North Braintree Drive, Schaumburg, IL 60194

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original terms. [ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:** You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:** If a payment is late, you will be charged 5.000% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
[ ] may [X] will not have to pay a penalty.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

(e) = estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower Joseph S Rocco Date | Borrower Date

Borrower Date | Borrower Date

TIL1 (Rev. 7/01)

7777777707070700076765242717744400777170
5633544621071311763667107620756243517762
3201077424173756010010753405777374764107
000001061374090305760101

BORROWER COPY

01/06/2005 4:58:58 PM

# EXHIBIT H

**EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.**
**120 S. LaSalle Street, 18th floor**
**Chicago, Illinois 60603-3403**
**(312) 739-4200**
**(800) 644-4673**
**(312) 419-0379 (FAX)**
**Email: edcombs@aol.com**
**www.edcombs.com**

April 20, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Re: Notice of rescission, claim and lien, Joseph S. Rocco and Nancy Rocco, 421 North Braintree, Schaumburg, IL 60194, loan of January 27, 2005

Ladies/Gentlemen:

Each of the above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on April 20, 2006.

Daniel A. Edelman

# Exhibit 4

FILED
MAY 1 6 2006
NR
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

TRUMAN ROGERS,
Plaintiff,

v.

TOWN & COUNTRY CREDIT
SAXON MORTGAGE SERVICES, INC.
Defendants.

JURY DEMANDED

06CV2736
JUDGE COAR
MAGISTRATE VALDEZ

COMPLAINT

**MATTERS COMMON TO MULTIPLE CLAIMS**

**INTRODUCTION**

1. Plaintiff, Truman Rogers, brings this action against mortgage lender Town and Country Credit ("Town & Country") to secure redress from predatory and fraudulent lending practices. Plaintiff seeks to rescind a residential mortgage loan for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226 and has named Saxon Mortgage Services, Inc. who is the current owner and servicer of the loan as a necessary party to the claim for rescission.

**JURISDICTION**

2. This Court has jurisdiction under 28 U.S.C. §1331 (general federal question), 15 U.S.C. §1640 (TILA) and 28 U.S.C. §1367 (supplemental jurisdiction). Venue in this District is proper because defendants transact business here.

**PARTIES**

3. Plaintiff, Truman Rogers, is a resident of Riverdale, Illinois.

4. Defendant Town and Country Credit is a national lender located in California. Its registered agent is National Registered Agents Inc. located at 200 W. Adams, Chicago, Illinois.

5. Town & Country is a creditor as defined in TILA and implementing Federal Reserve Board Regulation Z.

6. Saxon Mortgage Services, Inc. is the current owner and servicer of the loan as a necessary party to the claim for rescission. Its registered agent is Illinois Corporation Service, 801 Adlai Stevenson Dr., Springfield, Il. 62703.

## FACTS RELATING TO PLAINTIFF'S LOAN

7. Plaintiff met with Eric Mistal to apply for a refinance of his home loan.

8. Eric Mistal was a Town & Country loan officer and member of its President's Club in 2005. All communications and documents concerning the loan and application were sent to or from Mr. Mistal.

9. On September 21, 2005, plaintiff met with Eric Mistal and signed the closing documents for his loan. The loan had an interest rate of 9.4% even though plaintiff's former loan had a rate of 8.615%.

10. Town and Country provided plaintiff with a Notice of Right to Cancel, which stated that the loan can be cancelled no later then midnight on September 24, 2005. Town and Country also provided a notice stating that the loan could be cancelled within one week from the closing date.

11. On September 22, 2005, Plaintiff's original lender offered a significantly lower rate then the Town and Country rate.

12. On Friday September 23, 2005, plaintiff sent Town & Country the executed

Notice of Right to Cancel via facsimile. Plaintiff even had the Notice of Right to Cancel notarized.

13. Plaintiff telephoned Mr. Mistal that same day to confirm his cancellation. Mr. Mistal informed plaintiff to have his original creditor to confirm the rate and call him back on Monday.

14. Mr. Rogers telephone Mr. Mistal again on Monday and confirmed that he was eligible for even a lower rate.

15. On September 30, 2005, plaintiff learned that the refinance was funded.

16. Despite receiving the executed Notice of Right to Cancel, Town & Country founded the loan. Plaintiff has complained to it as well as the Illinois Department of Financial and Professional Regulation. Town and Country has refused repeated requests by plaintiff for recession.

**COUNT I- TILA- RESCISSION**

17. Plaintiff incorporates ¶¶1-16.

18. Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. §1635, and implementing Federal Reserve Board Regulation Z, 12 C.F.R. §226.23.

19. Section 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written**

communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) Exempt transactions. The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

20. Because plaintiff timely executed and delivered the notice of right to cancel, he was is entitled to rescind.

21. In addition, defendant's practice of providing its disclosure of One Week Cancellation Period form, when offered in conjunction with the Notice of Right to Cancel form, violates TILA's requirement that the creditor clearly and conspicuously disclose the borrower's absolute right to cancel the transaction within three business days.

22. A consumer who relies on the One Week form instead of the three business day statutory right to cancel loses benefits without being warned as much in advance.

23. Plaintiff has given notice of his election to rescind. Further, even if he did not, he has a continuing right to rescind as Town and Country did not clearly and conspicuously disclose the borrower's absolute right to cancel the transaction within three business days.

24. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against Town & Country Mortgage Company and Saxon Mortgage Services, Inc. for:

a. Rescission of the loan

b. Statutory damages for failing to honor the election to rescind.

c. Attorney's fees, litigation expenses and costs.

d. Such other or further relief as the Court deems appropriate.

**COUNT II – CONSUMER FRAUD ACT CLAIM**

25. Plaintiff incorporates ¶¶1-16. This claim is against Town & Country.

26. Defendant engaged in unfair and deceptive acts and practices, in violation of §§2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 by:

27. Failing to disclose the following material facts to plaintiffs:

a. That plaintiff would lose benefits if he relied on the One Week form rather the statutory three business day right to rescind.

28. Defendant's actions were also unfair actions in violation of §2 as it is an unfair practice to receive a facsimile that elected to cancel the refinance and lead plaintiff to believe that the refinance was cancelled during several telephone calls when it was not.

29. Section 2 of the Consumer Fraud Act provides:

> **Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].**

30. Defendant engaged in such unfair and deceptive acts and practices in the course of trade and commerce in financial services.

31. Defendant intended that plaintiff rely on the undisclosed facts, by signing both disclosures forms.

32. Plaintiff did so rely, and was damaged.

33. The conduct of defendant was deliberately oppressive, corrupt and dishonest.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against Town and Country for:

a. Compensatory and punitive damages;

b. Attorney's fees, litigation expenses and costs.

c. Such other or further relief, including rescission as the Court deems appropriate.

Respectfully submitted,
Plaintiff

By: ______________________
Her Attorney

Keith J. Keogh
Elizabeth Monkus
Law Offices of Keith J. Keogh, Ltd.
227 W. Monroe St., Ste. 2000
Chicago, Illinois 60606
312.726.1092 (office)
312.726.1093 (fax)
Keith@KeoghLaw.com

**JURY DEMAND**

Plaintiff demands trial by jury.

______________________