IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION<br><br>————————————————<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | MDL No. 1715<br><br>Lead Case No. 05-cv-07097<br><br>(Centralized before The Honorable Marvin E. Aspen) |

**DEFENDANTS' PROPOSED ORGANIZATION PLAN**

Defendants Ameriquest Mortgage Company ("Ameriquest"), Ameriquest Capital Corporation, Town & Country Credit Corporation and Argent Mortgage Company, LLC (collectively, "Defendants") submit this Proposed Organization Plan pursuant to the Court's February 7, 2006 Order.

**I.   STATUS OF TAG-ALONG ACTIONS AND OTHER PROCEEDINGS TO ENSURE ALL NECESSARY CASES AND PARTIES ARE BEFORE THIS COURT**

When this Multidistrict Litigation Proceeding ("MDL Proceeding") was last before the Court for a Status Conference in February 2006, one of the Court's primary concerns was ensuring that no substantive rulings be made before the Multidistrict Litigation Panel ("MDL Panel") had transferred all necessary actions to this Court. At that time, there were just five cases included in this MDL Proceeding. Since that time, the Panel has made significant progress in determining the scope of "tag-along" actions, having transferred 42 additional cases, but the Panel is still considering whether to transfer many additional cases.[1] Currently, 161 cases are part of this Multidistrict Litigation Proceeding: 118 exist; and 43 remain to be transferred.

---

[1] In the wake of another set of recent case filings by Plaintiffs' counsel Daniel Edelman and others, Defendants have filed their Second Motion for Reassignment of approximately 4 additional cases filed in the Northern District of Illinois. Plaintiffs' counsel have also filed their Third Motion for Reassignment

### A. Status of Conditional Transfer Orders

First, the MDL Panel has thus far issued four Conditional Transfer Orders ("CTO"), true and correct copies of which are attached hereto as Exhibits 1, 2, 3 and 4 respectively. Of the cases identified in these CTOs, 42 were transferred by operation of law when no party objected, or filed motions to vacate. The MDL Panel has not yet issued its determination after consideration at their May 25, 2006 hearing regarding the contested matters listed in CTO-1. No hearing has been set for those contested matters listed in CTO-2, CTO-3 and CTO-4 and Defendants expect those matters to be taken up at the Panel's July or August 2006 hearing, depending on the MDL Panel's schedule. Finally, there are 10 matters for which the Panel is still considering whether to issue a CTO. Attached hereto as Exhibit 5 is a true and correct copy of the Panel's June 9, 2006 Case Listing Report which demonstrates that 10 matters are still "awaiting info."

### B. Additional Cases Filed by Daniel Edelman

Second, as Daniel Edelman promised the Court at the April 7, 2006 hearing on Defendants' Motion for Reassignment of Related Cases ("Defendants' Reassignment Motion"), he has indeed filed many additional related cases in this District.[2] While 41 such cases filed by Mr. Edelman have already been reassigned to this MDL Proceeding, 24 remain and are subject to Plaintiffs' and Defendants' Second and Third Motions for Reassignment.

### C. Motions for Reassignment

Third, in an effort to bring all necessary parties before the Court, Defendants filed Defendants' Reassignment Motion, pursuant to which they sought to reassign 30 cases pending in the Northern District of Illinois to this Court. Plaintiffs responded to that motion by opposing

---

of approximately 22 additional cases filed in the Northern District of Illinois. As set forth below, Defendants expect most, if not all, of the issues in these motions to be resolved shortly by stipulation.

[2] All of the actions filed by Edelman, Combs, Latturner & Goodwin, LLC ("ECLG") appear to be the result of substantial efforts, which continue to this day, by ECLG to solicit lawsuits from persons who received a loan from Ameriquest or other Defendants in this proceeding, rather than from a reasonable and objective evaluation of whether in fact any individual borrower did or did not receive appropriate disclosures regarding his or her rescission rights. See Declaration of Elizabeth M. Smith in Support of Defendants' Reply to Plaintiffs' Memorandum Concerning Potential Foreclosures, ¶ 2, Exh. A and Declaration of Craig Varga in Support of Defendants' Reply to Plaintiffs' Memorandum Concerning Potential Foreclosures, ¶ 2, Exhs. A, B, and C, which are attached hereto as Exhibits 6 and 7 respectively.

reassignment of a handful of those 30 cases that were settled and awaiting dismissal or awaiting potentially dispositive rulings, and by requesting reassignment to this Court of an additional 6 cases. By Order dated April 4, 2006, 28 cases were reassigned to this Court (22 of the 30 cases for which Defendants sought reassignment, and the 6 cases for which the Plaintiffs requested reassignment). Defendants' Reassignment Motion was denied without prejudice with respect to the remaining eight cases, and the Court stated its intent to reconsider the reassignment issue regarding those eight cases based on their status at the time the Court considers the parties' proposed organization plans. Plaintiffs filed their Second Motion for Reassignment on April 20, 2006, seeking to reassign 13 additional cases. The Court granted this motion on April 26, 2006.

