**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION <br><br> _____ | MDL No. 1715 <br><br> Lead Case No. 05-cv-07097 <br><br> (Centralized before The Honorable Marvin E. Aspen) |

**DEFENDANT AMERIQUEST MORTGAGE COMPANY'S BRIEF REGARDING**
**WHETHER THE NOTICE TO MORTGAGEES WHO FACE FORECLOSURE**
**SHOULD BE SENT TO BORROWERS WHOSE LOANS ORIGINATED AFTER**
**JANUARY 23, 2006**

Pursuant to the Stipulation Re Form of Notice Re Temporary Injunctive Relief and [Proposed] Order Thereon ("Stipulation"), Plaintiffs and Ameriquest Mortgage Company ("Ameriquest") agreed to the form, timing, method of delivery and amount of bond for the Notice to Mortgagees who Face Foreclosure ("Notice"). In its Memorandum Opinion and Order ("Opinion and Order") requiring the Notice, the Court reasoned that such a Notice was necessary to protect certain borrowers who may have extended rescission rights under TILA, but who may face foreclosure prior to the time when the Court will rule on Plaintiffs' motions for class certification and for a preliminary injunction against Ameriquest. [1] However, as set forth in the Stipulation, the parties were unable to reach a complete agreement regarding whether the Notice must be sent, on a going forward basis, to borrowers whose loans originated after January 23, 2006. Ameriquest submits that there is no need to send the Notice to such borrowers.

---

[1] Specifically, the Court stated that the Notice is necessary to avoid the "unintended lapse of rescission rights and loss of residence pending our decision on Plaintiffs' motions." [Opinion and Order p. 9].

1

As set forth in detail below, borrowers whose loans originated after January 23, 2006 are sufficiently protected from potential Truth-in-Lending Act ("TILA") violations by the Settlement reached between Ameriquest and the Attorneys' General of 49 states (the "AG Settlement"). Specifically, pursuant to the AG Settlement an independent Monitor is in place at Ameriquest.[2] The Monitor has broad powers, and a broad job scope, which include ensuring that Ameriquest complies with TILA. Further protection for borrowers whose loans originated after January 23, 2006 exists because Ameriquest has exclusively used independent, third-party closing agents to conduct its loan closings since September 1, 2004, and Ameriquest investigates all requests for rescission based upon alleged irregularities with the Notice of Right to Cancel form ("NORTC") and rescinds loans where such allegations have merit. The AG Settlement, the presence and responsibilities of the Monitor, the use of independent third-party closing agents and the investigation and rescission of loans where warranted sufficiently address the Court's concerns and reasons for entering the Opinion and Order. Accordingly, no Notice is necessary for borrowers whose loans originated after the Monitor was appointed (which occurred shortly before the January 23, 2006 effective date of the AG Settlement).

I.     **Sufficient Protections Exist for Borrowers Whose Loans Originated After January 23, 2006 Such That the Notice is Unnecessary**

      A.     **The AG Settlement Provides Protection for Post January 23, 2006 Borrowers**

The AG Settlement became effective as of January 23, 2006.[3] The AG Settlement was reached after the chief law enforcement officers of the 49 states in which Ameriquest does business conducted an extensive, three year investigation of Ameriquest. The AG Settlement is the culmination of what the attorneys general of the 49 states found, in their collective judgment as the chief law enforcement officers of their respective states, was a fair resolution of all outstanding claims against Ameriquest for their states' citizens. Significantly, the claims

---

[2]  It should be noted that, while the Monitor is in place to ensure that Ameriquest complies with the law, he was not appointed because of any finding by the attorneys general or otherwise that Ameriquest engages, or has previously engaged in, systemic violations of TILA.

[3]  A true and correct copy of the AG Settlement is attached as Exhibit 8 to the previously filed "Defendants' Proposed Organization Plan." (Case 1:05-cv-07097; PACER Document 166-1, filed 6/13/2006).

addressed in the investigation of Ameriquest by the attorneys general, and the claims covered in the AG Settlement are by and large the *same* claims that are the subject of this MDL Proceeding.

The attorneys general are quickly moving to process the claims covered by the AG Settlement. To that effect, Rust Consulting has been initially selected to act as claims administrator to manage the claims process. [*See*, previously filed Declaration of Jeffrey D. Dahl, Case 1:05-cv-07097, Document 167, filed 6/13/06].

One particular concern of the attorneys' general that is addressed in the AG Settlement was the appointment of an independent monitor to ensure that Ameriquest complies with both the settlement and the law on a going forward basis. Accordingly, shortly prior to the January 23, 2006 effective date of the AG Settlement, Michael Moore was appointed as the independent monitor ("the Monitor") for Ameriquest. The Monitor is a former attorney general for the state of Mississippi. Pursuant to the AG Settlement, the Monitor does not report to Ameriquest. Rather, he reports to the attorneys general of each state. Thus, pursuant to the AG Settlement, the Monitor has a continuing duty to report to the attorneys' general of the 49 states on all of Ameriquest's lending practices.

