**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

IN RE AMERIQUEST MORTGAGE CO.    )
MORTGAGE LENDING PRACTICES    )
LITIGATION    )     MDL No. 1715
   )
_____)     Lead Case No. 05-cv-07097
   )
THIS DOCUMENT RELATES TO ALL    )     Centralized before Judge
ACTIONS    )     Marvin E. Aspen
   )

**ECLG PLAINTIFFS' CONSOLIDATED RESPONSE TO OTHER PROPOSED**
**ORGANIZATION AND MANAGEMENT PLANS**

        The plaintiffs represented by Edelman, Combs, Latturner and Goodwin, LLC ("ECLG")[1], respond as follows to other parties' proposed organization and case management plans:

**I.**      **INTRODUCTION**

        The plaintiffs and potential class members in the MDL deserve the best representation from the most qualified leadership, in light of the evaluative criteria set forth in Fed. R. Civ. P. 23(g)(1)(C)(i) for the appointment of class counsel. Recognizing that different plaintiffs' firms have different strengths, ECLG urges the Court to select a combination of plaintiffs' firms in order to constitute the strongest leadership. ECLG has not asked to be appointed sole lead counsel, and ECLG does not seek to exclude any plaintiffs' firm.

        In evaluating and selecting lead counsel, the Court should bear in mind that there are four, basic types or groups of cases in the Ameriquest MDL: (1) large, multi-state or national class actions; (2) smaller, non-FCRA, statewide class actions; (3) FCRA or Cole cases; and (4) individual

_____

[1]Plaintiffs and their cases are listed and briefly described in the attached Exhibit A. The list includes those within the MDL and those not yet within the MDL (due to the fact that they were file very recently).

cases. Further, a conflict of interest would exist for any plaintiffs' firm that is responsible for both the large class actions and the individual cases. The two groups of clients simply have different interests. For these reasons, ECLG believes that it is not in plaintiffs' and the class members' interest for this Court to appoint a single, unified leadership structure with responsibility for all cases. Rather, the Court should split the MDL proceeding into four tracks and appoint separate and independent lead counsel to head each track. The ECLG plaintiffs respectfully request that the Court appoint ECLG as co-lead counsel and make it responsible for (1) the individual cases, (2) the small class actions and (3) the FRCA or Cole cases.

II.     **THE COURT SHOULD APPOINT ECLG AS CO-LEAD COUNSEL AND MAKE IT RESPONSIBLE FOR (A) THE INDIVIDUAL CASES, (B) THE FCRA or COLE CASES, AND (B) THE SMALL CLASS ACTIONS**

      A.     **The Court Should Appoint ECLG Co-Lead Counsel With Responsibility for the Individual Cases**

By far, ECLG has the largest number of individual cases against Ameriquest parties and by far the most experience both effectively litigating and settling these cases. Exhibit A indicates ECLG currently has approximately 94 cases either in or on their way to the MDL. Of these, the vast majority, approximately 86, are individual cases. But, despite Ameriquest's complaints, many of these are not new cases. ECLG has been actively litigating individual cases against Ameriquest for over 18 months - prior to the filing of the original MDL cases in the transferring courts and prior to the publicity surrounding both Ameriquest's lending practices and the Attorney General Settlement ("AGS"). For instance, ECLG has already briefed summary judgement in five individual cases. Of these, ECLG won Jones v. Ameriquest, et al., 2006 U.S. Dist. LEXIS 3788 (N. D. Ill., Jan. 31, 2006), an opinion which this Court recently cited; lost Hamm v. Ameriquest, 2005 U.S. Dist. LEXIS 3788 (N. D . Ill., Jan. 31, 2006) which is now on appeal before

the Seventh Circuit, and the remaining three cases are awaiting rulings.[2]  ECLG represents the

plaintiffs in another eight cases in which discovery was complete or nearly complete prior to the

cases' reassignment to this Court.[3]  These cases were filed in late 2004 or early 2005, and ECLG

is now prepared to file summary judgment motions and/or discuss settlement.

        As the result of ongoing, active litigation against Ameriquest, ECLG has researched

and developed new legal theories and causes of actions (most of which did not and still do not have

analogs in other MDL cases) and has already obtained extensive document discovery and numerous

admissions from Ameriquest's closing agents and current and former Ameriquest employees.  For

instance, in the following cases, ECLG obtained admissions from the closing agent's employees or

signing notaries that they gave undated notices of right to cancel to the plaintiff(s) at the closing

table (and, in some cases, a whole class of borrowers): Anderson v. Ameriquest, 03 C 7301 (N.D.

Ill.); Wertepny v. Ameriquest, 05 C 1402 (N.D.Ill.); Talley v. Ameriquest, 05 C 1080 (N.D. Ill.);

Mikowski v. Ameriquest, 05 CV 411 (N. D. Ind.); and Lemmons v. Ameriquest, 05 C 4709

(N.D.Ill.).  Such admissions mean that these cases can be decided on motions for summary

judgment.

        Because of ECLG's aggressive litigation and discovery, ECLG has also successfully

---

[2]They are:  Washington v. Ameriquest, 05 C 1007 (N.D.Ill.)(Coar, J.); Hubbard v. Ameriquest, 05 389 (N.D.Ill.)(Filip, J.); and Abercrombie v. Argent Mortgage Co., et al., 05 C 1687 (Filip, J.).  The parties were in the middle of briefing summary judgment in a sixth case, Jimenez v. Ameriquest, 05 C 1009 (N.D.Ill.) when this Court entered an Order transferring the case to this Court.

[3]Furgeson v. Ameriquest, et al., 04 C 7627 (N.D.Ill.); Talley v. Ameriquest, et al., 05 C 1080 (N.D. Ill.); Wertepny v. Ameriquest, et al., 05 C 1402 (N.D.Ill.); Smith and Yanong v. Ameriquest, et al., 05 C 648 (N.D.Ill.); Harris v. Ameriquest, et al., 05 C 4025 (N.D. Ill.); Salazar v. Ameriquest, 05 C 4162; Pintsak v. Ameriquest, 05 C 5035 (N.D.Ill.); and Jimenez v. Ameriquest, 05 C 1009 (N.D.Ill.).

settled nine individual TILA rescission cases[4] and is currently negotiating settlement in another 13 individual TILA rescission cases.[5]  In short, in many cases, ECLG's hard work has already paid off in <u>results</u> for defendants' borrowers.  ECLG has also been working closely with other attorneys who have filed numerous individual cases, including serving as local counsel for Christopher Lefebvre, who represents over a dozen individual plaintiffs from Rhode Island.

