**EXHIBIT 12**

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN 02 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

SANDRA HARRIS and NORMAN HARRIS,
on behalf of themselves and the classes defined
herein,

           Plaintiffs,

           v.

TOWN & COUNTRY CREDIT CORP.,
AMC MORTGAGE SERVICES, INC.,
EMC MORTGAGE CORPORATION,
and DOES 1-5,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

JUDGE FILIP

MAGISTRATE JUDGE SCHENKIER

JURY DEMANDED

## COMPLAINT – CLASS ACTION

06C 3048

### INTRODUCTION

1.     Plaintiffs Sandra Harris and Norman Harris bring this action against a "subprime" mortgage lender and its affiliates and successor to rescind a mortgage for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226, and to recover damages for violation of state law.

### JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1332 (class actions), 1337 (interstate commerce), and 1367 (supplemental jurisdiction), and 15 U.S.C. §1640 (TILA). The total amount in controversy exceeds $5 million, plaintiffs are domiciliaries and citizens of Illinois, and defendants are domiciliaries and citizens of states other than Illinois. Defendants transact business in the

1

District and are deemed to reside here.

## PARTIES

3.       Plaintiffs Sandra Harris and Norman Harris are citizens of Illinois.  They own and reside in a single-family home at 14416 S. Lowe Ave., Riverdale, IL 60827 (referred to as Lowell on loan documents).

4.       Defendant Town & Country Credit Corporation is a corporation chartered under Delaware law with its principal place of business in California.  It maintains offices in and does business in Illinois.  Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

5.       Defendant Town & Country Credit Corporation is engaged in the business of originating "subprime" mortgages.

6.       Defendant Town & Country Credit Corporation makes more than 26 loans per year.

7.       Defendant Town & Country Credit Corporation is a "creditor" as defined in TILA and Regulation Z.

8.       Town & Country Credit Corporation is an affiliate of Ameriquest Mortgage Company.

9.       During 1999-2003, Ameriquest and its affiliates comprised the third largest subprime lender by volume, with $61.8 billion in total originations during the period. Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

10.     Defendant AMC Mortgage Services, Inc. is a corporation chartered under Delaware law with its principal place of business in California. It does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

11.     Defendant AMC Mortgage Services, Inc., an affiliate of Ameriquest Mortgage Company, services loans originated by Town & Country, and claims an interest in such loans, including the right to receive payments thereunder. It is joined as a necessary party.

12.     Defendant EMC Mortgage Corporation ("EMC") is a foreign corporation which transacts business in Illinois. Its principal place of business is 909 Hidden Ridge, Suite 190, Irving, TX 75038-3817. It is an affiliate of Bear Stearns. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

13.     EMC is the present servicer and, on information and belief, owner of plaintiffs' loan.

14.     EMC services thousands of residential mortgage loans. It holds itself out as specializing in "subprime" or "nonprime" residential loans. According to National Mortgage News, April 17, 2006 issue, and Mortgage Servicing News, April 2006 issue, EMC is the 13th largest originator of subprime residential mortgage loans in the United States and the 16th largest servicer of such loans, with a servicing portfolio of over $24 billion.

### FACTS RELATING TO PLAINTIFFS

15.     Prior to March 1, 2005, plaintiffs applied for a mortgage with Town & Country Credit Corporation.

16.     Plaintiffs needed and used the loan for personal, family or household

3

purposes, namely, refinancing of prior debt incurred for such purposes.

17.    The loan was closed on March 1, 2005.

18.    The following are documents relating to the loan:

a.    A note, Exhibit A.  Only Mrs. Harris signed the note.

b.    A mortgage, Exhibit B.  Both Mr. and Mrs. Harris signed the mortgage.

c.    A Truth in Lending disclosure statement, Exhibit C;

d.    The three-day notice of right to cancel required by the Federal Reserve Board, Exhibit D.

e.    A "one week cancellation period" document used by Ameriquest, Town & Country, and their affiliates, Exhibit E;

f.    A HUD-1 Settlement Statement, Exhibit F.  As shown on Line 903, one of the items paid with the loan proceeds was one years' hazard insurance premium.

g.    An "Escrow Account Disclosure Agreement," Exhibit G;

h.    A document entitled "Hazard Insurance Requirements and Authorization," Exhibit H, stating that a hazard insurance policy for a term of 1 year or more must be in force in order for the loan to close, and must contain a mortgagee clause in favor of Town & Country and its successors and assigns;

i.    An "Initial Escrow Account Disclosure Statement," Exhibit I.

j.    An "Escrow Account Agreement: Tax and Insurance," Exhibit J .  The loan included an escrow agreement for payment of taxes and insurance.

k.    An "Illinois Collateral Protection Insurance Disclosure," Exhibit

4

K.

