**EXHIBIT 18**

FILED
SEP 22 2006
SEP 22, 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY and CHANTEL THIBODEAU, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> AMERIQUEST MORTGAGE COMPANY, ) <br> AMC MORTGAGE SERVICES, INC. ) <br> and DEUTSCHE BANK NATIONAL TRUST ) <br> COMPANY, ) <br> ) <br> Defendants. ) | 06CV5148 <br> JUDGE DARRAH <br> MAGISTRATE JUDGE COLE <br><br><br> JURY TRIAL DEMAND |

## COMPLAINT

### INTRODUCTION

1. Plaintiffs Jeffrey and Chantel Thibodeau charge defendants with violation of the Truth in Lending Act through failure to honor a valid rescission request in violation of 15 U.S.C. § 1635. Plaintiffs also charge defendant Ameriquest with violation of New Hampshire law.

### JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to Title 28 of the United States Code, Sections 1331 and 1337 because plaintiffs' claim under the Truth in Lending Act arises under federal law. This Court has supplemental jurisdiction over plaintiffs' claim under state law pursuant to the Judicial Improvements Act of 1990, Pub.L.No. 101-650, 104 Stat. 5089, 28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because the defendants do business in this district. Also, the Judicial Panel on Multi-District Litigation has issued an order centralizing predatory lending litigation against Ameriquest in this district before Judge Aspen.

## PARTIES

4. Defendant Ameriquest Mortgage Company is a leading sub-prime mortgage lender. The company's main offices are in Orange, California, but it does business in this district. Defendant AMC Mortgage Services, Inc. services Ameriquest mortgages and has the right to receive payments thereunder and does business in this district. Defendant Deutsche Bank National Trust Company is the owner of plaintiffs' mortgage and also does business in this district.

5. Plaintiffs Jeffrey and Chantel Thibodeau, husband and wife, are residents of New Hampshire.

## BACKGROUND

6. Plaintiff Jeffrey Thibodeau is heating, ventilation, air conditioning and refrigeration technician. His wife, plaintiff Chantel Thibodeau, is a homemaker. Mr. and Mrs. Thibodeau own a home in Claremont, New Hampshire where they live with their youngest daughter, who is in school.

7. In early 2004, the Thibodeaus had two mortgages on their home. They decided to refinance the mortgages so that they could consolidate the two loans into one loan and get a lower rate. Mrs. Thibodeau filled out a form online and received a telephone call from Ameriquest. Mrs. Thibodeau spoke to an Ameriquest representative named Donald Dalton. Mrs. Thibodeau said that she wanted to refinance her two mortgages into one mortgage, fixed rate, with the lowest possible interest rate she could get. And Dalton said it would bee no problem for him to do that.

8. Mrs. Thibodeau and Dalton spoke on the telephone about ten times. At first, Dalton talked about getting the Thibodeaus a fixed rate in the high 6s or low 7s. Dalton also told Mrs. Thibodeau to stop paying other creditors because they would be paid out of the refinancing. Dalton also said that the closing costs would be rolled into the loan so that they would not cost the Thibodeaus anything.

9. In a later conversation, Dalton told Mrs. Thibodeau he couldn't give her the rate he'd quoted, that it was going to be a variable rate and little higher than he'd said. Mrs. Thibodeau asked him why that was, because they had already scheduled a closing. Dalton said that the Thibodeaus' credit was not as good as he thought it was. Mrs. Thibodeau asked Dalton why he was telling her this now because before it was fine. Dalton responded that the Thibodeaus had a lot of revolving credit card debt. Mrs. Thibodeau said she did not understand why that would be an issue if they were paying the credit card debt off why was it being counted against them. Dalton responded that their credit score would not go up for three months, so Mrs. Thibodeau said OK. Dalton then told Ms. Thibodeau to call back in three months and Ameriquest would be able to get them into a really low interest rate which would be fixed because their credit would be better for having paid off all the credit card bills. Mrs. Thibodeau asked Dalton if he was sure that Ameriquest was not going to charge her whole new closing costs for that and early payoff fees to which Dalton said no, no, no, Ameriquest doesn't want to lose their business. Mrs. Thibodeau asked Dalton that at least three times and he kept on reassuring her. Mrs. Thibodeau said she might check with another bank because she really wanted a fixed rate and Dalton said, OK you can do that, but don't check with too many because that will cause your credit rating to go lower. Dalton also warned Mrs. Thibodeau that the Thibodeaus would have to pay the appraisal fee out of their own pocket if they backed out of the deal.

10. Ameriquest prepared an adjustable rate note for $135,000 with an initial interest rate of 7.65% which could increase to as much as 13.65% depending on changes in the LIBOR rate. There was a prepayment penalty for the first three years equal to six months interest (or $4,131.00 at the outset). Ameriquest assessed the Thibodeaus settlement charges of $8,923.51 to get this loan.

