## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715<br><br>Lead Case No. 05-cv-07097<br><br>(Centralized before The Honorable Marvin E. Aspen) |

### DECLARATION OF JEFFREY D. DAHL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS TERRY TALLEY AND CHERYL TALLEYS' MOTION TO LIFT STAY

I, Jeffrey D. Dahl, declare as follows:

1. I am the Senior Vice President of Rust Consulting, Inc. ("Rust Consulting"), and have held this position for 13 years.

2. My job duties include engaging in financial management, system development and class action claims administration. My job duties also include oversight for the class action claims administration business at Rust Consulting.

3. As part of my job duties, I am responsible for and have managed over 250 class action settlements. Of these settlements, approximately 50% have been nationwide class action settlements.

4. Rust Consulting has been in existence for more than 25 years. Since its creation, it has been engaged in claims administration for class actions and for the last 15 years, it has been exclusively engaged in class action claims administration. Throughout the history of Rust Consulting, it has managed in excess of 750 class action settlements of which approximately 50% have been nationwide class actions.

5. On January 23, 2006, Ameriquest Mortgage Company ("Ameriquest") and the State Attorneys General of the 49 states in which Ameriquest has done business reached a settlement of all claims by all its borrowers in the 49 states ("AG Settlement"). Rust Consulting

1

has been initially selected to manage the settlement agreement and administrate the claims process.

6.      Rust Consulting has provided the parties with a proposal for claims administration which is designed to maximize the participation of borrowers in the AG Settlement.

7.      In some nationwide class actions where similar claimant outreach programs have been employed, Rust Consulting has been successful in achieving claims participation rate in excess of 90%.

8.      The AG Settlement has been structured to create strong incentives to maximize claimant participation.

9.      Based upon my and Rust Consulting's experience with similar nationwide class actions we expect that the claims participation rate will exceed 70% of all eligible Ameriquest borrowers.

10.      In order that Ameriquest borrowers can have immediate access to information about the AG Settlement, Rust Consulting has established a website that provides detailed information about the AG Settlement, including who may be eligible to receive restitution payments, as well as frequently asked questions.  The web address is http://www.ameriquestmultistatesettlement.com.  A true and correct copy of the printout of the home page for the website is attached hereto as Exhibit "1" and incorporated herein by reference. A true and correct copy of the AG Settlement, which can be obtained, in PDF form, from the website, is attached hereto as Exhibit "2" and incorporated herein by reference.

11.      The AG Settlement by its terms covers Ameriquest (and related entities) loans made from January 1, 1999 through December 31, 2005.

12.      As the claims administrator for the AG Settlement, I anticipate that in January of 2007, Rust Consulting will send the first notice of restitution pursuant to the AG Settlement.  The notice will be sent to borrowers who obtained a loan from Ameriquest (and/or related entities) from January 1, 1999 through December 31, 2005, and who meet certain requirements that the States will set.  I anticipate that the vast majority of borrowers who closed a loan between January 1, 1999 and December 31, 2005 will be eligible for a restitution payment under the requirements the States will set.

13.      As set forth in the AG Settlement and the Frequently Asked Questions section of the AG Settlement website, the lending practices that the States investigated, and which are

covered by the AG Settlement, include misrepresentations or omissions relating to loan types, terms and written disclosures, and the completion of underwriting and funding the loan on time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 11th day of October 2006 at Fairbault, Minnesota.

_____
Jeffrey D. Dahl

**EXHIBIT 1**

Ameriquest Mulit-State Settlement

# Ameriquest Multistate Settlement

Home

**Frequently Asked Questions (FAQs)**

**Settlement Agreement**

**E-mail The Administrator**

**Haga clic aqui para español**

## WELCOME TO THE INFORMATION WEB SITE FOR THE AMERIQUEST MULTISTATE SETTLEMENT

This Web site provides information about the States' January 2006 settlement with Ameriquest Mortgage Company (the "Settlement"). On this Web site you will find detailed information about the Settlement and who may be eligible to receive restitution payments, as well as answers to frequently asked questions.

The Settlement resolves an investigation by the Attorneys General and/or banking and finance regulators of every state (except Virginia) and the District of Columbia into claims that Ameriquest and other affiliated companies had engaged in various unlawful mortgage lending practices from January 1, 1999 through December 31, 2005. It includes Ameriquest, ACC Capital Holdings Corp., Town and Country Credit Corp., and AMC Mortgage Services, Inc. (formerly doing business under the name Bedford Home Loans). Together, all of these companies are referred to in this Web site as "Ameriquest."

The Settlement requires that a $295 million Settlement Fund be established to provide restitution payments to certain Ameriquest borrowers identified by the States. If you're eligible, you'll be sent a Notice letter in **early 2007** that will tell you the minimum dollar restitution payment you may receive. To accept your payment, you must sign and return, by the deadline indicated in the letter, a Release Form that will be included with your Notice letter.

By signing the Release Form and accepting your restitution payment, you are giving up some important legal rights that you should fully understand. However, you are **not** giving up any claim or defense you might have in response to a foreclosure. *Before making your decision whether to participate in the Settlement and sign the Release Form, you should consult with an attorney, or if you qualify, a legal aid or legal services organization. You should also read the Effect of Signing the Release Form section at the Frequently Asked Questions ("FAQ") link at the side of this page.*

To help you better understand the restitution payment process and decide whether to participate in the Settlement, answers to many frequently asked questions are provided at the FAQ link. To view an answer, just click on the applicable question. If you can't find the answer to your question, you can call toll-free 1-800-420-5875 and leave a message with your question. Your call will be returned as soon as possible.

**Designed By Rust Consulting, Inc.**

**EXHIBIT 2**

EXHIBIT 2

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into this 23rd day of January, 2006, between ACC Capital Holdings Corporation (hereafter ACCCH), a Delaware corporation with its principal place of business in Orange County, California, and the following subsidiaries: Ameriquest Mortgage Company (hereafter "AMQ"), Town & Country Credit Corporation (hereafter "TCCC"), and AMC Mortgage Services, Inc. f/k/a Bedford Home Loans (hereafter "AMC"), and the successors, assigns, predecessors, and any future acquired or created corporations or other business entities of ACCCH, AMQ, TCCC or AMC, engaged in the Retail Based origination and funding of real estate secured, owner-occupied, residential mortgage loans, on the one hand, and the states, commonwealths and districts participating in this Settlement by and through the respective State Attorneys General, state Financial Regulators and California District Attorneys (hereafter collectively the "Settling States" and individually a "Settling State"), on the other hand.

## I. DEFINITIONS

For purposes of this Agreement, the following Definitions apply (capitalized terms used in a definition are themselves defined below):

A. "Adjustable Rate Mortgage" means a Loan that has "a variable rate feature" as used in 12 C.F.R. § 226.18(f).

B. "Ameriquest Party(ies)" means, as the context requires, any ACCCH subsidiary, including those acquired or formed in the future, involved in the Retail Based origination and funding of real estate secured, owner-occupied, residential mortgage loans, and also including its current Retail Based real estate lending subsidiaries AMQ, AMC and TCCC, and the respective successors and assigns and all the respective employees, officers and directors (solely in their respective official capacities during the term of their employment or directorship and not in their individual capacities) of these subsidiaries. This term does not include ACCCH or any subsidiaries that are not involved in the Retail Based origination and funding of real estate secured, owner-occupied, residential mortgage loans.

1

C. "Annual Percentage Rate" or "APR" means the measure of the cost of credit expressed as a yearly rate, calculated according to the provisions of TILA.

D. "Appraisal" means a written or electronic analysis by an appraiser licensed or certified under the laws of the applicable state or other jurisdiction to conduct Appraisals of the value or worth of a single-family or 1-4 unit residential property proposed to serve as collateral for a Loan. The term does not include reports that estimate the value of residential property by means of an Automated Valuation Model or AVM.

E. "Appraisal Department" means that department of an Ameriquest Party housing employees with responsibility for ordering and reviewing appraisals, which is located at the regional or headquarters office of the Ameriquest Party. It includes members of the Appraisal and Business Control Groups but does not include any employees who are Sales Personnel.

F. "Borrower" means an individual who has consummated a Loan with an Ameriquest Party.

G. "Closing" means the process during which a Borrower executes a note and security instrument regarding a lien on real property in connection with a Loan. In some Settling States a Closing is referred to as a "settlement" and in others as an "escrow."

H. "Covered Transactions" means any Loans originated by any Ameriquest Party during the period January 1, 1999 through and including December 31, 2005.

I. "Debt Collector" means a person or entity who is a debt collector as that term is defined at 15 U.S.C. § 1692a (6), and [insert applicable state law provision, if any].

J. "Discount Points" means fees or charges paid by the Borrower to an Ameriquest Party at the time of origination of a Loan for the purpose of reducing the interest rate applicable to the Loan.

K. "District Attorneys" means the District Attorneys of Alameda, Los Angeles, Merced, Monterey, San Francisco and San Mateo Counties, California.

L. "Effective Date" means March 15, 2006.

2

M.     "Financial Regulator" means the administrative agency or agencies within any Settling State, which at any time between January 1, 1999 through and including December 31, 2005, exercised regulatory, licensing, examination, supervisory or other administrative enforcement authority over the Ameriquest Parties with respect to any of the Covered Transactions.

N.     "Fixed Rate Mortgage" means a Loan that is not an Adjustable Rate Mortgage.

O.     "Good Faith Estimate" and "GFE" mean an estimate of charges, prepared in accordance with section 5 of RESPA, which a Borrower is likely to incur in connection with the Closing of a proposed Loan.

P.     "Independent Loan Closer" means any person who is not an employee of the branch office where the Loan is originated, a spouse, parent, sibling, or child of a branch office employee, or a spouse of any such person, who has no financial interest in the Loan being closed other than payment of standard settlement fees and charges, and who is present at the time of Closing for the purpose of procuring the Borrower's execution of documents related to the Closing process.

Q.     "Lending Practices" means any representations, misrepresentations, omissions, disclosures or any other acts, events, facts, transactions, occurrences, or conduct, whether oral, written or otherwise, by an Ameriquest Party, including its employees or agents, arising out of, in connection with, or relating to any of the following:

1.     Loan types and terms, including Discount Points, interest rates, origination-related fees, monthly payment amounts, terms of Adjustable Rate and Fixed Rate Mortgages and Prepayment Penalties.

2.     Written disclosures, including the GFE and other documents required to be provided to a Potential Borrower by any law or otherwise, provided by an Ameriquest Party.

3.     The Borrower benefits of obtaining a Loan from an Ameriquest Party or from a repeat Refinancing with an Ameriquest Party.

3

4.    Coordination with Debt Collectors.

5.    The timely completion of the Underwriting functions and funding of a Loan.

6.    Closing of a Loan.

7.    Appraisals.

8.    Stated Income Loans.

9.    Disclosures to non-English speaking Borrowers and Potential Borrowers.

R.    "Loan" means a Retail Based, real estate secured, owner-occupied, residential mortgage loan originated and funded by an Ameriquest Party.

