## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | ) ) ) ) | MDL No. 1715 |
| | ) | Lead Case No. 05-cv-07097 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) ) | Centralized before Judge Marvin E. Aspen |

| | | |
|---|---|---|
| TERRY TALLEY and CHERYL TALLEY, | ) ) | |
| Plaintiffs, | ) ) | 05 C 1080 |
| v. | ) ) ) | Judge John Darrah (Reassigned to Judge Aspen for pretrial proceedings) |
| AMERIQUEST MORTGAGE COMPANY, DEUTSCHE BANK NATIONAL TRUST and AMC MORTGAGE SERVICES, INC. | ) ) ) ) ) | |
| Defendants. | ) ) | **JURY DEMANDED** |

## REPLY IN SUPPORT OF TERRY AND CHERYL TALLEY'S MOTION TO LIFT STAY

Plaintiffs Terry and Cheryl Talley reply as follows in support of their Motion To Lift The Stay as to their individual case:

## I.    INTRODUCTION

Ameriquest has presented scant legal analysis and abundant factual misrepresentations in its effort to show why the Court should not lift the stay as to the Talleys' individual case.

First, Ameriquest simply fails to apply the relevant legal standards to the specific factual situation of this MDL to show why lifting the stay would cause complications. Specifically, while Ameriquest raises the specters of potential prejudice to the non-moving parties, conflicting rulings and duplicative litigation/lack of economy of judicial resources, in fact it does not argue these points with specific facts. It merely asserts in vague, conclusory terms, that these would be the results. (Defs Resp., pp. 8, 9). Indeed, most of the facts Ameriquest presents have nothing to do with these standards. Ameriquest also argues that the Talleys have not shown hardship and inequity to themselves and that the stay would constitute a hardship for Ameriquest. On the contrary, an analysis of the facts in light of the applicable standards leads to the opposite conclusion.

## II.   DEFENDANTS INCORRECTLY APPLY THE RELEVANT LEGAL STANDARDS

Defendants cite In Re Vioxx, 2005 U.S. Dist. LEXIS 40743 (S. D. CA, July 8, 2005), in support of continuing the stay. However, the decision in Vioxx to impose a stay was taken by the Court under fundamentally different circumstances. Vioxx was a situation in which defendants in federal court in California moved for a stay of proceedings "in light of their likely transfer to a the multi-district litigation currently pending in the Eastern District of Lousiana...." At *2. That is to say, defendants' application for a stay was "premised on the eventual transfer of this case to the

1

MDL court." In that context and that context only, defendants there argued that a stay of the California cases would promote judicial economy and prevent inconsistent rulings because the issues were eventually going to be addressed by the MDL court. Id., **2-3. In that context, the <u>Vioxx</u> defendants were probably correct. But here the procedural posture is different.

Talley case is already before the MDL court. It is not going anywhere; neither are any of the Ameriquest cases that have been or are being transferred to this Court. Talley is now pending before the Court that is going to make all of the substantive and procedural rulings on issues arising within the MDL. Thus, there simply is no risk or threat of inconsistent rulings if the Court were to decide the <u>Talley</u> case on summary judgment motions.

For the same reason, because <u>Talley</u> is already here and not going anywhere, there is absolutely no risk or threat of duplicative litigation or a waste of judicial resources among different federal courts or judges. Any investment of time and resources this Court would make in <u>Talley</u> would only have to be made once. And there have not already been previous substantive rulings in <u>Talley</u>. Any pure issues of law raised in <u>Talley</u> would only need to be decided by this Court one time for all Ameriquest cases.

A.    **Plaintiffs Have Been Suffering Serious Prejudice and Continue to Suffer Serious Prejudice**

It is the measure of the corporate defendants' insularity and insensitivity that the Ameriquest parties deny that the Talleys are suffering financial hardship that has resulted from the Court's stay and that defendants fail to perceive any hardship or inequity to the Talleys if the stay is not lifted. Ameriquest admits that the Talleys are in default on their loan. (Defs' Resp., p. 3). Ameriquest, in its pleading, informs the Talleys for the very first time that, months ago, it placed a

2

"stop" on any foreclosure activity. It would have been some comfort to the Talleys, who for months have been living with the fear of losing their home, to know this earlier, but Ameriquest did not bother to tell them, just as it did not bother responding to the settlement demand the Talleys made on September 8, 2006, which indicated that their situation is urgent. (Appendix C of the Talleys' motion).

