# EXHIBIT D

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION
4  TERRY TALLEY and CHERYL TALLEY,   )
5       Plaintiffs,      )
6    vs.            ) No. 05 C 1080
7  AMERIQUEST MORTGAGE COMPANY,    )
8  DEUTSCHE BANK NATIONAL TRUST    )
9  and AMC MORTGAGE SERVICES, INC.,  )
10       Defendants.      )
11        The discovery deposition of K. SEAN
12  McKEE, called for examination, taken pursuant to
13  the Federal Rules of Civil Procedure of the United
14  States District Courts pertaining to the taking of
15  depositions, taken before DANA L. SHAPIRO, CSR NO.
16  84-3597, a Notary Public and Certified Shorthand
17  Reporter, of the State of Illinois, taken at Suite
18  1800, 120 South LaSalle Street, Chicago, Illinois,
19  on the 23rd day of January, A.D. 2006, at 10:15
20  a.m.
21
22
23
24

Page 2

1  PRESENT:
2
3    EDELMAN, COMBS, LATTURNER & GOODWIN, LLC,
4    (120 South LaSalle Street, Suite 1800,
5    Chicago, Illinois 60603,
6    312-739-4200), by:
7    MS. CATHLEEN M. COMBS;
8       appeared on behalf of the Plaintiffs;
9
10    VARGA BERGER LEDSKY HAYES & CASEY,
11    (224 South Michigan Avenue, Suite 350,
12    Chicago, Illinois 60604,
13    312-341-9400), by:
14    MR. JONATHAN N. LEDSKY,
15       appeared on behalf of the Defendants.
16
17
18
19
20
21
22
23
24  REPORTED BY: DANA L. SHAPIRO, CSR NO. 84-3597.

Page 3

1        (WHEREUPON, the witness was duly
2  sworn.)
3    K. SEAN McKEE,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6        EXAMINATION
7  BY MS. COMBS:
8    Q.  Could you state and spell your name for
9  the record, please.
10    A.  Sean McKee, S-e-a-n, McKee, M-c-K-e-e.
11    Q.  Where are you employed?
12    A.  I'm unemployed at the moment.
13    Q.  How long have you been unemployed?
14    A.  Four months.
15    Q.  Prior to that where were you employed?
16    A.  A Title Escrow Company, Inc.
17    Q.  What was your job title at A Title
18  Escrow?
19    A.  The president.
20    Q.  Is that company no longer in business?
21    A.  No.
22    Q.  That was as of four months ago?
23    A.  Right, four months.
24    Q.  Why did the company cease working?

Page 4

1    A.  Basically we only had one underwriter
2  and they pulled from us.
3    Q.  Meaning one title company that would
4  insure your customers?
5    A.  Yes.  Yes.  And it was Stewart Title
6  and Stewart Title had pulled.
7    Q.  How long was A Title Escrow, Inc. in
8  business?
9    A.  It incorporated November of '01.  We
10  started doing business December -- late December
11  of '01.
12    Q.  Could you describe what's the
13  business -- what was the business of A Title
14  Escrow, Inc.?
15    A.  It was a title company.  We issued
16  policies to lenders, owner's policies to the
17  owners on real estate transactions.
18    Q.  Prior to working at A Title Escrow,
19  Inc., where were you employed?
20    A.  Northwestern Illinois Title Company.
21    Q.  Where was that business located?
22    A.  In Freeport, Illinois.
23    Q.  What was your position?
24    A.  Sales rep, closer.

1 (Pages 1 to 4)

K. SEAN McKEE     JANUARY 23, 2006

Page 5

1    Q.   So did you handle closings while you
2  were employed at Northwestern Title -- Illinois
3  Title?
4    A.   Yes, I did.
5    Q.   How long were you employed there?
6    A.   Oh, since '94.
7    Q.   During that time period -- during that
8  entire time period, were you a sales rep/closer?
9    A.   Yes.
10    Q.   Where were you employed prior to that?
11    A.   At the time I was self-employed
12  insurance agent.
13    Q.   What kind of insurance?
14    A.   Property, casualty, life and health.
15    Q.   Did you work out of Freeport?
16    A.   No.  Actually it was south of the Quad
17  Cities.  The name of the town was Oquawka,
18  O-q-u-a-w-k-a, Illinois.
19    Q.   How long were you a self-employed
20  insurance salesman in Oquawka, Illinois?
21    A.   Four years.
22    Q.   Prior to that, where were you employed?
23    A.   I was in the finance field, couple
24  banks and mortgage brokering.

Page 6

1    Q.   Immediately prior to being
2  self-employed as an insurance agent, where were
3  you employed?
4    A.   There was a time there where actually
5  probably was it from '90 maybe to the fall of '93
6  and I helped take care of my parents.
7    Q.   You were not employed --
8    A.   '90 to '93.  In that period, right.
9    Q.   Prior to '90, where were you employed?
10    A.   I was down in Fort Lauderdale, Florida,
11  and I'm sorry I can't give you the name of the
12  brokerage I was at.  I was at Savings of America
13  and I was assistant branch manager.
14    Q.   How long were you in Fort Lauderdale?
15    A.   I was down there approximately six
16  years.
17    Q.   So that gets us back to 1984
18  approximately?
19    A.   Right.
20    Q.   Where were you employed then?
21    A.   In 1984?
22    Q.   Yes.
23    A.   At Bank of Pecatonica,
24  P-e-c-a-t-o-n-i-c-a, and that was in Pecatonica,

Page 7

1  Illinois.  Do you want me to spell it again?
2    Q.   What were your -- what was your
3  responsibility at Bank of Pecatonica?
4    A.   I was real estate loan manager.
5    Q.   How long did you have that position?
6    A.   Since 1979 maybe.
7    Q.   Prior to that, where were you employed?
8    A.   I worked at the Bank of Pecatonica as a
9  teller from '75.  I was just a teller.
10    Q.   Prior to that, where were you employed?
11    A.   I was in school.
12    Q.   Where did you attend school?
13    A.   Pecatonica High School.
14    Q.   Did you have any post high school
15  education?
16    A.   Some night classes at a community
17  college in Freeport, Illinois, Highland Community
18  College.
19    Q.   What was your area of study?
20    A.   Business.
21    Q.   Let's talk about A Title Escrow
22  Company.
23    A.   Okay.
24    Q.   How many employees did you have -- what

Page 8

1  was the maximum number of employees at A Title
2  Escrow?
3    A.   50.
4    Q.   50.  What year did you have 50
5  employees?
6    A.   '03 and '04.  Excuse me.  Probably
7  started around '04 into '05.  I'm sorry.  We
8  switched to a new year.
9    Q.   How many employees did you have in
10  September of 2003, if you recall?
11    A.   30.
12    Q.   Again, focusing on September of 2003.
13  What kinds of categories did those employees work
14  in?
15    A.   It went from searching to commitments,
16  policy -- policies, closing preparation, funding
17  the actual closer's sales reps.
18    Q.   How many closers did you have in
19  September of 2003?
20    A.   Six.
21    Q.   Did you handle closings all over
22  Northern Illinois?
23    A.   All through Illinois, Iowa, Wisconsin.
24    Q.   Did you yourself act as a closer at

2 (Pages 5 to 8)

K. SEAN McKEE     JANUARY 23, 2006

Page 9

1  closings during -- in the year 2003?
2      A.  Yes, I did.
3      Q.  How many closings did you handle in the
4  year 2003, if you could give me an estimate?
5      A.  I couldn't even give you a ballpark.
6  We did -- at that point in time we were probably
7  doing 300 closings a month, 30 to 50 say.
8      Q.  So yourself would handle --
9      MR. LEDSKY:  Object.  I'm not sure I
10  understood your answer.  Was it 30 or 50 a month?
11      THE WITNESS:  Myself I would do probably
12  between 30 and 50.  At that time the company
13  itself was doing like 300.
14  BY MS. COMBS:
15      Q.  A month?
16      A.  A month.  Roughly 10 to 15 percent.
17      Q.  Did you ever do closings in people's
18  homes?
19      A.  Yes.
20      Q.  Did you ever do closings in people's
21  homes when Ameriquest was the lender?
22      A.  Some we did.
23      Q.  Did you look at any documents before
24  you came here today?

Page 10

1      A.  No, I did not.
2      Q.  Did you speak with anybody about the
3  deposition today?
4      A.  No.
5      MR. LEDSKY:  Off.
6      MS. COMBS:  Off the record and you can do
7  this.
8          (WHEREUPON, said document was
9          marked McKee Deposition
10          Exhibit No. 1, for
11          identification, as of 1/23/06.)
12      MS. COMBS:  Back on the record.
13  BY MS. COMBS:
14      Q.  I'm handing you a set of documents that
15  are marked as Exhibit 1.
16      A.  Yes, ma'am.
17      Q.  I'd ask you to look at this set of
18  documents.  And I will note for the record these
19  were documents produced by Ameriquest, and they
20  are documents -- if you want to go ahead and
21  review this document, and while you are reviewing
22  it, my question for you is, did you handle the
23  closing?
24      A.  This looks like one that I had done.

Page 11

1      Q.  What document are you looking at now
2  when you answer the question?
3      A.  I went to the mortgage.
4      Q.  On the bottom of the page there is a
5  number.
6      A.  I'm sorry.  A-0019.
7      Q.  Let me just.  What is this document?
8      A.  It was the notary page to the mortgage.
9      Q.  Is that your signature above the space
10  that says Notary Public?
11      A.  Yes.
12      Q.  Is that your handwriting in the rest of
13  the document?
14      A.  The signature is mine, and it looks
15  like one of the girls might have filled in my
16  notary.
17      Q.  The 2/19/06 date where it says
18  commission expired is not your handwriting?
19      A.  No, that is.
20      Q.  Is the September 30, 2003 your
21  handwriting?
22      A.  No.
23      Q.  Then you are saying that where it says,
24  "I, K. Sean McKee"?

Page 12

1      A.  Yes, McKee.
2      Q.  I'm sorry.  Is that not your
3  handwriting?
4      A.  No, it is.
5      Q.  All of the handwriting on page A-19, is
6  that yours?
7      A.  No, the Terry C. Talley and Cheryl C.
8  Talley --
9      Q.  Are not?
10      A.  -- are not.
11      Q.  Stevenson for Stevenson County, is that
12  yours?
13      A.  Yes.  "I, a notary.  I, K. Sean McKee"
14  is.  The Talleys, Terry C. and Cheryl C. Talley
15  are not.
16      Q.  All right.  Now, do you recall what
17  procedures you followed -- do you remember this
18  deposition at the Talleys -- do you remember this
19  deposition -- I mean strike that.  Let's start all
20  over.
21          Do you remember the closing on
22  September -- well, it says 30, 2003 involving
23  Terry C. Talley and Cheryl C. Talley?
24      A.  I do not.  There was just so many

3 (Pages 9 to 12)

K. SEAN McKEE    JANUARY 23, 2006

Page 13

1  closings that transpired.
2      Q.  Do you remember a closing in Franklin
3  Grove, Illinois?
4      A.  I do not.
5      Q.  Do you remember where Franklin Grove
6  is?
7      A.  Yes.
8      Q.  Where is Franklin Grove?
9      A.  It's in the Chicago area. We would
10  travel. I might start out that morning in
11  Wisconsin closing and wind up down in the Chicago
12  area or even driving all the way to St. Louis so.
13      Q.  So you don't recall --
14      A.  I do not.
15      Q.  Is it fair to say though looking at
16  Exhibit A-19 that you would have actually
17  witnessed the signing by Terry Talley and Cheryl
18  C. Talley?
19      A.  The way the documents look, yes.
20      Q.  Is it your practice as a notary to
21  notarize documents when you don't see the --
22      A.  It's not a practice.
23      Q.  Does it occur?
24      A.  It has. At some point a document might

Page 14

1  get missed at the signing itself. We will
2  overnight it, and then notarize it as it comes
3  back, and usually there is ID with the file then
4  too. But it's not a standard practice, no, it's
5  not, to answer your question.
6      Q.  Do you recall what your practices were
7  with respect to the handling of documents at a
8  closing for Ameriquest in September 2003?
9      A.  How I would conduct a closing?
10      Q.  Yes. What was your practice?
11      A.  Ameriquest would send over their
12  numbers. We would do a settlement statement,
13  prepare our docs as far as what the title company
14  needs for their file. Ameriquest would either
15  e-mail the bank package to us or sometimes we
16  would wind up just going by their office and
17  picking a package up, get the package, go to the
18  customer's home, just briefly go through the
19  customer, you know.
20      Q.  What would be contained in the package
21  from Ameriquest? Let's assume that the documents
22  were e-mailed. What would be e-mailed? Would
23  there be multiple copies of the mortgage e-mailed
24  to you?

Page 15

1      A.  It would be one copy of their full bank
2  package, which would consist of their note, their
3  disclosures, their mortgage.
4      MS. COMBS: Excuse me. Sorry. Let's go off
5  the record.
6          (WHEREUPON, there was a short
7          interruption.)
8      MS. COMBS: Back on the record.
9  BY MS. COMBS:
10      Q.  You said that an e-mailed bank package
11  would include a note, their disclosures. What
12  else?
13      A.  Mortgage, sometimes good faith, the
14  final application. I mean I can't tell you every
15  document that was in there because their package
16  is quite --
17      Q.  If the documents were e-mailed by
18  e-mail -- I'm having a hard time this morning --
19  by Ameriquest, what would your firm do in order to
20  prepare the documents for closing?
21      A.  All we really needed to do at that
22  point was to retrieve it from the e-mail, print
23  it, and either we would print one copy and then
24  they would run a copy of it on the copy machine or

Page 16

1  they would print two copies.
2      Q.  So when you went to a closing, you
3  would take two complete copies?
4      A.  Yes, ma'am.
5      Q.  What was your practice as to how you
6  handled those documents at the closing?
7      A.  While one copy went to the customer
8  and -- unsigned, and then we would conduct the
9  closing, go through the documents and get them
10  signed, initialled with the actual bank package.
11      Q.  Now, so is it your testimony that at
12  the closing the documents that you left with the
13  customer would not be signed -- signed documents?
14      A.  Yes, ma'am.
15      Q.  After the closing, did you make any
16  copies of the documents for anyone?
17      A.  There were some customers that would
18  ask us, you know, say it was -- a lot of our stuff
19  was dec consolidations, cashouts. So there was
20  checks that were overnighted back to the
21  customers. And there were some customers if they
22  asked to get a copy of the signed package, we
23  would go ahead, go back to the office, run a copy
24  of the signed package and send it back with their

4 (Pages 13 to 16)

K. SEAN McKEE     JANUARY 23, 2006

Page 17

1   funding checks. That didn't happen all of the
2   time.
3       Q.   Assume that for purposes of my
4   questions that the customer did not ask for signed
5   copies. What were your procedures when you got
6   back to the office --
7       A.   At that time?
8       Q.   -- after the closing? Yes.
9       A.   Go back, you had a three-day rescission
10  period, we would wait that, wait for our wire, and
11  they had people that would tear the file down
12  and -- the original file, get it overnighted back
13  to the lender, in this case being Ameriquest, and
14  they went right to whichever branch it was. They
15  would have the original docs.
16      Q.   What do you mean when you say that
17  "they would tear down the file"?
18      A.   Well, basically all they do is they go
19  through, get the signed copy of the HUD and
20  everything and take the bank package, just we had
21  a little checklist is all, kind of generic, and
22  they would check to make sure that the documents
23  were there, that was for the checklist. Then it
24  just went in an overnight and back to the branch.

Page 18

1       Q.   Did anyone keep copies for A Title
2   Escrow?
3       A.   Yes, there is copies. We got where I
4   would have them run a copy of the signed package
5   and put it into the file.
6       Q.   Did you make any other copies for
7   anyone else -- was it your normal practice to make
8   any copies for anyone else?
9       A.   No, only if it was requested.
10      Q.   Again, referring back to the Exhibit
11  1. Do you recognize the first page, page A1 of
12  that document?
13      A.   Yes, I do.
14      Q.   What's that page?
15      A.   That's my wiring instructions.
16      Q.   Is this a document that's prepared by A
17  Title Escrow?
18      A.   It looks like one that they just
19  inputted into our system and would print out.
20      Q.   So this would be a document that was
21  printed from A Title Escrow's computer system?
22      A.   Yes. Then what we did was we would
23  forward that, as I said, the lenders to receive
24  our funds, and in this case being Ameriquest.

Page 19

1       Q.   Have you had an opportunity to review
2   the complaint that was filed here in this Talley
3   case?
4       A.   No, I have not.
5       Q.   Looking at document A2, do you
6   recognize this document?
7       A.   No.
8       Q.   Is this -- so this is not a document
9   that --
10      A.   A2 would have been from Ameriquest's
11  branch.
12      Q.   So you don't recognize the handwriting
13  on that document?
14      A.   No.
15      Q.   Now, if you could look -- I'm going to
16  digress a little bit.
17          Do you recall whether or not it would
18  frequently occur that Ameriquest's loans would not
19  fund right away?
20      A.   No, they didn't. A lot of theirs
21  didn't fund on the day it was to fund.
22      Q.   You are saying in fact it was --
23      A.   It might be -- there is a three day
24  rescission, that's excluding your weekends, but

Page 20

1   including Saturday and excluding holidays. But it
2   could be on some of them would run out like five
3   days or so.
4       Q.   But did you have any experience
5   where -- did you notice, for example, that it
6   might take weeks or months before an Ameriquest
7   loan funded?
8       A.   No, the longest it ever took that I can
9   remember is maybe a week and a half to two weeks
10  to fund. I wouldn't fund it. If it went out, you
11  know, like you just stated months, I wouldn't fund
12  it. We would have to go through the whole
13  process. I would make -- I would want a new bank
14  package and everything.
15      Q.   So that was your practice?
16      A.   Yes. I mean I would allot a few days
17  there, but that was it.
18      Q.   All right. If you could look at page
19  A20.
20      A.   The truth and lending disclosure.
21      Q.   Right. At the bottom it has dates next
22  to the signatures of Mr. and Mrs. Talley. Is the
23  handwriting for the dates on this document in your
24  handwriting?

