**Exhibit 5**

FOCUS - 1 of 1 DOCUMENT

Copyright 2003 FDCHeMedia, Inc. All Rights Reserved.
FDCH Political Transcripts

June 19, 2003 Thursday

**TYPE:** COMMITTEE HEARING

**LENGTH:** 29104 words

**COMMITTEE:** HOUSING AND URBAN AFFAIRS COMMITTEE

**SUBCOMMITTEE:** SENATE BANKING

**HEADLINE:** U.S. SENATOR RICHARD C. SHELBY (R-AL) HOLDS HEARING ON IDENTITY THEFT

**SPEAKER:**
U.S. SENATOR RICHARD C. SHELBY (R-AL), CHAIRMAN

**LOCATION:** WASHINGTON, D.C.

**WITNESSES:**

HOWARD BEALES, II, DIRECTOR OF CONSUMER PROTECTION, FEDERAL TRADE COMMISSION BU-
REAU
TIMOTHY CADDIGAN, SPECIAL AGENT IN CHARGE, CRIMINAL INVESTIGATION DIVISION, UNITED
STATES SECRET SERVICE
MICHAEL CUNNINGHAM, SENIOR VICE PRESIDENT, JP MORGAN CHASE CARD MEMBER SERVICES
LINDA FOLEY, EXECUTIVE DIRECTOR, IDENTITY THEFT RESOURCE CENTER
MICHAEL W. NAYLOR, DIRECTOR OF ADVOCACY, AARP
STUART PRATT, PRESIDENT & CEO, CONSUMER DATA INDUSTRY ASSOCIATION
WILLIAM HOUGH, VICE PRESIDENT OF CREDIT SERVICES, THE NEIMAN MARCUS GROUP
CAPTAIN JOHN HARRISON (U.S. ARMY, RET.), CONSUMER WITNESS

**BODY:**


U.S. SENATE COMMITTEE ON BANKING, HOUSING AND URBAN AFFAIRS
HOLDS A HEARING ON IDENTITY THEFT

JUNE 19, 2003

SPEAKERS:
U.S. SENATOR RICHARD C. SHELBY (R-AL)
CHAIRMAN
U.S. SENATOR ROBERT F. BENNETT (R-UT)
U.S. SENATOR WAYNE ALLARD (R-CO)
U.S. SENATOR MICHAEL B. ENZI (R-WY)
U.S. SENATOR CHARLES HAGEL (R-NE)
U.S. SENATOR RICK SANTORUM (R-PA)
U.S. SENATOR JIM BUNNING (R-KY)
U.S. SENATOR MICHAEL CRAPO (R-ID)

U.S. SENATOR RICHARD C. SHELBY (R-AL) HOLDS HEARING ON IDENTITY THEFT FD

U.S. SENATOR JOHN E. SUNUNU (R-NH)
U.S. SENATOR ELIZABETH DOLE (R-NC)
U.S. SENATOR LINCOLN D. CHAFEE (R-RI)

U.S. SENATOR PAUL S. SARBANES (D-MD)
RANKING MEMBER
U.S. SENATOR CHRISTOPHER J. DODD (D-CT)
U.S. SENATOR TIM JOHNSON (D-SD)
U.S. SENATOR JACK REED (D-RI)
U.S. SENATOR CHARLES E. SCHUMER (D-NY)
U.S. SENATOR EVAN BAYH (D-IN)
U.S. SENATOR ZELL MILLER (D-GA)
U.S. SENATOR THOMAS R. CARPER (D-DE)
U.S. SENATOR DEBBIE STABENOW (D-MI)
U.S. SENATOR JON S. CORZINE (D-NJ)

\*

SHELBY: The committee will come to order.

I first want to thank the witnesses for appearing this morning.

Today, the committee returns to considering the expiring preemption provisions of the Fair Credit Reporting Act. As part of this process, I believe it's essential that we undertake a thorough review of the larger context in which the act operates. In this regard, the first thing worth noting is the truly dynamic nature of the credit markets in our economy. In just the six years since the Fair Credit Reporting Act was last amended, significant changes have occurred. There are new participants, new technologies, new information use practices and new products. Indeed there is more that has changed than has remained the same in the operation of the credit markets since the last time Congress considered the Fair Credit Reporting Act.

While many of these changes introduce positive features, such as more credit and an expedited process for obtaining credit, not every new development has been positive. Unfortunately, as our economy has grown more automated, allowing more and more de-personalized transactions to occur, and as the transfer of personally identifiable information has become much more frequent, a new type of crime that takes advantage of these circumstances has emerged -- identity theft.

