# EXHIBIT 3

FILED
JAN 1 7 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KURT and NANCY FULLER, )  07CV291
                       )  JUDGE SHADUR
        Plaintiffs,    )  MAGISTRATE JUDGE COLE
                       )
vs.                    )
                       )
AMERIQUEST MORTGAGE COMPANY, )
AMC MORTGAGE SERVICES, INC.  )
and DEUTSCHE BANK NATIONAL TRUST )
COMPANY,               )  JURY TRIAL DEMAND
                       )
        Defendants.    )

## COMPLAINT

### INTRODUCTION

1.   Plaintiffs Kurt and Nancy Fuller seek rescission of their mortgage and other remedies pursuant to 15 U.S.C. § 1635. Plaintiffs also charge defendants with violation of Texas law.

### JURISDICTION AND VENUE

2.   This Court has jurisdiction pursuant to Title 28 of the United States Code, Sections 1331 and 1337 because plaintiffs' claim under the Truth in Lending Act arises under federal law. This Court has supplemental jurisdiction over plaintiffs' claim under state law pursuant to the Judicial Improvements Act of 1990, Pub.L.No. 101-650, 104 Stat. 5089, 28 U.S.C. § 1367.

3.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because the defendants do business in this district. Also, the Judicial Panel on Multi-District Litigation has issued an order centralizing predatory lending litigation against Ameriquest in this district before Judge Aspen.

## PARTIES

4. Defendant Ameriquest Mortgage Company is a leading sub-prime mortgage lender. The company's main offices are in Orange, California, but it does business in this district. Defendant AMC Mortgage Services, Inc. services Ameriquest mortgages and has the right to receive payments thereunder and does business in this district. Defendant Deutsche Bank National Trust Company is the owner of plaintiffs' mortgage and also does business in this district.

5. Plaintiffs Kurt and Nancy Fuller, husband and wife, are residents of Texas.

## BACKGROUND

6. Plaintiff Kurt Fuller is a maintenance mechanic with Frito-Lay. His wife, plaintiff Nancy Fuller, is a homemaker. Mr. and Mrs. Fuller own a home in Irving, Texas where they live with their daughter, who is in school.

7. In 2002, plaintiffs contacted Ameriquest about refinancing their mortgage. Plaintiffs were promised a fixed rate loan at 5.6%. At the closing, however, plaintiffs were presented with an adjustable rate loan which started at 9.625%.

8. Plaintiffs did not want an adjustable rate mortgage so, in or about December 2003, plaintiffs contacted Ameriquest about refinancing again, this time into a fixed rate mortgage. Mrs. Fuller spoke repeatedly to an Ameriquest representative. The conversations were mostly on the telephone, but Mrs. Fuller also once went to the Ameriquest's office in Arlington, Texas. She recalls that it was crowded with desks, files all over the floor, phones ringing off the wall, like a sweat shop or like the office in the movie Boiler Room.

9. Mrs. Fuller made it very clear that the Fullers were insisting that this time they really get a fixed rate loan and that getting a fixed rate loan was the whole point of their refinancing. The Ameriquest representative agreed that the Fullers would be getting a fixed rate loan and promised a fixed interest rate of 7.9% and monthly house payments of $633. The Ameriquest representative also told Mrs. Fuller that in a year she would be able to refinance again at a lower interest rate. The Ameriquest representative also told Mrs. Fuller that their

2

property would have to be appraised. Mrs. Fuller suggested using her own appraiser. The Ameriquest representative said it would be better if they used an appraiser chosen by Ameriquest. The Ameriquest representative said that the cost of the appraisal would be included in the loan, but the Fullers would have to pay the appraisal fee if they backed out of the deal.

10. The discussions dragged on for months. In June 2004, Ameriquest prepared an adjustable rate note for $87,200 with an initial interest rate of 7.9% which could increase to as much as 13.9% depending on changes in the LIBOR rate. Ameriquest assessed the Fullers fees and points of $3.961.43 to get this loan and also required the Fullers to pay a prepayment penalty under the prior Ameriquest mortgage of about $1,000.

11. The closing took place on June 15, 2004, at a title company in Irving, Texas. Mrs. Fuller noticed that, once again, Ameriquest had switched them into an adjustable rate loan. She complained. The closing agent called the Ameriquest representative who then spoke on the telephone to Mrs. Fuller. The Ameriquest representative explained that because it had taken so long to close the loan the interest rate on the fixed had gone up and the best he could do to get the Fullers the 7.9% rate he had promised was to get them an adjustable rate mortgage but not to worry because could refinance in a year at a lower interest rate. The Fullers signed the loan documents.

