## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SCOTT JEFFRESS;<br>PAMELA JEFFRESS;<br>TAMMY M. GOODS,<br>RITA GUYDON,<br>and KEVIN GUYDON,<br><br>Plaintiffs,<br><br>v.<br><br>AMERIQUEST MORTGAGE COMPANY,<br>AMC MORTGAGE SERVICES, INC., and<br>JOHN DOES 1-100,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2: 06 CV 102 RL<br><br>06 C 3423 (N.D.Ill.)(transferred for<br>pre-trial proceedings to MDL No.<br>1715, Lead Case No. 05 C 07097)<br><br>Judge Marvin E. Aspen<br><br><br>**JURY DEMANDED** |

## AMENDED COMPLAINT

### INTRODUCTION

1.     Plaintiffs bring this action against Ameriquest Mortgage Company and an affiliate to secure redress for predatory practices in making residential mortgage loans.  Plaintiffs allege violations of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA") and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA").

### JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), and 15 U.S.C. §§1640 (TILA) and 1691e (ECOA).

3.     Each defendant does business in the District and is deemed to reside here.

## PARTIES

### Plaintiffs

4.     Plaintiffs Scott Jeffress and Pamela Jeffress are husband and wife and reside in a home which they own at 3320 Willowdale Road, Portage, Indiana 46368, in Porter County.

5.     Plaintiff Tammy M. Goods is an individual who resides in a home which she owns at 7716 Juniper Avenue, Gary, IN 46403, in Lake County.

6.     Plaintiffs Rita Guydon and Kevin Guydon are husband and wife and reside in a home which they own at 4749 Adams Street, Gary, IN, in Lake County.

### Defendants

7.     Defendant Ameriquest Mortgage Company ("Ameriquest") is a Delaware corporation with its principal offices in California.  It maintains offices in and does business in Indiana as well as Illinois.   Its registered agent and office are National Registered Agents, Inc., 320 Meridian St., Indianapolis, IN 46204, or 200 W. Adams, Chicago, IL 60606.

8.     Defendant Ameriquest is engaged in the business of originating "subprime" mortgages.

9.     Defendant Ameriquest makes more than 26 loans per year.  It is a "creditor" as defined in TILA.

10. During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same

2

period in 2003.

11. Defendant AMC Mortgage Services, Inc. ("AMC") is a Delaware corporation with its principal place of business in California. It does business in Indiana as well as Illinois. Its registered agent and office are National Registered Agents, Inc., 320 Meridian St., Indianapolis, IN 46204, or 200 W. Adams, Chicago, IL 60606.

12. Defendant AMC services loans originated by Ameriquest. Borrowers such as plaintiffs are directed to make payments to AMC, which claims, among other interests, the right to payments under plaintiffs' loans.

13. Defendants John Does 1-100 are other persons, as yet unknown to plaintiffs, that own or claim interests in plaintiffs' mortgage loans.

## PRACTICES COMPLAINED OF

14. Ameriquest targets consumers for predatory, "subprime" loans. Ameriquest engages in a "bait and switch" scheme through which it lures borrowers with promises of favorable interest rates, monthly payments and/or loan terms, and then switches the terms at closing to less favorable ones.

15. Ameriquest holds itself out, in advertising, as a mortgage company that can quickly arrange for and close mortgage refinancings in short order—with terms quoted over the phone in as little as one business day, loan documents sent to a borrower shortly thereafter, and a closing taking place in a matter of weeks. These refinancings are most often completed for the purpose of "cashing out" equity built up in consumers' houses, in order to retire personal debts (on credit card accounts or other loans) or receive money for major personal expenses.

16. In a mailing, Ameriquest promises that "your Ameriquest personal

3

mortgage specialist will work with you to custom-tailor a loan with the terms and rates that work best for you" that Ameriquest "can tell you how much you qualify for in about a day," and that "we'll even do the paperwork for you!" Another advertising letter sent to homeowners by Ameriquest reiterates this information, stating specifically that "we'll give you an answer in about 24 hours." A third advertising letter states that an Ameriquest representative "will work with you—one-on-one, start to finish—to custom-tailor a loan with terms and rates that work for you. We'll even do the paperwork. You can get a decision as soon as the next business day and your loan could be funded in as little as 30 days."

17. A DVD Ameriquest sends to homeowners contains a thirty-minute "infomercial" style program. This includes several statements from Mary Jo Shelton, Ameriquest's vice-president for branch operations. Specifically, Ms. Shelton claims that Ameriquest employees are "trained to find ways to say yes, instead of no," and that Ameriquest wants to "create a lending solution that works for you, based on your needs and your situation." The DVD also states that an Ameriquest agent "will fill out the forms based on the information you provide. You'll be able to review the documents, and then sign." The infomercial also states that an Ameriquest agent would be with the borrower from the start of the refinancing process to the finish. Finally, the infomercial amplifies statements made in the mailing, emphasizing that a closing would usually take place in a matter of weeks, and stating specifically that "we can close your loan in days, not months."

