**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 <br><br> Lead Case No. 05-cv-07097 <br><br> Centralized before The Honorable Marvin E. Aspen |
| THIS DOCUMENT RELATES TO: THE NON-BORROWERS' CONSOLIDATED CLASS ACTION COMPLAINT [DOCKET NO. 323.] | |

**DEFENDANTS' AMENDED REPLY IN SUPPORT OF THEIR MOTION TO DISMISS CERTAIN COUNTS OF THE NON-BORROWER COMPLAINT AND FOR A MORE DEFINITE STATEMENT**

Defendants hereby submit an Amended Reply in support of their Motion to Dismiss Certain Counts of the Non-Borrower Complaint and for a More Definite Statement. The only amendment is the correction of a formatting error in Section I.

**I.    INTRODUCTION**

Plaintiffs' Opposition fails to remedy critical deficiencies in the Non-Borrower Complaint ("Complaint"):

- The Fair and Accurate Credit Transactions Act ("FACTA") amendments to the Fair Credit Reporting Act ("FCRA") explicitly bar private rights of action under Section 1681m. Quarterman's claim in Count II fails – he filed his lawsuit *after* the December 1, 2004 effective date of FACTA, and he does not (and cannot) allege that he received the mailer at issue prior to this effective date.

- Plaintiffs' claims that adverse action notices should have been sent under FCRA (Count III) and the Equal Credit Opportunity Act ("ECOA") (Count IV) fail for numerous, separate reasons as a matter of law. The only Plaintiff bringing this clam, Burggraff, fails to plead that an "adverse action" occurred under ECOA, and FCRA adopts the ECOA definition. Plaintiffs' argument that the FCRA definition also includes a "catch-all" provision fails, because of, among other things, clear statements from the legislative history and the simple rule disfavoring their interpretation because it would render the FCRA's adoption of the narrower ECOA definition superfluous.

- Plaintiffs' class definitions are insufficient as a matter of law because they do not inform Defendants of the time periods for each of the three alleged classes, which information is essential to determining defenses. Thus, for all counts that remain, a more definite statement is required.

For the reasons set forth below, Counts II, III and IV of the Non-Borrower Plaintiffs' Complaint should be dismissed in their entirety. As to Count I and, in the alternative to dismissal, Counts II, III and IV, the putative class definitions should be dismissed with leave to replead.

## II. PLAINTIFFS' CLAIMS FOR VIOLATION OF 15 U.S.C. SECTION 1681M FAIL.

In their Opening Brief, Defendants demonstrated that: 1) the amendments to FACTA abolished private rights of action under Section 1681m; 2) Quarterman's Section 1681m claim fails because he failed to allege that he received an offer letter prior to December 1, 2004 (the effective date of the FACTA amendments); and 3) even if Quarterman could allege that he received an offer letter prior to December 1, 2004, the FACTA amendments still require dismissal of Quarterman's claim. Quarterman concedes that FACTA eliminated private rights of action under 1681, and that this bar applies to claims that arise from conduct that occurs after December 1, 2004. Further, Quarterman does not dispute that no mailer was sent to him prior to December 1, 2004. Rather, he argues that his credit report was accessed prior to December 1, 2004, but caselaw makes clear that the relevant date is the date a mailer is received. Finally, even if Quarterman were able to amend his complaint (which he does not request) to allege receipt of an offer letter by this date, it could not save this claim, so Count II should be dismissed with prejudice.

### A. Quarterman's Claim Should Be Dismissed Because The Complaint Does Not Allege When He Received An Offer Letter.

In arguing that the conduct he complains of "took place prior [to] the date FACTA became effective," Quarterman points to allegations suggesting that Ameriquest may have obtained Quarterman's credit report before December 1, 2004. (Opp. Br. 2). That argument does not withstand scrutiny. Quarterman needed to allege precisely *when he received the Offer*

*Letter*, but he failed to do so.[1] The identical argument was made in *Miller v. Corestar Financial Group, Inc.*, 05-5133, 2006 U.S. Dist. LEXIS 45323 at *11-13 (E.D. Pa. June 29, 2006) (hereinafter, "*Miller I*"), where the plaintiff contended that the alleged violation occurred prior to the December 1, 2004 effective date of FACTA because "CoreStar received his credit information before that date." *Id.* at *12 n.2. The court expressly rejected that argument, reasoning that ". . . *no cause of action exists until the consumer receives the written solicitation.*" *Id. See also Putkowski v. Irwin Home Equity Corporation*, 423 F. Supp. 2d 1053, 1063-64 (N.D. Cal. 2006) (dismissing the plaintiff's claim for violation of the clear and conspicuous disclosure requirement because plaintiff failed to allege what mailer she received or when she received it).

