**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| _____ | Lead Case No. 05-CV-07097 |
| THIS DOCUMENT RELATES TO: **[Docket #323]** | (Centralized before The Honorable Marvin E. Aspen) |
| _____ | |
| AMERIQUEST MORTGAGE COMPANY, a Delaware corporation, | |
| Third-Party Plaintiff, | |
| v. | |
| TRANS UNION LLC, a Delaware corporation TRANS UNION CORPORATION, a Delaware corporation; CHOICEPOINT PRECISION MARKETING, INC., a Georgia corporation, EQUIFAX CREDIT INFORMATION SERVICES, INC., a Georgia corporation, EQUIFAX MARKETING SERVICES, a division of Equifax Credit Information Services, Inc. | |
| Third-Party Defendants. | |

## THIRD-PARTY COMPLAINT

Defendant and third-party plaintiff Ameriquest Mortgage Company ("Ameriquest")

alleges as follows:

BN 1289751v1

## THE PARTIES

1.     Ameriquest is a Delaware corporation with its principal place of business in Orange, California.

2.     Third-party defendants Trans Union LLC and Trans Union Corporation, sometimes doing business as PerformanceData (hereinafter collectively, "TransUnion"), are Delaware corporations with their principal place of business in Chicago, Illinois.

3.     Third-party defendant ChoicePoint Precision Marketing, Inc. ("ChoicePoint") is a Georgia corporation with its principal place of business in Alpharetta, Georgia.

4.     Third-party defendant Equifax Credit Information Services, Inc. ("Equifax") is a Georgia Corporation with its principal place of business in Atlanta, Georgia.

5.     Third-party defendant Equifax Credit Marketing Services is a division of Equifax Credit Information Services, Inc. ("ECMS").

6.     Ameriquest is informed and believes, and based thereon alleges, that each of the foregoing third-party defendants, was the agent, representative, co-conspirator, and/or servant of each of the remaining third-party defendants and was acting within the course and scope of that agency, representation, or service in doing and/or failing to do the acts herein alleged. Ameriquest is informed and believes, and thereon alleges, that these third-party defendants, and each of them, conspired together and willfully formed a deliberate design and purpose to, and/or entered into a scheme to do, the acts and/or omissions herein alleged, and in pursuance thereof, did and/or caused to be done such acts and/or omissions; that all of said acts and/or omissions were participated in and were done by all of these third-party defendants, or any one or more of them, as steps in furtherance of said conspiracy and for the purposes set forth herein.

- 2 -

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because this case relates to claims arising under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA").

8.      Venue is proper in this judicial district pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, because Ameriquest's claims against the third-party defendants herein arise directly out of claims asserted by plaintiffs Raymond Quarterman, Jr., Thomas Klutho, and Mary Forrest, on behalf of themselves and a putative class of non-borrowers nationwide (collectively, the "Non-Borrower Plaintiffs"), against Ameriquest in this Court.[1]  On December 6, 2006, the Non-Borrower Plaintiffs filed the Consolidated Complaint for Claims of Non-Borrowers (Docket #323) (the "Non-Borrower Complaint").  Through the Non-Borrower Complaint, the Non-Borrower Plaintiffs allege that the letters attached as Exhibits "A" through "E" to the Non-Borrower Complaint, as well as all similar letters sent by or at the behest of Ameriquest (the "Letters"), violated FCRA's firm offer of credit and/or clear and conspicuous disclosure requirements.  To the extent that these allegations are found to be true by a trier of fact, the alleged failure to comply with FCRA is directly attributable to the assistance, advice, recommendations, conduct, and actions of TransUnion, ChoicePoint, Equifax and ECMS.   As alleged herein, each of the Defendants provided, among other things, advice and direct-marketing services to Ameriquest in the development, formulation, creation, production and maintenance of a direct-mail marketing program (the "Direct Mail Program"), including, but not limited to, the use of the Letters sent to consumers utilizing prescreened consumer lists (the "Consumer Lists").

---

[1]   Plaintiff Raymond Quarterman, Jr. originally filed a similar complaint on behalf of himself and those similarly-situated nationwide in the United States District Court for the Central District of California on February 25, 2005. Of the other "named-plaintiffs," his is the earliest-filed Complaint that was consolidated into the Non-Borrower Complaint.

