## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 Lead Case No. 05-cv-07097 Centralized before the Honorable Marvin E. Aspen |

## DECLARATION OF JILL H. BOWMAN IN OPPOSITION TO ARNALL'S REQUEST TO STAY MERITS DISCOVERY

1.      Jill H. Bowman, an attorney declares:   I am a partner at the law firm of James, Hoyer, Newcomer and Smiljanich P.A. in Tampa, Florida and Co-Lead Counsel for the Borrower Class and Non-Borrower Class Plaintiffs in this multidistrict proceeding.

2.      On June 18, 2007, the Borrower Class Plaintiffs' filed a Motion for Leave to Amend the Borrowers Consolidated Complaint to join Roland Arnall.

3.      On July 17, 2007 Class Counsel agreed to provide Ameriquest and Arnall additional time to respond to Borrowers' Motion for Leave to Amend and the Amended Complaint in exchange for Arnall's agreement to: a) waive service, b) agree to simultaneously file any motion opposing the First Amended Consolidated Complaint (such as a motion to dismiss); and c) to toll any applicable limitations period resulting from the delay in joining him beginning on July 18, 2007.  These agreements were advantageous to Borrowers and likely shortened the time during which the Court would

consider Arnall's opposition to the Amended Complaint.  Class Counsel expressly

rejected a simultaneous request by Ameriquest Entities' ("Ameriquest") counsel to stay

merits discovery in the case.

      4.     Then, on July 25, 2007, I was contacted by Mr. Alan Salpeter,

representing Mr. Arnall, who requested that merits discovery be stayed: 1) until the Court

determined whether Arnall should be joined as a party Defendant; or 2) alternatively for

60 days.

      5.     I explained to Mr. Salpeter that Class Counsel had rejected a similar

request by Ameriquest (Exhibit A); that Ameriquest's request for additional delay due to

the joining of additional defendants had been considered and rejected by the Court; and

that additional delay was intolerable given what we now understood to be diminishing

operational levels at Ameriquest.  I also indicated to Mr. Salpeter that the case had been

stayed for a significant period and that only a few depositions had taken place so that it

should take very little time for him to get up to speed in any event.

      6.     On July 26, 2007, Class Counsel had a scheduled meet and confer

concerning discovery matters with counsel for Ameriquest, which Mr. Salpeter was

likewise permitted to attend.  Mr. Salpeter reiterated his requests to the larger group and

Borrowers' Class Counsel again responded making each of the points articulated above.

In addition, Borrowers' Class Counsel agreed to permit Mr. Salpeter to participate in

depositions informally in the interim without prejudice to his right to seek to re-open

those depositions should he be joined as a party.  And, Class Counsel indicated that it

would reconsider the requested stay should Arnall agree to be joined and Answer the

Borrowers' Consolidated Amended Complaint.  In response, Mr. Salpeter indicated that

Arnall would not agree to be joined and that Arnall would likely move to dismiss Borrowers' Consolidated Amended Complaint.

7.     Accordingly, Borrowers' oppose the request that merits discovery be delayed based on the request of a non-party who intends to challenge Borrowers' right to proceed against him in this action in the first instance.

8.     Attached as Exhibit B is a true and correct copy of excerpts of the depositions of  Wayne A. Lee.  The excerpts of the deposition of Mr. Lee are also filed with their corresponding video-clips submitted in the form of a DVD to the Court.

This declaration is signed on July 31, 2007, under penalty of perjury pursuant to the laws of the United States.

*/s/ Jill H. Bowman*
Jill H. Bowman

# EXHIBIT A

## Lori A. Fanning

| | |
|---|---|
| **From:** | Jill bowman [jbowman@jameshoyer.com] |
| **Sent:** | Wednesday, July 25, 2007 3:27 PM |
| **To:** | BLESAGE@buchalter.com; Lori A. Fanning; twiegand@winston.com |
| **Cc:** | jdavies@Buchalter.com; JZIEGLER@buchalter.com; mbfisher@buchalter.com; RBERMAN@buchalter.com; rmanvitz@buchalter.com; SSOMMERHALTER@buchalter.com; KDERMODY@lchb.com; rgeman@lchb.com; asalpeter@llgm.com; vschmeltz@llgm.com; Marvin A. Miller; klein@roddykleinryan.com |
| **Subject:** | RE: In re Ameriquest Mortgage Company Mortgage Practices     Litigation, MDL 1715 |

