# Exhibit A

## SUBSCRIBER AGREEMENT FOR EQUIFAX OFF-LINE SERVICES

This Agreement (this "Agreement") is dated and is effective as of 12/15, 2000, and is made among Equifax Credit Information Services, Inc. ("Equifax"), Direct Mail Credit Data, Inc. ("DMCD") and Ameriquest MTG Co. ("Subscriber"), so that Subscriber may obtain certain Equifax information services. Equifax, DMCD, and Subscriber agree as follows:

### I. GENERAL AGREEMENT

1. <u>Scope of Agreement</u>. This Agreement consists of the general terms set forth in the body of this Agreement and Exhibit A to this Agreement, which specifies the services that Subscriber is authorized to obtain. If there is a conflict between the general terms and conditions and Exhibit A, the provisions of Exhibit A will govern and control. Subscriber acknowledges that although Subscriber may request full credit reports after a Prescreen Program (as defined in Exhibit A, if applicable) on those consumers who accept Subscriber's Firm Offer of Credit or Insurance (as the term "firm offer of credit or insurance" is defined in the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. Section 1681 et seq., as amended), such back end reports are not available under this Agreement and, if obtained from Equifax, would have to be ordered directly from Equifax pursuant to a separate Agreement for Service.

2. <u>Information Services</u>. The services specified and defined in Exhibit A and as set forth in the applicable Work Order, the form of which is attached hereto as Exhibit B are and shall constitute the "Information Services."

3. <u>Performance of Services</u>. Subscriber acknowledges that the Information Services will be provided by Equifax's agent and subcontractor, DMCD, based on Equifax credit information. All references in this Agreement to the provision or performance of Information Services by Equifax shall be deemed to refer to the provision or performance of Information Services by DMCD in its capacity as Equifax's agent and subcontractor.

4. <u>Access</u>. Subscriber will be responsible for providing all hardware and software at its facilities necessary to access the Information Services.

5. <u>License of Information</u>. Equifax grants a non-exclusive license to Subscriber to use the information provided through the Information Services only as described in this Agreement. Subscriber may reproduce or store the information obtained from Equifax solely for Subscriber's own use in accordance with this Agreement. Subscriber will hold all information licensed under this Agreement in strict confidence and will not reproduce, reveal or make it accessible in whole or in part, in any manner whatsoever, to any others unless required by law, or unless Subscriber first obtains Equifax's written consent. Subscriber will not provide a copy of any consumer reports received hereunder to the consumer, except as may be required by law or approved in writing by Equifax, except in any state where this contractual prohibition would be invalid. Subscriber will immediately refer the consumer to Equifax whenever the consumer disputes information in a consumer report disclosed by Subscriber.

6. <u>Compliance with Laws</u>. Subscriber will comply with the provisions of the FCRA, the Federal Equal Credit Opportunity Act, as amended (the "ECOA"), all of their state law counterparts, all other applicable laws, federal or state, and all regulations promulgated under any of them, where applicable, including, without limitation, any provisions requiring adverse action notification to the consumer.

7.  <u>Audits</u>. Equifax may periodically audit Subscriber's practices and procedures to determine Subscriber's compliance with this Agreement. Subscriber will reasonably cooperate in those audits at no cost to Subscriber. Equifax may conduct on-site audits of Subscriber's facilities during normal business hours. In addition, Equifax may conduct audits by mail that may require Subscriber to provide documentation regarding permissible purposes for particular consumer reports ordered by Subscriber.

## II. REPORTING OF ACCOUNT INFORMATION

1.  Each month Subscriber shall prepare and deliver to Equifax, at Subscriber's expense, its most current account information (the "Subscriber Information"), in a mutually agreeable form and medium, on consumers that have credit accounts with Subscriber. In the event that Subscriber fails to regularly report Subscriber Information, then Subscriber shall not be permitted to obtain or receive any Prescreen Program hereunder. In the event that the Subscriber Information is reported without high balance or credit limit data elements, then Subscriber shall not be permitted to use or receive high balance or credit limit data elements, in connection with any Prescreen Program, as applicable, hereunder. At its expense, Equifax will incorporate the Information into Equifax's computerized credit reporting system, and will promptly return the media to Subscriber. Subscriber Information so incorporated will cease to be the property of Subscriber and shall become the property of Equifax. Subscriber shall notify Equifax immediately upon learning that Subscriber Information supplied is inaccurate or misleading, and will implement procedures to avoid re-reporting that Information.

