# Exhibit B

## SERVICE AGREEMENT

Company Name: __Ameriquest Mortgage Company  
Telephone No.(949) 955-1439 ext. 70072

Contact Name:  Gary Algiene  
Facsimile No._(949) 955-0619

Address: 2600 Michelson Drive, Suite 200

City:  Irvine     State:  CA     Zip:  __92612

This Agreement ["Agreement"] is entered into as of the eleventh day of _February 11, 2005 ["Effective Date"] by and between ChoicePoint Precision Marketing Inc. ["CHOICEPOINT"] and the above named Company ["Company"]. The parties agree as follows:

1. Subject to the restrictions set forth herein, CHOICEPOINT hereby grants to Company a nonexclusive and nontransferable license to use the marketing data provided under this Agreement ["Data"] for the lesser of 90 days from the date the Data is provided to Company, such other lesser time period as allowed under applicable law, or such other period as agreed upon by the parties. Upon the termination of this Agreement or expiration of the license granted pursuant to this Agreement, Company shall return or destroy all Data and information derived from Data within thirty (30) days of such event. Company shall use the Data provided under this Agreement for marketing purposes only in accordance with all federal, state and local laws, applicable Direct Marketing Association Guidelines (www.the-dma.org), and in a manner which gives due consideration to matters concerning privacy and confidentiality. The Data may not be merged or incorporated with any other file without the express written consent of CHOICEPOINT. Data may not be used to enhance a file or list owned by any third party, to develop any list enhancement product or product to prepare, publish, clean or maintain any directory. Data provided under this Agreement shall not be utilized by Company in Company internet applications or internet websites without the express written consent of CHOICEPOINT.

2. CHOICEPOINT does not warrant or guarantee the correctness or completeness of the information furnished including but not limited to warranties of merchantability or fitness for a particular purpose and will not be liable for any loss or injury caused in whole or in part either by its negligence or by contingencies beyond its control, in procuring, compiling, collecting, interpreting, communicating or delivering such information. CHOICEPOINT shall not be responsible or liable to Company for unknowingly including names and telephone numbers of individuals who have under applicable state laws properly elected not to receive sales solicitation telephone calls.

3. Subject to the limited and specific exception contained in paragraph four (4), Company understands and acknowledges that Data has not been collected for credit purposes and is not intended to be indicative of any consumer's credit worthiness, credit standing, credit capacity, or other characteristics listed in Section 603(d) of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA"). Subject to the limited and specific exception contained in paragraph four (4), Company represents and warrants that it shall not use Data as a factor in establishing any consumer's eligibility for (i) credit or insurance used primarily for personal, family or household purposes, (ii) employment purposes, or (iii) other purposes authorized under Section 604 of the FCRA or any similar statute.

4. In the event Company receives any Data from CHOICEPOINT that is consumer reporting data under the FCRA ("Prescreened List"), Company certifies that it will extend a firm offer of credit or insurance to each and every individual named on the Prescreened List, and that the offer will not be withdrawn or withheld after the offer is made, except as permitted by the FCRA. Company further agrees and warrants that it will use the Prescreened List in compliance with all applicable federal, state and local laws and regulations, including but not limited to the FCRA, and any additional restrictions that may be placed upon the Prescreened Lists by CHOICEPOINT.

5. It is recognized that all information provided by CHOICEPOINT hereunder in whatever form, i.e., either visual records or data processing formats, will be subject to the copyright and other property rights of CHOICEPOINT representing the gathering of a large amount of information, the selection therefrom and the rendition thereof into usable forms and formats. Company shall not commit or permit any act of omission or commission by its agents, employees, or any third party which will impair the copyright or CHOICEPOINT's proprietary rights in the information. Company shall (a) treat the Data with the same degree of care to protect it against unauthorized disclosure as Company normally treats its own information of like character, (b) not willfully cause or permit disclosure of Data to other than its employees (and others directly or indirectly engaged to do work in behalf of Company) who have a need to know ("authorized recipients"), and (c) obligate any authorized recipient to honor Company's above commitments.

6. No information such as demographics, financial status, lifestyle, and real estate data shall be directly disclosed to prospects solicited by Company. CHOICEPOINT reserves the right to review and in its sole discretion approve any direct mail solicitations, telephone scripts, ad copy or other communications for consistency with the DMA Guidelines and in light of considerations of privacy, confidentiality, good taste, and other issues to which consumers may be sensitive.

