IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PAUL W. DERDA and <br> CINDY K. DERDA, his wife, <br><br> Derdas, <br><br> vs. <br><br> AMERIQUEST MORTGAGE <br> COMPANY, a foreign corporation, <br> and NORTHWEST TITLE & ESCROW <br> CORPORATION, <br><br> Defendants. | ) <br> ) <br> ) <br> ) Case No. 4 06CV-01649 J C H <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT**
**NORTHWEST TITLE & ESCROW CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Northwest Title & Escrow Corporation, by its attorneys of record, and respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

**INTRODUCTION**

The Derdas herein, Paul W. Derda and Cindy K. Derda (hereinafter referred to as the "Derdas"), have filed a six (6) count Complaint in this Cause. Only Count II and Count III of the six (6) Counts in the Derdas' Complaint plead claims against the Defendant, Northwest Title & Escrow Corporation (hereinafter referred to as "NWT"). Count II is a Count for fraudulent representations directed against NWT and Ameriquest. Count III is a count for breach of fiduciary duty directed solely against both NWT. These are the only Counts of the Derdas' Complaint directed against NWT with the remaining Counts are directed solely against Ameriquest. There are no other pending counterclaims or cross-claims involving NWT.

**FACTS**

The uncontroverted facts in this case are set forth in the deposition of Cindy K. Derda (hereinafter referred to as "Cindy") taken August 15, 2005 when this same case was filed and pending in the Circuit

Court of St. Louis County, Missouri on or about November 30, 2005. Derdas' voluntarily dismissed the St. Louis County litigation and refiled this suit approximately one (1) year later. Because frequent reference to Cindy's deposition will be made in the underlying Statement of Uncontroverted Facts and this Memorandum, the referenced pages from the deposition of Cindy Derda (hereinafter "Cindy Depo") and deposition exhibits (hereinafter "Cindy Depo Exhibits") are attached to NWT's Statement of Uncontroverted Facts and incorporated by reference in this Memorandum. Also, the referenced pages from the deposition of NWT's employee, Nate Hufker (hereinafter "Nate Depo") are attached to NWT's Statement of Uncontroverted Facts and incorporated by reference in this Memorandum.

This case arises out of a residential refinancing loan between the Derdas and Ameriquest Mortgage Company (hereinafter referred to as "Ameriquest"). This refinancing loan was closed in November 2003. The purpose of this loan was to refinance the Derdas' existing mortgage with Fairbanks Capital Corporation (hereinafter referred to as "Fairbanks") and to pay off the Derdas' then existing credit card debt. (Cindy Depo. p. 41). The Derdas had previously taken out the loan with Fairbanks in October 2001 to consolidate their then existing first and second mortgages and to pay off their then existing credit card debt. (Cindy Depo p. 26). The credit card debt being paid through the November 2003 refinancing with Ameriquest was new debt incurred after the Fairbanks refinancing was closed in 2001. (Cindy Depo p. 42).

When the Derdas initially spoke with the Ameriquest loan officer, Jeremy Smith, (hereinafter referred to as "Jeremy") regarding an application to refinance the Fairbanks Mortgage, Cindy did not think they would qualify for the refinancing due to their poor credit history (Cindy Depo pp. 45-46). Cindy had previously worked as a junior underwriter for Wells Fargo Mortgage Company and had familiarity with the mortgage loan approval process. (Cindy Depo pp.31-34). Also, at the time the Derdas sought refinancing through Ameriquest, they had already sought and applied for consumer credit counseling (Cindy Depo p. 43).

When the Derdas made their application for the refinancing through Ameriquest, their intention was only to pay off the Fairbanks loan and to pay off their then existing credit card debt. (Cindy Depo. pp. 49-50). They did not discuss receiving cash back from the loan until after their initial application and until after the appraisal of their home was completed. (Cindy Depo. p. 51). It was only after the Derdas were told by Ameriquest's loan office, Jeremy, on or about November 11, 2003, that they were eligible for cash back from the loan, did the Derdas request cash back. (Cindy Depo. pp. 54-56). Cindy testified the Derdas would have proceeded with the loan refinancing through Ameriquest even if the cash back option was not available to them because they wanted to refinance the Fairbanks loan, pay-off their credit card debt and get a fresh start. (Cindy Depo. pp.57-59). Cindy admits she was the person who told Jeremy the Derdas' balance on the Fairbanks loan was approximately $108,000.00. (Cindy Depo. pp. 61-62). Cindy testified she was aware there may have been an additional pre-payment penalty associated with a payoff of the Fairbanks loan. (Cindy Depo. p. 64).

