IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

PAUL DERDA, et ux.,                    )
                                       )
           Plaintiffs,                 )
                                       )
v.                                     )    No. 04CC-2320
                                       )    Division 13
AMERIQUEST MORTGAGE, et al.,           )
                                       )
           Defendants.                 )


DEPOSITION OF CYNTHIA K. DERDA
TAKEN BY TODD W. RUSKAMP, ESQ.
ON BEHALF OF DEFENDANT AMERIQUEST
AUGUST 15, 2005


CERTIFIED COPY


REPORTED BY STEPHANIE K. RENNEGARBE
CERTIFIED SHORTHAND REPORTER
REGISTERED DIPLOMATE REPORTER
CERTIFIED REALTIME REPORTER
CERTIFIED BROADCAST CAPTIONER
IL CSR# 084-003232


RANKIN REPORTING & LEGAL VIDEO
1015 LOCUST STREET, STE. 911
ST. LOUIS, MISSOURI 63101
(314) 231-2202
(800) 285-2115

**Deposition of Cynthia K. Derda**

1    Q.    -- that you took out.  And then how does Aames

2    fit into this?

3    A.    When -- In October of 2001, I had applied for a

4    loan with Aames -- Well, they basically called me on the

5    phone and -- to see if we wanted to refinance our

6    mortgage.  And I said, "Well, no, there's no way we can,"

7    because we both had lost our jobs.  And he said, "Well,

8    there's ways to work around that."  And I wanted to get

9    rid of that second mortgage, because when you are faced

10   with that you don't know what's going to happen when your

11   income just stops.  So, he did a little bit of paperwork

12   and called us back and said that we were approved.

13   Q.    All right.  So then the Aames loan was a

14   refinancing that paid off the Countrywide and the

15   American General loans?

16   A.    Yes.  The first and second, yes.

17   Q.    Thank you very much for clarifying that.

18       Did you also pay off some credit card debt at

19   that time?

20   A.    Yes.

21   Q.    Did you get any cash out on that loan at that

22   time?

23   A.    No.

24   Q.    Do you have any of the loan documents related

25   to the original Prism loan?

26

**Deposition of Cynthia K. Derda**

1    A.    Yes.

2    Q.    And do you do the same sort of duties with the

3    company today as you did?

4    A.    Yes.  There was another job that I worked at in

5    between.

6    Q.    Okay.  Between April of '02 and June of '04?

7    A.    October of 2002 to October of 2003 -- October

8    31st, as a matter of fact, Halloween day, Wells Fargo

9    Mortgage.

10   Q.    Okay.  What did you do at Wells Fargo

11   Mortgage?

12   A.    I was a junior underwriter.

13   Q.    Working in one of their offices here in St.

14   Louis?

15   A.    Earth City.

16   Q.    Do you remember what the address of that

17   office was?

18   A.    No, I don't.

19   Q.    Okay.  Is that office still there, as far as

20   you know?

21   A.    No, they closed the whole site down on October

22   31, 2003, all -- They shut the doors.  Everybody was let

23   go.

24   Q.    All right.  And as a junior underwriter what

25   sort of things did you do while you were at Wells Fargo?

31

**Deposition of Cynthia K. Derda**

1      A.    I had to look and review all the loan

2  documentation, bank statements, pay stubs, W-2s,

3  basically I had to review -- and their loans were all

4  computer-generated, and I had to review all the loan

5  documentation and I didn't work in the closing or the --

6  like I wasn't a processor, I wasn't a closer, but I

7  worked with them.  Like if they had a loan to close, they

8  would hurry up and come to me and say, "Cindy, could you

9  change this loan amount, because we are going into

10  closing or" --

11      Q.    Okay.

12      A.    I did a lot there.  And I reviewed appraisals.

13      Q.    Did you -- Were you a decisionmaker as to

14  whether or not Wells Fargo would do a particular loan

15  that you were reviewing?

16      A.    Yes; yes.

17      Q.    And were you the final decisionmaker on loans?

18      A.    We were -- We were like the very easy simple

19  loans.  We didn't -- The class that I was with, we didn't

20  do the commercial or the -- you know, the huge loans, we

21  did the more simple, basic refinance, just the straight

22  refinance, and we can only decision loans up to a certain

23  dollar amount, and I believe -- it's been two years --

24  750,000.  But we -- they would go through us -- See, all

25  their loans was in a computer, and the way their -- they

                                                      32

**Deposition of Cynthia K. Derda**

1  had the system set up, you had like 27 to 30 screens that

2  you would have to go through, and their loans was all

3  computer-generated where it kind of once you locked --

4  the ad taker locked information, like the borrower's

5  name, address, income, their computer would generate and

6  did a lot of it for you.

7      Q.    Would generate loan documents?

8      A.    Once we got done, once I got done reviewing

9  verification, yeah, he did work for two years, their pay

10  stubs, their bank statements, you know, agreed with what

11  they stated in their original loan application, when I

12  felt that everything was correct, then I would

13  automatically do a G Fast, a commitment letter. The way

14  their system was you would automatically go into that

15  program and put the loan number in and it would

16  automatically send the borrower a commitment. And from

17  that point on we had no more -- that was alls we did.

