# **Exhibit A**

COPY

## Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

In Re AMERIQUEST MORTGAGE      )
COMPANY MORTGAGE LENDING       )
PRACTICES LITIGATION,          )    MDL No. 1715
_____)    05-CV-07097

VIDEOTAPED DEPOSITION OF WAYNE A. LEE
Santa Ana, California
Wednesday, May 9, 2007
Volume I

Reported by:
SHERYL HILTON MEYER
CSR No. 2852
JOB No. 637414

1   APPEARANCES:
2
3   For Plaintiff:
4     JAMES, HOYER, NEWCOMBER & SMILJANICH
      BY: JILL BOWMAN
5     Attorney at Law
      One Urban Center, Suite 550
6     4830 West Kentucky Boulevard
      Tampa, Florida 33609
7     (813) 286-4100
      e-mail: jbowman@jameshoyer.com
8
      LAW OFFICES OF DANIEL HARRIS
9     BY: DANIEL HARRIS
      Attorney at Law
10    150 North Wacker Drive, Suite 300
      Chicago, Illinois 60606
11    (312) 960-1802
12  For Defendant Ameriquest:
13    BUCHALTER NEMER FIELDS & YOUNGER
      BY: BERNARD E. LeSAGE
14    Attorney at Law
      1000 Wilshire Boulevard, Suite 1500
15    Los Angeles, California 90017
      (213) 891-0700
16
    For Defendant Argent:
17
      WINSTON & STRAWN
18    BY: THOMAS J. WIEGAND
      Attorney at Law
19    35 West Wacker
      Chicago, Illinois 60601
20    (312) 558-5600
21  Also Present Telephonically:
22    JEAN JANES, ESQ.
      EVAN KAUFMAN, ESQ.
23    GARY KLEIN, ESQ.
      SHENNAN KAVANAUGH, ESQ.
24    AL HOFELD, ESQ.
25

## Page 2

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF ILLINOIS
3
4   In Re AMERIQUEST MORTGAGE      )
     COMPANY MORTGAGE LENDING       )
5    PRACTICES LITIGATION,          )    MDL No. 1715
     _____)    05-CV-07097
6
7
8
9
10
11
12
13
14
15       Videotaped Deposition of WAYNE A. LEE,
16   Volume 1, taken on behalf of Plaintiffs
17   at 2850 Red Hill Avenue, Suite 120, Santa
18   Ana, California, beginning at 9:00 a.m.
19   and ending at 4:29 p.m. on Wednesday, May 9,
20   2007, before SHERYL HILTON MEYER, Certified
21   Shorthand Reporter No. 2852.
22
23
24
25

## Page 4

1   APPEARANCES (Continued):
2   Videographer:
3       DANIEL REYNOLDS
        ESQUIRE DEPOSITION SERVICES
4       2850 Red Hill Avenue, Suite 120
        Santa Ana, California 92705
5       (800) 640-2461
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              INDEX
 2  WITNESS                    EXAMINATION
 3  WAYNE A. LEE
    Volume 1
 4
 5        BY MS. BOWMAN              7
 6
 7
 8            EXHIBITS
 9  PLAINTIFFS'                    PAGE
10  EX 1   Complaint by Wayne A. Lee against      20
           Ameriquest Capital Corporation; 12 pages
11
    EX 2   Consulting Agreement between American   57
12         Capital Corporation and Wayne A. Lee;
           8 pages
13
14
15       INSTRUCTION NOT TO ANSWER
16            Page     Line
17            203      6
18
19
20
21
22
23
24
25
                  Page 5
```

```
 1        Santa Ana, California - Wednesday, May 9, 2007
 2              9:00 a.m. - 4:29 p.m.
 3
 4       THE VIDEOGRAPHER:  Good morning.  This begins
 5  videotape tape 1, Volume 1, in the deposition of Wayne
 6  Lee in the matter of In Re Ameriquest Mortgage Company
 7  in the United States District Court, Northern District of
 8  Illinois.  The case number is MDL 1715.
 9       Today's date is May 9, 2007.  The time on the
10  video monitor is now 9:01 a.m.  This deposition is taking
11  place at 2850 Red Hill Avenue in Santa Ana, California
12  and was made at the request of Jill Bowman of the Law
13  Offices of James, Hoyer, Newcomber & Smiljanich.  My
14  name is Daniel Reynolds.  I'm a notary public and video
15  specialist here on behalf of Esquire Deposition Services
16  Santa Ana with the court reporter Sheryl Hilton Meyer.
17       Would all counsel present please voice identify
18  yourselves and state whom you represent.
19       MR. LeSAGE:  Bernard LeSage of the Buchalter
20  firm representing the Ameriquest defendants.
21       MR. WIEGAND:  Tom Wiegand on behalf of Argent
22  Mortgage Company.
23       MS. BOWMAN:  Jill Bowman here with the co-lead
24  counsel in the class litigation against Ameriquest.
25       MR. HARRIS:  Daniel Harris representing various
                  Page 6
```

```
 1  individual plaintiffs.
 2       THE VIDEOGRAPHER:  And by telephone.
 3       MR. KLEIN:  Gary Klein and Shennan Kavanaugh,
 4  co-lead counsel in the Ameriquest class cases.
 5       MR. KAUFMAN:  Evan Kaufman, and I represent
 6  plaintiff the MDL class cases as well as plaintiff
 7  Leonardo Valdez in the California state case.
 8       MR. HOFELD:  Al Hofeld for various individual
 9  plaintiffs.
10       THE REPORTER:  I'm sorry, first name?
11       MR. HOFELD:  Al, A-l, Hofeld, H-o-f-e-l-d, for
12  various individual plaintiffs.
13       THE REPORTER:  Thank you.
14       THE VIDEOGRAPHER:  Do we have all appearances?
15  Thank you.  Would the court reporter please administer
16  the oath.
17       MS. JANES:  Excuse me.  I'm sorry.  I'm Jean
18  Janes for Argent in some of the individual cases.
19
20            WAYNE A. LEE,
21  having been first duly sworn, was examined and testified
22  as follows:
23
24            EXAMINATION
25  BY MS. BOWMAN:
                  Page 7
```

```
 1       Q   Good morning.  Could you state your name.
 2       A   Wayne Lee.
 3       Q   And, Mr. Lee, have you ever given a deposition
 4  before?
 5       A   Yes.
 6       Q   Was that previously deposed in a case against
 7  Ameriquest?
 8       A   I'm not sure.  It was years ago.  I'm not
 9  exactly sure.
10       Q   I apologize.  I think you're going to have to
11  speak up just so the people on the phone can hear you.
12       A   Okay.  Yeah, I don't recall which company it
13  was.
14       Q   Okay.  And have you ever been deposed in any
15  case filed against Argent?
16       A   No.
17       Q   I'm going to be asking you questions today.
18  Can we agree if you don't understand my questions that
19  you will let me know that?  Otherwise I'm going to assume
20  that you will — you understand them.  Is that all right?
21       A   Okay.
22       Q   Okay.  And you understand that you're under
23  oath today like you would be in a courtroom?
24       A   Yes.
25       Q   You're here today being represented by whom?
                  Page 8
```

**Page 9**

```
 1        MR. WIEGAND:  Tom Wiegand and Bernie LeSage.
 2   We made appearances earlier.
 3        MS. BOWMAN:  Okay.
 4     Q    And are they representing you in your personal
 5   capacity?
 6     A    No.
 7     Q    Are they representing you as a former employee
 8   of Argent Mortgage and the Ameriquest entities?
 9     A    Yes.
10     Q    Can you tell me are you currently --
11     A    Huh?
12        MR. LeSAGE:  We also represent you in your
13   individual capacity.
14        THE WITNESS:  Oh, okay.  So --
15        MR. LeSAGE:  I think --
16        THE WITNESS:  To be clarified.
17        MR. LeSAGE:  He's aware of the legal
18   distinctions here, but we're representing him in all
19   capacities.
20        MS. BOWMAN:  All right.
21     Q    Are you currently employed by America Capital
22   Corporation?
23     A    No.
24     Q    Are you currently employed by ACC Capital
25   Holdings?
```

**Page 10**

```
 1     A    No.
 2     Q    Are you currently employed by Ameriquest
 3   Mortgage Company?
 4     A    No.
 5     Q    Are you currently employed by Argent Mortgage
 6   Company?
 7     A    No.
 8     Q    Are you currently employed by any Ameriquest
 9   entity?
10     A    No.
11     Q    Do you have any kind of employment arrangement
12   with any of those entities such as a consulting
13   arrangement?
14     A    No.
15     Q    Could you just describe for me kind of the
16   hierarchy of the Ameriquest companies and how they fall
17   into the Ameriquest family.
18        MR. WIEGAND:  Objection.  I mean at least if we
19   can try to narrow it, put maybe a time frame on it and
20   talk about which company.  I don't know if you're talking
21   about the people in the company, the relation between
22   them --
23        MS. BOWMAN:  I'm just talking the hierarchy of
24   the companies.
25        MR. LeSAGE:  Today?  The question is when?
```

**Page 11**

```
 1   Otherwise it's vague and ambiguous, and I'll instruct him
 2   not to answer.  Please tell us when.
 3        MS. BOWMAN:  All right.
 4     Q    What's your understanding of the hierarchy of
 5   the companies today?
 6     A    I have no idea.
 7     Q    Okay.  The last time that you were employed by
 8   Ameriquest, what was your position?
 9     A    Chief executive officer of ACCCH.
10     Q    That's ACC Capital Holdings?
11     A    Ameriquest -- it's been a couple of years, so
12   ACCCH was Capital Holdings, yes.
13     Q    Okay.  And how long were you in that position?
14     A    Oh, 11 months.
15     Q    Okay.  And when did you leave that position?
16     A    Early May '05.
17     Q    Going back to the 11-month time frame during
18   which you were employed by ACC Capital Holdings, which I
19   guess is June to May -- June '04 to May '05?
20     A    Yeah, I don't really recall the exact dates,
21   but it was around there.
22     Q    Okay.  Can you tell me then what the hierarchy
23   of the companies was at that point in time during that
24   period.
25     A    Yes.
```

**Page 12**

```
 1     Q    Okay.
 2     A    Okay.  There's ACCCH which I was the CEO of.
 3   Then subsidiaries of that was Ameriquest --
 4     Q    And by Ameriquest you mean Ameriquest Mortgage
 5   Company?
 6     A    Uh-huh, Argent Mortgage Company, AMC Mortgage
 7   Services.  Town and Country Credit, I believe, rolled up
 8   to it.
 9     Q    Where did Ameriquest Mortgage Securities fit in
10   during that time frame?
11     A    I don't recall if it was rolled up to ACCCH or
12   not.
13     Q    And was ACCCH a wholly owned subsidiary of
14   Ameriquest Capital Corporation?
15     A    My understanding it was, but I wasn't preview
16   (sic) to the structure above the ACCCH level at all.
17     Q    Okay.  During your tenure as the CEO of the ACC
18   Capital Holdings can you tell me what positions Roland
19   Arnall held in the various entities?
20     A    In the rolled down -- the ones that rolled up
21   to ACCCH?
22     Q    No, starting with ACC Capital.
23     A    I don't know what his official title was.
24   Again I wasn't preview to the legal documents in the
25   structure at that level.
```

3 (Pages 9 to 12)

1  Q   Okay.  What about the other companies that
2  rolled up to ACCCH?
3  A   He didn't have any positions within those
4  companies.
5  Q   All right.  Now prior to June or thereabouts of
6  2004 you were the president of Argent Mortgage; is that
7  correct?
8  MR. WIEGAND:  Could you repeat the question?
9  THE WITNESS:  Yeah, repeat it.  The dates is
10 what I'm --
11 BY MS. BOWMAN:
12 Q   Prior to you becoming the CEO of ACCCH, you
13 were the president of Argent Mortgage; is that correct?
14 A   Prior to that, yeah.
15 Q   Okay.  And for what period of time were you the
16 president of Argent Mortgage?
17 A   I don't know the exact dates.  I was given the
18 title of president at Argent, I'm guessing, around two
19 years prior to me getting the CEO job so '03-ish, '02,
20 '03-ish range.  I don't remember the exact dates.
21 Q   And did you have a position in the -- with any
22 of the Ameriquest affiliates prior to becoming the
23 president of Argent Mortgage?
24 A   Prior to that, yeah.  I mean --
25 Q   What?

Page 13

1  A   Wholesale was part of Ameriquest Mortgage prior
2  to it being named Argent, so technically, yes.
3  Q   And what was your position in the Ameriquest
4  entities prior to becoming --
5  A   Senior executive vice president.
6  Q   And what entity was that?
7  A   Wholesale division, a newly formed wholesale
8  division.
9  Q   Of Ameriquest Mortgage Company?
10 A   Yes.
11 Q   And how long were you in that position?
12 A   Since January -- I'm pretty sure of this
13 date -- January 5th, '01 is when I officially took over
14 the capacity of running the startup wholesale company.
15 Q   And then at some point in time it was
16 separately incorporated into Argent Mortgage Company?
17 A   Yes.
18 Q   Okay.
19 A   And I'm not familiar with what date that was.
20 I just don't recall, but it's out there somewhere.
21 Q   Can you tell me if you had any position in the
22 Ameriquest companies prior to January 5th of 2001?
23 A   Yes.
24 Q   What was that?
25 A   I was a senior executive vice president at

Page 14

1  Ameriquest prior to going into the wholesale business.
2  Q   And how long were you in that position?
3  A   Again we're talking about titles, right?
4  Q   Sure.
5  A   So the exact title of senior executive vice
6  president, I'm not exactly sure, but I was an executive
7  with the company, and I joined the organizations back in
8  1990.
9  Q   Okay.
10 A   Okay.  And the reason I -- it's been many
11 names, okay, and many different corporate structures, so
12 I -- you know, and I had many, many titles throughout the
13 course of that period of time.
14 Q   During --
15 A   And I don't remember exactly which title I had
16 when and when I got promoted and that kind of stuff.
17 Q   Sure.
18 A   Okay.
19 Q   Maybe you can just kind of describe to me then
20 the progression of your responsibilities in those various
21 positions starting with your position as senior executive
22 vice president of Ameriquest.
23 MR. WIEGAND:  You said "progression."  Do you
24 want him to go backwards or forwards?
25 MS. BOWMAN:  Backwards.

Page 15

1  MR. WIEGAND:  Okay.
2  THE WITNESS:  Backwards.  Okay.  I ran the
3  sales group and the operations group.
4  BY MS. BOWMAN:
5  Q   And that was from prior to January 5th of 2001
6  back to what time?
7  A   Again I don't even recall if -- because there's
8  these different -- there's senior executive.  There's
9  executive vice president.  There's senior vice president.
10 There's vice president, and I held all these in different
11 capacities, and I'm not -- I don't recall if it's
12 technically a senior versus not, okay?  So maybe I'll
13 just do the description and -- because I don't remember
14 if that particular job was a senior or --
15 Q   Sure.
16 A   -- an executive senior or senior executive.  I
17 don't remember.
18 Q   Why don't you just tell me for how long you
19 ran --
20 A   I ran sales and operations for six to seven
21 months preceding my going to wholesale.
22 Q   Okay.  And what did you do before that?
23 A   I ran just the sales for Ameriquest, the sales,
24 not operations, sales.  And the exact time frame I'm not
25 sure.  I'll say a year, for maybe a year or maybe less

Page 16

4 (Pages 13 to 16)

1 just running sales.
2    Q   All right.  Back into the 1999 time frame?
3    A   Yeah.
4    Q   And what did you do prior to that?
5    A   I was a regional sales manager, yeah.
6    Q   And where were you located as a regional sales
7 manager?
8    A   Here, Southern California.
9    Q   Okay.  How long were you a regional sales
10 manager?
11    A   I don't recall honestly.  Technically I don't
12 know.  I'm guessing.
13    Q   Did you hold any positions prior to regional
14 sales manager --
15    A   Sure.
16    Q   -- with the company?
17    A   Sure.
18    Q   What were those?
19    A   Yeah.  It's the timing of this is too long ago.
20 I was a regional.  I was a senior vice president of
21 operations at one juncture, and again I have no -- I
22 don't remember the time frames.  I can give you like give
23 or take a two- or three-year period, right?  I was a vice
24 president on a different juncture of operations.  I was
25 an area sales manager for the company Ameriquest.

Page 17

1    Q   Okay.
2    A   I was a regional -- see, it's kind of coming
3 back to me.  It wasn't regional.  There's an area,
4 there's a regional, and there's a divisional.  So that
5 last one that I mentioned in '99 it's a divisional.
6    Q   Okay.
7    A   These titles I haven't thought about in years.
8 So let me -- those are basically the titles that I had,
9 and you could logically presume the progression.  I can't
10 give you the years.  I just don't recall.
11    Q   Okay.
12    A   You know what I mean --
13    Q   Sure.
14    A   -- how long and that type stuff.
15    Q   Once you -- in May of 2005 you left the
16 Ameriquest organization?
17    A   Yes.
18    Q   And how did that come about?
19    A   Me and Mr. Arnall had competing visions where
20 we thought we should go.
21    Q   Okay.  And what was his involvement with you
22 during that time frame when you were the CEO of ACC
23 Capital Holdings in talking to you about the vision for
24 the company?  What role was he playing?
25    A   Chairman of the board.

Page 18

1    Q   Chairman of the board of ACC Capital?
2    A   Yeah.
3    Q   Did you resign from your position at
4 Ameriquest?
5    A   Yes.
6    Q   And in the early part of this year you filed a
7 lawsuit against Ameriquest for breach of a subsequent
8 consulting agreement; is that correct?
9    A   Correct.
10    Q   You entered into a consulting agreement with
11 Ameriquest after your resignation in summer of 2005 --
12    A   Un-huh.
13    Q   -- and that was for a five-year term; is that
14 right?
15    A   Correct.
16    Q   And the initial payout of that consulting
17 agreement was $20 million.
18    A   Correct.
19    Q   And then there was supposed to be $6 million
20 installments over the next five years; is that right?
21    A   Yeah.
22    Q   Okay.
23         MR. LeSAGE:  Do you have extra copies?
24         MS. BOWMAN:  Yeah.  It's the complaint.
25         MR. HARRIS:  Do you have copies for me?

Page 19

1         MS. BOWMAN:  I don't think so.  I don't know if
2 I have another one or no.
3         MR. HARRIS:  Thank you.
4         THE REPORTER:  Exhibit 1.
5         MS. BOWMAN:  Yes, thank you.
6         (Plaintiffs' Exhibit 1 was marked for
7         identification by the court reporter.)
8 BY MS. BOWMAN:
9    Q   Mr. Lee, I'm going to hand you what I've marked
10 as Plaintiffs' Exhibit 1, and can you tell me is this
11 your complaint filed against Ameriquest Capital
12 Corporation in January of this year?
13    A   Give me a second.  Appears to be.
14    Q   Okay.  And this was the complaint that was for
15 the breach of the consulting agreement you entered into
16 with ACC Capital --
17    A   Uh-huh.
18    Q   -- following your resignation as chief
19 executive officer; is that correct?
20    A   Correct.
21    Q   Okay.  Here it says -- I'm going to talk about
22 some of the allegations --
23    A   Okay.
24    Q   -- that you were the president of Argent
25 Mortgage between 2001 and 2004; is that incorrect?

Page 20

5 (Pages 17 to 20)

1   A   I — yeah, I — I guess technically I've got to
2   know when exactly the date was that I was given the title
3   of president and when Argent was founded, but technically
4   speaking I ran the company since its infancy which was
5   2001 and acted as president —
6   Q   Okay.
7   A   — the head of it, whatever.
8   Q   When you're talking about the company, you're
9   talking about the wholesale lending business of
10  Ameriquest?
11  A   The wholesale lending business of Ameriquest
12  which was a separate division and then ultimately became
13  a company, and I'm not exactly sure on the legal
14  structure even when it was a separate division.
15  Q   Now the allegations of your complaint in
16  paragraph 1 talk about in this time frame when you were
17  president of Argent 2001 to 2004 or thereabouts —
18      MR. WIEGAND:  Counsel, I mean he did testify
19  earlier he thought Argent didn't come into existence
20  until, I think he said, '02 or '03.  Records will show
21  whatever it is and —
22      MS. BOWMAN:  That's fine.
23      MR. WIEGAND:  — he's tried to clarify — I
24  guess as long as I can kind of have a standing objection
25  that he isn't agreeing that in 2001 he's the president of
                    Page 21

1   Argent because technically that entity didn't exist.
2       THE WITNESS:  Yeah, my misstatement legally or
3   structurally would be in this complaint.  It wouldn't be
4   in my testimony earlier.
5   BY MS. BOWMAN:
6   Q   Okay.  During this — during that time frame
7   though when you were operating the wholesale business,
8   whether it was Ameriquest or Argent —
9   A   Right.
10  Q   — you came to understand that there had been
11  allegations against Ameriquest Mortgage Company of
12  corruption and financial improprieties; is that correct?
13      MR. WIEGAND:  Counsel, are you —
14      THE WITNESS:  That is not correct.
15  BY MS. BOWMAN:
16  Q   I'm referring to your allegation in paragraph 1
17  Ameriquest Mortgage Company was plagued with allegations
18  of corruption and financial improprieties.
19      MR. LeSAGE:  I would just object for the record
20  to the characterization of "your complaint."  This was
21  filed by a law firm on his behalf.
22  BY MS. BOWMAN:
23  Q   Mr. Lee —
24  A   No.  No.  I learned of the multi-state lawsuit
25  which is referenced in this document after I became CEO,
                    Page 22

1   not during my time at Argent.
2   Q   Okay.  And when you are talking about the
3   multi-state lawsuit, are you talking about the
4   investigation by the Attorneys General?
5   A   Yeah, the allegations and the investigation.
6   Q   Okay.  When you were operating Argent or the
7   wholesale side of the Ameriquest companies —
8   A   Uh-huh.
9   Q   — did you have any occasion to become aware of
10  any allegations of corruption or financial improprieties
11  at Ameriquest?
12  A   It would be hearsay.  No, I didn't have the
13  opportunity.
14  Q   Can you tell me how — from an operational
15  perspective was Argent actually separately like in a
16  separate building from Ameriquest?
17  A   Not in the early days.
18  Q   Okay.  Why don't you tell me how that
19  progression came about from —
20  A   And again —
21  Q   — 2001.
22  A   — the actual dates are very vague.
23  Q   Sure.  You just need to let me finish my
24  question so we're not talking over each other for —
25  A   Okay.
                    Page 23

1   Q   — the court reporter.  Just beginning in
2   2001 if you could tell me what the proximity was of your
3   location in the wholesale business and the operations of
4   Ameriquest Mortgage Company.
5   A   The operations were always separate.
6   Q   Were they located in the same building?
7   A   In the early days, yes.
8   Q   And what happened after that?
9   A   Moved to our own location.
10  Q   As the — was that after the company was
11  separately incorporated to your knowledge?
12  A   No, I believe it would have been before, but
13  again I don't remember.
14  Q   Okay.  During that time when you were working
15  in the wholesale business and then became the president
16  of Argent Mortgage, were you reporting directly to Roland
17  Arnall?
18  A   No.
19  Q   Who were you reporting to?
20  A   Kirk Langs in corporate structure.
21  Q   Okay.  What was Mr. Langs' position?
22  A   CEO, of what legal entity I'm not exactly sure.
23  I didn't have access to it.
24  Q   Did Mr. Langs report to Mr. Arnall?
25  A   My understanding —
                    Page 24

6 (Pages 21 to 24)

**Page 25**

```
1    Q   Yes.
2    A   -- is the CEO would report to a board member,
3  but I don't know.  I don't have access to the legal
4  structures, and -- above me at that time.
5    Q   I'm not talking about as a legal reporting
6  matter, but I'm talking about in terms of decision-making
7  and operations, was Mr. Langs talking to Mr. Arnall?
8        MR. WIEGAND:  Objection.
9        MR. LeSAGE:  As defined vague and ambiguous as
10 to time.
11 BY MS. BOWMAN:
12   Q   We're still in the time frame when you were the
13 president of Argent.
14   A   Which was an independently run company in a
15 different building so --
16   Q   Okay.
17       MR. WIEGAND:  And --
18 BY MS. BOWMAN:
19   Q   So you don't know whether Mr. Langs at that
20 time was reporting to Mr. Arnall?
21   A   I already stated I believed he did.  You know,
22 technically I believed he did.  Like a CEO reports to a
23 chairman of a board or has -- that's all I can really
24 tell you.
25   Q   Okay.  Now in mid-2004 you were invited to
```

**Page 26**

```
1  become the chief executive officer of ACC Capital
2  Holdings; is that correct?
3    A   Yes.
4    Q   Okay.  Can you tell me how that came about?
5    A   Mr. Arnall approached me and asked me if I
6  would consider it.
7    Q   Did you understand at that time from a
8  management and operational standpoint you would taking
9  over from Mr. Langs?
10   A   Yeah.
11   Q   And what was -- what happened to Mr. Langs?
12   A   I don't know.
13   Q   Did he resign?
14   A   I don't know.
15   Q   Was he still with the companies after you
16 became CEO?
17   A   No.
18   Q   Did you ever have any conversations with
19 Mr. Langs during the time period where you were
20 considering Mr. Arnall's inquiry about you becoming the
21 chief executive officer?
22   A   Conversations about what?  I mean could I have
23 said "Hi," yeah.
24   Q   Conversations about what the job entailed.
25   A   No.
```

**Page 27**

```
1    Q   Conversations about the -- any of the lawsuits
2  or allegations against Ameriquest?
3    A   No.
4    Q   Did you have any of those conversations with
5  Mr. Arnall?
6    A   No.  Well, I take that back.  About what the
7  job entailed?  Yes.  About lawsuits?  No.
8    Q   Okay.
9    A   Of course we had conversations about kind of
10 what the scope of the job was.
11   Q   Uh-huh.  Now as chief executive officer of ACC
12 Holdings, it was your understanding that you were going
13 to be responsible for the first time for both the
14 operations of Ameriquest Mortgage Company and Argent
15 Mortgage Company; is that correct?
16   A   Correct.
17   Q   And was there an existing president of
18 Ameriquest Mortgage Company when you took over as CEO?
19   A   By title, no.  I don't believe so, but again I
20 didn't look at the legal titles of everybody when I was
21 there.  When I assumed it, it didn't have a president --
22   Q   Okay.
23   A   -- or Kirk may have been acting as the
24 president and CEO.  I don't know.
25   Q   And did somebody replace you at Argent?
```

**Page 28**

```
1    A   In the capacity of president?
2    Q   Yes.
3    A   No.
4    Q   Did somebody take over your day-to-day
5  responsibilities at Argent?
6    A   They maintained day-to-day responsibilities
7  that they had, and I maintained the responsibilities of a
8  president at Argent.
9    Q   Okay.  Even in your position as CEO.
10   A   Yes.
11   Q   In paragraph 3 of the allegations of your
12 complaint -- actually let's go -- I'm sorry.  If you
13 could turn to page 5 of the complaint --
14   A   Page 5?
15   Q   Yes.
16   A   Okay.
17   Q   Now just to clarify in my own mind, Mr. Lee,
18 are you saying this prior to accepting the position of
19 CEO at ACC Capital Holdings you were unaware of any
20 allegations of impropriety against the Ameriquest
21 Mortgage Company?
22   A   I had no direct knowledge of any improprieties.
23 Speculation.
24   Q   You are aware of the AG investigation?
25   A   I was not aware of the AG investigation.
```

Esquire Deposition Services
800.640.2461

1  Q  Prior to becoming CEO you were not?
2  A  Huh-uh.
3  Q  So what was the basis of your awareness or
4  understanding at that time when you were considering
5  becoming CEO?
6        MR. WIEGAND: Objection --
7        THE WITNESS: Clarification.
8        MR. WIEGAND: -- misstates testimony.
9        THE WITNESS: What was my understanding of
10  what?
11  BY MS. BOWMAN:
12  Q  Of what, if any, allegations of improprieties
13  were -- had been made against Ameriquest Mortgage
14  Company.
15  A  That's speculation. I mean that's hearsay.
16  Q  Yes. I'm wanting to know what the origin of
17  the hearsay was.
18  A  I don't recall. I mean you're talking years
19  ago.
20  Q  In paragraph 15 of the complaint on page 5
21  you allege that you sought and received assurances from
22  Mr. Arnall that you would have the authority to make
23  crucial decisions and changes necessary to fix operations
24  across the affiliated companies. Do you see that?
25  A  Uh-huh.

Page 29

1  Q  Okay. What were those operational changes that
2  you sought assurances about?
3  A  Okay. Number one, hiring and firing decisions
4  with regards to key executives. You want to have control
5  over that as a CEO. The legal structure in the future
6  vision of how we're going to operate these individual
7  companies on an ongoing basis. And day-to-day decisions
8  on changes that need to be made within a company and/or
9  companies, typical.
10  Q  Okay. At any time that you took over as CEO,
11  did you come to understand that Ameriquest was facing a
12  multi-state investigation by the Attorney Generals
13  regarding their lending practices?
14  A  Subsequent to me becoming CEO, sure.
15  Q  Sure.
16  A  Yeah.
17  Q  And what was your involvement in those
18  inquiries?
19        MR. WIEGAND: Objection.
20  You can answer if you understand.
21        MR. LeSAGE: If you understand the time.
22  Objection. It's vague and ambiguous as to time.
23        MS. BOWMAN: We're talking about when he --
24        THE WITNESS: My bigger question is -- I
25  understand we're -- I'm under the impression we're

Page 30

1  talking about the time after I became CEO.
2  BY MS. BOWMAN:
3  Q  That's correct.
4  A  Okay. But involvement, I mean that's very
5  broad to me. Explain -- define the question.
6  Q  Did you participate in the investigation that
7  was being conducted by the Attorney Generals?
8        MR. WIEGAND: Objection. Did he --
9        THE WITNESS: Did I --
10  BY MS. BOWMAN:
11  Q  Did you participate in them?
12  A  Did I have conversation with the Attorney
13  Generals?
14  Q  Yes.
15  A  Yes.
16  Q  Who was involved on behalf of the Ameriquest
17  Mortgage Company and its affiliates in communicating with
18  the Attorney Generals during that investigation other
19  than yourself?
20  A  Primarily legal, the legal departments, legal
21  staff. There's a lot of people in the legal staff.
22  Outside counsel.
23  Q  Who else from an operational standpoint was
24  involved?
25  A  Define involved for me because I'm struggling

Page 31

1  with that --
2  Q  Sure.
3  A  -- that particular word.
4  Q  People that were obtaining information that
5  was requested by the Attorney Generals, people that were
6  communicating information to them.
7  A  Numerous.
8        MR. WIEGAND: Objection.
9        THE WITNESS: Yeah, I -- numerous people would
10  be gathering information because the information
11  requested was very broad --
12  BY MS. BOWMAN:
13  Q  Okay.
14  A  -- as I recall. So I couldn't even tell you
15  all the people that might be involved gathering
16  information.
17  Q  In the complaint at paragraph 16 you describe
18  in the ensuing months contrary to his prior assurances
19  before you became CEO Roland Arnall repeatedly blocked
20  your attempts to implement cost and operational reforms
21  across the affiliated companies. Do you see that?
22  A  Uh-huh.
23  Q  Can you describe for me what costs and
24  operational reforms were blocked by Mr. Arnall?
25  A  Sure. An example, the corporation was

Page 32

8 (Pages 29 to 32)

| | |
|---|---|
| 1 structured with a large shared services group, and many<br>2 of the services were provided to the business entities<br>3 in a shared services environment.<br>4     Q  Uh-huh.<br>5     A  I wanted to take the large, as I described,<br>6 bureaucratic group and push them down into the businesses<br>7 so they weren't shared services anymore. I believe that<br>8 would have gave greater control and accountability at the<br>9 business head level, much better cost control and<br>10 ultimate accountability with the people that were making<br>11 the requests to begin with.<br>12     Q  But what was the entity that was providing the<br>13 services to the various companies?<br>14     A  It's not an entity. It's like we have a legal<br>15 department, and all the companies use that legal, one<br>16 legal department. It's just an example.<br>17     Q  Okay. When you're talking about the services<br>18 group, was that a services group that was a part of the<br>19 of ACC Capital Holdings that was then providing services<br>20 to the mortgage lending subsidiaries?<br>21     A  I don't recall if it was technically in ACC<br>22 Capital Holdings or in ACC from a, you know, where did<br>23 they -- what cost centers are they in. I'm saying as an<br>24 operational function there were shared services, and they<br>25 weren't necessarily in the businesses where I wanted<br>Page 33 | 1 supervisory authority over the processing loan<br>2 coordinators --<br>3     A  Uh-huh.<br>4     Q  -- right?<br>5     A  Yes.<br>6     Q  And that's the structure that you attempted to<br>7 change at that time when you became CEO.<br>8     A  Correct.<br>9     Q  And it was blocked by Mr. Arnall?<br>10     A  It was -- I don't know if you'd describe it as<br>11 a block as much as maybe, you know, he was concerned<br>12 about the timing of it.<br>13     Q  And one of the concerns, Mr. Lee, wasn't it,<br>14 that the managers, the sales managers should not be<br>15 supervising those people, the loan coordinators, who were<br>16 processing and approving the loans as a result of the<br>17 potential for undue influence over those processing<br>18 employees?<br>19     MR. WIEGAND: Objection.<br>20     THE WITNESS: The appearance of impropriety is<br>21 more likely in that scenario.<br>22 BY MS. BOWMAN:<br>23     Q  Did you have any information at that time<br>24 when you became the CEO of Ameriquest that there were<br>25 allegations of impropriety against sales managers arising<br>Page 35 |
| 1 them. They shared legal and certain functions like that,<br>2 many IS functions.<br>3     Q  And that was across the companies including<br>4 Ameriquest, Argent and Town and Country?<br>5     A  Far less so on the Argent side.<br>6     Q  As far as the shared services?<br>7     A  Yes. And I had built many of the services and<br>8 built Argent very independent.<br>9     Q  Okay. What is the next cost and operational<br>10 reform that was blocked by Mr. Arnall?<br>11     A  I desired to separate the sales function from<br>12 a managerial structure within the branches at Ameriquest<br>13 and the processing functions in that branch, in the<br>14 branch, I wanted to put under separate management because<br>15 I believed it would -- I would gain enormous efficiency<br>16 when salespeople focus on what they do best, processing<br>17 people focus on what they do best.<br>18     Q  Okay. And that's the example that you describe<br>19 in paragraph 16 of the complaint?<br>20     MR. WIEGAND: Objection.<br>21     THE WITNESS: That's the process I described?<br>22 No. It's a structure.<br>23 BY MS. BOWMAN:<br>24     Q  Yeah. Okay. It's the structure that you<br>25 describe about the sales branch managers having<br>Page 34 | 1 out of this context that you thought that the separation<br>2 of those --<br>3     A  My objective --<br>4     MR. WIEGAND: Just a second. I'm waiting for<br>5 her to finish the question so I can object to it.<br>6     THE WITNESS: Okay.<br>7 BY MS. BOWMAN:<br>8     Q  Did you become aware of specific allegations<br>9 at that time when you became CEO against sales managers<br>10 unduly influencing processors or loan coordinators such<br>11 that you thought the appropriate remedy was to separate<br>12 their functions?<br>13     MR. WIEGAND: Objection.<br>14     THE WITNESS: Specific examples, no.<br>15 BY MS. BOWMAN:<br>16     Q  Did you ever make any inquiries as to whether<br>17 that structure of having the sales managers over the<br>18 loan, having supervisory authority over the loan<br>19 coordinators was in fact resulting in any impropriety?<br>20     A  No.<br>21     MR. WIEGAND: Objection.<br>22     THE WITNESS: Not that I recall.<br>23 BY MS. BOWMAN:<br>24     Q  Did you ever ask the question?<br>25     MR. WIEGAND: Objection.<br>Page 36 |

9 (Pages 33 to 36)

