## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS (CHICAGO)

| | |
|---|---|
| IN RE: AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL NO. 1715<br><br>LEAD CASE NO. 1:05-cv-07097 |
| AMERIQUEST MORTGAGE COMPANY, a Delaware corporation,<br>　　　　　　　Third-Party Plaintiff,<br><br>　　　vs.<br><br>TRANS UNION LLC, a Delaware corporation; TRANS UNION CORPORATION, a Delaware corporation; CHOICEPOINT PRECISION MARKETING, INC., a Georgia corporation; EQUIFAX CREDIT INFORMATION SERVICES, INC., a Georgia corporation; EQUIFAX MARKETING SERVICES, a division of Equifax Credit Information Services, Inc.;<br>　　　　　　　Third-Party Defendants. | (Centralized before The Honorable Marvin E. Aspen) |

### TRANS UNION CORPORATION AND TRANS UNION, LLC'S ANSWER TO THIRD-PARTY PLAINTIFF AMERIQUEST MORTGAGE COMPANY'S THIRD-PARTY COMPLAINT AND AFFIRMATIVE DEFENSES

Trans Union Corporation and Trans Union, LLC (collectively "Trans Union"), by counsel, respond to Third-Party Plaintiff Ameriquest Mortgage Company's Third-Party Complaint (the "Third-Party Complaint") as follows. For the Court's convenience, Third-Party Plaintiff's allegations are set forth verbatim with Trans Union's responses immediately following.

Defendant and third-party plaintiff Ameriquest Mortgage Company ("Ameriquest") alleges as follows:

## THE PARTIES

1.      Ameriquest is a Delaware corporation with its principal place of business in Orange, California.

**ANSWER**:  Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph.

2.      Third-party defendants Trans Union LLC and Trans Union Corporation, sometimes doing business as PerformanceData (hereinafter collectively, "TransUnion"), are Delaware corporations with their principal place of business in Chicago, Illinois.

**ANSWER**:  Trans Union admits that Trans Union, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois, sometimes did business as PerformanceData and that Trans Union Corporation is a Delaware corporation that does business in Chicago, Illinois.  Trans Union denies the remaining allegations of this paragraph.

3.      Third-party defendant ChoicePoint Precision Marketing, Inc. ("ChoicePoint") is a Georgia corporation with its principal place of business in Alpharetta, Georgia.

**ANSWER**:  Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph.

4.      Third-party defendant Equifax Credit Information Services, Inc. ("Equifax") is a Georgia Corporation with its principal place of business in Atlanta, Georgia.

**ANSWER**:  Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph.

5.      Third-party defendant Equifax Credit Marketing Services is a division of Equifax Credit Information Services, Inc. ("ECMS").

**ANSWER**:  Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph.

6.      Ameriquest is informed and believes, and based thereon alleges, that each of the foregoing third-party defendants, was the agent, representative, co-conspirator, and/or servant of each of the remaining third-party defendants and was acting within the course and scope of that agency, representation, or service in doing and/or failing to do the acts herein alleged. Ameriquest is informed and believes, and thereon alleges, that these third-party defendants, and each of them, conspired together and willfully formed a deliberate design and purpose to, and/or entered into a scheme to do, the acts and/or omissions herein alleged, and in pursuance thereof, did and/or caused to be done such acts and/or omissions; that all of said acts and/or omissions were participated in and were done by all of these third-party defendants, or any one or more of them, as steps in furtherance of said conspiracy and for the purposes set forth herein.

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because this case relates to claims arising under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

**ANSWER**:   Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

8.      Venue is proper in this judicial district pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, because Ameriquest's claims against the third-party defendants herein arise directly out of claims asserted by plaintiffs Raymond Quarterman, Jr., Thomas Klutho, and Mary

Forrest, on behalf of themselves and a putative class of non-borrowers nationwide (collectively, the "Non-Borrower Plaintiffs"), against Ameriquest in this Court.[1]  On December 6, 2006, the Non-Borrower Plaintiffs filed the Consolidated Complaint for Claims of Non-Borrowers (Docket #323) (the "Non-Borrower Complaint").  Through the Non-Borrower Complaint, the Non-Borrower Plaintiffs allege that the letters attached as Exhibits "A" through "E" to the Non-Borrower Complaint, as well as all similar letters sent by or at the behest of Ameriquest (the "Letters"), violated FCRA's firm offer of credit and/or clear and conspicuous disclosure requirements.  To the extent that these allegations are found to be true by a trier of fact, the alleged failure to comply with the FCRA is directly attributable to the assistance, advice, recommendations, conduct, and actions of TransUnion, ChoicePoint, Equifax and ECMS.  As alleged herein, each of the Defendants provided, among other things, advice and direct-marketing services to Ameriquest in the development, formulation, creation, production and maintenance of a direct-mail marketing program (the "Direct Mail Program"), including, but not limited to, the use of the Letters sent to consumers utilizing prescreened consumer lists (the "Consumer Lists").

**ANSWER**:  Trans Union states that the allegations of this paragraph relating to venue (as set forth in the first sentence of this paragraph) are legal conclusions and, so stating, denies them. Trans Union states that the Non-Borrower Complaint speaks for itself.  Trans Union denies the remaining allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny all other allegations of this paragraph and, so stating, denies them.

---

[1] Plaintiff Raymond Quarterman, Jr. originally filed a similar complaint on behalf of himself and those similarly-situated nationwide in the United States District Court for the Central District of California on February 25, 2005. Of the other "named-plaintiffs," his is the earliest-filed Complaint that was consolidated into the Non-Borrower Complaint.

