IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715<br><br>Lead Case No. 05-cv-07097<br><br>(Centralized before The Honorable Marvin E. Aspen) |
| THIS DOCUMENT RELATES TO DOCKET NO. 1062 | |

**AMERIQUEST MORTGAGE COMPANY'S OPPOSITION
TO CHOICEPOINT'S MOTION TO DISMISS**

**I.      INTRODUCTION**

This Court should deny the motion of Third Party Defendant ChoicePoint Precision Marketing LLC ("ChoicePoint") to dismiss Ameriquest Mortgage Company's ("Ameriquest") Third Party Complaint ("Complaint") because:

(1)     The Complaint alleges *multiple* contracts governing the relationship between ChoicePoint and Ameriquest (Complt. ¶ 21), not just the December 15, 2000 Agreement ("2000 Agreement") or the February 11, 2005 Agreement ("2005 Agreement") upon which ChoicePoint bases its motion to dismiss.  Because the Court has to take the Complaint's allegations as true, the Court cannot dismiss it based upon the disclaimers and exculpatory clauses in the contracts ChoicePoint has attached to its Motion or the Georgia case law purportedly incorporated by those contracts.

(2)     The Complaint alleges that ChoicePoint is liable for equitable indemnity and contribution, negligence, and negligent misrepresentation based, at least in part, on its violation of duties that the Fair Credit Reporting Act ("FCRA"), case law, and federal common law impose on credit reporting agencies like ChoicePoint.  It would undermine FCRA to allow

BN 1426192v1

agencies like ChoicePoint to avoid liability by hiding behind lenders like Ameriquest. Accordingly, federal common law can and should impose an obligation on ChoicePoint to indemnify or contribute to any judgment against Ameriquest in this matter. The cases ChoicePoint cites to the contrary are inapposite and non-binding; they do not require dismissal. Similarly, Ameriquest's tort claims cannot be dismissed as recast claims for indemnity or contribution. On the contrary, Ameriquest's tort claims are proper because they are based, at least in part, upon independent duties that FCRA imposes upon ChoicePoint that are separate from the contractual relationship between Ameriquest and ChoicePoint.

(3) Finally, in light of the policy behind the duties FCRA imposes upon entities like ChoicePoint, even if the Court considers the 2000 Agreement and/or the 2005 Agreement, the provisions in the contracts that purport to avoid or delegate such duties are void as against public policy.

**II. THE COMPLAINT ALLEGES THE EXISTENCE OF SEVERAL CONTRACTS BETWEEN AMERIQUEST AND CHOICEPOINT AND, ACCORDINGLY, THE COURT CANNOT DISMISS BASED ON THE AGREEMENTS THAT CHOICEPOINT HAS ATTACHED TO ITS MOTION**

ChoicePoint bases its motion to dismiss on the 2000 Agreement and the 2005 Agreement, which it has attached to its Motion. However, ChoicePoint "cannot … challenge the sufficiency of [Ameriquest's] claims simply by attaching documents that contain factual assertions contrary to those in the complaint." *Tibor Mach. Products, Inc. v. Freudenberg-NOK General Partnership*, 967 F. Supp. 1006, 1014 (N.D. Il. 1997). Indeed, "[i]n ruling on [a motion to dismiss], the [C]ourt [must] accept as true all well-pleaded facts alleged in the complaint and draw[] all reasonable inferences from those facts in favor of the plaintiff." *520 S. Michigan Ave. Associates, Ltd. v. Shannon*, 2007 WL 2728757, *1 (N.D. Ill. 2007). Ameriquest's Complaint alleges ***multiple*** contracts governing the parties' relationship and setting standards relating to prescreening. (Complaint ¶ 21.) It is reasonable to infer that the multiple agreements between the parties contained terms that altered or superseded those in the 2000 Agreement and/or the 2005 Agreement. It would not be appropriate for the Court to disregard the allegations of

multiple agreements, and the Court cannot dismiss the Complaint based on the 2000 Agreement and/or the 2005 Agreement.[1] Indeed, ChoicePoint's own claim that "the operative agreement at issue" is the 2000 Agreement [Motion, p. 7] is belied by the language in the 2005 Agreement which ChoicePoint also attaches, and which states that it is the "entire and only Agreement between the parties and there are merged herein all prior and collateral representations." [Motion, Exhibit B, para. 11].

