# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| THIS DOCUMENT RELATES TO DOCKET #1207 | Centralized before The Honorable Marvin E. Aspen |
| AMERIQUEST MORTGAGE CO., | |
| Third-Party Plaintiff, | |
| v. | |
| TRANS UNION, LLC, et. al, | |
| Third-Party Defendants. | |

## REPLY TO AMERIQUEST MORTGAGE COMPANY'S OPPOSITION TO CHOICEPOINT PRECISION MARKETING LLC'S MOTION TO DISMISS

Laurie S. Fulton (lfulton@wc.com)
Jon R. Fetterolf (jfetterolf@wc.com)
Paven Malhotra (pmalhotra@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Attorneys for Third-Party Defendant
ChoicePoint Precision Marketing LLC

**INTRODUCTION**

Ameriquest's feeble attempt to cobble together an argument to survive ChoicePoint's motion to dismiss must be denied. Confronted with contracts that unambiguously establish ChoicePoint owed Ameriquest no duty to ensure that Ameriquest's consumer mail pieces complied with the Fair Credit Reporting Act ("FCRA"), Ameriquest now shifts gears and asserts these obligations arise from two provisions of the FCRA itself. One provision requires a consumer reporting agency to furnish credit information only to persons "which it has reason to believe intend[ ] to use the information" for a "permissible purpose," 15 U.S.C. § 1681b, and the other requires a consumer reporting agency to have in place "reasonable procedures" to verify whether users of the data have a "permissible purpose" for obtaining the information, 15 U.S.C. § 1681e(a) & (e). *See* Ameriquest Mortgage Co.'s Opp'n to ChoicePoint Precision Mktg. LLC's Mot. to Dismiss at 4 ("Opp."). Ameriquest seizes upon these provisions as a veritable bonanza of obligations that ChoicePoint allegedly owes to Ameriquest. They purportedly enable Ameriquest to:

- shift all responsibility for the content of mail pieces onto the shoulders of consumer reporting agencies,[1]

- sidestep any bars on indemnification or contribution that otherwise exist under the FCRA,[2]

- recover tort damages for violation of these alleged duties,[3] and

---

[1] Ameriquest asserts: "In order to ensure that FCRA has the teeth Congress intended, then ChoicePoint, having reviewed Ameriquest's firm-offer letters yet continued to provide Ameriquest with prescreened lists . . . , should assume some or all liability in the event Ameriquest is found liable in this case." Opp. at 5.

[2] Ameriquest asserts: "In arguing that Ameriquest cannot maintain claims against if for equitable indemnity/implied indemnity and contribution, ChoicePoint ignores its *independent statutory obligations under the FCRA*—duties it owes to consumers *and Ameriquest alike*." *Id.* at 3 (emphases added).

- void its contracts with ChoicePoint because the public policy underlying these duties is violated by the terms of the contracts.[4]

Unfortunately for Ameriquest, the law is clear that the duties imposed by the FCRA on consumer reporting agencies run not to subscribers, like Ameriquest, who pay to access the data, but to consumers whose credit data is being accessed. Pursuant to the civil liability provisions of the FCRA, a consumer reporting agency is "liable to that consumer" whose information is improperly disseminated. *See* 15 U.S.C. §§ 1681n(a), 1681*o*(a).[5] If a consumer reporting agency violates the FCRA, redress can be sought only by a consumer or government agency. *Id. See also* 15 U.S.C. § 1681s (providing for administrative enforcement of the FCRA). Ameriquest has no standing to redress such a violation.

Because Ameriquest is not the beneficiary of any obligations under the FCRA, it is also not able to use the FCRA as the basis for any common law claims. Consequently, Ameriquest cannot dodge the FCRA's restrictions on indemnification and contribution, cannot claim ChoicePoint tortiously breached duties owed to it under the FCRA, and cannot escape the very releases it provided ChoicePoint by contract. Most importantly, Ameriquest is left with no basis

---

[3] Ameriquest asserts: "Ameriquest's tort claims are proper because they are based upon ChoicePoint's breach of its *separate and distinct duty under the FCRA* and case law . . . to exercise reasonable care when disseminating consumer information to ensure that the parties (like Ameriquest) who receive such information are complying with the FCRA's permissible purpose requirements. 15 U.S.C. Section 1681e." *Id.* at 8 (emphasis added).

