**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL Docket No. 1715 <br><br> Lead Case No. 05-cv-07097 <br><br> Centralized before The Honorable Marvin E. Aspen |
| THIS DOCUMENT RELATES TO: DOCKET # 859 | |

**AMERIQUEST MORTGAGE COMPANY'S SUR-REPLY IN OPPOSITION TO CHOICEPOINT'S MOTION TO DISMISS**

**I.     INTRODUCTION**

ChoicePoint should not be able to escape liability in this matter when, as alleged in Ameriquest's Third Party Complaint, it was an integral participant in Ameriquest's firm offer program. Contrary to what ChoicePoint would have this Court believe, Ameriquest has alleged that ChoicePoint did not simply sell the credit information necessary for Ameriquest to send its firm offer letters. Rather, ChoicePoint reviewed Ameriquest's firm offer letters, conditioned its sale of consumer information to Ameriquest upon its review of the letters, knew the FCRA requirements for such letters, and yet continued to sell the consumer information needed to send the letters to Ameriquest so that ChoicePoint could profit despite its knowledge of a potential FCRA violation. [Complaint, paras. 23-25, 65-68, 71-74] Further, Ameriquest, as alleged, reasonably relied upon ChoicePoint's expertise and actions, as ChoicePoint is one of the foremost experts in the credit information arena. [*Id.*]

It would be entirely inequitable to allow ChoicePoint to avoid culpability in this matter when it was significantly involved in Ameriquest's "firm offer" process, and when its own acts and omissions (as alleged in the Third Party Complaint) failed to satisfy its obligations under the FCRA to have reasonable grounds for believing the consumer report information it furnished to Ameriquest would be used for a permissible purpose. 15 U.S.C. Section 1681e. Accordingly, ChoicePoint can be liable to Ameriquest for equitable indemnity and contribution, as well as negligence and negligent misrepresentation, based upon its violation of the duties that FCRA, case law and federal common law impose on credit reporting agencies.

Further, ChoicePoint should not be allowed to use its contracts with Ameriquest to shift all responsibility for FCRA compliance to Ameriquest, and thereby avoid its own FCRA obligations. Indeed, as set forth below and in Ameriquest's Opposition papers, the FCRA public policy goal of protecting consumers would be undermined by allowing ChoicePoint to avoid liability by virtue of contractual language attempting to delegate its responsibilities to Ameriquest.

Finally, ChoicePoint's Reply Brief continues to improperly discount Ameriquest's allegations of multiple contracts in the Third Party Complaint. [See Complaint, para. 21] ChoicePoint's Motion, and its Reply, remain an improper "speaking" motion based upon the agreements (the 2000 Agreement and the 2005 Agreement) it contends govern the parties' relationship. However, the 2005 Agreement makes the 2000 Agreement irrelevant because the 2005 Agreement contains a merger clause overriding all prior agreements. The contradiction between Ameriquest's allegation of multiple contracts (both oral and written – and not limited to the 2000 Agreement and the 2005 Agreement) and ChoicePoint's contention that the 2000 Agreement and the 2005 Agreement are the sole contracts that govern the relationship establishes that factual questions exist such that this Court cannot dismiss the contract claims in the Complaint or base a ruling on Ameriquest's other claims on the terms in the 2000 and 2005 Agreements on which ChoicePoint impermissibly relies.

**II.     AMERIQUEST'S CONTRIBUTION AND INDEMNITY CLAIMS SHOULD BE ALLOWED TO PROCEED**

Claims for indemnity and contribution are based in equity.  In its Reply Brief, ChoicePoint argues that Ameriquest cannot sue it for indemnity or contribution because, notwithstanding ChoicePoint's intimate involvement in Ameriquest's firm offer program, and its review of the firm offer letters in question,  ChoicePoint only owes duties under FCRA to consumers, not to Ameriquest.  Given the allegations that ChoicePoint conditioned its sale of consumer information upon its review of the firm offer letters, and that ChoicePoint knew of potential FCRA violations, yet continued to sell the information (ostensibly for financial gain), dismissal of ChoicePoint would be entirely inequitable.  [Complaint, para. 23-25, 65-68, 71-74]. Assuming the Non-Borrower Plaintiffs' allegations that Ameriquest sent firm offer letters to consumers without a permissible purpose are correct, equity and the public policy underpinning the FCRA dictate that ChoicePoint, alleged to be an active and integral participant in Ameriquest's firm offer marketing program, should not be allowed to escape liability as a matter of law for its role in the alleged concomitant harm to the very consumers ChoicePoint has a statutory duty to protect.

