# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: AMERIQUEST MORTGAGE CO. | ) | |
| MORTGAGE LENDING PRACTICES | ) | MDL No. 1715 |
| LITIGATION | ) | Lead Case No. 05-7097 |
| ───────────────────────── | ) | |
| | ) | |
| AMERIQUEST MORTGAGE CO., | ) | Centralized before the |
| a Delaware Corporation, | ) | Honorable Marvin E. Aspen |
| | ) | |
| Defendant/Third-Party | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| TRANS UNION LLC, et al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us are two similar motions to dismiss the Third-Party Complaint (Docket No. 859), filed on July 5, 2007 by Defendant/Third-Party Plaintiff Ameriquest Mortgage Co. ("Ameriquest") in this MDL action. In the Third-Party Complaint, Ameriquest alleges that – if the allegations of the Non-Borrower Complaint[1] are found to be true – ChoicePoint Precision Marketing

─────────────

[1] The Consolidated Complaint for the Claims of Non-Borrowers (Docket No. 323) ("Non-Borrower Complaint") generally alleges that Ameriquest violated the Fair Credit Reporting Act ("FCRA") by accessing the credit reports of the putative class members without a "permissible purpose" because the solicitation letters sent to those consumers did not constitute "firm offers of credit" and/or by failing to provide required disclosures and notices. *See* 15 U.S.C. §§ 1681a(l), 1681(b).

LLC ("Choicepoint"), and Equifax Information Services LLC ("EIS")[2] along with Equifax Credit Marketing Services ("ECMS")[3] (collectively, "Equifax") breached their contracts with Ameriquest and engaged in negligent conduct. Ameriquest claims that any FCRA violation attributed to it in the Non-Borrower action stems directly from ChoicePoint's and Equifax's breaches of contract and other misconduct. Among other things, Ameriquest seeks indemnification and contribution from ChoicePoint and Equifax, as well as rescission of the pertinent contracts. For the reasons set forth below, we grant ChoicePoint's and Equifax's motions in part and deny them in part.[4]

## BACKGROUND

According to the Third-Party Complaint, Choicepoint, EIS and ECMS, each Georgia entities, are "credit reporting agencies" ("CRAs") as defined by the FCRA.[5] (Compl. ¶¶ 3-5, 21, 26, 31.) The Third-Party Complaint generally describes the relationship between Ameriquest and these CRAs, whereby Ameriquest paid the CRAs to provide information about consumers. Choicepoint, EIS and ECMS allegedly "entered into a series of written and oral agreements with Ameriquest," which are neither described in, nor attached to the complaint. (*Id.* ¶¶ 21, 26, 31.) Pursuant to these agreements with Ameriquest, ChoicePoint and ECMS "using Equifax data . . . provided Ameriquest with the Consumer Lists for Ameriquest's Direct Mail Program," enabling Ameriquest to write

---

[2] In its Motion to Dismiss, EIS indicates that it is the successor in interest to Equifax Credit Information Services, Inc.

[3] ECMS is alleged to be a division of EIS.

[4] The Third-Party Complaint also names Trans Union LLC and Trans Union Corporation as defendants. These entities filed an answer on October 1, 2007 and have not filed a Rule 12 motion.

[5] The Third-Party Complaint relatedly alleges that ChoicePoint is a "reseller" of credit information as defined by the FCRA. *See* 15 U.S.C. § 1681a(u).

prescreened consumers.  (*Id.* ¶ 21.)  These marketing letters ("Letters") purportedly made "'firm offers of credit' that contained proper 'clear and conspicuous' disclosures to consumers" as required by the FCRA.  (*Id.*)  For its part, EIS "provided the data and/or developed and marketed the computerized process/systems for generating the Consumer Lists" to be used in the Direct Mail Program.  (*Id.* ¶ 26.)

Ameriquest further alleges that Choicepoint and Equifax "represented to Ameriquest that [they] knew and operated within the requirements of FCRA."  (*Id.* ¶¶ 23, 28, 33.)  Choicepoint and Equifax represented that they were "aware of the responsibilities imposed by FCRA . . . including, but not limited to, those specific requirements under FCRA that pertain to making firms offers of credit and/or clear and conspicuous disclosures."  (*Id.*)  Ameriquest alleges that it reasonably relied on these representations in entering into the various agreements with ChoicePoint and Equifax.  (*Id.*)  The Third-Party Complaint also states that ChoicePoint and Equifax knew that the Consumer Lists would be used for the Direct Mail Program and "had the ability and opportunity to review, comment, and approve the Letters in order to satisfy [themselves] that . . . the Letters complied with all applicable laws."  (*Id.* ¶¶ 24-25, 29-30, 34-35.)

