# APPENDIX 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC SMITH and GUILLERMINA YANONG, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 05 C 0648 |
| v. ) | |
| ) | Judge Andersen |
| AMERIQUEST MORTGAGE COMPANY, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS

Defendant, Ameriquest Mortgage Company ("Ameriquest"), submits its response to Plaintiffs' first request for admissions.

### General Objections

1. Ameriquest objects to the requests to the extent that they purport to seek information for the time period January 21, 2002, to the present, in that the time period is overly broad and seeks information which is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.

2. Ameriquest objects to the requests as harassing, in that many requests duplicate the allegations of Plaintiff's complaint to which Ameriquest has already filed an answer.

### Requests for Admissions

1. Plaintiff owns and resides in a home at 1844 South 60th Court, Cicero, Illinois, 60804.

**RESPONSE:** Ameriquest further objects to the term "plaintiff" as vague, as there are two Plaintiffs in this action. Ameriquest cannot admit or deny the request. Ameriquest has made reasonable inquiry, and the information known or readily available is insufficient to enable Ameriquest to admit or deny the allegations in this request, as the allegations relate to facts exclusively within the knowledge of Plaintiffs.

2. Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

**RESPONSE:** Ameriquest admits that it is a corporation incorporated in a state other than Illinois and that it does business in Illinois. Ameriquest admits the allegations in the second sentence in this request. Ameriquest denies any remaining allegations in this request.

3. Ameriquest is engaged in the business of originating and servicing "subprime" mortgages and originates more than 26 loans per year.

**RESPONSE:** Ameriquest further objects to the term "subprime" as vague. Ameriquest admits that it is engaged in the business of originating and servicing loans, secured by mortgages, and that it originates more than 26 loans per year. Ameriquest denies the remaining allegations in this request.

4. Prior to February 20, 2002, plaintiff applied for a residential mortgage loan with Ameriquest, to be secured by her residence.

**RESPONSE:** Ameriquest further objects to the terms "plaintiff" and "her" as vague, as there are two Plaintiffs in this action. Ameriquest admits that Plaintiff Guillermina Yanong, prior to February 20, 2002, applied for a loan, to be secured by a mortgage. Ameriquest cannot admit or deny the allegations in this request regarding residence. Ameriquest has made reasonable inquiry, and the information known or readily available by Ameriquest is insufficient to enable it to admit or deny the allegations in this request regarding residence, as the allegations regarding residence relate to facts exclusively within the knowledge of Plaintiffs. Ameriquest denies the remaining allegations in this request.

5. Plaintiff used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**RESPONSE:** Ameriquest further objects to the term "plaintiff" as vague, as there are two Plaintiffs in this action. Ameriquest cannot admit or deny this request. Ameriquest has made reasonable inquiry and the information known or readily available by Ameriquest is

2

insufficient to enable Ameriquest to admit or deny this request, as the allegations related to facts exclusively within the knowledge of Plaintiffs.

6. The loan was closed on February 20, 2002.

**RESPONSE:** Ameriquest admits the allegations in this request.

7. The documents described below are true and accurate reproductions of documents received by plaintiff in connection with the residential mortgage loan he received:

    a. Note, Exhibit A;

    b. Mortgage, Exhibit B;

    c. A Truth in Lending disclosure statement, Exhibit C;

    d. Two different notices of right to cancel, Exhibits D and E;

    e. A settlement statement on form HUD-1A, Exhibit F;

**RESPONSE:** Ameriquest further objects to the term "plaintiff" and "he" as vague, as there are two Plaintiffs in this action. Ameriquest admits that, in connection with the loan transaction, Plaintiff Guillermina Yanong alone or Plaintiffs collectively received and signed a note, a mortgage, a Truth in Lending disclosure statement, several copies of a notice of right to cancel, several copies of a document entitled "one week cancellation period," and a settlement statement. Ameriquest affirmatively states that Exhibits A, B, C, D, and E appear to be copies, some incomplete copies, of a portion of the documents received and signed by Plaintiffs. Ameriquest denies that Exhibits D and E constitute two different notices of right to cancel. Ameriquest denies the remaining allegations in this request.

