# APPENDIX 18

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COPY

NELSON JIMENEZ and MELINDA JIMENEZ, )
)
Plaintiffs, )
)
vs. ) No. 05 C 1009
)
AMERIQUEST MORTGAGE COMPANY, )
WASHINGTON MUTUAL BANK, FA, and )
AMC MORTGAGE SERVICES, INC., )
)
Defendants. )

LOG
DOCKET
FILE
COPY ATTY

The deposition of MELINDA JIMENEZ, called by the Defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before MARGARET R. BEDDARD, a Notary Public within and for the County of Kane, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 350, 224 South Michigan Avenue, Chicago, Illinois, on the 1st day of September, A.D. 2005, at 10:31 a.m.

Page 70

you make more money than you were going to pay out; is that right?
A. Yes.
Q. And you went through that analysis before you went through with the loan?
A. Yes.
Q. Okay. And did you ever think -- Did you ever evaluate whether the loan itself was reasonably priced versus what you could do elsewhere?
A. No, we didn't.
Q. Okay. Did you have an idea that the loan was reasonably priced?
A. Yes.
Q. How did you know that?
A. About the interest rate? That it's kind of low.
Q. So you had a sense that the interest rate was low and that it was -- the loan was a good deal?
A. Yes.
Q. Okay. And you had a lawyer, right? You had a lawyer at that time to help you with the house purchase?
A. Yes.
Q. And did the lawyer -- I don't want to know

Page 71

what the lawyer told you.
But did the lawyer give you any advice about the loan and whether it was reasonably priced?
A. No, he didn't.
Q. He didn't.
Okay. Did you ever get another loan on this property in Chicago?
A. Another loan?
Q. Yes.
A. No.
Q. Just that one?
A. Just one.
Q. Okay. You then bought a house, is that right, in Romeoville?
A. Yes.
Q. And that year was when?
A. 2000.
Q. 2000?
A. Yes.
2001.
Q. 2001?
A. Yes.
Q. Okay. What made you decide to sell the house -- You sold the house, right? You sold the

Page 72

house in Chicago?
A. Yeah, we did.
Q. What made you decide to sell the house in Chicago and buy a house in Romeoville?
A. Because we looked for a bigger place.
Q. Anything else?
A. We wanted to get out of Chicago.
Q. Okay. Anything else?
A. That's it.
Q. Okay. Why did you want to leave Chicago?
A. People are saying about the kids it's better to be in suburbs.
Q. Okay. And did you have a price range for this house?
A. Yes.
Q. What was that?
A. Not more than 200.
Q. 200,000?
A. Yes.
Q. All right. And how did you select that price range?
A. The realtor give us -- Well, he told us that -- about our income. We could qualify to that price.

Page 73

Q. Who was the realtor?
A. The same Gene Villmel.
Q. The same gentleman who helped you with the first house purchase?
A. Yes.
Q. Okay. And he gave you an idea of how much of a loan you could qualify for given your income?
A. Yes.
Q. Did he also give you an estimate of what the payment would be?
A. He did.
Q. He did?
A. Yes.
Q. And that estimate was a monthly payment, or how often was the payment going to be due?
A. Monthly.
Q. Do you remember what that estimate was?
A. 1,400.
Q. 1,400?
A. Yes.
Q. Do you know if that was going to include taxes and insurance?
A. Yes.
Q. Okay. Did he tell you how much you could

Page 82

A. Yes.
Q. And did you think they were reasonable?
A. Yes.
Q. Okay. And how did you determine that they were reasonable?
A. Because we could afford a monthly payment.
Q. Did you compare the interest rate or the other terms of the loan to what you might be able to get elsewhere?
A. No, we didn't.
Q. Did you compare the interest rate or the terms of the loan to what your friends or relatives were borrowing money to buy homes for?
A. I think, yeah. My relatives.
Q. Okay. Did you understand my question? I was asking if you sort of compared your loan and interest rate to what other people you knew were getting?
A. Yeah.
Q. Okay. And you think you did?
A. Yes.
Q. To relatives?
A. Yeah.
Q. Who were buying houses or getting loans at

