**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| | Centralized before The Honorable Marvin E. Aspen |
| THIS DOCUMENT RELATES TO: BORROWERS' CONSOLIDATED CLASS ACTION | |

**MEMORANDUM OF POINTS AND AUTHORITIES REGARDING DISMISSAL OF BORROWERS' CONSOLIDATED CLASS ACTION REQUIRED BY THE SEVENTH CIRCUIT'S OPINION IN ANDREWS V. CHEVY CHASE BANK**

Pursuant to this Court's September 29, 2008 Order [Docket No. 2412], Defendants[1] submit this brief regarding the impact of the Seventh Circuit Court of Appeal's September 24, 2008 decision in *Bryan Andrews, et al. v. Chevy Chase Bank,* --- F.3d ----, 2008 WL 4330761 (7th Cir. 2008) on the Borrowers' Consolidated Class Action.

## I.      SUMMARY OF IMPACT OF *ANDREWS* DECISION

In *Andrews*, the Seventh Circuit held that as a matter of law TILA's rescission remedy may not be pursued on a class basis.  2008 WL 4330761 at *7.  The Seventh Circuit further reiterated that a class action is not a superior method of adjudicating claims which require hundreds or hundreds of thousands of individual proceedings.  *Id*. at *6.  This ruling establishes that class treatment of numerous mortgage transactions is inappropriate.  Specifically:

- Based on the holding of *Andrews,* Plaintiffs cannot certify a class for rescission under TILA and all class claims for rescission must be dismissed.

---

[1] "Defendants" collectively refers to Ameriquest Mortgage Company; AMC Mortgage Services; Ameriquest Mortgage Securities, Inc.; Town & Country Credit Corporation; Town & Country Title Services, Inc.; and ACC Capital Holdings Corporation.

- Other requested rescission relief under the Tenth (declaratory judgment), Eleventh (Cal. Bus. Prof. Code §17200), and Thirteenth Causes of Action (various state consumer protection acts) is also not appropriate for class treatment.

- Plaintiffs' remaining class claims likewise cannot survive because the claims are too highly individualized to satisfy the predominance and superiority requirements of Rule 23 of the Federal Rules of Civil Procedure. Foreshadowing *Andrews*, this Court denied class certification for a TILA rescission and consumer fraud class action because the bait and switch allegations would require a case by case determination of whether oral representations by defendants were made. See *Elliott v. ITT Corp.*, 150 F.R.D. 569, 575 (N.D. Ill. 1992). The same rationale as *Elliot* and *Andrews* applies here – class relief would not be efficient or economical.

- Because Defendants were not present when many of the oral misrepresentations were allegedly made at the closing, a factual analysis of the actions and oral representations of Third Party Defendants, closing agents and loan brokers, creates additional individual issues which will predominate over common issues of fact and law.

- Moreover, Plaintiffs cannot proceed with the case on a class basis because in order to do so, Plaintiffs would have to abandon the rescission rights of unnamed class members. Such an action would breach their fiduciary duty to the class.

- As demonstrated by the over 600 Opt-Out cases and 1500 Opt-Out Plaintiffs in this MDL, the proper way to proceed with these claims is on an individual basis. That will ensure that each case is decided on the merits of the particular action, which is necessary when non-uniform oral representations are at issue as in the case at bar.

- Multiple prior orders and pending motions must be vacated and/or denied because they are predicated on the erroneous conclusion that a TILA rescission class can be certified.

After application of *Andrews*, the Plaintiffs' putative class action can no longer exist and the class claims must be dismissed.[2]

## II.   *ANDREWS* MANDATES DISMISSAL OF THE FIRST CAUSE OF ACTION FOR VIOLATION OF THE TRUTH IN LENDING ACT BROUGHT ON BEHALF OF THE TILA SUBCLASS

Plaintiffs' First Cause of Action is for violation of TILA and is brought on behalf of the named Plaintiffs individually and on behalf of a nationwide "TILA Subclass". In this cause of action, Plaintiffs and the TILA Subclass seek a "declaration that they have the right to rescind their transactions . . .." [Borrowers' Consolidated Class Action Complaint ("Class Complaint"), ¶ 243.]

Following *Andrews*, this cause of action must be dismissed. The question presented to the Seventh Circuit in *Andrews* was whether "a class action [may] be certified for claims seeking

---

[2]  Of course, the individual claims therein will survive and should be treated as Opt-Opt claims.

the remedy of rescission under" TILA. *Andrews*, 2008 WL 4330761 at *1. As noted by the Seventh Circuit, the only two federal appellate courts to have previously addressed the issue held that the answer was "no". *Id.* at *1 and 2 (citing *McKenna v. First Horizon Home Loan Corp*., 475 F.3d 418 (1st Cir. 2007); *James v. Home Const. Co. of Mobile, Inc*., 621 F.2d 727 (5th Cir. 1980))[3]. The Seventh Circuit agreed, finding both that:

- the absence of any reference to class relief in TILA's rescission remedy leads to only one conclusion: that Congress did not intend TILA to authorize class-wide rescission; and

- there is a "fundamental incompatibility" between the rescission remedy and class treatment.

*Andrews*, 2008 WL 4330761 at *2.

