**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EVERETT WASHINGTON and | ) | |
| MONICA A. JONES, | ) | 07 C 327 |
| | ) | |
| Plaintiffs, | ) | Originally 5:06-cv-201 (W.D. Mich.) |
| | ) | |
| v. | ) | Transferred to Judge Aspen for |
| | ) | pretrial proceedings under MDL |
| AMERIQUEST MORTGAGE COMPANY, | ) | #1715, Lead Case #05 C 7097 |
| WILSHIRE CREDIT CORPORATION, BANK OF | ) | |
| NEW YORK MELLON TRUST COMPANY, | ) | |
| N.A., f/k/a THE BANK OF NEW YORK TRUST | ) | |
| COMPANY, N.A., as successor to JPMORGAN | ) | |
| CHASE BANK, N.A., as Trustee for RAMP | ) | |
| 2005-RP3, GMAC RESCAP, HOMECOMINGS | ) | |
| FINANCIAL, LLC, JERRY C. MULLINS, d/b/a | ) | |
| CERTIFIED APPRAISAL COMPANY, and | ) | |
| DOES 1-5, | ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs Everett Washington and Monica A. Jones bring this action

against a "subprime" mortgage lender to secure relief, including rescission, for violation of (A)

the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve

Board Regulation Z, 12 C.F.R. part 226, and (B) the Equal Credit Opportunity Act, 15 U.S.C.

§1691 et seq. ("ECOA").

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), and 15 U.S.C. §§1640 (TILA) and 1691e

1

(ECOA).

3.    Defendants do business in the District and are deemed to reside here.

Venue is therefore proper under 28 U.S.C. §1391(c).

## PARTIES

4.    Plaintiffs Everett Washington and Monica A. Jones own and reside in a

single family home located at 2708 Oakman, Detroit, MI  48238.

5.    Defendant Ameriquest Mortgage Company is a foreign corporation which

maintains offices in and does business in Illinois.  Its registered agent and office are National

Registered Agents, 200 W. Adams, Chicago, IL 60606.

6.    Defendant Ameriquest Mortgage Company is engaged in the business of

originating "subprime" mortgages.

7.    Defendant Ameriquest Mortgage Company made more than 26 loans per

year.

8.    Defendant Ameriquest Mortgage Company is a "creditor" as defined in

TILA and Regulation Z.

9.    During 1999-2003, Ameriquest was the third largest subprime lender by

volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct

to consumer" subprime mortgage originator in the United States.  During the first half of 2004,

Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in

2003.

10.    Defendant  Wilshire  Credit  Corporation  ("Wilshire")  is  a  foreign

corporation which does business in Michigan.  Its registered agent and office are CSC-Lawyers

2

Incorporating Service, 601 Abbott Road, East Lansing, MI 48823.

11.     Defendant Wilshire services numerous loans originated by Ameriquest, including plaintiffs',  and claims an interest in such loans, including the right to receive payment thereunder.   It is joined as a necessary party.

12.     Defendant Bank of New York Mellon Trust Company, N.A., f/k/a The Bank of New York Trust Company, N.A. is a national association which transacts business in Michigan.  It holds legal title to some loans originated by Ameriquest Mortgage Company, including plaintiffs' loan.  Its registered agent and office are C.T. Corporation System, 350 N. St. Paul St., Dallas, TX 75201.

13.     Defendant GMAC ResCap is a foreign corporation which transacts business in Michigan.  It holds legal title to some loans originated by Ameriquest Mortgage Company, including plaintiffs' loan.  Its corporate office is located at One Meridian Crossing, Minneapolis, MN 55432.

14.     Defendant Homecomings Financial, LLC, is a foreign corporation which transacts business in Michigan. It holds legal title to some loans originated by Ameriquest Mortgage Company. On information and belief, it also has an ownership interest in plaintiffs' loan. Its registered agent and office are CSC-Lawyers Incorporating Service (Company), 601 Abbott Rd., East Lansing, MI 48823.

15.     Jerry C. Mullins, doing business as Certified Appraisal Company, is a real estate appraiser in the state of Michigan.  His address is 9665 Sil St., Taylor, MI 48180.

## FACTS RELATING TO PLAINTIFFS

16.     Plaintiffs are ordinary consumers.  Everett Washington works as a

3

plumber, and, at the time of this loan transaction, Monica Jones worked as a rehabilitation counselor.

      17.    Prior to Nov. 23, 2004, Ameriquest solicited plaintiffs for a refinance.

      18.    Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

      19.    The loan was closed on Nov. 23, 2004.

      20.    Immediately prior to the closing, plaintiffs were informed that the loan terms were being altered to their detriment, as set forth on Exhibit A.

      21.    The following are documents relating to the loan:

      a.    A note, Exhibit B.  Only Everett Washington signed the note.

      b.    A mortgage, Exhibit C.  Both Everett Washington and Monica A. Jones signed the mortgage.

      c.    A  settlement statement, Exhibit D.

      d.    A Truth in Lending disclosure statement, Exhibit E.

      e.    The official Federal Reserve Board notice of right to cancel, Exhibit F.

      f.    A different, "one week" (actually six days) notice of right to cancel, Exhibit G.

      g.    An "itemization of settlement charges," Exhibit H.

      h.    A "summary of debts and disbursements," Exhibit I;

      i.    A list of "items to be paid off from loan proceeds," Exhibit J;

      j.    A document stating that if plaintiffs were charged a "discount fee"

their interest rate would be discounted, <u>Exhibit K</u>.

22.     Approximately one week before closing, plaintiffs met with an Ameriquest employee named Alfred Parham in his office. Parham then explained to plaintiffs that their rate would be fixed for two years, and then it might fluctuate either up or down, depending on federal interest rates.

23.     On or around Nov. 1, 2006, plaintiffs received a letter from Ameriquest raising their interest rate two full percentage points, from 7.6% to 9.6%

24.     Upon receiving this letter, plaintiff Everett Washington called Ameriquest to ask for an explanation. The Ameriquest employee who answered explained that adjustable-rate mortgage rates only go up.

25.     Indeed, Paragraph D of the Adjustable Rate Rider states, "My interest rate will never be... less than 7.600%."

26.     When Parham originally explained the adjustable-rate mortgage to plaintiffs, he intentionally misled them by suggesting that their rate might drop below 7.6%.

27.     His reason for doing so was to persuade plaintiffs to agree to an adjustable rate, thereby increasing the lender's "points and fees," interest income and profits.

28.     In connection with this loan, Ameriquest arranged for Jerry C. Mullins, doing business as Certified Appraisal Company, to perform an appraisal stating that plaintiffs' home was worth $215,000. See Section VI of pre-typed loan application, attached as <u>Exhibit M</u>. This appraisal value was substantially and artificially inflated.

29.     On information and belief, no appraiser ever stepped inside plaintiffs' home.

5

30.     The appraisal report is attached as Exhibit Q.  Plaintiffs never received a copy of Exhibit Q until it was produced as discovery in this lawsuit.

31.     Only two years earlier, in 2002, plaintiffs had refinanced with Ameriquest and received an appraisal showing that their home was only worth $185,000.  See Section VI of the pre-typed loan application for plaintiffs' previous refinance, attached as Exhibit N.

32.     In 2000, plaintiffs purchased their home for $131,000.  See Section II of Exhibit M.

33.     Parham told plaintiffs their appraisal value at another meeting in his office several days before closing.  Plaintiffs asked at that time why the price of their home had risen so significantly, and Parham answered that there were other homes in their neighborhood selling for at least $200,000.

34.     A search on Zillow.com shows that, at the present, the most expensive house in plaintiffs' immediate neighborhood is worth $161,000.  Exhibit O.

35.     When Ameriquest inflated plaintiffs' appraised value in 2004, they also raised plaintiffs' loan amount from $139,500 to $181,250 or 97.97% of the $185,000 value of Ameriquest's 2002 appraisal or 138.36% of the $131,000 purchase price in 2000.  Exhibits M and N.

36.     Ameriquest intended to falsify the value of plaintiffs' home on the appraisal report and the application it prepared.  It did so in order to increase the loan amount for which plaintiffs appeared to qualify; this, in turn, increased the lender's "points and fees," interest income and profits - the amount of each of which is to a substantial degree determined by the size of the loan.

6

37.     Due to the inflated appraisal, which means plaintiffs owe more on the home than it is worth, plaintiffs' options for refinancing have been severely limited.  Most reputable lenders will not make a loan that exceeds 80% of the value of the home ("LTV"), at least not without also imposing expensive private mortgage insurance ("PMI").

38.     At a third meeting in Parham's office a couple days before closing, Parham told plaintiffs that their mortgage payments would include an escrow for both their taxes and insurance payments.

39.     During the closing, Parham confirmed orally that plaintiffs' escrow still included both taxes and insurance payments.

40.     After closing, plaintiffs received notice in the mail that their insurance had been cancelled for lack of payments.

41.     When plaintiff Everett Washington called Ameriquest to ask why they had not been paying his insurance premiums, an Ameriquest employee denied that insurance had ever been included in plaintiffs' mortgage payments.

42.     Indeed, plaintiffs' Escrow Account Agreement shows no allocation for insurance payments.  Exhibit L.

43.     In addition, plaintiffs were charged a "loan discount" fee (Exhibit D).  On information and belief, they received no discount.

44.     After closing, plaintiffs were directed to pay AMC Mortgage Services.

45.     AMC Mortgage Services claims or claimed an interest in plaintiffs' loan, including the right to receive payments under it.

46.     Plaintiffs were later directed to make payments to Wilshire Credit

7

Corporation. It currently claims an interest or interests in plaintiff's loan.

47.     After plaintiffs filed this lawsuit, Wilshire Credit Corporation stopped mailing them monthly statements. Plaintiffs received their last monthly statement in December 2006. Plaintiff Everett Washington sent Wilshire Credit Corporation a letter requesting monthly statements, which has never been answered. He also attempted calling Wilshire, but someone at headquarters in California merely referred Mr. Washington to a Colorado branch. No one at the Colorado branch answered the phone.

48.     On information and belief, defendant Bank of New York Mellon Trust Company, N.A., f/k/a The Bank of New York Trust Company, N.A., as successor to JPMorgan Chase Bank, N.A., as Trustee of series RAMP 2005-RP3, currently hold title to plaintiffs' loan.

49.     Alternately, defendants GMAC ResCap and Homecomings Financial, LLC currently hold title to plaintiffs' loan.

50.     In the event Bank of New York Mellon Trust Company, GMAC ResCap, or Homecomings Financial does not own plaintiffs' loan, the owners are named as Does 1-5.

## COUNT I – TILA

51.     Plaintiffs incorporate paragraphs 1-50.

52.     This claim is against all defendants except Jerry C. Mullins, d/b/a Certified Appraisal Company.

53.     In order to give consumer borrowers the opportunity to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three days of

8

receiving notice of their right to rescind, whichever is later. More specifically, the statute, provides that:

> **Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.** (15 U.S.C. § 1635(a)).

54.     To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction. More specifically, the statute provides:

> **When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.** (15 U.S.C. § 1635(b).)

55.     To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately. More specifically, the statute provides:

> **The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.** (15 U.S.C. § 1635(a).)

56.     Regulation Z, promulgated by the Federal Reserve Board pursuant to the

9

Truth in Lending Act, amplifies the statutory requirements. The regulation restates the statutory rescission right, 12 C.F.R. § 226.23(a), and requires that the creditor "deliver" to each person entitled to rescind "two copies" of a document that "clearly and conspicuously disclose" 12 C.F.R. § 226.23(b)(1) the borrower's rescission rights.

57.    More specifically, the regulation provides:

**In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(i) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(ii) The consumer's right to rescind the transaction.**

**(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(iv) The effects of rescission, as described in paragraph (d) of this section.**

**(v) The date the rescission period expires.**  (12 C.F.R. § 226.23(b)(1).)

### DEFECTIVE NATURE OF DISCLOSURES

58.    In connection with the plaintiffs' loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiffs' right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23,  for (without limitation) the following reasons:

### Inadequate Number of Notices

59.    Plaintiffs received only one copy of the federal notice of right to cancel, instead of the four required (two per mortgagor).

10

**Notices Confusing Where Less Than All Owners Are Obligated**

60.     Exhibit F is inherently confusing with respect to who has a right to cancel in a case in which less than all of the persons signing the mortgage sign the note. The confusing portions were added by Ameriquest to the official Federal Reserve Board text.

61.     The top of Exhibit F has only Everett Washington's name on it, and is addressed to "borrower(s)." The text is addressed to "You," which is reasonably interpreted as applying to the individual whose name appears directly above. The bottom of the form states that "Each borrower" has the right to cancel, which is reasonably interpreted as meaning the persons named as "borrower(s)" at the top of the document. While there are signature lines for both plaintiffs at the bottom of the form, they are there described as "Borrower/ Owner," which presumably means something different than just "borrower."

