IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | ) ) ) ) | MDL NO. 1715<br><br>Lead Case No. 05-CV-07097 |
| | ) | (Centralized before Judge Aspen) |
| ROSE TERRY, et al.<br>　　　　　　Plaintiffs<br>　　-vs.- | ) ) ) ) ) | |
| AMERIQUEST MORTGAGE COMPANY, et al.<br>　　　　Defendants and Third-party<br>　　　　Plaintiffs<br>　　-vs.- | ) ) ) ) ) | Case No. 1:08-CV-02475<br><br>Honorable David H. Coar |
| FIRST AMERICAN TITLE INSURANCE COMPANY, et al.<br>　　　　　　Third-party Defendants | ) ) ) ) | |

**EXHIBIT 2**
**TO**
**THIRD-PARTY DEFENDANT**
**FIRST AMERICAN TITLE INSURANCE COMPANY'S**
**MOTION TO REASSIGN TO MDL**

Robert Radasevich
Jason A. Frye
rradasevich@ngelaw.com
Neal, Gerber & Eisenberg LLP
Two North LaSalle Street -Suite 1700
Chicago, IL 60602
(312) 269-8000
FAX (312) 578-4947

NGEDOCS: 020828.0601:1615784.1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROSE TERRY, TERRY WATT and<br>ROY PARNELL, JOHANNA GUYTON,<br>LUISA and JORGE BOLO,<br>SELVIN and BEATRICE QUIRE,<br>JUAN BAEZ and CRUZ RIVERA,<br>JULIE NORADIN, RAMSES FAVELA,<br>ANANAIS and ETHEL COLISTER,<br>MICHAEL COX and SUSAN LAWRENCE,<br>WENCES GARCIA and MARIA LARA,<br>ELIZABETH HILL, ALFREDO and<br>ANA VELIA JAIME, DENISE and CAREY LEE,<br>DARYL MONSON, LAWRENCE MUELLER,<br>JOHN and CONSTANCE PUGA,<br>BENJAMIN NEELY, JAMES SHEW,<br>HAROLD WELLS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 08-2475<br><br>Judge Coar<br><br>Magistrate Judge Mason<br><br><br>JURY TRIAL DEMAND |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| AMERIQUEST MORTGAGE COMPANY,<br>DAWN ARNALL, DAWN ARNALL as<br>Trustee for THE ROLAND and<br>DAWN ARNALL LIVING TRUST,<br>WAYNE LEE, AMERIQUEST CAPITAL<br>CORPORATION (n/k/a SBP Capital<br>Corporation), ACC CAPITAL<br>HOLDINGS CORPORATION, AMERIQUEST<br>MORTGAGE SECURITIES, INC.;<br>DEUTSCHE BANK NATIONAL TRUST<br>COMPANY, in its own capacity and<br>as Trustee for the following trusts: Ameriquest<br>Mortgage Securities, Inc. Asset Backed Pass<br>Through Certificates Series 2005-R6 Under The<br>Pooling and Servicing Agreement Dated as of<br>July 1, 2005 Without Recourse; Ameriquest<br>Mortgage Securities, Inc. Asset Backed Pass<br>Through Certificates Series 2006-R1 Under The<br>Pooling and Servicing Agreement Dated as of<br>February 1, 2006 Without Recourse;<br>Ameriquest Mortgage Securities, Inc. Asset Backed<br>Pass Through Certificates Series 2005-R7 Under | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

The Pooling and Servicing Agreement Dated as of )
August 1, 2005 Without Recourse; Ameriquest )
Mortgage Securities, Inc. Asset Backed )
Pass Through Certificates Series 2005-R10 )
Under The Pooling and Servicing Agreement )
Dated as of November 1, 2005 Without Recourse; )
Ameriquest Mortgage Securities, Inc. Asset )
Backed Pass Through Certificates Series )
2006-R2 Under The Pooling and Servicing )
Agreement Dated as of March 1, 2006 )
Without Recourse; Ameriquest Mortgage )
Securities, Inc. Asset Backed Pass Through )
Certificates Series 2005-R9 Under The Pooling )
and Servicing Agreement Dated as of )
October 1, 2005 Without Recourse; )
CITIFINANCIAL MORTGAGE COMPANY, )
INC.; GREENWICH CAPITAL FINANCIAL )
PRODUCTS, INC.; WM SPECIALTY )
MORTGAGE, LLC; CITIGROUP GLOBAL )
MARKETS, INC.; AMERIQUEST )
MORTGAGE SECURITIES, INC. ASSET )
BACKED PASS THROUGH )
CERTIFICATES SERIES 2005-R6; )
AMERIQUEST MORTGAGE SECURITIES, )
INC. ASSET BACKED PASS THROUGH )
CERTIFICATES SERIES 2006-R1; )
AMERIQUEST MORTGAGE SECURITIES, )
INC. ASSET BACKED PASS THROUGH )
CERTIFICATES SERIES 2005-R7; )
AMERIQUEST MORTGAGE SECURITIES, )
INC. ASSET BACKED PASS THROUGH )
CERTIFICATES SERIES 2005-R10; )
AMERIQUEST MORTGAGE SECURITIES, )
INC. ASSET BACKED PASS THROUGH )
CERTIFICATES SERIES 2006-R2; )
AMERIQUEST MORTGAGE SECURITIES, )
INC. ASSET BACKED PASS THROUGH )
CERTIFICATES SERIES 2005-R9; and )
CITI RESIDENTIAL LENDING, INC. )
)
)
                    Defendants.          )

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.     This case arises out of a fraudulent scheme and conspiracy, and a pattern and practice of wrongdoing, by Ameriquest Mortgage Company and certain associated entities and individuals.  Pursuant to this scheme, (1) Ameriquest employed deceptive practices to lure homeowners, such as plaintiffs, into mortgage refinancing transactions on terms that were substantially worse for the homeowners than originally represented; (2) Ameriquest failed to provide mortgage customers, such as plaintiffs, with disclosures required by the Truth in Lending Act; (3) Ameriquest and certain associated parties failed to honor valid rescission requests in violation of the Truth in Lending Act; (4) Ameriquest used false representations to sell legally defective mortgages to investors; (5) Ameriquest transferred monies received from the mortgage sales through its parent companies to the controlling Arnall family in order to defraud and hinder creditors (including defrauded customers and investors); and (6) Ameriquest, its parent companies and the controlling Arnall family agreed to pay $50 million to Wayne Lee in exchange for his silence about the fraudulent scheme.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to Title 28 of the United States Code, Sections 1331 and 1337 because plaintiffs are asserting claims under the Truth in Lending Act that arise under federal law.  This Court has supplemental jurisdiction over plaintiffs' claims under state law pursuant to the Judicial Improvements Act of 1990, Pub.L.No. 101-650, 104 Stat. 5089, 28 U.S.C. § 1367.

3

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because plaintiffs'
claims arose here. Also, defendants have done business in this district, conspired with other
parties doing business in this district and/or engaged in wrongdoing directed against residents of
this district.

**PARTIES**

4.     Plaintiffs are residents of this district and home owners who refinanced their
mortgages with Ameriquest Mortgage Company.

5.     Defendant Ameriquest Mortgage Company is a corporation organized under
Delaware law with its principal place of business in Orange, California. Defendant Ameriquest
Mortgage Securities, Inc. is a subsidiary of Ameriquest Mortgage Company. Defendant ACC
Capital Holdings Corporation is the owner of Ameriquest Mortgage Company and has its
principal place of business in Orange, California. Defendant Ameriquest Capital Corporation,
now known as SBP Capital Corporation, is the owner of ACC Capital Holdings Corporation and
has its principal place of business in Orange California. Dawn Arnall, a resident of California, is
the owner of Ameriquest Capital Corporation, either directly or through the Roland and Dawn
Arnall Living Trust. She is also the chair of the board of directors of Ameriquest Capital
Corporation and has served as chair or co-chair since about the time of her marriage to Roland
Arnall in 2000. Ms. Arnall is also the trustee and beneficiary of The Roland and Dawn Arnall
Living Trust. She is being sued herein both in her personal capacity and in her capacity as
trustee of The Roland and Dawn Arnall Living Trust. Wayne Lee, a resident of California, is the
former chief executive officer of ACC Capital Holdings Corporation. Defendant Deutsche Bank
National Trust Company, either in its own capacity or as trustee for various trusts, has been an

4

assignee of various mortgages originated by Ameriquest. The relevant trusts, for purposes of

this case, are Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates

Series 2005-R6; Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates

Series 2006-R1; Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates

Series 2005-R7; Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates

Series 2005-R10; Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates

Series 2006-R2; Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates

Series 2005-R9. Those same trusts are also being sued directly, as permitted by Rule 17(b) of

the Federal Rules of Civil Procedure. Defendants CitiFinancial Mortgage Company, Inc.,

Greenwich Capital Financial Products, Inc., WM Specialty Mortgage, LLC, Citigroup Global

Markets, Inc. are or were assignees of mortgages originated by Ameriquest. Defendant Citi

Residential Lending, Inc. services or serviced certain mortgages relevant hereto and is being

sued for failure to comply with its obligations under 15 U.S.C. § 1641(f).

## BACKGROUND

6.    Today, Ameriquest Mortgage Company is basically defunct. The company has

ceased lending operations and now has little to no assets to pay its many aggrieved customers

and other creditors.

7.    There was a time, however, when the Ameriquest and its affiliates constituted the

nation's leading subprime mortgage lender. In its heyday, the company generated billions of

dollars in revenue and made its founder and owner, Roland Arnall, enormously wealthy. In

2006, Forbes magazine listed Mr. Arnall as America's 86th richest person, with a net worth of $3

billion.

