**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STEVEN B. HODOR and VALERIE L. HODOR, ) | |
| ) | (Originally 5:06-cv-00181RHB, |
| Plaintiffs, ) | W. D. MI) |
| ) | |
| v. ) | 07-cv-318 (N.D.Ill.) |
| ) | |
| AMERIQUEST MORTGAGE COMPANY, ) | Transferred for pre-trial proceedings |
| DEUTSCHE BANK NATIONAL TRUST ) | to MDL No. 1715, Lead Case No. |
| COMPANY, as Trustee of AMERIQUEST ) | 05-cv-7097 |
| MORTGAGE SECURITIES, INC., Asset Backed ) | |
| Pass-Through Certificates, Series 2004-R3 under ) | |
| the Pooling & Servicing Agreement dated as of ) | |
| April 1, 2004, Without Recourse, AMERICAN ) | |
| HOME MORTGAGE SERVICING, INC., and ) | |
| DOES 1-5, ) | Judge Marvin E. Aspen |
| ) | |
| ) | **DEMAND FOR JURY TRIAL** |
| Defendant. ) | |

**THIRD AMENDED COMPLAINT**

**INTRODUCTION**

1.  Plaintiffs Steven B. Hodor and Valerie L. Hodor bring this action against a

"subprime" mortgage lender to secure relief, including rescission, for violation of: (A) the Truth

in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board

Regulation Z, 12 C.F.R. part 226; (B) the Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq.

("ECOA"); and Michigan state law.

**JURISDICTION AND VENUE**

2.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), 1367 (supplemental jurisdiction), and 15

U.S.C. §§1640 (TILA) and 1691e (ECOA).

1

3.     Defendants do business in the District and are deemed to reside here. Venue is therefore proper under 28 U.S.C. §1391( c).

## PARTIES

4.     Plaintiffs Steven B. Hodor and Valerie L. Hodor are husband and wife and own and reside in a single family home located at 38237 N. Jean Court, Westland, MI 48186.

5.     Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Illinois.  Its registered agent and office are National Registered Agents, 712 Abbott Road, East Lansing, MI 48823, or 200 W. Adams, Chicago, IL 60606.

6.     Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

7.     Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

8.     Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

9.     During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

10.     Defendant American Home Mortgage Servicing, Inc. ("AHMSI") is a foreign corporation which does business in Illinois and Michigan.  Its registered agent and office

2

are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

11.     Defendant American Home Mortgage Servicing, Inc. services some loans originated by Ameriquest Mortgage Company, including plaintiffs', and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

12.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005.  On information and belief it holds legal title to plaintiffs' loan, as trustee.

13.     Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Michigan. It is the beneficial owner of some loans originated by Ameriquest Mortgage Company, including plaintiffs.'  It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

## FACTS RELATING TO PLAINTIFFS

14.     Prior to February 6, 2004, Ameriquest solicited plaintiffs by phone. Raymond Singh, an Ameriquest Senior Account Executive, spoke with plaintiffs.

15.     At that time, Mr. Singh orally mislead plaintiffs by telling them that Ameriquest would refinance them at an interest rate of 5.87% and, later, that, if they made two payments per month instead of just one, their interest rate would be the equivalent of 6.0%.

16.     Mr. Singh also told plaintiffs that their interest rate was fixed when it was actually adjustable, and he told them at closing that Ameriquest could "re-write" the loan after two years so that plaintiffs would not have to be subject to the adjustable phase of the interest rate, which began in March, 2006.

17.     The loan was closed on February 6, 2004 at Ameriquest's office in Taylor,

3

MI.  Plaintiffs were rushed - so much so that plaintiffs noticed they were on a "production line," with other customers closing immediately before and after them.

18.     As of the date of the filing of the original complaint, plaintiffs' interest initial interest rate of 7.99% has already gone up over 3.0%, causing their monthly principal and interest payment to increase from $1,286 to $1,652.  The interest rate on plaintiffs' loan can increase by as much as 1% in each six month period and can go as high as 13.99%.  (ExhibitA).

19.     In connection with the loan, Ameriquest told plaintiffs that it arranged for a "drive-by" appraisal to be performed on plaintiffs' home.  No appraiser ever inspected the inside of plaintiff's home or the outside of the home at close range.  Plaintiffs never saw any appraiser visit or drive by their home.

20.     The appraised value was $195,000.  A copy of the appraisal report is attached hereto as Exhibit I.

21.     On information and belief, Ameriquest and/or True Value Appraisal significantly and artificially inflated the appraised value of plaintiffs' home.

22.     Defendants did this for the purpose of increasing the loan amount that plaintiffs qualified for, which in turn increased Ameriquest's points and fees, interest and profits. It also allowed True Value to continue to do business with Ameriquest.

23.     Due to the inflated appraisal, plaintiffs' loan-to-value ratio, then and now, exceeded/exceeds 80%, the acceptable underwriting ratio of reputable mortgage lenders.

24.     Consequently, in October, 2006, when plaintiffs sought to refinance their home with Rock Financial in Illinois in order to escape the effects of Ameriquest's adjustable interest rate, their application was rejected because their home appraised for only $168,000.  This

4

was nearly two years after the February, 2004 closing with Ameriquest.

25.     The over-appraised value, combined with the adjustable rate feature of the loan, both of which Ameriquest achieved through deception, have now trapped plaintiffs in a loan with an ever-increasing interest rate that they cannot afford.  As a result, plaintiffs are experiencing great financial and emotional stress.

26.     Ameriquest's practice violates the Consumer Mortgage Protection Act, M.C.L.S. §445.1634(3) which provides:

> **A person, appraiser, or real estate agent shall not make, directly or indirectly, any false, deceptive, or misleading statement or representation in connection with a mortgage loan including, but not limited to, the borrower's ability to qualify for a mortgage loan or the value of the dwelling that will secure repayment of the mortgage loan.**

27.     Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

28.     The following are documents relating to the loan:

   a.     A note, <u>Exhibit A</u>.  Only Steven B. Hodor signed the note.

   b.     A mortgage, <u>Exhibit B</u>.  Both Steven B. Hodor and Valerie L. Hodor signed the  mortgage.

   c.     A  settlement statement, <u>Exhibit C</u>.

   d.     A Truth in Lending disclosure statement, <u>Exhibit D</u>.

   e.     The official Federal Reserve Board notice of right to cancel, <u>Exhibit E</u>.

   f.     A different, "one week" (actually six days) notice of right to cancel, <u>Exhibit F</u>.

29.     Plaintiffs  were charged a "loan discount" fee of $3,510.  <u>Exhibit C</u>, line 802.  (See <u>Exhibit K</u> in which Ameriquest explains the loan discount fee.)  However, their interest rate was not discounted, but instead raised from 5.87% to 7.99%

30.     Plaintiffs did not receive a copy of their appraisal report at closing.

31.     Plaintiffs were later directed to make payments to AMC Mortgage Services, Inc., and then later to Citi Residential Lending, Inc.  Most recently, in 2009, plaintiffs were directed to make payments to American Home Mortgage Servicing, Inc.

32.     On information and belief, Deutsche Bank National Trust Company, N.A. holds legal title to plaintiffs' loan, as Trustee.  Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiffs' loan under Asset Backed Pass-Through Certificates, Series 2004-R3 under the Pooling & Servicing Agreement dated as of April 1, 2004, Without Recourse.

33.     In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiff's loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

## <u>COUNT I  – TILA</u>

34.     Plaintiffs incorporate paragraphs 1-33.  This claim is against all defendants.

35.     In order to give consumers the opportunity to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three days of receiving notice of their right to rescind, whichever is later.  More specifically, the statute, provides that:

**Except as otherwise provided in this section, in the case of any consumer credit**

**transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.** (15 U.S.C. § 1635(a)).

36.     To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction. More specifically, the statute provides:

**When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given by the obligor as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.** (15 U.S.C. § 1635(b).)

37.     To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately. More specifically, the statute provides:

**The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.** (15 U.S.C. § 1635(a).)

38.     Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in Lending Act, amplifies the statutory requirements. The regulation restates the statutory rescission right, 12 C.F.R. § 226.23(a), and requires that the creditor "deliver" to each person entitled to rescind

"two copies" of a document that "clearly and conspicuously disclose" 12 C.F.R. § 226.23(b)(1) the borrower's rescission rights.

