**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA J. SKANES, | ) | |
| | ) | 06 C 6765 (N.D.Ill.) |
| Plaintiff, | ) | |
| | ) | (Originally 06 C 688(W. D. MI)) |
| v. | ) | |
| | ) | |
| AMERIQUEST MORTGAGE COMPANY; | ) | |
| DEUTSCHE BANK NATIONAL TRUST | ) | |
| COMPANY, as Trustee of AMERIQUEST | ) | Transferred for pre-trial proceedings |
| MORTGAGE SECURITIES, INC., Asset-Backed | ) | to MDL No.1715, Lead Case No. 05 |
| Pass-Through Certificates, Series 2004-R5 under | ) | C 7097) |
| the Pooling & Servicing Agreement dated as of | ) | |
| June 1, 2004, Without Recourse; AMERICAN | ) | Judge Marvin E. Aspen |
| HOME MORTGAGE SERVICING, INC.; and | ) | |
| DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | **DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.     Plaintiff Barbara J. Skanes brings this action to rescind a residential mortgage and recover damages for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226.   Defendants also violated state law.

### JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), and 1367 (supplemental jurisdiction), and 15 U.S.C. §1640 (TILA).   Defendants transact business in the District and are deemed to reside here.

3.     Venue is proper because each defendant does business in the District.

1

## PARTIES

4.      Plaintiff Barbara J. Skanes owns and resides in a single family home at 4913 Mildred Avenue SE, Grand Rapids, MI 49508.

5.      Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Michigan.  Its registered agent and office are National Registered Agents, Inc., 712 Abbott Road, East Lansing, MI 48823.

6.      Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

7.      Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

8.      Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

9.      During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

10.      Defendant American Home Mortgage Servicing, Inc. is a foreign corporation which does business in Michigan and Illinois.  Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

11.      Defendant American Home Mortgage Servicing, Inc. services some loans originated by Ameriquest Mortgage Company, including plaintiff's, and claims an interest in such

loans, including the right to receive payments thereunder. It is joined as a necessary party.

12.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005. On information and belief, it holds legal title to plaintiffs' loan, as trustee.

13.     Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Michigan. It is the beneficial owner of some loans originated by Ameriquest Mortgage Company, including plaintiffs.' It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

## FACTS RELATING TO PLAINTIFF

14.     Prior to April 1, 2004, plaintiff applied for a mortgage with Ameriquest Mortgage Company.

15.     Plaintiff needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

16.     Prior to March 20, 2004, Ameriquest Mortgage Company ordered an appraisal of plaintiff's residence and property from defendant Homestead.

17.     Homestead, by its agent Trevino, performed the appraisal at plaintiff's residence and prepared the written appraisal report on or about March 20, 2004. A copy of the report is attached as Exhibit A.

18.     According to Exhibit A, the value of plaintiff's home at that time was $163,000.

19.     The true value of plaintiff's home was approximately $130,000-$135,000.

20.     On information and belief, the reported appraised value was substantially

and artificially inflated by Homestead and Trevino, for the purpose of increasing the loan amount plaintiff would qualify for, which ultimately increased the lender's profits, as further detailed below.

21.     The loan was closed on April 1, 2004.

22.     The following are documents relating to the loan:

        a.     A mortgage, <u>Exhibit B</u>;

        b.     A settlement statement, <u>Exhibit C</u>;

        c.     A Truth in Lending statement, <u>Exhibit D</u>;

        d.     A "summary of debts and disbursements," <u>Exhibit E</u>;

        e.     The three-day notice of right to cancel required by the Federal Reserve Board, <u>Exhibit F</u>.  None of the copies delivered to plaintiff was filled out.

        f.     A purported "one week" notice of right to cancel used solely by Ameriquest and related companies, <u>Exhibit G</u>.

23.     The notices of right to cancel furnished to plaintiff (<u>Exhibit F</u>) were incomplete in that they did not have the signing and cancellation dates filled in, in violation of 12 C.F.R. § 226.23(b)(5).

24.     Around April 2006, shortly before plaintiff's adjustable interest rate began rising, plaintiff attempted to refinance with Assurance Home Finance and with AEGIS Lending Corporation.  Both potential mortgage companies performed or arranged appraisals of plaintiffs' property, and then informed plaintiff that they could not refinance her because her loan amount exceeds the value of her home.

25.     At this point, an employee of AEGIS Lending Corporation also recommended that plaintiff contact the Michigan attorney general regarding her overappraisal.

26.     On May 24, 2006, an employee of Ameriquest's legal department named Fred Ayala sent plaintiff a letter, attached as <u>Exhibit I</u>, which acknowledges that her appraisal value had been listed as $163,000, and that a current market analysis estimated her actual appraisal value as $126,000.

27.     Plaintiff has been directed to make payments to Ameriquest Mortgage Company, then later to AMC Mortgage Services, Inc., and still later to Citi Residential Lending, Inc. Most recently, in 2009, plaintiff was directed to make payments to American Home Mortgage Servicing, Inc.

28.     On information and belief, Deutsche Bank National Trust Company, N.A., holds legal title to plaintiff's loan, as trustee. Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiff's loan under Asset Backed Pass-Through Certificates, Series 20045-R5 under the Pooling & Servicing Agreement dated as of June 1, 2004, Without Recourse.

29.     In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiff's loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

## COUNT I – TILA

30.     Plaintiff incorporates paragraphs 1-29. This claim is against all defendants.

31.     This claim is against Ameriquest Mortgage Company, Ameriquest Mortgage Securities, Inc., Deutsche Bank National Trust Company, and American Home Mortgage Servicing, Inc.

## RIGHT TO RESCIND

32.     Because the transaction was secured by plaintiff's home, and was not entered

5

into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

> **(a) Consumer's right to rescind.**
>
> > **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**
> >
> > **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**
> >
> > **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**
> >
> > **(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**
>
> **(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**
>
> > **(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**
> >
> > **(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

33.     In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiff's right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the reasons stated below.

34.     Plaintiff was not furnished completed notices of the right to cancel.

35.     The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

36.     Furthermore, the "one week" cancellation notice is misleading, as the period given is actually only six days long.

37.     Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

38.     Notice of rescission has been given to defendants.  A copy is attached as

Exhibit H.

39.     The loan has not been rescinded.

40.     Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

41.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.      A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b.      Statutory damages for the underlying disclosure violation;

c.      If appropriate, statutory damages for failure to rescind;

d.      A judgment declaring what obligation, if any, plaintiff has toward each defendant, taking into account the challenge for plaintiff's tender due to the inflated appraised value;

e.      Attorney's fees, litigation expenses and costs of suit; and

f.      Such other or further relief as the Court deems proper.

## COUNT II – MICHIGAN MORTGAGE BROKERS, LENDERS AND SERVICERS LENDING ACT

42.     Plaintiff incorporates paragraphs 1-29.

43.     This claim is against Ameriquest Mortgage Company.

44.     Defendant engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by misrepresenting the value of plaintiff's property.

45.     Plaintiff was induced to proceed with the loan by means of this misrepresentation.

46.     Plaintiff would not have taken out the loan if he had reason to know that the appraisal was inflated or that she was borrowing at an extremely high loan-to-value ratio.

47.     Plaintiff was damaged as a result in that (1) she was charged and paid excess points and fees and interest stemming from the inflated value and principal, and (2) she has attempted to but has been prevented from refinancing out of the high-loan-to-value loan, which was based on the inflated appraisal.

48.     Due to the inflated appraisal, plaintiff has incurred special damages that require a special remedy.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.      A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on all defendants;

b.      Appropriate compensatory and punitive damages;

c.      Appropriate special damages; and

c.      Such other or further relief as the Court deems appropriate.

