**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID JOHN DUCHENE,<br><br>Plaintiff,<br><br>v.<br><br>AMERIQUEST MORTGAGE COMPANY, DEUTSCHE BANK NATIONAL TRUST COMPANY, N.A., as Trustee of AMERIQUEST MORTGAGE SECURITIES, INC., Asset Backed Pass Through Certificates, Series 2005-R11 Under the Pooling and Servicing Agreement Dated as of December 1, 2005, Without Recourse; AMC MORTGAGE SERVICES, INC., AMERICAN HOME MORTGAGE SERVICING, INC., REAL ESTATE EXPERTS AND APPRAISERS , INC., and DOES 1-5,<br><br>Defendants. | ) | Case No. 06 C 6750<br><br>(Originally Case No. 06 C 13778 (E.D. Mich.))<br><br>(Transferred to Judge Aspen for pretrial proceedings under MDL #1715, Lead Case No. 05 C 7097)<br><br>**DEMAND FOR JURY TRIAL** |

**THIRD AMENDED COMPLAINT**

**INTRODUCTION**

1. Plaintiff David John Duchene brings this action against a "subprime" mortgage lender and its affiliates to rescind a mortgage and to recover damages for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226 and state laws.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question) and 1337 (interstate commerce) and 15 U.S.C. §1640 (TILA).

Defendants transact business in the District and are deemed to reside here.

**PARTIES**

3. Plaintiff David John Duchene owns and resides in a home at 17066 Arlington Avenue, Allen Park, MI 48101.

4. Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Michigan. Its registered agent and office are National Registered Agents, Inc., 712 Abbott Road, East Lansing, MI 48823.

5. Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

6. Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

7. Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

8. Defendant Ameriquest Mortgage Company offers "federally related mortgage loans" as defined in RESPA.

9. Defendant Ameriquest Mortgage Company is a "registrant" as defined in the Michigan Mortgage Brokers, Lenders, and Servicers Licensing Act.

10. During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period. Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States. During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

11.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005.  On information and belief, it holds legal title to plaintiff's loan, as trustee.

12.     Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Michigan.  It holds legal title to loans originated by Ameriquest Mortgage Company.  It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

13.     Defendant AMC  Mortgage Services, Inc., ("AMC") is a foreign corporation which does business in Michigan.  Its registered agent and office are National Registered Agents, Inc., 712 Abbott Road, East Lansing, MI 48823.

14.     Defendant AMC Mortgage Services, Inc., an affiliate of Ameriquest Mortgage Company, services loans originated by Ameriquest Mortgage Company, and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

15.     Defendant American Home Mortgage Servicing, Inc. ("AHMSI") is a foreign corporation which does business in Illinois and Michigan.  Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.  It services some loans originated by Ameriquest Mortgage Company, including plaintiff's, and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

16.     Defendant Real Estate Experts and Appraisers, Inc., is a domestic corporation which does business in Michigan.  Its registered agent is Fanny Clay, and its

registered office address is 17589 James Couzens, Detroit, MI, 48235.

**FACTS RELATING TO PLAINTIFF**

17. During September and October 2005, Mr. Duchene received weekly unsolicited mailers from Ameriquest. The advertisements said that Mr. Duchene was "pre-approved" and represented that Mr. Duchene could consolidate his debts and lower his monthly payment by refinancing with Ameriquest.

18. Prior to October 19, 2005, Mr. Duchene responded to the repeated advertisements and applied for a refinance mortgage loan with Ameriquest Mortgage Company.

19. Mr. Duchene needed and used the loan for personal, family or household purposes, namely, refinancing and consolidating his GMAC mortgage and two equity loans.

20. Ameriquest's agent, Raymond, ("Raymond") confirmed that Mr. Duchene could lower his monthly payment by refinancing with Ameriquest. However, after refinancing with Ameriquest, Mr. Duchene's monthly payment jumped from $1053.00 (tax and insurance escrow payment included) to $1201.00 (taxes and insurance not included).

21. Raymond also told Mr. Duchene that he qualified for a fixed-rate mortgage loan.

22. Immediately prior to the closing, plaintiff was informed that the loan terms were being altered to his detriment, as set forth on Exhibit A. Specifically, the interest rate had been increased from 7.25% to 8.99%, and the loan was an adjustable rate loan, rather than the fixed-rate loan that Raymond had promised.

23. Before closing, Mr. Duchene said to Raymond, "I wanted a fixed rate! This is not a fixed rate." Raymond reassured him, "This 8% *is fixed*, for two years. You don't

need to worry about the penalty. Just call me back in two years, so we can refinance you at a better rate. That's when this will be a better deal." Mr. Duchene was skeptical and he said, "Are you sure I can do this? I have never heard of this." Ameriquest's agent kept pushing, "Yes, this is a *fixed*-variable, and we'll refinance you before the two years are up."

24. Ameriquest used these sales tactics to deceive Mr. Duchene and give him the impression that his adjustable rate loan would function as a fixed-rate loan. Relying on Ameriquest's representations, Mr. Duchene thought he was signing up for a two-year fixed-rate mortgage that he would refinance before the loan "became" adjustable.

25. It was the policy and practice of Ameriquest to engage in "bait and switch" loan solicitation practices, whereas one set of terms was initially quoted after Ameriquest had obtained sufficient information to provide an accurate quote, and then more onerous terms (such as a higher interest rate and an adjustable rate loan) were imposed immediately before closing.

26. This "bait and switch" policy violates the Michigan Consumer Mortgage Protection Act, M.C.L.S. §445.1634(3) which provides:

> **A person, appraiser, or real estate agent shall not make, directly or indirectly, any false, deceptive, or misleading statement or representation in connection with a mortgage loan . . .**

27. Further, M.C.L.S. §445.1634(5) provides:

> **A statement or representation is deceptive or misleading if it has the capacity to deceive or mislead a borrower or potential borrower.**

28. Prior to October 19, 2005, Ameriquest arranged for an appraisal of Mr. Duchene's house and property.

29. The purported appraiser arrived at Mr. Duchene's house and took a few

pictures of the outside of the house. She did not speak to Mr. Duchene or ask to inspect the inside of the house. On information and belief, this person was Nicole Davis.

30.     Mr. Duchene then called Raymond to receive the results of the appraisal. Raymond confirmed that the appraisal had been conducted, but stated that "the appraisal was not agreeable to Ameriquest." Raymond then reassured Mr. Duchene that he could arrange for another appraisal that would work for Ameriquest.

31.     Several weeks later, at 7:30 P.M., a young man arrived at Mr. Duchene's home, claiming to be an appraiser hired by Raymond. He inspected the house and assured Mr. Duchene, "Don't worry. You're going to get your mortgage."

32.     Concerned as to why the first appraisal would reach different results than the second appraisal, Mr. Duchene called Raymond. Raymond urged, "Don't worry; you'll only need to pay for the first appraisal. I will pay for the second appraisal. This is what a good agent I am. I'm going to make sure you get your mortgage." Duchene then requested the results of the appraisals, but Raymond claimed that the figures were not yet available.

33.     The loan was closed on October 19, 2005.

34.     Mr. Duchene had a right to receive a copy of the appraisal report. Indeed, at closing, Ameriquest gave him a written disclosure so stating. See Exhibit I.

35.     At the closing, Mr. Duchene again requested the results of the appraisal. The notary said that Raymond would bring the results of the appraisal with the packet containing Duchene's closing documents at the end of the closing. After Mr. Duchene had signed Ameriquest's closing documents, Raymond gave Mr. Duchene his copies of the closing documents.

36.     After returning home, Mr. Duchene realized that the results of the appraisal were not in the packet of closing documents as he had been told. Mr. Duchene again called Raymond to request the appraisal results. Raymond said that it must have been an oversight and that he would send the appraisal in the mail. Mr. Duchene never received the appraisal, and he has not been able to reach Raymond.

37.     In April 2006, an AMC agent called Mr. Duchene and said that he should consider refinancing. Mr. Duchene responded that he thought he would need to wait at least a year to refinance, because he had paid so little of the principal. The AMC agent continued, "I don't see a problem; your house appraised for $166,000 so you have some flexibility." That was the first time that Mr. Duchene received the results of the appraisal that Ameriquest had arranged. He was shocked to hear that the house had appraised for that much and asked the AMC agent to verify the number. At this point, the agent got uncomfortable and said, "That's the figure in front of me." When pressed, the AMC agent said, "I don't have time to go over these numbers with you right now, but I will call you back." The AMC agent did not return Mr. Duchene's call.

38.     The typed, pre-printed loan application Ameriquest prepared for Mr. Duchene's closing states that his real property is worth $175,000! See p.2 of Exhibit J.

39.     On information and belief, the appraised value of Mr. Duchene's home was significantly and artificially inflated. A copy of the appraisal report, which Mr. Duchene did not receive from AMC Mortgage Services, Inc., until after June 27, 2006, is attached as Exhibit K.

40.     The appraisal report indicates it was prepared by Nicole Davis, an employee of Real Estate Experts and Appraisers, Inc. The same individual and company are

identified with fraudulent overappraisals in at least two other lawsuits involving Ameriquest. See, e.g., Chaumley, et al., v. Ameriquest Mortgage Company, et al.

41. In an attempt to support the overappraisal, the report states that Mr. Duchene's home is 1,200 square feet. See p. 2 of Exhibit K. In fact, it is only 997 square feet. In addition, the "comparables" selected by the appraiser are from a much newer, more affluent neighborhood nearby. Id., p. 3.

42. This was done for the purpose of increasing the loan amount that Mr. Duchene qualified for, which in turn increased the broker's commission and the lender's points and fees, interest and profits.

43. Due to the inflated appraisal, Mr. Duchene's loan-to-value ratio exceeds the acceptable underwriting ratios of reputable mortgage lenders. Consequently, he may be unable to refinance with another lender.

44. The over-appraised value, combined with the adjustable rate feature of the loan, both of which Ameriquest achieved through deception, have trapped Mr. Duchene in a loan with an ever-increasing interest rate that he soon will be unable to afford.

45. Ameriquest is aware that its appraisal is inflated. When it finally sent Mr. Duchene a copy of his appraisal report on June 27, 2006, it enclosed a cover letter restricting the use of the appraisal in an attempt to scare Mr. Duchene and chill him from taking legal action. A copy of the cover letter is attached hereto as Exhibit L.

