**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LORI ANN DUSSIA, | ) | |
| | ) | 1:07-cv-325 |
| Plaintiff, | ) | |
| | ) | (Originally 5:06-cv-196 (W.D. MI)) |
| v. | ) | |
| | ) | (Transferred to Judge Aspen for |
| AMERIQUEST MORTGAGE COMPANY, | ) | pretrial proceedings under MDL |
| DEUTSCHE BANK NATIONAL TRUST | ) | #1715, Lead Case # 05 C 7097) |
| COMPANY, N.A., as Trustee of AMERIQUEST | ) | |
| MORTGAGE SECURITIES, INC., Asset Backed | ) | |
| Pass Through Certificates, Series 2005-R11 Under | ) | |
| the Pooling and Servicing Agreement Dated as of | ) | |
| December 1, 2005, Without Recourse; | ) | |
| AMERICAN HOME MORTGAGE SERVICING, | ) | |
| INC., and DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | **JURY DEMANDED** |

**SECOND AMENDED COMPLAINT**

**INTRODUCTION**

1.     Plaintiff Lori Ann Dussia brings this action against a "subprime" mortgage

lender and its affiliates to rescind a mortgage for violation of the Truth in Lending Act, 15 U.S.C.

§1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part

226, and to recover damages under state law.

**JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), and 1367 (supplemental jurisdiction), and

15 U.S.C. §1640 (TILA).   Defendants transact business in the District and are deemed to reside

here.

1

## PARTIES

3.     Plaintiff Lori Ann Dussia owns and resides in a home at 10905 Shelp Lake Drive, Delton, MI  49046.

4.     Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Michigan.  Its registered agent and office are National Registered Agents, Inc., 712 Abbott Road, East Lansing, MI 48823, or  200 W. Adams, Chicago, IL 60606

5.     Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

6.     Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

7.     Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

8.     During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

9.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005.  On information and belief, it holds legal title to plaintiff's loan, as trustee.

10.     Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Michigan. It holds legal title to loans originated by Ameriquest Mortgage Company.  It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

11.     Defendant American Home Mortgage Servicing, Inc. is a foreign corporation which does business in Illinois and Michigan.  Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

12.     Defendant American Home Mortgage Servicing, Inc. services some loans originated by Ameriquest Mortgage Company, including plaintiff's, and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

## FACTS RELATING TO PLAINTIFF

13.     Prior to November 2, 2005, plaintiff applied for a mortgage with Ameriquest Mortgage Company.

14.     Plaintiff needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes and home improvements.

15.     Approximately one month before closing, an Ameriquest employee named Roger Huang spoke to plaintiff on the telephone and told her that she qualified for a 7.25% interest rate and that she would receive $25,000 "cash out."

16.     Plaintiff needed the $25,000 in order to pay off other debts, build a new deck for the front of her home, repair a water-damaged sub-floor in her bathroom, and install carpeting in her home.

17.     Approximately one week later, Huang called plaintiff back and told her

3

he could lower her interest rate if she paid off the balance of a sixty-day late payment to her previous mortgage company.

18.    Plaintiff paid the balance to her previous mortgage company several days before closing with Ameriquest.

19.    Next, still prior to closing, Huang had a conference call with plaintiff and with an employee of plaintiff's previous mortgage company to confirm that plaintiff's late mortgage payments had been paid in full.

20.    A few hours before closing, on November 2, 2005, Huang called plaintiff to confirm that he was faxing her closing documents to the title company.  At this time, he also mentioned that plaintiff would have an 8.35% interest rate.

21.    Also during this call, Huang informed plaintiff that she would only be getting $18,000 out of closing instead of the $25,000 she had originally been promised.

22.    When plaintiff asked why her rate had risen and why she was getting less cash out despite having paid her debt to her previous mortgage company, Huang answered that payment of that debt had not improved her credit as much as he had hoped it would and that the underwriter wouldn't allow the terms that Huang had promised her.

23.    Because Ameriquest did not give plaintiff as much cash out of her refinance as they had promised, plaintiff has been unable to replace the water-damaged sub-floor in her bathroom, install carpets or pay her other debts as she had planned.

24.    On information and belief, at the time that Ameriquest had offered plaintiff a 7.25% rate and $25,000 "cash out," Ameriquest had already obtained enough of plaintiff's credit and financial information to fully underwrite the loan.

4

25.     The loan was closed on November 2, 2005.

26.     Immediately prior to closing, Ameriquest informed plaintiff that other terms of the loan were being altered to her detriment, as set forth on Exhibit A.  Ameriquest raised plaintiff's settlement charges by $2,831.88 without a legitimate reason.

27.     The following are documents relating to the loan:

        a.      A note, Exhibit B;

        b.      A mortgage, Exhibit C;

        c.      A settlement statement, Exhibit D;

        d.      An "itemization of settlement charges," Exhibit E;

        e.      A Truth in Lending statement, Exhibit F;

        f.      The three-day notice of right to cancel required by the Federal Reserve Board, Exhibit G.  None of the copies delivered was completed.

        g.      A purported "one week" notice of right to cancel used solely by Ameriquest and related companies, Exhibit H;

        h.      A document entitled "Items to be paid off from loan proceeds," Exhibit I;

28.     In addition, prior to October 28, 2005, Ameriquest Mortgage Company arranged for an appraisal of plaintiff's residence and property.

29.     This appraisal of plaintiff's residence and property resulted in an appraised value of approximately $140,000.  Plaintiff was not provided with a copy of this appraisal or with the standard disclosure notice of how to request it. Rather, Huang notified plaintiff by phone of the appraised value of her property..

30.     Huang and Ameriquest then arranged for a second appraisal to be performed – by All About Appraisals Network, LLC, doing business as AAA Network.

31.     AAA Network performed another appraisal at plaintiffs' residence on or about October 27, 2005 and prepared a written appraisal report on October 28, 2005.  A copy of this appraisal is attached as Exhibit J;

32.     According to AAA Network's report, the appraised value of plaintiffs' home was $150,000.  Exhibit J.

33.     Between October 28, 2005 and November 2, 2005, Ameriquest prepared a pre-typed residential loan application for plaintiff to sign, attached as Exhibit K.  In Section VI of this application, Ameriquest represented the present market value of plaintiff's property as $170,000.

34.     Ameriquest then arranged to have plaintiff sign, at closing, the application containing this and other false information.  The application was one of scores of documents and hundreds of pages of documents presented to plaintiff at closing.  Plaintiff was unable to review each for accuracy at that time.

35.     The loan was closed on November 2, 2005.  The principal amount of the loan was $135,000 or 96% of the original $140,000 appraised value.  Ameriquest's fabricated appraisal value of $170,000 makes it appear that the loan-to-value ratio ("LTV") was 79.41%, which is just under the 80% LTV benchmark that is customary for the industry.

36.     Most reputable lenders will not make a loan that exceeds 80% of the value of the home ("LTV"), at least not without also imposing expensive private mortgage insurance ("PMI").

37.     Furthermore, plaintiff was charged a substantial "loan discount," <u>Exhibit C</u>, line 802.

38.     Ameriquest undertook and represented, in the document attached as <u>Exhibit L</u> and delivered to plaintiff at the closing, that the payment of a "loan discount" would reduce plaintiff's interest rate.

39.     However, on information and belief, plaintiff did not receive a discounted rate.

40.     Finally, plaintiff was also charged $300 for notary fees.  See <u>Exhibit D</u>, line 1106, and <u>Exhibit E</u>, line 1106.

41.     Plaintiff was later directed to make payments to AMC Mortgage Services, Inc., and then later to Citi Residential Lending, Inc.  Subsequently, in 2009, plaintiff was directed to make payments to American Home Mortgage Servicing, Inc.

42.     On information and belief, Deutsche Bank National Trust Company, N.A. holds legal title to plaintiff's loan, as Trustee.  Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiff's loan under Asset Backed Pass Through Certificates, Series 2005-R11 Under the Pooling and Servicing Agreement Dated as of December 1, 2005, Without Recourse.

43.     In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiff's loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.
On information and belief, Ameriquest Mortgage Securities, Inc., owns plaintiff's loan.

## COUNT I – TRUTH IN LENDING ACT

44.     Plaintiff incorporates paragraphs 1-43.

45.     This count is against all defendants.

## RIGHT TO RESCIND

46.     Because the transaction was secured by plaintiff's home, and was not

entered into for purposes of the initial acquisition or construction of that home, it was subject to

the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23.  Section 226.23

provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

**(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as**

8

to all consumers.

**(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

    **(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

    **(2) The consumer's right to rescind the transaction.**

    **(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

    **(4) The effects of rescission, as described in paragraph (d) of this section.**

    **(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

    **(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

    **(2) A credit plan in which a state agency is a creditor.**

### <u>GROUNDS FOR RESCISSION</u>

47.    In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiff's right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the reasons stated below.

48.    Ameriquest did not deliver to plaintiff two completed notices of the right to cancel on the Federal Reserve Board form. The transaction and cancellation dates were missing on both forms.

49.     In addition, the delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

50.     Furthermore, the "one week" cancellation notice is misleading, as the period given is actually only six days long.

51.     Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

52.     Notice of rescission has been given to defendants.  A copy is attached as Exhibit M.

53.     The loan has not been rescinded.

54.     Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

55.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.     A judgment voiding plaintiff's mortgage, capable of recordation in

10

the public records, and binding on defendants;

        b.      A judgment indicating what amounts, if any, plaintiff owes

defendants, taking in account the inflated appraisal;

        c.      Statutory damages for the underlying disclosure violation;

        d.      If appropriate, statutory damages for failure to rescind;

        e.      Attorney's fees, litigation expenses and costs; and

        f.      Such other or further relief as the Court deems appropriate.

## COUNT II – BREACH OF CONTRACT

56.     Plaintiff incorporates paragraphs 1-43.

57.     This claim is against Ameriquest only.

58.     Defendant Ameriquest contracted and undertook to provide a discounted

interest rate if plaintiff paid a loan discount fee. Exhibit L.

59.     Plaintiff paid the fee but, on information and belief, did not receive a

discounted rate. Exhibit D Line 802.

60.     Ameriquest thereby breached its agreement.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiff and against defendant for:

        a.      Appropriate damages;

        b.      Costs.

        c.      Such other or further relief as the Court deems appropriate.

## COUNT III – MICHIGAN MORTGAGE BROKERS, LENDERS AND SERVICERS LENDING ACT

61.     Plaintiff incorporates paragraphs 1-43.

62.     This claim is against Ameriquest.

63.     Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by (a) representing that the retention from the loan proceeds of a "loan discount" would result in a reduction of the interest rate and (b) then not reducing the interest rate.

64.     Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by representing that it was entitled to charge and charging notary fees of $300 (Exhibit D, line 1106, Exhibit E, line 1106) when Michigan law permits notary fees of $10 per notarial act or transaction.  MCL §55.285

65.     Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by: (A) promising plaintiff a 7.25% rate and $25,000 cash out after obtaining enough information to fully underwrite the loan and (B) later, at closing, increasing plaintiff's rate to 8.35% and only offering her $18,000 cash out.