The following is the current status of the eight cases for which Plaintiffs opposed reassignment. *Payne v. Ameriquest Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-5024) has been dismissed by joint motion of the parties, so no further action need be taken as to it. The following four cases: *Abercrombie v. Argent Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-1687); *Hubbard v. Ameriquest Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-0389); *Tammerello v. Ameriquest Mortgage Co., et al.*(Northern District of Illinois, Case No. 05-cv-0466); and *Washington, et al. v. Ameriquest Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-1007) all have summary judgment motions pending, and, for the reasons set forth in Defendants' Reassignment Motion, Defendants request that these four cases be reassigned to this Court. As regards *Jones v. Ameriquest Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-0432), the parties' cross motions for summary judgment were heard in January of this year, however, the Court has not yet entered a final judgment. Ameriquest is in agreement with Plaintiffs that this matter should not be reassigned to this Court. As regards *Lemmons v. Ameriquest Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-4709), the parties have not yet agreed to a settlement and the matter has been referred to a magistrate judge. As regards *Zarate v. Ameriquest Mortgage Co., et al.* (Northern District of Illinois, Case No. 05-cv-4696), the parties are still negotiating language within the draft settlement agreement.

On June 7, 2006, Plaintiffs filed their Third Motion for Reassignment, seeking to reassign 22 additional cases and on June 8, 2006, Defendants filed their Second Motion for Reassignment seeking to reassign 4 additional cases. From these motions, the parties will stipulate to reassign at least the following cases: *Gburek v. Ameriquest Mortgage Co.; Gburek v. Argent Mortgage*

*Co.; Rocco, et al. v. Ameriquest Mortgage Co., et al.; Rogers v. Town & Country Credit Corp., et al.; Geis, et al. v. Ameriquest Mortgage Company, et al.; Wessel, et al. v. Ameriquest Mortgage Company, et al.; Rodriguez, et al. v. Ameriquest Mortgage Company, et al.; Sedgwick, et al. v. Ameriquest Mortgage Company, et al.; Spencer v. Ameriquest Mortgage Company, et al.; Balark, et al. v. Ameriquest Mortgage Company, et al.; Dougherty, et al. v. Ameriquest Mortgage Company, et al.; Grabowski v. Ameriquest Mortgage Company, et al.; Besterfield v. Ameriquest Mortgage Company, et al.; Tieri v. Ameriquest Mortgage Company, et al.; Wisniewski v. Town & Country Credit Corp., et al.; Jiles v. Argent Mortgage Company, et al.; Walker, et al. v. Ameriquest Mortgage Company, et al.; Grabs v. Argent Mortgage Company, et al; Smith, et al. v. Ameriquest Mortgage Company, et al.; Eson, et al. v. Argent Mortgage Company, et al.; Brown, et al. v. Ameriquest Mortgage Company, et al.; Dearden v. Ameriquest Mortgage Company, et al.; Filian, et al. v. Ameriquest Mortgage Company, et al.; Melecio, et al. v. Town & Country Credit Corporation, et al.;* and *Mormon v. Ameriquest Mortgage Company, et al.*

      **D.    Motion to Join Third-Party Closing Agents As Cross-Defendants**

Finally, there are a fourth group of parties who will need to be added to this case before substantive litigation commences. This group is collectively referred to as "third-party closing agents."

Ameriquest, a retail lender, has exclusively used third-party closing agents to conduct its loan closings since July 2004 and has always used them for the borrowers' convenience.

Argent, as a wholesale lender, has no borrower contact during the loan origination process and has always used third-party closing agents to conduct its loan closings. Indeed, Argent as a wholesale lender does not have any verbal communications with borrowers whatsoever. Further, Argent plays no role in selecting third-party closing agents (rather, the mortgage broker and/or the borrower make this selection), and Argent representatives do not attend loan closings.

These third-party closing agents are charged with ensuring that the Notice of Right to Cancel ("NORTC") is properly completed and signed by the borrowers in accordance with the Truth in Lending Act ("TILA") at the time of each loan closing. No fewer than 132 cases included in this MDL Proceeding arise from allegations that the borrower received incomplete or improper NORTC forms in violation of TILA. While Defendants deny that there are systemic

problems with the completion of and/or provision of the NORTC to borrowers, to the extent there have been any errors with respect to individual loans, these errors were caused by the third-party closing agents. Accordingly, it is essential to bring these third-party closing agents before the Court so that all involved/interested parties (and their respective insurance carriers to the extent applicable) can meaningfully participate in settlement negotiations.[3] It is also essential to bring these third-party closing agents before the Court in this Proceeding for purposes of discovery and trial in order to avoid a multitude of repetitive lawsuits for indemnification and/or contribution. Thus, Defendants are prepared to file a Motion to Join Third-Party Closing Agents as Cross-Defendants.

Until the foregoing matters are decided by the Panel and/or this Court, Defendants submit that the current stay of litigation should remain in place so that no substantive rulings and/or settlement discussions can affect absent parties. Based on the timing of the Panel's rulings on those matters which were the subject of prior CTOs, assuming no additional cases are filed, Defendants believe the Panel should have completed its process of transferring potential "tag-along" actions to this Court by September 2006 and suggest a continued Status Conference at that time. Regardless of whether the Court agrees with this suggestion, Defendants submit their Proposed Organization Plan below so that once this case is placed on a litigation track, it can be managed efficiently toward a resolution.