### B. The Monitor Protects the Post January 23, 2006 Borrowers

The scope of the Monitor's work is not only to ensure compliance with the AG Settlement, but also to ensure that Ameriquest complies with the law, including TILA and its requirements regarding the completion of, and provision to borrowers of, the NORTC. The AG Settlement gives the Monitor broad discretion to review Ameriquest's operations. [AG Settlement, Section VI, para. F]. The Monitor must ensure that Ameriquest complies with the injunctive relief portion of the AG Settlement. [Section IV; Section VI, para. D]. In other words, the Monitor's job is to make sure that Ameriquest is complying with both the AG Settlement and the law.

### C. Ameriquest's Other Practices Protect the Post January 23, 2006 Borrowers

In addition, it should be noted Ameriquest has not, and does not admit (either through the AG Settlement, appointment of the Monitor, or otherwise) that it has engaged in any systemic violations of TILA. Further, neither the attorneys general who investigated Ameriquest nor this Court have found that Ameriquest has systemically violated TILA. Indeed, it is Ameriquest's practice to obtain a written acknowledgment signed by each borrower who is entitled to a

3

NORTC that he or she has received a fully compliant NORTC.[4]  Contrary to any inference that Ameriquest failed to provide NORTC's to its borrowers as a matter of course, these written acknowledgements establish a rebuttable presumption that Ameriquest complied with TILA.  *See* 15 U.S.C. Section 1635 (c ); *Williams v. First Gov't Mortg. & Investors Corp.*, 225 F.3d 738, 751 (D.C. Cir. 2000).[5]  Although in the Opinion and Order the Court states that there is a "relatively low" burden on Plaintiffs' to rebut the presumption created by the acknowledgments that they received the NORTC's (*See* Opinion and Order, pp. 7-8), Ameriquest is prepared to overcome that hurdle with testimony from its employees and/or independent third-party closing agents that it properly completed and provided the NORTC to its borrowers in nearly every case at issue herein.

Ameriquest has used independent third-party closing agents to close all of its loan transactions since September 1, 2004.  [*See* previously filed Declaration of Vicky Camacho in Support of Defendant Ameriquest Mortgage Company's Brief RE:  Mailing of Nationwide Notice of Possible Rescission Rights and Oppositions to Motions for Preliminary Injunction and Class Certification, Case 1:05-cv-07097, PACER Document 41].[6]  Accordingly, it is the independent third-party closing agents who provide the loan documents, including the NORTC's to the borrowers, and explain to the borrowers their rescission rights.  *Id.*   These independent third-party closing agents have their own obligations to follow all applicable Federal and State laws in connection with loan closings, and are paid for their services regardless of whether a loan closes or whether the borrower exercises his or her right to cancel the loan.  *Id.*  Thus, these

---

[4]  TILA expressly exempts several types of transactions from the requirement that each borrower be given an NORTC.  15 U.S.C. Section 1635(e).

[5]  The great majority of cases against Ameriquest that allege violations of TILA regarding the NORTC appear to be the result of substantial efforts, which continue to this day, by certain plaintiffs' counsel to solicit lawsuits from persons who received a loan from Ameriquest or other Defendants in this proceeding, rather than from a reasonable and objective evaluation of whether in fact any individual borrower did or did not receive appropriate disclosures regarding his or her rescission rights. *See* Declaration of Elizabeth M. Smith in Support of Defendants' Reply to Plaintiffs' Memorandum Concerning Potential Foreclosures, ¶ 2, Exh. A and Declaration of Craig Varga in Support of Defendants' Reply to Plaintiffs' Memorandum Concerning Potential Foreclosures, ¶ 2, Exhs. A, B, and C, which are attached to the previously filed Defendants' Proposed Organization Plan as Exhibits 6 and 7 respectively. [*See* Case 1:05-cv-07097; PACER Document 166-1, filed 6/13/2006].

[6]  Prior to September 1, 2004, Ameriquest used independent third-party closing agents to close its loan transactions if such use was convenient to the parties.  [*Id.*]

4

independent third-party closing agents provide an added layer of protection to ensure that borrowers are properly apprised of their rescission rights.

Finally, it is Ameriquest's practice when it receives a rescission request based upon alleged irregularities with the NORTC to diligently investigate such requests. Where Ameriquest finds that the allegations of irregularities have merit, Ameriquest agrees to the rescission.

Given that, since his appointment, one of the Monitor's tasks under the AG Settlement is to ensure that Ameriquest continues to correctly provide its borrowers with notice of their rescission rights, and given the written acknowledgments Ameriquest obtains from its borrowers and its practice of using independent third-party closing agents and rescinding loans where the facts establish that such a rescission is warranted, there is no need to send the supplemental Notice regarding rescission rights to borrowers whose loans originated after January 23, 2006.

## II.     Conclusion

For the foregoing reasons and authorities, Ameriquest respectfully submits that there is no need for it to send the Notice to borrowers whose loans originated after January 23, 2006.

DATED: June 20, 2006

Respectfully submitted,

BUCHALTER NEMER
A Professional Corporation

By:  /s/  Bernard E. LeSage

*Attorneys for Defendants Ameriquest Mortgage Company, Ameriquest Capital Corporation and Argent Mortgage Company*

Bernard E. LeSage (California Bar No. 61870)
BUCHALTER NEMER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

BN 888391v1

5