> **B.** **The Court Should Appoint ECLG Co-Lead Counsel With Responsibility for the Smaller Class Cases Only (Not The Large Class Actions)**

ECLG currently has nine class actions for lending practices in the MDL, more than any single plaintiffs' firm.  ECLG has been litigating one lending practice class action, <u>Coleman and Sanchez v. Ameriquest and Argent</u>, 04 CH 10533 (Circuit Court of Cook County, Ill.), for systemic bait-and-switch practices for two years - again, <u>prior</u> to the filing of most of the original MDL cases and <u>prior</u> to the publicity surrounding Ameriquest's lending practices and the AGS.   The federal class cases in which ECLG represents plaintiffs and proposed classes are:

<u>Besterfield v. Ameriquest</u>, 06 C 2676 (N.D.Ill.)
<u>Harris v. Town & Country Credit Corp</u>., 06 C 3048 (N.D.Ill.)

---

[4]They are: <u>Payne v. Ameriquest</u>, 05 C 5024 (N.D.Ill.); <u>Ameriquest v.</u> Luevano, 05 C 5114 (N.D.Ill.); <u>Ori v. Ameriquest</u> (2006 IL, unfiled); <u>Mulvaney v. Ameriquest</u> 06-1113 (C. D. Ill.); <u>Zarate v. Ameriquest</u>, 05 4696 (N.D.Ill.); <u>Tumas v. Ameriquest</u>, 03 C 5432; <u>Quinn v. Ameriquest</u>, 03 C 5059 (N.D.Ill.); <u>Price v. Ameriquest</u>, 05 C 6667 (N.D.Ill.); and <u>Lemmons v. Ameriquest</u>, 05 C 4709 (N.D.Ill.).  <u>Lemmons</u>, however, is currently the subject of plaintiff's pending motion to enforce a settlement agreement, and it remains to be seen whether the parties have an enforceable settlement.

[5]They include: <u>Beane v. Ameriquest</u> (MI, unfiled); <u>Bothwell v. Ameriquest</u>, 06-CV175 (N. D. Ind.); <u>Duchene v. Ameriquest</u> (MI, unfiled); <u>Diggins v. Ameriquest</u> (IL, unfiled); <u>Gorgon v. Ameriquest</u>, (MI, unfiled); <u>Hawkins v. Ameriquest</u>, 06 C 1848 (N.D.Ill.); <u>Henson v. Ameriquest</u>, 06 C 1876 (N.D.Ill.); <u>Melicio v. Town & Country</u>, 06 C 2832 (N.D.Ill.); <u>Miller v. Ameriquest</u>, 06 CV 189 (N.D.Ind.); <u>Mormon v. Ameriquest</u>, 06 C 2514 (N.D.Ill.); <u>Ryan v. Ameriquest</u> (MI, unfiled); <u>Szafran v. Ameriquest</u> (MI, unfiled); and <u>Spencer v. Ameriquest</u>, 06 C 2396 (N.D.Ill.).

<u>Jeffress v. Ameriquest</u>, 06 CV 101 (N.D.Ind.)
<u>Harless v. Ameriquest</u>, 06 CV 0695 (S.D.Ind.)(Co-Counsel is Dan Harris)
<u>Jewell v. Ameriquest</u>, 06 C 269 (N.D.Ill.)(Co-counsel is Dan Harris)
<u>Kukla v. Ameriquest</u>, 06-12466 (E. D. MI)
<u>Melecio v. Town & Country Credit Corp</u>., 06 C 2832 (N.D. Ill.)
<u>Mikowski v. Ameriquest</u>, 05 C 411 (N. D. Ind.)[6]
<u>Rodriguez v. Ameriquest</u>, 06 C 1950 (N.D.Ill.)

See also <u>Exhibit A</u>.

**1.  <u>Any</u> Plaintiff's Firm in the MDL that Is Permitted to Represent Both Individual Clients and Large Classes Will Have a Conflict of Interest**

<u>Any</u> plaintiffs' firm in the MDL that currently represents individual plaintiffs and also seeks appointment as class counsel in the large class actions would, if appointed, have a conflict of interest.  As Lieff-Roddy admits, "[I]t is difficult, if not impossible, to assert that a settlement on behalf of a class is fair and reasonable when other relief is available under individual settlements to a select group of clients."  (Lieff-Roddy Response In Opp. ECLG's Mtn Appt., p.7).  This very point, made by the Lieff-Roddy group with respect to ECLG, is also true of the Lieff and Roddy firms themselves and simply speaks to the need for there to be three or four separate tracks of litigation within the MDL, as suggested above.  (Lieff-Roddy response, pp. 5-7).  The Lieff, Roddy and James/Hoyer firms are seeking co-lead counsel status with respect to <u>all</u> cases in the MDL, including all <u>individual</u> cases.  In addition, the Roddy firm also represents individual clients.  The Stipulation and Standstill agreed to by the parties and entered by the Court on February 14, 2006, lists 13 individual clients of the Roddy firm.  Yet Roddy apparently has not filed their cases, only its class action cases.

---

[6]Plaintiffs have moved for leave to file an amended, class complaint, based upon the admission of Ameriquest's closing agent that it never filled in the dates on the notice of right to cancel forms provided to borrowers.  The motion is pending.

Indeed, the Lieff-Roddy group's response shows they are concerned by the numerous successful settlements that ECLG has achieved and continues to achieve in individual TILA rescission cases. Indeed, the high percentage of relief ECLG obtains in each cases could make the class recovery from any settlement of the Lieff-Roddy class actions look paltry and, therefore, objectionable. Motivated by this concern, Lieff-Roddy seeks to exclude ECLG from a leadership role over the individual cases and to seek sole lead counsel status, including over the individual cases, for itself. If they can control the pace and prosecution of the individual cases, then they can protect their class settlements from challenge. This is really a conflict not with ECLG but between the interests of individual plaintiffs and the interests of members of large classes.

The Lieff-Roddy group's criticism of ECLG's settlements in TILA rescission cases is ironic in light of the fact that it was Lieff-Roddy who sought from this Court an injunction that would give notice to borrowers that they may have a TILA right to rescind their loan. In other words, Lieff-Rodddy is criticizing ECLG for representing and obtaining settlements for such clients while at the same time seeking to notify borrowers of their right to file just the kind of cases ECLG has filed. When these borrowers receive notice and file cases, those cases may end up in the MDL.