19.     Each of Exhibits A-K is a standard form document, regularly used by Town & Country.

20.     Plaintiffs were later directed to make payments to AMC Mortgage Services, Inc., and later still to EMC.

21.     On information and belief, EMC owns plaintiffs' loan.

22.     In the event EMC does not own plaintiffs' loan (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

## COUNT I – TRUTH IN LENDING ACT

23.     Plaintiffs incorporate paragraphs 1-22.

24.     Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a) **Consumer's right to rescind.**

> **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

> **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

> **(3) The consumer may exercise the right to rescind until midnight of**

the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) Exempt transactions. The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

6

## GROUND FOR RESCISSION

25.    In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiffs' right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the reasons stated below.

26.    Exhibit D is inherently confusing with respect to who has a right to cancel in a case in which less than all of the persons signing the mortgage sign the note. The top of the form has only Mrs. Harris' name on it, and is addressed to "borrower(s)." The text is addressed to "You," which is reasonably interpreted as applying to the individual whose name appears directly above. The bottom of the form states that "Each borrower" has the right to cancel, which is reasonably interpreted as meaning the persons named as "borrower(s)" at the top of the document. While there are signature lines for both plaintiffs at the bottom of the form, they are there described as "Borrower/ Owner," which presumably means something different than just "borrower."

27.    The statute gives not only each person obligated to repay the loan but each person who resides in and has an ownership interest in the property the right to cancel, and requires a notice that unequivocally tells each such person that they have the right to cancel.

28.    The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

29.    Furthermore, the "one week" cancellation notice is misleading, as the

7

period given is actually only six days long.

30. Town & Country's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

31. Notice of rescission has been given to defendants. A copy is attached as Exhibit L.

32. The loan has not been rescinded.

33. Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

34. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b. Statutory damages for the underlying disclosure violation;

c. If appropriate, statutory damages for failure to rescind;

d. Attorney's fees, litigation expenses and costs.

e. Such other or further relief as the Court deems appropriate.

8

## COUNT II – BREACH OF CONTRACT

35.     Plaintiffs incorporate paragraphs 1-22.

36.     This claim is against EMC only.

37.     EMC took over servicing of plaintiffs' loan no later than October 2005.

38.     On information and belief, in about October 2005 EMC purchased a policy of "force placed" hazard insurance and charged it to plaintiffs' account. "Force placed" insurance is insurance which a lender or servicer obtains when the borrower does not have or maintain their own insurance.

39.     At the time, plaintiffs had insurance in force, and it was obvious from the loan documents that this was the case.

40.     The loan documents signed by or provided to plaintiffs:

        a.     Showed that a hazard insurance policy with a minimum term of one year had been paid for at the closing, Exhibit F, line 903.

        b.     Required that Town & Country or its assigns be named as loss payee, so that they would be notified of any cancellation of the policy, Exhibit H;

        c.     Created an escrow account to insure that future insurance premiums were paid, Exhibit F, line 1001, Exhibits G, I and J.

41.     Town & Country and its successors, including EMC, were not authorized to force place insurance if the borrower "provide[d] us with evidence of the insurance coverage required by your agreement with us . . . ."     Exhibit K.  Similarly, the standard form mortgage, Exhibit B, only authorizes the forced placement of insurance "If Borrower fails to maintain any of the coverages described above . . . ." (Exhibit B, p. 6, item 5, second paragraph)

9

42. Exhibits F-J constituted evidence of the required insurance coverage.

43. EMC had, or should have had, Exhibit B and Exhibits F-J.

44. EMC proceeded to force place hazard insurance when the loan documents showed that plaintiffs had insurance and EMC knew or should have known this.

45. Plaintiffs demanded that EMC cancel the force placed insurance, but EMC refused to do so.

46. EMC profits from the forced placement of hazard insurance. The insurance is more expensive than ordinary insurance. On information and belief, EMC or an affiliate obtains substantial commissions on force placed insurance.

47. On information and belief, EMC regularly force places hazard insurance when hazard insurance is purchased at the closing and the term of such insurance has not expired at the time of the forced placement.

48. On information and belief, EMC regularly force places hazard insurance when it knows that the insurance premiums are being paid for from an escrow account.

49. EMC has a policy and practice of force placing hazard insurance under such circumstances.

50. EMC's forced placement of hazard insurance under such circumstances constitutes a breach of the loan agreement.

51. Plaintiffs and each class member were damaged by the forced placement of insurance.

52. Unless enjoined from doing so, EMC will continue the unlawful conduct.

10

## CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring suit on behalf of a class. The class consists of (a) all persons (b) whose loans are serviced by EMC (c) and who had insurance force placed by EMC (d) when either (i) hazard insurance is purchased at the closing and the term of such insurance has not expired at the time of the forced placement or (ii) the hazard insurance premiums are being paid for from an escrow account or (iii) both, (e) where the loan was outstanding at any time within the ten years next before the filing of this action.