11. The closing took place on February 12, 2004, in the evening, at the Thibodeaus' home. A notary sent by Ameriquest sat with the Thibodeaus at their kitchen table. Mrs. Thibodeau noticed a paper saying there was an early payoff penalty and she asked the notary

3

about that. Ms. Thibodeau also told the notary that she didn't see a paper that says she can change this to a fixed rate loan in three months. Ms. Thibodeau reiterated that she would really like to have something in writing about that and the notary said oh, I wouldn't worry about that, if that is what you were told then I'm sure that it is true. The notary said that Ameriquest would probably send her an amendment if that is what Ameriquest had told them. Reassured, the Thibodeaus signed the loan papers.

12. After the closing, Mrs. Thibodeau spoke to Dalton about the prepayment penalty. Dalton told her not to worry, because if Ameriquest thought that they were going to lose her business, they will put her into a fixed rate loan rather than lose the business. Dalton also told the Thibodeaus that Ameriquest may charge a small fee to get out of the loan, like $2,000.

13. Three months after the closing, Mrs. Thibodeau called Ameriquest and asked to speak to Dalton. Dalton was no longer with the company, so they gave her another phone number to call. After she explained the situation, the new Ameriquest representative told her that what Dalton had promised was not something Ameriquest could do. The new representative also said he did not know why Dalton told the Thibodeaus that and proceeded to refer her to the loan department who tried to sell her a new loan at a fixed rate. Mrs. Thibodeau was told that Ameriquest could provide her a fixed rate loan for $146,000 or $148,000. Mrs. Thibodeau wondered why she would borrow $146,000 or $148,000 when she only owed $135,000, to which the Ameriquest representative explained that he wanted her to borrow the early payoff penalty, closing costs and points to get a fixed rate loan for about 7.5%. Mrs. Thibodeau decided it wasn't worth paying all that money to get a loan with an interest rate that was higher than what she had been previously promised. Mrs. Thibodeau had several more conversations with representative(s) of Ameriquest about getting a new loan. She told them what she had been promised by Dalton and each time it meant nothing. The Thibodeaus ended up sticking with this loan, which now has an interest rate of 10.65%.

## COUNT ONE – TRUTH IN LENDING ACT

14. Plaintiffs incorporate paragraphs one through thirteen above.

15. Ameriquest's disclosures to plaintiffs did not comply with the requirements of the Truth in Lending Act. To understand how the disclosures were defective, some background is helpful.

### REGULATORY FRAMEWORK

16. The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et. seq. requires the clear, fair, conspicuous and accurate disclosure of the costs and terms of credit. The statute's purpose is to protect consumers from inaccurate and unfair credit practices, and to assure a meaningful disclosure of credit terms so that the consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit.

17. Accordingly, the Board of Governors of the Federal Reserve System promulgated Regulation Z to implement the TILA. 12 C.F.R. § 226.1(a). A creditor is required by Regulation Z to make certain disclosures to the consumer, "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Regulation Z sets out certain guidelines for creditors to follow when disclosing the amount financed, the finance charge, and the annual percentage rate to the consumer and demands that these disclosures be accurate. 12 C.F.R. § § 226.18, 226.22, 226.5.

18. Regulation Z also requires that "disclosures shall reflect the terms of the legal obligation between the parties" 12 C.F.R. § 226.17(c)(1) and that the creditor accurately disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g)(1).

19. The Truth in Lending Act confers additional rights on home owners who refinance their mortgages with a new lender. In order to give these borrowers an opportunity to reflect on their other TILA disclosures and to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day

5

following the consummation of the transaction or three business days after receiving their final TILA disclosures or three business days of receiving notice of their right to rescind, whichever is later. More specifically, the statute provides that:

> Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.

15 U.S.C. § 1635(a).

20. To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction. More specifically, the statute provides:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

15 U.S.C. § 1635(b).

21. To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately. More specifically, the statute provides:

> The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

6

22. Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in Lending Act, amplifies the statutory requirements. Subject to exceptions not here pertinent, the regulation provides:

> In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction ....

12 C.F.R. § 226.23(a)(1).

23. The regulation goes on to require that the creditor "deliver" to "each consumer entitled to rescind" two copies of a document that "clearly and conspicuously disclose" the consumer's rescission rights. See 12 C.F.R. § 226.23(b)(1)

24. More specifically, the regulation provides:

> In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
>
>> (i) The retention or acquisition of a security interest in the consumer's principal dwelling.
>>
>> (ii) The consumer's right to rescind the transaction.
>>
>> (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
>>
>> (iv) The effects of rescission, as described in paragraph (d) of this section.
>>
>> (v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1).

25. Paragraph (d) goes on to explain the effects of rescission. Subparagraph (d)(1) provides:

> When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any

7

amount, including any finance charge.