S.    "Material Change in Terms" means:

1.    An increase in the interest rate of the Loan of thirty (30) basis points or more or any increase in Discount Points, other than as the result of trading Discount Points for interest rate at the affirmative request of the Borrower;

2.    Any increase in the repayment term of the Loan;

3.    A decrease in the Loan amount greater than one percent (1%);

4.    The addition of a Prepayment Penalty; or

5.    The change from a Fixed Rate Mortgage to an Adjustable Rate Mortgage.

T.    "Non-Prime Loan" means a Loan for which the APR is equal to or greater than two and one-half percentage points (2.5%) for first-lien loans or five percentage points (5%) for subordinate-lien loans above the Treasury yield for securities of a comparable period of maturity as of the fifteenth day of the month in which the interest rate on the Loan is set. Following receipt of the first Monitor's Report, due on March 31, 2007, and again upon receipt of the second Monitor's Report, due on March 31, 2008, the Compliance Committee shall renegotiate this provision in good faith with ACCCH and the Ameriquest Parties, taking into account the Ameriquest Parties' record of compliance reflected in the Monitor's Reports and any other relevant information.

4

U.      "Potential Borrower" means an individual who is seeking or receiving information about a Loan from an Ameriquest Party Sales Person; provided, however, that Potential Borrower does not include an individual who receives, but does not respond to, marketing materials or information, including advertisements.

V.      "Prepayment Penalty" means a fee assessed, pursuant to the terms of the Loan documents, when a Borrower pays off a Loan within a designated period of time after Closing, but excluding any fee or charge that may be assessed to facilitate Loan pay-off, such as a pay-off fee, fax fee, reconveyance fee or other fee that is not prohibited under applicable law and would be payable for the pay-off of any Loan without regard to whether the Loan documents impose what generally is understood to be a Prepayment Penalty.

W.      "Refinance" means to satisfy one Loan with the proceeds from a new Loan obtained by the same Borrower(s), using the same property as security. A Refinance does not include the matters identified in 12 CFR § 226.20(a)(1)-(5).

X.      "RESPA" means the federal Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 et seq., and Regulation X, promulgated pursuant thereto, 24 C.F.R. Part 3500, including subsequent amendments.

Y.      "Retail Based" means originated and funded by loans by employees or independent contractors acting in the name and on behalf of the lender directly to consumers. It does not include other methods of originating loans using third parties, such as mortgage brokers or loan correspondents.

Z.      "Sales Person" or "Sales Personnel" means any employee or employees who work in the AMC Portfolio Retention Department, at a branch office of any Ameriquest Party or who otherwise may reasonably be foreseen to have direct communications (whether in person, telephonically, or by electronic means) with Potential Borrowers for the purpose of originating a Loan and those who supervise those employees, including regional and area managers.

AA.     "Settlement Fund" means the amounts required to be paid under this Settlement Agreement for consumer restitution and settlement administration.

5

BB.    "State Attorneys General" means the chief legal officer of each state, commonwealth and the District of Columbia, except for the states of Hawaii and Georgia. For Hawaii, it means the Executive Director of the Hawaii Office of Consumer Protection, an agency with statutory authority to represent the State of Hawaii in Consumer Protection Actions. For Georgia, it means the Administrator of the Fair Business Practices Act, who is authorized by statute to enter into Settlement Agreements on behalf of the State of Georgia.

CC.    "Stated Income Loan" means a Loan where a Borrower is not required to provide verification or documentation to support all income listed on the Borrower's application.

DD.    "TILA" means the federal Truth-in-Lending Act, 15 U.S.C. §1601 et seq., and Regulation Z, promulgated pursuant thereto, 12 C.F.R. Part 226, including subsequent amendments.

EE.    "Underwriting" means the process of approving or denying a Loan based on an evaluation of the applicant's creditworthiness and ability to repay the Loan and an Appraisal of the market value of the residential property proposed to secure the Loan.

## II.  STIPULATED RECITALS

A.    The Settling States have received and investigated consumer complaints, and conducted examinations with respect to the Lending Practices of the Ameriquest Parties. Based upon these investigations and examinations, the Settling States have advised ACCCH and the Ameriquest Parties of their intention to initiate investigative, administrative or judicial proceedings, as the case may be, against the Ameriquest Parties.

B.    ACCCH and the Ameriquest Parties deny all the allegations raised by the Settling States and have advised the Settling States that they would vigorously defend any attempt by the Settling States to assert any claim based upon the Settling States' investigations and examinations. The Settling States, ACCCH and the Ameriquest Parties acknowledge that any litigation or administrative proceeding would be protracted and the result would be uncertain.

C.    The Settling States acknowledge that ACCCH and the Ameriquest Parties have cooperated with the Settling States' investigations and examinations of the Lending Practices.

6

D.     This Settlement Agreement shall not be interpreted as an admission of wrongdoing by ACCCH or the Ameriquest Parties or as an admission, concession, or evidence of any alleged fault, misrepresentation, act or omission or any other alleged violation of law, and it does not represent a formal finding of wrongdoing by any court or administrative agency.

E.     In the interest of resolving the issues raised by the complaints, investigations and examinations and to avoid the risks, loss of time and the costs associated with protracted litigation, the parties have entered into this Settlement Agreement. ACCCH and the Ameriquest Parties and the Settling States agree that the relief set forth in this Settlement Agreement is a fair and reasonable settlement of the claims alleged by the States.

### III.  PAYMENT OF RESTITUTION,
### ATTORNEYS' FEES, INVESTIGATION COSTS
### AND OTHER EXPENSES TO THE STATES

A.     **Payment Obligation of ACCCH.**   ACCCH is a party to this Settlement Agreement for the sole purpose of paying restitution and other amounts as set forth below in this Section III and in Sections V.C.3 and VI.E.

B.     **Payment of Restitution.**   ACCCH or AMQ shall pay the sum of two hundred ninety-five million dollars ($295,000,000) for the payment of restitution to Borrowers in the Settling States. The Settlement Fund shall be divided into two sub-funds:

1.     The sum of One Hundred Seventy-Five Million Dollars ($175,000,000) shall be used to provide restitution to Borrowers who obtained Loans from an Ameriquest Party during the period of January 1, 1999 to April 1, 2003 (hereafter "Sub-Fund A").

2.     The sum of One Hundred Twenty Million Dollars ($120,000,000) shall be used to provide restitution to Borrowers who obtained Loans from an Ameriquest Party between January 1, 1999 and December 31, 2005 (hereafter "Sub-Fund B").

C.     **Payment to the Settling States.**   Within three (3) business days after the Effective Date, ACCCH or AMQ shall pay, by wire transfer or as otherwise directed, the sum of Thirty Million Dollars ($30,000,000) to the Settling States for their attorneys' fees, investigation

costs, and other expenses related to the investigation and resolution of this matter. The Settling States, in their sole discretion, shall instruct ACCCH or AMQ regarding the share to be paid to each Settling State. Each Settling State may use all or part of its share to fund consumer fraud education, investigation, enforcement operations, litigation, public protection or local consumer aid, including contributions to develop a national mortgage licensing system. Each Settling State further retains the right to use any portion of its share for consumer restitution.

**D.** **Payment Schedule.** All payments to the Settlement Fund shall be by wire transfer to the Settlement Administrator and deposited by the Administrator into an interest bearing account. In the event the Settlement Administrator is not in place at the time any payment is due, ACCCH or AMQ shall make the payment into an escrow account established for that purpose with a trustee to be named by the Settling States, who shall deposit the payment with the Settlement Administrator as soon as one is in place. ACCCH or AMQ shall make the required payments according to the following schedule:

      1.     The sum of Forty-five Million Dollars ($45,000,000) shall be paid no later than three (3) business days after the Effective Date.

      2.     The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than ninety (90) days after the date the first payment is due.

      3.     The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than one hundred eighty (180) days after the date the first payment is due.

      4.     The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than two hundred seventy (270) days after the date the first payment is due.

      5.     The sum of Seventy Million Dollars ($70,000,000) shall be paid not later than three hundred sixty five (365) days after the date the first payment is due.

**E.** **Funds to Be Held in Trust.** All monies in the Settlement Fund, including interest income, shall be held in trust for the purposes stated in this Settlement Agreement. Neither ACCCH nor the Ameriquest Parties shall have any property right, interest, claim or title

8

to the Settlement Fund or any interest earned thereon once a deposit is made into the Settlement Fund.

**F.** **Distribution of Restitution to Borrowers.**

1. Sub-Fund A, together with accrued net after-tax income, if any, shall be distributed on a nationwide basis by the Settlement Administrator to Borrowers who received a Loan from any of the Ameriquest Parties from January 1, 1999, through and including April 1, 2003, according to a formula to be established by the Settling States.

2. Sub-Fund B, together with accrued net after-tax income, if any, shall be allocated among each of the Settling States according to each State's percentage share of the total, combined dollar Loan volume of the Ameriquest Parties, during the period in which the Covered Transactions occurred. Each Settling State shall use its share of this Sub-Fund to pay restitution to Borrowers in that State who obtained a Loan from an Ameriquest Party between January 1, 1999 and December 31, 2005; provided, however, that the Administrator shall at the instruction of the California Attorney General and the Alameda County District Attorney, which instruction shall be given jointly in their sole discretion, transfer that portion of the State of California's share of Sub-Fund B designated by the Attorney General and the Alameda District Attorney to the California Attorney General's Office for later distribution as directed by the Attorney General and the Alameda County District Attorney. This designated share shall be in addition to any amounts paid under Section III.C. Each Settling State shall have sole discretion in determining the criteria for distributing Sub-Fund B among eligible recipients, including providing additional restitution to Borrowers also receiving restitution from Sub-Fund A.

**G.** **Qualified Settlement Fund.** The fund established by this Settlement Agreement for the payment of restitution is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended.

9

## IV. INJUNCTIVE RELIEF

The Ameriquest Parties are enjoined with respect to their origination and funding of Loans from engaging in unfair or deceptive acts or practices and are further enjoined as follows:

**A.** **Scope.** The injunctive requirements set forth below are intended as a floor or minimum requirements governing the conduct of the Ameriquest Parties. Nothing set forth herein alters the requirements of state or federal law to the extent those laws offer greater protection to consumers.

**B.** **Disclosure of Loan Terms.** The Ameriquest Parties shall not make false, misleading or deceptive representations regarding Loan terms and shall make the following disclosures to Potential Borrowers in a clear manner:

1. *Oral Disclosures.* Ameriquest Parties' Sales Personnel, whenever they have obtained Non-Prime Loan pricing information from their respective pricing model based on credit information provided by a Potential Borrower and that Potential Borrower has in a conversation with an Ameriquest Party Sales Person agreed to the submission of a specific Non-Prime Loan proposal for processing (but in no event later than when an appraisal or loan documents have been ordered, whichever occurs first), shall provide oral disclosures as follows:

a. *Fixed Rate Mortgage - Specific Loan Terms.* If the proposed Non-Prime Loan is a Fixed Rate Mortgage, the Ameriquest Parties' Sales Personnel shall provide an oral disclosure in substantially the following form:

"The loan we have been discussing is a [insert term of the loan] year fixed rate loan for $ [insert loan amount]. The interest rate is [insert interest rate]%. The monthly payment is $[insert monthly payment], which does [or does not] include escrows for property taxes or insurance. Your loan does [or does not] include a prepayment penalty."