However, the financial harm to the Talleys is continuing because Ameriquest has not ceased its adverse credit reporting to credit bureaus. Exhibits A and B show that Ameriquest and AMC are reporting the Talleys between 30 and 120 days late and that they are in arrears by over $8,000. Ameriquest also has not offered the Talleys any payment plan options to allow them to catch up and to reduce the constantly accruing interest. Ameriquest also has a policy of rejecting partial payments, i.e., payments of anything less than the full arrearage owed. Thus, in this situation, which ensures that the Talleys will continue in arrears, Ameriquest will be able to continue indefinitely, until this case is resolved, to report adversely about the Talleys to the credit bureaus.

This hardship is an increasing source of prejudice to the Talleys in two ways. First, in order to take advantage of the remedy of TILA rescission they have sued for, the Talleys have to be able to qualify for refinancing. They will not be able to qualify on the private market if they simply continue in arrears and if Ameriquest continues to report them adversely month after month.[1]

This hardship and source of prejudice was not present when the Talleys' counsel completed discovery in their case in April, 2006 and before the stay was imposed. As Terry Talley's

---

[1]This is by no means a statement of fact or an admission that the Talleys are categorically unable to refinance. There are not-for-profit programs, set up to aid victims of predatory mortgage loans, that may be able to assist. Many ECLG plaintiffs with compromised credit have taken advantage of them successfully. Also, their prospects on the private market are not yet hopeless.

3

credit report also indicates, prior to June, 2006, the Talleys had only been late on their mortgage payment one time in a nearly three-year period. (Exhibit B). Because the Talleys have been ready to move for summary judgment since April, 2006, the litigation stay has delayed dispositive motions at a time when their financial situation has been deteriorating and when they most needed the financial relief they would obtain if they prevailed. While their case could have been resolved before they became unable to make payments, it can still be resolved now, by lifting the stay and allowing them to move for summary judgment. The Talleys and their attorneys believe, based on the evidence previewed below, that this would save their financial situation from getting much worse.

If the Talleys' case were resolved on summary judgment, Ameriquest's adverse credit reporting would end. If the Court held, on summary judgment, that the Talleys have a right to rescind, they could exercise that right and receive from Ameriquest $112,000 in relief - either as a credit to principal and by refinancing the remaining principal, which would in turn lower the amount of their monthly payments to a manageable level; or by selling their home, paying off the reduced principal balance from the sale proceeds and purchasing a less expensive home.

Under the present litigation stay, the Talleys' options are extremely limited. As a matter of law, they cannot sell their property now because that might extinguish their TILA rescission claim, although the law is presently unclear what happens if there is a wrongful refusal to rescind followed by a sale. "...[T]he right to rescind shall expire... upon sale of the property." 12 C.F.R. § 226.23(a)(3); see also, Handy v. Anchor Mortgage Corp., 2006 U.S. App. LEXIS 24639, *13 (7th Cir., Sept. 29, 2006), citing, Barrett v. JP Morgan Chase Bank, N.A., 445 F. 3rd 874, 878; 2006 U.S. App. LEXIS 9625, *11 (6th Cir., April 18, 2006). Moreover, refinancing now, without the benefit of a rescission, even though it recently became legally permissible in the 6th and 7th

4

Circuits, is financially much more difficult in the absences of rescission because, without the refund of finance charge, the amount of the new loan would be so much higher. If the Talleys lose their case, then they could still sell the property, pay off Ameriquest, end their payment obligations (and the adverse reporting) and start over with any remaining equity. But a stay leaves the Talleys without any remedy or relief with which to address a worsening credit and financial situation.