5 (Pages 17 to 20)

K. SEAN McKEE    JANUARY 23, 2006

Page 21

1    A.   I don't believe so.
2    Q.   What was your practice with respect to
3    the dating of documents?
4    A.   There was times when, you know, a date
5    would get missed or something and we would go
6    ahead and put that in.
7    Q.   You mean after the fact?
8    A.   Yes.
9    Q.   But generally was it your practice
10   to --
11   A.   To get it signed and dated all at the
12   table with the customer, yes.
13   Q.   What was the date of this closing, if
14   you can tell from the documents?
15   A.   Looks like September 30.
16   Q.   What are you referring to to establish
17   that?
18   A.   I was looking at the date, the upper
19   right-hand corner of the truth and lending
20   disclosure.
21   Q.   On what page is that?
22   A.   That's -- I'm sorry.  A20.  Looking at
23   A3, which is your note, September 3 -- 30, '03.
24   Q.   Now, if you could look at page A29.

Page 22

1    A.   Okay.
2    Q.   Do you recognize the form of this
3    document?
4    A.   Yes, I do.
5    Q.   What's this document?
6    A.   Your right to cancel, right of
7    rescission.
8    Q.   You will note that the box that's
9    titled "entered to document signing date" has a
10   handwritten date in it.  Do you recognize the
11   handwriting on that?
12   A.   No, I do not.
13   Q.   Was it your practice to fill in the
14   dates on the notice of right to cancel?
15   A.   On some lenders, yes.  Usually on these
16   a lot of times they were already all filled in.
17   Q.   Was it typical for an Ameriquest
18   Mortgage to -- Ameriquest closing that the notice
19   of right to cancel, the date of the transaction
20   would have been filled in by hand?
21   A.   Yes.
22   Q.   Do you know who would normally have
23   entered that date?
24   A.   Well, this looks like it would have

Page 23

1    been done either through our office or right at
2    the closing table.
3    Q.   Is this --
4    A.   A lot of the lenders it's already typed
5    into the actual form.
6    Q.   The 9/30 under entered document signing
7    date in the box, you have already testified that's
8    not your handwriting?
9    A.   No.
10   Q.   Would anyone else have entered that
11   date in the closing?
12   A.   The customer, the customer would.
13   Q.   You would have the customer enter in
14   the document signing date?
15   A.   The date.
16   Q.   Then what about the final date to
17   cancel?
18   A.   I can't honestly tell you on that.
19   Ameriquest, if I remember correctly, it's been --
20   you have got to excuse me, it's been so long since
21   we even dealt with Ameriquest.  I'm trying to
22   think.  It doesn't look like in this case.  We had
23   a lender, and I can't honestly say if it was
24   Ameriquest or what, that they would wind up doing

Page 24

1    a seven day rescission period instead of the
2    regular three business days, but in this case here
3    it does not.
4    Q.   Okay.  What was your practice with
5    respect to the signing of the notice of right to
6    cancel?  How did you handle that document?
7    A.   Basically I would just go through --
8    as myself as a closer just go through, explain
9    this is a right to cancel, giving you in this case
10   the three business days to refuse, and you can do
11   so by either contacting the lender, your loan
12   officer, a processor that might have worked
13   with or by faxes, and then usually give the
14   customer, which in this case would be the Talleys,
15   our fax number so if they would want to cancel
16   within the period of time, they could go ahead and
17   sign, date, prior to, and fax as long as it's
18   midnight of that day.
19   Q.   Now, if you look at the next page,
20   A30.  Do you recognize that document?
21   A.   Not right off the top of my head.
22   Q.   Do you see the title of it is one week
23   cancellation period?
24   A.   Yes.

6 (Pages 21 to 24)

K. SEAN McKEE    JANUARY 23, 2006

Page 25

1    Q.  Is this the document that you were
2  referring to when you said Ameriquest would
3  give --
4    MR. LEDSKY:  Object as mischaracterizing his
5  prior testimony.  He said he thought some lenders
6  might have done it, but I don't know he identified
7  Ameriquest.
8  BY THE WITNESS:
9    A.  I believe some had, but I didn't know
10  specifically if America was one.
11  BY MS. COMBS:
12    Q.  Okay.  All right.  How did you handle a
13  payout if the lender gave a one week cancellation
14  period?
15    A.  We never received our funds until it
16  was usually the day after -- say it was coming out
17  of rescission, midnight today being the 23rd, we
18  would not receive our funds until the 24th.
19  Okay.  In our bank, our bank would notify us.
20  Then if we had not received the actual note of
21  right to cancel and it not be signed and dated,
22  which is in the middle of the body of this, then
23  we would go ahead and fund.
24    Q.  Again, going back to A29.  If the

Page 26

1  numbers on the notice of right to cancel were not
2  filled in, your testimony was that you would in
3  some instances fill in the dates at the closing,
4  correct?
5    A.  Sometimes we would, yes.
6    Q.  If you do so, would you also fill in
7  the dates on the copies that are given -- that
8  were given to the customer?
9    A.  No, because the copy that the customer
10  got was not executed at all with dates, signatures
11  or anything.
12    Q.  So you wouldn't put any writing on any
13  copies given to the customer?
14    A.  No.  Unless as I had stated before,
15  they at the closing specifically asked for a copy
16  of the signed package.
17    Q.  Now, if you could open this document to
18  the -- never mind.
19    MS. COMBS:  Could I mark this as Exhibit 2.
20      (WHEREUPON, said document was
21      marked McKee Deposition
22      Exhibit No. 2, for
23      identification, as of 1/23/06.)
24  BY MS. COMBS:

Page 27

1    Q.  Okay.  You have been handed what's been
2  marked as Deposition Exhibit No. 2.  I'm going to
3  tell you that these are the set of documents that
4  our clients, the Talleys, received at closing.
5    MS. COMBS:  However, I will note for the
6  record that we stamped numbers at the bottom so
7  they are easier to handle, John.
8  BY MS. COMBS:
9    Q.  So I would like you to look at what has
10  been marked as ECL&G 37.  Do you recognize
11  that -- the form of that document?
12    A.  Yes.
13    Q.  It's the notice of right to cancel?
14    A.  Yes.
15    Q.  Do you see that it -- there is no
16  document signing date entered in the box on the
17  top half of the document and there is no enter
18  final date to cancel in the cancellation box.  Do
19  you see that?
20    A.  Yes.
21    Q.  Do you have any explanation for why
22  those dates are not filled in on this notice of
23  right to cancel?
24    A.  We hadn't got to the closing yet.

Page 28

1    Q.  Pardon?
2    A.  We hadn't gotten to the closing yet.
3    Q.  I don't understand.
4    A.  If this was e-mailed to us, it would
5  have been unsigned.  So we would have just ran a
6  copy for the Talleys of an unsigned package, so no
7  dates would have been executed.
8      Now, this didn't happen a lot, but
9  there was times where Ameriquest would go ahead,
10  and there is other lenders that would overnight us
11  bank packages, and have, you know, a folder.
12  These are customer's copies.  It's pretty well
13  stopped now with the computers where they have
14  gotten.  So I can't honestly tell if this might
15  have been a package that was overnighted to our
16  office.
17    Q.  So if you had a package that was
18  overnighted to you and the lender's documents were
19  separated from the customer's documents, what was
20  your practice with respect to the customer's
21  documents?  Would you just give them the entire
22  package?
23    A.  What it was -- it was in say a folder
24  with two sleeves, and usually on the right side

7 (Pages 25 to 28)

K. SEAN McKEE    JANUARY 23, 2006

Page 29

1  there was a customer copy from the lender on the
2  right side, the copy to be executed on the
3  left side, and we would take a binder clip, get it
4  signed, put our binder, get all of our docs
5  signed, that was on the left side, put a binder
6  clip on, throw that in the car and pass the folder
7  over to the customer.
8      Q.   Now, if you will notice in again
9  Exhibit 2, ECL&G 37, 38, 39, 40, 41 are all
10  notices of right to cancel unexecuted with no
11  document signing date and no final date to
12  cancel. Do you have any explanation for that?
13      A.   Each customer gets two copies and then
14  the lender keeps a copy.
15      Q.   So it's not unusual for the customer to
16  get five copies?
17      A.   No.
18      Q.   Okay.
19      A.   You see, each lender is a little
20  different. Some of them they only give you one in
21  the package. The customer always needs one of
22  these, just due to the fact of the cancellation.
23  Some lenders they gave you a slug of them, half a
24  dozen.

Page 30

1      Q.   Was it the practice of A Title Escrow,
2  Inc. to make more than -- to make five copies of a
3  notice to right to cancel to give to the customer?
4      A.   No. If it wasn't in the package
5  all -- if we pulled -- retrieved from our e-mail,
6  okay, we would just take this whole package, stick
7  it in and run a copy of it. So if there was five
8  or six of them in the package, they got five or
9  six copies of that document, otherwise they only
10  got one.
11      Q.   If you look at ECL&G 42, 43 to 46,
12  there are five -- is it fair to say there are five
13  copies of the one week cancellation period note
14  document?
15      A.   Yes.
16      Q.   Again, was it the practice of A Title
17  Escrow, Inc. to make five copies if the documents
18  were e-mailed from the lender?
19      A.   Yes.
20      Q.   Let me rephrase that. That was not
21  clear.
22          If the documents were e-mailed from the
23  lender and they contained five copies, then the
24  customer would get five copies, correct?

Page 31

1      A.   Yes.
2      Q.   If the documents were e-mailed from the
3  lender and only contained one notice of right to
4  cancel, the customer would only get one notice,
5  correct?
6      A.   Right. Whatever was in that bank
7  package coming across the e-mail, we just ran a
8  copy of the full package.
9      Q.   Now, could you review Exhibit 2 and
10  find for me the HUD-1.
11      A.   I do not see one.
12      Q.   Okay. Could you look in Exhibit 1 to
13  see if you can find the HUD-1.
14      A.   It would be in the first package. A21
15  is one of Ameriquest HUD-1's. In this first
16  package, A69, they have got another one here with
17  a different settlement date I see but unsigned.
18      Q.   Wait a minute. A69.
19      A.   Ameriquest settlement statement.
20      Q.   All right. Do you have any explanation
21  for why there would be two HUD-1's in this
22  transaction --
23      A.   Actually, if you go to A71, you have
24  got another one which is -- looks like -- you have

Page 32

1  to excuse me. I broke my glasses this morning.
2      Q.   Oh, no.
3      A.   Which looks like it's exactly like
4  A69. It's the same settlement date which -- no,
5  I can't explain any of that.
6      MS. COMBS: Off the record.
7          (WHEREUPON, discussion was had
8          off the record.)
9      MS. COMBS: Back on the record.
10  BY MS. COMBS:
11      Q.   You didn't find any other HUD-1's in
12  the package of Deposition Exhibit No. 1?
13      A.   I did not. Just the three that we had
14  discussed. There was not one through our system.
15      Q.   So if you could look at A21 and A69.
16      A.   A69 and A21?
17      Q.   Yes.
18      A.   All right.
19      Q.   Now, do you have any explanation for
20  why there would be two HUD-1's in this package?
21      A.   I do not, ma'am.
22      Q.   But is it fair to say they are two --
23  the documents are two different documents?
24      A.   They are.

8 (Pages 29 to 32)

K. SEAN McKEE    JANUARY 23, 2006

Page 33

1    Q.  A69 has a settlement date of 11/4/2003,
2  and A -- is that correct?
3    A.  Yes.
4    Q.  A61 -- A21 has a settlement date of
5  10/7/2003, correct?
6    A.  Yes.
7    Q.  A69 has a total wire of $401,000 and
8  some. And the A21 has a total wire of 399,000 and
9  some odd dollars.
10    A.  Yes.
11    Q.  Now, I'm going to hand you what's been
12  marked as Deposition Exhibit No. 3.
13        (WHEREUPON, said document was
14        marked McKee Deposition
15        Exhibit No. 3, for
16        identification, as of 1/23/06.)
17  BY THE WITNESS:
18    A.  Can I go ahead and close this one?
19  BY MS. COMBS:
20    Q.  Close it and put it aside because we
21  may need them again.
22        For the record, I have also marked
23  these as ECL&G documents 1 through 18. These are
24  documents that were also produced by the Plaintiff

Page 34

1  in this connection with this lawsuit, but they are
2  documents that she received outside of the
3  closing. I would like to point to you ECL&G page
4  3.
5    A.  All right.
6    Q.  Now, this is -- could you compare that
7  to A21.
8    A.  It's different.
9    Q.  Is it fair to say that the signatures
10  at the bottom are different, correct? Certainly
11  the one that starts out "Terry," and then kind of
12  goes off is somewhat different from the Terry on
13  A21 and ECL&G?
14    A.  Yes, it appears different, but then you
15  can go to another document and --
16    Q.  I'm not saying it's not his signature.
17  I'm saying it look likes --
18    A.  Right.
19    Q.  It's fair to say these are two
20  different documents?
21    A.  Oh, yes.
22    Q.  Also, it's fair to say that Deposition
23  Exhibit No. 3 you see, ECL&G 3 has a date next to
24  the signatures 10/6/03?

Page 35

1    A.  Yes.
2    Q.  Why is there no date next to the
3  signatures on A21? Do you have any explanation?
4    A.  I do not.
5    Q.  Do you recognize the handwriting on the
6  date on document Exhibit 3, page 3?
7    A.  No.
8    Q.  Again, if you will note there, although
9  the settlement date is 10/7/2003, the wire amount
10  is 389,958 as opposed to the other settlement date
11  of 10/7 has 399.161 for the total wire. Do you
12  have any explanation for that?
13    A.  I have none.
14    Q.  Do you know whether or not these
15  documents were -- do you know whether or not A
16  Title Escrow had any part in the document that's
17  attached as page 3 of Exhibit 3?
18    A.  I don't have any idea. No.
19    Q.  Are you aware that the Talley loan did
20  not fund until November or December of 2003?
21    A.  Just -- no. I had no idea until just
22  right now.
23    Q.  Were you aware that Mrs. Talley was
24  communicating regularly with Ameriquest about the

Page 36

1  question of why the loan had not funded?
2    A.  No.
3    Q.  Now --
4    MS. COMBS: Can you mark that as 4.
5        (WHEREUPON, said document was
6        marked McKee Deposition
7        Exhibit No. 4, for
8        identification, as of 1/23/06.)
9  BY MS. COMBS:
10    Q.  You have been handed a document titled
11  Deposition Exhibit No. 4, and it's a series of
12  documents, and I have taken the liberty also of
13  numbering them ECL&G 1 through 38. These are
14  documents produced by you in response to the
15  subpoena. Do you recognize these documents?
16    A.  Well, the overall document, not
17  specifically.
18    Q.  Were you the person who pulled the
19  documents in order to send them to us to respond
20  to the subpoena?
21    A.  No.
22    Q.  Who did that?
23    A.  A gentleman that was at the office that
24  retrieved the package itself or the file.

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

K. SEAN McKEE     JANUARY 23, 2006

Page 37

1    Q.   What was his name?
2    A.   Kevin.
3    Q.   Kevin?
4    A.   McKee.
5    Q.   Okay. Looking at page 1 of Exhibit 4.
6   Do you know who Haydas is, H-a-y-d-a-s? It says
7   "from Haydas."
8    A.   Processor from Ameriquest it looks
9   like. Because they have got it from and attention
10  Dawn, and Dawn was employed by me.
11   Q.   Do you recognize the form of this
12  document?
13   A.   Yes.
14   Q.   What's this document?
15   A.   Just our order form that we would
16  process and give to the customers.
17   Q.   Whose handwriting is on this document,
18  if you know?
19   A.   It looks like maybe Amanda Booker
20  ordered by. I'm not sure. Somebody could have
21  put her name in there.
22   Q.   Was this document prepared then by
23  Ameriquest using an A Title Escrow form?
24   A.   Yes.

Page 38

1    Q.   Then that would have been sent to A
2   Title from Ameriquest --
3    A.   Yes.
4    Q.   -- by fax?
5    A.   Yes.
6    Q.   What's the document beginning page 2 of
7   Exhibit 4 through 7?
8    A.   Our commitment to the lender.
9    Q.   What's the date that that was issued?
10   A.   September 16, 2003.
11   Q.   You are referring -- okay. Then could
12  you look at ECL&G page 8, and again, I'm talking
13  about Deposition Exhibit 4.
14   A.   Okay.
15   Q.   Do you recognize that document?
16   A.   Payoff letter.
17   Q.   Who would have prepared this document?
18   A.   This document here?
19   Q.   Yes.
20   A.   Would have been prepared by ABN Amro,
21  the lender that was getting paid off.
22   Q.   It's the payoff.
23       Now, if you could look at ECL&G 22.
24   A.   Okay.