Identity theft involves a person using someone else's personal information without their knowledge to commit fraud or theft. Practically speaking, the crime involves misappropriation of such personal information as a victim's name, date of birth, and Social Security number. Identity thieves then use this information to open new credit card accounts, to divert current accounts from victims to themselves and to open bank accounts in victim's names, among other things. The bad charges and the hot checks usually happen while the victims, banks, credit card companies and other firms are unaware that something is amiss. After all the activity and the skipped payments, businesses usually take action to get compensated and ultimately cut the thief off.

In most instances, this is when the victims first become aware of the fact that they've been targeted. It is also when they begin to experience the negative consequences, dealing with law enforcement and the collection agencies. Soon thereafter, when the criminal's handiwork shows up on their credit reports, they face the considerable task of restoring their good name and credit.

Plainly, this crime has many victims. Firms lose profits; individuals lose time, money and peace of mind when their good name and reputation are tarnished. In light of the serious nature of the consequences of identity theft, this issue would merit attention even if there were only a limited number of victims. Unfortunately there are thousands of victims whose numbers are growing at an increasingly faster pace. Indeed, it has been asserted that identity theft is the fastest growing crime in America.

This issue tracks across credit reporting in so many ways that it's essential that we consider it in the context of the reauthorization of the preemption provisions of the Fair Credit Reporting Act. Identity theft prevention, restoration of accurate reports and victim assistance, among many other areas, are things that were not on the radar screen when the 1996 amendments were passed into law. These are things we need to be thinking about as we go forward, things we

U.S. SENATOR RICHARD C. SHELBY (R-AL) HOLDS HEARING ON IDENTITY THEFT FD

SHELBY: We're not talking about that, we're talking about trying to prevent identity theft, trying to protect the consumer here. And you've been waffling here all morning.

BEALES: As I said, the commission hasn't taken a position. I think that there is -- adverse action notices have narrowed as we've moved to risk-based pricing, but the -- on the other hand, if you give notices too widely and in too many circumstances, then it no longer -- I mean, it becomes something that people ignore. I mean the adverse action notice, as it was originally envisioned, fit well in the set of circumstances where consumers needed to pay attention to the credit report and didn't raise a lot of false alarms. I think how to preserve that balance of doing both jobs is definitely an issue, and one that we're looking at.

SHELBY: Senator Sarbanes, do you have any...

SARBANES: I think Senator Bennett...

SHELBY: Senator Bennett, do you have a question?

SARBANES: I don't think he had a turn yet.

SHELBY: No, he's been in and out.

BENNETT: Yes. My constituents come to see me. And, important as you are, the voters in Utah who need to get their pictures taken sometimes have a higher sense of urgency.

As I deal with this issue over time, I have a reaction that I'd like to share with you. And first, let me say going back to that first hearing that we held in my subcommittee some years ago, I am very heartened at the progress that has been made. We were basically in this room looking at each other, throwing up our hands and saying, "What can we do?"

And the hearing highlighted a whole series of problems and very, very few, if any, strategies with which to deal with the problem. So I'm heartened by the degree of involvement, both of the Secret Service and the FTC. We've come a long way, and I think we should not lose sight of that fact.

There seems, to me, to be a very interesting paradox here. The more information we can get in the hands of what I would call the good guys, that is, people who want the information for legitimate purposes, they want to improve their service to customer; they want to be more efficient in offering products that the customer might use, and they use the information therefore for benign purposes, the better off we are.

At the same time, the more information we get in the hands of a wider number of people, by definition, the more vulnerable we are. And there is the paradox. We want affiliate sharing information, your response to Senator Dole, we want people at a wide range to have the information so they can check against each other when something seems to be going wrong. And at the same time, we don't want anybody to see this, for fear they might steal it.

And that, I think, is the challenge that is facing the Congress: how to see to it that we take steps to prevent people from stealing information, but do it in a way that does not harm the beneficial effect of having this information in the hands of a fairly large number of good guys, people who will use it for benign purposes, rather than evil purposes.

Is that a fair characterization of the challenge we face here?

BEALES: I think it is. I think that's exactly the nature of the problem. I think the challenge is to try to control access in a way that keeps information from getting to the bad guys, but makes as much information as possible available to the good guys. There are inherent risks that remain of the information being there, but it's not -- you can't -- if you hide the information, then you can pretend to be anybody.

BENNETT: So paradoxically, if I'm understanding what you're saying, you could make identity theft easier if you restricted too tightly the use of this information on the part of the good guys.

BEALES: Yes, sir. I think that's right. In fact, one claim that has been made to me in my discussions of this issue is that one of the reasons for identity theft is that now you have to make up a real person, because the information sharing system means you can't just make up a name and an address, because that won't work. The information sharing system will let us tell that there is no such person. So the name and address has to be real somebody in order to apply for credit under a false identity.

BENNETT: So in an attempt to block identity theft, it seems to me that the privacy advocates and the users of information are really on the same side. That is, the people who use the information to make marketing decisions and