12. In June 2006, the Fullers received a letter from Ameriquest stating that their interest rate would be raised to 9.9%. Another letter in December 2006 said the interest rate would be raised to 10.9%.

13. The Fullers have tried to refinance their mortgage but have not been able to do so. An independent appraiser has determined that at best the Fuller home is worth $92,500. The Fullers owe more than $85,000 on their mortgage, more than 90% of the fair market value. Under Texas law, a home mortgage cannot exceed 80% of the appraised value of the property. As a result, the Fullers cannot get another mortgage company to refinance their mortgage.

3

## COUNT ONE -- TRUTH IN LENDING ACT

14. Plaintiffs incorporate paragraphs one through thirteen above.

15. Ameriquest's disclosures to plaintiffs did not comply with the requirements of the Truth in Lending Act. To understand how the disclosures were defective, some background is helpful.

## REGULATORY FRAMEWORK

16. The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et. seq. requires the clear, fair, conspicuous and accurate disclosure of the costs and terms of credit. The statute's purpose is to protect consumers from inaccurate and unfair credit practices, and to assure a meaningful disclosure of credit terms so that the consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit.

17. Accordingly, the Board of Governors of the Federal Reserve System promulgated Regulation Z to implement the TILA. 12 C.F.R. § 226.1(a). A creditor is required by Regulation Z to make certain disclosures to the consumer, "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Regulation Z sets out certain guidelines for creditors to follow when disclosing the amount financed, the finance charge, and the annual percentage rate to the consumer and demands that these disclosures be accurate. 12 C.F.R. § § 226.18, 226.22, 226.5.

18. Regulation Z also requires that "disclosures shall reflect the terms of the legal obligation between the parties" 12 C.F.R. § 226.17(c)(1) and that the creditor accurately disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g)(1).

19. The Truth in Lending Act confers additional rights on home owners who refinance their mortgages with a new lender. In order to give these borrowers an opportunity to reflect on their other TILA disclosures and to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following

4

the consummation of the transaction or three business days after receiving their final TILA disclosures or three business days of receiving notice of their right to rescind, whichever is later. More specifically, the statute provides that:

> Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.

15 U.S.C. § 1635(a).

20. To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction. More specifically, the statute provides:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

15 U.S.C. § 1635(b).

21. To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately. More specifically, the statute provides:

> The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

22. Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in Lending Act, amplifies the statutory requirements. Subject to exceptions not here pertinent, the regulation provides:

> In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction ....

12 C.F.R. § 226.23(a)(1).

23. The regulation goes on to require that the creditor "deliver" to "each consumer entitled to rescind" two copies of a document that "clearly and conspicuously disclose[]" the consumer's rescission rights. See 12 C.F.R. § 226.23(b)(1)

24. More specifically, the regulation provides:

> In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
>
> > (i) The retention or acquisition of a security interest in the consumer's principal dwelling.
> >
> > (ii) The consumer's right to rescind the transaction.
> >
> > (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
> >
> > (iv) The effects of rescission, as described in paragraph (d) of this section.
> >
> > (v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1).

25. Paragraph (d) goes on to explain the effects of rescission. Subparagraph (d)(1) provides:

> When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any

6

amount, including any finance charge.

12 C.F.R. § 226.23(d)(1).

26. Subparagraph (d)(2) states:

Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

12 C.F.R. § 226.23(d)(2).

27. The Federal Reserve Board's commentary of paragraph 23(d)(2) explains that the words "any money or property" would include an appraisal fee. The commentary provides:

The consumer cannot be required to pay any amount in the form of money or property either to the creditor or to a third party as part of the credit transaction. Any amounts of this nature already paid by the consumer must be refunded. "Any amount" includes finance charges already accrued, as well as other charges, such as broker fees, application and commitment fees, or fees for a title search or appraisal, whether paid to the creditor, paid directly to a third party, or passed on from the creditor to the third party. It is irrelevant that these amounts may not represent profit to the creditor.

12 C.F.R. part 226 Supp.I para. 23(d)(2)-1.

### DEFECTIVE DISCLOSURES

28. Ameriquest's rescission disclosures to plaintiffs were defective in a number of respects. First, on the Notice of Right to Cancel form that was given to the Fullers at the closing, there is no date filled in for the expiration of the rescission period, a violation of 12 C.F.R. § 226.23(b)(1)(v).