18. Ameriquest uses these representations as part of a scheme to systematically bait customers into residential mortgage loan transactions with promises of fixed interest rates, low interest rates, low or no fees, lower monthly payments compared to then

4

current payments, no prepayment penalties, and/or the existence or absence of particular terms. When the paperwork is presented to customers for signature at closing, the terms are contrary to the terms promised. Frequently, borrowers are unaware that the terms of the mortgage documents do not match Ameriquest's prior representations.

19. After presenting new or different loan terms, if the borrower becomes aware of the changes, Ameriquest engages in scare and pressure tactics to cause customers to proceed with the transaction anyway. Ameriquest further uses their borrowers' concern about loan terms in the initial transaction as an opportunity to bait the hook for a second loan, by promising an early refinancing on better terms. The refinance loans then capitalize finance charges, provide an excuse for new and additional points and other closing costs and provide an opportunity for Ameriquest to reap other additional hidden profits at their borrowers' expense.

20. Ameriquest misleads the borrowers into signing loan documents without reading them by misrepresenting their contents and telling borrowers there is no need or time to read them and pressuring them to "just sign the papers."

21. While Ameriquest purports to provide a three-day right of rescission, it fails to provide notice of this right in the legally mandated form with full information about the legal deadline for cancellation. In many cases, Ameriquest fails to timely provide the legally required copies of the appropriate cancellation forms.

22. Ameriquest also fails to timely deliver copies of various loan papers, including required disclosures under the Truth in Lending Act, until after the loan is consummated. This prevents consumers from understanding the loan terms, including most importantly, the true cost of the loan.

5

23.     Ameriquest also has a uniform practice of removing certain documents, such as those relating to the prepayment penalty, before presenting the documents to the customer for signing. For this reason and others, customers are systematically denied any meaningful opportunity to discover that there terms on the final documents do not match the prior representations.

24.     Ameriquest trains and encourages its loan officers, called Account Executives, to engage in any conduct necessary to close the greatest number of loans as quickly as possible and to maximize the total loan principal. Ameriquest Account Executives receive daily leads on new customers that are generated by software at Ameriquest's Orange, California, headquarters. These leads target homeowners who are carrying both a mortgage and significant credit card and/or other consumer debt; persons who have mobile home mortgages; persons with less than perfect credit; and other financially-vulnerable persons. These homeowners are solicited through repeated mailers, telephone calls, and/or personal visits by Ameriquest sales personnel, all inviting them to consolidate their debts or to obtain money for expenses, with false and misleading promises of more favorable loan terms and/or reduced monthly payments. Ameriquest profits by obtaining high fees upfront and high interest rates in the interim and often by selling its loan portfolios to other companies.

25.     Ameriquest systematically trains its sales personnel through standardized sales presentations (videos) developed under the control of corporate headquarters in Orange, California, as well as by use of the movie "Boiler Room" which depicts unethical and illegal high-pressure sales practices by a securities brokerage firm. These videos demonstrate high-pressure mortgage sales, while failing to train employees on the legal requirements and

6

regulations for mortgage lending.

26.     Ameriquest also trains its sales personnel to routinely rush borrowers through the lengthy, complex documentation of the regulated closing process so as to divert the borrowers' attention from the documented terms of the loan.  Moreover, Ameriquest trains its Account Executives to overcome objections raised by borrowers at closing by offering immediate cash pending the closing of the loan and by assuring borrowers that they can refinance with better terms after improving their credit score, without disclosing that they could be subject to the prepayment penalty, higher interest rates and other fees if they did so.

27.     At all times relevant to this action, Ameriquest's uniform and fundamental business strategy with respect to the sale of home-secured loans has been to uniformly hold out to all prospective customers, through the use of misleading promotions and material omissions regarding loan terms, that refinancing and/or consolidating their debts with Ameriquest will be beneficial and will save them money when, in fact, it will not.  In addition, Ameriquest employs aggressive, misleading, and unfair high-pressure sales tactics to obfuscate loan terms both prior to closing and at closing, if and when customers question loan terms, in order to force the customers to close the loan.   Ameriquest makes loans in amounts so high in relation to the value of their homes that the resulting loan-to-value ratio (coupled with prepayment penalties and other restrictions) effectively strips their homes of equity and prevents the borrowers from refinancing their loans with Ameriquest's competitors.

28.     Because Ameriquest profits from the origination and "flipping" of loans and the subsequent sale of those loans to investment bankers and others as assets for mortgage-based securities, Ameriquest has little concern for the actual risk that the loans might default or

7

with the continued profitability of the loans after origination, except to the extent that Ameriquest can induce existing customers to refinance again and borrow more.

29.    Ameriquest routinely fails to provide required disclosures to borrowers prior to closing – including, but not limited to, the HUD-1 statement, Notice of Right to Cancel, a "good faith" Good Faith Estimate, settlement process information booklet and other disclosures required under TILA, thereby ensuring that borrowers have no meaningful opportunity to review them or to learn the true terms and costs of their loan transactions.

30.    Ameriquest has designed its compensation system to reward its Account Executives for "upselling" customers' loans, providing incentives for Account Executives to aggressively sell products in order to increase the amounts loaned to the maximum permitted by Ameriquest's underwriting goals, irrespective of the amounts requested by borrowers or supported by the actual value of the home.