In attempting to skirt the *Miller I* holding, Quarterman suggests that the *Miller* court effectively abandoned that holding in its more recent decision, *Miller v. Corestar Financial Group, Inc.,* No. 05-5133 (E.D. Pa. Feb. 5, 2007 (Exhibit F to Plaintiffs' Opposition) (hereinafter, "*Miller II*"). (Opp. Br. 2-3 n.1). This argument has no merit. *Miller I* dismissed plaintiff's clear and conspicuous disclosure requirement claim "with leave to amend if he *received the offer letter* before FACTA's effective date." *Miller I*, 2006 U.S. Dist. LEXIS 45323, at *13 (emphasis added). *Miller* did not amend in the manner contemplated by the court. Rather, the amended complaint added a new plaintiff (*Soroka*), and alleged that *Soroka* received letters expiring prior to December 1, 2004. *Miller II*, at p. 8. Based upon this language, the *Miller II* court allowed *Soroka's* claims to proceed. *Id.* at p. 8-9.

*Miller II* indeed hurts Quarterman's claim, as it reiterates that "the disclosure requirements must be included 'with each written solicitation made to the consumer.'. . . Therefore, no cause of action exists *until the consumer receives the written solicitation*." *Id.* at *5, n.1 (emphasis added). Accordingly, Quarterman's mere allegations that Ameriquest "accessed his consumer report" and later mailed him the Offer Letter are insufficient to state a claim. Count II fails to state a claim and should be dismissed.

---

[1] The evidence in this case will show that the Offer Letter (Exhibit A) was mailed on December 6, 2004, and Quarterman received it sometime thereafter. Defendants made this known in their Opening Memorandum, and Plaintiffs did not dispute it in their Opposition.

### B.   Even If Quarterman Could Allege That He Received An Offer Letter Prior To December 1, 2004, His Claim Should Still Be Dismissed.

Quarterman does not state in the Complaint the date that he received an Offer Letter, and he does not dispute that he received it after December 1, 2004. *See supra*, note 1. Even if Quarterman was able to amend, and requested to amend, his Complaint to allege that he did receive such an offer letter prior to the December 1, 2004 effective date of FACTA, the claim still would fail for two reasons. First, the ban on private causes of action is a change in a procedural rule, and is properly applied in suits arising before its enactment. Second, even if the ban on private causes of action could properly be characterized as substantive, rather than procedural, retroactive application of that ban is entirely appropriate here.[2]

#### 1.   15 U.S.C. Section 1681(m)(h)(8) applies here.

Quarterman argues that application of the Congressional ban on private causes of action under Section 1681m would constitute impermissible "retroactive" application of a statute. This argument directly contradicts Supreme Court precedent requiring courts to "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711 (1974). This rule applies "even though the law was enacted after the events giving rise to the suit." *Landgraf v. U.S.I. Film Prods.*, 511 U.S. 244, 273 (1994). Indeed, "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." 511 U.S. at 275. The critical issue in determining whether a retroactivity issue may exist is the "the relevant activity that the rule regulates." 511 U.S. at 291 (Scalia, J., concurring).

---

[2] This precise issue is currently pending before the Seventh Circuit in *Killingsworth*. (Opening Br. 7). In the event that, after this Court dismissed Count II for failure to plead a claim, Quarterman were to request to amend his complaint to allege receipt of an offer letter prior to December 1, 2004, the Seventh Circuit's opinion in *Killingsworth* would most likely then be available to provide guidance to the parties and the Court.