BN 1289751v1

## GENERAL ALLEGATIONS

## ALLEGATIONS AS TO TRANSUNION

15.     TransUnion is a credit reporting agency as defined in FCRA.  At all times relevant herein, and in connection with the Direct Mail Program, TransUnion, together with its affiliated companies, entered into a series of written and oral agreements with Ameriquest whereby TransUnion provided the data and developed and marketed the models and the computerized process/systems for generating the Consumer Lists.  The Consumer Lists were leased to Ameriquest in order for Ameriquest to have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.   Ameriquest never owned the Consumer Lists and was simply granted a license for such use for specified periods of time.

16.     TransUnion provided the data and developed and sold to Ameriquest the models and/or computerized process/systems for generating the Consumer Lists.

17.     At all times relevant herein, TransUnion represented to Ameriquest that it knew and operated within the requirements of FCRA.  Further, TransUnion represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnish information to consumer reporting agencies, as well as on users of consumer reports, including, but not limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures.  Ameriquest reasonably relied upon these representations in entering into the agreements with TransUnion and in utilizing the services TransUnion provided.

18.     TransUnion was fully aware that the data and Consumer Lists it provided, and/or the models/computerized process/systems it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers.  TransUnion was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit and the FCRA requirements regarding clear and conspicuous disclosures.   TransUnion required that the data it provided by virtue of the Consumer Lists and/or the models/computerized process/systems would be used consistent with all applicable consumer protection laws, including FCRA.

19.     In connection with the Direct Mail Program, and in order to ensure that Ameriquest's Direct Mail Program complied with FCRA, TransUnion required Ameriquest to provide it with drafts of the proposed Letters annually.  TransUnion required that as a condition of it providing Ameriquest with the Consumer Lists, TransUnion would have the opportunity to review, comment, and approve the Letters.  In other words, TransUnion would not provide Ameriquest with information on consumers until it satisfied itself that the Letters Ameriquest intended to send would comply with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

20.     TransUnion's continual review of Ameriquest's Direct Mail Program provided Ameriquest with assurance that the Direct Mail Program was at all times in compliance with applicable law, including FCRA.

## ALLEGATIONS AS TO CHOICEPOINT

21.     ChoicePoint is a credit reporting agency and/or a reseller of credit information as defined in FCRA.  At all times relevant herein, and in connection with the Direct Mail Program,

ChoicePoint entered into a series of written and oral agreements with Ameriquest whereby it, using Equifax data, agreed to provide, and provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program so that Ameriquest could have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.

22. ChoicePoint provided services related to the Direct Mail Program, including, but not limited to, providing the Consumer Lists for Ameriquest's use.

23. At all times relevant herein, ChoicePoint represented to Ameriquest that it knew and operated within the requirements of FCRA. Further, ChoicePoint represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnished information to consumer reporting agencies, as well as on users of consumer reports, including, but not limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures. Ameriquest reasonably relied upon these representations in entering into the agreements with ChoicePoint and in utilizing the services ChoicePoint provided.

24. ChoicePoint was fully aware that the Consumer Lists and other services it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers. ChoicePoint was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit, and the FCRA requirements regarding clear and conspicuous disclosures. ChoicePoint required that the data it provided by virtue of the Consumer Lists would be used consistent with all applicable consumer protection laws, including FCRA.

- 6 -

25.     In addition to having full knowledge of how Ameriquest would use the information it provided, ChoicePoint at all times had the ability and opportunity to review, comment, and approve the Letters in order to satisfy itself that Ameriquest's Direct Mail Program and the Letters complied with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

## ALLEGATIONS AS TO EQUIFAX

26.     Equifax is a credit reporting agency as defined in FCRA.  At all times relevant herein, and in connection with the Direct Mail Program, Equifax, together with its affiliated companies, including ECMS, entered into a series of written and oral agreements with Ameriquest whereby Equifax provided the data and/or developed and marketed the computerized process/systems for generating the Consumer Lists.  The Consumer Lists generated from Equifax data were provided to Ameriquest by Equifax and Choicepoint in order for Ameriquest to have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.