Bernie:

This is an e-mail response to your response to our letter of July 24, 2007 concerning various discovery matters. Respectfully, as a procedural matter, because Roland Arnall is not a party to the case at this time, he has no basis to disrupt discovery schedules agreed to by the existing parties. Contrary to your statement in paragraph 5, all counsel did not agree that counsel for Roland Arnall would need 60 days to get up to speed, or that discovery would not proceed as scheduled in the interim. The very limited agreement we made is set forth in the Stipulation filed with the Court, which merely sped up the process and time-line for joining Roland Arnall.

We expressly disagreed with and severed from the Stipulation your request for a discovery stay and stay of litigation which you HAD coupled with a proposal to mediate at some date in the future. Class counsel, including Gary Klein, Rachel Geman, and me, all spoke with you by conference and expressly rejected any proposal to delay written discovery, 30(b)(6) depositions, or any other matter other than those expressly set forth in the Stipulation. Indeed, you acknowledged Class Counsel's expectation that the 30(b)(6) depositions would continue in your July 18, 2007 e-mail letter indicating your understanding that such depositions would resume on August 6th (not July 23rd as previously agreed). Although Gary Klein indicated to you by his correspondence on July 20, 2007 that he never released the agreed dates of this week, you nonetheless unilaterally cancelled these depositions.

As we have explained before, Ameriquest's current operational levels as described by the corporate witnesses deposed to date have significantly diminished. Under these circumstances, Class Counsel cannot delay discovery and is not willing to defer 30(b)(6) depositions you have already agreed to schedule. Evidence and information have a tendency to be lost as a Company is winding down, as it appears Ameriquest is doing. Judge Denlow has also already considered the fact that additional Defendants may be joined and determined that discovery should proceed. Further, the 30(b)(6) depositions and some non-party witness depositions have been noticed for some time and all dates should be utilized to complete these depositions prior to setting of any other persons.

We agree that there will likely need to be some extension of the discovery schedule, but do not believe that dates for the 30(b)(6) depositions can be put off for any period of time given the very practical considerations that testimony must be preserved as indicated above. If you wish to agree that non-parties may freely attend the 30(b)(6) depositions, then Mr. Arnall's counsel certainly may be notified and may attend such depositions at his pleasure.

This being said, we are available at noon Central on Thursday to confer over these and other matters raised in our July 24, 2007 letter.

Thanks,

Jill H. Bowman

>>> "LeSage, Bernard" <BLESAGE@buchalter.com> 7/24/2007 6:35:19 PM >>>
Marvin and Co-Counsel,
1. This e-mail is a reply to the letter which was attached to your e-mail of this same date.

2.  From just a procedural issue, new counsel have been added.  Therefore, please include Alan Salpeter and Vince Schmeltz from the LeBoeuf Firm as well as my co-counsel from the Buchalter Firm on your future communications with Defendants.  Their respective e-mail addresses are all above.
3.  Just to clarify the record, without meeting and conferring, on June 18, Plaintiffs filed their motion for leave to file a first amended Borrower Class Complaint attempting to state causes of action sounding in alter ego and fraudulent transfer against Roland Arnall.  Not a single supporting fact was alleged.
4.  In addition to Roland Arnall, there remain in excess of 500 additional parties that are still not before the court, but who will be party to this MDL in the next 60 days.
5.  The parties then met and conferred and all parties agreed that new counsel for Roland Arnall would need 60 days to get up to speed and to file appropriate motions regarding the adequacy of the First Amended Borrower Class Complaint.
6.  Consequently, the Ameriquest Defendants also request that the depositions of high ranking officers, directors and PMK witnesses be delayed until at least the primary party defendants are before the court, and their counsel are given reasonable time to prepare to meaningfully participate in these legal proceedings and discovery.
7.  Defendants propose that all document and written discovery shall continue unabated. Much progress has been made in response to Plaintiffs more than 614 document requests.
8.  Moreover Defendants have set the deposition of the 78 representative class plaintiffs in order to meet the November cut off of discovery.  Defendants would recommend postponing such depositions as well.
9.  In order to accommodate such motions and depositions, Defendants would also propose that we stipulate to a reasonable extension of the discovery cut offs and related dates.
10.  We are prepared to meet and confer regarding all discovery issues as required by the Rules.
11.  You  suggest 1 p.m. Central on Thursday July 26 for the meet and confer.  Defendants could meet either at 12 noon Central on Thursday July 26, or any time on Friday, July 27, that is convenient to you and co-counsel.
12.  We can use by call in number or let us know if you have a conference number that you would prefer.