2.  If Subscriber is an insurance company, Subscriber's duty to provide Subscriber Information shall be subject to the following conditions: (i) Subscriber is only required to provide Subscriber Information regarding Consumers with whom it has an account relationship; (ii) the Subscriber Information shall not include data that Subscriber has obtained from third parties or data regarding any Consumer's insurance claims history, underwriting factors or insurance policy terms; and (iii) if Subscriber engages in any manner in the business of issuing or extending credit to Consumers, Subscriber will report transactional information regarding its credit accounts with such Consumers as a part of the Subscriber Information under Subsection II.1 above.

## III. PRICING

DMCD shall render invoices for the Information Services and Subscriber shall pay the invoiced amounts to DMCD within thirty (30) days of receipt of each invoice. The parties acknowledge that the prices for the Information Services shall be as agreed separately between Subscriber and DMCD. Interest shall accrue daily on all amounts not timely paid at the rate of 1.5% per month, or the maximum rate of interest permitted by law, whichever is greater. The prices/fees are exclusive of any excise, use or similar taxes. It is Subscriber's sole responsibility to pay those taxes. Equifax reserves the right to participate with DMCD in the collection of delinquent amounts from Subscriber.

## IV. TERM AND TERMINATION

1.  The term of this Agreement shall be for one (1) year from the date hereof, and thereafter shall automatically renew from year to year, provided, however, that any party hereto may terminate this Agreement for any reason upon thirty (30) days prior written notice to the other parties. Notwithstanding the above, Equifax or DMCD, in addition to any other remedies that may be available to it, may terminate this Agreement immediately by written notice if Subscriber ceases to conduct business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of, or becomes subject to, any proceeding under the Federal Bankruptcy Code of 1978, as amended, or any similar state insolvency or bankruptcy statute. In addition, if Subscriber materially breaches this

Agreement, either Equifax or DMCD may terminate this Agreement after providing written notice of the breach to the Subscriber with thirty days opportunity to cure; provided, however, that such termination shall be effective immediately upon notice if Equifax or DMCD reasonably believes that Subscriber has violated or is violating the FCRA, the ECOA, any of the state law counterparts to the FCRA, or any other applicable law or regulation.

2. Notwithstanding anything to the contrary in this Agreement, if the continued provision of all or any portion of the Information Services becomes impossible, impractical, or undesirable due to a change in applicable federal, state or local laws or regulations, or actual or threatened litigation, as determined by Equifax in its reasonable judgment, Equifax may cease to provide the affected services or products within, or pertaining to persons residing within, the affected jurisdiction. Equifax will attempt to provide written notice of its actions as far in advance of the effective date as is reasonably possible under the circumstances.

3. The obligations of Sections V, VI and all other indemnification, defense and hold harmless obligations will survive the termination of this Agreement.

## V. DISCLAIMER, RELEASE AND LIMITATION OF LIABILITY

1. Subscriber, Agent, and Equifax recognize that every business decision represents an assumption of risk and that none of the parties, in furnishing Subscriber Information or the Information Services to any other party, underwrites or assumes any other party's risk in any manner. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, OR ANY AMENDMENT, NO PARTY GUARANTEES OR WARRANTS THE CORRECTNESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE SUBSCRIBER INFORMATION OR INFORMATION SERVICES PROVIDED HEREUNDER. NO PARTY, NOR ANY OF THEIR OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, LICENSORS, AFFILIATED COMPANIES OR, IN THE CASE OF EQUIFAX, CONTRACTUALLY AFFILIATED CREDIT BUREAUS, WILL BE LIABLE TO ANY OTHER PARTY FOR ANY LOSS OR INJURY ARISING OUT OF, OR CAUSED IN WHOLE OR IN PART BY, THEIR ACTS OR OMISSIONS, INCLUDING ANY NEGLIGENCE, IN PROCURING, COMPILING, COLLECTING, INTERPRETING, PROCESSING, REPORTING OR TRANSMITTING ANY SUBSCRIBER INFORMATION, OR THE INFORMATION SERVICES. Subscriber recognizes that accessing the consumer credit database with additional or different identification information on a consumer, or at a different time from a prior request for information, may result in file content different from that on the date of the original access.

2. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, INCLUDING ANY AND ALL FUTURE AMENDMENTS, NO PARTY, NOR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, LICENSORS, AFFILIATED COMPANIES, INDEPENDENT CONTRACTORS, AGENTS OR, IN THE CASE OF EQUIFAX, CONTRACTUALLY AFFILIATED CREDIT BUREAUS, WILL BE RESPONSIBLE FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY OR SPECIAL DAMAGES, INCLUDING LOST PROFITS, SUFFERED OR INCURRED BY ANY OTHER PARTY HERETO ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

3. SUBSCRIBER RELEASES EQUIFAX, DMCD, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, LICENSORS, AFFILIATED COMPANIES AND, IN THE CASE OF EQUIFAX, CONTRACTUALLY AFFILIATED CREDIT BUREAUS, FROM ANY LIABILITY IN CONNECTION WITH THE INFORMATION SERVICES AND FROM ANY LOSS, DAMAGES, EXPENSES, COST OR OBLIGATIONS OF ANY KIND AND NATURE WHATSOEVER SUFFERED BY SUBSCRIBER RESULTING DIRECTLY OR INDIRECTLY FROM THE

INACCURACY OR INVALIDITY OF ANY INFORMATION SERVICE. SUBSCRIBER COVENANTS NOT TO SUE OR MAINTAIN ANY CLAIM, CAUSE OF ACTION, DEMAND, CROSS ACTION, COUNTERCLAIM, THIRD PARTY ACTION OR OTHER FORM OF PLEADING AGAINST EQUIFAX, DMCD, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, LICENSORS, AFFILIATED COMPANIES AND, IN THE CASE OF EQUIFAX, CONTRACTUALLY AFFILIATED CREDIT BUREAUS, FOR DAMAGE OR LOSS OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THE INACCURACY OR INVALIDITY OR ALLEGED INACCURACY OR INVALIDITY OF ANY INFORMATION SERVICES PROVIDED HEREUNDER.

4.  SUBSCRIBER, EQUIFAX, AND DMCD ACKNOWLEDGE THAT IT IS DIFFICULT OR IMPOSSIBLE TO ESTIMATE THE DAMAGES SUBSCRIBER WOULD SUFFER FROM ANY BREACH BY EQUIFAX AND/OR DMCD OF ANY TERM OR PROVISION OF THIS AGREEMENT, BUT THAT THE LIQUIDATED DAMAGES PROVIDED HEREIN REPRESENT A REASONABLE AND EQUITABLE PRE-ESTIMATE OF SUCH DAMAGES AND SUBSCRIBER, EQUIFAX AND DMCD THEREFORE INTEND TO PROVIDE FOR LIQUIDATED DAMAGES AS HEREIN PROVIDED, AND THAT THE AGREED UPON LIQUIDATED DAMAGES ARE NOT PUNITIVE OR PENALTIES AND ARE JUST, FAIR, AND REASONABLE, ALL IN ACCORDANCE WITH OFFICIAL CODE OF GEORGIA SECTION 13-6-7. HAVING REGARD TO THE FOREGOING, IN THE EVENT THAT NOTWITHSTANDING THE RELEASES, LIMITATIONS AND DISCLAIMERS CONTAINED IN THIS ARTICLE V, SUBSCRIBER IS DETERMINED BY A COURT OF COMPETENT JURISDICTION TO BE ENTITLED TO RECOVER DAMAGES FROM EITHER OR BOTH OF EQUIFAX OR DMCD WITH RESPECT TO ANY CLAIM, CAUSE OF ACTION, OR LOSS ARISING HEREUNDER, THEN SUBSCRIBER'S SOLE AND EXCLUSIVE REMEDY SHALL BE EXPRESSLY LIMITED TO EITHER: (A) REPLACEMENT OF THE INFORMATION AND/OR INFORMATION SERVICES GIVING RISE TO SUCH CLAIM, CAUSE OF ACTION, OR LOSS; OR (B) A REFUND OF AMOUNTS PAID BY SUBSCRIBER TO EQUIFAX AND DMCD IN RESPECT OF THE SPECIFIC INFORMATION AND/OR INFORMATION SERVICES GIVING RISE TO SUCH CLAIM, CAUSE OF ACTION, OR LOSS, IN EACH CASE, AS EQUIFAX AND DMCD, IN THEIR SOLE DISCRETION, SHALL DETERMINE, AND SUBSCRIBER SHALL HAVE NO CLAIM OR RIGHT TO ANY OTHER OR FURTHER DAMAGES, WHETHER DIRECT, INDIRECT, GENERAL, SPECIAL, INCIDENTAL, EXEMPLARY, OR CONSEQUENTIAL.