7. CHOICEPOINT's sole liability hereunder, as CHOICEPOINT may elect, regardless of the form of action, will be CHOICEPOINT's reperformance of nonconforming services, the refund of any fees Company has paid for such nonconforming services, or for certain costs mutually agreed to by CHOICEPOINT and Company resulting from the nonconforming services. In no event shall such certain costs exceed an amount equal to the fees paid to CHOICEPOINT under this Agreement. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT IS CHOICEPOINT LIABLE TO COMPANY OR TO ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO DAMAGES TO BUSINESS REPUTATION, LOST BUSINESS, OR LOST PROFITS), WHETHER FORESEEABLE OR NOT AND HOWEVER CAUSED, EVEN IF CHOICEPOINT IS ADVISED OF THE POSSIBILITY THAT SUCH DAMAGES MIGHT ARISE.

8. Company shall indemnify, defend, and hold CHOICEPOINT harmless from and against any and all liabilities, damages, losses, claims, costs, and expenses (including reasonable attorney's fees) arising out of or resulting from Company's use of the Data and/or services including, without limitation, (i) a failure to observe any use or data restriction set forth herein; (ii) any claim alleging that Company violated the legal rights of another person by supplying CHOICEPOINT with any data; and (iii) any violation of applicable law or regulation in using the services provided hereunder. Company shall use its best efforts to at all times keep CHOICEPOINT reasonably apprised of the status of any such actions.

9. Company agrees to pay CHOICEPOINT the various fees and charges for any data or analysis services supplied by CHOICEPOINT as set forth in Exhibit A. CHOICEPOINT will send an invoice to Company for amounts due, which shall be payable within thirty (30) days after receipt of the invoice. Should any invoice issued by CHOICEPOINT become past due, Company agrees to pay interest on the unpaid amount of such invoice at the rate of one-half percent (1.5%) per month, or the maximum rate allowed by law, if less.

10. Neither CHOICEPOINT nor any of its trade names, trademarks or service marks may be used for any purpose without the prior written consent of CHOICEPOINT.

11. This written Agreement contains the entire and only Agreement between the parties and there are merged herein all prior and collateral representations, promises and conditions in connection with the subject matter hereof and any representation, promise, guarantee or condition not incorporated herein shall not be binding upon either party. No waiver or amendment of this Agreement shall be binding on the parties unless in writing signed by an authorized official of CHOICEPOINT and the duly authorized representative of Company.

12. If any provision of this Agreement or any portion of any such provision shall be held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall remain in full force and effect, and the provision or portion thereof affected by such holding shall be modified, if possible, so that it is enforceable to the maximum extent permissible.

13. The term of this Agreement is one (1) year from the Effective Date, and shall automatically renew for successive one (1) year terms unless either party provides the other with written notice of its intent not to renew such Agreement at least thirty (30) days prior to the end of the then current term. Either party may terminate this License if the other party breaches the terms of this License and fails to remedy such breach after receiving written notice detailing the nature of the alleged breach and fifteen (15) days to remedy the alleged breach. This Agreement may be terminated by CHOICEPOINT immediately upon written notice to Company if, in ChoicePoint's reasonable judgment, any Data is being used or disclosed contrary to the terms of this Agreement.

14. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, notwithstanding any conflict of law provisions, and shall benefit and be binding upon the parties hereto and their respective successors and assigns.

15. In using Data and/or services provided hereunder, Company shall comply with all applicable federal, state, and local statutes, regulations, and rules from time to time in effect during the term of this Agreement, including, without limitation, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA"), the Gramm-Leach-Bliley Act, 15 U.S.C., Section 6801 et seq., ("GLBA"), corresponding state credit reporting and privacy statutes, substantive regulations promulgated under such statutes and applicable DMA Guidelines (collectively referred to herein as "Laws"). Company agrees that if such Laws change or the interpretation of such Laws change, CHOICEPOINT may change the terms of this Agreement and/or the services being provided to ensure compliance with the Laws.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

COMPANY:

BY: (signature) _[signature]_

PRINT NAME: Brian Woods

TITLE: CMO

DATE:

CHOICEPOINT PRECISION MARKETING INC.

BY: (signature) _[signature]_ Meredith L. Sidewater

PRINT NAME: Vice President

TITLE: Assistant General Counsel

DATE: 4/29/05

# EXHIBIT A

## Pricing

Pull 1 Uniques: $99/m    (Equifax $56/m, Demos $20/m, RiskBase $23/m)
Pull 2 Uniques: $73.50/m (Equifax $42/m, Demos $15/m, RiskBase $16.50/m)
Pull 3 Uniques: $47/m    (Eqauifax $28/m, Demos $10/m, RiskBase $9/m)
Pull 4 Uniques: $45/m    (Equifax $28/m, Demos $10/m, RiskBase $7/m)

## Annual Volume Commitment

Pricing is contingent on Company agreeing to purchase no less than 20,000,000 records during the initial term and any renewal term of this Agreement ("Volume Commitment"). In the event Company fails to meet the Volume Commitment during the initial term or any renewal term, Company and CHOICEPOINT agree to negotiate in good faith an equitable settlement of any Volume Commitment shortfall.