Ameriquest processed the Derdas' loan refinancing, and on November 12, 2003 a notary public from a company named A-Integrity, hired by Ameriquest, came to the Derdas' home to sign the loan closing documents (Cindy Depo. p. 65). Among the documents signed that day included: (1) the adjustable rate note to Ameriquest in the principal amount of $129,750.00 (Cindy Depo. Exhibit 1), (2) a deed of trust on the Derdas' residence to Ameriquest (Cindy Depo. Exhibit 2), (3) a one week cancellation period notice (Cindy Depo, Exhibit 9), (4) an acknowledgement of final loan terms (Cindy Depo. Exhibit 10), (5) a document entitled Important Notice to Borrowers (Cindy Depo. Exhibit 13), (6) a HUD 1 loan settlement statement (Cindy Depo. Exhibit 17), and (7) a NWT Acknowledgement/Disbursements Authorization Agreement (Cindy Depo. Exhibit 20). In her deposition, Cindy admits in her deposition that she and her husband signed all of the above documents together with other documents given to them on November 12, 2003 by the Notary Public. She also admitted the Notary left copies of the documents with her on November 12, 2003. (Cindy Depo. p. 70)

On November 19, 2003, Cindy called Ameriquest to inquire when the loan proceeds would be disbursed. On November 20, 2003, Cindy called someone, unknown to her, at NWT to see if the funds transfer had been wired from Ameriquest to NWT. She was told by NWT that the funds had been received from Ameriquest but that the pay-off amount of the Fairbanks loan had not been received and the loan proceeds would not be disbursed without that payoff amount. (Cindy Depo. p. 147). On the morning of November 21, 2003, Cindy again called NWT and spoke with its employee, Nate Hufker, who told her the payoff amount had come in at over $113,000 and that would result in a reduction of the cash back to the Derdas from approximately $8,800.00 to approximately $4,100.00. (Cindy Depo. p. 150). Cindy then instructed Nate not to issue any checks or do anything further on disbursing the loan proceeds because she was going to call Jeremy and cancel the loan. (Cindy Depo. p. 150). Nate Hufker testified in his deposition of August 15, 2005 that Ameriquest faxed NWT the Fairbanks final pay-off amount Friday, November 21, 2003 at approximately 10:01 a.m. (Nate Depo. p. 15). He also testified he told Cindy the funds were at NWT and he would have checks ready for her and the credit card payoffs available for her to pick up that day. (Nate Depo. p. 17). He acknowledged that Cindy asked him not to issue any checks until she talked to Jeremy at Ameriquest. (Nate Depo. p. 17).

Cindy testified she spoke with Jeremy at Ameriquest after speaking with Nate and asked Jeremy to cancel her loan because the Fairbanks payoff was more than she expected. Jeremy told her the loan could not be cancelled because the rescission period had expired. (Cindy Depo. p. 152). Thereafter Cindy called Nate and told him Jeremy would not cancel the loan. In that same conversation, she then instructed Nate to go ahead and issue the checks. (Cindy Depo. p. 188). Later on November 21, 2003, after some adjustments were made in the checks to payoff the credit card accounts, Cindy went to NWT, picked up the checks to send to the credit card companies and picked up two checks payable to the Derdas totaling approximately $4,700.00. (Cindy Depo. pp. 159-161). Nate testified the payoff check to Fairbanks was

sent by overnight mail on November 21, 2003 for delivery on Monday, November 24, 2003, after Cindy had authorized disbursement. (Nate Depo. p. 26).