18  Then it would go to a closer and we had no part of that,

19  unless they were going to closing and the loan amount was

20  wrong or the payoff amount. We would have to readjust

21  before it could go to the title company.

22      Q.    And you were involved in those types of --

23      A.    Yes.

24      Q.    -- adjustments?

25      A.    Yes.

                                                    33

**Deposition of Cynthia K. Derda**

1     Q.     And familiar with the process to go about

2    doing that?

3     A.     Yes.

4     Q.     And I think you said that the loan limit that

5    you worked within was $750,000?

6     A.     Yes.

7     Q.     And did -- did you work on loans that were

8    secured by mortgages on personal -- on real estate --

9     A.     Yes.

10     Q.     -- and homes?

11     A.     Yes.  Just your -- I only dealt with the

12    single-family dwelling.  Like appraisals, I could only --

13    I was only trained to do single-family dwellings.  I

14    couldn't do duplexes or condos, but the loans that I

15    dealt with were single-family residence.

16     Q.     Okay.  Were the loans that you dealt with

17    similar to the loan that you obtained from Ameriquest --

18     A.     Yes.

19     Q.     -- in 2003?

20     A.     Yes.

21     Q.     In the sense that it was a single-family home?

22     A.     Yes.

23     Q.     And within that price range?

24     A.     Yes.

25     Q.     All right.  Thank you.

34

**Deposition of Cynthia K. Derda**

1    mortgage with no -- we had no inkling at all that we were

2    going to lose our jobs."

3        Q.    Were you in a position where you were unable

4    to pay your monthly bills or obligations in a timely

5    fashion?

6        A.    It was hard.  It was hard.

7        Q.    And at that point you had the Fairbanks debt,

8    right, --

9        A.    Uh-huh.

10       Q.    -- on the house?  And then I assume you had

11   some credit card debt, as well?

12       A.    Yes.

13       Q.    And it was a struggle to be able to get those

14   bills paid?

15       A.    Yes.

16       Q.    Is it the case that you were looking to

17   refinance your house so that you could get some relief

18   from that credit card debt by having the refinancing pay

19   it?

20       A.    Yes.

21       Q.    Had the credit card debt that was giving you

22   difficulties accumulated since your last refinancing in

23   2001?

24       A.    I don't understand that question.

25       Q.    All right.  Let me ask it this way:  When you

41

**Deposition of Cynthia K. Derda**

1    did the refinancing in 2001, I think you told me earlier

2    that you paid some credit card debt.

3         A.    Yes.

4         Q.    Do you recall if you paid off all of your

5    credit card debt at that time?

6         A.    All of them was paid off at that time.

7         Q.    So the credit card debt you had in November of

8    2003, when the discussions with Ameriquest began, was

9    credit card debt that had accumulated since 2001?

10        A.    Right; because we had no income for a long,

11   long time, and we -- sometimes you have to live off

12   charge cards when you have no income.

13        Q.    Right.  And do you have a practice of

14   retaining your credit card bills that you get on a

15   monthly basis?

16        A.    Yes.

17        Q.    And do you still have those today?

18        A.    Well, most of mine, the ones that I have, they

19   come on-line.  They send me my statement on-line.

20        Q.    What about from that time period of 2001 to

21   2003, before your refinancing with Ameriquest?  Do you

22   have those bills?

23        A.    The only bills that I had was the ones that I

24   had faxed to Jeremy Smith.

25        Q.    As part of the application process?

42

**Deposition of Cynthia K. Derda**

1    discussion on November 6?

2       A.    He had called me and said that he got the

3    information over the Internet, and I had told him that

4    things were different, that I had gotten laid off from

5    Wells Fargo and I had no income, that we had signed up

6    for Consumer Credit, our credit was shot, I knew it.  And

7    he said that as long as one of our scores was over 500.

8    And I said, "Well, basically I'm going to prove you

9    wrong.  There's no way our loan would go through."  And

10   it was strictly supposed to be a refinance to pay off our

11   charges.  And he got the information, our Social Security

12   numbers, address, names, and he said that he would call

13   back.  And he called back maybe 15 minutes later and said

14   that Paul's score was 509.

15      Q.    Okay.  That was significant --

16      A.    He said that was significant for them.  It had

17   to be over 500.

18      Q.    Did he tell you what your score was?

19      A.    It was 490 something.  I don't remember the

20   exact number.

21      Q.    Now, you said that you told him that you were

22   going to prove him wrong?

23      A.    He said that as long as our score was over 500

24   -- And I said, "There's no way this loan will go through.

25   I worked at Wells Fargo Mortgage, I know the guidelines

45

**Deposition of Cynthia K. Derda**

1    you have to go by.  There's no way that this loan will go

2    through."

3        Q.    Okay.  And were there particular guidelines

4    that you were aware of that you thought would trip up

5    this loan?

6        A.    My credit was destroyed.

7        Q.    Okay.  You thought the credit score would

8    probably do it?

9        A.    Yeah, my credit was shot, and I knew that and I

10   openly told him my credit is bad.