```
1         THE WITNESS: I don't recall.
2   BY MS. BOWMAN:
3    Q    I'm sorry?
4    A    I don't recall.
5    Q    Did you conduct any investigations?
6         MR. LeSAGE: Asked and answered. Objection.
7   Asked and answered.
8         THE WITNESS: In a very large company, okay,
9   and this was a very large company, issues happen in the
10  branches and people conducted investigations. We had
11  legal departments, and we had an HR department that
12  would look into matters of impropriety that occurred.
13  BY MS. BOWMAN:
14   Q    Okay. Did you as the CEO of ACC Capital
15  Holdings ever direct anyone to conduct any such
16  investigation?
17   A    It was kind of built into the process. They
18  just -- something happens. Investigations are done. I
19  would hear about the results --
20   Q    Okay.
21   A    -- on occasion depending on the severity.
22   Q    And was it as a result of your learning about
23  some investigation that you determined that it would be
24  appropriate to remove the loan coordinators from under
25  the supervisory authority of the sales managers?
                    Page 37
```

```
1    A    Well, I believe it was a secondary benefit.
2    Q    I'm sorry?
3    A    I believe it was a secondary benefit to change
4   the -- the appearances of impropriety that that structure
5   creates.
6    Q    At the time when you took over as CEO of ACC
7   Capital Holdings, did -- the sales manager also had
8   supervisory authority over the in-house appraisers; is
9   that correct?
10   A    Okay. Say it again.
11   Q    Sure.
12   A    I'm trying to think.
13   Q    When you --
14   A    It's been a long time. Okay, go.
15   Q    When you became the CEO of ACC Capital
16  Holdings, wasn't it also the case that at that time the
17  sales managers in the branches had supervisory authority
18  over the in-house appraisers?
19   A    That I do not understand or believe to be true.
20   Q    What was your understanding as to who had --
21   A    The staff appraisers did not report to the
22  branch managers.
23   Q    Who did they report to?
24   A    The appraisal -- the head of the appraisal
25  department.
                    Page 38
```

```
1    Q    And where was that located?
2    A    Corporate. More specifically talking about
3   Ameriquest, so yeah, it would be corporate.
4    Q    Right. What are some of the other reforms that
5   Mr. Arnall opposed to you implementing in that time frame
6   when you took over as CEO?
7    A    That was a big one. You know, I mean as far as
8   specific reforms, he didn't object to it. He actually
9   agreed that we should do it. He didn't agree with my
10  approach in how we were going to do it.
11   Q    Okay. In your complaint at paragraph 16 you
12  indicate that Arnall repeatedly blocked plaintiff's
13  attempts to implement cost and operational reforms. Do
14  you see that?
15   A    Yep.
16   Q    And you've described two. What are the other
17  ones?
18   A    There's numerous in the cost area.
19   Q    Okay.
20   A    It's huge to me. It's numerous in the cost
21  area. I was trying to push these issues down. I was
22  trying to implement accountability at the business line
23  level, and there was resistance to pushing down those
24  costs into the business level which made it very
25  difficult to control expenses on a business level and
                    Page 39
```

```
1   make people accountable at the business level for me.
2   It was huge. So there's numerous examples in there
3   of just resistance to pushing those controls into the
4   businesses themselves because there was obviously a
5   philosophical difference of opinion on whether that was
6   valuable, I guess.
7    Q    What were the other operational reforms that
8   you requested that Mr. Arnall did not agree that you
9   could implement?
10        MR. WIEGAND: Objection.
11        THE WITNESS: None specifically other than the
12  big one to me was the separation of the two functions for
13  efficiency and -- but that's a huge one.
14  BY MS. BOWMAN:
15   Q    Okay. During this time frame when you were
16  making recommendations about operational and cost
17  reforms, in what manner were you communicating them to
18  Mr. Arnall?
19   A    His office was right next to mine. We'd sit
20  in his office and talk. Certainly presentations were
21  made at board meetings, and we talked on the phone
22  periodically.
23   Q    In those instances where Mr. Arnall disagreed
24  with you about making certain changes, cost or
25  operationally, did you prepare any notes or memorandums
                    Page 40
```

10 (Pages 37 to 40)

1 to the board?
2     A   Specific notes -- no, no. We go through our
3 budgetary process at board meetings and so forth, so no,
4 I don't believe so.
5     Q   Did you ever make any presentations to the
6 board recommending your operational changes?
7     A   I don't know if it was a presentation. I'm
8 sure discussions occurred on several of the operational
9 changes that I had requested throughout the course of my
10 appointment -- period of time there. Yeah, they weren't
11 ignorant to it, but I don't know that I sat here and had
12 a presentation "Here's what I want to do." People kind
13 of understood what I was doing, I guess, or wishing to
14 do.
15     Q   Other than Mr. Arnall who was the chairman of
16 the board at that time, who was on the board when you
17 were CEO?
18     A   Let's see. I believe Dawn Arnall.
19     Q   Is that his son?
20     A   No. That's his wife.
21     Q   Did you say Don or Donna?
22     A   Dawn.
23     Q   Dawn. I'm sorry.
24     A   I'm trying to -- it's been two years. What is
25 that guy's name. Bob Barnum.

Page 41

1     Q   Say it again.
2     A   Bob Barnum.
3     Q   Barnum. Can you spell that, please?
4     A   No. I barely could remember the last time, but
5 I'm presuming it's spelled like it sounds "Bar-num." And
6 at that time Deval Patrick was on for a short period of
7 time or he was there when I was there. He had just
8 joined for like the last board meeting I was there or
9 something. The rest of the names escape me, but there
10 was a couple other members of the board, and they just
11 escape me. It's been so long.
12     Q   All right. You describe in your complaint that
13 Mr. Arnall blocked or resisted some of these operational
14 and cost recommendations that you were making. Fair to
15 say that as chairman of the board he had the authority to
16 kind of veto some of those things?
17     A   Certainly.
18     MR. WIEGAND: Objection.
19     THE WITNESS: I would have to say sure. As an
20 owner of a company and chairman of the board you have the
21 right to influence the direction of your company.
22 BY MS. BOWMAN:
23     Q   Okay. And specifically if he told you not to
24 do something, it wouldn't be done.
25     MR. WIEGAND: Objection.

Page 42

1     THE WITNESS: I'm going to do what I believe
2 I have to do, so I wouldn't say that. If you tell me
3 to jump off a bridge, I'm not going to do it, okay?
4 BY MS. BOWMAN:
5     Q   No. It was actually the opposite. If he
6 instructed you not to make a particular operational
7 change, then you didn't make it.
8     MR. WIEGAND: Objection.
9     THE WITNESS: No, not necessarily true. If I
10 believed in something, I would fight until I convinced
11 him that it was what we needed to do.
12 BY MS. BOWMAN:
13     Q   Okay.
14     A   Most of the time there's a lack of
15 understanding when there's objections, and most of the
16 time it comes to timing.
17     Q   Sure. And ultimately there was so much of a
18 difference between what you thought needed to be done
19 and what he thought needed to be done that you actually
20 resigned from the company.
21     A   Honestly I don't know.
22     Q   You don't know why you resigned?
23     A   No, I know why I resigned because I expected
24 it to be done now because it was important to me. He
25 wasn't comfortable with me doing it now and/or my

Page 43

1 approach, and I was done selling it. I was going to
2 do it during my time frame or I was going to leave, and
3 guess what happened. I left.
4     Q   Okay.
5     A   It's really that simple.
6     Q   In paragraph 17 of your complaint you describe
7 what was happening in your view as Arnall's usurping of
8 your authority. Do you see that?
9     A   Paragraph 17.
10     Q   Yes.
11     MR. WIEGAND: Go ahead and take a chance to
12 read if you like. Counsel, I don't know what's a good
13 time for a break, but sometime soon if you don't mind.
14     MR. LeSAGE: Five minutes -- it's the end of
15 the hour in another five minutes. So if we can start
16 taking a routine every hour we take a potty break,
17 whatever you call it, a personal break. I'm getting
18 older.
19     THE WITNESS: Okay. All right. State your
20 question again.
21 BY MS. BOWMAN:
22     Q   Sure. In your complaint at paragraph 17 you
23 describe that Mr. Arnall was usurping your authority. In
24 what ways was he usurping your authority?
25     A   Not allowing me to push down those expenses

Page 44

11 (Pages 41 to 44)

1 or restructure and push down those primary costs.
2 There's one other example of where I wanted to cut the
3 marketing budget by 20 million bucks, and he overruled me
4 on that matter. Those are the examples I'm referring to.
5    Q   Okay. During the time prior to your
6 resignation, had you ever entered into any kind of a
7 noncompete agreement?
8    A   No, no. Noncompete, no.
9    Q   So during the period of time when you were at
10 Ameriquest and then president of Argent prior to becoming
11 CEO of Ameriquest --
12    A   Right.
13    Q   -- of ACC Capital Holdings you never at any
14 point in time were asked to execute a noncompete
15 agreement?
16    A   No, there's -- the only -- there's a
17 proprietary agreement, and it's been years since I've
18 actually read it, but it's not a noncompete. It's like
19 every employee signed this.
20       You know, you're not going to take company
21 stuff, right, that kind of document. You're not going
22 to -- there is something in there. It's been years
23 since I read it though, but it's not a noncompete like
24 you're asking. And, as I recall, that's the only
25 document I've ever been asked to sign as a condition of

1    A   I have no idea. I checked out.
2    Q   During your time as CEO of ACC Capital
3 Holdings, how would you describe Mr. Arnall's day-to-day
4 involvement with the operating companies Ameriquest and
5 Argent?
6       MR. WIEGAND: Objection.
7       THE WITNESS: I guess explain specifically kind
8 of what you're asking me.
9 BY MS. BOWMAN:
10    Q   Sure. What was he doing on a day-to-day basis
11 with relationship to those operating lenders?
12    A   He was knowledgeable on what's going on within
13 the businesses.
14    Q   Was he talking to you every day?
15    A   No, not me every day. There would be three
16 weeks, a month that would go by sometimes and I wouldn't
17 talk to him, and there's other times that I would talk to
18 him frequently, so --
19    Q   Was he in the office even during the period of
20 times when you were --
21    A   Yeah.
22    Q   -- having consistent contact with him?
23    A   Yeah.
24       MR. WIEGAND: Objection.
25       THE WITNESS: Sure. He was in the office.

1 employment.
2    Q   In paragraph 17 of your complaint you also talk
3 about there came a point in time when Mr. Arnall told
4 you to focus on the wholesale or the Argent side of the
5 business and that he would handle the Ameriquest Mortgage
6 Company retail operations; is that correct?
7    A   Correct.
8    Q   Okay. And can you explain to me what that
9 circumstance was?
10       MR. WIEGAND: Objection.
11       THE WITNESS: What do you mean the circumstance
12 was?
13 BY MS. BOWMAN:
14    Q   He just -- what did he do? He just came in and
15 told you?
16    A   He stated that.
17    Q   Okay.
18    A   I mean that's kind of, as I recall, the best
19 two-year-old memory is. It's pretty close to a quote.
20    Q   Okay. And did he then to your understanding
21 take over the operations of Ameriquest Mortgage
22 Company --
23       MR. LeSAGE: Objection as to time.
24 BY MS. BOWMAN:
25    Q   -- at the time he said that to you?

1 BY MS. BOWMAN:
2    Q   During your time as CEO of Ameriquest, did
3 you become aware of certain lawsuits being filed against
4 Ameriquest based on lending improprieties?
5    A   Alleged lending improprieties, yeah.
6    Q   Okay. And what was your involvement in the
7 conduct of those cases?
8       MR. WIEGAND: Objection.
9       MR. LeSAGE: Again objection as to time. While
10 he's CEO?
11       MS. BOWMAN: Yes.
12       THE WITNESS: Not specific involvement.
13 BY MS. BOWMAN:
14    Q   You had no specific involvement?
15    A   I didn't open a file and conduct an
16 investigation. That's not what I did.
17    Q   Okay. Did you -- I'm sorry?
18    A   I would have 30,000 view insight into what was
19 going on in there.
20    Q   When you say 30,000 view, you mean 30,000 feet.
21 Is that what you're saying?
22    A   Yes, 30,000-foot view, you know.
23    Q   Okay.
24    A   All right.
25    Q   Did you direct anybody that reported to you to

Page 49

1    conduct an internal investigation into those allegations?
2          MR. LeSAGE: Objection. Vague and ambiguous.
3    What allegations?
4    BY MS. BOWMAN:
5          Q    The allegations of the lawsuits that you
6    learned about when you became CEO.
7          MR. WIEGAND: Objection. Compound.
8          THE WITNESS: I can't specifically recall,
9    but again I'm going to make the statement we have legal
10   departments. We have an HR department. If there was an
11   allegation that comes in, a whistleblower, they would
12   investigate.
13   BY MS. BOWMAN:
14         Q    Okay. And I'm just trying to figure out what
15   the chain -- how that information got to you. What was
16   the chain of people that information went through to get
17   to you?
18         MR. WIEGAND: Objection. What information?
19         MR. LeSAGE: And I will instruct the witness
20   not to answer if it involves attorney-client privilege.
21         You can advise if it was through lawyers or
22   not, but I'll advise the witness that you're instructed
23   not to communicate any communication about lawsuits or
24   investigations that came through legal department.
25         THE WITNESS: They would all come through the

Page 50

1    legal department, so --
2    BY MS. BOWMAN:
3          Q    I'm not asking --
4          A    That's where I would hear it is from our chief
5    counsel.
6          Q    Sure. Okay. Well, who was that?
7          A    Tom Noto.
8          Q    I'm sorry?
9          A    Our chief counsel was Tom Noto.
10         Q    Can you spell his last name?
11         A    N-o-t-o. Is it "No-do" or "No-to"? I don't
12   recall, but I believe it's N-o-t-o, Noto.
13         Q    Okay. And I'm asking not for particular --
14   about the communications but who would have been involved
15   in reporting of that to you?
16         A    Legal.
17         Q    Okay. Anybody other than that?
18         A    Depends on the type of investigation.
19         Q    Sure. I'm talking about --
20         A    You're talking about specific complaints and
21   allegations, legal.
22         Q    Okay. What about internal investigations?
23         MR. WIEGAND: Objection.
24         THE WITNESS: What type of investigation would
25   define who would look into it.

Page 51

1    BY MS. BOWMAN:
2          Q    Okay. Well, then why don't you tell me who
3    those people would have been.
4          MR. LeSAGE: Objection. Vague and ambiguous.
5    Please clarify what you're talking about.
6          MS. BOWMAN: I'm --
7          MR. LeSAGE: Maybe now might be a good time if
8    we could take a five-minute break, and maybe you can
9    gather your notes because it's --
10         MS. BOWMAN: My notes aren't a problem.
11         MR. LeSAGE: Okay.
12         MS. BOWMAN: Let me see if I can't get this
13   list of people, and we'll take a break.
14         THE WITNESS: Okay.
15   BY MS. BOWMAN:
16         Q    If there were -- if you were conducting an
17   internal investigation about practices by the account
18   executives in the various branches, who would have been
19   involved in that?
20         MR. WIEGAND: Objection.
21         MR. LeSAGE: Objection. Vague and ambiguous,
22   and it's a hypothetical. I mean let's clarify whether
23   or not there was such an investigation while he was CEO.
24   You don't have to speculate as to what would
25   have happened if there was an investigation and none

Page 52

1    occurred. If you're aware of one, you're certainly free
2    to testify, but I'd like counsel to verify whether or not
3    any such investigations took place during the period of
4    time that you were CEO.
5          THE WITNESS: Okay.
6    BY MS. BOWMAN:
7          Q    Did any such investigations take place?
8          A    You know, I'm trying to think of specific
9    examples of investigations that I would specifically know
10   details, and none are coming to mind. Do I think that HR
11   had allegations of mistreatment by some employee? Yeah.
12   I mean I would hear things through our HR department when
13   employees were mistreated or there's some disgruntled and
14   stuff like that. I would hear.
15         Q    I'm sorry. Who in HR could have been
16   communicating that to you?
17         A    Typically the head, but it could be other
18   people, but typically the head of HR.
19         Q    Who was the head of HR when you were CEO?
20         A    Donna Lesch. Of Ameriquest we're talking
21   about, right?
22         Q    Yes.
23         A    Yeah, Donna Lesch.
24         Q    Can you spell that for me?
25         A    No, not really. It's L-e-s-c-h, something.

13 (Pages 49 to 52)

1 I don't remember.
2    Q    Are you familiar with the term "internal
3 controls"?
4    A    Uh-huh.
5    Q    Is that a department within Ameriquest Mortgage
6 Company?
7    A    Uh-huh.
8    Q    You have to say yes, because she can't write
9 down uh-huh.
10    A    Yes.
11    Q    Can you tell me who was involved in the
12 internal controls department?
13    A    Internal controls, and again it's been a couple
14 of years, I believe rolled up to legal. So it ultimately
15 was under the authority of Tom Noto --
16    Q    Okay.
17    A    -- but it was a legal department. It was
18 embedded in our legal department.
19    Q    Can you tell me who --
20    A    And that's my memory anyway, so --
21    Q    Sure. Can you tell me who else might have been
22 working in that department at that time when you were
23 CEO?
24    A    Well, while I was CEO. God, what was that
25 gal's name? For the life of me I do not recall and I

Page 53

1 should, but I do not recall that. There was a department
2 head to it, and I can't recall that person's name. It's
3 been too long. Well, maybe it will come back to me.
4 I'm not sure.
5    Q    Okay. Is there anybody other than HR and legal
6 that you are aware were -- was involved in any kind of an
7 internal investigation about Ameriquest Mortgage lending
8 practices?
9    A    Lending practices?
10    Q    Uh-huh.
11    A    No. They would all have funneled through that
12 pretty much, I mean when you're talking about lending
13 practices, yeah.
14    Q    Can you tell me who else was in what you're
15 describing as the legal department at that time?
16    A    Names that will come to mind, we had a Karen
17 Christianson. Oh, no. Karen -- oh, what was her name?
18 There was Tom Noto. Who was that gal that we hired?
19 Again it's been too long. I don't remember.
20         She was there for about six months. I had
21 hired this gal to specifically work on Ameriquest issues,
22 so -- and I can't recall her name. She was there a short
23 period of time, six months, maybe eight months. I hired
24 her after I became CEO. I don't recall her name just
25 off --

Page 54

1    Q    Okay. Anybody else?
2    A    That's terrible. I should remember these
3 people. It's not coming to me honestly. You're looking
4 for specific names in the legal department?
5    Q    No. What I'm -- let me ask you one more
6 question, and then we'll take a break.
7         MR. WIEGAND: Thank you.
8 BY MS. BOWMAN:
9    Q    During the time you were the CEO for ACC
10 Capital Holdings, did you have a personal assistant?
11    A    Yeah.
12    Q    Who was that?
13    A    Lela Strong.
14    Q    And to your knowledge is she still employed by
15 any of the Ameriquest companies?
16    A    I don't know. She was six months, a year ago
17 when I last talked to her, but I couldn't tell you if she
18 still is today.
19    Q    Okay. Did she hold a position prior to
20 becoming your personal assistant when you became CEO?
21    A    She was my personal assistant at Argent.
22    Q    At Argent. All right. Why don't we go ahead
23 and take that break.
24         MR. LeSAGE: Thank you.
25         THE VIDEOGRAPHER: Going off the record at

Page 55

1 10:06 a.m. Please remove your mikes.
2         (Recess.)
3         THE VIDEOGRAPHER: We're back on the record at
4 10:24 a.m.
5 BY MS. BOWMAN:
6    Q    Mr. Lee, we've been talking before we broke
7 about the complaint that you filed in January of this
8 year against Ameriquest.
9    A    Uh-huh.
10    Q    Can you tell me what were the circumstances
11 that gave rise to your decision to file the complaint?
12    A    Stated once, the operational push down, right?
13    Q    I'm talking --
14    A    No. These were the reasons that I decided to
15 leave.
16    Q    Okay. I'm asking you what are the reasons that
17 you decided to file the complaint against Ameriquest.
18         MR. HARRIS: Exhibit 1.
19 BY MS. BOWMAN:
20    Q    -- Exhibit 1?
21    A    Okay.
22         MR. LeSAGE: Okay.
23 BY MS. BOWMAN:
24    Q    What were the circumstances that led you to
25 file the complaint that is Exhibit 1?

Page 56

14 (Pages 53 to 56)

```
 1     A    Breach of contract.
 2     Q    And what exactly happened?
 3     A    I didn't receive my first installment as
 4   scheduled.
 5     Q    When you left the company as CEO in the summer
 6   of 2005 and entered into the consulting agreement --
 7     A    Uh-huh.
 8     Q    -- first can you tell me is that consulting
 9   agreement the one that's attached to the complaint that's
10   Exhibit 1?
11         MR. WIEGAND: Objection.
12         MR. LeSAGE: My copy doesn't have it.
13         THE WITNESS: I don't have one.
14         MS. BOWMAN: Okay. Exhibit 2.
15         (Plaintiffs' Exhibit 2 was marked for
16         identification by the court reporter.)
17   BY MS. BOWMAN:
18     Q    Taking a look at Exhibit 2, Mr. Lee, is that
19   the consulting agreement that you entered into with
20   Ameriquest Capital Corporation after resigning your
21   position as CEO?
22     A    Without reading its entirety, it appears to be.
23     Q    Okay. And after the point in time when you
24   entered into that agreement -- it's dated June 22nd of
25   2005. Is that about the time you entered into it?
```

Page 57

```
 1     A    Yeah.
 2     Q    After that time did you continue to work for
 3   the Ameriquest companies?
 4     A    No.
 5     Q    Well, what did you do then? You packed up your
 6   stuff and --
 7     A    I go to the gym and nothing. I haven't done
 8   anything.
 9     Q    Okay. And then you said that at some point
10   they failed to make an installment under the consulting
11   agreement?
12     A    Correct.
13     Q    Can you describe the circumstances surrounding
14   that.
15     A    What are you asking me to describe? Why they
16   chose not to pay me, what -- I don't know what you're --
17   clarify, I guess.
18     Q    Sure. Take a look at the complaint that's
19   Exhibit 1.
20     A    Okay. The complaint that's Exhibit 1.
21     Q    And I'm looking at paragraph, or, I'm sorry,
22   page 7.
23     A    Page 7. All right. Okay.
24     Q    Okay. And if you could read the section that
25   is entitled D "ACC Breached the Consulting Agreement," do
```

Page 58

```
 1   you see that? Can you read that section, and tell me if
 2   that accurately describes the circumstances under which
 3   you learned that you were not to be paid the first
 4   installment of $6 million under your consulting
 5   agreement?
 6     A    Okay. "On or about June 30th" --
 7         MR. WIEGAND: No. Just read it to yourself.
 8         THE WITNESS: Oh, okay.
 9         MR. WIEGAND: And then why don't you just let
10   us know when you're done reading it.
11         THE WITNESS: Okay. Okay. Question again?
12   BY MS. BOWMAN:
13     Q    Sure.
14     A    Does that accurately reflect? Yes.
15     Q    Okay. And at paragraph 26 you indicate that
16   two days prior to Ameriquest's obligation to pay the
17   first installment, you were -- went to the law offices
18   of -- the Buchalter law offices to meet with a Mr. Rick
19   Cohen; is that correct?
20     A    Correct.
21     Q    And Mr. Cohen is Mr. LeSage's partner; is that
22   correct?
23     A    I don't know. I don't know their structure. I
24   mean they work for the same firm.
25     Q    Okay.
```

Page 59