15.*[sic]* Trans Union is a credit reporting agency as defined in FCRA. At all times relevant herein, and in connection with the Direct Mail Program, Trans Union, together with its affiliated companies, entered into a series of written and oral agreements with Ameriquest whereby TransUnion provided the data and developed and marketed the models and the computerized process/systems for generating the Consumer Lists. The Consumer Lists were leased to Ameriquest in order for Ameriquest to have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers. Ameriquest never owned the Consumer Lists and was simply granted a license for such use for specified periods of time.

**ANSWER**: Trans Union admits that Trans Union, LLC is a "consumer reporting agency" as that term is defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* Trans Union states that any written agreements with Ameriquest speak for themselves, denies that it ever had oral agreements with Ameriquest, and it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

16.*[sic]* TransUnion provided the data and developed and sold to Ameriquest the models and/or computerized process/systems for generating the Consumer Lists.

**ANSWER**: Trans Union admits that it complied with its agreements with Ameriquest, that such agreements speak for themselves and, so stating, denies the remaining allegations of this paragraph.

17.*[sic]* At all times relevant herein, TransUnion represented to Ameriquest that it knew and operated within the requirements of FCRA. Further, TransUnion represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnish information to consumer reporting agencies, as well as on users of consumer reports, including,

but not limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures. Ameriquest reasonably relied upon these representations in entering into the agreements with TransUnion and in utilizing the services TransUnion provided.

**ANSWER**: Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

18.*[sic]* TransUnion was fully aware that the data and Consumer Lists it provided, and/or the models/computerized process/systems it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers. TransUnion was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit and the FCRA requirements regarding clear and conspicuous disclosures. TransUnion required that the data it provided by virtue of the Consumer Lists and/or the models/computerized process/systems would be used consistent with all applicable consumer protection laws, including FCRA.

**ANSWER**: Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph and, so stating, denies them.

19. *[sic]* In connection with the Direct Mail Program, and in order to ensure that Ameriquest's Direct Mail program complied with FCRA, TransUnion required Ameriquest to provide it with drafts of the proposed Letters annually. TransUnion required that as a condition of it providing Ameriquest with the Consumer Lists, TransUnion would have the opportunity to review, comment, and approve the Letters. In other words, TransUnion would not provide Ameriquest with information on consumers until it satisfied itself that the Letters Ameriquest

intended to send would comply with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**: Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph and, so stating, denies them.

20. *[sic]* TransUnion's continual review of Ameriquest's Direct Mail Program provided Ameriquest with assurance that the Direct Mail Program was at all times in compliance with applicable law, including FCRA.

**ANSWER**: Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph and, so stating, denies them.

**ALLEGATIONS AS TO CHOICEPOINT**

21. *[sic]* ChoicePoint is a credit reporting agency and/or a reseller of credit information as defined in FCRA. At all times relevant herein, and in connection with the Direct Mail Program, ChoicePoint entered into a series of written and oral agreements with Ameriquest whereby it, using Equifax data, agreed to provide, and provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program so that Ameriquest could have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

22. *[sic]* ChoicePoint provided services related to the Direct Mail Program, including, but not limited to, providing the Consumer Lists for Ameriquest's use.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

23. *[sic]* At all times relevant herein, ChoicePoint represented to Ameriquest that it knew and operated within the requirements of FCRA. Further, ChoicePoint represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnished information to consumer reporting agencies, as well as on users of consumer reports, including, but not limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures. Ameriquest reasonably relied upon these representations in entering into the agreements with ChoicePoint and in utilizing the services ChoicePoint provided.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

24. *[sic]* ChoicePoint was fully aware that the Consumer Lists and other services it provided to Ameriquest would be used as a part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers. ChoicePoint was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit, and the FCRA requirements regarding clear and conspicuous disclosures. ChoicePoint required that the data it provided by virtue of the Consumer Lists would be used consistent with all applicable consumer protection laws, including FCRA.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

25. *[sic]* In addition to having full knowledge of how Ameriquest would use the information it provided, ChoicePoint at all times had the ability and opportunity to review, comment, and approve the Letters in order to satisfy itself that Ameriquest's Direct Mail

Program and the Letters complied with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

## ALLEGATIONS AS TO EQUIFAX

26. *[sic]* Equifax is a credit reporting agency as defined in FCRA. At all times relevant herein, and in connection with the Direct Mail Program, Equifax, together with its affiliated companies, including ECMS, entered into a series of written and oral agreements with Ameriquest whereby Equifax provided the data and/or developed and marketed the computerized process/systems for generating the Consumer Lists. The Consumer Lists generated from Equifax data were provided to Ameriquest by Equifax and ChoicePoint in order for Ameriquest to have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

27. *[sic]* Equifax, for itself and/or through ChoicePoint, developed and sold to Ameriquest the Consumer Lists generated from Equifax data.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

28. *[sic]* At all times relevant herein, Equifax represented to Ameriquest that it knew and operated within the requirements of FCRA. Further, Equifax represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnish information to consumer reporting agencies, as well as on users of consumer reports, including, but not

limited to, those specific requirements under FCRA that pertain to making firm offers of credit and/or clear and conspicuous disclosures. Ameriquest reasonably relied upon these representations in entering into the agreements with Equifax and in utilizing the services Equifax provided.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