Ameriquest's allegations—that its relationship with ChoicePoint is governed by a series of oral and written contracts—are sufficient to put ChoicePoint on notice of its contract claims. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (stating all that is required to state a claim in a complaint filed in a federal court is a short statement of the legal claim); *See also Venture Associates Corp.*, 987 F.2d at 431. The Court should allow this case to proceed to factual discovery in order to flesh out the details of those agreements and which states' laws apply. Accordingly, neither can Ameriquest's contract claim against ChoicePoint (claim Two) be dismissed at this stage nor can the terms of either the 2000 Agreement or the 2005 Agreement be the foundation for the dismissal of any of Ameriquest's other claims.

### III. FCRA DOES NOT BAR AMERIQUEST'S CLAIMS FOR INDEMNITY AND CONTRIBUTION AGAINST CHOICEPOINT

In arguing that Ameriquest cannot maintain claims against it for equitable indemnity/implied indemnity and contribution, ChoicePoint ignores its independent statutory obligations under FCRA—duties it owes to consumers and Ameriquest alike. These duties distinguish this case from *Kudlicki v. MDMA, Inc.*, No. 05 C 2589, 2006 WL 1308617 (N.D. Ill. May 10, 2006) and the other cases ChoicePoint cites.[2]

---

[1] Because the Court cannot take ChoicePoint's representation that the 2000 Agreement controls the parties' relationship as true, it cannot apply Georgia law, as ChoicePoint has requested, or reach the assumption that the merger clause in the 2000 Agreement prevents any of the other contracts from supplementing or superseding its terms. Indeed, by ChoicePoint's own argument, the 2000 Agreement itself is entirely irrelevant, as it is superseded by the merger clause contained in the 2005 Agreement [2005 Agreement, para. 11].

[2] In *Kudlicki*, the third party defendant was an advertising agency, not a credit reporting agency. Indeed, none of the federal cases deciding the question of whether indemnity and contribution are available in a FCRA case involve the question of whether a credit reporting agency that has independent statutory obligations under FCRA can be liable for indemnity or contribution.

Ameriquest has alleged that ChoicePoint is a credit reporting agency and/or a reseller of credit information. [Complaint, para. 21]. ChoicePoint cannot escape its direct obligation under FCRA to take reasonable steps to ensure that the entities to which it disburses credit information have a permissible purpose for using such information. *See* 15 U.S.C. Section 1681e; *In re Matter of Trans Union Corporation*, Docket No. 9255, 2000 WL 257766, p. 1 and 2 (Federal Trade Commission February 10, 2000); *In re Trans Union Privacy Litigation*, 211 F.R.D. 328, 336-37 (N.D. Ill. 2002); *Pintos v. Pacific Creditors Association, et. al.* (Docket No. 04-17485), 2007 U.S. App. LEXIS 22519 (9th Cir. 2007). ChoicePoint is responsible for ensuring proper use of consumer credit reports:

> Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 605 [15 USCS Section 1681b]. These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. . . No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 604.

15 U.S.C. Section 1681e; *see also In re Matter of Trans Union Corporation*, Docket No. 9255, 2000 WL 257766, p. 1 and 2 (Federal Trade Commission February 10, 2000) (The FTC states that credit reporting agencies must have (1) "reason to believe that [the prescreen purchaser] intends to use the consumer report for purposes authorized under Section 604 of the FCRA;" and (2) "reasonable procedures to ensure that the [credit reporting agency] only furnish[es] consumer reports for the purposes set forth in" FCRA.)