[4] Ameriquest asserts: "Allowing ChoicePoint to rely upon the exculpatory language to avoid potential liability would cause injury to the public interest because it would enable ChoicePoint to *shirk its responsibility under FCRA* to protect consumer credit information." *Id.* at 10 (emphasis added).

[5] 15 U.S.C. § 1681n provides, "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable *to that consumer* . . ." (emphasis added). 15 U.S.C. § 1681*o* provides "Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable *to that consumer* . . ." (emphasis added).

to assert ChoicePoint had any duty to ensure its mail pieces complied with the FCRA. For these reasons, this Court must dismiss Ameriquest's Third-Party Complaint ("Complaint").

I. **AMERIQUEST'S CLAIMS ARE BARRED BY THE FAIR CREDIT REPORTING ACT.**

Ameriquest's Opposition supports the very arguments that ChoicePoint makes in support of its motion to dismiss: all of Ameriquest's claims arise directly from a finding that Ameriquest violated the FCRA and thus are nothing more than claims for indemnification and contribution. Because the FCRA prohibits a party from seeking indemnification or contribution for its own FCRA violations, the Complaint must be dismissed.

A. **There Is No Right to Indemnification or Contribution for a Violation of the FCRA.**

Ameriquest requests this Court do what no other court in the Seventh Circuit has done: permit a party to recover indemnification and contribution for violations of the FCRA.[6] Ameriquest does not dispute ChoicePoint's argument that under Seventh Circuit precedent, the right to indemnification or contribution, if it exists at all, lies only under the FCRA and not under any amorphous "principles of equity." *See* ChoicePoint Precision Mktg. LLC's Mem. in Supp. of Its Mot. to Dismiss at 4 ("Mem."). Ameriquest now suggests that a right to indemnification or contribution does exist under the FCRA and that any case law to the contrary is distinguishable

---

[6] In fact, no other court in the country has permitted such a result with one exception—the Fourth Circuit's decision in *Yohay v. Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 973-74 (4th Cir. 1987). As ChoicePoint noted in its Memorandum, this Court has criticized the *Yohay* decision for improperly addressing indemnification under the FCRA as a matter of state rather than federal law. *See* ChoicePoint Precision Mktg. LLC's Mem. in Supp. of Its Mot. to Dismiss at 4 n.2 ("Mem.") (*citing Kudlicki v. MDMA, Inc.*, No. 05 C 2589, 2006 U.S. Dist. LEXIS 27971, at *11 (N.D. Ill. May 10, 2006)).

- 3 -

insofar as it does not involve consumer reporting agencies or parties with an "independent statutory obligation under the FCRA." *See* Opp. at 3, 3 n.2 & 7. Ameriquest then goes so far as to suggest, albeit without any elaboration, that even if a right to indemnification or contribution does not exist under the FCRA, this Court should fashion such a right under the common law. *See id.* at 1, 2 & 5.

Not surprisingly, Ameriquest fails to cite a single case where a party has been permitted to recover indemnification or contribution under the FCRA, because such a case does not exist. The fact that ChoicePoint is a consumer reporting agency or has "independent statutory obligations," *see* Opp. at 3, is of no benefit to Ameriquest because such obligations run to consumers, not subscribers of data. Neither in *Kudlicki v. MDMA, Inc.*, No. 05 C 2589, 2006 U.S. Dist. LEXIS 27971 (N.D. Ill. May 10, 2006), nor in *Kay v. First Continental Trading, Inc.*, 966 F. Supp. 753, 754-55 (N.D. Ill. 1997)*,* nor in any other decision has this Court ever suggested that consumer reporting agencies are susceptible to claims of indemnification or contribution. These cases hold that indemnification and contribution are unavailable for *any* actor under the FCRA because Congress did not intend to permit wrongdoers to shift and thereby limit their liability under the FCRA. *See Kay*, 966 F. Supp. at 754-55. As the court in *McSherry v. Capital One FSB*, 236 F.R.D. 516 (W.D. Wash. 2006) explains:

> [I]mplying a right of contribution is particularly inappropriate where . . . the party seeking contribution is a member of the class whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class, and where there is no indication in the legislative history that Congress was concerned with softening the blow on joint wrongdoers.