**A.     An Extension of Federal Common Law Supports Ameriquest's Contribution and Indemnity Claims**

By its Third Party Complaint, Ameriquest has raised the issue of whether ChoicePoint had reasonable grounds for believing the consumer report information it sold to Ameriquest would be used for a permissible purpose under FCRA.  Ameriquest alleges that ChoicePoint reviewed Ameriquest's firm offer letters.  Ameriquest further alleges that ChoicePoint conditioned its sale of consumer information to Ameriquest upon its review of the letters.  [*See* Complaint, para. 65-68, 71-74]  Further, ChoicePoint knew the requirements for such letters, and yet continued to provide Ameriquest with consumer information to send the letters despite knowledge of a potential FCRA violation.  [*See* Complaint, para. 23-25]  It is without dispute that under FCRA ChoicePoint is responsible for ensuring proper use of its credit reports and

3

consumer information.  15 U.S.C. Section 1681e; *In re Matter of Trans Union Corporation*, Docket No. 9255, 2000 WL 257766, p. 1 and 2 (FTC February 10, 2007).

ChoicePoint argues that, notwithstanding the foregoing, it cannot ever be held to indemnify Ameriquest or contribute to any judgment against Ameriquest because under FCRA its duties run only to consumers (not to a lender such as Ameriquest).  However, there is no Court of Appeal decision, either in this Circuit or any other, that has held that such claims for indemnity and contribution do not lie.  Indeed, no published federal case, District Court or Court of Appeal, has specifically decided the question of whether a credit reporting agency, having independent statutory obligations under FCRA, can be liable for indemnity or contribution in a FCRA case.  Those District Court decisions generally addressing the issue of the existence of an indemnity or contribution claim under FCRA are distinguishable.

The *Kudlicki* case, cited by ChoicePoint, can be distinguished because there the third party defendant was an advertising agency, not a credit reporting agency that has independent statutory obligations under the FCRA.  *McSherry* is factually distinguishable because there a furnisher of credit information sought indemnity from a consumer.  The Court found that the furnisher of credit information could not seek indemnity from a consumer because Congress intended through FCRA to regulate the activities of furnishers of credit information for the benefit of consumers.  *McSherry*, 236 F.R.D. 516, 521-22.

The FCRA duties of credit reporting agencies (*See* 15 U.S.C. Section 1681(a) and (e)) support a federal common law rule favoring claims for indemnity and contribution against credit reporting agencies (as well as claims for negligence and negligent misrepresentation).  The purpose of FCRA is to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.  *Safeco Ins. Co. of America v. Burr*, 127 S.Ct. 2201, 2205 (2007).  Congress has stated that the credit reporting agencies are responsible for maintaining the balance between consumer privacy and the needs of a modern, credit driven economy.  *Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.* 427 F.3d 1043, 1045-46 (7th Cir. 2005); *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 725 (7th Cir. 2004).  It would thwart

the purpose of FCRA to allow ChoicePoint (and other credit reporting agencies) to escape all liability in the circumstances alleged, while collecting millions of dollars in fees for selling the credit information to Ameriquest.

Rather, ChoicePoint should bear at least some liability in the event Ameriquest is found liable in this case. Recognizing Ameriquest's right to seek contribution from ChoicePoint for any judgment obtained by the Non-Borrower Plaintiffs against Ameriquest would do no more than hold ChoicePoint responsible for compliance with its statutory duties to consumers. Simply because the Non-Borrower Plaintiffs have chosen to sue Ameriquest and not ChoicePoint should not give ChoicePoint a "free pass" to escape all liability as a matter of law.

### III. AMERIQUEST'S TORT CLAIMS AND CONTRACT CLAIMS ARE SUPPORTED BY THE ALLEGATIONS OF THE THIRD PARTY COMPLAINT

For the same reasons that the indemnity and contribution claims in the Third Party Complaint should survive ChoicePoint's Motion, Ameriquest's claims for negligence, negligent misrepresentation and breach of contract should also. Ameriquest's tort claims are proper because they are based upon ChoicePoint's breach of its independent and non-delegable duty under the FCRA to exercise reasonable care when disseminating consumer information to ensure that parties (like Ameriquest) who receive such information are complying with the FCRA's permissible purpose requirements. 15 U.S.C. Section 1681e, *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 337 (N.D. Ill. 2002); *Pintos v. Pacific Creditors Ass'n*, 2007 WL 2743502, 2 (9th Cir. 2007).