Based on these factual allegations, Ameriquest levies numerous charges against Choicepoint and Equifax.  Specifically, the Second, Third and Fourth Claims of the Third-Party Complaint set out breach of contract actions, contending that if "the allegations in the Non-Borrower Complaint are proven to be true, [each entity] breached its written and oral contracts with Ameriquest by failing in [their] prescreening activities, and the Consumer Lists [they] developed, as well as failing to ensure that the Letters . . . complied with the . . . requirements of FCRA."  (*Id.* ¶ 47; *see also id.* ¶¶ 54, 61.)  The Fifth Claim seeks equitable or implied indemnity against each third-party defendant,

while the Sixth Claim seeks contribution. In the Seventh Claim, Ameriquest claims that ChoicePoint and Equifax negligently misrepresented their experience in direct-mail programs, their knowledge of FCRA requirements and the Letters' compliance with such requirements. (*Id.* ¶¶ 77-78.) The Eighth Claim, for negligence, alleges that Choicepoint and Equifax violated their duties to properly generate the Consumer Lists, to further Ameriquest's interests, and to follow all federal laws. (*Id.* ¶¶ 84-86.) Finally, Ameriquest seeks rescission in the Ninth Claim on the grounds that ChoicePoint and Equifax falsely induced it to enter into their respective contracts.

## STANDARD OF REVIEW

The purpose of a motion to dismiss under 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). Accordingly, a court may grant a motion to dismiss under Federal Rule of Procedure 12(b)(6) only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007); *see Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618-19 (7th Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007). A sufficient complaint need not give "detailed factual allegations," but it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1964-65 (2007); *Killingsworth*, 507 F.3d at 618-19. These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 127 S. Ct. at 1964 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 102 (1957)); *see also* Fed. R. Civ. P. 8(a). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Thompson v. Ill. Dep't. of Prof'l Reg.*, 300 F.3d 750, 753 (7th Cir. 2002).

## ANALYSIS

### A. *Contract Claims and Defenses*

As mentioned earlier, the Third-Party Complaint alleges that Choicepoint, EIS and ECMS "entered into a series of written and oral agreements with Ameriquest." (*Id.* ¶¶ 21, 26, 31.)  With their opposition briefs, both ChoicePoint and Equifax submitted a December 15, 2000 Subscriber Agreement ("Subscriber Agreement"), which they allege is the operative document governing the parties' relationships.[6]  (ChoicePoint Mot. at 7; Equifax Mot. at 3-4.)  ChoicePoint and Equifax contend that:  (1) Ameriquest's claims are barred by the exculpatory clause of the Subscriber Agreement; and (2) they cannot be held liable for breach of contract because they had no duty to ensure the legality of the Letters under the Subscriber Agreement.  (ChoicePoint Mot. at 7-11; Equifax Mot. at 7-10.)  Both arguments would require us to evaluate the terms of the Subscriber Agreement, which was neither attached to, nor specifically identified in, the Third-Party Complaint.

ChoicePoint and Equifax argue that we may consider the Subscriber Agreement nonetheless because "'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim.'"  *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)); *see also* Fed. R. Civ. P. 10(c)*; 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).  "'This is a narrow exception' to the general rule that when additional evidence is attached to a motion to dismiss, 'the court must either convert the 12(b)(6) motion into a motion for

---

[6] ChoicePoint also attaches a February 11, 2005 Service Agreement with Ameriquest. (ChoicePoint Mot., Ex. B.)

summary judgment under Rule 56 . . . or exclude the documents.'" *188 LLC*, 300 F.3d at 735 (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)).

While this limited exception is suitable for cases interpreting contracts, *see Rosenblum*, 299 F.3d at 661; *188 LLC*, 300 F.3d at 735, we find it inapplicable under these circumstances. In the present case, Ameriquest alleges the existence of numerous written and oral contracts, but the Subscriber Agreement is not specifically referred to, identified or quoted in the Third-Party Complaint. *See, e.g., McReady v. Ebay, Inc.*, 453 F.3d 882, 891-92 (7th Cir. 2006) (affirming district court's decision to consider subpoena "repeatedly referenced" in the complaint); *Wright*, 29 F.3d at 1248 (similarly affirming decision to consider agreement "repeatedly quote[d] from and refer[red] to" in the complaint); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993) (affirming district court's decision to review correspondence attached to motion to dismiss where complaint pointed to these documents as the basis for contractual relationship). Moreover, ChoicePoint's and Equifax's submission of the Subscriber Agreement does not contradict, undermine or otherwise disprove Ameriquest's allegation that there are several agreements in play.

The Rule 12(b)(6) standard requires us to accept Ameriquest's allegation regarding the existence of multiple contracts as true. As a result, and despite ChoicePoint's and Equifax's representations, we cannot assume that the Subscriber Agreement is the solitary operative contract. Because we do not know whether the Subscriber Agreement is controlling – and we cannot consider evidence outside the complaint at this juncture – it may or may not be "central" to Ameriquest's claims. Indeed, it may be entirely irrelevant if superseded. In light of Ameriquest's allegations, we cannot rely on the terms of the Subscriber Agreement, including any exculpatory provisions, as a

basis to dismiss the Third-Party Complaint.[7]

### B. Equitable Claims for Indemnification and/or Contribution

In the Fifth and Sixth Claims, Ameriquest seeks indemnification and/or contribution from Third-Party Defendants under principles of equity. (Compl. ¶¶ 65, 69, 71, 75.) ChoicePoint and Equifax point out that "[c]ourts have repeatedly found that there is no right to contribution or indemnification under the FCRA." (ChoicePoint Mot. at 3.) In response, Ameriquest argues that Third-Party Defendants should not be immune to liability in light of their "independent statutory obligations under FCRA – duties [they owe] to consumers and Ameriquest alike." (Resp. to ChoicePoint Mot. at 3; Resp. to Equifax Mot. at 9.) Although the Seventh Circuit has not addressed this issue, we conclude that neither the FCRA, nor federal common law,[8] authorize indemnification or contribution under these circumstances.