8. The payment schedule on Exhibit C does not expressly state the intervals at which plaintiffs are to make payments.

**RESPONSE:** Ameriquest denies the allegations in this request.

9. The payment schedule on Exhibit C does not expressly state that payments on the loan are to be made monthly.

**RESPONSE:** Ameriquest denies the allegations in this request.

3

10.     The payment schedule on <u>Exhibit C</u> does not expressly state the day of the month that payments are due.

**RESPONSE:**     Ameriquest denies the allegations in this request.

11.     The 7-day right to cancel allegedly conferred by <u>Exhibit D and E</u> is not conferred by TILA.

**RESPONSE:**     Ameriquest further objects to this request as vague. Subject to and without waiving its objections, Ameriquest affirmatively states that the "one week cancellation period" document which Plaintiffs received and signed, a copy of which is attached as Exhibit E to Plaintiffs' first discovery requests, provides a right to cancel to Plaintiffs. Ameriquest admits that the length of the right to cancel provided to Plaintiffs by the "one week cancellation period" document received and signed by Plaintiffs is greater than the right to cancel conferred by the federal Truth in Lending Act. Ameriquest denies the remaining allegations in this request.

12.     The 7-day right to cancel allegedly conferred by <u>Exhibit D and E</u> does not offer or provide the same remedies as TILA.

**RESPONSE:**     Ameriquest further objects to this request as vague. Subject to and without waiving its objections, Ameriquest affirmatively states that the "one week cancellation period" document which Plaintiffs received and signed, a copy of which is attached as Exhibit E to Plaintiffs' first discovery requests, provides a right to cancel to Plaintiffs. Ameriquest denies that Plaintiffs could not have cancelled his loan, within the applicable time-frame, under the "one week cancellation period" document which Plaintiffs received and signed, just as Plaintiffs could have cancelled the loan under the "notice of right to cancel" document which Plaintiffs received and signed. Ameriquest denies the remaining allegations in this request.

Dated: August 5, 2005  AMERIQUEST MORTGAGE COMPANY, Defendant

By: _____
One of its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
Varga Berger Ledsky Hayes & Casey
A Professional Corporation
224 South Michigan Avenue
Suite 350
Chicago, Illinois 60604
(312) 341-9400
(312) 341-2900 (facsimile)

## CERTIFICATE OF SERVICE

I, Jonathan N. Ledsky, an attorney, hereby certify that a true and correct copy of the foregoing **Defendant's Response to Plaintiffs' First Request for Admissions**, was served upon:

Al Hofeld, Jr.
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603

by messenger delivery, properly addressed and fully prepaid, this 5th day of August, 2005, on or before the hour of 5:00 p.m.

_____
Jonathan N. Ledsky

5

# APPENDIX 15

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603-3403
(312) 739-4200
(800) 644-4673
(312) 419-0379 (FAX)
Email: edcombs@aol.com
www.edcombs.com

January 28, 2005

**BY MESSENGER**

Ameriquest Mortgage Corporation
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606

      Re:  Notice of rescission, claim and lien, Eric Smith and Guillermina Yanoung, 1844 South 60th Court, Cicero, Illinois, loan of February 20, 2002.

Ladies/ Gentlemen:

  The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act, in that the payment schedule was not fully disclosed and borrowers were given two, different and confusing types of notices of right to cancel.

  Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

  If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to 15 U.S.C. §1641(d).

  Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

           Sincerely,

           Daniel A. Edelman

cc: clients

      I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on.

_____
Daniel A. Edelman

# APPENDIX 16

# VARGA BERGER LEDSKY HAYES & CASEY
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

SANTA FE BUILDING
224 SOUTH MICHIGAN AVENUE
SUITE 350
CHICAGO, ILLINOIS 60604-2507

TELEPHONE: 312-341-9400
FACSIMILE: 312-341-2900

February 17, 2005

CRAIG A. VARGA
(312) 341-9820

cvarga@vblhc.com

**VIA FACSIMILE & U.S. MAIL**

Mr. Al Hofeld, Jr.
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603

Re: Notice of rescission, claim and lien, Eric Smith and Guillermina Yanoung, 1844 South 60th Court, Cicero, Illinois, loan of February 20, 2002

Dear Al:

We are in receipt of the attached letter (dated January 28, 2005) which was served on our client Ameriquest Mortgage Company's registered agent on January 28, 2005. The letter seeks rescission of a loan made by Ameriquest to Eric Smith and Guillermina Yanoung.