Page 83

the same time?
A. My relatives?
Q. Yes.
A. Not at the same time. What they got for their house. I asked them what interest rate, and they're saying 7, 7.5, so I figured we had a good deal.
Q. And when did they buy their house?
A. 19 -- I can't remember.
Q. Sometime just before yours?
A. Yeah.
Q. Okay. What was the name of your relatives who had bought this house just before you did?
A. Oh, you're talking about my present house, right?
Q. Yes, in Romeoville.
A. I was thinking about the second -- the first one.
Q. Okay. I'm sorry.
So before you bought the first one you had talked to some relatives and compared loan terms and interest rates?
A. Yes.
Q. Okay. And before you bought this second

Page 84

house had you talked with anybody comparing what you had been offered through Diamond Mortgage to what anybody else might have gotten elsewhere?
A. No.
Q. Okay. I mean, the interest rate wasn't much different being offered by Diamond Mortgage for this Romeoville house than had been offered when you bought the house in Chicago a few years earlier?
A. Yes.
Q. Did that have any impact on you, that the interest rate hadn't changed much?
A. No.
Q. Did you know whether or not interest rates were generally going down or going up?
A. Sometimes I heard about it's going to go down. You know, just hearsay.
Q. Do you know if your husband studies these things?
A. Yeah, he did.
Q. He does?
A. Yeah.
Q. So did you understand that he had compared the interest rate being offered by Diamond Mortgage for this second house to what you might be able to

Page 85

get elsewhere?
A. Yeah, he did.
Q. Okay. And you were confident that he had done that?
A. Yeah.
Q. Okay. Did you ever -- Do you understand when you borrow money to buy a house that you sign a document that entitles the loan company to take your house if you fail to make payments?
A. Yes.
Q. Okay. Do you understand that's called a mortgage?
A. Yes.
Q. Okay. You pledge your house as collateral for the loan so if you don't pay the loan they can take the property?
A. Yes.
Q. And you understand that?
A. Yes.
Q. Okay. Have you ever -- Since you bought your house in Romeoville have you ever pledged your house as collateral any other time?
A. You mean refinancing?
Q. Refinancing. That's one time, yes.

Have you ever refinanced?
A. Yes.
Q. How many times have you refinanced the house in Romeoville?
A. Two times.
Q. Two times?
A. Yes.
Q. Have you ever gotten what's called a line of credit or an equity line of credit for your house in Romeoville?
A. Equity line of credit? No, I'm not sure.
Q. Have you ever gotten what's called a second mortgage loan? Do you know what a second mortgage loan is?
A. No.
Q. Okay. Where you have a loan that's existing, and instead of just paying it off you get another loan and that lender just puts another mortgage on the property. He's just second in line to the first lender.
A. Yeah.
Q. Have you ever done that with your property in Romeoville?
A. Yes.

Q. Okay.
A. I think.
Q. Okay. And do you remember how many times?
A. I'm not sure.
Q. Have you done it once?
A. Once.
Q. Okay. Tell me, when did you do that?
A. 2002.
Q. And who was it with?
A. Bank One.
Q. Okay. You said you think you've refinanced your house twice, right?
A. Yeah. But I'm not sure if it's refinancing with Bank One.
Q. Okay.
A. But we're refinancing with Ameriquest, yes. I'm not sure about Bank One.
Q. All right. But you think you've --
When was the Ameriquest loan?
A. Ameriquest loan? They refinance our existing loan from other mortgage company.
Q. Okay. When was that?
A. When? 2002, December.
Q. December 2002?

A. Yes.
Q. Okay. What about this Bank One loan?
A. Bank One? I think it's 2001.
Q. 2001?
A. Yeah. We just borrowed money.
Q. Okay. And so you bought the house in Romeoville in 2001, right?
A. Yes.
Q. Using Diamond Mortgage?
A. Yes.
Q. And then you might have gotten a loan using the house with Bank One?
A. I'm not sure.
Q. Okay. And then you remember also a loan with Ameriquest?
A. Yeah, I remember that.
Q. Okay. Do you remember any other loan involving your house?
A. No.
Q. Do you remember a line of credit currently with your house?
A. Yes.
Q. You do have a line of credit now?
A. Yes.