In reaching the former finding, the *Andrews* court expressly noted that this Court in this case, among others, "ended their inquiry . . . and certified rescission classes under TILA" by improperly concluding that TILA does not explicitly prohibit class relief for rescission. *Andrews* 2008 WL 4330761 at *8-*9 (citing to *In re Ameriquest Mortgage Co. Mortgage Lending Practices*, No. 05-CV-7097, 2007 WL 1202544 (N.D. Ill. Apr. 23, 2007)). The Seventh Circuit confirmed that the analysis does not end there, but rather agreed with the First Circuit that:

> "the notion that Congress would limit liability to $500,000 with respect to one remedy while allowing the sky to be the limit with respect to another for the same violation strains credulity" . . . We think the presence of a cap on class-action recovery in TILA's damages provision, the absence of any reference at all to class recovery in its rescission provision, and the mechanics of the rescission process spelled out in §1635, all point more plausibly to the opposite interpretation: that TILA's rescission remedy -- by its terms an individualized, restorative rather than compensatory remedy -- is just that, a purely *individual* remedy that may not be pursued on behalf of a class.

*Andrews,* 2008 WL 4330761 at *10-11 (internal citations omitted).

As to the latter finding, the Seventh Circuit analyzed the mechanics of rescission and concluded that it was such an individualized process that the Rule 23(b)(3) standards for commonality and superiority could not be met. *Andrews* 2008 WL 4330761 at *14. Moreover, Plaintiffs cannot escape this result by distinguishing their case semantically as one seeking a

---

[3] The Seventh Circuit also found the California Court of Appeal Case of *LaLiberte v. Pac. Mercantile Bank*, 53 Cal. Rptr. 3d 745 (Cal. Ct. App. 2007), which reached the same conclusion, to be persuasive. *See, Andrews* at *6.

class-wide *"declaration"* that rescission is appropriate. The "remedy is so inherently personal that a court cannot venture further while addressing the plaintiffs as a class." Indeed, even if such a declaration was made, it would be impossible to avoid establishing "individual rescission procedures that will both meet the needs of each class member and assist Chevy Chase in recovery of the loan principal on each transaction without risking the immediate loss of its security instrument." *Id.* at *14-15.

Based on the foregoing, the Seventh Circuit in no uncertain terms held as follows: "***we hold as a matter of law that a class action for the rescission remedy under TILA may not be maintained***". *Id.* at *15. Accordingly, Plaintiffs' first cause of action for violation of TILA on behalf of a "TILA Subclass" must be dismissed.

### III. PLAINTIFFS' CLASS RESCISSION CLAIMS IN TENTH, ELEVENTH, AND THIRTEENTH CAUSES OF ACTION CANNOT SURVIVE FOR THE INDEPENDENT REASON THAT SUCH CLAIMS ARE, AS A MATTER OF LAW, TOO HIGHLY INDIVIDUALIZED TO SATISFY THE COMMONALITY, MANAGEABILITY AND SUPERIORITY REQUIREMENTS OF RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

As the Andrews' Court noted:

> [T]he fundamental incompatibility between the rescission remedy under TILA and the class-action device raises serious questions as to whether a TILA rescission class could ever be properly certified under Federal Rule of Civil Procedure 23(b). A Rule 23(b)(2) class may be maintained when "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED.R.CIV.P. [sic] 23(b)(2) (emphasis added); *see Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 897-98 (7th Cir. 1999) (noting Rule 23(b)(2)'s requirement of "final relief"). As we have explained, a declaration of a "rescission class" would only initiate a process of individual rescission actions. Significant individual aspects of the remedy, varying with each consumer's loan transaction, would remain to be worked out before each of the transactions could be unwound. . . . . The rescission remedy is so inherently personal that a court cannot venture further while addressing the plaintiffs as a class; it can do no more than simply declare that a certain group of plaintiffs have the right to initiate rescission, and that is not a form of "final" declaratory relief under Rule 23(b)(2).

* * * *

> Likewise, to certify a class under Rule 23(b)(3), common questions of law and fact must predominate over questions affecting individual members, and the class-action device must be superior to other methods of adjudicating the controversy. The Andrews strain to meet the predomination and superiority requirements here. *See, e.g., In re Mex. Money Transfer Litig.*, 267 F.3d 743, 746 (7th Cir .2001). If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims.
>
> * * * *
>
> Under these circumstances, proceeding as a class to "unwind" hundreds or thousands of individual credit transactions would not promote the primary purposes of the class-action mechanism: judicial economy and efficiency. See McKenna, 475 F.3d at 427; see also 1 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 1:1, at 3 (4th ed. 2002) ("A class action is a procedural device ... that can accomplish significant judicial economies."). Using a class action to resolve a multitude of individual, varied rescission claims is neither "economical" nor "efficient" in any sense of those terms.

*Andrews,* 2008 WL 4330761 at *12-14.

Here, Plaintiffs seek rescission not only with respect to their TILA claim, but also rescission in the form of injunctive relief with respect to their Tenth, Eleventh and Thirteenth Causes of Action. As was true with *Andrews,* unwinding hundreds or thousands of individual credit transactions would not promote the primary purposes of the class-action mechanism: judicial economy and efficiency. Significant individual aspects of the remedy, varying with each consumer's loan transaction, would remain to be worked out before each of the transactions could be unwound. Thus, class rescission claims in Plaintiffs' Tenth, Eleventh and Thirteenth Causes of Action must be dismissed.