62.     The statute gives not only each person obligated to repay the loan but each person who resides in and has an ownership interest in the property the right to cancel, and requires a notice that unequivocally tells each such person that they have the right to cancel.

**"One Week" Form**

63.     The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel.

64.     Further, the "one week" cancellation notice is misleading, as the period given is actually only six days long. Ameriquest's own personnel found this confusing, and were issued a "job aid" at the beginning of each month listing the expiration dates for the official and "one week" cancellation notices for loans closed each day during the month.

65.     Finally, the "one week" notice contains the same ambiguous and

11

confusing references to "borrower" and "owner" as defendants' version of the official Federal Reserve Board three-day notice.

66.     Notice of rescission has been given to defendants.  A copy is attached as Exhibit P.

67.     The loan has not been rescinded.

68.     Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

69.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.     A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b.     Statutory damages for the underlying disclosure violation;

c.     A judgment indicating what amount, if any, plaintiffs owe to defendants, taking into account the effect of the defendant's inflated appraisal in plaintiff's ability to tender;

d.     If appropriate, statutory damages for failure to rescind;

e.     Attorney's fees, litigation expenses and costs.

f.     Such other or further relief as the Court deems appropriate.

## COUNT II – ECOA

70.     Monica A. Jones incorporates paragraphs 1-69.

71.     This claim is against Ameriquest Mortgage Company.

72.     On information and belief, the majority of the instances in which less than all owners of the property sign a note in favor of defendant are where a husband and wife own the property and only the husband signs the note.

73.     On information and belief, it is defendant's practice, if the wife does not have an income and/or her credit score is no better than the husband's, to prepare the loan documents in this manner.

74.     Defendant's practice thus impairs and obfuscates the cancellation rights of women, and married women particularly, because of their gender and marital status, in violation of the ECOA's prohibition against discrimination on such bases.

WHEREFORE, plaintiff Monica A. Jones requests that the Court enter judgment in her favor and against defendant for:

a.      Appropriate statutory and punitive damages;

b.      Attorney's fees, litigation expenses and costs.

c.      Such other or further relief as the Court deems appropriate.

## COUNT III – BREACH OF CONTRACT

75.     Plaintiffs incorporate paragraphs 1-50.

76.     This claim is against Ameriquest only.

77.     Defendant Ameriquest contracted and undertook to provide to plaintiffs a discounted interest rate if plaintiff paid a loan discount fee.

13

78.     Plaintiffs paid the fee.  Exhibit D, line 802.  However, they did not receive a discounted rate.

79.     Ameriquest thereby breached its agreement.

80.     Plaintiffs were damaged as a result.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendant for:

a.     Appropriate damages;

b.     Costs; and

c.     Such other or further relief as the Court deems appropriate.

### COUNT IV – MICHIGAN MORTGAGE BROKERS, LENDERS AND SERVICERS LENDING ACT

81.     Plaintiffs incorporate paragraphs 1-50.

82.     This claim is against Ameriquest.

83.     Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL  §445.1672(b), by (a) representing that the retention from the loan proceeds of a "loan discount" would result in a reduction of the interest rate and (b) then not reducing the interest rate.

84.     Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b) by engaging in "bait and switch" practices, representing that plaintiffs' loan would include home insurance in their monthly payment, and then signing plaintiffs into a mortgage that does not include insurance payments.

85.     Defendants engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), when they misrepresented to plaintiffs their ability to qualify for

14

a mortgage loan by basing the representation on a fraudulently inflated appraised value.

86.     Defendants engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), when they misrepresented to plaintiffs that their adjustable-rate mortgage could fluctuate either up or down, while the actual terms of the loan only allow for the adjustable-rate to go up.

87.     Defendants made these representations for the purpose of inducing plaintiffs' reliance in the form of the plaintiffs borrowing the $181,250 loan. Defendants did this in order to increase the lender's "points and fees," interest and profits and to perpetuate themselves in business.

88.     Plaintiffs have suffered injury as a result of defendants' misrepresentations. They were overcharged, and their options for refinancing with reputable mortgage companies have been severely limited by defendants' actions, literally and indefinitely trapping them in a loan with an increasingly high interest rate.

89.     Plaintiffs were induced to transact with Ameriquest by means of these misrepresentations.

90.     Defendantd made the representations in the course of trade and commerce.

91.     Defendants made the representations for the purpose of inducing reliance, in the form of the plaintiffs transacting business with Ameriquest.

92.     Plaintiffs were injured by Ameriquest's misrepresentation.

WHEREFORE, the Court should enter judgment in favor of plaintiffs and against defendants for:

a.      A declaratory judgment, MCL §445.1681(1)(a);

b.      Injunctive relief, MCL §445.1681(1)(b);

15

  c.  Appropriate damages, MCL §445.1681(1)(c);

  d.  Attorney's fees, litigation expenses and costs of suit;

  e.  Such other and further relief as the Court deems proper.

### COUNT IV - COMMON LAW FRAUD

93. Plaintiffs incorporate paragraphs 1-50 above. This claim is against Ameriquest and Jerry C. Mullins, d/b/a Certified Appraisal Company.

94. Defendants represented to plaintiffs, based upon what they reported was the existing value of their home, that plaintiffs qualified for a certain loan amount.

95. This representation was a material term of defendants' transaction with plaintiffs.

96. Defendants' representation was false and fraudulent because it was based upon a materially false representation of the value of their home.

97. Defendants made this representation intentionally, with knowledge and/or reckless ignorance of its falsity.

98. Defendants' representation that plaintiffs qualified for the loan caused plaintiffs to rely on the misrepresentation to their detriment.

99. Plaintiffs' reliance was justifiable.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendants for:

  a.  actual and compensatory damages;

  b.  punitive damages; and

  c.  Such other or further relief as the Court deems appropriate.

16

## COUNT V - DAMAGES RESULTING FROM CIVIL CONSPIRACY

100.    Plaintiffs incorporate paragraphs 1-50 above.  This claim is against Ameriquest and Jerry C. Mullins, d/b/a Certified Appraisal Company.

101.    Defendants combined to arrange for and produce a fraudulent, appraised value of plaintiff's home.

102.    Defendants took concerted and overt actions to accomplish this fraudulent and unlawful purpose and goal.

103.    Among other things, they conspired - out of excessive concern for their own profit and continuation in business - to misrepresent, conceal and suppress the actual market value of plaintiffs' property.

104.    Plaintiffs were damaged as a result of defendants' conspiracy.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendants for:

a.    Actual damages;

b.    Incidental, consequential and special damages;

c.    Costs of litigation and expenses; and

d.    Such other or further relief as this Court deems appropriate.

## COUNT VI  - ECOA

105.    Plaintiffs incorporate paragraphs 1-50 above.  This claim is against Ameriquest and Wilshire.

106.    Plaintiffs were applicants within the meaning of 15 U.S.C. §1691a(b) and Regulation B (which defines "applicant" to include persons who have received credit).

17

107.    By filing this lawsuit in good faith pursuant to the Consumer Credit Protection Act, plaintiffs were and are engaged in a statutorily protected activity.

108.    As a result of filing this lawsuit, plaintiffs have suffered and continue to suffer adverse actions at the hands of defendants. Ameriquest and Wilshire have, by refusing to send monthly statements, taken retaliatory action against these and other plaintiffs and their accounts. These actions constitute "an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. § 202.2 (c)(1)(ii).

109.    A direct causal connection exists between plaintiffs' filing suit and defendants' subsequent treatment of their accounts, as detailed above.

110.    As a result of defendants' conduct, plaintiffs are entitled to recover actual damages as well as statutory damages, punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    Actual and statutory and punitive damages according to proof;

b    Reasonable attorneys' fees and costs;

c.    Injunctive relief, if the practices complained of have not ceased or do not cease immediately; and

d.    Such other and further relief the court deems proper and just.


s/Daniel A. Edelman
Daniel A. Edelman

18

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## **JURY DEMAND**

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

T:\18084\Pleading\2nd Amended Complaint_Pleading.wpd

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Edelman, hereby certify that on March 3, 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that true and correct copies were additionally sent via email or by U.S. Mail to those parties without email addresses.

Bernard E. LeSage
blesage@buchalter.com

Mark D. Van der Laan
Dykema Gossett PLLC
300 Ottawa Ave. NW
Suite 700
Grand Rapids, MI 49503

Jerry C. Mullins
d/b/a Certified Appraisal Company
9665 Sil St.
Taylor, MI 48180

Bank of New York Mellon Trust Company, N.A.
c/o Registered Agent
C.T. Corporation System
350 N. St. Paul St.
Dallas, TX 75201

<div align="right">

s/Daniel A. Edelman
Daniel A. Edelman

</div>

**<u>EXHIBIT A</u>**

Ameriquest Mortgage Company
28400 Northwestern Hwy., # 105
Southfield, MI 48034

(248)353-4285

## BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

EVERETT C. WASHINGTON

Date: November 23, 2004

Notice: [X] Delivered     [ ] Mailed

Loan Number: 0101022929 - 5536

Descriptior of Credit Request:

2708 OAKMAN COURT
DETROIT, MI 48238

[X] 1st Trust Deed/Mortgage    [ ] 2nd Trust Deed/Mortgage

[ ] Other: _____

Property Address: 2708 OAKMAN COURT

DETROIT, MI 48238      County of WAYNE

## TYPE OF TRANSACTION:

[ ] Purchase    [X] Refinance    Other _____

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS |
|---|---|
| [ ] Fixed Rate Loan  [X] Adjustable Rate Loan | [ ] Fixed Rate Loan  [X] Adjustable Rate Loan |
| Amount Financed: $ 153,061.31 | Amount Financed: $ 152,538.31   * |
| Settlement Charges: $ 9,338.69 (Includes all Prepaid Finance Charges) | Settlement Charges: $ 10,272.54   * (Includes all Prepaid Finance Charges) |
| Loan Amount: $ 161,250.00 | Loan Amount: $ 161,250.00 |
| Annual Percentage Rate: 9.465 % | Annual Percentage Rate: 9.504 %* |
| Term: 360 | Term: 360 |
| Initial Interest Rate: 7.600 % | Initial Interest Rate: 7.600 % |
| Margin: 6.748 % | Margin: 6.748 % |
| Prepayment Penalty: [X] YES [ ] NO | Prepayment Penalty: [X] YES [ ] NO |

Borrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based exclusively on information, statements, and representations (all material facts) which have been provided by the borrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change prior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. Borrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may require new loan documents to be executed by the borrower(s).

_____    _____
Borrower EVERETT C. WASHINGTON    Date

_____    _____
Borrower    Date

_____    _____
Borrower    Date

_____    _____
Borrower    Date

*These amounts may change due to any final adjustments made to the prepaid Interest amount collected on your loan at funding.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any rights under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the: FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY, ROOM 4037, WASHINGTON DC, 20580.



000001010229290404850101

STMTCO (Rev. 3/99)

**<u>EXHIBIT B</u>**

Loan Number: 0101022929 - 5536

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

November 23, 2004
Date

Orange
City

CA
State

2708 OAKMAN COURT, DETROIT, MI 48238
Property Address

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 181,250.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder "

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **7.600 %**. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
**(A) Time and Place of Payments**
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on **January 1, 2005** .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, **December 1, 2034** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my payments at: **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $ 1,138.55. This amount may change.
**(C) Monthly Payment Changes**
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of, **December, 2006** and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and seven-hundred forty-eight thousandth(s)** percentage point(s) (6.748%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials:



Loan Number: 0101022929 - 5536

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **9.600** % or less than **7.600%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000**% from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **13.600** % or less than **7.600** %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.   **PREPAYMENT PRIVILEGE**
I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

   **(A) Prepayment Made Three (3) year(s) After the Date of this Note**
If I make a prepayment commencing on or after the Three (3) year anniversary of the date of this Note, I may make that prepayment, in full or in part, without the imposition of a prepayment charge by the Lender.
   **(B) Prepayment Made Within Three (3) year(s) of the Date of this Note**
I agree to pay Lender a prepayment charge if I make a prepayment before the Three (3) year(s) anniversary of the date this Note is executed. The prepayment charge I will pay will be equal to one percent (1%) on the amount by which the total prepayment(s) within any 12-month period exceeds twenty percent (20%) of the original principal amount of the loan.
   **(C) Application of Funds**
I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.
   **(D) Monthly Payments**
If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and the Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

6.   **LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

7.   **BORROWER'S FAILURE TO PAY AS REQUIRED**
   **(A) Late Charges for Overdue Payment**
If the Note Holder has not received the full amount of any monthly payment by the end of  fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
   **(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
   **(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.
   **(D) No Waiver by Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
   **(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full  as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.   **GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

Initials: _____

Loan Number: 0101022929 - 5536

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
Borrower   EVERETT C. WASHINGTON                           Borrower

_____ (Seal)                    _____ (Seal)
Borrower                                                   Borrower



**EXHIBIT C**

# MORTGAGE

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated November 23, 2004
together with all Riders to this document.
(B) "Borrower" is EVERETT C. WASHINGTON & MONICA A. JONES