8.    In April 2004, National Mortgage News reported that Ameriquest was the number one subprime mortgage lender in 2003 and may have funded $40 billion in home mortgages and earned close to $1 billion in 2003.

9.    In February 2005, Bondweek reported that Ameriquest had roughly $53 billion in asset-backed sales in 2004.

10.    In February 2005, the Los Angeles Times reported that made about $37 billion in mortgages in the first nine months of 2004 and that, in recent years, Roland Arnall, Ameriquest's founder, had purchased "a 10-acre Los Angeles estate for $30 million from singer Engelbert Humperdinck and a ranch in Aspen, Colorado for $46 million from movie mogul Peter Guber."

11.    In July 2005, the Los Angeles Times reported that: "Financial statements filed with regulators and obtained this week by The Times show the company raked in $7.6 billion in revenue from 2002 through 2004, and turned a profit of more than $2.7 billion during that period, after paying expenses." The article went on to say that "Ameriquest's profit last year alone was more than $1.3 billion" and that "Arnall was ranked No. 321 on Forbes magazine's latest list of the world's billionaires.  His net worth was listed at $2 billion."

12.    In August 2005, the Los Angeles Times reported "Ameriquest Capital and its subsidiaries employ more than 15,000 people at about 300 U.S. offices, generating $82.7 billion in loans last year - making it the No. 1 sub-prime mortgage lender in the country."

13.    In September 2005, an article about Ameriquest appeared in Baseline.  The article reported: "According to the Mortgage Industry Directory, Ameriquest Capital earned $1 billion on $41 billion of loans it produced in 2003."  The article also said that "Financials in 2004: The privately held company originated an estimated $24 billion in sub-prime loans and reported an

estimated $2.1 billion in sales."

14.    In November 2005, National Mortgage News reported that "Ameriquest/Argent funded about $16.5 billion in the quarter."

15.    In February 2006, Origination News reported: "According to the Quarterly Data Report, Ameriquest and Argent, combined, funded about $70 billion in subprime loans last year, ranking first among all players in that niche."

16.    In June 2006, the Los Angeles Times reported that "ACC Capital Holdings Corp., the privately held parent of Ameriquest and its sister lenders, earned $257 million in 2005, down from $1.34 billion in 2004, according to copies of its annual financial statements obtained by The Times. Revenue fell from $4.13 billion to $3.67 billion."

17.    Ameriquest portrayed itself as a legitimate company and "The Proud Sponsor of the American Dream." In fact, the company was a boiler room operation, which systematically cheated customers through unfair, deceptive, unsafe and unsound lending practices. Former employees have testified that they were pressured and encouraged to close deals by any means necessary, including deceiving customers as to loan terms and using bait and switch sales practices.

18.    An article in the Los Angeles Times in February 2005 said:

Many of the ex-employees likened Ameriquest's culture to the rough-and-tumble world of "Boiler Room," a 2000 movie about fast-talking, young stock swindlers who revel in their powers of anything-goes salesmanship.

The comparison is more than happenstance: "That was your homework - to watch 'Boiler Room,'" Taylor said. Managers and employees passed around the film to keep themselves fired up, she and others explained. Kendall, in a sworn declaration in the Redwood City class-action case, said that watching "Boiler Room" was part of his Ameriquest training.

7

19.    The bait and switch sales practices were also facilitated by the company's general practice of not providing customers with written good faith estimates and preliminary TILA disclosures prior to the loan closing and by having customers sign loan applications at the closing.

20.    As a result of its pattern and practice of wrongdoing, Ameriquest incurred billions of dollars in potential liabilities to aggrieved customers.

21.    Upon information and belief, Ameriquest has received thousands of complaints from aggrieved customers and hundreds of law suits have been filed against Ameriquest by or on behalf of aggrieved customers. Some of these cases have been resolved. For example, in March 2005, Ameriquest settled a class action lawsuit which charged Ameriquest with bait and switch sales practices in four states, agreeing to pay claimants at least $15 million and up to $50 million, and to pay class counsel $10 million in fees.

22.    In January 2005, the State of Connecticut revoked Ameriquest's license to do business and in July 2005, Ameriquest agreed to pay a $1 million civil penalty to the State of Connecticut for improper prepaid finance charges assessed to customers in that State.

23.    In January 2006, following a multi-state investigation of improper sales practices, Ameriquest entered into a settlement with the Attorneys General of 49 States and the District of Columbia in which Ameriquest's parent company agreed to pay $325 million and Ameriquest agreed to reform its sales practices.

24.    In December 2008, Ameriquest settled a class action lawsuit in Minnesota for approximately $4 million. Also, in December 2008, putative class counsel announced that they were close to reaching a tentative class action settlement with Ameriquest in the Ameriquest

Lending Practices Multi-District Litigation pending before Judge Aspen in federal court in Chicago. Upon information and belief, the payments to class members and class counsel pursuant to that settlement could exceed $20 million.

25.    There have also been hundreds of individual lawsuits filed against Ameriquest, charging the company with improper sales practices. One such suit, *Melba Gillean v. Ameriquest,* in Oklahoma state court resulted in a November 2005 jury verdict for $1.94 million in actual damages and $3 million in punitive damages. The case was later settled on undisclosed terms. On information and belief, Ameriquest has settled more than a dozen individual customer cases for amounts in excess of $100,000 and dozens more for amounts in excess of $50,000. Hundreds of lawsuits are still pending against Ameriquest.

26.    Ameriquest has also incurred billions of dollars in potential liability to investors by selling mortgages to investors through the use of false representations. In 2004, Ameriquest and its underwriters sold Ameriquest mortgage-backed securities to investors for more than $9 billion. In 2005, Ameriquest and its underwriters sold Ameriquest mortgage-backed securities to investors for approximately $13 billion. In 2006, Ameriquest and its underwriters sold Ameriquest mortgage-backed securities to investors for approximately $2.4 billion. In connection with each of these securities offerings, Ameriquest represented: "that each mortgage loan was made in compliance with, and is enforceable under, all applicable local, state and federal laws and regulations in all material respects." Because this representation was false, Ameriquest incurred billions of dollars in potential liability to the investors that purchased Ameriquest mortgage-backed securities.

9

27.    Ameriquest also incurred liability to investors in connection with whole loan
sales. For example, in September 2007, Wachovia filed suit against Ameriquest alleging
misconduct by Ameriquest in connection with the underwriting of a pool of mortgages that
Wachovia had purchased from Ameriquest for more than $128 million.

28.    To some extent, the monies received by Ameriquest in its heyday went to pay the
company's expenses. But, to a large degree, the money was funneled to Roland Arnall (the
company's founder), Dawn Arnall (Mr. Arnall's second wife and widow) and The Roland and
Dawn Arnall Living Trust. The transfers rendered the company insolvent or left it with
unreasonably small capital in relation to its liabilities. The transfers were made for the purpose
and with the effect of hindering, delaying and defrauding the company's aggrieved customers
and other creditors.

29. Ameriquest is a wholly owned subsidiary of ACC Capital Holdings Corporation.
ACC Capital Holdings Corporation, in turn, is a wholly owned subsidiary of Ameriquest Capital
Corporation, now known as SBP Capital Corporation. The sole shareholder in Ameriquest
Capital Corporation was Roland Arnall or his family trust, The Roland and Dawn Arnall Living
Trust. Mr. Arnall died in March 2008. Currently, the sole shareholder of SBP Capital
Corporation is Dawn Arnall or the family trust, The Roland and Dawn Arnall Living Trust, of
which she is the trustee and beneficiary.

30.    Upon information and belief, monies received by Ameriquest for the sale of
mortgages was transferred to and through ACC Capital Holdings Corporation and Ameriquest
Capital Corporation to the controlling Arnall family. Upon information and belief, these
transfers took place through 2004, 2005 and first third of 2006. The transfers left Ameriquest

10

insolvent, in that its assets were exceeded by its liabilities. In any event, the transfers left Ameriquest with unreasonably small capital to pay its liabilities. The transfers had the purpose and effect of hindering creditors of Ameriquest and were fraudulent conveyances prohibited by various State laws.

31.    Upon information and belief, Dawn Arnall -- who has served as chair or co-chair of the board of directors of Ameriquest Capital Corporation since about the time of her marriage to Roland Arnall in 2000 and is the trustee and beneficiary of The Roland and Dawn Arnall Living Trust -- was a knowing participant in the scheme to hinder, delay and defraud creditors of Ameriquest. Ms. Arnall was intimately involved in the financial affairs of the company and the main purpose of its financial structure was to shield its "profits" from aggrieved customers and investors.

32.    ACC Capital Holdings Corporation incurred liability to Ameriquest's creditors as a result of its receipt of fraudulent conveyances from Ameriquest. Its transfers of money to the controlling Ameriquest Capital Corporation and to the controlling Arnall family constituted separate fraudulent conveyances. The transfers rendered ACC Capital Holdings Corporation insolvent or left it with unreasonably small capital and ACC Capital Holdings Corporation did not receive adequate consideration in return.

33.    Similarly, Ameriquest Capital Corporation incurred liability to Ameriquest's creditors as a result of its receipt of fraudulent conveyances from Ameriquest and ACC Capital Holdings Corporation. Its transfers of money to the controlling Arnall family constituted separate fraudulent conveyances. The transfers rendered Ameriquest Capital Corporation insolvent or left it with unreasonably small capital and Ameriquest Capital Corporation did not

receive adequate consideration in return.