  39. More specifically, the regulation provides:

**In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(i) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(ii) The consumer's right to rescind the transaction.**

**(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(iv) The effects of rescission, as described in paragraph (d) of this section.**

**(v) The date the rescission period expires.** (12 C.F.R. § 226.23(b)(1).)

### DEFECTIVE NATURE OF DISCLOSURES

  40. In connection with the plaintiffs' loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiffs' right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the following reasons:

### Insufficient Number of Federal Notices of Right To Cancel

  41. Ameriquest provided plaintiffs with only one federal notice of right to cancel form, instead of the four required by TILA (i.e., two each per mortgagor).

### Notices Confusing Where Less Than All Owners Are Obligated

  42. Exhibit E is inherently confusing with respect to who has a right to cancel

8

in a case in which less than all of the persons signing the mortgage sign the note.  The confusing portions were added by Ameriquest to the official Federal Reserve Board text.

43.     The top of <u>Exhibit E</u> has only Steven B. Hodor's name on it, and is addressed to "borrower(s)."  The text is addressed to "You," which is reasonably interpreted as applying to the individual whose name appears directly above.  The bottom of the form states that "Each borrower" has the right to cancel, which is reasonably interpreted as meaning the persons named as "borrower(s)" at the top of the document.  While there are signature lines for both plaintiffs at the bottom of the form, they are there described as "Borrower/ Owner," which presumably means something different than just "borrower."

44.     The statute gives not only each person obligated to repay the loan but each person who resides in and has an ownership interest in the property the right to cancel, and requires a notice that unequivocally tells each such person that they have the right to cancel.

### **"One Week" Form**

45.     The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel.

46.     Further, the "one week" cancellation notice is misleading, as the period given is actually only six days long.  Ameriquest's own personnel found this confusing, and were issued a "job aid" at the beginning of each month listing the expiration dates for the official and "one week" cancellation notices for loans closed each day during the month.

47.     Finally, the "one week" notice contains the same ambiguous and confusing references to "borrower" and "owner" as defendants' version of the official Federal Reserve Board three-day notice.

9

48. Notice of rescission has been given to defendants. A copy is attached as Exhibit G.

49. The loan has not been rescinded.

50. Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

51. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b. A judgment indicating the amount, if any, that plaintiffs owe defendants, taking into account the challenge to plaintiffs' ability to tender that is caused by defendants' inflated appraisal;

c. Statutory damages for the underlying disclosure violation;

d. If appropriate, statutory damages for failure to rescind;

e. Attorney's fees, litigation expenses and costs.

f. Such other or further relief as the Court deems appropriate.

## COUNT II – ECOA

52.     Valerie L. Hodor incorporates paragraphs 1-33.

53.     This claim is against Ameriquest Mortgage Company.

54.     On information and belief, the majority of the instances in which less than all owners of the property sign a note in favor of defendant are where a husband and wife own the property and only the husband signs the note.

55.     On information and belief, it is defendant's practice, if the wife does not have an income and/or her credit score is no better than the husband's, to prepare the loan documents in this manner.

56.     Defendant's practice thus impairs and obfuscates the cancellation rights of women, and married women particularly, because of their gender and marital status, in violation of the ECOA's prohibition against discrimination on such bases.

WHEREFORE, plaintiff Valerie L. Hodor requests that the Court enter judgment in favor of plaintiff  and against defendant for:

a.      Appropriate statutory and punitive damages;

b.      Attorney's fees, litigation expenses and costs.

c.      Such other or further relief as the Court deems appropriate.

## COUNT III – MORTGAGE BROKERS, LENDERS, AND SERVICERS LICENSING ACT

57.     Plaintiff incorporates paragraphs 1–33.  This claim is against Ameriquest.

58.     Defendants engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by inflating the appraised value of plaintiffs' house and, thereby,

11

misrepresenting plaintiffs' ability to qualify for the loan.

59.     Plaintiffs were induced to transact with Ameriquest by means of this misrepresentation.

60.     Defendants made the representation in the course of trade and commerce.

61.     Defendants made the representation for the purpose of inducing reliance in the form of plaintiffs' act of borrowing a higher principal than the otherwise would have.

62.     Plaintiffs were injured by the fraudulent overappraisal.  Their options for refinancing with reputable mortgage companies have been severely limited by defendants' actions. Ameriquest has effectively trapped plaintiffs in their current, ever-increasing adjustable-rate mortgage.

WHEREFORE, the Court should enter judgment in favor of plaintiffs and against Ameriquest for:

a.     A declaratory judgment, MCL §445.1681(1)(a);

b.     Injunctive relief, MCL §445.1681(1)(b);

c.     Appropriate damages, MCL §445.1681(1)(c);

d.     Attorney's fees, litigation expenses and costs of suit;

e.     Such other and further relief as the Court deems proper.

### COUNT IV – COMMON LAW FRAUD

63.     Plaintiff incorporates paragraphs 1–33.  This claim is against Ameriquest.

64.     Defendants represented that plaintiffs' home was worth $195,000 and, therefore, that plaintiffs qualified for a $175,500 loan.

65.     These representations were false.

12

66.    Defendants made these representations with knowledge that they were false or made them recklessly, without any knowledge of their truth and as positive assertions.

67.    Defendants made these representations with the intention that they should be acted upon by plaintiffs.

68.    Plaintiffs borrowed $175,500 from Ameriquest in reliance on Ameriquest's representations that they qualified for the loan, based on the appraised value of their home.

69.    Plaintiffs have suffered an injury as a result of defendants' misrepresentations. Their options for refinancing with reputable mortgage companies have been severely limited by defendants' actions. Ameriquest has effectively trapped plaintiffs in their current adjustable-rate mortgage.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiff and against defendants Ameriquest for:

a.    Actual and compensatory damages;

b.    Punitive damages; and

c.    Such other or further relief as the Court deems appropriate.

## COUNT V – DAMAGES RESULTING FROM CIVIL CONSPIRACY

70.    Plaintiff incorporates paragraphs 1–33. This claim is against Ameriquest.

71.    Ameriquest and its appraiser took concerted action to produce a fraudulent, inflated appraisal for the Hodors' home.

72.    As a result of this conspiracy, plaintiffs have suffered damages. Their options for refinancing with reputable mortgage companies have been severely limited by Ameriquest's actions. Ameriquest has effectively trapped plaintiffs in their current, adjustable rate mortgage loan.

13

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

      a.     Actual damages;

      b.     Incidental, consequential and special damages;

      c.     Costs of litigation and expenses; and

      d.     Such other or further relief as this Court deems appropriate.

### COUNT VI - MORTGAGE BROKERS, LENDERS, AND SERVICERS LICENSING ACT

73.     Plaintiffs incorporate paragraphs 1-33. This claim is against Ameriquest.

74.     Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b) by (a) representing to plaintiffs that Ameriquest would refinance them at an interest rate of 5.87% and, later, that if they made two payments per month their rate would be the equivalent of 6.0%; (b) misleading plaintiffs by telling them that their interest rate was fixed when it was actually adjustable; and (c) telling plaintiffs it could re-write the loan after two years.

75.     Plaintiffs were induced to transact with Ameriquest by means of these misrepresentations.

76.     Defendant Ameriquest made these representations in the course of trade and commerce.

77.     Defendant Ameriquest made the representations for the purpose of inducing reliance in the form of plaintiffs signing for a loan with an adjustable-rate mortgage from Ameriquest.

78.     Plaintiffs were injured by Ameriquest's misrepresentations. The interest rate and their monthly payment amounts have increased beyond their means to afford, and their options for refinancing are severely limited because of Ameriquest's overappraisal.

WHEREFORE, the court should enter judgment in favor of plaintiffs and against Ameriquest for:

a..     A declaratory judgment, MCL §445.1681(1)(a);

b.      Injunctive relief, MCL §445.1681(1)(b);

c.      Appropriate damages, MCL §445.1681(1)( c);

d.      Attorney's fees, litigation expenses and costs of suit;

e.      Such other and further relief as the Court deems proper.

## COUNT VII – BREACH OF CONTRACT

79.     Plaintiffs incorporate paragraphs 1-33.  This claim is against Ameriquest.

80.     Defendant Ameriquest contracted and undertook to provide a discounted interest rate if plaintiffs paid a loan discount fee.  Exhibit K.

81.     Plaintiffs paid the fee of $3,510 (Exhibit C, line 802), but their interest rate was increased rather than decreased.

82.     Ameriquest thereby breached its agreements with the plaintiffs.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendant for:

a.      Appropriate damages;

b.      Costs; and

.     c.      Such other or further relief as the Court deems appropriate.

15

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on May 18, 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also hereby certify that a copy was sent by U.S. mail to parties without an email address.