### COUNT III - CIVIL CONSPIRACY

49.     Plaintiff incorporates paragraphs 1-29.

50.     This claim is against Ameriquest Mortgage Company.

51.     Defendant, along with Douglas Trevino and Homestead Appraisal of Rockford,  intentionally inflated the appraised value or were aware that it was substantially inflated above the market value.

52.     Defendant, along with Douglas Trevino and Homestead Appraisal of Rockford, misrepresented, concealed and suppressed the true market value of plaintiff's property. The value of the property and home was a material fact in the transaction.

53.     Defendant, along with Douglas Trevino and Homestead Appraisal of Rockford, intended that plaintiff rely on their misrepresentation, concealment and suppression of this fact.

54.     Plaintiff took out the loan, the principal amount of which and other material terms were based on the inflated appraised value reported.

55.     Defendant's conduct was willful.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendant for:

a.      Actual damages;

b.      Incidental, consequential and special damages;

d.      Costs of litigation and expenses; and

e.      Such other or further relief as this Court deems appropriate.


s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs

10

James O. Latturner
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

### DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

### CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on May 21, 2008, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also hereby certify that a copy was sent by U.S. mail to parties without an email address.

| | |
|---|---|
| Mark D. Van der Laan | American Home Mortgage Servicing, Inc. |
| Dykema Gossett PLLC | c/o Registered Agent |
| 300 Ottawa Ave. NW | C.T. Corporation System |
| Suite 700 | 208 S. LaSalle St. |
| Grand Rapids, MI 49503 | Suite 814 |
| | Chicago, IL 60604 |

Bernard E. LeSage
blesage@buchalter.com

s/Daniel A. Edelman
Daniel A. Edelman

T:\16854\Pleading\2nd Amended Complaint_Pleading-0001.WPD

11

# EXHIBIT A

File No. 95023 Page #1



## APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
4913 MILDRED AVE SE
LOT 66 MEADOWLANE PLAT NO. 1
GRAND RAPIDS, MI 49508-4761

**FOR:**
AMERIQUEST MORTGAGE COMPANY
2505 E PARIS AVE
GRAND RAPIDS, MI 49549

**AS OF:**
3-20-04

**BY:**
DOUGLAS TREVINO
HOMESTEAD APPRAISAL OF ROCKFORD
236 PROSPECT STREET
ROCKFORD, MI 49341
PH: 616-866-6799
FAX: 616-866-6818

Douglas E. Trevino

Form GA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



| Borrower/Client BARBARA SKANES | | | | File No. 96023 |
|---|---|---|---|---|
| Property Address 4913 MILDRED AVE SE | | | | |
| City GRAND RAPIDS | County KENT | State MI | | Zip Code 49508-4761 |
| Lender AMERIQUEST MORTGAGE COMPANY | | | | |

## TABLE OF CONTENTS

Cover Page ............................................................................................ 1
Summary of Salient Features ................................................................ 2
USPAP Identification ............................................................................. 3
URAR ...................................................................................................... 4
Additional Comparables 4-6 ................................................................. 6
Multi-Purpose Supplemental Addendum .............................................. 7
Building Sketch (Page - 1) ..................................................................... 9
Subject Photos ...................................................................................... 10
Comparable Photos 1-3 ......................................................................... 11
Comparable Photos 4-6 ......................................................................... 12
Location Map .......................................................................................... 13
Statement of Limiting Conditions ......................................................... 14

File No. 060231 Page #2

## SUMMARY OF SALIENT FEATURES

| | | |
|---|---|---|
| SUBJECT INFORMATION | Subject Address | 4913 MILDRED AVE SE |
| | Legal Description | LOT 66 MEADOWLANE PLAT NO. 1 |
| | City | GRAND RAPIDS |
| | County | KENT |
| | State | MI |
| | Zip Code | 49508-4761 |
| | Census Tract | 0128.00 |
| | Map Reference | KENT COUNTY |
| SALES PRICE | Sale Price | $ NA |
| | Date of Sale | NA |
| CLIENT | Borrower / Client | BARBARA SKANES |
| | Lender | AMERIQUEST MORTGAGE COMPANY |
| DESCRIPTION OF IMPROVEMENTS | Size (Square Feet) | 947 |
| | Price per Square Foot | $ |
| | Location | SUBURB/AVG |
| | Age | Act 40+/-/Eff 5 |
| | Condition | AVERAGE |
| | Total Rooms | 5 |
| | Bedrooms | 3 |
| | Baths | 1 |
| APPRAISER | Appraiser | DOUGLAS TREVINO |
| | Date of Appraised Value | 3-20-04 |
| VALUE | Final Estimate of Value | $ 163,000 |

File No. 95023    Page #3

| Borrower  BARBARA SKANES | | | File No. 95023 |
| Property Address  4913 MILDRED AVE SE | | | |
| City  GRAND RAPIDS | County  KENT | State  MI | Zip Code  49508-4761 |
| Lender  AMERIQUEST MORTGAGE COMPANY | | | |

## APPRAISAL AND REPORT IDENTIFICATION

**This appraisal conforms to one of the following definitions:**

☒ Complete Appraisal    (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ Limited Appraisal    (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

**This report is one of the following types:**

☐ Self Contained    (A written report prepared under Standards Rule 2-2(a)  of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ Summary    (A written report prepared under Standards Rule 2-2(b)  of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ Restricted    (A written report prepared under Standards Rule 2-2(c)  of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

☐ The statements of fact contained in this report are true and correct.

☐ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

☐ I have no (or the specified) present or prospective interest in the property that is the subject of this report, and no (or the specified) personal interest with respect to the parties involved.

☐ I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

☐ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

☐ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

☐ My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

☐ I have (or have not) made a personal inspection of the property that is the subject of this report.

☐ No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

### Comments on Appraisal and Report Identification

Note any departures from Standards Rules 1-3 and 1-4, plus any USPAP-related issues requiring disclosure:

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name:  DOUGLAS TREVINO | Name: |
| Date Signed:  3-24-04 | Date Signed: |
| State Certification #: | State Certification #: |
| or State License #:  1201007652 | or State License #: |
| State:  MI | State: |
| Expiration Date of Certification or License:  7/31/2005 | Expiration Date of Certification or License: |
|  | ☐ Did   ☐ Did Not   Inspect Property |

Douglas E. Trevino

File No. 560231 Page #4

# UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. 56023

| Property Address | 4913 MILDRED AVE SE | City GRAND RAPIDS | State MI | Zip Code 49508-4761 |
|---|---|---|---|---|

Legal Description LOT 66 MEADOWLANE PLAT NO. 1    County KENT

Assessor's Parcel No. 41-18-29-303-034    Tax Year 2003    R.E. Taxes $ 1,300 EST    Special Assessments $ 0.00

Borrower BARBARA SKANES    Current Owner SAME    Occupant: ☒ Owner ☐ Tenant ☐ Vacant

Property rights appraised ☒ Fee Simple ☐ Leasehold    Project Type ☐ PUD ☐ Condominium (HUD/VA only)    HOA $ NA    /Mo.