46. This practice violates the Consumer Mortgage Protection Act, M.C.L.S. §445.1634(3) which provides:

> **A person, appraiser, or real estate agent shall not make, directly or**

**indirectly, any false, deceptive, or misleading statement or representation in connection with a mortgage loan including, but not limited to, the borrower's ability to qualify for a mortgage loan or the value of the dwelling that will secure repayment of the mortgage loan.**

47. The following are documents relating to the loan:

a. A mortgage, Exhibit B;

b. A Truth in Lending statement, Exhibit C;

c. A list of "items to be paid off from loan proceeds," Exhibit D;

d. "Itemization of settlement charges," Exhibit E;

e. The three-day notice of right to cancel required by the Federal Reserve Board, Exhibit F;

f. A purported "one week" notice of right to cancel used solely by Ameriquest and related companies, Exhibit G.

48. Ameriquest failed to provide a settlement statement to Mr. Duchene at closing, in violation of RESPA, 12 U.S.C. §2603 and Regulation X §3500.8.

49. Ameriquest failed to provide a copy to Mr. Duchene of the Adjustable Rate Note that he signed at closing.

50. Furthermore, Ameriquest charged plaintiff a loan discount fee of $1,494. Exhibit E, line 802. Ameriquest also provided plaintiff with a document representing that the payment of a "loan discount fee" would reduce plaintiff's interest rate. Exhibit M.

51. However, plaintiff received no discount. On the contrary, Ameriquest increased plaintiff's rate just before the closing. Exhibit A.

52. Additionally, plaintiff was charged $350.00 in notary fees. Exhibit E, line

1106.

53. Mr. Duchene was later directed to make payments to AMC Mortgage Services, Inc., and then later to Citi Residential Lending, Inc. Subsequently, in 2009, Mr. Duchene was directed to make payments to American Home Mortgage Servicing, Inc.

54. On information and belief, Deutsche Bank National Trust Company, N.A. holds legal title to plaintiff's loan, as Trustee. Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiff's loan under Asset Backed Pass Through Certificates, Series 2005-R11 Under the Pooling and Servicing Agreement Dated as of December 1, 2005, Without Recourse.

55. In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiff's loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

56. In the event Ameriquest hired an outside person and/or company to perform the appraisal, that entity or entities are named as Does 1-5.

57. Defendants Ameriquest and AMC Mortgage Services, Inc., have a pattern and practice of retaliating against its customers who exercise their rights under federal credit protection statutes by filing, in order to assert their rights in good faith, a lawsuit against Ameriquest and its affiliates.

58. Once a customer files suit, his/her account is "flagged," access to his or her on-line account is blocked, and he or she can no longer make payments via on line.

59. Next, when the customer calls AMC to inquire, they are no longer permitted to deal with a customer representative; they are informed that they must deal with the

president's office, and their call is routed to the same. Similarly, if they discover on-line that their account has been frozen, they are directed to call the President's office. Customers then have a very difficult time getting through to anyone at the president's office. Each time they call to inquire about their account or to make a payment, it takes between 15-60 minutes to get someone on the line. Often, their call is dropped before they reach anyone but after they have waited for several minutes, and they have no choice but to call back and start the waiting period over.

60. Before filing suit, plaintiff made his monthly payments on line. After filing suit, Ameriquest and/or AMC froze his access to his on-line account, and an on-line message and various customer representatives with AMC directed him to call the President's office.

61. Since the time plaintiff filed suit, plaintiff's on-line access to his account has been frozen. From September 2006 until January 2007, Ameriquest and AMC only permitted plaintiff to make his payments via "check-by-phone," for which an Ameriquest employee specifically told plaintiff they would waive the extra fee.

62. In order to make a payment, plaintiff had to call the President's office at Ameriquest and wait several minutes before a representative will speak with him. On information and belief, these phone calls are recorded.

63. In February 2007, a female Ameriquest employee called plaintiff and instructed him to begin paying by check through the mail. At this time, plaintiff asked why he couldn't make his payments online anymore. The Ameriquest employee replied that plaintiff's online account would remain frozen "until the litigation is settled."

64. All such servicing problems are the direct result of plaintiffs having filed suit against defendants. Customers who do not file lawsuits do not experience these types of problems at all, to the same extent or with the same degree of regularity.

## COUNT I – TRUTH IN LENDING ACT

65. Plaintiff incorporates ¶¶ 1-64. This claim is against all defendants except for Real Estate Experts and Appraisers, Inc.

66. Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

**(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f)**

**of the Act. [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) Exempt transactions. The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

**GROUNDS FOR RESCISSION**

67. In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiff's right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the reasons stated below.

68. Ameriquest Mortgage Company failed to provide the required disclosures

of the plaintiff's right to cancel in that none of the federal notices of right to cancel are completed. See Exhibit F.

69. The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

70. Furthermore, the "one week" cancellation notice is misleading, as the period given is actually only six days long.

71. Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

72. Notice of rescission has been given to defendants. A copy is attached as Exhibit H.

73. The loan has not been rescinded.

74. Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

75. 15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiff and against defendants for:

a. A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b. Statutory damages for the underlying disclosure violation;

c. If appropriate, statutory damages for failure to rescind;

d. Attorney's fees, litigation expenses and costs.

e. Such other or further relief as the Court deems appropriate.

**COUNT II – MORTGAGE BROKERS, LENDERS, AND SERVICERS LICENSING ACT**

76. Plaintiff incorporates ¶¶ 1–64. This claim is against Ameriquest and Real Estate Experts and Appraisers, Inc.

77. Defendants engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b) by inflating the appraised value of Mr. Duchene's house and misrepresenting Mr. Duchene's ability to qualify for the loan.

78. Mr. Duchene was induced to transact with Ameriquest by means of this misrepresentation.

79. Defendants made the representation in the course of trade and commerce.

80. Defendants made the representation for the purpose of inducing reliance, in the form of Mr. Duchene borrowing a higher principal.

81. Mr. Duchene was injured by the fraudulent overappraisal. His options for refinancing with reputable mortgage companies have been severely limited by defendants' actions. Ameriquest has effectively trapped Mr. Duchene in his current adjustable-rate mortgage.

WHEREFORE, the Court should enter judgment in favor of plaintiff and against Ameriquest and Real Estate Experts and Appraisers, Inc., for:

a. A declaratory judgment, MCL §445.1681(1)(a);

b. Injunctive relief, MCL §445.1681(1)(b);

c. Appropriate damages, MCL §445.1681(1)(c);

d. Attorney's fees, litigation expenses and costs of suit;

e. Such other and further relief as the Court deems proper.

**COUNT III – COMMON LAW FRAUD**

82. Plaintiff incorporates ¶¶ 1–64. This claim is against Ameriquest and Real Estate Experts and Appraisers, Inc.

83. Defendants represented that Mr. Duchene's house was worth $166,000 and that Mr. Duchene therefore qualified for a $149,400 loan.

84. These representations were false.

85. Defendants made these representations with knowledge that they were false, or made them recklessly, without any knowledge of their truth and as positive assertions.

86. Defendants made these representations with the intention that they should be acted upon by Mr. Duchene.

87. Mr. Duchene borrowed $149,400 from Ameriquest, in reliance on Ameriquest's representations that Mr. Duchene qualified for the loan, based on his home's appraisal.

88. Mr. Duchene has suffered an injury as a result of defendants' misrepresentations. His options for refinancing with reputable mortgage companies have been

severely limited by defendants' actions. Ameriquest has effectively trapped Mr. Duchene in his current adjustable-rate mortgage.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendant Ameriquest for:

a. Actual and compensatory damages;

b. Punitive damages; and

c. Such other or further relief as the Court deems appropriate.

**COUNT IV – DAMAGES RESULTING FROM CIVIL CONSPIRACY**

89. Plaintiff incorporates ¶¶ 1–64. This claim is against Ameriquest and Real Estate Experts and Appraisers, Inc.

90. Ameriquest and its appraiser took concerted action to produce a fraudulent, inflated appraisal for Mr. Duchene's home.

91. As a result of this conspiracy, Mr. Duchene has suffered damages. His options for refinancing with reputable mortgage companies have been severely limited by Ameriquest's actions. Ameriquest has effectively trapped Mr. Duchene in his current mortgage.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a. Actual damages;

b. Incidental, consequential and special damages;

c. Costs of litigation and expenses; and

d. Such other or further relief as this Court deems appropriate.

**COUNT V – MORTGAGE BROKERS, LENDERS, AND SERVICERS LICENSING ACT**

92. Plaintiff incorporates ¶¶ 1–64. This claim is against Ameriquest.

93. Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b) by (a) representing to Mr. Duchene that refinancing with Ameriquest would result in a lower monthly payment; (b) misleading Mr. Duchene about the nature of an adjustable-rate mortgage; and (c) promising that Mr. Duchene would be able to refinance before his interest rate and monthly payments increased.

94. Mr. Duchene was induced to transact with Ameriquest by means of these misrepresentations.

95. Defendant Ameriquest made the representations in the course of trade and commerce.

96. Defendant Ameriquest made the representations for the purpose of inducing reliance, in the form of Mr. Duchene agreeing to an adjustable-rate mortgage with Ameriquest.

97. Mr. Duchene was injured by Ameriquest's misrepresentations. His monthly payment has increased from $1053.00 (tax and insurance escrow payment included) to $1201.00 (taxes and insurance not included.) His payments will increase to $1347.90 on December 1, 2007. His options for refinancing are limited because of Ameriquest's overappraisal.

WHEREFORE, the Court should enter judgment in favor of plaintiff and against Ameriquest for:

  a. A declaratory judgment, MCL §445.1681(1)(a);

b. Injunctive relief, MCL §445.1681(1)(b);

c. Appropriate damages, MCL §445.1681(1)(c);

d. Attorney's fees, litigation expenses and costs of suit;

e. Such other and further relief as the Court deems proper.

**COUNT VI – BREACH OF CONTRACT**

98. Plaintiff incorporates ¶¶ 1-64.

99. This claim is against Ameriquest only.

100. Defendant Ameriquest contracted and undertook to provide a discounted interest rate if plaintiff paid a loan discount fee. Exhibit M.