66.     Plaintiff was induced to borrow a loan from defendants by means of these and other misrepresentations and deceits.

67.     Defendants made these representations in the course of trade and commerce.

68.     Plaintiff has suffered multiple injuries as a result of defendants' misrepresentations.

WHEREFORE, the Court should enter judgment in favor of plaintiff and against defendant for:

a.     A declaratory judgment, MCL §445.1681(1)(a);

b.     Injunctive relief, MCL §445.1681(1)(b);

c.     Appropriate damages, MCL §445.1681(1)(c);

d.     Attorney's fees, litigation expenses and costs of suit;

e.     Such other and further relief as the Court deems proper

## COUNT IV - COMMON LAW FRAUD

69.     Plaintiff incorporates paragraphs 1-43. This claim is against Ameriquest.

70.     Defendant represented to plaintiff, based upon what it reported was the existing value of her home, that plaintiff qualified for a certain loan amount.

71.     Defendant represented to plaintiff, both through the appraisal and orally, that this value was $150,000, while typing on her loan application that her home was worth $170,000, in order to push her loan through the approval process.

72.     These representations were material terms of defendant's transaction with plaintiff.

73.     Defendant's representations were false and fraudulent.

74.     Defendant made these representations intentionally, with knowledge and/or reckless ignorance of their falsity.

75.     Defendant's representations that plaintiff qualified for the loan caused plaintiff to rely on the misrepresentation to her detriment.

76.     Plaintiff's reliance was justifiable.

13

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants for:

a.  actual and compensatory damages;

b.  punitive damages; and

c.  Such other or further relief as the Court deems appropriate.


s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

s/ Daniel A. Edelman
Daniel A. Edelman

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Edelman, hereby certify that on June 12, 2009, a true and correct copy of the foregoing document was filed electronically.  Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that true and correct copies were additionally sent via email or by U.S. Mail to those parties without email addresses.

Mark D. van der Laan
Dykema Gossett PLLC
300 Ottawa Ave. NW
Suite 700
Grand Rapids, MI 49503

American Home Mortgage Servicing, Inc.
c/o Registered Agent
C.T. Corporation System
208 S. LaSalle St.
Suite 814
Chicago, IL 60604

s/ Daniel A. Edelman
Daniel A. Edelman

T:\17995\Pleading\2nd Amended Complaint_Pleading.wpd

# EXHIBIT A

Ameriquest Mortgage Company
325 E. Grand River Ave., #255
East Lansing, MI 48823

(888)419-6528

# BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

LORI Ann DUSSIA

Date: November 2, 2005

Notice: [X] Delivered    [ ] Mailed

Loan Number: 0137860185 - 5653

Description of Credit Request:

10905 SHELP LAKE DRIVE
Delton,MI 49046

[X] 1st Trust Deed/Mortgage    [ ] 2nd Trust Deed/Mortgage

[ ] Other: _____

Property Address: 10905 SHELP LAKE DRIVE

Delton, MI 49046      County of BARRY

## TYPE OF TRANSACTION:

[ ] Purchase    [X] Refinance    Other _____

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS: |
|---|---|
| [ ] Fixed Rate Loan   [X] Adjustable Rate Loan | [ ] Fixed Rate Loan   [X] Adjustable Rate Loan |
| Amount Financed: $ 128,075.20 | Amount Financed: $ 126,115.99   * |
| Settlement Charges: $ 7,899.80 | Settlement Charges: $ 10,721.68   * |
| (Includes all Prepaid Finance Charges) | (Includes all Prepaid Finance Charges) |
| Loan Amount: $ 135,000.00 | Loan Amount: $ 135,000.00 |
| Annual Percentage Rate: 10.711 % | Annual Percentage Rate: 10.853 %* |
| Term: 360 | Term: 360 |
| Initial Interest Rate: 8.350 % | Initial Interest Rate: 8.350 % |
| Margin: 6.250 % | Margin: 6.250 % |
| Prepayment Penalty: [X] YES [ ] NO | Prepayment Penalty: [X] YES [ ] NO |

Borrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based exclusively on information, statements, and representations (all material facts) which have been provided by the borrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change prior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. Borrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may require new loan documents to be executed by the borrower(s).

_____      _____
Borrower LORI Ann DUSSIA    Date      Borrower      Date

# EXHIBIT B

Loan Number: 0137860185 - 5653

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

| | | |
|---|---|---|
| November 2, 2005 | Orange | CA |
| Date | City | State |

10905 SHELP LAKE DRIVE, Delton, MI 49046
Property Address

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **135,000.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **8.350 %**. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on **January 1, 2006** .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, **December 1, 2035** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my payments at: **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,023.72**. This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of, **December, 2007** and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Loan Number: 0137860185 - 5653

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.350** % or less than **8.350%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000%** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **14.350** % or less than **8.350** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made Three (3) year(s) After the Date of this Note**

If I make a prepayment commencing on or after the Three (3) year anniversary of the date of this Note, I may make that prepayment, in full or in part, without the imposition of a prepayment charge by the Lender.

**(B) Prepayment Made Within Three (3) year(s) of the Date of this Note**

I agree to pay Lender a prepayment charge if I make a prepayment before the Three (3) year(s) anniversary of the date this Note is executed. The prepayment charge I will pay will be equal to one percent (1%) on the amount by which the total prepayment(s) within any 12-month period exceeds twenty percent (20%) of the original principal amount of the loan.

**(C) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and the Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Loan Number: 0137860185 - 5653

9.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.  **WAIVERS**
I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  **UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Borrower   LORI Ann DUSSIA                                Borrower

# EXHIBIT C

# MORTGAGE

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated November 2, 2005
together with all Riders to this document.

(B) "Borrower" is LORI Ann DUSSIA

Borrower's address is 10905 SHELP LAKE DRIVE, Delton,MI 49046
. Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT               Form 3023 1/01
0137860185-5653

11/01/2005 4:13:12

AM6MI (0401)

Page 1 of 16          Initials: _____

VMP Mortgage Solutions, Inc. (800)521-7291

0000013786018503013417O1

(C) "**Lender**" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "**Note**" means the promissory note signed by Borrower and dated November 2, 2005
The Note states that Borrower owes Lender one hundred thirty-five thousand and 00/100
Dollars
(U.S. $ 135,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 1, 2035
(E) "**Property**" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "**Escrow Items**" means those items that are described in Section 3.
(L) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:_____

AM6MI (0401)                 Page 2 of 16                 Form 3023 1/01

0137860185 - 5653

11/01/2005 4:13:12



0000013786018503013417 02

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the `County`                                        [Type of Recording Jurisdiction]
of `BARRY`                                        [Name of Recording Jurisdiction]:
`Legal Description Attached Hereto and Made a Part Hereof.`

Parcel ID Number: `08-12-460-012-00`                          which currently has the address of
`10905 SHELP LAKE DRIVE`                                                   [Street]
`Delton`                                        [City], Michigan `49046`        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials: _____

AM6MI (0401)                     Page 3 of 16                     Form 3023 1/01

`0137860185-5653`

`11/01/2005 4:13:12`



`0000001378601850301341703`

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

Initials: _____

AM6MI (0401)                    Page 4 of 16                    Form 3023 1/01

0137860185 - 5653

11/01/2005  4:13:12



0000013786018503013417O4

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _____

AM6MI (0401)                          Page 5 of 16                          Form 3023 1/01



0000013786018503013417D5

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

Initials:_____

AM6MI (0401)                          Page 6 of 16                          Form 3023 1/01

0137860185 - 5653

11/01/2005  4:13:12



0000013786018503013417O6

Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _____

AM6MI (0401)                    Page 7 of 16                    Form 3023 1/01

0137860185 - 5653

11/01/2005  4:13:12



0000013786018503013417017

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward

Initials: _____

AM6MI (0401)                          Page 8 of 16                          Form 3023 1/01

0137860185 - 5653

11/01/2005  4:13:12



0000013786018503013 41708

the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Initials: _____

AM6MI (0401)                    Page 9 of 16                    Form 3023 1/01

0137860185 - 5653

11/01/2005 4:13:12



00000137860185030134170 9

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

Initials: _____

AM6MI (0401)           Page 10 of 16           Form 3023 1/01

0137860185 - 5653

11/01/2005  4:13:12



0000013786018503013341710

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

AM6MI (0401)                                   Page 11 of 16                                   Form 3023 1/01

0137860185 - 5653

11/01/2005  4:13:12



000001378601850301341711

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable ·Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,



0000013786018503013417 12

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous

AM6MI (0401)                          Page 13 of 16          Initials: _____          Form 3023 1/01

0137860185 - 5653

11/01/2005 4:13:12



0000013786018503013417 13

Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Initials: _____

AM6MI (0401)          Page 14 of 16          Form 3023 1/01

0137860185 - 5653

11/01/2005 4:13:12



0000013786018503013417714

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                           LORI Ann DUSSIA                    -Borrower

_____          _____ (Seal)
                                                                             -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower

0137860185-5653

11/01/2005 4:13:12



0000013786018503013341715

**STATE OF MICHIGAN,**       County ss:

Acknowledged before me in _____ County,
Michigan, on _____ by
           Day/Month/Year

_____

_____

_____


_____
Notary Public, State of Michgan,
County of
My Commission Expires
Acting in the County of


This instrument was prepared By:
      Ameriquest Mortgage Company
      Kenneth Gunderman III
      325 E. Grand River Ave., #255,East Lansing, MI 48823



00000137860185030134171 6

400-16MI (12/03)          Page 16 of 16          0137860185 - 5653

                                 11/01/2005 4:13:12 PM

BORROWER NAME:

LOAN NUMBER:  0137860185 - 5653

## LEGAL DESCRIPTION

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 2nd day of November , 2005 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

10905 SHELP LAKE DRIVE, Delton, MI 49046
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **8.350 %**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of December, 2007 , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

Initials_____

Loan Number: 0137860185 - 5653



0000013786018503021503 01

11/01/2005 4:13:12 PM

610-1 (Rev 1/01)

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and one-quarter** percentage points ( **6.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.350% or less than 8.350%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %**) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.350)% or less than 8.350)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_____

Loan Number: 0137860185 - 5653



0000013786018503021 50302

610-2 (Rev 1/01)                     Page 2 of 3

11/01/2005 4:13:12 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
Borrower LORI Ann DUSSIA                          Borrower


_____ (Seal)        _____ (Seal)
Borrower                                          Borrower


Loan Number:  0137860185 - 5653


0000001378601850302150303

# EXHIBIT D

Nov. 2. 2005  3:54PM    AMERIQUEST 517-324-7190          No. 8381    P. 2

**A. Settlement Statement**

**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265

| B. Type of Loan | | | |
|---|---|---|---|
| 1. ☐ FHA  2. ☐ FmHA  3. ☒ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
| 4. ☐ VA  5. ☐ Conv Ins.  6. ☐ Seller Finance | MTL6148 | 0137860185 | |