## II. IMPACT OF AMERIQUEST'S SETTLEMENT WITH 49 ATTORNEYS GENERAL

Ameriquest and the State Attorneys General of the 49 states in which Ameriquest has done business over the last six years reached a settlement that likely resolves all of the disputes raised in these coordinated actions ("AG Settlement"). The AG Settlement, which became final on January 23, 2006, resolves all claims by borrowers in the 49 states regarding the lending practices of Ameriquest and certain related entities. The AG Settlement covers all loans made between January 1, 1999 and December 31, 2005.[4] A copy of the AG Settlement Agreement is

---

[3] Defendants have thus far identified 19 third-party closing agents used by Ameriquest and Argent in the matters before the MDL and expect to identify more. These third-party closing agents include, but are not limited to, Fidelity National Title Insurance Company of New York, Chicago Title Insurance Company, First American Title Insurance Company and Old Republic National Title Company.

[4] Notably, it appears that the statute of limitations for those cases included within this MDL Proceeding will bar any claims for loans originated prior to the January 1, 1999 date that governs the AG Settlement.

attached hereto as Exhibit 8. Pursuant to the AG Settlement, $295,000,000 in restitution will be provided to borrowers who opt to participate in the settlement.[5] Each such borrower will sign a broad release of liability in exchange for a share of the restitution.

Based on similar settlements reached between consortiums of Attorneys General and other national lenders, Ameriquest expects the claims rate for the AG Settlement to be in excess of 70%, leaving less than 30% of Ameriquest borrowers – only a portion of whom might be putative class members in the actions before the court – with claims. [Declaration of Jeffrey Dahl, ¶ 9.] In addition, given that the financial benefits of the AG Settlement are significant, some class representatives or plaintiffs in individual actions before this Court may opt to accept those benefits as well.

It is important to consider that the AG Settlement was reached after the chief law enforcement officers of 49 states conducted an extensive, three year investigation and reached a consensus as to what, in their collective judgment, was a fair resolution of all outstanding claims for their respective states' citizens. Based on the foregoing, the Court and the parties should not spend unnecessary time and resources resolving claims that will be rendered moot by the agreement that resulted from this process. Instead, the administration of the AG Settlement should move forward and this MDL proceeding should abate until the scope of those borrowers with remaining claims is determined.[6]

---

[5] Pursuant to the AG Settlement, the total settlement amount is $325,000,000.

[6] The bulk of the claims remaining after the AG Settlement is administered are likely to post-date February 3, 2003. This is significant since this is the date on which Ameriquest changed its loan pricing model to incorporate "fixed-pricing." Both the Attorneys General and other class action plaintiffs' counsel have acknowledged that this new pricing model substantially eliminates the possibility of systemic bait and switch practices, or other alleged pricing violations. For example, the AG Settlement has a two-tiered settlement that does not provide the same level of compensation for post-"fixed-pricing" borrowers. [See AG Settlement, Exh. 8, p. 9, paras. F (1) and (2).] Similarly, in the class settlement of the In re Ameriquest Cases ("Pierceall Cases"), California Superior Court Case No. JCCP No. 4162, class counsel agreed that Ameriquest's adoption of a fixed pricing system as of February 3, 2003 substantially eliminated the potential for bait and switch practices. In the Plan of Allocation for distribution of the settlement monies in the Pierceall Cases, borrowers who obtained loans after February 3, 2003 were required to submit additional assurances under oath that they were actually "baited and switched," and Ameriquest had the right to contest such claims through an arbitration proceeding in which class counsel must represent such borrowers for free. See Stipulation and Agreement of Settlement, p. 9, and Notice of Entry of Order Granting Final Approval of Class Settlement, p. 11, which are attached hereto as Exhibits 9 and 10 respectively.

The administration of the AG Settlement is well underway. Pursuant to the Settlement, an independent Monitor has been appointed to oversee compliance with the AG Settlement. The Monitor has broad duties and powers, which include supervising all aspects of Ameriquest's lending practices to ensure compliance with applicable laws such as TILA and RESPA. Moreover, the attorneys general and Ameriquest have already selected a nationwide claims administrator to administer the claims.

Pursuant to the Settlement, the Attorneys General of the 49 states have each filed lawsuits against Ameriquest (and related entities) in their respective state courts. Each of these complaints was dismissed pursuant to a stipulated or consent judgment entered into between the state and Ameriquest, except to the extent that the courts retained jurisdiction to enforce those judgments. Attached as Exhibit 11 is a list of the cases filed by each of the Attorneys General in each of the affected states.