However, the Court should note that the type of class cases in which ECLG represents the plaintiffs contrast sharply with the type that were originally transferred to the MDL. Whereas the original MDL cases propose large and often multi-state or national classes, often based on a single state's consumer fraud statute, ECLG's cases propose much smaller classes, based on discrete and readily identifiable issues.

ECLG believes that smaller, better defined classes are much more likely to survive the scrutiny of a Seventh Circuit appeal. In recent years, the Seventh Circuit has made it clear that large, national, state law classes are unsuitable for a variety of reasons, not the least of which is that

different law applies to different members of the class. See, e.g., <u>In re Bridgestone/Firestone, Inc.,</u> <u>Tires Products Liab. Litig</u>., 288 F.3d 1012, 1018 (7th Cir., 2002), cert. denied, 537 U.S. 1105 (2003). In addition, larger classes are more likely to contain conflicts of interest within the class. <u>Reynolds</u> <u>v. Beneficial National Bank, et al</u>., 288 F. 3d 277, 282 (7th Cir. 2002). The U.S. Supreme Court and the Seventh Circuit have held that where a sub-class has better or different claims or interests than the rest of a class, the sub-class should receive separate representation from other counsel. <u>Ortiz v.</u> <u>Fireboard Corp</u>., 527 U.S. 851, 857 (1999); <u>Amchem Products, Inc., v. Windsor</u>, 521 U.S. 591, 627 (1997); <u>Mirfasihi v. Fleet Mortgage Corp</u>., 05-3669, Slip Op. (7th Cir., June 19, 2006). Where such sub-classes do receive separate representation, there is no conflict of interest for the class and class counsel, and the class is adequately represented.

ECLG would not have a conflict of interest if it were responsible for both its smaller, non-FCRA class actions and the individual cases. The ECLG class cases propose mainly smaller classes on very discrete and circumscribed issues. For instance, <u>Mikowski</u> proposes a TILA rescission class of approximately 300 based on the practice of a single one of Ameriquest's closing agents that admitted it gave undated notices of right to cancel to borrowers. <u>Besterfield</u>, <u>Kukla</u> and <u>Melecio</u> each assert a statewide class claim based on defendant's practice of charging a "discount fee" but not actually providing a discount on the interest rate. In each case, the per class member recovery would likely not exceed the amount of the bogus discount fee - a few thousand dollars. In <u>Jewell</u> and <u>Rodriguez,</u> which each contain class claims for providing notices of right to cancel that are not addressed to all mortgagors, ECLG believes that this practice was not widespread and, thus, the classes are likely to be relatively small. <u>Jewell</u> asserts three Ohio TILA classes and a national class claim but one that is defined by defendant's practice of charging a "non-refundable" property valuation deposit, another narrowly defined practice that ECLG will yield a relatively small class.

Jeffress and Harless each assert Indiana classes under TILA and/or the ECOA for improper notices of right to cancel and/or bait-and-switch practices. Harless also asserts an Indiana TILA class for statutory damages based on providing undated notices of right to cancel. (Harris asserts a breach of contract class against a non-Ameriquest party for force-placement of hazard insurance.)

### C. The Court Should Appoint ECLG As Co-Lead Counsel With Responsibility for the Cole Cases

More than any other plaintiff's firm in the MDL, ECLG has excelled in the prosecution of the Cole cases. ECLG has won summary judgment in two Cole cases, Murray v. Finance America, LLC, 2006 U.S. Dist. LEXIS 15850 (N. D.Ill., April 4, 2006) and Kudlicki v. Farragut Financial Corp., 2006 U.S. Dist. LEXIS 20302 (N. Dist. Ill., Jan. 20, 2006). ECLG has successfully had classes certified in several Cole cases.[7] ECLG has also defeated motions to dismiss in numerous Cole cases.[8] In the Cole Cases, no conflict between individual cases and the

_____

[7]Murray v. New Cingular Wireless Servs., Inc., 232 F.R.D. 295 (N.D. Ill. 2005); Murray v. Cingular Wireless II, LLC, 05 C 1334, 2005 U.S. Dist. LEXIS 39542 (N.D. Ill. Dec. 22, 2005)(Exhibit A); Kudlicki v Farragut Fin. Corp., 05 C 2459, slip op. (N.D. Ill. Sept. 30, 2005)(Exhibit B); Tremble v. Ocean Bank, 05 C 2625, slip op. (Mar. 21, 2006)(Exhibit C); Murray v. Sunrise Chevrolet et al., 04 C 7668, 2006 U.S. Dist. LEXIS 19626 (N.D. Ill. Mar. 30, 2006)(Exhibit D); Wanek v. CMA Mortgage, Inc., 05 C 4775, slip op. (N.D. Ill. Apr. 17, 2006)(Exhibit E); Cavin v. Home Loan Center, 05 C 4987, 2006 U.S. Dist. LEXIS 31308 (N.D. Ill. May 10, 2006)(Exhibit F); and Sampson v. Western Sierra Acceptance Corp., 03 C 1396, 2003 U.S. Dist. LEXIS 5415 (N.D. Ill. Apr. 1, 2004), later opinion, 2004 U.S. Dist. LEXIS 11779 (N.D. Ill. July 1, 2004).

[8]Hernandez v. Chase Bank, U.S.A., N.A., 05 C 5274, 2006 U.S. Dist. LEXIS 28853 (N.D. Ill. May 2, 2006)(Appendix C); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2006 U.S. Dist. LEXIS 6619 (N.D. Ill. Feb. 15, 2006)(holding that the precise rate of interest is among the more important terms necessary to a "firm offer of credit"; Murray v. American International Group, Inc., 05 C 3881, 2006 U.S. Dist LEXIS 6985 (N.D. Ill. Feb. 23, 2006)(holding that courts must look to the terms of the offer in determining whether a "firm offer of credit" was extended); Wanek v. The New York Mortgage Co., 05 C 4774, slip op. (N.D. Ill. Dec. 27, 2005)(Appendix G); Wanek v. C.M.A. Mortgage, Inc., 05 C 4775, slip op. (N.D. Ill. Dec. 12, 2005)(Appendix H)(holding that because the mailing did not specify a precise interest rate or repayment period, the Court could not find, on a motion to dismiss, that the

Cole classes would exist because the latter are all composed of non-customers of defendants.