54.     The class is so numerous that joinder of all members is impractical.

55.     EMC has forced placed hazard insurance in more than 40 instances during the last 10 years when hazard insurance was purchased at the closing and the term of such insurance has not expired at the time of the forced placement.

56.     EMC has forced placed hazard insurance in more than 40 instances during the last 10 years when the hazard insurance premiums are being paid for from an escrow account.

57.     There are questions of law and fact common to the class which predominate over any questions affecting only individual class members. These predominant questions include:

        a.      Whether EMC has a policy and practice of force placing hazard insurance when its loan documents show that the borrower has hazard insurance in force;

        b.      Whether EMC thereby breaches its contract.

        c.      The appropriate relief.

58.     Plaintiffs will fairly and adequately protect the interests of the class.

11

Plaintiffs have retained counsel experienced in handling class actions and actions involving unlawful business practices. Neither plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action. Plaintiffs' claims are typical of the claims of the class, which all arise from the same operative facts and are based on the same legal theories.

59.    A class action for damages, pursuant to Fed.R.Civ.P. Rule 23(b)(3), is superior to any other method of adjudicating this controversy. Because EMC specializes in servicing "subprime" loans, many of its victims are economically unable to hire counsel. Management of this class action is likely to present significantly fewer difficulties than those presented in many class actions, e.g. class actions for securities fraud.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the class and against defendant for:

       a.      Compensatory damages;

       b.      Injunctive relief;

       c.      Costs.

       d.      Such other or further relief as the Court deems appropriate.

### COUNT III – CONSUMER FRAUD

60.    Plaintiffs incorporate paragraphs 1-22 and 37-50.

61.    This claim is against EMC only.

62.    EMC's forced placement of hazard insurance under such circumstances constitutes an unfair practice, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, in that (a) it obtains substantial sums of money from borrowers to which it is not entitled; (b) it unjustifiably and maliciously forces borrowers into default; and (c) it ruins borrowers'

12

credit ratings, so that they cannot escape EMC by refinancing.

63.     Plaintiffs and each class member were damaged by the forced placement of insurance.

64.     EMC's actions were malicious and sought to take advantage of the superior position conferred by its security interest to extract money that it knew was not legally owed.

65.     Unless enjoined from doing so, EMC will continue the unlawful conduct.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring suit on behalf of a class. The class consists of (a) all persons in Illinois (b) whose loans are serviced by EMC (c) and who had insurance force placed by EMC (d) when either (i) hazard insurance is purchased at the closing and the term of such insurance has not expired at the time of the forced placement or (ii) the hazard insurance premiums are being paid for from an escrow account or (iii) both, (e) where the loan was outstanding at any time within the three years next before the filing of this action.

67.     The class is so numerous that joinder of all members is impractical.

68.     EMC has forced placed hazard insurance for Illinois borrowers in more than 40 instances during the last 3 years when hazard insurance was purchased at the closing and the term of such insurance has not expired at the time of the forced placement.

69.     EMC has forced placed hazard insurance for Illinois borrowers in more than 40 instances during the last 3 years when the hazard insurance premiums are being paid for from an escrow account.

70.     There are questions of law and fact common to the class which

13

predominate over any questions affecting only individual class members. These predominant questions include:

> a.    Whether EMC has a policy and practice of force placing hazard insurance when its loan documents show that the borrower has hazard insurance in force;
>
> b.    Whether EMC thereby commits an unfair practice;
>
> c.    The appropriate relief.

71.    Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained counsel experienced in handling class actions and actions involving unlawful business practices. Neither plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action. Plaintiffs' claims are typical of the claims of the class, which all arise from the same operative facts and are based on the same legal theories.

72.    A class action for damages, pursuant to Fed.R.Civ.P. Rule 23(b)(3), is superior to any other method of adjudicating this controversy. Because EMC specializes in servicing "subprime" loans, many of its victims are economically unable to hire counsel. Management of this class action is likely to present significantly fewer difficulties than those presented in many class actions, e.g. class actions for securities fraud.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the class and against defendant for:

> a.    Compensatory damages;
>
> b.    Punitive damages;
>
> c.    Injunctive relief;
>
> d.    Attorney's fees, litigation expenses and costs.

14

e.    Such other or further relief as the Court deems appropriate.

_____
Daniel A. Edelman


Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Al F. Hofeld
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)


### JURY DEMAND

Plaintiffs demand trial by jury.

_____
Daniel A. Edelman

t:\16988\pleading\complaint_pleading.wpd

15