12 C.F.R. § 226.23(d)(1).

    26.    Subparagraph (d)(2) states:

Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

12 C.F.R. § 226.23(d)(2).

    27. The Federal Reserve Board's commentary of paragraph 23(d)(2) explains that the words "any money or property" would include an appraisal fee. The commentary provides:

The consumer cannot be required to pay any amount in the form of money or property either to the creditor or to a third party as part of the credit transaction. Any amounts of this nature already paid by the consumer must be refunded. "Any amount" includes finance charges already accrued, as well as other charges, such as broker fees, application and commitment fees, or fees for a title search or appraisal, whether paid to the creditor, paid directly to a third party, or passed on from the creditor to the third party. It is irrelevant that these amounts may not represent profit to the creditor.

12 C.F.R. part 226 Supp.I para. 23(d)(2)-1.

## DEFECTIVE DISCLOSURES

    28.    Ameriquest's rescission disclosures to plaintiffs were defective in a number of respects. First, on the Notice of Right to Cancel forms that were given to the Thibodeaus at the closing, there is no date filled in for the expiration of the rescission period, a violation of 12 C.F.R. § 226.23(b)(1)(v).

    29.    Second, Ameriquest told Mrs. Thibodeau that she would have to pay the appraisal fee if she backed out of the deal. This statement contradicted plaintiffs' right to rescind the transaction and get back "any money or property that has been given to anyone in connection with the transaction" 12 C.F.R. § 226.23(d)(2). The Federal Reserve Board's commentary of paragraph 23(d)(2) explains that the words "any money or property" would include an appraisal fee. By representing the appraisal fee was nonrefundable if plaintiffs tried to cancel the

8

transaction, Ameriquest misrepresented plaintiffs' rescission rights, thereby making the rescission notice defective under 12 C.F.R. § 226.23(b)(1)(iv).

30. Third, according to the settlement statement, Ameriquest would pay $35,688.27 to AMAXIMIS Lending LLC to pay off the Thibodeaus' second mortgage. According to a document entitled **COMPETITOR PAYOFF WORKSHEET**, the payoff to AMAXIMIS included $1,026.36 for "Padding at 3%". The padding adjustment should have been included in the finance charge, rather than the amount financed. As a result, Ameriquest materially understated the finance charge and APR in violation of 12 C.F.R. § 226.18.

31. Fourth, by falsely assuring plaintiffs that they would not have to pay a prepayment penalty or new closing costs if they wanted to switch to a fixed rate loan in three months, Ameriquest misled plaintiffs as to the cost of credit in violation of 12 C.F.R. § 226.18.

32. Under the Truth in Lending Act, if the rescission disclosures or TILA disclosures are deficient, then the rescission period is extended for up to three years. See 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first").

33. Ameriquest's rescission and TILA disclosures were defective. Accordingly, plaintiffs sent a rescission notice to Ameriquest, AMC Mortgage Services and to Deutsche Bank, the current owner of their mortgage on August 8, 2006.

34. Within twenty days of receiving the rescission notice, defendants should have released their security interest in plaintiffs' home and paid back to plaintiffs any money or property that plaintiffs have paid to them in connection with the loan. See 12 C.F.R. § 226.23(d)(2). Defendants have not done either.

35. Defendants' failure to honor the rescission request is a violation of the Truth in Lending Act. Plaintiffs are entitled to rescission plus statutory damages and other relief.

9

## COUNT TWO – VIOLATION OF NEW HAMPSHIRE LAW

36. Plaintiffs incorporate paragraphs one through thirty-five above.

37. In connection with trade or commerce, Ameriquest made false and misleading statements to plaintiffs intending to induce reliance. More specifically, Ameriquest engaged in a bait and switch by baiting plaintiffs into the mortgage transaction by offering a relatively favorable set of terms and then switching to less favorable terms. Ameriquest also misled plaintiffs as to whether they could switch to a fixed rate loan with no prepayment penalty and no closing costs.

38. Ameriquest's false and misleading statements to plaintiffs violated plaintiffs' rights under New Hampshire statutory and common law.

39. Ameriquest's false and misleading statements deceived plaintiffs and proximately caused them injury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court grant judgment against defendants as follows:

a. canceling defendants' security interest in plaintiffs' home and ordering defendants to provide plaintiffs with the money to which plaintiffs are entitled to under 12 C.F.R. § 226.23(d)(2);

b. awarding plaintiffs actual damages proximately caused by defendants' failure to comply with 12 C.F.R. § 226.23(d)(2);

c. awarding appropriate statutory damages;

d. ordering defendants to pay costs, penalties, and attorneys fees;

e. awarding plaintiffs actual and punitive damages;

f. granting such other relief as the Court deems just and proper.

10

Respectfully submitted by:

_____
Counsel for the Plaintiff

THE LAW OFFICES OF DANIEL HARRIS
Anthony Valach
Daniel Harris
150 N. Wacker Dr., Suite 3000
Chicago, IL 60606
Telephone: (312) 960-1802
Facsimile: (312) 960-1936