10

b.  *Fixed Rate Mortgage – With Discount Points.*  If the proposed Non-Prime Loan includes a fixed rate mortgage and provides for the payment of Discount Points, Ameriquest Parties' Sales Personnel shall provide an oral disclosure in substantially the following form:

> "This loan includes payment of [insert number] discount points, a fee you pay at closing that reduces the interest rate on your loan and also the amount of your monthly payment but increases the total amount of your loan.  You may be eligible for a loan with fewer discount points."

c.  *Adjustable Rate Mortgage – Specific Loan Terms.*  If the proposed Non-Prime Loan includes an Adjustable Rate Mortgage, Ameriquest Parties' Sales Personnel shall provide an oral disclosure in substantially the following form:

> "The loan we have been discussing is an adjustable rate loan for $[insert loan amount], with an initial interest rate of [insert initial interest rate]%.  Your initial monthly payment would be $[insert initial monthly payment], which does [or does not] include escrows for property taxes or insurance.  Your loan does [or does not] include a prepayment penalty.
>
> Because this is an adjustable rate loan, the initial interest rate and monthly payment I quoted you are only guaranteed for the first [insert length of initial fixed rate period] of the loan.  After that, your interest rate can increase by up to [insert rate adjustment cap] percent each year.  But, your interest rate can never be higher than [insert lifetime cap] percentage points over your initial interest rate."

11

> [NOTE: If the Sales Person has not previously discussed a specific Fixed Rate Mortgage proposal with the Potential Borrower, the Sales Person shall also provide an additional oral statement in substantially the following form.]
>
> "You may be eligible for a loan with an interest rate that does not change."

      d.    *Adjustable Rate Mortgage - With Discount Points.* If the proposed Non-Prime Loan includes an Adjustable Rate Mortgage and the payment of Discount Points, Ameriquest Sales Personnel shall provide an oral disclosure in substantially the following form:

> "This loan includes a payment of [insert the number] discount points, a $[insert the amount of the discount points in dollars] fee you will pay at closing to lower your initial interest rate and monthly payment. You may be eligible to pay fewer discount points, but if you do that your initial interest rate and monthly payment will be higher."

      e.    *Prepayment Penalty.* If the proposed Non-Prime Loan includes a Prepayment Penalty, Ameriquest Sales Personnel shall make an oral disclosure in substantially the following form:

> "This loan contains a prepayment penalty. That means if you pay off or refinance your loan within [insert the length of the period] you will pay a fee of as much as $[insert the amount of the fee in dollars]. You may be eligible for a loan without a prepayment penalty, but you would then pay a higher interest rate and a higher monthly payment."

12

f.     *Concluding Statement.*  The Ameriquest Parties' Sales Personnel shall conclude the conversation with the Potential Borrower by making a statement in substantially the following form:

> "We will be sending you some written disclosures that explain your options regarding a fixed versus adjustable rate loan, paying more or less discount points and a loan with or without a prepayment penalty.  If, after reading the information we send you, you wish to make any changes to this loan proposal, please give me a call."

g.     *Interest Rate Disclosure.*  The Ameriquest Parties shall disclose the interest rate being offered, if known, whenever asked by a Potential Borrower.

h.     *Written or Electronic Disclosures.*  The Ameriquest Parties' Sales Personnel shall be instructed that in the event a Potential Borrower's application is not submitted orally but in a written or electronic document (or submitted through a website or other electronic format), the foregoing oral disclosures, as and if applicable, shall be provided within three (3) days of receipt of the application, in writing by mail or by transmission by the same means used in submitting the application.

i.     *Failure to Make Oral Disclosures.*  If an Ameriquest Party discovers that a Sales Person has failed to make required oral disclosures to the Potential Borrower, that Ameriquest Party shall take prompt and appropriate disciplinary action, up to and including dismissal of the responsible personnel.

2.     *Written Disclosures.*  Within three (3) days after obtaining Loan pricing information from their respective pricing model based on credit information provided by a Potential Borrower and the Potential Borrower agreeing to the submission of a specific Loan proposal for processing (but in no event later than three (3) days after when an appraisal or loan documents have been ordered, whichever occurs first) and without

13

regard to any other disclosure requirements, the Ameriquest Parties shall provide the Potential Borrower a single page disclosure, in writing or electronically, which discloses the terms of the specific Loan proposal being offered to the Potential Borrower, in substantially the form as attached hereto as Exhibit A (hereafter "Disclosure Form"). The initial Disclosure Form may be included with other required disclosures being sent to Potential Borrowers at the same time.

a. If any one or more Material Changes in Terms occurs, subsequently making the initial Disclosure Form inaccurate, the Ameriquest Parties shall mail, not less than six (6) days before Closing, or deliver or cause to be delivered by courier, facsimile transmission, e-mail or website access so as to be received or accessed by the Potential Borrower at least three (3) days prior to Closing for a Non-Prime Refinance Loan and as soon as reasonably possible but in no event less than one (1) day prior to Closing for any other Loan, a revised Disclosure Form that reflects the Loan terms that will be presented to the Potential Borrower at Closing, including all Material Changes in Terms.

b. Notwithstanding the provisions of Section IV.B.2.a. above, an Ameriquest Party need not provide the Potential Borrower a revised Disclosure Form when the only Material Change in Terms is an increase in Discount Points of no more than forty-seven (47) basis points and that increase has been requested by the Potential Borrower to buy down an increase in the interest rate that would not by itself represent a Material Change in Terms.

c. If the revised Disclosure Form is mailed or delivered by courier or facsimile transmission, it must be accompanied by a cover letter advising the Potential Borrower that changes have been made to the terms of the proposed Loan. If the revised Disclosure Form is delivered by e-mail message, the subject line must contain the following: "IMPORTANT CHANGES to your [THE APPLICABLE AMERIQUEST PARTY] loan proposal." If the revised

14

Disclosure Form is delivered by website access, access to the website must be password protected.

       d.     Compliance with the time provisions of this subparagraph may be proven by satisfactory proof of one of the following:

            (1)     Timely mailing;

            (2)     Timely dispatch by courier or facsimile transmission;

            (3)     Confirmation of timely receipt of the e-mail by the Potential Borrower; or

            (4)     Confirmation of timely access to the web site by the Potential Borrower.

       e.     The Ameriquest Parties shall instruct the Independent Loan Closer that the final Disclosure Form must be the first document presented to the Potential Borrower at Closing by the Independent Loan Closer, who shall review it with, and have it signed by, the Borrower. In the event an Ameriquest Party employee is conducting the Closing, when permitted under this Settlement Agreement, the final Disclosure Form shall be the first document presented to the Potential Borrower at Closing, who shall review it with, and have it signed by, the Borrower.

       3.     In communicating with Potential Borrowers, the Ameriquest Parties shall not represent that their respective interest rate or terms are "better," "lower" than, or "competitive" with those of other mortgage lenders, or use words of similar import, unless such representations are in fact true.

       4.     The Ameriquest Parties shall not misrepresent the adjustable rate feature of any Adjustable Rate Mortgage. For example, the Ameriquest Parties may not:

       a.     State or imply that the interest rate on the Loan will not, or is unlikely to, adjust in the future;

15

b. State or imply that the interest rate on the Loan can go down (from its initial rate) as well as up, unless that is in fact true;

c. State or imply that the initial "fixed" interest rate in an Adjustable Rate Mortgage is the interest rate for the entire term of the Loan;

d. State or imply that the interest rate will go up only if the market rates increase, unless that is, in fact, true.

5. When comparing different Loans, the Ameriquest Parties shall not state or imply that monthly Loan payments, which include amounts escrowed for payment of property taxes and homeowner's insurance, are comparable with monthly Loan payments that do not include these amounts. The Ameriquest Parties shall inform a Potential Borrower whether the monthly payment discussed with or proposed to the Potential Borrower does or does not include any amount escrowed for taxes or insurance, as the case may be.

6. No Ameriquest Party shall represent to a Potential Borrower that it will be able to Refinance the Potential Borrower's proposed Loan at a later date on more favorable terms unless the Loan proposal being made to the Potential Borrower provides that the Ameriquest Party is contractually bound to Refinance the Potential Borrower's proposed Loan at the later date on more favorable terms.

7. The Ameriquest Parties shall not misrepresent to any Borrower or Potential Borrower the credit rating or credit status of that Borrower or Potential Borrower.

C. **Same Rate Available.** The Ameriquest Parties shall make Loans in accordance with a pricing model that is designed to produce (before the use of any price exception) the same interest rate and number of Discount Points for all Potential Borrowers with the same credit risk characteristics, who are applying for the same Loan, and who are the same with respect to any other characteristic(s) or fact(s) that affect the pricing information generated by the pricing model. Nothing herein shall prohibit an Ameriquest Party from making individual "price

16

exceptions" wherein the Ameriquest Party offers a Potential Borrower a rate that is lower than the rate for which the Potential Borrower otherwise qualifies ("Price Exception"). Provided, however, if in any ninety (90) day period the number of Borrowers receiving a Price Exception from an Ameriquest Party exceeds thirty percent (30%) of the Loans originated within the period, there shall be a rebuttable presumption that the Ameriquest Party has violated the provisions of this Section IV.C.

Price Exception does not include the following: (1) a price reduction given to prevent the Loan from becoming a high-cost or covered loan under the Home Ownership and Equity Protection Act (HOEPA), or any similar state law, or from violating any state law limitation on fees, rates, or other costs; (2) a price override given at or near the time of funding to honor a previous price commitment; or (3) a firm offer of credit to a pre-screened Potential Borrower that is required by the Fair Credit Reporting Act and based upon the pricing model price at the time of the offer but that is not accepted by the Potential Borrower until after the pricing model price has increased.

**D.** **Good Faith Estimates (GFE).** The Ameriquest Parties shall provide each Loan applicant with a GFE, as required by RESPA. The Ameriquest Parties shall not disparage, discredit, or otherwise encourage Potential Borrowers to disregard the GFE. For example, the Ameriquest Parties shall not represent to a Potential Borrower that the GFE is incorrect, reflects the worst case scenario, is not the true Loan proposal, or reflects terms that are higher or lower than the actual terms the Potential Borrower will receive.

**E.** **Borrower Benefit Assessment.** The Ameriquest Parties shall not enter into any Non-Prime Refinance Loan that does not provide a benefit to the Borrower. The Ameriquest Parties must document that each Non-Prime Refinance Loan provides a benefit and maintain such documentation in a readily retrievable format.