Ameriquest misleads this Court by suggesting that the Talleys, at this stage, must "allege" or "prove" that they can meet their obligation to tender to Ameriquest in the event of a Court-ordered rescission. (Defs' Resp., p. 6). Defendants cited no authority whatsoever for this argument. While defendants are correct that some courts condition the defendant's obligation to rescind on the borrower's ability to tender, there is no requirement, at the pleadings stage or especially on a motion to lift the stay, to "allege" or "prove" this ability. This is an argument defendants would be free to make at the remedies phase of the case. And at that time, plaintiffs could reasonably be expected to present evidence of their ability to tender or to request a certain period of time in which to tender. Further, Ameriquest's argument does not account for any difficult in tender it caused.

The stay operates in Ameriquest's favor because, the longer it is in place, the less likely it is that the Talleys or any plaintiffs will be able to take advantage of any TILA's rescission remedy. Due to Ameriquest's continuing adverse credit reporting, the stay certainly make it less likely that the Talleys could ever refinance, which means they would be precluded from taking advantage of the statutory remedy of rescission. This could ultimately result in the dismissal of their case.

The Talleys have suffered serious hardship and prejudice as a result of the stay, and

5

they will continue to suffer if the stay is not lifted. Board of Trustees v. Worldcom, 244 F,. Supp. 2d 900, 906, 2002 U.S. Dist. LEXIS 26190, *16 (N.D. Ill., October 16, 2002). Perhaps a lesser harm is delay itself. The Talleys first filed their case February 23, 2005 - over 20 months ago. Moreover, with the exception of one deposition (of Terry Talley), which defendants elected not to proceed with on the day this Court entered a stay, discovery in Talley has been complete for seven months - since April 4, 2006. The Talleys are entitled to assert their rights in Court in a speedy manner.

B.      **Defendants Would Not Be Subject to Hardship or Prejudice In Any Genuine Sense of These Terms**

First of all, the standard here is whether the non-moving parties would suffer prejudice. Ameriquest is the only "non-moving party" with respect to the Talleys' motion. Ameriquest is also the real beneficiary of the status quo. Thus, the Court should only consider whether lifting the stay would prejudice Ameriquest. It is kind and compassionate of Ameriquest to rush to the aid of other plaintiffs in the MDL and argue about possible prejudice to them, but none of the other plaintiffs or their counsel, with one notable exception,[2] have voiced these concerns so vociferously. On the contrary, the only other plaintiffs to file a response to the Talleys' motion was the "cooperating plaintiffs," whose position on the Talley motion is one of "provisional support," not of opposition. No plaintiffs benefit from the status quo.

There would be no genuine prejudice or hardship to defendants that would result from lifting the stay as to a single, individual case. Ameriquest's response does not mention a single way in which it would be prejudiced on the merits, in the Talley case or any other MDL case, if the Court were to lift the stay as to Talley.

---

[2]The Talleys address the "cooperating plaintiffs'" concern regrading collateral estoppel below.

Let no one doubt that Ameriquest has other reasons why it does not want the stay lifted. It would certainly prefer that as many plaintiffs as possible settle their case for less than full liability or that plaintiffs dismiss their case and take under the AG Agreement. Ameriquest would prefer to have the stay in place forever so that plaintiffs cannot conduct discovery and obtain evidence to prove their cases or increase the settlement value of those cases. Ameriquest would prefer not to have motions for summary judgment and trials and settlement conferences with the Court because, if that were to happen, the Court would see for itself the evidence and what's really happening to plaintiffs and class members as a result of Ameriquest's abusive lending practices. Ameriquest would also prefer to continue earning interest on its money for as long as possible. For these and similar reasons, lifting the stay as to one individual case may be inconvenient or a burden for Ameriquest, but that's not a showing sufficient to defeat this motion. <u>Board of Trustees v. Worldcom</u>, 244 F,. Supp. 2d 900, 905, 2002 U.S. Dist. LEXIS 26190, *15 (N.D. Ill., October 16, 2002). Ameriquest also whines to the Court that it would prefer that the Talleys mediate their case or take under the AG settlement and that these procedures would save Ameriquest on court time and attorney's fees, (Defs' Resp., p. 7),[3] but the Talleys disagree. Their disagreement is not a source of merits prejudice to Ameriquest.