Page 39

1    Q.   Again, is this the notary document that
2   you prepared at the closing?
3    A.   Yes, it would have just been a copy
4   that was in the other package.
5    Q.   That you would have kept for your A
6   Title Escrow records?
7    A.   Yes. Well, on this specific one, we
8   would send the documents off for the recordings.
9   Okay. This one as you can tell from ECL&G 22 has
10  been recorded, the book O311, page 1222. So we
11  would keep a copy of the recorded one due to the
12  fact when we do our update for the final policy.
13   Q.   Could you look at ECL&G page 25 on
14  Exhibit 4.
15   A.   That looks like a part of our HUD.
16   Q.   The settlement date on that document
17  shows a closing date of 11/04/03. Do you have any
18  explanation for why that date would have been
19  used?
20   A.   All that I can come up with because
21  this is not signed is for some reason did the
22  numbers change or something, you know. We get new
23  numbers. I can't honestly tell you. These are
24  just things that -- in a lot of circumstances, not

Page 40

1   just Ameriquest, all my lenders that we worked
2   with, we might get numbers a half a dozen times.
3   We might end up preparing this. The customer
4   sees, "We are only getting this much back. We are
5   paying these off." Well, that's not what they
6   want. So then we have to go and regroup
7   everything around, redo all of their numbers and
8   then it's fresh.
9    Q.   Could you look at ECL&G 27.
10   A.   Yes.
11   Q.   Do you recognize this document?
12   A.   Yes.
13   Q.   What's this document?
14   A.   It's our file ledger, what was cut out,
15  what checks were cut out from the funds that we
16  received from Ameriquest.
17   Q.   Can you tell what were the dates of the
18  checks.
19   A.   Looks like finally funded on 11/5 of
20  '03, November 5 of '03. It looks like our
21  incoming wire, which we would have received from
22  Ameriquest was $401,601.90.
23   Q.   Does this document show that checks
24  were actually issued pursuant to this in the

10 (Pages 37 to 40)

K. SEAN McKEE    JANUARY 23, 2006

Page 41

1  numbers that are listed on exhibit -- page 27 of
2  Exhibit 4?
3      A.   This is our final ledger when we cut
4  the checks. As you can see who everything was
5  payable to, to the very right of the document and
6  as you come down to the bottom showing the file
7  was in balance. It shows our payoff to Amro and A
8  Title Escrow, the appraiser, and it looks like
9  some bank cards and a check to Talleys for
10  $800.12, but this is our final one.
11      Q.   Now, up in the upper left corner of
12  that document it says November 5, '03. What does
13  that date refer to? Oh, no, looks like 15,
14  November, '03.
15      A.   Where at?
16      Q.   Upper right-hand corner.
17      A.   Here?
18      Q.   First entry, 15, November, '03.
19      A.   Mine looks like 05-November-03.
20      Q.   Do you know what that date is?
21      A.   The date that they would have funded
22  the file, the actual fund date.
23      Q.   So although the transaction date is
24  listed as 11/05/03, is it your testimony that the

Page 42

1  actual fund date was sometime in November?
2      A.   No. By looking at this -- by looking
3  at my file ledger it looks like we finally got the
4  number of November 5 of '03. All right. Then
5  that's when we did this transaction of cutting all
6  of these checks as you see on the document.
7      Q.   Then who would have sent in -- sent a
8  check of $800.12 to the Talleys?
9      A.   One of my girls in the tear down
10  funding area department and everything.
11      MR. LEDSKY: For the record, my copy of
12  Exhibit 4, page 27 does not have a date in the
13  upper left-hand corner that I can read. It's your
14  testimony that's 05-November-'03?
15      THE WITNESS: Yes, sir.
16      MR. LEDSKY: That date is the same as the
17  date as the transaction date?
18      THE WITNESS: Same as the transaction date.
19      MR. LEDSKY: Thank you.
20  BY THE WITNESS:
21      A.   See on this document, just to clarify.
22  We would have received the funds the 5th to go
23  ahead and fund this file out. Say for some
24  reason, just so you can understand the dates can

Page 43

1  be different if we were paying say real estate
2  taxes for Talley and it was too much for the
3  county, so we had to modify that check. You might
4  see this check for $800.12 as of on the 5th, but
5  in December you might see a check being payable to
6  Cook County for X amount of dollars in the balance
7  being another check being cut to Talleys for the
8  balance of that. So the way this one is it
9  balanced out that date. We did not have to go
10  back in after the fact and modify any checks for
11  anyone.
12  BY MS. COMBS:
13      Q.   So it's your testimony that the checks
14  in the Talley transaction were paid out --
15  executed on November 5, 2003?
16      A.   Yes.
17      Q.   Although the document -- the closing
18  was in September of 2003?
19      A.   Yes.
20      Q.   Reviewing your file, can you ascertain
21  which HUD-1 is the -- was the accurate HUD-1 for
22  the Talley transaction?
23      A.   No, I can't. I mean in all honesty.
24      Q.   Again, referring to your documents,

Page 44

1  Exhibit 4, there is at ECL&G 25 and 26 a HUD-1
2  that says final on it. Do you see that?
3      A.   Right.
4      Q.   Do you think it's fair to say that that
5  would be the final --
6      A.   This would have been the correct one
7  for the funding part, and why -- I'm just assuming
8  this. I'm just looking at the bottom line that
9  was cut to the Talleys of $800.12.
10      With this being the case -- it looks to
11  me the difference in the bottom lines on all of
12  these different HUD-1's is due to the fact,
13  without the calculator, is the payoffs are
14  different.
15      Q.   Based on the documents in front of you,
16  do you know whether or not the final -- strike
17  that. Let me just ask you straight away.
18      Do you know whether or not the final
19  HUD-1 was ever sent to the Talleys?
20      A.   I can't honestly tell you.
21      MS. COMBS: Can we take a quick break?
22      (WHEREUPON, a recess was had.)
23      MS. COMBS: Back on the record.
24  BY THE WITNESS:

11 (Pages 41 to 44)

K. SEAN McKEE    JANUARY 23, 2006

Page 45

1    A.   Stewart has got -- let me start over.
2  In talking with Attorney Hofeld, he wanted copies
3  of the checks that were actually disbursed out to
4  the Talleys, which I'm unable to give to him due
5  to the fact that Stewart took them for the audit
6  and has never returned them to me, Stewart Title,
7  who is my underwriter.
8  BY MS. COMBS:
9    Q.   Now, is it fair to say as you are
10 sitting here right now you do not remember the
11 Talleys' closing?
12   A.   No, I do not.
13   Q.   It's fair to say you don't remember
14 giving any particular documents to the Talleys?
15   A.   I do not, ma'am.
16   Q.   You don't know whether or not you gave
17 a completed Truth and Lending Statement to the
18 Talleys or a blank copy?
19   A.   No.
20   Q.   Is it fair to say that you could have
21 given them a blank copy?
22   A.   An unsigned document?
23   Q.   No, a notice of right to cancel that
24 did not have the dates filled in.

Page 46

1    A.   Yes.
2    Q.   You might -- that might have happened,
3  you just don't recall, correct?
4    A.   Right.
5    Q.   Then just another question. What
6  happened with A Title Escrow and Stewart Title?
7  What was the basis for the falling out?
8    A.   They said I was out of compliance with
9  them. And basically what it's boiled down to
10 is -- as you could see, this was a very new
11 company, it grew very fast, and could have been
12 very profitable for them to have as a Stewart
13 Title office, not as me as an agent. So there is
14 litigation.
15   MS. COMBS:  I don't have any further
16 questions at this point.
17   MR. LEDSKY:  I do have a few questions.
18   MS. COMBS:  John.
19   MR. LEDSKY:  Yes.
20        EXAMINATION
21 BY MR. LEDSKY:
22   Q.   Mr. McKee, my name is Jonathan Ledsky.
23 I'm the lawyer for Ameriquest Mortgage Company and
24 the other Defendants in this case. I have several

Page 47

1  questions for you. I will hopefully not plow over
2  too much ground Ms. Combs has covered, but there
3  are a few things I would like to know.
4        First of all, what's your current
5  address?
6    A.   My personal?
7    Q.   Yes.
8    A.   1502 West Frances, with an E, Street,
9  Freeport, Illinois 61032.
10   Q.   How long have you lived there
11 approximately?
12   A.   12 years.
13   Q.   It's a home that you own?
14   A.   Yes.
15   Q.   What's your Social Security number?
16   A.   Can I --
17   Q.   If I need to find you again, that's
18 all.
19   A.   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.
20   Q.   Thank you.
21   A.   Yes, sir.
22   Q.   You are here pursuant to a subpoena
23 that you received; is that correct?
24   A.   Yes, sir.

Page 48

1    Q.   Were you served that subpoena at this
2  home address?
3    A.   No, sir.
4    Q.   Where were you served that subpoena?
5    A.   I believe it was at my brother's house.
6    Q.   Do you know why someone would have
7  served you a subpoena at your brother's house?
8    A.   Yes. Because through all of this, not
9  with what we are doing today, but with my
10 litigation and everything going through with A
11 Title, there is some marital problems, so for
12 awhile I wasn't staying at my home. Freeport is a
13 small town and the gentleman that usually --
14 anything to serve me, the easiest way is to go to
15 my brother's place, usually I'm there. If I'm
16 not, he let's my brother know and then I give the
17 guy a call.
18   Q.   What's your brother's name?
19   A.   Kevin.
20   Q.   Kevin McKee?
21   A.   Yes, sir.
22   Q.   What's his address?
23   A.   I don't know the actual street number,
24 it's Pine Street, Freeport, Illinois.

12 (Pages 45 to 48)

K. SEAN McKEE    JANUARY 23, 2006

Page 49

1    Q.   What does -- your first initial is K;
2   is that correct?
3    A.   K.
4    Q.   What does that stand for?
5    A.   Kirby, K-i-r-b-y.
6    Q.   But you go by Sean, your middle name?
7    A.   Yes, sir.
8    Q.   Has there ever been an employee at A
9   Title Escrow whose name was Derrick?
10    A.   Pardon me?
11    Q.   Has there ever been an employee at A
12   Title Escrow whose name was Derrick?
13    A.   No.
14    Q.   If I could have you look at Exhibit 1.
15    A.   All right.
16    Q.   And turn to page A109.
17    A.   All right.
18    Q.   Do you recognize this document?
19    A.   Yes.
20    Q.   What is it?
21    A.   Instructions to us, to the title
22   company.
23    Q.   Top of the page -- these are
24   instructions from Ameriquest Mortgage Company?

Page 50

1    A.   From Ameriquest to the title company,
2   yes.
3    Q.   That would be to A Title Escrow?
4    A.   Yes, sir.
5    Q.   It says title officer, it says Kirby.
6   Do you see that?
7    A.   No.
8    Q.   Top of the page, middle in the box.
9    A.   Okay.
10    Q.   Do you see that?
11    A.   Yes.
12    Q.   Title officer Kirby.  Is that you?
13    A.   No.
14    Q.   Who would that be?
15    A.   My son.
16    Q.   Was your son employed at A Title
17   Escrow?
18    A.   Yes, sir.
19    Q.   What position did he hold?
20    A.   Well, at one point he was closer,
21   sales, and then executive vice president.
22    Q.   What is his full name?
23    A.   Kirby Sean, S-e-a-n, McKee, M-c-K-e-e,
24   II.

Page 51

1    Q.   Looking still at 109.  I'm sorry.
2    A.   That's fine.  Yes, sir.
3    Q.   In the lower left-hand corner there is
4   a signature, looks like for the branch manager of
5   Ameriquest.  Do you see that?
6    A.   I see something there.
7    Q.   Is that a signature you recognize?
8    A.   No, it is not, sir.
9    Q.   Did you deal with branch employees at
10   Ameriquest?
11    A.   Not much.
12    Q.   Who would have dealt with them at your
13   company?
14    A.   Dawn who was in the order department.
15    Q.   What is Dawn's last name?
16    A.   Burkhalter, B-u-r-k-h-a-l-t-e-r.
17    Q.   Anybody else who dealt with Ameriquest
18   on a regular basis?
19    A.   My wife some because she worked on the
20   orders, Danata, D-a-n-a-t-a.
21    Q.   Her last name is McKee?
22    A.   Yes, sir, Danata R.
23    Q.   Anybody else?
24    A.   All right.  We go through that.  That

Page 52

1   was the actual order department.  They would deal
2   with a Marcia, M-a-r-c-i-a, Hutchinson, and Kevin
3   McKee.  They would deal with -- this is just not
4   Ameriquest.  It would be all of our lenders.  Any
5   problems with title, et cetera, somebody didn't
6   get something released would have been paid off
7   but never filed the release, so they would work
8   with them to get it cleared so it would go to
9   close.
10         Ameriquest I want to say -- and why you
11   see my son's name Kirby on that one document, the
12   instructions to the title company is this was
13   basically one of Kirby's clients, the Ameriquest.
14   When it got back to the closing department, there
15   was -- they would deal with Kirby McKee, Eddie
16   Fletcher.  I'm not sure who else they might have
17   dealt with.  Them two there would be kind of their
18   key person, you know, otherwise it's just, you
19   know, they are probably talking with someone that
20   was preparing the settlements such.  Okay.
21    Q.   Looking again at 109.  There is a
22   signature on the lower right-hand corner for the
23   title company Adelle Woods?
24    A.   Yes.

13 (Pages 49 to 52)

K. SEAN McKEE    JANUARY 23, 2006

Page 53

1    Q.  Who is Adelle Woods?
2    A.  Adelle Woods was an employee of A
3  Title.  She did a lot of the scheduling for
4  closings, call on taxes, and, you know, worked in
5  the closing department itself.
6    Q.  Above her signature there is a line --
7  also another line for the title company, and I'm
8  trying to struggle with what that name is.
9    A.  ATEC, A Title Escrow Company.
10   Q.  That's your company's initials?
11   A.  Yes, just the --
12   Q.  After the closing you said I think
13  before because the notary on the mortgage was
14  signed by you, you believe that you handled this
15  closing; is that correct?
16   A.  Yes, sir.
17   Q.  When you -- after you handled the
18  closing and you left with fully signed copy of
19  documents for the lender, right?
20   A.  Yes.
21   Q.  What would you do with those
22  documents?  Would you come back to your office and
23  give them to somebody?  Would you send them to the
24  lender?  How would that work?

Page 54

1    A.  No, they would come back and go to tear
2  down department so to say.  The tear department
3  would send all bank packages back to the lenders.
4  If customers would call and they want copies, they
5  would get them copies and forward them to them, if
6  anything.  They would get all of the payoff checks
7  out, all of the proceeds checks to our borrowers,
8  and any other disbursements that might be being
9  paid out as far as credit card debt.
10   Q.  When you sent the copies for the lender
11  to the lender, did you send that with any kind of
12  cover letter or checklist with what was enclosed?
13   A.  Yes, usually there was just a generic
14  checklist of pretty much hit the hard docs, you
15  know, your truth and lending disclosures about the
16  insurance.  I don't know -- they were to fill in
17  every document.  I had a generic checklist of all
18  of the hard docs that are in basically every bank
19  package.  Then each lender has different
20  documents.  Then there is a spot where they are
21  supposed to fill that in, whatever that document
22  is, and it was -- that stapled to the top of
23  that and the package go back.
24   Q.  How would you send it to the lender?

Page 55

1    A.  Send the package back to them?
2    Q.  Yes.
3    A.  Overnight, usually UPS.
4    Q.  Looking through Exhibit 4, which are
5  the documents that A Title Escrow has produced in
6  this case.  Do you see any copies of a cover
7  letter or checklist of the documents that you sent
8  to the lender?
9    A.  No, sir.
10   Q.  Would you normally have kept a cover
11  sheet or checklist of the documents you sent to
12  the lender?
13   A.  They are supposed to.
14   Q.  But you don't see one there, do you?
15   A.  No, sir.
16   Q.  Do you see any kind of receipt or UPS
17  receipt or receipt for overnight of sending of
18  documents to Ameriquest for documents?
19   A.  No.  Why that is, UPS came in --
20      MR. LEDSKY:  That's to you.
21      MS. COMBS:  You are right.
22  BY THE WITNESS:
23   A.  They hooked into their computers.
24  There was this box and it just spit out a label.

Page 56

1  And then at the end of the day, you know, I might
2  have 200 overnights going out.  I would have a
3  printout of all of them.  But what I tried to do
4  is, any of the files that we dealt with that day
5  to get a copy and have a copy put in that, but
6  obviously on this file it did not have it.
7  BY MR. LEDSKY:
8    Q.  Okay.
9    A.  Now, I'm not so sure to say because
10  sometimes on Ameriquest, they would instead of us
11  charging them for the overnights, some of the
12  bars, they would have us just use like their
13  overnight a FedEx or something.  So that would be
14  why too.  I can't honestly -- I'm giving you
15  examples.
16   Q.  Looking again at Exhibit 4.  These are
17  the documents that you produced pursuant -- that
18  A Title produced pursuant to the subpoena.  Would
19  you agree with me that it's clear looking through
20  these documents that A Title Escrow did not retain
21  copies of the documents they sent on to Ameriquest
22  for this closing?
23   A.  I do not see any in this Exhibit 4.
24   Q.  Do you know if there could have been

14 (Pages 53 to 56)

K. SEAN McKEE     JANUARY 23, 2006

Page 57

1  other copies of documents that A Title Escrow
2  retained from this closing but has yet to be able
3  to locate in terms of producing documents?
4      A.   It's a possibility. As I stated
5  before, my problem with the Stewart Title, who
6  is -- was the underwriter, my files are within
7  three floors of my building, and they have been
8  through them, some of them I don't even have in my
9  office. We were just lucky enough that we were
10 able to find a full -- a file on this one. But
11 no, there is a possibility it could be some place
12 in my building. But at this time I can't even get
13 into my building.
14     Q.   Maybe then I need to ask you a couple
15 of questions about -- you say you have a lawsuit
16 presently with Stewart Title?
17     A.   Yes.
18     Q.   I don't want to ask you too many
19 questions about that lawsuit. What is the lawsuit
20 just generally about? Did you sue them or they
21 sued you?
22     A.   We are suing each other. I'm suing my
23 bank and the newspaper. There is a whole bunch of
24 people getting sued. Everybody is suing

Page 58

1  everybody.
2      Q.   Who are you suing?
3      A.   I'm going to be suing -- it's going to
4  be Stewart, Gateway Community Bank, Freeport
5  Journal Standard, and some individuals from
6  Stewart personally, and possibly the bank
7  personally too. I'm not sure if we are done there
8  or not. I can give you the name and phone number
9  of my attorney.
10     Q.   Who is your attorney?
11     A.   Theodore Liebovich.
12     Q.   How do you spell the last name?
13     A.   L-i-e-b-o-v-i-c-h.
14     Q.   Where is he located?
15     A.   Rockford, Illinois.
16     Q.   You have filed the lawsuits against
17 Stewart Title, Gateway Community Bank and --
18     A.   We haven't filed against Gateway and
19 the newspaper as of yet.
20     Q.   What's the name of the newspaper? I'm
21 sorry.
22     A.   Freeport Journal Standard.
23     Q.   You say that many of your documents are
24 at your office; is that what you said?