29. Second, Ameriquest told Mrs. Fuller that she would have to pay the appraisal fee if she backed out of the deal. This statement contradicted plaintiffs' right to rescind the transaction and get back "any money or property that has been given to anyone in connection with the transaction" 12 C.F.R. § 226.23(d)(2). The Federal Reserve Board's commentary of paragraph 23(d)(2) explains that the words "any money or property" would include an appraisal fee. By representing the appraisal fee was nonrefundable if plaintiffs tried to cancel the transaction, Ameriquest misrepresented plaintiffs' rescission rights, thereby making the rescission

7

notice defective under 12 C.F.R. § 226.23(b)(1)(iv).

30. Third, the Notice of Right to Cancel form given to the Fullers lists Kurt Fuller as the only borrower and creates the impression that only Mr. Fuller has the right to rescind the mortgage, whereas Mrs. Fuller also has that right.

31. Fourth, Ameriquest did not provide plaintiffs with the requisite number of copies of the Notice of Right to Cancel form.

32. Fifth, by falsely assuring plaintiffs that they would be getting a fixed rate mortgage and falsely assuring plaintiffs that they would be able to refinance in a year at a lower fixed rate, Ameriquest misled plaintiffs as to the cost of credit in violation of 12 C.F.R. § 226.18.

33. Under the Truth in Lending Act, if the rescission disclosures or TILA disclosures are deficient, then the rescission period is extended for up to three years. See 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first").

34. Ameriquest's rescission and TILA disclosures were defective. Accordingly, plaintiffs sent a rescission notice to Ameriquest, AMC Mortgage Services and to Deutsche Bank, the current owner of their mortgage on December 8, 2006.

35. Within twenty days of receiving the rescission notice, defendants should have released their security interest in plaintiffs' home and paid back to plaintiffs any money or property that plaintiffs have paid to them in connection with the loan. See 12 C.F.R. § 226.23(d)(2). Defendants have not done either.

36. Defendants' failure to honor the rescission request is a violation of the Truth in Lending Act. Plaintiffs are entitled to rescission plus statutory damages and other relief.

### COUNT TWO -- VIOLATION OF TEXAS LAW

37. Plaintiffs incorporate paragraphs one through thirty-six above.

38. In connection with trade or commerce, Ameriquest made false and misleading statements to plaintiffs intending to induce reliance. More specifically, Ameriquest engaged in a

8

bait and switch by baiting plaintiffs into the mortgage transaction by offering a relatively favorable set of terms and then switching to less favorable terms. Ameriquest also misled plaintiffs as to whether they would be able to refinance in a year at a lower rate.

39. Ameriquest's false and misleading statements to plaintiffs violated plaintiffs' rights under Texas law.

40. Ameriquest's false and misleading statements deceived plaintiffs and proximately caused them injury.

41. Ameriquest's violation of plaintiffs' rights is part of a pattern and practice of illegal behavior by Ameriquest. Defendants AMC Mortgage Services and Deutsche Bank Trust Company knowingly aided and abetted this illegal behavior by Ameriquest and are therefore also liable to plaintiffs.

42. Defendants have also violated plaintiffs' rights under the Texas Constitution because the loan secured by plaintiffs' homestead exceeded 80% of the fair market value of plaintiffs' property, because Ameriquest did not make disclosures to plaintiffs in the manner prescribed by the Texas Constitution and because the mortgage loan payments are adjustable in a manner prohibited by Texas law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs requests that the Court grant judgment against defendants as follows:

a. canceling defendants' security interest in plaintiffs' home and ordering defendants to provide plaintiffs with the money to which plaintiffs are entitled to under 12 C.F.R. § 226.23(d)(2);

b. awarding plaintiffs actual damages proximately caused by defendants' failure to comply with 12 C.F.R. § 226.23(d)(2);

c. awarding appropriate statutory damages;

d. ordering defendants to pay costs, penalties, and attorneys fees;

e. awarding plaintiffs actual and punitive damages;

9

f. granting such other relief as the Court deems just and proper.

Respectfully submitted by:

_____
Counsel for the Plaintiffs

Daniel Harris, Esq.
Anthony Valach, Esq.
The Law Offices of Daniel Harris
150 N. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 960-1802

10