31.    Ameriquest's compensation scheme also rewards Account Executives based on quantity of loans closed per month.  The minimum monthly quotas have risen consistently over time, reaching levels that are significantly higher than the number of loans closed by sales personnel at other mortgage companies.  Given that Ameriquest's Account Executives must reach the minimum quotas in order to be paid at any reasonable rate and that the quotas are very high, Ameriquest's policy all but ensures that its Account Executives will systematically engage in unfair and deceptive tactics to meet company quotas, with company knowledge of this widespread practice.

32.    A recent report in the *Los Angeles Times* described allegations made against Ameriquest for various predatory mortgage practices, allegations that were supported by

statements made by former Ameriquest employees. Ameriquest specifically uses telemarketing-style operations to make "cold calls" to homeowners offering to refinance their houses, with intense pressure put on Ameriquest employees to bring in business; a failure to constantly bring in business would result, according to Mark Bomchill, a former Ameriquest employee, in an employee's termination. Kenneth Kendall, another former Ameriquest employee, reported that Ameriquest does engage in the bait-and-switch scheme alleged here; specifically, he stated in the *Los Angeles Times* article that Ameriquest employees are trained to "promise certain interest rates and fees, only to change those rates at the time of the closing."

33.     Mr. Kendall's statement was made in connection with a lawsuit in California, Pierceall v. Ameriquest Mortgage Company, et al, No. 415620 (San Mateo Co. Super. Ct.) Mr. Kendall specifically said that "he was given a script of things to say to customers over the telephone," and that, "at our branch, only management had the authority to control the price modeling matrix, which was used to set rates and points. If the rates and points did not offer enough profit for Ameriquest, the loan application was put through again, until the rates and points were more favorable to Ameriquest. At the instruction of management, I along with other Ameriquest employees were encouraged to use 'bait' and 'switch' tactics. Employees would promise certain interest rates and fees, only to change those rates and fees at the time of closing."

34.     On information and belief, in the California litigation, Ameriquest acknowledged that in some states 40% of its customers had their annual percentage rates increased between the Good Faith Estimate and closing, and 34% had their note rates increased between the Good Faith Estimate and closing. (If the points and fees are increased but the note rate is not, only the annual percentage rate would be increased.)

9

35.    Ameriquest utilizes a confusing and unfair variable interest rate structure, which provides only for an increase and not a decrease in the borrower's interest rate.

36.    Ameriquest has a misleading charge for "discount points" or a "discount fee," amounting to hundreds or thousands of dollars added to the loan principal.  However, Ameriquest does not, in fact, "discount" the interest rate in exchange for this fee.

37.    Ameriquest regularly imposes a prepayment penalty for the purpose and with the effect of preventing borrowers from refinancing on better terms with other lenders.

38.    Ameriquest imposes duplicative and excessive costs and closing fees in amounts designed to strip home equity and prevent borrowers from refinancing without incurring high costs.

39.    Ameriquest routinely fails to provide required disclosures, including required financial disclosures and the statutorily mandated notice of right to cancel, and circumvents statutory protections by failing to leave a true copy of completed loan documents in borrowers' possession with the effect that borrowers cannot review the loan terms.

41.    Finally, defendant AMC Mortgage Services, Inc., has a pattern and practice of retaliating against its customers who exercise their rights under federal credit protection statutes by filing, in good faith, a lawsuit against Ameriquest and its affiliates.

42.    Once a customer files suit, his/her account is "flagged," access to his or her on-line account is blocked, and he or she can no longer make payments via on line.  In addition, in many cases, AMC stops sending monthly statements to the customer.

43.    Next, when the customer calls AMC to inquire, they are no longer permitted to deal with a customer representative; they are informed that they must deal with the

10

president's office, and their call is routed to the same. Similarly, if they discover on-line that their account has been frozen, they are directed to call the President's office. Customers then have a very difficult time getting through to anyone at the president's office. Each time they call to inquire about their account or to make a payment, it takes between 15-60 minutes to get someone on the line. Often, their call is dropped before they reach anyone but after they have waited for several minutes, and they have no choice but to call back and start the waiting period over.

44. When the customer finally gets someone on the line, they are often informed that their account has been flagged because of their lawsuit and that the only way they can make a payment is over the phone, i.e., "check-by-phone" (debiting a checking account) and that they will be charged a $10.00 fee for making the payment this way. In fact, customers are then charged the $10.00 fee for making their payment in the only manner AMC permits due to their suit.

45. Under TILA, when a loan is secured by the borrower's home, and was not entered into for purposes of the initial acquisition or construction of that home, it is subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

> (a) **Consumer's right to rescind.**
>
> > **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**
> >
> > **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed**

for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) Exempt transactions. The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

12

**(2) A credit plan in which a state agency is a creditor.**

46.     When borrowers inquire at closing about why they are not receiving their loans on the promised terms, they are often promised early refinancing on more favorable terms.

47.     By failing to disclose prior to the loan closing that the borrower would not receive loans on the terms originally promised, Ameriquest violated the ECOA, 15 U.S.C. §1691d.

48.     By failing to give borrowers complete and accurate information about their right to cancel the loan, Ameriquest violated TILA and Regulation Z, 15 U.S.C. §1635 and 12 C.F.R. §226.23.