As shown in Ameriquest's opening brief, the "relevant activity" that 15 U.S.C. Section 1681m(h)(8) regulates is *the filing of suits* to enforce Section 1681m, not the underlying substantive provisions of FCRA which regulate the content of firm offer of credit disclosures. (Opening Br. 6). Plaintiffs do not dispute this. Congress's ban on private causes of action is a "procedural rule" and should be applied to any lawsuit (regardless of whether the lawsuit was filed before the effective date of the rule) without going through a retroactivity analysis.[3] Numerous courts have held that, where the relevant activity is the filing of a lawsuit, there is nothing retroactive about applying the law in existence to bar claims filed after an amendment's effective date. *Lara-Ruiz v. INS*, 241 F.3d 934, 945 (7th Cir. 2001) (applying an amended statute for a removal proceeding brought after the effective date of the removal statute did not raise retroactivity concerns); *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 489 (8th Cir. 2004) (*Landgraf* not implicated because statute did not "regulate the underlying, allegedly illegal conduct," only the filing of a private lawsuit by the plaintiff); *Prof'l Mgmt. Assoc., Inc. Employees Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800, 803-04 (8th Cir. 2003) (a statute which precludes plaintiffs from filing securities fraud class actions under state law, "simply establishes a procedural rule regarding the filing of class action lawsuits alleging securities fraud, so no retroactivity analysis is warranted."); *see also Kolfenbach v. Mansour*, 36 F. Supp. 2d 1351, 1353 (S.D. Fla. 1999) (holding that a statutory bar on civil RICO claims could apply to conduct occurring before its passage); *Florida Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 165 F. Supp. 2d 1345 (S.D. Fla. 2001) (same); *ABF CapitalMgmt. v. Askin Capital Mgmt¸ L.P.*, 957 F. Supp. 1308, 1320-22 (S.D.N.Y. 1997) (rejecting the argument that "the elimination of a previously available remedy should not be applied to later-filed cases because the conduct complained of occurred prior to the change in the law"); *Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465 F. Supp. 936, 943 (D. Colo. 1979) (amendment eliminating a private right

---

[3] Further, the FACTA amendments apply only *prospectively* to lawsuits filed after FACTA's effective date. The FACTA amendments were not made effective immediately upon their adoption. Rather, almost a year passed between the enactment of FACTA on December 4, 2003, and the effective date of December 1, 2004. When an intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not considered retroactive. *Landgraf*, 511 U.S. at 265.

of action "affect[s] a remedy and not a substantive right," so should be applied to all claims filed after the amendment's effective date); *Salisbury v. S.B. Power Tool (In re Industrial Freight)*, 191 B.R. 825, 828-29 (C.D. Cal. 1996) (the Federal Aviation Administration Act barred a claim filed after its effective date, even though the underlying conduct predated the new law.)

Indeed, in *Killingsworth v. Household Bank*, No. 05 C 5729, 2006 U.S. Dist. LEXIS 4050 (N.D. Ill. January 31, 2006), a federal district court dismissed a claim under Section 1681m, reasoning that "because Killingsworth filed this suit after the December 1, 2004 effective date of [15 U.S.C. Section 1681m(h)(8)], the Court need not determine whether or not the statutory provision should be applied retroactively." *Id.* at *12-13. Quarterman tries to avoid the effect of *Killingsworth* by arguing that it contradicts language in *Murray v. GMAC Mortgage Co.*, 434 F.3d 948 (7th Cir. 2006), which suggests that FACTA does not apply to offers made before its effective date. (Opp. Br. 6). This argument fails because the Seventh Circuit has not held that FACTA does not apply to claims raised before its effective date. As that court recently noted, its language in Murray was mere dicta. *See Perry v. First National Bank d/b/a First National Credit Card*, 459 F.3d 816, 820, n.1 (7th Cir. 2006).[4] Quarterman also wrongly asserts that *Killingsworth* contradicts the Supreme Court's holding in *Landgraf*. To the contrary, *Landgraf* expressly recognizes that mere procedural or jurisdictional changes do not implicate retroactivity concerns because substantive rights are not impaired. 511 U.S. at 273-275. By dismissing Quarterman's claim, this Court would be following *Landgraf*, not violating it.

  **2. Even if Applying Section 1681m's Ban On Private Rights Of Act Did Raise Retroactivity Concerns, Barring Quarterman's Claim Would Not Be Impermissibly Retroactive.**

Because Quarterman did not file his lawsuit until after December 1, 2004, there is no need to engage in a retroactivity analysis under *Landgraf*. However, even under such an analysis, Quarterman's claim would still fail. To successfully assert under *Landgraf* that

---

[4] Quarterman also cites a number of district court cases to support the contention that FACTA cannot be applied to bar claims that arose prior to December 1, 2004. These cases wrongly rely on the above-referenced dicta in *Murray*, and/or fail to address Congress' statements about retroactivity in FACTA Section 312(f) and are not persuasive here.