27.     Equifax, for itself and/or through Choicepoint, developed and sold to Ameriquest the Consumer Lists generated from Equifax data.

28.     At all times relevant herein, Equifax represented to Ameriquest that it knew and operated within the requirements of FCRA.  Further, Equifax represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnish information to consumer reporting agencies, as well as on users of consumer reports, including, but not limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures.  Ameriquest reasonably relied upon these representations in entering into the agreements with Equifax and in utilizing the services Equifax

provided.

29.     Equifax was fully aware that the Consumer Lists and/or the models/computerized process/systems it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers.  Equifax was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit and the FCRA requirements regarding clear and conspicuous disclosures.   Equifax required that the data it provided by virtue of the Consumer Lists and/or the models/computerized process/systems would be used consistent with all applicable consumer protection laws, including FCRA.

30.     In addition to having full knowledge of how Ameriquest would use the information it provided, Equifax at all times had the ability and opportunity to review, comment, and approve the Letters in order to satisfy itself that Ameriquest's Direct Mail Program and the Letters complied with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

## ALLEGATIONS AS TO ECMS

31.     ECMS is a credit reporting agency as defined in FCRA.  At all times relevant herein, and in connection with the Direct Mail Program, ECMS entered into a series of written and oral agreements with Ameriquest whereby it, using Equifax data, agreed to provide, and provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program so that Ameriquest could have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.

32.     ECMS provided services related to the Direct Mail Program, including, but not limited to, providing the Consumer Lists for Ameriquest's use.

33. At all times relevant herein, ECMS represented to Ameriquest that it knew and operated within the requirements of FCRA. Further, ECMS represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnished information to consumer reporting agencies, as well as on users of consumer reports, including, but not limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures. Ameriquest reasonably relied upon these representations in entering into the agreements with ECMS and in utilizing the services ECMS provided.

34. ECMS was fully aware that the Consumer Lists and other services it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers. ECMS was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit, and the FCRA requirements regarding clear and conspicuous disclosures. ECMS required that the data it provided by virtue of the Consumer Lists would be used consistent with all applicable consumer protection laws.

35. In addition to having full knowledge of how Ameriquest would use the information it provided, ECMS at all times had the ability and opportunity to review, comment, and approve the Letters in order to satisfy itself that Ameriquest's Direct Mail Program and the Letters complied with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

BN 1289751v1

## FIRST CLAIM

### (Breach of Contract—Against TransUnion)

36.     Ameriquest re-alleges paragraphs 1 through 35 inclusive, and incorporates the same by reference.

37.     Ameriquest and TransUnion entered into oral and written contracts under which TransUnion agreed to provide data and develop and developed and marketed the models and computerized process/systems for generating the Consumer Lists, and agreed to provide and provided the Consumer Lists to Ameriquest for use in Ameriquest's Direct Mail Program to make firm offers of credit (with clear and conspicuous disclosures) to consumers.

38.     Ameriquest has performed its obligations under the contracts with TransUnion, including, but not limited to, paying TransUnion for its services.

39.     TransUnion was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA.  Ameriquest relied upon TransUnion's expertise and experience in the direct-mail marketing field with respect to ensuring that the models and computerized process/systems, and the Consumer Lists it provided were done in compliance with FCRA.  Further, Ameriquest relied upon TransUnion's expertise and review of the Letters to ensure its compliance with FCRA.

40.     In the event that the allegations in the Non-Borrower Complaint are proven to be true, Trans Union breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the models and systems and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

- 10 -

41.     Further, because TransUnion was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon TransUnion's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of the Customer Lists and the sending of the Letters were done in compliance with FCRA.  Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of TransUnion's actions, which actions must necessarily be construed as a breach of TransUnion's contracts with Ameriquest.  Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by TransUnion's breach.