Thanks,
Bernie


Bernard LeSage
Shareholder
BuchalterNemer, A Professional Corporation 1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-2457 Direct Dial: (213) 891-5230 | Cell Phone: (619) 985-4415 | Direct Fax: (213) 630-5715 | Switchboard: (213) 891-0700
Email: blesage@buchalter.com | www.buchalter.com

From: Lori A. Fanning [mailto:LFanning@millerlawllc.com]
Sent: Tuesday, July 24, 2007 2:40 PM
To: LeSage, Bernard; Thomas J. Wiegand (twiegand@winston.com)
Cc: Gary Klein; Dermody, Kelly M.; Jill bowman; Marvin A. Miller; Geman, Rachel
Subject: In re Ameriquest Mortgage Company Mortgage Practices Litigation, MDL 1715


Dear Messrs. LeSage and Weigand,  Please see the attached letter.  Lori A. FanningMiller Law LLC115 S. LaSalle StreetSuite 2910Chicago, IL 60603Phone 312-676-2667LFanning@MillerLawLLC.com  PRIVILEGE AND CONFIDENTIALITY NOTICE

This electronic mail and the information contained herein are intended for the named recipient only.  It may contain confidential and/or attorney privileged matter.  If you have received this electronic mail in error, please do not read any text other than the text of this Notice and do not open any attachments.  Also, please immediately notify the sender by replying to this electronic mail or by collect call to (312) 525-8316.  After notifying the sender as described above, please delete this electronic mail message immediately and purge the item from the deleted items folder (or the equivalent) of your electronic mail system.  Thank you

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in

error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see www.buchalter.com/CM/Custom/TOCFirmPolicies.asp.

IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS


In Re AMERIQUEST MORTGAGE )
COMPANY MORTGAGE LENDING )
PRACTICES LITIGATION, ) MDL No. 1715
_____ ) 05-CV-07097


VIDEOTAPED DEPOSITION OF WAYNE A. LEE

Santa Ana, California

Wednesday, May 9, 2007

Volume


Reported by:
SHERYL HILTON MEYER

CSR No. 2852

JOB No. 637414

2

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ILLINOIS

3

4    In Re AMERIQUEST MORTGAGE        )
     COMPANY MORTGAGE LENDING         )
5    PRACTICES LITIGATION,            )    MDL No. 1715
                                      )    05-CV-07097
6

7

8

9

10

11

12

13

14

15        Videotaped Deposition of WAYNE A. LEE,

16     Volume 1, taken on behalf of Plaintiffs

17     at 2850 Red Hill Avenue, Suite 120, Santa

18     Ana, California, beginning at 9:00 a.m.

19     and ending at 4:29 p.m. on Wednesday, May 9,

20     2007, before SHERYL HILTON MEYER, Certified

21     Shorthand Reporter No. 2852.

22

23

24

25

18

1    9:15A    Q    Okay.

2            A    I was a regional -- see, it's kind of coming

3    back to me.  It wasn't regional.  There's an area,

4    there's a regional, and there's a divisional.  So that

5    last one that I mentioned in '99 it's a divisional.

6            Q    Okay.

7            A    These titles I haven't thought about in years.

8    So let me -- those are basically the titles that I had,

9    and you could logically presume the progression.  I can't

10   give you the years.  I just don't recall.