**VI.   CONFIDENTIALITY**

Each party acknowledges that all materials and information disclosed to the other party (the "Non-disclosing Party") in connection with the performance of this Agreement, including the terms of this Agreement, consist of confidential and proprietary data. Each Non-disclosing Party will hold those materials and that information in strict confidence, and will restrict its use of those materials and that information to the purposes anticipated in this Agreement. If the law or legal process requires a Non-disclosing Party to disclose confidential and proprietary data, that party will notify the disclosing party of the request prior to disclosing any information. Thereafter the disclosing party may seek a protective order or waive the confidentiality requirements of this Agreement, provided that the Non-disclosing Party may only disclose the minimum amount of information that is be necessary to comply with the requirement. A Non-disclosing Party will not be obligated to hold confidential any information from any other party which (a) is or becomes publicly known through no act or omission of the Non-disclosing Party, (b) is received from any person or entity who, to the best of the Non-disclosing Party's knowledge, has no duty of confidentiality to the other party, (c) was already known to the Non-disclosing Party prior to the disclosure, and that knowledge was evidenced in writing prior to the date of the other party's disclosure, or (d) is developed by the Non-disclosing Party without using any of the disclosing party's information; provided, however, that Subscriber agrees to hold in confidence all consumer information received through the Information Services, regardless of the applicability of any of the foregoing exceptions. Each party will indemnify, defend and hold harmless the others from and

against any direct and actual loss, cost, liability and expense (including reasonable attorneys' fees) arising from the indemnifying party's breach of this Section VI.

**VII. MISCELLANEOUS**

1. <u>Assignment</u>. No party may assign its rights or obligations under this Agreement without the written consent of the other parties. Any transaction or series of transactions including, without limitation, any merger, consolidation, or other reorganization of Subscriber, or any issuance, sale, transfer or redemption of any capital stock of Subscriber, or interests in Subscriber that results in a change of control of Subscriber will be deemed to be an assignment of this Agreement. Following a deemed assignment, either Equifax or DMCD may terminate this Agreement upon written notice to Subscriber.

2. <u>Consent to Breach Not Waived</u>. No party will, by the lapse of time, and without giving written notice, be deemed to have waived any of its rights under this Agreement. No waiver of a breach of this Agreement will constitute a waiver of any prior or subsequent breach of this Agreement.

3. <u>Notices</u>. Notices must be in writing, must be delivered according to clause (a) or (b) below, and must be delivered to the address set forth on the signature page of this Agreement, or to such other address as a party may designate by notice in accordance with this provision. All notices under this Agreement will be deemed given on the date of delivery (a) by a nationally recognized overnight courier, or (b) by certified mail, return receipt requested.

4. <u>Force Majeure</u>. Notwithstanding any provisions to the contrary herein contained, no party will be liable to any other party for any delay or interruption in performance as to any obligation hereunder resulting from governmental emergency orders, judicial or governmental action, emergency regulations, sabotage, riots, vandalism, labor strikes or disputes, acts of God, fires, electrical failure, major computer hardware or software failures, equipment delivery delays, acts of third parties, or delays or interruptions in performance beyond its reasonable control.