The Derdas admit they did get the benefit of the Ameriquest loan. The loan proceeds paid off the credit card debt the Derdas had asked to be paid. (Cindy Depo. p. 104). The loan proceeds also paid off the Fairbanks loan. (Cindy Depo. p. 104). The Derdas also received approximately $4,700.00 in cash back from the loan, which they used for their benefit. (Cindy Depo. p. 104, 106-107). The dispute regarding the Ameriquest loan was not the amount of the loan or the loan payments; rather the only dispute was over the payoff amount to Fairbanks. The disputed payoff to Fairbanks centered around the charging of a prepayment penalty by Fairbanks and the payment of late fees and interest charges which had been assessed by Fairbanks. (Cindy Dep. P. 106). Cindy admitted in her deposition that the Derdas have subsequently reached a settlement with Fairbanks, due in part to a class action lawsuit over prepayment penalties, and received the sum of $3,000 as their settlement. (Cindy Depo. p. 115).

The Derdas admit they have only made four (4) loan repayments to Ameriquest. (Cindy Depo. p. 100). Instead they are periodically giving monies to Cindy's father to hold to apply to the loan. (Cindy Depo. p. 100-101). As of the date of her deposition, Cindy testified she has given her father approximately $13,000.00 to hold for them. (Cindy Depo. 101). She testified if she is forced to pay back the Ameriquest loan, she will. (Cindy depo p. 110).

Counts II and III of the Derdas' Complaint' seeks damages against NWT, in each Count, in the amount of $157,032.00 actual damages and an unspecified amount as and for punitive damages.

## ISSUES

1. Does a factually supported claim exist against NWT for fraudulent representation?

2. Does a factually supported claim exist against NWT for breach of fiduciary duty?

3. Should summary judgment be granted in favor of NWT and against the Derdas as a matter of law?

**LAW AND ARGUMENT**

1. **Applicable Law**

Summary Judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c), National Bank of Commerce of El Dorado, Arkansas vs. Dow Chemical Co., 165 F.3d 602 (8th Cir. 1999).

The standard for granting summary judgment is also well settled law in Missouri. A summary judgment movant has the burden to show a right to judgment flowing from material facts about which there is no genuine dispute. ITT Commercial Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371 (Mo. 1993). The Court views the record in the light most favorable to the party against whom summary judgment is sought and taken facts set forth in affidavits and otherwise plead in support of the Motion as true unless they are contradicted by the non-moving party's response. The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question. Wood v. Safeco Insurance Company of America, 980 S.W.2d 43 (E.D. Mo. 1998).

In a case, such as this one, the claims against NWT are not exclusive federal jurisdiction claims. This Court is being asked to hear the claims against NWT under diversity jurisdiction. 28 U.S.C. 1332. Any exclusive federal jurisdiction claims raised by the Derdas are filed against Ameriquest alone and do not involve NWT.

Since the two (2) Counts against NWT involve solely state common law questions, this Court is required to apply the law of the State of Missouri when deciding these claims. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), National Bank of Commerce & El Dorado, Arkansas vs. Dow Chemical Co., 165 F.3d 602 (8th Cir. 1999).

### 2. Alleged Fraudulent Representations by NWT

To establish a claim for fraudulent representations, the Plaintiffs must plead and prove each of the following elements:

1) A false, material representation;
2) The speaker's knowledge of its falsity or his ignorance of its truth;
3) The speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated;
4) The hearer's ignorance of the falsity of the statement;
5) The hearer's reliance on its truth and the right to rely thereon; and,
6) The proximate injury.

Moses.com Securities, Inc. v. Comprehensive Software Systems, Inc., 406 F.3d 1052 (8th Cir. 2005), citing Gast v. Ebert, 739 S.W.2d 545 at 547 (Mo. en banc 1987). To recover for fraudulent misrepresentations, the Plaintiffs must prove every element. Moses.com Securities, Inc., citing Artilla Cove Resort, Inc. v. Hartley, 72 S.W.3d 291 at 297 (S.D. Mo. 2002).