11       Q.    And on that topic for just a minute, is that a

12   result of any particular incident or --

13       A.    Well, my experience with Wells Fargo and

14   basically just common knowledge, you know.  I knew my

15   credit was ruined.

16       Q.    And it was ruined as a result of just not

17   paying the charge cards, or was there -- were there

18   other bills that --

19       A.    No, not having any income coming in at certain

20   times and --

21       Q.    Okay.  And you say he called you back about 15

22   minutes later that day?

23       A.    Yeah, he said he was going to do -- he got both

24   of our names, Social Security numbers, and he called back

25   and said that the score was 509, that it was a go.  And I

                                                              46

**Deposition of Cynthia K. Derda**

1    car for me.

2        Q.    Do you recall if during your conversations

3    with him on November 6 or when you dropped off the

4    documents on November 7 whether you asked him any

5    questions about the loan transaction?

6        A.    No.

7        Q.    You told me a few minutes ago that the reason

8    that you wanted to refinance was to pay off the charge

9    cards, --

10       A.    Uh-huh.

11       Q.    -- is that right?

12       A.    Yes.

13       Q.    Thank you.  And did you also understand that

14   the Fairbanks loan was going to be refinanced?

15       A.    The Fairbanks would be paid off.

16       Q.    Right; right.

17       A.    Right.

18       Q.    So that debt was going to be paid off and

19   refinanced into a new Ameriquest loan?

20       A.    Yes.

21       Q.    And you understood that?

22       A.    Yes.

23       Q.    And you also understood that the credit cards

24   would be paid off, too, right?

25       A.    Yes.

49

**Deposition of Cynthia K. Derda**

1    Q.    And that was something that you wanted?

2    A.    Yes.

3    Q.    And, as you understood it, were all of your

4    credit card debts going to be refinanced and paid off?

5    A.    Yes.

6    Q.    And that was something you you asked

7    Ameriquest to consider doing?

8    A.    Well, he said it would have to be that way in

9    order to get the loan.

10    Q.    And were you okay with that?

11    A.    Yes.

12    Q.    Did you talk with your husband about that

13    issue, do you recall?

14    A.    My husband and I -- I pretty much do

15    everything.  I -- It's always been that way.

16    Q.    It's that way at my house, too, fortunately.

17    A.    Yeah, that is all foreign to him.  I do it all.

18    Q.    So let me ask it this way.  Did your husband

19    at any time ever suggest to you that you shouldn't do

20    the refinancing with Ameriquest?

21    A.    At that point, no.

22    Q.    There came a point in time when he did?

23    A.    Yes.

24    Q.    All right.  And when was that?

25    A.    When we found out the huge difference between

50

### Deposition of Cynthia K. Derda

1    the payoff amount, which was many, many days later.

2        Q.    Okay.  We will probably get to that here.

3        A.    Yes.

4        Q.    So I'll make sure you get an opportunity to

5    tell me about that.

6        A.    Okay.

7        Q.    At the time that you had these initial

8    discussions with Jeremy on November 6 and November 7,

9    was there any discussion about cash out to you and Mr.

10   Derda?

11       A.    He did not mention that until after the

12   appraisal.  The appraiser came at 12:30 on Monday, which

13   was the 10th.

14       Q.    Okay.  I'll get to that in just a second.

15       A.    Okay.

16       Q.    On November 6 and November 7, you don't recall

17   there was any discussion of --

18       A.    No, it was strictly refinance, no cash out.

19       Q.    Just one thing as an aside.  Let me finish my

20   question --

21       A.    Okay.

22       Q.    -- before you answer.  It makes her life just

23   a bit easier.

24       A.    Okay.

25       Q.    She's not complaining, so --

51

**Deposition of Cynthia K. Derda**

1   Q.    Thank you.  Did you actually provide the

2   appraisal report to Ameriquest or just the number?

3   A.    No, they didn't ask.  I just gave them the

4   number.

5   Q.    And that's a report that you still have?

6   A.    Uh-huh; yes.

7   Q.    Do you recall when that information was

8   requested?

9   A.    It was verbally asked to me, and I truly don't

10  remember if it was Jeremy or the appraiser that asked if

11  I remembered what our previous appraisal came in at.

12  Q.    Okay.  And I assume you don't remember the day

13  that was requested?

14  A.    Monday, to the best of my -- which was the

15  10th.

16  Q.    Did you have any discussions with any

17  Ameriquest representatives on Monday the 10th, other

18  than what we have talked about?

19  A.    No.

20  Q.    A few minutes ago you told me that there was a

21  discussion at some point in time about you and Mr. Derda

22  obtaining cash out on this loan?

23  A.    That wasn't until Tuesday, the 11th, when

24  Jeremy called me and told us that the appraisal came

25  through and our LTV was at 75 and that we were eligible

54

**Deposition of Cynthia K. Derda**

1    for a cash out, and I was shocked.

2        Q.    Why is that?  Why were you shocked?

3        A.    Because I didn't think our -- we would have

4    ever been approved for a cash-out loan when your credit

5    is so bad.

6        Q.    Did you respond in any way to Mr. Smith when

7    he told you that?