```
 1     A    I can tell you that much.
 2     Q    And you had been familiar with Mr. Cohen prior
 3   to this meeting in June of 2006.
 4     A    Yes.
 5     Q    And what was it that Mr. Cohen advised you of
 6   in that meeting?
 7     A    That I wasn't going to get paid.
 8     Q    Okay. Did he tell you why?
 9     A    He said that I could have put policies and
10   procedures in place, that's the only statement that I
11   got, that could have prevented some of the -- whatever.
12     Q    What was the whatever he said?
13     A    Well, I think it's the Attorney General
14   allegations, but I don't know that because he never gave
15   me a specific.
16     Q    Okay. Did he say anything else?
17     A    No.
18     Q    Did you make any notes of the meeting?
19     A    I think they're pretty much summarized in here,
20   but no.
21     Q    Did you talk to anyone about your meeting with
22   Mr. Cohen?
23     A    Not too long thereafter, Counsel.
24     Q    Did you contact anybody at Ameriquest following
25   your meeting in June of 2006 with Mr. Cohen?
```

Page 60

15 (Pages 57 to 60)

Page 61

1       A   There was two different meetings with
2   Mr. Cohen, I believe, at that time and subsequent to
3   them, no, I didn't discuss this matter with anybody.
4       Q   Sure.  But after your first meeting with
5   Mr. Cohen where he advised you that you weren't going
6   to be paid the $6 million installment, did you make any
7   calls to anybody at Ameriquest?
8       A   No.
9       Q   Have any discussions with Mr. Arnall?
10      A   No.
11      Q   Was there anybody that had left Ameriquest that
12  you talked to at that time?
13      A   My wife.
14      Q   Okay.  Did you contact Mr. Langs?
15      A   Nope.
16      Q   Any of your former executives at Argent?
17      A   No.
18      Q   Did Mr. Cohen tell you at any point during that
19  meeting, the first meeting on June 12 of 2006, that they
20  considered you to be in breach of your consulting
21  agreement?
22      A   The words "breach" were not used.
23      Q   Okay.  When Mr. Cohen made the statement about
24  that you would have put in place policies and procedures,
25  what else did he say?

Page 62

1           MR. WIEGAND:  Object.
2           THE WITNESS:  Nothing material.
3   BY MS. BOWMAN:
4       Q   Did he describe those policies and procedures?
5       A   No.
6       Q   What was the whatever?
7           MR. WIEGAND:  Objection.
8   BY MS. BOWMAN:
9       Q   You used the term he said you could have put in
10  policies and procedures or whatever.
11      A   That's not a direct quote of something I recall
12  him saying, okay?  There was a general statement,
13  policies and procedures.  I questioned, and I got no
14  response.
15      Q   Okay.
16      A   I wanted to know too, okay?
17      Q   And he -- what did he say with regard to your
18  taking legal action?
19          MR. WIEGAND:  Objection.
20          THE WITNESS:  I didn't tell him I was taking
21  legal action.
22  BY MS. BOWMAN:
23      Q   Sure.  Paragraph 26 of this complaint says
24  "Mr. Cohen threatened that if the plaintiff tried to
25  secure his contractual rights through litigation, ACC

Page 63

1   would drag out the case for years."  Do you see that?
2       A   Yeah.  That's what he said.  I didn't say
3   that --
4       Q   No, I understand.
5       A   -- or something along that line.
6       Q   Okay.  And what exactly did he say?
7       A   Well, that's about as close as I recall because
8   I think I represented it fairly accurately in the
9   complaint, but I don't specifically remember.  It was,
10  you know, a year, year and a half ago, whatever it was,
11  so, but yeah.
12      Q   What was said at the second meeting by
13  Mr. Cohen?
14      A   Who set it up?
15      Q   No, what was said?  What did he --
16      A   Oh --
17      Q   -- tell you at the second meeting?
18      A   -- the objective of the second meeting, as I
19  had requested, different terms than was being offered
20  renegotiated terms of the remaining term of my contract,
21  and he had to consult with the company and come back and
22  gave me what their decision was.
23      Q   So in the first meeting you engaged in a
24  renegotiation of the consulting agreement with Mr. Cohen?
25      A   Correct.

Page 64

1       Q   Okay.  And what were the terms that were
2   proposed?
3       A   Instead of 6 million, 3 million a year, so
4   cutting it in half, if you will, the remaining term.
5       Q   Was that a proposal that you made?
6       A   No.
7       Q   He made that proposal?
8       A   Uh-huh.
9       Q   But it wasn't an offer?
10      A   You know, it's semantics, but I don't think he
11  is personally in a position to approve the offer.  I
12  think he was authorized to probably discuss this
13  proposal.  He's not an employee of the company, so --
14      Q   Okay.  And then did you make a counter?
15      A   Yeah.
16      Q   What was that?
17      A   The remaining noncompete terms -- for that type
18  of thing I would consider that as long as I can go to
19  work tomorrow, do you follow me, because there was a --
20  cutting it in half and still being tied up for four more
21  years of a noncompete wasn't satisfactory to me.  Does
22  that make sense to you?
23      Q   Yes.  So you countered that the 3 million might
24  be acceptable if they would eliminate your obligation not
25  to work --

16 (Pages 61 to 64)

1    A    There you go.
2    Q    – in the industry.
3    A    In the industry, yes.
4    Q    Okay.  And was that approved by the company?
5    A    No.
6    Q    And that was the substance of the second
7    meeting?
8    A    Yes.
9    Q    What else did he say at the second meeting?
10    A    It was reasonably short as I recall.  There was
11    no substance beyond that.  If they're not willing to do
12    that, then I walked.  I said "It's not acceptable to me
13    either.  I'll get back with you."
14    Q    Okay.  After that second meeting did you
15    contact anybody at Ameriquest?
16    A    No.
17    Q    Did you make any notes at that time in order to
18    provide those to anyone?
19    A    You know, I jotted down a couple of sentences
20    that are pretty much reflected in the complaint, you
21    know, that are just close to even at that time what I
22    recalled as a quote, do you follow me, which is
23    represented in this complaint.
24    Q    Sure.
25    A    I didn't put quotations around it in here

Page 65

1    because it's, you know, not that exact, but those
2    statements were pretty close.
3    Q    Okay.  And what did you do with those notes?
4    A    I couldn't even tell you.  I mean I generalized
5    them and sent them to my counsel like when I — two weeks
6    later in an e-mail.
7    Q    Okay.  At that time did you prepare any other
8    information that — about the time frame during which you
9    were CEO at Ameriquest, prepare any notes —
10    A    No.
11    Q    — or information?
12    A    No.
13    Q    The complaint that's Exhibit 1, you read that
14    before it was filed, correct?
15    A    Yeah.
16    Q    Okay.  And we can go paragraph by paragraph,
17    but based on your understanding at the time you filed the
18    complaint in January of 2007 —
19    A    Uh-huh.
20    Q    — was the factual information in the complaint
21    accurate?
22        MR. WIEGAND:  Well, objection.  I mean you
23    might want to go paragraph by paragraph because we
24    already found something in paragraph 1 that appears to
25    be inaccurate.

Page 66

1        THE WITNESS:  My specific title.
2        MR. WIEGAND:  So —
3    BY MS. BOWMAN:
4    Q    Okay.
5    A    So —
6    Q    So why don't you read paragraph 1 and tell me
7    if there's anything inaccurate in paragraph 1.
8    A    Okay.  Yeah.  I think what's jumping out at me
9    is technically I wasn't president.  I was the head of the
10    wholesale division since infancy, but what official date
11    I got the title of presidency, I don't know.  I can't
12    recall.  I know it was probably a couple of years into it
13    or a year into it or something like that.
14    Q    Yeah, and you're talking about your statement
15    that — the statement that says that from 2001 to 2004
16    you were the president of Argent Mortgage?
17    A    Right.  I was actually the president then after
18    2004.
19    Q    Apart from that paragraph 1 is accurate?
20    A    Yes.
21    Q    If you could review and tell me if paragraph 2
22    is accurate.
23    A    This is my understanding of the structure.  I
24    didn't necessarily have access to structures and titles
25    of Mr. Arnall at the ACC level.  Does that make sense?

Page 67

1    Q    But to the best of your knowledge —
2    A    To the best of my knowledge this is —
3    Q    Accurate?
4    A    — accurate, yeah.
5    Q    And how about paragraph 3?  Is that accurate?
6    A    There's one statement in here that doesn't feel
7    right, and I'm not sure at the time what I might have
8    been referring to or if my counsel, who actually prepared
9    this document put it because it meant something, but
10    I don't — I as a CEO or just a person within a corporate
11    structure doesn't set the law, so I don't — I can't
12    really do legal protocol, do you follow me, because I
13    don't make laws.  Congress, Senate, everybody else makes
14    laws and passes laws.  So I'm uncomfortable with that
15    phrase.  Other than that it's accurate.
16    Q    Okay.  So —
17    A    Protocols would probably be okay, but I don't
18    make laws.  So that's — and this kind of implies that I
19    make legal protocols.  I don't set laws, so I'm not
20    necessarily comfortable with that —
21    Q    Okay.
22    A    — word.
23    Q    So if —
24    A    I probably should have caught it back then.
25    Q    So if we change legal protocols to policies and

Page 68

17 (Pages 65 to 68)

Page 69

1  procedures, that would make you --
2      A   Procedures and policies, yeah.  Yeah,
3  processes, policies, procedures.  That kind of stuff is,
4  I think, what I --
5      Q   But other than that, the facts stated in
6  paragraph 3 are accurate?
7      A   Correct.
8      Q   How about paragraph 4?  Is that accurate?
9      A   Plaintiff would -- yeah.
10     Q   What about paragraph 5?  Is that accurate?
11     A   Correct, yes.
12     Q   Okay.  And paragraph 6, is that accurate?
13     A   You know, it's my beliefs.  You know, it's
14 speculative at some level because I mean I'm reading it
15 in the Orange County Register that the company is for
16 sale, right?  I don't have firsthand knowledge that it
17 was.  I'm reading it like the general population is.  Do
18 you follow me?
19     Q   Sure.
20     A   So I read it.  Therefore, you believe it's
21 true, but having been exposed to, you know, not
22 everything you read in the paper is necessarily true.
23     Q   Okay.
24     A   So I had no inside direct knowledge that these
25 were in fact true, and I couldn't categorically tell you

Page 70

1  it's for sale today.
2      Q   Okay.
3      A   Does that make sense?
4      Q   Sure.  But apart from knowing or not knowing
5  specifically whether or not --
6      A   Right.
7      Q   -- the reports were accurate, that remainder of
8  the paragraph 6 is accurate?
9      A   Okay.  Yeah.
10     Q   Okay.  What about paragraph 7?
11     MR. WIEGAND:  This could get tedious.  So
12 don't -- sorry, and counsel, I'm sure, agrees with
13 this --
14     THE WITNESS:  Yeah.
15     MR. WIEGAND:  -- don't start rushing through
16 it because otherwise it will take too long or something.
17 She can do it however she wants, but make sure, you know,
18 that you're reading it and considering the whole thing.
19     THE WITNESS:  Right.
20     MR. WIEGAND:  And 7 is a simple one, but I'm
21 just -- so I'm using that as an example so she won't
22 think I'm trying to hint at anything.
23     THE WITNESS:  You know, I'm reading 6, and
24 maybe I can -- you know, see words like "reprehensible"
25 and "indefensible."

Page 71

1      MR. WIEGAND:  And if you --
2      THE WITNESS:  They're beliefs at a particular
3  time, so they're not false.
4      MR. WIEGAND:  I'm not commenting on your answer
5  at all.
6      THE WITNESS:  Okay.
7      MR. WIEGAND:  I'm just saying that --
8      THE WITNESS:  7 is --
9      MR. WIEGAND:  -- if there are words you're
10 uncomfortable with, you know, you can tell us.
11     THE WITNESS:  7 is true.
12 BY MS. BOWMAN:
13     Q   And what about 8?  Is that accurate?
14     A   The caveat to the best of my understanding yes,
15 that was my understanding.
16     Q   Okay.
17     A   You know, if somebody is going on to pull a
18 legal document and say it's something different, I --
19     Q   Sure.
20     A   Yes.
21     Q   Paragraphs 9, 10 and 11 are largely legal, so
22 let's move to --
23     A   I didn't do it I don't think.
24     MS. BOWMAN:  Can we mute it or is that going to
25 stop them from -- let's go off the record.

Page 72

1      THE VIDEOGRAPHER:  We're off the record at
2  10:47 a.m.
3      (Recess.)
4      THE VIDEOGRAPHER:  We're back on the record at
5  10:51 a.m.
6  BY MS. BOWMAN:
7      Q   Mr. Lee, we were going through the allegations
8  of the complaint that's Plaintiffs' Exhibit 1, and can
9  you tell me if the allegations in paragraph 12 are
10 accurate?
11     A   Allegations?  I don't see an allegation in
12 paragraph 12.  Am I in the wrong spot?  It's --
13     Q   The statements in paragraph 12, are they
14 accurate?
15     A   Okay.  Yes.
16     Q   What about the statements in paragraph 13?
17     A   Yeah, this is that title thing here again.  "On
18 or about January" -- it's the president thing.  I'm not
19 sure what my title was when I took over in 2001.  I was
20 the head of Argent from its infancy.  Do you follow me?
21     Q   Yes.  It's the issue about whether or not they
22 were a separate company in which you were named president
23 as of 2001 or 2002 or 2003?
24     A   I officially --
25     MR. WIEGAND:  Objection.

18 (Pages 69 to 72)

1    THE WITNESS: -- became president at a later
2  date.
3  BY MS. BOWMAN:
4    Q  Okay. Other than that is paragraph 13
5  accurate?
6    MR. WIEGAND: Objection.
7    THE WITNESS: Again was it a legally
8  structured, brand-new company, was it a division or a
9  subsidiary, I frankly don't recall in the 2001 era. It
10 subsequently became its own company. Do you follow me?
11 BY MS. BOWMAN:
12   Q  Was it a subsidiary of ACC Capital Holdings --
13   MR. WIEGAND: Objection.
14 BY MS. BOWMAN:
15   Q  -- when it was separately incorporated?
16   A  I don't believe so. ACC Capital Holdings was
17 created at a later date.
18   Q  Okay. Was it a subsidiary of ACC?
19   A  I didn't have access to that.
20   Q  Fair to say it was in the family of Ameriquest
21 companies?
22   A  There you go. That I can assure you.
23   Q  Okay. And the ownership directly or indirectly
24 went back to Roland Arnall.
25   A  That's my understanding, yes.

Page 73

1    Q  Okay. Is paragraph 14 accurate?
2    A  Again I'm making the presumption he's the
3  ultimate wholly owned -- that's my understanding of his
4  role. He's the sole owner of the company without having
5  direct access to it, okay. Yeah, that's correct. I
6  would say the word "complete oversight of Ameriquest
7  Mortgage Company," but other than that it's correct.
8  I never ran the company at the top level. I was --
9  obviously held several positions at lower management
10 levels within Ameriquest in the '90s.
11   Q  Okay. So --
12   A  So the interpretation is complete oversight,
13 right, of that organization.
14   Q  As distinguished from oversight that you had
15 over various portions of that operation before?
16   A  That's the distinction.
17   Q  Okay.
18   A  That's the only distinction.
19   Q  And is paragraph 15 accurate?
20   MR. LeSAGE: I'll object to that question
21 unless you make that subject to his prior testimony
22 because he's already testified at length with regard to
23 the allegations in 15. You know, subject to his prior
24 testimony.
25   MR. WIEGAND: Counsel, there certainly are a

Page 74

1  lot of areas you've already covered in the deposition,
2  and now you're going at it a different way. And it's
3  your time, I guess, but just for the record I don't want
4  somebody to say that I should have spoken up, but I think
5  we're wasting time.
6    MR. HARRIS: You're the one that suggested we
7  go through paragraph by paragraph.
8    MR. WIEGAND: What I suggested was that he
9  should not have to answer a question without reading
10 through a document on the entire thing is everything
11 accurate. I said do you want to direct him to provisions
12 or -- but I don't want him to just, you know, wave a hand
13 and answer that question. That was my recommendation,
14 and she decided to go this way. That's fine. But it's
15 definitely a waste of time in my mind, but it's her
16 deposition, not mine.
17   THE WITNESS: Yeah.
18 BY MS. BOWMAN:
19   Q  How about paragraph 16? Is that accurate?
20   MR. WIEGAND: Objection.
21   MR. LeSAGE: Again same objections, subject to
22 prior testimony.
23   MR. WIEGAND: Counsel, is it okay if we adopt
24 his, whatever his earlier testimony was on this paragraph
25 or does he need to say all that again?

Page 75

1    MS. BOWMAN: He doesn't need to say anything
2  again. I'm asking him if the paragraph is accurate as
3  stated. He can answer the question.
4    MR. WIEGAND: Objection.
5    MR. LeSAGE: When it gets to the 11:00 hour,
6  can we take a break?
7    THE WITNESS: As stated earlier, yes, it's a
8  secondary benefit to alleviate the perceptions of
9  impropriety that that structure provides.
10 BY MS. BOWMAN:
11   Q  Okay. But the statements in paragraph 16 are
12 accurate, and you would add to them in the way that you
13 did earlier today?
14   A  Yeah.
15   Q  And what about the statements in paragraph 17?
16 Are they accurate?
17   MR. LeSAGE: Objection. Same objection as
18 before. Subject to his prior testimony.
19   THE WITNESS: I can't get into the mind, but I
20 will state this. Roland had agreed to this structure
21 verbally with me. Statements were he was uncomfortable
22 with my approach and style. That's all that was ever
23 said.
24 BY MS. BOWMAN:
25   Q  Okay. What are you clarifying in paragraph 17?

Page 76

19 (Pages 73 to 76)

1    A   Okay. I'm clarifying -- I'm speculating on --
2    that he had a different vision, okay? I'm making a
3    presumption in this statement in 17 that I can't support
4    because the facts that actually I can support is the
5    specific statements I agree with what you're trying to
6    do. I disagree with how you're going about doing it.
7    Do you follow me?
8    Q   So you're just explaining your --
9    A   Right. And I'm making the presumption that he
10   had a different vision. Even though his statement to me
11   was he believed in what I was doing, he didn't believe in
12   how I was going about it or my approach. Does that make
13   sense?
14       MR. WIEGAND: That's your answer? She doesn't
15   have to state --
16       THE WITNESS: Yeah.
17   BY MS. BOWMAN:
18   Q   At the time when you resigned in 2005, did you
19   believe that his statements, Mr. Arnall's statements,
20   that he agreed with your objectives but not your style
21   and approach were purely pretextual?
22       MR. WIEGAND: Objection.
23       THE WITNESS: What was the last word?
24   BY MS. BOWMAN:
25   Q   Pretextual, in other words, that he really

Page 77

1    didn't want you to do what you were trying to do.
2        MR. WIEGAND: Objection.
3        THE WITNESS: I don't believe that was his
4    objective.
5    BY MS. BOWMAN:
6    Q   How about paragraph 18? Is that accurate?
7        MR. LeSAGE: Again subject to prior testimony.
8        THE WITNESS: The only caveat is yeah, we
9    had -- we were doing well. Do you know what I mean?
10   I don't remember the specific loan volumes, but we
11   were doing well during this period of time. And we
12   did establish some records, and I don't remember the
13   specifics. It was -- we were doing well as an
14   organization at this time productivitywise.
15   BY MS. BOWMAN:
16   Q   And paragraph 19, is that accurate?
17   A   Yeah.
18   Q   Paragraph 20, is that accurate?
19   A   Yeah.
20   Q   Paragraph 21, was that accurate or is that
21   accurate?
22       MR. WIEGAND: I'm trying to -- I'm not reading
23   fast enough. Just give me a second.
24       MR. LeSAGE: We're at 11:03. When you get a
25   chance, let's take a break.

Page 78

1        MS. BOWMAN: All right. Let's just finish
2    this.
3        THE WITNESS: Yes.
4    BY MS. BOWMAN:
5    Q   Paragraph 22, is that accurate?
6    A   Yeah.
7    Q   Paragraph 23?
8    A   The only statement is I didn't sit here and
9    think about how many years I've been in the mortgage
10   industry, 24 years.
11   Q   Is that true?
12   A   I'm -- I was in consumer finance. I'm trying
13   to -- I started in like '83, and I was in consumer
14   finance until '87, and then I've been in mortgages ever
15   since. So whatever summation of that years is after is
16   when I would officially -- although I did mortgages when
17   I was in consumer finance, but it's not the thrust of the
18   business.
19   Q   Okay. Apart from the actual number 24 years --
20   A   Yes, it's correct.
21   Q   -- is the rest of it accurate?
22   A   Yeah. Semantics.
23   Q   And paragraph 23, is that accurate?
24   A   Yes.
25   Q   Paragraph 24, is that accurate?

Page 79

1    A   Yes.
2    Q   Paragraph 25, is that accurate?
3    A   Uh-huh.
4    Q   You have to say yes.
5    A   Yes. I'm sorry.
6    Q   Paragraph 26, is that accurate?
7        MR. LeSAGE: Objection. Subject to prior
8    testimony.
9        THE WITNESS: Yes, prior to previous testimony,
10   and again Rick Cohen's specific role within the
11   organization of Buchalter, Nemer, the law firm. I'm
12   making assumptions here, but that's my understanding.
13   BY MS. BOWMAN:
14   Q   That Mr. Cohen was outside counsel to ACC?
15   A   Yeah. What role he actually played in minutes
16   at the board meetings, I don't recall because it makes a
17   reference he attended board meetings. He took minutes.
18   I don't know what his official title was in that
19   capacity. Does that -- but I just --
20   Q   But he was at board meetings?
21   A   Yeah.
22   Q   And he did take minutes?
23   A   Yes.
24   Q   Okay.
25   A   So --

Page 80

20 (Pages 77 to 80)

| | |
|---|---|
| 1   Q   And with regard to paragraph 27 -- | 1   only talked to them twice, and I can't say that I talked |
| 2   A   Uh-huh. | 2   to them about these topics, all right, was Sam Marzouk |
| 3   Q   -- is that accurate? | 3   and Mike Urtel. |
| 4   A   It's accurate. I understand that there was a | 4   Q   Mike who? |
| 5   counteroffer that we previously testified to, but they -- | 5   A   Urtel. |
| 6   yes, they, of course, refused to pay the 6 million as | 6   Q   Can you spell that? |
| 7   originally agreed upon. | 7   A   U-r-t-e-l, I think. |
| 8   Q   Okay. And paragraph 28, is that accurate? | 8   Q   And what was Mr. Marzouk's -- |
| 9   A   Yes. | 9   A   He was -- |
| 10   Q   Paragraph 29, is that accurate? | 10   Q   -- role in the company? |
| 11   A   Yeah. | 11   A   He was sales at Argent when I left, had the |
| 12   Q   Paragraph 30, is that accurate? | 12   sales force at Argent. |
| 13   A   With clarification, much of my insight was | 13   Q   Okay. And what about Mr. Urtel? |
| 14   third party or what you would read afterwards. It's not | 14   A   It's production at Argent. |
| 15   known fact. I don't know what their loan volumes, only | 15   Q   You said you recall two specific conversations. |
| 16   I would hear from people, okay? And what they did with | 16   Can you tell me when those occurred? |
| 17   rates I would hear, you know. | 17   A   No, not really. Shortly after I left, two, |
| 18   Q   From whom? | 18   three months maybe, but not really. |
| 19   A   Boy, I'm trying to think. This was two years | 19   Q   Did you ever talk to anybody at Ameriquest |
| 20   ago. Well, I had a couple of conversations with | 20   during that time frame? |
| 21   executive management. Early on I would talk to Sam | 21   A   After I left. Greg Hanson. |
| 22   Marzouk, but I remember talking to him that, you know, | 22   Q   What was his position? |
| 23   we're raising rates; but more importantly I would read | 23   A   He was the CFO of ACC -- again CFO. I'll say |
| 24   it in the mortgage rags because it was news. You know, | 24   ACCCH I think is what it was, but again subject to -- |
| 25   there's always these mortgage publications back at that | 25   Q   Sure. |
| Page 81 | Page 83 |
| 1   period of time that talk about what's going on. That's | 1   A   -- some piece of paper. |
| 2   what I did because I didn't communicate with really | 2   Q   What did you talk to him about? |
| 3   anybody for the last couple of years. | 3   A   Just niceties, you know, not -- you know, |
| 4   Q   What about paragraph 31? Is that accurate? | 4   obviously I'd hear it's pretty tough times, that kind of |
| 5   A   It was prepared by my attorney, so certainly | 5   stuff, but we didn't get into specifics about what's |
| 6   the quotes I'm presuming are accurate that they came up | 6   going on. I really didn't have a whole lot of interest |
| 7   with. A lot of what I'm referring to here -- I wasn't | 7   in what happened after I left. |
| 8   there. Obviously I quit, and I don't have any direct | 8   Q   How many times did you talk to Mr. Hanson? |
| 9   knowledge. It's belief and hearsay, all right. | 9   A   I think just once since I left. |
| 10   Q   Who is the hearsay from? | 10   Q   How about anybody other than Mr. Hanson? |
| 11   A   I would presume it's -- because the only people | 11   A   That I spoke with that's an employee of the |
| 12   I ever talked to was like Sam Marzouk -- | 12   company? Well, boy, you know, I mean these are lifelong |
| 13         MR. WIEGAND: She doesn't want you to guess. | 13   friends. I'm trying to think of who. I don't recall |
| 14   Do you recall? | 14   everybody that I ever spoke to. You know, I'm sitting |
| 15         THE WITNESS: Specifically with regards to | 15   here I could have spoke to -- I mean I had dinner with a |
| 16   whether they did these things or not? After I left, no, | 16   friend and a bunch of Argent people that were employees |
| 17   I don't know whether he -- I don't know what he did after | 17   that remembered me and came up to me. Do you follow me? |
| 18   I left. I just believed at the time that this complaint | 18   "You're Wayne Lee, right?" |
| 19   was -- I don't think they did anything. That was my | 19         "Yeah." I don't even remember their names, but |
| 20   belief, all right? I'm mad, and that's my belief. | 20   they kind of know me, so -- |
| 21   BY MS. BOWMAN: | 21   Q   Did you talk to anybody specifically at |
| 22   Q   And what -- who other than Mr. Marzouk did you | 22   Ameriquest other than Mr. Hanson? |
| 23   talk to after you left Ameriquest in the summer of 2005? | 23   A   Yeah. I've talked to Aseem a couple of times. |
| 24   A   Who did I talk to that was still with the | 24   Q   What's his last name? |
| 25   company after I left? The only people I talked to, and I | 25   A   Mital, M-i-t-a-l. |
| Page 82 | Page 84 |

21 (Pages 81 to 84)

Esquire Deposition Services
800.640.2461

1    Q   He actually replaced you as CEO of Ameriquest?
2    A   Yeah, I don't know what other -- again I don't
3    know, but --
4    Q   How many times have you talked to him?
5    A   -- it's my understanding. He called me on one
6    occasion, and that's all that really is coming back to
7    me.
8    Q   What did he call you about?
9    A   Just telling me that they were going to be
10   doing a layoff just so I wouldn't be surprised and get a
11   bunch of calls from people.
12   Q   What did he tell you about that layoff?
13   A   That's about it. We didn't talk business.
14   Q   Did he tell you why the layoff was going to
15   occur?
16   A   No.
17       (Interruption in the proceedings.)
18       THE RECEPTIONIST: They were disconnected from
19   the conference call and want to be connected again.
20       MR. LeSAGE: Is this a good time for a break?
21       MS. BOWMAN: I only have three more paragraphs.
22   Let me pick those up, and then we'll take a break.
23       THE RECEPTIONIST: Do you want me to connect
24   them?
25       MS. BOWMAN: I don't think you can. We'll dial

Page 85

1    them back in just a minute.
2        THE VIDEOGRAPHER: Ms. Bowman, this tape will
3    run out in seven minutes.
4        MS. BOWMAN: Okay.
5    Q   Going back to the complaint that's Exhibit 1,
6    Mr. Lee, is paragraph 32 accurate?
7    A   To the best of my knowledge this is coming off
8    of publications and rags. Do you follow me? You know,
9    it was announced publicly in those forums. To the extent
10   they're accurate, that's my understanding.
11   Q   And what about paragraph 33? Is that accurate?
12   A   Best of my knowledge, yeah.
13   Q   How about paragraph 34? Is that accurate?
14   A   Again best of my knowledge, you know, because
15   I'm reading it's for sale and stuff through public forums
16   back to what my earlier testimony was, but yes, I learned
17   that the company was for sale --
18   Q   Okay. And --
19   A   -- through maybe less than an accurate forum.
20   Q   Yes. Did you make written demands to ACC to
21   pay you under your consulting agreement?
22   A   Yes.
23   Q   Do you have copies of those demands?
24   A   No, I do not.
25   Q   Were they provided to your counsel?

Page 86

1    A   My counsel prepared them.
2    Q   Okay. When you entered into the consulting
3    agreement after you resigned your position as CEO, was it
4    always your understanding that you would not actually be
5    consulting?
6    A   No, to the contrary.
7    Q   Okay. So you actually understood when you
8    entered into the consulting agreement that you would
9    actually be working; is that correct?
10   A   I believed that I'd be called upon.
11   Q   And that never happened?
12   A   No.
13   Q   Why did you believe that?
14   A   There was discussions that, you know, there
15   might be places on a board of directors that maybe I
16   could serve at a later date, you know, be on one of the
17   boards for one of the companies upon the sale of one of
18   the companies and/or all of the companies, that kind of
19   stuff. So there was that kind of dialogue, and so I
20   believed that at some point I would serve in some
21   capacity.
22   Q   And who were those conversations with?
23   A   Roland.
24   Q   Mr. Arnall?
25   A   Uh-huh.

Page 87

1    Q   Did you ever contact him about why you were
2    never called upon?
3    A   No.
4    Q   Was it more than one conversation with him?
5    A   No. You know, no, I don't think so. I mean
6    this all happened in a very short period of time, so it
7    was like a day, right, all this stuff went down in like
8    a day or two, right.
9    Q   Your resigning and then entering into the
10   consulting agreement?
11   A   Well, the basic terms, but we actually signed
12   the agreement like two weeks later because it gets
13   prepared, et cetera, but yeah, there was a -- this all
14   happened in a day or two.
15       MS. BOWMAN: Okay. We can take that break,
16   switch video.
17       THE VIDEOGRAPHER: This marks the end of
18   videotape number 1, Volume 1, in the deposition of Wayne
19   Lee. Going off the record at 11:19 a.m. Please remove
20   your mikes.
21       (Recess.)
22       THE VIDEOGRAPHER: This marks the beginning of
23   videotape number 2 in the continuing deposition of Wayne
24   Lee. We are back on the record at 11:38 a.m.
25   BY MS. BOWMAN:

Page 88

22 (Pages 85 to 88)

1    Q   Mr. Lee, during the period of time where you
2   were the CEO of ACC Capital Holdings, what was your
3   compensation package?
4    A   I drew a base pay.
5    Q   Okay.  Which was?
6    A   330-ish.
7    Q   330,000?
8    A   Yeah.
9    Q   And what were the other benefits?
10   A   You know, normal health, medical/dental that
11  kind of stuff, right, and then there was a discretionary
12  portion that would come up at the end of May or March of
13  every year.
14   Q   A bonus portion?
15   A   Yes.
16   Q   What was that based on?
17   A   There's no -- it was discretionary.
18   Q   Okay.
19   A   I never had anything that said "You you this.
20  You do that."
21   Q   Okay.  And did you ever receive a discretionary
22  bonus while you were the CEO of Ameriquest?
23   A   Well, certainly, yeah, every March.  So I got
24  promoted.  I was the CEO for a half a year.
25   Q   Okay.

Page 89

1    A   Do you follow me?
2    Q   Yes.
3    A   And then whenever the proceeding March was, and
4   I left in June, so in that March period I got a bonus.
5    Q   And what was it?
6    A   Off of memory I think it was 5 million.
7    Q   Were there any other benefits?
8    A   Cell phone.  Nothing -- no.  I mean I didn't
9   pay for my cell phone, you know, stuff like that.
10   Q   There was no ownership interest in the company?
11   A   No.
12   Q   What was your understanding of why you were
13  being offered a $50 million consulting agreement?
14       MR. WIEGAND:  Objection.
15       Go ahead.
16       THE WITNESS:  It's a noncompete.  They didn't
17  want me to go to work for a competitor.
18  BY MS. BOWMAN:
19   Q   In the course of your conversations with
20  Mr. Arnall about the consulting agreement, who all was
21  present?
22   A   Oh, who was present at what point?
23   Q   During the time when you were talking to
24  Mr. Arnall about the consulting agreement, who was there?
25   A   In that first like day -- because I left, you

Page 90

1   know, the day, that day or the next day or something like
2   that -- well, certainly Roland, and the only other person
3   that was present at one meeting, and I just don't know
4   what we were discussing at that particular time, was
5   Aseem Mital, okay?  The content of every of those
6   meetings that kind of happened, a couple of conversations
7   here, I don't know what I discussed with when; but
8   substantively there was meetings at that period of time
9   where Aseem was present when we were talking about me
10  leaving and that kind of stuff.
11   Q   Okay.  Where were the meetings taking place?
12       MR. WIEGAND:  Objection.
13  BY MS. BOWMAN:
14   Q   Were they at your office?
15   A   Corporate.  His office, my office, corporate.
16  Let's say corporate.
17   Q   That had been the office or the offices or the
18  office building out of which you had been operating for
19  the --
20   A   Yes --
21   Q   -- prior year?
22   A   -- 11 months, yeah.
23   Q   Okay.  Is it -- was it accurate what Mr. Cohen
24  said in your meeting with him where he indicated that
25  they weren't going to pay the first $6 million

Page 91

1   installment that you had failed to implement policies
2   and procedures --
3    A   Uh-huh.
4    Q   -- that could have prevented some of the
5   problems that were the subject of the Attorney General
6   investigation?
7    A   He didn't say the Attorney General
8   investigation --
9    Q   Okay.
10   A   -- because that occurred well before I ever
11  took the role of CEO, those allegations were.  That
12  wasn't subsequent to me taking over.
13   Q   Okay.  Did you fail to implement policies and
14  procedures that had resulted in problems at Ameriquest?
15   A   No.
16   Q   So his statement in your view was false?
17   A   Yeah.
18   Q   Have you ever considered whether or not there
19  were policies and procedures that you could have
20  implemented that would have protected Ameriquest from
21  some of the ongoing litigation?
22       MR. LeSAGE:  Objection.  Calls for speculation.
23       THE WITNESS:  Other than what's stated and
24  testified to, no.
25  BY MS. BOWMAN:

Page 92

23 (Pages 89 to 92)

1   Q   Okay. Have you ever thought about it?
2   A   No. I don't think about that place since I
3 left.
4   Q   Do you in any way blame yourself for the
5 ongoing litigation against Ameriquest about its mortgage
6 practices?
7   A   No.
8   Q   Do you think it's Roland Arnall's fault?
9   A   No.
10      MR. WIEGAND: Objection.
11      MR. LeSAGE: Calls for speculation.
12 BY MS. BOWMAN:
13  Q   The lawsuit that's -- the complaint for which
14 we have as Exhibit 1 --
15  A   Uh-huh.
16  Q   -- that was ultimately resolved between you and
17 ACC Capital?
18  A   Yes.
19  Q   Okay. And what was the resolution of that
20 lawsuit?
21  A   Oh, we settled on monetary terms.
22  Q   Okay. And what were those terms?
23  A   I received, and again 14,750 -- 14 million 750
24 of which 200,000, I believe, went to my attorney. So I