29. *[sic]* Equifax was fully aware that the Consumer Lists and/or the models/computerized process/systems it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers. Equifax was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit and the FCRA requirements regarding clear and conspicuous disclosures.   Equifax required that the data it provided by virtue of the Consumer Lists and/or the models/computerized process/systems would be used consistent with all applicable consumer protection laws, including FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

30. *[sic]* In addition to having full knowledge of how Ameriquest would use the information it provided, Equifax at all times had the ability and opportunity to review, comment, and approve the Letters in order to satisfy itself that Ameriquest's Direct Mail Program and the Letters complied with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

## ALLEGATIONS AS TO ECMS

31.*[sic]* ECMS is a credit reporting agency as defined in FCRA. At all times relevant herein, and in connection with the Direct Mail Program, ECMS entered into a series of written and oral agreements with Ameriquest whereby it, using Equifax data, agreed to provide, and provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program so that Ameriquest could have the Letters made and sent, and thereby make "firm offers of credit" that contained proper "clear and conspicuous" disclosures to consumers.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

32.*[sic]* ECMS provided services related to the Direct Mail Program, including, but not limited to, providing the Consumer Lists for Ameriquest's use.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

33.*[sic]* At all times relevant herein, ECMS represented to Ameriquest that it knew and operated within the requirements of FCRA. Further, ECMS represented to Ameriquest that it was aware of the responsibilities imposed by FCRA upon those persons who furnished information to consumer reporting agencies, as well as on users of consumer reports, including, but not limited to, those specific requirements under FCRA that pertain to making firm offers o credit and/or clear and conspicuous disclosures. Ameriquest reasonably relied upon these representations in entering into the agreements with ECMS and in utilizing the services ECMS provided.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

34.*[sic]* ECMS was fully aware that the Consumer Lists and other services it provided to Ameriquest would be used as part of Ameriquest's Direct Mail Program in order to send the Letters and make firm offers of credit (along with clear and conspicuous disclosures) to consumers. ECMS was also aware of the requirements under FCRA regarding use of the Consumer Lists to make firm offers of credit, and the FCRA requirements regarding clear and conspicuous disclosures. ECMS required that the data it provided by virtue of the Consumer Lists would be used consistent with all applicable consumer protection laws.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

35.*[sic]* In addition to having full knowledge of how Ameriquest would use the information it provided, ECMS at all times had the ability and opportunity to review, comment, and approve the Letters in order to satisfy itself that Ameriquest's Direct Mail Program and the Letters complied with all applicable laws, including, but not limited to, those related to firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

## FIRST CLAIM

### (Breach of Contract—Against TransUnion)

36.*[sic]* Ameriquest re-alleges paragraphs 1 through 35 inclusive, and incorporates the same by reference.

**ANSWER**:  Trans Union reasserts its answers and responses set forth herein.

37.*[sic]* Ameriquest and TransUnion entered into oral and written contracts under which TransUnion agreed to provide data and develop and developed and marketed the models and

computerized process/systems for generating the Consumer Lists, and agreed to provide and provided the Consumer Lists to Ameriquest for use in Ameriquest's Direct Mail Program to make firm offers of credit (with clear and conspicuous disclosures) to consumers.

**ANSWER**:  Trans Union states that the written contracts speak for themselves and, so stating, denies the allegations of this paragraph.

38.*[sic]* Ameriquest has performed its obligations under the contracts with TransUnion, including, but not limited to, paying TransUnion for its services.

**ANSWER**:  Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

39.*[sic]* TransUnion was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA. Ameriquest relied upon TransUnion's expertise and experience in the direct-mail marketing field with respect to ensuring that the models and computerized process/systems, and the Consumer Lists it provided were done in compliance with FCRA. Further, Ameriquest relied upon TransUnion's expertise and review of the Letters to ensure its compliance with FCRA.

**ANSWER**:  Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

40.*[sic]* In the event that the allegations in the Non-Borrower Complaint are proven to be true, Trans Union *[sic]* breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the models and systems and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

**ANSWER**:  Trans Union denies the allegations contained in this paragraph.

41.*[sic]* Further, because TransUnion was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon TransUnion's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of the Customer Lists and the sending of the Letters were done in compliance with FCRA. Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of TransUnion's actions, which actions must necessarily be construed as a breach of TransUnion's contracts with Ameriquest. Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by TransUnion's breach.

**ANSWER**:  Trans Union denies the allegations contained in this paragraph.

42.*[sic]* Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid TransUnion for its services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and ECMS exceeded approximately $680,000,000. Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

**ANSWER**:  Trans Union denies the allegations contained in this paragraph.

## SECOND CLAIM

### (Breach of Contract—against ChoicePoint)

43.*[sic]* Ameriquest re-alleges paragraphs 1 through 42 inclusive, and incorporates the same by reference.

**ANSWER**: Trans Union reasserts its answers and responses set forth herein.

44.*[sic]* Ameriquest and ChoicePoint entered into oral and written contracts under which ChoicePoint, using Equifax data, agreed to provide and provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program so that Ameriquest could make firm offers of credit and clear and conspicuous disclosures to consumers.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

45.*[sic]* Ameriquest has performed its obligations under the agreements with ChoicePoint, including, but not limited to, paying ChoicePoint for its services.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

46.*[sic]* ChoicePoint was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA. Ameriquest relied upon ChoicePoint's expertise and experience in the direct-mail marketing field with respect to ensuring that the Consumer Lists it provided were done in compliance with FCRA. Further, Ameriquest relied upon ChoicePoint's expertise and review of the Letters to ensure its compliance with FCRA.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

47.*[sic]* In the event that the allegations in the Non-Borrower Complaint are proven to be true, ChoicePoint breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous

disclosure requirements of FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

48. *[sic]* Further, because ChoicePoint was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon ChoicePoint's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of Customer Lists and the sending of the Letters were done in compliance with FCRA. Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of ChoicePoint's actions, which actions must necessarily be construed as a breach of ChoicePoint's contracts with Ameriquest. Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by ChoicePoint's breach.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

49. *[sic]* Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid ChoicePoint for its services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax, and ECMS exceeded approximately $680,000,000. Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

### THIRD CLAIM

### (Breach of Contract—against Equifax)

50.*[sic]* Ameriquest re-alleges paragraphs 1 through 49 inclusive, and incorporates the same by reference.