Congress intended that FCRA, through the duties it imposes on credit reporting agencies, achieve an important "balance between consumer privacy and the needs of a modern, credit-driven economy." *Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1045-1046 (7th Cir. 2005). Congress also expressed its plain interest in making credit reporting agencies responsible for maintaining this balance. *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 725 (7th Cir. 2004) (discussing "grave responsibility" that FCRA places on credit reporting agencies). Unlike in *Kudlicki,* these policies, which are "found in the statutory framework of the

- 4 -

FCRA", represent a significant federal interest that must be protected—even if it requires the extension of federal common law to do so. *See Kudlicki*, *supra*, at *12.

A central issue that Ameriquest's Complaint raises is whether ChoicePoint had reasonable grounds for believing that the consumer report information it furnished to Ameriquest would be used for a permissible purpose under FCRA [pursuant to 15 U.S.C. Section 1681b]. Ameriquest has alleged that ChoicePoint was aware of its obligations under FCRA, knew the contents of Ameriquest's prescreened firm offer letters and how Ameriquest would use the credit report information ChoicePoint provided, and at all times had the ability and opportunity to review, comment and approve Ameriquest's firm offer letters in order to satisfy itself that the letters complied with FCRA. [*See* Complaint ¶¶ 23-35]. Moreover, ChoicePoint was fully aware of the statutory and case law in this area [Complaint ¶ 25], including (but not limited to) the requirements regarding firm offer/prescreen letters set forth in *Cole v. U.S. Capital*, 389 F.3d 719 (7th Cir. 2004). Assuming that the Non-Borrower Plaintiffs are correct that Ameriquest's firm offer letters violated FCRA because they allegedly violate the *Cole* requirement that something of value must be present on the face of the letter (*See* Non-Borrower Complaint, Docket #323), then by virtue of its knowledge of, review of, and opportunity to review Ameriquest's firm offer letters, ChoicePoint would have, at a minimum, been on notice of a potential FCRA violation. Notwithstanding this knowledge and/or notice, ChoicePoint continued to provide Ameriquest with consumer report information to send its firm offer letters (ostensibly so that ChoicePoint could continue to receive the millions of dollars in fees Ameriquest was paying it for the information). At a minimum, a factual question exists as to whether ChoicePoint had reasonable grounds for believing its consumer report information would be used for a permissible purpose under these circumstances.

In order to ensure that FCRA has the teeth Congress intended, then ChoicePoint, having reviewed Ameriquest's firm-offer letters yet continued to provide Ameriquest with prescreened lists [*See* Complaint, ¶¶ 23-25], should assume some or all liability in the event Ameriquest is found liable in this case. None of the cases that ChoicePoint cites which come from the Seventh

Circuit are of assistance to ChoicePoint. As mentioned, *Kudlicki* involved a third party complaint against an advertising agency, not a credit reporting agency. *Kay v. First Continental Trading, Inc.*, 966 F.Supp. 753 (N.D. Ill. 1997) actually supports Ameriquest's position on this issue. In *Kay*, a former employee brought a FCRA action against his former employer and a credit reporting agency, based on a credit report that falsely attributed a state felony charge to him. The credit reporting agency cross-claimed against the employer for contribution. The cross-claim was dismissed on summary judgment. In holding that FCRA did not permit a contribution claim by a credit reporting agency against users of its consumer reports, the District Court reasoned:

> As *Wiggins v. Philip Morris, Inc.*, 853 F.Supp. 470, 482 (D.D.C. 1994) has pointed out in the course of rejecting an attempted imposition of consumer reporting agency obligations under the Act on the users of those agencies' consumer reports:
>
>> For example, the Act imposes different obligations upon consumer reporting agencies that provide consumer credit information and users of consumer reports. *Compare* 15 U.S.C.A. §§ 1681c-1681e (1982) *with id.* § 1681m. Users have a limited responsibility. Under the Act, the primary duty assigned to users of consumer information is mandatory disclosure to a consumer of the name and address of the consumer reporting agency that provided a report when the consumer is adversely affected by the dissemination of information provided for employment purposes. *See supra* § V. On the other hand, consumer reporting agencies were charged with several responsibilities. The Act requires consumer reporting agencies to maintain and follow a myriad of reasonable compliance and accuracy policies and to follow strict procedures in cases of disputed accuracy. If litigants were allowed to use section 1985(3) to compel users of consumer reports to comply with the duties imposed upon consumer reporting agencies via a federal conspiracy statute (and vice versa), then these litigants would be able to circumvent the intent of Congress and the purpose of the Act. (966 Supp. at 754-755.)