*Id.* at 521-22. As a user of consumer credit information, Ameriquest <u>itself</u> is subject to regulation under the FCRA and thus "a member of the class whose activities Congress intended to regulate for the protection and benefit of" the public. *Id.* at 521 (quotations omitted). *See also*

15 U.S.C. §§ 1681b(f) & 1681m (imposing obligations upon users of consumer credit information). To let one party regulated under the FCRA seek indemnification or contribution from another party regulated under the FCRA would accomplish precisely what Congress sought to avoid—a "softening [of] the blow for joint wrongdoers." *McSherry*, 236 F.R.D. at 522.[7]

With the doors to recovery under "equity" and the FCRA firmly closed, Ameriquest makes one last ditch effort to recover by attempting to pry open the door of "federal common law." *See* Opp. at 1, 2 & 5. Without any supporting analysis, it asserts that were ChoicePoint not subject to indemnification or contribution under the federal common law, the goals of the FCRA would be "undermine[d]" and "significant federal interests" would not be "protected." *Id.* at 1, 5. Ameriquest appears oblivious to the fact this Court has previously determined that there is no basis for fashioning a common law right to indemnification or contribution for violations of the FCRA. *See Kudlicki*, 2006 U.S. Dist. LEXIS 27971, at *8-9, *13; *Kay*, 966 F. Supp. at 754-55. Ameriquest offers no basis for this Court to overturn its prior decisions.

Ameriquest's concern that consumer reporting agencies like ChoicePoint will "avoid [their] responsibilities under the FCRA by the contention [they are] immune to claims for indemnity and contribution," Opp. at 6-7, is overblown and baseless. Consumer reporting agencies cannot avoid any obligations because they remain subject to suit by consumers and the government. Accordingly, this Court must dismiss Ameriquest's claims for indemnification and contribution.

---

[7] This Court has already rejected an indemnification and contribution claim against a party that did have independent statutory obligations under the FCRA. The party from whom indemnification was sought in *Kudlicki*—a marketing company—had obligations under the FCRA because it obtained consumer credit information on behalf of the Third-Party Plaintiff. Nevertheless, this Court was not deterred from dismissing a third-party plaintiff's claims for indemnification or contribution. *See Kudlicki*, 2006 U.S. Dist. LEXIS 27971 at *6-13.

### B. The Restrictions on Indemnification and Contribution for a FCRA Violation also Bar Ameriquest's Tort and Contract Claims.

ChoicePoint reiterates the argument set forth in its motion that the FCRA's restrictions on indemnification and contribution also serve to bar Ameriquest's tort and contract claims. The reason is simple: because the tort and contract claims are dependent upon Ameriquest itself being liable in the Non-Borrower class action, they are indistinguishable from indemnification and contribution claims and are thus barred under the FCRA. *See* Mem. at 4-6.

Ameriquest protests that this argument leads to the unacceptable result that no contract or tort claim could ever be brought against a consumer reporting agency. *See* Opp. at 8. Ameriquest's concern is unwarranted. The FCRA does not bar all contract and tort claims against consumer reporting agencies. It only bars claims of the sort being raised by Ameriquest because such claims are entirely dependent upon a finding in the Non-Borrower class action that Ameriquest's consumer mail pieces did not constitute firm offers of credit. *See* Third-Party Compl. ¶¶ 48 (breach of contract), 81 (negligent misrepresentation) & 87 (negligence).

In its Opposition, Ameriquest makes a flying leap from the four corners of the Complaint and argues that "if the Non-Borrower Plaintiffs' claims are proven, then ChoicePoint breached this separate duty [to ensure those it provides data to are complying with the FCRA]." *See* Opp. at 8.[8] Two fatal problems plague this argument. First, it demonstrates that Ameriquest's tort and contract claims against ChoicePoint <u>are</u> anchored in Ameriquest's own liability under the FCRA and are thus indistinguishable from its indemnification and contribution claims. Second, it fails to recognize that Ameriquest has its own separate and distinct obligations under the FCRA. It is both possible, and consistent with the Non-Borrower Complaint, that Ameriquest could breach its own obligations under the FCRA without ChoicePoint breaching any of its own obligations