Further, there is nothing in the FCRA that prevents Ameriquest from proceeding with its breach of contract claims as alleged. Even assuming *arguendo* ChoicePoint is correct that the FCRA does not allow Ameriquest to seek indemnity and contribution, there is nothing in the statute prohibiting parties from contractually undertaking duties to each other of the type on which Ameriquest's breach of contract claim is based.[1]

---

[1] In support of this argument, ChoicePoint contends that "it is both possible and consistent with the Non-Borrower Complaint, that Ameriquest could breach its own obligations under the FCRA without ChoicePoint breaching any of its own obligations under the FCRA." This contention is not only unpersuasive, it also points out at least one of the

5

As to ChoicePoint's contention these claims are improper under Rule 14 (ChoicePoint Reply at page 7, fn. 9) it has not cited any case that puts tort and contract claims, such as the ones Ameriquest alleges, on a different footing from indemnity and contribution claims. Indeed, Rule 14 allows for precisely this circumstance. A defendant may file a third party complaint against a non-party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Only Ameriquest's rescission claim is arguably not contingent on Ameriquest's liability to the Non-Borrower Plaintiffs.

## IV. CHOICEPOINT MAY NOT RELY ON THE 2000 AGREEMENT OR THE 20005 AGREEMENT TO AVOID EITHER CONTRACTUAL OR TORT LIABILITY

Ameriquest has sued ChoicePoint for breach of contract, negligence and negligent representation based upon, among other things, its review of the firm offer letters and its sale of consumer information conditioned on its review of the letters to ensure FCRA compliance. [Complaint, paras. 23-25, 67, 72, 77-81, 83-88, 44-49] ChoicePoint cannot use the 2000 Agreement or the 2005 Agreement to avoid liability to Ameriquest on these claims at this stage because, as Ameriquest alleges, there are multiple agreements that governed the parties' relationship [Complaint, para. 21], and because neither the 2000 Agreement nor the 2005 Agreement are properly before the Court as support for ChoicePoint's Motion.[2]

ChoicePoint's own contentions illustrate that these contracts cannot be considered at this juncture. For example, in both its Motion and Reply Brief, ChoicePoint asserts that the 2005 Agreement is "simply a pricing and volume commitment that did not override the 2000 Agreement." (Reply at p. 11) This is a factual assertion that is directly contradicted by the merger language in the 2005 Agreement itself, and creates a factual issue that cannot be decided on a motion to dismiss.

---

factual questions that should allow the Complaint to survive: whether ChoicePoint in fact breached its obligations under the FCRA such that it is liable to Ameriquest for indemnity, contribution, breach of contract, negligence and/or negligent misrepresentation.

[2] Further, simply because the 2000 Agreement and the 2005 Agreement contain a Georgia choice of law provision does not conclusively establish that Georgia law governs, or that all contracts entered into had a Georgia choice of law provision. ChoicePoint's new choice of law analysis (see Reply at pp. 11-12) raises issues of fact which cannot be decided on a motion to dismiss.

ChoicePoint incorrectly contends that under the holding of *Bell Atlantic Corp. v. Twombly*, 172 S.Ct. 1955, 1964-65, 2007 U.S. LEXIS 5901 (2007), Ameriquest has failed to adequately allege its breach of contract and other claims. However, *Twombly* involved standards for pleading a claim alleging a "contract" between defendants in restraint of trade or commerce under Section 1 of the Sherman Act, a claim which is not at issue here. To the extent *Twombly* is even applicable here, it requires that a plaintiff must allege "more than labels and conclusions . . . a formulaic recitation of the elements of a cause of action will not do." *Id.* Here, Ameriquest has amply satisfied this requirement. It has alleged the existence of multiple oral and written contracts [Complaint, paras. 1, 44], which, *inter alia*, obligated ChoicePoint to provide services including a review of firm offer letters to ensure compliance with FCRA [Complaint, paras. 23-25, 44-49], a breach of that obligation [Complaint para. 48], compliance with the contracts by Ameriquest [Complaint para. 45], and damages [Complaint para. 49]. To survive the pleading stage, Ameriquest is not required to allege or attach the contracts at issue. *520 Michigan Ave. Associates, Ltd. v. Shannon*, 2007 WL 2728757, *1 (N.D. Ill. 2007); Fed.R.Civ.P. 8(a)(2); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Under the Federal Rules, notice pleading is sufficient, and a plaintiff is not required to attach to a complaint any contracts or other documents on which claims are based. *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999). ChoicePoint itself readily acknowledges the existence of a contractual relationship with Ameriquest. The only issue, which should properly proceed past the pleading stage, is the precise nature and terms of the parties' contractual relationship.