We begin with the statute itself, which plainly does not grant Ameriquest any right to seek indemnification or contribution from CRAs. In fact, the only similar type of provision included in the FCRA states that "[a]ny person who obtains a consumer report from a [CRA] under false pretenses or knowingly without a permissible purpose shall be liable to the [CRA] for actual damages sustained by the [CRA] or $1,000, whichever is greater." *See, e.g.,* 15 U.S.C. § 1681n(b) (entitled "Civil liability for knowing noncompliance"). Thus, Congress explicitly permits a CRA

---

[7] Neither party sought to convert the Rule 12(b)(6) motion into a Rule 56 motion, and we decline to do so *sua sponte.*

[8] "Where contribution is sought by one who has had to pay damages for violating a federal statute, the scope and limitations of the right of contribution are invariably treated as questions of federal rather than state law." *Donovan v. Robbins,* 752 F.2d 1170, 1179 (7th Cir. 1985). Because Ameriquest seeks contribution and/or indemnity for any liability in the Non-Borrower action based on the alleged FCRA violations, federal law controls.

to recover damages under certain circumstances from a "person who obtains a consumer report." Congress, however, did *not* authorize users of consumer reports, like Ameriquest, to recover from CRAs under any circumstances.[9]

As various courts have observed, "'[i]t appears that Congress was meticulous in its enactment of the FCRA. The culpability, liability, remedy, and enforcement provisions demonstrate Congress's effort at creating a comprehensive statutory scheme.'" *Kodrick v. Ferguson*, 54 F. Supp. 2d 788, 796 (N.D. Ill. 1999) (quoting *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 470, 482 (D.D.C. 1994)); *Kay v. First Cont'l Trading, Inc.*, 966 F. Supp. 753, 754 (N.D. Ill. 1997) (same). In doing so, Congress apparently did not intend for the FCRA to include broad indemnification or contribution rights. Having reviewed the statutory framework, we agree with other decisions in this district that the FCRA's "structure really negates any inference" that contribution or indemnification are permitted. *Kay*, 966 F. Supp. at 754*; Kudlicki v. MDMA, Inc.*, No. 05-2589, 2006 WL 1308617, at *3 (N.D. Ill. May 10, 2006); *see also Meyers v. Freedom Credit Union*, No. 05-3526*,* 2007 WL 2753172, at *7 (E.D. Pa. Sept. 21, 2007) (stating that "[i]t is clear that FCRA does not expressly create a cause of action for indemnity or contribution"); *McSherry v. Capital One FSB*, 236 F.R.D. 516, 520-22 (W.D. Wash. 2006) (concluding that neither FCRA, nor federal common law, permits contribution under FCRA); *McMillan v. Equifax Credit Info. Servs., Inc.*, 153 F. Supp. 2d 129, 132 (D. Conn. 2001) (noting that "[c]ourts have found that the FCRA does not provide a right to indemnification").

With that in mind, we next consider whether federal common law recognizes, or should

---

[9] On the statute's face, not even consumers – those whom the FCRA seeks to protect – may obtain relief under 15 U.S.C. § 1681n(b). *See Miller v. Trans Union LLC*, No. 06-2883, 2007 WL 641559, at *4 (N.D. Ill. Feb. 28, 2007).

recognize, Ameriquest's claim to contribution or indemnification. The Supreme Court has commented on the limited nature of federal common law, stating that it need only be formulated in rare instances where "a federal rule of decision is necessary to protect uniquely federal interests" or "Congress has given the courts the power to develop substantive law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S. Ct. 2061, 2067 (1981) (analyzing whether federal common law permits contribution for Sherman Act violations, where "Congress neither expressly or implicitly intended to create" such a right under the statute itself) (internal quotations and citations omitted). Given these guiding principles, the Seventh Circuit has acknowledged that courts are understandably "reluctant to recognize a right of contribution as a matter of either federal common law or of statute." *Anderson v. Griffin*, 397 F.3d 515, 523 (7th Cir. 2005) (observing that "[a]ll . . . contribution does is add to the costs of litigation, and so unless there is a compelling reason to suppose that the legislature would want such a right to be enforced . . . it will not be").