We are also aware that on February 3, 2005, a lawsuit was filed on behalf of Eric Smith and Guillermina Yanoung against Ameriquest (Ameriquest's registered agent was served with the Complaint in that action on February 7, 2005). The filing of the suit less than a week after service of the rescission letter suggests an indifference to Ameriquest making any substantive review of the matter.

In any event, Ameriquest disagrees with the contentions made in the letter as to the alleged Truth in Lending Act violations. Accordingly, Ameriquest declines the rescission request as to the bases asserted in the letter. Ameriquest will further details its positions, as appropriate, within the context of the lawsuit which Mr. Smith and Ms. Yanoung have elected to initiate. Thank you.

Very truly yours,

Craig A. Varga

CAV:sto
Enclosure

# APPENDIX 17

Case: 1:05-cv-07097 Document #: 2305-9 Filed: 08/22/08 Page 13 of 18 PageID #:26004

JIMENEZ vs. AMERIQUEST                                    NELSON JIMENEZ, 08/30/05

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NELSON JIMENEZ and MELINDA JIMENEZ, )
)
                         Plaintiffs,  )
)
                vs.            )  No.
)
AMERIQUEST MORTGAGE COMPANY,            )
WASHINGTON MUTUAL BANK, FA, and         )
AMC MORTGAGE SERVICES, INC.,            )
)
                         Defendants.  )

    The deposition of NELSON JIMENEZ, called by the Defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before MARGARET R. BEDDARD, a Notary Public within and for the County of Kane, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 350, 224 South Michigan Avenue, Chicago, Illinois, on the 30th day of August, A.D. 2005, at 10:31 a.m.



Case: 1:05-cv-07097 Document #: 2305-9 Filed: 08/22/08 Page 14 of 18 PageID #:26005

NELSON JIMENEZ, 08/30/05            JIMENEZ vs. AMERIQUEST

## Page 14

1    Q. That was your first job in the United
2 States?
3    A. Yes.
4    Q. And what did you do at Ravenswood Hospital?
5    A. Housekeeping.
6    Q. And how long did you have that job?
7    A. Three to four years.
8    Q. And have you had any other jobs while in
9 the United States that you haven't mentioned yet?
10   A. Continental Bank doing nights. I probably
11 stayed there a year.
12   Q. You worked at Continental Bank at night?
13   A. Yeah.
14   Q. What did you do?
15   A. Doing cash letter packaging clerk.
16   Q. And what years did you work for Continental
17 Bank?
18   A. '80 or '81. Then after I do Ravenswood.
19   Q. What did a cash letter packaging clerk do?
20   A. We shipped like those personal checks. We
21 sort them, and we send them back to where they're
22 supposed to be sent. Those personal checks that
23 people issue, it's already been cashed. Then we just
24 sort them and send them to where it's supposed to go.

## Page 15

1    Q. For example, just so I understand what
2 you're saying, when I get my monthly check statement
3 from my bank, it has my negotiated checks -- or it
4 used to at least until about a year ago. Is that
5 what you're saying you did? You sorted checks and
6 then mailed these canceled checks back to the
7 customer?
8    A. No. We had bunch of them, boxes. It's
9 supposed to go to the bank, whoever owns that checks.
10   Q. How would you sort them?
11   A. We have one of those -- There's a number.
12 It was a long time ago. I stayed there a year. I
13 don't remember. I'm doing all night and then pull
14 out the checks that not belong there. Like put in
15 order. Then we send it to another department. They
16 just take care of the rest of it.
17   Q. You sorted them by what criteria?
18   A. Let's say those -- Let's say LaSalle Bank,
19 for example. People have checks by LaSalle Bank.
20 All LaSalle Bank -- We put all LaSalle here. Let's
21 say different -- All the checks that belong to
22 LaSalle goes here. Something like that.
23   Q. I see.
24      Okay. Did you have any special training