Q. That's after the Ameriquest loan?
A. Yes.
Q. Okay. And who's that with?
A. Chase.
Q. Chase?
A. Yes.
Q. And how did you get that?
A. Chase -- From Bank One. They gave us an offer through the mail.
Q. Do you remember when that loan was taken out -- or that line of credit?
A. Say it again.
Q. When was that line of credit obtained?
A. July.
Q. Of what year?
A. This year.
Q. So this is rather recently?
A. Yeah.
Q. Okay. I'm going to refer now to the loan with Bank One, not this recent one, but the one before.
A. Okay.
Q. Do you remember that one at all?
A. Yes.

# APPENDIX 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NELSON JIMENEZ and MELINDA JIMENEZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 1009 |
| | ) | |
| AMERIQUEST MORTGAGE COMPANY, | ) | Judge Moran |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant Ameriquest Mortgage Company ("Ameriquest") states the following as its Answer to Plaintiffs' Complaint:

1. Plaintiffs Nelson Jimenez and Melinda Jimenez bring this action against a "subprime" mortgage lender to rescind a mortgage for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

**ANSWER:** Ameriquest admits that Plaintiffs have filed a lawsuit against it. Ameriquest objects to the term "subprime" as vague. Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of the term "subprime." Ameriquest denies all remaining allegations in Paragraph 1. Ameriquest specifically denies that it violated the Truth in Lending Act, 15 U.S.C. § 1601, or implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), and 15 U.S.C. §1640 (Truth in Lending Act). Defendant does business in the District and is deemed to reside here.

**ANSWER:** Ameriquest does not contest subject matter jurisdiction, personal jurisdiction, or venue. Ameriquest denies any remaining allegations in Paragraph 2.

3. Plaintiffs are husband and wife and own and reside in a home at 270 Lilac Drive, Romeoville, IL 60446.

**ANSWER:** Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4. Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606. It is engaged in the business of originating "subprime" mortgages and makes more than 26 loans per year.

**ANSWER:** Ameriquest admits that it is a corporation, that it is incorporated in a state other than Illinois, and that it maintains offices and does business in Illinois. Ameriquest admits the allegations in the second sentence in Paragraph 4. Ameriquest objects to the term "subprime" as vague. Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of "subprime." Ameriquest admits that it engaged in the business of originating loans secured by mortgages and originates more than 26 loans per year. Ameriquest denies the remaining allegations in Paragraph 4.

5. On December 19, 2002, plaintiffs obtained a mortgage loan from Ameriquest.

**ANSWER:** Ameriquest admits the allegations in Paragraph 5.

6. Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**ANSWER:** Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.

7. The loan was closed on December 19, 2002.

**ANSWER:** Ameriquest admits the allegations in Paragraph 7.

8. On December 19, 2002, plaintiffs signed or received the following documents relating to the loan:

a. Note, Exhibit A;

b. Mortgage, Exhibit B;

c. A Truth in Lending disclosure statement, Exhibit C;

d. Two different notices of right to cancel, Exhibits D and E;

e. A settlement statement on form HUD-1A, Exhibit F.

ANSWER: Ameriquest admits that, in connection with the loan transaction, Plaintiffs received and signed a note, mortgage, a HUD-1 settlement statement, a Truth in Lending disclosure statement, a notice of right to cancel, and a document entitled "one week cancellation period." Ameriquest affirmatively states that Exhibits A, B, C, D, E, and F appear to be poor copies of incomplete and unsigned portions of the documents received by Plaintiffs. Ameriquest denies that Exhibits D and E constitute two different notices of right to cancel. Ameriquest denies the remaining allegations in Paragraph 8.

9. Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a) Consumer's right to rescind.

(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transaction described in paragraph (f) of this section.[fn]47

(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed or telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires . . .

(f) Exempt transactions. The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

ANSWER: Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the allegations that the transaction was secured by Plaintiffs' home. Ameriquest denies that 12 C.F.R. § 226.23(f)(2) states "(2) A credit plan in which a stage agency is a creditor." Ameriquest admits that the remaining allegations in Paragraph 9 contain a portion of the text of 12 C.F.R. § 226.23. Ameriquest denies the allegations of Paragraph 9 insofar as they purport to make any allegation of wrongdoing by Ameriquest under said statute. Ameriquest denies the remaining allegations in Paragraph 9.

10. The payment schedule is not fully and completely disclosed in Exhibit D.

ANSWER: Ameriquest denies the allegations in Paragraph 10.

11. Exhibit F detracts from and obfuscates Exhibit E.

**ANSWER:** Ameriquest denies the allegations in Paragraph 11.

12. Exhibit F suggests that the consumer has seven days to rescind under TILA, starting from December 17, 2002, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, which in plaintiffs' case was from December 19, 2002 through December 23, 2002, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees, or the procedural protections of §1635. It also provides for a different method of counting days and requires actual receipt of the notice by Ameriquest within the specified time. As a result of this and the earlier commencement date, the "one week" period expired December 24, 2002, only one day after the statutory period.

**ANSWER:** Ameriquest denies the allegations in Paragraph 12.

13. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

**ANSWER:** Ameriquest admits that the allegations in Paragraph 13 contain the text of 15 U.S.C. § 1635(g). Ameriquest denies the allegations of Paragraph 13 insofar as they purport to make any allegation of wrongdoing by Ameriquest under said statute. Ameriquest denies the remaining allegations in Paragraph 13.

14. The failure to fully and completely disclose the payment schedule violates 15 U.S.C. §1638 and 12 C.F.R. §226.28.

**ANSWER:** Ameriquest denies the allegations in Paragraph 14.

15. The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

**ANSWER:** Ameriquest denies the allegations in Paragraph 15.

## AFFIRMATIVE DEFENSES

Defendant Ameriquest states as its affirmative defenses as follows:

1. Plaintiffs' claim for statutory damages, costs, and attorney's fees for any alleged underlying Truth in Lending Act violation is barred by the one-year statute of limitations for statutory damages, costs and attorney's fees under the Truth in Lending Act.

2. Plaintiffs' purported cause of action fails to state a claim upon which relief may be granted.

3. If it should be deemed that Plaintiffs are entitled to rescission, any obligation on the part of Ameriquest to rescind the mortgage loan at issue in this lawsuit and release the lien on the subject property must be conditioned upon Plaintiffs' reimbursement or other return to Ameriquest of all funds disbursed on Plaintiffs' behalf in connection with the subject mortgage loan, less any finance charges, pursuant to 15 U.S.C. § 1605(b) and/or other rules of law or equity. Any obligation on the part of Ameriquest to rescind and to release any lien is conditioned upon Plaintiffs reimbursing or otherwise returning all funds disbursed on their behalf to Ameriquest in connection with the subject loan, less any finance charges.

WHEREFORE, Defendant Ameriquest Mortgage Company requests that this Court enter judgment in its favor and against Plaintiffs, Nelson S. Jimenez and Melinda Jimenez, award Ameriquest Mortgage Company its costs, and provide such further and additional relief as it deems just and appropriate.

Dated: April 13, 2005

Respectfully submitted,

**AMERIQUEST MORTGAGE COMPANY, Defendant**

By: ______________________
One of Its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
VARGA BERGER LEDSKY HAYES & CASEY
224 South Michigan Avenue, Suite 350
Chicago, Illinois 60604
(312) 341-9400

## CERTIFICATE OF SERVICE

Jonathan N. Ledsky, an attorney, hereby certifies that a true and correct copy of the foregoing Defendant's Answer to Plaintiff's Complaint was served upon:

Al Hofeld, Jr.
Edelman, Combs & Latturner, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603

by placing same in the United States mail chute located at 224 South Michigan Avenue, Chicago, Illinois 60604, properly addressed and postage fully prepaid, this 13th day of April, 2005, on or before the hour of 5:00 p.m.

Jonathan N. Ledsky

Shared/Ortega/Pleadings/AMQ-Jimenez Answer to Complaint.jnl