## IV. THE ABSENCE OF CLASS-WIDE RESCISSION RENDERS ALL CLASS RELIEF IMPROPER BECAUSE PLAINTIFFS CANNOT JETTISON AN IMPORTANT RIGHT OF UNNAMED CLASS MEMBERS WHILE ENFORCING THAT RIGHT INDIVIDUALLY

By law, class representatives and their counsel owe a fiduciary duty to protect the interests of absent class members. *Janik v. Rudy, Exelrod & Zieff*, 119 Cal. App. 4th 930, 934 (2004). This duty includes the obligation to raise all claims and theories of damage recovery

reasonably expected to be raised by the members of the class. *Id.; see also Technograph Printed Circuits Ltd. v. Methode Electronics* 285 F. Supp. 714, 721 (N.D. Ill.1968).

Here, as a result of the holding in *Andrews,* in order to proceed as a class on their TILA claims, Plaintiffs will waive any potential right they may have to rescission. It is undisputed that each putative class members' claims arises out of a single loan transaction with each individual putative class member. Thus, *all* claims arising out of that transaction - which include both a claim under TILA and for rescission, must be brought in a single action. *Mass. Sch. of Law at Andover, Inv. v. Am. Bar Ass'n*, F.3d 26 (1st Cir. 1998) ("a cause of action is defined as a set of facts that can be characterized as a single transaction or series of related transactions. . . this boils down to whether the causes of action arise out of a common nucleus of operative facts"). But, rescission may not be brought as a class claim. *Andrews,* 2008 WL 4330761. So, an election to proceed with the TILA claim would have the effect of barring each class member from attempting to bring a later claim for rescission.

Plaintiffs' counsel are therefore presented with an inherent conflict. As noted in *Andrews*, rescission rights are financially significant. "[U]nder TILA a prevailing debtor with a typical loan can expect to receive over $50,000, plus attorney's fees and costs, in a rescission action." 2008 WL 4330761 at *7. But, if a class were certified seeking remedies under TILA only, recovery would be limited to statutory damages - the lesser of $500,000 or 1 percent of the creditor's net worth. *Id.* at *5.

Since there are likely hundreds of thousands of putative class members, potential class recovery under TILA would likely only amount to $2 or $3 per class member. In essence, by proceeding with their class claims Plaintiffs would deprive any borrower actually injured by the alleged conduct of the only recovery with actual value—rescission. Under those circumstances, it is difficult to see how Plaintiffs' counsel or the named class representatives can presume to make this personal and important decision on behalf of absent class members. As demonstrated by the over 600 individual Opt-Out cases that are proceeding in this Court, Plaintiffs have the ability to find able counsel to pursue their rescission rights and such claims are more appropriate and amenable to individual treatment. Indeed, it seems likely that many of the named plaintiffs may elect to sever their claims from the class action complaint and choose to pursue their rescission rights on an individual basis.

## V. REGARDLESS OF THE REMEDY SOUGHT, PLAINTIFFS' CLASS CLAIMS IN THE SIXTH, SEVENTH, EIGHTH, NINTH, TENTH, ELEVENTH, AND THIRTEENTH CAUSES OF ACTION CANNOT BE CERTIFIED UNDER RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Before certifying a class, a court must conduct a rigorous analysis of the requirements set out in Federal Rule of Civil Procedure 23. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). To obtain class certification, Plaintiffs have the burden of establishing that the proposed classes each satisfy all four elements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) and one of the three subsets of Rule 23(b). *Amchem. Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Implicit in Rule 23 are two additional requirements: (1) Plaintiffs must show that the proposed class definitions are "precise, objective and presently ascertainable"; and (2) Plaintiffs must establish that Plaintiffs and the class they seek to represent have standing. *In re Copper Antitrust Litigation*, 196 F.R.D. 348, 353 (W.D. Wis. 2000).

Rule 23(b)(3) imposes two prerequisites to class certification thereunder. First, questions of law or fact common to the class must "predominate" over questions affecting the individual members. Fed. R. Civ. P. 23(b)(3). The predominance question "tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623; *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161 (N.D. Cal. 2001) (individual issues predominate if the court must conduct mini-trials examining the particular circumstances of each class member). Second, class-action treatment must be superior to other methods available for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The superiority requirement commands "the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190, as amended, 273 F. 3d 1266 (9th Cir. 2001) (citation omitted). Applying the foregoing principles here, it is clear that Plaintiffs may not maintain this action as a class action under Rule 23(b)(3).

The underlying premise of a Rule 23(b)(3) class is that class members suffer from a common injury that can be addressed by class-wide relief; its hallmark is homogeneity and cohesiveness. *Allison v. Citgo Petroleum*, 151 F.3d 402, 413 (5th Cir. 1998); *see also Barnes v.*

*American Tobacco Co.*, 161 F.3d 127, 142-44 (3d Cir. 1998) (Cohesiveness is required "because unnamed class members are bound by the action without the opportunity to opt out"). The existence of individual issues and manageability concerns therefore must be considered in determining whether to certify a class under Rule 23(b)(3). *Barnes*, 161 F.3d at 142-44 (citation omitted); *see Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981), *cert. denied*, 456 U.S. 917 (1982) (citations omitted) ("Some of the problems which arise in all of the subdivisions of Rule 23(b) are common to all forms of class action: identifying a class, cost of notice of settlement, and administrative burdens on the court in managing the litigation. This is especially true because the purpose of Rule 23 is to allow an efficient mechanism for disposing of multiple claims.") (citations omitted). As demonstrated below, the prevalence of individual issues and resulting manageability concerns preclude certification of the class under Rule 23(b)(3).