Borrower's address is 2708 OAKMAN COURT, DETROIT,MI 48.238
. Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01
0101022929-5536

11/23/2004 5:09:21

AM6MI (0401)

Page 1 of 18          Initials:_____

VMP Mortgage Solutions, Inc. (800)521-7291

0000010102292930301341701

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200   Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated November 23, 2004
The Note states that Borrower owes Lender one hundred sixty-one thousand two hundred
fifty and 00/100                                                                    Dollars
(U.S. $ 161,250.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 1, 2034
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____                          Form 3023 1/01

AM6MI (0401)                        Page 2 of 18

0101022929-5536

11/23/2004 5:09:21



0000010102282903013417022

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County                    [Type of Recording Jurisdiction]
of WAYNE                                        [Name of Recording Jurisdiction]:
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 12/4881                       which currently has the address of
2708 OAKMAN COURT                                                          [Street]
DETROIT                                  [City], Michigan 48238           [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials:_____

AM6MI (0401)                    Page 3 of 16                    Form 3023 1/01

0101022929-5536

11/23/2004 5:09:21


0000010102229030134170 3

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

Initials:_____

Form 3023 1/01

AM6MI (0401)                            Page 4 of 18

0101022929-5536

11/23/2004 5:09:21



0000010102289303013417D4

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials:_____

Form 3023 1/01

0101022929 - 5536

11/23/2004  5:09:21



0000010102292903013417O5

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

0101022929 - 5536

11/23/2004 5:09:21



0000010102292903013441708

Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _____

Form 3023 1/01

0101022929 - 5536

11/23/2004 5:09:21


0000010102292930134170T

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward

Initials: _____

Form 3023 1/01

0101022929 - 5536

11/23/2004 5:09:21



0000010102292903013417 08

the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Initials:_____

Form 3023 1/01

AM6MI (0401)                          Page 9 of 16

0101022929 - 5536

11/23/2004 5:09:21



0000010102292903013417 09

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

Initials:_____

Form 3023 1/01

0101022929 - 5536

11/23/2004 5:09:21



0000010102292903013417 10

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

Form 3023 1/01

AM6MI (0401)                                    Page 11 of 18

0101022929 - 5536

11/23/2004 5:09:21



0000010102292903013417 11

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,

0101022929 - 5536

11/23/2004 5:09:21



00000101022829030134171 2

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous

Initials:_____

Form 3023 1/01

AM6MI (0401)                    Page 13 of 16

0101022929 - 5536

11/23/2004 5:09:21


0000010102292930301341713

Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Initials:_____                    Form 3023 1/01

AM6MI (0401)                    Page 14 of 18

0101022929 - 5536

11/23/2004 5:09:21



0000010102282903013417 14

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                        _____ (Seal)
                                                        EVERETT C. WASHINGTON          -Borrower

_____                        _____ (Seal)
                                                        MONICA A. JONES                -Borrower

_____ (Seal)                 _____ (Seal)
                                -Borrower                                               -Borrower

_____ (Seal)                 _____ (Seal)
                                -Borrower                                               -Borrower

_____ (Seal)                 _____ (Seal)
                                -Borrower                                               -Borrower

AM6MI (0401)                          Page 15 of 16                    Form 3023 1/01
0101022929 - 5536

11/23/2004 5:09:21



0000010102292930301341715

**STATE OF MICHIGAN,**       County ss:

Acknowledged before me in _____ County,
Michigan, on _____  _____  by
            Day/Month/Year

_____

_____

_____

_____

Notary Public, State of Michgan,
County of
My Commission Expires
Acting in the County of

This instrument was prepared By:
     Ameriquest Mortgage Company
     Jennifer Yang
     28400 Northwestern Hwy., # 105, Southfield, MI 48034



00000101022928030134171G

400-16MI (12/03)       Page 16 of 16       0101022929 - 5536

11/23/2004 5:09:21 PM

BORROWER NAME:

LOAN NUMBER:   0101022929 - 5536

LEGAL DESCRIPTION

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

0000010102292903013417 17

LGL3LTR (09/03)

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 23rd day of November , 2004 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2708 OAKMAN COURT, DETROIT, MI 48238
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 7.600 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of December, 2006 , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

Initials_____

Loan Number: 0101022929 - 5536


0000010102292930215030 1

Page 1 of 3

11/23/2004 5:09:21 PM

610-1 (Rev 1/01)

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and seven-hundred forty-eight thousandth(s)** percentage points ( 6.748 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.600% or less than 7.600%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %**) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.600)% or less than 7.600)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_____

Loan Number: 0101022929 - 5536



0000010102292903002150302

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)  _____ (Seal)
Borrower EVERETT C. WASHINGTON       Borrower MONICA A. JONES

_____ (Seal)  _____ (Seal)
Borrower                              Borrower

Loan Number: 0101022929 - 5536



0000010102229030216030

810-3 (Rev 1/01)

Page 3 of 3

11/23/2004 5:09:21 PM

**EXHIBIT D**

Settlement Statement
U.S. Department of Housing and Urban Development

OMB Approval No. 2502-0491

File No.: 200000627692

**A. Optional Form for**
**Transactions without Sellers**

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Everett C Washington and Monica A Jones | AMERIQUEST MORTGAGE |
| 2708 Oakman Court | 28400 NORTH WESTERN HWY |
| Detroit, MI 48238 | SOUTHFIELD, MI 48034 |

Property Location:

2708 Oakman Court
Detroit, MI 48238

Loan Number: 0101022929

Settlement Agent: Mortgage Information Services, Inc
Place of Settlement: 4877 Galaxy Parkway, Suite 1
Cleveland, OH 44128

Settlement Date: 11/23/2004
Fund Date: 11/30/2004

**L. Settlement Charges**

| 800. Items Payable in Connection with Loan | | | | M. Disbursements to Others | |
|---|---|---|---|---|---|
| 801. Loan Origination Fee % to AMERIQUEST MORTGAGE | | | 1501. Mortgage Payoff to AMERIQUEST MORTGAGE | $145,507.45 |
| 802. Loan Discount 3.879 % to AMERIQUEST MORTGAGE | | $6,254.89 | 1502. Tax Payoff to Treasurer City of Detroit | $1,217.78 |
| 803. Appraisal Fee to AMERIQUEST MORTGAGE | | $400.00 | | |
| 804. Credit Report to | | | 1503. Creditor to Energy America | $434.00 |
| 805. Lender's Inspection Fee to | | | | |
| 806. Mortgage Insurance Application to | | | 1504. Creditor to MCI Worldcom Company | $36.00 |
| 807. Assumption Fee to | | | | |
| 808. to AMERIQUEST MORTGAGE | | | 1505. Creditor to Michigan AMR | $124.00 |
| 809. to AMERIQUEST MORTGAGE | | | | |
| 810. Tax Related Service Fee to AMERIQUEST MORTGAGE | | $70.00 | 1506. Creditor to PALISADES | $25.00 |
| 811. Flood Search fee to AMERIQUEST MORTGAGE | | $16.00 | | |
| 812. Lending Processing Fee to AMERIQUEST MORTGAGE | | $626.00 | 1507. Creditor to VERIZON WIRELESS | $262.00 |
| 813. Admin Fee to AMERIQUEST MORTGAGE | | $239.00 | | |
| 814. to AMERIQUEST MORTGAGE | | | 1508. Creditor to WM Beaumont Roy | $88.00 |
| 817. Application Fee to AMERIQUEST MORTGAGE | | $360.00 | | |
| **900. Items Required by Lender to be Paid in Advance** | | | 1509. to | |
| 901. Interest from 11/30/2004 to 12/1/2004 @ $33.58 /day | | $33.58 | 1510. to | |
| 902. Mortgage Insurance Premium for months to | | | 1511. to | |
| 903. Hazard Insurance Premium for months to | | | | |
| 904. to | | | 1512. to | |
| **1000. Reserves Deposited with Lender** | | | 1513. to | |
| 1001. Hazard insurance months @ per month | | | | |
| 1002. Mortgage insurance months @ per month | | | 1514. to | |
| 1003. City property taxes 1 month @$286.85 per month | | $286.85 | | |
| 1004. County property taxes months @ per month | | | 1515. to | |
| 1005. Assessment Taxes months @ per month | | | | |
| 1006. School property taxes months @ per month | | | 1516. to | |
| 1007. Other taxes months @ per month | | | | |
| 1008. Other taxes months @ per month | | | 1517. to | |
| 1009. months @ per month | | | | |
| 1010. months @ per month | | | 1518. to | |
| 1011. Aggregate Adjustment to AMERIQUEST MORTGAGE | | | | |
| **1100. Title Charges** | | | 1519. to | |
| 1101. Settlement or closing fee to Mortgage Information Services | | $125.00 | | |
| 1102. Abstract or title search to Mortgage Information Services | | | 1520. TOTAL DISBURSED (enter on line 1603) | $147,688.20 |
| 1103. Title examination to Mortgage Information Services | | | | |
| 1104. Title insurance binder to Mortgage Information Services | | | | |
| 1105. Document preparation to Diversified Business Alliance | | $100.00 | | |
| 1106. Notary fees to Mortgage Information Services | | | | |
| 1107. Quick Title Fee to Mortgage Information Services (includes above item numbers ) | | | | |
| 1108. Title insurance to Mortgage Information Services (includes above item numbers ) | | $787.00 | | |
| 1109. Lender's Coverage $161,250.00/$787.00 | | | | |
| 1110. Owner's Coverage $0.00/$0.00 | | | | |
| 1111. EPA 8.1 n/c to Mortgage Information Services | | | | |
| 1112. Comp 100 n/c to Mortgage Information Services | | | | |
| 1113. Arm Endorsement n/c to Mortgage Information Services | | | | |
| 1114. Courier Fee to Mortgage Information Services | | $50.00 | | |
| 1115. to | | | | |
| 1116. to | | | | |
| 1117. to | | | | |
| 1118. to | | | | |
| 1119. to | | | | |
| 1120. to | | | | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Recording Fees: Deed ; Mortg $87.00; Rel | | $87.00 | | |
| 1202. City/county tax/stamps: Deed ; Mortg | | | | |
| 1203. State tax/stamps: Deed ; Mortg | | | **N. NET SETTLEMENT** | |
| 1204. Tax certificates to Mortgage Information Services | | $25.00 | | |
| 1205. Held Sig Fee to Mortgage Information Services | | | 1500. Loan Amount | $161,250.00 |
| 1206. Assignment Fee to Mortgage Information Services | | | | |
| 1207. Mortgage Tax to Mortgage Information Services | | | 1601. Plus Cash/Check from Borrower | $0.00 |
| **1300. Additional Settlement Charges** | | | | |
| 1301. Survey to | | | 1602. Minus Total Settlement Charges (Line 1400) | $9,970.32 |
| 1302. Pest Inspection to | | | | |
| 1303 to | | | 1603. Minus Total Disbursements to Others (Line 1520) | $147,688.20 |
| 1304 to | | | | |
| 1305 to | | | | |
| 1306 to | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | $3,591.48 |
| 1307 to | | | | |
| 1308 to | | | | |
| 1400. Total Settlement Charges (enter on Line 1602) | | $9,970.32 | | |

Borrower's Signatures

Everett C Washington

Monica A Jones

/ Dan Nicolassi
Settlement Agent

11/23/04
Date

**FINAL**

**BORROWER COPY**

Settlement Statement
Optional Form for
Transactions without Sellers

A. U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0491

File No.: 2000000627092

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Everett C Washington and Monica A Jones | AMERIQUEST MORTGAGE |
| 2708 Oakman Court | 28400 NORTHWESTERN HWY |
| Detroit, MI 48238 | SOUTHFIELD, MI 48034 |
| Property Location: | Settlement Agent: Mortgage Information Services, Inc |
| 2708 Oakman Court | Place of Settlement: 4877 Galaxy Parkway, Suite 1 |
| Detroit, MI 48238 | Cleveland, OH 41128 |
| Loan Number: 0101022929 | Settlement Date: 11/23/2004 |
| | Fund Date: 11/31/2004 |