34.    The transfers to the Arnall family left Ameriquest and its parent companies

without sufficient funds to pay its creditors.  For example, according to a court paper filed by

Claude Arnall (Roland Arnall's brother), Claude Arnall agreed to a merger of Olympus Mortgage

(in which Claude Arnall had a 50% beneficial interest) into Argent Mortgage, a subsidiary of

Ameriquest Capital Corporation.  In return, Claude Arnall was promised more than $50 million.

On or about November 19, 2004, Claude Arnall received an initial payment in the amount of $20

million; in or about April 8, 2005, Claude Arnall received a second payment of $5 million; on or

about February 23, 2006, Claude Arnall received another payment of $2.4 million.  But then,

according to the papers filed by Claude Arnall:

> At or about this time, Roland Arnall asked Claimant to be patient on the payment
> of the amount remaining owing to him on the buy-out. Roland Arnall indicated
> that money was tight because he was settling several claims being investigated
> against ACC and its subsidiaries by the Attorney General of various states for
> allegedly predatory lending practices and that once these investigations were
> resolved and claims settled with payments, Claimant would receive the balance of
> his buy-out moneys in full.

However, after Roland Arnall died, his widow, Dawn Arnall, refused to pay.  Even though Ms.

Arnall was aware of the promise to pay Claude Arnall for his beneficial interest in Olympus

Mortgage, she told Claude Arnall that she was repudiating the debt because: "you have nothing

in writing."

35.    Because of Ameriquest's insolvency, its parent companies and the controlling

Arnall family paid some of its liabilities.  For example, the $325 million Attorney General

settlement was paid for by ACC Capital Holdings Corporation, even though the liabilities were

incurred by Ameriquest.

12

36.     Ameriquest, ACC Capital Holdings Corporation, Ameriquest Capital Corporation and Dawn Arnall also sought to conceal Ameriquest's insolvency and fraudulent conveyances by buying the silence of corporate insiders.

37.     In June 2005, the chief executive officer of ACC Capital Holdings Corporation, Wayne Lee, got into a disagreement with Roland Arnall about the proper management of Ameriquest. As a result of the disagreement, Mr. Lee resigned.

38.     After his resignation, Mr. Lee negotiated a so-called "Consulting Agreement" with Ameriquest. The "Consulting" label was window dressing. Mr. Lee was never called upon to do any consulting pursuant to this agreement. The guts of the agreement was a promise by Mr. Lee not to "disparage" Ameriquest or its affiliated companies. In exchange for this promise, Mr. Lee (whose salary as CEO of ACC Capital Holdings Corporation had been approximately $330,000) was promised $50 million.

39.     ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation paid Mr. Lee $20 million pursuant to the agreement on June 30, 2005. When ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation did not make the scheduled $6 million payment in 2006, Mr. Lee filed suit. The case was settled within months. ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation paid Mr. Lee an additional $14.75 million and Mr. Lee agreed that counsel approved by ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation would represent Mr. Lee in both a personal and professional capacity in all legal matters arising out of his time as CEO of ACC Capital Holdings Corporation.

40.    Mr. Lee was paid $34.75 million in exchange for his silence about Ameriquest's insolvency and the wrongdoing of those associated with Ameriquest.

## PLAINTIFFS' MORTGAGE TRANSACTIONS

41.    Plaintiffs are residents of this district who refinanced their mortgages with Ameriquest Mortgage Company and, as a result, have claims against Ameriquest and certain other parties under the Truth in Lending Act, the Illinois Consumer Fraud Act (except for a few individuals) and the Illinois Uniform Fraudulent Transfer Act.

**Rose Terry**

42.    Plaintiff Rose Terry is a school bus driver who owns a home in Evanston, Illinois. In 2005, she decided to refinance the mortgage on her home to pay off some personal debts. Ms. Terry spoke to a representative of Ameriquest, who told her that she would be getting a fixed rate mortgage with an interest rate around 7% to 8%. Ms. Terry was also told that she would get a better deal if she made timely payments for six months. At the closing, however, in May 2005, the terms of the deal were substantially different. Instead of the promised fixed rate loan, Ms. Terry received an adjustable rate mortgage which could go as high as 13.850%, depending on changes in the LIBOR rate. Also, when Ms. Terry contacted Ameriquest after making six months of timely payments, the representative she had dealt with was no longer there and she could not obtain the better deal she had been promised. In September 2005, Ms. Terry refinanced her mortgage with another lender.

43.    Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with Ms. Terry's mortgage refinancing transaction. The Notice of Right to Cancel forms that were delivered to Rose Terry at the closing did not set forth the date

14

that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Ms. Terry was given a document which indicated that she would owe $200 for an Appraisal/Property Valuation Fee Deposit, if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In addition, Ms. Terry was misinformed as to the cost of credit and payment schedule in that she was told she would be getting a fixed rate loan when, in fact, she was given an adjustable rate mortgage.

44.     Because of the defective disclosures, Ms. Terry's right to rescind the loan was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in March 2008, Ms. Terry sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of Ms. Terry's mortgage loan should have returned to Ms. Terry all money she had paid in connection with the mortgage (minus the original loan amount). See 12 C.F.R. § 226.23(d)(2). They have not done so.

45.     Defendants have given Ms. Terry inconsistent information as to the identity of the assignees of her mortgage. In March 2008, Ms. Terry (through her counsel) sent a letter to Citi Residential Lending, Inc. asking for the identity of the assignee. In response, on April 7, 2008, Citi Residential Lending, Inc. sent a letter stating that the "note holder on the loan is Deutsche Bank Trust." In August 2008, counsel for Ameriquest sent plaintiff's counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R6" as the "Investor" for the Terry loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the Terry loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST

15

COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET

BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING

AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE."

Moreover, the interrogatory answer referred plaintiff to a securities filing which indicates that, at

one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because

of the inconsistent responses, plaintiff is making alternative allegations as to the assignees of her

mortgage, naming Deutsche Bank National Trust Company in its own capacity, Deutsche Bank

as trustee for the above-mentioned trust and the trust itself as assignees of her mortgage (in

addition to Ameriquest Mortgage Securities, Inc.).

**Terry Watt and Roy Parnell**

46.    Plaintiffs Terry Watt and Roy Parnell, husband and wife, own a home in Chicago,

Illinois. Ms. Watt works for the Social Security Administration.    Mr. Parnell worked as a mail

handler for the U.S. Post Office, and recently retired.    In 2005, they decided to refinance the

mortgage on their home in order to consolidate some personal debts. They got in touch with

Ameriquest and a representative of Ameriquest told Ms. Watt that they would be getting a loan

with an interest rate of 7.75%.  Instead, however, at the closing in November 2005, Ameriquest

gave Ms. Watt and Mr. Parnell a mortgage with an interest rate of 8.990%. Also, Ms. Watt was

told that the loan would cost about $8,000 in fees and they would be getting about $8,000 in cash

out.  As it turned out, however, the fees were $12,000 and the cash out was $3,516.84 or

$3,532.59.  After the closing, the Watt/Parnell mortgage loan was transferred to CitiFinancial

Mortgage Company, Inc.  Ms. Watt and Mr. Parnell refinanced with another lender in February

2007.

16

47.    Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with Watt/Parnell mortgage refinancing transaction. The Notice of Right to Cancel forms that were delivered to Ms. Watt and Mr. Parnell at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Ms. Watt was told that she would owe $350 for an Appraisal fee if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In addition, Ms. Watt and Mr. Parnell were misinformed as to the cost of credit through the false representations as to their interest rate and fees.

48.    Because of the defective disclosures, Ms. Watt's and Mr. Parnell's right to rescind the loan was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in March 2008, Ms. Watt and Mr. Parnell sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and CitiFinancial Mortgage Company, Inc. should have returned to Ms. Watt and Mr. Parnell all money plaintiffs had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

**Johanna Guyton**

49.    Johanna Guyton owns a home in Chicago where she lives with her husband, her son, her daughter, three adopted foster children and her daughter's two children. In 2005, Ms. Guyton decided to refinance the mortgage on her home. She got in touch with Ameriquest and was promised a mortgage with an interest rate of 5%. The deal closed in May 2005. The loan amount was $180,000. But instead of getting the 5% interest rate she was promised, Ms. Guyton got an adjustable rate mortgage with an interest rate which began at 10.6% and could go as high as 16.6%. In exchange for this mortgage, Ms. Guyton was charged $13,729.81 in fees and

17

points.

50.    Ms. Guyton discovered the deal was not as promised and sought to refinance with another mortgage company. Ameriquest heard of this, contacted her and promised her a new mortgage with a lower interest than the competing offer. Ms. Guyton received a preliminary TILA disclosure dated November 28, 2005, which estimated that the finance charge for the new loan would be $371,421.98. The deal closed in December and the finance charge, as stated on the final TILA disclosure, turned out to be $491,796.65. The new mortgage was also adjustable, with an initial interest rate of 8.5% which could go as high as 14.5%. Ms. Guyton was charged $15,210.78 in fees and points in exchange for this new loan. Ms. Guyton has since refinanced her mortgage with another lender.

51.    Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the Guyton mortgage refinancing transactions. The Notice of Right to Cancel forms that were delivered to Ms. Guyton in connection with the May 2005 transaction did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Ms. Guyton was given a form which said she would owe $500 for an Appraisal fee if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In addition, Ms. Guyton was misinformed as to the cost of credit. With respect to the December 2005 refinancing, Ms. Guyton was given a Notice of Right to Cancel form on an H-8 form, instead of an H-9 form, in violation of 12 C.F.R. § 226.23(b)(2). Also, Ms. Guyton was given a form which said she would owe $475 for an Appraisal fee if she backed out of the deal and another form which said that she would owe $700 for an Appraisal fee, both of which misrepresented the effects of rescission in violation of 12

18

C.F.R. § 226.23(b)(1)(iv). Ms. Guyton was also misled as to the cost of credit.