Mark van der Laan
Dykema Gossett PLLC
300 Ottawa Ave. N.W.
Suite 700
Grand Rapids, MI 49503

Bernard E. LeSage
blesage@buchalter.com

s/Daniel A. Edelman
Daniel A. Edelman

16

# EXHIBIT A

Loan Number: 0069293702 - 5566

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVI  IONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.  THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

| February 6, 2004 | Orange | CA |
|---|---|---|
| Date | City | State |

38237 N Jean Ct., Westland, MI 48186
Property Address

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 175,500.00 (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is  **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **7.990 %.**  This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on   April 1, 2004 .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, March 1, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my payments at:   505 City Parkway West, Suite 100, Orange, CA 92868

or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 1,286.54.  This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of,  March, 2006  and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding  six percentage point(s) (6.000%) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

 Initials: _____  ____  ____

201-1MI (Rev 07/03)

1 of 3

02/06/2004 9:33:12 AM

Loan Number: 0069293702 - 5566

**(D)** Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **9.990** % or less than **7.990**%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One percentage point(s) **1.000**% from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **13.990** % or less than **7.990** %.

**(E)** Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)** Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A)** Prepayment Made Three (3) year(s) After the Date of this Note

If I make a prepayment commencing on or after the Three (3) year anniversary of the date of this Note, I may make that prepayment, in full or in part, without the imposition of a prepayment charge by the Lender.

**(B)** Prepayment Made With n Three (3) year(s) of the Date of this Note

I agree to pay Lender a prepayment charge if I make a prepayment before the Three (3) year(s) anniversary of the date this Note is executed. The prepayment charge I will pay will be equal to one percent (1%) on the amount by which the total prepayments within any 12-month period exceeds twenty percent (20%) of the original principal amount of the loan.

**(C)** Application of Funds

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D)** Monthly Payments

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and the Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)** Late Charges for Overdue Payment

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)** Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)** Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D)** No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)** Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

Initials: 

Loan Number: 0069293702 - 5566

9. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. **WAIVERS**
I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                        _____ (Seal)
Borrower   Steven B. Hodor                                      Borrower

_____ (Seal)                        _____ (Seal)
Borrower                                                        Borrower



3 of 3

201-33/6 (Rev 07/03)

02/06/2004 9:33:12 AM

# EXHIBIT B

# MORTGAGE

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated February 6, 2004
together with all Riders to this document.

(B) "Borrower" is Steven B. Hodor and Valerie L. Hodor, His Wife

Borrower's address is 38237 N Jean Ct., Westland, MI 48186
. Borrower is the mortgagor under this Security Instrument.

0069293702 - 5566

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01

-6(MI) (0005)

Page 1 of 15          Initials:_____

VMP MORTGAGE FORMS - (800)521-7291

02/06/2004 9:33:12

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated February 6, 2004
The Note states that Borrower owes Lender one hundred seventy-five thousand five
hundred and 00/100                                                          Dollars
(U.S. $175,500.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than March 1, 2034
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

0069293702-5566
Initials: _____

-6(MI) (0005)          Page 2 of 15          02/06/2004 9:33:12          Form 3025 1/01

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County               [Type of Recording Jurisdiction]
of WAYNE                                            [Name of Recording Jurisdiction]:
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 56056020142000                      which currently has the address of
38237 N Jean Ct.                                                               [Street]
Westland                                         [City] , Michigan 48186        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

0069293702-5566
Initials:

-6(MI) (0005)                   Page 3 of 15        02/06/2004 9:33:12  Form 3025 1/01

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any;





(c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the



work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

 **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

0069293702 - 5566
Initials:

-6(MI) (0006)          Page 8 of 15          02/06/2004 9:33:12          Form 3023 1/01

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if

0069293702 - 5566

Initials: _____



acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly

0069293702 - 5566

Initials:

notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and



-6(MI) (0005)　　　　　　Page 11 of 15　　02/06/2004 9:33:12

0069293702 - 5566
Initials:
Form 3023 1/01

(d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any

0069293702 -5566
Initials: _____

-6(MI) (0008)

Page 12 of 16    02/06/2004 9:33:12    Form 3023 1/01

Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.



-6(MI) (0005)

Initials:

Page 13 of 15

0069293702 - 5566

02/06/2004  9:33:12      Form 3023 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
Steven B. Hodor                              -Borrower

_____

_____ (Seal)
Valerie L. Hodor                              -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                                            -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                                            -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                                            -Borrower

-6(MI) (0005)                    Page 14 of 15        0069293702 - 5566
                                                      02/06/2004 9:33:12  Form 3023 1/01

STATE OF MICHIGAN, Wayne          County ss:

The foregoing instrument was acknowledged before me this _____ 6/2/04 _____ by
Day/Month/Year

Steven B. Hodor and Valerie L. Hodor,
his wife

My Commission Expires: 5/11/08

Linda R Kachinski
Notary Public Wayne County MI
My Commission expires May 11, 2008

Linda R. Kachinski
Notary Public

Wayne                County, Michigan

Prepared By:  Ameriquest Mortgage Company
Gina K. McKeehan
20600 Eureka Rd., # 518,Taylor, MI 48180





BORROWER NAME:

LOAN NUMBER: 0069293702 - 5566

## LEGAL DESCRIPTION

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

LGL3LTR (03/03)

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 6th day of February , 2004   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

38237 N Jean Ct., Westland, MI  48186
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  7.990 %. The Note provides for changes in the interest rate and the monthly payments, as follows: ·

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of March, 2006  and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Loan Number:  0069293702 - 5566

Initials_____

0000006929370203021S0301

510-1 (Rev 1/01)

Page 1 of 3

02/06/2004 9:33:12 AM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding six percentage points ( 6.000 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  9.990% or less than 7.990%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  One( 1.000 %) from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 13.990% or less than 7.990%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan Number:  0069293702 - 5566



Initials_____

610-2 (Rev 1/01)

Page 2 of 3

02/06/2004 9:33:12 AM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Steven B. Hodor_ (Seal)        _Valerie L Hodor_ (Seal)
Borrower Steven B. Hodor                Borrower Valerie L. Hodor


_____ (Seal)        _____ (Seal)
Borrower                                Borrower


Loan Number: 0069293702 - 5566



610-3 (Rev 1/01)                        Page 3 of 3                        02/06/2004 9:33:12 AM

# EXHIBIT C

Settlement Statement
Optional Form for
Transactions without Sellers

U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0491

WLI

Name & Address of Borrower:
Steven B. Hoder

38237 N Jean Ct.    Westland, MI 48186
Property Location: (if different from above)
38237 N Jean Ct., Westland, MI 48186

Name & Address of Lender:
Ameriquest Mortgage Company
20600 Eureka Rd , # 518
Taylor, MI 48180

Settlement Agent: NORTHWEST TITLE & ESCROW CORP.