Neighborhood or Project Name GRAND RAPIDS    Map Reference KENT COUNTY    Census Tract 0128.00

Sale Price $ NA    Date of Sale NA    Description and $ amount of loan charges/concessions to be paid by seller NA

Lender/Client AMERIQUEST MORTGAGE COMPANY    Address 2505 E PARIS AVE SUITE 100, GRAND RAPIDS, MI 49546

Appraiser DOUGLAS TREVINO    Address 236 PROSPECT STREET, ROCKFORD, MI 49341

| Location | ☒ Urban ☐ Suburban ☐ Rural |
| Built up | ☒ Over 75% ☐ 25-75% ☐ Under 25% |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow |
| Property values | ☐ Increasing ☒ Stable ☐ Declining |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply |
| Marketing time | ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. |

Predominant occupancy ☒ Owner ☐ Tenant ☐ Vacant (0-5%) ☒ Vacant (over 5%)

Single family housing PRICE $(000) 50 Low / 200+/- High    AGE (yrs) 5 / 100+/-    Predominant 140 / 25-30

Present land use % One family 90    2-4 family 5    Multi-family    Commercial 5

Land use change ☒ Not likely ☐ Likely ☐ In process    To:

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: NEIGHBORHOOD IS DEFINED BY 44TH ST ON THE NORTH, WING AVE ON THE EAST, EASTERN AVE ON THE WEST, AND 56TH ST ON THE SOUTH.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): SUBJECT PROPERTY IS LOCATED IN A QUIET RESIDENTIAL NEIGHBORHOOD. AREA EMPLOYMENT IS STABLE AND CENTRALIZED IN GRAND RAPIDS. AMENITIES ARE LOCATED CLOSE BY. APPEAL TO MARKET IS AVERAGE.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time — such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): THE MARKET IS CURRENTLY STABLE WITH MORTGAGE FUNDS AVAILABLE TO QUALIFIED BUYERS AT COMPETITIVE RATES. THERE IS NO EVIDENCE OF CONCESSIONS, BUY DOWNS, OR DISCOUNTS WHICH WOULD AFFECT MARKET VALUES. PROPERTY VALUES APPEAR STABLE WITH SUPPLY AND DEMAND IN BALANCE.

Project Information for PUDs (If applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? ☐ Yes ☐ No

Approximate total number of units in the subject project    Approximate total number of units for sale in the subject project

Describe common elements and recreational facilities:

| Dimensions 60X147.62 | | | Topography MOSTLY LEVEL |
| Site area 8,857 | Corner Lot ☐ Yes ☒ No | Size 60X147.62 |
| Specific zoning classification and description RESIDENTIAL R1-C | | Shape RECTANGULAR/AVG |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | Drainage APPEARS ADEQUATE |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | View NBHD/AVG |

Landscaping LAWNS/SIDE TREES

Driveway Surface CONCRETE

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | PAVED | ☒ | |
| Gas | ☒ | | Curb/gutter | ROLLED ASPHALT | ☒ | |
| Water | ☒ | | Sidewalk | CONCRETE | ☒ | |
| Sanitary sewer | ☒ | | Street lights | INCANDESCENT | ☒ | |
| Storm sewer | ☒ | | Alley | NONE | | |

Apparent easements OF RECORD

FEMA Special Flood Hazard Area ☐ Yes ☒ No

FEMA Zone C    Map Date 11/18/1981

FEMA Map No. 260107006SB

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): NO APPARENT ADVERSE EASEMENTS OR ENCROACHMENTS APPEAR TO AFFECT SUBJECT PROPERTY. PROPERTY DOES NOT APPEAR TO BE IN AN AREA SUSCEPTIBLE TO FLOODING.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units 1 | Foundation POUR CONC | Slab NONE | Area Sq. Ft. 947 | Roof NK ☐ |
| No. of Stories 1 | Exterior Walls FR/ALUM | Crawl Space NONE | % Finished 75% | Ceiling AVG ☒ |
| Type (Det./Att.) DET | Roof Surface COMP SHING | Basement FULL | Ceiling DROP | Walls AVG ☒ |
| Design (Style) RANCH | Gutters & Dwnspts. ALUM | Sump Pump NONE NOTED | Walls PNL | Floor NK ☐ |
| Existing/Proposed EXISTING | Window Type VCTP DH SLD | Dampness NONE NOTED | Floor CPT | None ☐ |
| Age (Yrs.) 40+/- | Storm/Screens ALUM | Settlement NONE NOTED | Outside Entry NO | Unknown ☐ |
| Effective Age (Yrs.) 5 | Manufactured House NO | Infestation NONE NOTED | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | 1 | | | 947 |
| Level 1 | | 1 | AREA | 1 | | | | 3 | 1 | | | 947 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains: 6 Rooms; 3 Bedroom(s); 1 Bath(s); 947 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|
| Floors | VINYL/CPT/AVG | Type FA | Refrigerator ☐ | None ☐ | Fireplace(s) # ☐ | None ☐ |
| Walls | DW/PNT/AVG | Fuel NG | Range/Oven ☒ | Stairs ☒ | Patio ☐ | Garage # of cars ☐ |
| Trim/Finish | WD/PNT/STN/AVG | Condition AVG | Disposal ☐ | Drop Stair ☐ | Deck REAR ☒ | Attached ☐ |
| Bath Floor | CPT/AVG | COOLING | Dishwasher ☐ | Scuttle ☒ | Porch ☐ | Detached 2 CAR |
| Bath Wainscot | TILE/AVG | Central CAIR | Fan/Hood ☒ | Floor ☐ | Fence FBY ☒ | Built-in ☐ |
| Doors | WD HC/AVG | Other NONE | Microwave ☒ | Heated ☐ | Pool ☐ | Carport ☐ |
| | | Condition AVG | Washer/Dryer ☐ | Finished ☐ | | Driveway PVT |

Additional features (special energy efficient items, etc.): NO ADDITIONAL ITEMS NOTED.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: HOME IS A RANCH IN AVERAGE CONDITION. NO FUNCTIONAL OR EXTERNAL DEPRECIATION ALLOWED WITH 4% PHYSICAL DEPRECIATION FOR AN EFFECTIVE AGE OF 5 IN AGE LIFE OF 50. WATER HEATER, FURNACE AND CENTRAL AIR ARE 4 YEARS OLD. ROOF WAS REPLACED IN 2003. WINDOWS WERE REPLACED IN 2003.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property.: NO APPARENT ADVERSE ENVIRONMENTAL CONDITIONS APPEAR TO AFFECT SUBJECT PROPERTY.

Freddie Mac Form 70 6/93    PAGE 1 OF 2    Fannie Mae Form 1004 6/93

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 96023

File No. 96023  Page #5
73752949

**Valuation Section**

## COST APPROACH

| ESTIMATED SITE VALUE | ........................ | = $ | 25,000 |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | | |
| Dwelling | 947 Sq. Ft. @ $ 88.00 | = $ | 83,336 |
| | 947 Sq. Ft. @ $ 15.00 | = | 14,205 |
| FIN BSMT DECK/BY | | = | 20,000 |
| Garage/Carport 528 Sq. Ft. @ $ 20.00 | | = | 10,560 |
| Total Estimated Cost New | | = $ | 128,101 |
| Less | Physical 6,124 Functional | External | |
| Depreciation | 6,124 | = $ | 6,124 |
| Depreciated Value of Improvements | ........................ | = $ | 122,977 |
| "As-is" Value of Site Improvements | ........................ | = $ | 8,000 |
| INDICATED VALUE BY COST APPROACH | ........................ | = $ | 155,977 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): MARSHALL & SWIFT COST MANUAL WAS UTILIZED AND ADJUSTED TO LOCAL BUILDING COSTS.
ABOVE GRADE SQUARE FOOTAGE 947.
NO FUNCTIONAL OR EXTERNAL DEPRECIATION ALLOWED WITH 4% PHYSICAL DEPRECIATION FOR AN EFFECTIVE AGE OF 5 IN AGE LIFE OF 60.
REL 60

## SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4913 MILDRED AVE SE GRAND RAPIDS | 824 SUMMER CREEK CT SE GRAND RAPIDS | | 875 SUMMER CREEK CT GRAND RAPIDS | | 5359 BURGIS AVE SE GRAND RAPIDS | |
| Proximity to Subject | | 0.47 miles | | 0.43 miles | | 0.50 miles | |
| Sales Price | $ NA | $ | 167,500 | $ | 165,000 | $ | 162,500 |
| Price/Gross Living Area | $ | $ 151.37 | | $ 139.71 | | $ 140.57 | |
| Data and/or | INSPECTION | MLS #48336 | | MLS #473284 | | MLS #48935 | |
| Verification Source | CITY | EXTERIOR VIEWING | | EXTERIOR VIEWING | | EXTERIOR VIEWING | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjust. | DESCRIPTION | +(-)$ Adjust. | DESCRIPTION | +(-)$ Adjust. |
| Sales or Financing Concessions | | CONVENT NONE KNOWN | | CONVENT NONE KNOWN | | CONVENT NONE KNOWN | |
| Date of Sale/Time | | 12-29-03 | | 7-14-03 | | 10-22-03 | |
| Location | SUBURB/AVG | SUBURB/AVG | | SUBURB/AVG | | SUBURB/AVG | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 60X147.62 | 34X145 IRR | | 37X133 IRR | | 75X145 | |
| View | NBHD/AVG | AVERAGE | | AVERAGE | | AVERAGE | |
| Design and Appeal | RANCH | RANCH | | RANCH | | RANCH | |
| Quality of Construction | FR/ALUM | FR/VINYL | | FR/VINYL | | FR/VINYL/BRK | |
| Age | Act 404/EFF 5 | Act 12/EFF 5 | | Act 11/EFF 5 | | Act 38/EFF 15 | +5,000 |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade | Total \| Bdrms \| Baths | Total \| Bdrms \| Baths | | Total \| Bdrms \| Baths | | Total \| Bdrms \| Baths | |
| Room Count | 6 \| 3 \| 1 | 6 \| 3 \| 2 | -2,000 | 6 \| 3 \| 2 | -2,000 | 6 \| 3 \| 1.5 | -1,000 |
| Gross Living Area | 947 Sq. Ft. | 1,100 Sq. Ft. | -2,295 | 1,181 Sq. Ft. | -3,510 | 1,156 Sq. Ft. | -3,135 |
| Basement & Finished | FULL | FULL | | FULL | | FULL | |
| Rooms Below Grade | RR,BATH | DEN | +2,000 | RR,BATH,RR | -1,000 | RR,BTH,RR | -1,000 |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FA/NGC/AIR | FA/NGC/AIR | | FA/NGC/AIR | | FA/NGC/AIR | |
| Energy Efficient Items | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Garage/Carport | 2 CAR GARAGE | 2 CAR GARAGE | | 2 CAR GARAGE | | 2 CAR GARAGE | |
| Porch, Patio, Deck, Pool(etc.), etc. | DECK | ENCL PORCH | | deck,sve pch,patli | -1,000 | deck,sve pch,patio | -1,000 |
| | NONE | 1 FFLC | -1,000 | 1 FFLC | -1,000 | 1 FFLC | -1,000 |
| Fence, Pool, etc. | FBY | FBY | | FBY | | FBY | |
| IMPROVEMENTS | NONE | NONE | | NONE | | NONE | |
| Net Adj. (total) | | ☐+ ☒- $ | 3,295 | ☐+ ☒- $ | 8,510 | ☐+ ☒- $ | 2,135 |
| Adjusted Sales Price of Comparable | | $ | 164,205 | $ | 156,490 | $ | 160,365 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): COMPS SELECTED ARE THE BEST AND MOST SIMILAR WITHIN THE PAST 12 MONTHS. SQUARE FOOTAGE WAS ADJUSTED AT $15 PER SQUARE FOOT.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | No prior sales insp at 3 years over MLS & owner | NO OTHER SALES IN THE PAST 12 MONTHS PER MLS | NO OTHER SALES IN THE PAST 12 MONTHS PER MLS | NO OTHER SALE IN THE PAST 12 MONTHS PER MLS |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: NO PREVIOUS REPORTED SALES OR LISTINGS FOR COMPS WITHIN PAST YEAR OR SUBJECT WITHIN PAST 3 YEARS PER MLS.

| INDICATED VALUE BY SALES COMPARISON APPROACH | ........................ | $ | 163,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ /Mo. x Gross Rent Multiplier = $ | | | |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans & specifications.
Conditions of Appraisal: THE COST APPROACH AND SALES COMPARISON APPROACH WERE BOTH CONSIDERED IN THE FINAL ESTIMATE OF VALUE.
Final Reconciliation: THE INCOME APPROACH WAS NOT DEVELOPED AND CONSIDERED IRRELEVANT. HOMES IN THE NEIGHBORHOOD ARE PRIMARILY SINGLE FAMILY RESIDENCES.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA form 1004B (Revised 6-93 ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 3-20-04 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 163,000 .

| APPRAISER: | | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
| Signature | Douglas Eichorn | Signature | ☐ Did ☐ Did Not |
| Name DOUGLAS EICHORN | | Name | Inspect Property |
| Date Report Signed 3-24-04 | | Date Report Signed | |
| State Certification # | State | State Certification # | State |
| Or State License # 1201007652 | State MI | Or State License # | State |

File No. 96023I Page #6

## UNIFORM RESIDENTIAL APPRAISAL REPORT
## MARKET DATA ANALYSIS

These recent sales of properties are most similar and proximate to subject and have been considered in the market analysis. The description includes a dollar adjustment, reflecting market reaction to those items of significant variation between the subject and comparable properties. If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus (−) adjustment is made, thus reducing the indicated value of the subject. If a significant item in the comparable is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the indicated value of the subject.

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 4913 MILDRED AVE SE GRAND RAPIDS | 5050 RUM CREEK CT SE GRAND RAPIDS | | | | | |
| Proximity to Subject | | 2.30 miles | | | | | |
| Sales Price | $ NA | $ 144,000 | | $ | | $ | |
| Price/Gross Living Area | $ | $ 160.18 | | $ | | $ | |
| Data and/or Verification Sources | INSPECTION CITY | MLS #477229 EXTERIOR VIEWING | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Sales or Financing Concessions | | CONVENT $3000 PAID | +3,000 | | | | |
| Date of Sale/Time | | 9-3-03 | | | | | |
| Location | SUBURB/AVG | SUBURB/AVG | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | 65X147.62 | 65X121 IRR | | | | | |
| View | NBHD/AVG | AVERAGE | | | | | |
| Design and Appeal | RANCH | RANCH | | | | | |
| Quality of Construction | FR/ALUM | FR/ALM/BRK | | | | | |
| Age | Act 40/4-/Eff 5 | Act 21/Eff 10 | +2,500 | | | | |
| Condition | AVERAGE | AVERAGE | | | | | |
| Above Grade | Total : Bdrms : Baths | Total : Bdrms : Baths | | | | Total : Bdrms : Baths | |
| Room Count | 5 : 3 : 1 | 5 : 2 : 1 | +3,000 | | | | |
| Gross Living Area | 947 Sq. Ft. | 899 Sq. Ft. | +720 | Sq. Ft. | | Sq. Ft. | |
| Basement & Finished Rooms Below Grade | FULL RR.BATH | FULL RR.BR.BATH | -1,000 | | | | |
| Functional Utility | AVERAGE | AVERAGE | | | | | |
| Heating/Cooling | FA/NG/CAIR | FA/NG/CAIR | | | | | |
| Energy Efficient Items | AVERAGE | AVERAGE | | | | | |
| Garage/Carport | 2 CAR GARAGE | 2 CAR GARAGE | | | | | |
| Porch, Patio, Deck, Fireplace(s), etc. | DECK NONE | DECK NONE | | | | | |
| Fence, Pool, etc. | FBY | FBY | | | | | |
| IMPROVEMENTS | NONE | NONE | | | | | |
| Net Adj. (total) | | ☒ + ☐ − $ | 6,220 | ☐ + ☐ − $ | | ☐ + ☐ − $ | |
| Adjusted Sales Price of Comparable | | Gross 7.5% $ Net 4.3% | 150,220 | Gross % Net % $ | | Gross % Net % $ | |
| Data, Price and Data Source for prior sales within year of appraisal | No prior sales Insp at 3 years per MLS & owner | NO OTHER SALE IN THE PAST 12 MONTHS PER MLS | | | | | |