101. Plaintiff paid the fee but did not receive a discounted rate. Exhibt E Line 802 and Exhibit A.

102. Ameriquest thereby breached its agreement.

103. Plaintiff was thereby damaged.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiff and against defendant for:

a. Appropriate damages;

b. Costs.

c. Such other or further relief as the Court deems appropriate.

**COUNT VII – MICHIGAN MORTGAGE BROKERS, LENDERS AND SERVICERS LENDING ACT**

104. Plaintiffs incorporates ¶¶ 1-64.

105. This claim is against Ameriquest.

106. Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by (A) representing that the retention from the loan proceeds of a "loan discount" would result in a reduction of the interest rate (Exhibit M) and then (b) not reducing the interest rate (Exhibt E Line 802 and Exhibit A).

107. Plaintiff was induced to acquiesce in the deduction from the loan proceeds of the loan discount by means of this misrepresentation.

108. Defendant Ameriquest made the representation in the course of trade and commerce.

109. Defendant Ameriquest made the representation for the purpose of inducing reliance, in the form of entering into the loan and Ameriquest's retention from the loan proceeds of "loan discount."

WHEREFORE, the Court should enter judgment in favor of plaintiff and against defendant for:

a. A declaratory judgment, MCL §445.1681(1)(a);

b. Injunctive relief, MCL §445.1681(1)(b);

c. Appropriate damages, MCL §445.1681(1)(c);

d. Attorney's fees, litigation expenses and costs of suit;

e. Such other and further relief as the Court deems proper.

**COUNT VIII - ECOA**

110. Plaintiff incorporates ¶¶ 1-64 above. This claim is against defendants AMC and Ameriquest.

111. Plaintiff was an applicant within the meaning of 15 U.S.C. §1691a(b) and Regulation B (which defines "applicant" to include persons who have received credit).

112. By filing this lawsuit in good faith pursuant to the Consumer Credit Protection Act, plaintiff was and is engaged in a statutorily protected activity.

113. As a result of filing this lawsuit, plaintiff has suffered and continue to suffer adverse actions at the hands of defendants. Ameriquest and AMC have, in ways detailed above and in other ways, taken retaliatory action against this and other plaintiffs and their accounts. These actions constitute "an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. § 202.2 (c)(1)(ii).

114. A direct causal connection exists between plaintiff's filing suit and defendants' subsequent treatment of his account, as detailed above.

115. Plaintiff was current on his accounts at the time that defendants began their adverse actions.

116. As a result of defendants' conduct, plaintiff is entitled to recover actual damages as well as statutory damages, punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. Actual and statutory and punitive damages according to proof;

b Reasonable attorneys' fees and costs;

c. Injunctive relief, if the practices complained of have not ceased or

do not cease immediately; and

d. Such other and further relief the court deems proper and just.

**COUNT IX – MORTGAGE BROKERS, LENDERS, AND SERVICERS LICENSING ACT**

117. Plaintiff incorporates ¶¶ 1–64. This claim is against Ameriquest.

118. Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b) by charging a notary fee of $350, Exhibit E, line 1106. This violates MCL §55.285, which provides:

> **The fee charged by a notary public for performing a notarial act shall not be more than $10.00 for any individual transaction or notarial act. A notary public shall either conspicuously display a sign or expressly advise a person concerning the fee amount to be charged for a notarial act before the notary public performs the act. Before the notary public commences to travel in order to perform a notarial act, the notary public and client may agree concerning a separate travel fee to be charged by the notary public for traveling to perform then notarial act.**

119. Ameriquest engaged in deceit by charging plaintiff an excessive notary fee.

WHEREFORE, the Court should enter judgment in favor of plaintiff and against Ameriquest for:

a. A declaratory judgment, MCL §445.1681(1)(a);

b. Injunctive relief, MCL §445.1681(1)(b);

c. Appropriate damages, MCL §445.1681(1)(c);

d. Attorney's fees, litigation expenses and costs of suit; and

e. Such other and further relief as the Court deems proper.

s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury.

s/ Daniel A. Edelman
Daniel A. Edelman

**CERTIFICATE OF SERVICE**

I, Daniel A. Edelman, hereby certify that on June 10, 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that true and correct copies were additionally sent via email or by U.S. Mail to those parties without email addresses.

Bernard E. LeSage
blesage@buchalter.com

Robert M. Horwitz
Andrew J. Kolozsvary
Dykema Gossett
400 Renaissance Center
Detroit, MI 48243

Real Estate Experts and Appraisers, Inc.
c/o Registered Agent
Fanny Clay
17589 James Couzens
Detroit, MI 48235

American Home Mortgage Servicing, Inc.
c/o Registered Agent
C.T. Corporation System
208 S. LaSalle
Suite 814
Chicago, IL 60604

s/ Daniel A. Edelman
Daniel A. Edelman

# EXHIBIT A

riquest Mortgage Company
e Parklane Blvd., Suite 1001 West
:born, MI 48126

:)279-9661

# BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

'id John Duchene

Date: October 19, 2005

Notice: [X] Delivered [ ] Mailed

Loan Number: 0135511566 - 5566

Description of Credit Request:

066 Arlington Ave.
en Park,MI 48101

[X] 1st Trust Deed/Mortgage [ ] 2nd Trust Deed/Mortgage

[ ] Other:

operty Address: 17066 Arlington Ave.
Allen Park, MI 48101 County of WAYNE

YPE OF TRANSACTION:

[ ] Purchase [X] Refinance Other

## ORIGINAL LOAN TERMS REQUESTED

[ ] Fixed Rate Loan [X] Adjustable Rate Loan

Amount Financed: $ 140,208.36

Settlement Charges: $ 8,130.64
(Includes all Prepaid Finance Charges)

Loan Amount: $ 147,239.00

Annual Percentage Rate: 10.100 %

m: 360

Initial Interest Rate: 7.250 %

Margin: 6.000 %

Prepayment Penalty: [X] YES [ ] NO

## FINAL LOAN TERMS:

[ ] Fixed Rate Loan [X] Adjustable Rate Loan

Amount Financed: $ 145,710.20 *

Settlement Charges: $ 4,656.80 *
(Includes all Prepaid Finance Charges)

Loan Amount: $ 149,400.00

Annual Percentage Rate: 10.354 %*

Term: 360

Initial Interest Rate: 8.990 %

Margin: 6.000 %

Prepayment Penalty: [X] YES [ ] NO

Borrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based exclusively on information, statements, and representations (all material facts) which have been provided by the borrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change prior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. Borrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may require new loan documents to be executed by the borrower(s).

Borrower David John Duchene Date

Borrower Date

Borrower Date

Borrower Date

*These amounts may change due to any final adjustments made to the prepaid interest amount collected on your loan at funding.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any rights under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the: FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY, ROOM 4037, WASHINGTON DC, 20580.

000001355115660404650101

STMTCO (Rev. 3/99)

# EXHIBIT B

# MORTGAGE

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated October 19, 2005 , together with all Riders to this document.

(B) **"Borrower"** is David John Duchene, A Single Man

Borrower's address is 17066 Arlington Ave., Allen Park,MI 48101 . Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3023 1/01
0135511566-5566
10/18/2005 3:45:25
AM6MI (0401)
Page 1 of 16 Initials:______
VMP Mortgage Solutions, Inc. (800)521-7291
0000013551156603013417O1

**(C) "Lender"** is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200 Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated October 19, 2005
The Note states that Borrower owes Lender one hundred forty-nine thousand four hundred and 00/100 Dollars
(U.S. $ 149,400.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 1, 2035 .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [X] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] VA Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County [Type of Recording Jurisdiction] of WAYNE [Name of Recording Jurisdiction]:

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 30004020631000 which currently has the address of 17066 Arlington Ave. [Street] Allen Park [City], Michigan 48101 [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials:________

0135511566 - 5566

10/18/2005 3:45:25

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward

Initials:________

0135511566-5566

10/18/2005 3:45:25

the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.



In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

00000135511566030134171O

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:__________

0135511566-5566

10/18/2005 3:45:25

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,



0135511566-5566



10/18/2005 3:45:25

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous

Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________________________ (Seal)
-Borrower
David John Duchene

_______________________________

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

0135511566 - 5566

10/18/2005 3:45:25

STATE OF MICHIGAN, County ss:

Acknowledged before me in ______________________ County, Michigan, on ______________________ by
Day/Month/Year

______________________

______________________

______________________

______________________
Notary Public, State of Michgan,
County of
My Commission Expires
Acting in the County of

This instrument was prepared By:
Ameriquest Mortgage Company
Deborah Osborn
Three Parklane Blvd., Suite 1001 West,Dearborn, MI 48126

BORROWER NAME:

LOAN NUMBER: 0135511566 - 5566

# LEGAL DESCRIPTION

00000135511566030134171 7

# ADJUSTABLE RATE RIDER

## (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 19th day of October , 2005 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

17066 Arlington Ave., Allen Park, MI 48101
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **8.990 %**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The interest rate I will pay may change on the first day of November, 2007 , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

Initials_______________

Loan Number: 0135511566 - 5566

000001355115660302150301

10/18/2005 3:45:25 PM

610-1 (Rev 1/01)

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six** percentage points ( **6.000** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.990%** **or less than 8.990%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %)** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.990)% or less than 8.990)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_______________

Loan Number: 0135511566 - 5566

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_______________________ (Seal) _______________________ (Seal)
Borrower David John Duchene — Borrower

_______________________ (Seal) _______________________ (Seal)
Borrower — Borrower

Loan Number: 0135511566 - 5566

00000135511566030215030

10/18/2005 3:45:25 PM

610-3 (Rev 1/01)

# EXHIBIT C

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary [X] Final

..Ameriquest Mortgage Company
Three Parklane Blvd., Suite 1001 West
Dearborn, MI 48126
(888)279-9661

Broker License:

rowers: David John Duchene

Type of Loan: ADJUSTABLE RATE
Date: October 19, 2005

ldress: 17066 Arlington Ave.
ty/State/Zip: Allen Park, MI 48101

Loan Number: 0135511566 - 5566

operty: 17066 Arlington Ave., Allen Park, MI 48101

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| ne cost of your credit as a yearly ate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.354 % | $ 335,997.81 | $ 145,710.20 | $ 481,708.01 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,201.04 | 12/01/2005 | | | |
| 335 | $1,347.90 | 12/01/2007 | | | |
| 1 | $1,336.55 | 11/01/2035 | | | |

VARIABLE RATE FEATURE:
[X] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

ECURITY: You are giving a security interest in the property located at: 17066 Arlington Ave., Allen Park, MI 48101

SSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original terms. [ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

ROPERTY INSURANCE: You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

ATE CHARGES: If a payment is late, you will be charged 5.000% of the overdue payment.