C. Note:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Lori Ann Duszia<br>16905 Shelp Lake Drive<br>Dalton, MI 49046 | | Ameriquest Mortgage Company<br>325 E. Grand River Ave. #255<br>East Lansing, MI 48823 |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| Shady Heights, Lot 17, Book 3, Page 37<br>16905 Shelp Lake Drive<br>Dalton, MI 49046 | Michigan Title<br>544 Cherbourg Dr  Ste 100<br>Lansing, MI 48917   Tax ID: 540278746 |

| | Place of Settlement | L. Settlement Date |
|---|---|---|
| | Michigan Title<br>544 Cherbourg Dr  Ste 100<br>Lansing, MI 48917 | 11/2/2005<br>Fund: 11/9/2005 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due from Borrower | | 400. Gross Amount Due to Seller | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to borrower | $10,704.18 | 403. | |
| 104. Payoff EMC Mortgage | $106,042.00 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City property taxes | | 406. City property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Annual Assessments | | 408. Annual Assessments | |
| 109. Yearly Tax | | 409. Yearly Tax | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| 120. Gross Amount Due From Borrower | $116,746.18 | 420. Gross Amount Due to Seller | $0.00 |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess Deposit | |
| 202. Principal amount of new loan(s) | $135,000.00 | 502. Settlement Charges to Seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing Loan(s) Taken Subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City property taxes | | 510. City property taxes | |
| 211. County property taxes | | 511. County property taxes | |
| 212. Annual Assessments | | 512. Annual Assessments | |
| 213. Yearly Tax | | 513. Yearly Tax | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | $135,000.00 | 520. Total Reduction Amount Due Seller | $0.00 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross Amount due from borrower (line 120) | $116,746.18 | 601. Gross Amount due to seller (line 420) | $0.00 |
| 302. Less amounts paid by/for borrower (line 220) | $135,000.00 | 602. Less reductions in amt. due seller (line 520) | $0.00 |
| 303. Cash To Borrower | $18,253.82 | 603. Cash  Seller | $0.00 |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following:  • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;

Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate;  • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement.  These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. The information requested does not lend itself to confidentiality.

Nov. 2. 2005 3:55PM AMERIQUEST 517-324-7190 No. 8381 P. 3

File No. MTL6148

| L. Settlement Charges | | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | $0.00 | | @ % × $0.00 | | |
| Division of Commission (line 700) as follows: | | | | | | |
| 701. | | to | | | | |
| 702. | | to | | | | |
| 703. Commission Paid at Settlement | | | | | $0.00 | $0.00 |
| 800. Items Payable In Connection with Loan | | | | | | |
| 801. Loan Origination Fee % | | to | | | | |
| 802. Loan Discount 4.859% | | to Ameriquest Mortgage Company | | | $6,559.65 | |
| 803. Appraisal Fee | | to Ameriquest Mortgage Company | | | $450.00 | |
| 804. Credit Report | | to | | | | |
| 805. Lender's Inspection Fee | | to | | | | |
| 806. Mortgage Insurance Application | | to | | | | |
| 807. Assumption Fee | | to | | | | |
| 808. Lenders Processing Fee | | to Ameriquest Mortgage Company | | | $626.00 | |
| 809. Admin Fee | | to Ameriquest Mortgage Company | | | $239.00 | |
| 810. Application Fee | | to Ameriquest Mortgage Company | | | $360.00 | |
| 811. . | | to | | | | |
| 812. . | | to | | | | |
| 813. . | | to | | | | |
| 900. Items Required by Lender To Be Paid In Advance | | | | | | |
| 901. Interest from 11/9/2005 to 12/1/2005 @ $30.88/day | | | | | $679.36 | |
| 902. Mortgage Insurance Premium for months | | to | | | | |
| 903. Hazard Insurance Premium for years | | to | | | | |
| 904. Flood Insurance Premium | | to | | | | |
| 905. | | to | | | | |
| 1000. Reserves Deposited With Lender | | | | | | |
| 1001. Hazard Insurance | | 3 months @ | $70.00 | per month | $210.00 | |
| 1002. Mortgage Insurance | | months @ | | per month | | |
| 1003. City property taxes | | months @ | | per month | | |
| 1004. County property taxes | | 9 months @ | $71.63 | per month | $644.67 | |
| 1005. Annual Assessments | | months @ | | per month | | |
| 1006. Yearly Tax | | months @ | | per month | | |
| 1007. | | months @ | | per month | | |
| 1008. | | months @ | | per month | | |
| 1009. | | 0 months @ | | per month | | |
| 1010. | | 0 months @ | | per month | | |
| 1011. Aggregate Adjustment | | | | | | |
| 1100. Title Charges | | | | | | |
| 1101. Settlement or closing fee | | to LandAmerica Michigan Title | | | $50.00 | |
| 1102. Abstract or title search | | to | | | | |
| 1103. Title examination | | to | | | | |
| 1104. Title insurance binder | | to | | | | |
| 1105. Document Preparation | | to | | | | |
| 1106. Notary fees | | to nat rocco | | | $300.00 | |
| 1107. Attorney's fees | | to | | | | |
| (includes above items numbers: | | | | ) | | |
| 1108. Title Insurance | | to LandAmerica Michigan Title | | | $429.50 | |
| (includes above items numbers: | | | | ) | | |
| 1109. Lender's coverage | | $135,000.00/$429.50 . | | | | |
| 1110. Owner's coverage | | $0.00/$0.00 | | | | |
| 1111. Courier Fee | | to LandAmerica Michigan Title | | | $70.00 | |
| 1112. Recording Processing Fee | | to | | | | |
| 1200. Government Recording and Transfer Charges | | | | | | |
| 1201. Recording Fees Deed | | ; Mortgage $86.00 | ; Releases | | $86.00 | |
| 1202. City/County Tax Deed Stamps | | ; Mortgage | to | | | |
| 1203. State Tax/Stamps Deed | | ; Mortgage | to | | | |
| 1204. Recording Processing Fee | | to | | | | |
| 1300. Additional Settlement Charges | | | | | | |
| 1301. Survey | | to | | | | |
| 1302. Pest Inspection | | to | | | | |
| 1303. Overnight/Delivery Services | | to | | | | |
| 1304. | | to | | | | |
| 1305. | | to | | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | | | | $10,704.18 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

Nov. 2. 2005 3:55PM AMERIQUEST 517-324-7190 Title    No. 8381   P. 4

File No. MTL6148

Lori Ann Dussia

### SETTLEMENT AGENT CERTIFICATION

HUD-1 Settlement Statement which I have prepared is a true and accurate ount of this transaction. I have caused the funds to be disbursed in ...cordance with this statement.

Settlement Agent                    Date

Warning: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Previous Editions are Obsolete                    Page 3                    form HUD-1 (3/86)
                                                                           Handbook 4305.2

EXHIBIT E

## CLOSING INSTRUCTIONS
## ITEMIZATION OF SETTLEMENT CHARGES

| Title Company/Attorney | Title Officer/Attorney | Phone Number | Order Number |
|---|---|---|---|
| MICHIGAN TITLE | PATRICK T. DARDEN | (517)323-4300 | MTL6148 |

| Borrower(s) | Property Address |
|---|---|
| ΡRI Ann DUSSIA | 10905 SHELP LAKE DRIVE |
| | Delton          MI          49046 |
| | Loan Number: 0137860185 |

FROM: Ameriquest Mortgage Company - Bakersfield, CA __ Phone No. **(661)321-3364**      Fax **(661)321-3375**
Branch Name      Branch Phone No.      Branch Fax Number

BELOW IS A LIST OF ALL SETTLEMENT CHARGES AND DISBURSEMENTS APPLICABLE TO THIS LOAN. YOU MUST USE THESE FIGURES TO PREPARE YOUR SETTLEMENT STATEMENT. YOU CANNOT DEVIATE FROM THESE FIGURES WITHOUT PRIOR WRITTEN AUTHORIZATION FROM VICE PRESIDENT OF LOAN OPERATIONS AND/OR ITS DIRECTORS . IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.

| LINE NO. ON SETTLEMENT STATEMENT | PAYEE | | AMOUNT |
|---|---|---|---|
| 801. Loan origination fee    % to | | | |
| 802. Loan discount  4.859  % to  Ameriquest Mortgage Company | | | $6,559.65 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | | | $450.00 |
| 804. Credit Report fee | | | |
| 805. Inspection fee | | | |
| 806. Yield Spread Premium to | | | |
| 809. | | | |
| 810. Tax Related Service Fee to | | | |
| 811. Flood Search Fee to | | | |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | | | $626.00 |
| 813.Admin to Ameriquest Mortgage Company | | | $239.00 |
| 814. Doc. Prep. Fee to | | | |
| 815. Credit Report Fee to | | | |
| 816. Origination Fee    % to | | | |
| 817. Application Fee to  Ameriquest Mortgage Company | | | $360.00 |
| 818. Underwriting Fee to | | | |
| 819. Service Provider Fee to | | | |
| 820. Processing Fee  to | | | |
| 821. Underwriting Fee to | | | |
| 822. Appraisal Fee to | | | |
| 901. Interest from 11/09/2005  to  12/01/2005  @  $30.88  per day | | | $679.36 |
| 902. Mortgage insurance premium for          months to | | | |
| 903. Hazard ins prem  to | | | |
| 904. Flood ins prem  to | | | |
| 1001. Hazard insurance  3  months @ $ 70.00  per month | | | $210.00 |
| 1002. Mortgage insurance    months @ $    per month | | | |
| 1003. Earthquake ins    months @ $    per month | | | |
| 1004. County prop. taxes  9  months @ $  71.63  per month | | | $644.67 |
| 1005. Annual assess.    months @ $    per month | | | |
| 1006. Flood    months @ $    per month | | | |
| 1007. Windstorm ins    months @ $    per month | | | |
| 1008. | | | |
| 1101. Settlement or closing fee to  MICHIGAN TITLE | | (W) | $50.00 |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to  nat rocco | | | $300.00 |
| 1107. Attorney's fees to | | | |
| 1108. Title insurance to  MICHIGAN TITLE | | (W) | $447.00 |
| 1109. Lender's coverage | | | |
| 1110. Owner's coverage        $ | | | |
| 1111. Settlement/Disbursement fee to | | | |
| 1112. Escrow Fee to | | | |
| 1201. Recording fees | | (W) | $86.00 |
| 1202. City/county tax/stamps | | | |
| 1203. State tax/ stamps | | | |
| 1204. State specific fee | | | |
| 1301. Demand to | | | |
| 1302. Pest Inspection to | | | |
| 1303. Survey Fee | | | |
| 1304. Staff Appraiser Fee | | | |
| 1305. Reconveyance Fee to | | | |
| 1306. | | | |
| 1307. Property Val Fee to | | | |
| 1308. Courier Fee | | (W) | $70.00 |

.y amounts appearing on these lines are prepaid finance charges and cannot be increased or added once loan documents nave been prepared unless new loan documents are generated.