Accordingly, Ameriquest submits that this MDL Proceeding should be stayed until this process is completed and the vast majority of the borrowers at issue are removed from these proceedings.[7]

### III. GLOBAL MOTIONS THAT SHOULD PRECEDE SETTLEMENT DISCUSSIONS, DISCOVERY AND OTHER MOTIONS

If implementation of the fair resolution reached by the Attorneys General of 49 states does not result in complete resolution of the claims at issue herein, Defendants submit that this case should be postured for meaningful settlement negotiations. Defendants suggest that this can and should be accomplished through the Court hearing and deciding motions involving certain legal issues that, once decided by the Court, will serve to significantly reduce the remaining issues, and assist in focusing these remaining issues for purposes of settlement. Defendants

---

[7] An additional reason why the proceedings should be stayed is that there are matters pending on appeal in circuit courts that may resolve specific issues before this Court. For example, *Hamm v. Ameriquest Mortgage Co.* (United States District Court for the Northern District of Illinois, Case No. 05-3984) is pending appeal before the Seventh Circuit. The appeal addresses whether the omission of the word "monthly" from the Ameriquest TILA disclosure statement constitutes a TILA violation, entitling the borrower to rescind the mortgage loan. This issue was decided in Ameriquest's favor at the trial court level. Many of the pending lawsuits raise this very issue. The pendency of the appeal and the expected ruling of the Seventh Circuit should resolve many issues in the lawsuits presently pending before this Court.

submit that the Court should rule on these motions prior to allowing the parties to move forward with discovery and general law and motion practice.[8]

### A. Motion as To Ameriquest

While the vast majority of Ameriquest borrowers nationwide are expected to release Ameriquest from the claims raised in this MDL Proceeding through the AG Settlement, of those who remain, many will likely have already released Ameriquest through the mechanism of an earlier class action settlement, thereby further reducing the number of participants in the MDL Proceeding.

Ameriquest has settled multiple class action cases throughout the country. Each of these class action settlements has resulted in the release of Ameriquest from further liability from tens of thousands of borrowers. Ameriquest will file a Motion to Exclude from the MDL Proceeding those parties who have provided releases to Ameriquest through these class actions (as well as those who have released Ameriquest in individual actions).

### B. Motion as To Argent

As with Ameriquest, if the Court preliminarily resolves certain issues related to Argent, such rulings will considerably narrow the issues involved in this case, and assist the parties toward potential settlement. Argent's lending practices differ significantly from those of Ameriquest.[9] Unlike Ameriquest which is a retail mortgage originator that deals directly with borrowers, Argent is a wholesale mortgage lender that does not engage in direct dealings with retail mortgage customers. Argent does not have any verbal communications with borrowers, and does not do any direct marketing to borrowers. Rather, Argent sells its mortgage products through independent, third-party mortgage brokers. These brokers are independent contractors licensed by the states in which they do business, and are free to work with as many different lenders as they wish. Argent plays no role in selecting the appraisers, title insurers, or closing agents used for its loans. Rather, it is the mortgage broker or the borrower who selects these service providers. Further, Argent representatives do not attend loan closings. Most significantly, 100% of Argent's loans are closed by third-party closing agents that have independent legal duties to ensure that the closings occur in accordance with the law, and that

---

[8] Since these motions involve legal issues, discovery related to these motions will be unnecessary.

[9] Argent and Ameriquest are sometimes included in the same actions because they have similar ownership.

proper notices, including notices regarding a borrower's right to rescind a mortgage loan transaction, are provided to the borrowers.

Based upon the foregoing, it may be possible to legally resolve the issue of whether Argent can be liable for alleged "bait and switch" tactics when Argent merely funds the loans, and when it is the third-party mortgage brokers and/or closing agents that make any representations to borrowers during the loan origination process.

### C. Other Potential Motions that, if Decided Preliminarily, Could Significantly Reduce the Issues to be Resolved and Could Aid in Settlement

Concurrently with paring down the size of the putative classes, Defendants intend to bring several motions that address some of the common themes/legal issues running through the included cases. Each of these themes, or theories of liability, fails as a matter of law and Defendants submit that judicial economy will be best served by resolving these issues before discovery commences or class issues are litigated. The issues to be addressed by these motions will include that: (a) Defendants' use of the Truth in Lending Act Model Notice of Right to Cancel Form ("NORTC") H8, instead of H9, does not constitute a violation of the Truth in Lending Act; (b) Defendants' loan origination practices preclude any finding of "bait and switch"; (c) the fact that a borrower possesses a blank NORTC does not constitute a violation of the Truth in Lending Act; and (d) the fact that Defendants allow their borrowers an additional four days to consider and rescind their loans, for any reason at no cost to the borrower, does not constitute a violation of the Truth in Lending Act.[10]

### D. Potentially Dispositive Motions in Individual Cases

Finally, Defendants had motions pending in several of the transferred actions, or intend to file motions specific to transferred actions. These include, for the most part, approximately 9 Motions to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and 8 Motions for Summary Judgment. Given the volume of cases, Defendants would prefer to determine whether the AG Settlement, or any of the global motions referenced above, resolve some or all of these cases, before presenting these motions to the Court in order to have a consistent decision in these cases.

---

[10] Although it is not a motion that will resolve a global issue, as mentioned in Section I above, Defendants will bring a Motion to Join Third-Party Closing Agents as Cross-Defendants so that all necessary parties are before the Court for purposes of settlement discussions, discovery and trial.