### D.  ECLG Should Be Appointed Co-Lead Counsel For Additional Reasons

ECLG has been litigating consumer and mortgage lending cases in the Northern District of Illinois for over two decades.  Its cases have largely made the Seventh Circuit consumer law according to which this Court will decide legal issues in this MDL.  A sampling of recent ECLG cases in which TILA issues were decided favorably for plaintiffs include:  Jones v. Ameriquest, et al., 2006 U.S. Dist. LEXIS 3788 (N. D. Ill., Jan. 31, 2006); Navara v. Long Beach Mortgage, No.05 C 864, 2006 U.S. Dist. LEXIS 4908 (N. D. Ill., Jan. 26, 2006); Latham Residential  Loan Ctrs. of Am., Inc., 03 C 7094, 2004 U.S. Dist. LEXIS 7993 (N. D. Ill., May 5, 2004); Adams v. Nationscredit Fin. Servs.Corp., 351 F. Supp. 2d 829 (N. D. Ill. 2004); Payton v. New Century Mortgage Corp., 2003 U.S. Dist. LEXIS 18366 (N. D. Ill., Oct. 10, 2003); Jenkins v. Mercantile Mortgage Co., 231 F. Supp. 2d 737 (N.D. I.. 2002); Coleman v. Equicredit Corp. Of Am., 2002 U.S Dist LEXIS 969 (N.D.Ill., Jan. 22, 2002); Dowdy v. First Metropolitan Mortgage Co., 2002 WL 745851 (N.D.Ill. Jan. 29, 2002); Smith v. Cash Store Management, Inc., 195 F.3d 325 (7th Cir. 1999); and Reese v. Hammer Financial Corp., 1999 U.S. Dist. LEXIS 18812 (N.D.Ill., Nov. 29, 1999).

ECLG also succeeded in obtaining certification of two TILA rescission classes in McIntosh v. Irwin Union Bank & Trust, 215 F.R.D. 26 (D. Mass., May 13, 2003) and Rodrigues v. Members Mortgage Co., et al., 226 F. R.D. 147 (D. Mass., Feb. 3, 2004).  The only other

---

mailing constituted a "firm offer of credit"); Murray v. Sunrise Chevrolet Inc., 04 C 7668, 2005 U.S. Dist. LEXIS 20397, at *6-9 (N.D. Ill. Sept. 15, 2005)("missing terms may render it impossible for a court to determine whether an offer has value... without these terms, this Court cannot determine whether this offer has value"); Miller v. Homeowners Loan Corp., 05 C 2590, slip op. (N.D. Ill. Aug. 22, 2005)(Appendix I); Murray v. GMAC Mortgage Corp., 05 C 1229, slip op. (N.D. Ill. Aug. 2, 2005).

decision allowing certification of a TILA rescission class in the United States is <u>Williams v. Empire Funding Corp</u>., 183 F.R.D. 428 (E. D. PA, Nov. 23, 1998). The <u>McIntosh</u> case was also a good decision on the issue of whether a borrower who refinances can still recover under a TILA rescission claim. The Sixth Circuit recently followed <u>McIntosh</u> in deciding this issue in <u>Barrett v. JP Morgan Chase Bank, NA</u>, 445 F.3d 874, 881 (6th Cir. 2006). This issue will be important in this MDL, where some plaintiffs will have refinanced in order to escape an adjustable interest rate and ever-increasing monthly payments.

ECLG currently represents the plaintiff in a case on appeal before the Seventh Circuit, <u>Hamm v. Ameriquest</u>, 05 C 227 (N.D.Ill.), 05-3984 (7th Cir.).

ECLG currently serves as liaison counsel in the predatory mortgage serving case, <u>In Re Ocwen Federal Bank FSB Mortgage Servicing Litigation</u>, MDL No. 1604, pending in the Northern District of Illinois.

Finally, ECLG leadership over the individual, small class and <u>Cole</u> actions would bring meaningful geographic diversity to plaintiffs' leadership structure. With the single exception of the Miller/Faucher firm, which does not specialize in consumer or predatory lending litigation, ECLG is the only Midwestern firm of significant size and resources within this MDL. The firms and proposed classes in the Lieff-Roddy group are concentrated primarily on the east and west coasts. ECLG represents plaintiffs and classes in the states of Illinois, Indiana, Michigan and Ohio and has found that certain of defendants' lending practices were more prevalent in certain specific states and regions. For instance, appraisal fraud by Ameriquest is especially widespread in Michigan, where ECLG has filed a number of cases on the issue. The plaintiffs and class members in the Midwestern states should have solid

10

representation within the plaintiffs' leadership structure.

### III.  THE LIEFF-RODDY FIRMS' PLAINTIFFS' PROPOSED PLAN

#### A.  Points Of Agreement

ECLG plaintiffs agree with the Lieff-Roddy plaintiffs that there is an urgent need to proceed that requires that the current stay on proceedings be lifted.  As aforementioned, ECLG currently has eight individual cases in which discovery has been completed and where it is now prepared to move for summary judgment or have settlement conferences.  Filed between 12 and 18 months ago, these cases should not be delayed any longer.  The plaintiff-borrowers are experiencing financial distress.  Further, the legal issues and claims in these cases are representative of many other cases in the MDL.  That is why ECLG's plan proposes to move for summary judgment or hold settlement conferences in these cases.  (ECLG Plan, p. 7).  Given the representative nature of the issues in these cases, this could resolve legal issues and/or lead to settlement in a much larger group of cases with similar claims.

#### B.  Points Of Disagreement

The Lieff-Roddy firms' proposed plan has some deficiencies.  Disappointingly, Lieff-Roddy seeks to completely exclude ECLG, which has clearly excelled in the prosecution of the individual, Cole, and small, non-FCRA class actions.[9]

Nevertheless, as ECLG has all along made clear to the other plaintiffs' counsel, ECLG is willing to share a co-lead counsel role with any of the well-qualified plaintiffs' firms in

---

[9] The Lieff and Roddy firms "object to the appointment of the Edelman firm as a co-lead counsel for either the class or individual cases, or with respect to any discrete claim in the MDL."  (Lieff-Roddy plan, pp. 2-3, ftnt. 1).

11

the MDL. ECLG does not oppose a leadership structure in which the Lieff and Roddy firms or any other plaintiffs' firms participate as co-lead counsel, except with respect to their conflict of interest between seeking to represent large classes and individual clients, as noted above.