**F.** **Foreign Language Provisions.** The Ameriquest Parties shall continue their current policy of: (a) maintaining a program of testing and certifying appropriate Sales Personnel for fluency in the Spanish language, and (b) translating into Spanish (i) all documents legally

17

required to be translated, (ii) the Disclosure Form and (iii) any other disclosure documents voluntarily provided to Potential Borrowers under an Ameriquest Party's Best Practices. If an Ameriquest Party advertises in any language other than English or Spanish, it must adopt and implement a similar policy with respect to consumers who speak the other language.

**G.    Prepayment Penalties.**

1.    The Ameriquest Parties shall reimburse a consumer for any Prepayment Penalty paid by that consumer if the existence of the penalty was not timely and fully disclosed. The Ameriquest Parties shall be deemed to have complied with this requirement of full and timely disclosure by the mailing or delivery of the Disclosure Form as provided in Paragraph IV.B.2 above.

2.    For any Non-Prime Adjustable Rate Mortgage Loan originated one (1) year or later after the Effective Date that has a Prepayment Penalty, the term of the Prepayment Penalty may not exceed six months beyond the fixed rate term of the Loan. For a period of five (5) years after the Effective Date, the Ameriquest Parties shall, with respect to such Loans, limit the interest rate adjustment during the Prepayment Penalty term to not more than two (2) percentage points.

3.    The Ameriquest Parties shall not make false, misleading or deceptive representations regarding a Prepayment Penalty provision. For example:

a.    Whenever an Ameriquest Party orally represents that a Potential Borrower can Refinance at a later date, that Ameriquest Party must also simultaneously advise the Potential Borrower of any obligation to pay a Prepayment Penalty.

b.    The Ameriquest Parties shall not promise or represent to a Potential Borrower that the Ameriquest Parties will waive a Prepayment Penalty at some future date, unless that promise is contemporaneously communicated in writing and is included as a term in the Loan made to the Potential Borrower.

18

c.       The Ameriquest Parties shall not refer to a Prepayment Penalty as a "Prepayment Privilege," a "Prepayment Benefit," a "Prepayment Opportunity," or use any similar term that tends to mislead a Potential Borrower regarding the obligation to pay a penalty.

d.       The Ameriquest Parties shall not state, infer or imply that the circumstances that would trigger a Prepayment Penalty may not or will not occur; provided, however, that the Ameriquest Parties may inform a Potential Borrower of the facts regarding when a Prepayment Penalty included in a Loan proposal does and does not have to be paid according to its terms.

4.       The Ameriquest Parties shall continue their current practice of not providing their employees with any monetary incentive or other compensation for including a Prepayment Penalty provision in a Loan.

**H.       Repeat Refinancings.**

1.       No Ameriquest Party may solicit Borrowers with existing Non-Prime Loans for Refinancing within twenty-four (24) months of the Loan Closing date unless it:

a.       Receives a request for a pay-off statement from the Borrower or by someone authorized by the Borrower;

b.       Is contacted by a Borrower who expressly inquires about Refinancing; or

c.       Otherwise has a good faith belief, supported by objective evidence, that the Borrower is considering Refinancing.

2.       Any proposed Refinancing of a Borrower's Non-Prime Refinance Loan must provide a benefit pursuant to Section IV.E above.

3.       No Ameriquest Party employee may offer, give or receive compensation to or from a fellow employee, including employees of the Portfolio Retention Centers, in connection with Refinancing a Borrower within twenty-four (24) months of the Closing

19

date of an existing Loan; provided, however, this restriction shall not apply to payments made under an Ameriquest Party's then existing compensation policy.

**I.      Independent Loan Closers.**

1.      *Use of Independent Loan Closers.*      The Ameriquest Parties shall use an Independent Loan Closer for all of their Non-Prime Loan Closings.

2.      *Written Instructions and Whistleblower Agreement.*      The Ameriquest Parties shall provide each Independent Loan Closer with written instructions and procedures, which the Independent Loan Closer shall be required to follow at Closings. The Ameriquest Parties shall require the Independent Loan Closer to provide a written report both to designated Ameriquest Party senior management, and to the Monitor during the compliance monitoring period, if the Independent Loan Closer discovers unfair, deceptive, misleading or unlawful behavior by any Ameriquest Party employee in connection with any Loan. If an Ameriquest Party learns that an Independent Loan Closer failed to report such misconduct, the Ameriquest Party shall take disciplinary action against the Independent Loan Closer, including temporary or permanent removal from the list of approved Independent Loan Closers. The Ameriquest Parties may not retaliate against an Independent Loan Closer for reporting misconduct.

3.      Independent Loan Closers shall be instructed by the Ameriquest Parties to explain fully the Closing process and Loan documents to Potential Borrowers and to answer all questions from Potential Borrowers to the best of the Independent Loan Closer's ability, unless the Independent Loan Closer is prohibited by law or professional standards from doing so. Further, Independent Loan Closers shall be instructed not to pressure or rush Potential Borrowers at Closing or encourage them to close by suggesting Potential Borrowers may use the rescission period either to read Loan documents or to address questions or objections raised at Closing.

4.      Employees of Ameriquest Parties may attend Non-Prime Loan Closings only if requested by a Potential Borrower. Ameriquest Party employees attending a

20

Closing may not pressure or rush Potential Borrowers, encourage them to close by suggesting they may use the rescission period either to read Loan documents or to address questions or objections raised at Closing, or in any way obstruct the ability of the Independent Loan Closer to perform his or her duties. The Independent Loan Closer shall be required to report any violation of this Paragraph IV.I.4 by any Sales Personnel to designated persons in the appropriate regional or headquarters office of the applicable Ameriquest Party. Persons designated may not be Sales Personnel.

5. Notwithstanding the foregoing, Ameriquest employees may conduct and attend Closings of Loans that are not Non-Prime Loans.

**J.    Closings.**

1. Before Closing a Loan, the Ameriquest Parties shall ensure that (a) the Potential Borrower has satisfied all credit Underwriting requirements; (b) an Appraisal or AVM has been submitted and evaluated (if required); and, (c) standard title-related information has been received and reviewed.

2. The Ameriquest Parties may Close a Loan subject to satisfaction of standard industry contingencies such as execution and receipt of state-specific documents (e.g., New York and New Jersey same-name affidavits, Texas election not to rescind forms, receipt of pay stubs for proof of employment, credit report explanation letters, use of proceeds letters and hazard insurance loss payee endorsements).

3. If an Ameriquest Party schedules a Closing before satisfying the requirements set forth above in Paragraph IV.J.1, it may not represent, suggest or imply to a Potential Borrower that a Loan has been or will be approved, unless and until these Closing requirements are met. If an Ameriquest Party communicates with a Potential Borrower to schedule a Closing before the Closing requirements have been met, it must clearly inform the Potential Borrower that the Loan has not yet been approved, and that Closing is contingent upon resolution of all outstanding issues.

21

**K.** **Loan Funding.** The Ameriquest Parties must fully and unconditionally disburse the proceeds of all Refinance Loans to the Borrower, settlement agent, or other creditors as reflected in the settlement statement on the first business day after the expiration of any rescission period provided for by law or internal Best Practices; provided, however, that the Ameriquest Parties will not be deemed to have violated this requirement where: (1) Closing contingencies as set forth in Paragraph IV.J.2 have not been satisfied; (2) an Ameriquest Party is prevented from fully disbursing the proceeds because the wire transfer is delayed (by no more than one (1) day) due to the volume of other scheduled Closings; or (3) by other causes beyond an Ameriquest Party's reasonable control and occurring without its fault or negligence, including, Acts of God, floods, fires, government restrictions, wars, strikes and insurrections.

If an Ameriquest Party fails, for reasons other than those described above, to timely disburse the Refinance Loan proceeds, it shall reimburse any resulting interest, late fees, or other charges incurred by the Borrower, and fully cooperate in assisting the Borrower in removing any adverse credit report information arising from the non-timely payment. Notwithstanding the foregoing, no Ameriquest Party shall be required to disburse the proceeds of any Loan until it is reasonably satisfied the Borrower has not rescinded the Loan transaction.

**L.** **Appraisals.**

1. *Conducting Appraisals.* The Ameriquest Parties shall take reasonable steps to ensure all Appraisals are accurate, that appraisers do not inflate property values and that no employee of an Ameriquest Party attempts to influence the development, reporting, result or review of any Appraisal or otherwise interferes with an appraiser's professional duty to perform the Appraisal impartially, objectively and independently.

2. *Removal of Branch from Appraiser Selection.* The Ameriquest Parties shall implement a system to ensure that Appraisals are ordered as part of an automated, centralized process apart from the branch sales offices. Sales Personnel may not select appraisers.

22

The Ameriquest Parties shall inform all appraisers currently on their approved or accepted lists that they are no longer dependent upon the branch offices for Appraisal assignments, that only the Appraisal Department can remove them from a panel, and that they are to ignore, and report immediately to the Appraisal Department, any effort by any Sales Person, including any Mortgage Specialist, Branch Manager, Area Sales Manager, or Regional Sales Manager to influence appraised value in any way.

Similarly, the Ameriquest Parties shall instruct Sales Personnel they are not to engage in any communications with any appraiser regarding the substantive content of the Appraisal report or the final appraised value, or to attempt to influence the results of the Appraisal in any way and, if they are found to have done so, they will be subject to immediate disciplinary action, up to and including dismissal.

3.     *Automated Selection of Ranked Appraisers Required.*     A panel of qualified, approved appraisers shall be created for each State. When a new Loan file is opened, the automated system will assign the Appraisal to an appraiser on the appropriate panel using an algorithmic system designed to limit choice or selection from the discretion of Ameriquest Party employees. This algorithmic system shall be created and maintained by the Appraisal Department and may involve ranking appraisers on the basis of legitimate and relevant factors, including:

a.     The appraiser's familiarity with the geographic locale of the subject property and the type of property to be appraised;

b.     The number of Appraisals the appraiser is capable of performing within a given time period;

c.     The appraiser's record with respect to responsiveness and timeliness;

d.     The status of the appraiser's license; and

23

e.     Whether, at the time of the Appraisal request, the appraiser has prior Appraisals under going pre- or post-funding review or investor due diligence review.

In limited cases (but in no event for purposes of a second or subsequent Appraisal), the Appraisal Department may assign Appraisals to appraisers not selected using the algorithmic system, if the consideration of previously unconsidered legitimate and relevant factors dictates. In that event, the Appraisal Department shall document the reasons for its departure from the normal selection process and maintain the documentation in a readily retrievable format. In no event, however, shall the willingness or unwillingness of an appraiser to produce a desired value become a factor in the selection of an appraiser.