Contrary to Ameriquest's assertion, made without knowledge of what actually transpired in discovery in <u>Talley</u>, adding the third party closing agent in this case will not necessitate

---

[3]These complaints are particularly ironic in light of the fact that, as demonstrated <u>Appendix C</u> to the Talleys' motion, on September 8, 2006, the Talleys sent a written settlement offer to Ameriquest and followed up in writing several times. Ameriquest never bothered to respond, not even with the professional courtesy of a phone call.

any further discovery.[4] Prior to the stay, plaintiffs took the initiative to subpoena all available documents from A Title Escrow, Ameriquest's closing agent for the Talley loan. Plaintiffs also took the deposition of the individual who performed the closing and disbursed the proceeds of the Talleys' loan. Ameriquest had an opportunity to ask and did ask as many questions as it wanted, as shown below. All documents of plaintiffs and defendants, including multiple sets of written discovery requests, have been exchanged, and these can now easily be reproduced and made available to any third party quickly.

The Talley case is in a unique posture. Unlike most of the individual cases in the MDL, discovery in Talley is completed (but for one deposition). Thus, defendants' reference before this Court to "engag[ing] in open, unrestricted discovery and motion practice" that would "prejudice other parties" are totally false claims. (Defs' Resp., pp. 6, 9). Lifting the stay as to Talley could not result in any duplicative discovery or motion practice because discovery is done. Plaintiffs - and defendants, unless they attempt a second bite at the apple - will not be conducting any "core" discovery that will be conducted in coordinated fashion in the other cases. In Re: Bridgestone/Firestone, Inc., 128 F. Supp. 2d 1196, 1197-98, 2001 U.S. Dist. LEXIS 320, ** 5-6 (S. D. Ind., Jan. 12, 2001). The remaining discovery in Talley, a single deposition, is entirely "case-

---

[4]Even though Ameriquest could have done so long ago, the Talleys do not oppose Ameriquest's joinder of its closing agent for the Talley loan, provided Ameriquest acts immediately. (Defs' resp., p. 10). The Talleys' case was pending for 14 months before it became subject to the MDL stay, and during all of that time Ameriquest never moved to join its closing agent. Even after plaintiffs tracked down, subpoenaed and deposed the closing agent, and after the closing agent admitted to giving all blank notices of right to cancel (as set forth below), Ameriquest still did not join the closing agent! It is not that the Talleys are ignoring Ameriquest's desire to join its closing agent, (Defs' Resp., pp. 9-10); it is that Ameriquest has simply never done it!

specific." Id., 1198; **5-7. So are pre-trial motions, if any, that the parties may seek to file in the event summary judgment is denied.[5] Id. For the same reason, no rulings on discovery issues will be required. In Re Ocwen Federal Bank FSB Mortgage Servicing Litigation, 397 F. Supp. 2d 957, 963, 2005 U.S. Dist. LEXIS 27047, *16 (N. D. Ill. Nov. 9, 2005).

Because defendants would suffer no prejudice on the merits and plaintiffs have and will continue to suffer serious hardship and prejudice, it is evident that balancing weighs in favor of lifting the stay as to the Talleys.

## III.     LIFTING THE STAY WOULD NOT PREJUDICE OTHER PLAINTIFFS

Even while it argues that the Talleys are not suffering hardship, Ameriquest argues that lifting the stay only as to the Talleys would be unfair to other plaintiffs, who may be suffering financial hardship. (Defs' Resp., pp. 7-8). Although Ameriquest's compassion for other plaintiffs is touching, all individual plaintiffs have been free all along to move to lift the stay as to their case. Only the Talley plaintiffs have actually followed the Court's instruction and done so.

The Talleys respectfully suggest that the earlier Motion To Lift Stay filed by the "cooperating plaintiffs" was perhaps too general and sweeping for the Court to meaningfully consider. Indeed, at the June 13, 2006 status, after ECLG plaintiffs explained that the stay was prejudicing some plaintiffs who are experiencing financial distress as the result of delay and/or Ameriquest's conduct, the Court offered to hear motions based on specific financial hardships. The Court said, "My suggestion is that if you have those kind of situations, you deal with them on an ad hoc basis; you don't need a status call for that. File the appropriate motion and give the defendant

---

[5]The only other "motion practice" is defendant's simple, routine, agreed motion for leave to join A Title Escrow. This could be filed next week.