Page 59

1      A.   Yes.
2      Q.   What's the address of the office?
3      A.   524 West Stephenson Street, that's with
4  a p-h instead of a v, Freeport, Illinois.
5      Q.   You don't -- is it true you don't
6  presently have access to that building?
7      A.   I don't at this time.
8      Q.   Who has access?
9      A.   The bank, Gateway Community Bank.
10     Q.   The documents -- when you went to look
11 for documents in this case involving the Talleys,
12 where did you find the documents that were
13 produced?
14     A.   The ones that we have here today?
15     Q.   Yes.
16     A.   In a folder for Talley.
17     Q.   Where was the folder physically?
18     A.   I can't honestly tell you if it was
19 on -- would have been either on the fourth floor
20 or second floor at 524 West Stephenson.
21     Q.   I thought you said you didn't have
22 access to the building? Was this before --
23     A.   At the time that I got this two in here
24 to Chicago. At the time I produced these I had

Page 60

1  access.
2      Q.   Did you know if you looked everywhere
3  in your documents for Talley documents?
4      A.   Yes, they tried to go through
5  everything.
6      Q.   So --
7      A.   I didn't personally look myself. It
8  was not me.
9      Q.   I understand. You gave an -- you
10 yourself gave an instruction to somebody to look
11 throughout your title company's files for the
12 Talley documents?
13     A.   Yes, because sometimes with big
14 packages and that usually there is another folder
15 attached because we can't get everything into the
16 one. Okay. So, you know, I don't know. See this
17 went final and everything. So I don't know if
18 during something that it got broke apart and, you
19 know, got lost with them. I have got probably
20 upwards of 30,000 files in these three years.
21     Q.   Do you know if Gateway Community Bank
22 is somehow preserving your records? What have
23 they done to your office space and those records?
24     A.   Nothing.

15 (Pages 57 to 60)

K. SEAN McKEE    JANUARY 23, 2006

Page 61

1    Q.   It's also staying the same?
2    A.   Status quo as of right now.
3    Q.   Why is that?
4    A.   Because we are in the middle of a
5    foreclosure. The judge granted it and then we
6    just refiled some other documents Friday. So
7    there is a possibility I will get access back into
8    the building here in the next week or so. On all
9    of that, you know, the questions either of you
10   have, please feel comfortable, I will let my
11   attorney know to go ahead. I let him do all of
12   the --
13   Q.   Does your attorney know that you were
14   coming today to this deposition?
15   A.   Yes.
16   Q.   If you could turn to Exhibit 1, turn to
17   page 124. Do you recognize this document?
18   A.   Yes.
19   Q.   What is it?
20   A.   Just the signature affidavit.
21   Q.   When you say "just," what's the purpose
22   of this document?
23   A.   Different variations like as you see at
24   the upper left-hand it's Terry C. Talley printed

Page 62

1    in there, so he signs it Terry C. Talley, and then
2    down he's also known as Terry Talley and so just
3    without the C.
4    Q.   Is this document notarized?
5    A.   Yes.
6    Q.   Is that your notary stamp on it?
7    A.   Yes, sir.
8    Q.   Is that your signature in the lower
9    right-hand corner?
10   A.   Yes.
11   Q.   Was it your practice to notarize
12   documents? That is, did people sign these
13   documents in your presence before you notarized
14   them?
15   A.   Yes. There was times when, you know,
16   we would have to get something resigned or
17   whatever. And as I stated before, you know, not
18   just myself, but I tried to make it a practice
19   with all of the closers to get ID at the table so
20   if we had to do this we had something in the file.
21   Q.   Looking at 124. Above your signature
22   there is handwriting, some that looks printed,
23   some that looks cursive. Is that handwriting
24   yours?

Page 63

1    A.   The Talleys isn't. The cursive part?
2    Q.   Yes.
3    A.   Yes.
4    Q.   So the Illinois is yours?
5    A.   From there down.
6    Q.   What about "my commission expires," do
7    you see that?
8    A.   2/19.
9    Q.   Is that yours?
10   A.   Yes.
11   Q.   I'm sorry. I didn't hear you.
12   A.   Yes.
13   Q.   You say the printed handwriting where
14   it says Terry C. Talley, Terry Talley, Cheryl C.
15   Talley, Cheryl Talley, you say that handwriting
16   was not yours?
17   A.   No.
18   Q.   Would that have been written in before
19   you notarized this document?
20   A.   No. Probably when I got back to the
21   office, probably didn't do it at the closing
22   table. One of the girls who worked there wrote
23   the names in.
24   Q.   One of the girls in the what?

Page 64

1    A.   From the tear down. Now, with
2    Ameriquest, the one thing, and I don't know if you
3    want it on the record or not. We wound up and due
4    to -- as you have seen all of the HUDs and
5    everything, I quit dealing with Ameriquest, just
6    due to this fact it was too much because you were
7    having to change files so often and it was so time
8    consuming. This was one company I didn't try to
9    make a practice of it that I had made, I don't
10   know if it was my son Kirby or Eddie, get ahold of
11   them and tell them we weren't going to do no more
12   with them.
13   Q.   As the numbers change, is that what you
14   are saying?
15   A.   Yes, everything. It was just so much
16   work. There would be times even when you would go
17   to the closing and, you know, the whole thing
18   would be wrong for one reason or another or they
19   wanted to renegotiate it at the closing table. So
20   we are already here, as you can tell which is 2
21   1/2 hour drive for one of my people, and then it
22   would have to get rescheduled for another day, and
23   I would wind up with one closing fee, but go do
24   the closing twice, show up. It just got to be too

16 (Pages 61 to 64)

Page 65

1   much.
2       Q.   Do you remember when you stopped doing
3   business with Ameriquest?
4       A.   I can't honestly tell you, sir.
5       Q.   Was it sometime after September 2003?
6       A.   Yes, maybe right at the end of '03, the
7   first part of '04.
8       Q.   If we could turn to page 29 within
9   Exhibit 1.
10      A.   29?
11      Q.   Yes.
12      A.   Okay, sir.
13      Q.   This is the notice of right to cancel
14  that you talked about earlier?
15      A.   Yes, sir.
16      Q.   Earlier today you testified to your
17  experience as a closer even before you started the
18  company A Title Escrow?
19      A.   Yes, sir.
20      Q.   Who trained you to be a closing agent?
21      A.   Nobody really.  When I first started
22  doing real estate loans, you had a note and a
23  mortgage and a settlement statement, that was it.
24  So I kind of just went through the ranks as the

Page 66

1   government changed everything, you know, seminars,
2   but no one person actually.
3       Q.   I think my question probably was a poor
4   one.
5            What instituted your training as a
6   closer, not just generally a person per se, but
7   what did you do to train yourself as a closer?
8       A.   I was in finance, you know, and at the
9   bank itself, you know, I handled the real estate
10  department, and, you know, as I stated I did all
11  of the closings there.  It's a little different
12  then because they actually came into the bank
13  instead of running all over the country.  When I
14  started that -- doing this, you know, you didn't
15  have the regulations as we do today.  So as things
16  would change, I had to change with them, and so I
17  would go to the seminars and that's, you know, how
18  I started.
19      Q.   Now, looking at page 29.  I'm going to
20  ask you a variety of questions about it, so you
21  could keep the page turned to that.
22      A.   29?
23      Q.   Yes, Exhibit 1.  Do you understand,
24  sir, that in a refinancing involving a borrower's

Page 67

1   home, that they are under federal law entitled to
2   three days to change their mind?
3       A.   Yes, sir.
4       Q.   When did you first become aware of this
5   federal law?
6       A.   When they came out with the decision in
7   the 1970s, late '70s.
8       Q.   You have been aware of the law for a
9   long, long time?
10      MS. COMBS:  Before you were born.
11      MR. LEDSKY:  I was born before the '70s,
12  Cathy.
13      MS. COMBS:  Not much.
14      MR. LEDSKY:  Unfortunately, yes.
15  BY MR. LEDSKY:
16      Q.   So you understood when you were at a
17  closing with the borrowers, that this document,
18  the notice of right to cancel, was a pretty
19  important document among the various documents
20  that were given to the borrower; is that correct?
21      A.   Yes, sir.
22      Q.   Because this document gave them a
23  chance to change their mind if they wanted to?
24      A.   This document and a piece of note

Page 68

1   paper.  They can fax over, "I want to cancel this
2   loan" on just a legal tablet with the date, and I
3   had them -- I told all of the clients, and I had
4   my closers tell them to make sure they fax it due
5   to the fact that we have got the fax transmittal
6   that would come through.  So I would -- I have
7   accepted rescissions on just -- so.
8       Q.   Now, I'm going to ask you.  When you
9   came to this document among the various documents
10  for a closing, did you take time and explain to a
11  borrower their right to cancel the loan?
12      A.   I usually sat down and just stated
13  that, "This is your right to cancel.  If after I
14  leave here for some reason, whatever, you do not
15  want this loan to go through, then I need your
16  signature right here where it says, 'I wish to
17  cancel' and then date it prior to midnight of the
18  third business day."
19      Q.   So you would actually point to a spot
20  in the document?
21      A.   You had to because half of the time
22  they would sign before the document.
23      Q.   Rather than sign below acknowledgment
24  of receipt of it.

17 (Pages 65 to 68)

K. SEAN McKEE    JANUARY 23, 2006

Page 69

1  A.  You get some of them they could
2  just -- you had to get to the point where, "I
3  need your signature right here. This is so if you
4  decide to cancel, that's where you would sign,"
5  you know.
6  Q.  And so at the bottom of the page though
7  there is a place that the borrower has to sign to
8  acknowledge the receipt of two of these notices of
9  right to cancel; is that correct?
10  A.  Yes, sir.
11  Q.  By signing the bottom of the document
12  the borrower says they are acknowledging they
13  received two copies of the notice of right to
14  cancel, right?
15  A.  Yes.
16  Q.  Now, when you were looking at this
17  document, because you had to look at it to point
18  to them where they should sign or shouldn't sign,
19  would you ever notice that these boxes -- these
20  two boxes for the date of this transaction and the
21  final date to cancel, would you ever notice they
22  were blank?
23  A.  Sometimes.
24  Q.  When you noticed they were blank, what

Page 70

1  would you do?
2  A.  Well, if they were blank, we would fill
3  in the actual date that we were closing, okay, and
4  then the date that it would -- they would have,
5  like say this one was the fourth would be its fund
6  date, then we would have to fill in the date they
7  would have to rescind it out.
8  Q.  You are using the royal we here. Would
9  you physically do that at the closing if those
10  boxes were blank?
11  A.  Sometimes. Sometimes we would have the
12  customer, you know.
13  Q.  Now, you understood because you are an
14  experienced person at closing loans that you were
15  leaving copies of this notice of right to cancel
16  with the borrowers themselves; is that right?
17  A.  Yes.
18  Q.  If you ever encountered these two boxes
19  being blank, would you ever then go through the
20  copies of the documents being left with the
21  borrowers and fill in the blanks in those copies
22  with the dates that you were filling in for the
23  lender copy?
24  A.  No, I wouldn't. I wouldn't go through

Page 71

1  the borrower's copies?
2  Q.  Yes.
3  A.  No, sir.
4  Q.  Wouldn't you think it was important for
5  the borrowers to know the final date they had to
6  cancel that you were inserting on the lender
7  copy? Wouldn't you think it was important for
8  them to know on the borrower copy you were leaving
9  behind?
10  A.  What I would do when I would leave the
11  table -- before I would leave the table, they
12  would have my phone number, the office phone
13  number, a fax number, and this is the final date
14  that you would have. It didn't get onto their
15  copy of the document, but I would have them write
16  it down because we had a little kind of welcome
17  sheet from us, and I would have them write that
18  right down. Usually everybody would write my name
19  down or whatever the closer's name was.
20  Q.  I'm going to ask you to look at Exhibit
21  2, that's the documents that the Plaintiffs said
22  they got at the closing. I want you to look for
23  that welcome sheet that they would have written
24  this information down on that you just described.

Page 72

1  A.  Well, in this case here just -- I can't
2  say this for sure is that this is probably a
3  package that was picked up at the branch and then
4  they went to close, okay. So the documents that
5  we see right here would have been in that folder.
6  For my docs to get signed and see what it would be
7  like this is our banking package I would have to
8  get signed and this would be the customer copy.
9  It looks to me like it would be something we went
10  right to the branch and got. It was in one of
11  their folders, so when we were done here you go.
12  MS. COMBS:  When you are talking about branch
13  you are talking about Ameriquest branch?
14  BY THE WITNESS:
15  A.  The actual one that did the order.
16  BY MR. LEDSKY:
17  Q.  Sir, let me ask you a question then
18  just following up that. If you look through the
19  Ameriquest documents, that's Exhibit 1, you will
20  notice that there are only -- there is only a
21  lender copy of the notice of right to cancel.
22  There are no borrower copies of the notice of
23  right to cancel. If you look through Exhibit 2,
24  which are the documents the Plaintiff says they

18 (Pages 69 to 72)

Page 73

1   received at the closing, you will notice there is
2   a lender copy and four borrower copies of the
3   notice of right to cancel. I submit to you these
4   are not duplicate copies of the same document.
5   They are different documents in what the Plaintiff
6   says they received and what Ameriquest received
7   back from A Title Escrow.
8       A.  All that I can state is this package,
9   this Exhibit 1, is the one that we actually
10  physically got signed. The dates are coinciding.
11  That's what's leading me to believe that this --
12  it wasn't e-mailed to us, because not all of the
13  documents are there. If the package would have
14  been e-mailed to me, anything that would have been
15  coming across that e-mail, the customer would have
16  got says it's this many documents 200, then they
17  would have got 200 pages.
18      We would not go through, take the time
19  and pull out just the specific docs and run.
20  Don't have time for it. You put the whole package
21  in the copy machine, push the button and go about
22  doing something else. Because as we can see,
23  Exhibit 2 and Exhibit 1, there is quite a few more
24  documents.