49.     By "flagging" the accounts of customers who file lawsuits against them, making them wait an inordinate amount of time to speak with a representative, ceasing to send them statements, limiting them to one method of payment for which they are then charged extra, treating them rudely and by other retaliatory conduct, defendants Ameriquest and AMC violated and continue to violate 15 U.S.C. § 1691(a)(3) and 12 C. F. R. § 202.2(z).

50.     As a result, plaintiffs and the members of the class described below have been harmed and continue to incur damages and suffer harm.  Plaintiffs seek rescission, damages, restitution, a declaration of the right to rescind, attorneys fees, costs, and any other relief the Court deems proper.

## FACTS RELATING TO SCOTT JEFFRESS AND PAMELA JEFFRESS

51.     Prior to June 21, 2005, Scott Jeffress and Pamela Jeffress were solicited for a refinance mortgage loan by Ameriquest.

52.     During the initial phone contacts with plaintiffs Scott Jeffress and Pamela

13

Jeffress, Ameriquest's representative were promised an approximately 6.5% loan with lower payments than their current loan.

53.    During the initial communications with plaintiffs Scott Jeffress and Pamela Jeffress, Ameriquest obtained comprehensive financial information from or concerning plaintiffs, including information about their income, employment, property value, current mortgage loan, debts, and credit - information that was sufficient to underwrite a loan.

54.    Plaintiffs Scott Jeffress and Pamela Jeffress needed and used the loan for personal, family or household purposes, namely, refinancing of prior debts incurred for such purposes.

55.    On or about June 21, 2005, Ameriquest closed the loan.

56.    Immediately prior to the closing, the terms of the loan were changed to the detriment of Scott Jeffress and Pamela Jeffress. The annual percentage rate was increased from 9.261% to 10.145%. The initial interest rate was changed from 6.990% to 8.990%. The margin which governed future rate changes was increased from 6% to 6.25%. The monthly payments were now higher than on plaintiffs' prior loan rather than lower. These changed terms were reflected on Exhibit A.

57.    Plaintiffs Scott Jeffress and Pamela Jeffress were charged a "loan discount" fee of $4,678.11 (3.52% of the principal amount of the loan), but they received no discount.

58.    Other fees charged included a $70 tax related fee, a $9 flood search fee, a $626 processing fee, a $239 warehouse fee, and a $360 "application fee" (deducted from the loan proceeds). See Exhibit B.

14

59.     Plaintiffs Scott Jeffress and Pamela Jeffress received two, different and inconsistent notices of right to cancel, the three-day notice required by TILA (Exhibit C) and a "one week" notice created and used only by Ameriquest (Exhibit D).

60.     Exhibit D is a form document regularly used by Ameriquest in the class members' transactions.

61. The "one week" notice detracts from and obfuscates the required notice in that it suggests that the consumer has one week to rescind under TILA, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

62.     Furthermore, it is misnamed, because it only gives six days to cancel, not a week.  Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

63.     The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

64.     The loan imposed a prepayment penalty. See note, attached as Exhibit E, and mortgage, Exhibit F.

65.     After Scott and Pamela Jeffress filed this lawsuit, defendant AMC stopped sending them monthly statements.

66.     Before filing suit, plaintiffs made their monthly payments on line.  After filing suit, Ameriquest and/or AMC froze their access to their on-line account, and an on-line message directed them to call the President's office.

15

67.     After the lawsuit was filed, defendant AMC only permitted and permits plaintiffs to make their payments <u>via</u> "check-by-phone," and AMC has charged them an extra fee each time plaintiffs have made a payment.

68.     In order to make a payment, plaintiffs have to call the President's office at Ameriquest and wait several minutes before a representative will speak with them.  On information and belief, these phone calls are recorded.

## FACTS RELATING TO TAMMY M. GOODS

69.     Prior to December 2, 2005, plaintiff Tammy M. Goods was solicited for a refinance mortgage loan by Ameriquest.

70.     Plaintiff Tammy M. Goods needed and used the loan for personal, family or household  purposes, namely, refinancing of prior debts incurred for such purposes.

71.     On or about December 2, 2005, Ameriquest closed the loan.

72.     Tammy M. Goods was charged a "loan discount" fee of $5,168.13 (3.323% of the principal amount of the loan), but in fact she received no discount on the interest rate Ameriquest gave her.

73.     Other fees charged included a $70 tax related fee, a $9 flood search fee, a $626 processing fee, a $239 warehouse fee, and  a $360 "application fee" (deducted from the loan proceeds).  <u>See</u> <u>Exhibit G</u>.

74.     Plaintiff Tammy M. Goods received two, different and inconsistent notices of right to cancel, the three-day notice required by TILA (<u>Exhibit H</u>) and a "one week"  notice created and used only by Ameriquest (<u>Exhibit I</u>).

75.     Before filing suit, Ms. Goods made her monthly payments on line.  After

16

filing suit, Ameriquest and/or AMC restricted her access to her on-line account, and an on-line message directed her to call the President's office.

76.    Ms. Goods had to 30-60 minutes per call on the phone with the President's office. The representative was often rude to Ms. Goods because she had filed a lawsuit.

77.    After Ms. Goods filed suit, defendant AMC only permitted and permits plaintiff to make her payments via "check-by-phone," and AMC has charged her an extra fee for such payments.