FACTA should not bar his claim, Quarterman must show that: 1) Congress did not expressly prescribe the temporal reach of FACTA; *and* 2) FACTA impaired some substantive right that he had, increased some liability for past conduct, or imposed new duties with respect to transactions already completed. 511 U.S. at 280. Quarterman cannot succeed on either showing, much less both.

On the question of whether Congress expressed its intent about FACTA's temporal reach, Quarterman wrongly claims that "[n]ot a whisper exists in the legislative history or in the statute itself that Congress intended the FACTA Amendment should apply to conduct that pre-dates the effective date of the amendments to the FCRA." (Opp. Br. 4-5). As outlined in Ameriquest's opening brief (pages 8-10), Congress (in Section 312(f) of FACTA) *specifically addressed* the temporal scope of Section 1681m(h)(8)'s bar to private suits in a "rule of construction." Section 312(f) makes clear that Congress expressly chose to preserve private rights of action that existed as of December 3, 2003 – the day before the enactment of FACTA. At least one federal district court has recognized this fact. In *Crowder v. PMI Mortgage Ins. Co.*, No. 2:06cv0114-VPM[WO], 2006 U.S. Dist. LEXIS 35497 (M.D. Ala. May 26, 2006), a case cited by Defendants in their initial brief (Opening Br. 9) and ignored by Plaintiffs in their opposition, the court dismissed plaintiffs' FCRA claim because it was filed *after* the effective date of FACTA. *Id.* at *14. Citing Section 312(f), the court reasoned that "Congress intended to bar private civil actions filed after the relevant *effective date* (1 December 2004) when the conduct occurred after *3 December 2003*." *Id.* at *12-13 (italics in original).

In order to successfully avoid Section 1681m(h)(8)'s bar, Quarterman must also show that applying that bar here would impair some right that he possessed when he acted, increased liability for past conduct, or imposed new duties with respect to transactions already completed. *Landgraf*, 511 U.S. at 280. Quarterman vainly argues that applying this bar will vitiate "consumers' right to protect themselves" against improper use of their private information, and that abrogation of private causes of action leaves "consumers with no protection" and violators of FCRA's clear and conspicuous requirement "free to violate the requirements of the law."

(Opp. Br. 5). The "right" protected by the clear and conspicuous disclosure provisions of FCRA was not impaired by Congress's decision to bar private claims. Those provisions remain and are enforceable by the Federal Trade Commission.[5]

Further, even if Congress's bar to private causes of action did deprive Quarterman of some "right," certainly Quarterman did not possess that right at the time that he acted. Under *Landgraf*, a right must be "vested" to be protected from retroactive application of the law. 511 U.S. at 574. Here, Quarterman alleges that Ameriquest accessed his credit between February 10, 2004 and December 9, 2004 (and this whole argument assumes that he were able to plead that he received a mailer prior to December 1, 2004), all of which occurred ***after*** the enactment of the FACTA amendments, and ***after*** February 2004, when Congress announced the effective date of the FACTA amendments. Quarterman filed no claim, and took no other action with respect to the claimed violations of Section 1681m(d) until ***after*** 15 U.S.C. Section 1681m(h)(8) became effective. Accordingly, "familiar considerations of fair notice, reasonable reliance and settled expectations," do not point against application of the present law to Quarterman. *Landgraf*, 511 U.S. at 270.[6]

### III.  NO ADVERSE ACTION NOTICES WERE REQUIRED UNDER FCRA OR ECOA.

In their Opening Brief, Defendants showed that the FCRA adopts the ECOA's definition of "adverse action" (called the "Credit Specific Definition") and that this definition applies to the claims of Burggraff, the only Plaintiff to allege he should have received an adverse action notice.

---

[5] Neither Quarterman nor any of the other Non-Borrower Plaintiffs allege that they suffered any actual damages or harm to their financial privacy by virtue of their receipt of the Offer Letter and specifically, the allegedly non-compliant disclosures contained therein. Quarterman's claim for failure to provide "clear and conspicuous" disclosures is not about his right to protect himself against use of his private information without his knowledge and consent; Rather, it is about an alleged technical violation of a statute, which if he can prove that Ameriquest acted willfully, would entitle him to a small statutory penalty and recovery of fees for his lawyers.