42.     Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid TransUnion for its services over the relevant time period.  Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and ECMS exceeded approximately $680,000,000.  Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

## SECOND CLAIM

### (Breach of Contract – against ChoicePoint)

43.     Ameriquest re-alleges paragraphs 1 through 42 inclusive, and incorporates the same by reference.

44.     Ameriquest and ChoicePoint entered into oral and written contracts under which ChoicePoint, using Equifax data, agreed to provide and provided Ameriquest with the Consumer

Lists for Ameriquest's Direct Mail Program so that Ameriquest could make firm offers of credit and clear and conspicuous disclosures to consumers.

45.     Ameriquest has performed its obligations under the agreements with ChoicePoint, including, but not limited to, paying ChoicePoint for its services.

46.     ChoicePoint was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA. Ameriquest relied upon ChoicePoint's expertise and experience in the direct-mail marketing field with respect to ensuring that the Consumer Lists it provided were done in compliance with FCRA. Further, Ameriquest relied upon ChoicePoint's expertise and review of the Letters to ensure its compliance with FCRA.

47.     In the event that the allegations in the Non-Borrower Complaint are proven to be true, ChoicePoint breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

48.     Further, because ChoicePoint was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon ChoicePoint's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of Customer Lists and the sending of the Letters were done in compliance with FCRA. Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of ChoicePoint's actions, which actions must necessarily be construed as a breach of ChoicePoint's contracts with Ameriquest. Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is

- 12 -

assessed damages as a result, such damages will have been directly and proximately caused by ChoicePoint's breach.

49. Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid ChoicePoint for its services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax, and ECMS exceeded approximately $680,000,000. Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

## THIRD CLAIM

### (Breach of Contract – against Equifax)

50. Ameriquest re-alleges paragraphs 1 through 49 inclusive, and incorporates the same by reference.

51. Ameriquest and Equifax entered into oral and written contracts under which Equifax agreed to provide data and to develop and developed and marketed the computerized process/systems for generating the Consumer Lists, and agreed to provide and provided the Consumer Lists to Ameriquest for use in Ameriquest's Direct Mail Program to make firm offers of credit (with clear and conspicuous disclosures) to consumers.

52. Ameriquest has performed its obligations under the contracts with Equifax, including, but not limited to, paying Equifax for its services.

53. Equifax was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA. Ameriquest relied upon Equifax's expertise and experience in the direct-mail marketing field with respect to ensuring

that the data, the computerized process/systems, and the Consumer Lists it provided were done in compliance with FCRA. Further, Ameriquest relied upon Equifax's expertise and review of the Letters to ensure its compliance with FCRA.

54.     In the event that the allegations in the Non-Borrower Complaint are proven to be true, Equifax breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the models and systems and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

55.     Further, because Equifax was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon Equifax's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of the Customer Lists and the sending of the Letters were done in compliance with FCRA. Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of Equifax's actions, which actions must necessarily be construed as a breach of Equifax's contracts with Ameriquest. Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by Equifax's breach.

56.     Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid Equifax for its services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and ECMS exceeded approximately $680,000,000. Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or

other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

## FOURTH CLAIM

### (Breach of Contract – against ECMS)

57.     Ameriquest re-alleges paragraphs 1 through 56 inclusive, and incorporates the same by reference.

58.     Ameriquest and ECMS entered into oral and written contracts under which ECMS, using Equifax data, agreed to provide and provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program so that Ameriquest could make firm offers of credit and clear and conspicuous disclosures to consumers.

59.     Ameriquest has performed its obligations under the agreements with ECMS, including, but not limited to, paying ECMS for its services.

60.     ECMS was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA.  Ameriquest relied upon ECMS's expertise and experience in the direct-mail marketing field with respect to ensuring that the Consumer Lists it provided were done in compliance with FCRA.  Further, Ameriquest relied upon ECMS's expertise and review of the Letters to ensure its compliance with FCRA.

61.     In the event that the allegations in the Non-Borrower Complaint are proven to be true, ECMS breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

62.     Further, because ECMS was required to perform all of its duties under its written

and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon ECMS's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of Customer Lists and the sending of the Letters were done in compliance with FCRA.  Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of ECMS's actions, which actions must necessarily be construed as a breach of ECMS's contracts with Ameriquest.  Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by ECMS's breach.