11           Q    Okay.

12           A    You know what I mean --

13           Q    Sure.

14           A    -- how long and that type stuff.

15           Q    Once you -- in May of 2005 you left the

16   Ameriquest organization?

17           A    Yes.

18           Q    And how did that come about?

19           A    Me and Mr. Arnall had competing visions where

20   we thought we should go.

21   9:16A    Q    Okay.  And what was his involvement with you

22   during that time frame when you were the CEO of ACC

23   Capital Holdings in talking to you about the vision for

24   the company?  What role was he playing?

25           A    Chairman of the board.

19

1        Q    Chairman of the board of ACC Capital?

2        A    Yeah.

3        Q    Did you resign from your position at

4    Ameriquest?

5        A    Yes.

6        Q    And in the early part of this year you filed a

7    lawsuit against Ameriquest for breach of a subsequent

8    consulting agreement; is that correct?

9        A    Correct.

10        Q    You entered into a consulting agreement with

11    Ameriquest after your resignation in summer of 2005 --

12        A    Un-huh.

13        Q    -- and that was for a five-year term; is that

14    right?

15        A    Correct.

16        Q    And the initial payout of that consulting

17    agreement was $20 million.

18  9:17A    A    Correct.

19        Q    And then there was supposed to be $6 million

20    installments over the next five years; is that right?

21        A    Yeah.

22        Q    Okay.

23             MR. LeSAGE:  Do you have extra copies?

24             MS. BOWMAN:  Yeah.  It's the complaint.

25             MR. HARRIS:  Do you have copies for me?

                                                                    20
1                          MS. BOWMAN:  I don't think so.  I don't know if
2        I have another one or no.
3                          MR. HARRIS:  Thank you.
4                          THE REPORTER:  Exhibit 1.
5                          MS. BOWMAN:  Yes, thank you.
6                          (Plaintiffs' Exhibit 1 was marked for
7                          identification by the court reporter.)
8        BY MS. BOWMAN:
9                Q    Mr. Lee, I'm going to hand you what I've marked
10       as Plaintiffs' Exhibit 1, and can you tell me is this
11       your complaint filed against Ameriquest Capital
12       Corporation in January of this year?
13   9:18A    A    Give me a second.  Appears to be.
14               Q    Okay.  And this was the complaint that was for
15       the breach of the consulting agreement you entered into
16       with ACC Capital --
17               A    Uh-huh.
18               Q    -- following your resignation as chief
19       executive officer; is that correct?
20               A    Correct.
21               Q    Okay.  Here it says -- I'm going to talk about
22       some of the allegations --
23               A    Okay.
24               Q    -- that you were the president of Argent
25       Mortgage between 2001 and 2004; is that incorrect?

34

1   them.   They shared legal and certain functions like that,
2   many IS functions.

3        Q     And that was across the companies including
4   Ameriquest, Argent and Town and Country?

5        A     Far less so on the Argent side.

6        Q     As far as the shared services?

7        A     Yes.   And I had built many of the services and
8   built Argent very independent.

9        Q     Okay.   What is the next cost and operational
10  reform that was blocked by Mr. Arnall?

11       A     I desired to separate the sales function from
12  a managerial structure within the branches at Ameriquest
13  and the processing functions in that branch, in the
14  branch, I wanted to put under separate management because
15  I believed it would -- I would gain enormous efficiency
16  when salespeople focus on what they do best, processing
17  people focus on what they do best.

18  9:37A   Q     Okay.   And that's the example that you describe
19  in paragraph 16 of the complaint?

20             MR. WIEGAND:   Objection.

21             THE WITNESS:   That's the process I described?
22  No.   It's a structure.

23  BY MS. BOWMAN:

24       Q     Yeah.   Okay.   It's the structure that you
25  describe about the sales branch managers having

35

1    supervisory authority over the processing loan

2    coordinators --

3         A    Uh-huh.

4         Q    -- right?

5         A    Yes.

6         Q    And that's the structure that you attempted to

7    change at that time when you became CEO.

8         A    Correct.

9         Q    And it was blocked by Mr. Arnall?

10        A    It was -- I don't know if you'd describe it as

11   a block as much as maybe, you know, he was concerned

12   about the timing of it.