5. <u>Entire Agreement; Amendment</u>. All prior understandings, proposals or representations dealing with the subject matter of this Agreement are terminated and canceled entirely. This Agreement will not be more strongly construed against any party, regardless of who is more responsible for its preparation. This Agreement may not be amended except by a written agreement that acknowledges modification of this Agreement, and that is signed by an authorized representative of Subscriber, of DMCD, and of Equifax.

6. <u>Severability</u>. If any part of this contract is found to be illegal or unenforceable, then that part will be curtailed only to the extent necessary to make it, and the remainder of the Agreement, legal and enforceable.

7. <u>Applicable Law</u>. This Agreement will be governed solely by the internal laws of the State of Georgia, without regard to principles of conflicts of law.

8. <u>Independent Contractor</u>. Nothing in this Agreement creates a joint venture, partnership, principal-agent or mutual agency relationship between any of the parties. No party has any right or power under this Agreement to create any obligation, expressed or implied, on behalf of any other party.

9. <u>Headings</u>. The titles or captions used in this Agreement are for convenience only and will not be used to construe or interpret any provision hereof.

10. <u>Authority</u>. Each person signing below represents and warrants that he or she has the necessary authority to bind the principal set forth below.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**EQUIFAX CREDIT INFORMATION SERVICES, INC.**
1550 Peachtree Street, NW
Atlanta, Georgia 30309

By: _/s/ Michael W. Cahn_

Title: _VP_

**SUBSCRIBER:**
Address: _1100 TOWN & COUNTRY #500_

_ORANGE, CA 92868_

By: _/s/_

Title: _KEVIN MOREFIELD_

**DIRECT MAIL CREDIT DATA, INC.**
3 Riverside Drive
Andover, Massachusetts 01810

By: _/s/_

Title: _General Counsel_

**EXHIBIT A**

Following are the Information Services that may be provided under this Agreement and the additional terms and conditions that apply to those Information Services.

I. **PRESCREENING SERVICES.**

The following terms and conditions apply to the Prescreening Services. "Prescreening Services" are a type of Information Service in which a list of consumer names provided by Subscriber will be processed against an Equifax database ("List Edit"), or a list or lists may be generated from the Equifax consumer credit information database ("Direct Extract"). Notwithstanding anything to the contrary in the Agreement or this Exhibit, Subscriber is authorized to obtain Prescreening Services only in connection with the provision of firm offers to **extend credit** to consumers.

Specifications. DMCD will complete the Project in accordance with the File Compilation specifications (the "Specifications") designated by Subscriber in a Work Order in the form attached hereto as Exhibit B. The Specifications will designate what categories of Credit Data are to be included.

(A) Prescreening Certifications. Subscriber certifies that it has a present intention to grant credit or provide insurance to all individuals on the final list of names meeting its selection criteria ("Prescreened List"), as returned to Subscriber by DMCD for each prescreen program, and that Subscriber will make a Firm Offer of Credit or Insurance (as the term "firm offer of credit or insurance" is defined in the FCRA) to each individual identified on the Prescreened List (provided, however, that Subscriber's Approved Additional Processor (as defined in Paragraph I(D) below), if any, may eliminate some names on the initial list, using industry standard elimination processes or additional selection criteria which Processor is not able to apply, and Subscriber will not be obligated to extend a Firm Offer of Credit or Insurance to names eliminated in this manner; and in such case, the list as further edited by the Approved Additional Processor will be the Prescreened List). Equifax will post promotional prescreen inquiries to the credit file of each individual on the Prescreened List. The Prescreened List: (1) is for the exclusive use of Subscriber in connection with its solicitation; and (2) will be held strictly in confidence.

(B) Net Prescreen Name Counts. In each program involving an Approved Additional Processor, Subscriber agrees that it will submit to DMCD a net count of the number of names on the Prescreened List within thirty (30) days after the date DMCD shipped the initial list of names to Subscriber's Approved Additional Processor for preparation of the Prescreened List **[refer to Names Mailed definition]**.