In Count II of their Complaint, after incorporating the allegations contained in Counts against the other Defendant, Ameriquest, the Derdas allege NWT made fraudulent representations to them as follows:

> 49. Defendant Northwest had the duty and responsibility, because of its special or fiduciary relationship with Paul and Cindy, to advise them that the representations made by Ameriquest, as alleged above were false, that Fairbanks payoff had not been made, and that Paul and Cindy could in fact refuse to authorize distribution of the loan proceeds, but Northwest failed to do so and is guilty of fraudulent concealment by its silence.
>
> 50. Ameriquest's actions in falsely misrepresenting the facts and Northwest's silence in failing to advise Paul and Cindy of the false representations of said Jeremy were intentional, willful, and outrageous because of said defendants' evil motives and reckless indifference to the rights of others and therefore Paul and Cindy are entitled to punitive damages because of Defendants' conduct.
>
> 51. Northwest was the escrow agent designated to hold and dispense the funds loaned to Plaintiffs by Ameriquest, and therefore, a fiduciary relationship was established between Northwest and the Plaintiffs.
>
> 52. When Paul and Cindy told Nate they could not cancel the loan because Jeremy told them they had signed the closing statement for the loan, the three day rescission time had expired and the payoff to Fairbanks had already been

>   made, Nate had a duty to tell Derdas the representations of Jeremy were false and they could cancel the loan.
>
> 53. In the alternative, if no fiduciary relationship existed, Nate, having superior knowledge that the payoff to Fairbanks had not been made, had a legal duty to tell Plaintiffs that fact because such information was not reasonable available to Plaintiffs.

The facts, set forth in the parties' sworn deposition testimony, are uncontroverted with respect to the role played by NWT in this entire transaction. The Derdas have failed to allege any facts in their pleadings or in their depositions which establish that NWT committed any of the acts which constitute fraudulent representation, as defined by Missouri law. Fraudulent misrepresentations involve knowingly or recklessly supplying false information or omitting information. <u>Wengert v. Thomas L. Meyer, Inc.</u>, 152 S.W.3d 379 at 382 (E.D. Mo. 2004). A variant of fraudulent misrepresentation is fraudulent omission. Silence may amount to a representation, constituting the first element of fraudulent misrepresentation, only if the party sought to be held accountable for fraud (1) conceals material facts and (2) has a legal duty to disclose such facts. <u>Moses.com Securities, Inc</u>.

The Derdas present no facts that NWT or its representative, Nate, misrepresented, concealed or failed to disclose <u>anything</u> to them. The Derdas' only allegations in support of their claim are that NWT (and Nate) had a duty to tell them: a) the representations made by Ameriquest with respect to their loan were false; b) that the Fairbanks payoff had not been made; and c) that the Derdas could in fact refuse to authorize distribution of the loan proceeds.

There is no evidence presented that either NWT or its employee, Nate, had any knowledge that any representations made by Jeremy at Ameriquest were false. One of the elements of fraud is that NWT would have to have actual knowledge of the falsity of representations. Here, the Derdas have presented no evidence to establish NWT's knowledge of the falsity of any of the alleged Ameriquest representations and therefore, this element of fraudulent misrepresentation has not been established.

There was no evidence presented that NWT or Nate misrepresented the status of the payoff of the Fairbanks loan. There is also no evidence that the Derdas ever asked this question of NWT or Nate. In fact, the evidence is uncontroverted that Nate did not make any disbursements of the loan proceeds until after Cindy talked to Jeremy at Amerquest and then called Nate and instructed him to proceed with the loan disbursements. (Cindy Depo. pp. 159-161, 188 and Nate Depo. pp. 17, 26).Therefore, the Derdas have failed to establish any misrepresentation regarding this fact. If anything, the evidence establishes the Derdas instructed Nate to proceed.

Lastly, the Derdas claim NWT and Nate had a duty to advise them they could, in fact, refuse to authorize distribution of the loan proceeds. There is no evidence to establish that the Derdas <u>could</u>, at the time alleged, actually refuse to authorize disbursement of the loan proceeds without being in breach of the loan agreement. The uncontroverted facts are that the time for the Derdas to rescind the loan had passed and therefore, they <u>could not</u> cancel the loan or refuse to authorize disbursement. (Cindy Depo., Exhibit 9, Nate Depo. p. 19). The duty the Derdas are seeking to impose on NWT in this instance amounts to the rendering of legal opinions with respect to the loan closing. (Cindy Depo., Exhibit 20). There is no evidence NWT or Nate were competent to render legal opinions or that they had any duty to do so. Basically, the Derdas are complaining that Nate should have advised them of their legal rights with respect to closing. Paragraph 1 of said Exhibit 20 expressly states NWT cannot give borrowers legal advice or counsel in connection with the mortgage or any other matters. This argument fails to meet any of the elements of fraudulent misrepresentation.