8        A.    Well, I told him, I said I'm -- you know, I'm

9    shocked.

10       Q.    Okay.  Did he give you any indication at that

11   time what the available cash out might be on the loan?

12       A.    It was around 9,100.

13       Q.    And did you give Jeremy any indication as to

14   whether or not you and Mr. Derda wanted to obtain that

15   cash out on the loan?

16       A.    I had told him, I said if we are -- if we are

17   approved for that I would, yeah, like to get our

18   basement -- you know, finish our basement.  We talked

19   about several things that night.  I also asked him if I

20   could buy down on my interest, because I wasn't happy

21   with the 9.9.

22       Q.    What do you mean by buy down?

23       A.    Where you could buy down your points so your

24   interest isn't so high.  And he told me it would be like

25   2,400, and he said, you know, I would really advise you

                                                        55

**Deposition of Cynthia K. Derda**

1    not to do that, you need your cash.  So, since we were

2    not escrowing after I found out what the payments were

3    going to be, I decided not to escrow, and I thought,

4    well, since we are eligible to get that much cash back,

5    we can put our taxes aside for two years.  I could handle

6    this for two years.

7        Q.    So, you made the decision not to escrow real

8    estate taxes?

9        A.    Yes, when I found out how high our payments was

10    going to be.

11        Q.    Did you also make the decision not to escrow

12    insurance?

13        A.    Yes.

14        Q.    And the idea was that with the cash out that

15    you would obtain you could set money aside --

16        A.    Yes.

17        Q.    -- to pay those obligations?

18        A.    Yes.

19        Q.    Prior to being informed on November 11 of the

20    cash out opportunity, you didn't believe that there

21    would be an opportunity to obtain cash out?

22        A.    Hu-huh; no.

23        Q.    Is that a no?

24        A.    No, no.

25        Q.    And prior to that time had you made the

56

**Deposition of Cynthia K. Derda**

1　decision not to go forward with the loan?

2　　A.　I'm sorry, I didn't understand that.

3　　Q.　Prior to Mr. Smith telling you that there was

4　an opportunity to obtain cash out on this loan were you

5　still interested --

6　　A.　Yes.

7　　Q.　-- in going forward with the loan?

8　　A.　Yes.

9　　Q.　And is it the case that if you hadn't had an

10　opportunity to obtain cash out you would have still gone

11　forward?

12　　A.　I would have still gone through with it.

13　　Q.　Did you discuss anything else with Mr. Smith

14　on November 11?

15　　A.　Yes.

16　　Q.　And what was that?

17　　A.　We talked about -- He said that he had -- he

18　said that the loan was ready to go, that he had faxed

19　Fairbanks the payoff amount on Tuesday, and that the --

20　we would close on Wednesday, the 12th at 3:00.

21　　Q.　Which was the next day, right?

22　　A.　Yes.　And we discussed the payments.　He told

23　me the payments before escrowing and after escrowing, and

24　I chose to not escrow because the payments were higher.

25　I'm sorry.　You were writing.

57

**Deposition of Cynthia K. Derda**

1    Q.    That's okay.  I'm trying to listen, but --

2    A.    Okay.  Basically your last-minute details.  And

3  he said he had faxed off the payoff amount and we were

4  ready to go.  We did talk about -- I told him that I

5  didn't want to pay a lot in fees, but mind you, I never

6  received any paperwork prior to this; no commitment, no

7  truth in lending.  I had no idea what our fees were going

8  to be.

9    Q.    Did you receive any good faith estimate from

10  Ameriquest on this loan?

11    A.    No.

12    Q.    Do you know what a good faith estimate is?

13    A.    Yes.  Back on -- which I'm -- Back on the 6th,

14  when I did talk to Jeremy the first time, he told me that

15  whenever they'd take in a loan application their computer

16  automatically generates a commitment package.  He said,

17  "When you get it, throw it away.  It's no good, it's not

18  right."  And I said, "Okay."  And I believe it came,

19  because I did what he said, I threw it away.  He said it

20  was no good.

21    Q.    So there was a packet of information that came

22  to you?

23    A.    Right.  He said that the loan amount was not

24  correct.  And he said it was no good.

25    Q.    Do you recall when that -- when those

                                                          58

**Deposition of Cynthia K. Derda**

1 documents arrived?

2     A.    It was maybe a week. Because I know when I got

3 them I kind of glanced them, saw the loan amount that

4 read 150. And I said, "Well, he is right, they are

5 wrong," and I threw them away. I don't believe it was

6 before we closed.

7     Q.    You believe that that package arrived after

8 November 12?

9     A.    Yes, but since his focus was on stressing to me

10 it was not correct, he said that the computer

11 automatically generated commitment packages when you

12 applied for a loan.

13     Q.    You told me earlier that you would have gone

14 forward without the loan -- or with the loan even if

15 there was no cash out?

16     A.    Yes.

17     Q.    Why was it that you were interested in going

18 forward with this loan?

19     A.    To pay off my charge, to have a new start.

20     Q.    Pay off the credit cards that were overdue?

21     A.    Yes.

22     Q.    And it was going to provide some breathing

23 room for you?