25 got less than the 200,000 which paid my counsel directly

Page 93

1 you know.
2   Q   Were there any other -- apart from the money,
3 was there anything else that was a part of the terms of
4 that settlement?
5   A   The only -- my understanding the only remaining
6 terms, and I've read it, okay, is they represent me in
7 ongoing matters -- now I understand personal as well
8 as professional, right, with regards to the companies
9 obviously and mutual nondisparagement.
10  Q   Okay.
11  A   That's it.
12  Q   So you now can go out and can get another job
13 in the mortgage lending business?
14  A   Uh-huh.
15  Q   They eliminated the noncompete --
16  A   Yep.
17  Q   -- which was your original counteroffer to
18 them.
19  A   To eliminate the noncompete, yes.
20  Q   And essentially it was on those terms, about
21 half of the money that you thought you were entitled to
22 and then the elimination of a noncompete.
23  A   Right.
24      MR. WIEGAND: Objection.
25      THE WITNESS: There's a lot of provisions in

Page 94

1 there. Obviously I can't hire people. All that stuff is
2 gone. It's not just noncompete. I can go to work, but I
3 can also -- all the provisions that we just read in the
4 consulting agreement and what have you. It's all been
5 redone. My only ongoing obligation is nondisparagement
6 for a period of time.
7 BY MS. BOWMAN:
8   Q   You mentioned that during the time that you
9 were CEO of ACCCH you had some conversations with the
10 Attorney Generals as a part of that investigation. Can
11 you tell me who you talked to.
12  A   We had a dinner with a room full of -- I mean
13 there was like all of them there. I mean I can't
14 remember their names, but, you know, we had dinner
15 meetings. I got introduced to a lot of them. You know,
16 we had conversations over dinner. Some of the staffers,
17 you know, they met me, all right. So I mean that's the
18 forum that I met many of these individuals.
19  Q   Did you have any specific conversations with
20 any of the AGs about their investigation of Ameriquest?
21  A   Huh-uh, counsel. Counsel did, that was
22 specific.
23  Q   During these dinner meetings was there any
24 discussion of the operations of Ameriquest?
25  A   Oh, no. It was get to know each other, more

Page 95

1 informal. It's dinner.
2   Q   Were you involved in any formal discussions
3 with the Attorney Generals about the terms of the
4 settlement?
5   A   I wasn't directly handling those matters.
6   Q   Yes, but were you involved in any kind of
7 conversations with the Attorney Generals about any of
8 the aspects of that settlement?
9   A   Not that I recall.
10  Q   When you were a CEO of Ameriquest Capital
11 Holdings, did you communicate by e-mail?
12  A   Certainly.
13  Q   Okay. Did you communicate with Mr. Arnall by
14 e-mail?
15  A   No, not really. He didn't communicate that
16 way.
17  Q   How did you communicate with him?
18  A   I talked to him. He'd call or he asked me into
19 his office.
20  Q   Was their regular reporting to him, in other
21 words, the preparation of reports that you delivered to
22 Mr. Arnall?
23  A   No, not coming from me. He didn't -- not
24 coming from me. I couldn't tell you what kind of reports
25 he got from everybody else, but I didn't provide him

Page 96

24 (Pages 93 to 96)

1  anything.
2      Q   As a general matter apart from communications
3  with Mr. Arnall, you did communicate with your own
4  employees and persons within the company by e-mail?
5      A   Yeah.
6      Q   Did you --
7      A   Blackberry.
8      Q   They're addictive, yes.
9      A   Uh-huh.
10     Q   Did you keep any kind of a calendar during that
11 time frame?
12     A   I personally didn't.  Do you mean in the
13 computer?  I didn't, no.
14     Q   Okay.  Was a calendar kept for you?
15     A   Yeah, whatever calendar I had would have been
16 kept for me by my assistant.
17     Q   Would it have been an electronic or paper
18 calendar?
19     A   I couldn't tell you what she did.
20     Q   Well, how did you know what you had on your
21 calendar for a day?
22     A   She'd write it on my little, you know, you have
23 a little flip the date.
24     Q   So you had a physical calendar --
25     A   Yeah.

Page 97

1      Q   -- in your office?
2      A   Those, you know, the 29th, right, and then, you
3  know, there's the one or 9:00 in the morning through 5:00
4  at night.  She'd write things on there, and I'd know I'd
5  have a meeting.
6      Q   Okay.  And how -- was that just given to you on
7  a daily basis?
8      A   Yeah.  She'd come in in the morning and
9  schedule -- make sure I had wrote on there what I have
10 for the day.
11     Q   Okay.  And did you make notes on those
12 calendars?
13     A   No.
14     Q   What happened to them?
15     A   I presume they were thrown away.  I didn't take
16 them.
17     Q   Did you make any notes or other records of like
18 a kind of to do operationswise and to do costwise when
19 you became CEO of all the things that you wanted to
20 accomplish?
21         MR. WIEGAND:  Objection.
22         THE WITNESS:  You approach the day.  You'd
23 write down, yellow pad, here's a couple, two things I
24 want to accomplish today, and I need to talk to this
25 person about it or that person about it.  Of course I

Page 98

1  did that.  Then once I talked to them and get those
2  initiatives going, they would take care of them.
3  BY MS. BOWMAN:
4      Q   Okay.  But what was your practice with regard
5  to those notes?  Did you maintain them in a file?
6      A   No.
7      Q   Give them to your secretary?
8      A   No.
9      Q   Did you make any kind of an agenda of the things
10 that you wanted to see happen, you know, kind of a big
11 picture overview of the things that you wanted to see
12 happen after you became CEO?
13     A   Well, I certainly remember doing it,
14 reorganizations and stuff like that.  There was pictures
15 drawn.  I didn't maintain them.  I would have staffers do
16 them, and I didn't personally do that.
17     Q   As far as preparing the actual documents --
18     A   Yes.
19     Q   -- that laid out the --
20     A   Right.
21     Q   -- changes?
22     A   I wouldn't have personally done that.
23     Q   Okay.
24     A   I would articulate what I wanted, and somebody
25 would do that, and so I didn't personally maintain the

Page 99

1  stuff --
2      Q   Can --
3      A   -- that I think you're describing.
4      Q   And can you -- can you tell me based on your
5  understanding were those computer-generated documents,
6  grafts, charts, drawings, whatever you're describing?
7      A   Yeah, yeah.  I mean org charts are going to
8  come off some kind of computer program, I assume, right,
9  but I don't know exactly the forums they use, whether
10 they -- you know, software, I would presume they use it
11 to make it more efficient.
12     Q   When you left the company as CEO, did you take
13 any materials with you?
14     A   Yes.
15     Q   What were those?
16     A   An indemnification agreement.
17     Q   And what was that?
18     A   It's typical in companies.  They give you an
19 indemnification when you sit on a board of directors
20 or something against personal liability, and they'll
21 represent you.  I haven't read it in a long time, but I
22 walked out of there with an indemnification agreement,
23 and that was it.
24     Q   That was separate and apart from your
25 consulting agreement?

Page 100

25 (Pages 97 to 100)

1    A   Which occurred two weeks later. I was already
2  at home.
3    Q   Okay.
4    A   That's the distinction. That's the only
5  distinction I'm trying to make.
6    Q   Okay. And the indemnification agreement was
7  simply that they would indemnify you for any of your
8  conduct while you were --
9    A   You can't indemnity somebody for --
10    Q   -- the business.
11    A   -- yeah, whatever those things do, you know,
12  they indemnify you. They can't indemnify somebody for
13  their bad behavior, but -- I haven't read it in two and a
14  half years. So I don't even recall what specifically it
15  represents, but --
16    Q   Is it something that you asked them for?
17    A   It was something I personally did not ask them
18  for. It was given to me.
19    Q   Okay. Do you have an understanding of why?
20    MR. WIEGAND: Objection.
21    THE WITNESS: I received it because a board
22  member asked for it.
23  BY MS. BOWMAN:
24    Q   Which board member?
25    A   Bob Barnum.
                    Page 101

1    MR. WIEGAND: Objection.
2    THE WITNESS: I wouldn't say that I needed
3  agreement, but it's prudent that the board has an
4  appreciation of broad issues, and I have a responsibility
5  to get buy-in.
6  BY MS. BOWMAN:
7    Q   To do what?
8    A   Get buy-in on major operational changes and
9  issues to not just Mr. Arnall but the board, but there
10  is not this signature it's okay for me to move forward
11  with initiatives, but I certainly made the board aware
12  of material operating changes and what I believe might be
13  the ramifications or impacts.
14    Q   Okay. And to the extent Mr. Arnall disagreed
15  with those proposals or the timing of those proposals,
16  you were not then at liberty to move forward with them at
17  your pleasure.
18    MR. LeSAGE: Objection. Asked and answered.
19    THE WITNESS: It wouldn't be prudent for me to
20  override, so I think I've answered that.
21  BY MS. BOWMAN:
22    Q   The bottom line is if he told you not to do it,
23  you would not do it.
24    MR. LeSAGE: Objection.
25    MR. WIEGAND: Objection.
                    Page 103

1    Q   Do you know why he asked for one?
2    A   No.
3    Q   How did it come to your attention that he had
4  asked that you be provided an indemnification agreement?
5    A   I as CEO had to execute them, sign them.
6  That's the reason I know they exist. That's it.
7    Q   Is it fair to say that with regard to any big
8  picture operational changes that you wanted to make when
9  you became CEO of Ameriquest, you had to have Roland
10  Arnall sign off on those?
11    MR. WIEGAND: Objection.
12    THE WITNESS: No. He didn't sign anything.
13  BY MS. BOWMAN:
14    Q   Did you consider him to be your boss?
15    MR. WIEGAND: Objection. It's kind of all been
16  asked and answered.
17    THE WITNESS: At some level he's the owner of
18  the company. Of course, he's your boss, just like you
19  have a responsibility to shareholders.
20  BY MS. BOWMAN:
21    Q   And if you were going to implement any
22  operational or cost changes like the ones that you've
23  already talked about, then you understood that you needed
24  his agreement to do that.
25    MR. LeSAGE: Objection. Asked and answered.
                    Page 102

1    MR. LeSAGE: You're trying to confuse him.
2  He's already --
3    MS. BOWMAN: Not really.
4    MR. LeSAGE: -- testified it was the board,
5  and you're saying -- you're making it very confusing as
6  to Mr. Arnall versus the board, and he's told you three
7  times it's the board.
8  BY MS. BOWMAN:
9    Q   And if Mr. Arnall told you not to do something,
10  you would not do it; is that correct?
11    A   As a representative of the board, yeah.
12    Q   It's your understanding Mr. Arnall controlled
13  the board?
14    MR. WIEGAND: Objection.
15    THE WITNESS: I can't -- control is a very --
16  his title is, my understanding, he was the chairman of
17  the board. That doesn't give his control of independent
18  board members. He was the chairman of the board and the
19  owner of the company, so 100 percent shareholder.
20  BY MS. BOWMAN:
21    Q   Okay. And what were -- what was the, to your
22  understanding, the operation of the board with results --
23  as it goes to their consideration of material issues?
24  Was there a -- did they vote? Was there simply
25  discussion and a decision?
                    Page 104

26 (Pages 101 to 104)

Esquire Deposition Services
800.640.2461

1    MR. WIEGAND: Objection --
2    MR. LeSAGE: There's no foundation --
3    MR. WIEGAND: -- it's really, really compound.
4    MR. LeSAGE: -- he was a board member or at
5 that level.
6    THE WITNESS: I'm sorry. I didn't hear my
7 counsel.
8    MR. LeSAGE: I said objection. There's no
9 foundation laid with regard to your ability to know what
10 goes on at all the board meetings.
11    THE WITNESS: That's very true.
12 BY MS. BOWMAN:
13    Q   As CEO did you regularly attend board meetings?
14    A   Yes, I did.
15    Q   Okay. Can you tell me during your tenure as
16 CEO what was the methodology used by the board in making
17 decisions about material issues presented to them?
18    MR. WIEGAND: Objection.
19    THE WITNESS: Define material.
20 BY MS. BOWMAN:
21    Q   Well, did they consider nonmaterial issues?
22    A   Not really.
23    Q   Okay. So how about then just what was the
24 procedure that they used to consider the issues that were
25 presented to them?

Page 105

1    MR. WIEGAND: Objection.
2    THE WITNESS: There's not one procedure in
3 every particular case. I don't recall every one, but
4 we discussed all aspects of the businesses in board
5 meetings.
6 BY MS. BOWMAN:
7    Q   And if there was a decision to be made, how
8 would that decision be made?
9    MR. WIEGAND: Objection.
10    THE WITNESS: Consensus or agreement.
11 BY MS. BOWMAN:
12    Q   Was that done by vote?
13    A   You know, particular items -- I mean there was
14 votes, I mean voting on certain things, and there was
15 other things that were just generally agreed upon, you
16 know. I mean yeah, we need to do this or yeah, we don't
17 need to do that or we should do it this way, so yes. Yes
18 to both I guess is what I'm saying.
19    Q   And during your tenure as CEO were there
20 minutes maintained of those board meetings?
21    MR. WIEGAND: Objection.
22    THE WITNESS: Presumption, yes, of every
23 single -- I mean yeah, my presumption was yes --
24 BY MS. BOWMAN:
25    Q   Okay.

Page 106

1    A   -- minutes were maintained.
2    Q   Who was taking the minutes of the board
3 meetings?
4    A   I think I stated in here my understanding was
5 his role was to do that.
6    Q   Was Mr. Cohen --
7    A   Yes.
8    Q   -- of the Buchalter firm?
9    A   Right, he did sometimes, and I'm trying to
10 think. I don't recall if there was any other
11 representatives that took meetings in his absence or,
12 you know, that kind of minutia, but --
13    Q   Okay. During your tenure as CEO were there any
14 other officers of the company or any of the affiliates
15 that regularly attended board meetings?
16    A   I mean the board members certainly and business
17 leaders and department heads would occasionally be called
18 in to talk to them, make presentations or what have you.
19    Q   Sure. Any other regular attenders?
20    A   You have business heads, and you have the board
21 of directors. There was no -- and then -- and then, of
22 course, legal representation, you know, minutes, what
23 have you. That's what I recall on a regular basis.
24    Q   Other than the consulting agreement and the
25 indemnification agreement, did you take any documents

Page 107

1 with you when you left your position as CEO of
2 Ameriquest?
3    A   I think I have a phone book, you know what I
4 mean, corporate phone numbers.
5    Q   Would that be the internal corporate phone
6 book?
7    A   Yeah.
8    Q   Anything else?
9    A   No, that's it.
10    Q   Did you take any electronic information?
11    A   No.
12    Q   Now prior to your becoming the CEO of ACC
13 Capital Holdings during the period of time when you were
14 running Argent --
15    A   Uh-huh.
16    Q   -- was Mr. Arnall involved in the operations of
17 Argent Mortgage?
18    A   Certainly not day-to-day operations, no.
19    Q   Your communications with Mr. Arnall about the
20 operations of Ameriquest Mortgage Company once you became
21 CEO, was that different from the level of communications
22 that you had with him prior to that when you were
23 president of Argent?
24    A   Yes.
25    Q   Would it be fair to say that he was more

Page 108

27 (Pages 105 to 108)

1  actively involved in the business of Ameriquest Mortgage
2  Company?
3      A   Yes.
4      Q   And can you describe for me or identify for
5  me, I guess is a better term, any employees of Argent
6  Mortgage that were also to your understanding officers
7  or employees of any of the other Ameriquest companies?
8      A   Okay. Again we're back to the corporate
9  structure thing, and I'm sure there's a legal framework
10  of corporate structure.
11     Q   I'm just asking your understanding.
12     A   Right. I think there were shared board members
13  between companies. Clearly we had shared services in the
14  HR in the early stages, and things evolved over time too,
15  right; but in the early stages when we were a shared
16  company and we weren't operating as Argent yet, it's much
17  different than when we became Argent, established its own
18  board, its own executives, et cetera. All right?
19         So that's my struggle with it, but generally
20  speaking the day-to-day operations, there was no shared
21  executives between Ameriquest and Argent on a day-to-day
22  operating. Legal services, you look at, you know, what
23  I mean? HR at various stages, yeah, they would probably
24  have a seat there, you know what I mean, on a legal
25  corporate structure although their day-to-day involvement

Page 109

1  would be minimal.
2      Q   Okay. From your perspective what was the, for
3  lack of a better term, business of Ameriquest Capital
4  Corporation?
5      A   To me?
6      Q   Yes.
7      A   Shared services. What other holdings Roland
8  has, I'm sure there's a whole lot more, okay? And I know
9  there was other organizations that reported there like
10  our auto division, okay, which was separate from the
11  mortgage division, but to me it was shared services.
12  That was their role.
13         MS. BOWMAN: Is everybody still on the line?
14         MR. KLEIN: Yes.
15         MS. JANES: Yes, this is Jean Janes.
16         MS. BOWMAN: Okay. My phone just rang, and I
17  was using that as the early alert system to
18  disconnection.
19     Q   What, from your understanding, was the business
20  of Ameriquest or ACC Capital Holdings?
21     A   A corporate structure to have the mortgage
22  group under because we had several companies.
23     Q   Okay. So to your understanding ACC Capital
24  Holdings was the holding company for the mortgage
25  businesses?

Page 110

1      A   That was my ultimate goal, and provide a
2  minimal amount of shared services at that level.
3      Q   Okay. But what was your understanding of the
4  actual structure then?
5      A   Much of the shared services was still at the
6  ACC level.
7      Q   Okay.
8      A   And I wanted to push that down to the mortgage
9  group and individualize it. That was one of the big
10  bones of contention.
11     Q   Okay.
12     A   Right. In turn the holding company from being
13  shared services to just being a holding company and
14  investing in different bases or whatever the heck he
15  wanted to do with it. Okay?
16     Q   And what to your understanding was the business
17  of Ameriquest Mortgage Company?
18     A   Mortgage lending and servicing.
19     Q   Retail mortgage lending and servicing?
20     A   Yes.
21     Q   And was that the combination of Ameriquest
22  Mortgage Company and Ameriquest Mortgage Services?
23     A   That was separated. Ameriquest Mortgage
24  Company became just a retail originator under me after
25  I became CEO as something I wanted to do, and I wasn't

Page 111

1  stopped from doing that.
2      Q   All right. And prior to that Ameriquest
3  Mortgage Company had been both the retail originator and
4  servicer?
5      A   Yes.
6      Q   And how long had that been the case?
7      A   As long as I kind of knew. You know, I mean it
8  always was lumped together.
9      Q   Okay. And what is -- what was the business of
10  Argent Mortgage Company?
11     A   Wholesale lender.
12     Q   Okay. Why don't you just give me a basic
13  understanding of what differentiated that from the retail
14  organization.
15     A   It's a business-to-business platform versus a
16  business-to-consumer platform.
17     Q   Sure. And I'm trying to just get a layperson's
18  description of what it was that Argent was doing that was
19  different than retail lending.
20         MR. WIEGAND: Objection. Asked and answered.
21  Don't -- you're implying that he didn't answer your
22  question. He did that perfectly.
23         MS. BOWMAN: I'm asking him for more of a
24  layperson's view.
25         MR. WIEGAND: Objection. I don't understand

Page 112

28 (Pages 109 to 112)

**Page 113**

1  the question at all.
2  BY MS. BOWMAN:
3     Q  If you were going to describe the business of
4  Argent Mortgage to, you know, your next-door neighbor,
5  what would you tell him?
6       MR. WIEGAND: Don't assume business-to-business
7  is wrong, but answer her question.
8       THE WITNESS: My simple -- that's what I would
9  because they don't necessarily understand what businesses
10  I'm doing businesses with. I would say it's a business-
11  to-business platform versus a business-to-consumer.
12  You're dealing directly with the end borrower, okay?
13       You can say -- I can sit here and say well, we
14  did business with mortgage brokers and mortgage bankers,
15  but I think that's more confusing to the layman versus
16  doing business directly with people. I mean that's the
17  only major -- that's the distinction.
18  BY MS. BOWMAN:
19     Q  Okay. And in the context of the Argent
20  wholesale business was Argent funding the loans?
21     A  Yes.
22     Q  Were they identified as the lender on consumer
23  closing papers?
24     A  Yes.
25     Q  Okay.

**Page 114**

1     A  There was a small, and I don't even know to
2  what extent we wound up doing it, there might have been a
3  small amount of correspondents where they would be in the
4  mortgage banker's name, but it was negligible. Generally
5  speaking all of Argent's loans were funded in Argent's
6  name with a small minutia of correspondent lending
7  dabbled in there in various cases or various times.
8     Q  Okay. And what was the business of Town and
9  Country Mortgage?
10       MR. WIEGAND: Objection.
11       THE WITNESS: Mortgage lending.
12  BY MS. BOWMAN:
13     Q  Were they a retail mortgage lender?
14     A  Yes, business to consumer.
15     Q  And then Ameriquest Mortgage Services you
16  indicated was incorporated after you became CEO?
17     A  Yes.
18     Q  And then the servicing portion of the company
19  was separated from the retail lending?
20     A  Correct. It was -- changed the name from
21  Ameriquest and everything, so it became -- my
22  understanding is it became its own legal structure.
23     Q  Okay. And what about Argent Mortgage? Was
24  Argent servicing its own loans?
25     A  No. It was being -- and again legal things,

**Page 115**

1  it was being subserviced by Ameriquest's servicing
2  division --
3     Q  Okay.
4     A  -- through some kind of servicing agreement.
5     Q  And did that continue after the incorporation
6  of the servicing group?
7     A  No, that would be subserviced by the new group.
8     Q  And was that always the case since the
9  wholesale business was started?
10     A  Yes.
11     Q  Can you tell me what the business was to your
12  understanding of Ameriquest Securities?
13     A  No, I can't.
14     Q  Did you understand that the loans that both
15  Argent and Ameriquest were making were being pooled and
16  sold as mortgage-backed securities?
17     A  Yes, I did.
18     Q  In the context of Ameriquest Capital
19  Corporation what were the other businesses other than
20  mortgage lending that came under that company?
21     A  We had an auto division.
22     Q  The auto loans?
23     A  Yeah, it was auto loans, auto lending, yeah.
24  That's it. It's mortgage and lending and auto lending,
25  and I couldn't speak to what else is up there.

**Page 116**

1     Q  Okay. And in your position as CEO of ACC
2  Capital Holdings, were you also responsible for the auto
3  division?
4     A  No, I was not.
5     Q  What were the services divisions that were a
6  part of ACC Capital Holdings?
7     A  Okay. Oh, the shared services thing?
8     Q  Right.
9     A  Shared legal services, IS services, HR
10  services -- pardon me. It's been a while. It's not
11  second nature anymore. That's what is coming to mind,
12  I'm sure there was something else, but it's just been a
13  while.
14     Q  Okay.
15     A  The biggies are IS, legal and HR.
16     Q  And what about marketing?
17     A  No, very company specific.
18     Q  Can you tell me was this, the shared services
19  division, was that true back through time that the
20  companies generally shared those kinds of services
21  division?
22     A  Yes.
23     Q  And that was at least true back to 1999?
24     A  Yes.
25     Q  Okay. Was there anything else that was a part

Esquire Deposition Services
800.640.2461

of ACC Capital Holdings other than the shared services?
 A   Yeah. Again I just know what I know as far as
our businesses, and I know they rolled up to it. That's
my understanding which is mortgages and auto and maybe
some of our securitization shelves or something, but I
can't speak to it because I didn't necessarily have
access and preview to the legal structure up at the ACC
level.
 Q   Okay. Can you describe for me what the
structure of Ameriquest Mortgage Company was when you
became the CEO of ACCCH as far as the various divisions
and structure all the way down through the sales offices.
 A   Okay. That's complex. All right. Now you're
talking about when I first took over --
 Q   Right.
 A   -- Ameriquest or rolled under me. Generally
speaking you had Ameriquest, the retail origination sales
force and branch structure, okay?
 Q   So we're starting out at the branches. You're
starting out at the branches?
 A   No. I'm just saying you had the origination
platform rolled under Ameriquest, the retail origination
platform known as Ameriquest. You had the servicing
platform --
 Q   Okay.

Page 117

 A   -- known as Ameriquest. Okay?
 Q   Uh-huh.
 A   And technically under Ameriquest again a lot of
the shared services, I believe, were actually at the ACC
level. Do you follow me?
 Q   Sure.
 A   But, you know, I perceived it all to be pretty
much Ameriquest. I mean all those shared services were
Ameriquest because ACC is an acronym for Ameriquest
Capital. So that's why I'm struggling, you know. I
understand there is a legal separation between Ameriquest
Mortgage Company and Ameriquest Capital Corporation, but
I'm looking at it all as Ameriquest; but for -- I think
what you're asking, it's servicing and retail branch
structure, and then, of course, the supporting
infrastructure for that business.
 Q   Sure. Well, let's talk about from the lending
side as opposed to the servicing side at Ameriquest --
 A   Okay.
 Q   -- when you took over as CEO. What was the
design of that infrastructure?
 A   Bottom up, top down? You're talking about the
sales side.
 Q   Yes, the sales side.
 A   Okay.

Page 118

 Q   And you can start with the branches if you want
if that's easier.
 A   Okay. We had branches, okay.
 Q   Is that the most disburse form of the sales
force that was in place during the time you were CEO?
 A   Yes.
     MR. WIEGAND: Objection.
     THE WITNESS: Yeah.
BY MS. BOWMAN:
 Q   Okay.
 A   I mean a branch is a branch and has people in
it.
 Q   Sure, and what were -- who were or what were
the -- was the structure of the branch?
 A   Okay. A manager.
 Q   Okay.
 A   You have salespeople, you have processing
staff, loan processors.
 Q   Is there anybody else that was located at the
branches?
 A   Yes.
 Q   Who?
 A   Not in every branch --
 Q   Okay.
 A   -- okay? You have their sales managers which

Page 119

is the next level, area sales managers.
 Q   And they would be located at a branch within
the area?
 A   Odds are they would be located at one of a
number of branches that rolled up to them. Does that
make sense?
 Q   Yes.
 A   Okay.
 Q   Okay. And after the area sales managers what
was the next level?
 A   Regional sales managers.
 Q   Do you know how many of those there were when
you came on as CEO?
 A   I remember it to be six, but don't hold me to
that. It might have been seven, but in that range, six
to seven.
 Q   And what was the hierarchy above the regional
sales manager?
 A   You had a head of sales.
 Q   And that's who the regional sales managers
reported to?
 A   The -- hang on a second here. No. There is
one more level. There is a divisional.
 Q   Okay. Divisional, were they called divisional
sales managers?

Page 120

30 (Pages 117 to 120)

1    A   I think so.
2    Q   And how many of those were there?
3    A   Couple. I think there was two.
4    Q   All right.
5    A   It's been a while, so —
6    Q   Sure.
7    A   But I -- there is a couple of those. That
8  position existed.
9    Q   Okay. Above that was the head of sales?
10   A   Then you have the head of sales.
11   Q   And was it essentially a tiered reporting, one
12  level reported to the next, reported to the next?
13   A   Logically, yes.
14   Q   And who was over the head of sales?
15   A   When I took over Mary Joe last name Shelton?
16   Q   What was her position?
17   A   Officially I don't know, but she was the head
18  of sales, you know. Probably executive vice president
19  or something like that, head of retail sales or -- I
20  don't know what the -- I don't remember what the real
21  title was, but she was the head of sales.
22   Q   Okay. And then did she report to anyone? Was
23  anyone above her?
24   A   Me. When I took over, then she would have
25  reported to me —

Page 121

1    Q   Okay.
2    A   -- because I was the acting president, I guess.
3    MR. LeSAGE: Can we go to 12:30 for lunch?
4    MS. BOWMAN: Yes, that's fine.
5    MR. LeSAGE: It's 12:24.
6  BY MS. BOWMAN:
7    Q   And then from the retail side --
8    A   Uh-huh.
9    Q   -- perspective then you reported to Mr. Arnall
10  and the board?
11   A   Yes.
12   Q   And prior to --
13   A   Well, no. Again forget legal structure here.
14   Q   Uh-huh.
15   A   Repeatedly from Roland I report to Aseem Mital
16  who was the president as I understood it of ACC. Do you
17  follow me? I'm ACCCH which fell under ACC.
18   Q   Okay.
19   A   He is the president of ACC. That's my
20  understanding. So I rolled to Aseem in a reporting
21  structure and then ultimately the board beyond that.
22  And certainly, you know, companies have boards there
23  too. So you have your responsibilities to those boards.
24   Q   Okay. So Ameriquest Mortgage Company had a
25  board of directors as well.

Page 122

1    A   Yeah. A lot of shared members, but --
2    Q   Sure.
3    A   -- yeah.
4    Q   When you took over as CEO of the company in the
5  summer of 2004, who were the, to your recollection, the
6  board members?
7    A   I don't think I can do better than what I gave
8  you. I don't remember the names because they were
9  shared. So I think you kind of got a look at the shared
10  people that I testified to earlier.
11   Q   Okay. So all the people that you identified
12  before would have also been board members of Ameriquest
13  Mortgage Company?
14   A   Right.
15   Q   Would they have also been board members of
16  Argent Mortgage Company?
17   A   In some cases people would come in because
18  there is a couple of different independent members and
19  other people would leave because they weren't on that
20  board, but there was all these different companies, so --
21  and I don't recall all their names. It's just been too
22  long. I didn't get to know them all that personally
23  because I wasn't CEO for very long.
24   Q   But prior to your position as CEO, did you
25  regularly attend board meetings?

Page 123

1    A   No.
2    Q   Did you regularly attend board meetings of
3  Argent?
4    A   Well, yes. I would present the Argent story
5  to the board of directors on a quarterly basis pretty
6  consistently, but I wouldn't attend the rest.
7    Q   Okay.
8    A   Okay.
9    Q   But a CEO then —
10   A   I would be called to board meetings on a
11  consistent basis, yes. "What's going on with your
12  business?"
13   Q   Okay. We've talked now about the kind of
14  hierarchy within the retail lending side of Ameriquest.
15  Can you describe for me on the servicing side what that
16  hierarchy was?
17   A   God. I'm not as good at that. I don't think I
18  can give you a good picture. You know, there was a head
19  of servicing, and she structured it how she structured
20  it.
21   Q   And who was that when you were CEO?
22   A   Jane Johnson.
23   Q   And do you know if she is still with the
24  company?
25   A   I have no idea.

Page 124

31 (Pages 121 to 124)

1    Q    What about Mary Joe Shelton? Is she still with
2  the company?
3    A    I have no idea. They shut down the branches,
4  so I don't know.
5    Q    Can you describe for me the -- and we'll see
6  if our lunch is here -- can you describe for me what the
7  business structure was, the hierarchy was at Argent
8  Mortgage?
9    A    I'll do better there.
10   Q    Okay.
11       MR. WIEGAND: At what time?
12  BY MS. BOWMAN:
13   Q    During the time that you -- well, during, I
14  guess, the entirety of the operation of the wholesale
15  business including --
16   A    It changed a lot because there was nothing to
17  a big company.
18   Q    Okay. Well, why don't you --
19   A    Pick a time.
20   Q    Why don't you try to give me a perspective over
21  time then starting from the time when you were CEO.
22       MR. LeSAGE: I object. It calls for a
23  narrative. I think I'll instruct the witness not to
24  answer that. Let's pick a time and go from there.
25       MS. BOWMAN: I asked him to start with CEO and

Page 125

1  give me a structure.
2        THE WITNESS: You're talking about CEO of the
3  whole company which is basically the end, right --
4  BY MS. BOWMAN:
5    Q    Yes.
6    A    -- last 11 months. That's perfect. You had
7  sales, you had production, and you had operations.
8    Q    Okay. Were they essentially three business
9  units?
10   A    Yeah. I mean not business units, departments.
11  It's an organizational structure, okay? There's a sales
12  unit.
13   Q    Uh-huh.
14   A    There's production unit that processes and
15  underwrites loans, and then there's operations that's a
16  controls unit.
17   Q    Okay. What was --
18   A    And I think I'm remembering the names right,
19  but that's -- those were three big categories that come
20  to my mind right now.
21   Q    Okay. And in between you as the chairman of
22  the board was there anyone between you and the head of
23  those various units, any positions between you and the
24  head of those various units?
25   A    The people that headed those three units

Page 126

1  reported directly to me as president.
2    Q    And in that time frame who were -- who is the
3  head of the sales unit?
4    A    Sam Marzouk we talked about.
5    Q    Okay. And the production unit?
6    A    Mike Urtel we talked about.
7    Q    And the operations unit?
8    A    Tom Sang.
9    Q    Can you spell his last name?
10   A    I think it's S-a-n-g.
11   Q    S-a-n-g --
12   A    S-a-n-g.
13   Q    -- g-e?
14   A    I don't think there's an E. I don't know.
15   Q    All right.
16   A    That's the best I can give you.
17   Q    Okay. And can you tell me what the kind of
18  responsibility of the sales unit was in the business?
19  What did they do?
20   A    Okay. Tell the brokers and bankers who we are,
21  what we do and how to do business with us.
22   Q    How about the production unit? What did they
23  do?
24   A    Loans come in. They'd process them through
25  funding.

Page 127

1    Q    And what about the operations unit? What did
2  they do?
3    A    Audit controls, vendor management, vendor
4  maintenance, those kinds of items, appraisal, appraisal
5  review I'll say.
6    Q    Okay. During the time that you were president
7  of Argent from or, I guess --
8    A    Whatever the time frame was.
9    Q    -- head of Argent or the wholesale business --
10   A    Yes.
11   Q    -- from 2001 until you took the position as
12  CEO, did the wholesale business have each of these units?
13   A    In some semblance, maybe by a different name,
14  but generally speaking a structure was the objective from
15  the beginning.
16   Q    Okay. And were all of those three people that
17  you identified involved during that entire period of
18  time?
19   A    Not the entire period of time.
20   Q    Okay. Can you tell me if there was other kinds
21  of management groups in Argent, there was other people
22  other than the people that you've identified?
23       MR. WIEGAND: Now we're talking from 2003
24  forward because --
25       THE WITNESS: The beginning.

Page 128

32 (Pages 125 to 128)

Page 129