**ANSWER**:  Trans Union reasserts its answers and responses set forth herein.

51.*[sic]* Ameriquest and Equifax entered into oral and written contracts under which Equifax agreed to provide data and to develop and developed and marketed the computerized process/systems for generating the Consumer Lists, and agreed to provide and provided the Consumer Lists to Ameriquest for use in Ameriquest's Direct Mail Program to make firm offers of credit (with clear and conspicuous disclosures) to consumers.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

52.*[sic]* Ameriquest has performed its obligations under the contracts with Equifax, including, but not limited to, paying Equifax for its services.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

53.*[sic]* Equifax was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA. Ameriquest relied upon Equifax's expertise and experience in the direct-mail marketing field with respect to ensuring that the data, the computerized process/systems, and the Consumer Lists it provided were done in compliance with FCRA. Further, Ameriquest relied upon Equifax's expertise and review of the

Letters to ensure its compliance with FCRA.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

54.*[sic]* In the event that the allegations in the Non-Borrower Complaint are proven to be true, Equifax breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the models and systems and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

55.*[sic]* Further, because Equifax was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon Equifax's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of the Customer Lists and the sending of the Letters were done in compliance with FCRA. Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of Equifax's actions, which actions must necessarily be construed as a breach of Equifax's contracts with Ameriquest. Further, if the Non-Borrower Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by Equifax's breach.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

56.*[sic]* Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid Equifax for its services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and ECMS exceeded approximately $680,000,000. Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

## FOURTH CLAIM

### (Breach of Contract—against ECMS)

57.*[sic]* Ameriquest re-alleges paragraphs 1 through 56 inclusive, and incorporates the same by reference.

**ANSWER**:  Trans Union reasserts its answers and responses set forth herein.

58.*[sic]* Ameriquest and ECMS entered into oral and written contracts under which ECMS, using Equifax data, agreed to provide and provided Ameriquest with the Consumer List for Ameriquest's Direct Mail Program so that Ameriquest could make firm offers of credit and clear and conspicuous disclosures to consumers.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

59.*[sic]* Ameriquest has performed its obligations under the agreements with ECMS, including, but not limited to, paying ECMS for its services.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

60.*[sic]* ECMS was required to perform all of its duties under the contracts with Ameriquest in compliance with all applicable laws, including FCRA. Ameriquest relied upon ECMS's expertise and experience in the direct-mail marketing field with respect to ensuring that the Consumer Lists it provided were done in compliance with FCRA. Further, Ameriquest relied upon ECMS's expertise and review of the Letters to ensure its compliance with FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

61.*[sic]* In the event that the allegations in the Non-Borrower Complaint are proven to be true, ECMS breached its written and oral contracts with Ameriquest by failing in its prescreening activities, and the Consumer Lists it developed, as well as failing to ensure that the Letters used by Ameriquest complied with the firm offer of credit and clear and conspicuous disclosure requirements of FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

62.*[sic]* Further, because ECMS was required to perform all of its duties under its written and oral contracts with Ameriquest in compliance with all applicable laws, including FCRA, Ameriquest relied upon ECMS's expertise and experience in the direct-mail marketing field with respect to ensuring that the procurement of Customer Lists and the sending of the Letters were done in compliance with FCRA. Thus, if a violation of FCRA is proven by the Non-Borrower Plaintiffs, then such violation is because of ECMS's actions, which actions must necessarily be construed as a breach of ECMS's contracts with Ameriquest. Further, if the Non-Borrower

Plaintiffs demonstrate a violation of FCRA, and if Ameriquest is assessed damages as a result, such damages will have been directly and proximately caused by ECMS's breach.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

63. *[sic]* Ameriquest has suffered damages in an amount according to proof, but in no event less than the amount of any consideration Ameriquest paid ECMS for its services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and ECMS exceeded approximately $680,000,000. Further, Ameriquest has also suffered damages in the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

## FIFTH CLAIM

### (Equitable Indemnity/Implied Indemnity—Against All Third-Party Defendants)

64. *[sic]* Ameriquest re-alleges paragraphs 1 through 63 inclusive, and incorporates the same by reference.

**ANSWER**:  Trans Union reasserts its answers and responses set forth herein.

65. *[sic]* In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, any loss that Ameriquest suffers in connection with the Non-Borrower Complaint including, but not limited to, any judgment, settlement, attorneys' fees, costs, or other equitable relief, is directly attributable to the advice, conduct, and actions of TransUnion, ChoicePoint, Equifax and ECMS (collectively, the "Third-Party

Defendants"). In particular, but for the Third-Party Defendants' assurances that they had experience developing and using these same processes, systems, models, the Consumer Lists and firm offer letters, Ameriquest would not have implemented its Direct Mail Program. Similarly, but for the Third-Party Defendants' review of the Letters and concomitant assurances that the Letters used by Ameriquest complied with the requirement of being a firm offer of credit and contained clear and conspicuous disclosures as required by FCRA, Ameriquest would not have sent the Letters, and would not be in a position of suffering damages in connection with the Non-Borrower Complaint (should a trier of fact find in favor of the Non-Borrower Plaintiffs).