Likewise, ChoicePoint should not be permitted to avoid its responsibilities under FCRA by the contention it is immune to claims for indemnity and contribution by users of its consumer

reports as a matter of law. Indeed, its greater statutory duties support those claims by Ameriquest in this case.

No federal case from any Circuit has specifically decided the question of whether a credit reporting agency, having independent statutory obligations under FCRA, can be liable for indemnity and/or contribution in a FCRA case. *Lyle v. Food Lion, Inc.*, 954 F.2d 984 (4th Cir. 1992), *Gilmore v. List & Clark Construction Co.*, 866 F.Supp. 1310 (D. Kan. 1994) and *Mortgage, Inc. v. U.S.D.C. for Dist. of Nev.*, 934 F.2d 209 (9th Cir. 1991), which ChoicePoint cites, are distinguishable from our case because they are not decisions interpreting FCRA. Moreover, in both *Lyle* and *Gilmore*, the employer defendants attempted to indemnify themselves (from FLSA or Title VII liability) by suing their own employees, over whom they ostensibly had control, and responsibility to oversee. Here, Ameriquest is suing ChoicePoint, a separate company over which Ameriquest has no control, and which itself has specific, independent obligations under FCRA. (see discussion above; 15 U.S.C. Section 1681e)[3]

Finally, *McSherry v. Capital One FSB*, 236 F.R.D. 516 (W.D. Wash. 2006) is inapposite. Although *McSherry* involved an interpretation of FCRA, it is not on point because there a furnisher of credit information (much like ChoicePoint here) sought indemnity from a consumer. The court found that the furnisher of credit information could not seek indemnity because Congress intended through FCRA to regulate the activities of furnishers of credit information for the benefit of consumers. 236 F.R.D. 516, 521-22.

Contrary to ChoicePoint's assertions, the deterrent effect of FCRA will not be undermined by allowing Ameriquest to proceed with its indemnity and contribution claims against ChoicePoint. Rather, the opposite is true. ChoicePoint should not be allowed to escape its obligations under FCRA by shifting all responsibility to the entities, such as Ameriquest, to

---

[3] In *Gilmore*, the court reasons, in part, that the employer cannot seek indemnity from the employee via a third-party complaint on a Title VII claim because the plaintiffs in the underlying lawsuit could not hold that employee personally liable. *Gilmore*, 866 F.Supp. 1310, 1313. The same reasoning does not apply in this case. Under FCRA, at 15 U.S.C. section 1681e, ChoicePoint has independent obligations to ensure that the credit information it disburses is used for a permissible purpose. Unlike the employee in *Gilmore*, ChoicePoint could be held liable to plaintiffs for such violations. *Id.*

which it provides credit information. Because ChoicePoint is the type of business at which FCRA is primarily aimed, it would undermine the goals of FCRA if credit reporting agencies, like ChoicePoint, could avoid as a matter of law any possible liability to indemnify, or contribute to a judgment against, lenders like Ameriquest who rely on their expertise.

### IV.     AMERIQUEST'S CONTRACT AND TORT CLAIMS ALSO ARE PROPER, AND ARE NOT SIMPLY RECAST CLAIMS FOR INDEMNITY AND CONTRIBUTION