---

[8] ChoicePoint denies it has any such duty under the FCRA.

under the FCRA. In its Third-Party Complaint, however, Ameriquest tries to foist its obligations and liability under the FCRA upon ChoicePoint. This is simply not permitted. Congress has barred wrongdoers under the FCRA from "softening the blow" by shifting liability amongst themselves through indemnification or contribution—regardless of how any particular cause of action is captioned. Mindful of Congress's policy decisions, courts have barred contract and tort claims similar to those raised by Ameriquest when confronted with statutes that do not provide for indemnification or contribution. *See* Mem. at 5-6 (citing cases under the Fair Labor Standards Act, the False Claims Act, and Title VII of the Civil Rights Act of 1964). This Court should reject Ameriquest's tort and contract claims for what they are: a thinly-veiled attempt to circumvent the FCRA's restrictions on indemnification and contribution.[9]

## II. AMERIQUEST'S CLAIMS ARE BARRED BY APPLICABLE CONTRACTUAL AGREEMENTS.

Ameriquest maintains this Court is not obligated to apply the contracts that ChoicePoint has identified and attached to its Motion, but then fails to identify which agreements are applicable. Ameriquest, in short, wants to have its cake and eat it too. Even if the FCRA did not stand in the way of Ameriquest's recovery, its own contractual commitments would. *See* Mem. at 7-11. Ameriquest's contract, tort, indemnification, and contribution claims must be dismissed because written agreements entered into by the parties establish, as a matter of law, that (1) Ameriquest covenanted not to sue ChoicePoint, (2) released ChoicePoint of any liability, and (3) assumed all responsibility for the content of the mail pieces. *See id.* at 8, 10-11. Ameriquest does not deny that it entered into these agreements. Instead, it responds, these agreements may

---

[9] Even if these claims were not barred under the FCRA, which ChoicePoint contends they are, the claims are improper under Rule 14, which governs third-party actions. *See* Mem. at 5 n.3. Ameriquest does not challenge this argument in its Opposition.

have been overridden by subsequent unspecified agreements or that these agreements may be ineffective. Neither of these responses is sufficient to save Ameriquest's claims.

### A. The Mere Allegation of Multiple Contracts is Insufficient to Save Ameriquest's Contract, Tort, Indemnification, and Contribution Claims.

Ameriquest opposes ChoicePoint's motion on the grounds that it alleged "multiple contracts govern[ ] the parties' relationship" and "it is reasonable to infer that the multiple agreements between the parties contained terms that altered or superseded those in the 2000 Agreement and/or the 2005 Agreement." Opp. at 2-3. Ameriquest's argument is unpersuasive for two reasons. Ameriquest does not dispute the 2000 and 2005 agreements were entered into by the parties and are operable agreements. Even more significantly, Ameriquest does not allege that the unspecified, phantom agreements did in fact alter or supersede the 2000 and 2005 agreements. It simply alleges that they may have. This is not a sufficient factual predicate for surviving a motion to dismiss.

After the Supreme Court's decision in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007), it is no longer reasonable, if it ever was, for this Court to infer that unidentified contracts contain terms favorable to Ameriquest merely because Ameriquest alleges they "may." In *Twombly*, the Court made clear that "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . . " 127 S. Ct. at 1964-65 (citations and internal quotations omitted). When the existence of a possible agreement is at issue, plaintiff's complaint requires, "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.