Further, even assuming they are controlling at this juncture (and they should not be), Ameriquest's contractual certifications of a "permissible purpose" in either the 2000 Agreement or the 2005 Agreement are insufficient as a matter of law to shift ChoicePoint's legal duties under the FCRA to Ameriquest and to exonerate ChoicePoint from liability. *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 337 (N.D. Ill. 2002); *Pintos*, 2007 U.S. App. LEXIS 22519 at *14-15. In both *Trans Union Corp. Privacy Litigation* case and *Pintos*, the Court

concluded that notwithstanding the existence of certifications, a credit reporting agency may not furnish reports if reasonable grounds exist to believe that they would be used impermissibly and that such certifications by the user of the consumer information is not by itself sufficient to satisfy the FCRA duties of a credit reporting agency. As Ameriquest alleges, ChoicePoint had a duty (contractually and by virtue of the above case law and Section 1681e of the FCRA) to review the firm offer letters and to refrain from furnishing credit information to send the letters if "reasonable grounds" existed for ChoicePoint to believe that the letters did not satisfy the FCRA "permissible purpose" requirement. Any certification by Ameriquest does not *per se* satisfy ChoicePoint's statutory duties, which are not delegable.

**V.     THE DISCLAIMER PROVISIONS IN THE CONTRACTS CHOICEPOINT ATTACHES ARE VOID AS AGAINST PUBLIC POLICY**

ChoicePoint may not use the exculpatory or disclaimer terms of the 2000 Agreement and/or the 2005 Agreement to avoid either contractual or tort liability for yet another reason. Even if these terms were part of the operative agreements, they are void as against public policy (as explained in detail in Ameriquest's Opposition Brief). The argument of ChoicePoint that the exculpatory and disclaimer language are not void as against public policy because "ChoicePoint limits the entities to which it is willing to provide credit data and certainly does not provide credit data to the public at large" [Reply Brief, p. 10, fn. 11] merely raises an issue of fact that is not appropriate for determination on a motion to dismiss. Given Ameriquest's allegations, there is at least a factual question regarding whether the exculpatory and disclaimer language in the contracts caused injury to the public interest by purportedly allowing ChoicePoint to delegate its FCRA responsibilities.

ChoicePoint's position, that the contractual disclaimers and exculpatory terms either exempt it from complying with its obligations under Section 1681e of the FCRA or satisfy those obligations *per se*, alone establishes that these contract terms are void as against public policy. Congress squarely placed the responsibility upon entities such as ChoicePoint to refrain from giving credit reporting information unless they have reasonable grounds for believing that such

8

information will be used for a permissible purpose. 15 U.S.C. Section 1681e; *Pintos*, 2007 U.S. App. LEXIS 22519 at *14-15. In so doing, Congress certainly did not intend to allow credit reporting agencies to ignore the language of the firm offer of credit letters it received from purchasers of prescreened lists simply because those purchasers signed an adhesion contract certifying a permissible purpose. *Id.*

## VI. CONCLUSION

For the foregoing reasons and those set forth in its Opposition, Ameriquest respectfully requests that the Court deny ChoicePoint's Motion to Dismiss Ameriquest's Third-Party Complaint.

DATED: November 6, 2007

By: /s/ Bernard E. Lesage
*Attorneys for Ameriquest Mortgage Company*

Bernard E. LeSage, Esq.
BUCHALTER NEMER, a P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
(213) 891-0700
(213) 896-0400 (fax)

BN 1477888v1

9

## **CERTIFICATE OF SERVICE**

      I, Bernard E. LeSage, hereby certify that on this 6th day of November 2007, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

      By: /s/ Bernard E. LeSage