Ameriquest argues that we should extend federal common law in this case, to allow its contribution and indemnification claims, because Congress "expressed its plain interest in making credit reporting agencies responsible for maintaining [the intended] balance ['between consumer privacy and the needs of a modern, credit-driven economy']." (Resp. to ChoicePoint Mot. at 4; Resp. to Equifax Mot. at 10 (quoting *Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1045-46 (7th Cir. 2005).) Ameriquest contends that because Third-Party Defendants bear this responsibility, in the form of statutory duties "to consumers and Ameriquest alike," they must be "required to indemnify, or contribute to a judgment against, lenders like

Ameriquest that rely on their expertise."[10]  (*Id.*)

Ameriquest's reliance on Third-Party Defendants' statutory obligations, however, is misplaced.[11]  First, as noted above, the FCRA is quite comprehensive and explicitly sets forth the obligations owed by various actors to the consumer, as well as enforcement provisions.  If Congress did not see fit to include a contribution or indemnity provision in the carefully-crafted FCRA, which it has amended repeatedly, it does not seem "necessary" for us to create such a common law right.  The federal interest furthered by the FCRA is to protect consumer privacy without stifling commerce, not to protect users of credit information in their dealings with a CRA.  *See* 15 U.S.C. §§ 1681(a), (b), 1681e.  We perceive no need for contribution or indemnification where the FCRA provides for civil and/or administrative enforcement directly against all who violate its applicable provisions.  *See Anderson*, 397 F.3d at 523; *Kudlicki*, 2006 WL 1308617, at *3 (concluding that "federal common law cannot be the basis for a cause of action for contribution under the FCRA").  Moreover, this controversy does not involve "uniquely federal interests" such as those found in cases concerning "the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases."  *Tex. Indus., Inc.*, 451 U.S. at 641; *see also Northop Corp. v. AIL Sys., Inc.*, 959 F.2d 1424, 1426 (7th Cir. 1992); *King v. Gibbs*, 876 F.2d 1275, 1282 (7th Cir. 1989) (observing that

---

[10] Ameriquest does not claim that Congress granted us the power to develop substantive law in this dispute.  *Tex. Indus., Inc.*, 451 U.S. at 640.

[11] Ameriquest argues that the existence of Third-Party Defendants' statutory duties distinguishes this case from *Kudlicki*, where the third-party defendant entered into a contract to prepare, address and mail advertising flyers but allegedly did not have its own obligations under the FCRA.  (Resp. to ChoicePoint Mot. at 3, 5-6; Resp. to Equifax Mot. at 9-10.)  Regardless, and as discussed above, the statutory duties do not give rise to a cause of action for Ameriquest.

the "right to indemnification is obviously unrelated to such areas of the law").

Second, and despite Ameriquest's unsupported contention, the Congressionally-mandated duties of a CRA run to the consumer, not to the users of information provided by a CRA. Certainly Third-Party Defendants shoulder "grave" responsibilities under the FCRA, which requires them to ensure the accuracy, proper utilization and confidentiality of consumer credit information. *See* 15 U.S.C. § 1681(a)(4); *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 725 (7th Cir. 2004). Again, however, the statutory framework strongly suggests that these duties are owed exclusively to consumers. *See* 15 U.S.C. § 1681(b). Ameriquest has not identified any statutory provision or authority indicating that Third-Party Defendants owe it (or should owe it) a statutory or common law duty. While Ameriquest correctly states that Third-Party Defendants must implement reasonable procedures to ensure they share credit information with users only as permitted by the FCRA, the primary case cited by Ameriquest for this proposition was brought by a *consumer*, not by the subscriber. *See Pintos v. Pac. Creditors Assoc.*, 504 F.3d 792, 796-97, 800-01 (9th Cir. 2007) (holding that CRA has an independent obligation to verify certification regarding the intended use of a credit report and could be held liable for FCRA violation in consumer's lawsuit against both). The existence of these statutory duties to consumers does not translate into a common law obligation to Ameriquest, particularly where no such obligation is contemplated by the statute itself. Based on our review of the statute, its purposes and available interpretations, we conclude that there is no compelling reason to extend federal common law, as described in *Texas Industries, Inc.*, to create an action for contribution or indemnification under the FCRA in this case.[12] Accordingly, Ameriquest's Fifth and

---

[12] "[A]lthough the decision in *Texas Industries* only addressed the right of contribution, the legal framework established . . . has been extended to indemnification." *Kudlicki*, 2006 WL 1308617, at *3.

Sixth Claims are dismissed with prejudice for failure to state a claim.[13]

### C.      *Tort Claims*

#### 1.      *Choice-of-Law Considerations*

Before addressing the sufficiency of the Seventh and Eighth Claims of the Third-Party Complaint, we must identify which state's substantive law should apply to these tort claims. According to the Third-Party Complaint, Ameriquest is a California corporation and Third-Party Defendants are Georgia entities with their principal places of business in Georgia. (Compl. ¶¶ 1, 3-5.) Both parties cite Georgia law in their briefs, apparently in accordance with the choice of law provision of the Subscriber Agreement. (*See* ChoicePoint Mot., Ex. A ¶ 7.) As Ameriquest correctly points out, because we cannot rely on the terms of the Subscriber Agreement at this juncture, we also may not assume that Georgia law governs.[14] (*See* Resp. to ChoicePoint Mot. at

---

[13] ChoicePoint relatedly contends that the FCRA's exclusion of indemnification and contribution claims also bars Ameriquest's contract and tort claims. (ChoicePoint Mot. at 4-6). Although this argument has some intuitive appeal, ChoicePoint has not offered (and we have been unable to locate) any authority mandating that we foreclose Ameriquest's remaining claims. We find the non-binding opinions cited by ChoicePoint unpersuasive, particularly as they interpret different federal statutes with different purposes. While we decline to extend federal common law to permit indemnification and contribution, as above, we do not hold that Ameriquest's remaining claims necessarily fail as ChoicePoint argues, as they could be based on independent obligations arising under contract or state common law. Whether those claims can succeed on such separate grounds remains to be seen.