## Page 16

1 for this job?
2    A. No.
3    Q. Did you work anywhere before working at
4 Continental Bank?
5    A. Here in America, no.
6    Q. So that was your first job?
7    A. Ravenswood and Continental, same time.
8    Q. Okay. And so you've had five jobs since
9 you've been in the United States by my count,
10 Continental Bank, Ravenswood, the Filipino
11 restaurant, and then two jobs at Chicago Read Mental
12 Health Center; is that correct?
13   A. I didn't include one. I work at Folled
14 Publishing Group. But it was part-time work.
15   Q. Folled?
16   A. Folled, F-o-l-l-e-d.
17   Q. Folled Publishing?
18   A. Yes.
19   Q. What did you do for them?
20   A. Less than six months back in '83, I think.
21   Q. What did you do there?
22   A. I do order picking. Order picking.
23   Q. What's order picking?
24   A. Order peeler. There's an order. You peel

## Page 17

1 up the order.
2    Q. You would get an order, and then you would
3 find the book in the warehouse to fill the order?
4    A. Yes.
5    Q. And what years did you do that?
6    A. '82 or '83.
7    Q. Okay. I met your wife outside.
8      Are you married?
9    A. Yes.
10   Q. Okay. And have you ever been married
11 before this time?
12   A. No.
13   Q. Okay. And do you have children?
14   A. Yes.
15   Q. How many?
16   A. Three.
17   Q. And what are their ages?
18   A. 18, 17, and 5.
19   Q. Okay. And they all live with you at home?
20   A. Yes.
21   Q. You said you've lived at this Lilac Drive
22 address in Romeoville for about three years; is that
23 correct?
24   A. We move in 2001. More than three years

Case: 1:05-cv-07097 Document #: 2305-9 Filed: 08/22/08 Page 15 of 18 PageID #:26006

MENEZ vs. AMERIQUEST                                    NELSON JIMENEZ, 08/30/05

Page 18

1 maybe. More than three years now.
2    Q. Okay. When did you move in?
3    A. February 2001. I don't remember the date.
4    Q. February 2001 is an approximate date?
5    A. Yeah.
6    Q. Okay. Did you buy the house then?
7    A. Yes.
8    Q. Okay. Had you ever owned property before
9 then?
10   A. Yes. I sold the old house to buy the new
11 one.
12   Q. Okay. How many houses have you owned?
13   A. What do you mean by that? At the same
14 time?
15   Q. I mean, you've mentioned two.
16   A. Yeah, two.
17   Q. Have you owned any other houses?
18   A. No.
19   Q. Have you owned additional property at any
20 time?
21   A. No.
22   Q. Have you owned property that you haven't
23 lived in?
24   A. No.

Page 19

1    Q. So you've owned two houses?
2    A. Yeah.
3    Q. Okay. And when did you buy the first
4 house?
5    A. That was in 1996.
6    Q. And where was that?
7    A. Here in Chicago. North side. Northwest
8 side.
9    Q. And what made you move from the northwest
10 side of Chicago to Romeoville?
11   A. We needed a bigger house, I believe,
12 because the one we got is smaller.
13   Q. Okay. Before you bought your first house
14 in 1996 did you look at various houses before you
15 decided on the one you bought?
16   A. Yes.
17   Q. What were some of the factors that went
18 into your decision to buy the particular house that
19 you bought rather than some of the other ones that
20 you had looked at?
21   A. The neighborhood, I believe. It's nearest
22 to the school.
23   Q. What school was that?
24   A. Smyser. The Smyser School.

Page 20

1    Q. Miser School?
2    A. Smyser, S-m-y-s-e-r. That's elementary
3 school.
4    Q. Is that a public school or a private
5 school?
6    A. Public.
7    Q. And why did you want to be near that
8 school?
9    A. Well, I think for convenience. Close to my
10 house. Close to where I work.
11   Q. Other than the neighborhood, was there
12 anything else that you were looking for in a
13 particular house?
14   A. No.
15   Q. Was price important to you?
16   A. Yeah, that's one too.
17   Q. And how did you decide how much you could
18 spend to buy a house?
19   A. We were a first-time buyer. You need only
20 about 5 percent.
21   Q. 5 percent for what?
22   A. Of the amount of the house you're looking
23 for.
24   Q. So you put a down payment of 5 percent?