A.      **Each Transaction Would Have To Be Examined To Determine If A Borrower Is Properly Part Of The Class And/Or Subclass.**

Plaintiffs must establish that an objectively identifiable "class" exists. *Simer*, 661 F.2d at 669. Class definitions which require the court to determine the merits of every individual's claim to determine if they are within the class do not meet this requirement. *See*, *e.g.*, *Crosby v. Social Security Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (denying class certification because the proposed definition made class members "impossible to identify prior to individualized fact-finding and litigation"). Here, Plaintiffs' class definitions allege only a potential wrong that must be analyzed on a transaction-by-transaction basis to determine if an actual wrong occurred and the borrower is entitled to rescind his or her loan, and thus become part of the class.

For example, Plaintiffs' putative classes include borrowers who supposedly received a Notice of Right to Cancel ("NORTC"), in which the date of expiration of the right to cancel was left blank.[4] [Complaint ¶ 240.] A borrower's mere receipt of an incomplete NORTC, however, is not a violation of TILA. At best, it creates a potential claim, dependent upon, among other facts, whether the borrower also received a completed NORTC.

This is not mere hyperbole. Defendants have evidence that Borrower Plaintiffs acknowledged in writing that they received fully compliant NORTC forms. The written

---

[4] The individualized nature of each borrower's potential claims was recently emphasized in Opt-Out Plaintiffs' Reply Memorandum in Support of Their Motion to Clarify. [Docket No. 2453.] These individualized issues include, among other things, the underlying facts giving rise to the claims, differing strengths of the claims asserted, the role of third party closing agents, the role of successors in interest to the loans, the current status of the loans (paid off, delinquent or in good standing), and the state in which the loan was originated. *Id.*

acknowledgements establish a rebuttable presumption that Defendants complied with TILA as to these borrowers. *See* 15 U.S.C. § 1635(c); *Williams v. First Gov't Mortgage & Investors Corp.*, 225 F.3d 738, 751 (D.C. Cir. 2000). To rebut this presumption, each borrower must present competent evidence to the contrary. *Williams*, 225 F.3d at 751; *Whitlock v. Midwest Acceptance Corp.*, 76 F.R.D. 190, 191 (D. Mo. 1977), *rev'd on other grounds*, 575 F.2d 652 (8th Cir. 1978) (plaintiffs' failure to controvert the presumption created by TILA entitled Defendants to summary judgment). This alone would require this Court to oversee countless "mini-trials" just to determine if these borrowers are even members of the putative class.

**B.     The Court Would Have To Consider Defendants' Defenses And Each Borrower's Circumstances.**

Even if it were possible to determine, on a class basis, whether the notice of rescission rights provided to borrowers was adequate, individual issues still would render this putative class action unmanageable because Defendants are entitled to inquire into the individual circumstances of each borrower's transaction to determine whether they have a defense to the borrower's right of rescission, including those based on each borrower's personal circumstances. *See, e.g.*, *Gibbons*, 208 F.R.D. at 287 (denying certification of a TILA rescission class because disclosures, while on wrong form, may have been sufficient to certain borrowers based on their own circumstances). Borrowers vary on several grounds, including individual financial circumstances, sophistication, and familiarity with mortgage loans (including rescission rights) through previous transactions.

For instance, even if some borrowers did not receive adequate written notice of their rescission rights (a point Defendants thoroughly contest), any borrowers who had actual knowledge of their right to rescind should be excluded from any class because they cannot have suffered any harm. *See, e.g.*, *Contimortgage v. Delawder*, 2001 WL 884085, at *6 (Ohio Ct. App. July 30, 2001) (holding that TILA should not be applied in a "rote and technical fashion which penalizes lenders in instances in which no harm has occurred"); *Mackey v. Household Bank, F.S.B.*, 677 So. 2d 1295, 1298 (Fla. Dist. Ct. App. 1996) (discussing TILA and noting that "[l]aws should be enforced with common sense and applied without losing sight of the legislative purpose behind their enactment"). In this regard, the Court must consider the oral instructions and explanations, if any, provided by the different closing agents at each particular closing. TILA rescission rights also do not apply to any borrower who used the loan for business use

because TILA does not apply to a loan that is primarily for business purposes, *see* 15 U.S.C. § 1603(1), or if the refinance is secured by a second-home or non-primary residence, *see id.* § 1635(a).[5]  In short, the Court would have to closely examine the circumstances of each loan, including the awareness of each borrower and the use of each loan, to determine whether a borrower actually should be entitled to rescind his or her loan.

**C.    Because Defendants Utilized Third Party Closing Agents Individual Issues Of Fact Will Predominate Over Common Issues.**

Plaintiffs allege, among other things, that Defendants failed to make various disclosures which are required by state and federal law to the Borrower Plaintiffs in connection with their loans.  The Complaint further alleges that Defendants made material misrepresentations to the Borrowers in connection with the origination of loans.  These allegations include, for example:

- That Defendants failed to "deliver copies of various loan papers, including required disclosures under the Truth in Lending Act, until after the loan is consummated."  (*See* Class Action Complaint, at ¶ 112).

- That there were various deficiencies with respect to the Notice of Right to Cancel that Defendants provided to each borrower pursuant to the Truth in Lending Act ("TILA"), such as not providing enough copies of the Notice and not correctly filling out the final date on which the borrower could exercise his or her statutory right to cancel.  (*Id.* at ¶ 256).

- That Defendants had a "practice of removing certain documents, such as those relating to prepayment penalty, before presenting the documents to the customer for signing."  (*Id.* at ¶ 114).

- That Defendants have engaged in a pattern of "misrepresenting or concealing loan terms" from the Borrowers.  (*Id.* at ¶ 109).