**L. Settlement Charges**

| | | | |
|---|---|---|---|
| 800. Items Payable in Connection with Loan | | | |
| 801. Loan Origination Fee % to AMERIQUEST MORTGAGE | | | $6,154.89 |
| 802. Loan Discount 3.879 % to AMERIQUEST MORTGAGE | | | $100.00 |
| 803. Appraisal Fee | to | | |
| 804. Credit Report | to | | |
| 805. Lender's Inspection Fee | to | | |
| 806. Mortgage Insurance Application | to | | |
| 807. Assumption Fee | to | | |
| 808. | to AMERIQUEST MORTGAGE | | |
| 809. | to AMERIQUEST MORTGAGE | | $70.00 |
| 810. Tax Related Service Fee | to AMERIQUEST MORTGAGE | | $16.00 |
| 811. Flood Search fee | to AMERIQUEST MORTGAGE | | $626.00 |
| 812. Lenders Processing Fee | to AMERIQUEST MORTGAGE | | $139.00 |
| 813. Admin Fee | to AMERIQUEST MORTGAGE | | |
| 814. | to AMERIQUEST MORTGAGE | | $360.00 |
| 817. Application Fee | to AMERIQUEST MORTGAGE | | |
| 900. Items Required by Lender to be Paid in Advance | | | $33.58 |
| 901. Interest from 11/30/2004 to 12/1/2004 @ $33.58 /day | | | |
| 902. Mortgage Insurance Premium for months to | | | |
| 903. Hazard Insurance Premium for months to | | | |
| 904. | to | | |
| 1000. Reserves Deposited with Lender | | | |
| 1001. Hazard insurance | month @ per month | | |
| 1002. Mortgage insurance | month @ per month | | |
| 1003. City property taxes | 1 month @ $286.85 per month | | $286.85 |
| 1004. County property taxes | months @ per month | | |
| 1005. Assessment Taxes | months @ per month | | |
| 1006. School property taxes | months @ per month | | |
| 1007. Other taxes | months @ per month | | |
| 1008. Other taxes | months @ per month | | |
| 1009. | months @ per month | | |
| 1010. | months @ per month | | |
| 1011. Aggregate Adjustment | to AMERIQUEST MORTGAGE | | |
| 1100. Title Charges | | | $325.00 |
| 1101. Settlement or closing fee | to Mortgage Information Services | | |
| 1102. Abstract or title search | to Mortgage Information Services | | |
| 1103. Title examination | to Mortgage Information Services | | |
| 1104. Title insurance binder | to Mortgage Information Services | | |
| 1105. Document preparation | to Diversified Business Alliance | | $400.00 |
| 1106. Notary fees | to Mortgage Information Services | | |
| 1107. Quick Title Fee (includes above item numbers ) | | | |
| 1108. Title insurance | to Mortgage Information Services | | $787.00 |
| (includes above item numbers ) | | | |
| 1109. Lender's Coverage | $161,250.00/$787.00 | | |
| 1110. Owner's Coverage | $0.00/$0.00 | | |
| 1111. EPA 8.1 n/c | to Mortgage Information Services | | |
| 1112. Comp 100 n/c | to Mortgage Information Services | | |
| 1113. Arm Endorsement n/c | to Mortgage Information Services | | $60.00 |
| 1114. Courier Fee | to | | |
| 1115. | to | | |
| 1116. | to | | |
| 1117. | to | | |
| 1118. | to | | |
| 1119. | to | | |
| 1120. | to | | |
| 1200. Government Recording and Transfer Charges | | | $87.00 |
| 1201. Recording Fees: Deed ; Mortg $87.00; Rel | | | |
| 1202. City/county tax/stamps: Deed ; Mortg | | | |
| 1203. State tax/stamps: Deed ; Mortg | | | |
| 1204. Tax certificates | to Mortgage Information Services | | $25.00 |
| 1205. Hold Sig Fee | to Mortgage Information Services | | |
| 1206. Assignment Fee | to Mortgage Information Services | | |
| 1207. Mortgage Tax | to Mortgage Information Services | | |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey | to | | |
| 1302. Pest Inspection | to | | |
| 1303. | to | | |
| 1304. | to | | |
| 1305. | to | | |
| 1306. | to | | |
| 1307. | to | | |
| 1308. | to | | $3,970.32 |
| 1400. Total Settlement Charges (enter on Line 1602) | | | $9,970.32 |

**M. Disbursements to Others**

| | | |
|---|---|---|
| 1501. Mortgage Payoff | | $145,507.48 |
| to AMERIQUEST MORTGAGE | | |
| 1502. Tax Payoff | | $1,217.75 |
| to Treasurer City of Detroit | | |
| 1503. Creditor | | $434.00 |
| to Energy America | | |
| 1504. Creditor | | $30.00 |
| to MCI Worldcom Company | | |
| 1505. Creditor | | $124.00 |
| to Michigan AMR | | |
| 1506. Creditor | | $25.00 |
| to PALISADES | | |
| 1507. Creditor | | $262.00 |
| to VERIZON WIRELESS | | |
| 1508. Creditor | | $88.00 |
| to WM Beaumont Roy | | |
| 1509. | | |
| to | | |
| 1510. | | |
| to | | |
| 1511. | | |
| to | | |
| 1512. | | |
| to | | |
| 1513. | | |
| to | | |
| 1514. | | |
| to | | |
| 1515. | | |
| to | | |
| 1516. | | |
| to | | |
| 1517. | | |
| to | | |
| 1518. | | |
| to | | |
| 1519. | | |
| to | | |
| 1520. TOTAL DISBURSED (enter on line 1603) | | $147,688.20 |

FINAL

BORROWER COPY

**N. NET SETTLEMENT**

| | |
|---|---|
| 1600. Loan Amount | $161,250.00 |
| 1601. Plus Cash/Check from Borrower | $0.00 |
| 1602. Equals Total Settlement Charges (Line 1400) | $9,970.32 |
| 1603. Minus Total Disbursements to Others (Line 1520) | $147,688.20 |
| 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | $3,591.48 |

Borrower's Signatures

Everett C Washington

Monica A Jones

/ Dan Nicoletti                     11/23/04
Settlement Agent                    Date

**EXHIBIT E**

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Preliminary ☐  Final ☒

LENDER: Ameriquest Mortgage Company
28400 Northwestern Hwy., # 105
Southfield, MI 48034
(248)353-4285

Broker License:

Borrowers: EVERETT C. WASHINGTON

Type of Loan:  ADJUSTABLE RATE
Date:  November 23, 2004

Address:  2708 OAKMAN COURT
City/State/Zip:  DETROIT, MI 48238

Loan Number:  0101022929 - 5536

Property:  2708 OAKMAN COURT, DETROIT, MI 48238

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.504 % | $ 318,166.20 | $ 152,538.31 | $ 470,704.51 |

**YOUR PAYMENT SCHEDULE WILL BE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,138.55 | 01/01/2005 | | | |
| 335 | $1,319.60 | 01/01/2007 | | | |
| 1 | $1,313.31 | 12/01/2034 | | | |

**VARIABLE RATE FEATURE:**
☒ Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**  You are giving a security interest in the property located at:  2708 OAKMAN COURT, DETROIT, MI 48238

**ASSUMPTION:**  Someone buying this property
☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**  You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:**  If a payment is late, you will be charged 5.000% of the overdue payment.

**PREPAYMENT:**  If you pay off your loan early, you
☒ may  ☐ will not  have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower EVERETT C. WASHINGTON _____ Date _____

Borrower MONICA A. JONES _____ Date _____

Borrower _____ Date _____

Borrower _____ Date _____



TIL1 (Rev. 7/01)
00000101022929030575010t

**ORIGINAL COPY**

11/23/2004 5:09:21 PM

**EXHIBIT F**

# NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   November 23, 2004
LOAN NO.:   0101022929 - 5536
TYPE:   ADJUSTABLE RATE

BORROWER(S): EVERETT C. WASHINGTON

ADDRESS:        2708 OAKMAN COURT
CITY/STATE/ZIP:   DETROIT, MI 48238

PROPERTY:   2708 OAKMAN COURT
            DETROIT, MI  48238

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is

    ENTER DOCUMENT SIGNING DATE
    11/23/04

    or
2. The date you received your Truth in Lending disclosures;
    or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN:  FUNDING
PHONE: (714)634-3494
FAX:   (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

    ENTER FINAL DATE TO CANCEL
    11/27/04

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____          _____
SIGNATURE                                DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____   ____   _____   ____
BORROWER/OWNER  EVERETT C. WASHINGTON   Date   BORROWER/OWNER  MONICA A. JONES   Date

_____   ____   _____   ____
BORROWER/OWNER                   Date   BORROWER/OWNER                   Date

1004-NRC (Rev 11/03)
00000101022929040005 0101

**LENDER COPY**

11/23/2004 5:09:21 PM

**<u>EXHIBIT G</u>**

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0101022929 - 5536

Borrower(s): EVERETT C. WASHINGTON

Date: November 23, 2004

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____     _____
Borrower/Owner  EVERETT C. WASHINGTON          Date

_____     _____
Borrower/Owner  MONICA A. JONES                Date

_____     _____
Borrower/Owner                                 Date

_____     _____
Borrower/Owner                                 Date

---

## REQUEST TO CANCEL

I/We want to cancel loan #_____

_____     _____
Borrower/Owner Signature                       Date

11/23/2004 5:09:21 PM



0000001010222929040422010I

**LENDER COPY**

850 (10/00)

**EXHIBIT H**

## CLOSING INSTRUCTIONS
### ITEMIZATION OF SETTLEMENT CHARGES

| Title Company/Attorney | Title Officer/Attorney | Phone Number | Order Number |
|---|---|---|---|
| CT - MORTGAGE INFORMATION SVCS. | TITLE PROCESS GROUP | (800)877-7557 | 200800627692 |

| Borrower(s) | Property Address |
|---|---|
| EVERETT C. WASHINGTON | 2708 OAKMAN COURT |
| | DETROIT          MI          48238 |
| | Loan Number: 0101022929 |

FROM: Ameriquest Mortgage Company - Southfield, MI    Phone No. (248)353-4285    Fax (248)353-8191
Branch Name                                                                  Branch Phone No.                       Branch Fax Number

BELOW IS A LIST OF ALL SETTLEMENT CHARGES AND DISBURSEMENTS APPLICABLE TO THIS LOAN. YOU MUST USE THESE FIGURES TO PREPARE YOUR SETTLEMENT STATEMENT. YOU CANNOT DEVIATE FROM THESE FIGURES WITHOUT PRIOR WRITTEN AUTHORIZATION FROM VICE PRESIDENT OF LOAN OPERATIONS AND/OR ITS DIRECTORS .

| LINE NO. ON SETTLEMENT STATEMENT | PAYEE | AMOUNT |
|---|---|---|
| 801. Loan origination fee    % to | | |
| 802. Loan discount  3.879  % to  Ameriquest Mortgage Company | | $8,254.89 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | | $400.00 |
| 808. Yield Spread Premium to | | |
| 809 | | |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | | $70.00 |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | | $16.00 |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | | $625.00 |
| 813 Admin to Ameriquest Mortgage Company | | $239.00 |
| 814. Doc. Prep. Fee to | | |
| 815. Credit Report Fee to | | |
| 816. Origination Fee    % to | | |
| 817. Application Fee to  Ameriquest Mortgage Company | | $360.00 |
| 818. Underwriting Fee to | | |
| 819. Service Provider Fee to | | |
| 820. Processing Fee to | | |
| 821. Underwriting Fee to | | |
| 822. Appraisal Fee to | | |
| 901. Interest from 11/21/2004  to 12/01/2004  @  $33.58 per day | | $335.80 |
| 902. Mortgage insurance premium for          months to | | $0.00 |
| 903. Hazard Ins prem  to | | |
| 904. Flood Ins prem  to | | |
| 1001. Hazard insurance    months @ $    per month | | |
| 1002. Mortage insurance    months @ $    per month | | |
| 1003. Earthquake Ins    months @ $    per month | | |
| 1004. County prop. taxes  1  months @ $  286.85 per month | | $286.85 |
| 1005. Annual assess.    months @ $    per month | | |
| 1006. Flood    months @ $    per month | | |
| 1007. Windstorm Ins    months @ $    per month | | |
| 1008. | | |
| 1101. Settlement or closing fee to  CT - MORTGAGE | | $350.00 |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to  DIVERSIFIED BUSINESS ALLIANCE | | $400.00 |
| 1107. Attorney's fees to | | |
| 1108. Title insurance to  CT - MORTGAGE INFORMATION | | $787.00 |
| 1109. Lender's coverage | | |
| 1110. Owner's coverage          $ | $787.00 | |
| 1111. Settlement/Disbursement fee to | | |
| 1112. Escrow Fee to | | |
| 1201. Recording fees to | | $87.00 |
| 1202. City/county tax/stamps | | |
| 1203. State tax/ stamps | | |
| 1204. State specific fee | | |
| 1301. Demand to | | |
| 1302. Pest Inspection to | | |
| 1303. Survey Fee | | |
| 1304. Staff Appraiser Fee | | |
| 1305. Reconveyance Fee to | | |
| 1306. | | |
| 1307. Property Val Fee to | | $80.00 |
| 1308. Courier Fee | | |

*Any amounts appearing on these lines are prepaid finance charges and cannot be increased or added once loan documents have been prepared unless new loan documents are generated.