52.     Because of the defective disclosures, Ms. Guyton's right to rescind both loans was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in February 2008, Ms. Guyton sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all assignees should have returned to Ms. Guyton all money she had paid in connection with the mortgages (minus the original loan amounts). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

53.     Defendants have given Ms. Guyton inconsistent information as to the identity of the assignees of her mortgage. In August 2008, counsel for Ameriquest sent plaintiff's counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R6" as the "Investor" for the first Guyton loan and "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2006-R1" as the "Investor" for the second Guyton loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the first Guyton loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE" and the second Guyton loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1 UNDER THE POOLING AND SERVICING

19

AGREEMENT DATED AS OF FEBRUARY 1, 2006, WITHOUT RECOURSE".  Moreover,

the interrogatory answer referred plaintiff to a securities filing which indicates that, at one time,

Ameriquest Mortgage Securities, Inc. had also been an assignee of the loans. Because of the

inconsistent responses, plaintiff is making alternative allegations as to the assignees of her

mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as

assignees of her mortgages (in addition to Ameriquest Mortgage Securities, Inc.).

### Jorge and Luisa Bolo

54.     Jorge and Luisa Bolo own a home in River Grove, Illinois.  In 2005, they decided

to refinance the mortgage on their home to pay off a home equity loan. Ms. Bolo spoke to a

representative of Ameriquest who promised a fixed rate loan with an interest rate of 6.25%.  At

the closing in June 2005, however, the Bolos were given an adjustable rate mortgage which

could go as high as 12.2%.  The Bolos refinanced with another lender in September 2006.

55.     Ameriquest did not comply with its disclosure obligations under the Truth in

Lending Act in connection with the Bolos' mortgage refinancing transaction.  Ameriquest

delivered only one Notice of Right to Cancel form, instead of the two each required by 12 C.F.R.

§ 226.23(b)(1), and that one copy did not set forth the date that the rescission period expired,

which is a violation of 12 C.F.R. § 226.23(b)(1)(v).  Also, the Bolos were misinformed as to the

cost of credit and payment schedule in that Ms. Bolo was told they would be getting a fixed rate

loan when, in fact, they were given an adjustable rate mortgage.

56.     Because of the defective disclosures, the Bolos' right to rescind the loan was

extended for three years. *See* 12 C.F.R. § 226.23(a)(3).  Accordingly, in March 2008, the Bolos

sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3).  In response, Ameriquest and all the

assignees of the Bolo mortgage loan should have returned to the Bolos all money the Bolos had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

57.    Defendants have given the Bolos inconsistent information as to the identity of the assignees of their mortgage. In March 2008, the Bolos (through counsel) sent a letter to Citi Residential Lending, Inc. asking for the identity of the assignee. In response, on April 7, 2008, Citi Residential Lending, Inc. sent a letter stating that the "note holder on the loan is Deutsche Bank Trust." In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R7" as the "Investor" for the Bolo loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the Bolo loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF AUGUST 1, 2005, WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiffs to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiffs are making alternative allegations as to the assignees of their mortgage, naming Deutsche Bank National Trust Company in its own capacity, Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of her mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Selvin and Beatrice Quire**

58.     Selvin and Beatrice Quire own a home in Evanston, Illinois. Mr. Quire is a sales associate with Home Depot and Ms. Quire is a secretary at Evanston Hospital. In 2005, they decided to refinance their mortgage in order to get a better rate. After receiving a flyer in the mail, they got in touch with Ameriquest. A representative of Ameriquest promised Ms. Quire a fixed rate mortgage with an interest rate between 8% and 9%. Instead, however, at the closing in June 2005, Ameriquest provided the Quires with an adjustable rate mortgage with an initial interest rate of 9.1%, but which could go as high as 15.1% depending on changes in the LIBOR rate. The Quires refinanced with another lender in May 2006.

59.     Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the Quires' mortgage refinancing transaction. The Notice of Right to Cancel forms given to the Quires at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Ms. Quire was told that she would owe $350 for an Appraisal fee if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In addition, the Quires were  misinformed as to the cost of credit and payment schedule in that Ms. Quire was told they would be getting a fixed rate loan when, in fact, they were given an adjustable rate mortgage. Ameriquest also misrepresented the cost of credit by adding a "padding" adjustment of $5,055.00 to the payoff to the prior lender and including that amount in the amount financed rather than in the finance charge.

22

60.    Because of the defective disclosures, the Quires' right to rescind the loan was

extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in April 2008, the Quires

sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the

assignees of the Quire mortgage loan should have returned to the Quires all money the Quires

had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. §

226.23(d)(2). They have not done so.

61.    Defendants have given the Quires inconsistent information as to the identity of

the assignees of their mortgage. In March 2008, the Quires (through counsel) sent a letter to Citi

Residential Lending, Inc. asking for the identity of the assignee. In response, on May 13, 2008,

Citi Residential Lending, Inc. sent a letter stating that the "note holder on the loan is Deutsche

Bank Trust." In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying

"Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R7"

as the "Investor" for the Quire loan. In a subsequent letter, dated September 25, 2008, counsel

for Ameriquest said that "the term investor is synonymous with assignee." However, in an

interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated

that the Quire loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST

COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET

BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 UNDER THE POOLING

AND SERVICING AGREEMENT DATED AS OF AUGUST 1, 2005, WITHOUT

RECOURSE." Moreover, the interrogatory answer referred plaintiffs to a securities filing which

indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the

loan. Because of the inconsistent responses, plaintiffs are making alternative allegations as to

the assignees of their mortgage, naming Deutsche Bank National Trust Company in its own

capacity, Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees

of her mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

### Juan Baez and Cruz Rivera

62.     Juan Baez and Cruz Rivera, husband and wife, own a home in Melrose Park,

Illinois. In 2005, they took out a loan from Ameriquest to refinance the mortgage on their home.

Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in

connection with the mortgage refinancing transaction. The Notice of Right to Cancel forms

delivered at the closing did not set forth the date that the rescission period expired in violation of

12 C.F.R. § 226.23(b)(1)(v). Also, plaintiffs were given a document which said they would owe

$207 for an Appraisal fee if they backed out of the deal, which misrepresented the effects of

rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In addition, plaintiffs were misinformed

as to the cost of credit and payment schedule in that the payments were $300 more per month

than Cruz Rivera had been told to expect. Plaintiffs refinanced with another lender in December

2005.

63.     Because of the defective disclosures, plaintiffs' right to rescind the loan was

extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in April 2008, plaintiffs sent rescission

notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of

the mortgage loan should have returned to Juan Baez and Cruz Rivera all money plaintiffs had

paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. §

226.23(d)(2). They have not done so.

24

64.    Defendants have given Juan Baez and Cruz Rivera inconsistent information as to the identity of the assignees of their mortgage. In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R6" as the "Investor" for the loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the Baez/Rivera loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiffs to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiffs are making alternative allegations as to the assignees of their mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of her mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Julie Noradin**

65.    Julie Noradin owns a home in Chicago. In May 2005, she refinanced the mortgage on her home with Ameriquest as the lender. In April 2006, she refinanced with Ameriquest again. Ms. Noradin has since refinanced with another lender.

25

66.    Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the Noradin refinancing transactions. The Notice of Right to Cancel forms that were delivered to Ms. Noradin in connection with the May 2005 transaction did not set forth the correct date on which the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Ms. Noradin was given a form which said she would owe $207 for an Appraisal fee if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). With respect to the April 2006 deal, Ms. Noradin was given a Notice of Right to Cancel form on an H-8 form, instead of an H-9 form, in violation of 12 C.F.R. § 226.23(b)(2). Also, the Notice of Right to Cancel forms delivered at the closing did not set forth the date that the rescission period expired in violation of 12 C.F.R. § 226.23(b)(1)(v). In addition, Ms. Noradin was given a form which said she would owe $207 for an Appraisal fee if she backed out of the deal, misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

67.    Because of the defective disclosures, Ms. Noradin's right to rescind both loan was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in April 2008, Ms. Noradin sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all assignees should have returned to Ms. Noradin all money she had paid in connection with the mortgages (minus the original loan amounts). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

68.    Defendants have given Ms. Guyton inconsistent information as to the identity of the assignees of her first mortgage. In August 2008, counsel for Ameriquest sent plaintiff's counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through

26

Certificates, Series 2005-R6" as the "Investor" for the first Noradin loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the first Noradin loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE". Moreover, the interrogatory answer referred plaintiff to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loans. Because of the inconsistent responses, plaintiff is making alternative allegations as to the assignees of her mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of the first Noradin mortgage (in addition to Ameriquest Mortgage Securities). Defendants have identified Greenwich Capital Financial Products, Inc. as the investor/transferee of the second Noradin loan, so Greenwich is being sued as assignee of that loan.

**Ananias and Ethel Colister**

69.     Ananias and Ethel Colister own a home in Sauk Village, Illinois. In 2005, they decided to refinance the mortgage on their home. A representative of Ameriquest promised them a deal which would reduce their monthly mortgage payments to something less than the $640 per month that the Colisters were then paying. However, under the deal with Ameriquest, the monthly mortgage payments turned out to be $807.53 per month, substantially more than was promised.