Place of Settlement: 4265 WHITE BEAR PRKWY STE#1300-A SAINT PAUL, MN 55110

| Loan Number: 0069293702 - 5566 | Settlement Date: Estimated 02/13/2004 |

### L.  Settlement Charges

| 800.  Items Payable in Connection with Loan | | M.  Disbursement to Others | | |
|---|---|---|---|---|
| 801. Loan origination fee    % to | | 1501. | | |
| 802. Loan discount  2.000  % to  Ameriquest Mortgage Company | $3,510.00 | BANK ONE | (W) | $43,377.77 |
| 803. Apprsl/Prop Val to True Value | $300.00 | 1502. | | |
| 804. Credit report to | | REGIONS MORTGAGE | (W) | $109,219.84 |
| 805. Inspection fee to | | 1503. | | |
| 806. | | Treasurer 2003 Winter | (W) | $955.55 |
| 807. | | 1504. | | |
| 808. Yield Spread Premium to | | | | |
| 809. | | 1505 | | |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | $70.00 | | | |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | $16.00 | | | |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | $626.00 | 1506. | | |
| 813.Admin to Ameriquest Mortgage Company | $239.00 | | | |
| 814. Doc. Prep. Fee to | | 1507. | | |
| 815. Credit Report Fee to | | | | |
| 816. Origination Fee    % to | | 1508. | | |
| 817. Application Fee to  Ameriquest Mortgage Company | $360.00 | | | |
| 818. Underwriting Fee to | | 1509 | | |
| 819. Service Provider Fee to | | | | |
| 820. Processing Fee  to | | 1510 | | |
| 821. Underwriting Fee to | | | | |
| 822. Appraisal Fee to | | 1511 | | |
| 900.  Items Required by Lender to be Paid in Advance | | | | |
| 901. Interest from 02/13/2004  to  03/01/2004  @  $38.42  per day | $653.14 | 1512 | | |
| 902. Mortgage insurance premium for        months to | | | | |
| 903. Hazard ins prem  to | $0.00 | 1513. | | |
| 904. Flood Ins prem  to | | | | |
| 1000. Reserves Deposited with Lender | | 1514. | | |
| 1001. Hazard insurance    months @ $    per month | | | | |
| 1002. Mortgage insurance    months @ $    per month | | 1515. | | |
| 1003. Earthquake Ins    months @ $    per month | | | | |
| 1004. County prop. taxes    months @ $    per month | | | | |
| 1005. Annual assess.    months @ $    per month | | 1520. TOTAL DISBURSED (enter on line 1603) | | $153,553.1 |
| 1006. Flood    months @ $    per month | | | | |
| 1007. Windstorm Ins    months @ $    per month | | Total Wire:    $169,525.86 | | |
| 1008. | | | | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee to  Northwest | $300.00 | | | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to  Osborne Closing Services, Inc | $200.00 | | | |
| 1107. Attorney's fees to | | | | |
| 1108. Title insurance to  Northwest | $776.70 | | | |
| 1109. Lender's coverage | $776.70 | | | |
| 1110. Owner's coverage    $ | | | | |
| 1111. Settlement/Disbursement fee to | | | | |
| 1112. Escrow Fee to | | | | |
| 1200. Government Recording and Transfer Charges | | | | |
| 1201. Recording fees | $69.00 | N.  NET SETTLEMENT | | |
| 1202. City/county tax/stamps | | | | |
| 1203. State tax/ stamps | | | | |
| 1204. State specific fee | | 1600. Loan Amount | | 175,500 |
| 1205. State specific fee | | 1601. Plus Cash/Check from Borrower | | |
| 1300. Additional Settlement Charges | | | | |
| 1301. Demand to | | 1602. Minus Total Settlement Charges (line 1400) | | $7,11! |
| 1302. Pest Inspection to | | | | |
| 1303. Survey Fee | | 1603. Minus Total Disbursements to Others (line 1620) | | $153,55 |
| 1304. Staff Appraiser Fee | | | | |
| 1305. Reconveyance Fee to | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period) | | $14,82 |
| 1306. | | | | |
| 1307. Property Val Fee to | | | | |
| 1308. Courier Fee | | | | |
| 1400. Total Settlement Charges (enter on line 1602) | $7,119.84 | | | |

0000006929370203505170201

Borrower(s) Signature(s):

X _Steven B. Hoder_

Approved:

Approved for Funding By:                    Branch:  Taylor, MI 48180

Public reporting burden for this collection of information is estimated to average 0.35 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0491), Washington, D.C. 20503. Do not send this completed form to either of these addresses.

## Instructions for completing form HUD-1A

**Note:** This form is issued under authority of the Real Estate Settlement Procedures Act (RESPA). 12 U.S.C. 2601 et seq. The regulation for RESPA is Regulation X, codified as 24 CFR 3500, and administered by the Department of Housing and Urban Development (HUD). Regulation Z referred to in the next paragraph is the regulation implementing the Truth in Lending Act (TILA), 15 U.S.C. 1601 et seq. and codified as 12 CFR part 226.

HUD-1A is an optional form that may be used for refinancing and subordinate lien federally related mortgage loans, as well as for any other one-party transaction that does not involve the transfer of title to residential real property. The HUD-1 form may also be used for such transactions, by utilizing the borrower's side of the HUD-1 and following the relevant parts of the instructions set forth in Appendix A of Regulation X. The use of either the HUD-1 or HUD-1A is not mandatory for open-end lines of credit (home-equity plans), as long as the provisions of Regulation Z are followed.

### Background

The HUD-1A settlement statement is to be used as a statement of actual charges and adjustments to be given to the borrower at settlement. The instructions for completion of the HUD-1A are for the benefit of the settlement agent who prepares the statement; the instructions are not a part of the statement and need not be transmitted to the borrower. There is no objection to using the HUD-1A in transactions in which it is not required, and its use in open-end lines of credit transactions (home-equity plans) is encouraged. It may not be used as a substitute for a HUD-1 in any transaction in which there is a transfer of title and a first lien is taken as security.

Refer to the "definitions" section of Regulation X for specific definitions of terms used in these instructions.

### General Instructions

Information and amounts may be filled in by typewriter, hand printing, computer printing, or any other method producing clear and legible results. Additional pages may be attached to the HUD-1A for the inclusion of customary recitals and information used locally for settlements or if there are insufficient lines on HUD-1A.

The settlement agent shall complete the HUD-1A to itemize all charges imposed upon the borrower by the lender, whether to be paid at settlement or outside of settlement, and any other charges that the borrower will pay for at settlement. In the case of "no cost" or "no point" loans, these charges include any payments the lender will make to affiliated or independent settlement service providers relating to this settlement. These charges shall be included on the HUD-1A, but marked "P.O.C." for "paid outside of closing," and shall not be used in computing totals. Such charges also include indirect payments or back-funded payments to mortgage brokers that arise from the settlement transaction. When used, "P.O.C." should be placed in the appropriate lines next to the identified item, *not in the columns themselves.*

Blank lines are provided in Section L for any additional settlement charges. Blank lines are also provided in Section M for recipients of all or portions of the loan proceeds. The names of the recipients of the settlement charges in Section L and the names of the recipients of the loan proceeds in Section M should be set forth on the blank lines.

## Line item instructions

The identification information at the top of the HUD-1A should be completed as follows:

The borrower's name and address is entered in the space provided. If the property securing the loan is different from the borrower's address, the address or other location information on the property should be entered in the space provided. The loan number is the lender's identification number for the loan. The settlement date is the date of settlement in accordance with §3500.2 of Regulation X, not the end of any applicable rescission period. The name and address of the lender should be entered in the space provided.

**Section L. Settlement Charges.** This section of the HUD-1A is similar to section L of the HUD-1, with the deletion of lines 700 through 704, relating to real estate broker commissions. The instructions for filling out the HUD-1 as set forth in Appendix A of Regulation X proved additional information regarding Section L, if needed.

Line 1400 in the HUD-1A is for the total settlement charges charged to the borrower. Enter this total on line 1602 as well. This total should include Section L amounts from additional pages, if any are attached to this HUD-1A.

**Section M. Disbursement to Others.** This section is used to list payees, other than the borrower, of all or portions of the loan proceeds (including the lender, if the loan is paying off a prior loan made by the same lender), when the payee will be paid directly out of the settlement proceeds. It is not used to list payees of settlement charges, nor to list funds disbursed directly to the borrower, even if the lender knows the borrower's intended use of the funds.

For example, in a refinancing transaction, the loan proceeds are used to pay off an existing loan. The name of the lender for the loan being paid off and the pay-off balance would be entered in Section M. In a home improvement transaction when the proceeds are to be paid to the home improvement contractor, the name of the contractor and the amount paid to the contractor would be entered in Section M. In a consolidation loan, or when part of the loan proceeds is used to pay off other creditors, the name of each creditor and the amount paid to that creditor would be entered in Section M. If the proceeds are to be given directly to the borrower and the borrower will use the proceeds to pay off existing obligations, this would not be reflected in Section M.

**Section N. Net Settlement.** Line 1600 normally sets forth the principal amount of the loan as it appears on the related note for this loan. In the event this form is used for an open-ended home equity line whose approved amount is greater than the initial amount advanced at settlement, the amount shown on Line 1600 will be the loan amount advanced at settlement. Line 1601 is used for all settlement charges that are both included in the totals for lines 1400 and 1602 and are not financed as part of the principal amount of the loan. This is the amount normally received by the lender from the borrower at settlement, which would occur when some or all of the settlement charges were paid in cash by the borrower at settlement, instead of being financed as part of the principal amount of the loan. Failure to include any such amount in line 1601 will result in an error in the amount calculated on line 1604. P.O.C. amounts should not be included in line 1601.

Line 1602 is the total amount from line 1400.
Line 1603 is the total amount from line 1520.
Line 1604 is the amount disbursed to the borrower. This is determined by adding together the amounts for lines 1600 and 1601, and then subtracting any amounts listed on lines 1602 and 1603.