Comments:

Comments:

Market Data Analysis 6-93

Form UA2.(AC) — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 350231 Page #7

# MULTI-PURPOSE SUPPLEMENTAL ADDENDUM
## FOR FEDERALLY RELATED TRANSACTIONS

Douglas E. Tavino

| | |
|---|---|
| Borrower/Client | BARBARA SKANES |
| Property Address | 4913 MILDRED AVE SE |

| City | GRAND RAPIDS | County | KENT | State | MI | Zip Code | 49508-4761 |
|---|---|---|---|---|---|---|---|

Lender AMERIQUEST MORTGAGE COMPANY

This Multi-Purpose Supplemental Addendum for Federally Related Transactions was designed to provide the appraiser with a convenient way to comply with the current appraisal standards and requirements of the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of Currency (OCC), The Office of Thrift Supervision (OTS), the Resolution Trust Corporation (RTC), and the Federal Reserve.

> **This Multi-Purpose Supplemental Addendum is for use with any appraisal. Only those statements which have been checked by the appraiser apply to the property being appraised.**

## ☒ PURPOSE & FUNCTION OF APPRAISAL

The purpose of the appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender in evaluating the subject property for lending purposes. This is a Federally related transaction.

## ☒ EXTENT OF APPRAISAL PROCESS

☒ The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales within the subject market area. The original source of the comparables is shown in the Data Source section of the market grid along with the source of confirmation, if available. The original source is presented first. The sources and data are considered reliable. When conflicting information was provided, the source deemed most reliable has been used. Data believed to be unreliable was not included in the report nor used as a basis for the value conclusion.

☒ The Reproduction Cost is based on ___MARSHALL AND SWIFT COST MANUAL ADJUSTED TO LOCAL BUILDING COSTS.___ supplemented by the appraiser's knowledge of the local market.

☒ Physical depreciation is based on the estimated effective age of the subject property. Functional and/or external depreciation, if present, is specifically addressed in the appraisal report or other addenda. In estimating the site value, the appraiser has relied on personal knowledge of the local market. This knowledge is based on prior and/or current analysis of site sales and/or abstraction of site values from sales of improved properties.

☒ The subject property is located in an area of primarily owner-occupied single family residences and the Income Approach is not considered to be meaningful. For this reason, the Income Approach was not used.

☐ The Estimated Market Rent and Gross Rent Multiplier utilized in the Income Approach are based on the appraiser's knowledge of the subject market area. The rental knowledge is based on prior and/or current rental rate surveys of residential properties. The Gross Rent Multiplier is based on prior and/or current analysis of prices and market rates for residential properties.

☐ For income producing properties, actual rents, vacancies and expenses have been reported and analyzed. They have been used to project future rents, vacancies and expenses.

## ☒ SUBJECT PROPERTY OFFERING INFORMATION

According to ___MLS___ the subject property:

☒ has not been offered for sale in the past: ☒ 30 days ☐ 1 year ☐ 3 years.
☐ is currently offered for sale for $ _____ .
☐ was offered for sale within the past: ☐ 30 days ☐ 1 year ☐ 3 years for $ _____ .
☐ Offering information was considered in the final reconciliation of value.
☐ Offering information was not considered in the final reconciliation of value.
☐ Offering information was not available. The reasons for unavailability and the steps taken by the appraiser are explained later in this addendum.

## ☒ SALES HISTORY OF SUBJECT PROPERTY

According to ___MLS___ the subject property:

☐ has not transferred in the past twelve months. ☒ has not transferred in the past thirty-six months.
☐ has transferred in the past twelve months. ☐ has transferred in the past thirty-six months.
☐ All prior sales which have occurred in the past twelve months are listed below and reconciled to the appraised value, either in the body of the report or in the addenda.

| Date | Sales Price | Document # | Seller | Buyer |
|---|---|---|---|---|
| | | | | |
| | | | | |

## ☒ FEMA FLOOD HAZARD DATA

☒ Subject property is not located in a FEMA Special Flood Hazard Area.
☐ Subject property is located in a FEMA Special Flood Hazard Area.

| Zone | FEMA Map/Panel # | Map Date | Name of Community |
|---|---|---|---|
| C | 260107005B | 11/18/1981 | GRAND RAPIDS |

☐ The community does not participate in the National Flood Insurance Program.
☒ The community does participate in the National Flood Insurance Program.
☐ It is covered by a regular program.
☐ It is covered by an emergency program.

Form MPA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 960231 Page #8

☒ **CURRENT SALES CONTRACT**

☒ This subject property is *currently not under contract*.
☐ The contract and/or escrow instructions *were not available for review*. The unavailability of the contract is explained later in the addenda section.

☐ The contract and/or escrow instructions *were reviewed*. The following summarizes the contract:

| Contract Date | Amendment Date | Contract Price | Seller |
|---|---|---|---|
| | | | SAME |

☐ The contract indicated that personal property *was not included* in the sale.
☐ The contract indicated that personal property *was included*. It consisted of _____
   Estimated contributory value is $ _____
☒ Personal property *was not included* in the final value estimate.
☐ Personal property *was included* in the final value estimate.
☐ The contract indicated *no financing concessions* or other incentives.
☐ The contract indicated *the following concessions* or incentives: _____

☐ If concessions or incentives exist, the comparables were checked for similar concessions and appropriate adjustments were made, if applicable, so that the final value conclusion is in compliance with the Market Value defined herein.

☒ **MARKET OVERVIEW**     Include an explanation of current market conditions and trends.

  **3-6**   months is considered a reasonable marketing period for the subject property based on   **MLS DATA**

☒ **ADDITIONAL CERTIFICATION**

The Appraiser certifies and agrees that:
(1) The analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), except that the Departure Provision of the USPAP does not apply.
(2) Their compensation is not contingent upon the reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.
(3) This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

☒ **ADDITIONAL (ENVIRONMENTAL) LIMITING CONDITIONS**

The value estimated is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions unless otherwise stated in this report. The appraiser is not an expert in the identification of hazardous substances or detrimental environmental conditions. The appraiser's routine inspection of and inquiries about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively unless otherwise stated in this report. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous substances or detrimental environmental conditions on or around the property that would negatively affect its value.

☒ **ADDITIONAL COMMENTS**

MICHIGAN APPRAISERS ARE REQUIRED TO BE LICENSED AND ARE REGULATED BY THE DEPARTMENT OF CONSUMER & INDUSTRY SERVICES, P.O. BOX 30018, LANSING, MI 48909.

☒ **APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Appraiser's Signature _Douglas E. Auringer_   Effective Date 3-20-04   Date Prepared 3-24-04
Appraiser's Name (print) DOUGLAS AURINGER   Phone # 616 1 866-6799
State MI   ☒ License / _____   ☐ Certification # 1201007652   Tax ID # _____

☐ **CO-SIGNING APPRAISER'S CERTIFICATION**

☐ The co-signing appraiser *has personally inspected* the subject property, both inside and out, and has made an exterior inspection of all comparable sales listed in the report. The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser.
☐ The co-signing appraiser *has not personally inspected* the interior of the subject property and:
   *has not inspected* the exterior of the subject property and all comparable sales listed in the report.
   *has inspected* the exterior of the subject property and all comparable sales listed in the report.
☐ The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report, including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser with the exception of the certification regarding physical inspections. The above describes the level of inspection performed by the co-signing appraiser.
☐ The co-signing appraiser's level of inspection, involvement in the appraisal process and certification are covered elsewhere in the addenda section of this appraisal.