PREPAYMENT: If you pay off your loan early, you [X] may [ ] will not have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower David John Duchene Date

Borrower Date

Borrower Date

Borrower Date

L1 (Rev. 7/01) 000001355115660305750101

ORIGINAL COPY

10/18/2005 3:45:25 PM

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary [X] Final

Ameriquest Mortgage Company
Three Parklane Blvd., Suite 1001 West
Dearborn, MI 48126
(888)279-9661

Broker License:

ɔwers:David John Duchene

Type of Loan: ADJUSTABLE RATE
Date: October 19, 2005

ɪress: 17066 Arlington Ave.
//State/Zip: Allen Park,MI 48101

Loan Number: 0135511566 - 5566

ɔperty: 17066 Arlington Ave., Allen Park, MI 48101

| ANNUAL ERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| ɜ cost of your credit as a yearly ɘ. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.354 % | $ 335,997.81 | $ 145,710.20 | $ 481,708.01 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,201.04 | 12/01/2005 | | | |
| 335 | $1,347.90 | 12/01/2007 | | | |
| 1 | $1,336.55 | 11/01/2035 | | | |

VARIABLE RATE FEATURE:
[X] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

ƎCURITY: You are giving a security interest in the property located at: 17066 Arlington Ave., Allen Park, MI 48101

ƧSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original terms. [ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

ꓤOPERTY INSURANCE: You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

ATE CHARGES: If a payment is late, you will be charged 5.000% of the overdue payment.

PREPAYMENT: If you pay off your loan early, you [X] may [ ] will not have to pay a penalty.

ʖee your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

We hereby acknowledge reading and receiving a complete copy of this disclosure.

orrowerDavid John Duchene Date

Borrower Date

_rower Date

Borrower Date

.1 (Rev. 7/01) 000001355115660305750101

BORROWER COPY

10/18/2005 3:45:25 PM

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary [X] Final

L ... Ameriquest Mortgage Company
Three Parklane Blvd., Suite 1001 West
Dearborn, MI 48126
(888)279-9661

Broker License:

owers: David John Duchene

Type of Loan: ADJUSTABLE RATE
Date: October 19, 2005

dress: 17066 Arlington Ave.
y/State/Zip: Allen Park,MI 48101

Loan Number: 0135511566 - 5566

operty: 17066 Arlington Ave., Allen Park, MI 48101

| ANNUAL ERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| e cost of your credit as a yearly te. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.354 % | $ 335,997.81 | $ 145,710.20 | $ 481,708.01 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,201.04 | 12/01/2005 | | | |
| 335 | $1,347.90 | 12/01/2007 | | | |
| 1 | $1,336.55 | 11/01/2035 | | | |

VARIABLE RATE FEATURE:
[X] Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

ECURITY: You are giving a security interest in the property located at: 17066 Arlington Ave., Allen Park, MI 48101

SSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

ROPERTY INSURANCE: You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

ATE CHARGES: If a payment is late, you will be charged 5.000% of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower David John Duchene Date

Borrower Date

Borrower Date

Borrower Date

IL1 (Rev. 7/01) 000001355115660305750101

BORROWER COPY

10/18/2005 3:50:51 PM

# EXHIBIT D

## EMS TO BE PAID OFF FROM LOAN PROCEEDS

David John Duchene

in Number : 0135511566 - 5566

| Payee | | Amount |
|---|---|---|
| GMAC MORTGAGE CORP | (W) | $126,129.77 |
| HFC - USA | (W) | $8,245.10 |
| CHARTER ONE NA | (W) | $10,242.47 |

Total Wire: $146,060.20

Loan Amount: 149,400.00

Deposit at Escrow/Title: $0.00

Funds Held By Lender: —

Borrower Proceeds: (W)$125.86

(W) = Included in Wire

**IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.**

Title Company Representative Signature Date

395-7UNV (4/2005)

000001355115660307430707

## E... TO BE PAID OFF FROM LOAN PROCEEDS

o . David John Duchene

n Number : 0135511566 - 5566

| Payee | | Amount |
|---|---|---|
| GMAC MORTGAGE CORP | (W) | $126,129.77 |
| HFC - USA | (W) | $8,245.10 |
| CHARTER ONE NA | (W) | $10,242.47 |

Total Wire: $146,060.20

Loan Amount: 149,400.00

Deposit at Escrow/Title: $0.00

Funds Held By Lender: —

Borrower Proceeds: (W)$125.86

(W) = Included in Wire

**IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.**

Title Company Representative Signature Date

195-7UNV (4/2005)



00001355115660307430707

# EXHIBIT E

# CLOSING INSTRUCTIONS
## ITEMIZATION OF SETTLEMENT CHARGES

| Title Company/Attorney | Title Officer/Attorney | Phone Number | Order Number |
|---|---|---|---|
| NORTHWEST TITLE 7 | BRIAN SCHNEIDER | (810)534-5300 | 716711 |

...hn Duchene

Property Address: 17066 Arlington Ave. Allen Park MI 48101

Loan Number: 0135511566

FROM: Ameriquest Mortgage Company - Dearborn, MI (Branch Name) Phone No. (888)279-9661 (Branch Phone No.) Fax (313)253-1069 (Branch Fax Number)

BELOW IS A LIST OF ALL SETTLEMENT CHARGES AND DISBURSEMENTS APPLICABLE TO THIS LOAN. YOU MUST USE THESE FIGURES TO PREPARE YOUR SETTLEMENT STATEMENT. YOU CANNOT DEVIATE FROM THESE FIGURES WITHOUT PRIOR WRITTEN AUTHORIZATION FROM VICE PRESIDENT OF LOAN OPERATIONS AND/OR ITS DIRECTORS.

IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.

| LINE NO. ON SETTLEMENT STATEMENT | PAYEE | | AMOUNT |
|---|---|---|---|
| 801. Loan origination fee % to | | | $1,494.00 |
| 802. Loan discount 1.000 % to | Ameriquest Mortgage Company | | $400.00 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | | | |
| 804. Credit Report fee | | | |
| 805. Inspection fee | | | |
| 808. Yield Spread Premium to | | | |
| 809. | | | |
| 810. Tax Related Service Fee to | | | |
| 811. Flood Search Fee to | | | |
| 812. Lenders Processing Fee to | Ameriquest Mortgage | | $626.00 |
| 813. Admin to | Ameriquest Mortgage Company | | $239.00 |
| 814. Doc. Prep. Fee to | | | |
| 815. Credit Report Fee to | | | |
| 816. Origination Fee % to | | | $360.00 |
| 817. Application Fee to | Ameriquest Mortgage Company | | |
| 818. Underwriting Fee to | | | |
| 819. Service Provider Fee to | | | |
| 820. Processing Fee to | | | |
| 821. Underwriting Fee to | | | |
| 822. Appraisal Fee to | | | |
| 901. Interest from 10/26/2005 to 11/01/2005 @ $36.80 per day | | | $220.80 |
| 902. Mortgage insurance premium for months to | | | |
| 903. Hazard ins prem to | | | |
| 904. Flood ins prem to | | | |
| 1001. Hazard insurance months @ $ per month | | | |
| 1002. Mortgage insurance months @ $ per month | | | |
| 1003. Earthquake ins months @ $ per month | | | |
| 1004. County prop. taxes months @ $ per month | | | |
| 1005. Annual assess. months @ $ per month | | | |
| 1006. Flood months @ $ per month | | | |
| 1007. Windstorm ins months @ $ per month | | | |
| 1008. | | | |
| 1101. Settlement or closing fee to | NORTHWEST TITLE 7 | (W) | $100.00 |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | NOTARY SERVICES | (W) | $350.00 |
| 1107. Attorney's fees to | | | |
| 1108. Title insurance to | NORTHWEST TITLE 7 | (W) | $482.00 |
| 1109. Lender's coverage | | | |
| 1110. Owner's coverage $ | | | |
| 1111. Settlement/Disbursement fee to | NORTHWEST | (W) | $250.00 |
| 1112. Escrow Fee to | | (W) | $85.00 |
| 1201. Recording fees | | | |
| 1202. City/county tax/stamps | | | |
| 1203. State tax/ stamps | | | |
| 1204. State specific fee | | | |
| 1301. Demand to | | | |
| 1302. Pest inspection to | | | |
| 1303. Survey Fee | | | |
| 1304. Staff Appraiser Fee | | | |
| 1305. Reconveyance Fee to | | | |
| 1306. | | | |
| 1307. Property Val Fee to | | | |
| 1308. Courier Fee | | (W) | $50.00 |

*Any amounts appearing on these lines are prepaid finance charges and cannot be increased or added once loan documents have been prepared unless new loan documents are generated.

0000013551156603074307 06

Title Company Representative Signature ____________ Date

# EXHIBIT F

# NOTICE OF RIGHT TO CANCEL

DATE: October 19, 2005
LOAN NO.: 0135511566 - 5566
TYPE: ADJUSTABLE RATE

ER: Ameriquest Mortgage Company

ROWER(S): David John Duchene

RESS: 17066 Arlington Ave.
/STATE/ZIP: Allen Park,MI 48101

PERTY: 17066 Arlington Ave.
Allen Park, MI 48101

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal t under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the wing events occurs last:

1. The date of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
|---|
| ______________ |

;

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we ceive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your me has been cancelled, and we must return to you any money or property you have given to us or anyone else in nnection with this transaction.

ou may keep any money or property we have given you until we have done the things mentioned above, but you must en offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its easonable value. You may offer to return the property at your home or at the location of the property. Money must be eturned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your ffer. you may keep it without further obligation.