---

Title Company Representative Signature       Date



00000137860185030743070 6

## CLOSING INSTRUCTIONS
## ITEMIZATION OF SETTLEMENT CHARGES

| Title Company/Attorney | Title Officer/Attorney | Phone Number | Order Number |
|---|---|---|---|
| **MICHIGAN TITLE** | **PATRICK T. DARDEN** | **(517)323-4300** | **MTL6148** |

| Borrower(s) | Property Address |
|---|---|
| 'RI Ann DUSSIA | 10905 SHELP LAKE DRIVE |
| | Delton                MI          49046 |
| | Loan Number: 0137860185 |

FROM: **Ameriquest Mortgage Company - Bakersfield, CA**   Phone No. **(661)321-3364** _____ Fax **(661)321-3375**
Branch Name                                                            Branch Phone Number                              Branch Fax Number

BELOW IS A LIST OF ALL SETTLEMENT CHARGES AND DISBURSEMENTS APPLICABLE TO THIS LOAN. YOU MUST USE THESE FIGURES TO PREPARE YOUR SETTLEMENT STATEMENT. YOU CANNOT DEVIATE FROM THESE FIGURES WITHOUT PRIOR WRITTEN AUTHORIZATION FROM VICE PRESIDENT OF LOAN OPERATIONS AND/OR ITS DIRECTORS. IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.

| LINE NO. ON SETTLEMENT STATEMENT                    PAYEE | AMOUNT |
|---|---|
| 801. Loan origination fee      % to | |
| 802. Loan discount  4.859  % to  Ameriquest Mortgage Company | $6,559.65 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | $450.00 |
| 804. Credit Report fee | |
| 805. Inspection fee | |
| 806. Yield Spread Premium to | |
| 809. | |
| 810. Tax Related Service Fee to | |
| 811. Flood Search Fee to | |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | $626.00 |
| 813.Admin to Ameriquest Mortgage Company | $239.00 |
| 814. Doc. Prep. Fee to | |
| 815. Credit Report Fee to | |
| 816. Origination Fee      % to | |
| 817. Application Fee to  Ameriquest Mortgage Company | $360.00 |
| 818. Underwriting Fee to | |
| 819. Service Provider Fee to | |
| 820. Processing Fee  to | |
| 821. Underwriting Fee to | |
| 822. Appraisal Fee to | |
| 901. Interest from 11/09/2005  to  12/01/2005  @  $30.88  per day | $679.36 |
| 902. Mortgage insurance premium for            months to | |
| 903. Hazard ins prem  to | |
| 904. Flood ins prem  to | |
| 1001. Hazard insurance  3  months @ $ 70.00  per month | $210.00 |
| 1002. Mortgage insurance       months @ $   per month | |
| 1003. Earthquake Ins     months @ $    per month | |
| 1004. County prop. taxes  9  months @ $ 71.63  per month | $644.67 |
| 1005. Annual assess.   months @ $    per month | |
| 1006. Flood     months @ $    per month | |
| 1007. Windstorm Ins     months @ $    per month | |
| 1008. | |
| 1101. Settlement or closing fee to  MICHIGAN TITLE                              (W)   $50.00 | |
| 1102. Abstract or title search to | |
| 1103. Title examination to | |
| 1105. Document preparation to | |
| 1106. Notary fees to  nat rocco | $300.00 |
| 1107. Attorney's fees to | |
| 1108. Title insurance to  MICHIGAN TITLE                                        (W)   $447.00 | |
| 1109. Lender's coverage | |
| 1110. Owner's coverage          $ | |
| 1111. Settlement/Disbursement fee to | |
| 1112. Escrow Fee to | |
| 1201. Recording fees                                                             (W)   $86.00 | |
| 1202. City/county tax/stamps | |
| 1203. State tax/ stamps | |
| 1204. State specific fee | |
| 1301. Demand to | |
| 1302. Pest Inspection to | |
| 1303. Survey Fee | |
| 1304. Staff Appraiser Fee | |
| 1305. Reconveyance Fee to | |
| 1306. | |
| 1307. Property Val Fee to | |
| 1308. Courier Fee                                                                (W)   $70.00 | |

⌐ amounts appearing on these lines are prepaid finance charges and cannot be increased or added once loan documents have been prepared unless new loan documents are generated.



00000137860185030743070G

_____          _____
Title Company Representative Signature          Date

# EXHIBIT F

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

☐ Preliminary  |X| Final

LENDER: Ameriquest Mortgage Company
325 E. Grand River Ave., #255
East Lansing, MI 48823
(888)419-6528

Broker License:

Borrowers: LORI Ann DUSSIA

Type of Loan: ADJUSTABLE RATE
Date: November 2, 2005

Address: 10905 SHELP LAKE DRIVE
City/State/Zip: Delton, MI 49046

Loan Number: 0137860185 - 5653

Property: 10905 SHELP LAKE DRIVE, Delton, MI 49046

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 10.853 % | $ 314,866.92 | $ 126,115.99 | $ 440,982.91 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,023.72 | 01/01/2006 | | | |
| 6 | $1,213.17 | 01/01/2008 | | | |
| 329 | $1,239.81 | 07/01/2008 | | | |
| 1 | $1,237.12 | 12/01/2035 | | | |

**VARIABLE RATE FEATURE:**
|X| Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 10905 SHELP LAKE DRIVE, Delton, MI 49046

**ASSUMPTION:** Someone buying this property
|X| cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:** You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:** If a payment is late, you will be charged **5.000%** of the overdue payment .

**PREPAYMENT:** If you pay off your loan early, you
|X| may  ☐ will not  have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary    [X] Final

LENDER: Ameriquest Mortgage Company
325 E. Grand River Ave., #255
East Lansing, MI 48823
(888)419-6528

Broker License:

Borrowers: LORI Ann DUSSIA

Type of Loan:  ADJUSTABLE RATE
Date:  November 2, 2005

Address:      10905 SHELP LAKE DRIVE
City/State/Zip:  Delton, MI 49046

Loan Number:  0137860185 - 5653

Property:     10905 SHELP LAKE DRIVE, Delton, MI  49046

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 10.853 % | $ 314,866.92 | $ 126,115.99 | $ 440,982.91 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,023.72 | 01/01/2006 | | | |
| 6 | $1,213.17 | 01/01/2006 | | | |
| 329 | $1,239.81 | 07/01/2008 | | | |
| 1 | $1,237.12 | 12/01/2035 | | | |

**VARIABLE RATE FEATURE:**
[X] Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**   You are giving a security interest in the property located at: 10905 SHELP LAKE DRIVE, Delton, MI 49046

**ASSUMPTION:**   Someone buying this property
[X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**   You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**   If a payment is late, you will be charged **5.000%** of the overdue payment .

**PREPAYMENT:**   If you pay off your loan early, you
[X] may   [ ] will not   have to pay a penalty.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

EXHIBIT G

# NOTICE OF RIGHT TO CANCEL

eriquest Mortgage Company

DATE: November 2, 2005
LOAN NO.: 0137860185 - 5653
TYPE: ADJUSTABLE RATE

): LORI Ann DUSSIA

10905 SHELP LAKE DRIVE
P: Delton,MI 49046

10905 SHELP LAKE DRIVE
Delton, MI 49046

tering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal
ral law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the
occurs last:

e of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
| --- |
| _____ |

;

te you received your Truth in Lending disclosures;

te you received this notice of your right to cancel.

transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we
ce, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your
cancelled, and we must return to you any money or property you have given to us or anyone else in
nis transaction.

ay money or property we have given you until we have done the things mentioned above, but you must
rn the money or property. If it is impractical or unfair for you to return the property you must offer its
. You may offer to return the property at your home or at the location of the property. Money must be
dress below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your
ep it without further obligation.

NCEL

cancel this transaction, you may do so by notifying us in writing, at:

ortgage Company
ss Rd
92806

ATTN: FUNDING
PHONE: (714)634-3494
FAX: (800)664-2256

written statement that is signed and dated by you and states your intention to cancel, or you may use
ng and signing below. Keep one copy of this notice because it contains important information about

mail or telegram, you must
o later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |
| _____ |

he THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver
to cancel some other way, it must be delivered to the above address no later than that time.
EL

_____        _____
                            DATE

ch acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the

# NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   November 2, 2005
LOAN NO.:   0137860185 - 5653
TYPE:   ADJUSTABLE RATE

BORROWER(S): LORI Ann DUSSIA

ADDRESS:          10905 SHELP LAKE DRIVE
CITY/STATE/ZIP:   Delton, MI 49046

PROPERTY:   10905 SHELP LAKE DRIVE
            Delton,  MI  49046

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

**ENTER DOCUMENT SIGNING DATE**

_____   ;

    or
2.   The date you received your Truth in Lending disclosures;
    or
3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN:  **FUNDING**
PHONE: **(714)634-3494**
FAX:      **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

**ENTER FINAL DATE TO CANCEL**

_____

or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____          _____
SIGNATURE                              DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the

# NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: November 2, 2005
LOAN NO.: 0137860185 - 5653
TYPE: ADJUSTABLE RATE

BORROWER(S): LORI Ann DUSSIA

ADDRESS: 10905 SHELP LAKE DRIVE
CITY/STATE/ZIP: Delton, MI 49046

PROPERTY: 10905 SHELP LAKE DRIVE
Delton, MI 49046

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is

**ENTER DOCUMENT SIGNING DATE**
_____

or
2. The date you received your Truth in Lending disclosures;
or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN: **FUNDING**
PHONE: **(714)634-3494**
FAX:     **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

**ENTER FINAL DATE TO CANCEL**
_____

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____          _____
SIGNATURE                                          DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the

# EXHIBIT H

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0137860185 - 5653   Borrower(s): LORI Ann DUSSIA

Date: November 2, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

   Ameriquest Mortgage Company
   1600 S Douglass Rd Anaheim, CA 92806
   ATTN: Funding Department
   Phone: (714)541-9960
   Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.


_____  _____
Borrower/Owner  LORI Ann DUSSIA   Date


_____  _____
Borrower/Owner         Date


_____  _____
Borrower/Owner         Date


_____  _____
Borrower/Owner         Date

---

### REQUEST TO CANCEL

I/We want to cancel loan # _____

_____  _____
Borrower/Owner Signature      Date

---



00000137860185040422 0101

850 (10/00)

11/01/2005 4:13:12 PM

**LENDER COPY**

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0137860185 - 5653          Borrower(s): LORI Ann DUSSIA

Date: November 2, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____          _____
Borrower/Owner  LORI Ann DUSSIA                      Date

_____          _____
Borrower/Owner                                                    Date

_____          _____
Borrower/Owner                                                    Date

_____          _____
Borrower/Owner                                                    Date

---

## REQUEST TO CANCEL

I/We want to cancel loan #_____.