## IV. SETTLEMENT TRACK

Any claims remaining after the administration of the AG Settlement and the outcome of the above-mentioned motions concerning legal issues, should then be placed in a settlement track. While Defendants have continued to try to settle individual cases throughout the course of this MDL Proceeding (and will continue to do so where possible),[11] Defendants believe that a formal settlement track will help resolve the mop-up actions on behalf of those borrowers who choose not to accept the benefits of the fair resolution reached on their behalf by their respective Attorneys General.

While Defendants are open to any suggestions the Court may have for a global resolution of these matters, Defendants propose that a settlement procedure, such as a private mediation, be scheduled to take place following the administration of the AG Settlement and the Court's determination on the Global Motions discussed in Section III above, when it is clear precisely which borrowers and which issues remain in this proceeding. At that time the parties should be able to determine which borrowers have not released their purported claims against Defendants and, based on the scope of the remaining putative class members, the parties can then determine whether it makes most sense to conduct mediations as to particular issues, as to particular defendants, in individual cases or on a global basis.

## V. CONSOLIDATION

Defendants submit that the cases should not be consolidated. While there are several discrete issues raised in many of the 161 cases included in this MDL proceeding, and while those issues should be handled in a coordinated manner for purposes of discovery and decided consistently, there are too many disparate issues, factual inquiries and legal standards among the cases to consolidate them, even in subgroups. The following is a summary of the discrete categories into which the cases procedurally should be divided and handled, and an explanation of why there is too much disparity among the factual and legal issues in each, even within the separate categories, to make any substantive consolidation beneficial.

---

[11] The following potential "tag-along" cases have settled: *Melendez v. Ameriquest Mortgage Co.* (District of Rhode Island, Case No. 05-cv-0153); *Mitchell, et al. v. Ameriquest Mortgage Co., et al.* (Southern District of Alabama, Case No. 05-cv-0078); *Reese v. Ameriquest Mortgage Co., et al.* (Western District of Tennessee, Case No. 05-cv-793).

### A. Notice of Right to Cancel ("NORTC") Claims

There are approximately 132 cases in this MDL Proceeding in which plaintiffs allege that they were not provided with proper notice of their rescission rights under TILA and corresponding states' laws. Plaintiffs' claims in this regard generally involve the following allegations: (1) they did not receive the correct number of copies of NORTCs; (2) they received NORTCs that were not properly completed; (3) they received the wrong form of NORTC; and/or (4) they were confused by Ameriquest's granting to them of 7 days—4 more days than required under applicable law—to rescind their loans.

To resolve each plaintiff's claims for rescission, the Court will have to undertake a detailed factual analysis regarding each plaintiff's transaction. First, each plaintiff will have to establish his or her standing to pursue a rescission claim against Defendants. *See* 15 U.S.C. §§ 1635(a) & (b) (to have standing to seek rescission under TILA, a person must first have (1) demanded rescission from the creditor, and (2) provided the creditor with 20 days to respond to the demand); *Jefferson v. Security Pac. Fin. Servs.,* 162 F.R.D. 123, 125-26 (N.D. Ill. 1995) ("[T]he notice and waiting period prescribed by Section 1635(b) must be satisfied before this Court can conclude that a class member has standing.").

Even if each plaintiff can establish his or her standing to bring a rescission claim against Defendants, other individualized factual inquiries abound in these matters. While TILA requires creditors to "clearly and conspicuously disclose" the right of rescission in transactions that afford borrowers that right, 15 U.S.C. § 1635(a), it "does not require perfect notice." *Veale v. Citibank, F.S.B.*, 85 F.3d 577, 581 (11th Cir. 1996). There is no mandated form; a lender may use any form it wishes as long as the disclosures are "reasonably understandable." *See* 15 U.S.C. § 1635(h); 12 C.F.R. § 226, Supp. I, ¶ 17(a)-1 (2003). Furthermore, determining whether notice of rescission rights was clear and conspicuous in a given transaction requires close scrutiny of all circumstances surrounding the transaction. *See, e.g., Rodash v. AIB Mortg. Co*., 16 F.3d 1142, 1146 (11th Cir. 1994) ("determination of clear and conspicuous notice of rescission rights under TILA is intensely fact-based") (citing *In re Porter*, 961 F.2d at 1076); *accord Smith v. Highland Bank*, 108 F.3d 1325, 1327 (11th Cir. 1997) (holding that judging a lender's compliance with the rescission notice provision is not mechanical and involves scrutinizing the totality of the circumstances); *Gibbons*, 208 F.R.D. at 287 (refusing to certify a class based on defendant's purported provision of NORTCs in the wrong form; "The relevant inquiry is not the number on

the form received by each borrower – it is whether the language in the form adequately informs the recipient of his/her rights.").