While the Lieff-Roddy group's response claims it offered ECLG "several key leadership roles," (Lieff-Roddy response, p. 1), in fact it never offered ECLG a co-lead role with respect to any track of the MDL litigation. It offered ECLG undefined roles with respect to individual and Cole cases. When asked about the meaning of this offer, they specifically denied that they were offering a lead role with respect to any group of cases. At a conference call of all plaintiffs' counsel, when ECLG suggested that co-lead counsel consist of (1) either the Lieff or the Roddy firms, (2) the Lerach firm and (3) ECLG, the Leiff and Roddy firms refused, would not consider any compromise, and ECLG was excluded from all further conference calls among plaintiffs' counsel.

The Lieff-Roddy proposal plan is deficient in other ways. While ECLG has great respect for the work of the plaintiffs' firms in Lieff-Roddy proposed leadership, it simply is not accurate to state that this proposed "team consists of lawyers and firms experienced in the prosecution of predatory lending and Fair Credit Reporting Act cases." (Lieff-Roddy Resp., p. 4). ECLG respectfully points out that several of the proposed firms, including some of those proposed as co-lead counsel, have little or no experience with litigating consumer lending or predatory mortgage lending cases. The Court need only skim the firm biographies to see that this is true. (Lieff-Roddy Resp., Exhibits C, D & F).

As shown above, the Lieff-Roddy's proposed exclusion of ECLG from any lead counsel position is not at all warranted by an objective appraisal of the assets ECLG would

bring.  Tacitly acknowledging this fact, Lieff-Roddy criticizes ECLG's alleged conduct in the

Riddle[10] , GMAC [11]

_____

[10]As recently noted by Judge Castillo in an FCRA case, "Edelman, Combs is extremely experienced in the field of consumer class actions . . . and meets the adequacy of Rule 23(a)." New Cingular, supra, at 301.  See also Cingular Wireless II, LLC, supra; Farragut Financial Corp., supra; Tremble v. Ocean Bank, supra; Sunrise Chevrolet, supra.

Lieff-Roddy rely first upon the Seventh Circuit's opinion in Riddle & Assocs., P.C. v. Kelly, 414 F.3d 832 (7th Cir. 2005), where Plaintiff's counsel was sanctioned for sending a pre-litigation demand letter.  However, at least three judges have found ECL&G to be adequate class counsel after considering the circumstances surrounding the Riddle decision, including the District Court Judge who imposed those very sanctions.

First, in Cingular Wireless II, supra, Judge Blanche M. Manning, the District Court Judge in Riddle, certified a class of over 800,000 persons whose "consumer reports" were accessed by Cingular without a "permissible purpose" in violation of the FCRA.  Judge Manning summarized, "[i]n short, Cingular has failed to convince the court that Edelman & Combs has offered sub-par advice or engaged in unethical behavior in this case.  It thus concludes that the named plaintiffs and Edelman & Combs are adequate within the meaning of Rule 23(a)(4)." Cingular Wireless II, LLC, supra, at *10.

Second, Judge William T. Hart also found ECL&G adequate after considering Riddle. "Nevertheless, the court does not find that these examples of sanctionable conduct show that counsel cannot adequately represent a class in this case.  While counsel may in other cases have gone beyond the bounds of proper representation, their record here supports that they are competent for this case.  It is found that plaintiff's counsel are adequately qualified to represent the class.  The class will be certified and plaintiff's counsel will be appointed as class counsel." Chapman v. Worldwide Asset Mgmt., L.L.C., 04 C 7625, 2005 U.S. Dist. LEXIS 18881, at *18 (N.D. Ill. Aug. 30, 2005).

Third, Judge Joan Humphrey Lefkow recently followed Chapman and also found ECL&G adequate after considering Riddle.  Judge Lefkow stated that "the Edelman firm's conduct in numerous cases before this assigned judge has been consistently professional.  And since defendants have failed to identify a single case in support of their position that counsel's sanctionable conduct in an unrelated case can serve as a basis to disqualify a plaintiff as class representative, the court finds that the Edelman firm is qualified to represent the class in this case." Longo v. Law Offices of Gerald E. Moore & Associates, P.C. et al., 04 C 5759, slip op. at 10 (N.D. Ill. Mar. 30, 2006)(Exhibit K)(Motion for Reconsideration as to other matters filed on April 7, 2006, Docket No. 52).

With respect to the specific circumstances underlying Riddle, ECL&G was sanctioned for

sending a pre-litigation demand letter in 2000 to Riddle demanding $3,000 for a violation of the Fair Debt Collection Practices Act. The letter alleged a § 1692g violation of the Act, an "overshadowing" claim. The demand letter was in error. In fact, Riddle's debt collection letter contained a false threat of litigation, a § 1692e violation, rather than § 1692g, because it was sent by Mr. Riddle, an attorney, threatening litigation, even though Mr. Riddle never files collection lawsuits in Illinois.

ECL&G was sanctioned for "unreasonably and vexatiously" multiplying litigation even though Riddle filed the lawsuit, not ECL&G. In essence, ECL&G was sanctioned for making an error in a demand letter that if made in a complaint would have easily been corrected by amendment. Additionally, the Seventh Circuit recently declined to follow Riddle in Bender v. Freed, 436 F.3d 747, 750-51 (7th Cir. Feb. 2, 2006). In Bender, the Seventh Circuit affirmed a district court ruling that that sanctions under 28 U.S.C. § 1927 for multiplying proceedings unreasonably or vexatiously are not available for conduct occurring prior to the commencement of litigation. Id. at 751.

Furthermore, Defendant's argument, in sum, is that ECL&G should be disqualified as class counsel because ECL&G was too zealous in its representation of a client six years ago. However, this does not logically suggest ECL&G will not vigorously represent the classes here. Furthermore, the logical result of Defendant's position would be that ECL&G could never be class counsel, a severe sanction and certainly not one imposed by the Seventh Circuit.

Notably, Defendant does not allege that Plaintiff's counsel sent an unreasonable pre-suit demand letter in this case or engaged in any improper activity in this case. Therefore, the errant ruling in Riddle provides absolutely no basis for challenging Plaintiff's counsel's adequacy.

[11] Next, Lieff-Roddy focus on one line of dicta from GMAC Mortgage to suggest Plaintiff's counsel might be inadequate based upon the Seventh Circuit's discussion of the terms of a proposed settlement, which was not finalized or presented to the Court.

However, the issue in GMAC Mortgage was whether the District Court erred in denying plaintiff's motion for class certification, not whether the terms of a proposed class settlement complied with Federal Rule 23's requirements. Neither the District Court nor the Seventh Circuit ever considered or reviewed the specific terms of the proposed class settlement. The proposed settlement had never been reduced to writing. The question of the class plaintiff's incentive award was purely hypothetical. The settlement was cited to the Seventh Circuit purely to show there was no possibility of "annihilating damages."