4.     *Appraiser Panels.*

a.     *Service Areas.*  If an appraiser declines an assignment because the appraiser, in his or her professional judgment, believes the property is outside of the appraiser's professional service area, the Appraisal Department shall assign the Appraisal to another appraiser and may not pressure the declining appraiser to accept the assignment.  The Ameriquest Parties shall not punish appraisers, including by reducing future assignments, for declining assignments the appraiser believes are outside the appraiser's professional service area.

b.     *Inclusion on a Panel.*  As a prerequisite to inclusion on a panel, an appraiser must be in good standing with his or her State licensing authority.  Only persons who are not Sales Personnel may oversee the selection of appraisers on the panel.

(1)     Before being assigned to a panel, all appraisers who currently or in the past have performed Appraisals on behalf of an Ameriquest Party, including staff appraisers, must have their work product audited for quality and compliance by the Appraisal Department or by a

24

licensed third party appraiser retained for auditing purposes. The Ameriquest Parties agree to review or have reviewed, for each of these appraisers, the greater of ten (10) Appraisals or fifteen percent (15%) of the total number of Appraisals performed by the appraiser for Refinance Loans submitted for approval during the six months prior to the review. If the total number of Appraisals performed by an appraiser during that period is less than ten (10), then all Appraisals performed by that appraiser during that period shall be reviewed. Whenever possible, Appraisals shall be selected for review from the pool of Appraisals performed by the appraiser on Refinance Loans submitted for approval and previously subject to investor due diligence or pre- or post-funding reviews during the period. To the extent the number of previously reviewed Appraisals is insufficient for this purpose, additional Appraisals shall be selected at random from the remaining previously unreviewed Appraisals in the pool. If the result of this review indicates further evaluation is necessary, the Appraisal Department (or Third Party Reviewer) shall conduct an additional audit of a random sample of fifteen percent (15%) of Appraisals drawn from those performed by the appraiser for Refinance Loans submitted for approval during the year prior to this review. Any Ameriquest Party may use an appraiser who has been placed on a panel by another Ameriquest Party. No Ameriquest Party may use an appraiser who fails an audit review by any Ameriquest Party.

(2)     Appraisers who have been previously disciplined by their State licensing authority are not eligible for inclusion on a panel. The foregoing provision shall not apply where the discipline is for reasons not involving dishonesty or appraisal quality. In the unlikely event that a sufficient number of non-disciplined appraisers are not available to serve a

particular defined service area, an Ameriquest Party may use an appraiser who has been disciplined previously by his or her State but only if the discipline did not involve allegations of fraud or misrepresentation, the license was not suspended and the last disciplinary action was at least one year prior to the proposed retention date.

5.    *Appraiser Independence.*  The Ameriquest Parties shall comply with the independence standards set forth in the October 28, 2003, Independent Appraisal and Evaluation Functions statement by the Office of the Comptroller of the Currency, Federal Reserve Board of Governors, Federal Deposit Insurance Corporation, Office of Thrift Supervision and National Credit Union Association, as amended from time to time.

6.    *Communication of Expected Value to Appraiser Prohibited.*

a.    There shall be no direct communication between Branch Managers or Mortgage Specialists and appraisers except for communications initiated by the appraiser in response to which the Manager or Specialist shall immediately refer the appraiser to the appropriate persons in the Appraisal Department.

b.    In the case of Refinance Loans, no Ameriquest Party employee may identify on the Appraisal order form or communicate by any other means to any individual appraiser or firm either the Loan amount or any other express or implied statement of the anticipated or desired Appraisal value. However, the Borrower's estimated value of the property may be identified on the Appraisal order form but only if accompanied by a statement it is being provided solely to assist the appraiser in determining the relative complexity of the Appraisal and that it is not a target or expected value.

7.    *Appraisal Review.*  At the same time the completed Appraisal report is delivered (by whatever means) to the Appraisal Department, the report may be forwarded or otherwise made available to the applicable Branch Manager.

26

a.      If, for the initial Appraisal only, the Branch Manager has a good faith belief that the Appraisal contains an error or is otherwise professionally deficient, the Branch Manager may submit a written or electronically transmitted request to the Appraisal Department explaining the objection and requesting the appraiser address the specific issue raised.  If the Appraisal Department agrees that a good faith basis for the review exists, either on the basis of a request from the Branch Manager or on the basis of a pre-funding review, the Appraisal Department may request in writing or by electronic transmittal the appraiser do one or more of the following:

(1)     Consider additional appropriate information about the property, including additional comparables;

(2)     Provide further detail, substantiation, or explanation for the appraiser's valuation; or

(3)     Correct errors in the Appraisal.

The Appraisal Department may not request that an appraiser review an Appraisal solely on the grounds that the valuation is not high enough to qualify the Potential Borrower for the proposed Loan and shall not suggest a specific value.

b.      The Ameriquest Parties shall document and retain in a readily retrievable format any change in the Appraisal and the reason for the change.

8.      *Second Appraisals.*  If, after the review process set forth in Paragraph IV.L.7 above has been completed, the Ameriquest Party continues to believe the Appraisal is professionally deficient, that Ameriquest Party may order a second Appraisal from the next appraiser on the panel.  The Ameriquest Parties may not order a second Appraisal prior to the completion of this review process; provided, however, that nothing contained herein shall prevent an Ameriquest Party from ordering two simultaneous Appraisals where a particular Loan program requires two different Appraisals.  The

27

Ameriquest Parties may also order a second Appraisal in the following cases: (a) where the appraised value of the property is within ten percent (10%) of the value necessary to make the proposed Loan, (b) where the Ameriquest Party reasonably believes the property has been damaged or has otherwise declined in value since the first Appraisal, or (c) where the Appraisal has expired before the Loan has been closed. The Ameriquest Parties shall pay the cost of any second Appraisal ordered because the appraised value was within ten percent (10%) of the value necessary to make the proposed Loan. In no event shall the Ameriquest Parties order more than two Appraisals.

9. *Appraisal Audits.* Each Ameriquest Party shall maintain a record of its Appraisal review and second Appraisal requests, retrievable by branch office, mortgage specialist and by appraiser. This record shall contain the value determined by each Appraisal and the amount of any change in value resulting from the review or second Appraisal. The Ameriquest Parties shall audit an appraiser's work whenever the Appraisal Department requests review of more than a certain percentage of Appraisals performed by the appraiser for Refinance Loans submitted for approval during a twelve (12) month period. For those appraisers with less than ten (10) Appraisals performed during a twelve (12) month period, the Ameriquest Parties shall review the appraiser's work only if the Appraisal Department made two or more review requests during the period.

An Ameriquest Party shall conduct a comprehensive review of its Appraisal review process whenever the number of review requests or the number of second Appraisals by the Ameriquest Party submitted during a twelve (12) month period exceeds a certain percentage of the total of all first Appraisals during the same period. The exact percentages to be used to determine whether an Appraisal audit is required will be established by agreement between the Ameriquest Parties and the Compliance Committee no later than twelve (12) months after the Effective Date.

28

10. *Discipline/Mandatory Reporting.* If an Ameriquest Party has a reasonable basis to believe an appraiser is violating applicable laws, or is otherwise engaging in unethical or unprofessional conduct, that Ameriquest Party shall refer the matter to the applicable state appraiser regulatory agency, if any. Similarly, if an Ameriquest Party learns that one of its employees or agents involved in the Loan production process has attempted to influence the Appraisal valuation process in any manner, it shall immediately discipline the offending person, up to and including dismissal.

11. *Appraisal Monitoring.* The Appraisal Department shall review twenty percent (20%) of all Appraisals for Refinance Loans submitted for approval (which review may be pre- or post-funding) as part of its existing internal quality control procedures. Review appraisers must be independent of Loan sales and shall be assigned to review Appraisals from no more than ten (10) specific states within the same geographic region.

12. *Copies of Appraisals to Borrowers.* A complete copy of the Appraisal (or the AVM report if that was used for determining the value of the property) must be provided to the Borrower. If more than one Appraisal (or AVM report) is completed, copies of all Appraisals (or AVM reports) must be provided to the Borrower.

13. *Appraiser Compensation.* Appraisers must be timely paid for every completed Appraisal regardless of whether the Loan actually closes. The Ameriquest Parties shall not pay additional or bonus compensation to an appraiser for meeting the desired Appraisal value and no Ameriquest Party employee may accept compensation of any kind from an appraiser or Appraisal firm for an Appraisal assignment.

M. **Stated Income Loans.**

1. The Ameriquest Parties shall not:

a. Inflate or fabricate, or encourage a Potential Borrower to inflate or fabricate the source or amount of a Potential Borrower's actual income or assets; or

29

      b.      Sign any document on behalf of a Borrower.

      2.      The Ameriquest Parties shall instruct the Independent Loan Closer to review with the Potential Borrower, and require the Potential Borrower to sign, at and as a condition of Closing, a statement certifying the Potential Borrower understands that:

      a.      The Loan has been approved based on the amount of income reported by the Potential Borrower;

      b.      The amount of income reported by the Potential Borrower is accurate;

      c.      If the Potential Borrower's income is in fact less than the amount set forth in the Loan application, the Potential Borrower understands there is a significant risk that the Potential Borrower will not be able to afford the Loan and may lose their home through foreclosure or be forced into bankruptcy; and

      d.      Any false statements may subject the Potential Borrower to criminal penalties.

      3.      The Ameriquest Parties shall maintain a record of those applications that are originally submitted as full document or limited document (also called Fast Trac) Loans that are subsequently approved as Stated Income Loans.

      4.      The Underwriting guidelines employed by the Ameriquest Parties shall require the amount of stated income be reasonable for the occupation and experience claimed.

      5.      If a Stated Income Loan is based upon self-employment or a home-based business, the Ameriquest Parties shall request evidence of the existence of the business.

      **N.**      **<u>Employee Compensation Programs</u>.**  The compensation system employed by an Ameriquest Party may not provide incentives that encourage its employees: (1) to include a Prepayment Penalty provision in a Loan, (2) to quote a Potential Borrower an interest rate inconsistent with the Same Rate Available provision of this Settlement Agreement, or (3) to otherwise increase compensation based on Loan fees or Closing costs.

**O.**　**Quotas.**　The Ameriquest Parties may not require its employees to complete an unreasonable minimum number of Loan applications or Loan Closings per month or other time period where the result is that employees violate any provision of this Settlement Agreement or the law.　No branch, regional or area sales manager may establish a quota system separate from that established by an Ameriquest Party; provided, however, nothing in this Settlement Agreement shall prohibit regional, area or branch managers from conducting reasonable sales or incentive contests.