9

a chance to respond and we will deal with it." (Exhibit C, pp. 13-14). The Talleys have simply followed that instruction. If other specific plaintiffs are facing financial hardship and prejudice from the stay, they should come before the Court individually.

Ameriquest is not authorized to speak for any plaintiffs. Ameriquest does not represent any plaintiffs (despite the great compassion it purports to have).

In any event, Ameriquest did not at all explain or develop its vague argument heading that lifting the stay as to the Talleys will "unfairly prejudice scores of other litigants." (Defs' Resp., p. 8). It mentions the existence of similar cases but explains no further. (Id.). Perhaps Ameriquest is really concerned that the Talleys, through moving for summary judgment, will place into the public court record, for this Court and all parties to see, the actual and dispositive evidence that the Ameriquest gave the Talleys only incomplete notices of right to cancel.[6] But that would not be the kind of "prejudice" that Ameriquest has a right to avoid. Perhaps Ameriquest is concerned that another summary judgment victory against Ameriquest will raise the settlement values of the individual cases Ameriquest wants to dispose of in mediation. Perhaps Ameriquest wants to prevent this Court from seeing or hearing any evidence of its wrongdoing. But none of these concerns constitutes true "prejudice."

### A. The Court, Were it To Decide Talley, Would Not Be Deciding Legal Issues that Would Unfairly Impact Other Cases

Ameriquest argues that a substantive ruling in the Talley case would somehow

---

[6]This, however, is not the only TILA violation for which plaintiffs would seek summary judgment, as Ameriquest's response implies. (Pp. 7-8). The TILA disclosures were all misdated due to Ameriquest's practice of changing disbursements after closing. Plaintiffs would also seek summary judgment on two other TILA violations that are currently on appeal in the Seventh Circuit, but they understand that the Court would want to wait to decides those grounds until after the Seventh Circuit has ruled.

prejudice other plaintiffs who assert the same or similar causes of action, especially the same alleged violations of TILA. (Defs' Resp., p. 9). However, the Talley's allegation of having receiving all blank notices of right to cancel is a well-established cause of action; that is to say, there is no novel, legal issue that the Court would be called upon to address. Further, it is a claim the proof of which is extremely fact-intensivet depends on what occurred at the particular closing. Those cases in the MDL that do not settle are going to have to be disposed of on summary judgment or at trial on the basis of facts.

Further, the Talley's second ground for TILA rescission - that all TILA disclosures Ameriquest gave the Talleys were misdated because Ameriquest changed the disbursements of the loan after closing and without giving the Talleys an opportunity to review the changes - is an issue that is raised in only a very small number of MDL cases, all of which have been brought by plaintiffs represented by ECLG. Thus, although the Court will have to decide whether this was in fact a violation, the issue will only affect a small number of individual cases within the MDL.[7] The ECLG plaintiffs believe that Talley is a particularly dramatic and harmful example of Ameriquest's practice.

Both Ameriquest's and the "cooperating plaintiffs'" ( at p. 2) concern that a ruling in the Talley case could have collateral estoppel affect on other cases is easily addressed. The Talleys respectfully suggest that the Court simply allow any plaintiff, group of plaintiffs or any defendant who wishes to be heard - on a dispositive legal issue or a legal interpretation of a specific lending practice - an opportunity to file a concise brief on the issue. In other words, the answer to

---

[7]The final two TILA violations that the Talleys allege are on appeal. These issues have already been briefed in several cases; thus, there is no risk of prejudice by allowing the parties to brief them here.

11

this concern is not to simply continue the stay indefinitely but to figure how fairly to proceed with litigation so that the Talleys' hardship can end.

## IV.    THE TALLEYS MAY WIN ON SUMMARY JUDGMENT

There is absolutely no requirement, on a motion to lift a stay, for the Talleys to show that they are likely to prevail on the merits; to the extent this is Ameriquest's argument, it proffers zero authority for the proposition. (A motion to lift a stay does not require the same showing as a motion for preliminary injunction.)