Page 74

1       Q.  Looking at Exhibit 1, page 29. The
2   handwriting in these boxes -- handwritten dates in
3   these two boxes, do you recognize the handwriting
4   in either of these two boxes?
5       A.  No, kind of looks like Cheryl --
6   Cheryl Talley's.
7       Q.  Is it your handwriting?
8       A.  No, sir.
9       Q.  Does it look like any of the
10  handwriting of people who used to work with A
11  Title Escrow?
12      A.  I couldn't honestly tell you.
13      Q.  Does it look like the handwriting of
14  anybody in your tear down department?
15      A.  I can't honestly say. You know, I
16  never really paid that much attention to, you
17  know, the individuals. Some of it kind of stuck
18  out that worked for me.
19      Q.  Your handwriting you mean?
20      A.  In all honesty, I can't.
21      Q.  I can appreciate that.
22      When you were a closer, that is for A
23  Title Escrow, would somebody look at the documents
24  you were taking out to the borrowers at the

Page 75

1   borrower's home prior to you picking them up and
2   taking them to the borrower's home?
3       A.  Well, usually just flip through real
4   quick to make sure we had our hard docs as they
5   call them, you know, your mortgage, detail and
6   everything. Each different lender you couldn't
7   remember all of the junk docs, so you would try to
8   do that, yes.
9       Q.  Whose job would that be at A Title
10  Escrow?
11      A.  The closer.
12      Q.  That would have been your
13  responsibility if you were closing a loan before
14  you went out there?
15      A.  Uh-huh.
16      Q.  Yes?
17      A.  Yes, sir.
18      Q.  She can't write down you are nodding.
19  I'm not trying to be impolite.
20      A.  No, that would be the actual closer's
21  responsibility.
22      Q.  When you went through the closing
23  documents before you went out there, did you look
24  to see if documents such as the notice of right to

Page 76

1   cancel had dates inserted in these boxes?
2       A.  No.
3       Q.  From your experience closing, I think
4   you said maybe 30 Ameriquest loans a month.
5       A.  Not just Ameriquest.
6       Q.  30 a month?
7       A.  Total.
8       Q.  How many loans did you yourself close
9   of Ameriquest a month?
10      A.  Not many. Not many. A lot of them my
11  closing, you know. At the end of the month,
12  that's when we got busy and whoever could close
13  and was a closer was out on the road, and
14  sometimes it was for two days, you know. My
15  closers might not get home until 6:00 in the
16  morning. We might be closing these things at
17  midnight, you know. I wouldn't do that many. If
18  they needed me to go out on the road, I would go
19  out on the road. Otherwise I stayed in the office
20  and did the in-house closings. Some of them were
21  Ameriquest because it would run a campaign through
22  our area or something. I had people that would
23  drive sometimes because they wanted to close at a
24  title company. Drive from Chicago out because

19 (Pages 73 to 76)

K. SEAN McKEE    JANUARY 23, 2006

Page 77

1  they wanted to go to a title company, you know.
2      Q.   Did you have sufficient experience with
3  Ameriquest to understand that their notice of
4  right to cancel would require the dates in these
5  two boxes to be filled in?
6      A.   Yes, sir. I realized that the date had
7  to be in there.
8      Q.   You knew it would be checking for those
9  dates, to be checking to see if those dates needed
10  to be filled in?
11      A.   Right.
12      Q.   If they needed to be filled in you
13  would fill them in?
14      A.   Yes, sir.
15      Q.   You understood that the notice of right
16  to cancel was a sufficiently important document
17  that needed to be done correctly?
18      A.   Yes, sir.
19      Q.   If you were looking at the package
20  before you left your office to go to a customer
21  in-house closing, and you noticed that the notice
22  of right to cancel needed to be filled in and you
23  filled in the hard documents.
24      A.   I tried to get the customer to fill the

Page 78

1  dates in.
2      Q.   Why is that?
3      A.   Just to have them go ahead and do it.
4  You know, I would tell them the dates.
5      Q.   Right.
6      A.   But then if it got missed or something,
7  yes, I would fill them in. I had enough to do. I
8  didn't need to be filling in dates. But to be
9  filling dates as you are going through the closing
10  here's the document and, you know, I'm flipping
11  through just to see if I have them documents. I
12  get to the document, okay. There is no date on
13  this one. Okay. "As you are signing that, would
14  you please enter a date," you know, and "specify
15  the date" and everything. I don't know if it was
16  this lender or not.
17      One lender though sent an annual sheet
18  along for that year explaining which holidays was
19  exempt, okay, were the non-business holidays,
20  which ones were -- she took into consideration and
21  everything. So there was times where they would
22  get dated wrong. Okay. And before it could fund,
23  not just with Ameriquest, you know, but the other
24  lenders, any of the documents that were not done

Page 79

1  correctly for that lender, they would kickback to
2  us, and before they would even send us the money,
3  I had to send somebody out or overnight the
4  document to get it resigned.
5      Q.   But I guess my question is a little bit
6  different. You understood when you were closing
7  Ameriquest loans that the dates on this notice of
8  right to cancel would need to be filled in; is
9  that correct?
10      A.   Yes, sir.
11      Q.   Before you even went out to the
12  customer, I'm asking, did you ever fill in these
13  dates?
14      A.   No, sir, never had the time.
15      Q.   Did someone in your office fill in
16  these dates before you went out?
17      A.   No, sir.
18      Q.   This Ameriquest -- on an Ameriquest
19  loan you would have these dates filled in at the
20  borrower's house?
21      A.   Yes, sir.
22      Q.   Would you ever fill in those
23  corresponding dates on the customer copies on the
24  notice of right to cancel?

Page 80

1      A.   No, sir.
2      Q.   You never did that?
3      A.   No, sir.
4      Q.   Even though this was a very important
5  document?
6      A.   No, sir.
7      Q.   Even though you were leaving two copies
8  with the borrower?
9      A.   No.
10      MR. LEDSKY: I have no further questions.
11      MS. COMBS: Just for the record, you are
12  entitled to review your deposition to see if the
13  court reporter accurately took down what you
14  want. Otherwise we can just -- she will just
15  prepare it. So if you want to review it, you
16  can. Do you want to review your deposition?
17      THE WITNESS: I feel comfortable.
18      MR. LEDSKY: To be frank, sir, typically
19  people do reserve their right to reserve. If
20  either Ms. Combs or I order it, we would be happy
21  to supply you.
22      THE WITNESS: That would be fine.
23      MS. COMBS: Then one other thing. I
24  understand you probably will never be able to get

20 (Pages 77 to 80)

K. SEAN McKEE    JANUARY 23, 2006

Page 81

1  back into your -- or you may not want to look for
2  documents when you get back into your offices. If
3  you do have an opportunity to look for additional
4  Talley documents and you find some, could you make
5  sure you send some to us.
6      THE WITNESS: Yes. I have got -- probably
7  this week I will be over there.
8      MS. COMBS: Okay. Great. I would appreciate
9  it.
10     THE WITNESS: I have done so many, people got
11 questions about files. I have still got to -- I
12 had this service so I have got to finish it. Let
13 me see because my attorney is working on getting
14 me back in this week.
15     MR. LEDSKY: Thank you, sir.
16     MS. COMBS: Thank you.
17         FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
24

Page 82

1      IN THE UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF ILLINOIS
3           EASTERN DIVISION
4  TERRY TALLEY and CHERYL TALLEY,   )
5      Plaintiffs,      )
6      vs.          ) No. 05 C 1080
7  AMERIQUEST MORTGAGE COMPANY,     )
8  et al.,          )
9      Defendants.      )
10     I certify that I have read the
11 transcript of my deposition consisting of Pages 1
12 to 81, inclusive, and I do again subscribe and
13 make oath that the same is a true, correct and
14 complete transcript of my deposition so given, and
15 includes changes, if any, so made by me.
16
17
18         K. SEAN McKEE
19
20 SUBSCRIBED AND SWORN TO
21 before me this     day
22 of      , 2006.
23
24     Notary Public

Page 83

1  STATE OF ILLINOIS   )
2               )
3  COUNTY OF COOK      )
4      I, DANA L. SHAPIRO, a Notary Public
5  within and for the County of Cook, State of
6  Illinois, and a Certified Shorthand Reporter of
7  said state, do hereby certify:
8      That previous to the commencement of
9  the examination of the witness, the witness was
10 duly sworn to testify the whole truth concerning
11 the matters herein;
12     That the foregoing deposition
13 transcript was reported stenographically by me,
14 was thereafter reduced to typewriting under my
15 personal direction and constitutes a true record
16 of the testimony given and the proceedings had;
17     That the said deposition was taken
18 before me at the time and place specified;
19     That I am not a relative or employee or
20 attorney or counsel, nor a relative or employee of
21 such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in
23 the outcome of this action.
24     IN WITNESS WHEREOF, I do hereunto set

Page 84

1  my hand and affix my seal of office at Chicago,
2  Illinois, this 17th day of March, 2006.
3
4
5
6  Notary Public, Cook County, Illinois.
7  My commission expires 9/27/07.
8
9  C.S.R. Certificate No. 84-3597.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

21 (Pages 81 to 84)

K. SEAN McKEE    JANUARY 23, 2006

Page 85

```
 1              WITNESS INDEX
 2    WITNESS              EXAMINATION
 3    K. SEAN McKEE
 4       By Ms. Combs          3
 5       By Mr. Ledsky        46
 6
 7
 8
 9              E X H I B I T S
10    NUMBER              MARKED FOR ID
11    McKee Deposition Exhibit
12    No. 1........................................... 10
13    No. 2........................................... 26
14    No. 3........................................... 33
15    No. 4........................................... 36
16
17
18
19
20
21
22
23
24
```

22 (Page 85)

K. SEAN McKEE     JANUARY 23, 2006

**A**

able 57:2,10 80:24
ABN 38:20
accepted 68:7
access 59:6,8,22
   60:1 61:7
accurate 43:21
accurately 80:13
acknowledge 69:8
acknowledging
   69:12
acknowledgment
   68:23
act 8:24
action 83:23
actual 8:17 16:10
   23:5 25:20 41:22
   42:1 48:23 52:1
   70:3 72:15 75:20
additional 81:3
address 47:5 48:2
   48:22 59:2
Adelle 52:23 53:1,2
affidavit 61:20
affix 84:1
agent 5:12 6:2
   46:13 65:20
ago 3:22
agree 56:19
ahead 10:20 16:23
   21:6 24:16 25:23
   28:9 33:18 42:23
   61:11 78:3
ahold 64:10
al 82:8
allot 20:16
Amanda 37:19
AMC 1:9
America 6:12 25:10
Ameriquest 1:7
   9:21 10:19 14:8
   14:11,14,21 15:19
   17:13 18:24 20:6
   22:17,18 23:19,21
   23:24 25:2,7 28:9
   31:15,19 35:24
   37:8,23 38:2 40:1
   40:16,22 46:23
   49:24 50:1 51:5
   51:10,17 52:4,10
   52:13 55:18 56:10
   56:21 64:2,5 65:3
   72:13,19 73:6
   76:4,5,9,21 77:3
   78:23 79:7,18,18
   82:7

Ameriquest's 19:10
   19:18
amount 35:9 43:6
Amro 38:20 41:7
annual 78:17
answer 9:10 11:2
   14:5
anybody 10:2 51:17
   51:23 74:14
apart 60:18
appeared 2:8,15
appears 34:14
application 15:14
appraiser 41:8
appreciate 74:21
   · 81:8
approximately 6:15
   6:18 47:11
area 7:19 13:9,12
   42:10 76:22
ascertain 43:20
aside 33:20 ....
asked 16:22 26:15
asking 79:12
assistant 6:13
assume 14:21 17:3
assuming 44:7
ATEC 53:9
attached 35:17
   60:15
attend 7:12
attention 37:9
   74:16
attorney 45:2 58:9
   58:10 61:11,13
   81:13 83:20,21
audit 45:5
Avenue 2:11
aware 35:19,23
   67:4,8
awhile 48:12
A-0019 11:6
A-19 12:5 13:16
A.D 1:19
a.m 1:20
A1 18:11
A109 49:16
A2 19:5,10
A20 20:19 21:22
A21 31:14 32:15,16
   33:4,8 34:7,13
   35:3
A29 21:24 25:24
A3 21:23
A30 24:20
A61 33:4

A69 31:16,18 32:4
   32:15,16 33:1,7
A71 31:23

**B**

B 85:9
back 6:17 10:12
   14:3 15:8 16:20
   16:23,24 17:6,9
   17:12,24 18:10
   25:24 32:9 40:4
   43:10 44:23 52:14
   53:22 54:1,3,23
   55:1 61:7 63:20
   73:7 81:1,2,14
balance 41:7 43:6,8
balanced 43:9
ballpark 9:5
bank 1:8 6:23 7:3,8
   14:15 15:1,10
   16:10 17:20 20:13
   25:19,19 28:11
   31:6 41:9 54:3,18
   57:23 58:4,6,17
   59:9,9 60:21 66:9
   66:12
banking 72:7
banks 5:24
bars 56:12
Based 44:15
basically 4:1 17:18
   24:7 46:9 52:13
   54:18
basis 46:7 51:18
beginning 38:6
behalf 2:8,15
believe 21:1 25:9
   48:5 53:14 73:11
BERGER 2:10
big 60:13
binder 29:3,4,5
bit 19:16 79:5
blank 45:18,21
   69:22,24 70:2,10
   70:19
blanks 70:21
body 25:22
boiled 46:9
book 39:10
Booker 37:19
born 67:10,11
borrower 67:20
   68:11 69:7,12
   71:8 72:22 73:2
   80:8
borrowers 54:7

67:17 70:16,21
   71:5 74:24
borrower's 66:24
   71:1 75:1,2 79:20
bottom 11:4 20:21
   27:6 34:10 41:6
   44:8,11 69:6,11
box 22:8 23:7 27:16
   27:18 50:8 55:24
boxes 69:19,20
   70:10,18 74:2,3,4
   76:1 77:5
branch 6:13 17:14
   17:24 19:11 51:4
   51:9 72:3,10,12
   72:13
break 44:21
briefly 14:18
broke 32:1 60:18
brokerage 6:12
brokering 5:24
brother 48:16
brother's 48:5,7,15
   48:18
building 57:7,12,13
   59:6,22 61:8
bunch 57:23
Burkhalter 51:16
business 3:20 4:8
   4:10,13,13,21
   7:20 24:2,10 65:3
   68:18
busy 76:12
button 73:21
B-u-r-k-h-a-l-t-e-r
   51:16

**C**

C 1:6 12:7,7,14,14
   12:23,23 13:18
   61:24 62:1,3
   63:14,14 82:6
calculator 44:13
call 48:17 53:4 54:4
   75:5
called 1:12 3:4
campaign 76:21
cancel 22:6,14,19
   23:17 24:6,9,15
   25:21 26:1 27:13
   27:18,23 29:10,12
   30:3 31:4 45:23
   65:13 67:18 68:1
   68:11,13,17 69:4
   69:9,14,21 70:15
   71:6 72:21,23

73:3 76:1 77:4,16
   77:22 79:8,24
cancellation 24:23
   25:13 27:18 29:22
   30:13 .
car 29:6
card 54:9
cards 41:9
care 6:6
case 17:13 18:24
   19:3 23:22 24:2,9
   24:14 44:10 46:24
   55:6 59:11 72:1
CASEY 2:10
cashouts 16:19
casualty 5:14
categories 8:13
CATHLEEN 2:7
Cathy 67:12
cease 3:24
Certainly 34:10
Certificate 84:9
Certified 1:16 83:6
certify 82:10 83:7
cetera 52:5
chance 67:23
change 39:22 64:7
   64:13 66:16,16
   67:2,23
changed 66:1
changes 82:15
charging 56:11
check 17:22 41:9
   42:8 43:3,4,5,7
checking 77:8,9
checklist 17:21,23
   54:12,14,17 55:7
   55:11
checks 16:20 17:1
   40:15,18,23 41:4
   42:6 43:10,13
   45:3 54:6,7
Cheryl 1:4 12:7,14
   12:23 13:17 63:14
   63:15 74:5,6 82:4
Chicago 1:18 2:5
   2:12 13:9,11
   59:24 76:24 84:1
circumstances
   39:24
Cities 5:17
Civil 1:13
clarify 42:21
classes 7:16
clear 30:21 56:19
cleared 52:8

Page 1

K. SEAN McKEE    JANUARY 23, 2006

clients 27:4 52:13
68:3
clip 29:3,6
close 33:18,20 52:9
72:4 76:8,12,23
closer 4:24 8:24
24:8 50:20 65:17
66:6,7 74:22
75:11 76:13
closers 8:18 62:19
68:4 76:15
closer's 8:17 71:19
75:20
closing 8:16 10:23
12:21 13:2,11
14:8,9 15:20 16:2
16:6,9,12,15 17:8
21:13 22:18 23:2
23:11 26:3,15
27:4,24 28:2 34:3
39:2,17 43:17
45:11 52:14 53:5
53:12,15,18 56:22
57:2 63:21 64:17
64:19,23,24 65:20
67:17 68:10 70:3
70:9,14 71:22
73:1 75:13,22
76:3,11,16 77:21
78:9 79:6
closings 5:1 8:21
9:1,3,7,17,20 13:1
53:4 66:11 76:20
coinciding 73:10
college 7:17,18
Combs 2:3,7 3:7
9:14 10:6,12,13
15:4,8,9 25:11
26:19,24 27:5,8
32:6,9,10 33:19
36:4,9 43:12
44:21,23 45:8
46:15,18 47:2
55:21 67:10,13
72:12 80:11,20,23
81:8,16 85:4
come 39:20 41:6
53:22 54:1 68:6
comes 14:2
comfortable 61:10
80:17
coming 25:16 31:7
61:14 73:15
commencement
83:8
commission 11:18

63:6 84:7
commitment 38:8
commitments 8:15
communicating
35:24
community 7:16,17
58:4,17 59:9
60:21
company 1:7 3:16
3:20,24 4:3,15,20
7:22 9:12 14:13
46:11,23 49:22,24
50:1 51:13 52:12
52:23 53:7,9 64:8
65:18 76:24 77:1
82:7
company's 53:10
60:11
compare 34:6
complaint 19:2
complete 16:3
82:14
completed 45:17
compliance 46:8
computer 18:21
computers 28:13
55:23
concerning 83:10
conduct 14:9 16:8
connection 34:1
consideration 78:20
consist 15:2
consisting 82:11
consolidations
16:19
constitutes 83:15
consuming 64:8
contacting 24:11
contained 14:20
30:23 31:3
Cook 43:6 83:3,5
84:6
copies 14:23 16:1,3
16:16 17:5 18:1,3
18:6,8 26:7,13
28:12 29:13,16
30:2,9,13,17,23
30:24 45:2 54:4,5
54:10 55:6 56:21
57:1 69:13 70:15
70:20,21 71:1
72:22 73:2,4
79:23 80:7
copy 15:1,23,24,24
16:7,22,23 17:19
18:4 26:9,15 28:6

29:1,2,14 30:7
31:8 39:3,11
42:11 45:18,21
53:18 56:5,5
70:23 71:7,8,15
72:8,21 73:2,21
corner 21:19 41:11
41:16 42:13 51:3
52:22 62:9
correct 26:4 30:24
31:5 33:2,5 34:10
44:6 46:3 47:23
49:2 53:15 67:20
69:9 79:9 82:13
correctly 23:19
77:17 79:1
corresponding
79:23
counsel 83:20,21
country 66:13
county 12:11 43:3,6
83:3,5 84:6
couple 5:23 57:14
court 1:1 80:13
82:1
Courts 1:14
cover 54:12 55:6,10
covered 47:2
credit 54:9
CSR 1:15 2:24
current 47:4
cursive 62:23 63:1
customer 16:7,13
17:4 21:12 23:12
23:12,13 24:14
26:8,9,13 29:1,7
29:13,15,21 30:3
30:24 31:4 40:3
70:12 72:8 73:15
77:20,24 79:12,23
customers 4:4
16:17,21,21 37:16
54:4
customer's 14:18
28:12,19,20
cut 40:14,15 41:3
43:7 44:9
cutting 42:5
C.S.R 84:9
_____
D
DANA 1:15 2:24
83:4
Danata 51:20,22
date 11:17 21:4,13
21:18 22:9,10,19