## FACTS RELATING TO KEVIN GUYDON AND RITA GUYDON

78.    Prior to May 15, 2005, Kevin Guydon and Rita Guydon were solicited for a refinance mortgage loan by Ameriquest.

79.    Plaintiffs Kevin Guydon and Rita Guydon needed and used the loan for personal, family or household purposes, namely, refinancing of prior debts incurred for such purposes.

80.    On or about May 15, 2005, Ameriquest closed the loan.

81.    Plaintiffs Kevin Guydon and Rita Guydon were charged a "loan discount" fee of $2,463.08 (3.075% of the principal amount of the loan), but they received no discount.

82.    Other fees charged included a $70 tax related fee, a $9 flood search fee, a $626 processing fee, a $239 warehouse fee, and a $360 "application fee" (deducted from the loan proceeds). See Exhibit J.

83.    Plaintiffs Kevin Guydon and Rita Guydon received two, different and inconsistent notices of right to cancel, the three-day notice required by TILA (Exhibit K) and a "one week" notice created and used only by Ameriquest (Exhibit L).

17

84. <u>Exhibit L</u> is a form document regularly used by Ameriquest in the class members' transactions.

85. The "one week" notice detracts from and obfuscates the required notice in that it suggests that the consumer has one week to rescind under TILA, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

86. Furthermore, it is misnamed, because it only gives six days to cancel, not a week. Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

87. The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

88. The loan imposed a prepayment penalty. <u>See</u> note, attached as <u>Exhibit M</u>, and mortgage, <u>Exhibit N</u>.

## COUNT I – TILA

89. Plaintiffs Scott Jeffress and Pamela Jeffress, Tammy M. Goods and Kevin Guydon and Rita Guydon incorporate all preceding paragraphs by reference.

90. Defendant Ameriquest Mortgage Company violated TILA and Regulation Z by failing to provide notices of right to cancel that were clear, conspicuous or consistent with the forms and regulations of the Federal Reserve Board.

91. Plaintiffs are entitled to rescind their loans and to recover statutory damages.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.      A judgment voiding plaintiffs' mortgages, capable of recordation in the public records;

b.      Statutory damages for failure to rescind;

c.      Attorney's fees, litigation expenses and costs of suit;

d.      Such other or further relief as the Court deems proper.

## COUNT II - ECOA

92. Plaintiffs Scott Jeffress and Pamela Jeffress incorporate all preceding paragraphs by reference.

93. Plaintiffs Scott Jeffress and Pamela Jeffress were applicants within the meaning of 15 U.S.C. §1691a(b) and Regulation B (which defines "applicant" to include persons who have received credit).

94.     Ameriquest violated 15 U.S.C. §1691(d) by refusing to grant credit to plaintiffs Scott Jeffress and Pamela Jeffress on the terms requested and/or promised and failing to provide plaintiffs with written notices of adverse action, within 30 days of application, stating the specific reasons for such action.

95.     As a result of Ameriquest's conduct, plaintiffs Scott Jeffress and Pamela Jeffress have suffered actual damages, and are entitled to recover such actual damages as well as punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

19

a.  Actual and statutory and punitive damages according to proof;

b.  Reasonable attorneys' fees and costs; and

c.  Such other and further relief the court deems proper and just.

## COUNT III - ECOA

96.  Plaintiffs Scott Jeffress and Pamela Jeffress and Tammy M. Goods incorporate all preceding paragraphs by reference. Their claims under this Count are against defendants Ameriquest and AMC.

97. Plaintiffs were applicants within the meaning of 15 U.S.C. §1691a(b).

98.  By filing this lawsuit in good faith pursuant to the Consumer Credit Protection Act, plaintiffs were and are engaged in a statutorily protected activity.

99.  As a result of filing this lawsuit, plaintiffs have suffered and continue to suffer adverse actions at the hands of defendants. Ameriquest and AMC have, in ways detailed above and in other ways, taken retaliatory action against these and other plaintiffs and their accounts. These actions constitute "an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. § 202.2 (c)(1)(ii).

100.  A direct causal connection exists between plaintiffs' filing suit and defendants' subsequent treatment of their accounts, as detailed above.

101.  Plaintiffs were current and have remained current on their accounts throughout the time of defendants' adverse actions.

102.  As a result of defendants' conduct, plaintiffs have suffered actual damages and are entitled to recover actual damages as well as statutory damages, punitive

damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. Actual and statutory and punitive damages according to proof;

b Reasonable attorneys' fees and costs;

c. Injunctive relief, if the practices complained of do not cease immediately; and

d. Such other and further relief the court deems proper and just.