[6] *Hughes Aircraft Co. v. U.S. ex rel Schumer*, 520 U.S. 939 (1997) (Opp. Br. 4) is inapposite. *Hughes* involved the creation of a cause of action that did not exist when the parties acted, and not the elimination of a cause of action. Creating a right of action increases liability and imposes new duties, and thus imposes new burdens on persons after the fact. These are the very concerns raised by the presumption against retroactivity. However, when a statute merely eliminates a civil remedy, these retroactivity concerns are not implicated. *Landgraf*, 511 U.S. at 271.

(Opening Br. 11-13). Under that definition, lenders are only required to provide adverse action notices under either ECOA or FCRA when they deny credit, change the existing terms of a credit arrangement, or refuse to grant credit in the amount of or on the terms requested by a borrower. *Id.* Defendants also showed that they were not required to provide such a notice on the facts as alleged by Plaintiffs, and that both policy rationales and legislative history confirm this conclusion. (Opening Br. 13-16). In response, Plaintiffs advance two primary arguments: 1) while the Credit Specific Definition applies, FCRA's "catch-all" provision also applies in determining the need for adverse action notices in credit transactions; and 2) even if only the Credit Specific Definition were applicable, Plaintiffs were entitled to an adverse action notice because Defendants refused to grant credit on terms requested by the Plaintiffs. Both arguments miss the mark. The statutory schemes and subsequent caselaw demonstrate that the catch-all provision has no place in this lawsuit, and that only the Credit Specific Definition defines an "adverse action." Further, a credit application does not equate to a request for specific credit terms and cannot serve as the trigger that requires an adverse action notice. Finally, as discussed below, Plaintiffs' class allegations of not receiving an adverse action notice when they did not receive the "best available terms" for a loan are insufficient to state a claim.

### A. The FCRA "Catch-All" Provision Is Not Applicable Here.

Plaintiffs argue that Ameriquest took adverse action against Burggraff by offering him less than "the best available credit terms based in whole or in part upon information in a consumer report." (Opp. Br. 7). While Plaintiffs do not dispute that the Credit-Specific definition of "adverse action" applies here, they argue that the alternative definition embodied by the FCRA "catch-all" provision *also* applies and requires Ameriquest to provide an adverse action notice when it fails to provide the "best available credit terms." This argument is misguided for several reasons:

First, the catch-all provision is not part of ECOA, which sets forth only the Credit Specific Definition. Plaintiffs' ECOA claim therefore fails.

Second, it is clear from FCRA's own language that its catch-all provision was not intended to regulate credit transactions of the type at issue here. FCRA separately defines "adverse action" in different contexts where consumer reports might be used: (1) credit transactions; (2) insurance underwriting; (3) employment decisions; (4) licensing eligibility, and (5) other business transactions and account reviews. Congress added the catch-all provision in 1996 as part of the Consumer Credit Reporting Act of 1996 (P.L. 104-208) to overturn a prior FTC interpretation that FCRA only required notice by consumer report users to consumers of adverse action relating to credit, insurance or employment.[7] The legislative history confirms that Congress intended the catch-all provision to apply only when the transaction did not fall within a category already covered by the statute, such as credit transactions or insurance underwriting.[8]

Third, when interpreting a statute, it is well-settled that: 1) specific provisions prevail over general provisions; and 2) a court must not read a catch-all section so broadly as to swallow up the more specific sections of a statute or to render them superfluous. *See HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981); *United States v. Colacurcio*, 84 F.3d 326, 333 (9th Cir. 1996). If Plaintiffs are correct and the catch-all provision applied in all credit transactions, it impermissibly would render the narrower Credit Specific Definition superfluous.

Fourth, the FTC – the body responsible for enforcing FCRA and ECOA – has confirmed that only the Credit Specific Definition applies in the credit context. The FTC has consistently recognized that Congress defined "adverse action" in the credit context to have only the meaning set forth in ECOA (i.e., only the Credit Specific Definition). (Opening Br. 11-12).[9]

---

[7] *See* Statement of General Policy or Interpretation, 55 Fed. Reg. 18804, May 4, 1990. [Supplemental Request for Judicial Notice ("Supp.. RJN"), Exh. 1]

[8] *See* S. Rep. No. 104-185, at 31-32 (1995); H.R. Rep. No. 103-486, at 26-27 (1994) (explaining that earlier proposed version of the catch-all definition was intended to cover a refusal to cash a check, lease real estate or open a new transaction account based on a consumer report). [Supp. RJN, Exhs. 2 and 3.]