63.     Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid ECMS for its services over the relevant time period.  Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and ECMS exceeded approximately $680,000,000.  Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

## FIFTH CLAIM

### (Equitable Indemnity/Implied Indemnity—Against All Third-Party Defendants)

64.     Ameriquest re-alleges paragraphs 1 through 63 inclusive, and incorporates the same by reference.

65.     In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, any loss that Ameriquest suffers in connection with the Non-Borrower Complaint including, but not limited to, any judgment, settlement, attorneys' fees, costs, or other equitable relief, is directly attributable to the advice, conduct, and

actions of TransUnion, ChoicePoint, Equifax and ECMS (collectively, the "Third-Party Defendants"). In particular, but for the Third-Party Defendants' assurances that they had experience developing and using these same processes, systems, models, the Consumer Lists and firm offer letters, Ameriquest would not have implemented its Direct Mail Program. Similarly, but for the Third-Party Defendants' review of the Letters and concomitant assurances that the Letters used by Ameriquest complied with the requirement of being a firm offer of credit and contained clear and conspicuous disclosures as required by FCRA, Ameriquest would not have sent the Letters, and would not be in a position of suffering damages in connection with the Non-Borrower Complaint (should a trier of fact find in favor of the Non-Borrower Plaintiffs).

66. Moreover, under the terms of the enforceable oral agreements between Ameriquest and the Third-Party Defendants, the Third-Party Defendants were responsible for ensuring that the Direct Mail Program was conducted in full compliance with all applicable state and federal laws, including FCRA.

67. Ameriquest reasonably relied on the claims, representations, and promises made by the Third-Party Defendants. In particular, Ameriquest relied on the Third-Party Defendants' claims, assurances and representations that they would follow the rules set forth in FCRA for, among other things, the creation, review and approval of the Letters. Ameriquest further relied upon the Third-Party Defendants' review of the Letters, and refusal to provide the Consumer Lists until after review of the Letters, to ensure FCRA compliance.

68. Further, Ameriquest relied upon TransUnion, ChoicePoint, Equifax, and ECMS, which provided information/data and models/systems and the Consumer Lists for Ameriquest to identify prospective Ameriquest customers which would allow Ameriquest to send such prospective consumers a firm offer of credit. Ameriquest relied upon TransUnion's,

ChoicePoint's, Equifax's and ECMS' representations that the information/data and models/systems and the Consumer Lists complied with the requirements of FCRA.

69.     Under principals of equity, Ameriquest is entitled to indemnification from the Third-Party Defendants in an amount sufficient to reimburse Ameriquest for any judgment, settlement, attorneys' fees, costs, or other equitable relief that Ameriquest may suffer in connection with the Non-Borrower Complaint.

## SIXTH CLAIM

### (Contribution—Against All Third-Party Defendants)

70.     Ameriquest re-alleges paragraphs 1 through 69 inclusive, and incorporates the same by reference.

71.     In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, any loss that Ameriquest suffers in connection with the Non-Borrower Complaint, including, but not limited to, any judgment, settlement, attorneys' fees, costs, or other equitable relief, is directly attributable to the claims, advice, conduct, and actions of the Third-Party Defendants.  In particular, but for the Third-Party Defendants' assurances that they had experience using and developing these same processes, systems, models, the Consumer Lists and firm offer letters, Ameriquest would not have implemented its Direct Mail Program.  Similarly, but for the Third-Party Defendants' review of the Letters and concomitant assurances that the Letters used by Ameriquest complied with the requirement of being a "firm offer of credit" and contained clear and conspicuous disclosures as required by FCRA, Ameriquest would not have sent the Letters, and would not be in a position of suffering damages in connection with the Non-Borrower Complaint (should a trier of fact find in favor of the Non-Borrower Plaintiffs).

BN 1289751v1

72.     Ameriquest reasonably relied on the claims, representations, and promises made by the Third-Party Defendants.  In particular, Ameriquest relied on the Third-Party Defendants' claims, assurances, and representations that they would follow the rules set forth in FCRA for, among other things, the creation, review, and approval of the Letters.  Ameriquest further relied upon the Third-Party Defendants' review of the Letters, and refusal to provide the Consumer Lists until after review of the Letters, to ensure FCRA compliance.