13   9:38A    Q    And one of the concerns, Mr. Lee, wasn't it,

14   that the managers, the sales managers should not be

15   supervising those people, the loan coordinators, who were

16   processing and approving the loans as a result of the

17   potential for undue influence over those processing

18   employees?

19             MR. WIEGAND:    Objection.

20             THE WITNESS:    The appearance of impropriety is

21   more likely in that scenario.

22   BY MS. BOWMAN:

23        Q    Did you have any information at that time

24   when you became the CEO of Ameriquest that there were

25   allegations of impropriety against sales managers arising

42

1      Q     Say it again.

2      A     Bob Barnum.

3      Q     Barnum.  Can you spell that, please?

4      A     No.  I barely could remember the last time, but

5   I'm presuming it's spelled like it sounds "Bar-num."  And

6   at that time Deval Patrick was on for a short period of

7   time or he was there when I was there.  He had just

8   joined for like the last board meeting I was there or

9   9:48A something.  The rest of the names escape me, but there

10   was a couple other members of the board, and they just

11   escape me.  It's been so long.

12      Q     All right.  You describe in your complaint that

13   Mr. Arnall blocked or resisted some of these operational

14   and cost recommendations that you were making.  Fair to

15   say that as chairman of the board he had the authority to

16   kind of veto some of those things?

17      A     Certainly.

18            MR. WIEGAND:  Objection.

19            THE WITNESS:  I would have to say sure.  As an

20   owner of a company and chairman of the board you have the

21   right to influence the direction of your company.

22   BY MS. BOWMAN:

23      Q     Okay.  And specifically if he told you not to

24   do something, it wouldn't be done.

25            MR. WIEGAND:  Objection.

1          THE WITNESS:  I'm going to do what I believe

2     I have to do, so I wouldn't say that.  If you tell me

3     to jump off a bridge, I'm not going to do it, okay?

4  9:49A BY MS. BOWMAN:

5          Q     No.  It was actually the opposite.  If he

6     instructed you not to make a particular operational

7     change, then you didn't make it.

8          MR. WIEGAND:  Objection.

9          THE WITNESS:  No, not necessarily true.  If I

10    believed in something, I would fight until I convinced

11    him that it was what we needed to do.

12    BY MS. BOWMAN:

13         Q     Okay.

14         A     Most of the time there's a lack of

15    understanding when there's objections, and most of the

16    time it comes to timing.

17         Q     Sure.  And ultimately there was so much of a

18    difference between what you thought needed to be done

19    and what he thought needed to be done that you actually

20    resigned from the company.

21         A     Honestly I don't know.

22         Q     You don't know why you resigned?

23         A     No, I know why I resigned because I expected

24    it to be done now because it was important to me.  He

25    wasn't comfortable with me doing it now and/or my

44

1      approach, and I was done selling it.  I was going to

2      do it during my time frame or I was going to leave, and

3      guess what happened.  I left.

4  9:50A    Q    Okay.

5            A    It's really that simple.

6            Q    In paragraph 17 of your complaint you describe

7      what was happening in your view as Arnall's usurping of

8      your authority.  Do you see that?

9            A    Paragraph 17.

10           Q    Yes.

11               MR. WIEGAND:  Go ahead and take a chance to

12     read if you like.  Counsel, I don't know what's a good

13     time for a break, but sometime soon if you don't mind.

14               MR. LeSAGE:  Five minutes -- it's the end of

15     the hour in another five minutes.  So if we can start

16     taking a routine every hour we take a potty break,

17     whatever you call it, a personal break.  I'm getting

18     older.

19               THE WITNESS:  Okay.  All right.  State your

20     question again.

21     BY MS. BOWMAN:

22           Q    Sure.  In your complaint at paragraph 17 you

23     describe that Mr. Arnall was usurping your authority.  In

24     what ways was he usurping your authority?

25  9:51A    A    Not allowing me to push down those expenses

46

1    employment.

2         Q    In paragraph 17 of your complaint you also talk

3    about there came a point in time when Mr. Arnall told

4    you to focus on the wholesale or the Argent side of the

5    business and that he would handle the Ameriquest Mortgage

6    Company retail operations; is that correct?

7  9:54A    A    Correct.