(C) Re-Use of Names. Subscriber may re-use names provided by DMCD in a prescreen program solely to make follow up mailings or contacts with the consumers in connection with the same Firm Offer of Credit or Insurance originally made to the consumer, and for no other purpose, at the rates agreed to by the parties. Subscriber will provide Equifax with a tape of names re-used each time they are re-used. Subscriber will not use the names for any other purpose. The Prescreened List shall not be used for the processing of credit applications or underwriting insurance in the normal course of business. In the event any claim or litigation arises out of Subscriber's improper use of any Prescreened List, Subscriber shall defend, indemnify and hold Equifax and DMCD harmless from and against all losses, liabilities and expenses incurred by either of them arising from or related to such claim or litigation, including reasonable attorney's fees.

(D)     <u>Approved Additional Processors.</u> Subscriber must notify DMCD if Subscriber desires to use additional processors to perform processing, modeling, or other approved services in connection with any prescreen program. Each such additional processor must execute Equifax's standard third party agency agreement, or a similar agreement acceptable in form and substance to Equifax, before Equifax will provide any lists or information to such additional processor; and each additional processor that executes Equifax's standard third party agency agreement, or a similar agreement acceptable in form and substance to Equifax, will be an "Approved Additional Processor" for the duration of its agreement with Equifax. Equifax will not be liable for any actions or inactions of any Approved Additional Processor in connection with the prescreen program.

(E)     <u>Social Security Numbers.</u> Equifax is prohibited by law from providing complete Social Security numbers to Subscriber in connection with a prescreen program. Pursuant to industry practices, Equifax will truncate one or more digits of each Social Security number returned to Subscriber, and Subscriber understands and agrees that those numbers will only be used internally for identification purposes in connection with solicitation respondents. Subscriber will not allow the numbers to show on the mailing face of the offer, nor will Subscriber use them in the solicitation materials.

(F)     <u>List Monitor Methods.</u> In connection with any credit prescreen program, any Prescreened List may contain decoy names. Subscriber will not, and will not permit the Approved Additional Processor, if any, to remove the decoy names except in the normal course of eliminating names.

(G)     <u>Firm Offer Content.</u> Subscriber will be responsible for the preparation of firm offer materials. Subscriber agrees to provide to Equifax and DMCD a copy of any mail pieces or telemarketing scripts to be used to extend the Firm Offers of Credit or Insurance to the consumers on the Prescreened List.

(H)     <u>Credit Scores Available for Use in Prescreen Projects.</u> The following credit scores may be incorporated into Subscriber's prescreen selection criteria. Subscriber will abide by the additional terms and conditions set forth in Part II of this Exhibit A relating to the selected credit scores.

(1)     <u>Equifax General Risk$^{SM}$</u> - The Equifax General Risk Score is a credit scoring service that ranks consumers in the Equifax computerized consumer credit reporting database relative to other consumers in the Equifax consumer credit database with respect to the likelihood of those consumers paying their accounts as agreed and predicts the probability of serious delinquency, charge-off, and bankruptcy over a 24- month period from the date of scoring.

(2)     <u>BEACON®</u> - BEACON is a credit scoring service based on a model developed by Fair Isaac and Equifax that ranks consumers in the Equifax computerized consumer credit reporting database relative to other consumers in the database with respect to the likelihood of those consumers paying their accounts as agreed. Equifax is the authorized agent of Fair Isaac for purposes of executing this Agreement for BEACON, and for collection of all fees for the service.

(3)     <u>INSCORE™</u> - InScore is a point scoring service based on prediction algorithms developed by Fair Isaac and Equifax that evaluates certain information in the computerized consumer credit reporting database of Equifax, which is designed to rank order a consumer with respect to likely insurance loss ratio relativities. Equifax is the authorized agent of Fair Isaac for purposes of executing this Agreement for InScore, and for collection of all fees for the service.

II.     **ADDITIONAL TERMS APPLICABLE TO CREDIT SCORES**

(A)     <u>Disclosure of Scores.</u> Subscriber will hold all credit scores received from Equifax in strict confidence and will not disclose that information ("Scores") to the consumer or to others except as required by law. Although Subscriber may provide the principal factors contributing to the Scores to

the consumer subject of the report when those principal factors are the basis of Subscriber's adverse action against the subject consumer, Subscriber must describe the principal factors in a manner which complies with Regulation B of the ECOA. Subscriber agrees that under no circumstances will it disclose or provide the consumer subject the actual Score, except and insofar as such prohibition is not enforceable. The Score is proprietary and may not be used as the reason for adverse action and, accordingly, shall not be disclosed to any consumer.