There is no evidence that any statements made by Nate or anyone else connected with NWT were false or that Nate had any knowledge superior to the information the Derdas already had. The Derdas admitted that NWT did not learn the Fairbanks payoff amount until November 21, 2003, when Nate told that amount to Cindy Derda. (Cindy Depo. pp. 141, 150). The Derdas fail to establish any false statements which were made to them by NWT. In fact, there is no evidence the Derdas were supplied any incorrect or

false information by NWT or its employees or that any material facts were concealed from them by NWT or its employees. Paragraph 3 of said Exhibit 20, in bold and underlined language, states:

> "**The borrower also acknowledges that AMERIQUEST MORTGAGE may have provided Northwest Title with an estimate of your contract payoff and that final post-signing adjustments may be required to fully satisfy your existing mortgage**."

The Derdas signed Exhibit 20 on November 12, 2003 and were given a copy of this document more than ten (10) days before the actual disbursements took place. In order to recover for fraudulent non-disclosure, the Derdas must show that NWT knew or should have known about the underlying factual information that it failed to disclose. Wengert v. Thomas L. Meyer, Inc., 152 S.W.3d 379 at 382 (E.D. Mo. 2004). The Derdas offer no factual evidence to support this claim and it is submitted no such factual evidence exists.

In order to recover against NWT on Count II of their Petition, the Plaintiffs must prove all elements of fraudulent misrepresentation. Moses.com Security, Inc. Plaintiffs have failed to establish any of the requisite elements of fraudulent misrepresentation. Because the Plaintiffs have failed to prove any of the elements of fraudulent misrepresentation by NWT, they have failed to sustain their burden of proof with respect to Count II and therefore, summary judgment in favor of NWT and against the Plaintiffs on Count II is proper.

### 3. Alleged Breach of Fiduciary Duty by NWT

Both Counts II and III of Plaintiffs Complaint make similar allegations regarding alleged breaches of fiduciary duty owed to the Derdas by NWT. In order to recover under this theory, the Derdas must first establish a fiduciary duty existed between them and NWT.

Derdas allege NWT was an escrow agent who had the responsibility to hold and dispense funds loaned to the Derdas by Ameriquest. It is fundamental law that, by definition, an escrow agent is not a party to the underlying transaction. UT Communications Credit Corp. v. Resort Development, Inc., 861 S.W.2d 699 (E.D. Mo. 1993). The Derdas signed an Acknowledgement/Disbursement on November 12, 2003. (Cindy Depo. Exhibit 20). There is no language in Exhibit 20 which creates a fiduciary duty between

NWT and the Derdas. On the contrary, Exhibit 20 expressly limits Northwest Title's duties to those of an escrow or disbursing agent and not those of a fiduciary. Because NWT is not a party to the transaction between the Derdas and Ameriquest, it does not owe the Derdas any duty beyond what is contained in Exhibit 20. <u>UT Communications Credit Corp. v. Resort Development, Inc.</u> The Derdas have not alleged NWT has violated any of the terms of Exhibit 20.

Paragraph 52 of Count II and Paragraph 56 of Count III allege Nate had a duty to tell the Derdas the representations of Jeremy were false and that they could cancel the loan. Paragraph 1 of Exhibit 20 states:

> 1. "The undersigned borrowers of the above-described property state that they are aware Northwest Title & Escrow Corp is handling part or all of the closing of the refinance and that Northwest Title & Escrow Corp. cannot give borrower legal advise or counsel in connection with the mortgage or other matters."