24     A.    Yes.

25     Q.    Did you discuss with Mr. Smith the pricing of

59

**Deposition of Cynthia K. Derda**

1    Q.    Thank you.

2    A.    My intentions was not to stay after two years.

3    It was more of a correction loan, because I told Jeremy,

4    "I can handle this for two years."  It was more of a just

5    to get us back on our feet.  And I knew after two years I

6    was not going to stay.

7    Q.    Okay.  So, at the time you were thinking, "We

8    will do this refinancing, pay off these credit card

9    debts and Fairbanks, and then by the time the two years

10   expires on the fixed rate, we will go elsewhere and get

11   financing"?

12   A.    Yes.

13   Q.    Have you done that?

14   A.    No.

15   Q.    Are you planning to do that?

16   A.    It's up to my attorney.

17   Q.    Sorry to do this to you, --

18   A.    That's fine.

19   Q.    -- but is there anything else that you recall

20   about any discussions with Jeremy on November 11 that we

21   haven't talked about?

22   A.    He went over all the final loan.  Oh, he did

23   ask me if I knew -- had any idea what maybe my payoff

24   amount would be, and I said, "I don't know."  I said,

25   "The only thing I know is that when we previously were

61

1  going to refinance with AMC," which was months prior,

2  which we didn't go through with it, "the gentleman was

3  talking 108 something," but I didn't know if that was the

4  payoff amount or the principal. I don't -- That wasn't

5  my -- I didn't know those -- you know, exactly what it

6  was. And I had quoted him that I didn't want to go over

7  109.

8      Q.    And when did you tell him that?

9      A.    Tuesday, the 11th.

10      Q.    What caused you to say that?

11      A.    Well, because I'm just thinking of everything

12  that we owe and, you know, thinking of prepayment

13  penalties, and I just -- I didn't want to get our loan

14  amount on our home way -- you know, real, real high,

15  but --

16      Q.    Well, did you have some belief that the payoff

17  to Fairbanks, as I think we have been agreeing to call

18  it, was -- was going to possibly be more than $109,000?

19      A.    No. I had no idea, because Jeremy said he

20  faxed off for the payoff amount on that day.

21      Q.    On November 11th?

22      A.    Which was November 11th.

23      Q.    Did you have the Fairbanks loan documents in

24  your possession at that time?

25      A.    Yes.

62

**Deposition of Cynthia K. Derda**

1     Q.    -- in this sense.  Is it fair for me to say

2    you knew there was a prepayment penalty under the

3    Fairbanks loan documents, but you didn't know if it

4    would apply to a payoff as part of the Ameriquest loan?

5    A.    The way that I understand it, the closer your

6    loan gets to being paid -- This is how I understood it

7    from Mark, who was our loan officer at the time -- that

8    you will or will not be charged prepayment penalties.  I

9    -- I'm not a loan officer.  But when Jeremy said that he

10    talked -- he faxed over the payoff amount, you know,

11    because normally there are, you know, prepayment

12    penalties, and I had told him that I didn't want to go

13    over 109 if there were prepayment penalties.

14    Q.    Okay.  Well, if the payoff on Fairbanks was

15    more than 109, then what was going to happen?

16    A.    I didn't want to go through with the loan.

17    Q.    And you communicated that to Jeremy?

18    A.    Well, at the time we had no idea what it was --

19    if there was or if there wasn't.

20    Q.    And why didn't you want to go through with the

21    loan if it was over 109,000?

22    A.    It took away from our cashout that we was

23    supposed to get.

24    Q.    But this was the same loan where you wanted to

25    go forward with it even if you didn't get a cash out,

64

**Deposition of Cynthia K. Derda**

1    correct?

2        A.    Right.  We didn't know we could get a cash out

3    until that Tuesday.

4        Q.    Just to follow-up on something that I think

5    you alluded to, did you have a discussion with Aames or

6    Fairbanks about refinancing this loan before you had

7    your discussion with Ameriquest?

8        A.    No.

9        Q.    Was there any other lender that you talked

10   about refinancing with other than Ameriquest in November

11   of 2003?

12       A.    No.

13       Q.    Did you sign the loan documents on November

14   12?

15       A.    The notary came to our house.  She was supposed

16   to be there at 3.  It was maybe 4, I called Jeremy Smith.

17   She still wasn't there.  She said that the electricity

18   went out at Ameriquest and that she should be there soon.

19   And I believe she came around 5:00.

20       Q.    And do you recall her name?

21       A.    No.

22       Q.    Do you know if she was an Ameriquest employee?

23       A.    I assume, since she came as a notary with all

24   the paperwork from Ameriquest.

25       Q.    But did she tell you one way or the other?

                                                          65

1    the settlement, that it would be okay.

2        Q.    Do you recall anything else that the notary

3    talked with you about at the closing?

4        A.    No.

5        Q.    Did the notary leave copies of the loan

6    documents for you?

7        A.    Yes.

8        Q.    Did you have any discussion with the notary

9    concerning your recision rights at that time?