```
1        MR. WIEGAND:  -- she's not talking about when
2   it was a wholesale business as part of Ameriquest.  Now
3   she said Argent.  So now we're talking sometime after
4   2003 or so until mid-'04.
5        THE WITNESS:  I can't recall exactly, you know,
6   when Sam Marzouk started with the company, okay?  I know
7   it was a couple of years into it, so sometime in 2003,
8   I'm guessing.  So I don't know if it was pre-Argent or
9   post-Argent, do you follow me, but he joined the company
10  later.
11  BY MS. BOWMAN:
12       Q    And came into the wholesale business?
13       A    No.  He was in the wholesale business.  We
14  hired him from somebody else.
15       Q    Okay.
16       MR. LeSAGE:  It's 12:35.  Is this a good time
17  to break?
18       MS. BOWMAN:  I'm almost done with this series.
19       THE WITNESS:  And Tom Sang also joined the
20  company later, and again it was probably year two or year
21  three of me being the head, and I don't know what legal
22  structure it fell over or under when he was there.
23  BY MS. BOWMAN:
24       Q    Were there any other individuals that were
25  involved with you in the management of the wholesale
```

Page 130

```
1   business whether it was Ameriquest, wholesale or Argent?
2        A    Yeah.  We had 5,000 employees, so I had lots of
3   management.
4        Q    Okay.  So --
5        A    Right.  I mean --
6        Q    -- under these three?
7        A    -- there's lots of organizational structure.
8        Q    Under these three units there's lots of
9   organizational --
10       A    Well, I'm trying to think of other -- you know,
11  I mean, of course, we had a legal group, right?
12       Q    Okay.
13       A    You know, those are the big operating functions
14  is what I gave you, but there's other departments.  There
15  was an HR group embedded in Argent.  We built and made
16  this company very independent --
17       Q    Okay.
18       A    -- from the shared services world.  I had a
19  technology arm and so forth that rolled up to a fourth
20  person Jeff Gillis because I know you're going to ask the
21  name.
22       Q    Uh-huh.  Who was running your HR group?
23       A    Ann Jeanette Valenta, and don't ask me how to
24  spell it.  Valenta.
25       Q    And you had a separate legal group?
```

Page 131

```
1        A    I had legal representation, but there was a lot
2   of shared services in that area still.
3        Q    All right.
4        A    And, you know, I had outside counsel that did a
5   lot of Argent-specific work for me.
6        Q    Was there anyone in-house at Argent in the
7   legal department?
8        A    Uh-huh.
9        Q    Who was that?
10       A    Mike -- Mike Mayer in the later years,
11  certainly not in the early days, shared services.
12       MS. BOWMAN:  Okay.  Well, we can go ahead and
13  take a break.  I'll come back to this.
14       THE VIDEOGRAPHER:  Going off the record at
15  12:36 p.m.  Please remove your mikes.
16       (Lunch recess.)
17       THE VIDEOGRAPHER:  We're back on the record at
18  1:18 p.m.
19  BY MS. BOWMAN:
20       Q    Mr. Lee, we were talking before we broke for
21  lunch about kind of the organizational structural of
22  Argent during the time period when you were CEO for both
23  the companies and then looking at some of those issues
24  back over time.  I'd like to talk to you specifically
25  about the sales unit.
```

Page 132