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

66.*[sic]* Moreover, under the terms of the enforceable oral agreements between Ameriquest and the Third-Party Defendants, the Third-Party Defendants were responsible for ensuring that the Direct Mail Program was conducted in full compliance with all applicable state and federal laws, including FCRA.

**ANSWER**:   Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

67.*[sic]* Ameriquest reasonably relied on the claims, representations, and promises made by the Third-Party Defendants. In particular, Ameriquest relied on the Third-Party Defendants' claims, assurances and representations that they would follow the rules set forth in FCRA for, among other things, the creation, review and approval of the Letters. Ameriquest further relied upon the Third-Party Defendants' review of the Letters, and refusal to provide the Consumer Lists until after review of the Letters, to ensure FCRA compliance.

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

68. *[sic]* Further, Ameriquest relied upon TransUnion, ChoicePoint, Equifax, and ECMS, which provided information/data and models/systems and the Consumer Lists for Ameriquest to identify prospective Ameriquest customers which would allow Ameriquest to send such prospective consumers a firm offer of credit.  Ameriquest relied upon TransUnion's, ChoicePoint's, Equifax's and ECMS' representations that the information/data and models/systems and the Consumer Lists complied with the requirements of FCRA.

**ANSWER**:  Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph and, so stating, denies them.

69. *[sic]* Under principals of equity, Ameriquest is entitled to indemnification from the Third-Party Defendants in an amount sufficient to reimburse Ameriquest for any judgment, settlement, attorneys' fees, costs, or other equitable relief that Ameriquest may suffer in connection with the Non-Borrower Complaint.

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

## SIXTH CLAIM

### (Contribution—Against All Third-Party Defendants)

70. *[sic]* Ameriquest re-alleges paragraphs 1 through 69 inclusive, and incorporates the same by reference.

**ANSWER**:  Trans Union reasserts its answers and responses set forth herein.

71. *[sic]* In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, any loss that Ameriquest suffers in connection with the Non-Borrower Complaint, including, but not limited to, any judgment, settlement, attorneys' fees, costs, or other equitable relief, is directly attributable to the claims, advice, conduct, and actions of the Third-Party Defendants. In particular, but for the Third-Party Defendants' assurances that they had experience using and developing these same processes, systems, models, the Consumer Lists and firm offer letters, Ameriquest would not have implemented its Direct Mail Program. Similarly, but for the Third-Party Defendants' review of the Letters and concomitant assurances that the Letters used by Ameriquest complied with the requirement of being a "firm offer of credit" and contained clear and conspicuous disclosures as required by FCRA, Ameriquest would not have sent the Letters, and would not be in a position of suffering damages in connection with the Non-Borrower Complaint (should a trier of fact find in favor of the Non-Borrower Plaintiffs).

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

72. *[sic]* Ameriquest reasonably relied on the claims, representations, and promises made by the Third-Party Defendants. In particular, Ameriquest relied on the Third-Party Defendants' claims, assurances, and representations that they would follow the rules set forth in FCRA for, among other things, the creation, review, and approval of the Letters. Ameriquest further relied upon the Third-Party Defendants' review of the Letters, and refusal to provide the Consumer Lists until after review of the Letters, to ensure FCRA compliance.

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

73.*[sic]* Further, Ameriquest relied upon TransUnion, ChoicePoint, Equifax and ECMS which provided information/data and models/systems and the Consumer Lists for Ameriquest to identify prospective Ameriquest customers which would allow Ameriquest to send such prospective consumers a firm offer of credit. Ameriquest relied upon TransUnion's, ChoicePoint's, Equifax's and ECMS' representations that the information/data and models/systems and the Consumer Lists complied with the requirements of FCRA.

**ANSWER**:  Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph and, so stating, denies them.

74.*[sic]* Ameriquest did not know, and had no reason to know, that the Third-Party Defendants would not follow the rules set forth in FCRA with respect to the Letters and/or the information/data, models/systems, and the Consumer Lists they provided.

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

75.*[sic]* Under principles of equity, Ameriquest is entitled to contribution from the Third-Party Defendants in an amount sufficient to reimburse Ameriquest for any judgment, settlement, attorneys' fees, costs, or other equitable relief that Ameriquest may suffer in connection with the Non-Borrower Complaint that exceeds Ameriquest's pro-rata share of its liability.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

## SEVENTH CLAIM

### (Negligent Misrepresentation—Against All Third-Party Defendants)

76.*[sic]* Ameriquest re-alleges paragraphs 1 through 75 inclusive, and incorporates the same by reference.

**ANSWER**: Trans Union reasserts its answers and responses set forth herein.

77.*[sic]* The Third-Party Defendants each represented to Ameriquest that they had experience using and developing the direct-mail programs, processes, systems, models, the Consumer Lists, and firm offer Letters that they sold to Ameriquest. The Third-Party Defendants each represented to Ameriquest that they were aware of the requirements imposed by FCRA that pertain to the making of firm offers of credit and/or clear and conspicuous disclosures, and that the services they provided to Ameriquest were compliant with such requirements. The Third-Party Defendants each provided assurances to Ameriquest that the Letters were compliant with FCRA. The Third-Party Defendants each knew that Ameriquest would be using the services and information they provided for its Direct Mail Program and to send the Letters.