Contrary to ChoicePoint's assertions, Ameriquest's contract and tort claims are not "simply re-captioned claims for indemnification and contribution." (Motion at p. 4) Regardless of whether Ameriquest can assert indemnity or contribution claims against ChoicePoint, Ameriquest's tort claims are proper because they are based upon ChoicePoint's breach of its separate and distinct duty under FCRA and case law (cited above) to exercise reasonable care when disseminating consumer information to ensure that the parties (like Ameriquest) who receive such information are complying with FCRA's permissible purpose requirements. 15 U.S.C. Section 1681e. As noted above, if the Non-Borrower Plaintiffs' claims are proven, then ChoicePoint breached this separate duty when it failed to review Ameriquest's firm offer letters, continued to provide Ameriquest with prescreened consumer lists, allowed Ameriquest to use those lists to send the firm offer letters, and continued to accept payment from Ameriquest for such lists, notwithstanding notice that the letters were allegedly not FCRA compliant. [Complaint,¶¶ 23-25, 77-80, 84, 87] Accordingly, there is nothing to prevent Ameriquest from seeking to recover under tort theories, even assuming *arguendo* its indemnification and contribution claims were subject to dismissal.

ChoicePoint's argument, as it relates to Ameriquest's breach of contract claim, is even more specious. It is absolutely irrefutable that no provision in FCRA, or any legislative history, evidences any intent to prevent parties to contractually undertake duties to each other of the type on which Ameriquest's breach of contract claim is based. Indeed, the Court in *Kudlicki, supra*, while dismissing the third party plaintiff's indemnity and contribution claims, allowed its breach of contract claim to go forward.

V. **CHOICEPOINT CANNOT USE THE CONTRACT TO AVOID ITS OBLIGATIONS TO COMPLY WITH FCRA**

Contrary to ChoicePoint's assertions, it cannot avoid liability to Ameriquest by relying upon the exculpatory clauses and/or disclaimer language set forth in the contracts it attaches to its Motion, in addition to the reasons set forth in Section II, above.

A. **ChoicePoint Cannot Avoid Liability Based Upon Ameriquest's Certification of a Permissible Purpose**

ChoicePoint incorrectly argues that the exculpatory and disclaimer language in the 2000 Agreement and the 2005 Agreement, whereby Ameriquest certifies compliance with FCRA, satisfies ChoicePoint's obligations under 15 U.S.C. Section 1681e and gives it reasonable grounds for believing that Ameriquest had a permissible purpose for using the credit report information ChoicePoint provided. [*See* Motion, p . 8-10] In substance, ChoicePoint contends that it can turn a blind-eye to its obligations under FCRA by simply inserting provisions into a contract (which it drafted) that shift all of ChoicePoint's legal duties under FCRA to Ameriquest. This argument is totally devoid of merit. As the Court in *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 337 (N.D. Ill. 2002) states, "[a]s is evident from the statute itself, receipt of the certification alone is not sufficient to establish that Trans Union has 'maintained reasonable procedures.' Some reasonable investigation is also required."

Indeed, the Ninth Circuit recently considered this same argument and concluded that 15 U.S.C. Section 1681e requires a credit reporting agency to do more than simply obtain a certification from its subscribers that they will comply with the law. *Pintos*, 2007 U.S. App. LEXIS 22519 at *14-15. As the Ninth Circuit states in *Pintos*,

> [a] credit reporting agency may be liable for its subscriber's violation when the agency fails to comply with the statutory obligations imposed by 15 U.S.C. Section 1681e. *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). **Experian argues that because PCA gave it a 'blanket certification' – a written promise to use Experian's credit reports only for permissible purposes – the agency satisfied its statutory obligations under Section 1681e. We disagree.**

> Section 1681e requires more from a credit reporting agency than merely obtaining a subscriber's general promise to obey the law. After prospective subscribers 'certify the purposes for which [credit] information is sought, and certify that the information will be used for no other purpose,' the reporting agency must make a 'reasonable effort' to verify the certifications and ***may not furnish reports if 'reasonable grounds' exist to believe that reports will be used impermissibly***. 15 U.S.C. Section 1681e(a). Under the plain terms of Section 1681e(a), a subscriber's certification cannot absolve the reporting agency of its independent obligation to verify the certification and determine that no reasonable grounds exist for suspecting impermissible use. Blanket certification cannot eliminate all genuine issues of material fact with regard to Experian's liability. *Id.* [emphasis added].