- 8 -

Ameriquest offers no "factual matter" concerning these unidentified contracts other than that they purportedly exist. *See* Third-Party Compl. ¶¶ 44, 47, 48. This is insufficient, particularly since ChoicePoint and Equifax have now identified the operable contracts. Ameriquest, in contrast, provides no facts concerning the parties, dates, or terms of the unidentified agreements, or how they relate to the written agreements provided by Equifax and ChoicePoint. Neither does Ameriquest come forward with any allegation that the parties subsequently agreed to abandon the written modification requirements contained in the 2000 and 2005 Agreements. Consequently, this Court should not give any credence to Ameriquest's allegations about possible subsequent oral agreements. *See* Mem. at 9-10. Because Ameriquest's factual allegations concerning any other agreements do not "raise a right to relief above the speculative level," *Twombly*, 127 S. Ct. at 1965, they are insufficient to state a claim for breach of contract and insufficient to rebut the effects of the written agreements that Ameriquest itself has acknowledged entering into. Indeed, this Court has previously held that where "an exhibit contradicts the assertions made in the complaint itself and reveals facts that foreclose recovery as a matter of law, the exhibit controls." *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 873 F. Supp. 111, 123 n.18 (N.D. Ill.), *aff'd*, 67 F.3d 605 (7th Cir. 1995). Accordingly, this Court is entitled to consider the effects of the 2000 and 2005 agreement on Ameriquest's claims and rely upon them as a basis to dismiss those claims.[10]

---

[10] Ameriquest quotes this Court's decision in *Tibor Machine Products, Inc. v. Freudenberg-NOK General Partnership*, 967 F. Supp. 1006, 1014 (N.D. Ill. 1997) for the proposition that ChoicePoint cannot "challenge the sufficiency of [Ameriquest's] claims simply by attaching documents that contain factual assertions contrary to those in the complaint." *See* Opp. at 2. Ameriquest fails to quote the following sentence, which reads, "Nevertheless . . . the court generally is not required to ignore facts in the complaint that undermine the plaintiff's claim." *Id.*

**B.     Ameriquest, Through Written Contracts, Limited its Rights, and No Public Policy Concern Overrides the Clear Language of the Written Agreements.**

The parties agree that pursuant to the plain language of the written contracts, Ameriquest is responsible for the content of firm offer letters, covenants not to sue, and releases ChoicePoint of any liability. Ameriquest argues such provisions are nevertheless ineffective for two reasons. First, it argues that a consumer reporting agency cannot satisfy its obligation to make reasonable efforts to verify those who purchase its credit data have a permissible purpose simply by obtaining a certification of permissible purpose from the user; some kind of verification is required. *See* Opp. at 9-10. These arguments relate to lawsuits brought against consumer reporting agencies by consumers who allege that the agencies breached duties owed to them under the FCRA. There is no precedent for Ameriquest's attempt to apply these arguments to avoid its own responsibilities pursuant to the contract and pursuant to the FCRA.

Second, Ameriquest suggests any release of liability or covenant not to sue is void as against public policy because it allows ChoicePoint to "cause injury to the public interest because it would enable ChoicePoint to shirk its responsibility under the FCRA." Opp. at 10. This argument is pure fiction. No public interest is in jeopardy given that ChoicePoint remains subject to suit by consumers and the government.[11]

Ameriquest's position that the 2000 Agreement is ineffective because it was replaced by the 2005 Agreement also provides it no relief. *See* Opp. at 3. As explained in the Motion to

---

[11] Ameriquest's extensive reliance upon *Barton v. Peterson*, 733 F. Supp. 1482, 1488-89 (N.D. Ga. 1990) is puzzling. Noting the "extreme caution" a court must use before "declaring a contract void against public policy," that court actually *rejected* an attempt to void a release on public policy grounds, in part, because the defendant was not "willing to perform [its] service for any member of the public." *Id.* at 1489. Likewise, ChoicePoint limits the entities to which it is willing to provide credit data and certainly does not provide credit data to the public at large. Ameriquest—a large, sophisticated, multibillion dollar commercial enterprise—is not entitled to escape its contractual obligations under the guise of "public policy."

Dismiss, the 2005 Agreement is simply a pricing and volume commitment that did not override the 2000 Agreement. *See* Mem. at 11. Yet even if it did, Ameriquest would be no better off. The terms of the 2000 agreement would bar any recovery for the alleged violations Ameriquest identifies as having taken place before February 11, 2005—the date the 2005 contract was executed. Thereafter, the terms of the 2005 Agreement would bar Ameriquest's recovery. Under that agreement, Ameriquest represented that it would abide by the FCRA, extend a firm offer of credit to any individual on a prescreened list, and indemnify and hold ChoicePoint harmless. Thus, regardless of which agreement controls, the result is the same: Ameriquest's claims must be dismissed.