[14] The Subscriber Agreement submitted by Third-Party Defendants provides that: "This Agreement will be governed solely by the internal laws of the State of Georgia, without regard to principles of conflicts of law." (ChoicePoint Mot., Ex. A ¶ 7.) Even if we considered this provision, it does not explicitly govern these tort disputes, but merely the Subscriber Agreement. *Walker v. Bankers Life & Cas. Co.*, No. 06-6906, 2007 WL 967888, at *3 (N.D. Ill. Mar. 28*,* 2007) (stating that "choice of law clauses do not govern tort claims unless it is clear this was the parties' intent"); *see Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862-63 (N.D. Ill. 2002). An exception might apply to the extent that the tort claims are dependent on the Subscriber Agreement, or an agreement with similar language. *Walker*, 2007 WL 967888, at *3; *Medline Indus. Inc.*, 230 F. Supp. 2d at 862-63. This exception is of no consequence here,

3, n.1.)

"When a federal court applies state law, it uses the choice of law principles of its forum state" – here, Illinois – to determine what substantive law controls. *Huthwaite v. Randstad Gen'l P'ship (US), L.L.C.*, No. 06-1548, 2006 WL 3065470, at *2 (N.D. Ill. Oct. 24, 2006); *see Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915-16 (7th Cir. 2006); *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995); *Clark v. Experian Info. Sys., Inc.*, No. 03-7882, 2005 WL 1027125, at *2 (N.D. Ill. Apr. 26, 2005). The Illinois Supreme Court recently stressed that "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 2007 WL 4200826, at *4 (Ill. Nov. 29, 2007); *Allianz Ins. Co. v. Guidant Corp.*, 373 Ill. App. 3d 652, 658, 869 N.E.2d 1042, 1049 (2d Dist. 2007) ("Choice-of-law considerations are not implicated unless there is an actual conflict of law among the various states with an interest in a particular dispute."); *see Clark*, 2005 WL 1027125, at *2; *In re Aircrash Disaster Near Roselawn*, 948 F. Supp. 747, 750 (N.D Ill. 1996). Illinois choice-of-law principles dictate that, in the absence of an actual conflict, Illinois substantive law shall govern as the law of the forum. *SBC Holdings, Inc. v. Travelers Cas. & Sur. Co.*, 374 Ill. App. 3d 1, 13, 872 N.E.2d 10, 21 (1st Dist. 2007); *see Clark*, 2005 WL 1027125, at *2.

Accordingly, we reviewed the relevant common laws of Georgia, California and Illinois and are satisfied that no conflict exists.[15] Each state employs substantively similar tests for negligent

---

however, because we evaluate Ameriquest's tort claims on principles settled in both Georgia and Illinois law.

[15] Neither the Third-Party Complaint, nor the parties' briefs, suggest that any other state's law might be relevant to the choice-of-law analysis.

-13-

misrepresentation[16] and negligence.[17]  Each state recognizes the economic loss doctrine, raised by

Third-Party Defendants, which "requires a purchaser to recover in contract for purely economic loss

due to disappointed expectations, unless he can demonstrate harm above and beyond a broken

contractual promise." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988, 102 P.3d

268, 272 (Cal. 2004).  These three states also recognize a relevant exception to the economic loss

doctrine whereby:

> one who supplies information during the course of his business . . . or in any transaction in
> which he has a pecuniary interest has a duty of reasonable care and competence to parties
> who rely upon the information in circumstances in which the maker was manifestly aware
> of the use to which the information was to be put and intended that it be so used.

*City of Cairo v. Hightower Constr. Eng'rs, Inc.*, 278 Ga. App. 721, 729, 629 S.E.2d 518, 525 (Ga.

App. Ct. 2006) (quoting *Holloman v. D.R. Horton Inc.*, 241 Ga. App. 141, 147-48, 524 S.E.2d 790

(Ga. App. Ct. 1999).[18]  Finally, in each state, "a misrepresentation of the law is ordinarily not

---

[16] Authorities describing the *prima facie* case for negligent misrepresentation include: *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 243-44, 70 Cal. Rptr. 3d 199, 213 (2d Dist. 2007); *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 475-76, 481-82, 131 Cal. Rptr. 2d 885 (2d Dist. 2003); *J.E. Black Constr. Co., Inc. v. Ferguson Enters., Inc.*, 284 Ga. App. 345, 348, 643 S.E.2d 852, 855 (Ga. App. Ct. 2007); *Saye v. Unumprovident Corp.*, No. 06-1487, 2006 WL 2850432, at \*3-4 (N.D. Ga. Oct. 2, 2006); *Bd. of Educ. of City of Chi. v. A,C & S, Inc.*, 131 Ill. 2d 428, 452-53, 546 N.E.2d 580, 591-92 (Ill. 1989)*; Kopley Group V, L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1017-18, 876 N.E.2d 218, 228-29 (1st Dist. 2007).