Page 21

1    A. Yes.
2    Q. And you're going to borrow the rest?
3    A. Yes.
4    Q. Okay. And did you know how much a loan
5 would cost to borrow the rest?
6    A. Yes.
7    Q. And how did you know that?
8    A. Through reading. Through studying.
9    Q. What did you study?
10   A. I look at the magazines or any kind of
11 periodicals about how to -- how to buy a house.
12   Q. So you did your --
13   A. Stuff like that.
14   Q. You did your research before you did it?
15   A. Yeah.
16   Q. And so you had an idea of how much a loan
17 might cost you for the 95 percent that you were
18 borrowing?
19   A. Yes.
20   Q. Did you know that as a payment amount or as
21 an interest rate? How did you look at that?
22      Do you understand my question?
23   A. Can you repeat that?
24   Q. Sure. If there's ever a time that you

Case: 1:05-cv-07097 Document #: 2305-9 Filed: 08/22/08 Page 16 of 18 PageID #:26007

RIQUEST JIMENEZ vs. AMERIQUEST | NELSON JIMENEZ, 08/30/05

Page 74

1  $6,000 in one year. 5 to 6,000 a year.
2  Q. The value of your property went up?
3  A. No. The property tax. The tax that you
4  pay for the house.
5  Q. Oh, okay. So it went from about $2,000
6  when you bought the house to 5 or --
7  A. 5 to 6.
8  Q. 5 or 6 in one year?
9  A. Yes.
10  Q. Okay. And what did -- How did you learn
11  about that?
12  A. When I got the statement from Fifth Third
13  and they got the escrow. They said I still owed them
14  because the property changed. I had to pay them
15  this. But at that time I couldn't afford it, so I
16  decided to refinance it.
17  Q. Okay. And what did you do once you made
18  that decision to refinance?
19  A. At that time I'm going to be short if I pay
20  that property tax right away. If I refinance it,
21  that's going to lower my monthly payment, too.
22  Q. I understand that.
23     My question is, you decided you wanted to
24  refinance the loan; is that correct?

Page 75

1  A. Yeah.
2  Q. Okay. What did you do?
3  A. I had to get some money to pay the property
4  tax. I was going to be a little low then. I have to
5  refinance it.
6  Q. Did you attempt to refinance with
7  Fifth Third Bank?
8  A. Yeah, at first. But they giving me a
9  higher rate.
10  Q. What kind of rate did they offer you?
11  A. Something 8. 8 percent. Around there.
12  Q. 8 percent or higher?
13  A. Yeah.
14  Q. Okay. So what did you do next after you
15  decided not to refinance with Fifth Third?
16  A. I consider refinancing to another
17  company -- to another financing company.
18  Q. Did you approach other companies?
19  A. No.
20  Q. What did you do?
21  A. Just reading their brochure or what they
22  sent through the mail. I just read that.
23  Q. Do you ever look at the newspapers I think
24  on Fridays or on Sundays? There's a chart of people

Page 76

1  in the home section of people who offer
2  refinancings -- companies that offer refinancings.
3  Did you ever look at that?
4  A. Yes.
5  Q. To see what various interest rates were?
6  A. Yes.
7  Q. Okay. Did you contact your friend -- or
8  the person at Diamond Mortgage to see if they could
9  refinance?
10  A. Yeah. I tried the guy from mortgage --
11  from Diamond Mortgage. Yes, I did.
12  Q. And what did he do?
13  A. He checked my credit first.
14  Q. And what happened?
15  A. He told me I couldn't get a better rate
16  because of my credit -- those credit obligations.
17  Q. He couldn't get you a better rate than
18  what?
19  A. Than the average rate. It was supposed to
20  be around 6 percent. I always get about 2 percent
21  higher than 6.
22  Q. Okay. So could he -- Could he offer you
23  financing at Diamond Mortgage?
24  A. He tried. He said, "You're going to be