Defendants deny that their disclosures to any of the Plaintiffs were defective, or violated any state or federal law.  More importantly, since 2004, every loan closed by Defendants was closed by an independent third party ("Closing Agents") with no direct affiliation to Defendants.  These Closing Agents were employees of title companies or, in certain states whose laws required it, attorneys licensed to practice law in the state where the closing took place.  The Closing Agents were paid by Defendants to provide all disclosures required by TILA (and other state and federal laws) to Defendants' borrowers.  Each of the Closing Agents represented to

---

[5] There are numerous other defenses to a rescission claim, including that a borrower does not have the right to rescind a loan that has been paid off.  *King v. California*, 784 F.2d 910, 912 (9th Cir. 1986); *accord Coleman v. Equicredit Corp.*, No. 01 C 2130, 2002 WL 88750, at *2 (N.D. Ill. Jan. 22, 2002).

Defendants that they were qualified to close loans and were knowledgeable about the required disclosures requirements.

The utilization of these third party Closing Agents shows that there can be no patterns or practice common among the closing of each individual loan. In order to establish the truth of any allegation regarding misconduct during the closing of the loan, this Court and the parties would have to delve into the details of every closing transaction to determine: (1) whether each borrower received the proper disclosures; (2) the completeness of the disclosures that were given; (3) whether documents were concealed; (4) whether misrepresentations were made; (5) the scope of the Closing Agent's misconduct; and (6) whether the Closing Agent is liable for his/her conduct. Such an individualized inquiry places an onerous burden on the parties and the Court and only serves to illustrate that Plaintiffs' claims may not be resolved on a class basis.

**D.    A "Bait and Switch" Class Cannot Be Certified Because Individual Issues Will Predominate Over Common Issues Of Fact And Law.**

Seventh Circuit courts have repeatedly acknowledged that fraud claims are plaintiff-specific. *See, e.g. Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436, 443 (7th Cir. 2000) ("[B]ecause the complaints allege fraud, which is plaintiff-specific, issues common to all of the class members were not likely to predominate over issues peculiar to specific members…"); *see also Nagel v. ADM Investor Services, Inc.*, 65 F.Supp. 2d 740, 746 (N.D. Ill. 1999) (Easterbrook Op.) ("Plaintiffs say they were the victims of fraud, but fraud claims are person-specific. Who said what to whom and when, and who relied on which statements, are not things that can be resolved with respect to all [plaintiffs] as a class.").

*Elliott v. ITT Corp.*, 150 F.R.D. 569, 575, is especially instructive in this context, both for its application of the law to the facts and because the opinion was issued by this Court. Elliott alleged that the defendants engaged in a practice of "insurance packing," through which the defendants sold insurance products by deceptively bundling them in with other consumer credit transactions. For example, Elliott alleged that when borrowers closed on their loans, they were presented with pre-typed documents that included additional charges for insurance that they had not requested. According to the complaint, borrowers either did not notice the additional charges or were talked out of their objections through a series of deceptive representations. Plaintiffs attempted to certify a class based on TILA and consumer protection act claims.

Against this background, this Court noted that, "[w]here the decision to invest is in large part based on an investor's oral communications with his or her broker, class certification has generally been denied due to individual questions of reliance." *Elliott*, 150 F.R.D. at 581-582. More specifically, the Court observed that "the complaint suggests that a number of oral communications surrounded each loan transaction." *Id.*, at 580 n.8. As a result, "[a]s is not the case in an action under the fraud on the market theory, and because of the conflicting and presumably varying messages confronting purchasers of insurance, one cannot assume the kind of uniform communications on a nationwide basis that would justify a presumption that customers were deceived." *Id.,* at 583. In other words, it is necessary "to determine what borrowers were told about the [product]" because "there is a good possibility of possibly significant variations in the mix of information presented to customers." *Id.,* at 585, 583.

All of Plaintiffs' "bait and switch" claims here depend upon individual questions of fact and law. For instance, Plaintiffs contend that Defendants offered one set of loan terms at the inception of the loan origination process, but provided different terms when the loan closed. Further, Plaintiffs allege that Defendants made misrepresentations to borrowers at the time of closing to induce borrowers to sign loan documents that contain worse loan terms than those promised during the loan application process. In order to resolve these claims, the Court would have to examine the meetings, conversations, and circumstances involved in the negotiations between Defendants and borrowers for each of the mortgage loans made by Defendants across the nation in the past 8 years. Among other things, this would necessarily require depositions of each of the individual borrowers, each of the particular Defendant's employees who had contact with each of the borrowers, and each independent third party who closed the loan.

The foregoing is only a small part of the necessary analysis. Once Defendants' initial estimated terms are established (the purported "bait"), the parties would then have to delve into the final terms of the loan documents each Class member signed to determine if there was any unjustified variation in the terms (the alleged "switch"). This would necessarily require an analysis of each borrower's individual loan file to determine if there was a change in terms and whether there were legitimate business reasons for such change. Specifically, for example, Defendants may have learned after issuance of the federally mandated Good Faith Estimate that the particular borrower's financial condition or the condition of the property securing the loan did not warrant the terms initially estimated. Likewise, the borrower may have opted for a

different loan program than that contemplated in the original estimate, perhaps to increase the cash proceeds from the loan, to secure a lower interest rate by accepting a prepayment penalty, or to secure an initially lower monthly payment by accepting an adjustable rate. All of these scenarios entail changes in loan terms. None involve deceptive tactics. Determining whether these and other scenarios explain the changes in borrowers' loan terms will require extensive individualized analysis.