_____                    _____
Title Company Representative Signature                         Date


00000101022929030074307 06

**EXHIBIT I**

Ameriquest Mortgage Company

Summary of Debts and Disbursements
(Refinance Loans Only)

Borrower: EVERETT C. WASHINGTON

Date: November 23, 2004
Branch:
Southfield, MI

Loan Number: 0101022929 - 5536

| Fees | | |
|---|---|---|
| Loan Discount Fee | 3.879 | $6,254.89 |
| Lender Retained Fees | | $1,311.00 |
| Prepaid Interest | | $335.80 |
| Fees Paid to Others | | $2,370.85 |

Short to Close

Total Payoffs $147,043.44

Cash to Borrower $3,934.02

Total Points & Fees $10,272.54

| CREDITORS DEBTS | BALANCE | PAYOFFS | PAYMENTS |
|---|---|---|---|
| CONCORD SERVICE CORP | $6,758.00 | | $202.74 |
| AMERIQUEST MORTGAGE CO | | $144,862.69 | |
| ANN ARBOR CREDIT BUREA | | | |
| DISCOVER FINANCIAL SVC | $6,631.00 | | $148.00 |
| ENERGY AMERICA | | $434.00 | |
| MCI WORLDCOM CO | | $30.00 | |
| MEDICAL PAYMENT DATA | | | |
| MI HEALTCARE | | | |
| MICHIGAN AMR | | $124.00 | |
| PALISADES | | $25.00 | |
| VERIZON WIRELESS/GREAT | | $262.00 | |
| WM BEAUMONT ROY | | $88.00 | |
| 2004 CITY TAXES | | $1,217.75 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



00000101022929020479010 1

Total Payments: $350.74

**EXHIBIT J**

## ITEMS TO BE PAID OFF FROM LOAN PROCEEDS

Borrower : EVERETT C. WASHINGTON

Close Date: 11/23/2004

Loan Number : 0101022929 - 5536

| Payee | | Amount |
|-------|-----|--------|
| AMERIQUEST MORTGAGE CO | (W) | $144,862.69 |
| ENERGY AMERICA | (W) | $434.00 |
| MCI WORLDCOM CO | (W) | $30.00 |
| MICHIGAN AMR | (W) | $124.00 |
| PALISADES | (W) | $25.00 |
| VERIZON WIRELESS/GREAT | (W) | $262.00 |
| WM BEAUMONT ROY | (W) | $88.00 |
| 2004 CITY TAXES | (W) | $1,217.75 |

Total Wire: $182,661.46

Loan Amount: 161,250.00

Cash/Check from Borrower:

Borrower Proceeds: $3,934.02

Estimated Funding Date: 11/30/2004

_____
Title Company Representative Signature     Date

Print Date: 11/23/2004     05:09PM

895-7UNV (2/2004)

**EXHIBIT K**

**Ameriquest Mortgage Company**

Borrower Name: EVERETT C. WASHINGTON

Loan Number: 0101022929 - 5536

Borrower Name:

Property Address: 2708 OAKMAN COURT
DETROIT, MI 48238

## UNDERSTANDING YOUR OPTIONS REGARDING
## INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other. A "discount point" is a one-time fee that equals one (1) percent of the loan amount that lowers the interest rate of the loan. So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio. The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points. The following example shows how your options work.



**STARTING LOAN TERMS SCENARIO**

In this example, the base rate is 7% and points are 1.6%, which is $1,600:

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 7% |
| Discount points: | 1.6% ($1,600) |



**LOWER RATE SCENARIO**

To receive a lower interest rate, you can take a loan with an additional 1.6 discount points:

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 6% |
| Discount points: | 3.2% ($3,200) |



**REDUCED DISCOUNT POINT SCENARIO**

To reduce your discount points by 1.6, your interest rate would be 1 percentage point higher:

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 8% |
| Discount points: | 0% (0) |

\* The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor. A discount point lowers the interest rate but *not* necessarily the overall cost of the loan. A lower rate may be a good choice if you don't plan to sell or refinance for some time. On the other hand, you might not want to have additional discount points if you think you'll sell or refinance soon. Your account executive can give you more information about the options available to you and the exact terms of your loan.



854 (Rev 08/24/03)

**EXHIBIT L**

**Ameriquest Mortgage Company**



00000101022929040490101

Ameriquest Mortgage Company
28400 Northwestern Hwy., # 105
Southfield, MI 48034

Borrower: EVERETT C.

## ESCROW ACCOUNT AGREEMENT
## TAX & INSURANCE

Loan Number: 0101022929 - 5536

I/We have applied for a real estate loan with Ameriquest Mortgage Company hereinafter referred to as "Lender," to be secured by a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") and repaid as stated in a Promissory Note.
**Lender does not require an Escrow Account.** Accordingly, if I/we elect the option of establishing an Escrow Account, I/we may cancel it at any time. If, however, I/we default under the terms of the Promissory Note or Security Instrument, Lender may change the Tax and Insurance Escrow Account from optional to a required Tax and Insurance Escrow Account. Lender may charge me/us an escrow account cancellation fee.

If I/we do not elect to establish an Escrow Account, I/we may do so after loan closing by contacting the Loan Servicing Department. An escrow account set up fee may be charged. (If the servicing of the loan is sold, the new servicer may not offer the option of an escrow account.)

**Borrower(s)' Escrow Account Preference is Indicated Below:**

| | No, I/we do not want an escrow account established on this loan. _____I_____ (Initials) |
|---|---|

| | |
|---|---|
| XX | **Yes, I/we would like an escrow account established on this loan. Please escrow for the following:** |

Property Taxes $ _____286.85_____ * per month _____I_____ (Initials)

Hazard Insurance $ _____ * per month _____I_____ (Initials)

Flood Insurance $ _____ * per month _____I_____ (Initials)

Earthquake Insurance $ _____ * per month _____I_____ (Initials)

Windstorm Insurance $ _____ * per month _____I_____ (Initials)

*1/12 of the estimated annual amount.

I/We agree to make the Note payments and pay Lender the amounts Lender has estimated for deposit into the Tax and Insurance Escrow Account. These amounts are estimated to pay, when due, taxes and insurance premiums relating to the loan.

If Lender determines that there will not be enough money to pay the expenses, Lender may require me/us to increase payments into the Tax and Insurance Escrow Account. Lender will not have to pay the expenses if there is not enough money in the Tax and Insurance Escrow Account. A default under the Security Instrument may occur if any of the described expenses remain unpaid.

Lender or any investor who purchases the loan may change or cancel the Tax and Insurance Escrow Account arrangements as allowed by law.

If the law of the state in which the property is located requires payment of interest on money in the Escrow Account, Lender will compute and pay interest at a rate of no less than the minimum required by such applicable law.

BORROWER ACKNOWLEDGMENT:

Executed this 23rd day of November, 2004.

_____     _____

EVERETT C. WASHINGTON

**EXHIBIT M**

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [ ] the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or [X] the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

Mortgage Applied for: [ ] VA [X] Conventional [ ] Other (explain): [ ] FHA [ ] USDA/Rural Housing Service

Agency Case Number:

Lender Case Number: 0101022929

| Amount | Interest Rate | No. of Months | Amortization Type |
|---|---|---|---|
| $161,250.00 | 7.600 % | 360 | [ ] Fixed Rate [ ] GPM [ ] Other (explain): [X] ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state, & ZIP): 2708 OAKMAN COURT, DETROIT, MI 48238

No. of Units: 1

Legal Description of Subject Property (attach description if necessary)

Year Built: 1950

Purpose of Loan: [ ] Purchase [X] Refinance [ ] Construction [ ] Construction-Permanent [ ] Other (explain):

Property will be: [X] Primary Residence [ ] Secondary Residence [ ] Investment

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [ ] made [ ] to be made |
|---|---|---|---|---|
| 2000 | $130,000.00 | $ 0.00 | | Cost: $ 0.00 |

Title will be held in what Name(s): EVERETT C. WASHINGTON & MONICA A. JONES

Manner in which Title will be held:

Estate will be held in: [X] Fee Simple [ ] Leasehold (show expiration date)

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable): EVERETT C. WASHINGTON | Co-Borrower's Name (include Jr. or Sr. if applicable): |
| Social Security Number: [redacted] Home Phone (incl. area code): [redacted] DOB (MM/DD/YYYY): [redacted] Yrs. School: | Social Security Number: Home Phone (incl. area code): DOB (MM/DD/YYYY): Yrs. School: |
| [X] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated; Dependents (not listed by Co-Borrower) no.: 0 ages: | [ ] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated; Dependents (not listed by Borrower) no.: ages: |
| Present Address (street, city, state, ZIP) [X] Own [ ] Rent 4 No. Yrs.: 2708 OAKMAN COURT DETROIT,MI 48238 | Present Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs.: |
| Mailing Address, if different from Present Address: | Mailing Address, if different from Present Address: |

If residing at present address for less than two years, complete the following:

| Borrower | Co-Borrower |
|---|---|
| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs.: | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs.: |

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Name & Address of Employer [ ] Self Employed: BEN WASHINGTON AND SONS 7116 TIREMAN ST DETROIT, MI 48204 | Name & Address of Employer [ ] Self Employed: |
| Yrs. on this job: 1 | Yrs. on this job: |
| Yrs. employed in this line of work/profession: 1 | Yrs. employed in this line of work/profession: |
| Position/Title/Type of Business: JOURNEYMEN PLUMBER | Position/Title/Type of Business: |
| Business Phone (incl. area code): | Business Phone (incl. area code): |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Borrower | Co-Borrower |
|---|---|
| Name & Address of Employer [ ] Self Employed | Name & Address of Employer [ ] Self Employed |
| Dates (from - to) | Dates (from - to) |
| Monthly Income $ | Monthly Income $ |
| Position/Title/Type of Business | Position/Title/Type of Business |
| Business Phone (incl. area code) | Business Phone (incl. area code) |
| Name & Address of Employer [ ] Self Employed | Name & Address of Employer [ ] Self Employed |
| Dates (from - to) | Dates (from - to) |
| Monthly Income $ | Monthly Income $ |
| Position/Title/Type of Business | Position/Title/Type of Business |
| Business Phone (incl. area code) | Business Phone (incl. area code) |

0101022929

Initials: ______

| Borrower's cell | Borrower's pager |
|---|---|
| Co-Borrower's cell | Co-Borrower's pager |

00000101022929060599060 1



VMP -21N (0301) VMP Mortgage Solutions (800)521-7291

Redacted

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 5,310.57 | $ | $ 5,310.57 | Rent | $ 0.00 | |
| Overtime | 0.00 | | 0.00 | First Mortgage (P&I) | 1,456.00 | 1,138.55 |
| Bonuses | 0.00 | | 0.00 | Other Financing (P&I) | 0.00 | 0.00 |
| Commissions | 0.00 | | 0.00 | Hazard Insurance | 60.00 | 60.00 |
| Dividends/Interest | 0.00 | | 0.00 | Real Estate Taxes | 286.84 | 286.85 |
| Net Rental Income | 0.00 | | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 5,310.57 | $ | $ 5,310.57 | Total | $ 1,802.84 | $ 1,485.40 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income    Notice:  Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [ ] Jointly [X] Not Jointly

| ASSETS | Cash or Market Value | | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | | |
|---|---|---|---|---|---|---|
| Description | | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance | |
| Cash deposit toward purchase held by: | $ 0.00 | | Name and address of Company | $ Payment/Months | $ | |
| List checking and savings accounts below | | | *** SEE ADDENDUM *** | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| THE BRICE GROUP - PLUMBERS LOCAL NO. 98 | | | | | | |
| | | | Acct. no. | | | |
| Acct. no. | $ 16,896.83 | | Name and address of Company | $ Payment/Months | $ | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| | | | Acct. no. | | | |
| Acct. no. | $ | | Name and address of Company | $ Payment/Months | $ | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| | | | Acct. no. | | | |
| Acct. no. | $ | | Name and address of Company | $ Payment/Months | $ | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| | | | Acct. no. | | | |
| Acct. no. | $ | | Name and address of Company | $ Payment/Months | $ | |
| Stocks & Bonds (Company name/number & description) /0 | $ 0.00 | | | | | |
| | | | Acct. no. | | | |
| | | | Name and address of Company | $ Payment/Months | $ | |
| Life Insurance net cash value | $ 0.00 | | | | | |
| Face amount: $ 0.00 | | | | | | |
| Subtotal Liquid Assets | $ 16,896.83 | | Acct. no. | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 215,000.00 | | | | | |
| Vested interest in retirement fund | $ 0.00 | | Name and address of Company | $ Payment/Months | $ | |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | | | |
| Automobiles owned (make and year) | $ | | | | | |
| | | | Acct. no. | | | |
| | | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | | |
| Other Assets (itemize) | $ | | Job-Related Expense (child care, union dues, etc.) | $ | | |
| | | | Total Monthly Payments | $ 350.74 | | |
| Total Assets a. | $ 231,896.83 | | Net Worth (a minus b) $ 18,507.83 | Total Liabilities b. | $ 13,389.00 | |

0101022929

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

VMP -21N (0305)



00000  0102292806055900002

## V. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 2708 OAKMAN COURT DETROIT, MI 48238 | H SFR | $ 215000 | $ 0 | $ 0 | $ 1452 | $ 347 | $ 0 |
| | | | | | | | |
| | Totals | $ 215000 | $ 0 | $ 0 | $ 1452 | $ 347 | $ 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 144,862.69 |
| e. Estimated prepaid items | 33.58 |
| f. Estimated closing costs | 2,748.00 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 6,254.89 |
| i. Total costs (add items a through h) | 153,899.16 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 161,250.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 161,250.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -7,350.84 |

## VII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes/No | Co-Borrower Yes/No |
|---|---|---|
| a. Are there any outstanding judgments against you? | No X | |
| b. Have you been declared bankrupt within the past 7 years? | No X | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | No X | |
| d. Are you a party to a lawsuit? | No X | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | No X | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | No X | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | No X | |
| h. Is any part of the down payment borrowed? | No X | |
| i. Are you a co-maker or endorser on a note? | No X | |
| j. Are you a U.S. citizen? | Yes X | |
| k. Are you a permanent resident alien? | No X | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | Yes X | |
| m. Have you had an ownership interest in a property in the last three years? | Yes X | |
| (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | |
| (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER** ☐ I do not wish to furnish this information.

Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino

Race: ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White

Sex: ☐ Female ☑ Male

**CO-BORROWER** ☐ I do not wish to furnish this information.

Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino

Race: ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White

Sex: ☐ Female ☐ Male

To be Completed by Interviewer
This application was taken by:
☐ Face-to-face interview
☐ Mail
☑ Telephone
☐ Internet

| Interviewer's Name (print or type) | |
|---|---|
| Alfred Parham | |
| Interviewer's Signature | Date |
| | |
| Interviewer's Phone Number (incl. area code) | |
| (714) 541-9960 | |

Name and Address of Interviewer's Employer
Ameriquest Mortgage Company.
28400 Northwestern Hwy., # 105
Southfield, MI 48034



**<u>EXHIBIT N</u>**

0038424313

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☒ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☒ Conventional ☐ Other: | ☐ FHA ☐ FmHA | Agency Case Number | Lender Case Number 0038424313 |

| Amount | Interest Rate | No. of Months | Amortization Type: | |
|---|---|---|---|---|
| $139,500.00 | 9.500 % | 360 | ☐ Fixed Rate ☐ GPM | ☐ Other (explain): ☒ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) | | No. of Units |
|---|---|---|
| 2708 Oakman Court, DETROIT, MI 48238 | | |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| | 0 |

| Purpose of Loan | ☐ Purchase ☐ Construction ☐ Other (explain): ☒ Refinance ☐ Construction-Permanent | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| 0 | $0.00 | $ 0.00 | Refi-Cash Out | Cost: $ 0.00 |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| Everett C. Washington and Monica A. Jones, Husband and Wife | | ☒ Fee Simple ☐ Leasehold (show expiration date) |

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | Everett C. Washington | |
| Social Security Number | | |
| Home Phone (incl. area code) | | |
| Age | 37 | |
| Yrs. School | 12 | |
| Marital Status | ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated |
| Dependents (not listed by Co-Borrower) | no. 0 ages | no. ages |
| Present Address (street, city, state, ZIP) | ☒ Own ☐ Rent No. Yrs. 2 | ☐ Own ☐ Rent No. Yrs. |
| | 2708 Oakman Court DETROIT, MI 48238 | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) | ☐ Own ☐ Rent No. Yrs. | Former Address (street, city, state, ZIP) | ☐ Own ☐ Rent No. Yrs. |
|---|---|---|---|

| Former Address (street, city, state, ZIP) | ☐ Own ☐ Rent No. Yrs. | Former Address (street, city, state, ZIP) | ☐ Own ☐ Rent No. Yrs. |
|---|---|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer | Ben Washington & Sons | ☐ Self Employed Yrs. on this job | | ☐ Self Employed Yrs. on this job |
| | | Yrs. employed in this line of work/profession | | Yrs. employed in this line of work/profession |
| Position/Title/Type of Business | | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income | | | Monthly Income |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income | | | Monthly Income |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

| Borrower's Signature X Everett C. Wash | Date '9-21-02 | Borrower's cell phone | Borrower's pager number |
|---|---|---|---|
| Co-Borrower's Signature X | Date | Co-Borrower's cell phone | Co-Borrower's pager number |

Page 1 of 4

VMP MORTGAGE FORMS - (800)521-7291

-21 (8210).07

Freddie Mac Form 65 10/92
Fannie Mae Form 1003 10/92

Redacted

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | 4,269.66 | | 4,269.66 | Rent | 0.00 | |
| | | | | First Mortgage (P&I) | 1,393.37 | 1,173.00 |
| Overtime | | | | Other Financing (P&I) | | 0.00 |
| Bonuses | | | | Hazard Insurance | 80.83 | 80.83 |
| Commissions | | | | Real Estate Taxes | 125.00 | 125.00 |
| Dividends/Interest | | | | Mortgage Insurance | 0.00 | 0.00 |
| Net Rental Income | 0.00 | | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | | | Other: | 0.00 | 0.00 |
| Total | 4,269.66 | | 4,269.66 | Total | 1,599.20 | 1,378.83 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | | Monthly Amount |
|---|---|---|---|
| B/C | | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☒ Not Jointly

| ASSETS | | Cash or Market Value |
|---|---|---|
| Description | | |
| Cash deposit toward purchase held by: | | 0.00 |
| List checking and savings accounts below | | |
| Name and address of Bank, S&L, or Credit Union | | |
| | | |
| Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union | | |
| | | |
| Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union | | |
| | | |
| Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union | | |
| | | |
| Acct. no. | | |
| Stocks & Bonds (Company name/number & description) | | |
| | | |
| Life insurance net cash value | | 0.00 |
| Face amount: $ 0.00 | | |
| Subtotal Liquid Assets | | 0.00 |
| Real estate owned (enter market value from schedule of real estate owned) | | 185,000.00 |
| Vested interest in retirement fund | | 0.00 |
| Net worth of business(es) owned (attach financial statement) | | 0.00 |
| Automobiles owned (make and year) | | |
| | | |
| Other Assets (itemize) | | |
| | | |
| Total Assets a. | | 185,000.00 |

| LIABILITIES | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|
| Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
| Name and address of Company: $ Pmt./Mos. | 590.00 | 37,108.00 |
| FORD MOTOR CR | 63 | |
| 1301 WEST LONG LAK | | |
| TROY, MI 48098 | | |
| Acct. no. ABN2196BEL | | |
| Name and address of Company $ Pmt./Mos. | (1,543.00) | (129,728.00) |
| CFMC/AHFS | 85 | |
| P O BOX 143009 | | |
| IRVING, TX 75014 | | |
| Acct. no. 1572609 | | |
| Name and address of Company $ Pmt./Mos. | 91.00 | 4,327.00 |
| DISCOVER FIN | 50 | |
| POB 15316 | | |
| WILMINGTON, DE 19850 | | |
| Acct. no. 601100500024 | | |
| Name and address of Company $ Pmt./Mos. | 17.00 | 688.00 |
| NHLD BANK | 41 | |
| POB 98706 | | |
| LAS VEGAS, NV 89193 | | |
| Acct. no. 0000312432 | | |
| Name and address of Company $ Pmt./Mos. | 6.39 | 213.00 |
| MI HEALTCARE | 34 | |
| 29777 TELEGRAPH RD | | |
| SOUTHFIELD, MI 48034 | | |
| Acct. no. 666719 | | |
| Name and address of Company $ Pmt./Mos. | 7.86 | 262.00 |
| VERIZONWRLS | 34 | |
| 1515 E. W | | |
| SCHAUMBURG, IL 60173 | | |
| Acct. no. 36218312 | | |
| Name and address of Company $ Pmt./Mos. | (970.00) | (0.00) |
| Auto Owners | | |
| Acct. no. | | |
| Alimony/Child Support/Separate Maintenance Payments Owed to: | | |
| Job Related Expense (child care, union dues, etc.) | 0.00 | |
| Total Monthly Payments | 712.25 | |
| Net Worth (a minus b) | 142,202.00 | Total Liabilities b. 42,798.00 |

Borrower's Signature: _Everett Wood_    Date 9/9/02

Co-Borrower's Signature:    Date

Fannie Mae Form 1003 10/92
Freddie Mac Form 65 10/92

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)**

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) ▼ | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 2708 Oakman DETROIT, MI 48238 | R | SFR | $ 185000 | $ 128100 | $ 0 | $ 1544 | $ 225 | $ 0 |
| | | | | | | | | |
| | | | | | | | | |
| | | Totals | $ 105000 | $ 128100 | $ 0 | $ 1544 | $ 225 | $ 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. | Purchase price | $ 0.00 |
| b. | Alterations, improvements, repairs | 0.00 |
| c. | Land (if acquired separately) | 0.00 |
| d. | Refinance (incl. debts to be paid off) | 1,717.31 |
| e. | Estimated prepaid items | 789.25 |
| f. | Estimated closing costs | 0.00 |
| g. | PMI, MIP, Funding Fee | 0.00 |
| h. | Discount (if Borrower will pay) | 4,450.05 |
| i. | Total costs (add items a through h) | 6,956.61 |
| j. | Subordinate financing | 0.00 |
| k. | Borrower's closing costs paid by Seller | 0.00 |
| l. | Other Credits (explain) | 0.00 |
| | | 0.00 |
| | | 0.00 |
| | | 0.00 |
| m. | Loan amount (exclude PMI, MIP, Funding Fee financed) | 139,500.00 |
| n. | PMI, MIP, Funding Fee financed | 0.00 |
| o. | Loan amount (add m & n) | 139,500.00 |
| p. | Cash from/ to Borrower (subtract j, k, l & o from i) | -132,543.39 |

## VII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|---|
| a. | Are there any outstanding judgments against you? | | X | | |
| b. | Have you been declared bankrupt within the past 7 years? | | X | | |
| c. | Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. | Are you a party to a lawsuit? | | X | | |
| e. | Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. | Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. | Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. | Is any part of the down payment borrowed? | | X | | |
| i. | Are you a co-maker or endorser on a note? | | X | | |
| j. | Are you a U.S. citizen? | X | | | |
| k. | Are you a permanent resident alien? | | X | | |
| l. | Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. | Have you had an ownership interest in a property in the last three years? | X | | | |
| | (1) What type of property did you own -- principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| | (2) How did you hold title to the home -- solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in this application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information contained in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

**Certification:** I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X Everett West | 9-23-02 | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may neither discriminate on the basis of this information, nor on whether you choose to furnish it. However, if you choose not to furnish the above information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER**
Race/National Origin:
- [ ] I do not wish to furnish this information
- [ ] American Indian or Alaskan Native
- [ ] Asian or Pacific Islander
- [ ] White, not of Hispanic origin
- [X] Black, not of Hispanic origin
- [ ] Hispanic
- [ ] Other (specify)

Sex: [ ] Female  [X] Male

**CO-BORROWER**
Race/National Origin:
- [ ] I do not wish to furnish this information
- [ ] American Indian or Alaskan Native
- [ ] Asian or Pacific Islander
- [ ] White, not of Hispanic origin
- [ ] Black, not of Hispanic origin
- [ ] Hispanic
- [ ] Other (specify)

Sex: [ ] Female  [ ] Male

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | Reuben Foreman | Ameriquest Mortgage Company |
| [ ] face-to-face interview | Interviewer's Signature | Date 28400 Northwestern Hwy., # 240 |
| [ ] by mail | | Southfield, MI 48034 |
| [X] by telephone | Interviewer's Phone Number (incl. area code) | |
| | (248) 352-4295 | |

Fannie Mae Form 1003
10/92 Freddie Mac Form 65 10/92

VMP-21 (9210).07

0038424313

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:  Washington, Everett C. | Agency Case Number: |
| | Co-Borrower: | Lender Case Number:  0038424313 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
| X  *Everett (Wash*   | 9-23-02 | X | |

LMP-21 (9210).07

Page 4 of 4

Fannie Mae Form 1003 10/92
Freddie Mac Form 65 10/92

**EXHIBIT O**



**Your Edge in Real Estate**

**Welcome!** Please **Sign In**. New to Zillow? Register **here**.

**Showing** 2708 Oakman Ct, Detroit, MI 48238



© 2006 NAVTEQ | © 2006 GlobeXplorer and Suppliers | © 2006 Proxix

| # | Address | Home Type | BR | BA | Zestimate™ | Home (sq ft) | Lot (sq ft) | Year Built | Date Sold |
|---|---------|-----------|----|----|-----------|-------------|------------|-----------|-----------|
| | 2708 Oakman Ct | Misc | -- | 2.5 | $117,929 | 2,335 | 12,022 | 1936 | -- |

© 2006 Zillow.com, All Rights Reserved

**<u>EXHIBIT P</u>**

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
## 120 S. LaSalle Street, 18th floor
### Chicago, Illinois  60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
### Email:  edcombs@aol.com
### www.edcombs.com

October 20, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Wilshire Credit Corporation
c/o registered agent
CSC-Lawyers Incorporating Service
601 Abbott Road
East Lansing, MI 48823

> Re:  Notice of rescission, claim and lien, Everett Washington, Monica A.
> Jones,  2708 Oakman, Detroit, MI  48238, loan of Nov. 23, 2004

Ladies/Gentlemen:

The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on October 20, 2006.