27

70.    Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the Colisters' mortgage refinancing transaction. The Notice of Right to Cancel forms delivered to the Colisters at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, the Colisters were given a document which said they would owe $350 for an Appraisal fee if they backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In addition, the Colisters were misinformed as to the cost of credit and payment schedule.

71.    Because of the defective disclosures, the Colisters' right to rescind the loan was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in May 2008, the Colisters sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and CitiFinancial Mortgage (the assignee of the Colister mortgage) should have cancelled their security interest and tendered to the Colisters all money the Colisters had paid in connection with the mortgage. *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

**Michael Cox and Susan Lawrence**

72.    Michael Cox and Susan Lawrence, husband and wife, own a home in South Holland, Illinois. In 2005, they decided to refinance the mortgage on their home. A representative of Ameriquest promised them a fixed rate mortgage with an interest rate of 7% to 8%. Instead, however, in September 2005, they received an adjustable rate mortgage with an interest rate that began at 10.25% and could go as high as 16.25%.

73.     Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the mortgage refinancing transaction. Plaintiffs only received two Notice of Right to Cancel forms, rather than two each for a total of four as required by 12 C.F.R. § 226.23(b)(1). Also, the Notice of Right to Cancel forms delivered at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Further, plaintiffs were misinformed as to the cost of credit and payment schedule. Plaintiffs have since refinanced with another lender.

74.     Because of the defective disclosures, plaintiffs' right to rescind the loan was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in July 2008, plaintiffs sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3).
In response, Ameriquest and all the assignees of the mortgage loan should have returned to plaintiffs all money the plaintiffs had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

75.     Defendants have given plaintiffs inconsistent information as to the identity of the assignees of their mortgage. In July 2008, plaintiffs (through counsel) sent a letter to Citi Residential Lending, Inc. asking for the identity of the assignee. In response, on July 31, 2008, Citi Residential Lending, Inc. sent a letter stating that the "note holder on the loan was Ameriquest Mortgage Securities." In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R10" as the "Investor" for the Cox/Lawrence loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008,

29

Ameriquest and its affiliate co-defendants stated that the Cox/Lawrence loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiffs to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiffs are making alternative allegations as to the assignees of their mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of her mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Ramses Favela**

76.    Ramses Favela, an electrician, owns a home in Chicago where he lives with his two children. In early 2006, he decided to refinance the mortgage on his home. A representative of Ameriquest promised him a mortgage with an interest rate lower than 8.3% and monthly payments of about $1,500 and told him to stop paying his current mortgage prior to the closing of the loan. Instead of the promised loan, however, Mr. Favela received an adjustable rate mortgage with initial monthly payments of $2,005.97 and an interest rate that began 9.85% which could go as high as 15.85%. Mr. Favela refinanced with another lender in September 2006.

77.    Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the Favela mortgage refinancing transaction. The Notice of Right to Cancel forms delivered to Mr. Favela at the closing did not set forth the date the

30

rescission period expired in violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Mr. Favela was

given a document which said he would owe $200 for an Appraisal fee if he backed out of the

deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

Further, Mr. Favela was misinformed as to the cost of credit and payment schedule.

    78.    Because of the defective disclosures, Mr. Favela's right to rescind the loan was

extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in March 2008, Mr.

Favela sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and

WM Specialty Mortgage, LLC (the assignee of the Favela mortgage) should have tendered to

Mr. Favela all money Mr. Favela had paid in connection with the mortgage (minus the original

loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

**Wences Garcia and Maria Lara**

    79. Wences Garcia and Maria Lara own a home in Chicago, Illinois. In 2005, they

decided to refinance the mortgage on their home. A representative of Ameriquest told them they

would be getting a mortgage with a fixed interest rate for five years, an initial interest rate of

something like 6.1% and house payments like $1,500 per month. Instead, however, Mr. Garcia

and Ms. Lara got a mortgage with an adjustable rate mortgage with an initial interest rate of

7.95% which could go up after two years and could go as high as 13.95%. Also, plaintiffs were

also promised $5,000 cash out but only received $2,208.38. Plaintiffs refinanced with another

lender in December 2007.

    80.    Ameriquest did not comply with its disclosure obligations under the Truth in

Lending Act in connection with the mortgage refinancing transaction. Plaintiffs received only

one Notice of Right to Cancel form at the closing which set forth the date that the rescission

31

period expired in violation of 12 C.F.R. § 226.23(b)(1)(v) which requires delivery of two

properly completed forms for each homeowner entitled to rescind. Also, plaintiffs were given a

document which said they would owe $207 for an Appraisal fee if they backed out of the deal,

which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). In

addition, plaintiffs were misinformed as to the cost of credit and payment schedule.

     81.    Because of the defective disclosures, plaintiffs' right to rescind the loan was

extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in March 2008, plaintiffs sent rescission

notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of

the mortgage loan should have returned to plaintiffs all money plaintiffs had paid in connection

with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have

not done so.

     82.    Defendants have given Wences Garcia and Maria Lara inconsistent information

as to the identity of the assignees of their mortgage. In August 2008, counsel for Ameriquest

sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed

Pass Through Certificates, Series 2005-R10" as the "Investor" for the loan. In a subsequent

letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is

synonymous with assignee." However, in an interrogatory answer dated November 19, 2008,

Ameriquest and its affiliate co-defendants stated that the Garcia-Lara loan had been transferred

to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST

MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES,

SERIES 2005-R10 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS

OF NOVEMBER 1, 2005, WITHOUT RECOURSE." Moreover, the interrogatory answer

referred plaintiffs to a securities filing which indicates that, at one time, Ameriquest Mortgage

Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses,

plaintiffs are making alternative allegations as to the assignees of their mortgage, naming

Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of her

mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

### Elizabeth Hill

83.    Elizabeth Hill owns a home in Chicago. In 2005, she decided to refinance the

mortgage on her home and got in touch with Ameriquest. A representative of Ameriquest

promised her a fixed rate loan with an interest rate around 8%. Instead, in August 2005,

however, Ms. Hill got an adjustable rate mortgage with an initial interest rate of 10.1% which

could go as high as 16.1%. Later, that same year, Ms. Hill refinanced again with Ameriquest.

This time she was promised a loan with a fixed interest rate of 7%. Instead, however, in

December 2005, Ms. Hill got a fixed rate mortgage with an interest of 8.5%.

84.    Ameriquest did not comply with its disclosure obligations under the Truth in

Lending Act in connection with the Hill refinancing transactions. One of the Notice of Right to

Cancel forms that were delivered to Ms. Hill in connection with the May 2005 transaction set

forth an incorrect date as to when the rescission period expired, which is a violation of 12 C.F.R.

§ 226.23(b)(1)(v). Also, Ms. Hill was given a form which said she would owe $350 for an

Appraisal fee if she backed out of the deal, which misrepresented the effects of rescission in

violation of 12 C.F.R. § 226.23(b)(1)(iv). With respect to the December 2005 deal, Ms. Hill was

given a Notice of Right to Cancel form on an H-8 form, instead of an H-9 form, in violation of

12 C.F.R. § 226.23(b)(2). Also, Ms. Hill was given a form which said she would owe $207 for

an Appraisal fee if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

85.     Because of the defective disclosures, Ms. Hill's right to rescind the loan was extended for three years. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in June 2008, Ms. Hill sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and WM Specialty Mortgage, LLC (the assignee of the first mortgage) should have tendered to Ms. Hill all monies she paid in connection with the mortgage. Ameriquest and CitiFinancial Mortgage Company, Inc. (the assignee of the second mortgage) should have cancelled the security interest and tendered all the money Ms. Hill paid in connection with that mortgage. *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

**Alfredo and Ana Velia Jaime**

86.     Alfredo and Ana Velia Jaime, husband and wife, own a home in Chicago, Illinois. In 2005, they decided to refinance the mortgage on their home with Ameriquest. Ameriquest did not comply with its disclosure obligations under the Truth in Lending Act in connection with the mortgage refinancing transaction. The Notice of Right to Cancel forms delivered at the closing did not set forth the date that the rescission period expired in violation of 12 C.F.R. § 226.23(b)(1)(v). Moreover, the forms were addressed solely to Alfredo Jaime and made it appear that only he had the right to rescind (since he was the only borrower) when in fact Ms. Jaime also had a right to rescission since she is a co-owner of the home. Also, plaintiffs were given a document which said they would owe $207 for an Appraisal fee if they backed out of the deal and another document which said they would owe $350 if they backed out of the deal, both of which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

34

Plaintiffs have since refinanced with another lender.

87.    Because of the defective disclosures, plaintiffs' right to rescind the loan was extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in April 2008, plaintiffs sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of the mortgage loan should have returned to plaintiffs all money plaintiffs had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

88.    Defendants have given plaintiffs inconsistent information as to the identity of the assignees of their mortgage. In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R1" as the "Investor" for the loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the Jaime loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF FEBRUARY 1, 2006, WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiffs to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiffs are making alternative allegations as to the assignees of their mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of their mortgage (in addition to Ameriquest Mortgage Securities,

35

Inc.).

**Denise and Carey Lee**

89.     Carey and Denise Lee, husband and wife, own a home in Chicago, Illinois. In

2005, they decided to refinance on their home. They got in touch with Ameriquest and a

representative of Ameriquest promised them a mortgage with an interest rate of 9.8%. Instead,

however, they got an adjustable rate mortgage with an initial interest rate of 10.3%, which could

go as high as 16.3%. Mr. and Mrs. Lee went back to Ameriquest. This time they were promised

that their monthly payments would go down if they refinanced their mortgage again. Instead,

however, the payments increased by more than $220 per month. Mr. and Mrs. Lee were charged

$8,416.11 in fees and points in connection with the second refinancing. Plaintiffs have since

refinanced with another lender.