Branch: Taylor, MI 48180

Loan Number: 0069293702 - 5566

0000006929370200305170202

HUD1A1 (Rev. 5/03)

# EXHIBIT D

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Ameriquest Mortgage Company
20600 Eureka Rd., # 518
Taylor, MI 48180
(734)283-8730

| | Preliminary | | X | Final |

Broker License:

Borrowers: Steven B. Hodor

Type of Loan:  ADJUSTABLE RATE
Date:  February 6, 2004

Address:        38237 N Jean Ct.
City/State/Zip:   Westland, MI 48186

Loan Number:  0069293702 · 5566

Property:    38237 N Jean Ct., Westland, MI 48186

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 8.316 % | $ 293,619.01 | $ 169,525.86 | $ 463,144.87 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $1,286.54 | 04/01/2004 | | | |
| 1 | $1,277.01 | 03/01/2034 | | | |

**VARIABLE RATE FEATURE:**
X  Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**   You are giving a security interest in the property located at: 38237 N Jean Ct, Westland, MI 48186

**ASSUMPTION:**  Someone buying this property   X  cannot assume the remaining balance due under original terms.
| | may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**   You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:**  If a payment is late, you will be charged  5.000%  of the overdue payment .

**PREPAYMENT:**  If you pay off your loan early, you
X  may      will not     have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

*Steven B. Hodor*  2-6-2004

Borrower Steven B. Hodor           Date          Borrower  Valerie L. Hodor                      Date

*Valerie L Hodor*  2-6-2004

Borrower           Date          Borrower                      Date

TIL1 (Rev. 7/01)

000000689785702030425010

## ORIGINAL COPY

# EXHIBIT E

## NOTICE OF RIGHT TO CANCEL

LENDER:  Ameriquest Mortgage Company

DATE:  February 6, 2004
LOAN NO.:   0069293702 - 5566
TYPE:   ADJUSTABLE RATE

BORROWER(S): Steven B. Hodor

ADDRESS:        38237 N Jean Ct.
CITY/STATE/ZIP:   Westland,MI 48186

PROPERTY:  38237 N Jean Ct.
              Westland, MI  48186

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.  The date of the transaction, which is



ENTER DOCUMENT SIGNING DATE

10|6|04

or
2.  The date you received your Truth in Lending disclosures;
or
3.  The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

HOW TO CANCEL
If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1100 Town and Country Road, Suite 200
Orange, CA 92868

ATTN:  FUNDING
PHONE: (714)541-9960
FAX:     (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

ENTER FINAL DATE TO CANCEL

10/10/04

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____          _____
SIGNATURE                                                     DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_Steven B. Hodor_    2-6-2004    _Valerie L. Hodor_  2-06-0-
BORROWER/OWNER Steven B. Hodor      Date      BORROWER/OWNER Valerie L. Hodor       Date

_____    _____    _____    _____
BORROWER/OWNER                           Date      BORROWER/OWNER                            Date

1054-NRC (Rev 11/03)

0000069293702040005010 1

LENDER COPY

02/06/2004 9:33:12 AM

# EXHIBIT F

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0069293702 - 5566          Borrower(s): Steven B. Hodor

Date: February 6, 2004

You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason. This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you. No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1100 Town and Country Road, Suite 200  Orange, CA 92868
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_Stevens B. Hodor_       _2-6-2004_
Borrower/Owner  Steven B. Hodor     Date

_Valerie L. Hodor_       _2-06-2004_
Borrower/Owner  Valerie L. Hodor     Date

_____     _____
Borrower/Owner     Date

_____     _____
Borrower/Owner     Date

## REQUEST TO CANCEL

I/We want to cancel loan #_____

_____     _____
Borrower/Owner Signature     Date

02/06/2004 9:33:12 AM

0000006929370204042201 01

LENDER COPY

150 (10/00)

# EXHIBIT G

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
### 120 S. LaSalle Street, 18th floor
### Chicago, Illinois 60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
### Email: edcombs@aol.com
### www.edcombs.com

July 25, 2006

BY CERTIFIED MAIL

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Re:   Notice of rescission, claim and lien, Steven B. Hodor, Valerie L. Hodor, 38237 N. Jean Court, Westland, MI 48186, loan of February 6, 2004

Ladies/Gentlemen:

The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than the addressees listed above, please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on July 25, 2006.

_____

Daniel A. Edelman

# EXHIBIT H

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☒ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☒ Conventional ☐ Other (explain): ☐ FHA ☐ USDA/Rural Housing Service | | Agency Case Number | Lender Case Number 0069293702 |
|---|---|---|---|---|
| Amount $175,500.00 | Interest Rate 7.990 % | No. of Months 360 | Amortization Type: ☒ Fixed Rate ☐ Other (explain): ☐ GPM ☐ ARM (type): | |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) 38237 N Jean Ct., Westland, MI 48186 | | No. of Units 1 |
|---|---|---|
| Legal Description of Subject Property (attach description if necessary) | | Year Built 1970 |

| Purpose of Loan | ☐ Purchase ☐ Construction ☒ Refinance ☐ Construction-Permanent ☐ Other (explain): | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| 1969 | $120,000.00 | $0.00 | | Cost: $0.00 |

| Title will be held in what Name(s) Steven B. Hodor and Valerie L. Hodor. | Manner in which Title will be held | Estate will be held in: ☒ Fee Simple |
|---|---|---|
| His Wife | | ☐ Leasehold (show expiration date) |

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) Steven B. Hodor | | Co-Borrower's Name (include Jr. or Sr. if applicable) | |

| Social Security Number | Home Phone (incl. area code) | DOB(MM/DD/YYYY) | Yrs. School 12 | Social Security Number | Home Phone (incl. area code) | DOB(MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|
| ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | | Dependents (not listed by Co-Borrower) no. 0 ages | | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | | Dependents (not listed by Borrower) no. ages | |

| Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 34 No. Yrs. 38237 N Jean Ct. Westland, MI 48186 | | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|---|
| Mailing Address, if different from Present Address | | Mailing Address, if different from Present Address |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|
| Name & Address of Employer ☐ Self Employed Ford Motor Co. | Yrs. on this job 27 Yrs. employed in this line of work/profession 27 | Name & Address of Employer ☐ Self Employed | Yrs. on this job Yrs. employed in this line of work/profession |
| Position/Title/Type of Business Engineer | Business Phone (incl. area code) (313)322-3000 | Position/Title/Type of Business | Business Phone (incl. area code) |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer ☐ Self Employed | Dates (from - to) Monthly Income $ | Name & Address of Employer ☐ Self Employed | Dates (from - to) Monthly Income $ |
|---|---|---|---|
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name & Address of Employer ☐ Self Employed | Dates (from - to) Monthly Income $ | Name & Address of Employer ☐ Self Employed | Dates (from - to) Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

0069293702

| ☐ Borrower's cell | ☐ Borrower's pager |
|---|---|
| ☐ Co-Borrower's cell | ☐ Co-Borrower's pager |

Initials: _S.B.H._

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04
Page 1 of 4
VMP®-21N (0305)    VMP Mortgage Solutions (800)521-7291

0000069293702060599 0501

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 6,835.45 | $ | $ 6,835.45 | Rent | $ 0.00 | |
| Overtime | 0.00 | | 0.00 | First Mortgage (P&I) | 635.00 | $ 1,286.54 |
| Bonuses | 0.00 | | 0.00 | Other Financing (P&I) | 519.00 | 0.00 |
| Commissions | 0.00 | | 0.00 | Hazard Insurance | 23.54 | 23.54 |
| Dividends/Interest | 0.00 | | 0.00 | Real Estate Taxes | 196.49 | 196.49 |
| Net Rental Income | 0.00 | | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 6,835.45 | $ | $ 6,835.45 | Total | $ 1,374.03 | $ 1,506.57 |

* Self Employed Borrowers may be required to provide additional documentation such as tax returned financial statements.

Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| | | Monthly Amount |
|---|---|---|
| B/C | | 0.00 |
| B | | 0.00 |
| B | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☒ Not Jointly

| ASSETS Description | Cash or Market Value | | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ 0.00 | | LIABILITIES | | | |
| | | | Name and address of Company | | $ Payment/Months | $ |
| List checking and savings accounts below | | | *** SEE ADDENDUM *** | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| Vested 401k Retirement - Aggregated | | | | | | |
| | | | Acct. no. | | | |
| | | | Name and address of Company | | $ Payment/Months | |
| Acct. no. | $ *0.00 | | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| Checking/Savings - Aggregated | | | Acct. no. | | | |
| | | | Name and address of Company | | $ Payment/Months | $ |
| Acct. no. | $ *500.00 | | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| | | | Acct. no. | | | |
| | | | Name and address of Company | | $ Payment/Months | $ |
| Acct. no. | $ | | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | | |
| | | | Acct. no. | | | |
| | | | Name and address of Company | | $ Payment/Months | $ |
| Acct. no. | $ | | | | | |
| Stocks & Bonds (Company name/number & description) /0 | $ 0.00 | | | | | |
| | | | Acct. no. | | | |
| | | | Name and address of Company | | $ Payment/Months | $ |
| Life insurance net cash value | $ 0.00 | | | | | |
| Face amount: $ 0.00 | | | | | | |
| Subtotal Liquid Assets | $ 0.00 | | Acct. no. | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 0.00 | | Name and address of Company | | $ Payment/Months | $ |
| Vested interest in retirement fund | $ 0.00 | | | | | |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | | | |
| Automobiles owned (make and year) | | | Acct. no. | | | |
| | | | Alimony/Child Support/Separate Maintenance Payments Owed to: | | $ | |
| Other Assets (itemize) | $ | | Job-Related Expense (child care, union dues, etc.) | | $ | |
| | | | Total Monthly Payments | | $ 1,354.00 | |
| Total Assets a. | $ 0.00 | | Net Worth (a minus b) ► | -58,229.00 | Total Liabilities b. | 58,229.00 |