☐ **CO-SIGNING APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Co-Signing Appraiser's Signature _____   Effective Date _____   Date Prepared _____
Co-Signing Appraiser's Name (print) _____   Phone # ( ) _____
State _____   ☐ License _____   ☐ Certification # _____   Tax ID # _____

Form MPA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE




File No. 860231 Page # 9

**Building Sketch (Page - 1)**

| Borrower/Client | BARBARA SKANES | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4913 MILDRED AVE SE | | | | | |
| City | GRAND RAPIDS | County | KENT | State | MI | Zip Code 49508-4761 |
| Lender | AMERIQUEST MORTGAGE COMPANY | | | | | |



Sketch by Apex/IV™

Comments

| AREA CALCULATIONS SUMMARY | | | | LIVING AREA BREAKDOWN | | |
|---|---|---|---|---|---|---|
| Code | Description | Size | Net Totals | | Breakdown | Subtotals |
| GLA1 | First Floor | 946.86 | 946.86 | First Floor | | |
| GAR | Garage | 528.00 | 528.00 | | 24.3 x 26.7 | 891.92 |
| OTH | Deck | 196.00 | 196.00 | | 1.5 x 18.7 | 28.05 |
| | | | | | 1.5 x 17.8 | 26.70 |
| | TOTAL LIVABLE (rounded) | | 947 | 3 Calculations Total (rounded) | | 947 |

Form SKT.BIdSkl — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 06023I Page #10

## Subject Photo Page

| | |
|---|---|
| Borrower/Client | BARBARA SKANES |
| Property Address | 4913 MILDRED AVE SE |
| City | GRAND RAPIDS | County | KENT | State | MI | Zip Code | 49508-4761 |
| Lender | AMERIQUEST MORTGAGE COMPANY |



**Subject Front**

4913 MILDRED AVE SE

| | |
|---|---|
| Sales Price | NA |
| Gross Living Area | 947 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1 |
| Location | SUBURB/AVG |
| View | NBHD/AVG |
| Site | 60X147.62 |
| Quality | FR/ALUM |
| Age | Act 40+/-EH 5 |



**Subject Rear**



**Subject Street**

Form PIC3x5.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

 

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client | BARBARA SKANES |
| Property Address | 4913 MILDRED AVE SE |
| City GRAND RAPIDS | County KENT State MI Zip Code 49508-4761 |
| Lender AMERIQUEST MORTGAGE COMPANY | |

File No. 96023 | Page #11



### Comparable 1

824 SUMMER CREEK CT SE

| | |
|---|---|
| Prox. to Subject | 0.47 miles |
| Sale Price | 167,500 |
| Gross Living Area | 1,100 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | SUBURB/AVG |
| View | AVERAGE |
| Site | 34X145 IRR |
| Quality | FR/VINYL |
| Age | Act 12/Eff 5 |



### Comparable 2

875 SUMMER CREEK CT

| | |
|---|---|
| Prox. to Subject | 0.43 miles |
| Sale Price | 165,000 |
| Gross Living Area | 1,191 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | SUBURB/AVG |
| View | AVERAGE |
| Site | 37X133 IRR |
| Quality | FR/VINYL |
| Age | Act 11/Eff 5 |



### Comparable 3

5359 BURGIS AVE SE

| | |
|---|---|
| Prox. to Subject | 0.59 miles |
| Sale Price | 162,500 |
| Gross Living Area | 1,156 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.5 |
| Location | SUBURB/AVG |
| View | AVERAGE |
| Site | 75X145 |
| Quality | FR/VINYL/BRK |
| Age | Act 38/Eff 15 |

Form PIC3x5.CR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

 

## Comparable Photo Page

File No. 96028| Page #12

| | |
|---|---|
| Borrower/Client | BARBARA SKANES |
| Property Address | 4913 MILDRED AVE SE |
| City GRAND RAPIDS | County KENT | State MI | Zip Code 49508-4761 |
| Lender AMERIQUEST MORTGAGE COMPANY | |



### Comparable 4

5050 RUM CREEK CT SE

| | |
|---|---|
| Prox. to Subject | 2.30 miles |
| Sale Price | 164,000 |
| Gross Living Area | 899 |
| Total Rooms | 5 |
| Total Bedrooms | 2 |
| Total Bathrooms | 1 |
| Location | SUBURB/AVG |
| View | AVERAGE |
| Site | 65X121 IRR |
| Quality | FR/ALM/BRK |
| Age | Act 21/Eff 10 |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

Form PIC3x5.CR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**Location Map**

File No. 96023 Page #19

| Borrower/Client | BARBARA SKANES | | |
|---|---|---|---|
| Property Address | 4913 MILDRED AVE SE | | |
| City | GRAND RAPIDS | County | KENT | State | MI | Zip Code | 49508-4761 |
| Lender | AMERIQUEST MORTGAGE COMPANY | | |





**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) pay ent is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pay  these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of
hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute
the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

---

Freddie Mac Form 439 6-93         Page 1 of 2         Fannie Mae Form 1004B 6-93

File No. 96023 Page # 15

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**    4913 MILDRED AVE SE, GRAND RAPIDS, MI 49508-4761

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _Douglas E. Quick_ | Signature: _____ |
| Name: DOUGLAS _____ | Name: _____ |
| Date Signed: 3-24-04 | Date Signed: _____ |
| State Certification #: _____ | State Certification #: _____ |
| or State License #: 1201007652 | or State License #: _____ |
| State: MI | State: _____ |
| Expiration Date of Certification or License: 7/31/2005 | Expiration Date of Certification or License: _____ |
| | ☐ Did   ☐ Did Not Inspect Property |

Form ACR_DEFD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Case 1:06-cv-00688-RHB Document 1-3 Filed 09/21/2006 Page 1 of 21

# EXHIBIT B

# MORTGAGE

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated April 1, 2004
together with all Riders to this document.
(B) "Borrower" is BARBARA J. SKANES

Borrower's address is 4913 MILDRED AVE SE, GRAND RAPIDS,MI 49508
. Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01
0073752909 - 5640

04/01/2004 3:00:41

AM6MI (0310)

Page 1 of 16                           Initials: _____

VMP Mortgage Solutions (800)521-7291



0000007375290903013417O1

**(C) "Lender"** is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated April 1, 2004
The Note states that Borrower owes Lender one hundred forty-eight thousand five hundred and 00/100                                                                    Dollars
(U.S. $ 148,500.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2034

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:_____

AM6MI (0310)                          Page 2 of 16                          Form 3023 1/01

0073752909-5640

04/01/2004 3:00:41


000000737529090301341702

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the **County**                                         [Type of Recording Jurisdiction]
of **KENT**                                              [Name of Recording Jurisdiction]:
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: **41-18-29-303-034**                      which currently has the address of
**4913 MILDRED AVE SE**                                                          [Street]
**GRAND RAPIDS**                                       [City], Michigan **49508**        [Zip Code]
("Property Address"):

       TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

       BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials:_____

**AM6MI** (0310)                              Page 3 of 16                              Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



000000737529090301341703

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

AM6MI (0310)　　　　　　　　　　　　Page 4 of 16　　　Initials: _____　　　Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41


0000007375290903013417704

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials:_____

AM6MI (0310)　　　　　　　　　Page 6 of 16　　　　　　　　　Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



0000007375290903013041705

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

Initials:_____

AM6MI (0310)          Page 6 of 16          Form 3023 1/01

0073752909-5640

04/01/2004 3:00:41



Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _____

0073752909 - 5640

04/01/2004 3:00:41



0000007375290903013417707

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward

Initials:_____

AM6MI (0310)                          Page 8 of 16                          Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41