## W TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN: FUNDING
PHONE: (714)634-3494
FAX: (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
|---|
| ______________ |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

SIGNATURE ______________ DATE ______________

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

BORROWER/OWNER David John Duchene ______ Date

BORROWER/OWNER ______ Date

BORROWER/OWNER ______ Date

BORROWER/OWNER ______ Date

LENDER COPY

1064-NRC (Rev 11/03) 000001355115660400050101

10/18/2005 3:45:25 PM

## NOTICE OF RIGHT TO CANCEL

ER: Ameriquest Mortgage Company

DATE: October 19, 2005
LOAN NO.: 0135511566 - 5566
TYPE: ADJUSTABLE RATE

ROWER(S): David John Duchene

RESS: 17066 Arlington Ave.
/STATE/ZIP: Allen Park,MI 48101

PERTY: 17066 Arlington Ave.
Allen Park, MI 48101

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the wing events occurs last:

1. The date of the transaction, which is

ENTER DOCUMENT SIGNING DATE

__________________________ ;

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we ceive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your ime has been cancelled, and we must return to you any money or property you have given to us or anyone else in nnection with this transaction.

ou may keep any money or property we have given you until we have done the things mentioned above, but you must ien offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its easonable value. You may offer to return the property at your home or at the location of the property. Money must be eturned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your ffer you may keep it without further obligation.

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

ENTER FINAL DATE TO CANCEL

__________________________

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

______________________________ SIGNATURE

______________________________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

______________________________ Date
BORROWER/OWNER David John Duchene

______________________________ Date
BORROWER/OWNER

______________________________ Date
BORROWER/OWNER

______________________________ Date
BORROWER/OWNER

**BORROWER COPY**

1064-NRC (Rev 11/03)

000001355115660400050101

10/18/2005 3:45:25 PM

# NOTICE OF RIGHT TO CANCEL

DATE: October 19, 2005
LOAN NO.: 0135511566 - 5566
TYPE: ADJUSTABLE RATE

)ER: Ameriquest Mortgage Company

ROWER(S): David John Duchene

RESS: 17066 Arlington Ave.
'/STATE/ZIP: Allen Park,MI 48101

)PERTY: 17066 Arlington Ave.
Allen Park, MI 48101

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal t under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the )wing events occurs last:

1. The date of the transaction, which is [ENTER DOCUMENT SIGNING DATE ________ ];

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we ceive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your )me has been cancelled, and we must return to you any money or property you have given to us or anyone else in )nnection with this transaction.

ou may keep any money or property we have given you until we have done the things mentioned above, but you must ıen offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its easonable value. You may offer to return the property at your home or at the location of the property. Money must be eturned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your ffer, you may keep it without further obligation.

## V TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of [ENTER FINAL DATE TO CANCEL ________ ]

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

______________________ SIGNATURE

______________________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

______________________ Date
BORROWER/OWNER David John Duchene

______________________ Date
BORROWER/OWNER

______________________ Date
)RROWER/OWNER

______________________ Date
BORROWER/OWNER

**BORROWER COPY**

1064-NRC (Rev 11/03) 000001355115660400050101

10/18/2005 3:45:25 PM

# NOTICE OF RIGHT TO CANCEL

)ER: Ameriquest Mortgage Company

DATE: October 19, 2005
LOAN NO.: 0135511566 - 5566
TYPE: ADJUSTABLE RATE

ROWER(S): David John Duchene

RESS: 17066 Arlington Ave.
'/STATE/ZIP: Allen Park,MI 48101

)PERTY: 17066 Arlington Ave.
Allen Park, MI 48101

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal t under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the )wing events occurs last:

1. The date of the transaction, which is ENTER DOCUMENT SIGNING DATE ______________ ;

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we ceive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your )me has been cancelled, and we must return to you any money or property you have given to us or anyone else in )nnection with this transaction.

ou may keep any money or property we have given you until we have done the things mentioned above, but you must ien offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its easonable value. You may offer to return the property at your home or at the location of the property. Money must be eturned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your ffer, you may keep it without further obligation.

## H..V TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of ENTER FINAL DATE TO CANCEL ______________

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

______________________ SIGNATURE ______________________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

______________________ Date
BORROWER/OWNER David John Duchene

______________________ Date
BORROWER/OWNER

______________________ Date
?ROWER/OWNER

______________________ Date
BORROWER/OWNER

**BORROWER COPY**

1064-NRC (Rev 11/03) 000001355115660400050101

10/18/2005 3:50:51 PM

# NOTICE OF RIGHT TO CANCEL

DATE: October 19, 2005
LOAN NO.: 0135511566 - 5566
TYPE: ADJUSTABLE RATE

DER: Ameriquest Mortgage Company

ROWER(S): David John Duchene

DRESS: 17066 Arlington Ave.
Y/STATE/ZIP: Allen Park,MI 48101

OPERTY: 17066 Arlington Ave.
Allen Park, MI 48101

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal nt under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the owing events occurs last:

1. The date of the transaction, which is **ENTER DOCUMENT SIGNING DATE** ______________

   or
2. The date you received your Truth in Lending disclosures;

   or
3. The date you received this notice of your right to cancel.

you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we eceive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your ome has been cancelled, and we must return to you any money or property you have given to us or anyone else in onnection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must hen offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## W TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX: **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of **ENTER FINAL DATE TO CANCEL** ______________

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

______________________ SIGNATURE ______________ DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

BORROWER/OWNER David John Duchene ______ Date

BORROWER/OWNER ______ Date

RROWER/OWNER ______ Date

BORROWER/OWNER ______ Date

**BORROWER COPY**

1064-NRC (Rev 11/03) 000001355115660400050101

10/18/2005 3:50:51 PM

# EXHIBIT G

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0135511566 - 5566

Borrower(s): David John Duchene

Date: October 19, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

Borrower/Owner David John Duchene ____________ Date ____________

Borrower/Owner ____________ Date ____________

Borrower/Owner ____________ Date ____________

Borrower/Owner ____________ Date ____________

## REQUEST TO CANCEL

**I/We want to cancel loan #**____________.

Borrower/Owner Signature ____________ Date ____________

10/18/2005 3:45:25 PM

LENDER COPY

00001355115660404220101

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0135511566 - 5566
Borrower(s): David John Duchene
Date: October 19, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

____________________ ____________
Borrower/Owner David John Duchene — Date

____________________ ____________
Borrower/Owner — Date

____________________ ____________
Borrower/Owner — Date

____________________ ____________
Borrower/Owner — Date

## REQUEST TO CANCEL

**I/We want to cancel loan #**____________________.

____________________ ____________
Borrower/Owner Signature — Date

10/18/2005 3:45:25 PM

**BORROWER COPY**



# ONE WEEK CANCELLATION PERIOD

Borrower(s): David John Duchene

Loan Number: 0135511566 - 5566

Date: October 19, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

____________________ ____________
Borrower/Owner David John Duchene Date

____________________ ____________
Borrower/Owner Date

____________________ ____________
Borrower/Owner Date

____________________ ____________
Borrower/Owner Date

## REQUEST TO CANCEL

**I/We want to cancel loan #**____________________

____________________ ____________
Borrower/Owner Signature Date

10/18/2005 3:45:25 PM

0000013551156604042201O1

**BORROWER COPY**



# ONE WEEK CANCELLATION PERIOD

Loan Number: 0135511566 - 5566

Borrower(s): David John Duchene

Date: October 19, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

______________________ Date ______

Borrower/Owner David John Duchene

______________________ Date ______

Borrower/Owner

______________________ Date ______

Borrower/Owner

______________________ Date ______

Borrower/Owner

**REQUEST TO CANCEL**

**I/We want to cancel loan #**______________________.

______________________ Date ______

Borrower/Owner Signature

10/18/2005 3:50:51 PM

000001355115660404220101

BORROWER COPY

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0135511566 - 5566

Borrower(s): David John Duchene

Date: October 19, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

Borrower/Owner David John Duchene ____________________ Date ____________

Borrower/Owner ____________________ Date ____________

Borrower/Owner ____________________ Date ____________

Borrower/Owner ____________________ Date ____________

## REQUEST TO CANCEL

**I/We want to cancel loan #**____________________.

Borrower/Owner Signature ____________________ Date ____________

10/18/2005 3:50:51 PM

**BORROWER COPY**

# EXHIBIT H

**EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.**
**120 S. LaSalle Street, 18th floor**
**Chicago, Illinois 60603-3403**
**(312) 739-4200**
**(800) 644-4673**
**(312) 419-0379 (FAX)**
**Email: edcombs@aol.com**
**www.edcombs.com**

May 26, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Re: Notice of rescission, claim and lien, David John Duchene, 17066 Arlington Avenue, Allen Park, MI 48101, loan of October 19, 2005

Ladies/Gentlemen:

Each of the above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on May 26, 2006.