_____          _____
Borrower/Owner Signature                                     Date



0000013786018504042201 01

850 (10/00)

11/01/2005 4:13:12 PM

**BORROWER COPY**

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0137860185 - 5653          Borrower(s): LORI Ann DUSSIA

Date:  November 2, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.**  This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make.  To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.**  No money will be disbursed before 10:00 a.m. on the first business day after this period expires.  Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends.  You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan.  The written statement must be signed and dated by any one borrower.  Your request must be delivered to:

> Ameriquest Mortgage Company
> 1600 S Douglass Rd Anaheim, CA 92806
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____          _____
Borrower/Owner  LORI Ann DUSSIA                   Date

_____          _____
Borrower/Owner                                              Date

_____          _____
Borrower/Owner                                              Date

_____          _____
Borrower/Owner                                              Date

---

### REQUEST TO CANCEL

I/We want to cancel loan #_____.

_____          _____
Borrower/Owner Signature                             Date

---



0000013786018504042201 01

850 (10/00)

11/01/2005 4:13:12 PM

**BORROWER COPY**

# EXHIBIT I

## ITEMS TO BE PAID OFF FROM LOAN PROCEEDS

~ ~rower :  LORI Ann DUSSIA

Loan Number :   0137860185 - 5653

| Payee | Amount |
|---|---|
| EMC MORTGAGE                    (W) | $106,042.00 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Total Wire:    $124,931.32

Loan Amount:              135,000.00

Funds Held By
Lender:

Deposit at Escrow/Title:          $0.00

Borrower Proceeds:   (W)$18,236.32

(W) = Included in Wire

**IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.**

_____          _____
Title Company Representative Signature          Date

895-7UNV  (4/2005)



## ITEMS TO BE PAID OFF FROM LOAN PROCEEDS

Borrower :   LORI Ann DUSSIA

Loan Number :   0137860185 - 5653

| Payee | | Amount |
|-------|---|--------|
| EMC MORTGAGE | (W) | $106,042.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total Wire:   $124,931.32

Loan Amount:            135,000.00

Funds Held By
Lender:

Deposit at Escrow/Title:        $0.00

Borrower Proceeds:   (W)$18,236.32

(W) = Included in Wire

**IMPORTANT: THE DATE OF SETTLEMENT MUST EQUAL THE CLOSING DATE.**

Title Company Representative Signature            Date



00000137860185030743070?

# EXHIBIT J

File No. 10905(Rehab) Part #2



## APPRAISAL OF REAL PROPERTY

### LOCATED AT:
10905 SHELP LAKE DRIVE
08-12-480-012-00
DELTON, MI 49046

### FOR:
AMERIQUEST MORTGAGE CORPORATION
1100 W. TOWN AND COUNTRY ROAD
ORANGE, CA 92868

### AS OF:
10/28/2005

### BY:
ALEXANDER A SAWYER
IN CONJUNCTION WITH
AAA NETWORK
475 RANCH DRIVE
MUSKEGON, MI 49441
PHONE 888-799-8915 / FAX 231-798-8076

AAA Network (888) 799-3915

File No. 10805shelp| Page #3

## FIRREA / USPAP ADDENDUM

Borrower   LORI DUSSIA
Property Address   10905 SHELP LAKE DRIVE
City   DELTON   County   BARRY   State   MI   Zip Code   49046
Lender/Client   AMERIQUEST MORTGAGE CORPORATION

### Purpose
THE PURPOSE OF THIS APPRAISAL IS TO ESTIMATE MARKET VALUE.

### Scope
THE SCOPE OF WORK FOR THIS APPRAISAL INCLUDES AN ANALYSIS OF INFORMATION GATHERED FROM AN INTERIOR/EXTERIOR INSPECTION P.O.
THE SUBJECT PROPERTY, AN EXTERIOR INSPECTION OF ALL COMPARABLE PROPERTIES, MLS DATA, PUBLIC ASSESSING - EQUALIZATION - TAX
DATA, AND INFORMATION PROVIDED BY OWNERS, REALTORS, AND/OR OTHER RELEVANT PARTIES WHEN AVAILABLE.

### Intended User / Intended Use:
THIS APPRAISAL IS INTENDED TO BE USED FOR THE PURPOSES OF FINANCING BY THE CLIENT AND LENDING INSTITUTIONS DEEMED APPROPRIAT
BY THE CLIENT. NO OTHER USE OR USER IS IMPLIED

### History of Property
Current listing information:   THIS APPRAISAL IS INTENDED TO BE USED FOR THE PURPOSES OF FINANCING BY THE CLIENT AND LENDING INSTITUTIONS
DEEMED APPROPRIATE BY THE CLIENT. NO OTHER USE OR USER IS IMPLIED

Prior sale   SEE APPRAISAL ADDENDUM FOR DETAILS.

### Exposure Time / Marketing Time:
SEE APPRAISAL ADDENDUM FOR DETAILS.

### Personal (non-realty) Transfers:
ANY AND ALL PERSONAL PROPERTY TRANSFERS ARE ADDRESSED IN THE ATTACHED APPRAISAL REPORT.

### Additional Comments
APPRAISERS ARE REQUIRED TO BE LICENSED AND ARE REGULATED BY THE MICHIGAN DEPARTMENT OF LABOR AND ECONOMIC GROWTH, P.O.
BOX 30018, LANSING, MICHIGAN, 48909.

### Certification Supplement
1.  This appraisal assignment was not based on a requested minimum valuation, a specific valuation or an approval of a loan.
2.  My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value
    estimate the attainment of a stipulated result or the occurrence of a subsequent event.

Appraiser(s)   ALEXANDER A SAWYER   Supervisory Appraiser(s)
Effective date / Report date   10/28/2005   Effective date / Report date

AAA Network (888) 799-8915

File No. 10906shelp Page #4
BOS 1970-131122985

# UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. 10906shelp

| Property Address | 10906 SHELP LAKE DRIVE | City DELTON | State MI | Zip Code 49046 |
|---|---|---|---|---|

| Legal Description | 08-12-460-012-00 | | County BARRY |
|---|---|---|---|

Assessor's Parcel No. SEC.4, T1N-R10W, LOT 17 SHADY HEIGHTS.  Tax Year 2004-05  R.E. Taxes $ 864  Special Assessments $ NONE APP

Borrower LORI DUSSIA   Current Owner LORI DUSSIA   Occupant ☒ Owner ☐ Tenant ☐ Vacant

Property rights appraised ☒ Fee Simple ☐ Leasehold   Project Type ☐ PUD ☐ Condominium (HUD/VA only)   HOA $ /Mo.

Neighborhood or Project Name SHELP LAKE   Map Reference 24340   Census Tract 0105.00

Sale Price $ 150,000   Date of Sale N/A   Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client AMERIQUEST MORTGAGE CORPORATION   Address 1100 W. TOWN AND COUNTRY ROAD, ORANGE, CA 92868

Appraiser ALEXANDER A SAWYER   Address 478 RANCH DR, MUSKEGON, MI 49441

| Location | ☐ Urban ☒ Suburban ☐ Rural |
| Built up | ☐ Over 75% ☒ 25-75% ☐ Under 25% |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow |
| Property values | ☐ Increasing ☒ Stable ☐ Declining |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply |
| Marketing time | ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. |

Single family housing
PRICE $(000) / AGE (yrs)
Low 125 / Low 20
High 500 / High 75
Predominant 175 / 55

Present land use %
One family 05
2-4 family
Multi-family
Commercial
PUBLIC 6

Land use change
☒ Not likely ☐ Likely
☐ In process
To: ____

Occupancy: ☒ Owner ☐ Tenant ☐ Vacant (0-5%) ☐ Vacant (over 5%)

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: A TEN MILE RADIUS AROUND THE SUBJECT WAS USED AS THE NEIGHBORHOOD BOUNDARY. HOMES WITHIN THIS RADIUS ENJOY THE SAME LEVEL OF ECONOMIC AND SOCIAL CONDITIONS AND PUBLIC SERVICES AS TO BE MARKET.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): SIMILAR PROPERTIES WITHIN THE NEIGHBORHOOD ARE WELL MAINTAINED AND RANGE IN STYLE, CONDITION, AND MARKET APPEAL. THE NEIGHBORHOOD IS LOCATED IN NOT CLOSE PROXIMITY TO INTERSTATE HIGHWAYS, SHOPPING, ENTERTAINMENT, HOSPITALS, SCHOOLS, AND COLLEGES/UNIVERSITIES. NEIGHBORHOOD AMENITIES ARE CONSIDERED TO BE AVERAGE FOR THE AREA. LOCAL CIVIL SERVICES AND PUBLIC TRANSPORTATION ARE APPROPRIATE TO THE POPULATION DENSITY.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): THE SUBJECT IS LOCATED IN A STABLE REGION CONSISTING OF SEVERAL METROPOLITAN CENTERS OF VARYING SIZE AND SEVERAL RAPIDLY DEVELOPING SUBURBAN AND RURAL MARKETS. THE LOCAL ECONOMY IS STRONG AND SUPPORTED BY DIVERSE SOURCES OF EMPLOYMENT. FINANCING CONCESSIONS ARE SOMEWHAT TYPICAL AT THIS TIME, HOWEVER, THERE WAS NO ADVERSE IMPACT ON MARKETABILITY OF PROPERTIES SIMILAR TO THE SUBJECT. MARKET EXPOSURE IS ADEQUATE AND MARKETING TIME IS AVERAGE FOR THE AREA.