Thus, a plaintiff's allegations that he or she does not presently possess two copies of the NORTC, or that he or she received an incomplete NORTC, does not, standing alone, amount to a violation of TILA. At best, it creates a potential claim, dependent upon, among other facts, whether the plaintiff, in fact, received two properly completed copies of the NORTC in the correct form. This is not mere hyperbole. In his Declaration in support of plaintiffs' Motion for Provisional Certification of "Rescission" Class [Docket, No. 16], Daniel Blinn identified 134 borrowers of Ameriquest who supposedly received an incomplete NORTC. [Id., ¶ 10, Ex. A.] As demonstrated in the Declaration of Michael Gibson filed in support of Ameriquest's Opposition to plaintiffs' Motion for Provisional Certification of "Rescission" Class [Docket, No. 42], however, 132 of these 134 borrowers (98.5%) acknowledged in writing that they all received fully compliant NORTCs. [Id., ¶ 5, Ex. A.] The written acknowledgements establish a rebuttable presumption that Ameriquest complied with TILA as to these persons. *See* 15 U.S.C. § 1635(c); *Williams v. First Gov't Mortg. & Investors Corp.*, 225 F.3d 738, 751 (D.C. Cir. 2000). To rebut this presumption, each of the 132 borrowers must present competent evidence to the contrary. *Williams*, 225 F.3d at 751; *Whitlock v. Midwest Acceptance Corp.*, 76 F.R.D. 190, 191 (D. Mo. 1977), rev'd on other grounds, 575 F.2d 652 (8th Cir. 1978) (plaintiffs' failure to controvert the presumption created by TILA entitled defendants to summary judgment).

Likewise, a plaintiff's mere receipt of an "incorrect" form of NORTC does not, standing alone, equate to a TILA violation. Whether it is a violation of TILA depends upon, among other things, Ameriquest was even required to provide the plaintiff with a notice of rescission rights, as TILA expressly exempts several types of transactions from its rescission requirements. 15 U.S.C. § 1635(e). Most applicable to claims at bar in this proceeding, Section 1635(e)(2) sets forth the "refinancing" exemption and provides that Section 1635 does not apply to "a transaction which constitutes a refinancing or consolidation (with no new advances) of the principal balance then due and any accrued and unpaid finance charges of an existing extension of credit by the same creditor secured by an interest in the same property." *See* 12 C.F.R. § 226.23(f) (under the refinancing exemption, the right of rescission applies only "to the extent the new amount financed exceeds the unpaid principal balance, any earned unpaid finance charge on the existing debt, and amount attributed solely to the costs of the refinancing or consolidation").

Thus, a borrower may rescind only the "new money" portion of a refinancing by the same creditor, and when a refinancing by the same creditor does not involve "new money," no disclosure of the (nonexistent) right to rescind is necessary. *In re Porter*, 961 F.2d 1066, 1074 (3d Cir. 1992). Accordingly, the Court must review every loan file in which a plaintiff's loan paid off a prior loan with Defendants to determine whether the refinancing exemption is applicable (i.e., whether the new amount financed exceeded the unpaid principal balance, any earned unpaid finance charge on the existing debt, and amount attributed solely to the costs of the refinancing or consolidation). *Id.*

Finally, the Court must inquire into the individual circumstances of each borrower's transaction to determine whether Defendants have a defense to the borrower's right of rescission, including those based on each borrower's personal circumstances. *See, e.g., Gibbons*, 208 F.R.D. at 287 (denying certification of a TILA rescission class because disclosures, while on wrong form, may have been sufficient to certain borrowers based on their own circumstances). Borrowers vary on several grounds, including individual financial circumstances, sophistication and familiarity with mortgage loans (including rescission rights) through previous transactions. For instance, even if some borrowers did not receive adequate written notice of their rescission rights (a point Ameriquest thoroughly contests), any borrower who had actual knowledge of their right to rescind should be excluded from any class because they cannot have suffered any harm. *See, e.g., Contimortgage v. Delawder*, 2001 WL 884085, at *6 (Ohio Ct. App. July 30, 2001) (holding that TILA should not be applied in a "rote and technical fashion which penalizes lenders in instances in which no harm has occurred"); *Mackey v. Household Bank*, F.S.B., 677 So. 2d 1295, 1298 (Fla. Dist. Ct. App. 1996) (discussing TILA and noting that "[l]aws should be enforced with common sense and applied without losing sight of the legislative purpose behind their enactment"). In this regard, the Court must consider the oral instructions and explanations, if any, provided by the different closing agents at each particular closing. TILA rescission rights also do not apply to any borrower who used the loan for business purposes. Such borrowers must be excluded from the class because TILA does not apply to a loan that is primarily for business purposes, or if the refinance is secured by a second-home or non-primary residence. *See* 15 U.S.C. § 1603(1) and § 1635(a). In short, the Court would have to closely examine the circumstances of each loan, including the awareness of each borrower, the use of each loan and

the involvement of each third-party closing agent, to determine whether a borrower actually should be entitled to rescind his or her loan. This process will not be served by consolidation.