Finally, Judge Amy J. St. Eve recently certified a class in a similar matter despite the same attacks. Tremble v. Ocean Bank, supra. Judge St. Eve found ECL&G to be adequate class counsel and with respect to the dicta from the Seventh Circuit in GMAC Mortgage, stated, "based on the current record the Court concludes that denial of certification due to allegedly inadequate counsel would be premature. The Court, however, will revisit the issue of adequacy

and <u>Indymac</u>[12] cases.  However, these attacks do not at all show that ECLG is inadequate to serve as co-lead counsel.  ECLG believes it would not be in the best interest of plaintiffs and the class members in the MDL for it to be excluded as co-lead counsel with responsibility for the individual, the <u>Cole</u> class and the non-FRCA, small class actions.

## IV.    DEFENDANTS PROPOSED PLAN

### A.    Points of Agreement With Defendants' Plan

ECLG plaintiffs agree with defendants - with important qualifications - that joining closing agents as parties could facilitate settlement in certain cases.  (Defs' plan, pp. 4-5).  ECLG plaintiffs would not oppose an immediate motion to do so but point out that this would not necessitate a continuation of the current stay.  Although ECLG must point out that Ameriquest has never joined a title company or closing agent as a party in any case in which ECLG has represented the plaintiffs (so that its proposal would represent a new practice), in cases where Ameriquest has invited a closing agent to participate in settlement discussions there has been a high rate of successful settlement.  But there is no reason for defendants to wait to join their closing agents.[13]

_____

as circumstances warrant in later stages of this litigation." <u>Tremble</u>, <u>supra</u>, at 6.  Plaintiff believes this is the proper course.

[12]In <u>Indymac</u>, the defendant had represented in open court the number of class members. That number was consistent with the discovery that had been taken by ECLG.  When the objectors claimed that they had not received a notice, ECLG asked the defendant to explain why those people had not received notice.  ECLG insisted that defendant either substantiate the prior representation or abandon the settlement.  Defendant did the latter.

[13]At the same time, defendants overrate the procedure.  Defendants' use of outside closing agents was by no means universal and, thus, in many cases, the only defendant will still be the Ameriquest party.  Within the MDL, there are many cases in which the plaintiffs' loan

ECLG plaintiffs also agree generally with defendants that there should be meaningful settlement discussions. ECLG and defendants' local counsel in the individual cases have a history of successfully negotiating settlements in cases against defendants. ECLG has already obtained settlements in nine cases and is currently discussing settlement in 13 unfiled or recently filed cases. However, ECLG plaintiffs are absolutely <u>opposed</u> to any stay on discovery while settlement negotiations are occurring. (Defs' Plan, pp. 10, 16). ECLG believes that the good settlements it has achieved are the direct result of aggressive discovery tactics and the evidence and admissions that result from aggressive discovery. Without the benefit of discovery, plaintiffs' negotiating position in settlement discussions is inherently weak. Plaintiffs have a right to discovery in their cases. Finally, ECLG plaintiffs are opposed to defendant's suggestion of private mediation. (Defs' Plan, p. 10). The ECLG plaintiffs prefer this Court's direct involvement in the settlement negotiations for at least a handful of cases. ECLG believes that such involvement from the Court would begin to give the Court a grasp of the legal and factual issues at work in these cases.

Ameriquest suggests that the parties brief common legal issues in a handful of cases now so that the Court's rulings can facilitate settlement of a larger set of cases. (Dfs' plan,

transactions occurred prior to July, 2004, the date when Ameriquest began to rely more or less exclusively on outside closing agents. Moreover, in the course of litigation, ECLG has learned that, even after that date, there were some closings that were in fact (if not on paper) conducted by Ameriquest. Thus, Ameriquest's statement that "to the extent there have been any errors with respect to individual loans, these errors were caused by the third-party closing agents" is not even wholly true after July, 2004. Rather, in these transactions, Ameriquest's own employees were performing closings - in borrower's homes, in restaurants, Ameriquest's offices, etc. - and often without proper training. ECLG has obtained admissions from both closing agents and former Ameriquest employees that they delivered undated notices of right to cancel, as noted above. The point here is that, where an outside closing agent did not actually perform the closing, it is not necessary to wait for the joinder of any third party.

p. 9). ECLG plaintiffs think this could work in some cases but not in the absence of discovery. Ameriquest appears to want the issues decided in the abstract, apart from the cases themselves, and without relevant evidence gleaned from discovery. (Defs' plan, p. 9). Plaintiffs are willing now to brief legal issues in the context of summary judgment in the eight cases where discovery has been completed and where the cases have been pending for between 12 and 18 months. ECLG plaintiffs would also agree to "fast track" the discovery process in certain other representative cases.

Finally, ECLG plaintiffs agree in one sense with defendants' general point that the individual TILA rescission cases will require "a detailed factual analysis of each plaintiff's transaction" that necessitates significant written and oral discovery in each case (Defs' plan, p. 11). That is, the ECLG plaintiffs agree that liability in the individual cases depends on whether the proper disclosures were provided at closing in the proper manner and, therefore, the closing is usually the focus of intense discovery. Because of the sheer number of individual cases, discovery should get underway now.

## B. Points of Disagreement

However, defendants' plan is one that, in many ways, simply seeks to delay and draw out this proceeding for as long as possible - in order to reduce the size of proposed classes and preclude future actions. Defendants' proposed plan seek to delay, limit and prevent discovery, which is always plaintiffs' most potent weapon. (Defs' plan, p. 18).

### 1. MDL Cases Should Not Be Stayed For the AGS Pay-Out

Litigation should not be stayed delayed until after the Attorney General

Settlement ("AGS") is paid out. (Defs' plan, p. 7, 18). This is especially true for the individual cases, where, it is already clear, the plaintiffs have implicitly opted for private litigation over participation in the AGS. The AGS is an opt-in agreement; those who opt in sign a release of all claims. By virtue of their filed cases, the individual plaintiffs are prevented from opting in to the AGS agreement. Thus, there is no sense, as defendants argue, in which individual plaintiffs who have already chosen to file a case rather than participate in the AGS are going to be "removed from these proceedings." (Defs' plan, p. 7). This is pure rhetoric. Further, it is clear that plaintiffs with individual cases stand to gain a far greater recovery through litigation than through the AGS. In Illinois, restitution to each Ameriquest borrower who qualifies will average less than $1,000. (ECLG Plaintiffs Proposed Plan, Exhibit A, ¶¶ 7-8). In previous individual TILA rescission cases against Ameriquest, ECLG typically settles for or wins for the plaintiff a multiple of this amount. Because the individual plaintiffs are not going to opt-in to the AGS at this point, there is no reason why the prosecution of cases in the MDL should be delayed.