**P.**　**Whistleblower Policies and Procedures.**　The Ameriquest Parties shall adopt written policies and procedures to facilitate reporting of suspected improper conduct by Ameriquest Party employees.　Each Ameriquest Party shall provide a copy of these policies and procedures, including the name, address and telephone number of a manager designated by that Ameriquest Party to receive reports of suspected improper conduct, to all current employees and all newly hired employees at the time of their employment.　These policies and procedures shall include provisions to:

　　　1.　　Encourage the reporting of suspected improper conduct;

　　　2.　　Take reasonable steps to preserve the anonymity of the whistleblower to the maximum extent practical;

　　　3.　　Investigate the allegations of suspected improper conduct and report the results of that investigation to senior management; and

　　　4.　　Protect the whistleblower from retaliation.

**Q.**　**Employee Training.**

　　　1.　　Ameriquest Party branch employees shall complete a training course appropriate to the duties and responsibilities of each employee, which shall include:

　　　　　a.　　A discussion of the Ameriquest Party's obligations under this Settlement Agreement and a written summary of the Settlement Agreement provided to each trainee;

31

b. A discussion of the purpose and general prohibitions of state unfair or deceptive acts or practices statutes as they relate to secured real estate mortgage lending.

2. Newly hired Sales Personnel shall complete a training course which shall include, in addition to the elements described above, basic training in mortgage lending and in ethical sales practices.

3. The General Counsel of ACCCH shall discuss with each of ACCCH's and the Ameriquest Parties' officers and directors their respective general duties and responsibilities as they relate to the real estate secured mortgage lending activities of ACCCH or the Ameriquest Party with which they are associated and provide each of them with a written summary of this Settlement Agreement.

4. Each employee required to complete the training courses referred to in Paragraphs IV.Q.1-2 above, and each officer and director of ACCCH and each Ameriquest Party shall execute a form, which shall be maintained in a readily retrievable format by ACCCH or the applicable Ameriquest Party, acknowledging:

a. Completion of the training or discussion with the ACCCH Counsel, as the case may be;

b. They have received, read and understand the Ameriquest Party's obligations under this Settlement Agreement as set forth in the above-referenced written summary;

c. They understand that violations of applicable state and federal laws may subject them to individual liability and judicial or administrative sanction; and

d. They understand that violations of applicable state and federal laws may subject the Ameriquest Party to liability and judicial or administrative sanction.

32

**R.** <u>No Coordination with Debt Collectors</u>. Neither the Ameriquest Parties nor its employees may compensate Debt Collectors for providing referrals nor may the Ameriquest Parties or its employees work in concert with Debt Collectors to pressure a Potential Borrower to obtain a Loan from an Ameriquest Party. Nothing in this Section IV.R shall prohibit the Ameriquest Parties from purchasing bulk mailing lists from Debt Collectors or receiving uncompensated referrals from Debt Collectors, whether or not solicited.

### V. SETTLEMENT ADMINISTRATION

**A.** <u>State Settlement Administration and Compliance Committee</u>. Within fifteen (15) days of the Effective Date, the Settling States shall designate a State Administration and Compliance Committee (the "Compliance Committee"). The Compliance Committee shall serve as the Settling States' representative in the administration of this Settlement Agreement and the monitoring of compliance with it by ACCCH and the Ameriquest Parties.

**B.** <u>Claims Process</u>. Subject to the provisions of this Settlement Agreement pertaining to Sub-Fund A, each Settling State shall determine the procedures to provide notice and distribute restitution to its eligible Borrowers.

**C.** <u>Procedures for Administration of the Settlement</u>.

1. Within ninety (90) days of the Effective Date, the Ameriquest Parties, in consultation with the Compliance Committee, shall choose and retain an Administrator ("the Administrator") to administer the distribution of restitution payments under this Settlement Agreement. The Administrator shall be deemed appointed and the contract approved unless within fifteen (15) days of receipt of the proposed contract identifying the proposed Administrator, more than one-third (1/3) of the number of the Settling States object to the appointment.

2. Subject to the limitations of Section III above, each Settling State shall determine the criteria, procedures and manner of allocation and distribution of restitution to the eligible Borrowers in that State and may direct the Administrator with respect to these matters.

33

3.     ACCCH or the Ameriquest Parties shall pay to the Settlement Fund an amount sufficient to pay the Administrator's reasonable fees and expenses, including attorneys' fees and costs of litigation, if any, related to maintaining the confidentiality of customer and proprietary information; provided, however, that in no event shall the total of fees, expenses and costs of administration exceed Seven Million Five Hundred Thousand Dollars ($7,500,000).   From time to time, as the Settlement Fund incurs administrative costs, it shall render an invoice of the reasonable costs incurred to ACCCH or the Ameriquest Parties and ACCCH or the Ameriquest Parties shall, within thirty (30) days of receipt, transfer that amount to the Settlement Fund for payment to the Administrator.   Any unexpended portion of this amount at the termination of the administration of this Settlement Agreement shall revert to ACCCH or the Ameriquest Parties.

4.     The Ameriquest Parties shall provide to the Administrator all information reasonably necessary for the administration of this Settlement Agreement, within a reasonable time not to exceed thirty (30) days after receipt of the request for information. The Ameriquest Parties shall be ordered to provide this information under 15 U.S.C. § 6802(e) (1)(A), (5) and (8) of the Gramm-Leach-Bliley Act.   Information pertaining to individual eligible Borrowers, including names and other identifying information may be provided to the Settling States but only if:

a.     The information is used solely for the purpose of contacting eligible Borrowers concerning the award of restitution under the Settlement Agreement;

b.     The information consists solely of identifying information about eligible Borrowers who have failed to respond to two or more written notices about the restitution offer; and

34

c.    Any personal identifying information related to a Borrower provided to a Settling State shall be considered non-public, confidential data not subject to disclosure under the applicable Settling State's public records law.

**D.**    **Warranties.**  The Ameriquest Parties shall warrant to the Settling States at the time of supplying information to the Administrator that the information is complete and accurate. If the Ameriquest Parties supply information that is incomplete or inaccurate and that results in an eligible Borrower receiving no restitution or less restitution than that Borrower otherwise would have been entitled to receive under the Settling State's restitution plan if complete and accurate information had been provided, the Ameriquest Parties shall pay the difference between the restitution received by the Borrower, if any, and the amount that should have been paid had complete and accurate information been provided.  The Ameriquest Parties and the Settling States mutually warrant to the other that the individuals executing this Settlement Agreement are duly authorized to do so and that, as a result of their execution, this Settlement Agreement shall be enforceable against any party.

**E.**    **Onsite Inspections.**  The Administrator shall permit reasonable onsite inspection by the Settling States on the premises of the Administrator to monitor administration of this Settlement Agreement.

**F.**    **Taxes.**  Income taxes, if any, on income earned by the Administrator on funds held temporarily by the Administrator pending distribution as restitution shall be paid out of the income earned by those funds.

## VI. COMPLIANCE MONITORING

**A.**    **Implementation Timeline.**  The Ameriquest Parties shall implement the changes required by this Settlement Agreement as soon as reasonably feasible but not later than March 15, 2007.

**B.**    **Ameriquest Internal Monitoring.**  No later than ninety (90) days after the Effective Date, the Ameriquest Parties shall implement a program of internal monitoring to insure its compliance with this Settlement Agreement.  This program shall include, at a

minimum, periodic on-site visitation of branch offices, and a Mystery Shopping program (except for AMC), all designed to test the Ameriquest Parties' employees' compliance with this Settlement Agreement and the Ameriquest Parties' policies and procedures regarding the Loan origination and funding process.

  **C.**  **Customer Satisfaction Monitoring in Welcome Calls.** The Ameriquest Parties will attempt to contact, by telephone, each Borrower as his or her Loan is transferred to Loan servicing. During such calls, Loan servicing personnel will review the Borrower's Loan terms with Borrowers and assess their overall satisfaction with the Loan origination and funding process. When material deficiencies or problems with the Loan origination or funding process are identified, the matter will be promptly referred to a complaint resolution unit.

  **D.**  **Appointment of an Independent Monitor.** The Compliance Committee and the Ameriquest Parties shall agree on the appointment of an independent Monitor (hereafter the "Monitor") to oversee compliance with the provisions of this Settlement Agreement by the Ameriquest Parties. In the event the parties fail to reach agreement on a Monitor within ninety (90) days after the Effective Date, the Compliance Committee shall appoint a Monitor.

  Within thirty (30) days after the appointment of the Monitor, the Compliance Committee and the Ameriquest Parties shall agree with the Monitor on a proposed work plan and contract, which shall include all reasonable and necessary costs of the Monitor. If the Monitor, the Compliance Committee and the Ameriquest Parties fail to reach agreement within that time, the Compliance Committee shall determine a fair and reasonable work plan and contract in consultation with the Ameriquest Parties and the Monitor.

  In the event of any dispute arising over the Monitor's performance or the reasonableness of the Monitor's costs and fees, either an Ameriquest Party or the Monitor may request the Compliance Committee arbitrate the dispute. In such event, the determination of the Compliance Committee shall be final.

  **E.**  **Costs of the Monitor.** ACCCH or AMQ shall pay all reasonable and necessary costs of the Monitor. Reasonable and necessary costs shall be limited to those set out in the

Monitor Contract, but in no event shall they exceed Two Million Dollars ($2,000,000) per calendar year. The Ameriquest Parties and the Compliance Committee may agree to the performance of additional necessary work by the Monitor in an amount not to exceed One Million Five Hundred Thousand Dollars ($1,500,000) for the entire Monitoring period. Agreement for any additional work shall not be unreasonably withheld.

**F.**    **Powers of the Monitor.**

1.    The Monitor shall have broad discretion to review the Ameriquest Parties' operations to ensure that each of them complies with the terms of this Settlement Agreement. The Monitor shall have all powers reasonable and necessary to efficiently and effectively discharge its responsibilities under this Settlement Agreement.

2.    The Ameriquest Parties shall provide the Monitor access to all documents necessary to permit the Monitor to fulfill its duties in a manner, format and time frame convenient to the Monitor. Similarly, the Ameriquest Parties shall provide the Monitor with reasonable access to their employees as the Monitor reasonably determines necessary to fulfill its duties under this Settlement Agreement. The Ameriquest Parties shall make its employees available for interview, either telephonic or in-person, within seven (7) business days of the Monitor's request. Any customer or proprietary information provided to the Monitor shall remain the sole property of the Ameriquest Parties and shall be treated as confidential information, subject to the provisions of Section VI.H and Section VIII.F.

3.    For Loan sampling purposes, the Monitor shall request the number of Loans needed for a ninety-five percent (95%) confidence level, with an error tolerance of plus or minus five percent (5%).

4.    The Ameriquest Parties shall provide the Monitor with private workspace and access to a photocopier whenever the Monitor makes inspections of the Ameriquest Parties' documents, files and other materials.

**G.**     **Oversight and Compliance.**     The Monitor shall issue a report (hereafter "Report") to the Compliance Committee for the periods ending December 31, 2006; June 30, 2007; December 31, 2007; December 31, 2008; December 31, 2009; and December 31, 2010. Each report is due three (3) months after the close of the period covered by the Report. A copy of the Report shall be submitted simultaneously to undersigned counsel for the Ameriquest Parties. The Report shall include:

1.     The Monitor's evaluation of the Ameriquest Parties' compliance with this Settlement Agreement; and

2.     The factual basis for the Monitor's conclusions.

The Monitor shall confer with the Ameriquest Parties and the Compliance Committee prior to issuing each Report.