Nevertheless, just as Ameriquest did not bother to respond to the Talley's settlement offer, Ameriquest's counsel apparently did not bother to familiarize themselves with the evidence of record in the Talley case. If they had, they would not so cavalierly assert, without any references to evidence, that "the Talleys misrepresent the strength of their supposed evidence on summary judgment." (Defs' Resp., p. 10).

In fact, based on the evidence and the evidence alone, there is no dispute that the Talleys, at their closing, received all blank notices of right to cancel from Ameriquest's closing agent. Beyond the plaintiffs' documents and their own testimony about the notices of right to cancel they received, as shown below Ameriquest's own closing agent testified that he always gave undated notices! Thus, the Talleys' counsel have more than enough evidence to overcome the mere, "rebuttable" presumption of proper disclosure created by the completed notice of right to cancel contained in Ameriquest's file. 15 U.S.C. § 1635(c) (Defs' resp., p.12); In Re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation, MDL No. 1715, Lead Case No. 05-CV-7097, p. 7 (N.D.Ill., May 30, 2006)(Aspen, J.). In its response to the Talleys' motion, Ameriquest once again, for the second time in this MDL proceeding, "mistakenly suggests that these completed forms with

12

signed acknowledgments foreclose the possibility of Plaintiffs' success." (Id., p. 7). If Ameriquest's counsel were familiar with the testimony of its own closer, who repeatedly admitted giving all blank notices, Ameriquest would understand that discovery and the evidence has evolved way beyond the point where Ameriquest can simply stand on the completed copy of the NORTC that appears in its file. (Defs' resp., p. 12).

   To prevail, plaintiffs "will be required to show that Ameriquest delivered NORTCs that omitted the rescission deadline." In Re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation, MDL No. 1715, Lead Case No. 05-CV-7097, p. 4. During discovery, the Talleys' counsel (not Ameriquest, by the way) issued two subpoenas to A Title Escrow, Inc. A document subpoena was for the closing agent's file for the Talley's transaction. A subpoena for deposition was for the person who closed and disbursed the Talley loan. The complete loan file was produced, but the Talleys had to obtain a rule to show cause Order from Judge Darrah before Sean McKee, the president and the closer for the Talley loan, appeared for his deposition. Mr. McKee's full testimony is attached as Exhibit D.

   After testifying that he was the closer for the Talleys' Ameriquest, and under questioning by Ameriquest's own counsel, Mr. McKee admitted repeatedly that it was "never" his practice to

deliver notices of right to cancel with the transaction and cancellation dates filled in, as follows:

> Mr. Ledsky:  If you ever encountered these two boxes being blank [the transaction and cancellation boxes on the notice of right to cancel], would you ever then go through the copies of the documents being left with the borrowers and fill in the blanks in those copies with the dates that you were filling in for the lender copy?
>
> Mr. McKee:  No, I wouldn't. I wouldn't go through the borrower's copies.

13

Q:     Yes.

A:     No, sir.

Q:     Wouldn't you think it was important for the borrowers to know the final date they had to cancel that you were inserting on the lender copy? Wouldn't you think it was important for them to know on the borrower copy you were leaving behind?

A:     ...I didn't get onto their copy of the document.... (Pp.70, line 18 – p. 71, line 15).

And again:

Q. Would you ever fill in those corresponding dates on the customer copies on the notice of right to cancel?

A. No, sir.

Q. You never did that?

A. No, sir.

Q. Even though this was a very important document?

A. No, sir.

Q. Even though you were leaving two copies with the borrower?

A. No, sir.

Q. I have no further questions.  (P. 79, line 22 – p. 80, line 10).[8]

        Mr. McKee also testified that he, when he looked through closing documents prior

to going to a closing, he did not look to see if the notice of right to cancel forms had the dates

---

[8] When questioned by plaintiffs' counsel, Ameriquest's closer gave the same testimony. For instance:

Ms. Combs:  So you wouldn't put any writing on any copies [of the notice of right to cancel] given to the customer?