22:23 23:7,11,14
23:15,16 24:17
27:16,18 29:11,11
31:17 32:4 33:1,4
34:23 35:2,6,9,10
38:9 39:16,17,18
41:13,20,21,22,23
42:1,12,16,17,17
42:18 43:9 68:2
68:17 69:20,21
70:3,4,6,6 71:5,13
77:6 78:12,14,15
dated 21:11 25:21
78:22
dates 20:21,23
22:14 26:3,7,10
27:22 28:7 40:17
42:24 45:24 70:22
73:10 74:2 76:1
77:4,9,9 78:1,4,8
78:9 79:7,13,16
79:19,23
dating 21:3
Dawn 37:10,10
51:14
Dawn's 51:15
day 1:19 19:21,23
24:1,18 25:16
56:1,4 64:22
68:18 82:21 84:2
days 20:3,16 24:2
24:10 67:2 76:14
deal 51:9 52:1,3,15
dealing 64:5
dealt 23:21 51:12
51:17 52:17 56:4
debt 54:9
dec 16:19
December 4:10,10
35:20 43:5
decide 69:4
decision 67:6
Defendants 1:10
2:15 46:24 82:9
department 42:10
51:14 52:1,14
53:5 54:2,2 66:10
74:14
DEPONENT 81:17
deposition 1:11
10:3,9 12:18,19
26:21 27:2 32:12
33:12,14 34:22
36:6,11 38:13
61:14 80:12,16
82:11,14 83:12,17

85:11
depositions 1:15
Derrick 49:9,12
describe 4:12
described 71:24
detail 75:5
DEUTSCHE 1:8
difference 44:11
different 29:20
31:17 32:23 34:8
34:10,12,14,20
43:1 44:12,14
54:19 61:23 66:11
73:5 75:6 79:6
digress 19:16
direction 83:15
directly 83:22
disbursed 45:3
disbursements 54:8
disclosure 20:20
21:20
disclosures 15:3,11
54:15
discovery 1:11
discussed 32:14
discussion 32:7
District 1:1,2,14
82:1,2
DIVISION 1:3 82:3
docs 14:13 17:15
29:4 54:14,18
72:6 73:19 75:4,7
document 10:8,21
11:1,7,13 13:24
15:15 18:12,16,20
19:5,6,8,13 20:23
22:3,5,9 23:6,14
24:6,20 25:1
26:17,20 27:11,16
27:17 29:11 30:9
30:14 33:13 34:15
35:6,16 36:5,10
36:16 37:12,14,17
37:22 38:6,15,17
38:18 39:1,16
40:11,13,23 41:5
41:12 42:6,21
43:17 45:22 49:18
52:11 54:17,21
61:17,22 62:4
63:19 67:17,19,22
67:24 68:9,20,22
69:11,17 71:15
73:4 77:16 78:10
78:12 79:4 80:5
documents 9:23

K. SEAN McKEE   JANUARY 23, 2006

10:14,18,19,20
13:19,21 14:7,21
15:17,20 16:6,9
16:12,13,16 17:22
21:3,14 27:3
28:18,19,21 30:17
30:22 31:2 32:23
32:23 33:23,24
34:2,20 35:15
36:12,14,15,19
39:8 43:24 44:15
45:14 53:19,22
54:20 55:5,7,11
55:18,18 56:17,20
56:21 57:1,3
58:23 59:10,11,12
60:3,3,12 61:6
62:12,13 67:19
68:9 70:20 71:21
72:4,19,24 73:5
73:13,16,24 74:23
75:23,24 77:23
78:11,24 81:2,4
doing 4:10 9:7,13
23:24 48:9 65:2
65:22 66:14 73:22
dollars 33:9 43:6
dozen 29:24 40:2
drive 64:21 76:23
76:24
driving 13:12
due 29:22 39:11
44:12 45:4 64:3,6
68:4
duly 3:1,4 83:10
duplicate 73:4
D-a-n-a-t-a 51:20

**E**

E 47:8 85:9
earlier 65:14,16
easier 27:7
easiest 48:14
EASTERN 1:3 82:3
ECL&G 27:10 29:9
30:11 33:23 34:3
34:13,23 36:13
38:12,23 39:9,13
40:9 44:1
Eddie 52:15 64:10
EDELMAN 2:3
education 7:15
either 14:14 15:23
23:1 24:11 59:19
61:9 74:4 80:20
employed 3:11,15

4:19 5:2,5,10,22
6:3,7,9,20 7:7,10
37:10 50:16
employee 49:8,11
employees 7:24 8:1
8:5,9,13 51:9
enclosed 54:12
encountered 70:18
enter 23:13 27:17
78:14
entered 22:9,23
23:6,10 27:16
entire 5:8 28:21
entitled 67:1 80:12
entry 41:18
Escrow 3:16,18 4:7
4:14,18 7:21 8:2
18:2,17 30:1,17
35:16 37:23 39:6
41:8 46:6 49:9,12
50:3,17 53:9 55:5
56:20 57:1 65:18
73:7 74:11,23
75:10
Escrow's 18:21
establish 21:16
estate 4:17 7:4 43:1
65:22 66:9
estimate 9:4
et 52:5 82:8
everybody 57:24
58:1 71:18
exactly 32:3
examination 1:12
3:6 46:20 83:9
85:2
examined 3:5
example 20:5
examples 56:15
excluding 19:24
20:1
excuse 8:6 15:4
23:20 32:1
executed 26:8 28:7
29:2 43:15
executive 50:21
exempt 78:19
exhibit 10:10,15
13:16 18:10 26:19
26:22 27:2 29:9
31:9,12 32:12
33:12,15 34:23
35:6,17 36:7,11
37:5 38:7,13
39:14 41:1,2

42:12 44:1 49:14
55:4 56:16,23
61:16 65:9 66:23
71:20 72:19,23
73:9,23,23 74:1
85:11
experience 20:4
65:17 76:3 77:2
experienced 70:14
expired 11:18
expires 63:6 84:7
explain 24:8 32:5
68:10
explaining 78:18
explanation 27:21
29:12 31:20 32:19
35:3,12 39:18
e-mail 14:15 15:18
15:22 30:5 31:7
73:15
e-mailed 14:22,22
14:23 15:10,17
28:4 30:18,22
31:2 73:12,14

**F**

fact 19:22 21:7
29:22 39:12 43:10
44:12 45:5 64:6
68:5
fair 13:15 30:12
32:22 34:9,19,22
44:4 45:9,13,20
faith 15:13
fall 6:5
falling 46:7
far 14:13 54:9
fast 46:11
fax 24:15,17 38:4
68:1,4,5 71:13
faxes 24:13
federal 1:13 67:1,5
FedEx 56:13
fee 64:23
feel 61:10 80:17
field 5:23
file 14:3,14 17:11
17:12,17 18:5
36:24 40:14 41:6
41:22 42:3,23
43:20 56:6 57:10
62:20
filed 19:2 52:7
58:16,18
files 56:4 57:6
60:11,20 64:7

81:11
fill 22:13 26:3,6
54:16,21 70:2,6
70:21 77:13,24
78:7 79:12,15,22
filled 11:15 22:16
22:20 26:2 27:22
45:24 77:5,10,12
77:22,23 79:8,19
filling 70:22 78:8,9
final 15:14 23:16
27:18 29:11 39:12
41:3,10 44:2,5,16
44:18 60:17 69:21
71:5,13
finally 40:19 42:3
finance 5:23 66:8
find 31:10,13 32:11
47:17 57:10 59:12
81:4
fine 51:2 80:22
finish 81:12
firm 15:19
first 3:4 18:11
31:14,15 41:18
47:4 49:1 65:7,21
67:4
five 20:2 29:16 30:2
30:7,8,12,12,17
30:23,24
Fletcher 52:16
flip 75:3
flipping 78:10
floor 59:19,20
floors 57:7
Florida 6:10
focusing 8:12
folder 28:11,23
29:6 59:16,17
60:14 72:5
folders 72:11
followed 12:17
following 72:18
follows 3:5
foreclosure 61:5
foregoing 83:12
form 22:2 23:5
27:11 37:11,15,23
Fort 6:10,14
forward 18:23 54:5
four 3:14,22,23
5:21 73:2
fourth 59:19 70:5
Frances 47:8
frank 80:18
Franklin 13:2,5,8

Freeport 4:22 5:15
7:17 47:9 48:12
48:24 58:4,22
59:4
frequently 19:19
fresh 40:8
Friday 61:6
front 44:15
full 15:1 31:8 50:22
57:10
fully 53:18
fund 19:19,21,21
20:10,10,11 15:23
35:20 41:22 42:1
42:23 70:5 78:22
funded 20:7 36:1
40:19 41:21
funding 8:16 17:1
42:10 44:7
funds 18:24 25:15
25:18 40:15 42:22
further 46:15 80:10
81:17

**G**

Gateway 58:4,17
58:18 59:9 60:21
generally 21:9
57:20 66:6
generic 17:21 54:13
54:17
gentleman 36:23
48:13
getting 38:21 40:4
57:24 81:13
girls 11:15 42:9
63:22,24
give 6:11 9:4,5
24:13 25:3 28:21
29:20 30:3 37:16
45:4 48:16 53:23
58:8
given 26:7,8,13
45:21 67:20 82:14
83:16
giving 24:9 45:14
56:14
glasses 32:1
go 10:20 14:17,18
15:4 16:9,23,23
17:9,18 20:12
21:5 24:7,8,16
25:23 28:9 31:23
33:18 34:15 40:6
42:22 43:9 48:14
49:6 51:24 52:8

K. SEAN McKEE    JANUARY 23, 2006

54:1,23 60:4
61:11 64:16,23
66:17 68:15 70:19
70:24 72:11 73:18
73:21 76:18,18
77:1,20 78:3
goes 34:12
going 14:16 19:15
25:24 27:2 33:11
48:10 56:2 58:3,3
64:11 66:19 68:8
71:20 78:9
good 15:13
GOODWIN 2:3
gotten 28:2,14
government 66:1
granted 61:5
Great 81:8
grew 46:11
ground 47:2
Grove 13:3,5,8
guess 79:5
guy 48:17

**H**

H 85:9
half 20:9 27:17
29:23 40:2 68:21
hand 22:20 33:11
84:1
handed 27:1 36:10
handing 10:14
handle 5:1 8:21 9:3
9:8 10:22 24:6
25:12 27:7
handled 16:6 53:14
53:17 66:9
handling 14:7
handwriting 11:12
11:18,21 12:3,5
19:12 20:23,24
22:11 23:8 35:5
37:17 62:22,23
63:13,15 74:2,3,7
74:10,13,19
handwritten 22:10
74:2
happen 17:1 28:8
happened 46:2,6
happy 80:20
hard 15:18 54:14
54:18 75:4 77:23
Haydas 37:6,7
HAYES 2:10
head 24:21
health 5:14

hear 63:11
helped 6:6
hereto 83:22
hereunto 83:24
high 7:13,14
Highland 7:17
hit 54:14
Hofeld 45:2
hold 50:19
holidays 20:1 78:18
78:19
home 14:18 47:13
48:2,12 67:1 75:1
75:2 76:15
homes 9:18,21
honestly 23:18,23
28:14 39:23 44:20
56:14 59:18 65:4
74:12,15
honesty 43:23
74:20
hooked 55:23
hopefully 47:1
hour 64:21
house 48:5,7 79:20
HUD 17:19 39:15
HUDs 64:4
HUD-1 31:10,13
43:21,21 44:1,19
HUD-1's 31:15,21
32:11,20 44:22
Hutchinson 52:2
H-a-y-d-a-s 37:6

**I**

ID 14:3 62:19 85:10
idea 35:18,21
identification 10:11
26:23 33:16 36:8
identified 25:6
II 50:24
Illinois 1:2,17,18
2:5,12 4:20,22 5:2
5:18,20 7:1,17
8:22,23 13:3 47:9
48:24 58:15 59:4
63:4 82:2 83:1,6
84:2,6
Immediately 6:1
impolite 75:19
important 67:19
71:4,7 77:16 80:4
include 15:11
includes 82:15
including 20:1
inclusive 82:12

incoming 40:21
incorporated 4:9
INDEX 85:1
indirectly 83:22
individuals 58:5
74:17
information 71:24
initial 49:1
initialled 16:10
initials 53:10
inputted 18:19
inserted 76:1
inserting 71:6
instances 26:3
instituted 66:5
instruction 60:10
instructions 18:15
49:21,24 52:12
insurance 5:12,13
5:20 6:2 54:16
insure 4:4
interested 83:22
interruption 15:7
involving 12:22
59:11 66:24
in-house 76:20
77:21
Iowa 8:23
issued 4:15 38:9
40:24

**J**

January 1:19
job 3:17 75:9
John 3:17 46:18
Jonathan 2:14
46:22
Journal 58:5,22
judge 61:5
junk 75:7

**K**

K 1:11 3:3 11:24
12:13 49:1,3
82:18 85:3
keep 18:1 39:11
66:21
keeps 29:14
kept 39:5 55:10
Kevin 37:2,3 48:19
48:20 52:2
key 52:18
kickback 79:1
kind 5:13 17:21
34:11 52:17 54:11
55:16 65:24 71:16

74:5,17
kinds 8:13
Kirby 49:5 50:5,12
50:23 52:11,15
64:10
Kirby's 52:13
knew 77:8
know 14:19 16:18
20:11 21:4 22:22
25:6,9 28:11
35:14,15 37:6,18
39:22 41:20 44:16
44:18 45:16 47:3
48:6,16,23 52:18
52:19 53:4 54:15
54:16 56:1,24
60:2,16,16,17,19
60:21 61:9,11,13
62:15,17 64:2,10
64:17 66:1,8,9,10
66:14,17 69:5
70:12 71:5,8
74:15,17 75:5
76:11,14,17 77:1
78:4,10,14,15,23
known 62:2
K-i-r-b-y 49:5

**L**

L 1:15 2:24 83:4
label 55:24
LaSalle 1:18 2:4
late 4:10 67:7
LATTURNER 2:3
Lauderdale 6:10,14
law 67:1,5,8
lawsuit 34:1 57:15
57:19,19
lawsuits 58:16
lawyer 46:23
leading 73:11
leave 68:14 71:10
71:11
leaving 70:15 71:8
80:7
ledger 40:14 41:3
42:3
Ledsky 2:10,14 9:9
10:5 25:4 42:11
42:16,19 46:17,19
46:21,22 55:20
56:7 67:11,14,15
72:16 80:10,18
81:15 85:5
left 16:12 29:3,5
41:11 53:18 70:20

77:20
left-hand 42:13
51:3 61:24
legal 68:2
lender 9:21 17:13
23:23 24:11 25:13
29:1,14,19 30:18
30:23 31:3 38:8
38:21 53:19,24
54:10,11,19,24
55:8,12 70:23
71:6 72:21 73:2
75:6 78:16,17
79:1
lenders 4:16 18:23
22:15 23:4 25:5
28:10 29:23 40:1
52:4 54:3 78:24
lender's 28:18
lending 20:20 21:19
45:17 54:15
letter 38:16 54:12
55:7
let's 7:21 12:19
14:21 15:4 48:16
liberty 36:12
Liebovich 58:11
life 5:14
likes 34:17
line 44:8 53:6,7
lines 44:11
listed 41:1,24
litigation 46:14
48:10
little 17:21 19:16
29:19 66:11 71:16
79:5
lived 47:10
LLC 2:3
loan 7:4 20:7 24:11
35:19 36:1 68:2
68:11,15 75:13
79:19
loans 19:18 65:22
70:14 76:4,8 79:7
locate 57:3
located 4:21 58:14
long 3:13 4:7 5:5,19
6:14 7:5 23:20
24:17 47:10 67:9
67:9
longer 3:20
longest 20:8
look 9:23 10:17
13:19 19:15 20:18
21:24 23:22 24:19

27:9 30:11 31:12
32:15 34:17 38:12
38:23 39:13 40:9
49:14 59:10 60:7
60:10 69:17 71:20
71:22 72:18,23
74:9,13,23 75:23
81:1,3
looked 60:2
looking 11:1 13:15
19:5 21:18,22
37:5 42:2,2 44:8
51:1 52:21 55:4
56:16,19 62:21
66:19 69:16 74:1
77:19
looks 10:24 11:14
18:18 21:15 22:24
31:24 32:3 37:8
37:19 39:15 40:19
40:20 41:8,13,19
42:3 44:10 51:4
62:22,23 72:9
74:5
lost 60:19
lot 16:18 19:20
22:16 23:4 28:8
39:24 53:3 76:10
Louis 13:12
lower 51:3 52:22
62:8
lucky 57:9
L-i-e-b-o-v-i-c-h
58:13

**M**

M 2:7
machine 15:24
73:21
manager 6:13 7:4
51:4
March 84:2
Marcia 52:2
marital 48:11
mark 26:19 36:4
marked 10:9,15
26:21 27:2,10
33:12,14,22 36:6
85:10
matters 83:11
maximum 8:1
ma'am 10:16 16:4
16:14 32:21 45:15
McKEE 1:12 3:3
3:10,10 10:9
11:24 12:1,13