_____
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiffs demand trial by jury.

_____
Daniel A. Edelman

t:\16275\pleading\complaint-multiple plaintiffsz_pleading.wpd

# EXHIBIT A

ariquest Mortgage Company
2 Indianapolis Blvd., Suite 100
hererville, IN 46375

19)865-6378

## 3ORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

:ott G Jeffress

Date: June 21, 2005

Notice: [X] Delivered ☐ Mailed

Loan Number: 0123705501 - 5570

Description of Credit Request:

:20 Willowdale APT./UNIT road
ortage, IN 46368

[X] 1st Trust Deed/Mortgage ☐ 2nd Trust Deed/Mortgage

☐ Other: _____

roperty Address: 3320 WILLOWDALE RD

Portage, IN 46368          County of PORTER

YPE OF TRANSACTION:

☐ Purchase   [X] Refinance   Other _____

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS: |
|---|---|
| ☐ Fixed Rate Loan [X] Adjustable Rate Loan | ☐ Fixed Rate Loan [X] Adjustable Rate Loan |
| Amount Financed: $ 126,228.60 | Amount Financed: $ 126,669.79 |
| Settlement Charges: $ 7,252.40 (Includes all Prepaid Finance Charges) | Settlement Charges: $ 8,255.50 (Includes all Prepaid Finance Charges) |
| Loan Amount: $ 132,581.00 | Loan Amount: $ 132,750.00 |
| Annual Percentage Rate: 9.261 % | Annual Percentage Rate: 10.145 %* |
| Term: 360 | Term: 360 |
| Init... Interest Rate: 6.990 % | Initial Interest Rate: 8.990 % |
| Margin: 6.000 % | Margin: 6.250 % |
| Prepayment Penalty: [X] YES ☐ NO | Prepayment Penalty: [X] YES ☐ NO |

3orrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based xclusively on information, statements, and representations (all material facts) which have been provided by the iorrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change orior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. 3orrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may equire new loan documents to be executed by the borrower(s).

| | | | |
|---|---|---|---|
| 3orrower  Scott G Jeffress | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| 3orrower | Date | Borrower | Date |

*These amounts may change due to any final adjustments made to the prepaid interest amount collected on your loan at funding.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any rights under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the: FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY, ROOM 4037, WASHINGTON DC, 20580.



,0001237055010404650101

STMTCD (Rev. 3/03)

# EXHIBIT B

U.S. Department of Housing and Urban Development

**Settlement Statement**
**Optional Form for Transactions without Sellers**

OMB Approval No. 2502-0265

File No.: 200000724589

| | |
|---|---|
| A. & Address of Borrower:<br>G Jeffress and Pamela J Jeffress<br>Willowdale Rd.<br>...ne, IN 46368 | Name & Address of Lender:<br>Ameriquest Mortgage Company<br>55 West 86th Avenue<br>Merrville, IN 46410 |
| Property Location:<br>W ... le Rd.<br>...ne 368<br>Num...r 0123705501-5570 | Settlement Agent: Mortgage Information Services, Inc.<br>Place of Settlement: 6801 Lake Plaza Drive Suite A101<br>Indianapolis, IN 46220<br><br>Settlement Date: 6/21/2005<br>Fund Date: 6/28/2005 |

**M. Disbursements to Others**

| Settlement Charges | | | | 1501. Mortgage Payoff to AMER GEN FIN | $115,506.40 |
|---|---|---|---|---|---|
| ...ems Payable in Connection with Loan | | | | 1502. Tax Payoff to Porter County Treasurer | $483.63 |
| ...oan Discount 3.524 % to Ameriquest Mortgage Company | | $4,678.11 | | | |
| | to Ameriquest Mortgage Company | $350.00 | | | |
| ...ppraisal Fee | to Ameriquest Mortgage Company | | | 1503. Payoff to FNCC | $175.00 |
| ...redit Report | to | | | 1504. Payoff to PROVIDIAN | $4,023.00 |
| ...ender's Inspection Fee | to | | | 1505. Payoff to CBUSA | $734.00 |
| ...ortgage Insurance Application | to | | | | |
| ...ssumption Fee | to | | | 1506. Payoff to CBUSA | |
| | to | | | 1507. Payoff to DMCCB | $2,005.00 |
| ...ax Related Fees | to Ameriquest Mortgage Company | $370.00 | | | |
| ...arch Fee | to Ameriquest Mortgage Company | $9.00 | | 1507. Payoff to GEMBUCP | $507.00 |
| ...enders processing fee | to Ameriquest Mortgage Company | $626.00 | | | |
| ...arehouse fee | to Ameriquest Mortgage Company | $239.00 | | 1508. Payoff to MERRICK BK | $866.00 |
| | to Ameriquest Mortgage Company | $360.00 | | | |
| ...pplication Fee | to | | | 1509. | |
| Items Required by Lender to be Paid in Advance | | | | 1510. | |
| ...terest from 6/28/2005 to 7/1/2005 @ $32.70 /day | | $98.10 | | | |
| ...ortgage Insurance Premium for months to | | | | 1511. | |
| ...azard Insurance Premium for months to | | | | 1512. | |
| Reserves Deposited with Lender | | | | | |
| Hazard insurance | 11 months @$69.33 per month | $762.63 | | 1513. to | |
| Mortgage insurance | month @ per month | | | | |
| City property taxes | month @ per month | | | 1514. to | |
| County property taxes | 6 months @$71.86 per month | $431.16 | | | |
| Assessment Taxes | months @ per month | | | 1515. to | |
| School property taxes | months @ per month | | | | |
| Other taxes | months @ per month | | | 1516. to | |
| Other taxes | months @ per month | | | | |
| | months @ per month | | | 1517. to | |
| Aggregate Adjustment | to Ameriquest Mortgage Company | | | | |
| Title Charges | | | | 1518. to | |
| Settlement Fee | to Mortgage Information Services POC (L) $450.00 | | | 1519. to | |
| Abstract or title search | to | $225.00 | | | |
| Title examination | to Mortgage Information Services | | | 1520. TOTAL DISBURSED (enter on line 1603) | $124,300.03 |
| Title Insurance binder | to Mortgage Information Services POC (L) $50.00 | | | | |
| Document preparation | to Mortgage Information Services | | | | |
| AMC Closing Service | to | | | | |
| ...Attorney's fees | to | | | | |
| ...udes (m numbers ) | | | | | |
| ...Ti... ance | to Mortgage Information Services | $332.50 | | | |
| ...udes ab... item numbers ) | | | | | |
| Lender's Coverage | $133,750.00/$332.50 | | | | |
| Owner's Coverage | $0.00/$0.00 | | | | |
| Courier Fee | to Mortgage Information Services POC (L) $60.00 | | | | |
| Release Fee | to Mortgage Information Services | $25.00 | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| Government Recording and Transfer Charges | | $49.00 | | | |
| Recording Fees: Deed ; Mortg $49.50; Rel | | | | | |
| City/county tax/stamps: Deed ; Mortg | | | | N. NET SETTLEMENT | |
| State tax/stamps: Deed ; Mortg | | | | | |
| Tax certificates | to | | | 1600. Loan Amount | $133,750.00 |
| | to | | | | |
| | to | | | 1601. Plus Cash/Check from Borrower | $0.00 |
| Additional Settlement Charges | | | | | |
| Survey | to | | | 1602. Minus Total Settlement Charges (Line 1400) | $8,255.50 |
| Pest Inspection | to | | | | |
| | to | | | 1603. Minus Total Disbursements to Others (Line 1520) | $124,300.03 |
| | to | | | | |
| | to | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | $194.47 |
| | to | | | | |
| | to | | | | |
| Total Settlement Charges (enter on Line 1602) | | $8,255.50 | | | |