[9] Plaintiffs rely on *Treadway v. Gateway Chevrolet Oldsmobile Inc*., 362 F.3d 971 (7th Cir. 2004) and *Crane v. American Home Mortgage*, No. Civ.A.03-5784, 2004 U.S. Dist. LEXIS 12770 (E.D. Pa. July 1, 2004) to support the notion that the catch-all provision applies to credit transactions. As discussed in Ameriquest's opening brief at page 12, reliance on that authority is misplaced. Plaintiffs also cite to several cases where courts have held in the insurance context that adverse action notice is required when an insurer issues a policy at higher than the best available premium rate. (Opp. Br. 9). The issue of whether "adverse action" occurs under FCRA in the insurance context, when a consumer does not receive the "best available rate" for insurance after a review of his or her

Fifth, Plaintiffs' proposed interpretation of the adverse action requirement in this case would result in huge additional costs associated with issuing hundreds of millions of adverse action notices per year. Moreover, such a scheme would essentially render an adverse action notice ubiquitous. (*See* Opening Br. 15). As the Supreme Court itself noted, "*[m]eaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure … and the need to avoid … [informational overload].'" *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980) (citation omitted) (discussing disclosures required by the Truth in Lending Act) (alterations in original). The FTC cautioned Congress to this effect when Congress was addressing revisions to the FCRA, and this caution is relevant here as well. (*See* Opening Br. 14-15).

### B. The Credit Specific Definition Did Not Require Ameriquest To Issue An Adverse Action Notice In This Case.

Plaintiffs also argue that even the Credit Specific Definition of "adverse action" required Ameriquest to issue an adverse action notice when it refused to provide credit on the "best available terms." Specifically, Plaintiff Burggraff alleges that Ameriquest "offered [Burggraff] refinancing terms on his home, including 5.9% interest on a 15 year loan," that Burggraff "indicated that he was interested in refinancing on those terms and applied for the loan," and that Ameriquest later informed Burggraff "that the terms had changed to 7.151% on a 30 year loan, and then to 9.697% on a 30 year loan." (Opp. Br. 8).

This argument fails. While Burggraff may have applied for credit with Ameriquest,[10] an application for credit is much different than a request for specific credit terms. In 2001, the FTC examined whether an adverse action notice was required under FCRA when a company approved a credit application only under its highest rates based upon a "risk score" derived from information reported by a credit bureau. The FTC made clear that such a notice *was not*

---

consumer report, is currently being considered by the United States Supreme Court on certiorari in *Safeco Insurance Company v. Burr* (Nos. 06-84, 06-100).

[10] In fact, in the Complaint itself, Burggraff does not even specifically allege that he applied for a loan with Ameriquest. (See Complaint, ¶¶ 54-56)

*required*: ". . . if you did not apply for credit on particular terms, . . . you are not entitled to [adverse action] notice because you did not suffer 'adverse action' as defined in Section 603(k)(1)(A) of the FCRA." (See Letter from Laura D. Berger, Esq. of the FTC to Mr. Elias Latour dated June 28, 2001 ("Berger-Latour Letter") (RJN Exh. 2).[11] Burggraff may not overcome his failure to allege that he requested specific credit terms by transmuting the allegation that Ameriquest "offered" certain terms to mean that Burggraff himself requested those terms (or to use Burggraff's words, "applied for" those terms). Indeed, Plaintiffs' Opposition concedes that Ameriquest contacted Burggraff and presented potential refinancing terms, and that Burggraff indicated he was interested in refinancing, and applied for a loan. (Opp. Br. 8).[12] Such allegations are not, and cannot be, tantamount to requesting specific credit terms.

      **C.    Plaintiffs' Class Allegations Regarding Requests for Specific Credit Terms Are Insufficient.**

Plaintiff Burggraff seeks to certify a putative class of non-borrowers who were offered less than the "best available terms" for credit transactions based upon a review of their credit reports. (Complaint, ¶¶ 65, 101-102). However, although the Complaint discusses Burggraff's

---

[11] Moreover, in the Official Staff Commentary to Regulation B (the statute which interprets and implements ECOA) the Federal Reserve defines "application" broadly to encompass more than the situation where a borrower requests specific credit terms. See 12 C.F.R. part 202 Supplement I, Section 2(f)(3), (4) and (5). In doing so, the Federal Reserve acknowledges that an "application" for credit is not necessarily the same as a "request for particular credit terms."