73.     Further, Ameriquest relied upon TransUnion, ChoicePoint, Equifax and ECMS which provided information/data and models/systems and the Consumer Lists for Ameriquest to identify prospective Ameriquest customers which would allow Ameriquest to send such prospective consumers a firm offer of credit.  Ameriquest relied upon TransUnion's, ChoicePoint's, Equifax's and ECMS' representations that the information/data and models/systems and the Consumer Lists complied with the requirements of FCRA.

74.     Ameriquest did not know, and had no reason to know, that the Third-Party Defendants would not follow the rules set forth in FCRA with respect to the Letters and/or the information/data, models/systems, and the Consumer Lists they provided.

75.     Under principles of equity, Ameriquest is entitled to contribution from the Third-Party Defendants in an amount sufficient to reimburse Ameriquest for any judgment, settlement, attorneys' fees, costs, or other equitable relief that Ameriquest may suffer in connection with the Non-Borrower Complaint that exceeds Ameriquest's pro-rata share of its liability.

## SEVENTH CLAIM

### (Negligent Misrepresentation—Against All Third-Party Defendants)

76.     Ameriquest re-alleges paragraphs 1 through 75 inclusive, and incorporates the same by reference.

- 19 -

77.     The Third-Party Defendants each represented to Ameriquest that they had experience using and developing the direct-mail programs, processes, systems, models, the Consumer Lists, and firm offer Letters that they sold to Ameriquest.  The Third-Party Defendants each represented to Ameriquest that they were aware of the requirements imposed by FCRA that pertain to the making of firm offers of credit and/or clear and conspicuous disclosures, and that the services they provided to Ameriquest were compliant with such requirements.   The Third-Party Defendants each provided assurances to Ameriquest that the Letters were compliant with FCRA.  The Third-Party Defendants each knew that Ameriquest would be using the services and information they provided for its Direct Mail Program and to send the Letters.

78.     In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then at the time the Third-Party Defendants made these representations, they knew, or should have known, that they were materially false. The Third-Party Defendants, given their positions, expertise, and experience in the direct-mail marketing field, knew or should have known that these representations were false when made.

79.     The Third-Party Defendants made these representations with the intention to induce Ameriquest to enter into the various oral and written agreements between Ameriquest and the Third-Party Defendants and to induce Ameriquest to use the Third-Party Defendants' services, for which Ameriquest would pay the Third-Party Defendants substantial fees.

80.     Ameriquest reasonably relied on the Third-Party Defendants' representations in implementing its Direct Mail Program and in sending the Letters.

81.     In the event that the allegations in the Non-Borrower Complaint are proven to be true, and Ameriquest is found liable to the Non-Borrower Plaintiffs for any judgment, settlement,

attorneys' fees, costs or other equitable relief, then as a direct and proximate result of the Third-Party Defendants' representations, Ameriquest will have suffered damages including, but not limited to, any damages that it suffers in connection with the Non-Borrower Complaint.

## EIGHTH CLAIM

### (Negligence—Against all Third-Party Defendants)

82.     Ameriquest re-alleges paragraphs 1 through 81, inclusive, and incorporates the same by reference.

83.     As a credit reporting agency that was providing data and developing and marketing models and the computerized process/systems for generating the Consumer Lists, and in generating the Consumer Lists for Ameriquest's use, TransUnion had a duty to properly develop, market, and generate such items.  In doing the foregoing, TransUnion also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action.  This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans.  This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

84.     As a credit reporting agency developing and generating the Consumer Lists for Ameriquest's use, ChoicePoint had a duty to properly develop and generate such items.  In doing the foregoing, ChoicePoint also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action.  This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans.  This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous

disclosures under FCRA.