8         Q    Okay. And can you explain to me what that

9    circumstance was?

10                  MR. WIEGAND:  Objection.

11                  THE WITNESS:  What do you mean the circumstance

12   was?

13   BY MS. BOWMAN:

14        Q    He just -- what did he do?  He just came in and

15   told you?

16        A    He stated that.

17        Q    Okay.

18        A    I mean that's kind of, as I recall, the best

19   two-year-old memory is.  It's pretty close to a quote.

20        Q    Okay. And did he then to your understanding

21   take over the operations of Ameriquest Mortgage

22   Company --

23                  MR. LeSAGE:  Objection as to time.

24   BY MS. BOWMAN:

25        Q    -- at the time he said that to you?

93

1        Q    Okay.  Have you ever thought about it?

2        A    No.  I don't think about that place since I

3   left.

4        Q    Do you in any way blame yourself for the

5   ongoing litigation against Ameriquest about its mortgage

6   practices?

7        A    No.

8        Q    Do you think it's Roland Arnall's fault?

9        A    No.

10            MR. WIEGAND:  Objection.

11            MR. LeSAGE:  Calls for speculation.

12   BY MS. BOWMAN:

13        Q    The lawsuit that's -- the complaint for which

14   we have as Exhibit 1 --

15  11:43A  A    Uh-huh.

16        Q    -- that was ultimately resolved between you and

17   ACC Capital?

18        A    Yes.

19        Q    Okay.  And what was the resolution of that

20   lawsuit?

21        A    Oh, we settled on monetary terms.

22        Q    Okay.  And what were those terms?

23        A    I received, and again 14,750 -- 14 million 750

24   of which 200,000, I believe, went to my attorney.  So I

25   got less than the 200,000 which paid my counsel directly,

94

1    you know.

2         Q    Were there any other -- apart from the money,

3    was there anything else that was a part of the terms of

4    that settlement?

5         A    The only -- my understanding the only remaining

6    terms, and I've read it, okay, is they represent me in

7    ongoing matters -- now I understand personal as well

8    as professional, right, with regards to the companies

9    obviously and mutual nondisparagement.

10   11:44A   Q    Okay.

11        A    That's it.

12        Q    So you now can go out and can get another job

13   in the mortgage lending business?

14        A    Uh-huh.

15        Q    They eliminated the noncompete --

16        A    Yep.

17        Q    -- which was your original counteroffer to

18   them.

19        A    To eliminate the noncompete, yes.

20        Q    And essentially it was on those terms, about

21   half of the money that you thought you were entitled to

22   and then the elimination of a noncompete.

23        A    Right.

24             MR. WIEGAND:   Objection.

25             THE WITNESS:   There's a lot of provisions in

108

1    with you when you left your position as CEO of

2    Ameriquest?

3    12:02P    A    I think I have a phone book, you know what I

4    mean, corporate phone numbers.

5              Q    Would that be the internal corporate phone

6    book?

7              A    Yeah.

8              Q    Anything else?

9              A    No, that's it.

10             Q    Did you take any electronic information?

11             A    No.

12             Q    Now prior to your becoming the CEO of ACC

13   Capital Holdings during the period of time when you were

14   running Argent --

15             A    Uh-huh.

16             Q    -- was Mr. Arnall involved in the operations of

17   Argent Mortgage?

18   12:04P    A    Certainly not day-to-day operations, no.

19             Q    Your communications with Mr. Arnall about the

20   operations of Ameriquest Mortgage Company once you became

21   CEO, was that different from the level of communications

22   that you had with him prior to that when you were

23   president of Argent?

24             A    Yes.

25             Q    Would it be fair to say that he was more

## <u>CERTIFICATE OF SERVICE</u>

I, Marvin A. Miller, an attorney, hereby certify that on July 31, 2007, service of the ***Declaration of Jill H. Bowman in Opposition to Arnall's Request to Stay Merits Discovery*** was accomplished pursuant to ECF as to Filing Users and I will comply with LR 5.5 as to Non-ECF Users.


*/s/ Marvin A. Miller*
Marvin A. Miller