(B) <u>ECOA Statements.</u> Equifax reasonably believes that, subject to validation by Subscriber on its own records, (1) the scoring algorithms used in the computation of the Scores are empirically derived from consumer credit information from Equifax's consumer credit reporting database, and are demonstrably and statistically sound methods of rank ordering candidate records from the Equifax database for the purposes for which the Scores were designed, and each is intended to be an "empirically derived, demonstrably and statistically sound credit scoring system" as defined in Regulation B, with the understanding that the term "empirically derived, demonstrably and statistically sound," is defined only in a general manner by Regulation B, and has not been the subject of any significant interpretation; and (2) the scoring algorithms used in calculating the Scores do not use a "prohibited basis," as that term is defined in Regulation B, except as permitted to be used under Regulation B.

(C) <u>Release.</u> Neither Equifax nor Fair Isaac guarantee the predictive value of the Scores with respect to any consumer, and do not intend to characterize any consumer as to credit worthiness or expected insurance loss ratio relativities, as the case may be, and any predictive values represent estimates only. Subscriber releases Equifax, Fair Isaac, and their respective officers, directors, employees, agents, sister or affiliated companies, or any of Equifax's third party contractors, licensors, suppliers, or contractually affiliated credit bureaus (cumulatively, "Affiliated Persons and Entities"), from liability for any damages, losses, costs or expenses, whether direct or indirect, suffered or incurred by Subscriber, resulting from any failure of a Score to accurately predict the credit worthiness or expected insurance loss ratio relativities, as the case may be, of any consumer in connection with Subscriber's actions in regard to any such consumer. In the event the Score was not correctly applied to the credit file by Equifax, the sole remedy of Subscriber and the sole responsibility of Equifax shall be to reprocess the credit file through the Score at no additional charge. Subscriber agrees to hold Equifax, Fair Isaac, and their respective Affiliated Persons and Entities, harmless from any and all damage, cost and expense arising or resulting from the publishing or other disclosure by Subscriber or Subscriber's employees or agents, of the Scores, the credit report or other information contrary to the conditions set forth in paragraph II.(A).

(D) <u>Audit of Models.</u> Subscriber may audit a sample of the Scores and principal factors and compare them to the anonymous underlying credit reports in accordance with Equifax's audit procedures. If the Scores and principal reasons are not substantiated by the credit files provided for the audit, Equifax will review programming of the model and make corrections as necessary until the Scores and principal reasons are substantiated by the audit sample credit reports. After that review and approval, Subscriber will be deemed to have accepted the resulting Scores and principal factors delivered. It is Subscriber's sole responsibility to validate all credit scoring models on its own records and performance.

(E) <u>End User Agreements.</u> Subscriber warrants that, before delivering or requesting Equifax to deliver Scores to any third party (including any processors and distributors), Subscriber will enter into a contract with such third party that (a) limits the use of the Scores by the third party only to the use permitted to Subscriber under this Agreement, (b) contains substantially similar terms and conditions as this Agreement including, without limitation, confidentiality, and (c) identifies Equifax and Fair, Isaac, as appropriate, as express third party beneficiary/ies to such contract.

### III. OTHER INFORMATION SERVICES

The following are additional Information Services that may be provided under this Agreement. Subscriber agrees to abide by the additional terms and conditions, listed below, relating to the selected additional Information Services.

(A) <u>Anonymous Credit Information Compilations</u>. Subscriber may obtain anonymous credit information compilations under the following terms and conditions.