Cindy Derda, in her deposition, admits she has no factual basis for her allegations that Nate, or anybody who worked for NWT, had the power or authority to tell the Derdas what their legal rights were with respect to cancellation of the loan. (Cindy Depo. p. 190). Instead, she bases her allegations upon her own beliefs of what NWT should have done upon learning the Fairbanks payoff was greater than the Derdas expected. (Cindy Depo. p. 190), despite the fact that the Derdas were placed on notice when they signed Exhibit 20 that final payoff amounts were subject to change. Cindy further admits that it was her understanding NWT was merely the disbursing agent for the transaction. (Cindy Depo. pp. 191). She also admits that the person who came to her house to sign the loan documents and settlement statement was not employed by NWT, but rather was affiliated with Ameriquest. (Cindy Depo. p. 65, 191). It is also clear that at all times relevant, the Derdas had in their possession Cindy Depo., Exhibit 9, which was Ameriquest's Loan Cancellation Policy.

Nate Hufker, in his deposition, confirms that NWT, the title company, cannot cancel the loan. The lender, Ameriquest, is the only one who can cancel a loan. (Nate Hufker Depo. p. 19). At the time Cindy

Derda first told Nate, on November 21, 2003, she was calling Jeremy at Ameriquest to cancel the loan, she was already past the seven (7) day rescission period to cancel. (Cindy Depo, Exhibit No. 9). Neither Nate nor Northwest Title had any duty to tell Cindy any statements made by Jeremy regarding cancellation of the loan were false, as alleged by the Derdas in Paragraph 52 of Count II or Paragraph 56 of Count III. It further appears to be uncontroverted that, at the time Jeremy made the statement, the loan could not be cancelled, and his statement to her was truthful and accurate.

Cindy Derda admitted that neither she nor her husband ever communicated in writing with Ameriquest that they wanted to cancel the loan. (Cindy Depo. p. 93). Instead, after being told by Jeremy that they were past the time to rescind the loan, the Derdas authorized NWT to disburse the funds and did, in fact, realize the benefits of the loan proceeds. (Cindy Depo. pp. 188, 104, 106-107).

The uncontroverted facts of this case are that NWT cooperated fully with the Derdas in the disbursement of their loan proceeds. Nate disclosed to Cindy the correct payoff amounts when asked. Nate agreed not to process disbursement payments until Cindy had a chance to speak with Jeremy at Ameriquest regarding cancellation. When Cindy telephoned Nate to tell him Jeremy said she could not cancel the loan, she authorized Nate to proceed with the disbursements. Nate proceeded to make disbursements, adjusting some of the credit card payments based on revisions made by Cindy and approved by Ameriquest. Nate made the final payoff to Fairbanks, adjusting for the new payoff figure, in accordance with the authorization given NWT by the Derdas to make payoff adjustments pursuant to Paragraph 3 of Cindy Depo, Exhibit 20. NWT did not mail the final payoff to Fairbanks until November 21, 2003, after the Derdas had authorized final disbursement of the loan proceeds. Again the Derdas fail to present any factual evidence of any wrongdoing by NWT or its employees.

The Plaintiffs have failed to prove a breach of any alleged fiduciary duty by NWT. The Plaintiffs have failed to sustain their burden of proof with respect to their claims against NWT in either Count II or

Count III of their Complaint. Therefore, summary judgment in favor of NWT and against the Plaintiffs on both Counts II and Counts III is proper.

## CONCLUSION

The Derdas herein, Paul W. Derda and Cindy K. Derda have failed to present any factual basis which is sufficient to support their claim against Northwest Title & Escrow Corporation. Viewing all uncontroverted facts, in the light most favorable to the Derdas, the Derdas fail to prove their claim against Northwest Title and, therefore, Northwest Title is entitled, as a matter of law, to have Judgment entered in its favor and against the Derdas as a matter of law.

                                                               ROTH, EVANS & LADING, P.C.

                    BY:         /s/ Christopher B. Hunter
                                  Christopher B. Hunter, EDMBE # 20591
                                  1401 S. Brentwood Blvd., Ste. 585
                                  St. Louis, Missouri 63144
                                  Telephone: 314-961-5100
                                  Facsimile: 314-968-3330
                                  Email: cbhunter@rothlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing instrument was electronically sent and mailed, postage prepaid, and sent by United States Postal Service, this _____ day of _____, 2007 to:

Harold G. Johnson
Mitchell D. Johnson
Mavis Kennedy, of counsel
Attorneys at Law
500 Northwest Plaza, Suite 715
St. Ann, MO 63074

Mr. Todd Ruskamp
Shook, Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, MO 64108-2613

_____
Emily Gray