10       A.    The three-day recision was over on the 17th.

11       Q.    And were you familiar at that time with

12   recision rights --

13       A.    Yes.

14       Q.    -- as a result of your loan work at Wells

15   Fargo?

16       A.    Yes.

17       Q.    And were you also familiar with recision

18   rights as a result of prior loans that you had obtained?

19       A.    Yes.

20       Q.    Did you have any discussion with the notary

21   about an extended recision period?

22       A.    No.

23       Q.    You didn't talk with the notary about the fact

24   that you could rescind the loan until November 19?

25       A.    No.

                                                        70

Deposition of Cynthia K. Derda

1    this loan?

2        A.    Yes.

3        Q.    How many have you made, do you recall?

4        A.    Up until May of last year.

5        Q.    May of 2004?

6        A.    Yes.

7        Q.    So you paid the January, February and March

8    payments?

9        A.    And April.

10       Q.    I'm sorry.  And April.

11       A.    Yes.

12       Q.    Ought to know my calendar.

13             Is there some reason that you stopped paying

14   in May 2004?

15       A.    My attorney.

16       Q.    Other than any advice that you received from

17   your attorney, is there any reason that you stopped

18   paying in 2004?

19       A.    No.

20       Q.    Are you paying the payments due under the

21   Ameriquest loan into any other account currently?

22       A.    I have been giving them to my dad.

23       Q.    And do you know what your father is doing with

24   those payments?

25       A.    They are in savings.

                                                    100

**Deposition of Cynthia K. Derda**

1    Q.    Why is it you are giving them to your father?

2    A.    Because I asked him if he would just hold some

3    money for me.

4    Q.    And have you been making your payments to your

5    father since May 2004?

6    A.    I just give him money periodically and --

7    Q.    Do you know how much money your father is

8    holding currently?

9    A.    Not currently, no.

10   Q.    Do you have any idea?

11   A.    I'm thinking around 13.

12   Q.    1,300?

13   A.    Thousand.

14   Q.    $13,000.  Did you -- Strike that.

15         Did your father ask you why it was you wanted

16   to pay him this money?

17              MR. JOHNSON:  Let me -- just for the

18   record --

19   Q.    Do you need to consult with your attorney?

20   A.    Yes.

21   Q.    What I would like you to do before you consult

22   with your attorney is to try to answer the question as

23   best you can.  I'm happy to allow you to answer -- or to

24   consult with your lawyer, but I would like for you to

25   answer the question as best you can unless your attorney

                                                        101

**Deposition of Cynthia K. Derda**

1  in default on the loan?

2      A.    Yes.

3      Q.    And notwithstanding knowing that or

4  understanding that Ameriquest might take that position,

5  you are still choosing to make the payments to your

6  father, rather than to Ameriquest?

7      A.    Yes.

8      Q.    And is it your intent to continue making your

9  house payment -- Strike that.

10          Is it your intent to continue making payments

11  to your father rather than to Ameriquest?

12      A.    It's up to my attorney.

13      Q.    Now, there isn't any dispute, is there, that

14  Ameriquest paid all of the credit card debts that you

15  wanted it to pay?

16      A.    Yes, they did.

17      Q.    All right.  And there isn't any dispute, is

18  there, that Ameriquest paid Fairbanks 108,000 and

19  change, is there?

20      A.    108,223.

21      Q.    Is there's no dispute to that, is there?

22      A.    No.

23      Q.    And there isn't any dispute that Ameriquest

24  disbursed in excess of $4,000 in cash to you, is there?

25      A.    I wasn't told that.

                                                    104

**Deposition of Cynthia K. Derda**

1      A.    Correct.

2      Q.    -- in cash from Ameriquest?

3      A.    Yes.

4      Q.    So, the credit card payoffs aren't disputed,

5    the Fairbanks loan pay off in the amount of 108,223 is

6    not disputed, and the cash payment to you and your

7    husband is not disputed, right?

8      A.    The -- The payoff amount is -- was disputed.

9      Q.    I understand.  I'm just trying to make sure

10   you and I are understanding each other as to what

11   Ameriquest did pay, all right?

12     A.    I'm sorry.  Yes.

13     Q.    Okay.

14     A.    Yes.

15     Q.    So those three amounts we know were paid by

16   Ameriquest, right?

17     A.    Yes.

18     Q.    And as part of the loan transaction you and

19   your husband agreed that you were going to pay

20   Ameriquest back, correct?

21     A.    Correct.

22     Q.    And you're not doing that today, are you?

23     A.    No.

24     Q.    You certainly got a benefit from Ameriquest

25   paying off your credit cards, did you not?

106

## Deposition of Cynthia K. Derda

1    A.    Yes.

2    Q.    And you got a benefit from Ameriquest paying

3  off Fairbanks, did you not?

4    A.    Yes.

5    Q.    And you got a benefit from them paying you the

6  $4,700 and whatever change it was in cash, right?

7    A.    Yes.

8    Q.    And you used that $4,700?

9    A.    Yes.

10    Q.    All right.  Is all of that money gone?

11    A.    Yes.

12    Q.    What kinds of things did you use that money

13  for?

14    A.    Put towards our basement.

15    Q.    Okay.  Did you remodel your basement?

16    A.    We were -- We are in the process of trying to

17  get it completed.