```
1        A    Okay.
2        Q    Can you describe to me what -- describe to me
3   what the hierarchal structure was within the sales unit
4   and what their kind of operating goals were.
5        MR. WIEGAND:  Objection.
6        THE WITNESS:  There was a sales executive --
7   I'm trying to even think what their title was -- account
8   rep, account executive.  I'm -- I don't recall.  It was
9   one of those two.  The salesperson.  Okay.
10  BY MS. BOWMAN:
11       Q    Okay.
12       A    And their objective was to go call on
13  businesses and explain who we were, what we did and how
14  to do business with us.
15       Q    Okay.  And was that the -- were those the only
16  employees within the sales unit?
17       A    No.
18       Q    Okay.
19       A    They rolled up to -- I think I called them --
20  when I left, they were called regional sales managers.
21       Q    Okay.  And who did they report to, the regional
22  sales manager?
23       A    The head of sales.
24       Q    And that was?
25       A    Sam Marzouk.
```

33 (Pages 129 to 132)

1    Q    Were there actually regional sales offices of
2    Argent Mortgage?
3    A    No.
4    Q    Okay. How was the company laid out physically?
5    A    Okay. We were specific to what, sales?
6    Q    To the sales unit.
7    A    Okay. All home-based with one exception, the
8    head of sales.
9    Q    Was --
10   A    He worked out of one of our centers, our big
11   production centers. So he wasn't home-based.
12   Q    When you're saying home-based, are you talking
13   about in Orange County, California?
14   A    No.
15   Q    Where was Argent based?
16   A    Where they lived. You mean where was Argent
17   based?
18   Q    Yes.
19   A    Okay.
20   Q    Okay.
21   A    Home-based means they have a laptop and they
22   work from their house. That's what I'm trying to --
23   Q    Okay.
24   A    Okay?
25   Q    We were talking past each other.

Page 133

1    A    Right. I apologize.
2    Q    And then --
3    A    Not corporate.
4    Q    And that was true for the regional sales
5    administration and the sales personnel. They were all --
6    A    All sales personnel with the exception of the
7    head of sales, Sam Marzouk, were home-based when I left.
8    Q    Okay. And how many regional sales managers
9    were there?
10   A    Again not an exact number, but I think there
11   was like 16 when I left, 16, 17, something like that.
12   Q    And had that grown over time?
13   A    Certainly.
14   Q    And what about sales personnel?
15   A    How many sales reps?
16   Q    Right.
17   A    I think when I left, we were approaching right
18   around the 450, 500-ish range of sales reps.
19   Q    Okay. When you talk about the salespersons
20   going out and calling on businesses, those businesses
21   were what kind of businesses?
22   A    Mortgage businesses, mortgage brokers and
23   mortgage bankers.
24   Q    Okay. And were there policies and procedures
25   that those salespersons were obligated to follow that

Page 134

1    were from Argent?
2    A    In regards to what area? I mean certainly
3    there was policies and procedures within the company that
4    all employees had to follow --
5    Q    Okay.
6    A    -- all right?
7    Q    Let's see if we can think about it this way.
8    Were the salespeople simply signing up the accounts or
9    were they an ongoing relationship with those mortgage
10   brokers or mortgage bankers?
11   A    They're relationship people --
12   Q    Okay.
13   A    -- who we are, what we do and how to do
14   business. I mean they're relationship people.
15   Q    Okay. And were they providing materials and
16   information to --
17   A    Yes.
18   Q    -- the mortgage brokers or mortgage bankers?
19   A    Yes.
20   Q    Okay. How was that done? Was that done
21   centrally or on a salesperson-by-salesperson basis?
22   A    It's a very technical world these days, but
23   there's programs, there's pricing, products. They're
24   produced by corporate or, you know, the company.
25   Q    Uh-huh.

Page 135

1    A    And they're the distribution mechanism, and
2    they do it in a variety of ways. They might drop it off.
3    They might mail it, you know.
4    Q    Okay.
5    A    I'm sure there's e-mail where they e-mail, fax
6    things to them, you know, I mean the normal communication
7    methodologies that exist in the world today.
8    Q    Sure. As far as can you describe for me what
9    kind of uniform information the sales personnel were
10   providing to brokers and mortgage bankers about what
11   Argent was doing?
12   A    Products and pricing sheets.
13   Q    Is there anything else?
14   A    Hmm, I mean that's what they did, products and
15   pricing sheets. Nothing is coming to mind. I mean
16   that's --
17   Q    Did any of the sales personnel from Argent
18   participate in land closings with borrowers?
19   A    A big company. It may have happened, but it
20   certainly would against policy. I mean stay away.
21   Q    Okay. And what policy are you talking about?
22   A    Independent third-party close through title
23   companies. That's what we required on our loans. Title
24   and escrow, and I don't want to be too specific, but, you
25   know, third-party closing agents.

Page 136

34 (Pages 133 to 136)

1    Q   Okay. And was that third party separate and
2  apart from the brokers and mortgage bankers who were
3  originating the loans?
4    A   That was one of the many goals, yes.
5    Q   Okay. Was there some period of time during
6  which the mortgage bankers and mortgage brokers were
7  closing their own loans?
8    A   Well, it occurs in the industry if that's what
9  you're asking. Mortgage bankers, mortgage -- there's no
10  requirements legally you can't close your own loans. So
11  yeah, there's people that do that.
12        MR. WIEGAND: But you're not now talking about
13  within Argent or even within the wholesale business as
14  well at Ameriquest, correct?
15        MS. BOWMAN: I'd appreciate if we not engage in
16  talking to the witness.
17        MR. WIEGAND: All right. Then I'm going to --
18  all right. I'm going to have to object to the question.
19  Please try to keep the questions focused on a time frame
20  and whether he's talking about at the company or not.
21  So go ahead.
22  BY MS. BOWMAN:
23    Q   Were the brokers and the mortgage lenders that
24  Argent was dealing with, were they at times closing their
25  own loans?

Page 137

1    A   Not to my knowledge.
2    Q   That would have violated company policy if that
3  had happened?
4    A   I wanted independent closing agents that would
5  have been independent from, of course, our company as
6  well as the customer.
7    Q   If Argent sales representatives had been
8  participating in those loan closings whether they were
9  with a third-party processor or the mortgage banker or
10  broker, that would have also violated Argent's policies?
11    A   Right. I mean certainly my wish is -- I don't
12  know exactly, it's been a long time -- what was written
13  at that point in time as far as policies, but we had
14  third-party closers. That was my wishes and --
15    Q   Did --
16    A   -- my understanding.
17    Q   I'm sorry. I didn't mean to interrupt you.
18    A   That's okay.
19    Q   Did Argent provide instructions or information
20  to the third-party closing agents about practices that
21  Argent wanted to see happen in connection with closings?
22    A   And again I'm probably not the best, but I'm
23  going off recollection, there is closing instructions
24  attached to, I believe, every set of loan documents, all
25  right, or signing instructions; but again I'm probably

Page 138

1  not the best to ask, but you can't just have lone
2  documents show up. You wouldn't know what to do with
3  it. So there was some level of instruction certainly.
4    Q   Okay.
5    A   Okay?
6    Q   Apart from -- well, and that was being provided
7  by Argent to the third-party closers?
8    A   Because we would be forwarding the documents.
9    Q   That's correct.
10    A   Yeah.
11    Q   Okay. As far as -- apart from loan closing
12  instructions for a particular set of loan documents,
13  was Argent providing any materials or policies to the
14  third-party closers about the way in which they wanted,
15  you know, closing issues handled, any kind of like
16  broader instructions?
17        MR. WIEGAND: Objection.
18        THE WITNESS: I don't know. I don't know. I
19  guess I don't understand "broader instructions,"
20  what that could even mean.
21  BY MS. BOWMAN:
22    Q   Was Argent providing to the third-party closers
23  specific additional disclosures that they wanted to make
24  sure that the customers all received, borrowers all
25  received at the closing?

Page 139

1        MR. WIEGAND: Can you repeat the question?
2  (Record read.)
3        MR. WIEGAND: Objection.
4        THE WITNESS: A loan set of documents has, and
5  I won't say hundreds, but numerous specific disclosures.
6  I'm not the most knowledgeable person to tell you what
7  they are, but there is a lot of -- every one of those
8  documents is there for a reason --
9  BY MS. BOWMAN:
10    Q   Okay.
11    A   -- okay, most of which are required by law,
12  I would presume, certain types of disclosure. And we
13  had -- our document sets were pretty detailed.
14    Q   Are you talking about generally the individual
15  loan packages right now.
16    A   Certainly, yeah.
17    Q   Okay. I'm talking about separate and apart
18  from that, did Argent regularly provide general
19  instructions to third-party closers about how they
20  specifically wanted loans closed?
21    A   Not that I'm aware of.
22    Q   Okay. If we wanted to -- if there was, if you
23  wanted to go back and find out what information apart
24  from actual loan documents had been sent from Argent to
25  third-party closers, who would be the best person to talk

Page 140

35 (Pages 137 to 140)

1  to about that?
2      A   Compliance department – let's say Mike Mayer
3  because the compliance department rolled up to Mike Mayer
4  which is the attorney.  Mike Mayer assuming he's still
5  there.
6      Q   Okay.  With regard to the sales or the sales
7  personnel –
8      A   Uh-huh.
9      Q   – were they providing any additional
10  information or any kind of Argent standard practices to
11  the brokers and mortgage bankers that were originating
12  Argent mortgages?
13      A   Standard practices.  You've got to explain that
14  to me.
15      Q   Sure.  Were they providing them with any
16  instructional material about interacting with the
17  consumers about Argent products?
18      A   No.
19      Q   Okay.  Were they –
20      A   They would introduce Argent products, but they
21  wouldn't tell them how to –
22      Q   How to sell them.
23      A   Certainly not.
24      Q   Well, were they providing them with any scripts
25  to help them describe or explain the Argent products?

Page 141

1      A   Not to my knowledge.
2      Q   Okay.  Were they – did they provide to the
3  mortgage brokers and lenders best practices information
4  about communicating with borrowers?
5          MR. WIEGAND:  Objection.
6          THE WITNESS:  What best practices?
7  BY MS. BOWMAN:
8      Q   Whatever Argent wanted to communicate to them.
9          MR. WIEGAND:  Objection.
10          THE WITNESS:  Argent didn't want to communicate
11  with the consumer.
12  BY MS. BOWMAN:
13      Q   I meant with the brokers and the bankers.
14  Other than rates, you say you talked about they provide
15  them with product sheets and rate sheets, information
16  about the products.  Was there anything else?
17      A   Okay.  You know --
18          MR. WIEGAND:  Objection.  What's the question?
19          THE WITNESS:  Yeah.
20          MR. WIEGAND:  We're now three on to the
21  preceding question.
22  BY MS. BOWMAN:
23      Q   Okay.  I said is there anything else that they
24  provided to them.
25      A   No, not that's coming to mind.  I mean it's

Page 142

1  been a long time, but no.  Product -- they tell them
2  our products, how to do business with us, programs and
3  products and how to do business with us.
4      Q   And if we wanted to find out what specific
5  materials were provided to brokers and mortgage bankers
6  by Argent, who would be the best person to talk to about
7  that?
8      A   Well, any distributed items, company-approved
9  distributed items I would say Mike Mayer.  Again you're
10  going through legal, right?
11      Q   And would the head of sales have been aware of
12  those materials?
13      A   He would have been a recipient of them after
14  they're approved.
15      Q   Who would have been the people that developed
16  them?
17      A   Well, there's a marketing group within the
18  company, a marketing department, but that's not all
19  marketing materials – rate sheets and stuff like that,
20  you know.
21      Q   Okay.  And from the standpoint of marketing
22  materials, who would have been preparing marketing
23  materials used by Argent to send to brokers and mortgage
24  bankers?
25      A   The person or what are you asking me?

Page 143

1      Q   Right.  The group –
2      A   The head of marketing, they develop
3  materials –
4      Q   Okay.
5      A   – legal approves.
6      Q   But who is marketing?
7      A   There was more than one, okay –
8      Q   Okay.
9      A   – because of the time frames here again.
10      Q   Sure.  Okay.  When you were CEO.
11      A   The head of our marketing department was David
12  Stark.  I think that's – I think that's his name.
13      Q   And who would have been involved in the
14  development of the rate sheets and product descriptions
15  that were sent to brokers and mortgage bankers?
16      A   Who would have been involved?  A lot of people,
17  okay?  I mean when you're talking about your product
18  development, a lot of people.  Legal is involved because
19  you have compliance rules you have to adhere to.  A lot
20  of people.
21      Q   Okay.  And when we're talking about the
22  actually preparation of the documents, the communicating
23  documents, who was responsible for preparing those?
24      A   I would say it's very collaborative --
25      Q   Okay.

Page 144

36 (Pages 141 to 144)

Esquire Deposition Services
800.640.2461

1    A    – okay?
2    Q    What would be – who were the groups that would
3  be involved?
4    A    You clearly have your marketing group. You
5  clearly have your analytics group that studies what our
6  competitors are doing. You clearly have your head of
7  sales. It's like all areas of the company because that's
8  the business you're in is what I'm trying to say. All
9  departments are touching. They've got to understand and
10 have input into your product. They just do.
11   Q    Okay.
12   A    So that's why I'm struggling with this
13 question.
14   Q    Sure.
15   A    It's literally every organization in the
16 company.
17   Q    Okay.
18   A    All right?
19   Q    And who is the head of the analytics group?
20   A    I don't remember. It rolled up to – you know,
21 in that hierarchy it rolled up to Jeff Gillis, that name
22 I gave you earlier. So I think that's about as good as
23 I'm going to do. I don't remember that small group –
24   Q    Okay.
25   A    – you know, handful of people that study.

Page 145

1    Q    Sure. Were there contracts or agreements
2  between Argent and the mortgage brokers or – and/or
3  mortgage bankers?
4    A    Yeah.
5    Q    What were the elements? I mean what was in
6  those contracts? What were they agreeing to do or not
7  do?
8        MR. WIEGAND: Objection.
9        THE WITNESS: It's probably been four years,
10 five years since I've looked a one, but I'm going to
11 describe it as representations and warranties, all
12 right –
13 BY MS. BOWMAN:
14   Q    All right.
15   A    – both ways at some level, and expectations,
16 but that's about as deep as I'm going to be able to get.
17   Q    What were the subjects of the contracts though?
18 Was it just simply compensation of the brokers and
19 mortgage bankers or –
20   A    I don't know.
21       MR. WIEGAND: Objection. She didn't finish the
22 question or what.
23 BY MS. BOWMAN:
24   Q    – or what?
25       MR. WIEGAND: Compound.

Page 146

1        Go ahead. Objection.
2        THE WITNESS: It's – yeah. I've got to say I
3  don't recall specifically what was in there. I gave you
4  a very broad general thing, and, you know, you're trying
5  to get very specific like I don't know what it says.
6  It's our guidelines, right. Try to get it to fit our
7  underwriting standards so we don't waste our time. You
8  know, there's some expectations, right, so –
9  BY MS. BOWMAN:
10   Q    Did it describe the compensation of the brokers
11 and mortgage bankers?
12   A    I don't recall it doing that, no.
13   Q    How was that established?
14   A    Product sheets. The maximums and limitations
15 and stuff are on product sheets.
16   Q    Okay. Was it Argent's responsibility as the
17 lender through the mortgage brokers and mortgage bankers
18 to provide consumers with the good faith estimates?
19   A    Again I'm going off my recollection of the
20 time. Legally we were required as a lender to send them
21 a good faith estimate.
22   Q    Yes.
23   A    No, I believe, as I recall.
24   Q    Okay. So you were relying on the mortgage
25 brokers and mortgage bankers to send a good faith

Page 147

1  estimate to the consumers?
2    A    I didn't say that. Legally I wasn't required
3  to send one. The broker was or the mortgage banker.
4    Q    Okay. Was Argent sending consumers good faith
5  estimates?
6    A    Yes.
7    Q    Was that happening directly upon receipt of an
8  application sent from Argent to the consumer's home or –
9    A    Semantics here.
10   Q    Sure.
11   A    We didn't receive applications.
12   Q    All right.
13   A    We received loan packages. Brokers took
14 applications. All right? It's the business-to-business
15 versus business-to-customer, but to answer your question,
16 we sent them directly to the consumer.
17   Q    And as a practical matter what was the timing
18 of that? How did that occur in the process of receiving
19 the information from the broker and then getting out the
20 good faith estimate to the consumer?
21       MR. WIEGAND: Objection.
22       THE WITNESS: And again I checked out for a
23 while, so it's like my understanding and my memory was
24 that good faith estimates when you were required to send
25 them, right, was within less than 72 hours or something,

Page 148

37 (Pages 145 to 148)

Esquire Deposition Services
800.640.2461

1 three days, and we did that. Whether we were required or
2 not, that was our objective to send them out within three
3 days or less of receipt of a loan file.
4 BY MS. BOWMAN:
5    Q    Okay.  When you're saying that what you
6 received was not an application but was a loan file,
7 what documents are you describing as being included in
8 the package submitted by the broker or mortgage lender?
9    A    Well, you have a more comprehensive loan file.
10 You have credit information already pulled by the broker,
11 okay?  You have the application.  That's part of the
12 file.  You have appraisals in many, you have income
13 documentation, those types of things.
14    Q    Okay.  And how from a production standpoint
15 did it happen that a good faith estimate was sent out by
16 Argent to a consumer on receipt of this loan -- these
17 loan documents from mortgage bankers and brokers?
18    A    How did it happen?
19    Q    Who prepared the good faith estimate?
20    A    Oh, how do you describe -- a person doesn't
21 prepare it.  It was computers, okay?
22    Q    Okay.
23    A    A loan gets inputted into our computer system
24 based on the return -- the terms requested by the broker,
25 and we would use those terms to draw up the good faith

Page 149

1 estimate documents based on the terms requested by the
2 broker's submission, you know, I want these terms under
3 this program.  And then a computer would make sure it
4 went out.  It's sent to the mailhouse and gets shipped
5 to consumers direct.  It's all electronic.
6    Q    And --
7    A    We didn't lick envelopes.
8    Q    When you talk -- when you say the terms
9 requested by the broker, apart from interest rate, what
10 other terms would that include that would be input into
11 the computer?
12        MR. WIEGAND:  Objection.
13        THE WITNESS:  LTV.
14 BY MS. BOWMAN:
15    Q    Okay.
16    A    All right.  Loan amount, certainly rate to name
17 a couple.
18    Q    Would there be any kind of comparison with --
19 between what the broker was requesting and the underlying
20 loan documents to determine whether that was appropriate
21 to put into the computer what the broker was requesting?
22        MR. WIEGAND:  Objection.
23        THE WITNESS:  Okay.  There -- I really don't
24 understand the question.  There is no loan documents.
25 BY MS. BOWMAN:

Page 150

1    Q    Well, you said you receive an application, an
2 appraisal, income documents and credit information.
3    A    Yeah.
4    Q    Okay.  That's what comes from the broker or the
5 mortgage banker.
6    A    Yeah.
7    Q    And along with that comes the terms requested
8 by the broker.
9    A    Yes.
10    Q    And then those terms are put through a computer
11 system that kicks out a good faith estimate --
12    A    Yes.
13    Q    -- and sends it to the consumer, correct?
14    A    Uh-huh.
15    Q    And I'm asking you if there's any verification
16 at Argent of whether the terms requested match the
17 application, credit information and income documents?
18        MR. WIEGAND:  Objection.
19        Do you understand the question?
20        THE WITNESS:  Not really because, you know,
21 I've got to say it this way.  A broker shops loans to
22 many lenders, and they ask for very low rates and terms
23 that may or may not -- the borrower may or may not
24 qualify for, period.  All right?  They shop the loan.
25 That's kind of their job, all right, and so they're

Page 151

1 making requests that are often much more lucrative to
2 their consumer than they may otherwise qualify for in
3 some case.
4 BY MS. BOWMAN:
5    Q    Okay.  But it's based on those terms requested
6 by the broker that Argent then prepares the good faith
7 estimate and sends to the consumer.
8    A    And/or, and this is as I recall, and/or what
9 we're willing to approve it at, the ultimate final loan
10 terms.
11    Q    That's what I was asking --
12    A    Okay.
13    Q    -- if there is any intervening decision-making
14 going on about what loan terms get sent out to the
15 consumer in the good faith estimate.
16    A    Yes.
17    Q    Okay.  And how does that happen?  The broker
18 submits the terms.
19    A    Makes a request.
20    Q    Makes the request.
21    A    Submits documents.
22    Q    Right.  And what is the mechanism or person
23 or review process at Argent that occurs to determine
24 what terms then get translated into the good faith
25 estimate?

Page 152

38 (Pages 149 to 152)

1    MR. WIEGAND: Objection.
2    THE WITNESS: Okay. The loan gets processed,
3 underwritten and approved or denied and/or suspended
4 because we don't have adequate documentation to make a
5 decision or render a decision.
6 BY MS. BOWMAN:
7    Q    And so a good faith estimate doesn't go out
8 to a consumer unless the loan has been completely
9 underwritten?
10    A    I would generally say yes.
11    Q    Okay. And who is that done by, the production
12 unit?
13    A    Yeah. It's -- what did we call it. It's sales
14 production -- yeah, it's sales production operations,
15 production. It's been a while.
16    Q    Okay.
17    A    So they process and underwrite the loan.
18    Q    And that's all before the good faith estimate
19 goes to the consumer.
20    MR. WIEGAND: Objection.
21    THE WITNESS: I can't state in every instance.
22 Thousands and thousands of applications are received,
23 okay, but I'll give you a generalization --
24 BY MS. BOWMAN:
25    Q    Okay.

Page 153

1    A    -- okay? Most of our loans received were
2 processed in 24 hours or less.
3    Q    Okay.
4    A    Okay. The good faith estimate goes out in
5 three days or less. Is there some in there? I'm sure.
6    Q    And how -- would it be a person in the
7 production unit that would review the loan file as it
8 came in in order to make that determination about whether
9 to submit the good faith estimate based on the broker-
10 requested terms or other terms done by a person?
11    A    People do that, yeah.
12    Q    Okay.
13    A    People make the final decision.
14    Q    And then people -- the people put those, that
15 information into the system that automatically mails it
16 to the consumers?
17    A    The good faith estimate?
18    Q    Yes.
19    A    Well, it's based on the information in the
20 computer on whatever the status, if approved, suspended
21 or denied. All right.
22    Q    Is that done electronically so there's like an
23 electronic record of the loan -- of each of the loan
24 documents that comes in, and then the production person's
25 determination approves suspended or denied?

Page 154

1    A    Is it done electronically?
2    Q    Yeah. Does it all come in electronically?
3 In other words, they have a bunch of loan files sitting
4 around them. Is it all done electronically?
5    A    Well, I would say both.
6    MR. WIEGAND: Objection.
7    THE WITNESS: They have a lot of files, and
8 then the data is input into systems.
9 BY MS. BOWMAN:
10    Q    All right. What other -- other than the
11 materials on the closing package that we talked about,
12 is there any other interim information that is sent by
13 Argent to consumers?
14    A    Interim?
15    Q    Yeah.
16    Q    Can you define interim?
17    Q    You described that the good faith estimate
18 would be sent out within 72 hours of --
19    A    Uh-huh.
20    Q    -- of receipt of the loan package from the
21 broker, mortgage banker --
22    A    Right.
23    Q    -- and that there would be other documents
24 provided to the consumer that were part of a closing
25 package.

Page 155

1    A    Absolutely, sure.
2    Q    Okay. And --
3    A    Through title --
4    Q    Right.
5    A    -- right.
6    Q    But those documents would have been prepared by
7 Argent?
8    A    Uh-huh.
9    Q    You have to say yes for her.
10    A    Oh, yes.
11    Q    And I'm asking if there's anything else between
12 the time that Argent receives the loan file from the
13 mortgage broker or banker and the time when the consumer
14 sits down at the third-party closing table, is there any
15 other information or material that Argent sends to the
16 consumer?
17    A    Not that I recall, no.
18    Q    Okay. Who in the company would be the best
19 person to answer that question about any other direct
20 communications with borrowers?
21    A    Compliance or legal which is legal Mike Mayer.
22    Q    Was there ever occasions where Argent received
23 material from a mortgage broker or banker that might have
24 had incomplete income documentation or something like
25 that, would that -- in those instances would Argent

Page 156

39 (Pages 153 to 156)

Esquire Deposition Services
800.640.2461

1    contact borrowers directly?
2        A    Define contact. We sent out a final
3    disposition notice to borrowers well, you know, on loans
4    that didn't close --
5        Q    Okay.
6        A    -- okay? And again whether -- I can't recall
7    whether it was a legal requirement or not. It just
8    felt like the right thing to do to me way back then, but
9    that's it.
10       Q    Sure. Other than --
11       A    So they got final disposition.
12       Q    Other than that were there people in Argent's
13   production unit, once they received the loan files, that
14   were calling consumers about income documentation?
15       A    No. They better not have been.
16       Q    All right. How about contact with appraisers?
17       A    We had an appraisal department.
18       Q    Okay.
19       A    So define appraisals, appraisers.
20       Q    Well, were the mortgage brokers and bankers
21   submitting the appraisals to Argent?
22       A    Yes.
23       Q    Okay. And then Argent submitted those for
24   review to their appraisal group as a part of the loan
25   processing?

Page 157

1        A    Yes.
2        Q    And then those -- were those appraisals -- was
3    that appraisal group then independently contacting the
4    outside appraisers?
5        A    You know, I'm not sure that I know. I mean
6    as a general practice I got -- my answer would be no, but
7    I think I would be a little ignorant to think that they
8    didn't call up and get clarifications and questions at
9    some level on how they came up with stuff. I think that
10   would be wrong to think that that didn't occur.
11       Q    Okay. Did Argent ever contact consumers to
12   verify information in their loan applications?
13       A    No, not that I recall, no. We didn't contact
14   consumers.
15       Q    In connection with, and I realize this may vary
16   over time, so let's start with the time during the time
17   in which you were CEO --
18       A    Okay.
19       Q    -- over both Argent and Ameriquest. Were there
20   particular loan products that Argent was marketing or did
21   that change all the time?
22       A    I mean I could sit here and say define program,
23   okay? It changes daily because you have programs, and
24   you have pricing, and they're market-sensitive. So I --
25   I don't know where I can go with that, more clear than

Page 158

1    that.
2        Q    Did Argent have a specific policy concerning
3    loan-to-value ratios that were generally applicable
4    across all of their products?
5        A    Yes.
6        Q    Okay. What were those?
7        A    Well, too complexed. Too complexed.
8        Q    To answer you mean?
9        A    To describe, yeah.
10       Q    Okay. Well, if we wanted to know what that
11   information was, what would we look at?
12       A    A product sheet, product matrix, whatever you
13   want to call it.
14       Q    And those would be updated and then sent back
15   out to the mortgage brokers and bankers?
16       A    Uh-huh.
17       Q    You have to say yes.
18       A    Yes. And they're not just sent, okay? They
19   change. It's computerized, okay?
20       Q    Okay. So --
21       A    It's not like we're licking envelopes --
22       Q    Okay.
23       A    -- okay?
24       Q    Somebody is -- are they accessing like an FTP
25   site that has your products and information if they have

Page 159

1    a contract with you?
2        A    Websites, yeah, the primary communication
3    method.
4        Q    And would there -- the information available to
5    the mortgage brokers and bankers on the website, would
6    that be password protected so that they couldn't get it
7    if they didn't have a contract with you?
8        A    Yeah.
9        Q    Okay. And then --
10       A    Not every aspect of the website is password
11   protected --
12       Q    Sure.
13       A    -- but yeah, generally speaking there's a
14   password -- I recall a password-protected portion. I
15   don't remember everything that was in there, but --
16       Q    All right. And from an information standpoint
17   was the -- that information that was available to the
18   mortgage brokers and bankers on Argent's website, was
19   that archived and maintained so that you could see what
20   was available to them over time?
21       A    That's a computer question. I know there is
22   backups and stuff, but I couldn't -- I don't know that I
23   could generally answer that. I don't know to what level
24   of backup because I mean we'd literally change this
25   bucket in one state by this amount, you know, move the

Page 160

40 (Pages 157 to 160)

1  rate up or down 10 basis points. I mean I'm struggling
2  to think that you're going to be able to re-create the
3  rates on a daily basis to that detail in how we moved
4  rates because it's state specific, product-specific.
5  Does that make sense?
6      Q   Sure. Let me ask you who would know the answer
7  to that question about what could be retrieved back over
8  time about the information that was available to brokers
9  and mortgage bankers?
10     A   Well, it's the technology group, and I don't
11 know whose -- you know, the name I've been giving you
12 who headed up there, Jeff Gillis, I know is no longer
13 with the company. He hasn't been for a couple of years
14 too. So I'm going to have to say Mark Serago is your
15 best source for that assuming he's still around.
16     Q   Now was he part of a shared services group?
17     A   Yeah, yep.
18     Q   Was he located at the same location as Argent?
19     A   No, corporate Ameriquest or actually he wasn't
20 even in that building, but -- he was in -- IS had its own
21 building. It's a big part of the company. So he wasn't
22 actually in -- I don't recall. I don't think he was in
23 corporate Ameriquest. He was in his own building --
24     Q   Okay.
25     A   -- okay?

Page 161

1      Q   Yeah.
2      A   I don't know where he's at now.
3      Q   With regard to the sales personnel -- we're
4  calling them salespersons or sales representatives, the
5  home-based representatives for Argent, how were they
6  compensated?
7      A   Again it's been a while. Small base, and I
8  gave them -- I think they had an expense allowance
9  because it's a relationship, you know. I didn't do -- it
10 was an expense allowance, and then there was a variable
11 comp program.
12     Q   What was the variable portion based on?
13     A   Volume of loans brought in, summation of volume
14 of loans brought in.
15     Q   Was it -- is it a straight calculation, dollars
16 per loans, or was it tied to the value of those loans?
17 How was that --
18     A   Flat straight calculation.
19     Q   So ten loans meant this much variable income --
20     A   Yep. Not unit based, not ten loans.
21     Q   Okay.
22     A   Total of the loan amounts.
23     Q   Total dollars?
24     A   Total dollar of the loan amounts --
25     Q   Okay.

Page 162

1      A   -- not number of loans brought in.
2      Q   All right. So if I went out and got with a
3  broker who was generating a bunch of $60,000 loans,
4  that may not be as lucrative as going out and getting --
5  hooking up with a broker who is generating half a million
6  dollar loans.
7      A   That would definitely not be as lucrative.
8      Q   Okay. So it was tied to -- was it tied to
9  anything else other than the total dollar volume of the
10 loans?
11     A   Specific to the sales representative?
12     Q   Yes.
13     A   No.
14     Q   And how -- did they have specific sales areas?
15     A   Uh-huh. Yeah, yes.
16     Q   Okay. So a particular person would have a
17 geographic area in which they would be marketing to the
18 brokers and mortgage bankers in that area?
19     A   I'll call it calling on those brokers versus
20 marketing. That implies they're like the marketing
21 department mailing. They called on those brokers in a
22 geographic area.
23     Q   Okay. And did the volume-based compensation
24 there -- excuse me -- vary by area?
25     A   No.

Page 163

1      Q   What was the way in which the regional sales
2  managers were compensated?
3      A   Same way.
4      Q   Did they engage in any direct communications
5  with the mortgage brokers and bankers?
6      A   Certainly.
7      Q   Okay. So was there -- did they just get --
8  they got -- what do you call it -- whatever the
9  salespersons under them were producing as far as total
10 volume, that total volume was ascribed to the regional
11 sales manager?
12     A   It rolls up, yeah.
13     Q   Okay. So they weren't competing with the sales
14 managers.
15     A   No.
16     Q   They were assisting them.
17     A   They were assisting them. They weren't
18 competing with them.
19     Q   Okay. Was there -- at the sales manager level
20 was there some sort of percentage of the total volume
21 that was the --
22     A   It was a basis, but it's not a percentage --
23     Q   Okay.
24     A   -- because it's a percentage of what, right,
25 of loan volume. You can describe it that way, I guess,

Page 164

41 (Pages 161 to 164)

Page 165

1  but I don't remember what the number was, but it was like
2  three basis points of the total volume.
3      Q    Okay.
4      A    And then again don't quote me on that number.
5  It was -- because the volume numbers are pretty big, you
6  know, when you add up all the loans, so --
7      Q    And then what about the regional sales
8  managers? Was it some lesser --
9      A    That's what -- who we were talking about,
10  regional.
11      Q    I'm sorry. I dropped back down to the sales,
12  the regular sales representatives.
13      A    Oh, I'm sorry. That -- when I left, they were
14  at 25 -- and again this is memory, it's been a while --
15  25 basis points.
16      Q    Okay. Of the total sales volume?
17      A    Of the total sales volume they brought in.
18      Q    And how was that calculated, on a monthly
19  basis, an annual basis?
20      A    It was a monthly commission program, bonus
21  program, whatever it was officially named.
22      Q    Okay. And then the regional sales managers
23  were the three basis points?
24      A    Yeah, it was -- but then again those numbers
25  changed over time. That was, yeah, it's like three

Page 166

1  basis, small, well, for obvious reasons, okay?
2      Q    Because they were getting the roll up of all
3  of the sales representatives in their particular region?
4      A    Yes.
5      Q    And they also had a small base salary?
6      A    No. They had a base salary component --
7      Q    Okay.
8      A    -- but it wasn't -- I wouldn't call it small.
9  It was more of a --
10      Q    Okay.
11      A    -- a decent base salary.
12      Q    All right. So they had a base salary and a
13  three basis points.
14      A    And they had, I think, an expense allowance
15  probably too. I don't remember what it was, but a small
16  amount.
17      Q    But it was essentially those three components
18  again?
19      A    Same thing.
20      Q    Oh, okay. Yeah. Can you explain what three
21  basis points is?
22      A    You know, we're going to put the zeros here,
23  but I'm looking at that as three -- I'm interpreting it
24  like you. It's like three-tenths of a percent, okay?
25  And I could be mistaken. It might be -- yeah, I think

Page 167

1  it's three-tenths of a percent when you're dealing with
2  basis points. I'm just speaking the mortgage language,
3  right.
4      Q    Okay.
5      A    It's certainly not 10 percent, right, or 3
6  percent.
7      Q    Or 3 percent.
8      A    It's three-tenths of a percent-type thing,
9  uh-huh.
10      Q    Okay. And what about the -- what about the
11  head of sales? How was head of sales compensated?
12      A    When I left -- I'm not as clear on that one,
13  but I think it was -- I think it was a roll up, similar,
14  and I don't recall any other components. There is a --
15  there was a bonus program and then a discretionary piece,
16  right.
17      Q    Okay.
18      A    As I recall the roll -- it was a simple roll up
19  again with a discretionary piece in addition.
20      Q    And a base salary.
21      A    And a base salary which, of course, rolls up
22  accordingly too.
23      Q    And during the time when you were the president
24  of Argent as opposed to CEO --
25      A    Yes.

Page 168

1      Q    -- what was your compensation system?
2      A    I stated that earlier.
3      Q    As the president of Argent?
4      A    It didn't change.
5      Q    Oh, it didn't change from then, from when you
6  were president?
7      A    I don't recall getting an adjustment to my
8  base. I could be incorrect, but it was -- I don't recall
9  when I made the move from going from president of just
10  Argent to the whole thing. I don't recall -- I don't
11  believe there was a salary adjustment at that point in
12  time. There was a title adjustment, but there wasn't a
13  salary adjustment.
14      Q    Okay. Was there an adjustment in the way that
15  you received the variable portion of your income or was
16  it always just purely discretionary?
17      A    Purely discretionary, so I can't answer it.
18  It's discretionary, all right?
19      Q    Yeah. Well, I didn't know if it was based
20  on --
21      A    I would hope there would be, but that's all I
22  can answer for you.
23      Q    But it wasn't tied to --
24      A    No.
25      Q    -- loan volume --

1     A   No.
2     Q   -- or anything specific. And was it, to your
3  understanding, both the time you were CEO and also at the
4  time when you were president of Argent the discretionary
5  portion of your salary set by Mr. Arnall?
6     A   I don't think you could be that broad --
7     Q   Okay.
8     A   -- for two things. Time frames --
9     Q   All right.
10    A   -- and I don't think Mr. Arnall made those
11 decisions exclusively. It's collaborative during much of
12 that.
13    Q   Okay. Well, what is the time frame distinction
14 that you're making in your mind?
15    A   I'm the head of Argent. Kirk Langs, I don't
16 know what involvement he had in setting my discretionary,
17 if any.
18    Q   Who -- sorry. Who communicated it to you?
19    A   I don't know that I can answer that for every
20 single year.
21    Q   I think you already described to me the
22 discretionary bonus that you believe you received in
23 2005, March of 2005 time frame.
24    A   Okay.
25    Q   Can you describe for me the one that you
Page 169

1  remember, yeah.
2     Q   Okay. And that was even back to the time frame
3  when you were the head of sales and -- head of sales and
4  operations at Ameriquest?
5     A   Yes, that's as I remember it. I don't remember
6  having anything other than discretionary, most positions.
7  I'm not saying when I was an area manager and first
8  started with the company, I don't recall. I'm sure I had
9  something, all right, but --
10    MR. LeSAGE: When you get to a good spot, we've
11 been at it for an hour --
12    MS. BOWMAN: Okay.
13    MR. LeSAGE: -- a break.
14    MS. BOWMAN: Okay. Let me just do one thing
15 before I forget it.
16    Q   Did Argent have a set of approved third-party
17 closing agents that it required brokers and mortgage
18 bankers to use?
19    A   Third-party closing agents -- there, and again
20 I'm not the best at this. I don't think there was a list
21 you can use these guys or you can't, but there was a
22 process to ensure the people that we were doing business
23 with existed, all right, and like reputable. And you
24 have to validate because you're wiring a lot of money
25 to people, and you've got to be real, okay? So there was
Page 171

1  received in 2004?
2     A   Can I describe it?
3     Q   How much was it?
4     A   I think it was the same. It was five, and
5  again it's a couple years ago, but I kind of remember
6  those things. So I think it was the same.
7     Q   If somebody paid me that, I'd remember too.
8  What about 2003?
9     A   It was less. It was two or three. Again I'm
10 guessing on that one.
11    Q   And do you have any idea about 2002?
12    A   No. Much less --
13    Q   Okay.
14    A   -- I would presume.
15    Q   Was your compensation system, the elements of
16 it as you've described it, consistent from the time you
17 took over the wholesale business? Did it have those
18 three elements?
19    A   Well, what three elements? I had a base pay.
20 I had benefits.
21    Q   Right, and then --
22    A   Then I had a discretionary piece.
23    Q   Okay. Is that how your compensation always
24 was?
25    A   It's pretty much been that way as long as I can
Page 170

1  a process to validate legitimacy of the -- I'm stopping
2  short of saying we sat and approved every title company
3  because there's thousands of loans through individual
4  brokers.
5     Q   Right.
6     A   But you build a huge database when you're in
7  business long enough so you kind of know who they are.
8  Does that make sense?
9     Q   Well, I guess the -- so did you -- so Argent
10 did have a set of preapproved --
11    A   Processing.
12    Q   -- third party --
13    A   Yeah. There's processes. I can't --
14    Q   Okay.
15    A   -- I'm not the right guy to ask.
16    Q   Who is the right guy?
17    A   Well, I don't know that it's a guy. Tom Sang.
18    THE VIDEOGRAPHER: The tape ends in four
19 minutes.
20    MS. BOWMAN: Okay. We can go off and --
21    THE VIDEOGRAPHER: All right.
22    MS. BOWMAN: -- let everybody have their break.
23    THE VIDEOGRAPHER: This marks the end of
24 videotape number 2 in the deposition of Wayne Lee. We're
25 going off the record at 2:15 p.m.
Page 172

43 (Pages 169 to 172)

Esquire Deposition Services
800.640.2461

1    (Recess.)
2        THE VIDEOGRAPHER: This marks the beginning
3    of videotape number 3 in the continuing deposition of
4    Wayne Lee. We are back on the record at 2:31 p.m.
5    BY MS. BOWMAN:
6        Q   Mr. Lee, during the time when you were
7    president of Argent and CEO of both Ameriquest and --
8    over Ameriquest and Argent --
9        A   Uh-huh.
10       Q   -- can you describe -- can you explain to me
11   what, in the case of Argent, what the broker compensation
12   system was. How were brokers compensated?
13       MR. WIEGAND: Objection.
14       Go ahead.
15       THE WITNESS: They would charge origination
16   points.
17   BY MS. BOWMAN:
18       Q   Okay.
19       A   I didn't compensate them. They would charge
20   origination points.
21       Q   And did Argent have particular guidelines for
22   what would be paid to brokers in connection with certain
23   originations?
24       A   Certainly.
25       Q   Okay. Can you just tell me what the parameters

Page 173

of that was?
1
2        A   There's thresholds.
3        Q   Okay.
4        A   Some of them are legal limitations, right,
5    states have caps that you can charge, right, and some of
6    them we went above and beyond that and set the caps a
7    little bit lower on total points and fees chargeable to
8    a consumer.
9        Q   And how was that driven? Was it a product
10   basis or regional or geographic basis?
11       A   Nothing that simple.
12       Q   Okay.
13       A   You've got states, you've got cities in some
14   cases that have -- I mean you're familiar with all the
15   legislation being passed in the mortgage area. So it's
16   extremely complexed on, you know, the thresholds and
17   the limitations by state, sometimes cities, counties --
18       Q   Okay.
19       A   -- certainly the fed level.
20       Q   I'm sorry. I didn't mean to interrupt you.
21       A   That's okay.
22       Q   Were you utilizing yield set premiums in the
23   payment of brokers?
24       A   Yield set premiums is a component of
25   origination fees, yes.

Page 174

1        Q   Where would this have been detailed for the
2    brokers to understand what it was that they would be
3    entitled to? Was it in the rate sheets themselves or --
4        MR. WIEGAND: Objection.
5        THE WITNESS: Yeah. I mean detailed where,
6    to whom?
7    BY MS. BOWMAN:
8        Q   To the brokers.
9        A   Product offer --
10       MR. WIEGAND: Objection.
11       THE WITNESS: -- product sheets.
12   BY MS. BOWMAN:
13       Q   And would the product sheets be those that we
14   talked about that were maintained electronically on the
15   website?
16       A   Yeah. There's written versions. There's
17   underwriting guidelines, you know. I'm not sure that the
18   product sheet's going to be the end all, be all vehicle
19   for every compliance rule that was out there is my
20   concern in my statement to you. There's a variety of
21   documents and information available on a website in
22   various places and/or signing of documents and so forth.
23   Do you know what I'm saying?
24       Q   Yeah. Were Argent's underwriting guidelines
25   available to the brokers and mortgage bankers?

Page 175

1        A   I believe they were in our website, and that's
2    my recollection of -- it was available to approved
3    brokers.
4        Q   And by approved you mean those you entered into
5    contractors with?
6        A   Uh-huh.
7        Q   You have to say yes.
8        A   Yes.
9        Q   Sorry.
10       A   I had water in my mouth.
11       Q   I appreciate you not saying it at that moment
12   then. Was there any kind of function in Argent where
13   persons other than the sales representatives would go
14   out and audit the loan files being generated by certain
15   brokers or mortgage bankers?
16       A   Go out where?
17       Q   Or internally audit the loans being generated
18   by certain mortgage bankers or brokers?
19       MR. WIEGAND: Objection.
20       THE WITNESS: Being generated. Okay. What I'm
21   struggling with here, okay, is do I audit the broker?
22   BY MS. BOWMAN:
23       Q   Yes.
24       A   No. I don't go to their offices and ask to
25   open up their file and understand their process.

Page 176

44 (Pages 173 to 176)

| | |
|---|---|
| 1  Q  Okay.<br>2  A  They don't have any requirement to allow me<br>3  to do that. So if that's the question, I'm saying no.<br>4  Q  Okay.<br>5  A  It's not the role of an account executive<br>6  because you said that that was what -- anybody other than<br>7  the account executive goes to the broker. They don't go<br>8  there to audit them, okay? So the way you phrased that,<br>9  that's what you implied that they do. They don't audit<br>10  them.<br>11  Q  Okay. I meant was there anyone -- other<br>12  account executives or sales representatives, they're<br>13  interested in contracting with the brokers to make Argent<br>14  loans, right?<br>15  A  Right.<br>16  Q  That's their job? Okay.<br>17  A  Right.<br>18  Q  I was asking if there was a separate function<br>19  or separate set of people that went out and evaluated the<br>20  material and information being utilized by the brokers.<br>21      MR. WIEGAND: Objection.<br>22      THE WITNESS: What material and information?<br>23  BY MS. BOWMAN:<br>24  Q  The sales practices of the brokers. Was there<br>25  anybody at Argent who was checking on the sales practices<br>Page 177 | 1  Q  How did that happen?<br>2  A  Adverse and random samplings.<br>3  Q  What do you mean by adverse?<br>4  A  I have -- I'll give you just one example. This<br>5  is --<br>6  Q  Okay.<br>7  A  I have -- I see a certain number of -- or I<br>8  believe that the market in a particular area, okay, the<br>9  property values are falling. I'm uncomfortable, a little<br>10  more uncomfortable there. I would tell them to go verify<br>11  and make sure that I'm okay appraisalwise, and that would<br>12  be an example of an adverse selection where I'd say go<br>13  check out this area, all right?<br>14      Or if I had a questionable anything, a loan<br>15  file that didn't feel good and I saw more than one with a<br>16  particular broker, I might say go do a month's worth of<br>17  audit of everything. That's another example of how an<br>18  adverse would be used.<br>19  Q  Okay.<br>20  A  Okay?<br>21  Q  And who within Argent was involved in the<br>22  actual audit of the loan files?<br>23  A  It was one of the functions of operations.<br>24  Q  Okay. And that was Tom Sang's group?<br>25  A  Yes. I swallowed the water.<br>Page 179 |
| 1  of the brokers?<br>2  A  No.<br>3  Q  And as far as an internal process when loans<br>4  would come in, loan packages would come into the<br>5  production group --<br>6  A  Yes.<br>7  Q  -- was there an audit function going on at that<br>8  point?<br>9  A  When they first come in, underwriting is.<br>10  Q  That's --<br>11  A  A loan file comes in. It gets underwritten.<br>12  You can argue that elements of underwriting is audit.<br>13  Q  Okay.<br>14  A  They're looking at documents, validating<br>15  documents. To the extent that we can, they're confirming<br>16  the information represented in the file, right?<br>17  Q  Okay.<br>18  A  So I consider that -- you could argue<br>19  underwriting/audit. There is an audit function held by<br>20  underwriting.<br>21  Q  Okay. And was there any other kind of auditing<br>22  of closed loans by Argent?<br>23  A  Yes.<br>24      MR. WIEGAND: Objection.<br>25  BY MS. BOWMAN:<br>Page 178 | 1  Q  Thank you. Okay. And then the random audit<br>2  would just be what it is?<br>3  A  An example, you know, one out of every ten<br>4  loans.<br>5  Q  Okay.<br>6  A  All right. And in no systematic order. That's<br>7  a sample of a random, I'm not saying that's the<br>8  methodology they used, but that would be random.<br>9  Q  What were the other responsibilities of maybe<br>10  divisions or groups within the operations unit?<br>11  A  The responsibilities of departments?<br>12  Q  Right. You said you had an audit function<br>13  under operations unit.<br>14  A  Sure.<br>15  Q  What else?<br>16  A  The appraisal department rolled up there as I<br>17  recall.<br>18  Q  Okay.<br>19  A  Vendor management.<br>20  Q  What is that?<br>21  A  It's that title process we talked about<br>22  earlier. That would be where that title, you know,<br>23  making sure the wires go to the approved, or not<br>24  necessarily approved, whatever the process was on titles<br>25  that we talked about earlier that I don't really know<br>Page 180 |

45 (Pages 177 to 180)

1 exactly, but there was a process of approving brokers,
2 client services department that basically approved
3 brokers, qualified and approved them.
4      Q    And that was based on information submitted by
5 the sales representatives?
6      A    No.
7      Q    No?
8      A    Generally by the broker themselves.
9      Q    Okay. Any other?
10     A    Oh, I apologize. Client services, appraisal,
11 audit, vendor management. I think that's -- well, that's
12 what's coming to mind in that area.
13     Q    At the time that you were the CEO still the
14 functioning president of Argent --
15     A    Uh-huh.
16     Q    -- who was responsible for the audit function?
17 Who was ever auditing within Argent?
18     A    I mean beneath Tom Sang --
19     Q    Right.
20     A    -- you're asking? Well, I guess I'm going to
21 need clarification because there's different types of
22 audits --
23     Q    Okay.
24     A    -- okay?
25     Q    The ones that you described are loan audits,

*Page 181*

1      A    don't recall. I honestly don't recall.
2      Q    What about appraisals?
3      A    Richard Medina.
4      Q    And was he located at the corporate offices of
5 Argent?
6      A    Argent corporate.
7      Q    Okay. And was -- did he have an appraisal
8 background?
9      A    He was an appraiser, yes.
10     Q    What about the -- what you call the compliance
11 reviews?
12     A    I'm going to say Mike Mayer, that counsel, but
13 there was a compliance officer under him, but I can't
14 recall the name.
15     Q    Okay. And would that same thing be true for
16 the review of final dispositions?
17     A    I believe that rolled up under compliance,
18 yeah. It's a compliance-type thing.
19     Q    Okay. Who was it under Tom Sang that was over
20 vendor management?
21     A    I apologize. It's been too long. I don't
22 recall.
23     Q    How about client services?
24     A    I don't recall.
25     Q    What was the process by which client services

*Page 183*

1 audits of loan files, right?
2      A    Yeah. There's other types of audits, elements
3 of a loan file also.
4      Q    Okay. Why don't you tell me what different
5 kinds of audits were being performed?
6      A    Okay. You have underwriting, okay, appraisal,
7 and I stopped short of saying it's an audit; but it's a
8 review of compliance, you know, and I'll call it, you
9 know, as an example the HUMDA -- or not the HUMDA. Well,
10 HUMDA is one thing, right, to make sure you have all the
11 information you need to file an accurate -- it required a
12 HUMDA report, but it would be --
13     Q    So we have it on the record, kind of, what does
14 HUMDA stand for?
15     A    I'm trying to remember what the acronym stands
16 for. I don't remember what the acronym stands for. I
17 know what it is, but I don't know what it stands for.
18 H-M -- I don't know. I don't recall, but anyway the
19 RESPAs to make sure they go out and then the cancel or
20 the final disposition. So there's that type of audit,
21 right, and it's and/or, making sure we'd adhere to it.
22 Those are the ones that are coming to my mind right now.
23     Q    Okay. And who under Tom Sang was involved in
24 or responsible for underwriting audits?
25     A    That's what I'm struggling to remember. I

*Page 182*

1 would evaluate and approve a broker? What did they look
2 at?
3      A    I can give you a 30,000-foot view of my
4 understanding of it. As far as exactly what they did, I
5 can't answer that.
6      Q    Okay.
7      A    Obviously we made sure they're licensed where
8 licenses were required, their license is in good
9 standing. They would submit what I'll call like an
10 application --
11     Q    Okay.
12     A    -- okay? Like you would if you were applying
13 for a loan, but not obviously that comprehensive. It
14 describes their business to us at some level, all
15 right --
16     Q    Uh-huh.
17     A    -- with that information so we have an
18 understanding of what they are as well as other entities
19 they might own like title or escrow because I was
20 interested in independent closings. We'd have an
21 understanding of that.
22          And then they would use, you know, software
23 programs that are and Internet programs that access a
24 lot of data in this world today. I know they research,
25 and I'm thinking of the name as LexisNexis. They would

*Page 184*

Esquire Deposition Services
800.640.2461

1  go back and look at complaints. We would use various
2  software that lenders, and I'm not sure that we ever did
3  this or to what level we did. Lenders Share, information
4  about customers. I don't recall personally us buying
5  that, but we do as much research as we can about any
6  customer relations that anybody might have with that
7  broker through the vehicles that are availed in today's
8  world. Today we pull credit profiles on them, and from
9  there I -- that's about as deep as I can get for you.
10    Q   What was the philosophical issue in your mind
11  that you wanted independent closing agents?
12        MR. WIEGAND: Objection.
13        THE WITNESS: The concern that I had was the
14  perception of improprieties. That's it.
15  BY MS. BOWMAN:
16    Q   As far as the people in the production unit go,
17  the people underwriting the loans --
18    A   Uh-huh.
19    Q   -- how were they compensated?
20    A   Underwriters, as I recall, was simply a base
21  pay. I don't believe there was any variable component in
22  their pay.
23    Q   What about the people in the appraisal
24  department? How are they compensated?
25    A   I think they were the same. I think they

Page 185

1         MR. WIEGAND: Objection.
2         THE WITNESS: -- what do you mean?
3  BY MS. BOWMAN:
4     Q   In wholesale when you entered into the
5  wholesale market --
6     A   Uh-huh.
7     Q   -- on behalf of Ameriquest --
8     A   Uh-huh.
9     Q   -- what did that look like? What did that unit
10  look like at that time as far as the number of people
11  involved and how many sales representatives you had?
12    A   When I took it over in when, January of '01?
13    Q   January of '01; yes.
14    A   There was, and again I'm guessing, a company
15  with 15 people in it, something like that.
16    Q   Okay. And was there some period of time before
17  you took over that wholesale group within Ameriquest in
18  January of 2001 that there was someone else that was
19  heading it?
20    A   That group of 15?
21    Q   Yes.
22    A   Yes.
23    Q   Who was that?
24    A   Wayne Waldron.
25    Q   And how long prior to your involvement in

Page 187

1  were just a base pay -- oh, no. I think there was some
2  variable component, but I think it was discretionary.
3  I remember it being discretionary, but I could be wrong.
4  I don't know if there's an actual program for them or
5  not. I don't recall, but I think there is some level
6  of variable pay there, but it was minuscule and
7  discretionary. That's the way I kind of remember it.
8     Q   Okay. How about the folks in vendor
9  management? How were they compensated?
10    A   That's base pay. I don't remember any variable
11  component.
12    Q   And how about the folks in client services?
13    A   Base pay.
14    Q   During the time when you were over the
15  wholesale operations for Ameriquest and then when it
16  became Argent, can you describe for me the way in
17  which -- the manner in which that company was grown. Was
18  it done expanding into states or is there some sort of a
19  general plan?
20    A   I don't know. To answer the question was there
21  a plan? Certainly, okay. We would file a budget every
22  year.
23    Q   Okay. What was the expansion experience? I
24  mean what did you start out with and --
25    A   What did I --

Page 186

1  January of 2001 did that wholesale group exist?
2     A   I'll say a year, give or take.
3     Q   And had it always been under the direction of
4  Mr. Waldron during that time?
5     A   Since inception -- during that time since
6  inception, yes.
7     Q   Okay. And starting from that time in January
8  of 2001 when you took over the wholesale group that was
9  within Ameriquest, can you describe for me the manner in
10  which that group grew over the time until you left the
11  company.
12    A   Okay. The manner -- I -- do you mean
13  structure? Do you mean --
14    Q   Yeah. I mean how did you go about going from
15  15 people to, whatever you said, 5,000 people?
16    A   A lot of hiring -- I mean an awful lot of
17  hiring.
18    Q   Apart from the tongue-in-cheek answer.
19        MR. WIEGAND: Well, what else is there? I mean
20  can you get more specific?
21        MS. BOWMAN: Sure, I --
22        MR. WIEGAND: I mean describe your life until
23  today. I mean --
24  BY MS. BOWMAN:
25    Q   I'm talking about what was it you did to grow

Page 188

47 (Pages 185 to 188)

1  that business?
2      A  I put together a business vision.
3      Q  Okay.
4      A  And then I proceeded to execute upon it.
5      Q  How many sales representatives did you have in
6  January of 2001 when you took over that wholesale group?
7      A  I'm thinking, and I'm guessing, I'm thinking of
8  the 15 employees that were attached to the unit, 7 of
9  them were salespeople.
10     Q  And at the end of the time when you were at the
11  company, how many salespeople were there?
12     A  I previously stated, and it's my best guess,
13  between 450 and 500, something like that.
14     Q  When you were running the wholesale division of
15  Ameriquest and then subsequently the president of Argent,
16  did you consider yourself to be competing with Ameriquest
17  Mortgage Company?
18     A  In what way?
19     Q  You were out there trying to originate loans
20  from the same people.
21     A  I wasn't originating loans to people.
22     Q  You were lending money to brokers who were
23  originating loans --
24     A  The customer was originating loans.
25     Q  Okay.

Page 189

1      A  I didn't compete against Ameriquest.  The
2  broker did and the banker.
3      Q  Was there any kind of a limitation on the kinds
4  of products that you could offer through Argent as a
5  result of being under the umbrella of Ameriquest?
6      MR. WIEGAND:  Objection.
7      THE WITNESS:  I -- I'll say at some level,
8  sure.
9  BY MS. BOWMAN:
10     Q  Okay.  I guess did you have -- were you limited
11  to the same products that Ameriquest was offering through
12  its retail --
13     A  No.
14     Q  -- organizations?  No.  What were the
15  limitations?
16     A  I'll give you an example of a limitation --
17     Q  Okay.
18     A  -- because, you know, I can't even comprehend
19  them all.  Points and fees limitations above and beyond
20  state requirements.  That would be an example of
21  something we would share corporatewide.
22     Q  Was there any policy and product limitations in
23  Ameriquest that weren't -- that were something that was
24  separate and apart from some legal requirement that was
25  also imposed upon Argent Mortgage products?

Page 190

1      MR. WIEGAND:  Objection.
2      THE WITNESS:  A policy?
3  BY MS. BOWMAN:
4      Q  Right.
5      MR. WIEGAND:  Could you read the question back,
6  please?
7      (Record read.)
8      THE WITNESS:  Yeah.  The one I just stated was
9  one example, and there's -- I'll give you one more.
10  BY MS. BOWMAN:
11     Q  Okay.
12     A  Prepayment penalty limitations that were more
13  restrictive than state and federal requirements, and
14  those were decided corporatewide all companies.
15     Q  Okay.
16     A  Those are what you described.
17     Q  Yes.  And what about refinancing?  Were you
18  limited in your ability to refinance Argent loans?
19     MR. WIEGAND:  Objection.
20     THE WITNESS:  At Argent I didn't refinance any
21  Argent loans.  We didn't do any direct consumer lending.
22  BY MS. BOWMAN:
23     Q  Okay.  But if there was a consumer that came
24  back to a broker that had obtained an Argent loan, was
25  there any limitations on Argent refinancing that loan?

Page 191

1      A  Yeah.  We didn't have a department to even do
2  it.
3      Q  They couldn't submit a refinance through the
4  broker?
5      A  Through the broker, sure.
6      Q  Okay.  That's what -- all right.  If Argent
7  had issued a loan say in January 2004, was there any
8  time limitation upon, you know, that they could not issue
9  another loan that would replace the prior Argent loan?
10     A  Okay.  I'm going to answer that question no,
11  but there were guidelines, and discretion came into play
12  depending upon circumstances; but there were guidelines
13  established in that area of a broker refinancing the same
14  borrower over and over again and submitting it back to
15  us.
16     Q  And what were the guidelines?
17     A  You know, I really don't recall.  I think it's
18  what is coming to mind, and, like I said, don't hold me
19  to it, but less than a 12-month or any time less than a
20  year, some processes kicked in or something like that.  A
21  certain type of underwriter would have to look at it and
22  be involved and so forth.
23     Q  Were the loans that were being made by Argent
24  pooled together with Ameriquest originated loans for
25  purposes of securitization?

Page 192

1     A   Less so in the later days.
2     Q   Okay.
3     A   In the early days absolutely.
4         MS. BOWMAN:  Could we go off the record for
5  just a minute?
6         THE VIDEOGRAPHER:  Sure.  Going off the record
7  at 3:03 p.m.
8         (Recess.)
9         THE VIDEOGRAPHER:  We're back on the record at
10 3:04 p.m.
11 BY MS. BOWMAN:
12    Q   Okay.  Mr. Lee, I'd like to go back over to the
13 time when you became the CEO over both Argent Mortgage
14 Company and Ameriquest.  And if you could tell me,
15 focusing on Ameriquest now and the sales portion of that
16 organization, the hierarchy that was in place during that
17 time the end of 2004 -- the middle of 2004 through the
18 middle of 2005.
19    A   Okay.
20    Q   What was the sales unit hierarchy --
21    A   Didn't we do that?
22    Q   -- in Ameriquest?
23    A   We had the branch.  We did that.
24    Q   I thought that was during the time when you
25 were the sales manager or --
Page 193

1     A   No.  I was -- I wasn't attached to retail until
2  I became the CEO.  I was out of it since 2001 --
3     Q   Okay.
4     A   -- so I was referring to that.
5     Q   That time frame?
6     A   That time frame.
7     Q   Okay.
8     A   Yeah.
9     Q   Then if you could go ahead and tell me the
10 account representatives at the branches, how were they
11 compensated?
12    A   They had a base pay, and they had a variable
13 component.
14    Q   What was the variable component based on?
15    A   Systemized, you know, based on credit grade of
16 the loan, credit profile of the loan, you know.  It's
17 loan volume, loan size.  All those components were part
18 of a model that determined potential value, revenue
19 value.  That's it.
20    Q   What do you mean by potential value?
21    A   Of what that loan is worth in profit or I mean
22 in revenue.
23    Q   What was the last term you used, potential
24 value and then --
25    A   The potential revenue that this brings to our
Page 194

1  organization --
2     Q   Okay.
3     A   -- but it's a very complicated formulatic that
4  arrives at it, and I'm certainly not the best to describe
5  it, but I know a 30,000-foot view.
6     Q   Okay.  And who was it that was doing that
7  calculation?
8     A   Systems.  Not humans, systems.
9     Q   Okay.  During your time as CEO at ACCCH; is
10 that right --
11    A   Yes.
12    Q   -- were there in place for account
13 representatives quotas or minimum numbers of loans that
14 had to be closed in a month period of time?
15        MR. WIEGAND:  Objection.
16        THE WITNESS:  There is no policy of a quota.
17 BY MS. BOWMAN:
18    Q   Would it have been contrary to Ameriquest's
19 policy to impose a quota?
20    A   Yeah.  You're specifically talking about
21 salespeople.
22    Q   Yes, a quota on the number of loans that had to
23 be closed by the salespeople.
24    A   Right.
25    Q   That would have been -- if there was such a
Page 195

1  quota that had been imposed, that would have been
2  contrary to company policy?
3     A   I believe so, yeah.
4     Q   Okay.
5     A   I don't have any recollection of any other way.
6  I certainly don't know of any stated policy.
7     Q   Okay.  And above the account representatives
8  you had the branch managers; is that right?
9     A   Uh-huh.
10    Q   And how were they compensated?
11    A   Base pay, and at that time I believe it was a
12 roll up.
13    Q   Some percentage or --
14    A   Yes, some basis points of a roll up of that
15 same revenue aggregated number.
16    Q   The revenue aggregated number based on the
17 complicated formula?
18    A   Yes.  There you go.
19    Q   All right.  So it wasn't -- comparing it to
20 what we discussed with Argent Mortgage, which was a
21 straight look at the total value of the loans --
22    A   No, simply the dollar amount lent volume.
23    Q   Right.  And this is something -- from the
24 Ameriquest side was much more driven by a variable
25 formula?
Page 196

49 (Pages 193 to 196)

Esquire Deposition Services
800.640.2461

1    A    Yes.
2    Q    All right.  And then from branch managers we
3 went to divisions, right?
4    A    No.
5    Q    Branch to region?
6    A    I don't think they called them -- area.
7    Q    You're right.
8    A    It was area.
9    Q    And how were they compensated?
10    A    I believe it's a roll, and I recall it to be a
11 roll.  I don't -- that's --
12    Q    Another roll up of all of the --
13    A    Yeah, of the branches.  I believe it was a
14 roll -- roll up of that same aggregated number, and
15 obviously the percentages earned correspondingly go
16 down.  I'm trying to remember if there was any kind of
17 discretionary piece at that level, and it's not coming
18 back to me.
19    Q    Okay.  After the area manager there were the
20 regional managers?
21    A    Regionals.
22    Q    And what was their compensation?
23    A    And there were a handful of them, so I -- I
24 can't get into the -- I notice there was -- I believe
25 there was a pretty meaningful discretionary component

Page 197

1 those goals a part of the compensation system?
2    A    I would argue it's probably more in the
3 discretionary piece, okay?  I mean my point is yeah, I
4 mean here's what we expected you to do, you accomplished,
5 you know, and now I'm thinking about the discretionary
6 piece, you know --
7    Q    Sure --
8    A    -- so --
9    Q    -- but that was not true for the area managers?
10 There was no --
11    A    I don't recall there being a big discretionary
12 piece for the areas.  I frankly don't recall that being
13 meaningful at that level.
14    Q    So their compensation was purely production
15 based?
16    A    Based on the formulatic approach which --
17    Q    Okay.
18    A    -- okay.
19    Q    And then the --
20    A    They have base pay too, right.
21    Q    But the point at which that might have changed
22 was at the regional manager level where there was some
23 discretionary thing that might have included whether or
24 not they meet the goals for the region.
25    A    Yeah.  There's --

Page 199

1 at that level.
2    Q    Okay.
3    A    I frankly can't -- I can't recall whether it's
4 a roll of revenue or just volume within their group,
5 loan volume originated by their branches; but clearly
6 there was a productivity level in there, and I believe
7 there's other areas of discretion, you know, allotted
8 amount for discretion areas, you know, promotions and all
9 the things you consider in discretion.  But I can't get
10 real detailed for that handful of people.  It wasn't a
11 straight roll up I don't believe.
12    Q    Okay.  When you're talking about the regional
13 managers, were their goals set for loan volume or loan
14 origination volume at the regional level?
15    A    Well, management does set goals.
16    Q    Sure.
17    A    Okay.  And I'm not saying that in the area
18 level goals don't get set, but there is budget
19 expectations, minimum expectations that you try -- you
20 need branches to be profitable.  There's -- you know, we
21 have expectations for a branch.  That's a goal.  So to
22 answer the question I think at all levels of management
23 you're establishing expectations/goals.
24    Q    Okay.  But I guess my question was were those
25 goals -- in the context of the regional managers were

Page 198

1    Q    All right.
2    A    I'm very vague.  I was there a very short
3 period of time, and I didn't draft those programs so --
4    Q    Yeah.
5    A    -- okay?
6    Q    Would there be -- would those programs be in
7 writing?  In other words, would the employee or the
8 manager have been given a sheet that says -- describing
9 their compensation?
10    A    Yeah.
11    Q    Okay.
12    A    Not necessarily the discretionary piece.  It's
13 not going to describe how we come by that, but certainly
14 there's compensation programs for most positions in the
15 company.
16    Q    And how would those have been communicated to
17 employees?  Would that have been available on an Intranet
18 or given to them at the time of their employment?
19    A    Certainly you hire somebody.  They're given
20 their compensation program.  So a variety of ways is the
21 best way I can answer it.
22    Q    Would there be documents over time that would
23 have reflected the various compensation programs in
24 place for each of those levels in the sales group at
25 Ameriquest?

Page 200

50 (Pages 197 to 200)

Page 201