**ANSWER**: Trans Union states that it has insufficient knowledge to admit or deny the allegations of this paragraph and, so stating, denies them.

78.*[sic]* In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then at the time the Third-Party Defendants made these representations, they knew, or should have known, that they were materially false.

The Third-Party Defendants, given their positions, expertise, and experience in the direct-mail marketing field, knew or should have known that these representations were false when made.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

79.*[sic]* The Third-Party Defendants made these representations with the intention to induce Ameriquest to enter into the various oral and written agreements between Ameriquest and the Third-Party Defendants and to induce Ameriquest to use the Third-Party Defendants' services, for which Ameriquest would pay the Third-Party Defendants substantial fees.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

80.*[sic]* Ameriquest reasonably relied on the Third-Party Defendants' representations in implementing its Direct Mail Program and in sending the Letters.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

81.*[sic]* In the event that the allegations in the Non-Borrower Complaint are proven to be true, and Ameriquest is found liable to the Non-Borrower Plaintiffs for any judgment, settlement, attorneys' fees, costs or other equitable relief, then as a direct and proximate result of the Third-Party Defendants' representations, Ameriquest will have suffered damages including, but not limited to, any damages that it suffers in connection with the Non-Borrower Complaint.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

## EIGHTH CLAIM

### (Negligence—Against all Third-Party Defendants)

82.*[sic]* Ameriquest re-alleges paragraphs 1 through 81, inclusive, and incorporates the same by reference.

**ANSWER**: Trans Union reasserts its answers and responses set forth herein.

83.*[sic]* As a credit reporting agency that was providing data and developing and marketing models and the computerized process/systems for generating the Consumer Lists, and in generating the Consumer Lists for Ameriquest's use, TransUnion had a duty to properly develop, market, and generate such items. In doing the foregoing, TransUnion also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action. This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans. This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**: Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

84.*[sic]* As a credit reporting agency developing and generating the Consumer Lists for Ameriquest's use, ChoicePoint had a duty to properly develop and generate such items. In doing the foregoing, ChoicePoint also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action. This included the duty to follow any and

all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans. This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

85.*[sic]* As a credit reporting agency that was providing data and developing the computerized process/systems for generating the Consumer Lists, and in generating the Consumer Lists for Ameriquest's use, Equifax had a duty to properly develop, market, and generate such items. In doing the foregoing, Equifax also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action. This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans. This also included the duty to follow any and all federal laws relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**:  Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

86.*[sic]* As a credit reporting agency developing and generating the Consumer Lists for Ameriquest's use, ECMS had a duty to properly develop and generate such items. In doing the foregoing, ECMS also had a duty to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action. This included the duty to follow any and all federal laws relating to identifying/contacting consumers who would qualify for prescreened credit in connection with mortgage loans. This also included the duty to follow any and all federal laws

relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA.

**ANSWER**: Trans Union denies that the statements contained in this paragraph require a response from Trans Union.

87.*[sic]* Third-Party Defendants breached their respective duties by providing services and products that exposed Ameriquest to legal action. In addition, in the event that the allegations in the Non-Borrower Complaint are proven to be true, then TransUnion, ChoicePoint, Equifax and ECMS breached their respective duties to Ameriquest, in that they negligently failed to follow the criteria and rules set forth in FCRA in performing the above-mentioned obligations to Ameriquest and further failed to exercise due care and comply with applicable standards of care in their respective fields.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

88.*[sic]* As a direct result of the Third-Party Defendants' negligence, Ameriquest has suffered damages in an amount to be proven at trial, but in no event less than any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to the Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

**ANSWER**: Trans Union denies the allegations of this paragraph as they apply to Trans Union. Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

## NINTH CLAIM

### (Rescission of Contracts—Against all Third-Party Defendants)

89.*[sic]* Ameriquest re-alleges paragraphs 1 through 88 inclusive, and incorporates the same by reference.

**ANSWER**:  Trans Union reasserts its answers and responses set forth herein.

90.*[sic]* As set forth above, each of the Third-Party Defendants entered into various contracts with Ameriquest.

**ANSWER**:   Trans Union states that the allegations of this paragraph are legal conclusions and, so stating, denies them.

91.*[sic]* In these contracts (and elsewhere) the Third-Party Defendants each represented to Ameriquest that they had experience using and developing these same direct-mail programs, processes, systems, models, the Consumer Lists, and firm offer Letters. The Third-Party Defendants each represented to Ameriquest that they were aware of the requirements imposed by FCRA that pertain to the making of firm offers of credit and/or clear and conspicuous disclosures, and that the services they provided to Ameriquest were compliant with such requirements.   The Third-Party Defendants each provided assurances to Ameriquest that the Letters were compliant with FCRA. Ameriquest relied upon these representations, assurances and inducements to enter into the various contracts with the Third-Party Defendants. The Third-Party Defendants each knew that Ameriquest would be using the information and services they provided for its Direct Mail Program, and to send the Letters, and that such must be compliant with all applicable laws including FCRA.

**ANSWER**:  Trans Union states that the contracts speak for themselves and, so stating, deny the allegations of this paragraph.

92.*[sic]* In the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then the foregoing representations by the Third-Party Defendants were materially false, and falsely induced Ameriquest to enter into the foregoing contracts and pay them substantial fees in connection therewith. Thus, in the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then each of the contracts between Ameriquest and the Third-Party Defendants should be rescinded, and the Third-Party Defendants should be required to return to Ameriquest the amount of all consideration each of the Third-Party Defendants received from Ameriquest for its services.