Here, the Complaint cannot be dismissed because it alleges that notwithstanding any certification, ChoicePoint had reasonable grounds for suspecting impermissible use. Thus, there is a factual issue regarding whether ChoicePoint satisfied its obligations under FCRA. If, as Ameriquest alleges, ChoicePoint did not, then ChoicePoint is subject to liability to Ameriquest on the causes of action contained in its Complaint.

### B. The Exculpatory and Disclaimer Language Is Void As Against Public Policy

In any event, the exculpatory and disclaimer clauses upon which ChoicePoint relies are void and unenforceable as against public policy. In FCRA, the United States Congress has articulated the public policy to protect consumer credit information and has charged the consumer reporting agencies with the primary responsibility for protecting the consumer's right to privacy. 15 U.S.C. Section 1681(a)(3) and (4); 15 U.S.C. Section 1681e. Allowing ChoicePoint to rely upon the exculpatory language to avoid potential liability would cause injury to the public interest because it would enable ChoicePoint to shirk its responsibility under FCRA to protect consumer credit information. *See Barton v. Peterson*, 733 F.Supp. 1482, 1488-89 (N.D. Ga. 1990).

*Barton* holds that a contract is void on public policy grounds when:

(1) the contract concerns a business of a type generally thought suitable for public regulation;

(2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public;

(3) the party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain establish standards;

(4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services;

(5) in exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and it makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; and

(6) as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. *Barton v. Peterson,* 733 F.Supp. 1482, 1488-89.

Under this test, the exculpatory and disclaimer provisions ChoicePoint cites are void since: (1) the services in the contracts are regulated by the FCRA (*See* 15 U.S.C. Section 1681e; 1681b); (2) the services, as recognized by Congress and the FTC, are a matter of practical necessity (*See In the Matter of Trans Union Corporation*, Docket No. 9255, 2000 WL 257766, p. 2 (Federal Trade Commission February 10, 2000)); (3) ChoicePoint is willing to perform the services for those coming within certain established standards; (4) ChoicePoint has a decisive advantage of bargaining strength since it is one of only a few sources for this type of information; (5) ChoicePoint's contracts are standard adhesion contracts; and (6) as alleged in the Complaint, Ameriquest was subjected to potential liability in the Non-Borrower Complaint by virtue of ChoicePoint's carelessness in review of Ameriquest's firm offer letters for compliance with FCRA. Accordingly, ChoicePoint may not rely upon the exculpatory and disclaimer provisions in the 2000 Agreement or the 2005 Agreement because such provisions

violate public policy. At a minimum, these are factual issues regarding the enforceability of these contract terms.

Indeed, ChoicePoint's position, as stated in its Motion, is that it was not required to comply with its obligations under Section 1681e of FCRA, and did not need to review Ameriquest's firm offer letters for a "permissible purpose," because it had shifted that responsibility to Ameriquest by virtue of the contracts. This position alone establishes that the contract language on which ChoicePoint relies is void as against public policy. Congress squarely placed the responsibility upon entities such as ChoicePoint to refrain from giving credit reporting information unless they have reasonable grounds for believing that such information will be used for a permissible purpose. 15 U.S.C. Section 1681e. *Pintos*, 2007 U.S. App. LEXIS 22519 at *14-15. In so doing, Congress certainly did not mean to allow such entities to ignore the language of the prescreen firm offer letters it received from purchasers of prescreened lists simply because those purchasers signed an adhesion contract certifying a permissible purpose. *Id.*