### III.  GEORGIA LAW MANDATES THE DISMISSAL OF AMERIQUEST'S TORT AND RESCISSION CLAIMS.

Wholly apart from any bars erected by the FCRA or Ameriquest's own contractual commitments, Georgia law bars Ameriquest's tort and rescission claims. Accordingly, this Court must dismiss Counts VII, VIII, and IX of the Third-Party Complaint. Ameriquest argues it is premature to decide upon the application of Georgia law: "An inquiry is needed to determine which state(s)' laws apply to each agreement, how those laws differ, and which are properly applicable to the case at hand." Opp. at 13 n.4. *See generally id.* at 12-15. However, the 2000 and 2005 Agreements, which are provided to the Court, are governed by Georgia law. *See* Mem. Ex. A ¶ VII.7, Ex. B ¶ 14. Georgia law governs both because the contracts provide that they are governed by Georgia law and because Georgia has the most significant relationship to this dispute, as both Equifax and ChoicePoint are headquartered and incorporated there. *See* Mem. at 12 n.8. The law governing tort and rescission claims is determined by the state with the most significant relationship to a dispute, not simply a contractual choice of law provision. *See id.*

- 11 -

(*citing Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 739 N.E.2d 1263, 1269 (Ill. 2000); Restatement (Second) of Conflict of Law §§ 6, 145 (1971)). Ameriquest does not dispute this. Neither does it identify any other state whose laws might govern, nor how that state's laws conflict with those of Georgia. Therefore, this Court is entitled to assume Georgia law governs. *Cf. Munch v. Sears Roebuck & Co.*, No. 06 C 7023, 2007 U.S. Dist. LEXIS 62897, at *15 (N.D. Ill. Aug. 27, 2007).

Under Georgia law, Ameriquest's tort and rescission claims must be dismissed. Ameriquest offers no further argument on its rescission claim. As for its tort claims, Ameriquest simply observes that "a single . . . course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation, it also violates a duty owed to plaintiff independent of contract to avoid harming him." Opp. at 13 (*citing Brookview Holdings LLC v. Suarez*, 285 Ga. App. 90, 94 (Ga. Ct. App. 2007) (quotations omitted)). The alleged independent duty Ameriquest relies upon is the "separate and distinct duty under the FCRA and case law (cited above) to exercise reasonable care when disseminating consumer information to ensure that the parties (like Ameriquest) who receive such information are complying with the FCRA's permissible purpose requirements." Opp. at 14. Any such duty is owed to consumers, not to subscribers of data like Ameriquest. *See supra* 1-2. Without demonstrating the existence of a duty independent of those imposed under the contract itself, Ameriquest has no basis to sue in tort. Ameriquest apparently concedes that a contracting party suing solely for an economic loss must do so in contract, not tort. The appellant in *Brookview* could sue in contract and tort because a physical harm—a murder—took place. No non-economic loss is alleged in Ameriquest's complaint. *Allen v. Hartsfield Co.*, 183 S.E. 821 (Ga. Ct. App. 1936), the other case cited by Ameriquest, is also of little relevance. The appellee

waived his right to sue on contract and opted to sue in tort instead.  Ameriquest made no similar election and thus has no basis for an action in tort.

ChoicePoint's remaining arguments are undisputed by Ameriquest, and, accordingly Ameriquest's claims should be dismissed.  *See* Mem. at 12.  Ameriquest's negligent misrepresentation claim fails because no misrepresentation was identified, there was no reasonable reliance as a matter of law, and misrepresentations of law are not actionable.  *See id.* at 13-14.  Ameriquest's rescission claim is barred because, *inter alia*, it is untimely and Ameriquest can do nothing to restore ChoicePoint to the status quo ante.  *See id*. at 14-15.

## CONCLUSION

For the foregoing reasons, ChoicePoint respectfully requests that this Court grant the Motion to Dismiss and dismiss the Third-Party Complaint in its entirety.

Dated:  October 30, 2007.                                Respectfully Submitted,

ChoicePoint Precision Marketing LLC

By: /s/ Laurie S. Fulton
One of Its Attorneys

Laurie S. Fulton (lfulton@wc.com)
Jon R. Fetterolf (jfetterolf@wc.com)
Paven Malhotra (pmalhotra@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2007 a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Laurie S. Fulton