[17] Authorities describing the *prima facie* case for negligence include: *Ladd v. Cty. of San Mateo*, 12 Cal. 4th 913, 917, 50 Cal. Rptr. 2d 309, 311 (Cal. 1996); *Gilmer v. Ellington*, 159 Cal. App. 4th 190, 70 Cal. Rptr. 3d 893, 896-97 (2d Dist. 2008); *La Quinta Inns, Inc. v. Leech*, Nos. 07-2432 & 2433, 2008 WL 204859, at \*3 (Ga. Ct. App. Jan. 25, 2008); *Hudson v. Swain*, 282 Ga. App. 718, 721, 639 S.E.2d 319, 321 (Ga. Ct. App. 2006); *Adams v. N. Ill. Gas Co.*, 211 Ill. 2d 32, 43-44, 809 N.E. 2d 1248, 1257 (Ill. 2004); *Shank v. H.C. Fields*, 373 Ill. App. 3d 290, 292, 869 N.E.2d 261, 265 (4th Dist. 2007).

[18] Additional authorities describing the economic loss doctrine and its exceptions include: *Vision Tech. Design & Manuf., Inc. v. Gen'l Wire Spring Co.*, No. 07-412, 2008 WL 323958, at \*10 (E.D. Cal. Feb. 5, 2008); *Robinson Helicopter Co., Inc.*, 34 Cal. 4th at 988-91, 102 P.3d at

actionable." *Saye v. Unumprovident Corp.*, No. 06-1487, 2006 WL 2850432, at *3-4 (N.D. Ga. Oct. 2, 2006).[19]  Given the similarities in the pertinent law, we conclude that no conflict exists and will apply Illinois law.


### 2.    *Negligent Misrepresentation*

To state a claim for negligent misrepresentation under Illinois law, a plaintiff must allege: (1) "a false statement of material fact;" (2) "intention to induce the other party to act;" (3) "action by the other party in reliance on the truth of the statement[];"(4) "damage to the other party resulting from such reliance;" and (5) "the defendant's own carelessness or negligence in ascertaining the truth of the statement."  *Kopley Group V, L.P.*, 376 Ill. App. 3d at 1017, 876 N.E.2d at 228.  In addition, "[a] successful plaintiff must plead . . . that defendant owes a duty to the plaintiff to communicate accurate information."  *Id.*; *see First Midwest Bank, N.A.*, 218 Ill. 2d at 334-35, 843

---

272-75; *Jewelers Mut. Ins. Co. v. Firstar Bank Ill.*, 341 Ill. App. 3d 14, 22-23, 792 N.E.2d 1, 7-8 (1st Dist. 2003); *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 311-12, 773 N.E.2d 84, 94-95 (1st Dist. 2002).  We note that discussion of the economic loss doctrine is related to and often intertwined with the *prima facie* case for negligent misrepresentation.  Regardless of the precise formulation, the case law in these three jurisdictions generally provides that the extracontractual duty necessary to circumvent the economic loss doctrine and to state a claim for misrepresentation can arise where the offending party conveyed false information "in a commercial setting for a business purpose."  *Friedman*, 107 Cal. App. 4th at 477, 481, 131 Cal. Rptr. 2d at 885; *see First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 335, 843 N.E.2d 327, 332 (Ill. 2006).

[19] Additional authorities describing the use of misrepresentations of law as a basis for a fraud claim include: *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004); *Haviland v. S. Cal. Edison Co.*, 172 Cal. 601, 608, 158 P. 328, 331 (Cal. 1916); *Robbins v. Nat'l Bank of Ga.*, 241 Ga. 538, 543, 246 S.E.2d 660, 664 (Ga. 1978); *Capitol Materials, Inc. v. Kellogg & Kimsey, Inc.*, 242 Ga. App. 584, 586, 530 S.E.2d 488, 490 (Ga. App. Ct. 2000); *Hoseman v. Weinschneider*, 322 F.3d 468, 476 n.2 (7th Cir. 2003); *Landmark Ford, Inc. v. Di Benedetto*, No. 94-6752, 1995 WL 591442, at *2 (N.D. Ill. Oct. 4, 1995); *Elipas Enters., Inc. v. Silverstein*, 243 Ill. App. 3d 230, 236-37, 612 N.E.2d 9, 13-14 (1st Dist. 1993).

N.E.2d at 332; *A,C & S, Inc.*, 131 Ill. 2d at 452, 546 N.E.2d at 591.

Here, Ameriquest alleges that Third-Party Defendants represented their "experience using and developing the direct-mail programs, processes, systems, models, the Consumer Lists, and firm offer Letters they sold to Ameriquest." (Compl. ¶ 77.)  They further "represented to Ameriquest that they were aware of the requirements of imposed by FCRA that pertain to the making of firm offers of credit and/or clear and conspicuous disclosures, and that the services they provided to Ameriquest were compliant with such requirements." (*Id.*)  Third-Party Defendants also "provided assurances to Ameriquest that the Letters were compliant with FCRA," having full knowledge that Ameriquest would use their services to implement the Direct Mail Program. (*Id.*)  Ameriquest alleges that "[i]n the event that the Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then at the time the Third-Party Defendants made these representations, they knew, or should have known, that they were materially false," based on their experience in the direct-mail marketing field. (*Id.* ¶ 78.)  Ameriquest also alleges that Third-Party Defendants made these statements to "induce Ameriquest to enter into the various oral and written agreements" and to use their services, "for which Ameriquest would pay . . . substantial fees." (*Id.* ¶ 79.)  Finally, Ameriquest alleges reasonable reliance on these representations and that "[i]n the event that Ameriquest is found liable to the Non-Borrower Plaintiffs . . . then as a direct and proximate result of [these misrepresentations], Ameriquest will have suffered damages." (*Id.* ¶ 81.)