Page 77

1  higher. You're going to have to pay higher interest
2  rate."
3  Q. Okay. So what did you do then?
4  A. I called Ameriquest.
5  Q. You called Ameriquest?
6  A. Yes.
7  Q. And you had Ameriquest's telephone number
8  how?
9  A. Through the mail. I think they send me
10  through those ads.
11  Q. Before you called Ameriquest you said you
12  had contacted Fifth Third Bank; is that correct?
13  A. Yes.
14  Q. And you had contacted Diamond Mortgage; is
15  that correct?
16  A. Yes.
17  Q. Had you contacted anybody else before you
18  called Ameriquest in pursuit of a new loan?
19  A. Yeah, I believe so.
20  Q. Who had you called?
21  A. I called this guy. I don't remember this
22  guy, you know. But I called him, and he called back.
23  But then after that I decided not to deal anymore.
24  Then that's it.

Case: 1:05-cv-07097 Document #: 2305-9 Filed: 08/22/08 Page 17 of 18 PageID #:26008

NELSON JIMENEZ, 08/30/05     JIMENEZ vs. AMERIQUEST

Page 78

1   Q. So you called one other person?
2   A. About financing, yes. And he called back.
3 I didn't have a chance to talk to him because I was
4 thinking it might be --
5   Q. How did you get his name?
6   A. Through the ad too. Through the mail.
7   Q. Okay. So Ameriquest was the fourth company
8 that you contacted?
9   A. More likely, yes.
10   Q. Could there have been others?
11   A. I don't remember. But there's a lot of
12 people calling my house about refinancing. I don't
13 remember them all.
14   Q. So you spoke to people who had called your
15 house?
16   A. Yes.
17   Q. And did you discuss specifics with any of
18 them -- you know, what they could do for you?
19   A. Yeah. They tell you lower my monthly
20 payment and stuff like that.
21   Q. Why was it you called Ameriquest?
22   MR. HOFELD: Objection. Asked and answered. He
23 testified why.
24   MR. LEDSKY: I know.

Page 79

1 BY MR. LEDSKY:
2   Q. But you said you got a lot of ads in the
3 mail, is that right, for companies that would
4 refinance you?
5   A. Yes.
6   Q. Okay. Why did you select Ameriquest to
7 call?
8   A. I believe it's a good financing company.
9   Q. And why did you believe that?
10   A. Maybe through their -- You see them on TV.
11 Or like Ditech.com. I thought those are good
12 companies.
13   Q. Do you remember who you spoke to that first
14 time you called them?
15   A. I think -- I talked to a lady at first, but
16 I don't remember.
17   Q. And what -- Do you remember what you said
18 to her and what she said to you?
19   A. I think I told her I'm interested to get a
20 loan -- a refinancing loan.
21   Q. And what did she say to you?
22   A. I think she took some information, my name,
23 address. Something like that.
24   Q. Did you give her any credit information?

Page 80

1   A. Yeah. They asked where I work or something
2 like that, how much I earn.
3   Q. Did you tell her why you wanted to
4 refinance?
5   A. They didn't ask me why I refinance. When
6 they look at your credit, they can tell that you need
7 to refinance.
8   Q. And why did you believe at this time that
9 you did need to refinance?
10   A. Because you're paying too much every month.
11 We want to lower down our monthly payments.
12   Q. When you say you wanted to lower your
13 monthly payments, did you want to lower your payments
14 involving your house or lower your monthly payments
15 involving all of your obligations?
16   A. I believe including the credit cards, yeah.
17   Q. So it was more than just your house
18 payment?
19   A. Yes.
20   Q. So you wanted to lower your credit card
21 payments as well?
22   A. Yes.
23   Q. So your intention was to pay some of these
24 credit card companies so that those payments would be