Furthermore, even if Plaintiffs were able to establish the elements of their class claims by resorting to common proof -- which, as demonstrated above, they cannot -- Defendants still would be entitled to present defenses to those claims, including equitable defenses, requiring individual inquiries. *See Cortez v. Purolator Air Filtration Prods.*, 23 Cal. 4th 163, 180 (Cal. 2000) ("In deciding whether to grant the remedy or remedies sought by a UCL plaintiff, the court must permit the defendant to offer [equitable] considerations"); *see also Abt v. Mazda Am. Credit*, No. 98-C-2931, 1999 WL 350738, at *3 (N.D. Ill. May 19, 1999) (defenses that are peculiar to the named plaintiff or a small subset of the plaintiff may prohibit class certification).

As only one example, with respect to Plaintiffs' claims concerning the imposition of terms in the final loan contract different than those initially estimated, Defendants would be entitled to raise equitable defenses of waiver and estoppel on the grounds that borrowers would have discovered that the terms differed from those initially offered by Defendants by simply reviewing the applicable portions of the loan documents before signing them.[6] *See Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1292 (7th Cir. 1989) ("basic contract law establishes a duty to read [a] contract; it is no defense to say, 'I did not read what I was signing.'"); *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1136 (7th Cir. 1994) ("a contracting party is under a duty to learn the contents of a written contract before signing it . . . and . . . the negligent failure to do so will estop the contracting party from avoiding the contract on the ground of ignorance of its contents") (citation excluded); *Yablon v. Metropolitan Life Ins. Co.*, 200 Ga. 693, 707, 38 S.E. 2d 534 (Ga. 1946) ("If one signs a written contract without acquainting himself with its contents, he is estopped by his own negligence to ask relief from his [own] obligation, if there is no fraud or artifice in procuring his signature."); *Cendant Mobility*

---

[6] This is especially true in light of the fact that defendant Ameriquest Mortgage Company gave each borrower seven days to review the final written agreement, seek clarity from Ameriquest, shop for better terms from a different lender, consult with an attorney, financial advisor or other trusted person, and, if they so chose, rescind the loan at no cost at all.

*Services Corp. v. Falconer*, 135 S.W. 3d 349, 354 (Tex. App. Ct. 2004) ("It is well settled that the parties to a contract have an obligation to protect themselves by reading what they sign.") (citation omitted).

Indeed, for the foregoing reasons, federal courts have routinely rejected class treatment of claims nearly identical to those at issue here. For example, in *Richardson v. Nationwide Mortgage*, 1985 U.S. Dist. LEXIS 23826 (D. Md. 1985), plaintiffs alleged that they applied for a loan and were advised at the time of application that they would receive "long term financing." Id. at *4. At the time they signed the final loan documents, however, plaintiffs purportedly learned that the loan was an interest-only loan requiring a balloon payment after one year. Plaintiffs contended that the loan terms were inadequately explained to them and that, when they questioned the loan officer, they were advised that the loan "was only temporary and . . . would automatically be converted into a long term loan." *Id*. In addition, plaintiffs further alleged the loan fees were excessive. Similar to the instant action, plaintiffs sought to represent a class for, among other things, violation of state consumer protection laws. *Id*.

The district court in *Richardson* flatly rejected certification, finding that the individualized nature of the loan negotiation process barred certification of a class:

> Any determination of liability will require the resolution of numerous factual issues which may differ with each individual borrower. First, the unique circumstances of each borrower will need to be examined with regard to, inter alia, their degree of sophistication and the extent to which they reasonably relied on defendants' alleged misstatements ... whether such borrower suffered any damage, and the extent to which such borrower may have already sought relief against the defendants ... Potential defenses, such as ... waiver ... will need to be examined individually as well.
>
> Second, the oral representations made to the individual borrowers by the brokers, lenders and settlement attorneys prior to, at, or after settlement will need to be examined individually. Despite plaintiffs' assertions that the loan process used by defendants was standardized, the plaintiffs would have to be questioned to assure that each was given the same oral representations. Moreover, different plaintiffs might have asked different questions of the defendants, and answers given to such questions might be relevant to the misrepresentation issue. Finally, the fact that different brokers and different settlement attorneys were involved in various loan transactions makes the prospect of resolving factual issues concerning oral representations made to many borrowers all but impossible.

*Id*. at *8-10; *see also O'Brien v. J.I. Kislak Mortgage Corp.*, 934 F. Supp. 1348, 1358-59 (S.D. Fla. 1996) (denying certification of class based on lender's alleged systematic understating of

- 14 -

finance charges on TILA disclosure statements; the court held that a finding of liability would turn on "thousands of complex and individualized factual determinations thus destroying commonality"); *Parker v. George Thompson Ford*, 83 F.R.D. 378, 381 (N.D. Ga. 1979) (rejecting class certification after determining that "a finding of fact would be required for each alleged class member to decide" the reason for obtaining the loan).

**E.      Variations In Applicable Law Destroy Superiority And Commonality.**

Each loan contract with each Plaintiff contains a choice-of-law provision, designating as the applicable law that of the state in which the property securing the loan is located. These choice-of-law provisions will require application of the laws of nearly every state in the country. The named Plaintiffs alone bring the laws of California, Connecticut, Delaware, Florida, Georgia, Indiana, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Nevada, Ohio, Pennsylvania, and Texas into play. This disparity in laws defeats superiority and commonality of Plaintiffs' Sixth, Seventh, Eighth, Ninth, Tenth, and Thirteenth Causes of Action.