Daniel A. Edelman

# EXHIBIT Q

CERTIFIED APPRAISAL COMPANY
RESIDENTIAL APPRAISALS

0101022929
File No. msb17

## APPRAISAL OF



SINGLE FAMILY RESIDENCE

### LOCATED AT:

2708 OAKMAN COURT
DETROIT, MI 48238

### FOR:

AMERIQUEST MORTGAGE COMPANY
1600 DOUGLASS ROAD
ANAHEIM 92806

### BORROWER:

WASHINGTON

### AS OF:

2004/11/18

### BY:

JERRY C MULLINS SRA

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 48180 313-258-9979

OO-ECLG0024530

CHEAPPRAISALY
RESIDENTIAL APPRAISALS

0101022929
File No. msb17

AMERIQUEST MORTGAGE COMPANY
1600 DOUGLASS ROAD
ANAHEIM 92806

File Number: msb17

In accordance with your request, I have personally Inspected and appraised the real property at:

2708 OAKMAN COURT
DETROIT, MI 48238

The purpose of this appraisal is to estimate the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property as of   2004/11/18          is:

$215,000
Two Hundred Fifteen Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

*Jerry C. Mullins*

JERRY C MULLINS  SRA

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 48180 313-258-9979

OO-ECLG0024531

CERTIFIED APPRAISAL COMPANY

# UNIFORM RESIDENTIAL APPRAISAL REPORT

0101022929
File No. msb17

**Property Description**

| | | | | |
|---|---|---|---|---|
| Property Address 2708 OAKMAN COURT | | City DETROIT | State MI | Zip Code 48238 |
| Legal Description SEE ATTACHED ADDENDUM | | | County WAYNE | |
| Assessor's Parcel No. N/A | | Tax Year 98 | R.E. Taxes \$ | Special Assessments \$ N/A |
| Borrower WASHINGTON | Current Owner SAME | | Occupant: [X] Owner □ Tenant □ Vacant |
| Property rights appraised [X] Fee Simple □ Leasehold | Project Type □ PUD □ Condominium (HUD/VA only) | | HOA\$ | /Mo. |
| Neighborhood or Project Name N/A | | Map Reference SMSA 2160 | Census Tract | |
| Sale Price \$ REFI | Date of Sale NONE | Description and \$ amount of loan charges/concessions to be paid by seller NONE NOTED | | |
| Lender/Client AMERIQUEST MORTGAGE COMPANY | Address 1600 DOUGLASS ROAD, ANAHEIM, CA, 92806 | | | |
| Appraiser JERRY C MULLINS SRA | Address 25971 CONTINENTAL CIRCLE, TAYLOR MICHIGAN 48180 | | | |

| Location | [X] Urban □ Suburban □ Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|
| Built up | [X] Over 75% □ 25-75% □ Under 25% | | PRICE (000) | AGE (yrs) | One family 95% | [X] Not likely □ Likely |
| Growth rate | □ Rapid [X] Stable □ Slow | [X] Owner | 80 Low | 25 | 2-4 family | □ In process |
| Property values | □ Increasing [X] Stable □ Declining | □ Tenant | 250 High | 110 | Multi-family | To: |
| Demand/supply | □ Shortage [X] In balance □ Over supply | [X] Vacant (0-5%) | Predominant | | Commercial 5% | |
| Marketing time | [X] Under 3 mos. □ 3-6 mos. □ Over 6 mos. | □ Vacant (over 5%) | | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: SEE ATTACHED ADDENDUM...

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): THE AREA IS COMPRISED OF A MIXTURE OF SIZES, AGE, AND QUALITY OF CONSTRUCTION SINGLE FAMILY RESIDENTIAL HOMES. THE SUBJECT IS IN CLOSE PROXIMITY TO ALL SUPPORT FACILITIES SUCH AS SHOPPING, EMPLOYMENT, TRANSPORTATION, SCHOOLS, ETC. AREA DISPLAYS AVERAGE APPEAL WITH NO INORDINATE ADVERSE INFLUENCES AFFECTING MARKETABILITY OF REAL ESTATE IN THE AREA. MARKET CONDITIONS AND PROPERTY VALUES WITHIN THE NEIGHBORHOOD ARE CONDUCIVE TO THE ENVIRONMENT.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time — such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): GENERAL MARKET CONDITIONS IN SUBJECTS AREA ARE STABLE WITH SUPPLY AND DEMAND IN BALANCE. CONVENTIONAL MORTGAGES ARE READILY AVAILABLE WITH NO SELLER CONCESSIONS. MANY SALES TRANSPIRE WITH FINANCING CONCESSIONS SUCH AS FHA AND VA MORTGAGES AT INTEREST RATES ACCEPTABLE TO A TYPICAL BUYER. NEARBY EMPLOYMENT IS FROM A VARIETY OF SOURCES AND CONSIDERED STABLE.

Project Information for PUDs (if applicable) — Is the developer/builder in control of the Home Owners' Association (HOA)? □ YES □ NO
Approximate total number of units in the subject project N/A    Approximate total number of units for sale in the subject project N/A
Describe common elements and recreational facilities: N/A

| | | |
|---|---|---|
| Dimensions 40X132 | | Topography LEVEL ABOVE STREET |
| Site area 5280 Sq.Ft. | Corner Lot □ Yes [X] No | Size TYPICAL FOR AREA |
| Specific zoning classification and description SINGLE FAMILY RESIDENTIAL | | Shape MOSTLY RECTANGULAR |
| Zoning compliance [X] Legal □ Legal nonconforming (Grandfathered use) □ Illegal □ No zoning | | Drainage APPEARS ADEQUATE |
| Highest & best use as improved: [X] Present use □ Other use (explain) | | View RESIDENTIAL |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | CONCRETE | [X] | □ | Landscaping | CONFORMING |
| Gas | [X] | | Curb/gutter | CONCRETE | [X] | □ | Driveway Surface | CONCRETE |
| Water | [X] | | Sidewalk | CONCRETE | [X] | □ | Apparent easements | TYPICAL UTILITIES |
| Sanitary sewer | [X] | | Street lights | MERCURY VAPOR | [X] | □ | FEMA Special Flood Hazard Area □ Yes [X] No | |
| Storm sewer | [X] | | Alley | NONE | □ | □ | FEMA Zone C    Map Date 7-2-81 | |
| | | | | | | | FEMA Map No. 260222 | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): SEE ATTACHED ADDENDUM...

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | CONCRETE | Slab | 0% | Area Sq.Ft. | 1216 | Roof | UNK |
| No. of Stories | 2 | Exterior Walls | BRICK | Crawl Space | 0% | % Finished | 60% | Ceiling | UNK [X] |
| Type (Det./Att.) | DETACH | Roof Surface | ASPHALT | Basement | 100% | Ceiling | ACOUSTIC | Walls | UNK [X] |
| Design (Style) | COLONIAL | Gutters & Dwnspts. | ALUMINUM | Sump Pump | NONE NOTED | Walls | PANELING | Floor | □ |
| Existing/Proposed | EXISTING | Window Type | WOOD D. H. | Dampness | NONE NOTED | Floor | TILE | None | □ |
| Age (Yrs.) | 1931 | Storm/Screens | ALUMINUM | Settlement | NONE NOTED | Outside Entry | NONE | Unknown | □ |
| Effective Age (Yrs.) | 31 | Manufactured House | NO | Infestation | NONE NOTED | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | AREA | | | AREA | | 1,216 |
| Level 1 | AREA | 1 | 1 | 1 | | | | | | | | 1,216 |
| Level 2 | | | | | | | | 4 | 2 | | | 1,216 |
| | | | | | | | | | | | | 0 |

Finished area above grade contains: 7 Rooms; 4 Bedroom(s); 2 Bath(s); 2,432 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | CARPET/TILE/AVG | Type | FWA | Refrigerator | [P] | None | [X] | Fireplace(s) # 1 | [X] | None | □ |
| Walls | DRYWALL/AVG | Fuel | GAS | Range/Oven | [P] | Stairs | □ | Patio | [X] | Garage 2 | # of cars |
| Trim/Finish | WOOD/AVG | Condition | AVG | Disposal | □ | Drop Stair | □ | Deck | □ | Attached | |
| Bath Floor | CERAMIC/AVG | COOLING | | Dishwasher | [X] | Scuttle | [X] | Porch | [X] | Detached | 2 |
| Bath Wainscot | CERAMIC/AVG | Central | YES | Fan/Hood | [P] | Floor | □ | Fence | [X] | Built-in | |
| Doors | WOOD/AVG | Other | NONE | Microwave | [P] | Heated | □ | Pool | □ | Carport | |
| | | Condition | AVG | Washer/Dryer | [P] | Finished | □ | | | Driveway | 3 |

Additional features (special energy efficient items, etc.): SEE ATTACHED ADDENDUM...

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.: SEE ATTACHED ADDENDUM...

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: AT THE TIME OF INSPECTION, THERE WERE NO ADVERSE ENVIRONMENTAL CONDITIONS NOTED. NO EVIDENCE OF THE PRESENCE OF UFFI NOTED.

OO-ECLG0024532

CERTIFIED APPRAISAL COMPANY
0101022929
**UNIFORM RESIDENTIAL APPRAISAL REPORT** File No. msb17

| Valuation Section | | |
|---|---|---|
| ESTIMATED SITE VALUE.......................... = $ | 18,000 | Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | | |

| | | | | |
|---|---|---|---|---|
| Dwelling | 2,432 Sq. Ft. @ $ | 79.00 | = $ | 192,100 |
| Bsmt. 1216 | Sq. Ft. @ $ | 12.00 | = $ | 14,600 |
| F/P,Porch | | | | 8,800 |
| Garage/Carport | 400 Sq. Ft. @ $ | 22.00 | = $ | 8,800 |
| Total Estimated Cost New | | | = $ | 215,600 |
| Less 70 Physical Functional External | | | | |
| Depreciation $24,500 | | Est. Remaining Econ. Life 19 | = $ | 24,500 |
| Depreciated Value of Improvements.................. = $ | | | | 191,000 |
| "As-Is" Value of Site Improvements.................. = $ | | | | 6,000 |
| INDICATED VALUE BY COST APPROACH............. = $ | | | | 215,000 |

ALL COST FIGURES ARE BASED UPON THE MARSHALL & SWIFT COST CALCULATOR HANDBOOK. THE LAND VALUE IS TYPICAL FOR SUBJECT'S AREA AND HAS BEEN DRIVEN BY ABSTRACTION METHOD, BASED UPON THE PHYSICAL, CONDITION OF THE PROPERTY AND ITS EFFECTIVE AGE, THE REMAINING ECONOMIC LIFE IS AROUND 40-45 YEARS,