90.     Ameriquest's disclosures did not comply with the requirements of the Truth in

Lending Act. In connection with the first loan, one of the Notice of Right to Cancel forms had

an incorrect date as to when the rescission period expired and others had no date. This violated

12 C.F.R. § 226.23(b)(1)(v). Moreover, the forms were addressed solely to Carey Lee and made

it appear that only he had the right to rescind (since he was the only borrower) when in fact

Denise Lee also had a right to rescission since she is a co-owner of the home. Also, plaintiffs

were given a document which said they would owe $350 if they backed out of the deal, which

misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). Further,

plaintiffs were misinformed as to the cost of credit. With respect to the second refinancing,

plaintiffs were given Notice of Right to Cancel form on an H-8 form, instead of an H-9 form, in

violation of 12 C.F.R. § 226.23(b)(2). Moreover, only two of the forms had the date the

36

rescission period expired, instead of the four forms (two each) required by 12 C.F.R.

§ 226.23(b)(1). Further, plaintiffs were given a document which said they would owe $350 if

they backed out of the deal, which misrepresented the effects of rescission in violation of 12

C.F.R. § 226.23(b)(1)(iv). In addition, plaintiffs were misinformed as to the cost of credit.

91.    Because of the defective disclosures, plaintiffs' right to rescind the loan was

extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in February 2008, plaintiffs sent

rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the

assignees of the mortgage loan should have returned to plaintiffs all money plaintiffs had paid in

connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2).

They have not done so.

92.    In an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate

co-defendants stated that the first Lee loan had been transferred to "DEUTSCHE BANK

NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE

SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7

UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF AUGUST 1,

2005, WITHOUT RECOURSE" and the second Lee loan had been transferred to "DEUTSCHE

BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE

SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1

UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF MARCH 1, 2006,

WITHOUT RECOURSE". Moreover, the interrogatory answer referred plaintiffs to a securities

filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an

assignee of the loans. Plaintiffs are making alternative allegations as to the assignees of their

37

mortgages, naming Deutsche Bank as trustee for the above-mentioned trusts and the trust

themselves as assignees of their mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Daryl Monson**

93.    Daryl Monson owns a home in Chicago, Illinois. In 2005, he decided to refinance

the mortgage on his home. A representative of Ameriquest promised him a fixed rate loan with

an interest rate between 8% and 8.5% and monthly payments of about $1,000. Instead, however,

Mr. Monson an adjustable rate loan with an initial rate of 10.05% which could go as high as

16.05% and his monthly payments were $1,394.44. Mr. Monson has since refinanced with

another lender.

94.    Ameriquest did not comply with its disclosure obligations under the Truth in

Lending Act in connection with the Hill refinancing transactions. The Notice of Right to Cancel

forms that were delivered to Mr. Monson at the closing did not set forth the date the rescission

period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, Mr. Monson was told

that the appraisal fee was non-refundable and also given a form which said he would owe $350

for an Appraisal fee if he backed out of the deal, which misrepresented the effects of rescission

in violation of 12 C.F.R. § 226.23(b)(1)(iv). Mr. Monson was also misinformed as to the cost of

credit.

95.    Because of the defective disclosures, plaintiff's right to rescind the loan was

extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in February 2008, plaintiff sent rescission

notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of

the mortgage loan should have returned to plaintiff all money plaintiff had paid in connection

with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have

not done so.

96.     Defendants have given plaintiff inconsistent information as to the identity of the

assignees of his mortgage. In August 2008, counsel for Ameriquest sent plaintiffs' counsel a

chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates,

Series 2005-R9" as the "Investor" for the loan. In a subsequent letter, dated September 25, 2008,

counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in

an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants

stated that the loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST

COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET

BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R9 UNDER THE POOLING

AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2005, WITHOUT

RECOURSE." Moreover, the interrogatory answer referred plaintiff to a securities filing which

indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the

loan. Because of the inconsistent responses, plaintiff is making alternative allegations as to the

assignees of his mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and

the trust itself as assignees of his mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Lawrence Mueller**

97.     Lawrence Mueller owns a home in Forest Park, Illinois. In 2005, he decided to

refinance the mortgage. Mr. Mueller got in touch with Ameriquest and received a preliminary

TILA disclosure which said that the finance charge for the loan would be $386,585.02. In fact,

the finance charge, according to the final TILA disclosure, turned out to be $416,563.08. Also,

the preliminary TILA disclosure estimated the APR at 7.241%, but in fact the APR was 7.700%.

98.     Ameriquest's disclosures did not comply with the requirements of the Truth in

Lending Act. Plaintiff was given a document which said he would owe $500 for an Appraisal

fee if he backed out of the deal, which misrepresented the effects of rescission in violation of 12

C.F.R. § 226.23(b)(1)(iv). Plaintiff was also misinformed as to the cost of credit.

99.     Because of the defective disclosures, plaintiff's right to rescind the loan was

extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in April 2008, plaintiff sent rescission

notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of

the mortgage loan should have cancelled the security interest and tendered to plaintiff all money

plaintiff had paid in connection with the mortgage. *See* 12 C.F.R. § 226.23(d)(2). They have not

done so.

100.     Defendants have given plaintiff inconsistent information as to the identity of the

assignees of his mortgage. In August 2008, counsel for Ameriquest sent plaintiffs' counsel a

chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates,

Series 2005-R-10" as the "Investor" for the loan. In a subsequent letter, dated September 25,

2008, counsel for Ameriquest said that "the term investor is synonymous with assignee."

However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-

defendants stated that the loan had been transferred to "DEUTSCHE BANK NATIONAL

TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC.

ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 UNDER THE

POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005,

WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiff to a securities

40

filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiff is making alternative allegations as to the assignees of his mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of his mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Benjamin Neely**

101.    Benjamin Neely owns a home in Chicago. In 2005, he decided to refinance the mortgage on his home. A representative of Ameriquest promised him a mortgage with an interest rate of around 7%. But, in fact, Mr. Neely received an adjustable rate mortgage with an interest rate which began at 10.35% and could go as high as 16.35%. Mr. Neely has since refinanced with another lender.

102.    Ameriquest's disclosures did not comply with the requirements of the Truth in Lending Act. At the closing, plaintiff was told he would owe fees if he backed out of the deal. Also, plaintiff was given a document which said he would owe $350 for an Appraisal fee if he backed out of the deal. Both of these representations misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv). Plaintiff was also misinformed as to the cost of credit.

103.    Because of the defective disclosures, plaintiff's right to rescind the loan was extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in April 2008, plaintiff sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of the mortgage loan should have cancelled the security interest and tendered to plaintiff all money plaintiff had paid in connection with the mortgage. *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

104.     Defendants have given plaintiff inconsistent information as to the identity of the assignees of his mortgage. In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R9" as the "Investor" for the loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R9 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2005, WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiff to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiff is making alternative allegations as to the assignees of his mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of his mortgage (in addition to Ameriquest Mortgage Securities, Inc.)

**John and Constance Puga**

105.     John and Constance Puga own a home in Bolingbrook, Illinois. In 2005, they decided to refinance the mortgage on their home. A representative of Ameriquest promised them a 15 year mortgage with an interest rate of 6.75%, that for the first five years it would be interest only and that after the first five years the payments would remain the same and would all go to pay off the principal. In fact, Ameriquest prepared a 30 year mortgage, the interest rate was

42

fixed for only the first five years and thereafter could go as high as 12.75% but could never go

below 6.75% and after the first five years (assuming no changes in the LIBOR index) the

monthly payments would increase by more than $300 per month and would go to pay both

principal and interest.

106.    Ameriquest's disclosures did not comply with the requirements of the Truth in

Lending Act. With the possible exception of a settlement statement, the closing agent did not

leave any documents with the Pugas after the closing, in violation of 12 C.F.R. § 226.23(b)(1).

Plaintiffs were also misinformed as to the cost of credit and payment schedule. Plaintiffs are

entitled to rescission of their mortgage transaction with Ameriquest.

### James Shew

107.    James Shew owns a home in Chicago. In 2005, he decided to refinance the

mortgage on his home. A representative of Ameriquest promised a mortgage with a 7% interest

rate. Instead, he received an adjustable rate mortgage with an initial interest rate of 7.5% which

could go as high as 13.5%. Also, Mr. Shew was told that his monthly payments (which began at

$1,461.36) would include an escrow for taxes and insurance, but in fact they did not. When Mr.

Shew complained to upper management at Ameriquest he was told the only remedy was to

refinance with an escrow. Mr. Shew has since refinanced with another lender.

108.    Ameriquest's disclosures did not comply with the requirements of the Truth in

Lending Act. The Notice of Right to Cancel forms delivered at the closing did not set forth the

date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also,

Mr. Shew was given a document which said he would owe $350 for an Appraisal fee if they

backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R.

43

§ 226.23(b)(1)(iv).   Plaintiff was also misinformed as to the cost of credit.

109.    Because of the defective disclosures, plaintiff's right to rescind the loan was extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in May 2008, plaintiff sent rescission notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and all the assignees of the mortgage loan paid to plaintiff all money plaintiff had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. § 226.23(d)(2). They have not done so.