0069293702

initials: [signature]

Page 2 of 4



## VI. ASSETS AND LIABILITIES (cont.)

Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 38237 N Jean Westland, MI 48186 | H SFR | 0 | 107000 | 0 | 635 | 196 | 0 |
| 38237 N Jean | H SFR | 0 | 43227 | 0 | 519 | 24 | 0 |
| | | | | | | | |
| Totals | | 0 | 150227 | 0 | 1154 | 220 | 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 151,734.00 |
| e. Estimated prepaid items | 381.40 |
| f. Estimated closing costs | 3,032.50 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 5,858.29 |
| i. Total costs (add items a through h) | 161,006.19 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee finance d) | 175,500.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 175,500.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -14,493.81 |

## VII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | X | | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | X | | | |
| (1) What type of property did you own -- principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home -- solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Steven B. Hoder_ | 2-1-2006 | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information. | CO-BORROWER | ☐ I do not wish to furnish this information. |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino   ☒ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino   ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☒ White | Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☐ White |
| Sex: | ☐ Female   ☒ Male | Sex: | ☐ Female   ☐ Male |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) Raymond Singh | Name and Address of Interviewer's Employer Ameriquest Mortgage Company. |
|---|---|---|
| ☐ Face-to-face interview | Interviewer's Signature | 20600 Eureka Rd., # 518 |
| ☐ Mail | | Taylor, MI 48180 |
| ☒ Telephone | Interviewer's Phone Number (incl. area code) (714) 541-9960 | |
| ☐ Internet | | |

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>Hodor, Steven B. | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number:<br>0069293702 |



I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X *Steven B. Hodor* | 3 6-2004 | X | |

0069293702

Ⓥⓝⓜⓟ-21N (0205)

Page 4 of 4

Freddie Mac Form 65 0
Fannie Mae Form 1003 0

Addendum for Loan # : 0069293702 - Hodor, Steven B.

--- LIABILITIES ---

| Creditor | :CBUSASEARS | Acct. # | : 512107184689 |
|---|---|---|---|
| Address | : | Balance | : $11,595.00 |
| | | Payment | : $242.00 |
| C/S/Z | :, | Rem. Term | : 48 |
| Acct. Type | :Revolving | | |
| In Name Of | : | | |

| Creditor | :STANDARD FEDERAL BANK / LOAN OPERATIONS | Acct. # | : 107200209228584 |
|---|---|---|---|
| Address | : | Balance | : $14,765.00 |
| | | Payment | : $268.00 |
| C/S/Z | :, | Rem. Term | : 56 |
| Acct. Type | :Installment | | |
| In Name Of | : | | |

| Creditor | :BANK ONE | Acct. # | : 412540004299 |
|---|---|---|---|
| Address | : | Balance | : [$43,227.00] |
| | | Payment | : [$519.00] |
| C/S/Z | :, | Rem. Term | : 84 |
| Acct. Type | :Credit Line | | |
| In Name Of | : | | |

| Creditor | :DISCOVER FIN | Acct. # | : 601100540025 |
|---|---|---|---|
| Address | :DECLINES TO VERIFY W/O AUTH | Balance | : $7,679.00 |
| | | Payment | : $171.00 |
| C/S/Z | :WILMINGTON,DE 19850 | Rem. Term | : 45 |
| Acct. Type | :Revolving | | |
| In Name Of | : | | |

| Creditor | :Kohls Dep St | Acct # | : 20325877752 |
|---|---|---|---|
| Address | :N56 W17000 Ridge | Balance | : $1,601.00 |
| | | Payment | : $80.00 |
| C/S/Z | :Menomonee Fall,WI 53051 | Rem. Term | : 21 |
| Acct. Type | :Revolving | | |
| In Name Of | : | | |

| Creditor | :REGIONS MORTGAGE | Acct. # | : 7320090063900 |
|---|---|---|---|
| Address | :P.O. BOX 19629 | Balance | : [$107,000.00] |
| | | Payment | : [$635.00] |
| C/S/Z | :Montgomery,AL 36101- | Rem. Term | : 169 |
| Acct. Type | :Mortgage | | |
| In Name Of | : | | |

| Creditor | :MBNA AMERICA | Acct. # | : 431302 |
|---|---|---|---|
| Address | :RATES BY FAX ONLY | Balance | : $6,420.00 |
| | | Payment | : $144.00 |
| C/S/Z | :ATTN INQUIRY,DE 19801 | Rem. Term | : 45 |
| Acct. Type | :Revolving | | |
| In Name Of | : | | |

| Creditor | :FORD MOTOR CREDIT | Acct. # | : 35545223 |
|---|---|---|---|
| Address | :P.O. BOX 689 | Balance | : $16,169.00 |
| | | Payment | : $449.00 |
| C/S/Z | :ORANGE,CA 92666- | Rem. Term | : 37 |
| Acct. Type | :Auto | | |
| In Name Of | : | | |

| Creditor | :Treasurer 2003 Winter | Acct. # | : |
|---|---|---|---|
| Address | : | Balance | : [$0.00] |
| | | Payment | : [$0.00] |
| C/S/Z | : | Rem. Term | : 0 |
| Acct. Type | :Taxes | | |
| In Name Of | : | | |

We/s fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X *Steven B. Hodor* | 2-6-2004 | X | |



000000069293702060599005b5

# EXHIBIT I



**MORTGAGE SERVICES℠**

P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

October 11, 2006

Steven B. Hodor
38237 N. Jean Ct.
Westland, MI 48186

Re:        Loan Number 0069293702
Property Address:    38237 N. Jean Ct.
                     Westland, MI 48186

Dear Mr. Hodor:

As requested, enclosed is a copy of the Appraisal Report on the above referenced property. The Appraisal Report is being sent to you under the following terms and conditions. If you are unable or unwilling to comply with all of the conditions set forth below, please return the Appraisal Report to:

      AMC Mortgage Services, Inc.
      Attn: Service Relations, Loan Research
      P.O. Box 11000
      Santa Ana, CA 92711-1100

1. The Appraisal Report is to be used solely for the purpose of evaluating your property in connection with your loan.

2. You understand, acknowledge, and agree that the Appraisal Report is being provided by AMC Mortgage Services, Inc., (AMC) without any representations or warranties as to its contents.

3. You understand, acknowledge, and agree that intervening circumstances may have rendered the information and assumptions contained in the Appraisal Report obsolete, incomplete, or even misleading.

4. You understand, acknowledge, and agree that the Appraisal Report was prepared for the exclusive use of AMC, and that subsequent distribution was not contemplated when the Appraisal Report was commissioned, prepared, or delivered.

5. You covenant and agree not to seek any damages or redress or to make any claims for damages, costs, expenses, or liabilities of any kind against the appraiser or arising out of your use of the Appraisal Report.

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.



6. You covenant and agree to indemnify, defend, and hold AMC, its shareholders, officers, directors, employees, affiliates, and agents harmless from and against any claims, costs, expenses, damages, or liabilities of any kind including reasonable attorney's fees incurred by AMC resulting from or arising out of your use of the Appraisal Report.

7. You convene and agree to keep the Appraisal Report confidential and not disclose, distribute, disseminate, copy, or otherwise reproduce or release the Appraisal Report or its contents to any person except as is strictly necessary for the evaluation or understanding of the Appraisal Report, in any manner to any person without first obtaining a written agreement of confidentiality similar in scope to this letter.

Please keep this letter with your other loan records.

Sincerely,

Monica Arredondo
Office of the President
AMC Mortgage Services, Inc.