0000007375290930134170B

the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Initials: _____

AM6MI (0310)          Page 9 of 16          Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



0000007375290903013417709

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

Initials: _____

AM6MI (0310)                    Page 10 of 16                    Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



0000007375290903013417I0

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:_____

AM6MI (0310)          Page 11 of 16          Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



0000007375290903013417111

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,

AM6MI (0310)                     Page 12 of 18          Initials: _____          Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



000000737529090301341712

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous

Initials: _____

AM6MI (0310)                     Page 13 of 16                     Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41



0000007375290903013441713

Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Initials: _____

AM6MI (0310)                                    Page 14 of 16                                    Form 3023 1/01

0073752909 - 5640

04/01/2004 3:00:41


0000007375290903013417 14

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                    BARBARA J. SKANES            -Borrower


_____        _____ (Seal)
                                                                 -Borrower


_____ (Seal)  _____ (Seal)
                    -Borrower                                    -Borrower


_____ (Seal)  _____ (Seal)
                    -Borrower                                    -Borrower


_____ (Seal)  _____ (Seal)
                    -Borrower                                    -Borrower


AM6MI (0310)                    Page 15 of 16                    Form 3023 1/01
0073752909-5640

04/01/2004 3:00:41


0000000737529090301341715

**STATE OF MICHIGAN,**  County ss:

The foregoing instrument was acknowledged before me this _____ by
                                                        Day/Month/Year

_____

_____

_____

My Commission Expires:

_____
Notary Public

_____ County, Michigan

Prepared By: Ameriquest Mortgage Company
             Holly Chelette
             2505 E. Paris Ave., # 100, Grand Rapids, MI 49546



0000007375290903013417166

400-18MI (12/03)                    Page 16 of 16              0073752909 - 5640

                                                              04/01/2004 3:00:41 PM

                0073752909 - 5640

                04/01/2004 3:00:41

BORROWER NAME:

LOAN NUMBER:   0073752909 - 5640

LEGAL DESCRIPTION

0000007375290903013417 17

LGL3LTR (08/03)

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 1st day of April , 2004    and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

4913 MILDRED AVE SE, GRAND RAPIDS, MI  49508
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of   5.950 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(A) Change Dates**
The interest rate I will pay may change on the first day of  May, 2006  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials_____

Loan Number:  0073752909 - 5640



0000007375290903021150301

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and three-quarters** percentage points ( **5.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.950% or less than 5.950%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  One( **1.000** %) from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 11.950)% or less than 5.950)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_____

Loan Number:  0073752909 - 5640



0000007375209030215030 2

610-2 (Rev 1/01)                    Page 2 of 3

04/01/2004 3:00:41 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)   _____ (Seal)
Borrower BARBARA J. SKANES   Borrower

_____ (Seal)   _____ (Seal)
Borrower   Borrower

Loan Number: 0073752909 - 5640


0000007375290903021503 03

610-3 (Rev 1/01)   Page 3 of 3   04/01/2004 3:00:41 PM

Case 1:06-cv-00688-RHB Document 1-4 Filed 09/21/2006 Page 1 of 2

# EXHIBIT C

Settlement Statement
Optional Form for
Transactions without Sellers

U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0491

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| BARBARA J. SKANES | Ameriquest Mortgage Company |
| | 2505 E. Paris Ave., # 100 |
| 4913 MILDRED AVE SE    GRAND RAPIDS, MI 49508 | Grand Rapids, MI 49546 |
| Property Address: (if different from above) | Settlement Agent: NORTHWEST TITLE & ESCROW CORP. |
| MILDRED AVE SE, GRAND RAPIDS, MI 49508 | Place of Settlement: 4255 WHITE BEAR PARKWAY, #1300A  SAINT PAUL, MN 55110 |

| L.    Settlement Charges | | | | |
|---|---|---|---|---|
| Items Payable in Connection with Loan | | Loan Number: 0073752909 - 5640 | Settlement Date: Estimated 04/08/2004 | |
| Loan origination fee    % to | | M.    Disbursement to Others | | |
| 802. Loan discount  4.114  % to  Ameriquest Mortgage Company | $6,109.29 | 1601. HOME COMING FUNDING NE          (W) | | $137,706.41 |
| 803. Apprs/Prop Val to AMERIQUEST MTG | $450.00 | | | |
| 804. Credit report to | | 1502. | | |
| 805. Inspection fee to | | | | |
| 806. | | 1503. | | |
| 807. | | | | |
| 808. Yield Spread Premium to | | 1503. | | |
| 809. | | 1504. | | |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | $70.00 | | | |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | $16.00 | 1505. | | |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | $826.00 | | | |
| 813.Admin to Ameriquest Mortgage Company | $239.00 | 1506. | | |
| 814. Doc. Prep. Fee to | | | | |
| 815. Credit Report Fee to | | 1507. | | |
| 816. Origination Fee    % to | | | | |
| 817. Application Fee to  Ameriquest Mortgage Company | $360.00 | 1508. | | |
| 818. Underwriting Fee to | | | | |
| 819. Service Provider Fee to | | 1509. | | |
| 820. Processing Fee  to | | | | |
| 821. Underwriting Fee to         - | | 1510. | | |
| 822. Appraisal Fee to | | | | |
| 900. Items Required by Lender to be Paid in Advance | | 1511. | | |
| 901. Interest from 04/08/2004  to  05/01/2004  @  $24.21  per day | $556.83 | | | |
| 902. Mortgage insurance premium for        months to | | 1512. | | |
| 903. Hazard ins prem  to | $0.00 | | | |
| 904. Flood ins prem  to | | 1513. | | |
| 1000. Reserves Deposited with Lender | | | | |
| 1001. Hazard insurance    months @ $    per month | | 1514. | | |
| 1002. Mortgage insurance    months @ $    per month | | | | |
| 1003. Earthquake Ins    months @ $    per month | | 1515. | | |
| County prop. taxes    months @ $    per month | | | | |
| Annual assess.    months @ $    per month | | | | |
| Flood    months @ $    per month | | 1520. TOTAL DISBURSED (enter on line 1603) | | $137,706.41 |
| Windstorm Ins    months @ $        per month | | | | |
| 1006. | | Total Wire:    $140,072.88 | | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee to  NORTHWEST TITLE | $300.00 | | | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to  THE CLOSER CO. | $400.00 | | | |
| 1107. Attorney's fees to | | | | |
| 1108. Title insurance to  NORTHWEST TITLE | $384.10 | | | |
| 1109. Lender's coverage        $384.10 | | | | |
| 1110. Owner's coverage        $ | | | | |
| 1111. Settlement/Disbursement fee to | | | | |
| 1112. Escrow Fee to | | | | |
| 1200. Government Recording and Transfer Charges | | N.    NET SETTLEMENT | | |
| 1201. Recording fees | $100.00 | | | |
| 1202. City/county tax/stamps | | | | |
| 1203. State tax/ stamps | | 1600. Loan Amount | | 148,500.00 |
| 1204. State specific fee | | | | |
| 1205. State specific fee | | 1601. Plus Cash/Check from Borrower | | |
| 300. Additional Settlement Charges | | | | |
| 1301. Demand to | | 1602. Minus Total Settlement Charges (line 1400) | | $9,611.22 |
| 1302. Pest inspection to | | | | |
| 1303. Survey Fee | | 1603. Minus Total Disbursements to Others (line 1520) | | $137,706.41 |
| 1304. Staff Appraiser Fee | | | | |
| 1305. Reconveyance Fee to | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period) | | $1,182.37 |
| 1306. | | | | |
| 1307. Property Val Fee to | | | | |
| 1308. Courier Fee | | | | |
| 1400. Total Settlement Charges (enter on line 1602) | $9,611.22 | | | |