Daniel A. Edelman

# EXHIBIT I

Loan No. 0135511566 - 5566

# APPRAISAL/PROPERTY VALUATION DISCLOSURE

| wer's Name(s): | Lender: |
|---|---|
| hene | Ameriquest Mortgage Company<br>Three Parklane Blvd., Suite 1001 West<br>Dearborn, MI 48126 |
| erty Address: | Date: |
| 6 arlington ave<br>Park, MI 48101 | October 5, 2005 |

**have the right to a copy of the appraisal/property valuation report used in connection with your lication for credit. If you wish a copy, please write to us at the mailing address we have provided. We st hear from you no later than 90 days after we notify you about the action taken on your credit application 'ou withdraw your application.**

Contact: Branch Manager

Lender/Broker: Ameriquest Mortgage Company

Address: Three Parklane Blvd., Suite 1001 West

Dearborn, MI 48126

Telephone: (888)279-9661

orrower David Duchene Date

Borrower Date

3orrower Date

Borrower Date

000001355115661004460101

ordisl (Rev. 3/03)

# EXHIBIT J

# ...rm Residential Loan Application

...lication is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," ...able. Co-Borrower information must also be provided ( and the appropriate box checked) when [ ] the income or assets of a person other than the "Borrower" ...orrower's spouse) will be used as a basis for loan qualification or [X] the income or assets of the Borrower's spouse will not be used as a basis for ...on, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a ...operty state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

...ge ...d for: [ ] VA [X] Conventional [ ] Other (explain): [ ] FHA [ ] USDA/Rural Housing Service

Agency Case Number:

Lender Case Number: 0135511566

...t: 400.00 | Interest Rate: 8.990 % | No. of Months: 360 | Amortization Type: [ ] Fixed Rate [ ] GPM [ ] Other (explain): [X] ARM (type):

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

...Property Address (street, city, state, & ZIP): ... Arlington Ave., Allen Park, MI 48101

No. of Units: 1

...escription of Subject Property (attach description if necessary)

Year Built: 1980

...e of Loan [ ] Purchase [ ] Construction [ ] Other (explain): [X] Refinance [ ] Construction-Permanent

Property will be: [X] Primary Residence [ ] Secondary Residence [ ] Investment

...lete this line if construction or construction-permanent loan.

| ...ot ...ed | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

...lete this line if this is a refinance loan.

| ...ed | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [ ] made [ ] to be made |
|---|---|---|---|---|
| | $85,000.00 | $ 145,600.00 | refi-Cash Out | Cost: $ 0.00 |

...will be held in what Name(s): David John Duchene, A Single Man

Manner in which Title will be held:

Estate will be held in: [X] Fee Simple [ ] Leasehold (show expiration date)

...e of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

**Borrower**

...wer's Name (include Jr. or Sr. if applicable): ...id John Duchene

...l Security Number: ...5^ 1045 | Home Phone (incl. area code): (313)563-8904 | DOB (MM/DD/YYYY): 03/25/1948 | Yrs. School: 12

[ ] Married [X] Unmarried (include single, divorced, widowed) [ ] Separated

Dependents (not listed by Co-Borrower) no. 0 ages

...nt Address (street, city, state, ZIP) [X] Own [ ] Rent 12 No. Yrs.

...66 Arlington Ave.

...en Park, MI 48101

...ing Address, if different from Present Address

**Co-Borrower**

Co-Borrower's Name (include Jr. or Sr. if applicable)

Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School

[ ] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated

Dependents (not listed by Borrower) no. ages

Present Address (street, city, state, ZIP) [ ] Own [ ] Rent ____ No. Yrs.

Mailing Address, if different from Present Address

...esiding at present address for less than two years, complete the following:

...ner Address (street, city, state, ZIP) [ ] Own [ ] Rent ____ No. Yrs.

...66 ARLINGTON AVE.

...EN PARK, MI 48101

Former Address (street, city, state, ZIP) [ ] Own [ ] Rent ____ No. Yrs.

## IV. EMPLOYMENT INFORMATION

**Borrower**

...ne & Address of Employer [ ] Self Employed

post office
...599 VANBORN
...ARBORN, MI 48124

Yrs. on this job: 24

Yrs. employed in this line of work/profession:

...ition/Title/Type of Business: ...il carrier

Business Phone (incl. area code): (313)247-7174

**Co-Borrower**

Name & Address of Employer [ ] Self Employed

Yrs. on this job

Yrs. employed in this line of work/profession

Position/Title/Type of Business

Business Phone (incl. area code)

...employed in current position for less than two years or if currently employed in more than one position, complete the following:

...me & Address of Employer [ ] Self Employed | Dates (from - to) | Monthly Income $

...sition/Title/Type of Business | Business Phone (incl. area code)

Name & Address of Employer [ ] Self Employed | Dates (from - to) | Monthly Income $

Position/Title/Type of Business | Business Phone (incl. area code)

...me & Address of Employer [ ] Self Employed | Dates (from - to) | Monthly Income $

...ition/Title/Type of Business | Business Phone (incl. area code)

Name & Address of Employer [ ] Self Employed | Dates (from - to) | Monthly Income $

Position/Title/Type of Business | Business Phone (incl. area code)

...35511566

...ddie Mac Form 65 01/04
...nie Mae Form 1003 01/04
...e 1 of 4

Initials: ______

Borrower's cell | Borrower's pager
Co-Borrower's cell | Co-Borrower's pager

000001355115660605990601

...-21N (0305) VMP Mortgage Solutions (800)521-7291

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Empl. Income* | $ 4,427.47 | $ | $ 4,427.47 | Rent | $ 0.00 | |
| | 0.00 | | 0.00 | First Mortgage (P&I) | 1,053.00 | $ 1,201.04 |
| | 0.00 | | 0.00 | Other Financing (P&I) | 203.00 | 0.00 |
| ...issions | 0.00 | | 0.00 | Hazard Insurance | 69.83 | 69.83 |
| ...nds/Interest | 0.00 | | 0.00 | Real Estate Taxes | 132.85 | 132.85 |
| ...ntal Income | 0.00 | | 0.00 | Mortgage Insurance | 102.44 | 0.00 |
| (before completing, ... notice in "describe ...ncome," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| | $ 4,427.47 | $ | $ 4,427.47 | Total | $ 1,561.12 | $ 1,403.72 |

...Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ 0.00 |
| | | 0.00 |
| | | |

## VI. ASSETS AND LIABILITIES

...Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are ...iently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If ...o-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [ ] Jointly [X] Not Jointly

| ASSETS ...ription | Cash or Market Value |
|---|---|
| ... deposit toward purchase held by: | $ 0.00 |
| ...checking and savings accounts below | |
| ...e and address of Bank, S&L, or Credit Union: ...ted 401k Retirement - Aggregated | |
| ...no. | $ 55,441.78 |
| ...e and address of Bank, S&L, or Credit Union: ...cking/Savings - Aggregated | |
| ...no. | $ 0.00 |
| ...ne and address of Bank, S&L, or Credit Union | |
| ...no. | $ |
| ...me and address of Bank, S&L, or Credit Union | |
| ...no. | $ |
| ...ocks & Bonds (Company name/ number ...description) | $ 0.00 |
| ...e Insurance net cash value; ...ce amount: $ 0.00 | $ 0.00 |
| ...ubtotal Liquid Assets | $ 55,441.78 |
| ...al estate owned (enter market value ...m schedule of real estate owned) | $ 175,000.00 |
| ...sted interest in retirement fund | $ 0.00 |
| ...t worth of business(es) owned ...tach financial statement) | $ 0.00 |
| ...tomobiles owned (make and year) | $ |
| ...ets (itemize) | $ |
| Total Assets a. | $ 55,441.78 |

Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property.

| LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|
| Name and address of Company: *** SEE ADDENDUM *** Acct. no. | $ Payment/Months | $ |
| Name and address of Company; Acct. no. | $ Payment/Months | $ |
| Name and address of Company; Acct. no. | $ Payment/Months | $ |
| Name and address of Company; Acct. no. | $ Payment/Months | $ |
| Name and address of Company; Acct. no. | $ Payment/Months | $ |
| Name and address of Company; Acct. no. | $ Payment/Months | $ |
| Name and address of Company; Acct. no. | $ Payment/Months | $ |
| Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Job-Related Expense (child care, union dues, etc.) | $ | |
| Total Monthly Payments | $ 771.04 | |
| Net Worth (a minus b) $ 31,146.78 | Total Liabilities b. | $ 24,295.00 |

...5511566

Initials: ______

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

...-21N (0305)

VI. ASSETS AND LIABILITIES (cont.)

ule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| y Address (enter S if sold, PS if pending sale rental being held for income) | | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|---|
| ington Ave. 1ST ., MI 48101 | H | SFR | $ 175000 | $ 125158 | $ 0 | $ 1053 | $ 68 | $ 0 |
| lington Ave. 2ND Park, MI 48101 | H | SFR | 0 | 7966 | 0 | 133 | 68 | 0 |
| Arlington Ave 3RD Park, MI 48101 | H | SFR | 0 | 10036 | 0 | 71 | 68 | 0 |
| | | Totals | $ 0 | $ 143160 | $ 0 | $ 1257 | $ 203 | $ 0 |

ny additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

VII. DETAILS OF TRANSACTION

| | |
|---|---|
| urchase price | $ 0.00 |
| lterations, improvements, repairs | 0.00 |
| and (if acquired separately) | 0.00 |
| efinance (incl. debts to be paid off) | 145,532.00 |
| stimated prepaid items | 292.50 |
| stimated closing costs | 3,153.00 |
| MI, MIP, Funding Fee | 0.00 |
| iscount (if Borrower will pay) | 4,685.14 |
| otal costs (add items a through h) | 153,662.64 |
| ubordinate financing | 0.00 |
| orrower's closing costs paid by Seller | 0.00 |
| Other Credits (explain) | 0.00<br>0.00<br>0.00<br>0.00<br>0.00 |
| Loan amount (exclude PMI, MIP, Funding Fee financed) | 149,400.00 |
| PMI, MIP, Funding Fee financed | 0.00 |
| Loan amount (add m & n) | 149,400.00 |
| Cash from/to Borrower (subtract j, k, l & o from i) | 4,262.64 |

VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | X | | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | X | | | |
| (1) What type of property did you own - - principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home - - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

IX. ACKNOWLEDGMENT AND AGREEMENT

of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any on who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited ine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the n") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; ll statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its essors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, ers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the mation provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my ents on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such quency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan unt may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has e any representation or warranty, express or implied to me regarding the property or the condition or value of the property; and (11) my transmission of this ication as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video rdings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of application were delivered containing my original written signature.

| ower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| | | X | |

X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with al credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law ides that a lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is ired to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender t review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type an applied for.)