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? ☐ Yes ☐ No
Approximate total number of units in the subject project ____   Approximate total number of units for sale in the subject project ____
Describe common elements and recreational facilities. ____

| Dimensions IRREGULAR | | Topography SLOPES TO LAKE |
| Site area 50' LAKE FRONTAGE | Corner Lot ☐ Yes ☒ No | Size TYPICAL FOR AREA |
| Specific zoning classification and description ZONE- R1  CLASS-401 | | Shape IRREGULAR/FOLLOWS SHORELINE |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | Drainage APPEARS ADEQUATE |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | | View RES.LAKE FRONT |

Landscaping MATURE/AVERAGE
Driveway Surface GRAVEL
Apparent easements ROAD AND UTILITY
FEMA Special Flood Hazard Area ☐ Yes ☒ No
FEMA Zone N/A   Map Date N/A
FEMA Map No. NONE

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | GRAVEL | ☒ | |
| Gas | ☒ | | Curb/gutter | NONE | | ☐ |
| Water | ☐ | WELL | Sidewalk | NONE | | ☐ |
| Sanitary sewer | ☐ | SEPTIC | Street lights | NONE | | ☐ |
| Storm sewer | ☐ | NONE | Alley | NONE | | ☐ |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): THE SUBJECT SITE IS SUBURBAN IN LOCATION AND PHYSICAL CHARACTERISTICS. THERE WERE NO ADVERSE EASEMENTS, ENCROACHMENTS, SPECIAL ASSESSMENTS, SLIDE AREAS, OR NONCONFORMING/ILLEGAL ZONING USES NOTED

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units ONE | Foundation CONCRETE BLK | Slab PARTIAL | Area Sq. Ft. 0 | Roof |
| No. of Stories 1 | Exterior Walls VINYL | Crawl Space PARTIAL | % Finished 0 | Ceiling |
| Type (Det./Att.) DETACHED | Roof Surface C/A SHINGLE | Basement NONE | Ceiling N/A | Walls |
| Design (Style) RANCH | Gutters & Dwnspts. NONE/NONE | Sump Pump NONE | Walls N/A | Floor |
| Existing/Proposed EXISTING | Window Type VINYL/DH | Dampness NONE APPARENT | Floor N/A | None |
| Age (Yrs.) 59 | Storm/Screens BUILT IN | Settlement NONE NOTED | Outside Entry N/A | Unknown ☒ |
| Effective Age (Yrs.) 20 | Manufactured House NO | Infestation NONE NOTED | | CONCEALED |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 0 |
| Level 1 | | 1 | AREA | 1 | | | | 2 | 1.6 | | | 1,052 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains:  5 Rooms;  2 Bedroom(s);  1.5 Bath(s);  1,052 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | AMENITIES | CAR STORAGE: NONE |
|---|---|---|---|---|---|---|
| Floors | CRT,VNL/AVG | Type FA | Refrigerator ☒ | None ☒ | Fireplace(s) # NONE ☐ | None ☒ |
| Walls | DW,PNT/AVG | Fuel NG | Range/Oven ☒ | Stairs ☐ | Patio NONE ☐ | Garage # of Cars |
| Trim/Finish | WD,STN/AVG | Condition AVG | Disposal ☐ | Drop Stair ☐ | Deck EXTENSIVE ☒ | Attached ☐ |
| Bath Floor | VINYL/GD | COOLING | Dishwasher ☐ | Scuttle ☒ | Porch REAR ☒ | Detached ☐ |
| Bath Wainscot | RESIN/GD | Central NONE | Fan/Hood ☒ | Floor ☐ | Fence NONE ☐ | Built-in ☐ |
| Doors | INT-HC/AVG | Other N/A | Microwave ☒ | Heated ☐ | Pool NONE ☐ | Carport ☐ |
| | EXT-WOOD/AVG | Condition N/A | Washer/Dryer ☒ | Finished ☐ | | Driveway 3+ ☒ |

Additional features (special energy efficient items, etc.): THE SUBJECT HAS 4 CEILING FANS, HAS TONGUE AND GROOVE CEILINGS IN SOME ROOMS AND HAS A LARGE LAKE SIDE PORCH.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: THE SUBJECT IS AN AVERAGE MAINTAINED STICK-BUILT HOME OF AVERAGE CONSTRUCTION WITH TYPICAL PHYSICAL DEPRECIATION AND NO FUNCTIONAL OR EXTERNAL DEPRECIATION NOTED. THERE WAS NO DEFERRED MAINTENANCE OR NEEDED REPAIRS NOTED.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property.: THERE WERE NO APPARENT ADVERSE ENVIRONMENTAL CONDITIONS NOTED AT THE TIME OF INSPECTION.

PAGE 1 OF 2
Freddie Mac Form 70  6/93                                           Fannie Mae Form 1004  6/93

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 1090Sshelp Page #3

6051970-131122985

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 1090Sshelp

**Valuation Section**

| ESTIMATED SITE VALUE | = $ | 80,000 |
|---|---|---|

ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS:

| Dwelling | 1,052 Sq. Ft @$ | 102.00 | = $ | 107,304 |
|---|---|---|---|---|
| | Sq. Ft @$ | | = $ | |
| DECK | | | = | 2,500 |
| Garage/Carport | Sq. Ft @$ | | = $ | |
| Total Estimated Cost New | | | = $ | 109,804 |
| Less | Physical | Functional | External | |
| Depreciation | 36,698 | | = $ | 36,698 |
| Depreciated Value of Improvements | | | = $ | 73,206 |
| "As-is" Value of Site Improvements | | | = $ | 4,500 |
| INDICATED VALUE BY COST APPROACH | | | = $ | 157,706 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD VA and FmHA, the estimated remaining economic life of the property): SITE VALUE ESTIMATE IS BASED ON THE APPRAISER'S KNOWLEDGE OF THE LOCAL MARKET AND AN ANALYSIS OF AVAILABLE SITE SALES OF SIMILAR CHARACTERISTICS AND MARKET APPEAL. THE ESTIMATED REPLACEMENT COSTS WERE DERIVED FROM LOCAL CONTRACTORS AND VENDORS.

REMAINING PHYSICAL AND ECONOMIC LIFE = 80 YRS

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 10906 SHELP LAKE DRIVE DELTON | 11803 FAIR LAKE DRIVE DELTON | 11547 SCOTT PARK ROAD DELTON | 10747 SHELP LAKE DRIVE DELTON |
| Proximity to Subject | | 6.95 miles | 7.21 miles | 0.22 miles |
| Sales Price | $ 150,000 | $ 150,000 | $ 162,000 | $ 140,000 |
| Price/Gross Living Area | $ 142.59 | $ 120.88 | $ 217.20 | $ 128.91 |
| Data and/or Verification Source | INSPECTION PBLC RCRDS, MLS | MLS # 2616774 MLS | MLS # 2616493 MLS | MLS # 2528903 MLS |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | CONVENTIONAL | CONVENTIONAL NONE NOTED | | FHA NONE NOTED | | CONVENTIONAL NONE NOTED | |
| Date of Sale/Time | | 5/24/05 DOM 5 | | 9/20/05 DOM 104 | | 9/2/05 DOM 39 | |
| Location | SUBURBAN | SUBURBAN | | SUBURBAN | | SUBURBAN | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 50' LAKE FRONT | 49' LAKE FRONT | +3,200 | 100' LAKE FRONT | EVEN | 50' LAKE FRONT | |
| View | RES,LAKE FRONT | RES,LAKE FRONT | | RES,LAKE FRONT | | RES,LAKE FRONT | |
| Design and Appeal | RANCH | BUNGALOW/AVG | | RANCH/AVG | | RANCH/AVG | |
| Quality of Construction | VINYL/AVG | VINYL/AVG | | ALUM/AVG | | VINYL/AVG | |
| Age | A50/20 | A55/20 | | A40/E20 | | A63/20 | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade Room Count | Total 5 Bdrms 2 Baths 1.5 | Total 5 Bdrms 2 Baths 1 | +1,000 | Total 4 Bdrms 1 Baths 1 | +1,000 | Total 5 Bdrms 2 Baths 1 | +1,000 |
| Gross Living Area | 1,052 Sq. Ft. | 1,326 Sq. Ft. | −6,384 | 750 Sq. Ft. | +4,832 | 1,086 Sq. Ft. | −544 |
| Basement & Finished Rooms Below Grade | CRAWL,SLAB NONE | SLAB NONE | | FULL BASEMENT 1BD,1F | −7,600 −1,500 | CRAWL,SLAB NONE | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | NGFA/ NO CEN AC | PPFA/NO CEN AC | | PPFA/NO CEN AC | | PPFA/NO CEN AC | |
| Energy Efficient Items | NONE NOTED | NONE NOTED | | NONE NOTED | | NONE NOTED | |
| Garage/Carport | NONE | 2 CAR | −5,000 | 2 CAR | −5,000 | CARPORT (2) | −1,000 |
| Porch, Patio, Deck, Fireplace(s), etc. | DECK NONE | PATIO ONE FIREPLACE | +1,000 −750 | DECK ONE FIREPLACE | −750 | DECK NONE | |
| Fence, Pool, etc. | NONE | NONE | | NONE | | LAKEFRONT SHED | −500 |
| OTHER | NONE | | | | | | |
| Net Adj. (total) | | ☐+ ☒− $ | 4,934 | ☒+ ☐− $ | 8,918 | ☒+ ☐− $ | 1,044 |
| Adjusted Sales Price of Comparable | | Net 3.3% Gross 7.9% $ 155,086 | | Net 5.5% Gross 26.9% $ 153,982 | | Net 0.7% Gross 2.7% $ 138,956 | |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): *****SEE TEXT ADDENDUM*****

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | NO PRIOR SALES LAST 3 YRS PER MLS & PR | NO PRIOR SALES THE LAST 12 MONTHS PER MLS AND PUBLIC RECORDS | NO PRIOR SALES THE LAST 12 MONTHS PER MLS AND PUBLIC RECORDS | NO PRIOR SALES THE LAST 12 MONTHS PER MLS AND PUBLIC RECORDS |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: CURRENT AGREEMENT DOES NOT APPLY - NO KNOWN LISTING OR SALES HISTORY AVAILABLE WITHIN THE LAST 3 YEARS PER MLS AND PUBLIC RECORDS.

| INDICATED VALUE BY SALES COMPARISON APPROACH | $ 150,000 |
|---|---|

INDICATED VALUE BY INCOME APPROACH (if Applicable) Estimated Market Rent $ /mo. x Gross Rent Multiplier = $

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans & specifications.

Conditions of Appraisal: NONE

Final Reconciliation: THE SALES COMPARISON APPROACH WAS GIVEN GREATEST CONSIDERATION IN FINAL DETERMINATION OF MARKET VALUE. THE COST APPROACH WAS FOUND TO SUPPORT THE SALES ANALYSIS CONCLUSIONS. THE INCOME APPROACH DOES NOT APPLY.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form #439/FNMA form 1004B (Revised 6/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 10/28/2005 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 150,000.

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature ☐ Did ☐ Did Not Inspect Property |
| Name ALEXANDER A SAWYER | Name |
| Date Report Signed 10/28/2005 | Date Report Signed |
| State Certification # | State Certification # State |
| Or State License # 1201-00-5137 State MI | Or State License # State |

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**Supplemental Addendum**

File No. 10905shelp    Page #6

File No. 10905shelp

| Borrower/Client | LORI DUSSIA | | | |
|---|---|---|---|---|
| Property Address | 10905 SHELP LAKE DRIVE | | | |
| City DELTON | County BARRY | State MI | Zip Code 49046 |
| Lender | AMERIQUEST MORTGAGE CORPORATION | | | |

### URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach

A THROUGHOUT SEARCH OF THE SUBJECT NEIGHBORHOOD REVEALED A LIMITED
NUMBER OF COMPARABLE SALES SIMILAR TO THE SUBJECT. ALL SALES WERE
CONSIDERED TO BE THE BEST AVAILABLE WITH CONSIDERATION TO ARCHITECTURE,
SIZE, AMENITIES, LAKE FRONTAGE, AND PROXIMITY TO THE SUBJECT - PER MLS.

COMPARABLE # 2 IS LOCATED ON A SMALLER LAKE AND FRONTAGE FOOT VALUE IS
HALF OF THAT OF SUBJECT AND COMPARABLES # 1 & 3.