### B. Bait and Switch Claims

No fewer than 18 of the cases included in this MDL Proceeding involve allegations that Defendants engaged in bait and switch tactics. Of these, four are putative nationwide class actions, three are putative class actions purporting to cover the states of Florida and Illinois. The crux of a bait and switch claim is that the borrower was allegedly told he or she would receive one set of loan terms, but then received (and agreed to in writing) something different. As an initial matter, in order to determine what the borrower was allegedly told in connection with his or her unique loan will require the parties to depose – and the court to consider the testimony of – every person involved in the origination of the loan. This will include borrowers, loan origination officers, account executives, loan brokers, third party closing agents, appraisers and other witnesses. As the court in *Richardson v. Nationwide Mortg.* (1985 Md.) 1985 U.S. Dist. LEXIS 23836 noted:

> Any determination of liability will require the resolution of numerous factual issues which may differ with each individual borrower. First, the unique circumstances of each borrower will need to be examined with regard to, inter alia, their degree of sophistication and the extent to which they reasonably relied on defendants' alleged misstatements . . . whether such borrower suffered any damage, and the extent to which such borrower may have already sought relief against the defendants. . . . Potential defenses, such as . . . waiver . . . will need to be examined individually as well.
>
> Second, the oral representations made to the individual borrowers by the brokers, lenders and settlement attorneys prior to, at, or after settlement will need to be examined individually. Despite plaintiffs' assertions that the loan process used by defendants was standardized, the plaintiffs would have to be questioned to assure that each was given the same oral representations. Moreover, different plaintiffs might have asked different questions of the defendants, and answers given to such questions might be relevant to the misrepresentation issue. Finally, the fact that different brokers and different settlement attorneys were involved in various loan transactions makes the prospect of resolving factual issues concerning oral representations made to many borrowers all but impossible. *Id*. at 8-10.

In addition, there are a myriad of reasons that loan terms might change between the time a borrower first speaks with an account executive and the time the borrower signs final loan documents. Just a few examples would be:

- The borrower opted for a different loan program after learning more about the products available;

- The borrower decided that he wanted more cash proceeds from the loan at the time of closing and requested a greater loan amount;

- The borrower opted to accept a prepayment penalty to obtain a lower rate, realizing that he intended to keep the loan until after the prepayment penalty period expired;

- The borrower decided that he intended to refinance in a few years and opted for the lower initial rate that might come with an adjustable rate;

- The underwriting process revealed that the borrower had worse credit than initially represented and he no longer qualified for the terms in the estimates;

- The underwriting process revealed that the borrower had more secured debt than initially represented, and he no longer qualified for the terms in the estimates;

- The underwriting process revealed that the borrower had less income than represented and no longer qualified for the terms in the estimates;

- The property did not appraise at a high enough value to support the loan applied for; and

- Interest rates fluctuated between the preliminary disclosures and closing.

Therefore, in addition to deposing numerous individuals to determine what representations were made, the court and the parties will have to analyze each loan transaction to determine whether there was a reason for the change in terms. This great factual disparity renders the "bait and switch" cases improper for consolidation.

### C. Discount Fee Claims

Thus far, at least 17 of the cases included in this MDL Proceeding involve allegations that Defendants engage in bait and switch tactics. Of these, two are putative nationwide class actions, eight are putative class actions purporting to cover one of the states of Florida, Indiana, Massachusetts, New Jersey and New York.

These "discount fee" claims arise out of the allegation that the borrower believed that he or she was entitled to a lower interest rate in exchange for the payment of a discount fee. As

with the "bait and switch" cases, resolution of these claims will require a detailed inquiry into whether and the extent to which the borrower did in fact receive what he or she says was promised, in this case a lower interest rate in exchange for payment of all or a portion of a discount fee, and the basis of each borrower's belief regarding the interest rate they would receive, including depositions of all parties with whom the borrower spoke about his or her loan during the origination process. The parties and Court will also be required to analyze each borrowers' creditworthiness and, as set forth above, the reason for any variance in terms throughout the negotiation process. Thus, as with the "bait and switch" cases, the "discount fee" cases are not amenable to consolidated treatment.

### D. Fair Credit Reporting Act

Thirteen of the included cases involve allegations that Defendants violated the Fair Credit Reporting Act ("FCRA"). Of these, three are putative nationwide class actions, ten are putative class actions purporting to cover one of the states of Illinois, Indiana, Massachusetts, Minnesota, Missouri, Ohio, Pennsylvania, and Wisconsin. These FCRA claims arise from two distinct allegations: (1) that Defendants failed to issue "adverse action" notices when offering credit on terms different that those initially applied for by borrowers; and (2) that Defendants used borrowers' consumer credit reports for an impermissible purpose by sending materials to borrowers that did not qualify as firm offers of credit.

There are many legal issues to be resolved before a plan can be devised to resolve these claims. Defendants anticipate that there will be significant motion practice with respect to these claims, and again propose that a these cases be shifted to a settlement track before significant litigation commences.

### E. Equal Credit Opportunity Act/Fair Housing Act

There are no fewer than 22 included cases that involve allegations that Defendants violated the Equal Credit Opportunity Act ("ECOA") and/or the "Fair Housing Act" ("FHA") Of these, 4 are putative nationwide class actions, 6 are putative class actions purporting to cover one of the states of Florida, Illinois, Indiana, Massachusetts, Minnesota and Pennsylvania. Both of these types of claims arise out of allegations that Defendants discriminated against borrowers on the basis of race, age, gender and/or national origin in connection with the loan terms received.