More globally, this MDL should not wait for the AGS because, first of all, the AGS does not "resolve all claims." (Defs' plan, p.5). As the ECLG plaintiffs explained in their motion for appointment as co-lead counsel, the AGS does not cover any of the thousands of loans made by MDL defendant Argent Mortgage Company, LLC. Rather, it only resolves the claims of Ameriquest borrowers who choose to opt-in to the AGS once they receive notice. Thus, there is no legal or procedural authority or sense to support defendants' argument that the legal claims of MDL plaintiffs who do not opt-in to the AGS "will be rendered moot" by that agreement. Again, this is pure rhetoric. Second, the AGS does not resolve "all loans" made in the six-year period covered by the AGS. (Defs' plan, p.5). Again, it only resolves claims on

loans in that period <u>if</u> the borrower chooses to opt-in, and the Ameriquest parties have already admitted that a minimum of 30% of covered borrowers are not going to opt-in.

Finally, defendants argue, essentially, that the MDL claims of plaintiffs whose transactions with Ameriquest occurred after February 3, 2003 are not viable because its new pricing model "substantially eliminates the possibility of bait-and-switch practices." (P. 6, ftnt., p. 6). First of all, this is an issue for discovery. Second, there are many other types of class and individual claims in the MDL cases. Finally, all of the cases in the MDL have loan transaction dates prior to the AGS's requirement for Ameriquest to cease and/or reform its various abusive or questionable practices.

### 2. Pending Appeals Will Not Resolve "Many" of the Legal Issues in the MDL

Defendants also argue that pending appeals may resolve legal issues presented in "many" cases in the MDL. (Defs' plan, p. 7). This is not true. ECLG plaintiffs are aware of a single appeal, <u>Hamm v. Ameriquest</u>, 05 227 (N.D.Ill.), involving a single legal issue that is present only in a handful of ECLG's older, individual cases. The issue is whether Ameriquest disclosed the borrower's repayment schedule on its TILA Disclosure Statement in the manner and method required by TILA. Plaintiff appealed Judge Der-Yeghiayan's grant of summary judgment for defendant in <u>Hamm</u> because Judge Der-Yeghiayan did not consider the requirements of TILA or any 7th Circuit precedent. Judge Coar, in a well-reasoned opinion in <u>Jones v. Ameriquest</u>, 2006 U.S. Dist. LEXIS 3788 (N.D.Ill., Jan. 31, 2006), reached the exact opposite holding on the same issue but cited authority. Besides <u>Hamm</u> and <u>Jones</u>, only approximately 12 other cases (out of the 161 MDL cases total) contain a claim based on

Ameriquest's payment schedule.[14]  Further, no case of which ECLG is aware contains a class claim based on the payment schedule.  This is partly because, by August, 2004, Ameriquest had changed the disclosure of the payment schedule to comply with TILA.  Finally, most plaintiffs in cases that have a payment schedule claim also have other legal claims set forth in their complaint.  These other claims can and should proceed without delay.

### 3.    Argent Could Indeed Be Liable

Defendants also argue that Argent could not be legally liable for bait-and-switch fraud because it does not, defendants argue, have direct contact with borrowers.  This is factually incorrect.  Even though it is a wholesale lender, Argent still prepares the preliminary disclosures, especially the Good Faith Estimate and the preliminary TILA Disclosure Statement, which disclose initial loan terms and which are delivered to the borrower shortly after application.  It also decides the final loan terms and prepares the "Final Acknowledgment of Loan Terms" and all other final closing documents.  Further, it communicates with brokers who then often simply pass on the informational content of those communications to borrowers.

### 4.    Discovery Should Not Be Stayed Under Any Circumstances

Discovery should not be delayed or stayed.  (Defs' plan, p. 9).  This MDL is, fundamentally, about Ameriquest's lending practices.  Significant discovery is required to reveal and define the nature and scope of those practices.  While ECLG plaintiffs are absolutely

---

[14]The cases include: Washington v. Ameriquest, Hubbard v. Ameriquest, Abercrombie v. Ameriquest, Talley v. Ameriquest; Jimenez v. Ameriquest, Furgeson v. Ameriquest, Smith v. Ameriquest; Treadwell v. Ameriquest; Williams-Harris v. Ameriquest; Key v. Ameriquest, Smith and Yanong v. Ameriquest; and Mills v. Ameriquest.  In only two cases, Abercrombie v. Argent and Mills v. Ameriquest, is the payment schedule the sole basis asserted for TILA rescission.

opposed to a blanket stay on discovery in all cases, as stated ECLG is willing to select representative cases and/claims in which discovery proceeds and to allow similar claims and cases to await determination of the issues in the representative cases. This would accomplish the goal of judicial economy that defendants suggest is important, but without prejudicing plaintiffs. Further, certain claims, such as Ameriquest's practice of delivering undated notices of right to cancel, are highly fact-dependant and not amenable to briefing in the absence of discovery. (Defs' plan, p. 9).

> **5.     Cases About To Be Decided Should Not Be Reassigned; No Savings of Judicial Time and Effort Would Result**

Defendants request that this Court reassign three ECLG-cases that for months have had fully briefed, cross motions for summary judgment pending. (Defs' plan, p. 3). Plaintiffs in these cases respectfully disagree and request that this Court not reassign those cases. No Local Rule 40.4 purpose would be served by reassignment at this point in time. On the contrary, the judges in <u>Washington</u>, <u>Hubbard</u>, and <u>Abercrombie</u> have by now have invested substantial judicial time and effort into determining the legal and factual issues in those cases, and reassigning them at this point would only increase the judicial time and effort necessary to decide those cases and would delay their disposition.