**H.**     **Use of the Monitor's Reports.**     The Monitor's Reports and testimony may be used by the Settling States, ACCCH or the Ameriquest Parties in any court hearing, trial or other proceeding relating to this action, and the Reports shall be admissible into evidence if there is an alleged violation of this Agreement. The Monitor's Report and testimony with respect to any particular alleged violation shall not be admissible or used in any such proceeding by any Settling State if the Ameriquest Parties have cured to the reasonable satisfaction of the Settling States the alleged violation within a reasonable time, which shall be no fewer than thirty (30) days and no more than ninety (90) days after receipt of the report. Provided, however, that the Ameriquest Parties shall not be afforded an opportunity to cure for the purpose of preventing a Settling State from using the Monitor's Report and testimony when the violation of the same injunctive provision is found to have occurred in over ten percent (10%) of the Loan transactions reviewed by the Monitor in any one state in more than one Report. Subject to each of the Settling State's individual public records laws, the Monitor's Reports shall not be disclosed to any private party without fifteen (15) days prior notice to the Ameriquest Parties, to permit the Ameriquest Parties adequate opportunity to object to their disclosure. The Ameriquest Parties'

remedy against the Settling States for any violation of this fifteen (15) day prior notice requirement is limited to seeking return of the documents from the private party.

Nothing in this Settlement Agreement limits the right of a Settling State to conduct investigations or examinations independent of the work of the Monitor.

I.     **Retention of Documents.**  The Ameriquest Parties shall generate, retain and make readily available to any Settling State for inspection, upon reasonable notice and without the necessity of a subpoena or other legal process, all material records and documents reasonably necessary to document compliance with this Settlement Agreement.  The Ameriquest Parties shall maintain these records and documents for a minimum of five (5) years after the Monitor's final Report.

## VII. RELEASES

A.     **Release from Borrowers.**  Each Borrower who receives a payment from the Settlement Fund shall first execute the following release (which shall be provided to Borrowers in both English and Spanish):

"'We' and 'our' mean the Borrowers under the Loan account number(s) listed above.  If there is only one Borrower, these terms refer to that single Borrower.  The 'Ameriquest Parties' are Ameriquest Mortgage Company, Town and Country Credit Corporation, Ameriquest Mortgage Services, Inc., formerly known as Bedford Home Loans, ACC Capital Holdings Corporation and their respective (i) predecessors, past, present and future direct and indirect parents, owners, subsidiaries, affiliated and other related persons or entities of any kind (be they corporations, partnerships, trusts, individuals), including the successors and assigns of any of the foregoing, and (ii) all past, present and future owners, employees, officers, agents, directors, insurers, and any other representatives of all the foregoing, including, for natural persons, both in their official and individual capacities.

By our signatures(s) below we acknowledge that we have read the following release and are bound by its terms.  In consideration for the restitution payment we are to receive, we release the Ameriquest Parties from all civil claims, causes of action, any other right to obtain any type

39

of monetary damages (including punitive damages), expenses, attorneys' and other fees, rescission, restitution or any other remedies of whatever kind at law or in equity, in contract, in tort (including, but not limited to, personal injury and emotional distress), arising under any source whatsoever, including any statute, regulation, rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial proceeding, whether known or unknown, and whether or not alleged, threatened or asserted by us or by any other person or entity on our behalf, including any currently pending or future purported or certified class action in which I am now or may hereafter become a class member, that arise from or are related to the following lending practices engaged in by the Ameriquest Parties, during the period from January 1, 1999 through December 31, 2005, in connection with the Loan account numbers listed above:

All representations, misrepresentations, disclosures or any other acts, events, facts, transactions, occurrences, omissions or conduct, whether oral, written or otherwise, by the Ameriquest Parties, arising out of, in connection with or relating to any of the following:

1.  Loan types and terms, including discount points, interest rates, origination-related fees, monthly payment amounts, terms of adjustable rate and fixed rate mortgages and prepayment penalties.

2.  Written disclosures, including the Good Faith Estimate, other documents required to be provided to a Potential Borrower by any law or otherwise provided by an Ameriquest Party.

3.  The Borrower benefits of obtaining a loan from an Ameriquest Party or from a repeat refinancing with an Ameriquest Party.

4.  Coordination with debt collectors.

5.  The timely completion of the underwriting functions and funding of a loan.

6.  Closing of a loan.

7.  Appraisals.

8.  Stated income loans.

40

9.      Disclosures to non-English speaking Borrowers and Potential Borrowers.

Notwithstanding this release, we may affirmatively or defensively assert any claim or defense that we have with respect to my loan with an Ameriquest Party in response to a judicial or threatened non-judicial foreclosure, including those related to the lending practices listed in this release."

In those States with statutory or common law provisions requiring specific language to effectively waive known or unknown claims, the language of the release from the Borrower set forth above shall be modified to include the specific language required by the statutory or common law provisions.

**B.      Release from the State.**   The relief to be provided by ACCCH and the Ameriquest Parties resolves all civil and administrative investigations and proceedings, if any, including those that are pending or closed, that have been or could have been brought by the Settling States against the Ameriquest Parties, as defined in the "Release from Borrowers" set forth above, based upon the Lending Practices with respect to the Covered Transactions. This release is effective so long as restitution and other payments required under the terms of this Settlement Agreement are timely made. However, this release by the Settling States does not include a waiver or release of any civil or administrative claims, regulatory matters, or causes of action relating to any practices, acts or omissions by any Ameriquest Party that are not based upon the Lending Practices with respect to the Covered Transactions.

### VIII. MISCELLANEOUS

**A.      State Authority.**  The relief provided in this Settlement Agreement, including all payments by ACCCH or by the Ameriquest Parties, to the Settlement Fund or any accounts established by this Settlement Agreement, is in response to and in compliance with each Settling State's authority to regulate ACCCH and the Ameriquest Parties and each of the Settling States' police powers.

41

**B.**     **Removal of the Administrator or the Monitor.** The Settling States reserve the right to remove and replace the Monitor or Administrator upon approval of two-thirds (2/3) of the number of the Settling States.

**C.**     **Compliance with State and Federal Law and Prior Agreements.** Nothing in this Settlement Agreement shall relieve the Ameriquest Parties of their obligation to comply with applicable state and federal law. Where state statutes or regulations, letters of understanding or agreements with the Ameriquest Parties, entered into and in force with a Financial Regulator or state agency of a Settling State, provide greater consumer protections than the terms or provisions included in this Settlement Agreement, the Settling State statutes, regulations, letters of understanding or agreements with the Ameriquest Parties shall govern.

**D.**     **Modification of the Settlement Agreement.** This Settlement Agreement may be modified only by order of the appropriate state Court or in a state non-judicial forum, as the case may be. After making a good faith effort to obtain the concurrence of the other party for the requested relief, which concurrence shall not be unreasonably withheld, the party seeking modification may petition the appropriate Court or non-judicial forum, as the case may be, for modification of the terms and conditions of this Settlement Agreement.

**E.**     **Limitation on Use of Information from the Ameriquest Parties.** This Settlement Agreement and any information provided by the Ameriquest Parties in the course of negotiating this Settlement Agreement shall not be used by any Settling State as the basis for the denial, revocation, suspension or non-renewal of, or imposition of any condition on, any license, authorization, approval or consent that ACCCH or an Ameriquest Party may now have, or may hereafter seek to obtain under any Settling State's lending, banking, insurance or similar financial laws or regulations, except as expressly provided in this Settlement Agreement.

**F.**     **Disclosure of Information.** If a Settling State receives a request for documents provided by an Ameriquest Party relating to the subject matter of this Settlement Agreement, the negotiation of this Settlement Agreement, the Monitor's Reports, or information obtained by the Administrator or Monitor in connection with this Settlement Agreement, the Settling State shall

42

comply with applicable public disclosure laws and promptly provide notice to the Ameriquest Parties of the request that will afford the Ameriquest Parties the reasonable opportunity to assert that the documents subject to the request are exempt from disclosure.

G. **No Disqualification to Do Business.** This Settlement Agreement is not intended to disqualify ACCCH or the Ameriquest Parties from engaging in any business in the Settling States. Further, this Settlement Agreement is not intended to have any effect upon the existing ACCCH or Ameriquest Party licenses in any of the Settling States. This Settlement Agreement may not be used as any basis for the denial, revocation, suspension or non-renewal of, or imposition of any condition on, any license, authorization, approval or consent that ACCCH or an Ameriquest Party may now have or hereafter may seek under the laws of any Settling State.

H. **Settlement Agreement Enforceable Only By the Parties.** This Settlement Agreement may only be enforced by the Parties. This Settlement Agreement shall not be interpreted to alter the contractual terms of any Loan agreement that any Borrower has with any of the Ameriquest Parties, or constitute a novation of any Loan agreement, except as expressly provided in this Settlement Agreement. Each state court or other state forum in which settlement documents under this Settlement Agreement are filed shall retain jurisdiction to enforce the terms and conditions of this Settlement Agreement.

None of the Settling States may bring an action to enforce this Settlement Agreement unless the Settling State bringing the action has notified ACCCH and the Ameriquest Parties in writing of their intent to file and of the alleged violations, specifically citing the applicable provisions of the Settlement Agreement on which the proposed action is to be based. This notice shall be no less than fifteen (15) days prior to filing the action.

I. **Submission to Jurisdiction for Limited Purpose.** ACCCH and the Ameriquest Parties submit to the jurisdiction of the courts or non-judicial forums in the Settling States for the limited purpose of entering into and enforcing this Settlement Agreement only. Any acts, conduct or appearance by ACCCH or the Ameriquest Parties shall not constitute or be construed

43

as a submission to the general jurisdiction of any court or non-judicial forum in any of the Settling States for any purpose whatsoever.

      **J.**    **Conflict with Subsequent Law.**  In the event that any law conflicts with any provision of this Settlement Agreement, making it impossible for ACCCH or the Ameriquest Parties to comply both with the law and with the provisions of this Settlement Agreement, the provisions of the law shall govern.

      **K.**    **No Third Party Beneficiaries Intended.**  This Settlement Agreement is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary.

      **L.**    **Service of Notices and Process.**  Service of notices and process required by this Settlement Agreement, or its enforcement shall be served on the following persons, or any person subsequently designated by the parties:

| | |
|---|---|
| For ACCCH and the Ameriquest Parties: | ACC Capital Holdings Company<br>1100 Town & Country Road<br>Orange, California 92868<br>Attn: Thomas J. Noto, Esquire<br>Executive Vice President and<br>General Counsel<br>Fax: (714) 479-0406 |
| For the Settling States: | Iowa Office of the Attorney General<br>Consumer Protection Division<br>Hoover State Office Building<br>Des Moines, Iowa 50319<br>Attn: Patrick Madigan, Esquire<br>Assistant Attorney General<br>Fax: (515) 281-6771 |
| For [State]: | [insert] |

      **M.**    **Waiver/Construction.**  The failure of any party to exercise any rights under this Settlement Agreement shall not be deemed a waiver of any right or any future rights. If any part of this Settlement Agreement shall for any reason be found or held invalid or unenforceable by any court of competent jurisdiction, such invalidity or unenforceability shall not affect the

remainder of this Settlement Agreement, which shall survive and be construed as if such invalid or unenforceable part had not been contained herein.