Mr. McKee:  No.  Unless as I had stated before, they specifically asked for a copy of the signed package.  (P. 26, lines 12 – 16).

inserted in the boxes. (Pp. 75, line 22 – p. 76, line 2.). He testified that he never filled in the dates

on the notices of right to cancel before going to a closing and that no one in his office did. (P. 79,

line 11 – 17). He also testified that he tried to get the customer to fill in the dates. (Pp. 77, line 24

– p. 78, line 16). But none of the notices of right to cancel in the Talleys' possession have dates in

the boxes. He also testified that he did not recognize the handwriting of the cancellation date

scrawled on the notice of right to cancel contained in Ameriquest's file. (p. 22, lines 8-12). The

Talleys would testify that the handwritten date is not theirs. In light of the rest of his testimony, this

raises the question of whether someone at Ameriquest filled in the cancellation date after closing to

make it appear that the notices of right to cancel had been properly executed.

There is also no dispute, based on the all the evidence of record, that Ameriquest

delayed the funding of the Talley loan until six weeks after closing and that, when they did fund it,

Ameriquest changed the disbursements from what had been disclosed to the Talleys. The delay

damaged the Talley's credit and forced them to pay increased interest to creditors. Ameriquest's

closing and disbursing agent testified in detail concerning the different HUD-1 Settlement

Statements that were prepared for the Talley transaction. Mr. McKee authenticated all of the

documents plaintiffs need to prove that the disbursements changed and why. He even testified that

it was such a common practice for Ameriquest to change disbursements, so much so that "I quit

dealing Ameriquest." (P. 64, line 1 – p. 65, line 7; p. 19, line 17 – p. 20, line 17). The Talley's

counsel have obtained Ameriquest training documents that explain why the disbursements changed

so frequently between closing and funding. The documents are subject to a protective order and so

cannot be described in or attached to this motion.

15

## V.     THE TALLEYS HAVE NOT BREACHED ANY AGREEMENT AMONG COUNSEL OR PARTIES

Defendants imply that they had a good faith mediation agreement worked out with ECLG and that the latter, betraying good faith, are somehow breaching that agreement by proceeding with the Talleys' motion to lift the stay. (Defs' Resp., p. 5). Such false allegations are unfortunate and may damage future negotiations. But the mirage defendants paint quickly disappears before the facts. On September 8, 2006, the Talleys sent a written settlement to defendants (Appendix C to the Talleys' motion). Ameriquest never bothered to respond. At the in-person meeting among ECLG and Ameriquest counsel that took place at ECLG's offices on September 14, 2006, the Talley settlement demand was raised. The purpose of the meeting was to reach agreement on a mediation procedure. Despite assurances by Ameriquest counsel that it would give the Talley's settlement offer priority attention, they did not bother to follow up. The Talleys and their counsel all along stressed the urgency of their situation. Among other things, it is clear that, well before there was an agreement as to a mediation procedure, the Talleys indicated that if settlement could not be reached, they would seek a lifting of the stay. Despite ambiguous, equivocating statements in its response brief ("Ameriquest was actively negotiating with ECLG on a method of resolving the Talley case through the mediation process"), Ameriquest made no effort whatsoever to resolve Talley. (Defs' Resp., p. 6). It did not even design to communicate regarding Talley.

## VI.     THE TALLEYS DO NOT WANT TO PARTICIPATE IN THE AG SETTLEMENT

Ameriquest argues, foolishly, that the stay should not be lifted because the Talleys should have an opportunity to participate in the AG Settlement. Again, Ameriquest's sincere kindness is appreciated. But, in case Ameriquest doesn't understand what's going on here:  the

16

Talleys do not want to participate in the AG Settlement. They are not going to. They will not opt-in when they receive notice. They have already - by virtue of aggressively pursuing their claims in private litigation - excluded themselves. And wisely: according to the Illinois AG's office, in Illinois the maximum that any Ameriquest borrower will see from the AG Agreement is less than $1,000! (See Exhibit E). On the other hand, the Talleys have now paid to Ameriquest approximately $112,000 in finance charges. If they prevail, Ameriquest will have to refund it to the Talleys.

## V.      CONCLUSION

For all of the reasons stated above, plaintiffs Terry and Cheryl Talley respectfully request that this Court lift the stay as to their individual case.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, IL 60603
(312) 739-4200/(312) 419-0379 (FAX)

17