26:21 33:14 36:6
37:4 46:22 48:20
50:23 51:21 52:3
52:15 82:18 85:3
85:11
mean 12:19 15:14
17:16 20:16 21:7
43:23 74:19
Meaning 4:3
Michigan 2:11
middle 25:22 49:6
50:8 61:4
midnight 24:18
25:17 68:17 76:17
mind 26:18 67:2,23
mine 11:14 41:19
minute 31:18
mischaracterizing
25:4
missed 14:1 21:5
78:6
modify 43:3,10
moment 3:12
money 79:2
month 9:7,10,15,16
76:4,6,9,11
months 3:14,22,23
20:6,11
morning 13:10
15:18 32:1 76:16
mortgage 1:7,9
5:24 11:3,8 14:23
15:3,13 22:18
46:23 49:24 53:13
65:23 75:5 82:7
multiple 14:23
M-a-r-c-i-a 52:2
M-c-K-e-e 3:10
50:23

**N**

N 2:14
name 3:8 5:17 6:11
37:1,21 46:22
48:18 49:6,9,12
50:22 51:15,21
52:11 53:8 58:8
58:12,20 71:18,19
names 63:23
NATIONAL 1:8
need 33:21 47:17
57:14 68:15 69:3
78:8 79:8
needed 15:21 76:18
77:9,12,17,22
needs 14:14 29:21

never 25:15 26:18
45:6 52:7 74:16
79:14 80:2,24
new 8:8 20:13
39:22 46:10
newspaper 57:23
58:19,20
night 7:16
nodding 75:18
non-business 78:19
normal 18:7
normally 22:22
55:10
Northern 1:2 8:22
82:2
Northwestern 4:20
5:2
notarize 13:21 14:2
62:11
notarized 62:4,13
63:19
notary 1:16 11:8,10
11:16 12:13 13:20
39:1 53:13 62:6
82:24 83:4 84:6
note 10:18 15:2,11
21:23 22:8 25:20
27:5 30:13 35:8
65:22 67:24
notice 20:5 22:14
22:18 24:5 26:1
27:13,22 29:8
30:3 31:3,4 45:23
65:13 67:18 69:13
69:19,21 70:15
72:20,21,22 73:1
73:3 75:24 77:3
77:15,21 79:7,24
noticed 69:24 77:21
notices 29:10 69:8
notify 25:19
November 4:9
35:20 40:20 41:12
41:14,18 42:1,4
43:15
number 8:1 11:5
24:15 42:4 47:15
48:23 58:8 71:12
71:13,13 85:10
numbering 36:13
numbers 11:2 26:1
27:6 39:22,23
40:2,7 41:1 64:13

**O**

oath 82:13

Object 9:9 25:4
obviously 56:6
occur 13:23 19:18
odd 33:9
office 14:16 16:23
17:6 23:1 28:16
36:23 46:13 53:22
57:9 58:24 59:2
60:23 63:21 71:12
76:19 77:20 79:15
84:1
officer 24:12 50:5
50:12
offices 81:2
Oh 5:6 32:2 34:21
41:13
okay 7:23 22:1 24:4
25:12,19 27:1
29:18 30:6 31:12
37:5 38:11,14,24
39:9 50:9 52:20
56:8 60:16 65:12
70:3 72:4 78:12
78:13,19,22 81:8
ones 59:14 78:20
open 26:17
opportunity 19:1
81:3
opposed 35:10
Oquawka 5:17,20
order 15:19 36:19
37:15 51:14 52:1
72:15 80:20
ordered 37:20
orders 51:20
original 17:12,15
outcome 83:23
outside 34:2
overall 36:16
overnight 14:2
17:24 28:10 55:3
55:17 56:13 79:3
overnighted 16:20
17:12 28:15,18
overnights 56:2,11
owners 4:17
owner's 4:16
O-q-u-a-w-k-a 5:18
O311 39:10

**P**

package 14:15,17
14:17,19,20 15:2
15:10,15 16:10,22
16:24 17:20 18:4
20:14 26:16 28:6

28:15,17,22 29:21
30:4,6,8 31:7,8,14
31:16 32:12,20
36:24 39:4 54:19
54:23 55:1 72:3,7
73:8,13,20 77:19
packages 28:11
54:3 60:14
page 11:4,8 12:5
18:11,11,14 20:18
21:21,24 24:19
34:3 35:6,17 37:5
38:6,12 39:10,13
41:1 42:12 49:16
49:23 50:8 61:17
65:8 66:19,21
69:6 74:1
pages 73:17 82:11
paid 38:21 43:14
52:6 54:9 74:16
paper 68:1
Pardon 28:1 49:10
parents 6:6
part 35:16 39:15
44:7 63:1 65:7
particular 45:14
parties 83:21
pass 29:6
payable 41:5 43:5
paying 40:5 43:1
payoff 38:16,22
41:7 54:6
payoffs 44:13
payout 25:13
Pecatonica 6:23,24
7:3,8,13
people 17:11 57:24
62:12 64:21 74:10
76:22 80:19 81:10
people's 9:17,20
percent 9:16
period 5:7,8 6:8
17:10 24:1,16,23
25:14 30:13
person 36:18 52:18
66:2,6 70:14
personal 47:6 83:15
personally 58:6,7
60:7
pertaining 1:14
phone 58:8 71:12
71:12
physically 59:17
70:9 73:10
picked 72:3
picking 14:17 75:1

K. SEAN McKEE    JANUARY 23, 2006

piece 67:24
Pine 48:24
place 48:15 57:11
  69:7 83:18
Plaintiff 33:24
  72:24 73:5
Plaintiffs 1:5 2:8
  71:21 82:5
please 3:9 61:10
  78:14
plow 47:1
point 9:6 13:24
  15:22 34:3 46:16
  50:20 68:19 69:2
  69:17
policies 4:16,16
  8:16
policy 8:16 39:12
poor 66:3
position 4:23 7:5
  50:19
possibility 57:4,11
  61:7
possibly 58:6
post 7:14
practice 13:20,22
  14:4,10 16:5 18:7
  20:15 21:2,9
  22:13 24:4 28:20
  30:1,16 62:11,18
  64:9
practices 14:6
preparation 8:16
prepare 14:13
  15:20 80:15
prepared 18:16
  37:22 38:17,20
  39:2
preparing 40:3
  52:20
presence 62:13
PRESENT 2:1
presently 57:16
  59:6
preserving 60:22
president 3:19
  50:21
pretty 28:12 54:14
  67:18
previous 83:8
print 15:22,23 16:1
  18:19
printed 18:21 61:24
  62:22 63:13
printout 56:3
prior 3:15 4:18

5:10,22 6:1,9 7:7
  7:10 24:17 25:5
  68:17 75:1
probably 6:5 8:6
  9:6,11 52:19
  60:19 63:20,21
  66:3 72:2 80:24
  81:6
problem 57:5
problems 48:11
  52:5
Procedure 1:13
procedures 12:17
  17:5
proceedings 83:16
proceeds 54:7
process 20:13 37:16
processor 24:12
  37:8
produced 10:19
  33:24 36:14 55:5
  56:17,18 59:13,24
producing 57:3
profitable 46:12
Property 5:14
Public 1:16 11:10
  82:24 83:4 84:6
pull 73:19
pulled 4:2,6 30:5
  36:18
purpose 61:21
purposes 17:3
pursuant 1:12
  40:24 47:22 56:17
  56:18
push 73:21
put 18:5 21:6 26:12
  29:4,5 33:20
  37:21 56:5 73:20
P-e-c-a-t-o-n-i-c-a
  6:24
p-h 59:4

**Q**

Quad 5:16
question 10:22 11:2
  14:5 36:1 46:5
  66:3 72:17 79:5
questions 17:4
  46:16,17 47:1
  57:15,19 61:9
  66:20 80:10 81:11
quick 44:21 75:4
quit 64:5
quite 15:16 73:23
quo 61:2

**R**

R 51:22
ran 28:5 31:7
ranks 65:24
read 42:13 82:10
real 4:17 7:4 43:11
  65:22 66:9 75:3
realized 77:6
really 15:21 65:21
  74:16
reason 39:21 42:24
  64:18 68:14
recall 8:10 12:16
  13:13 14:6 19:17
  46:3
receipt 55:16,17,17
  68:24 69:8
receive 18:23 25:18
received 25:15,20
  27:4 34:2 40:16
  40:21 42:22 47:23
  69:13 73:1,6,6
recess 44:22
recognize 18:11
  19:6,12 22:2,10
  24:20 27:10 35:5
  36:15 37:11 38:15
  40:11 49:18 51:7
  61:17 74:3
record 3:9 10:6,12
  10:18 15:5,8 27:6
  32:6,8,9 33:22
  42:11 44:23 64:3
  80:11 83:15
recorded 39:10,11
recordings 39:8
records 39:6 60:22
  60:23
redo 40:7
reduced 83:14
refer 41:13
referring 18:10
  21:16 25:2 38:11
  43:24
refiled 61:6
refinancing 66:24
refuse 24:10
regroup 40:6
regular 24:2 51:18
regularly 35:24
regulations 66:15
relative 83:19,20
release 52:7
released 52:6
remember 12:17,18
  12:21 13:2,5 20:9

23:19 45:10,13
  65:2 75:7
renegotiate 64:19
rep 4:24
rephrase 30:20
reported 2:24 83:13
reporter 1:17 80:13
  83:6
reps 8:17
rep/closer 5:8
requested 18:9
require 77:4
rescheduled 64:22
rescind 70:7
rescission 17:9
  19:24 22:7 24:1
  25:17
rescissions 68:7
reserve 80:19,19
resigned 62:16 79:4
respect 14:7 21:2
  24:5 28:20
respond 36:19
response 36:14
responsibility 7:3
  75:13,21
rest 11:12
retain 56:20
retained 57:2
retrieve 15:22
retrieved 30:5
  36:24
returned 45:6
review 10:21 19:1
  31:9 80:12,15,16
reviewing 10:21
  43:20
right 3:23 6:8,19
  12:16 17:14 19:19
  20:18,21 22:6,6
  22:14,19 23:1
  24:5,9,21 25:12
  25:21 26:1 27:13
  27:23 28:24 29:2
  29:10 30:3 31:3,6
  31:20 32:18 34:5
  34:18 35:22 41:5
  42:4 44:3 45:10
  45:23 46:4 49:15
  49:17 51:24 53:19
  55:21 61:2 65:6
  65:13 67:18 68:11
  68:13,16 69:3,9
  69:13,14 70:15,16
  71:18 72:5,10,21
  72:23 73:3 75:24

77:4,11,15,22
  78:5 79:8,24
  80:19
right-hand 21:19
  41:16 52:22 62:9
road 76:13,18,19
Rockford 58:15
Roughly 9:16
royal 70:8
Rules 1:13
run 15:24 16:23
  18:4 20:2 30:7
  73:19 76:21
running 66:13

**S**

S 85:9
SAITH 81:17
sales 4:24 5:8 8:17
  50:21
salesman 5:20
sat 68:12
Saturday 20:1
Savings 6:12
saying 11:23 19:22
  34:16,17 64:14
says 11:10,17,23
  12:22 37:6 41:12
  44:2 50:5,5 63:14
  68:16 69:12 72:24
  73:6,16
scheduling 53:3
school 7:11,12,13
  7:14
se 66:6
seal 84:1
Sean 1:11 3:3,10
  11:24 12:13 49:6
  50:23 82:18 85:3
searching 8:15
second 59:20
Security 47:15
see 13:21 24:22
  27:15,19 29:19
  31:11,13,17 34:23
  41:4 42:6,21 43:4
  43:5 44:2 46:10
  50:6,10 51:5,6
  52:11 55:6,14,16
  56:23 60:16 61:23
  63:7 72:5,6 73:22
  75:24 77:9 78:11
  80:12 81:13
seen 64:4
sees 40:4
self-employed 5:11

K. SEAN McKEE    JANUARY 23, 2006

| | | | | |
|---|---|---|---|---|
| 5:19 6:2 | signing 13:17 14:1 | 83:1,5,7 | T 85:9 | things 39:24 47:3 |
| seminars 66:1,17 | 22:9 23:6,14 24:5 | stated 20:11 26:14 | table 21:12 23:2 | 66:15 76:16 |
| send 14:11 16:24 | 27:16 29:11 69:11 | 57:4 62:17 66:10 | 62:19 63:22 64:19 | think 23:22 44:4 |
| 36:19 39:8 53:23 | 78:13 | 68:12 | 71:11,11 | 53:12 66:3 71:4,7 |
| 54:3,11,24 55:1 | signs 62:1 | statement 14:12 | tablet 68:2 | 76:3 |
| 79:2,3 81:5 | sir 42:15 47:21,24 | 31:19 45:17 65:23 | take 6:6 16:3 17:20 | third 68:18 |
| sending 55:17 | 48:3,21 49:7 50:4 | States 1:1,14 82:1 | 20:6 29:3 30:6 | thought 25:5 59:21 |
| sent 38:1 42:7,7 | 50:18 51:2,8,22 | Status 61:2 | 44:21 68:10 73:18 | three 19:23 24:2,10 |
| 44:19 54:10 55:7 | 53:16 55:9,15 | stayed 76:19 | taken 1:12,15,17 | 32:13 57:7 60:20 |
| 55:11 56:21 78:17 | 62:7 65:4,12,15 | staying 48:12 61:1 | 36:12 83:17 | 67:2 |
| separated 28:19 | 65:19 66:24 67:3 | stenographically | talk 7:21 | three-day 17:9 |
| September 8:10,12 | 67:21 69:10 71:3 | 83:13 | talked 65:14 | throw 29:6 |
| 8:19 11:20 12:22 | 72:17 74:8 75:17 | Stephenson 59:3,20 | talking 38:12 45:2 | time 5:7,8,11 6:4 |
| 14:8 21:15,23 | 77:6,14,18 79:10 | Stevenson 12:11,11 | 52:19 72:12,13 | 9:6,12 15:18 17:2 |
| 38:10 43:18 65:5 | 79:14,17,21 80:1 | Stewart 4:5,6 45:1 | Talley 1:4,4 12:7,8 | 17:7 24:16 57:12 |
| series 36:11 | 80:3,6,18 81:15 | 45:5,6 46:6,12 | 12:14,23,23 13:17 | 59:7,23,24 64:7 |
| serve 48:14 | sitting 45:10 | 57:5,16 58:4,6,17 | 13:18 19:2 20:22 | 67:9 68:10,21 |
| served 48:1,4,7 | six 6:15 8:20 30:8,9 | stick 30:6 | 35:19,23 43:2,14 | 73:18,20 79:14 |
| service 81:12 | sleeves 28:24 | stopped 28:13 65:2 | 43:22 59:16 60:3 | 83:18 |
| SERVICES 1:9 | slug 29:23 | straight 44:17 | 60:12 61:24 62:1 | times 21:4 22:16 |
| set 10:14,17 27:3 | small 48:13 | street 1:18 2:4 47:8 | 62:2 63:14,14,15 | 28:9 40:2 62:15 |
| 83:24 | Social 47:15 | 48:23,24 59:3 | 63:15 81:4 82:4,4 | 64:16 78:21 |
| settlement 14:12 | somebody 37:20 | strike 12:19 44:16 | Talleys 12:14,18 | title 3:16,17,17 4:3 |
| 31:17,19 32:14 | 52:5 53:23 60:10 | struggle 53:8 | 24:14 27:4 28:6 | 4:5,6,7,13,15,18 |
| 33:1,4 35:9,10 | 74:23 79:3 | stuck 74:17 | 41:9 42:8 43:7 | 4:20 5:2,3 7:21 |
| 39:16 65:23 | somewhat 34:12 | study 7:19 | 44:9,19 45:4,11 | 8:1 14:13 18:1,17 |
| settlements 52:20 | son 50:15,16 64:10 | stuff 16:18 | 45:14,18 59:11 | 18:21 24:22 30:1 |
| seven 24:1 | son's 52:11 | submit 73:3 | 63:1 | 30:16 35:16 37:23 |
| SHAPIRO 1:15 | sorry 6:11 8:7 11:6 | subpoena 36:15,20 | Talley's 74:6 | 38:2 39:6 41:8 |
| 2:24 83:4 | 12:2 15:4 21:22 | 47:22 48:1,4,7 | taxes 43:2 53:4 | 45:6 46:6,6,13 |
| sheet 55:11 71:17 | 51:1 58:21 63:11 | 56:18 | tear 17:11,17 42:9 | 48:11 49:9,12,21 |
| 71:23 78:17 | south 1:18 2:4,11 | subscribe 82:12 | 54:1,2 64:1 74:14 | 50:1,3,5,12,16 |
| short 15:6 | 5:16 | SUBSCRIBED | tell 15:14 21:14 | 52:5,12,23 53:3,7 |
| Shorthand 1:16 | space 11:9 60:23 | 82:20 | 23:18 27:3 28:14 | 53:9 55:5 56:18 |
| 83:6 | speak 10:2 | sue 57:20 | 39:9,23 40:17 | 56:20 57:1,5,16 |
| show 40:23 64:24 | specific 39:7 73:19 | sued 57:21,24 | 44:20 59:18 64:11 | 58:17 60:11 65:18 |
| showing 41:6 | specifically 25:10 | sufficient 77:2 | 64:20 65:4 68:4 | 73:7 74:11,23 |
| shows 39:17 41:7 | 26:15 36:17 | sufficiently 77:16 | 74:12 78:4 | 75:9 76:24 77:1 |
| side 28:24 29:2,3,5 | specified 83:18 | suing 57:22,22,24 | teller 7:9,9 | titled 22:9 36:10 |
| sign 24:17 62:12 | specify 78:14 | 58:2,3 | terms 57:3 | today 9:24 10:3 |
| 68:22,23 69:4,7 | spell 3:8 7:1 58:12 | Suite 1:17 2:4,11 | Terry 1:4 12:7,14 | 25:17 48:9 59:14 |
| 69:18,18 | spit 55:24 | supply 80:21 | 12:23 13:17 34:11 | 61:14 65:16 66:15 |
| signature 11:9,14 | spot 54:20 68:19 | supposed 54:21 | 34:12 61:24 62:1 | told 68:3 |
| 34:16 51:4,7 | St 13:12 | 55:13 | 62:2 63:14,14 | top 24:21 27:17 |
| 52:22 53:6 61:20 | stamp 62:6 | sure 9:9 17:22 | 82:4 | 49:23 50:8 54:22 |
| 62:8,21 68:16 | stamped 27:6 | 37:20 52:16 56:9 | testified 3:5 23:7 | total 33:7,8 35:11 |
| 69:3 | stand 49:4 | 58:7 68:4 72:2 | 65:16 | 76:7 |
| signatures 20:22 | standard 14:4 58:5 | 75:4 81:5 | testify 83:10 | town 5:17 48:13 |
| 26:10 34:9,24 | 58:22 | switched 8:8 | testimony 16:11 | train 66:7 |
| 35:3 | stapled 54:22 | sworn 3:2,5 82:20 | 25:5 26:2 41:24 | trained 65:20 |
| signed 16:10,13,13 | start 12:19 13:10 | 83:10 | 42:14 43:13 83:16 | training 66:5 |
| 16:22,24 17:4,19 | 45:1 | system 18:19,21 | Thank 42:19 47:20 | transaction 22:19 |
| 18:4 21:11 25:21 | started 4:10 8:7 | 32:14 | 81:15,16 | 31:22 41:23 42:5 |
| 26:16 29:4,5 | 65:17,21 66:14,18 | S-e-a-n 3:10 50:23 | theirs 19:20 | 42:17,18 43:14,22 |
| 39:21 53:14,18 | starts 34:11 | | Theodore 58:11 | 69:20 |
| 72:6,8 73:10 | state 1:17 3:8 73:8 | T | thing 64:2,17 80:23 | transactions 4:17 |