Borrower's Signatures

Scott G Jeffress

Pamela J Jeffress

_Cassey Hill_
Settlement Agent

06/21/05
Date

# EXHIBIT C

## NOTICE OF RIGHT TO CANCEL

:NC    Ameriquest Mortgage Company

DATE:  June 21, 2005
LOAN NO.:  0123705501 - 5570
TYPE:   ADJUSTABLE RATE

)RROWER(S): Scott G Jeffress

)DRESS:      3320 Willowdale APT./UNIT road
ITY/STATE/ZIP:  Portage,IN 46368

ROPERTY:   3320 WILLOWDALE RD
             Portage,  IN  46368

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal
ght under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the
llowing events occurs last:

| ENTER DOCUMENT SIGNING DATE |
|---|

1.  The date of the transaction, which is    *6-21-05*

   or
2.  The date you received your Truth in Lending disclosures;
   or
3.  The date you received this notice of your right to cancel.

you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we
:ceive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your
>me has been cancelled, and we must return to you any money or property you have given to us or anyone else in
>nnection with this transaction.

)u may keep any money or property we have given you until we have done the things mentioned above, but you must
en offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its
:asonable value. You may offer to return the property at your home or at the location of the property. Money must be
:turned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your
'fer, you may keep it without further obligation.

**HOW TO CANCEL**

If yo    .ide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN:  FUNDING
PHONE: (714)634-3494
FAX:    (800)664-2256

'ou may use any written statement that is signed and dated by you and states your intention to cancel, or you may use
iis notice by dating and signing below. Keep one copy of this notice because it contains important information about
our rights.

If you cancel by mail or telegram, you must
send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
|---|

*6-24-05*

or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver
/our written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____          _____
SIGNATURE                          DATE

he undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the
ederal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and
eform Act of 1980 (Public Law 96-221).

ach borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____     Date        _____     Date
)RROWER/OWNER Scott G Jeffress              BORROWER/OWNER PAMELA J JEFFRESS

_____     Date        _____     Date
)RROWER/OWNER                               BORROWER/OWNER

**LENDER COPY**

s4-NRC (Rev 11/03)

0000012370550104000050101

06/21/2005 11:17:07 AM

# EXHIBIT D

## ONE WEEK CANCELLATION PERIOD

Loan Number: 0123705501 - 5570          Borrower(s): Scott G Jeffress

Date:  June 21, 2005

You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason. This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you. No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request ust be delivered to:

> Ameriquest Mortgage Company
> 1600 S Douglass Rd Anaheim, CA 92806
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

---
Borrower/Owner  Scott G Jeffress                    Date

---
Borrower/Owner  PAMELA J JEFFRESS                   Date

---
Borrower/Owner                                      Date

---
Borrower/Owner                                      Date

---

### REQUEST TO CANCEL
I/We want to cancel loan #_____.

---
Borrower/Owner Signature                            Date



06/21/2005 11:17:07 AM

**LENDER COPY**

130 (10/00)

# EXHIBIT E

Loan Number: 0123705501 - 5570

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

June 21, 2005
Date                                    City                                    State