[12] Burggraff's allegations in the Complaint concede that the "offers" of 5.9% for 15 years, and 7.151% for 30 years were "preliminary terms." (Complaint, ¶ 25). These were not even real "offers." Rather, they are Good Faith Estimates required by the Real Estate Settlement Procedures Act ("RESPA") to be sent prior to underwriting the loan. Plaintiff's argument that an application is the same as a request for specific credit terms would have this Court find that every time a lender sends out a Good Faith Estimate that contains certain terms, then those terms are always what the borrower specifically requested (i.e., as Burggraff argues, the terms the borrower "applied for."). That cannot be the case. Under RESPA, a lender is required to send the Good Faith Estimate within three days of receipt of an application. 12 U.S.C. Section 2604, 24 C.F.R. Sections 3500.6 and 3500.7. The threshold for what constitutes an application under RESPA is fairly low, requiring only the submission of a borrower's financial information and the identification of a property. See 24 C.F.R. Section 3500.2(b). Therefore, lenders will often consider that an application has been made, and send out the Good Faith Estimate, before ever discussing particular loan terms. In this scenario, an application actually occurs before the lender even gives a preliminary estimate of the terms for which a borrower may qualify. Accordingly, the application itself cannot (as Burggraff argues) translate into a request for specific credit terms.

specific situation, it is wholly devoid of allegations contending that the *putative class members* requested specific credit terms, or even any allegation that they requested Ameriquest's best available terms. This is significant because under the ECOA Credit Specific Definition at 15 U.S.C. Section 1691(d)(6) (which FCRA incorporates at 15 U.S.C. Section 1681a(k)(1)(A)), Ameriquest did not take adverse action against the putative class, because it did not refuse to grant credit in "substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). Accordingly, Plaintiffs' class claims for violation of the ECOA and FCRA adverse action notice requirements should be dismissed.[13]

### IV. PLAINTIFFS' OPPOSITION FAILS TO CURE THE DEFECTS WITH THEIR CLASS ALLEGATIONS.

Plaintiffs acknowledge that they must "give the defendant notice of plaintiff's claims." (Opp. Br. 10). Yet, they refuse to do so. The class definitions of Sub-Classes A and B fail to specify the scope of the class in terms of dates when the relevant violations occurred. As a result, Defendants cannot tell from the Complaint whether they have a statute of limitations defense. Moreover, the lack of temporal specificity to the definition of Sub-Class B is also inappropriate and denies Defendants the opportunity to analyze Plaintiffs' claims in light of the FACTA amendments, which eliminated the private right of action for claims that arise after December 1, 2004. 15 U.S.C. § 1681m(h)(8).

The definition of Sub-Class C (regarding adverse action under FCRA and ECOA) is also deficient. Like Sub-Class B, Sub-Class C is based upon an alleged violation of Section 1681m of FCRA, yet it does not account for the fact that the FACTA amendments eliminated private rights of action for claims arising after December 1, 2004. *Id.* Further, the class definition of Sub-Class C improperly attempts to encompass individuals who sought loans from Ameriquest from April 2001 forward. Based on the plain reading of the Complaint, FCRA and ECOA, Sub-

---

[13] Analysis of the FACTA amendments to FCRA confirms that an adverse action notice is not required when a lender fails to offer "best available" rates. Ameriquest set forth this argument in its motion (Opening Br. 15-16), but Plaintiffs failed to address it.

Class C is properly subject to a motion to dismiss because the FCRA and ECOA two-year statute of limitations bars claims for conduct occurring before November 30, 2002.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Counts II, III and IV, and require Plaintiffs to replead the class definitions for Count I and, in the alternative to dismiss Counts II, III and IV.

DATED: March 5, 2007

Respectfully submitted,

By:    /s/ Bernard E. LeSage

*Attorneys for Ameriquest Mortgage Company and Ameriquest Capital Corporation*

Bernard E. LeSage, Esq.
Sarah K. Andrus, Esq.
BUCHALTER NEMER, a P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700

## **CERTIFICATE OF SERVICE**

I, Bernard E, LeSage, hereby certify that on this 5th day of March 2007, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By:    /s/ Bernard E. LeSage