85.     As a credit reporting agency that was providing data and developing the computerized process/systems for generating the Consumer Lists, and in generating the Consumer Lists for Ameriquest's use, Equifax had a duty to properly develop, market, and generate such items.  In doing the foregoing, Equifax also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action.  This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans.  This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

86.     As a credit reporting agency developing and generating the Consumer Lists for Ameriquest's use, ECMS had a duty to properly develop and generate such items.  In doing the foregoing, ECMS also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action.  This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans.  This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

87.     Third-Party Defendants breached their respective duties by providing services and products that exposed Ameriquest to legal action.  In addition, in the event that the allegations in the Non-Borrower Complaint are proven to be true, then TransUnion, ChoicePoint, Equifax and ECMS breached their respective duties to Ameriquest, in that they negligently failed to follow the criteria and rules set forth in FCRA in performing the above-mentioned obligations to

Ameriquest and further failed to exercise due care and comply with applicable standards of care in their respective fields.

88.     As a direct result of the Third-Party Defendants' negligence, Ameriquest has suffered damages in an amount to be proven at trial, but in no event less than any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to the Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

## NINTH CLAIM

**(Rescission of Contracts—Against all Third-Party Defendants)**

89.     Ameriquest re-alleges paragraphs 1 through 88 inclusive, and incorporates the same by reference.

90.     As set forth above, each of the Third-Party Defendants entered into various contracts with Ameriquest.

91.     In these contracts (and elsewhere) the Third-Party Defendants each represented to Ameriquest that they had experience using and developing these same direct-mail programs, processes, systems, models, the Consumer Lists, and firm offer Letters.  The Third-Party Defendants each represented to Ameriquest that they were aware of the requirements imposed by FCRA that pertain to the making of firm offers of credit and/or clear and conspicuous disclosures, and that the services they provided to Ameriquest were compliant with such requirements.   The Third-Party Defendants each provided assurances to Ameriquest that the Letters were compliant with FCRA.  Ameriquest relied upon these representations, assurances and inducements to enter into the various contracts with the Third-Party Defendants.  The Third-Party Defendants each knew that Ameriquest would be using the information and services they provided for its Direct Mail Program, and to send the Letters, and that such must be compliant

with all applicable laws including FCRA.

92.     In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then the foregoing representations by the Third-Party Defendants were materially false, and falsely induced Ameriquest to enter into the foregoing contracts and pay them substantial fees in connection therewith.  Thus, in the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then each of the contracts between Ameriquest and the Third-Party Defendants should be rescinded, and the Third-Party Defendants should be required to return to Ameriquest the amount of all consideration each of the Third-Party Defendants received from Ameriquest for its services.

**WHEREFORE**, Ameriquest prays for judgment against the Third-Party Defendants on all claims as follows:

1.     For monetary damages in an amount according to proof at trial, but in no event less than the amount of all consideration Ameriquest paid each of the Third-Party Defendants for its respective services over the relevant time period.  Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and EDMS exceeded approximately $680,000,000.

2.     For monetary damages in an amount according to proof at trial, but in no event less than the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to the Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

3.     For monetary damages in an amount to be proven at trial, but not less than is sufficient to indemnify Ameriquest for any and all damages that Ameriquest incurs in connection

with the Non-Borrower Complaint, including, but not limited to, any judgment, settlement, attorneys' fees, costs, or other equitable relief that the Non-Borrower Plaintiffs are awarded as against Ameriquest (and/or its affiliates);

4.     For rescission of the contracts between Ameriquest and the Third Party Defendants and that the Third Party defendants be ordered to return to Ameriquest the amount of all consideration each of the Third-Party Defendants received from Ameriquest for its services.

5.     For reasonable attorneys' fees and costs of suit; and

6.     For such other relief as the Court may deem just and proper.

DATED: July 5, 2007                          Respectfully submitted,

                                             BUCHALTER NEMER
                                             A Professional Corporation


                                             By: _/s/_ Bernard E. LeSage _____
                                                 *Attorneys for Defendant and Third-Party*
                                                 *Plaintiff, Ameriquest Mortgage Company*

                                             Bernard E. LeSage (California Bar No. 61870)
                                             Sarah K. Andrus (California Bar No. 174323)
                                             BUCHALTER NEMER
                                             A Professional Corporation
                                             1000 Wilshire Boulevard, Suite 1500
                                             Los Angeles, California 90017-2457
                                             Telephone: (213) 891-0700
                                             Facsimile: (213) 896-0400

BN 1289751v1