(1) <u>Duties of Parties</u>. Subscriber will provide DMCD with the names, addresses and social security numbers of individuals who either responded or failed to respond to firm offers of credit or insurance extended by Subscriber. DMCD will provide anonymous credit data (the "Credit Data") for each individual designated by Subscriber (subject to the occasional unavailability of Credit Data regarding some consumers). The Credit Data may be accompanied by the Equifax General Risk Score if requested by Subscriber, but will not be accompanied by the BEACON Score or the InScore Score unless Subscriber has paid a fee of $195,000 per year, as to each such Score, which fee covers only the right to receive and use such BEACON or InScore Scores, as the case may be, under this Part III.A for modeling and analysis use in connection with Subscriber's prescreen solicitations executed to acquire new accounts to be owned by Subscriber. The Credit Data and Scores for any individual may be referred to as a "Subscriber File Compilation." In order to preserve the anonymity of each individual, all Credit Data and Scores will be electronically provided by DMCD to Subscriber without names, addresses, and/or Social Security numbers corresponding to the individual subjects.

(2) <u>Specifications</u>. DMCD will complete the Project in accordance with the Specifications designated by Subscriber in a separate Work Order in the form attached hereto as Exhibit B. The Specifications will designate what categories of Credit Data are to be included.

(3) <u>Subscriber File Compilation Results</u>. DMCD will provide the Subscriber File Compilations directly to Subscriber. Except as provided in the Specifications, DMCD will not provide the Subscriber File Compilations to any parties other than Subscriber.

(4) <u>Ownership and License of Subscriber File Compilations</u>. No Subscriber File Compilation furnished under this Agreement may be sold, disclosed to any third parties or made a part of any product developed by Subscriber or any of its agents. Equifax grants to Subscriber only a non-assignable right to use the Subscriber File Compilations in accordance with and for the purposes described in this Agreement. Equifax reserves all other rights in and to the Subscriber File Compilations. Subscriber will have no right to sublicense to others. The right to use the Subscriber File Compilations granted to Subscriber in this Agreement will last for so long as this Agreement is in effect, and thereafter, for so long as Subscriber uses the Subscriber File Compilations for the purposes described in this Agreement.

(5) <u>Use and Confidentiality</u>. Subscriber will utilize the Subscriber File Compilations only for purposes of evaluating data in connection with the extension of Firm Offers of Credit or Insurance. For any other use, Subscriber must obtain DMCD's/Equifax's prior written consent, and DMCD/Equifax may withhold its/their consent in its/their sole discretion.

(6) <u>Prohibited Uses of Project Results</u>. Without limiting the general restrictions on use contained in this Agreement, Subscriber agrees that it will not use the Subscriber File Compilations to attempt to determine the scoring algorithms or other formulae utilized in calculating the Scores.

(7)  <u>Additional Terms Applicable to BEACON and InScore Scores</u>.  If liability is imposed upon Fair Isaac, Equifax, or DMCD with respect to either of the BEACON Scores or the InScore Scores, the combined liability of Equifax, Fair Isaac, and DMCD to Subscriber with respect to either such Scores shall be limited to $10,000, or the fees received from Subscriber for providing the BEACON Scores, or the InScore Scores, as the case may be, during the twelve (12) month period immediately preceding the date of Subscriber's claim, whichever is less.  Subscriber acknowledges that the BEACON Score service, and the InScore Score service, and its/their associated output are proprietary and unless required by law, Subscriber will not publicly disseminate or otherwise disclose to others any analysis or reports derived from the BEACON or InScore Scores except with Equifax's and Fair Isaac's express written permission, or to an Approved Additional Processor (and only if such Approved Additional Processor has signed an agreement that limits the use of the BEACON and/or InScore Scores only to the use permitted to the Subscriber, identifies Equifax and Fair Isaac as express third party beneficiary/ies to such contract, and prohibits the Approved Additional Processor from publicly disseminating or otherwise disclosing the BEACON and/or InScore Scores or any results of any analysis or other reports derived from the BEACON and/or InScore Scores).  The BEACON and/or InScore Scores shall not be used for "Adverse Action" as defined by the Equal Credit Opportunity Act or Regulation B.  Subscriber shall not use the BEACON and/or InScore Scores for model development, validation (except as expressly permitted herein), reverse engineering or model calibration.

(8)  <u>Archive Data</u>.  In the event that Subscriber shall obtain access to archive data under this Agreement, Subscriber shall execute the appropriate archive data license agreement and abide by all of the terms of such license agreement.