18    Q.    What kinds of things have you already done in

19  the basement?

20    A.    Put up drywall, a new ceiling, carpeting,

21  painting.

22    Q.    Okay.

23    A.    That's what we have done now.  And new steps.

24    Q.    Okay.  And are you using the basement?

25    A.    Yes.

107

**Deposition of Cynthia K. Derda**

1      Q.    How much less did you receive in a cash

2    disbursement from Ameriquest than you expected, Ms.

3    Derda?

4      A.    5,300.

5      Q.    And since that time you have reached a

6    settlement with Fairbanks to pay you $3,000?

7      A.    Correct.

8      Q.    You may place Exhibit 13 aside.  I will hand

9    you what's been marked Exhibit 14, Bates numbered 73.

10           Exhibit 14 is titled Errors and Omissions

11    Compliance Agreement.  Do you see that?

12      A.    Yes.

13      Q.    Does that document contain your signature?

14      A.    Yes.

15      Q.    And the signature of your husband?

16      A.    Yes.

17      Q.    I assume this document was signed at closing

18    with a notary?

19      A.    Yes.

20      Q.    You may place that aside.  Let me hand you

21    what has been marked as Deposition Exhibit 15.  It's 79.

22           This document is entitled Uniform

23    Residential Loan Application.  Is that your document at

24    the bottom -- or your signature at the bottom of page

25    one?

                                                        115

**Deposition of Cynthia K. Derda**

1   she said, "Even if it did we can't do anything because we

2   don't have the payoff." And I said, "Well, yes, we do.

3   We just closed on the loan a week ago and I have

4   everything right here." And she said, "I'm going to have

5   to call Jeremy."

6       Q.    And she's referring to the Fairbanks payoff, I

7   take it?

8       A.    Yes.

9       Q.    So did you have just the one conversation with

10  Jeremy on the 19th in which he suggested that you call

11  the title company to see if the wire had come in?

12      A.    Right.

13      Q.    Then you had two conversations with the title

14  company?

15      A.    I believe I called them maybe twice, because he

16  said I could call them during the day to see if the

17  money's been wired, and it takes, you know, maybe an

18  hour, couple hours to get things completed.

19      Q.    So then you called him on the 20th, on

20  Thursday?

21      A.    He called me first on the 20th and he said that

22  the wire had come in, but he didn't have the payoff

23  amount, and they wouldn't disburse without the payoff

24  amount.

25      Q.    Okay. And then that's when you then had your

147

**Deposition of Cynthia K. Derda**

1   she said, "Even if it did we can't do anything because we

2   don't have the payoff." And I said, "Well, yes, we do.

3   We just closed on the loan a week ago and I have

4   everything right here." And she said, "I'm going to have

5   to call Jeremy."

6       Q.   And she's referring to the Fairbanks payoff, I

7   take it?

8       A.   Yes.

9       Q.   So did you have just the one conversation with

10  Jeremy on the 19th in which he suggested that you call

11  the title company to see if the wire had come in?

12      A.   Right.

13      Q.   Then you had two conversations with the title

14  company?

15      A.   I believe I called them maybe twice, because he

16  said I could call them during the day to see if the

17  money's been wired, and it takes, you know, maybe an

18  hour, couple hours to get things completed.

19      Q.   So then you called him on the 20th, on

20  Thursday?

21      A.   He called me first on the 20th and he said that

22  the wire had come in, but he didn't have the payoff

23  amount, and they wouldn't disburse without the payoff

24  amount.

25      Q.   Okay. And then that's when you then had your

                                                          147

**Deposition of Cynthia K. Derda**

1     A.    Nate.

2     Q.    And what is it that you recall he said in that

3 regard?

4     A.    I called the title company and I asked that if

5 I could speak with the person in charge with the -- the

6 Derda loan or basically whoever I needed to speak with,

7 and Nate got on the phone and I said, "Nate, this is

8 Cindy Derda, and I just talked to Jeremy.  He said he got

9 the payoff amount.  Do you have it?"  And he said, "Yes.

10 Wow, it came in at over 113,000."  He said, "This is

11 going to drop your cash amount down to 41."  And I said,

12 "Don't want to do anything.  I'm going to cancel this

13 loan, I am not going to go through with it."  And I told

14 him I was going to call Jeremy and I would call him back.

15     Q.    At this point in time did you understand that

16 the title company still had the funds that had been

17 wired to it?

18     A.    Well, I'm assuming, because they -- Jeremy said

19 that the funds were wired.

20     Q.    Right.  But when you told Nate you were going

21 to cancel the loan -- Strike that.

22     When you told Nate that you were going to

23 cancel the loan, did he suggest to you that any of the

24 funds had been disbursed?

25     A.    He did not make any comment.

150

## Deposition of Cynthia K. Derda

1       A.     Yes.

2       Q.     Right after?

3       A.     It was right after I hung up the phone.

4       Q.     What did you say to Jeremy?

5       A.     Well, it took me three times to get ahold of

6  him. They said he wasn't at his desk. Called back, he

7  still wasn't at his desk. Then I called and asked to

8  speak with the manager. He wasn't at his desk, so then

9  like two minutes later then Jeremy called me, and I said,

10  "Jeremy, my payoff amount came in at over $113,000. I am

11  not going through with this loan, I want to cancel." And

12  he said, "I know. I don't know why it's so high."