```
 1    A   Okay. Can you reread that for me, please?
 2        (Record read.)
 3        THE WITNESS: Are you asking me if there is old
 4   versus current? Is that what the question is?
 5   BY MS. BOWMAN:
 6    Q   Right.
 7    A   Again that's backup stuff. I would -- I don't
 8   know, but I would presume that we probably have to some
 9   level that stuff, and it's not we. I mean the company
10   would have at some level programs that went back several
11   years. I would presume --
12    Q   Okay.
13    A   -- they're obtainable somehow.
14    Q   Who would be the best person to ask about that?
15    A   Comp programs would be HR.
16    Q   Okay. And who was the head of HR when you
17   left?
18    A   Of Ameriquest?
19    Q   Right.
20    A   I'm going to tell you this to use the global
21   one Donna Lesch, the enterprise one.
22    A   All right.
23    A   I think she was acting in both roles.
24    Q   Do you know if she's still with the company?
25    A   I have no idea.
```

Page 202

```
 1    Q   During the year that you were the CEO, can you
 2   tell me what the net income was of Ameriquest?
 3    A   Net income. Describe it.
 4    Q   Well, why don't you tell me what income
 5   information you know about.
 6    A   Pretax, post tax?
 7        MR. WIEGAND: Objection.
 8   BY MS. BOWMAN:
 9    Q   I'm talking about post tax, I'm sorry.
10    A   Okay. Ameriquest retail origination --
11    Q   Right.
12    A   I'm not convinced I ever saw it broke out
13   separate from the consolidated.
14    Q   Well, what were the consolidated earnings of
15   the company?
16    A   What time frame?
17    Q   During the time when you were CEO.
18        MR. LeSAGE: I'm going to object and instruct
19   the witness not to answer.
20        MS. BOWMAN: Why.
21        MR. LeSAGE: Because it's not relevant. What's
22   it relevant to, and what could it possibly lead to?
23        MS. BOWMAN: Well, I think that you're in
24   violation of the discovery rules if you're instructing
25   the witness not to answer. Do you think it's relevant to
```

Page 203

```
 1   the ongoing building of the company to meet claims in the
 2   cases?
 3        MR. LeSAGE: Well, when we get there, I'll have
 4   it inserted if we have to, but I'll instruct him not to
 5   answer.
 6        (Instruction not to answer.)
 7        THE WITNESS: I wouldn't recall the specific
 8   numbers anyway. It's been too long.
 9   BY MS. BOWMAN:
10    Q   And what -- did you receive those figures, the
11   financial figures, when you were CEO?
12    A   I will see monthly budgetary and actual
13   expenses and revenue numbers, yes.
14    Q   Okay. Was there a particular group in
15   Ameriquest that was developing those or --
16    A   Accounting and finance. Accounting and
17   finance.*
18    Q   Okay. And who was the head of that group?
19    A   For Ameriquest?
20    Q   Yes.
21    A   Karen Christianson. That's when I left. Okay?
22    Q   Uh-huh. Now above the regional managers within
23   Ameriquest how were -- there was a head of sales; is that
24   correct?
25    A   I'm remembering a divisional level too,
```

Page 204

```
 1   regionals and then there was divisional --
 2    Q   Okay. So --
 3    A   -- all right.
 4    Q   How were the divisional managers compensated?
 5    A   I'm in that regional level now. There was only
 6   a couple of them, so it's -- they had a base pay, and I
 7   believe they had a variable component; but they also
 8   had a discretionary component at that level. And
 9   particulars, I don't think it was a role in my point. I
10   don't remember it to be that, but I can't really describe
11   what it was.
12    Q   Okay. Can you describe to me, to your
13   understanding, the training that an account executive
14   would receive at Ameriquest during the time when you
15   were CEO.
16    A   Okay. And again I'm probably not the right
17   person to ask. I mean Donna Lesch managed that training
18   group --
19    Q   Okay.
20    A   -- and put together much of the materials, but
21   they -- we had developed, and I just had seen them. It's
22   not like I partook upon the training program, okay, but
23   we had a list of materials, books and materials that
24   were prepared; and they were required to go through those
25   materials, orient themselves to, excuse me, the company,
```

51 (Pages 201 to 204)

**Page 205**

1 the industry, et cetera, and provide the basic components
2 of how to sell a loan, what our expectations were as well
3 as, you know, what our products were.
4    Q   Okay. Do you know specifically when you were
5 chairman or, I'm sorry -- chairman -- chief executive
6 officer, who was in the training group?
7    A   Huge group. At Ameriquest?
8    Q   Yes.
9    A   I don't remember. It's not coming to me. The
10 training for Ameriquest pretty much was orchestrated by
11 Donna, and she had a staff, and there were people, and
12 I know who they are. I just can't recall their names. I
13 apologize, and specifically attached to Ameriquest in the
14 branch training, -- it just isn't clicking with me.
15    Q   Can you describe for me how that training would
16 take place? Was it central training? Was it done at the
17 branches?
18    A   A combination.
19    Q   Okay. And how -- over what period of time
20 would an account executive be considered in training?
21    A   I guess there's some level of argument they're
22 always in training, but I couldn't tell -- the length of
23 the program, we were adding modules and chapters. They'd
24 come in. They'd get some formal orientation and training
25 to the company.

**Page 206**

1    Q   You mean they would come into the corporate
2 headquarters?
3    A   Yep.
4    Q   Okay.
5    A   And then they would do these -- there was
6 online training modules, and there was instructor-based
7 training modules where our training group would go out
8 to various regions. And then at functions and meetings
9 we would provide curriculums and trainings in those
10 areas. So it's very -- it's a huge combination. Any
11 time you get in front of them, we were doing something.
12 And then there's the online curriculum or the books that
13 I'm referring to that I kind of remind -- remember being
14 an online curriculum, you know, where they can go
15 through, that kind of thing.
16    Q   Now --
17    A   And that was always expanding.
18    Q   When you're saying an online curriculum, are
19 you talking about something that was available on an
20 Intranet system?
21    A   Yes. That's what I'm remembering it is. I
22 mean there's hard copies too. They'd get hard copies
23 and then they could do stuff. It's a combination,
24 interactive-type thing. There's just a lot of mediums.
25 All right? We didn't fly them in every time they

**Page 207**

1 concluded a chapter. All right? That's my point. They
2 communicated in other ways.
3    Q   Who was it that was actually engaged in the
4 interview and hiring of account executives?
5    A   It varies, but a variety of people.
6    Q   Okay. Who are they?
7    A   Okay. Sometimes you have -- well, the branch
8 manager clearly is going to hire -- be involved in it,
9 but sometimes you might have other people on your staff
10 talk to them also. Particular area managers might
11 request that I be involved in the hiring and interviewing
12 of a loan officer within one of their branches.
13    Q   What -- on what -- why would this have occurred
14 that you would have been involved?
15    A   Brand-new manager. If I'm an area manager --
16    Q   Yes.
17    A   -- and I got whatever handful of branches and
18 I got a brand-new manager, I want to talk to a few of
19 his candidates before he hires them. So those kinds of
20 discretionary decisions occurred. So lots of people
21 could have been involved in interviewing of people.
22    Q   Okay. But you're talking about even when you
23 were CEO, you were involved in the --
24    A   No. I didn't say me.
25    Q   Okay. I thought you --

**Page 208**

1    A   Okay. I said area managers.
2    Q   The area managers.
3    A   A branch manager could be involved in the
4 hiring of an account executive in a branch.
5    Q   Okay.
6    A   An area manager could be involved. Sometimes,
7 I don't know, maybe a regional manager said "I'm going to
8 talk to the guy because I'm in the branch," all right --
9    Q   Okay.
10    A   -- so --
11    Q   Were the account executives primarily hired by
12 the branch managers?
13    A   I think that's a good characterization, yeah.
14       MS. BOWMAN: Okay. I'm going to need about a
15 three-minute break for personal reasons.
16       MR. LeSAGE: All right.
17       THE VIDEOGRAPHER: Going off the record at 3:26
18 p.m.
19       (Recess.)
20       THE VIDEOGRAPHER: Back on the record at 3:38
21 p.m.
22       MS. BOWMAN: Okay. For purposes of the record
23 we're continuing as plaintiffs in the class cases to ask
24 questions of Mr. Lee, and you've indicated Mr. LeSage,
25 that you need to adjourn the deposition at 4:30 is our

1 understanding; that it's your position that Mr. Lee may
2 not be recalled even though the hours of testimony will
3 be beneath the seven and a half hours permitted under
4 federal rules.
5 And, of course, we maintain that we can seek
6 leave of court to have additional time with Mr. Lee given
7 the broad base of his knowledge. And just for purposes
8 of the record we also want to indicate that Mr. Harris
9 and other individual plaintiff lawyers may have some
10 additional questions for Mr. Lee that we may not get to
11 today.
12 Anyway, our position would be that we would be
13 entitled to the full amount of time and to, of course,
14 seek any necessary leave to have Mr. Lee recalled if we
15 don't reach some topic today, and Mr. Harris would like
16 to make a comment.
17 MR. HARRIS: I have questions. I have
18 additional questions, but you indicated off the record
19 that I cannot start asking my questions until Ms. Bowman
20 is completely finished with her questions, and I
21 understand that she's not going to be done by 4:30.
22 So basically by putting that condition there, you're
23 preventing me from asking any questions given the fact
24 that she has questions that are going to take her beyond
25 4:30.

Page 209

1 MR. LeSAGE: Yes. This is the position of the
2 defendants. We have a court order saying there's seven
3 and a half hours of testimony. I told you at the
4 beginning at 9:00 we'd have to adjourn knowledge the
5 deposition at 4:30 for both reasons, that it's seven and
6 a half hours as well as the fact that I have another
7 obligation to go to.
8 We are not going to permit the tag team
9 approach of letting someone say that they're not
10 finished. If you, Ms. Bowman, set the deposition, she
11 goes until she's finished. She has to adjust her time to
12 make accommodation to other plaintiffs. If you want to
13 rest her time, she has to be done. If she wants to go
14 back and get a court order, fine; but our position is
15 seven and a half hours, and that's what we're committed
16 to today and that ends at 4:30.
17 MS. BOWMAN: Okay. And just for purposes of
18 the record if the videographer could read the number of
19 hours of actual testimony that has been recorded today.
20 MR. LeSAGE: We are at 4 hours 55 minutes on
21 the record.
22 MR. HARRIS: What time is it?
23 THE VIDEOGRAPHER: The time is now 3:41 p.m.
24 MR. HARRIS: All right. I'd just like to add
25 that I have an independent right to ask questions.

Page 210

1 MR. LeSAGE: It all will be subject to a
2 motion. If Ms. Bowman is done, fine; otherwise, it's
3 our position that no one else can go forward until she's
4 done.
5 BY MS. BOWMAN:
6 Q Mr. Lee, can you tell me were there strategies
7 or programs in place aimed at the recruiting of account
8 executives at Ameriquest when you were CEO?
9 A Strategies or --
10 Q Particular forums at which you were marketing
11 to hire account executives or ways --
12 A Yes.
13 Q -- that would be accomplished.
14 MR. WIEGAND: Objection.
15 BY MS. BOWMAN:
16 Q And who were those created by, the strategies?
17 A Collaboratively is the best way for me to
18 answer that, I think.
19 Q Okay. Who would have been the collaborating
20 parties?
21 A Certainly sales personnel have input, so
22 certainly HR has input.
23 Q Okay.
24 A Certainly senior management has input.
25 Certainly legal has input. I mean --

Page 211

1 Q Legal has input into the strategies for hiring
2 account executives?
3 A Got to comply.
4 Q With what?
5 A Any legal requirements for any position,
6 approval of advertisements materials, et cetera.
7 Anything you're sending out in a public forum, legal, has
8 input --
9 Q Okay.
10 A -- so --
11 Q Other than the sales group within Ameriquest,
12 what were the other divisions or units, the groups within
13 Ameriquest?
14 A What period of time?
15 Q I'm talking about still when you were CEO.
16 A It changed while I was CEO.
17 Q Okay. Why don't you start with when you first
18 became CEO. I assume what you're talking about is the
19 separation of the services group into a separate entity?
20 A That's part of it --
21 Q Okay.
22 A -- certainly.
23 Q So what were the other groups within Ameriquest
24 when you became CEO?
25 A Again you're talking the legal structure. I

Page 212

53 (Pages 209 to 212)

Esquire Deposition Services
800.640.2461

1    couldn't tell you which personnel resided under the
2    Ameriquest Mortgage Company shell and what resided at
3    ACC.
4        Q    From an operational standpoint what were the
5    functioning groups of people involved in --
6        A    Okay.
7        Q    -- the Ameriquest loan origination activity?
8        A    Okay. Well, Ameriquest had sales, servicing
9    under Ameriquest Mortgage Company. You had processing --
10   what did they call it? I think they actually called it
11   loan processing --
12       Q    Okay.
13       A    -- okay, different names, same kind of --
14   processing. You know, there's a funding department.
15   There's, you know, legal representation, you know, in the
16   business line. I think a lot of the services were at the
17   ACC level, but again I don't know who sat at the cost
18   center.
19       Q    Right.
20       A    All right? And dedicated HR functions. Again
21   that's a cost center game, right, whether --
22       Q    Might have been a shared services issue?
23       A    Yeah, you're dealing with -- the shared
24   services cross over a lot more there, and that's what I
25   was -- I ultimately changed a lot of that while I was --

Page 213

1    in the short period of time while I was there.
2        Q    Okay. Were there any other groups or operating
3    groups?
4        A    You know, I would have to say yeah. I mean you
5    have sales. You have production. You have operations.
6    You have underwriting. You have an appraisal department.
7        Q    Okay.
8        A    You have audit functions at various areas, an
9    audit department. I don't remember the exact names of
10   them. You had a training department, you had a
11   recruiting department, all this under HR. I mean
12   departments -- there's a lot of stuff. You had certainly
13   legal. You had -- we had a compliance group under our
14   legal department. I mean there's a vendor management
15   function there. I mean, you know, all of that stuff
16   exists in a big company like Ameriquest was.
17       Q    From the standpoint of the auditing department,
18   in general during the year that you were CEO what kind of
19   audits were being performed on the Ameriquest Mortgage
20   side?
21       A    When I started or when I finished?
22       Q    Well, we'll start at the beginning, when you
23   started?
24       A    I can't speak to it. I don't have a lot of
25   clarification. Audits were being conducted. I didn't

Page 214

1    see and have visibility to the extent that I wanted to
2    into the results of those audits. So I don't have a
3    whole lot of -- but we clearly did an underwriting audit.
4    The appraisal department did an audit. Compliance did
5    that same maintenance. I changed a lot of the reporting
6    so I could see, you know, the fruits of their labor, if
7    you will.
8        Q    Sure.
9        A    Does that make sense?
10       Q    What was the reporting when you first came into
11   your position as CEO for those various audits? Who were
12   they going to before you?
13       A    Layers of management somewhere down the
14   organization, you know, probably their immediate
15   supervisors, all right? So compliance-related issues
16   would go to the chief counsel, but I'm speculating here.
17   I'm speculating, you know.
18            The audit would go to the head of the audit
19   group, right, and his staff and it wouldn't necessarily
20   get to me. So that's why -- maybe it went to the sales
21   force, and maybe it went a lot of places, but I can't
22   tell you where every place it went.
23       Q    Okay. And what was it that you did when you
24   became CEO? What were the changes that you made within
25   the reporting and the visibility of audits.

Page 215

1        A    Okay. I mean the first thing -- I mean as far
2    as the shared services, there was a lot of initiatives
3    that were pushed down into the businesses, okay? We've
4    already talked about that. The function -- a lot of
5    functionality of shared services were pushed down.
6    In other words, the dedicated staff that sat up in the
7    holding company were now part of Ameriquest --
8        Q    Okay.
9        A    -- or part of servicing, okay? So I had more
10   accountability and cost controls within the particular
11   business unit. That was number one, you know, a big
12   change. Specific to Ameriquest I created a structure
13   like the following sales, production, operations and a
14   new group that didn't exist, business controls. Sound
15   familiar?
16       Q    Yes. Okay. And how did that impact the
17   reporting, the audit reporting?
18       A    Okay. I was able -- now that it's all under
19   the control of one management, you mitigate redundancy.
20   You create a more systematic distribution network to get
21   the information to the people that need to know. And
22   you can clarify your goals and objectives with each one
23   of those audits as well as give direction because it's
24   consolidated and streamlined and efficient and easier
25   communication as opposed to being scattered

Page 216

54 (Pages 213 to 216)

Esquire Deposition Services
800.640.2461

1  departmentally.
2     Q    Okay.  In the context of the various groups
3  that you just described, sales, production, operation and
4  business controls, were those then for reporting units up
5  to you as CEO?
6     A    Well, technically I was acting as president and
7  CEO of Ameriquest, so yes.
8     Q    And who was the head of the sales group under
9  your redesign?
10    A    Mary Joe Shelton.
11    Q    And she had been the head of sales before?
12    A    I'm pretty sure she was head of sales when I
13 started, when I came on board 11 months prior, yeah.
14    Q    Okay.  And as far as the part of the
15 organization that she was over, was that essentially the
16 sales hierarchy that we've been talking about for the
17 last several hours?
18    A    Yes.
19    Q    Okay.  Tell me about who was over the
20 production group.
21    A    Gentleman -- when I left, a gentleman by the
22 name of Mike Dorner.
23    Q    Do you know how to spell his last name.
24    A    Just like it sounds, "Dor-Ner."
25    Q    Okay.

Page 217

1     A    That's the best I can give you.
2     Q    And do you know if he's still with the company?
3     A    I have no idea.
4     Q    What was the -- fell under the production group
5  as it was reorganized by you?
6     A    There -- I'll call it the loan files coming
7  from the branch.  There's an audit function, scrubbing,
8  processing, an audit function.  There's funding and all
9  the processes associated with that.  And I mean those
10 are -- that's what I really know it as loan processing
11 and loan funding.
12    Q    Would it include underwriting?
13    A    Yeah.  And they have underwriters there who
14 would scrub files, make sure the stuff was where it was
15 supposed to be and it looked like what was represented,
16 yeah.
17    Q    Okay.  And was there a separate group outside
18 of the production group that was auditing what the
19 production group was doing?
20    A    That's what the business controls evolved to
21 become.
22    Q    Okay.  Before we get to the business controls,
23 what functions fell under the operations group?
24    A    Okay.  Let me see what my four were here.
25    Q    Sales --

Page 218

1     A    I apologize.  It's been years.
2     Q    Sales, production, operations, business
3  controls.
4     A    I might be confusing operations and business
5  controls.  I think that's one function.  I don't know
6  why I said that.  I called it operations at Argent.
7  It's business controls.  I'm getting the two companies
8  confused is my point.  I think it's the similar function.
9  Do you follow me?
10    Q    Yes.
11    A    I might have called it something different
12 here.
13    Q    Okay.  Who was the head of that group when you
14 left the company?
15    A    Operation or business controls?
16    Q    Correct.
17    A    Renee Dean.
18    Q    Is that a man or a woman?
19    A    It's a woman.
20    Q    Do you know if she's still with the company?
21    A    No, I can't say I do.  I've heard that she
22 left, but I don't know that she left.
23    Q    What is -- what were the areas that fell under
24 that group, business controls?
25    A    Very similar to what we talked about there.

Page 219

1  There was audit, appraisal, vendor management -- God,
2  I'm probably getting a little tired -- customer relations
3  issues, you know.  I think there was some customer
4  service department in there.  It's been a while, but
5  those similar kinds of functionalities that we had
6  previously talked about at Argent, and I might be missing
7  some, I apologize, but similar functions.
8     Q    Okay.  Now was the group, the different groups
9  that you're describing now, that was after the mortgage
10 servicing group was separated out as a separate company?
11    A    Yeah, from a time -- I mean I wasn't there that
12 long.  So it all kind of happened pretty quickly, but I
13 think that happened after we had separated the servicing
14 out, yes.  That's my recollection.
15    Q    Now as far as the customer service function of
16 business controls, what was the process within Ameriquest
17 Mortgage during the time you were CEO or the review of
18 customer complaints?
19    A    The process within Ameriquest.
20    Q    Yes.
21    A    After the separation and the creation of the
22 department or prior?
23    Q    Well, let's start with after the separation of
24 the servicing group.
25    A    Okay.  Creation of a customer relations

Page 220

55 (Pages 217 to 220)

1   group –
2       Q    Okay.
3       A    – and I don't remember what it was actually
4   called. You know, there's things like internal controls,
5   but my understanding or my memory of internal controls,
6   that was rolled up under a legal function. So there
7   was a customer service, customer complaint, customer
8   relations, customer issue group embedded in there.
9           They'd take the calls, resolve matters to the
10  extent they could. If they couldn't, some might get
11  transferred to legal. Some might go to the servicing
12  company because it's a servicing-related issue. To a
13  great extent it's a coordination role, but they also
14  resolved issues too, obviously.
15      Q    Now before the servicing group was separated
16  out into a separate entity, was that customer relations
17  group in existence but handling both pre and post
18  transaction issues?
19      A    I think my memory of it was it was all called
20  internal controls that rolled up to legal at that point
21  in time.
22      Q    Okay.
23      A    Do you follow me?
24      Q    Yes.
25      A    Not everything belonged in legal, right, only

Page 221

1   legal-related matters so – but I think they all – if my
2   memory serves me, they all rolled into internal controls
3   which handled customer complaints.
4       Q    Okay. And the internal controls group when you
5   first came on as CEO, was that also handled by Renee
6   Dean?
7       A    No, it rolled up under the legal structure.
8       Q    Okay. Which was?
9       A    Tom Noto.
10      Q    And that was under the shared services context?
11      A    Yeah, because you're servicing both, servicing
12  into Ameriquest, so yeah.
13      Q    Now how was it – how was it – if a customer
14  called into the customer relations group, would there –
15  how would that information be handled? Would there be
16  some record made of each and every call or complaint?
17      A    I don't know that I can specifically answer
18  your question, but certainly I would hope so, okay? So
19  yeah, we had systems right where they would track, and
20  they would have follow-up. I've seen them, you know.
21  I'm presuming they have been used to a great extent, and
22  I certainly know that spreadsheets and, you know,
23  automated ways were created to be able to communicate and
24  track and follow up.
25      Q    Okay. And was there some sort of a database

Page 222

1   that was being utilized to do that?
2       A    I'm not a technician, but I would presume yes,
3   to the best of my – of course, the data is stored to
4   follow up.
5       Q    I guess my question is is the information being
6   taken down in handwriting or is it being entered into a
7   computer?
8       A    No. I'm talking about computer data entry.
9       Q    Okay. And with regard to vendor management,
10  would that have been the same kind of role as the vendor
11  management group at Argent?
12      A    Similar.
13      Q    Were you working with closing agents and –
14      A    Obviously they – much more robust because you
15  as a lender, you are approving the closing. As a direct
16  lender you are approving the closing agent.
17      Q    Okay. And do you know who was over vendor
18  management at the time you left the company?
19      A    I can't remember. I apologize.
20      Q    How about the appraisal group?
21      A    That one I should remember. Yeah, I should
22  remember. I don't recall. It's not coming to me. I
23  guess I can plug it in later if it comes to me.
24      Q    What about the audit group? Is there somebody
25  over audit?

Page 223

1       A    I'm not sure, but Michelle Cooksey is coming to
2   mind.
3       Q    Cooksey you said?
4       A    Cooksey, yes, "Cook-See," s-e-y.
5       Q    Okay. With regard to the various policies
6   and procedures that would have been in place in
7   Ameriquest and applicable to the various level of sales
8   associates, corporate policies –
9       A    Uh-huh.
10      Q    – how would those be maintained?
11      A    Policies and procedure department, and I
12  remember it rolling up under legal, at the end at
13  least it rolled up under legal, and they would maintain
14  policies and procedures.
15      Q    And how would those be communicated to
16  employees?
17      A    A variety of ways. Products –
18      Q    I'm sorry.
19      A    Products, training.
20      Q    Was there a central system for the maintenance
21  of policies and procedures that could be accessed by
22  employees who had a question?
23      A    We had an Intranet –
24      Q    Okay.
25      A    – whether I can say it's every single one,

Page 224

56 (Pages 221 to 224)

Esquire Deposition Services
800.640.2461

1    I don't know, but certainly a lot of procedures and
2    policies were in our Intranet and our online training
3    materials and so forth, so yeah.
4        Q    And, for instance, if a branch manager wanted
5    to know what the document destruction policy of the
6    company was, was there --
7        A    Yeah.
8        Q    -- would that have been available to them on
9    the Intranet?
10       A    Yeah. I'm under the impression the answer is
11   yes, okay, because it was you type in a word, and you
12   could get clarification on where to go and get
13   information. So I've seen it in Word. The specific
14   documentation policy, I'm presuming it's in there from
15   two years ago because we had one.
16       Q    The document destruction policy?
17       A    Yeah. I remember we had one, so I would
18   presume you would be able to access it via that system.
19       Q    Okay. Do you know what it is offhand?
20       A    Different for different companies, but we
21   were retaining all documents for, I think, seven years,
22   something like that, related to loan files. And it's
23   more complex than that, but --
24       Q    Do you know what the document retention policy
25   was on customer complaints?

Page 225

1        A    No. I don't know.
2        Q    Did the policies and procedures, did that roll
3    up under business controls?
4        A    I think policies and procedures -- I remember
5    it rolling up under legal.
6        Q    You talked before about the different things
7    that you wanted to implement when you came into the
8    company as CEO, one of them being greater authority over
9    hiring and firing. Can you explain to me what was the
10   policy at Ameriquest and what you thought it needed to be
11   as CEO, incoming CEO?
12       A    Okay. The biggest issue that I'll describe
13   here from my perspective was simply organizational
14   structure. When a large portion of your expenses are
15   in a shared services environment, which you don't have
16   control over how money is spent, who's making decisions
17   how that money is being spent on your behalf, that was
18   kind of -- I wanted to push those functions into the
19   business, and I wanted to be able to have people that
20   were accountable to the individual businesses accountable
21   to the spending and the result. And I believed there
22   would be greater accountability by delegating that
23   authority not only to the structure but to the result to
24   me and the business units under me.
25       Q    Okay. And were you permitted to do that?

Page 226

1        A    At some level, yes. As a result of -- you see,
2    I was able to push much of the spending down and create
3    some separation and structure in these various business
4    units, but I wanted to take it -- eliminate much more
5    shared services. There was still a lot of expenditure
6    up there and push that down that I didn't get done.
7        Q    With regard to the policies at the company
8    about what level of personnel had to be involved in
9    certain kinds of decisions like, for example, firing a
10   regional manager --
11       A    Uh-huh.
12       Q    -- were there set policies within Ameriquest
13   about who had to sign off on certain hires or certain
14   fires?
15       A    Within Ameriquest, no.
16       Q    So who would have had the authority to hire or
17   fire say a branch manager?
18       A    Well, you're not going to allow somebody to
19   just go in and fire somebody without HR's involvement --
20       Q    Okay.
21       A    -- okay? So I will say this. An area manager
22   may go in and let somebody go, but they're going to do it
23   with the blessing of the HR department. Does that make
24   sense or I mean does that answer your question?
25       Q    Sure.

Page 227

1        A    Somebody in the HR department is going to be
2    involved before it can happen.
3        Q    Okay. And was there at any level -- did
4    there -- did you have to sign off on a hire or fire?
5        A    Did I have to? No.
6        Q    So HR had full authority?
7        A    Yeah. Now would I want to be involved in
8    somebody that was my immediate supervisor or my report,
9    yeah. I would be involved in the hiring of somebody that
10   reports immediately to me --
11       Q    Okay.
12       A    -- because I'm the hiring -- if they're direct
13   reports, I guess the answer is yes, because whoever is
14   the hiring supervisor has to approve the hire. So people
15   that reported immediately to me, I would have to sign off
16   along with HR's clearance.
17       Q    Okay. Were there any positions that were
18   either your direct reports or, you know, down the chain
19   that Mr. Arnall had to sign off on?
20       A    Certainly shared services functions where he
21   would be involved. Forget signature for a minute. He
22   would request to be involved. He wouldn't actually sign
23   a hiring. It's not the way it was.
24       Q    Okay.
25       A    He would want to be involved in the hiring of

Page 228

57 (Pages 225 to 228)

Page 229