**ANSWER**:  Trans Union denies the allegations of this paragraph as they apply to Trans Union.  Trans Union states that it has insufficient knowledge to admit or deny the remaining allegations of this paragraph and, so stating, denies them.

**WHEREFORE**, Ameriquest prays for judgment against the Third-Party Defendants on all claims as follows:

1.     For monetary damages in an amount according to proof at trial, but in no event less than the amount of all consideration Ameriquest paid each of the Third-Party Defendants for its respective services over the relevant time period. Ameriquest estimates that the combined consideration paid to TransUnion, ChoicePoint, Equifax and EDMS exceeded approximately $680,000,000.

2.     For monetary damages in an amount according to proof at trial, but in no event less than the amount of any judgment, settlement, attorneys' fees, costs, or other equitable relief that is awarded to the Non-Borrower Plaintiffs against Ameriquest in connection with the Non-Borrower Complaint.

3. For monetary damages in an amount to be proven at trial, but not less than is sufficient to indemnify Ameriquest for any and all damages that Ameriquest incurs in connection with the Non-Borrower Complaint, including, but not limited to, any judgment attorneys' fees, costs, or other equitable relief that the Non-Borrower Plaintiffs are awarded as against Ameriquest (and/or its affiliates);

4. For rescission of the contracts between Ameriquest and the Third Party Defendants and that the Third Party defendants be ordered to return to Ameriquest the amount of all consideration each of the Third-Party Defendants received from Ameriquest for its services.

5. For reasonable attorneys' fees and costs of suit; and

6. For such other relief as the Court may deem just and proper.

**ANSWER**: Trans Union denies that Third-Party Plaintiff is entitled to any damages, costs, fees, equitable or other relief from or against Trans Union.

## AFFIRMATIVE DEFENSES

1. Third-Party Plaintiff has failed to state a claim against Trans Union upon which relief may be granted.

2. Third-Party Plaintiff's state law and common law claims are preempted by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x.

3. Third-Party Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

4. Third-Party Plaintiff's claims are barred, in whole or in part, by 15 U.S.C. §§ 1681h(e) and/or 1681(t).

5.      At all relevant times, Trans Union acted within the absolute and qualified privileges afforded it under the FCRA, the United States Constitution, applicable State Constitutions, and the common law.

6.      Third-Party Plaintiff's claims are barred, in whole, or in part, by the equitable theories of estoppel, waiver, and laches.

7.      Third-Party Plaintiff's claims are barred, in whole or in part, by the doctrines of assumption of risk, contributory negligence, failure of consideration, fraud, payment, release, res judicata, statute of frauds and waiver.

8.      Third-Party Plaintiff has failed to take reasonable steps to mitigate its damages, if any.

9.      Third-Party Plaintiff's damages are the result of acts or omissions committed by Third-Party Plaintiff.

10.     Third-Party Plaintiff's damages are the result of acts or omissions committed by the other parties over whom Trans Union has no responsibility or control.

11.     Third-Party Plaintiff's damages are the result of acts or omissions committed by non-parties to this action over whom Trans Union has no responsibility or control.

12.     Any claim for exemplary or punitive damages asserted by Third-Party Plaintiff violates Trans Union's rights under the Due Process and Excessive Fines clauses of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of applicable State Constitutions, and under the First Amendment of the United States Constitution and the analogous provisions of applicable State Constitutions.

13.     Any alleged reliance by Third-Party Plaintiff was not reasonable.

14.     Trans Union reserves the right to assert additional defenses as may become apparent through additional investigation and discovery.

WHEREFORE, Trans Union, by counsel, denies that Third-Party Plaintiff is entitled to judgment or to any of the relief sought, and respectfully requests that judgment be entered in its favor and against Third-Party Plaintiff on all counts set forth in the Third-Party Complaint, and that Trans Union be awarded its costs incurred in defending this action, along with such other relief as this Court deems equitable and just.

Respectfully submitted,


 s/ Robert J. Schuckit
Robert J. Schuckit, Esq. (IL Bar #6183900)
Schuckit & Associates, P.C.
30th Floor, Market Tower
10 W. Market Street, Suite 3000
Indianapolis, IN  46204
Telephone:  317-363-2400
Fax:  317-363-2257
E-Mail:  rschuckit@schuckitlaw.com

*Counsel for Trans Union, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been filed electronically on the **1st day of October, 2007**. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing.