In *In the Matter of Trans Union Corporation*, the FTC specifically held that a credit reporting agency must have "reason to believe that [the prescreen purchaser] intends to use the consumer report for purposes authorized under" FCRA. *In the Matter of Trans Union Corporation*, Docket No. 9255, 2000 WL 257766, p. 1 (Federal Trade Commission February 10, 2000). In so holding, the FTC stated, "one of FCRA's principal goals was to protect the privacy of individuals whose sensitive credit and financial data are collected, used, reviewed and transmitted by CRAs." *Id.* at 2. For this reason, Congress "provide[d] safeguards designed to protect the confidentiality of these data" and "CRAs [must] maintain reasonable procedures to ensure that they only furnish consumer reports for the purposes set forth in" FCRA. *Id.* Further, as set forth above, the Ninth Circuit has recently reaffirmed that a credit reporting agency must make a reasonable effort to verify certifications provided by subscribers, and may not furnish reports to subscribers if reasonable grounds exist to believe that reports will be used

impermissibly, even if subscribers provide a "blanket certification" of FCRA compliance. *Pintos*, 2007 U.S. App. LEXIS 22519 at *14-15.

ChoicePoint's exculpatory and disclaimer provisions are an impermissible attempt to circumvent the duty imposed upon credit reporting agencies by FCRA. Public policy (as articulated by Congress and the FTC) requires the credit reporting agencies to maintain reasonable procedures to ensure compliance with FCRA. The exculpatory and disclaimer provisions upon which ChoicePoint relies are void as against public policy because they improperly allow ChoicePoint to draft away its statutory obligations.

## VI. AMERIQUEST CAN RECOVER IN BOTH CONTRACT AND TORT[4]

There is no legal impediment to Ameriquest maintaining claims in both tort and breach of contract. "'It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract to avoid harming him.'" *Brookview Holdings, LLC v. Suarez et al.*, 285 Ga. App. 90, 94 (March 29, 2007); *see also Allen v. Harsfield Co.*, 183 S.E. 821 (1936) (a legal duty can arise not only by operation of law but by a contract between the parties). *Id.*

In the case at hand, Ameriquest has sufficiently pled claims sounding both in contract and in tort. Ameriquest alleges that ChoicePoint breached the multiple agreements it had with Ameriquest by, *inter alia*, failing to review Ameriquest's prescreen/firm offer letters for FCRA compliance as ChoicePoint represented it would in connection with its provision of credit report information for use in Ameriquest's prescreening program. [Complaint, ¶¶ 23-35; 43-49; 77-80; 84, 87].

Further, Ameriquest's allegations meet the requirement of *Brookview Holdings, LLC*, that tort liability may be established, in addition to contractual liability, where the defendant's

---

[4] As a preliminary matter, the Georgia case law to which ChoicePoint cites is not applicable since it is unclear which state's law applies. An inquiry is needed to determine which state(s)' laws apply to each agreement, how those laws differ, and which are properly applicable to the case at hand. However, for purposes of the remainder of its Brief, Ameriquest adopts ChoicePoint's assumption that Georgia law applies.

liability arises from breach of a duty independent of the contract. Here, ChoicePoint's liability arises not only from breach of contract, but also from its breach of a duty "independent of contract." Namely, ChoicePoint breached its separate and distinct duty under the FCRA and case law (cited above) to exercise reasonable care when disseminating consumer information to ensure that the parties (like Ameriquest) who receive such information are complying with FCRA's permissible purpose requirements. As noted above, if the Non-Borrower Plaintiffs' claims are proven, then ChoicePoint breached this separate duty. Accordingly, Ameriquest can recover in both contract and tort.

### VII. AMERIQUEST IS ENTITLED TO PURSUE ITS RESCISSION CLAIM

While ChoicePoint claims Georgia law precludes Ameriquest's claim for rescission, as noted above, there are multiple agreements between the parties that are governed by different choice of law provisions that designate the application of different state law. Accordingly, the sufficiency of this claim may not be determined under Georgia law at this stage.

Respectfully Submitted,

Dated: October 9, 2007

By: /s/ Bernard E. LeSage
Attorneys for Ameriquest Mortgage Company

Bernard E. LeSage
Sarah K. Andrus
BUCHALTER NEMER,
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Phone: (213) 891-0700
Facsimile: (213) 896-0400

## **CERTIFICATE OF SERVICE**

      I, Bernard E, LeSage, hereby certify that on this 9th day of October 2007, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                               By:    /s/ Bernard E. LeSage

BN 1426192v1