We first consider whether Ameriquest sufficiently alleges that ChoicePoint or Equifax owed it a duty to communicate accurate information.  Third-Party Defendants contend that the economic loss doctrine bars Ameriquest's tort claims because it has not alleged any extracontractual duty. (ChoicePoint Mot. at 12-13; Equifax Mot. at 13-14.)  Under Illinois law, claims of negligent

misrepresentation can succeed, despite the economic loss doctrine, "if [the defendant] is in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank, N.A.*, 218 Ill. 2d at 335, 843 N.E.2d at 332; *Brogan v. Mitchell Int'l, Inc.*, 181 Ill. 2d 178, 183, 692 N.E.2d 276, 278 (Ill. 1998) (identifying recognized circumstances where a duty to communicate accurate information arises); *see Kemper/Prime Indus. Partners v. Montgomery Watson Ams., Inc.*, 487 F.3d 1061, 1063-64 (7th Cir. 2007). Determining whether "a particular enterprise is in the business of supplying information for the guidance of others in their business transactions . . . [involves] a 'precise, case-specific inquiry.'" *Prime Leasing, Inc.*, 332 Ill. App. 3d at 311, 773 N.E.2d at 94 (quoting *Rankow v. First Chi. Corp.*, 870 F.2d 356, 361 (7th Cir. 1989)). Keeping in mind the Rule 12(b)(6) standard, we reasonably infer from Ameriquest's allegations regarding Third-Party Defendants' activities as credit reporting agencies that they are plausibly "in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank, N.A.*, 218 Ill. 2d at 335, 843 N.E.2d at 332. As a result, Ameriquest has alleged sufficiently that Third-Party Defendants had a duty to provide it accurate information. *See United Labs., Inc. v. Savaiano*, No. 06-1442, 2007 WL 4162808, at *7 (N.D. Ill. Nov. 19, 2007).

We next determine whether Ameriquest alleges a misrepresentation of material fact. Ameriquest states that Third-Party Defendants misrepresented their understanding of and compliance with the FCRA's requirements. (*Id.* ¶ 77.) Ameriquest further complains that Third-Party Defendants "provided assurances to Ameriquest that the Letters were compliant with FCRA," which constitute misrepresentations "[i]n the event that Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact." (*Id.*) In other words, if Ameriquest is held liable for FCRA violations – i.e., if the Letters do not constitute firm offers of credit, or if

Ameriquest failed to provide required disclosures or adverse action notices – then Third-Party Defendants' assurances were false.

ChoicePoint contends that these allegations are not actionable, and Ameriquest did not respond to this argument. (ChoicePoint Mot. at 13-14.) "As a general rule, one is not entitled to rely upon a misrepresentation of law since both parties are presumed to be equally capable of knowing and interpreting the law." *City of Aurora v. Green*, 126 Ill. App. 3d 684, 688, 467 N.E.2d 610, 613 (2d Dist. 1984); *see Hoseman*, 322 F.3d at n.2 (stating that "[a] misrepresentation as to the law cannot give rise to a claim of fraudulent inducement"); *see, e.g., Haviland*, 172 Cal. at 608, 158 P. at 331 ("Whether the true ground for the rule be that everyone is presumed (or rather, bound) to know the law, or that a representation regarding the law constitutes an . . . opinion upon which the [other] party . . . has no right to rely, the rule itself is thoroughly well settled."). Third-Party Defendants' unspecified representations and assurances about the legality of the Letters plainly concern a matter of law and cannot support this claim.

Nonetheless, Ameriquest has also alleged that Third-Party Defendants misrepresented their "experience using and developing the direct-mail programs, processes, systems, models, the Consumer Lists, and firm offer Letters they sold to Ameriquest." (Compl. ¶ 77.) According to the Third-Party Complaint, ChoicePoint and Equifax further misrepresented their awareness of FCRA requirements relevant to their dealings with Ameriquest. (*Id.*) These alleged misrepresentations concern past and/or existing facts, rather than law or opinion. As such, Ameriquest's negligent misrepresentation claim can proceed on these alleged statements.[20]

---

[20] Third-Party Defendants do not challenge the materiality of the alleged misrepresentations. "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected

-18-

### 3. Negligence

Even assuming that the economic loss doctrine does not bar Ameriquest's negligence claim, we conclude that the Eighth Claim nonetheless cannot stand. "To prevail in an action for negligence, the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach." *Adams*, 211 Ill. 2d at 43, 809 N.E. 2d at 1257. "Duty is a question of whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* at 44, 809 N.E. 2d at 1257. The existence of a duty owed to the plaintiff by the defendant is thus the cornerstone of a negligence action, and as Third-Party Defendants point out, it is absent here.