Page 81

1 lower?
2   A. Yes.
3   Q. Did you convey that -- Did you tell that to
4 the lady during the first Ameriquest telephone call?
5   A. I don't remember.
6   Q. Okay. Did you have a second telephone
7 conversation with someone at Ameriquest?
8   A. Maybe so. I think, yeah. Marcus probably,
9 yeah.
10   Q. Who?
11   A. Marcus Gonzalez.
12   Q. Who's Marcus Gonzalez?
13   A. He's the one who went to our house to have
14 our closing done.
15   Q. Okay. After this first telephone
16 conversation with the lady do you remember a second
17 telephone conversation?
18   A. Yeah. They probably -- This guy probably
19 call asking -- to let us know that we have to come to
20 your house at this time and be there so we can close,
21 I believe.
22   Q. Okay. Do you think there were
23 conversations between the time you spoke to the lady
24 and the time you arranged for the date for your loan

Case: 1:05-cv-07097 Document #: 2305-9 Filed: 08/22/08 Page 18 of 18 PageID #:26009

JIMENEZ vs. AMERIQUEST NELSON JIMENEZ, 08/30/05

Page 162

Q. You agree that this is the letter that you received from them?
A. Yes.
Q. Have you received more than one letter -- more than one advertisement letter from the Edelman firm?
A. This is the only one.
Q. And what did you do when you received this letter, if anything?
A. It mentioned Ameriquest.
Q. So what did you do, if anything?
A. I just followed what the letter said.
Q. What's the letter say? Did you call them? Did you write to them?
A. I believe I called them.
Q. You called the Edelman firm?
A. Yes.
Q. Do you remember who you spoke to?
A. I don't remember.
Q. Do you remember if it was a man or a woman?
A. We send the documents. The documents that we had we send to them.
Q. Before you had received this advertisement letter in the mail had you contacted any lawyer with

Page 163

regard to Ameriquest?
A. No.
Q. Had you expressed any disappointment to Ameriquest with any aspect of your loan?
A. No.
Q. Had you thought about filing a lawsuit against Ameriquest before receiving this advertisement letter from this law firm?
A. No.
Q. If you could turn to Exhibit 1, page 179. These are the documents that you produced. This page 179 appears to be a loan statement; is that correct?
A. Yes.
Q. And how often do you receive these from Ameriquest -- or from AMC Mortgage Services?
A. Every month.
Q. Okay. If I'm looking at this one, this one's dated April 5, 2005; is that correct?
A. Yes.
Q. I just picked this one. Although there are many just like it; is that correct?
A. Page 179?
Q. Yes.

Page 164

1   I mean, if you look through the documents
2 that your attorney's produced to me, there are many
3 different loan statements that have been produced; is
4 that correct?
5   A. Yes.
6   Q. This one says that your monthly payment
7 amount is $1,551.84; is that correct?
8   A. Yes.
9   Q. And yet it looks like under the column --
10 or the section Activity Since Your Last Statement
11 that your last payment was for $1,600.
12       Do you see that?
13   A. Yes.
14   Q. Okay. When I reviewed many of these loan
15 statements -- monthly loan statements, it looks to me
16 that you've at times, and not infrequently at times,
17 paid more than what's required under the loan.
18   A. I always put extra.
19   Q. You always put extra; is that right?
20   A. Yes.
21   Q. And my question is to you why?
22   A. Well, you put more on your principal. It
23 may help to lower my interest computation every
24 month.

Page 165

1   Q. And how do you know if you put extra that
2 it goes to principal and not interest?
3   A. Because the scheduled payments is 1551. If
4 I added more, the rest then would go to principal.
5   Q. And you know that to be true?
6   A. Yes.
7   Q. Okay. And how long have you been making
8 payments in an amount greater than required?
9   A. Many times. Most of the time, I believe.
10   Q. And did you do this before you even --
11 before you had a loan with Ameriquest? Did you do
12 this with other loans as well?
13   A. Yes.
14   Q. And how do you decide whether to pay more
15 than is required or not?
16   A. Well, it will help to save us money. It
17 will help to lower our interest payment.
18   Q. And do you recall where you learned that?
19   A. Through reading.
20   Q. Are you in the habit of reading information
21 about consumer finance?
22   A. I guess so, yes.
23   Q. And what do you read?
24   A. I rely on the newspaper most of the time.