It is beyond dispute that the choice-of-law provisions are valid and enforceable. In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). In determining the validity of choice-of-law provisions, nearly every state follows the Restatement of Conflicts of Law which "reflects a strong policy favoring enforcement" of the parties' selection of applicable law.[7] *See e.g. Nedlloyd Lines, B.V. v. Superior Court*, 3 Cal. 4th 459, 462 (Cal. 1992). The court must first determine (1) whether the chosen state has a substantial relationship to the parties or the transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If either of the foregoing are satisfied, the provision should be enforced unless the party opposing its application can establish both that "the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue". *Id*. at 468, 471 (upholding choice of law provision where opposing party failed to make such a showing).

If a party to a contract is located in the jurisdiction designated in the choice-of-law provision, the provision is presumptively valid. *See Hambrecht & Quist Venture Partners v. American Med. Int'l, Inc.*, 38 Cal. App. 4th 1532, 1540 (Cal. App. Ct. 1995) ("if one of the

---

[7] For the sake of brevity, Defendants have limited their discussion of choice-of-law provisions pursuant to California law.

parties to a contract resides in the chosen state, the parties have a reasonable basis for their choice") (citing *Nedlloyd*, 4 Cal. 4th at 467); *Consul Ltd. v. Solide Enterprises*, 802 F.2d 1143, 1147 (9th Cir. 1986). The choice-of-law provision at hand designates the applicable law as that of the location of the borrower, the subject property and the place in which the contract was negotiated. Thus, the chosen state has a substantial relationship to the parties and the transaction, and there is a reasonable basis for the parties' choice of law. *Nedlloyd*, 4 Cal. 4th at 462.

In addition, *Nedlloyd* itself reflects a fundamental public policy that is surely worthy of protection -- the right of contracting parties to be assured that the terms of their agreements will be enforced. Residents in other states certainly would expect the laws of their home states to apply to any litigation arising out of their loan with Ameriquest. Plaintiffs cannot reasonably argue that a borrower in New Hampshire or Nebraska or Tennessee would want the law of California to apply -- particularly when the agreed-upon law is that of the borrower's home state. In addition, as discussed below, the laws vary from state to state with respect to the claims raised by Plaintiffs, with some states offering more protection than others. Why should a resident of a state that offers more protection or greater recovery than another be stripped of the benefits of their home state's laws? As such, there is clearly not only a "reasonable basis" for the choice of law, but the chosen state undeniably has a "substantial relationship" to the parties and the transaction, and the choice-of-law provisions should be upheld. *Id.; see also, e.g., General Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995) (upholding choice-of-law provision based on the *Nedlloyd* requirement that the scope of such a clause must be "broadly construed").

Moreover, where the parties' relationship arises from a contract, a choice-of-law provision specifying that "the agreement" shall be "governed by" the laws of a particular jurisdiction applies to tort claims as well as contractual claims. *Nedlloyd*, 4 Cal. 4th at 469. In upholding a choice-of-law provision nearly identical to that in the present case and applying it to a tort claim, the Nedlloyd court held as follows:

> [I]n order to control completely the agreement of the parties, Hong Kong law must also govern ... the legal duties created by or emanating from the [agreement] ..., including any fiduciary duties. If Hong Kong law were not applied to these duties, it would effectively control only part of the agreement, not all of it. Such an interpretation would be inconsistent with the unrestricted character of the choice of law clause.

Id. at 469. This analysis applies equally to consumer contracts. *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 918 (Cal. 2002) (rejecting argument that *Nedlloyd* analysis was limited to agreements between sophisticated business parties and expressly extended analysis to consumer contracts).

Consistent with these established authorities, the parties' choice-of-law provisions in the loan contracts are valid, applicable and enforceable. Consequently, liability and damages determinations for each of the Class members must be made under varying substantive laws. When legal questions vary from state to state and hence require the court to make diverse legal rulings in a multitude of jurisdictions, the questions of law necessarily are more individual than common to all. *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1013, 1015 (7th Cir. 2002) ("no class action is proper unless all litigants are governed by the same legal rules ... [o]therwise the class cannot satisfy the commonality and superiority requirements"); *Castano v. American Tobacco Co.*, 84 F. 3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *Georgine v. Amchem Prods.*, 83 F.3d 610, 618 (3d Cir. 1996) (decertifying class because legal and factual differences in the plaintiffs' claims "when exponentially magnified by choice-of-law considerations, eclipse any common issues in this case"); *In re American Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (granting mandamus in a multi-state products liability action, in part because "[t]he district court ... failed to consider how the law of negligence differs from jurisdiction to jurisdiction"); *see also Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (Ruth Bader Ginsburg, J.) (directing district courts to consider variations in state law with respect to class certification and noting that even "[t]he Uniform Commercial Code is not uniform").

In summary, the Court cannot properly consider Plaintiffs' state law claims because, in order to evaluate potential liability and affirmative defenses, the entirety of *each* Defendant's relationship with the thousands of borrowers from the past eight years would have to be separately litigated by the parties and evaluated by the Court. The burden of adjudicating all of the various factual and legal questions in this action on a class-action basis plainly outweighs any potential benefits and will unduly burden Defendants and the Court.