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 2708 OAKMAN COURT | 3841 FULLERTON | 5921 OAKMAN | 2276 OAKMAN BOULEVARD |
| | DETROIT | DETROIT | DETROIT | DETROIT |
| Proximity to Subject | | 10 BLOCKS | 8 BLOCKS | 4 BLOCKS |
| Sales Price | REFI | $ 200,000 | $ 207,000 | $ 228,000 |
| Price/Gross Liv. Area | $ 0.00 ⌀ | $ 80.06 ⌀ | $ 111.05 ⌀ | $ 81.88 ⌀ |
| Data and/or Verification Sources | INSPECTION | MLS # 24124659 | MLS # 24072931 | MLS # 24038101 |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | NONE | CONVENTIONAL 1 DOM | | CONVENTIONAL 7 DOM | | CONVENTIONAL 58 DOM | |
| Date of Sale/Time | | 2004/09/29 CLOSED | | 2004/07/21 CLOSED | | 2004/07/14 CLOSED | |
| Location | URBAN/AVG | URBAN/AVG | | URBAN/AVG | | URBAN/AVG | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 40X132 | 40X131 | | 45X144 | | 153X120 | |
| View | RESIDENTIAL | RESIDENTIAL | | RESIDENTIAL | | RESIDENTIAL | |
| Design and Appeal | 2 STORY/AVG | 2 STORY/AVG | | 1.5 STORY/AVG | | 2 STORY/AVG | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Age | 1931 YRS | 1939 YRS | | 1949 YRS | | 1928 YRS | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count 30 | 7 4 2.00 | 8 4 2.00 | | 6 3 1.50 | | 8 4 3.2 | |
| Gross Living Area | 2,432 Sq.Ft. | 2,498 Sq.Ft. | 2,000 | 1,864 Sq.Ft. | +17,000 | 2,781 Sq.Ft. | -10,500 |
| Basement & Finished Rooms Below Grade | BASEMENT FINISHED | BASEMENT FINISHED | | BASEMENT FINISHED | | BASEMENT AVERAGE | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | GFA/CAC | GFA/CAC | | GFA/CAC | | GFA/CAC | |
| Energy Efficient Items | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Garage/Carport | 2 GARAGE | 2 GARAGE | | 2 GARAGE | | 2 GARAGE | |
| Porch, Patio, Deck, Fireplace(s), etc. | PORCH, PATIO FIREPLACE | PORCH, PATIO FIREPLACE | | PORCHES FIREPLACE | | PORCH, PATIO FIREPLACE | |
| Fence, Pool, etc. | FENCE | FENCE | | FENCE | | FENCE | |
| OTHER | UPD.KITCHEN | UPD. KITCHEN | | UPD. KITCHEN | | UPD.KITCHEN | |
| Net Adj. (total) | | [+] [X] | 2,000 | [X] [+] | 17,000 | [+] [X] | 10,500 |
| Adjusted Sales Price of Comparable | | Gross: 1% Net: .1% | 198,000 | Gross: 8% Net: -8% | 224,000 | Gross: 5% Net: +5% | 217,500 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): DIFFERENCE IN GROSS LIVING AREA WERE ADJUSTED AT $30 PER SQUARE FOOT, ALL THREE SALES ARE IN THE MARKET AREA OF SUBJECT AND ARE GOOD INDICATORS OF VALUE. ADJUSTED COMPARABLES ARE WITHIN A VERY TIGHT RANGE OF VALUE. GREATEST WEIGHT GIVEN TO SALES #1 & #2 WITH RELIANCE ON ALL THREE SALES. SALES IN EXCESS OF ONE MILE USED TO EQUATE SIMILAR LOCATIONAL APPEAL.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | NO SALE IN LAST 36 MONTHS | NO SALE IN LAST 12 MONTHS OTHER THAN ABOVE. | NO SALE IN LAST 12 MONTHS OTHER THAN ABOVE. | NO SALE IN LAST 12 MONTHS OTHER THAN ABOVE. |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: THE SUBJECT PROPERTY DOES NOT HAVE A SALE PENDING OR IS CURRENTLY LISTED FOR SALE. THE ABOVE COMPARABLES HAVE NO PRIOR SALES AND ARE NOT CURRENTLY LISTED FOR SALE.

| | | |
|---|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH .................................. | $ | 215,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ | N/A /Mo. x Gross Rent Multiplier N/A = $ | 0 |

This appraisal is made [X] "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans and specifications.
Conditions of Appraisal: SEE ATTACHED ADDENDUM

Final Reconciliation: GREATEST WEIGHT GIVEN TO THE MARKET APPROACH TO VALUE WHICH BEST REFLECTS ACTIONS OF TYPICAL BUYERS AND SELLERS IN THE MARKETPLACE. DUE TO THE AGE OF THE SUBJECT THE COST APPROACH WAS GIVEN LEAST WEIGHT IN FINAL VALUE. THE INCOME APPROACH IS NOT A VALID INDICATOR OF VALUE.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 2004/11/18 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 215,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature Jerry C. Mullins | Signature | ☐ Did ☐ Did Not |
| Name JERRY C MULLINS SRA | Name | Inspect Property |
| Date Report Signed 11/21/2004 | Date Report Signed | |
| State Certification # | State | State |
| Or State License # 1201001506 | State MI | Or State License # State |

OO-ECLG0024533

 

ADDENDUM

0101022920
File No. msb17

**Scope of The Appraisal**

THIS IS A SUMMARY APPRAISAL REPORT WHICH IS INTENDED TO COMPLY WITH THE REQUIREMENTS SET FORTH UNDER STANDARDS RULE 2-2(b) IN THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE FOR DISCUSSIONS OF THE DATA, REASONING, AND ANALYSES THAT WERE USED IN THE APPRAISAL PROCESS TO DEVELOP THE APPRAISER'S OPINION WITHIN THE REPORT CONCERNING THE DATA, REASONING, AND ANALYSIS IS RETAINED IN THE APPRAISER'S FILE WHERE APPROPRIATE.

SUBJECT PROPERTY DATA WAS BASED UPON AN INTERIOR AND EXTERIOR INSPECTION OF THE SUBJECT PROPERTY. ADDITIONAL DATA ON THE SUBJECT PROPERTY AND COMPARABLES WAS COMPILED FROM PUBLIC RECORDS, ASSESSOR DATA, AND MULTI-LIST INFORMATION, WHERE REASONABLY AVAILABLE IN A TIMELY MANNER.

**Neighborhood Boundaries**

THE SUBJECT PROPERTY IS LOCATED IN A CONFORMING AREA OF ONE AND TWO STORY AVERAGE QUALITY HOMES BUILT AROUND 1930. THE SUBJECT PROPERTY IS BOUNDED ON THE NORTH BY W. DAVISON FREEWAY, ON THE SOUTH BY OAKMAN BOULEVARD, ON THE WEST BY LIVERNOIS AVENUE, AND ON THE EAST BY LINWOOD STREET IN THE CITY OF DETROIT. THE SUBJECT PROPERTY IS LOCATED IN THE DETROIT SCHOOL DISTRICT.

**Site Comments**

THE SUBJECT PROPERTY IS LOCATED ON A STANDARD INTERIOR LOT FRONTING A RESIDENTIAL STREET AMONG SIMILAR HOUSING WITH NO ADVERSE SITE INFLUENCES OBSERVED. THE WELL MAINTAINED SITE HAS GOOD APPEAL WITH LOCAL PROPERTIES. THE SIZE, SHAPE, AND TOPOGRAPHY OF THE SUBJECT SITE ARE TYPICAL FOR AREA..

**Additional Features**

THE INTERIOR OF THE SUBJECT PROPERTY IS TYPICAL OF THE HOMES IN THIS NEIGHBORHOOD. THE APPRAISED VALUE INCLUDES ONLY THOSE ITEMS THAT ARE CONSIDERED PART OF THE REAL ESTATE. THE SUBJECT PROPERTY IS A TWO STORY AVERAGE QUALITY HOME WITH FINISHED BASEMENT, FULL CERAMIC BATHROOM, HARDWOOD FLOORS, UPDATED KITCHEN CABINETS WITH SOME BUILT-IN APPLIANCES, AND DETACHED TWO CAR GARAGE WITH CONCRETE DRIVEWAY.

**Condition of Improvements**

THE SUBJECT PROPERTY HAS BEEN UNDER CURRENT OWNERSHIP FOR 5 YEARS AND REFLECTS GOOD MAINTENANCE LEVELS WITH NUMEROUS QUALITY UPGRADES. NO EVIDENCE OF DEFERRED MAINTENANCE, FUNCTIONAL OBSOLESCENCE OR EXTERNAL INFLUENCES. ALL SYSTEMS APPEAR TO BE IN WORKING ORDER. LESS THAN NORMAL PHYSICAL DEPRECIATION WAS OBSERVED.

**Conditions of Appraisal**

NO CONDITIONS ARE ATTACHED TO THIS APPRAISAL. THE SUBJECT PROPERTY IS APPRAISED IN ITS AS IS CONDITION WITH NO REPAIRS REQUIRED. LIMITED APPRAISER MELISSA BLEVINS LICENSE #1201071620 ASSISTED IN OVER 75% OF THIS APPRAISAL REPORT INCLUDING COLLECTING, VERIFYING, AND RECORDING INFORMATION.

**Final Reconciliation**

ALL THREE COMPARABLES WERE GIVEN CONSIDERATION AND ARE GOOD INDICATORS OF VALUE FOR THE SUBJECT PROPERTY.

NO SPECIFIC WEIGHT WAS PLACED ON ANY ONE COMPARABLE.

THE FINAL ESTIMATE OF VALUE FALLS WITHIN THE ADJUSTED VALUE RANGE OF THE COMPARABLES.

**License Agreement**

IN MICHIGAN, APPRAISERS ARE REQUIRED TO BE LICENSED/CERTIFIED AND ARE REGULATED B THE MICHIGAN DEPARTMENT OF CONSUMER AND INDUSTRY SERVICES, LICENSING DIVISION, P.O. BOX 30018, LANSING, MICHIGAN, 48909

OO-ECLG0024534



0101022929
File No. msb17

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

### STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc. ) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc. ) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

---

OO-ECLG0024535

0101022929
File No. mab17

**APPRAISERS CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED:  2708 OAKMAN COURT, DETROIT, MI  48238

APPRAISER:

SUPERVISORY APPRAISER (only if required)

Signature:  _Jerry C. Mullins_
Name:  JERROC MULLINS  SRA
Date Signed:  11/21/2004
State Certification #:
or State License #:  1201001506
State:
Expiration Date of Certification or License:

Signature:  _____
Name:  _____
Date Signed:  _____
State Certification #:  _____
or State License #:  _____
State:  _____
Expiration Date of Certification or License:  _____

☐ Did   ☐ Did Not Inspect Property

OO-ECLG0024536



## DIMENSION LIST ADDENDUM

| | | |
|---|---|---|
| Borrower: WASHINGTON | File No.: msb17 | |
| Property Address: 2708 OAKMAN COURT | Case No.: 0101022929 | |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | | |

| GROSS BUILDING AREA (GBA) | 2,432 | |
|---|---|---|
| GROSS LIVING AREA (GLA) | 2,432 | |
| Area(s) | Area | % of GBA |
| Living | 2,432 | 100.00 |
| Level 1 | 1,216 | 50.00 |
| Level 2 | 1,216 | 50.00 |
| Level 3 | | |
| Other | | |
| Basement | | |
| Garage | | |

| Area Measurements | | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Measurements | Factor | | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
| 38.00 x 32.00 x | 1.00 | = | 1,216.00 | X | | | | | |
| 38.00 x 32.00 x | 1.00 | = | 1,216.00 | | X | | | | |

OO-ECLG0024537

 SUBJECT PROPERTY PHOTO ADDENDUM 

| Borrower: WASHINGTON | | File No.: msb17 |
|---|---|---|
| Property Address: 2708 OAKMAN COURT | | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | | |



FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: 2004/11/18
Appraised Value: $ 215,000



REAR VIEW OF
SUBJECT PROPERTY



STREET SCENE

OO-ECLG0024538



COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: WASHINGTON | File No.: msb17 |
| Property Address: 2708 OAKMAN COURT | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | |



**COMPARABLE SALE #1**

3841 FULLERTON
DETROIT
Sale Date: 2004/09/29
Sale Price: $ 200,000



**COMPARABLE SALE #2**

5921 OAKMAN
DETROIT
Sale Date: 2004/07/21
Sale Price: $ 207,000



**COMPARABLE SALE #3**

2276 OAKMAN BOULEVARD
DETROIT
Sale Date: 2004/07/14
Sale Price: $ 228,000

OO-ECLG0024539



LOCATION MAP

| | |
|---|---|
| Borrower: WASHINGTON | File No.: msb17 |
| Property Address: 2708 OAKMAN COURT | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | |

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 48180 313-258-9979

OO-ECLG0024540

LOCATION MAP

| Borrower: WASHINGTON | | File No.: msb17 |
| Property Address: 2708 OAKMAN COURT | | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | | |

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 4:180 313-258-9979

OO-ECLG0024541

SKETCH

| Borrower: WASHINGTON | File No.: msb17 |
| Property Address: 2708 OAKMAN COURT | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | |

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 48180 313-258-9979

OO-ECLG0024542

**FLOOD MAP**

| | |
|---|---|
| Borrower: WASHINGTON | File No.: msb17 |
| Property Address:2708 OAKMAN COURT | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | |

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 48180 313-258-9979

OO-ECLG0024543



FLOORPLAN

| Borrower: WASHINGTON | File No.: msb17 |
| Property Address: 2709 OAKMAN COURT | Case No.: 0101022929 |
| City: DETROIT | State: MI | Zip: 48238 |
| Lender: AMERIQUEST MORTGAGE COMPANY | |

Sketch by Apex IV Windows™

### AREA CALCULATIONS SUMMARY

| Code | Description | Size | Totals |
|------|-------------|------|--------|
| GLA1 | First Floor | 1216.00 | 1216.00 |
| GLA2 | Second Floor | 1216.00 | 1216.00 |
| TOTAL LIVABLE (rounded) | | | 2432 |

### LIVING AREA BREAKDOWN

| Breakdown | | Subtotals |
|-----------|--|-----------|
| First Floor | | |
| 32.0 x 38.0 | | 1216.00 |
| Second Floor | | |
| 32.0 x 38.0 | | 1216.00 |
| 2 Areas Total (rounded) | | 2432 |

25971 CONTINENTAL CIRCLE TAYLOR, MICHIGAN 48180 313-258-9979

OO-ECLG0024544