110.    Defendants have given plaintiff inconsistent information as to the identity of the assignees of his mortgage. In August 2008, counsel for Ameriquest sent plaintiffs' counsel a chart identifying "Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R10" as the "Investor" for the loan. In a subsequent letter, dated September 25, 2008, counsel for Ameriquest said that "the term investor is synonymous with assignee." However, in an interrogatory answer dated November 19, 2008, Ameriquest and its affiliate co-defendants stated that the loan had been transferred to "DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT RECOURSE." Moreover, the interrogatory answer referred plaintiff to a securities filing which indicates that, at one time, Ameriquest Mortgage Securities, Inc. had also been an assignee of the loan. Because of the inconsistent responses, plaintiff is making alternative allegations as to the assignees of his mortgage, naming Deutsche Bank as trustee for the above-mentioned trust and the trust itself as assignees of his mortgage (in addition to Ameriquest Mortgage Securities, Inc.).

**Harold Wells**

111.    Harold Wells owns a home in Maywood, Illinois. In 2006, he decided to

refinance the mortgage on his home. Harold Wells spoke on the telephone with an Ameriquest

representative who said he would lower Mr. Wells' interest rate and monthly payment. Wells

had been paying about $1,026 (including escrow) and his interest rate was about 8.5%.

Ameriquest said the monthly payment would be about $900 per month (and Mr. Wells assumed

that would include escrow) and the interest rate would be around 7% and fixed. In fact,

however, Ameriquest gave Mr. Wells an adjustable rate mortgage with an initial interest rate of

9.95% which could go as high as 15.95%. Also, the monthly payments, which began at $932.22,

did not include escrow. Mr. Wells has since refinanced with another lender.

112.    Ameriquest's disclosures did not comply with the requirements of the Truth in

Lending Act. The Notice of Right to Cancel forms delivered at the closing did not set forth the

date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

Plaintiff was also misinformed as to the cost of credit.

113.    Because of the defective disclosures, plaintiff's right to rescind the loan was

extended. *See* 12 C.F.R. § 226.23(a)(3). Accordingly, in June 2008, plaintiff sent rescission

notices pursuant to 12 C.F.R. § 226.23(a)(3). In response, Ameriquest and Citigroup Global

Markets, Inc. (the assignee of the Wells loan) should have paid to plaintiff all money plaintiff

had paid in connection with the mortgage (minus the original loan amount). *See* 12 C.F.R. §

226.23(d)(2). They have not done so.

## COUNT ONE -- TRUTH IN LENDING ACT

114.    Plaintiffs incorporate paragraphs one through one hundred thirteen above.

115.    Ameriquest's disclosures to plaintiffs in connection with plaintiffs' mortgage refinancing transactions did not comply with the requirements of the Truth in Lending Act.

### REGULATORY FRAMEWORK

116.    The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et. seq. requires the clear, fair, conspicuous and accurate disclosure of the costs and terms of credit. The statute's purpose is to protect consumers from inaccurate and unfair credit practices, and to assure a meaningful disclosure of credit terms so that the consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit.

117.    Accordingly, the Board of Governors of the Federal Reserve System promulgated Regulation Z to implement the TILA. 12 C.F.R. § 226.1(a). A creditor is required by Regulation Z to make certain disclosures to the consumer, "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Regulation Z sets out certain guidelines for creditors to follow when disclosing the amount financed, the finance charge, and the annual percentage rate to the consumer and demands that these disclosures be accurate. 12 C.F.R. § § 226.18, 226.22, 226.5.

118.    Regulation Z also requires that "disclosures shall reflect the terms of the legal obligation between the parties" 12 C.F.R. § 226.17(c)(1) and that the creditor accurately disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g)(1).

119.    The Truth in Lending Act confers additional rights on home owners who refinance their mortgages with a new lender.  In order to give these borrowers an opportunity to reflect on their other TILA disclosures and to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three business days after receiving their final TILA disclosures or three business days of receiving notice of their right to rescind, whichever is later.  More specifically, the statute, provides that:

> Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.

15 U.S.C. § 1635(a).

120.    To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction.  More specifically, the statute provides:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission.  Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

47

15 U.S.C. § 1635(b).

121.    To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately. More specifically, the statute provides:

> The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

122. Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in Lending Act, amplifies the statutory requirements. Subject to exceptions not here pertinent, the regulation provides:

> In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction ....

12 C.F.R. § 226.23(a)(1).

123.    The regulation goes on to require that the creditor "deliver" to "each consumer entitled to rescind" two copies of a document that "clearly and conspicuously disclose[]" the consumer's rescission rights. *See* 12 C.F.R. § 226.23(b)(1)

124.    More specifically, the regulation provides:

> In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
>
> (i) The retention or acquisition of a security interest in the

48

consumer's principal dwelling.

(ii) The consumer's right to rescind the transaction.

(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1).

125.    Paragraph (d) goes on to explain the effects of rescission. Subparagraph (d)(1) provides:

When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

12 C.F.R. § 226.23(d)(1).

126.    Subparagraph (d)(2) states:

Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

12 C.F.R. § 226.23(d)(2).

127.    The Federal Reserve Board's commentary of paragraph 23(d)(2) explains that the words "any money or property" would include an appraisal fee. 12 C.F.R. Part 226, Supp. I, para. 23(d)(2)-1.

128.    Under the Truth in Lending Act, if the rescission disclosures or material TILA disclosures are deficient, then the rescission period is extended for up to three years. *See* 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right

to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first").

129.     Moreover, under the statute, any consumer who has a right to rescind a mortgage refinancing transaction under 15 U.S.C. § 1635 "may rescind the transaction as against any assignee of the obligation." 15 U.S.C. § 1641(c).

130.     Accordingly, plaintiff Rose Terry seeks rescission of her mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of her mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 and/or DEUTSCHE BANK NATIONAL TRUST COMPANY and AMERIQUEST MORTGAGE SECURITIES, INC.  In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.  Ms. Terry also sues defendant Citi Residential Lending, Inc. for failure to comply with its obligations under 15 U.S.C. § 1641(f).

131.     Plaintiffs Terry Watt and Roy Parnell seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignee of their mortgage, CitiFinancial Mortgage Company, Inc.  In addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of The

50

Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

132.    Plaintiff Johanna Guyton seeks rescission of her mortgage transactions and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of her first mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 and AMERIQUEST MORTGAGE SECURITIES, INC., and the assignees of her second mortgage: DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF FEBRUARY 1, 2006, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1 and AMERIQUEST MORTGAGE SECURITIES, INC.  In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust, because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

133. Plaintiffs Jorge and Luisa Bolo seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of their mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS

TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF AUGUST 1, 2005, WITHOUT RECOURSE; and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 and/or DEUTSCHE BANK NATIONAL TRUST COMPANY and AMERIQUEST MORTGAGE SECURITIES, INC. In addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company. Plaintiffs are also suing defendant Citi Residential Lending, Inc. for failure to comply with its obligations under 15 U.S.C. § 1641(f).

134.    Plaintiffs Selvin and Beatrice Quire seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of their mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF AUGUST 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 and/or DEUTSCHE BANK NATIONAL TRUST COMPANY and AMERIQUEST MORTGAGE SECURITIES, INC. In addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company. Plaintiffs are also suing defendant Citi Residential Lending, Inc. for failure

to comply with its obligations under 15 U.S.C. § 1641(f).

135.    Plaintiffs Juan Baez and Cruz Rivera seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of their mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 and AMERIQUEST MORTGAGE SECURITIES, INC. In addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

136.    Plaintiff Julie Noradin seeks rescission of her mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of her first mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF JULY 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R6 and AMERIQUEST MORTGAGE SECURITIES, INC. and the assignee of her second mortgage, Greenwich Capital Financial Products, Inc. In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn

Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest

Mortgage Company.

137.    Plaintiffs Ananias and Ethel Colister seek rescission of their mortgage

transaction, and associated relief such as statutory fees and damages, from Ameriquest Mortgage

Company and the assignee of their mortgage, CitiFinancial Mortgage. In addition, plaintiffs are

pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn

Arnall Living Trust, because the Arnall Trust is the alter ego or successor of Ameriquest

Mortgage Company.

138.    Plaintiffs Michael Cox and Susan Lawrence seek rescission of their mortgage

transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage

Company and the assignees of their mortgage, DEUTSCHE BANK NATIONAL TRUST

COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET

BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 UNDER THE POOLING

AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT

RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED

PASS THROUGH CERTIFICATES, SERIES 2005-R10 and AMERIQUEST MORTGAGE

SECURITIES, INC. In addition, plaintiffs are pursuing this claim against Dawn Arnall in her

capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the

alter ego or successor of Ameriquest Mortgage Company. Plaintiffs are also suing defendant

Citi Residential Lending, Inc. for failure to comply with its obligations under 15 U.S.C.

§ 1641(f).