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

# APPRAISAL:



- ☐ Acknowledgment of Conditional Loan Consummation
- ☐ Appraisal Review
- ☐ Permits, (if applicable)
- ☐ Authorization to Fund with Withholds (including all Withhold Documentation, if applicable)
- ☐ Survey
- ☐ Termite Report
- ☐ Addendums
- ☐ 442 with Original Photos
- ☐ Original Appraisal with Original Photos

00692937O2

File No. jean3823

APPRAISAL OF



Single Family

LOCATED AT:

38237 North Jean Court
Westland, MI 48186

FOR:

Ameriquest
20600 Eureka Rd
Taylor, MI 48180

BORROWER:

Hador

AS OF:

2004/02/13

BY:

Nicole Davis

Summary Appraisal Report

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. Jean3823

**Property Description**

| Property Address 38237 North Jean Court | City Westland | State MI | Zip Code 48186 |
|---|---|---|---|

Legal Description Lot 142 Judson Manor Sub | County Wayne

Assessor's Parcel No. 56056020142000 | Tax Year 2003 | R.E. Taxes $ 1,335.00 | Special Assessments $ 0.00

Borrower Hador | Current Owner Hador | Occupant: [X] Owner [ ] Tenant [ ] Vacant

Property rights appraised [X] Fee Simple [ ] Leasehold | Project Type [ ] PUD [ ] Condominium (HUD/VA only) | HOA $ 0.00 /Mo.

Neighborhood or Project Name Judson Manor Sub | Map Reference 56-05 | Census Tract 5583

Sale Price $ Refinance | Date of Sale N/A | Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client Ameriquest | Address 20600 Eureka Rd., Taylor, MI 48180

Appraiser Nicole Davis | Address 6178 Dexter Romulus, MI 48174

| Location | [ ] Urban [X] Suburban [ ] Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|
| Built up | [X] Over 75% [ ] 25-75% [ ] Under 25% | | PRICE $(000) | AGE (yrs) | One family 50% | [X] Not likely [ ] Likely |
| Growth rate | [ ] Rapid [X] Stable [ ] Slow | [X] Owner | 100 Low | 20 | 2-4 family 5% | [ ] In process |
| Property values | [ ] Increasing [X] Stable [ ] Declining | [ ] Tenant | 200 High | 60 | Multi-family 5% | |
| Demand/supply | [ ] Shortage [X] In balance [ ] Over supply | [ ] Vacant (0-5%) | 125 Predominant | 34 | Commercial 5% | |
| Marketing time | [X] Under 3 mos. [ ] 3-6 mos. [ ] Over 6 mos. | [ ] Vacant (over 5%) | | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: North of Palmer, South of Cherry Hill, East of Newburgh and West of John Hix.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): Subject area is comprised of primarily single family residences mixed in style and age. All forms of normal neighborhood amenities such as schools, places of worship and employment centers are within close proximity to the area. No adverse conditions noted. Commercial usage is noted along main roadways, with no adverse affect.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Conventional financing is readily available at acceptable rates. Local market conditions indicate a balanced supply/demand of homes, with a typical marketing time of under 3 months. FHA/VA, Land Contract and Cash sales are sometimes utilized as alternative forms of financing with no adverse affect on value or marketability.

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] YES [X] NO

Approximate total number of units in the subject project N/A | Approximate total number of units for sale in the subject project N/A

Describe common elements and recreational facilities: N/A

| Dimensions 55x129 | | Topography | Level at grade |
|---|---|---|---|
| Site area 7095 Sq.Ft. | Corner Lot [ ] Yes [X] No | Size | Typical for Area |
| Specific zoning classification and description R-1 Single Family Residential | | Shape | Rectangular |
| Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning | | Drainage | Appears Adequate |
| Highest & best use as improved: [X] Present use [ ] Other use (explain) | | View | Residential |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | | |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | Concrete | [X] | [ ] | Landscaping | Typical for area | |
| Gas | [X] | | Curb/gutter | Concrete | [X] | [ ] | Driveway Surface | Concrete | |
| Water | [X] | | Sidewalk | Concrete | [X] | [ ] | Apparent easements | Normal Utility | |
| Sanitary sewer | [X] | | Street lights | Pole Mtg | [X] | [ ] | FEMA Special Flood Hazard Area | [ ] Yes [X] No | |
| Storm sewer | [X] | | Alley | None | [ ] | [ ] | FEMA Zone C | Map Date 01-17-85 | |
| | | | | | | | FEMA Map No. 2607390005 A | | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): Site is typical for area in size and appeal with no readily apparent adverse easements or encroachments noted.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|
| No. of Units 1 | Foundation ConcBlock | Slab None | Area Sq.Ft. 1281.74 | | Roof Cncld | [X] |
| No. of Stories 1 | Exterior Walls Brick | Crawl Space None | % Finished 50 | | Ceiling Cncld | [X] |
| Type (Det./Att.) Detached | Roof Surface Asph Shingle | Basement Yes | Ceiling Drop Tile | | Walls Cncld | [X] |
| Design (Style) Ranch | Gutters & Dwnspts. Aluminum | Sump Pump None | Walls Wd Panel | | Floor Cncld | [X] |
| Existing/Proposed Existing | Window Type Vinyl | Dampness None noted | Floor Tile | | None | [ ] |
| Age (Yrs.) 34 | Storm/Screens Yes | Settlement at time of Inspection | Outside Entry None | | | |
| Effective Age (Yrs.) 15 | Manufactured House No | Infestation None | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | 1 | | | | X | | 1,282 |
| Level 1 | | 1 | 1 | 1 | | | | 3 | 2 | | | 1,324 |
| Level 2 | | | | | | | | | | | | 0 |

Finished area above grade contains: 6 Rooms 3 Bedroom(s) 2 Bath(s) 1,324 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | ATTIC | | AMENITIES | | CAR STORAGE | |
|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Carpet/Tile | Type FWA | Refrigerator None | | [X] | Fireplace(s) # | [ ] | None | [ ] | |
| Walls | Plaster | Fuel Gas | Range/Oven | Stairs | [ ] | Patio Concrete | [X] | Garage | # of cars |
| Trim/Finish | Wd painted | Condition Average | Disposal | Drop Stair | [ ] | Deck | [ ] | Attached | [ ] |
| Bath Floor | Vinyl | COOLING | Dishwasher | Scuttle | [ ] | Porch Concrete | [X] | Detached 2 | [ ] |
| Bath Wainscot | Vinyl | Central Yes | Fan/Hood | [X] | Floor | [ ] | Fence | [ ] | Built-in | [ ] |
| Doors | Hollow core | Other N/A | Microwave | Heated | [ ] | Pool | [ ] | Carport | [ ] |
| | | Condition Average | Washer/Dryer | Finished | [ ] | | | Driveway Adeq | [ ] |

Avg Cond/ Avg Quality

Additional features (special energy efficient items, etc.): Subject has been adequately maintained and has typical features and amenities for its market area. Subject has a porch, patio, central cooling system and 2 car garage. No value given to personal property.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.: No functional obsolescence is noted. Exterior inspection noted no external obsolescence. Physical depreciation is based on 1% per effective year.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: At the time of inspection, there were no adverse environmental conditions noted.

PAGE 1 OF 2

Freddie Mac Form 70 6-93 | Fannie Mae Form 1004 6-93

Summary Appraisal Report

## UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. Jean3823

**Valuation Section**

| | | |
|---|---|---|
| ESTIMATED SITE VALUE.................................. = $ | 2,000 | Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | | Cost figures are taken from Marshall and Swift Residential |
| Dwelling 1,324 Sq.Ft. @ $ 130.00 = $ 172,120 | | Cost Handbook with local multiplier rounded. The Cost |
| Bsmt. 1282 Sq.Ft. @ $ 60.00 = $ 76,920 | | Approach is not given equal weight due to the lower land |
| | | values in the area and the difficulty in measuring |
| Garage/Carport 0 Sq.Ft. @ $ 20.00 = 0 | | accumulated depreciation. Based on 20 years effective age, |
| Total Estimated Cost New ............................ = $ 249,040 | | remaining economic life is estimated to be 40 years. |
| Less 0 Physical Functional External Est. Remaining Econ. Life -15 | | |
| Depreciation $50,316 = $ 50,316 | | |
| Depreciated Value of Improvements ............... = $ 198,724 | | |
| "As-Is" Value of Site Improvements ................ = $ | | |
| INDICATED VALUE BY COST APPROACH ........ = $ | 200,700 | |