Borrower(s) Signature(s):

| Approved for Funding By: | Approved: | Branch:  Grand Rapids, MI 49546 |
|---|---|---|

00000073752909030517020I

# EXHIBIT D

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

☐ Preliminary   ☒ Final

NDER:Ameriquest Mortgage Company
2505 E. Paris Ave., # 100
Grand Rapids, MI 49546
(888)419-6529

Broker License:

Borrowers:BARBARA J. SKANES

Type of Loan: ADJUSTABLE RATE
Date: April 1, 2004

Address:      4913 MILDRED AVE SE
City/State/Zip:   GRAND RAPIDS, MI 49508

Loan Number: 0073752909 - 5640

Property:   4913 MILDRED AVE SE, GRAND RAPIDS, MI 49508

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.252      % | $ 207,865.65 | $ 139,822.88 | $ 347,688.53 |

**YOUR PAYMENT SCHEDULE WILL BE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $885.57 | 06/01/2004 | | | |
| 335 | $971.56 | 06/01/2006 | | | |
| 1 | $962.25 | 05/01/2034 | | | |

**VARIABLE RATE FEATURE:**
☒   Your loan has a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**   You are giving a security interest in the property located at: 4913 MILDRED AVE SE, GRAND RAPIDS, MI 49508

**ASSUMPTION:**  Someone buying this property   ☒  cannot assume the remaining balance due under original terms.
may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**      You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**    If a payment is late, you will be charged  5.000%  of the overdue payment .

**PREPAYMENT:**   If you pay off your loan early, you
☒  may       ☐  will not      have to pay a penalty.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower BARBARA J. SKANES _____ Date _____   Borrower _____ Date _____

ower _____ Date _____   Borrower _____ Date _____



Rev. 7/01)           0000007375290900305790101

**ORIGINAL COPY**

04/01/2004 3:00:41 PM

# EXHIBIT E

meriquest Mortgage Company   Case 1:06-cv-00688-RHB   Document #: 2794-2 Filed: 09/21/2006   Page 2 of 2
Case 1:05-cv-07097 Document #: 2794-2 Filed: 09/21/09 Page 55 of 64 PageID #:31060
(Refinance Loans Only)

Borrower: BARBARA J. SKANES

Date:   April 1, 2004
Branch:
Grand Rapids, MI

Loan Number:   0073752909 - 5640

| Fees | | |
|---|---|---|
| Loan Discount Fee | 4.114 | $6,109.29 |
| Lender Retained Fees | | $1,311.00 |
| Prepaid Interest | | $556.83 |
| Fees Paid to Others | | $1,634.10 |

Short to Close

Total Payoffs          $137,706.41

Cash to Borrower        $1,182.37

Total Points & Fees          $9,611.22

| CREDITORS DEBTS | BALANCE | PAYOFFS | PAYMENTS |
|---|---|---|---|
| BANK OF AMERICA | $10,144.00 | | $223.00 |
| CAPITAL ONE BANK | $418.00 | | $12.00 |
| CAPITAL ONE BANK | $1,014.00 | | $58.00 |
| CAPITAL ONE BANK | $940.00 | | $28.00 |
| HHLD BANK | $7,269.00 | | $146.00 |
| HHLD BANK   - | $73.00 | | $15.00 |
| HOME COMING FUNDING NE | | $137,706.41 | |
| KOHLS DEP ST | $407.00 | | $20.00 |
| PROVIDIAN FINANCIAL | $3,170.00 | | $96.00 |
| PROVIDIAN FINANCIAL | $1,694.00 | | $51.00 |
| RNB - MFLDS | $640.00 | | $33.00 |
| SAMS CLUB/MBGA | $678.00 | | $29.00 |
| UNVL/CITI | $25,403.00 | | $569.00 |
| WAL-MART/MBGA | $805.00 | | $34.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



000000737529090204790101

(Rev.01/02)

Total Payments:          $1,304.00

# EXHIBIT F

## NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   April 1, 2004
LOAN NO.:   0073752909 - 5640
TYPE:   ADJUSTABLE RATE

BORROWER(S): BARBARA J. SKANES

ADDRESS:       4913 MILDRED AVE SE
CITY/STATE/ZIP:   GRAND RAPIDS,MI 49508

PROPERTY:   4913 MILDRED AVE SE
                    GRAND RAPIDS, MI 49508

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
| --- |
|  |

;

or
2.   The date you received your Truth in Lending disclosures;
or
3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company          ATTN:   FUNDING
1100 Town and Country Road, Suite 200     PHONE: (714)541-9960
Orange, CA 92868                         FAX:     (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must
send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |
|  |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____          _____
SIGNATURE                                          DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____          _____          _____          _____
BORROWER/OWNER BARBARA J. SKANES          Date          BORROWER/OWNER          Date

_____          _____          _____          _____
BORROWER/OWNER          Date          BORROWER/OWNER          Date

164-NRC (Rev 11/03)

0000007375290904000501 01

**LENDER COPY**

04/01/2004 3:00:41 PM

## NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   April 1, 2004
LOAN NO.:   0073752909 - 5640
TYPE:   ADJUSTABLE RATE

BORROWER(S): BARBARA J. SKANES

ADDRESS:   4913 MILDRED AVE SE
CITY/STATE/ZIP:   GRAND RAPIDS,MI 49508

PROPERTY:   4913 MILDRED AVE SE
          GRAND RAPIDS,  MI  49508

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.  The date of the transaction, which is | ENTER DOCUMENT SIGNING DATE |  ;

    or
2.  The date you received your Truth in Lending disclosures;
    or
3.  The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1100 Town and Country Road, Suite 200
Orange, CA 92868

ATTN:  FUNDING
PHONE:  (714)541-9960
FAX:     (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of | ENTER FINAL DATE TO CANCEL |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____          _____
SIGNATURE                                DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____   ____        _____   ____
BORROWER/OWNER BARBARA J. SKANES   Date        BORROWER/OWNER                     Date


_____   ____        _____   ____
BORROWER/OWNER                     Date        BORROWER/OWNER                     Date

064-NRC (Rev 11/03)

0000007375290904000050101

**BORROWER COPY**

04/01/2004 3:00:41 PM

# EXHIBIT G

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0073752909 - 5640          Borrower(s): BARBARA J. SKANES

Date: April 1, 2004

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

> Ameriquest Mortgage Company
> 1100 Town and Country Road, Suite 200  Orange, CA 92868
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____          _____
Borrower/Owner  BARBARA J. SKANES          Date

_____          _____
Borrower/Owner                             Date

_____          _____
Borrower/Owner                             Date

_____          _____
Borrower/Owner                             Date

---

### REQUEST TO CANCEL

I/We want to cancel loan #_____

_____          _____
Borrower/Owner Signature                   Date

---



0000007373E29090404220101

$50 (10/00)

04/01/2004 3:00:41 PM

**LENDER COPY**

Case 1:06-cv-09688-RHB    Document 1-9    Filed 09/21/2006    Page 1 of 4

# EXHIBIT H

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.

### 120 S. LaSalle Street, 18th floor
### Chicago, Illinois 60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
Email: edcombs@aol.com
www.edcombs.com

July 12, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite1100
Orange, CA 92868

Re:     Notice of rescission, claim and lien,  Barbara J. Skanes, 4913
         Mildred Avenue SE, Grand Rapids, MI 49508,  loan of April 1,
         2004

Ladies/Gentlemen:

        The above client hereby gives notice that she rescinds the above loan for
noncompliance with the Truth in Lending Act.

        Please be further advised that we have been retained by the above client to file suit
against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

        If you claim that the owner of the loan is other than one of the companies named,
please identify the owner pursuant to 15 U.S.C. §1641(d).

        Finally, please provide an account history so that we may compute the appropriate
amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: client

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on July 12, 2006.

_____
Daniel A. Edelman