RROWER [ ] I do not wish to furnish this information.
nicity: [ ] Hispanic or Latino [X] Not Hispanic or Latino
e: [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [X] White
[ ] Female [X] Male

CO-BORROWER [ ] I do not wish to furnish this information.
Ethnicity: [ ] Hispanic or Latino [ ] Not Hispanic or Latino
Race: [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [ ] White
Sex: [ ] Female [ ] Male

| be completed by Interviewer | | |
|---|---|---|
| application was taken by:<br>[ ] Face-to-face interview<br>[ ] Mail<br>[ ] Telephone<br>[ ] Internet | Interviewer's Name (print or type)<br>Raymond Singh<br>Interviewer's Signature / Date<br>Interviewer's Phone Number (incl. area code)<br>(714)541-9960 | Name and Address of Interviewer's Employer<br>Ameriquest Mortgage Company.<br>Three Parklane Blvd., Suite 1001 West<br>Dearborn,MI 48126 |

# nuation Sheet/Residential Loan Application

| continuation sheet if more space to Residential Loan rk B for or Co-Borrower. | Borrower: Duchene, David John; | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: 0135511566 |

We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| orrower's Signature: | Date | Co-Borrower's Signature: X | Date |
|---|---|---|---|

# EXHIBIT K

File arlington170-05

APPRAISAL OF

Single Family

LOCATED AT:

17066 Arlington Ave.
Allen Park, MI 48101

FOR:

Ameriquest Mortgage
Orange County
California, MI

BORROWER:

Duchene

AS OF:

2005/10/10

BY:

Nicole Davis

07/28/2006 15:53 FAX 005/019

Summary Appraisal Report

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. arlington170-05

Property Description

Property Address 17066 Arlington Ave. City Allen Park State MI Zip Code 48101

Legal Description Lot 631 Also SW 1/2 Adj Vac Alley Dearborn Ecorse Townline Sub County Wayne

Assessor's Parcel No. 30004020631000 Tax Year 2004 R.E. Taxes $ 1,507.00 Special Assessments $ 0.00

Borrower Duchene Current Owner Duchene Occupant: [X] Owner [ ] Tenant [ ] Vacant

Property rights appraised [X] Fee Simple [ ] Leasehold Project Type [ ] PUD [ ] Condominium (HUD/VA only) HOA$ 0.00 /Mo.

Neighborhood or Project Name Dearborn Ecorse Townline Sub No2 Map Reference 30-00 Census Tract 5760

Sale Price $ Refinance Date of Sale N/A Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client Ameriquest Mortgage Address Orange County, California, MI

Appraiser Nicole Davis Address 8916 S. Wayne Rd., Romulus, MI 48174

| | | | | Predominant occupancy | Single family housing PRICE $(000) | AGE (yrs) | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | [X] Owner | 100 Low | 20 | One family 90% | [X] Not likely [ ] Likely |
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | [ ] Tenant | 200 High | 80 | 2-4 family 5% | [ ] In process |
| Growth rate | [ ] Rapid | [X] Stable | [ ] Slow | [X] Vacant (0-5%) | Predominant | | Multi-family | To: |
| Property values | [ ] Increasing | [X] Stable | [ ] Declining | [ ] Vacant (over 5%) | 160 | 40 | Commercial 5% | |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | | | | | |
| Marketing time | [X] Under 3 mos. | [ ] 3-6 mos. | [ ] Over 6 mos. | | | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: North of I 94 South of Outer Dr. East of Southfield and West of I 94.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): Subject area is comprised of primarily single family residences mixed in style and age. All forms of normal neighborhood amenities such as schools, places of worship and employment centers are within close proximity to the area. No adverse conditions noted. Commercial usage is noted along main roadways, with no adverse effect.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Local market conditions indicate a balanced supply/demand of homes, with a typical marketing time of under 3 months at acceptable rates. Conventional financing is readily available. FHA/VA, Land Contract and Cash sales are sometimes utilized as alternative forms of financing with no adverse effect on value or marketability.

Project Information for PUDs (If applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] YES [X] NO

Approximate total number of units in the subject project N/A Approximate total number of units for sale in the subject project N/A

Describe common elements and recreational facilities: N/A

Dimensions 40X129 Corner Lot [ ] Yes [X] No

Site area 5160 Sq.Ft.

Specific zoning classification and description R-1 Single Family Residential

Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning

Highest & best use as improved: [X] Present use [ ] Other use (explain)

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | Concrete | [X] | [ ] |
| Gas | [X] | | Curb/gutter | Concrete | [X] | [ ] |
| Water | [X] | | Sidewalk | Concrete | [X] | [ ] |
| Sanitary sewer | [X] | | Street lights | Pole Hung | [X] | [ ] |
| Storm sewer | [X] | | Alley | None | | [ ] |

Topography Level at grade; Size Typical for Area; Shape Rectangular; Drainage Appears Adequate; View Residential; Landscaping Typical for area; Driveway Surface Concrete; Apparent easements Normal Utility; FEMA Special Flood Hazard Area [ ] Yes [X] No; FEMA Zone C Map Date 05-06-96; FEMA Map No. 2602170002 C

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): Site is typical for area in size and appeal with no readily apparent adverse easements or encroachments noted.

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | ConcBlock | Slab | None | Area Sq.Ft. | 1200.12 | Roof | [ ] |
| No. of Stories | 1 Story | Exterior Walls | Brick | Crawl Space | None | % Finished | 90% | Ceiling Uncld | [X] |
| Type (Det./Att.) | Detached | Roof Surface | Asph Shingle | Basement | Yes | Ceiling | Drop Tile | Walls Uncld | [X] |
| Design (Style) | Ranch | Gutters & Dwnspts. | Aluminum | Sump Pump | None | Walls | Wd panel | Floor | [ ] |
| Existing/Proposed | Existing | Window Type | Vinyl | Dampness | None noted | Floor | Tile | None | [ ] |
| Age (Yrs.) | 40 | Storm/Screens | Yes | Settlement | at time of | Outside Entry | None | Unknown | [ ] |
| Effective Age (Yrs.) | 20 | Manufactured House | No | Infestation | inspection | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | X | | | X | | 1,200 |
| Level 1 | | 1 | | 1 | | | | 3 | 1.00 | | | 1,200 |
| Level 2 | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | 0 |

Finished area above grade contains: 5 Rooms; 3 Bedroom(s); 1 Bath(s); 1,200 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Carpet/Tile | Type | FWA | Refrigerator | [ ] | None | [X] | Fireplace(s) # | [ ] | None | [ ] |
| Walls | Plaster | Fuel | Gas | Range/Oven | [ ] | Stairs | [ ] | Patio | [ ] | Garage | # of cars |
| Trim/Finish | Wd Painted | Condition Avg age | | Disposal | [X] | Drop Stair | [ ] | Deck | [ ] | Attached | |
| Bath Floor | Vinyl | COOLING | | Dishwasher | [ ] | Scuttle | [ ] | Porch Concrete | [X] | Detached | 2 |
| Bath Wainscot | Vinyl | Central | Yes | Fan/Hood | [X] | Floor | [ ] | Fence | [ ] | Built-In | |
| Doors | Hollow core | Other | N/A | Microwave | [ ] | Heated | [ ] | Pool | [ ] | Carport | |
| Avg Cond/Avg Quality | | Condition Avg age | | Washer/Dryer | [ ] | Finished | [ ] | | | Driveway | |

Additional features (special energy efficient items, etc.): Subject has been adequately maintained and has typical features and amenities for the market area. Subject has a porch and a 2 car garage. No value given to personal property.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: No functional obsolescence is noted. Exterior inspection noted no external obsolescence. Physical depreciation is based on 1% per effective year.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: At the time of inspection, there were no adverse environmental conditions noted.

Summary Appraisal Report

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. arlington170-05

Valuation Section

ESTIMATED SITE VALUE = $ 10,000

ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS:

Dwelling 1,200 Sq. Ft. @ $ 130.00 = $ 156,000

Bsmt. 1200 Sq. Ft. @ $ 50.00 = 60,000

= 8,000

Garage/Carport 400 Sq. Ft. @ $ 20.00 =

Total Estimated Cost New = $ 224,000

Less 0 Physical | Functional | External

Depreciation $44,800 = $ 44,800

Depreciated Value of Improvements = $ 179,200

"As-Is" Value of Site Improvements = $

INDICATED VALUE BY COST APPROACH = $ 189,200

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): Cost figures are taken from Marshall and Swift Residential Cost Handbook with local multipliers rounded. The Cost Approach is not given equal weight due to the lower land values in the area and the difficulty in measuring accumulated depreciation. Based on 20 years effective age, remaining economic life is estimated to be 40 years.

| ITEM | SUBJECT | COMPARABLE NO. 1 | +(-)$ Adjustment | COMPARABLE NO. 2 | +(-)$ Adjustment | COMPARABLE NO. 3 | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 17068 Arlington Ave. Allen Park | 17415 Kappen Allen Park | | 17045 Anna Allen Park | | 17228 Kappen Ave. Allen Park | |
| Proximity to Subject | | 4 Blocks East | | 1 Block South | | 4 Blocks North | |
| Sales Price | $ Refinance | | $ 145,000 | | $ 160,000 | | $ 175,000 |
| Price/Gross Liv. Area | $ 0.00 | $ 111.54 | | $ 132.89 | | $ 145.83 | |
| Data and/or Verification Sources | Assessor Inspection | Assessor/Ext Inspection MLS# 1015407 | | Assessor/Ext Inspection MLS# 1010788 | | Assessor/Ext Inspection MLS# 25058388 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | | DESCRIPTION | | DESCRIPTION | |
| Sales or Financing Concessions | N/A | Conventional N/A | | Conventional N/A | | Conventional N/A | |
| Date of Sale/Time | N/A | 2005/08/30 | | 2004/11/26 | | 2005/07/21 | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | Suburban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 40X128 | 80X120 | | 75X120 | | 80X156 | |
| View | Residential/Avg | Residential/Avg | | Residential/Avg | | Residential/Avg | |
| Design and Appeal | 1Story /Avg | 1 Story/ Avg | | 1Story /Avg | | 1Story /Avg | |
| Quality of Construction | Brick/Avg | Brick/Avg | | Brick/Avg | | Brick/Avg | |
| Age | A 40 E 20 | A 40 E 20 | | A 38 E 20 | | A 40 E 20 | |
| Condition | Average | Average | | Average | | Average | |
| Above Grade Room Count (Total / Bdrms / Baths) | 6 / 3 / 1.00 | 5 / 3 / 1.00 | | 4 / 2 / 1.00 | | 5 / 3 / 1.00 | |
| Gross Living Area | 1,200 Sq.Ft. | 1,300 Sq.Ft. | -1,100 | 1,204 Sq.Ft. | | 1,200 Sq.Ft. | |
| Basement & Finished Rooms Below Grade | Basement Finished | Basement Part Finished | 1,000 | Basement Finished | | Basement Finished | |
| Functional Utility | 3 Bedroom/Avg | 3 Bedroom/Avg | | 2 Bedroom/Avg | 4,000 | 3 Bedroom/Avg | |
| Heating/Cooling | FWA /C-Air | FWA /C-Air | | FWA/None | 1,500 | FWA C/Air | |
| Energy Efficient Items | Standard | Standard | | Standard | | Standard | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 2 Car Garage | | 2 Car Garage | |
| Porch, Patio, Deck, Fireplace(s), etc. | Porch/None No Fireplace | Porch/None No Fireplace | | Porch/None 1 Fireplace | 500 | Porch/None No Fireplace | |
| Fence, Pool, etc. | | | | | | | |
| Net Adj. (total) | | [ ] + [ ] - | $ 100 | [X] + [ ] - | $ 6,000 | [X] + [ ] - | $ 0 |
| Adjusted Sales Price of Comparable | | | $ 144,900 | | $ 166,000 | | $ 175,000 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): See Attached Addendum

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | No other sales during the past 36 months | No other sales during the past 12 months | No other sales during the past 12 months | No other sales during the past 12 months |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: The subject property is not currently listed or under contract, 36 month Sales History ; no activity

INDICATED VALUE BY SALES COMPARISON APPROACH $ 166,000

INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier N/A = $ 0

This appraisal is made [X] "as is" [ ] subject to the repairs, alterations, inspections or conditions listed below [ ] subject to completion per plans and specifications.