FRONTAGE FOOTAGE WAS ADJUSTED @ $1,600 PER FOOT AND DWELLING SIZE WAS
ADJUSTED @ $16 PER S/F. THE MARKET INDICATES THAT, OTHER THAN BATHROOMS,
ROOM COUNT IS ADJUSTED FOR AS TOTAL S/F.

SUBJECT AND SOME OR ALL COMPARABLES USE A COMBINATION OF WELL AND
SEPTIC SYSTEMS. THESE SYSTEM ARE COMMON FOR THE AREA AND HAVE NO
EFFECT ON PRICE OR MARKETABILITY.

GRAVEL ROADS ARE COMMON AROUND LAKES IN BARRY AND OTHER COUNTIES.
MANY ARE THAT WAY BY LOCAL GOVERNMENT ORDINANCE TO LIMIT RAIN WATER
RUN OFF.

File No. 10995 stein| Page #7

# MULTI-PURPOSE SUPPLEMENTAL ADDENDUM
# FOR FEDERALLY RELATED TRANSACTIONS

AAA Network (888) 799-8915

| Borrower/Client | LORI DUBBIA | | | |
|---|---|---|---|---|
| Property Address | 10995 SHELP LAKE DRIVE | | | |
| City DELTON | | County BARRY | State MI | Zip Code 49046 |
| Lender | AMERIQUEST MORTGAGE CORPORATION | | | |

This Multi-Purpose Supplemental Addendum for Federally Related Transactions was designed to provide the appraiser with a convenient way to comply with the current appraisal standards and requirements of the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of Currency (OCC), the Office of Thrift Supervision (OTS), the Resolution Trust Corporation (RTC), and the Federal Reserve.

> **This Multi-Purpose Supplemental Addendum is for use with any appraisal. Only those statements which have been checked by the appraiser apply to the property being appraised.**

☒ **PURPOSE & FUNCTION OF APPRAISAL**

The purpose of the appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender in evaluating the subject property for lending purposes. This is a federally related transaction.

☒ **EXTENT OF APPRAISAL PROCESS**

☒ The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales within the subject market area. The original source of the comparables is shown in the Data Source section of the market grid along with the source of confirmation, if available. The original source is presented first. The sources and data are considered reliable. When conflicting information was provided, the source deemed most reliable has been used. Data believed to be unreliable was not included in the report nor used as a basis for the value conclusion.

☒ The Reproduction Cost is based on __research obtained from local builders and contractors,__ adjusted for economy of scale and amenities, supplemented by the appraiser's knowledge of the local market.

☒ Physical depreciation is based on the estimated effective age of the subject property. Functional and/or external depreciation, if present, is specifically addressed in the appraisal report or other addenda. In estimating the site value, the appraiser has relied on personal knowledge of the local market. This knowledge is based on prior and/or current analysis of site sales and/or abstraction of site values from sales of improved properties.

☒ The subject property is located in an area of primarily owner-occupied single family residences and the Income Approach is not considered to be meaningful. For this reason, the Income Approach was not used.

☐ The Estimated Market Rent and Gross Rent Multiplier utilized in the Income Approach are based on the appraiser's knowledge of the subject market area. The rental knowledge is based on prior and/or current rental rate surveys of residential properties. The Gross Rent Multiplier is based on prior and/or current analysis of prices and market rates for residential properties.

☐ For income producing properties, actual rents, vacancies and expenses have been reported and analyzed. They have been used to project future rents, vacancies and expenses.

☒ **SUBJECT PROPERTY OFFERING INFORMATION**

According to __the local MLS__ the subject property:

☒ has not been offered for sale in the past. ☐ 30 days ☒ 1 year ☐ 3 years
☐ is currently offered for sale for $
☐ was offered for sale within the past ☐ 30 days ☐ 1 year ☐ 3 years for $
☐ Offering information was considered in the final reconciliation of value.
☐ Offering information was not considered in the final reconciliation of value.
☐ Offering information was not available. The reasons for unavailability and the steps taken by the appraiser are explained later in this addendum

☒ **SALES HISTORY OF SUBJECT PROPERTY**

According to __public records data and/or the local MLS__ the subject property

☒ Has not transferred ☐ in the past twelve months. ☒ In the past thirty-six months. ☐ In the past 5 years.
☐ Has transferred ☐ In the past twelve months. ☐ In the past thirty-six months. ☐ In the past 5 years.
☐ All prior sales which have occurred in the past __ are listed below and reconciled to the appraised value, either in the body of the report or in the addenda.

| Date | Sales Price | Document # | Seller | Buyer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

☒ **FEMA FLOOD HAZARD DATA**

☒ Subject property is not located in a FEMA Special Flood Hazard Area.
☐ Subject property is located in a FEMA Special Flood Hazard Area.

| Zone | FEMA Map/Panel # | Map Date | Name of Community |
|---|---|---|---|
| N/A | NONE | N/A | |

☒ The community does not participate in the National Flood Insurance Program.
☐ The community does participate in the National Flood Insurance Program.
☐ It is covered by a regular program.
☒ It is covered by an emergency program.

Page 1 of 2

Form MPA3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 10805shelp Page #8

☒ **CURRENT SALES CONTRACT**

☒ The subject property is currently not under contract.
☐ The contract and/or escrow instructions were not available for review. The unavailability of the contract is explained later in the addenda section.

☐ The contract and/or escrow instructions were reviewed. The following summarizes the contract:

| Contract Date | Amendment Date | Contract Price | Seller |
|---|---|---|---|
| | | | |

☐ The contract indicated that personal property was not included in the sale.
☐ The contract indicated that personal property was included. It consisted of _____ Estimated contributory value is $ _____

☐ Personal property was not included in the final value estimate.
☐ Personal property was included in the final value estimate.
☐ The contract indicated no financing concession or other incentives.
☐ The contract indicated the following concessions or incentives:
☐ If concessions or incentives exist, the comparables were checked for similar concessions and appropriate adjustments were made, if applicable, so that the final value conclusion is in compliance with the Market Value defined herein.

☒ **MARKET OVERVIEW**    Include an explanation of current market conditions and trends.

0-3 months is considered a reasonable marketing period for the subject property based on _____

☒ **ADDITIONAL CERTIFICATION**

The Appraiser certifies and agrees that:
(1) The analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), except that the Departure Provision of the USPAP does not apply.
(2) Their compensation is not contingent upon the reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.
(3) This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

☒ **ADDITIONAL (ENVIRONMENTAL) LIMITING CONDITIONS**

The value estimated is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions unless otherwise stated in this report. The appraiser is not an expert in the identification of hazardous substances or detrimental environmental conditions. The appraiser's routine inspection of and inquiries about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively unless otherwise stated in this report. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous substances or detrimental environmental conditions on or around the property that would negatively affect its value.

☒ **ADDITIONAL COMMENTS**

THIS REPORT HAS BEEN ELECTRONICALLY PREPARED IN COMPLIANCE WITH USPAP GUIDELINES WHICH INCLUDES A SECURE DIGITAL SIGNATURE AND ADEQUATE SECURITY MEASURES IN PLACE TO PROTECT THE DATA PRODUCED BY THE APPRAISER.

☒ **APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Appraiser's Signature _____    Effective Date 10/28/2005    Date Prepared 10/29/2005
Appraiser's Name (print) ALEXANDER A SAWYER    Phone # 888 793 8915
State MI    ☒ License ☐ Certification # 1201-00-5137    Tax ID # 20-7347034

☐ **CO-SIGNING APPRAISER'S CERTIFICATION**

☐ The co-signing appraiser has personally inspected the subject property, both inside and out, and has made an exterior inspection of all comparable sales listed in the report. This report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of this report including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser.
☐ The co-signing appraiser has not personally inspected the interior of the subject property and:
☐ has not inspected the exterior of the subject property and all comparable sales listed in this report.
☐ has inspected the exterior of the subject property and all comparable sales listed in the report.
☐ The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of this report, including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser with the exception of the certification regarding physical inspections. The above describes the level of inspection performed by the co-signing appraiser.
☐ The co-signing appraiser's level of inspection, involvement in the appraisal process and certification are covered elsewhere in the addenda section of this appraisal.

☐ **CO-SIGNING APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Co-Signing Appraiser's Signature _____    Effective Date _____    Date Prepared _____
Co-Signing Appraiser's Name (print) _____    Phone # _____
State _____ ☐ License ☐ Certification # _____    Tax ID # _____

Form MPA3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



**Building Sketch (Page - 1)**

| | | | | |
|---|---|---|---|---|
| Borrower/Client | LORI DUSSIA | | | |
| Property Address | 10906 SHELP LAKE DRIVE | | | |
| City | DELTON | County | BARRY | State MI Zip Code 49046 |
| Lender | AMERIQUEST MORTGAGE CORPORATION | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1052.0 | 1052.0 |
| P/P | Deck | 164.0 | 164.0 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 4.0 x 7.0 | 28.0 |
| 32.0 x 32.0 | 1024.0 |

Net LIVABLE Area    ( Rounded )    1052

2 Items    ( Rounded )    1052

Form SKT.BldSkI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 10905shelp | Page # 10

## Subject Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client | LORI DUSSIA | | | |
| Property Address | 10905 SHELP LAKE DRIVE | | | |
| City DELTON | County BARRY | State MI | Zip Code 49046 | |
| Lender | AMERIQUEST MORTGAGE CORPORATION | | | |



### Subject Front

| | |
|---|---|
| | 10905 SHELP LAKE DRIVE |
| Sales Price | 150,000 |
| Gross Living Area | 1,052 |
| Total Rooms | 5 |
| Total Bedrooms | 2 |
| Total Bathrooms | 1.5 |
| Location | SUBURBAN |
| View | RES,LAKE FRONT |
| Site | 50' LAKE FRONT |
| Quality | VINYL/AVG |
| Age | A58/20 |

### Subject Rear



### Subject Street



Form PIC3x5.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 10905ahtdtj  Page #11

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client | LORI DUSSIA |
| Property Address | 10905 SHELP LAKE DRIVE |
| City DELTON | County BARRY State MI Zip Code 49046 |
| Lender | AMERIQUEST MORTGAGE CORPORATION |



### Comparable 1

11803 FAIR LAKE DRIVE

| | |
|---|---|
| Prox. to Subject | 8.56 miles |
| Sale Price | 160,000 |
| Gross Living Area | 1,326 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 1 |
| Location | SUBURBAN |
| View | RES,LAKE FRONT |
| Site | 48' LAKE FRONT |
| Quality | VINYL/AVG |
| Age | A56/20 |



### Comparable 2

11547 SCOTT PARK ROAD

| | |
|---|---|
| Prox. to Subject | 7.21 miles |
| Sale Price | 182,900 |
| Gross Living Area | 750 |
| Total Rooms | 4 |
| Total Bedrooms | 1 |
| Total Bathrooms | 1 |
| Location | SUBURBAN |
| View | RES,LAKE FRONT |
| Site | 100' LAKE FRONT |
| Quality | ALUM/AVG |
| Age | A40/E20 |