These causes of action give rise to significant individualized factual issues that are not conducive to consolidation. In particular, to resolve these claims, each class member's credit history and creditworthiness will need to be thoroughly investigated to determine whether the particular loan terms offered were in line with that borrower's unique credit profile. This investigation will need to be conducted on a loan by loan basis and include a review of each of the matters listed above in the bait and switch category. With these types of individual issues, there will be no benefit to consolidation.

   F.  **Cases Against Argent Mortgage**

The cases pending against Argent involve many of the same issues as those pending against Ameriquest (the most significant being allegations of "bait and switch," violations of TILA based upon failure to provide and/or irregularities with the Notice of Right to Cancel, and/or alleged violations of RESPA). However, the cases pending against Argent will necessarily involve examination of different factual circumstances than exist in the cases pending against Ameriquest because Argent is a wholesale lender whose involvement in the loan process is merely to fund loans originated by independent mortgage brokers. Given that its business model is distinct from that of Ameriquest, it would not be possible to consolidate the Argent cases with the Ameriquest cases. Rather, for purposes of motion and discovery practice, the Argent cases should be handled and treated separately from the Ameriquest cases.

**VI.  DISCOVERY SHOULD BE STAYED UNTIL PRELIMINARY MOTIONS ARE DECIDED AND THEN MUST BE COORDINATED TO ALLOW MINIMAL IMPACT ON DEFENDANTS**

Defendants do not believe that discovery will be needed to address the motions outlined in section III above. Because each of these motions is designed to resolve discrete – but significant – portions of cases, Defendants propose that these motions precede any other law and motion or discovery matters (but that they take place after administration of the AG Settlement). Once the AG Settlement is completed and these motions addressing global issues are decided, Defendants submit that the issues and parties in this proceeding will be sufficiently narrowed and delineated for the parties to engage in meaningful settlement discussions. Accordingly, the Defendants propose that a mediation be scheduled immediately after the motions addressing global issues are decided. Upon the conclusion of the mediation, the parties can then assess the balance of the remaining cases to determine how best to coordinate discovery and motion practice.

**VII. PROCEDURES FOR FILING PAPERS AND SERVICE OF PARTIES**

Given that there are in excess of 160 cases included in this proceeding, Defendants submit that they should be required to serve only Plaintiffs' lead counsel, or liaison counsel, with pleadings. Lead, or liaison, counsel can implement a procedure for notification of filings and distribution of papers to the remaining counsel and, alternatively, all such counsel can receive filings from PACER. With respect to the filing of papers/briefs, Ameriquest submits that an automatic briefing schedule should be implemented for all motions as follows: all motions shall be filed with a supporting brief, if one is desired; oppositions/responses shall be filed 21 days thereafter; reply briefs shall be filed 14 days thereafter.

**VIII. CONCLUSION**

In summary, Defendants propose that the following protocol be utilized to resolve the issues in this case:

1. First and foremost, all litigation should be stayed until the AG Settlement has been administered and the Court and parties can determine which of the included claims, if any, have not been resolved.

2. Once the claims process in the AG Settlement has been completed, Defendants propose to file a few global motions designed to further pare down the scope of the claims by excluding those borrowers who have already settled with Defendants either through class action, or individual, settlements and those claims that are conducive to global resolution as set forth in Section III above. Discovery and other motion practice should be stayed during this phase.

3. Once the Court has decided these global issues and the parties know the potential scope of the remaining putative classes and claimants, those claims should be immediately submitted to a private mediation.

4. Any claims not resolved by the prior three steps should then be placed on an ordinary litigation track. Defendants should be required to file responsive pleadings, including re-filing those dispositive motions that were already pending in individual cases at that time of transfer (and that are not covered by the motions regarding global issues).

5. To the extent any claims survive the prior four steps, including pleading challenges, discovery should be commenced, but coordinated so that the impact on all parties is minimized.

DATED: June 13, 2006

        Respectfully submitted,

        AMERIQUEST MORTGAGE COMPANY,
        AMERIQUEST CAPITAL CORPORATION
        AND TOWN & COUNTRY CREDIT
        CORPORATION

        /s/ Bernard E. LeSage
        By: One of Their Attorneys

        Bernard E. LeSage (California Bar No. 61870)
        BUCHALTER NEMER
        A Professional Corporation
        1000 Wilshire Boulevard, Suite 1500
        Los Angeles, CA 90017-2457
        Telephone: (213) 891-0700
        Facsimile: (213) 896-0400


DATED: June 13, 2006

        ARGENT MORTGAGE COMPANY, LLC

        /s/ Thomas J. Wiegand
        By: One of Its Attorneys

        Thomas J. Wiegand
        WINSTON & STRAWN lLP
        35 W. Wacker Drive
        Chicago, Illinois 60601-9703
        Telephone: (312) 558-5600
        Facsimile: (312) 558-5700

## CERTIFICATE OF SERVICE

     I, Bernard E, Lesage, hereby certify that on this 13th day of June 2006, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                By: /s/ Bernard E. LeSage