> **6.     Defendants' Proposed Plan Contains Inappropriate and Misleading Legal Argument**

Finally, defendants' plan contains misleading, legal argument. For instance, defendant recommends that one subdivision of MDL cases be the TILA rescission cases. Defendants then present, at pages11-14 of their proposed plan, a TILA jurisprudence of "reasonableness" that not only is not the applicable law in the Seventh Circuit, but which simply

contradicts, and has already been rejected by, the Seventh Circuit.[15]

---

[15]The Seventh Circuit recognizes that TILA and Regulation Z require disclosure of several key credit terms, computed in the precise manner prescribed by the Regulation and using precise terminology.  In the Seventh Circuit, "[S]trict compliance with the required disclosures and terminology is required."  Smith v. No. 2 Galesburg Crown Fin. Corp., 615 F.2d at 416-7.  "Congress did not intend that creditors escape liability for merely technical violations" so that "arguably inconsequential terminological deviations from the Act's required language [are] violations."  Id.  Thus, "[a]ny misgivings which creditors may have about the technical nature of the requirements should be addressed to Congress or the Federal Reserve Board not to the courts."  Id.  Such a strict assessment of damages by courts was intended by Congress to create a 'private attorney general' scheme of enforcement which would obviate the need for a large federal bureaucracy to perform such a task."  In re Steinbrecher, 110 B.R. 155, 161 (Bankr. E.D. Pa. 1990); Streit v. Fireside Chrysler-Plymouth, Inc., 697 F. 2d at 196.

The Seventh Circuit has consistently required strict compliance with TILA's required disclosures and terminology.  Smith v. No. 2 Galesburg Crown Fin. Corp., 615 F.2d at 416; Cowen v. Bank United of Texas, FSB, 70 F.3d at 941; Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1379-80 (11th Cir. 1984); April v. Union Mortgage Co., 709 F. Supp. 809, 811 (N.D. Ill. 1989).  The Seventh Circuit explained the rationale for its position long ago:

> **It is not sufficient to attempt to comply with the spirit of TILA in order to avoid liability.  Rather, strict compliance with the required disclosures and terminology is required. Many violations of TILA involve technical violations without egregious conduct of any kind on the part of the creditor. However, Congress did not intend that creditors should escape liability for merely technical violations. . . . We will therefore require strict adherence to the required terminology under the statute and regulations, and we will not countenance deviations from those requirements, however minor they may be in some abstract sense.**

Smith v.No. 2 Galesburg Crown Fin. Corp., 615 F.2d at 416.

It follows that, as "fundamentally a disclosure statute," TILA does not require the consumer to suffer actual injury, damages, deception or misunderstanding in order to have standing or to maintain a cause of action.  Smith v. Cash Store Management, 195 F.3d 325, 328 (7th Cir. 1999)("lenders are generally liable under TILA for inaccuracies, even absent a showing that the inaccuracies are misleading").  Cowen v. Bank United of Texas, FSB, 70 F.3d at 940 ("Truth In Lending Act allows a monetary recovery even if the failure to disclose the charge caused the borrower no harm"); Brown v. Marquette Savings & Loan Association, 686 F.2d at 614 ("[I]t is no defense that the consumer was neither misled nor harmed by the violation"); Diaz v. Westgate Lincoln Mercury, Inc., 1994 U.S. Dist. LEXIS 16300, *11 ("...[S]ubjective matters,

Defendants' plan contains other inappropriate and misleading arguments. For example, its argument that each bait-and-switch claim will require extensive oral discovery (and hence is not amendable to class certification or consolidation) is not necessarily true. (Defs' plan, pp. 14-15) As already mentioned, key pre-closing and closing documents provided to plaintiffs and class members can sufficiently reveal a pattern of baiting-and-switching consumers

---

such as the plaintiff's actual reliance, deception or misunderstanding with respect to the creditor's printed document, generally are not required elements of TWA [sic] claims"); Johnson v. Steven Sims Subaru, Inc., 1993 U.S. Dist. LEXIS 8078, *24 (N. Dist. Ill., Bucklo, Mag. J)(courts have assessed damages without requiring a showing of reliance or causation); Villareal v. Snow, 1996 U.S. Dist. LEXIS 662, *8 (N. Dist. Ill., Lindberg, J.).

To successfully prove a TILA rescission claim, a plaintiff is only required to show that (1) defendant is a "creditor" within the meaning of TILA; (2) defendant's transaction with plaintiff was a "consumer credit transaction"; (3) the transaction was "consummated" as defined by TILA; and (4) that there was some failure to make a disclosure required by the Act or in the manner required by the Act. Diaz v. Westgate Lincoln Mercury, Inc., 1994 U.S. Dist. LEXIS 16300, *25-27 (N.Dist. Ill., Nov. 7, 1994)(Pallmeyer, Mag. J.).

As the Seventh Circuit has summarized its TILA jurisprudence, the rule is: "Subject to narrow exceptions, 'hypertechnicality reigns' in the application of TILA." Smith v. Cash Store Management, 195 F. 3d at 328; Cowen v. Bank United of Texas, FSB, 70 F.3d at 941.

In their proposed plan, defendants, without relying on a single authority in the Seventh Circuit, argue that the correct approach for evaluating whether a disclosure violates TILA is an ad hoc or reasonableness analysis that looks at all the surrounding circumstances of the transaction. However, this argument represents a strand of Fifth Circuit, pre-Truth In Lending Simplification Reform Act (1980) jurisprudence that this Court specifically rejected 26 years ago in Smith v. No. 2 Galesburg Crown Finance Corp., 615 F.2d at 417 :

**...[We] believe the that the approach used by the Fifth Circuit in the Pennino case is sounder than the more ad hoc analysis utilized by the same court in Dixon and Bussey. We will therefore require strict adherence to the required terminology under the statute and regulations, and we will not countenance deviations from those requirements, however minor they may be in some abstract sense.** At 417.

23

on loan terms.  The same is true with respect to plaintiffs' "discount fee" fraud claims.  (Defs' plan, p. 16).

Finally, defendants complain that ECLG's cases are the result of solicitation, not "objective evaluation" of whether the borrower received appropriate disclosures.  (P. 2).  ECLG responds that it evaluates each potential case in light of the applicable consumer disclosure statutes and turns down many more cases than it accepts.  ECLG notes that most borrowers are not aware of their rights and are ready and willing to file actions because they often believe they have been deceived and gouged by Ameriquest's predatory lending practices.  ECLG's solicitation practices are lawful and ethical; defendants do not argue otherwise.

## V.  CONCLUSION

For all of the reasons stated above and in ECLG plaintiffs' Motion for Appointment As Co-lead Counsel, the plaintiffs represented by ECLG respectfully request that the Court appoint ECLG as Co-Lead Counsel With Responsibility for the individual cases, the small class actions and the Cole cases.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

24

Daniel A. Edelman
Cathleen Combs
James Latturner
Tara Goodwin
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\16124\pleading\case management plan