**N.**    **Stipulated Judgments, Consent Decrees and Administrative Orders.**  ACCCH and the Ameriquest Parties shall execute appropriate stipulated judgments, consent decrees or administrative settlement documents, as the case may be, with the State Attorneys General and Financial Regulators of the Settling States and, in California, with the participating District Attorneys, incorporating the provisions of this Settlement Agreement and any state-specific agreements no later than March 10, 2006.  If by March 10, 2006, states representing eighty-five percent (85%) or more of the total, combined dollar Loan volume of the Ameriquest Parties' Covered Transactions, on the one hand, and ACCCH and the Ameriquest Parties, on the other hand, have executed the appropriate stipulated judgments, consent decrees or administrative settlement documents, as the case may be, those Settling States shall then file (or take other action as may be appropriate to give effect to this Settlement Agreement) those documents on or about March 15, 2006.  After the stipulated judgment, consent decree or administrative settlement document entered into and filed, this Settlement Agreement shall merge with that stipulated judgment, consent decree or administrative settlement document and have no independent force and effect.

**O.**    **Termination of Agreement.**  In the event states representing fifteen percent (15%) or more of the total, combined dollar Loan volume of the Ameriquest Parties' Covered Transactions and ACCCH and the Ameriquest Parties fail to execute the appropriate stipulated judgments, consent decrees or administrative settlement documents on or before March 10, 2006, ACCCH or the Ameriquest Parties may, in their sole discretion, give notice to the Settling States on or before March 13, 2006, of the termination of this Settlement Agreement.  In such event, this Settlement Agreement shall be of no further force and effect.

In the event the eighty-five percent (85%) participation threshold is reached or if it is not reached but neither ACCCH nor the Ameriquest Parties give effective notice to terminate the Settlement Agreement, ACCCH or AMQ may reduce the final payment to the Settlement Fund

proportionally, based upon the share of the total, combined dollar Loan volume of the Ameriquest Parties' Covered Transactions of any states that are not Settling States. Except for this proportional reduction in the final payment to the Settlement Fund, the failure of states representing fewer than fifteen percent (15%) of the total, combined dollar Loan volume of the Ameriquest Parties' Covered Transactions to become Settling States shall not affect in any way the Settlements reached with Settling States that have filed or executed a stipulated judgment, consent decree or administrative settlement document.

      **P.**    **Counterparts.** The terms of this Settlement Agreement are contractual and not merely recital. This Settlement Agreement may be signed in one or more counterparts, each of which shall be deemed an original. Facsimile copies of this Settlement Agreement and the signatures hereto may be used with the same force and effect as an original.

**Date:**

**ON BEHALF OF THE SETTLING STATES:**

**TERRY GODDARD, Attorney General**
State of Arizona

Robert A. Zumoff
Senior Litigation Counsel
1275 W Washington St.
Phoenix, Arizona 85007
TEL: (602) 542-7722

46

**BILL LOCKYER, Attorney General**
State of California

ALBERT NORMAN SHELDEN
Senior Assistant Attorney General

BENJAMIN DIEHL
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
TEL: 213-897-5548


**LISA MADIGAN, Attorney General**
State of Illinois


TOM JAMES
Assistant Attorney General


SUSAN ELLIS
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
TEL: 312-814-8553


**TOM MILLER, Attorney General**
State of Iowa

PATRICK MADIGAN
Assistant Attorney General
1305 East Walnut Street
Des Moines, Iowa 50319
TEL: (515) 281-5926

47

**BILL LOCKYER, Attorney General**
State of California

ALBERT NORMAN SHELDEN
Senior Assistant Attorney General

BENJAMIN DIEHL
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
TEL: 213-897-5548

**LISA MADIGAN, Attorney General**
State of Illinois

TOM JAMES
Assistant Attorney General

SUSAN ELLIS
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
TEL: 312-814-8553

**TOM MILLER, Attorney General**
State of Iowa

PATRICK MADIGAN
Assistant Attorney General
1305 East Walnut Street
Des Moines, Iowa 50319
TEL: (515) 281-5926

**ELIOT SPITZER, Attorney General**
State of New York

Mark Fleischer
Assistant Attorney General

AMY SCHALLOP
Assistant Attorney General
The Capitol
Albany, New York 12224-0341
TEL: (518) 486-9763

**ROB MCKENNA, Attorney General**
State of Washington

DAVID W. HUEY
Assistant Attorney General
1019 Pacific Avenue, 3rd Floor
P.O. Box 2317
Tacoma, Washington 98401-2317
TEL: (253) 593-5057

**DIANA L. TAYLOR, Superintendent of Banks**
New York State Banking Department

Barbara Kent
Director of Consumer Affairs and Financial Products
One State Street
New York, New York 10004-1417
TEL: (212) 709-3503

48

**ELIOT SPITZER, Attorney General**
State of New York

_____
Mark Fleischer
Assistant Attorney General

_____
AMY SCHALLOP
Assistant Attorney General
The Capitol
Albany, New York 12224-0341
TEL: (518) 486-9763

**ROB MCKENNA, Attorney General**
State of Washington

_____
DAVID W. HUEY
Assistant Attorney General
1019 Pacific Avenue, 3rd Floor
P.O. Box 2317
Tacoma, Washington 98401-2317
TEL: (253) 593-5057

**DIANA L. TAYLOR, Superintendent of Banks**
New York State Banking Department

_____
Barbara Kent
Director of Consumer Affairs and Financial Products
One State Street
New York, New York 10004-1417
TEL: (212) 709-3503

48

**ELIOT SPITZER, Attorney General**
State of New York

Mark Fleischer
Assistant Attorney General

AMY SCHALLOP
Assistant Attorney General
The Capitol
Albany, New York 12224-0341
TEL: (518) 486-9763

**ROB MCKENNA, Attorney General**
State of Washington

DAVID W. HUEY
Assistant Attorney General
1019 Pacific Avenue, 3rd Floor
P.O. Box 2317
Tacoma, Washington 98401-2317
TEL: (253) 593-5057

**DIANA L. TAYLOR, Superintendent of Banks**
New York State Banking Department

Barbara Kent
Director of Consumer Affairs and Financial Products
One State Street
New York, New York 10004-1417
TEL: (212) 709-3503

48

**THOMAS J. ORLOFF**
**District Attorney of Alameda County**

On Behalf of the District Attorneys of Alameda, Los Angeles,
Merced, Monterey, San Francisco and San Mateo Counties.

By: _____

Lawrence C. Blazer
Senior Deputy District Attorney
Alameda County District Attorney's Office
1225 Fallon Street
Oakland, CA 94612
TEL: (510) 272-6222

## ON BEHALF OF ACCCH AND THE AMERIQUEST PARTIES

## ACC CAPITAL HOLDINGS CORPORATION

BY:_____
TITLE:_____

## AMERIQUEST MORTGAGE COMPANY

BY:_____
TITLE:_____

## AMERIQUEST MORTGAGE SERVICES, INC. f/k/a BEDFORD HOME LOANS

BY:_____
TITLE:_____

49

**ON BEHALF OF ACCCH AND THE AMERIQUEST PARTIES:**

**ACC CAPITAL HOLDINGS CORPORATION**

BY: _Thomas J. Noto_

Thomas J. Noto, Esq.

TITLE: Executive Vice President & General Counsel

**AMERIQUEST MORTGAGE COMPANY**

BY: _Thomas J. Noto_

Thomas J. Noto, Esq.

TITLE: Executive Vice President

**AMERIQUEST MORTGAGE SERVICES, INC. f/k/a BEDFORD HOME LOANS**

BY: _Thomas J. Noto_

Thomas J. Noto, Esq.

TITLE: Executive Vice President

**TOWN AND COUNTRY CREDIT CORPORATION**

BY: _Thomas J. Noto_

Thomas J. Noto, Esq.

TITLE: Executive Vice President

Jan-20-2006 02:16pm From-AMERIQUEST MORTGAGE    N    7148356155    T-927 P.002/003 F-094

Approved as to Form and Substance:

RONALD W. STEVENS
Counsel to ACCCH and the Ameriquest Parties
Kirkpatrick & Lockhart, Nicholson Graham LLP
10100 Santa Monica Blvd, Seventh Floor
Los Angeles, CA 90067
TEL: (310) 552-5521

CLAYTON S. FRIEDMAN
Counsel to ACCCH and the Ameriquest Parties
Buchalter Nemer
18400 Von Karman Ave., Suite 800
Irvine, CA 92612
TEL: (949)-224-6284

# IMPORTANT NOTICE OF LOAN TERMS OFFERED BY [COMPANY]

## Date of this Notice: _____

The **TOTAL AMOUNT** of your proposed mortgage loan is $_____.

Your loan amount includes **TOTAL LENDER FEES of (BOLD/UNDERLINED) $**

[For fixed-rate loans] Your **MONTHLY PAYMENTS** of principal and interest will be **$ _____** for the life of your loan.

[For ARM loans] Your **MONTHLY PAYMENTS** of principal and interest will be $ ____ for the first ____ [initial adjustment term], after which they may increase as your loan interest rate adjusts.

[As applicable: This amount does **NOT** include the cost of your property taxes and homeowner's insurance]

## [For fixed rate loans]

Ameriquest is offering you a loan at _____% **INTEREST**.

## [For ARM loans]

[Company] is offering you a loan starting at _____% **INTEREST**.

This loan is a fixed rate loan for [initial adjustment term]. After that the rate may adjust. This means that after the initial period, your interest rate and loan payments can go up every [subsequent adjustment period], depending on market rates. [As applicable: The rate will not ever go lower than _____%.]

This loan has a **PREPAYMENT PENALTY**. This means that if you were to prepay your loan in full within [term], you could pay a charge as high as $_____.

Ameriquest is charging you **$_____ (BOLD/UNDERLINED)** in loan **DISCOUNT POINTS**, which lowers the interest rate on your loan. You may choose a loan with fewer discount points and a higher interest rate. Below is a comparison:

| **Loan as Presented** | | **WITH FEWEST DISCOUNT POINTS** | |
|---|---|---|---|
| Loan Amount | _____ | Loan Amount | _____ |
| Current Interest Rate | _____ | New Interest Rate | _____ |
| Discount Points ____% $ | _____ | Discount Points | _____ |
| Monthly Payment | _____ | Monthly Payment | _____ |

**Please contact your Ameriquest mortgage specialist if you have questions about this loan proposal.**