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

K. SEAN McKEE    JANUARY 23, 2006

transcript 82:11,14
  83:13
transmittal 68:5
transpired 13:1
travel 13:10
tried 56:3 60:4
  62:18 77:24
true 59:5 82:13
  83:15
TRUST 1:8
truth 20:20 21:19
  45:17 54:15 83:10
try 64:8 75:7
trying 23:21 53:8
  75:19
turn 49:16 61:16,16
  65:8
turned 66:21
twice 64:24
two 16:1,3 20:9
  28:24 29:13 31:21
  32:20,22,23 34:19
  52:17 59:23 69:8
  69:13,20 70:18
  74:3,4 76:14 77:5
  80:7
typed 23:4
typewriting 83:14
typical 22:17
typically 80:18

_____ U _____

Uh-huh 75:15
unable 45:4
understand 28:3
  42:24 60:9 66:23
  77:3 80:24
understood 9:10
  67:16 70:13 77:15
  79:6
underwriter 4:1
  45:7 57:6
unemployed 3:12
  3:13
unexecuted 29:10
Unfortunately
  67:14
United 1:1,13 82:1
unsigned 16:8 28:5
  28:6 31:17 45:22
unusual 29:15
update 39:12
upper 21:18 41:11
  41:16 42:13 61:24
UPS 55:3,16,19
upwards 60:20

use 56:12
usually 14:3 22:15
  24:13 25:16 28:24
  48:13,15 54:13
  55:3 60:14 68:12
  71:18 75:3

_____ V _____

v 59:4
VARGA 2:10
variations 61:23
variety 66:20
various 67:19 68:9
vice 50:21
vs 1:6 82:6

_____ W _____

wait 17:10,10 31:18
want 7:1 10:20
  20:13 24:15 40:6
  52:10 54:4 57:18
  64:3 68:1;15
  71:22 80:14,15,16
  81:1
wanted 45:2 64:19
  67:23 76:23 77:1
wasn't 30:4 48:12
  73:12
way 13:12,19 43:8
  48:14
week 20:9 24:22
  25:13 30:13 61:8
  81:7,14
weekends 19:24
weeks 20:6,9
welcome 71:16,23
went 8:15 11:3 16:2
  16:7 17:14,24
  20:10 59:10 60:17
  65:24 72:4,9
  75:14,22,23 79:11
  79:16
weren't 64:11
West 47:8 59:3,20
WHEREOF 83:24
whichever 17:14
wife 51:19
wind 13:11 14:16
  23:24 40:3 64:23
wire 17:10 33:7,8
  35:9,11 40:21
wiring 18:15
Wisconsin 8:23
  13:11
wish 68:16
witness 3:1,4 9:11

25:8 33:17 42:15
  42:18,20 44:24
  55:22 72:14 80:17
  80:22 81:6,10
  83:9,9,24 85:1,2
witnessed 13:17
Woods 52:23 53:1,2
work 5:15 8:13
  52:7 53:24 64:16
  74:10
worked 7:8 24:12
  40:1 51:19 53:4
  63:22 74:18
working 3:24 4:18
  81:13
wouldn't 20:10,11
  26:12 70:24,24
  71:4,7 76:17
wound 64:3
write 71:15,17,18
  75:18
writing 26:12
written 63:18 71:23
wrong 64:18 78:22
wrote 63:22

_____ X _____

X 43:6 85:9

_____ Y _____

year 8:4,8 9:1,4
  78:18
years 5:21 6:16
  47:12 60:20

_____ $ _____

$401,000 33:7
$401,601.90 40:22
$800.12 41:10 42:8
  43:4 44:9

_____ 0 _____

01 4:9,11
03 8:6 21:23 40:20
  40:20 41:12,14,18
  42:4,14 65:6
04 8:6,7 65:7
05 1:6 8:7 82:6
05-November 42:14
05-November-03
  41:19

_____ 1 _____

1 10:10,15 18:11
  31:12 32:12 33:23
  36:13 37:5 49:14
  61:16 65:9 66:23

72:19 73:9,23
  74:1 82:11 85:12
1/2 64:21
1/23/06 10:11 26:23
  33:16 36:8
10 9:16 85:12
10/6/03 34:24
10/7 35:11
10/7/2003 33:5 35:9
10:15 1:19
1080 1:6 82:6
109 51:1 52:21
11/04/03 39:17
11/05/03 41:24
11/4/2003 33:1
11/5 40:19
12 47:12
120 1:18 2:4
1222 39:10
124 61:17 62:21
15 9:16 41:13,18
1502 47:8
16 38:10
17th 84:2
18 33:23
1800 1:18 2:4
1970s 67:7
1979 7:6
1984 6:17,21

_____ 2 _____

2 26:19,22 27:2
  29:9 31:9 38:6
  64:20 71:21 72:23
  73:23 85:13
2/19 63:8
2/19/06 11:17
200 56:2 73:16,17
2003 8:10,12,19 9:1
  9:4 11:20 12:22
  14:8 35:20 38:10
  43:15,18 65:5
2006 1:19 82:22
  84:2
22 38:23 39:9
224 2:11
23rd 1:19 25:17
24th 25:18
25 39:13 44:1
26 44:1 85:13
27 40:9 41:1 42:12
29 65:8,10 66:19,22
  74:1

_____ 3 _____

3 21:23 33:12,15

34:4,23,23 35:6,6
  35:17,17 85:4,14
30 8:11 9:7,10,12
  11:20 12:22 21:15
  21:23 76:4,6
30,000 60:20
300 9:7,13
312-341-9400 2:13
312-739-4200 2:6
33 85:14
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 47:19
350 2:11
36 85:15
37 27:10 29:9
38 29:9 36:13
389,958 35:10
39 29:9
399,000 33:8
399.161 35:11

_____ 4 _____

4 36:4,7,11 37:5
  38:7,13 39:14
  41:2 42:12 44:1
  55:4 56:16,23
  85:15
40 29:9
41 29:9
42 30:11
43 30:11
46 30:11 85:5

_____ 5 _____

5 40:20 41:12 42:4
  43:15
5th 42:22 43:4
50 8:3,4,4 9:7,10,12
524 59:3,20

_____ 6 _____

6:00 76:15
60603 2:5
60604 2:12
61032 47:9

_____ 7 _____

7 38:7
70s 67:7,11
75 7:9

_____ 8 _____

8 38:12
81 82:12
84-3597 1:16 2:24
  84:9

_____ 9 _____

K. SEAN McKEE    JANUARY 23, 2006

| | | | | |
|---|---|---|---|---|
| 9/27/07 84:7<br>9/30 23:6<br>90 6:5,8,9<br>93 6:5,8<br>94 5:6 | | | | |

ESQUIRE DEPOSITION SERVICES, LLC - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

# EXHIBIT E

Atty. No. 41106

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| MIGUEL SANCHEZ and SHARON COLEMAN, | ) ) ) | |
| Plaintiffs, | ) ) | 04 CH 10533 |
| v. | ) ) ) | Judge Dorothy Kinnaird |
| AMERIQUEST MORTGAGE COMPANY and ARGENT MORTGAGE COMPANY, L.L.C., | ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF AL HOFELD, JR.

I, Al Hofeld, Jr., do hereby declare under penalty of perjury and pursuant to 735 ILCS 5/1-109 that the following is true and correct:

1.     I am one of the attorneys for the plaintiffs in the above-captioned case. I am employed by Edelman, Combs, Latturner & Goodwin, LLC.

2.     On February 13, 2006, I first contacted Tom James and Sue Ellis of the Consumer Protection Division of the Office of the Illinois Attorney General to learn more about the nationwide, out-of-court settlement between Ameriquest-related companies and the attorneys general of 49 states ("the Agreement"). Mr. James and Ms. Ellis informed me that they headed the investigation of Ameriquest-related companies for the Illinois Attorney General's office and that they are also involved in aspects of administration of the settlement, including the determination of the formula according to which Illinois borrowers will receive an amount of restitution under the Settlement.

3.     A few days later, Mr. James, Ms. Ellis and I had a phone conference lasting

approximately 20-30 minutes in which they answered my questions. I made and kept notes from that conversation.

4.     During that conversation, they informed me that they estimate that sometime in autumn, 2006, Ameriquest borrowers in Illinois will receive an initial notice informing them of the settlement and that they will have the clearly stated option of "opting in" or accepting the settlement and waiving any claims or, alternatively, rejecting the settlement and pursuing private litigation.

5.     Mr. James and Ms. Ellis also explained that, under the Agreement, there are two classes of borrowers, pre-SNAP and post-SNAP. "SNAP" is the universal pricing model Ameriquest adopted in January, 2003. The Pre-SNAP class runs from 1999-2004. They informed me that, in Illinois, there were approximately 21,000 loans in the pre-SNAP class, which includes Ameriquest, Town & Country and Bedford loans. The post-SNAP class includes 2004 and 2005. In Illinois, there are approximately 28,000 loans in the post-SNAP class, which also includes Ameriquest, Town & Country and Bedford loans.

6.     Mr. James and Ms. Ellis explained that Argent was not a party to the Agreement and that, therefore, Argent borrowers/loans are not eligible to receive any restitution. They explained that the release contained in the Agreement releases Argent because it covers all entities that are "subsidiaries" of ACC Capital Holdings Corporation, which Argent is.

7.     Mr. James and Ms. Ellis explained that, in Illinois, borrowers in the pre-SNAP class will receive a per capita distribution, and some will also receive a distribution based on harms and calibrated to a measure of financial harm suffered. Pre-SNAP loans/borrowers will receive a minimum of $600 per loan and a maximum of $1,000 per loan. The exact amount, they explained, will depend of the rate of participation and the amount of points and fees Ameriquest

charged each borrower. They said that most but not all borrowers in this class will qualify for some amount.

8. Mr. James and Ms. Ellis further explained that borrowers in the post-SNAP class in Illinois will receive much less than those in the pre-SNAP class. Each post-SNAP class member will receive an amount not to exceed half of the amount that a pre-SNAP class member will receive. Additionally, more people than in the pre-SNAP class will not be eligible to receive any amount. For those on the post-SNAP class who do receive something, the average award will be $300 per loan.

9. Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Further affiant sayeth not.

Executed this 3rd _____ day of May, 2006.

_____
Al Hofeld, Jr.

## CERTIFICATE OF SERVICE

I, Al Hofeld, Jr., hereby certify that on June 13, 2006, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that true and correct copies were additionally sent via email or by U.S. Mail or hand delivery to those parties without email addresses.

*Attorneys for Plaintiffs Cheryl Williams and Duvall Naughton*

*Lieff Cabraser Heimann & Berstein, LLP*
Elizabeth J. Cabraser, ecabraser@lchb.com
Kelly M. Dermody, kdermod@lchb.com
Caryn Becker, cbecker@lchb.com
Gena E. Wiltsek, gwiltsek@lchb.com
Rachel German, rgerman@lchb.com

*The Tien Law Firm, LLP*
Lawrence Tien, ltien@tienlawgroup.com
Kamran Mashoyekh,
    kamran@tienlawgroup.com

*Attorneys for Plaintiffs Albert Knox, Nona Knox, Maria Torres, Heladio Arellanes, and Maria Arellanes*

*Fenwick & West LLP*
Emmett C. Stanton, estanton@fenwick.com
Aaron Myers, amyers@fenwick.com
Bryan A. Kohm, bkohn@fenwick.com

*Community Legal Services in East Palo Alto*
Shirley Hochhausen,
    s_hochhausen@hotmail.com

*Attorneys for Plaintiff Adolph Peter Kurt Burggraff*

Douglas Bowdoin,
dbowdoin@bowdoinlaw.com

*Kirby Noonan & Sweat*
Jonathan Andrews Boynton,
    jboyton@knlh.com
Sarah Brite Evans, sevans@knlh.com

*James Hoyer Newcoomer & Smiljanich*
Terry Smiljanich,
    tsmiljanich@jameshoyer.com
Kathleen Clark Knight,
    kknight@jameshoyer.com

| | |
|---|---|
| *Attorneys for Plaintiffs Latonya Williams, Duwayne Williams, William F. Tolbert, Daisybel Tolbert, David R. Murphy, David M. Wakefield, Isabell M. Murphy, Janet Wakefield and Lynn Gay* | *Roddy Klein & Ryan*<br>Gary Klein, klein@roddykleinryan.com<br>Elizabeth Ryan, ryan@roddykleinryan.com<br>Shennan Kavanagh,<br>    kavanagh@roddykleinryan.com |
| *Attorneys for Plaintiffs Latonya Williams, Duwayne Williams, William F. Tolbert and Daisybel Tolbert* | *Horowitz, Horowitz & Associates*<br>O. Randolph Bragg, rand@horowitzlaw.com<br><br>*Law Office of Theresa I. Wigginton*<br>Theresa I. Wigginton,<br>    terri@twiggintonlaw.com |
| *Attorneys for Defendants Ameriquest Mortgage Company, Ameriquest Capital Corporation, Argent Mortgage Company and Town and Country Credit Corporation*<br><br>*Attorneys for Defendant Ameriquest Mortgage Company* | *Buchalter Nemer, A Professional Corp.*<br>Bernard E. LeSage, blesage@buchalter.com<br>Sarah K. Andrus, sandrus@buchalter.com<br>Buchalter Nemer, bnemer@buchalter.com<br><br>*Kirkpatrick & Lockhart Nicholson Graham LLP*<br>Daniel A. Casey, dcasey@klng.com<br>Jonathan B. Morton, jmorton@klng.com<br>Jeffery T. Kucerajkucera@klng.com<br>Brian Mark Forbes, bforbes@klng.com<br>Ryan M. Tosi, rtosi@klng.com<br>R. Bruce Allensworth,<br>    ballensworth@klng.com<br><br>*Varga Berger Ledsky Hayes & Casey*<br>Craig Varga, cvarga@vblhc.com<br><br>*Dykema Gossett, PLLC*<br>Harry N. Arger, harger@dykema.com<br>Todd A. Gale, tgale@dykema.com<br>Richard E. Gottlieb, rgottlieb@dykema.com<br>David A. Wheeler, dwheeler@dykema.com |
| *Attorneys for Plaintiff Giavone Tammerello* | *Stanley Hill &n Associates, P.C.& Associates, P.C.*<br>Stanley L. Hill, stanhill@megsinet.net<br>Dalal M. Jarad, dmjarad@aol.com |
| *Additional Party* | *The Law Offices of Daniel Harris*<br>Daniel Harris, lawofficedh@yahoo.com |

*Attorney for Defendants AMC Mortgage Service, Inc. and Ameriquest Mortgage Company*

*Edward P. Grimmer, PC*
Edward P. Grimmer, ed@grimmerlaw.com

*Attorney for Citifinancial Mortage Company, Inc.*

*Bunger & Robertson*
Suzette V. Sims, ssims@lawbr.com

*Attorneys for GMAC Mortgage Corporation*

*Wooden & McLaughlin LLP*
James M. Boyers,
        jboyers@woodmclaw.com
Jamie A. Young,
        jyoung@woodenmclaw.com

*Registered Agent for AMC Mortgage Service, Inc., Ameriquest Mortgage Company, Argent Mortgage Company, LLC and Town and Country Credit Corporation*

National Registered Agents (Hand-delivery)
200 W. Adams Street
Chicago, IL 60606

*Registered Agent for Ameriquest Mortgage Securities, Inc.*

National Registered Agents (via US Mail)
2030 Main Street, Suite 1030
Irvine, CA 92614

s/Al Hofeld, Jr.
Al Hofeld, Jr.

3