3320 WILLOWDALE RD, Portage, IN 46368
Property Address

**BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 132,750.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  Ameriquest Mortgage Company.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of  8.990 %. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**PAYMENTS**
(A) Time and Place of Payments
   I will pay principal and interest by making payments every month.
   I will make my monthly payments on the first day of each month beginning on   August 1, 2005 .
   I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, July 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is
   ... 'd the "Maturity Date."
   .... make my payments at:   505 City Parkway West, Suite 100, Orange, CA 92868

   or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
   Each of my initial monthly payments will be in the amount of U.S. $ 1,067.19. This amount may change.
(C) Monthly Payment Changes
   Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
   The interest rate I will pay may change on the first day of,  July, 2008  and on that day every  sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
   Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
   If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
   Before each Change Date, the Note Holder will calculate my new interest rate by adding  six and one-quarter percentage point(s) (6.250%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials: _____ _____ _____ _____

201-1(f). ,. 07/03)                     1 of 3                          06/21/2005 11:17:07 AM

**)) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.990 % or less than 8.990%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One percentage point(s) 1.000%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.990 % or less than 8.990 %.

**E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made Three (3.00) year(s) After the Date of this Note**

I will not have to pay a prepayment charge if I make a prepayment on the Three (3.00) year anniversary of the date this Note is executed, or at any time thereafter.

**(B) Prepayment Made Within Three (3.00) year(s) of the Date of this Note**

I will pay Lender a prepayment charge if, in any twelve (12) month period before the Three (3.00) year anniversary of the date this Note is executed, I prepay more than 20% of the original principal balance of this Note. The prepayment charge will be six (6) months interest, at the rate then in effect on this Note, on the amount in excess of 20% of the original principal balance that I prepay within such 12 month period.

**(C) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any ₹ loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any s₋ already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.



201-2U... ... ..., 07/03)

2 of 3

Initials:

08/21/2005 11:17:07 AM

Loan Number: 0123705501 - 5570

OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including th~ obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this ote. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

)ral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment if a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written greement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement etween us regarding this Note or the instrument which secures this Note, must be in a signed writing to be egally enforceable.

VITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)       _____(Seal)
Borrower   Scott G Jeffress                Borrower


_____(Seal)       _____(Seal)
Borrower                                  Borrower

# EXHIBIT F

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated June 21, 2005
together with all Riders to this document.
(B) "Borrower" is SCOTT G. JEFFRESS AND PAMELA J. JEFFRESS

Borrower is the mortgagor under this Security Instrument.

INDIANA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3015  1/01

06/21/2005 11:17:07                                        0123705501 - 5570

AM6IN (0404)
Page 1 of 15                    Initials:_____
          VMP Mortgage Solutions, Inc. (800)521-7291

00000123705501030127 1001

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated June 21, 2005
The Note states that Borrower owes Lender one hundred thirty-two thousand seven
hundred fifty and 00/100                                              Dollars
(U.S. $ 132,750.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than July 1, 2035          .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:_____

AM6IN (0404)                    Page 2 of 15                    Form 3015  1/01

0123705501-5570
06/21/2005 11:17:07

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County                                                                                  [Type of Recording Jurisdiction]
of PORTER                                                                       [Name of Recording Jurisdiction] :
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 08-00292846                          which currently has the address of
3320 WILLOWDALE RD                                                                    [Street]
Portage                                          [City], Indiana 46368           [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials: _____

AM6IN (0404)                          Page 3 of 15                          Form 3015  1/01
06/21/2005 11:17:07                                              0123705501 - 5570



0000012370550103012715503

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

Initials: _____

0123705501 - 5570
06/21/2005 11:17:07


0000012370550103012716D4

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or

0123705501-5570

06/21/2005  11:17:07



ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

Initials:_____

AM6IN (0404)                          Page 6 of 15                          Form 3015 1/01

0123705501 - 5570

06/21/2005 11:17:07



Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials:_____

AM6IN (0404)                    Page 7 of 15                    Form 3015  1/01

0123705501 - 5570
06/21/2005  11:17:07


0000012370550103012713807

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by any insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials:_____

AM6IN (0404)                                    Page 8 of 15                                    Form 3015  1/01

0123705501 - 5570

06/21/2005 11:17:07



As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless



Initials:_____

0123705501 -5570

06/21/2005 11:17:07

0000012370550103012716I0

Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or

0123705501 - 5570

06/21/2005  11:17:07



0000012370550103012716I1

cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

AM6IN (0404)                              Page 12 of 15                    Initials: _____          Form 3015  1/01

0123705501 - 5570

06/21/2005  11:17:07                     

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Valuation and Appraisement. Borrower waives all right of valuation and appraisement.

Initials:_____

AM6IN (0404)                    Page 13 of 15                    Form 3015 1/01

0123705501-5570
06/21/2005 11:17:07



0000012370550103012715I3

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                 Scott G Jeffress            -Borrower

_____        _____ (Seal)
                                 PAMELA J JEFFRESS           -Borrower

_____ (Seal)    _____ (Seal)
               -Borrower                                     -Borrower

_____ (Seal)    _____ (Seal)
               -Borrower                                     -Borrower

_____ (Seal)    _____ (Seal)
               -Borrower                                     -Borrower

AM6IN (0404)                Page 14 of 15              Form 3015 1/01
06/21/2005 11:17:07
                        0123705501-5570


000001237055010301271614