13  Should I just keep going what I said to him?

14       Q.     Sure.

15       A.     I told him, I said, "This is not fair. This

16  loan is costing me over $12,000." And I said, "If I

17  would have known the payoff amount was this high over a

18  week ago when we closed on the loan I would have never

19  gone through with this loan. It's not fair." And he

20  said, "You cannot cancel this loan, because your three-

21  day recision is over and the money has already been

22  wired, it's done. There's absolutely nothing I can do."

23  He kept saying, "I'm sorry, there's nothing I can do." I

24  said, "This isn't fair. My husband and I want to cancel

25  this loan." He said, "You are going to have to call

                                                    152

1      Q.    At this point you hadn't received the cash out
2 on the loan?
3      A.    Yes, we received it on Friday.
4      Q.    Oh, you did. Okay.
5      A.    When I went to the title company.
6      Q.    We will get back to then, all right?
7      A.    Okay.
8      Q.    Because we haven't talked about that. When
9 you were talking with Ameriquest you already had your
10 cash in hand?
11      A.    Yeah, I told her I could give it back.
12      Q.    All right. The problem is that you went
13 uh-huh.
14      A.    I'm sorry.
15      Q.    That's okay. It's me just rushing you, I'm
16 sorry.
17      A.    She asked me if I had mailed the checks to the
18 charge card people, and I said yes. I said, "Jeremy told
19 me the money had already been wired, there was nothing we
20 could do." I said, "But I could get the money back."
21      Q.    You could get the money back from who?
22      A.    I would have gone to my dad and he would have
23 gladly given it to me.
24      Q.    Your father would have given you what money
25 back?

159

**Deposition of Cynthia K. Derda**

1    A.    The charge card amount.

2    Q.    Okay.  Just so that we are straight, you got

3    the charge card payoffs on November 21 on Friday?

4    A.    Yes.

5    Q.    They were in the form of separate checks?

6    A.    Yes, I have them here.

7    Q.    Okay.  And those were checks for each of the

8    charge card accounts shown on lines 1501 through 1515 on

9    Exhibit 17, except for 1503?  That wasn't a very good

10   question, but --

11   A.    Well, when I got to the title company some of

12   the charge card amounts was wrong.

13   Q.    Because you had made payments?

14   A.    I'm sorry.  I didn't understand.

15   Q.    Because you had made payments in the interim;

16   is that what you are --

17   A.    Yes, and settlement amount that they had faxed

18   Jeremy.

19   Q.    Okay.  But the -- The point of my question

20   wasn't to verify that the numbers were right, but is

21   your testimony that you received separate checks for

22   payment to First Premier Bank and to Target --

23   A.    Yes.

24   Q.    -- and to Providian and you received all those

25   on Friday, the 21st?

160

## Deposition of Cynthia K. Derda

1    A.    Yes.

2    Q.    You received a check payable to yourself and

3  Mr. Derda?

4    A.    Yes.

5    Q.    That was in the amount of what?

6    A.    There was two, because Nate had to redo them.

7    Q.    4,100 on one?

8    A.    Then plus the difference in the errors in the

9  charge cards.

10    Q.    Do you have those two figures in your file?

11    A.    Uh-huh.

12    Q.    Could you just tell me what those figures are

13  so I stop using inaccurate numbers?

14    A.    954.

15    Q.    $954?

16    A.    Uh-huh.  And $4,159.

17    Q.    $4,159?

18    A.    Yes.

19    Q.    Those were the two payments to you and Mr.

20  Derda?

21    A.    Yes.

22    Q.    All right.  Can you go through those stack of

23  check stubs you have, identify the payee and the amount

24  on each one of those.

25    A.    Oral Maxillof.

161

**Deposition of Cynthia K. Derda**

1     A.     That's when I said, "Jeremy, I want to cancel
2  this loan."
3     Q.     All right.
4     A.     And we had that conversation.  Then I called
5  Nate back, and I said, "Nate, Jeremy said that I cannot
6  cancel this loan."
7     Q.     Okay.
8     A.     And he said that he would get the checks ready.
9  And I said, "Well, I guess I have no choice."
10    Q.     Now, one of the allegations in your complaint
11 is that you allege that Nate had a responsibility to
12 tell you that you could cancel the loan.  What do you --
13 What do you mean by that statement?
14    A.     I believe that there's laws and procedures
15 against things like this, you know, coming up.  And when
16 I told him that Jeremy said that I could not cancel the
17 loan, I feel that he should have gone to a supervisor or
18 -- there's got to be a lawful procedure for them to
19 follow when there's such a difference in the -- I feel
20 that he should have gone to his supervisor or called
21 Jeremy and said, you know --
22    Q.     Okay.  To your knowledge, did Northwest Title
23 have any control over procedures within Ameriquest?
24    A.     I don't know the laws on that.
25    Q.     Okay.

                                                        188