```
 1   certain positions.
 2        Q   And what were those positions?
 3        A   A CFO.
 4        Q   Okay.
 5        A   The head of capital markets.  Well, those are
 6   the ones I'll speak to because we wound up hiring those
 7   positions while I was there or we were looking to fill
 8   those positions while I was there.
 9        Q   All right.  Would he have also been involved in
10   the hiring of any head of sales?
11        A   For Ameriquest?
12        Q   Yes.
13        A   I think he would offer input, yes.
14        Q   Okay.  How about any of the heads of the other
15   groups?
16        A   What do you mean other groups?
17        Q   The head of HR, if he had required input into
18   that?
19        A   At Ameriquest?
20        Q   Yes.
21        A   I think he would have input there, yeah.
22        Q   And the head of legal?
23        A   Yeah.
24        Q   Okay.  What is the basis of your understanding
25   that he's 100 percent shareholder of the Ameriquest
```

Page 230

```
 1   companies.
 2        A   It's a privately held company, and that was
 3   just the understanding.  I don't -- I don't believe he
 4   ever had any partners because I've been there a long
 5   time, and I never met any, okay?  So -- in the early days
 6   I think he had one that I was aware of, but I heard he
 7   bought him out, but I don't know it.  He had a partner,
 8   but since -- for the last several years it's my
 9   understanding --
10        Q   Okay.
11        A   -- not knowledge, just understanding.
12        Q   Was there -- were there any other kinds of
13   decisions that would have required or would have caused
14   you to seek his input such as what products were being
15   offered by Ameriquest?  Would he have wanted to have
16   input into that?
17        A   Certainly.  You know, it depends on the product
18   though.  I mean I'm not saying all products but certain
19   types of products he would involve himself.  It wasn't
20   necessarily a requirement.  It's just he would -- you
21   just kind of know to, you know, I'm thinking about
22   doing this.  You know, are you okay?  You know, it's
23   like a board, right?  I mean you don't just do major
24   introductions of new things without some discussion with
25   material people on the board.
```

Page 231

```
 1        Q   Okay.  And as far as implementing new internal
 2   controls, would he have been involved in that?
 3            MR. WIEGAND:  Objection.
 4            THE WITNESS:  Yeah, define the control.
 5   BY MS. BOWMAN:
 6        Q   In other words, would he have been involved
 7   in determining what kinds of audits should be performed
 8   within the company Ameriquest?
 9        A   No.  No.
10        Q   During your time as CEO of Ameriquest, did you
11   ever become aware of the kind of allegation of the bait/
12   switch sales tactics?
13            MR. WIEGAND:  Objection.
14            THE WITNESS:  I read the complaints of the
15   Attorney Generals.
16   BY MS. BOWMAN:
17        Q   As a result of having read that complaint, did
18   you as CEO conduct any kind of inquiry to determine what
19   the basis of that complaint might be?
20        A   Well, like I said, departments were talking to
21   and discussing the issues to try to understand their
22   basis for the complaints of bait and switch.  I'm not
23   sure that we believed that we were bait and switching.
24   We were trying to understand where they were coming from,
25   what their concerns were.
```

Page 232

```
 1        Q   I understand what you're saying.  I'm asking
 2   if you as the CEO undertook to engage in any interviews
 3   personally of people inside the company?
 4        A   Oh, no, no, no.  I didn't conduct interviews,
 5   not that I recall.
 6        Q   Okay.  Did you have any meetings with the HR
 7   department regarding the training of account executives
 8   during that time frame?
 9            MR. WIEGAND:  Objection.  You mean after he
10   read the complaint?
11            MS. BOWMAN:  Yes.  I'm sorry, yes, after he
12   read the complaint.
13            THE WITNESS:  I would have conversations, and
14   I would see and be involved in training materials before
15   and after reading the complaint all the time.
16   BY MS. BOWMAN:
17        Q   Okay.
18        A   You know, I mean sometimes we're adding new
19   things.  I would see things or I might even speak at one
20   of the seminars when they come in.  I would actually
21   talk to the new recruits and answer questions they might
22   have.  So yeah, that was part of my function on occasion;
23   but, you know, it's not like I was embedded in the
24   developmental process of our training programs.
25        Q   Sure.  Did you ever -- after reading the AG
```

Esquire Deposition Services
800.640.2461

Page 233

1  complaint, did you have any discussions with HR about
2  specific changes you thought needed to be made to the
3  training materials being utilized with the account
4  executives?
5      MR. WIEGAND: Objection.
6      THE WITNESS: Specific discussions -- I'm not
7  recalling any specific discussions about "They allege
8  this. Please change that." It's not -- it's not coming
9  to me.
10 BY MS. BOWMAN:
11     Q   Okay. Did you make any recommendations to the
12 changes to the training programs for account executives
13 as a result of the AG complaint?
14     A   That's the same question to me, and nothing is
15 coming to mind. It's been a while, but nothing is coming
16 to mind right off.
17     Q   And would there be any record of any
18 recommendations or materials that you might have
19 submitted to the HR department at that time?
20     A   I would presume somebody would write it down in
21 those departments. If I wanted something, they'd get it
22 done, right.
23     Q   Okay.
24     A   So they would keep -- they would be the
25 custodians of the records.

Page 234

1      Q   Did you after reading the AG complaint ask for
2  any reports or information from various areas of the
3  company in order to understand anything that you read in
4  the complaint?
5      A   I created a business controls group that
6  consolidated all audits and those functions under one
7  group with the specific objective to get clear visibility
8  and summarization of those types of issues, and that's
9  what that group does to a great extent; and yeah, there
10 was product produced by them. I don't remember what the
11 names were, but --
12     Q   I mean --
13     A   -- there were reports, yeah.
14     Q   -- those would have been forwarded to you in
15 that time frame after you had read the complaint?
16     A   Yeah, I left shortly thereafter. I think I
17 might have saw two, a couple of months' worth of them,
18 and they were still refining the reports, et cetera,
19 et cetera. Do you follow me?
20     Q   Yes. What were -- initially do you recall what
21 kinds of reporting you were asking be done and rolled up
22 to you after reading the AG complaint?
23     A   Audit, underwriting audit reports, appraisal
24 audit reports. I'm not sure again if it was in this
25 group, but I certainly wanted compliance, make sure all

Page 235

1  of our RESPAs and stuff were going out and, you know,
2  canceled, denials were being handled in compliance, those
3  reports there.
4      Q   Were there any sales group reporting that you
5  initiated after reading the AG complaint?
6      A   Reporting?
7      Q   Yes.
8      A   No. There's so much reporting in sales.
9  You're measuring their productivity. I'm trying to
10 figure out what was before and after.
11     Q   No, I'm talking --
12     A   Because, you know, I wasn't there that long.
13 Everything was kind of after, all right? So every report
14 I ever read, it was after. I learned about the Attorney
15 General complaint pretty damn quickly after taking on
16 this role. It was prevalent throughout that
17 organization. Do you follow me? So like everything was
18 after I read the complaint. My whole experience --
19     Q   Okay.
20     A   -- as CEO, and forget whether I read. I
21 certainly had knowledge of the complaint and the basic
22 issues at hand, whether I specifically read it before or
23 after, but you follow me?
24     Q   Yeah. After you became CEO though, did you
25 request any specific kinds of reporting coming up through

Page 236

1  the sales department?
2      A   Yeah. I would get productivity reports, you
3  know, how much did this branch do. We would refine
4  productivity by branch. I remember seeing reports
5  regarding how quickly we were processing loans, you know,
6  I mean how effective we were --
7      Q   Okay.
8      A   -- how the average loan application to funding
9  times, that kind of stuff, you know. Productivity
10 matrixes.
11     Q   Yes, but there was --
12     A   I didn't look at loan officer level did this
13 guy book a loan this month, but lower levels I'm sure
14 did within the organization. I know reports existed.
15     Q   Were you asking for any compliance reporting
16 from any of the sales levels such as branch managers
17 compliance reporting, area managers compliance reporting?
18     A   They don't compliance report.
19     Q   Did you ask for any compliance reviews of any
20 of the branch offices?
21     A   We had -- I personally --
22     Q   Yes.
23     A   -- never requested anybody to go out to this
24 branch and conduct a compliance review, okay, but we did
25 have people visit branches and audit them.

59 (Pages 233 to 236)

```
1     Q   Did you --
2     A   I'm trying to remember when that occurred,
3  but I believe we had an external audit department is
4  my recollection, and I think it sat under legal also.
5     Q   Do you know what the time frames were during
6  which that auditing would take place on like a seriotic
7  time basis or did that change when you arrived?
8     A   I didn't change anything in that particular
9  area, so I couldn't tell you what the frequency was.
10 I never asked --
11    Q   Okay. Would you have --
12    A   -- that I can recall.
13    Q   Sorry.
14    A   That I can recall.
15    Q   Would you have -- as a result of your creation
16 of the internal controls group, would you have begun to
17 receive those audits of the different sales groups as
18 CEO?
19        MR. WIEGAND: Objection.
20        THE WITNESS: I didn't create the internal
21 controls group.
22 BY MS. BOWMAN:
23    Q   Okay.
24    A   That existed years. Business controls, okay?
25    Q   Uh-huh.
```

Page 237

```
1     A   And just for clarification, it was a business
2  controls group is what I remember it being called. Yeah,
3  I indicated I used to -- I got a couple months' worth
4  of audit reports in a variety of areas, you know, and
5  summarization of trends and stuff like that. I had
6  gotten a couple of months of them before I left the
7  company.
8     Q   Was it your understanding that prior to your
9  changing -- your creating the business controls group
10 and making sure that you got copies of those audits --
11    A   Uh-huh.
12    Q   -- were all those audits being performed and
13 just not sent up the chain or --
14    A   These audit functions were not new --
15    Q   Okay.
16    A   -- okay?
17    Q   Yep.
18    A   But I'll give you -- in production or
19 processing or in loan processing for Ameriquest they
20 audited loans. They had it built into that department.
21 So they audited their employees' work. I separated it
22 out and changed the reporting structure of that. We had
23 internal controls. We had compliance people. We had
24 that. I just was consolidating many of those functions
25 and those audits under -- it's like the government did.
```

Page 238

```
1  They created a Department of Homeland Security, right?
2     Q   Right.
3     A   It's a little bit of the same. So there's one
4  person accountable to make sure the people know what they
5  need to know and have more visibility, but it was more of
6  a consolidation of functions throughout, embedded in the
7  organization than it was a creation of something new for
8  visibility and communication purposes.
9     Q   Okay. So all these audits that you've been
10 describing to your understanding --
11    A   Ameriquest did appraisal audits. Ameriquest
12 did underwriting audits. Ameriquest had compliance
13 people that audited, you know, what I -- it was the
14 visibility and the communication and the budgeting and
15 accountability were the primary objectives of creating
16 much of the structure.
17    Q   Okay. So if -- to your understanding if
18 somebody wanted to go back and actually find the
19 appraisal audits for the last five years, there should
20 have been appraisal audits performed during each of those
21 five years?
22    A   Yeah. I would think they're obtainable or
23 they're out there somewhere.
24    Q   Okay. And the same would be true for the other
25 types of audits that you described.
```

Page 239

```
1     A   Underwriting, yeah.
2     Q   Were there any kind of decisions concerning the
3  Ameriquest Mortgage Company that Roland Arnall reserved
4  to himself; in other words, he was going to make the
5  decisions about this particular area, what was going to
6  be happening?
7         MR. WIEGAND: Objection.
8         THE WITNESS: No. He wouldn't make decisions
9  independently. He would get insight from people. He
10 might be involved. Like I said earlier, he would request
11 to be involved in certain decisions regarding a CFO --
12 BY MS. BOWMAN:
13    Q   Sure.
14    A   -- right, or a -- so -- but he would never
15 independently make that without involvement of other
16 people.
17    Q   Okay. With regard to the -- there was a
18 marketing group within Ameriquest; is that right?
19    A   Yes.
20    Q   Okay. Who was the head of the marketing group?
21    A   At Ameriquest Kevin Moorefield.
22    Q   All right. And did Ameriquest also use an
23 outside marketing agency?
24    A   Certainly there was an advertising agency.
25    Q   And who was that?
```

Page 240

60 (Pages 237 to 240)

Esquire Deposition Services
800.640.2461

| | |
|---|---|
| 1    A   I remember it being DDB. I don't know what | 1   however. |
| 2   it's an acronym for. | 2    MR. WIEGAND: And we're not arguing on the |
| 3    Q   Okay. Do you know where they were located? | 3   record I mean unless you really need to argue on the |
| 4    A   It's a worldwide agency -- | 4   record. He said he needs to go at 4:30. |
| 5    Q   All right. | 5    MS. BOWMAN: As far as the review, I don't see |
| 6    A   -- and I think they had a local branch. I'd | 6   why a normal 30-day -- is that -- |
| 7   been to one of their offices years prior, so they had a | 7    MR. LeSAGE: I would propose the following |
| 8   local branch. It's like -- but they're -- they have | 8   stipulation; that the original transcript be sent |
| 9   offices in Europe. I don't know what their headquarters | 9   directly to my office. I'll take custody of it and that |
| 10   is. | 10   it will be reviewed, corrected and signed within 30 days |
| 11    Q   But it was a -- there was a physical office in | 11   of receipt. If it's not so corrected, signed and |
| 12   California? | 12   verified within 30 days, you can use a copy as if it had |
| 13    A   Yeah. | 13   been so corrected and signed. |
| 14    Q   Okay. | 14    MS. BOWMAN: Okay. That's fine. And if we |
| 15    A   Yeah. | 15   can also agree just as a matter of procedure since we're |
| 16    Q   It was in Orange County? | 16   heading into these depositions that we'll just |
| 17    A   I remember it to be. | 17   consecutively mark exhibits. |
| 18    Q   Okay. | 18    MR. LeSAGE: I agree with that so that we're |
| 19    A   It might be L.A. though. It might have been an | 19   now at Exhibit Number 3. |
| 20   L.A. office, but there's an office here. I didn't get on | 20    MS. BOWMAN: Right. |
| 21   a plane to get there. | 21    MR. LeSAGE: So stipulated. |
| 22    Q   Okay. Do you know during your time as CEO at | 22    THE VIDEOGRAPHER: Done? |
| 23   Ameriquest whether Ameriquest was engaged in direct mail | 23    MR. LeSAGE: Time. |
| 24   marketing? | 24    THE VIDEOGRAPHER: This concludes Volume 1 of |
| 25    A   Yes. | 25   the deposition of Wayne Lee. There were three videotapes |
| <div align="center">Page 241</div> | <div align="center">Page 243</div> |
| 1    Q   And are you familiar with the process of | 1   used in this volume. We're now off the record for the |
| 2   prescreening consumers through credit reporting agencies? | 2   day. We're now off the record for the day at 4:29 p.m. |
| 3    A   Am I familiar with the process? I can't say | 3    THE REPORTER: Would you like a copy, |
| 4   that I am. | 4   Mr. LeSage? |
| 5    Q   Okay. Are you familiar with prescreen direct | 5    MR. LeSAGE: A copy, please. |
| 6   mail marketing? | 6    MR. HARRIS: How much time do we have on the |
| 7    A   You've got to define it for me. | 7   record? |
| 8    Q   Where a credit provider submits criteria to | 8    THE VIDEOGRAPHER: We have five hours and 40 |
| 9   a credit reporting agency in order to obtain the | 9   minutes on the record. |
| 10   identifications of persons meeting that criteria in order | 10   // |
| 11   to send them a mail solicitation. | 11   // |
| 12    A   I would imagine technically it's possible. I | 12 |
| 13   believe that there's components of that, but its credit | 13 |
| 14   profile, I'm not sure that a credit profile is pulled in | 14 |
| 15   those screenings. | 15 |
| 16    MR. WIEGAND: She just wants to know if you're | 16 |
| 17   familiar with it. | 17 |
| 18    THE WITNESS: Obviously not very much on how it | 18 |
| 19   works. I'm not a computer guy. | 19 |
| 20    MR. LeSAGE: We are at the 4:30 bewitching | 20 |
| 21   hour. Can we enter into a stipulation with regard to | 21 |
| 22   the original transcript signing and verifying it. | 22 |
| 23    MR. HARRIS: For the record I haven't had a | 23 |
| 24   chance to ask my questions yet. | 24 |
| 25    MR. LeSAGE: I understand. It's now 4:30 | 25 |
| <div align="center">Page 242</div> | <div align="center">Page 244</div> |

<div align="center">61 (Pages 241 to 244)</div>

```
1
2
3
4
5
6
7
8
9        I, WAYNE LEE, do hereby declare under
10  penalty of perjury that I have read the foregoing
11  transcript; that I have made such corrections as appear
12  noted, in ink, initialed by me, or attached hereto; that
13  my testimony as contained herein, as corrected, is true
14  and correct.
15       EXECUTED this _____ day of _____
16  20___, at _____
              (City)          (State)
17
18
19  _____
     WAYNE LEE
     Volume 1
20
21
22
23
24
25
                    Page 245
```

```
1
2
3        I, the undersigned, a Certified Shorthand
4   Reporter of the State of California, do hereby certify:
5        That the foregoing proceedings were taken
6   before me at the time and place herein set forth; that
7   any witnesses in the foregoing proceedings, prior to
8   testifying, were placed under oath; that a verbatim
9   record of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; further, that the foregoing is an accurate
12  transcription thereof.
13       I further certify that I am neither
14  financially interested in the action nor a relative or
15  employee of any attorney of any of the parties.
16       IN WITNESS WHEREOF, I have this date
17  subscribed my name.
18
19  Dated:_____
20
21
     _____
     SHERYL HILTON MEYER
22   CSR NO. 2852
23
24
25
                    Page 246
```

62 (Pages 245 to 246)

1

2

3

4

5

6

7

8

9          I, WAYNE LEE, do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made such corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15          EXECUTED this ___*19*___ day of __*June*__

16   20*07*, at __*Irvine*__ , __*Ca*__ .
                     (City)         (State)

17

18

19   WAYNE LEE
     Volume 1

20

21

22

23

24

25

245



BuchalterNemer
A Professional Law Corporation

18400 Von Karman Avenue, Suite 800, Irvine, California 92612-0514
Telephone (949) 760-1121 / Fax (949) 720-0182

File Number: L7526-0683
Direct Dial Number: (949) 224-6412
E-Mail Address: *jmealey-hatch@buchalter.com*

June 21, 2007

**VIA FACSIMILE &**
**FIRST CLASS MAIL**

Jill H. Bowman, Esq.
James, Hoyer, Newcomer & Smiljanich
4830 West Kennedy Boulevard, Suite 550
Tampa, Florida 33609

     Re:    In re: Ameriquest Mortgage Co. Mortgage Lending Practices Litigation
             MDL Docket No. 1715
             May 9, 2007 Deposition of Wayne A. Lee

Dear Ms. Bowman:

    Please be advised that Wayne Lee has signed the original of his May 9, 2007 deposition transcript after the changes contained on the enclosed Deposition Transcript Errata Sheet were made. I have enclosed copies of the relevant pages of Mr. Lee's deposition transcript that contain the changes as well as his initials confirming the change.

             Very truly yours,

             BUCHALTER NEMER
             A Professional Corporation

             By     *Joanne D. Mealey-Hatch*

                   Joanne D. Mealey-Hatch
                   Assistant to Joanne N. Davies, Esq.

/jdh
Enclosures
cc:    Mr. Wayne Lee (with enclosures)
       Bernard E. LeSage, Esq. (with enclosures)
       Daniel M. Harris, Esq. (with enclosures)
       Thomas J. Wiegand, Esq. (with enclosures)
       Jean K. Janes, Esq. (with enclosures)
       Evan Jay Kaufman, Esq. (with enclosures)
       Gary E. Klein, Esq. (with enclosures)
       Shennan Alexandra Kavanaugh, Esq. (with enclosures)
       Albert F. Hofeld, Esq. (with enclosures)
       Sheryl Hilton Meyer, CSR (with enclosures)

_In re Ameriquest Mortgage Company Mortgage Lending Practices Litigation_

**United States District Court, Northern District of Illinois**
**Case No. MDL No. 1715, 05-CV-07097**

DEPOSITION TRANSCRIPT ERRATA SHEET

Name of Deponent: Wayne A. Lee

Date of Deposition: Wednesday, May 9, 2007

| PAGE NO. | LINE NO. | CHANGE FROM | CHANGE TO |
|---|---|---|---|
| 9 | 17 | "He's aware of the legal . . ." | "He's not aware of the legal . . ." |
| 11 | 25 | "Yes." | "Yes, I can tell you what I believed to be the hierarchy at the time." |
| 12 | 15 | "My understanding it was, but I wasn't preview . . ." | "My understanding it was, but I wasn't privy . . ." |
| 12 | 24 | "Again, I wasn't preview . . ." | "Again, I wasn't privy . . ." |
| 23 | 1 | " . . . not during my time at Argent." | " . . . not during my time at Argent. I believe my lawyer was just paraphrasing the multistate claims." |
| 61 | 8 | "No." | "No, not that I recall." |
| 82 | 2-3 | "really anybody for the last couple of years." | "hardly anybody at the company for the last couple of years." |
| 82 | 9 | " . . . knowledge. It's belief and hearsay, all right." | " . . . knowledge after I left. It's belief and hearsay, all right." |
| 82 | 20 | " . . . belief, all right? I'm mad, and that's my belief." | " . . . belief, all right? I was angry, and that's my belief." |
| 82 | 25 | "The only people I talked to" | "The only people I recall I talked to" |
| 116 | 7 | "Okay. Oh, the shared services thing?" | "Okay, Oh, the ACC shared services thing?" |

| PAGE NO. | LINE NO. | CHANGE FROM | CHANGE TO |
|---|---|---|---|
| 147 | 20 | "Legally we were required as a lender to send them . . ." | "Legally we were not required as a lender to send them . . ." |

I, Wayne A. Lee, make the above changes to my deposition taken in the matter of *In re Ameriquest Mortgage Company Mortgage Lending Practices litigation* on May 9, 2007.

Dated: ___6 - 19___, 2007

_____
Wayne A. Lee

- 2 -