| | |
|---|---|
| Caryn Becker, Esq. | Gary Edward Klein, Esq. |
| cbecker@lchb.com | klein@roddykleinryan.com |
| Charles McLeod Baird, Esq. | Kelly M. Dermody, Esq. |
| charlesmbaird@att.net | kdermody@lchb.com |
| Rachel Geman, Esq. | Shennan Kavanagh, Esq. |
| rgeman@lchb.com | kavanagh@roddykleinryan.com |
| Terry A. Smiljanich, Esq. | Jill Henniger Bowman, Esq. |
| tsmiljanich@jameshoyer.com | jbowman@jameshoyer.com |
| Samuel H. Rudman, Esq. | Dominic J. Rizzi, Esq. |
| srudman@lerachlaw.com | drizzi@caffertyfaucher.com |
| Evan Jay Kaufman, Esq. | Lori Ann Fanning, Esq. |
| ekaufman@lerachlaw.com | lfanning@millerlawllc.com |
| Marvin Alan Miller, Esq. | Daniel Mark Harris, Esq. |
| mmiller@millerlawllc.com | lawofficedh@yahoo.com |
| Keith James Keogh, Esq. | Elizabeth Monkus, Esq. |
| keith@keoghlaw.com | emonkus@hrolaw.com |
| Bernard E. LeSage, Esq. | Brandon A. Block, Esq. |
| blesage@buchalter.com | bblock@buchalter.com |
| Craig Allen Varga, Esq. | Jonathan N. Ledsky, Esq. |
| cvarga@vblhc.com | jledsky@vblhc.com |
| Joshua R. Mandell, Esq. | Sarah K. Andrus, Esq. |
| jmandell@buchalter.com | sandrus@buchalter.com |
| Stephen Philip Kikoler, Esq. | Thomas Joseph Wiegand, Esq. |
| skikoler@muchshelist.com | twiegand@winston.com |
| David Edward Dahlquist, Esq. | Greg J. Miarecki, Esq. |
| ddahlquist@winston.com | gmiarecki@winston.com |
| James Michael Dash, Esq. | Lorne Todd Saeks, Esq. |
| jdash@muchshelist.com | lsaeks@muchshelist.com |
| Melinda J. Morales, Esq. | Kristina M. Van Buskirk, Esq. |
| mmorales@muchshelist.com | kvanbuskirk@ngelaw.com |
| Synde B. Keywell, Esq. | James McGinnis Boyers, Esq. |
| synde.keywell@bryancave.com | jboyers@woodmclaw.com |
| Renee Lynn Zipprich, Esq. | Richard Eric Gottlieb, Esq. |
| rzipprich@dykema.com | rgottlieb@dykema.com |
| Harry N. Arger, Esq. | Michelle Bacher Fisher, Esq. |
| harger@dykema.com | mfisher@dykema.com |
| Alan Norris Salpeter, Esq. | Bradley Ian Schecter, Esq. |
| asalpeter@llgm.com | bschecter@llgm.com |
| Therese King Nohos, Esq. | Vincent P. Schmeltz, III, Esq. |
| tnohos@llgm.com | vschmeltz@llgm.com |

| Jimmie H. Brown, Esq. | Ralph O. Scoccimaro, Esq. |
|---|---|
| help@bspclaw.com | help@bspclaw.com |
| Laurie S. Fulton, Esq. | Jon R. Fetterolf, Esq. |
| lfulton@wc.com | jfetterolf@wc.com |
| Paven Malhotra, Esq. | Bradley J. Miller, Esq. |
| pmalhotra@wc.com | bmiller@kilpatrickstockton.com |
| Robert Eliot Shapiro, Esq. | Stephanie Michelle Zimdahl, Esq. |
| rob.shapiro@bfkpn.com | stephanie.zimdahl@bfkpn.com |
| Daniel A. Edelman, Esq. | Albert F. Hofeld, Jr., Esq. |
| courtecl@edcombs.com | ahofeld@edcombs.com |
| Andrew G. Pizor, Esq. | Anne A. Bergman, Esq. |
| apizor@consumerlawgroup.com | aabergman@aol.com |
| Brian Lewis Bromberg, Esq. | Charles M. Delbaum, Esq. |
| brian@bromberglawoffice.com | cdelbaum@nclc.org |
| Daniel S. Blinn, Esq. | Richard A. Kudla, Esq. |
| dblinn@consumerlawgroup.com | richard.kudla@aig.com |
| Richard Andre Lilly, Esq. | Tara Leigh Goodwin, Esq. |
| rlilly@ademilaw.com | tgoodwin@edcombs.com |

The undersigned further certifies that a true copy of the foregoing was served on the following parties via First Class, U.S. Mail, postage prepaid, on the **1st day of October, 2007**, properly addressed as follows:

| Rosalind Van Gorp<br>*Pro Se* Plaintiff | Brian H. Newman, Esq.<br>Cheryl M. Lott, Esq.<br>Melody A. Petrossian, Esq.<br>Rachel A.P. Saldana, Esq.<br>Buchalter Nemer<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017 |
|---|---|
| Richard P. Colbert, Esq.<br>Alexandra van Nes Dolger, Esq.<br>Day Berry & Howard LLP<br>One Canterbury Green<br>Stamford, CT 06901-2047 | Elmer E. Evans, Esq.<br>1137 – 13th Street<br>Des Moines, IA 50314 |
| Bryan Anthony Vroon, Esq.<br>Vroon & Crongeyer LLP<br>1718 Peachtree Street, Suite 1088<br>Atlanta, GA 30309 | Argent Mortgage Company, LLC<br>3 Park Plaza, 10th Floor<br>Irvine, CA 92614 |
| GMAC Mortgage Corporation<br>c/o Wooden & McLaughlin<br>One Indiana Square, Suite 1800<br>211 N. Pennsylvania<br>Indianapolis, IN 46204 | Joanne N. Davies, Esq.<br>Buchalter Nemer<br>18400 Von Karman Avenue, Suite 800<br>Irvine, CA 92612 |

 s/ Robert J. Schuckit
Robert J. Schuckit, Esq. (IL Bar #6183900)
Schuckit & Associates, P.C.
30th Floor, Market Tower
10 W. Market Street, Suite 3000
Indianapolis, IN 46204
Telephone: 317-363-2400
Fax: 317-363-2257
E-Mail: rschuckit@schuckitlaw.com

*Counsel for Trans Union, LLC and Trans Union Corporation*