In the Third-Party Complaint, Ameriquest alleges that, "as . . . credit reporting agenc[ies] developing and generating the Consumer Lists for Ameriquest's use, [Third-Party Defendants] had a duty to property develop and generate such items." (Compl. ¶ 84.) In doing so, Third-Party Defendants also bore a duty "to further Ameriquest's interests, and to avoid conduct which could expose Ameriquest to legal action." (*Id.*) According to Ameriquest, this duty included an obligation to "follow any and all federal laws relating to identifying/contacting customers who would qualify for prescreened credit in connection with mortgage loans" and "relating to the making of firm offers of credit and clear and conspicuous disclosures under FCRA." (*Id.*) Ameriquest alleges that:

---

to rely in making a decision." *Wernikoff v. Health Care Serv. Corp.*, 376 Ill. App. 3d 228, 233-34, 877 N.E.2d 11, 16 (1st Dist. 2007). Although Third-Party Defendants generally argue that the Third-Party Complaint lacks sufficient facts to state a claim, we disagree and note that negligent misrepresentation claims need not be pled with specificity. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLC*, 475 F.3d 824, 839, n.10 (7th Cir. 2007) (evaluating negligent misrepresentation claim "according to the pleading requirements of Rule 8, not the heightened pleading requirements of Rule 9").

in the event that the allegations in the Non-Borrower Complaint are proven to be true, then [Third-Party Defendants] breached their respective duties to Ameriquest, in that they negligently failed to follow the criteria and rules set forth in FCRA in performing the above-mentioned obligations . . . and further failed to exercise due care and comply with applicable standards of care in their respective fields.

(*Id.* ¶ 87.)

Third-Party Defendants contend that this claim fails because Ameriquest has not alleged that they owe it any extracontractual duty. (ChoicePoint Mot. at 12-13; Equifax Mot. at 12-14.) Ameriquest responds that, in addition to the breach of contract, Third-Party Defendants "breached [their] separate and distinct dut[ies] under the FCRA and case law . . . to exercise reasonable care when disseminating consumer information to ensure that the parties (like Ameriquest) who receive such information are complying with FCRA's permissible purpose requirements." (Resp. to ChoicePoint Mot. at 14.) As discussed earlier, however, Third-Party Defendants' obligations under the FCRA create duties they owe to consumers, not to Ameriquest. This alleged duty under the FCRA to properly develop and generate the Consumer Lists does not exist for the benefit of Ameriquest. Moreover, Third-Party Defendants' purported duty "to further Ameriquest's interests" must arise under the parties' contracts, if anywhere. Ameriquest has not alleged how the FCRA, or any state statute or common law, gives rise to such a duty. In sum, Ameriquest alleges duties that arise under either the FCRA or applicable contracts, neither of which can serve as the basis of a negligence claim in these circumstances.[21] As a result, we dismiss this claim without prejudice.

### D. Rescission

In its Ninth Claim, Ameriquest seeks rescission of its unspecified contract(s) with Third-

---

[21] To the extent that the Third-Party Complaint alleges a duty to provide accurate information, any breach of that duty may be remedied via the negligent misrepresentation claim, which as discussed above is excepted from the economic loss doctrine.

Party Defendants, based on their alleged misrepresentations. (Compl. ¶¶ 90-92.) Ameriquest claims that, "[i]n the event that Non-Borrower Plaintiffs' allegations in the Non-Borrower Complaint are found to be true by a trier of fact, then the foregoing representations by Third-Party Defendants were materially false, and falsely induced Ameriquest to enter into" relationships with them. (*Id*. ¶ 92.) Third-Party Defendants ask that we dismiss this claim for various substantive and procedural reasons found in Georgia law. (ChoicePoint Mot. at 14-15; Equifax Mot. at 15-17.)

Ameriquest did not counter any of the arguments presented by Third-Party Defendant. Rather, despite having relied on Georgia law earlier in its brief, Ameriquest merely responded that "the sufficiency of this claim may not be determined under Georgia law at this stage." (Resp. to ChoicePoint Mot. at 14; Resp. to Equifax Mot. at 12.) Although Ameriquest did not indicate what state's law should be controlling, we nonetheless agree that a choice-of-law analysis is required before we can determine the sufficiency of the rescission allegations. It is unclear whether a choice-of-law provision contained in any particular contract might cover a rescission claim. Furthermore, and unlike the tort claims, we perceive certain potentially dispositive differences between state laws with respect to the equitable remedy of rescission. Accordingly, we deny the motions to dismiss as to the Ninth Claim without prejudice, but we can revisit this issue as appropriate.

## CONCLUSION

For the reasons set forth above, we deny ChoicePoint's and Equifax's motions to dismiss (Docket Nos. 1044 and 1062) with respect to the Second, Third and Fourth Claims, which allege breach of contract. We further deny the motions as to the Seventh Claim (negligent misrepresentation) and the Ninth Claim (rescission). We grant the motions as to the Fifth and Sixth Claims, for indemnification and contribution, and hereby dismiss these claims with prejudice. We

further dismiss the Eighth Claim for negligence without prejudice.  It is so ordered.


MARVIN E. ASPEN
United States District Judge


Date: March 5, 2008