## V. MULTIPLE PRIOR ORDERS AND PENDING MOTIONS BEFORE THIS COURT ARE BASED ON THE ERRONEOUS CONCLUSION THAT A TILA RESCISSION CLASS CAN BE CERTIFIED

Multiple prior motions and orders in this case have been based on the now-faulty premise that a class for TILA rescission claims can be certified. Based on *Andrews*, any such pending orders must be vacated, and any such pending motions must be withdrawn or denied. First, Plaintiffs sought early on to certify a TILA rescission class ("Rescission Class") and obtain a preliminary injunction requiring Ameriquest to send certain notices to the Rescission Class and accompany those notices with a 30-day stay of any pending foreclosure. [*See* Docket Nos. 13[8] and 14[9]]

Four separate Orders resulted from these Motions:

- **Stipulation and Order for Standstill [Docket Nos. 43 and 54]:** Pursuant to this Stipulation, entered as an Order on February 21, 2006, rescission claims of unnamed putative Rescission Class members whose rescission rights would otherwise lapse "shall be treated as if [such rights] did not lapse" and shall be subject to the terms of any preliminary injunction ultimately entered by the Court.

- **May 30, 2006 Memorandum Opinion and Order [Docket No. 143]:** In this Order the Court did not expressly rule on the Motion for Preliminary Injunction, but noted that "we do not address the ultimate merits of the motions . . . and evaluate only the more limited question of whether temporary injunctive relief is necessary to protect the rights of the subset of putative class members who face foreclosure despite the potential existence of extended rescission rights." The Court did, however, issue injunctive relief requiring Ameriquest to send notices to unnamed putative Rescission Class members of their rescission rights. The Court expressly did not address Ameriquest's argument that Plaintiffs could not prevail on the merits because "class actions seeking declaratory relief regarding rescission rights are barred by TILA".

- **Stipulation re: Form of Notice re: Temporary Injunctive Relief [Docket No. 155]:** In the May 30, 2006 Memorandum Opinion and Order, the Court instructed the parties to reach an agreement regarding the form and content of the Notice to be mailed to putative Rescission Class members. This Stipulation addresses those issues and provides the framework for the notices sent by Ameriquest.

- **November 2, 2006 Minute Entry [Docket No. 282]:** By this Order the Court required that the Notices to be mailed to putative Rescission Class members also be

---

[8] Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction on Behalf of the Proposed Rescission Class ("Motion for Preliminary Injunction").

[9] Plaintiffs' Memorandum in Support of Motion for Provisional Certification of Rescission Class for Purposes of Preliminary Injunctive Relief ("Motion for Class Certification").

BN 2335431v5

mailed to those Rescission Class members who obtained loans after the Independent Monitor appointed by the Attorneys General of 49 states pursuant to their Settlement with Ameriquest took office.

Following those rulings, on April 23, 2007, the Court again rejected Ameriquest's argument that a TILA Rescission Class cannot be certified:

- **April 23, 2007 Memorandum Opinion and Order [Docket No. 701]:** Here, the Court denied Defendants' Motion to Dismiss Plaintiffs' First Cause of Action for a declaration of rescission rights under TILA. The Court rejected the First Circuit's holding in *McKenna* and further determined that a declaration of rescission rights could be appropriate for class treatment.

Each of the foregoing rulings is premised on TILA rescission claims being appropriate for class action treatment. In light of the Seventh Circuit's *Andrews* holding that "as a matter of law . . . a class action for the rescission remedy under TILA may not be maintained", each of these rulings must be vacated. Similarly, the Motion for Preliminary Injunction and Motion for Class Certification, on which the Court has not ruled, must be withdrawn or denied.

## VII. CONCLUSION

In summation, resolution of the mortgage crisis tormenting this nation cannot come through class action litigation. Resolution will not come through blunt force that enriches only class counsel. Rather, resolution will come on a case by case basis that takes into account the issues surrounding the loan and the needs of the borrower. In some cases this may mean rescission and in other cases it may mean loan modification. While Plaintiffs' counsel would like the Court to believe the Defendants are the bad actors that brought this country to the brink of financial ruin, the plain truth is that Defendants are just not that important or powerful.

Testifying before the United States Senate Committee on Finance on September 28, 2008, Dr. Lawrence B. Lindsey[10] noted the "we must recognize that this is not a 'subprime' crisis as some call it, but a problem faced by every homeowner. Over 75 million American homeowners face the prospect of historically unprecedented declines in the value of their most

---

[10] Dr. Lindsey served as a Governor of the Federal Reserve System from 1991 to 1997, as Special Assistant to the President for Domestic Economic Policy during the first Bush Administration, and as Senior Staff Economist for Tax Policy at the Council of Economic Advisers during President Reagan's first term. Dr. Lindsey served five years on the Economics faculty of Harvard University and held the Arthur F. Burns Chair for Economic Research at the American Enterprise Institute.

important asset, their homes. The consequences of this will make housing an even less liquid asset. This will not only curtail spending, but it will also have knock-on effects in our national labor market as worker mobility will become impaired. This happened in Japan during the 1990s. Solutions that focus on 'subprime' problems like foreclosure but make the mortgage market even less attractive for new money are counterproductive both for lower end borrowers and for the broader public."

DATED:  October 15, 2008

By:    /s/  Bernard E. LeSage
*Attorneys for Ameriquest Mortgage Company;*
*AMC Mortgage Services; Ameriquest Mortgage*
*Securities, Inc.; Town & Country Credit*
*Corporation; Town & Country Title Services,*
*Inc.; and ACC Capital Holdings Corporation*

Bernard E. LeSage, Esq.
BUCHALTER NEMER, a P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
(213) 891-0700
(213) 896-0400 (fax)

BN 2335431v5

**CERTIFICATE OF SERVICE**

I, Bernard E. LeSage, hereby certify that on this 15th day of October 2008, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: /s/ Bernard E. LeSage

BN 2335431v5