139.    Plaintiff Ramses Favela seeks rescission of his mortgage transaction and

54

associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignee of his mortgage, WM Specialty Mortgage, LLC. In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust, because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

140.     Plaintiffs Wences Garcia and Maria Lara seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of their mortgage DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 and AMERIQUEST MORTGAGE SECURITIES, INC. In addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

141.     Plaintiff Elizabeth Hill seeks rescission of her mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of her mortgages, WM Specialty Mortgage, LLC (the assignee of the first mortgage) and CitiFinancial Mortgage Company, Inc. (the assignee of her second mortgage). In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

142.    Plaintiffs Alfredo and Ana Velia Jaime seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of their mortgage DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF FEBRUARY 1, 2006, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2006-R1 and AMERIQUEST MORTGAGE SECURITIES, INC.  In addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of the Roland and Dawn Arnall Living Trust because The Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

143.    Plaintiffs Carey and Denise Lee seek rescission of their mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of their first mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF AUGUST 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R7 and AMERIQUEST MORTGAGE SECURITIES, INC. and the assignees of their second loan, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS

56

TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS

THROUGH CERTIFICATES, SERIES 2006-R1 UNDER THE POOLING AND SERVICING

AGREEMENT DATED AS OF MARCH 1, 2006, WITHOUT RECOURSE and/or

AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH

CERTIFICATES, SERIES 2006-R1 and AMERIQUEST MORTGAGE SECURITIES, INC.  In

addition, plaintiffs are pursuing this claim against Dawn Arnall in her capacity as trustee of The

Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of

Ameriquest Mortgage Company.

144.    Plaintiff Daryl Monson seeks rescission of his mortgage transaction and

associated relief such as statutory fees and damages from Ameriquest Mortgage Company and

the assignees of his mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS

TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS

THROUGH CERTIFICATES, SERIES 2005-R9 UNDER THE POOLING AND SERVICING

AGREEMENT DATED AS OF OCTOBER 1, 2005, WITHOUT RECOURSE and/or

AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH

CERTIFICATES, SERIES 2005-R9 and AMERIQUEST MORTGAGE SECURITIES, INC.  In

addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The

Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of

Ameriquest Mortgage Company.

145.    Plaintiff Lawrence Mueller seeks rescission of his mortgage transaction and

associated relief such as statutory fees and damages from Ameriquest Mortgage Company and

the assignees of his mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS

TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R10 and AMERIQUEST MORTGAGE SECURITIES, INC. In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

146.    Plaintiffs John and Constance Puga seek rescission related relief from Ameriquest Mortgage Company and from Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

147.    Plaintiff Benjamin Neely seeks rescission of his mortgage transaction and associated relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees of his mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R9 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2005, WITHOUT RECOURSE and/or AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH CERTIFICATES, SERIES 2005-R9 and AMERIQUEST MORTGAGE SECURITIES, INC. In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of

58

Ameriquest Mortgage Company.

148.    Plaintiff James Shew seeks rescission of his mortgage transaction and associated

relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignees

of his mortgage, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF

AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH

CERTIFICATES, SERIES 2005-R10 UNDER THE POOLING AND SERVICING

AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT RECOURSE and/or

AMERIQUEST MORTGAGE SECURITIES, INC. ASSET BACKED PASS THROUGH

CERTIFICATES, SERIES 2005-R10 and AMERIQUEST MORTGAGE SECURITIES, INC.

In addition, plaintiff is pursuing this claim against Dawn Arnall in her capacity as trustee of The

Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of

Ameriquest Mortgage Company.

149.    Plaintiff Harold Wells seeks rescission of his mortgage transaction and associated

relief such as statutory fees and damages from Ameriquest Mortgage Company and the assignee

of his mortgage, Citigroup Global Markets, Inc.  In addition, plaintiff is pursuing this claim

against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust

because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

### COUNT TWO -- ILLINOIS CONSUMER FRAUD ACT

150.    Plaintiffs incorporate paragraphs one through one hundred thirteen above.

151.    Ameriquest Mortgage Company, in connection with trade or commerce, made

false and misleading representations to plaintiffs (except Julie Noradin, Wences Garcia and

59

Maria Lara) intending to induce reliance. Ameriquest baited plaintiffs into mortgage transactions by offering relatively favorable terms and then switched at the closing to terms less favorable to plaintiffs. This conduct violated the Illinois Consumer Fraud Act and proximately caused damages to plaintiffs compensable under that statute.

152.    Plaintiffs are entitled to benefit of the bargain damages based on the differences between the deals that they were promised and what they have since had to pay on their mortgages. Plaintiffs are also entitled to punitive damages because Ameriquest engaged in reckless or willful misconduct. Plaintiffs are also pursuing these claims against Dawn Arnall in her capacity as trustee of The Roland and Dawn Arnall Living Trust because the Arnall Trust is the alter ego or successor of Ameriquest Mortgage Company.

### COUNT THREE -- ILLINOIS UNIFORM FRAUDULENT TRANSFER ACT

153.    Plaintiffs incorporate paragraphs one through one hundred thirteen above.

154.    Plaintiffs are creditors of Ameriquest within the meaning of the Illinois Uniform Fraudulent Transfer Act and have been since their mortgage refinancing transactions with Ameriquest.

155.    Plaintiffs are challenging fraudulent transfers which took place, upon information and belief, in California.

156.    During the period June 9, 2004 through September 8, 2006, Ameriquest received money from whole loan sales and securitized loan sales. The securitized loan sales were made pursuant to prospectuses dated June 9, 2004, July 2, 2004, July 29, 2004, August 31, 2004, September 20, 2004, October 6, 2004, November 3, 2004, February 23, 2005, April 28, 2005, June 24, 2005, July 29, 2005, August 25, 2005, September 28, 2005, October 27, 2005, November 23, 2005, December 14, 2005, December 16, 2005, February 8, 2006, March 10, 2006

and September 8, 2006.

157.    Ameriquest transferred the monies that it received from the sale of mortgages to its parent companies, ACC Capital Holdings Corporation and Ameriquest Capital Corporation, now known as SBP Capital Corporation, which in turn transferred the monies to Roland Arnall, Dawn Arnall and The Roland and Dawn Arnall Living Trust. Ameriquest did not receive adequate consideration in exchange for these transfers.

158.    At the time of the transfers, Ameriquest was insolvent in that its liabilities exceeded its assets. In the alternative, at the time of the transfers, Ameriquest had unreasonably small capital in that its assets were unreasonably small in relation to its liabilities. In the alternative, the transfers rendered Ameriquest insolvent or left Ameriquest with unreasonably small capital.

159.    The transfers were made with the intent, on the part of both transferor and transferee, to hinder, delay and defraud creditors of Ameriquest.

160. At the time of the transfers to the Arnall family, ACC Capital Holdings Corporation and Ameriquest Capital Corporation were insolvent in that their liabilities exceeded their assets. In the alternative, at the time of the transfers, ACC Capital Holdings Corporation and Ameriquest Capital Corporation had unreasonably small capital in that their assets were unreasonably small in relation to their liabilities. In the alternative, the transfers rendered ACC Capital Holdings Corporation and Ameriquest Capital Corporation insolvent or left ACC Capital Holdings Corporation and Ameriquest Capital Corporation with unreasonably small capital. ACC Capital Holdings Corporation and Ameriquest Capital Corporation did not receive adequate consideration in exchange for these transfers.

161.    The transfers were made with the intent, on the part of both transferor and transferee, to hinder, delay and defraud creditors of ACC Capital Holdings Corporation and Ameriquest Capital Corporation.

162.    In or about June or July 2005, ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation paid $20 million to Wayne Lee, the former CEO of ACC Capital Holdings Corporation, in exchange for his promise not to disparage Ameriquest, ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation by revealing their wrongdoing and insolvency. Sometime in or about January through May 2007, ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation paid an additional $14.75 million to Wayne Lee, the former CEO of ACC Capital Holdings Corporation, in exchange for his promise not to disparage Ameriquest, ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation by revealing their wrongdoing and insolvency. The monies used to pay Lee were the result of fraudulent transfers from Ameriquest to ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation. ACC Capital Holdings Corporation and/or Ameriquest Capital Corporation did not receive adequate consideration in exchange for these transfers.

163.    The monies paid to Lee were paid pursuant to a conspiracy to hinder, delay and defraud creditors of Ameriquest and its parent companies. The parties to the conspiracy included Dawn Arnall, both in her individual capacity and as trustee of The Roland and Dawn Arnall Living Trust, Wayne Lee, Ameriquest, ACC Capital Holdings Corporation and Ameriquest Capital Corporation.

164.    Because of the fraudulent conveyances, the transfers to Wayne Lee, Dawn Arnall,

The Roland and Dawn Arnall Living Trust, ACC Capital Holdings Corporation and Ameriquest

Capital Corporation should be voided and the monies returned to Ameriquest to the extent

needed to pay plaintiffs' claims in full.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court grant judgment against defendants as

follows:

a.    canceling defendants' security interest in plaintiffs' homes and ordering

defendants to provide plaintiffs with the money to which plaintiffs are entitled to under 12

C.F.R. § 226.23(d)(2);

b.    ordering defendants to pay costs, penalties, and attorneys fees;

c.    awarding plaintiffs actual and punitive damages;

d.    voiding the fraudulent transfers and returning the money to Ameriquest, and/or

imposing a constructive trust, to the extent necessary to pay plaintiffs' claims; and

e.    granting such other relief as the Court deems just and proper.

Date:  January 20, 2009                    Respectfully submitted by:

                                           /s/ Anthony P. Valach, Jr.
                                           Counsel for the Plaintiffs

                                           THE LAW OFFICES OF DANIEL HARRIS
                                           Daniel Harris
                                           Anthony Valach
                                           150 N. Wacker Dr., Suite 3000
                                           Chicago, IL 60606
                                           Telephone: (312) 960-1802
                                           Facsimile: (312) 960-1936
                                           lawofficedh@yahoo.com

## CERTIFICATE OF SERVICE

I, Anthony P. Valach, Jr., hereby certify that on this 20th day of January 2009, a true and correct copy plaintiffs' **SECOND AMENDED COMPLAINT** of was served, via the Court's electronic filing system, upon counsel of record.


/s/ Anthony Valach
Anthony Valach