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 38237 North Jean Court Westland | 322 Randolph Westland | 1531 Barchester St Westland | 38431 Loruss Westland |
| Proximity to Subject | | 8 Blocks northwest | 6 Blocks southwest | 6 Blocks north |
| Sales Price | Refinance | $ 195,000 | $ 176,000 | $ 187,900 |
| Price/Gross Liv. Area | $ 0.00 ⊠ $ | 147.17 ⊠ $ | 134.76 ⊠ $ | 138.16 ⊠ $ |
| Data and/or Verification Sources | Assessor Inspection | Assessor/Ext. Inspection MLS# 23039735 | Assessor/Ext. Inspection MLS# 23114987 | Assessor/Ext. Inspection MLS# 23113418 |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | N/A | Conventional N/A | | Conventional N/A | | N/A N/A | |
| Date of Sale/Time | 2004/02/13 | 2003/08/06 | | 2003/12/23 | | 2003/11/26 | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | Suburban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 65x129 | 65x129 | | 65x129 | | 80x116 | |
| View | Residential/Avg | Residential/Avg | | Residential/Avg | | Residential/Avg | |
| Design and Appeal | 1 Story/Avg | 1 Story/Avg | | 1 Story/Avg | | 1 Story/Avg | |
| Quality of Construction | Brick/Avg | Brick/Vinyl/Avg | | Brick/Alum/Avg | | Brk/Wood/Avg | |
| Age | A 34 E 20 | A 9 E 5 | -2,000 | A 27 E 20 | | A 33 E 20 | |
| Condition | Average | Average | | Average | | Average | |
| Above Grade | Total 6 Bdrms 3 Baths 2.00 | Total 6 Bdrms 3 Baths 2.00 | | Total 6 Bdrms 3 Baths 2.00 | | Total 6 Bdrms 3 Baths 2.50 | -500 |
| Room Count | | | | | | | -200 |
| Gross Living Area | 1,324 Sq.Ft. | 1,325 Sq.Ft. | | 1,306 Sq.Ft. | 100 | 1,360 Sq.Ft. | |
| Basement & Finished Rooms Below Grade | Basement Finished | Basement Unfinished | 2,000 | Basement Finished | | Basement Finished | |
| Functional Utility | 3 Bedroom/Avg | 3 Bedroom/Avg | | 3 Bedroom/Avg | | 3 Bedroom/Avg | |
| Heating/Cooling | FWA/C-Air | FWA/C-Air | | FWA/C-Air | | FWA/C-Air | |
| Energy Efficient Items | Standard | Standard | | Standard | | Standard | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 2 Car Garage | | 2 Car Garage | |
| Porch, Patio, Deck, Fireplace(s), etc. | No Fireplace | Porch/Deck 1 Fireplace | -500 | Porch/Deck No Fireplace | | Porch/Deck 1 Fireplace | -500 |
| Fence, Pool, etc. | | | | | | | |
| Net Adj. (total) | | + X - | 500 | X + - | 100 | + X - | 1,200 |
| Adjusted Sales Price of Comparable | | $ 194,500 | | $ 176,100 | | $ 186,700 | |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): After adjustments, all comparables are considered in the final estimate of value. All comparables are relevant for
Effective ages assigned were based on general condition of the dwelling, taking into consideration any updating and maintenance performed or lack thereof.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | No other sales during the past 36 months | No other sales during the past 12 months | No other sales during the past 12 months | No other sales during the past 12 months |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: The subject property is not currently listed or under contract. 36 month Sales History : no activity

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH .............. = $ | 195,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier N/A = $ | |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans and specifications.
Conditions of Appraisal: See Attached...

Final Reconciliation: The greatest weight is given to the Sales Comparison Approach as the data is extracted directly from the marketplace. The Cost Approach lends support. The Income Approach is not relevant due to the lack of reliable rental data in this owner occupied area.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 2004/02/13
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 195,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature Fanny Clay ☒ Did ☐ Did Not Inspect Property |
| Name Nicole Davis | Name Fanny Clay |
| Date Report Signed 02/19/2004 | Date Report Signed 02/19/2004 |
| State Certification # State MI | State Certification # State MI |
| Or State License # 1201069704 | Or State License # 1201002775 State |

Produced using ACI software, 800.234.8727 www.aciweb.com

Real Estate Experts & Appraisers

**ADDENDUM**                                          File No.  jsan3823

SCOPE OF THE APPRAISAL:  The scope of the appraisal encompasses the necessary research and analysis to prepare a report in accordance with the intended use. Subject property data was based on the physical inspection of the property's interior and exterior, and any plans or specifications provided.

Additional data was compiled from public records, Multi-List service, or other identified sources. The original source of the comparable sales is shown in the 'Data Source' section in the market grid, along with any additional source, available. Comparables were inspected on the exterior and through public records. The data and sources are considered reliable, however when conflicting information was present, the source deemed the most reliable has been utilized. Data believed to be unreliable was not included in this report.

Flood data was verified using maps provided by the Federal Emergency Management Agency; National Flood Insurance programs.

APPRAISER COMPETENCY:  I certify that I am qualified and competent by training, knowledge, and experience to perform this appraisal. Appraisers are required to be licensed and are regulated by the Michigan Department of Commerce, P.O. Box 30018, Lansing, Michigan 48909.

Conditions of Appraisal
All sales confirmed closed. All data assumed to be accurate. This is a summary appraisal report prepared in accordance with the Uniform Standards of Professional Appraisal Practice. GRMls not used due to the lack of reliable rental data in this owner occupied area. This appraisal is prepared as a Summary Appraisal report under USPAP.

The appraisal is not a home inspection report and should not be relied upon to report the condition of the property being appraised.

Nicole Davis, limited appraiser #1201069704, has significantly assisted in the preparation of this report including collecting/verifying data for use in the market, income and cost approaches when applicable and the final reconciliation of value . GRMls not used due to the lack of reliable rental data in this owner occupied area. This report is prepared as a Summary Appraisal under USPAP.

File No. Jean3823

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgage or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

File No. jean3823

**APPRAISERS CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED:  38237 North Jean Court, Westland, MI 48186

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
|---|---|
| Signature: | Signature: _Fanny Clay_ |
| Name: Nicole Davis | Name: Fanny Clay |
| Date Signed: 02/19/2004 | Date Signed: 02/19/2004 |
| State Certification #: | State Certification #: |
| or State License #: 1201069704 | or State License #: 1201002775 |
| State: MI | State: |
| Expiration Date of Certification or License: | Expiration Date of Certification or License: |
| | ☒ Did ☐ Did Not Inspect Property |

Freddie Mac Form 439 6-93        Page 2 of 2        Fannie Mae Form 1004B 6-93

SUBJECT PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Hador | |
| Property Address: 38237 North Jean Court | File No.: jean3823 |
| City: Westland | Case No.: |
| Lender: Ameriquest | State: MI Zip: 48186 |



FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: 2004/02/13
Appraised Value: $ 195,000



REAR VIEW OF
SUBJECT PROPERTY



STREET SCENE

### COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Hador | |
| Property Address: 38237 North Jean Court | File No.: Jean3823 |
| City: Westland | Case No.: |
| Lender: Ameriquest | State: MI     Zip: 48186 |



**COMPARABLE SALE #1**

322 Randolph
Westland
Sale Date: 2003/08/06
Sale Price: $ 195,000



**COMPARABLE SALE #2**

1531 Barchester St
Westland
Sale Date: 2003/12/23
Sale Price: $ 176,000



**COMPARABLE SALE #3**

38431 Loruss
Westland
Sale Date: 2003/11/26
Sale Price: $ 187,900



FLOORPLAN

Borrower: Hador
Property Address: 38237 North Jean Court
City: Westland
Lender: Ameriquest

File No.: Jean3823
Case No.:
State: MI
Zip: 48185

## Main Floor

Ranch w/ Basement

Sketch by Apex IV Windows™

TOTAL LIVABLE   (rounded)   1324

2 Areas Total (rounded)   1324



LOCATION MAP

| Borrower: Hador | | |
|---|---|---|
| Property Address: 38237 North Jean Court | File No.: jean3823 | |
| City: Westland | Case No.: | |
| Lender: Ameriquest | State: MI | Zip: 48186 |

# EXHIBIT K

**Ameriquest Mortgage Company**

Borrower Name: Steven Hodor

Loan Number: 0069293702 - 5566

Borrower Name:

Property Address: 38237 N Jean
Westland, MI 48186

## UNDERSTANDING YOUR OPTIONS REGARDING
## INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other. A "discount point" is a one-time fee that equals one percent of the loan amount that lowers the interest rate of the loan. So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio. The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points. The following example shows how your options work.







 * The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor. A discount point lowers the interest rate but *not* necessarily the overall cost of the loan. A lower rate may be a good choice if you don't plan to sell or refinance for some time. On the other hand, you might not want to have additional discount points if you think you'll sell or refinance soon. Your account executive can give you more information about the options available to you and the exact terms of your loan.



0000000692937020405930101

854 (Rev, 09/24/03)