Conditions of Appraisal: See Attached...

Final Reconciliation: The greatest weight is given to the Sales Comparison Approach as the data is extracted directly from the marketplace. The Cost Approach lends support. The Income Approach is not relevant due to the lack of reliable rental data in this owner occupied area.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 2005/10/10 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 166,000

APPRAISER:

Signature [signature]

Name Nicole Davis

Date Report Signed 10/14/2005

State Certification # State MI

Or State License # 1201066704 State MI

SUPERVISORY APPRAISER (ONLY IF REQUIRED):

Signature

Name

Date Report Signed

State Certification # State

Or State License # State

[X] Did [ ] Did Not Inspect Property

True Value Appraisals

7/28/2006 15:53 FAX

File No. arlington170-05

## ADDENDUM

SCOPE OF THE APPRAISAL: The scope of the appraisal encompasses the necessary research and analysis to prepare a report in accordance with the intended use. Subject property data was based on the physical inspection of the property's interior and exterior, and any plans or specifications provided.

Additional data was compiled from public records, Multi-List service, or other identified sources. The original source of the comparable sales is shown in the "Data Source" section in the market grid, along with any additional source, available. Comparables were inspected on the exterior and through public records. The data and sources are considered reliable, however when conflicting information was present, the source deemed the most reliable has been utilized. Data believed to be unreliable was not included in this report.

Flood data was verified using maps provided by the Federal Emergency Management Agency, National Flood Insurance programs.

APPRAISER COMPETENCY: I certify that I am qualified and competent by training, knowledge, and experience to perform this appraisal. Appraisers are required to be licensed and are regulated by the Michigan Department of Commerce, P.O. Box 30018, Lansing, Michigan 48909.

Comments on Sales Comparison
After adjustments, all comparables are considered in the final estimate of value. All comparables are relevant for masonry construction, style, square footage and proximity to the subject. Effective ages assigned were based on general condition of the dwelling, taking into consideration any updating and maintenance performed or lack thereof.

The subject is located in a stable area which has few relevant recorded sales within the past twelve months. In order to utilize the most relevant comparables, it became necessary to exceed the six month guideline for comp# 2. Exceeding this guideline will have no adverse affect on the value or marketability of the subject.

Conditions of Appraisal
All sales confirmed closed, All data assumed to be accurate. This is a summary appraisal report prepared in accordance with the Uniform Standards of Professional Appraisal Practice. GRM is not used due to the lack of reliable rental data in this owner occupied area. This appraisal is prepared as a Summary Appraisal report under USPAP.

The appraisal is not a home inspection report and should not be relied upon to report the condition of the property being appraised.

File No. arlington170-08

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

CONTINGENT AND LIMITING CONDITIONS: The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

File No. arlington170-05

APPRAISERS CERTIFICATION: The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

SUPERVISORY APPRAISER'S CERTIFICATION: If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED: 17068 Arlington Ave., Allen Park, MI 48101

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
|---|---|
| Signature: [signature] | Signature: |
| Name: Nicole Davis | Name: |
| Date Signed: 10/14/2005 | Date Signed: |
| State Certification #: | State Certification #: |
| or State License #: 1201089704 | or State License #: |
| State: MI | State: |
| Expiration Date of Certification or License: 07/31/2007 | Expiration Date of Certification or License: |
| | ☒ Did ☐ Did Not Inspect Property |

SUBJECT PROPERTY PHOTO ADDENDUM

File No.: arlington170-05
Case No.:
Borrower: Duchann
Property Address: 17086 Arlington Ave.
City: Allen Park
State: MI
Zip: 48101
Lender: Ameriquest Mortgage

FRONT VIEW OF SUBJECT PROPERTY

Appraised Date: 2005/10/10
Appraised Value: $ 169,000

REAR VIEW OF SUBJECT PROPERTY

STREET SCENE



COMPARABLE PROPERTY PHOTO ADDENDUM

File No.: arlington170-05
Borrower: Duchene
Case No.:
Property Address: 17080 Arlington Ave.
City: Allen Park
State: MI
Zip: 48101
Lender: Ameriquest Mortgage

COMPARABLE SALE #1

17416 Keppen
Allen Park
Sale Date: 2005/08/30
Sale Price: $ 145,000

COMPARABLE SALE #2

17045 Anne
Allen Park
Sale Date: 2004/11/26
Sale Price: $ 160,000

COMPARABLE SALE #3

17228 Keppen Ave.
Allen Park
Sale Date: 2005/07/21
Sale Price: $ 175,000

07/28/2006 15:54 FAX 012/013

FLOORPLAN

| | |
|---|---|
| Borrower: Duchene | File No.: arlington170-06 |
| Property Address: 17056 Arlington Ave. | Case No.: |
| City: Allen Park | State: MI Zip: 48101 |
| Lender: Ameriquest Mortgage | |

Main Floor
Bedroom
Bedroom
Bedroom
Bath
Kitchen
Living Room
Ranch W/ Basement



## LOCATION MAP

File No.: arlington170-05

Case No.:

Borrower: Duchene

Property Address: 17008 Arlington Ave.

State: MI

Zip: 48101

City: Allen Park

Lender: Amaralgmat Mortgage

©2002 DeLorme (www.delorme.com) Street Atlas USA® 2003.

# EXHIBIT L

P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

June 27, 2006

David John Duchene
17066 Arlington Ave
Allen Park, MI 48101-

Re: Loan No: 0135511566
Property: 17066 Arlington Ave
Allen Park MI 48101

Dear Homeowner(s):

As requested, enclosed is a copy of the Appraisal Report on the above referenced property. The Appraisal Report is being sent to you with the following terms and conditions. If you are unable or unwilling to comply with all of the conditions set forth below, please return the Appraisal Report to:

AMC Mortgage Services, Inc.
P.O. Box 11000
Santa Ana, CA 92711-1100
Attention: Customer Care Department

1. The Appraisal Report is to be used solely for the purpose of evaluating your property in connection with your loan.

2. You understand, acknowledge, and agree that the Appraisal Report is being provided by AMC Mortgage Services (AMC) without any representations or warranties as to its contents.

3. You understand, acknowledge, and agree that intervening circumstances may have rendered the information and assumptions contained in the Appraisal Report obsolete, incomplete, or even misleading.

4. You understand, acknowledge, and agree that the Appraisal Report was prepared for the exclusive use of AMC, and that subsequent distribution was not contemplated when the Appraisal Report was commissioned, prepared, or delivered.

5. You covenant and agree not to seek any damages or redress or to make any claims for damages, costs, expenses, or liabilities of any kind against the appraiser or arising out of your use of the Appraisal Report.

SC002/005/NHD

P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

Appraisal Report Request Letter
Page 2

6. You covenant and agree to indemnify, defend, and hold AMC, its shareholders, officers, directors, employees, affiliates, and agents harmless from and against any claims, costs, expenses, damages, or liabilities of any kind including reasonable attorney's fees incurred AMC resulting from or arising out of your use of the Appraisal Report.

7. You covenant and agree to keep the Appraisal Report confidential and not disclose, distribute, disseminate, copy, or otherwise reproduce or release the Appraisal Report or its contents to any person except as is strictly necessary for the evaluation or understanding of the Appraisal Report, in any manner to any person without first obtaining a written agreement of confidentiality similar in scope to this letter.

For information on your home loan, visit www.myamcloan.com. If you have any additional questions or concerns, please contact Customer Care at (800) 430-5262, Monday through Friday, 5:00 a.m. to 6:00 p.m., Pacific Time.

Please keep this letter with your other loan records.

Sincerely,

Customer Care Department

SC002/005/NHD

# EXHIBIT M

**Ameriquest Mortgage Company**

Borrower Name: David Duchene

Loan Number: 0135511566 - 5566

Borrower Name:

Property Address: 17066 arlington ave
Allen Park, MI 48101

## UNDERSTANDING YOUR OPTIONS REGARDING INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other. A "discount point" is a one-time fee that equals one (1) percent of the loan amount that lowers the interest rate of the loan. So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio. The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points. The following example shows how your options work.

STARTING LOAN TERMS SCENARIO*

**In this example, the base rate is 7% and points are 1.6%, which is $1,600:**

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 7% |
| Discount points: | 1.6% ($1,600) |

LOWER RATE SCENARIO

**To receive a lower interest rate, you can take a loan with an additional 1.6 discount points:**

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 6% |
| Discount points: | 3.2% ($3,200) |

3.2% ($3,200) 6% Points Rate

REDUCED DISCOUNT POINT SCENARIO

**To reduce your discount points by 1.6, your interest rate would be 1 percentage point higher:**

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 8% |
| Discount points: | 0% (0) |

* The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor. A discount point lowers the interest rate but *not* necessarily the overall cost of the loan. A lower rate may be a good choice if you don't plan to sell or refinance for some time. On the other hand, you might not want to have additional discount points if you think you'll sell or refinance soon. Your mortgage specialist can give you more information about the options available to you and the exact terms of your loan.