### Comparable 3

10747 SHELP LAKE DRIVE

| | |
|---|---|
| Prox. to Subject | 0.22 miles |
| Sale Price | 140,000 |
| Gross Living Area | 1,085 |
| Total Rooms | 5 |
| Total Bedrooms | 2 |
| Total Bathrooms | 1 |
| Location | SUBURBAN |
| View | RES,LAKE FRONT |
| Site | 50' LAKE FRONT |
| Quality | VINYL/AVG |
| Age | A63/20 |

Form PIC3x5.CR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 10905Stello | Page #12

# Location Map

| Borrower/Client | LORI DUSSIA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 10905 SHELP LAKE DRIVE | | | | | | |
| City | DELTON | County | BARRY | State | MI | Zip Code | 49048 |
| Lender | AMERIQUEST MORTGAGE CORPORATION | | | | | | |



**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

> * Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concession based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

AAA Network (888) 799-8915
Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in this appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

ROBERTA ALAINE BETLEJEWSKI, LIMITED LICENSE APPRAISER (#1201070523) ASSISTED IN THE INSPECTION OF THE SUBJECT, PREPARATION OF DATA, ANALYSIS, AND SUBSEQUENT CONCLUSIONS OF THIS REPORT. THE SIGNING APPRAISER CERTIFIES THAT MS. BETLEJEWSKI IS COMPETENT TO PERFORM THE TASKS ASSIGNED.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 10905 SHELP LAKE DRIVE, DELTON, MI 49046

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: ALEXANDER A SAWYER | Name: |
| Date Signed: 10/28/2005 | Date Signed: |
| State Certification #: | State Certification #: |
| or State License #: 1201.00-5137 | or State License #: |
| State: MI | State: |
| Expiration Date of Certification or License: 7/31/2006 | Expiration Date of Certification or License: |
| | ☐ Did   ☐ Did Not Inspect Property |

# EXHIBIT K

## niform Residential Loan Application

is application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," applicable. Co-Borrower information must also be provided ( and the appropriate box checked) when ☐ the income or asse ts of a person other than the "Borrower" cluding the Borrower's spouse) will be used as a basis for loan qualification or ☒ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a ci... ty property state, or the Borrower is relying on other property located in a community property state a s a basis for repayment of the loan.

### I. TYPE OF MORTGAGE AND TERMS OF LOAN

| ortgage | VA | X | Conventional | Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|---|
| plied for: | FHA | | USDA/Rural Housing Service | | | 0137860185 |

| nount | Interest Rate | No. of Months | Amortization | Fixed Rate | Other (explain): |
|---|---|---|---|---|---|
| 135,000.00 | 6.350 % | 360 | Type: | ☐ GPM | X ARM (type): |

### II. PROPERTY INFORMATION AND PURPOSE OF LOAN

bject Property Address (street, city, state, & ZIP)    No. of Units

905 SHELP LAKE DRIVE, Delton, MI 49046    1

gal Description of Subject Property (attach description if necessar y)    Year Built

1980

| rpose of Loan | ☐ Purchase | ☐ Construction | Other (explain): | Property will be: | | |
|---|---|---|---|---|---|---|
| | X Refinance | ☐ Construction-Permanent | | X Primary Residence | ☐ Secondary Residence | ☐ Investment |

mplete this line if construction or construction-permanent loan.

| ar Lot quired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

mplete this line if this is a refinance loan.

| quired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | ☐ made | ☐ to be made |
|---|---|---|---|---|---|---|
| 95 | $140,000.00 | $ 107,000.00 | | | Cost: $ 0.00 | |

tle will be held in what Name(s)   LORI Ann DUSSIA    Manner in which Title will be held    Estate will be held in:

X Fee Simple
☐ Leasehold (show expiration date)

ource of Down Payment, Settlement Charges and/or Subordinate Financing (expla in)

### III. BORROWER INFORMATION

| | Borrower | Co-Borrower | |
|---|---|---|---|

rrower's Name (include Jr. or Sr. if applicable)    Co-Borrower's Name (include Jr. or Sr. if applicable)

RI Ann DUSSIA

| Social Security Number | Home Phone (incl. area code) | DOB(MM/DD/YYYY) | Yrs. Schoo | Social Security Number | Home Phone (incl. a rea code) | DOB(MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|
| | | | 12 | | | | |

| ☐ Married | X Unmarried (include singe, divorced, widowed) | Dependents (not listed by Co-Borrower) | | ☐ Married | ☐ Unmarried (include singe, divorced, widowed) | Dependents (not listed by Co-Borrower) | |
|---|---|---|---|---|---|---|---|
| ☐ ...arated | | no. 0 | ages | ☐ Separated | | no. | ages |

Present Address (street, city, state, ZIP)  X Own  ☐ Rent  6  No. Yrs.    Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs.

905 SHELP LAKE DRIVE

elton, MI 49046

ailing Address, if different from Present Address    Mailing Address, if different from Present Address

residing at present address for less than two years, complete the following:

Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs.    Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs.

0905 SHELP LAKE DRIVE

ELTON, MI 49046

### IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|

| ame & Address of Employer | X Self Employed | Yrs. on this job | Name & Address of Employer | ☐ Self Employed | Yrs. on this job |
|---|---|---|---|---|---|
| A EXPRESS | | 2 | | | |

Yrs. employed in this line of work/profession    Yrs. employed in this line of work/profession

| osition/Title/Type of Business | Business Phone (incl. areacode) | Position/Title/Type of Business | Business Phone (incl. areacode) |
|---|---|---|---|
| RUCK DRIVER | (416)677-3355 | | |

employed in current position for less than two years or if currently employed in more than one position, complete the following:

| ame & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |

| osition/Title/Type of Business | Business Phone (incl. areacode) | Position/Title/Type of Business | Business Phone (incl. areacode) |
|---|---|---|---|

| ame & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |

| osi... Title/Type of Business | Business Phone (incl. areacode) | Position/Title/Type of Business | Business Phone (incl. areacode) |
|---|---|---|---|

0137860185

raddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04
Page 1 of 4

VMP-21N (0305)    VMP Mortgage Solutions (800)521-7291

| Initials: _____ | Borrower's cell | Borrower's pager |
|---|---|---|
| | Co-Borrower's cell | Co-Borrower's pager |

0000013786018506055906B01

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 4,000.00 | | 4,000.00 | Rent | 0.00 | |
| Overtime | 0.00 | | 0.00 | First Mortgage (P&I) | 1,043.00 | $ 1,023.72 |
| s | 0.00 | | 0.00 | Other Financing (P&I) | 0.00 | 0.00 |
| ssions | 0.00 | | 0.00 | Hazard Insurance | 70.00 | 70.00 |
| Dividends/Interest | 0.00 | | 0.00 | Real Estate Taxes | 72.00 | 71.63 |
| Net Rental Income | 0.00 | | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other incomes," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 4,000.00 | $ | 4,000.00 | Total | $ 1,185.00 | $ 1,165.35 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income   Notice:  Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| B | | $ 0.00 |
| B | | 0.00 |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☒ Not Jointly

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Description | | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
| Cash deposit toward purchase held by: | $ 0.00 | | | |
| List checking and savings accounts below | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | *** SEE ADDENDUM *** | | |
| Vested 401k Retirement · Aggregated | | | | |
| | | Acct. no. | | |
| Acct. no. | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| Checking/Savings · Aggregated | | | | |
| | | Acct. no. | | |
| Acct. no. | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/ number & description) / 0 | $ 0.00 | | | |
| | | Acct. no. | | |
| Life insurance net cash value | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 0.00 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 170,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 809.88 | |
| Total Assets a. | $ 0.00 | Net Worth (a minus b) ► $ -26,996.00 | Total Liabilities b. | $ 26,996.00 |

0137860185

Initials: _____

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

VMP® -21N (0305)

0000013786018506050580502

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| .0905 SHELP LAKE DRIVE n. MI 49046 | H SFR | $ 170000 | $ 102829 | $ 0 | $ 1043 | $ 142 | $ 0 |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 0 | $ 102829 | $ 0 | $ 1043 | $ 142 | $ 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 106,042.00 |
| e. Estimated prepaid items | 1,595.79 |
| f. Estimated closing costs | 2,628.00 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 4,725.00 |
| i. Total costs (add items a through h) | 114,990.79 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. ...n amount ...clude PMI, MIP, Funding Fee finance d) | 135,000.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 135,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -20,009.21 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure... | | X | | |
| f. Are you presently delinquent or in default on any Federal debt... | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | X | | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | X | | | |
| (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both, under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER** [ ] I do not wish to furnish this information.
Ethnicity: [ ] Hispanic or Latino [X] Not Hispanic or Latino
Race: [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [X] White
Sex: [X] Female [ ] Male

**CO-BORROWER** [ ] I do not wish to furnish this information.
Ethnicity: [ ] Hispanic or Latino [ ] Not Hispanic or Latino
Race: [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [ ] White
Sex: [ ] Female [ ] Male

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) Roger Huang | Name and Address of Interviewer's Employer Ameriquest Mortgage Company. |
|---|---|---|
| [ ] Face-to-face interview [ ] Mail [X] Telephone [ ] Internet | Interviewer's Signature ___ Date ___ | 325 E. Grand River Ave., #255 East Lansing, MI 48823 |
| | Interviewer's Phone Number (incl. area code) (714) 541-9960 | |

0137860185
...-21N (0305)

Page 3 of 4

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

0000013786018506059990603

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>DUSSIA, LORI Ann | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number:<br>0137860185 |

I/ . . .y understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | | X | |

0137860185

 -21N (0305)



0000013786018560605990604

Page 4 of 4

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

# EXHIBIT L

## Ameriquest Mortgage Company

Borrower Name: LORI Ann DUSSIA

Loan Number: 0137860185 - 5653

Borrower Name:

Property Address: 10905 SHELP LAKE DRIVE
Delton, MI 49046

## UNDERSTANDING YOUR OPTIONS REGARDING
## INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other. A "discount point" is a one-time fee that equals one (1) percent of the loan amount that lowers the interest rate of the loan. So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio. The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points. The following example shows how your options work.







* The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor. A discount point lowers the interest rate but *not* necessarily the overall cost of the loan. A lower rate may be a good choice if you don't plan to sell or refinance for some time. On the other hand, you might not want to have additional discount points if you think you will sell or re

# EXHIBIT M

## EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
### 120 S. LaSalle Street, 18th floor
### Chicago, Illinois 60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
### Email: edcombs@aol.com
### www.edcombs.com

October 30, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Re:  Notice of rescission, claim and lien, Lori Ann Dussia, 10905 Shelp
Lake Drive, Delton, MI 49046, loan of November 2, 2005

Ladies/Gentlemen:

The above client hereby give notice that she rescinds the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: client

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on October 30, 2006.

_____
Daniel A. Edelman