**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IRA C. THOMPSON, ) | |
| ) | 07 C 323 |
| Plaintiff, ) | |
| ) | (Originally 06 C 189 (W.D. Mich.)) |
| v. ) | |
| ) | (Transferred to Judge Aspen for |
| AMERIQUEST MORTGAGE COMPANY; ) | pretrial proceedings under MDL |
| JPMC SPECIALTY MORTGAGE, LLC, f/k/a ) | #1715, Lead Case #05 C 7097) |
| WM SPECIALTY MORTGAGE, LLC; ) | |
| CHASE HOME FINANCE, LLC, and DOES 1-5, ) | |
| ) | **DEMAND FOR JURY TRIAL** |
| Defendant. ) | |

**SECOND AMENDED COMPLAINT**

**INTRODUCTION**

1.       Plaintiff Ira C. Thompson brings this action against a "subprime"

mortgage lender to secure relief, including rescission, for violation of the Truth in Lending Act,

15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12

C.F.R. part 226.

**JURISDICTION AND VENUE**

2.       This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), and 15 U.S.C. §1640 (TILA).

3.       Defendants do business in the District and are deemed to reside here.

Venue is therefore proper under 28 U.S.C. §1391(c).

**PARTIES**

4.       Plaintiff Ira C. Thompson owns and resides in a home located at 4188

1

Syracuse St., Dearborn Heights, MI 48125.

5.     Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Michigan.  Its registered agent and office are National Registered Agents, 712 Abbott Road, East Lansing, MI 48823, or 200 W. Adams, Chicago, IL 60606.

6.     Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

7.     Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

8.     Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

9.     During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

10.     Defendant Chase Home Finance, LLC is a foreign corporation which does business in Michigan and Illinois. Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

11.     Defendant Chase Home Finance, LLC services loans some originated by Ameriquest Mortgage Company, including plaintiffs' and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

2

12.     Defendant JPMC Specialty Mortgage, LLC, f/k/a WM Specialty Mortgage, LLC, is a foreign corporation which transacts business in Illinois.  It holds legal title to some loans originated by Ameriquest Mortgage Company, including plaintiffs'.  Its registered agent is Corporation Service Company, located at 84 State St., Boston, MA 02109.

**FACTS RELATING TO PLAINTIFF**

13.     Prior to June 14, 2005, plaintiff applied for a mortgage with Ameriquest Mortgage Company.  Al Clark was the Ameriquest employee who communicated with plaintiff at all relevant times.

14.     Plaintiff needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

15.     The loan was closed in plaintiff's home on June 14, 2005.  The closer rushed through the closing documents and provided minimal explanation.

16.     According to the Good Faith Estimate and the preliminary Truth in Lending Disclosure, both dated May 4, 2005 and mailed to plaintiff before closing, plaintiff's interest rate would be 10.2% with monthly payments of $1,003.  (Exhibits A & B, respectively).

17.     Immediately prior to the closing, plaintiff was informed that the loan terms were being altered to his detriment, as set forth on Exhibit C.

18.     The following are documents relating to the loan:

        a.      A note, Exhibit D.

        b.      A mortgage, Exhibit E.

        c.      A "summary of debts and disbursements," Exhibit F.

        d.      A Truth in Lending disclosure statement, Exhibit G.

e.     The official Federal Reserve Board notice of right to cancel, Exhibit H.  The copy of  Exhibit H furnished to plaintiff was incomplete, as indicated.

f.     A different, "one week" (actually six days) notice of right to cancel, Exhibit I.

19.     At the closing, plaintiff saw that his rate had been raised to 11.99% with monthly payments of $1,156.  (Plaintiff's note (Exhibit D) indicates that the initial rate (for the first two years only) is 11.9% fixed.  Beginning in July, 2007, the rate can adjust upward by as much as 1.0% in each six-month period, and the rate can go as high as 17.99%!)

20.     When plaintiff asked why the rate had changed, the closer denied having that information and promised plaintiff that he would be able to refinance for a lower, fixed rate six months later.  The latter was a material representation for plaintiff.

21.     However, there is no language in the actual loan documents providing for plaintiff's right to refinance.

22.     From December, 2005 to August 2006, plaintiff's wife, Lisa Thompson, called Ameriquest approximately once a month to refinance.  Each time, plaintiff was rejected.

23.     In order to induce plaintiff to sign the loan, Ameriquest also represented to plaintiff that an appraisal performed by Precise Appraisals, Inc., (Exhibit J) showed that the home was worth $150,000.

24.     Plaintiff and his wife had done work to their house, and their house had features that other nearby houses did not have, so they had no reason to doubt the accuracy of the appraisal at that time.

25.     Ameriquest did not provide plaintiff with a copy of the appraisal at the

4

time of closing.

26.     When plaintiff requested a copy of the appraisal at closing, he was told the appraisal was for Ameriquest's records only, even though Ameriquest charged him $300 for it and even though he has a right under federal law to receive a copy.

27.     Plaintiff's wife called Ameriquest after the closing to again request a copy of the appraisal, and finally received it in the mail about one month later.  It was accompanied by a letter that informed her that, by accepting a copy of the appraisal, her husband was accepting a host of terms and conditions, one of which is confidentiality and another of which is not to make any claims for damages against the appraiser or AMC (Exhibit J).

28.     The appraisal report states that plaintiff's shower is ceramic tiled, which it is not (Exhibit J).

29.     The appraisal report also states that the house contains all double-hung windows.  (Exhibit J.)  In fact, there are no double-hung windows in plaintiff's home.

30.     The appraisal report contains numerous other falsehoods that plaintiff will prove.

31.     In August 2006, plaintiff attempted to refinance with New Day Trust Mortgage and had another appraisal done by A.S.A.P. Appraisal, Inc., which showed that plaintiff's home was only actually worth $112,000.

32.     New Day Trust Mortgage discouraged plaintiff's application for refinancing, explaining that, if their loan were approved, plaintiff's mortgage indebtedness would exceed the actual value of his home.  Most lenders will not approve of a loan for more than 80% of the value of the borrower's home, at least not without also imposing expensive private mortgage insurance

("PMI").

33.    According to the results of a search of records of the Michigan Department of Labor and Economic Growth Bureau of Commercial Services, http://www.cis.state.mi.us/bcs_free/default.asp?Facility=Yes), there is no licensed real estate appraiser by the name of Precise Appraisals, Inc., in the state of Michigan.

34.    Plaintiff relied on the appraised value in signing the loan documents.

35.    In fact, the home was over-appraised by approximately 25%.

36.    While Ameriquest's inflated the appraisal effectively prevents plaintiff from refinancing out of the loan, Ameriquest's high adjustable interest rate subjects plaintiff to ever rising monthly mortgage payments.  Thus, Ameriquest effectively trapped plaintiff in a predatory loan that he soon will be unable to afford.

37.    Plaintiff was charged a "loan discount," but, on information and belief, received no discount.

38.    Plaintiff was later directed to make payments to AMC Mortgage Services, Inc., then to Citi Residential Lending, Inc., and most recently to Chase Home Finance, LLC.

39.    On information and belief, JPMC Specialty Mortgage, LLC, f/k/a WM Specialty Mortgage, LLC, owns plaintiff's loan.

40.    In the event JPMC Specialty Mortgage, LLC, f/k/a WM Specialty Mortgage, LLC, does not own plaintiffs' loan (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

## COUNT I – TILA

41.    Plaintiff incorporates paragraphs 1-40.  This claim is against all

defendants.

42.     In order to give consumer borrowers the opportunity to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three days of receiving notice of their right to rescind, whichever is later.  More specifically, the statute, provides that:

> **Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.**  (15 U.S.C. § 1635(a)).

43.     To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction.  More specifically, the statute provides:

> **When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission.  Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.**  (15 U.S.C. § 1635(b).)

44.     To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately.

More specifically, the statute provides:

> **The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.** (15 U.S.C. § 1635(a).)

45.     Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in Lending Act, amplifies the statutory requirements. The regulation restates the statutory rescission right, 12 C.F.R. § 226.23(a), and requires that the creditor "deliver" to each person entitled to rescind "two copies" of a document that "clearly and conspicuously disclose" 12 C.F.R. § 226.23(b)(1) the borrower's rescission rights.

46.     More specifically, the regulation provides:

> **In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**
>
> **(i) The retention or acquisition of a security interest in the consumer's principal dwelling.**
>
> **(ii) The consumer's right to rescind the transaction.**
>
> **(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**
>
> **(iv) The effects of rescission, as described in paragraph (d) of this section.**
>
> **(v) The date the rescission period expires.** (12 C.F.R. § 226.23(b)(1).)

## DEFECTIVE NATURE OF DISCLOSURES

47.     In connection with the plaintiff's loan, Ameriquest Mortgage Company

8

failed to provide the required disclosures of the plaintiff's right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the following reasons:

### Incomplete Notices

48.    The official Notice of Right to Cancel form delivered to plaintiff did not set forth the date the rescission period expired, a violation of 12 C.F.R. § 226.23(b)(1)(v).

### "One Week" Form

49.    The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel.

50.    Further, the "one week" cancellation notice is misleading, as the period given is actually only six days long. Ameriquest's own personnel found this confusing, and were issued a "job aid" at the beginning of each month listing the expiration dates for the official and "one week" cancellation notices for loans closed each day during the month.

51.    Finally, the "one week" notice contains the same ambiguous and confusing references to "borrower" and "owner" as defendants' version of the official Federal Reserve Board three-day notice.

52.    Notice of rescission has been given to defendants. A copy is attached as Exhibit K.

53.    The loan has not been rescinded.

54.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

55.    15 U.S.C. §1635(g) provides:

9

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a. A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b. Statutory damages for the underlying disclosure violation;

c. If appropriate, statutory damages for failure to rescind;

d. A declaration of the amount plaintiff is required to tender, which amount should be reduced by the inflated portion of the appraisal used by Ameriquest to induce the loan.

e. Attorney's fees, litigation expenses and costs.

f. Such other or further relief as the Court deems appropriate.

## COUNT II – MICHIGAN MORTGAGE BROKERS, LENDERS AND SERVICERS LENDING ACT

56. Plaintiff incorporates paragraphs 1–40.

57. Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b) by engaging in "bait and switch" practices, i.e., promising the plaintiff a 10.2% interest rate in writing after obtaining sufficient financial information to provide an accurate quote (Exhibit A), and then altering these terms to the plaintiff's detriment immediately prior to closing by raising the interest rate to 11.99%.  Exhibit C.

10

58. Defendants also engaged in fraud, deceit and material misrepresentation, in violation of MCL §445.1672(b), by substantially and artificially inflating the appraised value of plaintiff's house.

59. Defendants made the representation for the purpose of inducing plaintiff's reliance, in the form of plaintiff agreeing to borrower a higher principal.

60. Plaintiff was injured by the fraudulent overappraisal. His options for refinancing with reputable mortgage companies have been severely limited by defendants' actions. By means of the overappraisal, Ameriquest has effectively trapped plaintiff in his current, adjustable-rate mortgage.

61. In addition, the higher loan amount, based on the fraudulent overappraisal, has resulted in plaintiff paying more interest and fees than her would have with an honest appraisal.

62. Further, Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of MCL § 445.1672(b) by misrepresenting to plaintiff that he he could refinance for a lower, fixed rate after six months and then not actually allowing him to do so.

63. Plaintiff was induced to transact with Ameriquest by means of these misrepresentations.

64. Defendant Ameriquest made these representations in the course of trade and commerce.

65. Defendant Ameriquest made the representation for the purpose of inducing reliance, in the form of the plaintiffs transacting business with Ameriquest with the result of

11

greater profits to Ameriquest.

66.     Plaintiff was injured by all of Ameriquest's misrepresentations.

WHEREFORE, the Court should enter judgment in favor of plaintiff and against Ameriquest for:

a.      A declaratory judgment, MCL §445.1681(1)(a);

b.      Injunctive relief, MCL §445.1681(1)(b);

c.      Appropriate damages, MCL §445.1681(1)(c);

d.      Attorney's fees, litigation expenses and costs of suit;

e.      Such other and further relief as the Court deems proper.

## COUNT III – COMMON LAW FRAUD

67.     Plaintiff incorporates paragraphs 1–40.

68.     Defendants represented that plaintiff's house was worth $150,000.

69.     This representation was false.

70.     Defendants made this representation with knowledge that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion.

71.     Defendants made this representation with the intent that it should be acted upon by plaintiff.

72.     Plaintiff borrowed $112,499.00 from Ameriquest, in reliance on Ameriquest's representations that plaintiff qualified for the loan, based on the appraised value of his home.

73.     Plaintiff has suffered an injury as a result of defendants' misrepresentations, as set forth above.

12

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendant Ameriquest for:

a.  Actual and compensatory damages;

b.  Such other or further relief as the Court deems appropriate.

## COUNT IV – BREACH OF CONTRACT

74.  Plaintiff incorporates paragraphs 1-40.

75  This claim is against Ameriquest.

76.  Defendant undertook and contracted to lower plaintiff's interest rate if plaintiff paid a loan discount.

77.  Plaintiff paid a loan discount fee.

78.  In fact, defendant failed to lower plaintiff's interest rate in consideration therefor.

79.  Defendant thereby breached its contract.

80.  Plaintiff was damaged as a result.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiff and against defendant for:

a.  Appropriate damages;

b.  Costs.

c.  Such other or further relief as the Court deems appropriate.

s/ Daniel A. Edelman
Daniel A. Edelman

13

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
       & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

s/ Daniel A. Edelman
Daniel A. Edelman

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on June 19, 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also hereby certify that a copy was sent by U.S. mail to parties without an email address.

Mark D. Van der Laan                Chase Home Finance, LLC
Dykema Gossett PLLC             c/o Registered Agent
300 Ottawa Ave. NW               C.T. Corporation System
Suite 700                            208 S. LaSalle St.
Grand Rapids, MI 49503         Suite 814
                                 Chicago, IL 60604

Bernard LeSage
blesage@buchalter.com

s/Daniel A. Edelman
Daniel A. Edelman

T:\18107\Pleading\2nd Amended Complaint_Pleading.wpd

# EXHIBIT A

Loan Number  0119859246-8565
Credit Unlimited Mortgage Company

Address: Three Parklane Blvd., Suite 1001 West
          Dearborn, MI 48126

Applicant(s): Ira C. Thompson

Property Address: 4188 Syracuse St.
                  Dearborn Heights, MI 48125

Sales Price/Value:
Base Loan Amount: 112,498.00
Total Loan Amount: 112,498.00
Type of Loan: ADJUSTABLE RATE
Date Prepared: May 4, 2005
Rate: 10.200 %          Term: 360 Months
Broker:

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A Settlement Statement that you will be receiving at settlement. The HUD-1 or HUD-1A Settlement Statement will show you the actual cost for items paid at settlement. The loan terms and fees may change based on the information gathered during the underwriting and loan approval process or as a result of negotiations between you and the Lender.

"L" designates those costs to be paid outside of closing by Lender.    "S" designates those costs to be paid by Seller    * Paid Outside of Closing

| 800 ITEMS PAYABLE IN CONNECTION WITH LOAN: | | 1100 TITLE CHARGES: | |
|---|---|---|---|
| 801 Loan Origination Fee (    %) | | 1101 Settlement or Closing Fee $215.00 to $350.00 | $240.00 |
| 802 Loan Discount Fee (3.518 %) | $3,956.64 | 1102 Abstract or Title Search   to | |
| 803 Appraisal/Property Valuation | $300.00 | 1103 Title Examination | |
| 804 Credit Report $  to $ | | 1104 Title Insurance Binder | |
| 805 Lender's Inspection Fee | | 1105 Document Preparation Fee | |
| 806 Mortgage Insurance Application Fee | | 1106 Notary Fees | |
| 807 Assumption Fee | | 1107 Attorney Fees | |
| 808 Yield Spread Premium to Broker | | 1108 Title Insurance $475.00 to $600.00 | $600.00 |
| 809 | | 1109 | |
| 810 Tax Related Service Fee | $70.00 | 1110 | |
| 811 Flood Search Fee | $16.00 | 1111 Settlement/Disbursement Fee | |
| 812 Lender's Processing Fee | $826.00 | 1112 Escrow Fee | |
| 813 Admin to Ameriquest Mortgage | $239.00 | | |
| 814 Doc Prep Fee to | | | |
| 815 Credit Report Fee paid to Broker | | 1200 GOVERNMENT RECORDING AND TRANSFER CHARGES: | |
| 816 Origination Fee to broker (   %) | | 1201 Recording Fees: | $50.00 |
| 817 Application Fee to Ameriquest | $360.00 | 1202 City/County Tax/Stamps: | |
| 818 Underwriting Fee to Broker | | 1203 | |
| 819 Service Provider Fee to | | 1204 | |
| 820 Processing Fee to Broker | | 1205 | |
| 821 Underwriting Fee to Lender | | | |
| 900 ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | 1300 ADDITIONAL SETTLEMENT CHARGES: | |
| 901 Interest for 60 days @ $31.44  per day | $314.40 | 1301 Demand | |
| 902 Mortgage Ins Premium | | 1302 Pest Inspection | |
| 903 Hazard Ins Premium | | 1303 Survey | |
| 904 Flood Ins. Premium | | 1304 Staff Appraiser Fee | |
| 1000 RESERVES DEPOSITED WITH LENDER: | | 1305 Flood/Insurance Fee | |
| 1001 Haz Ins Prem          months @ $ | | 1306 | |
| 1002 Mortgage Ins          months @ $ | | 1307 Appraisal Val Fee to | |
| 1003 Earthquake Ins        months @ $ | | 1308 Courier Fee | $47.00 |
| 1004 City Prop Taxes       months @ $ | | TOTAL ESTIMATED SETTLEMENT CHARGES | $6,721.04 |
| 1005 Annual Assmts         months @ $ | | TOTAL SETTLEMENT CHARGES PAID BY LENDER | $0.00 |
| 1006 Flood Ins            months @ $ | | TOTAL ESTIMATED MONTHLY PAYMENT | |
| 1007 Windstorm Ins         months @ $ | | Principal & Interest | $1,003.93 |
| 1008 | | Real Estate Taxes | |
| TOTAL ESTIMATED FUNDS NEEDED TO CLOSE | | Flood & Hazard Insurance | |
| Down payment | | Mortgage Insurance | |
| Est. Closing Costs | $6,406.64 | TOTAL MONTHLY PAYMENT | $1,003.93 |
| Est. Prepaid Items/Reserves | $314.40 | | |
| OTHER : POC Borrower | $0.00 | | |
| TOTAL EST. FUNDS NEEDED TO CLOSE | $6,721.24 | | |
| TOTAL FEES PAID BY LENDER | $0.00 | | |

THIS SECTION TO BE COMPLETED BY LENDER ONLY IF A PARTICULAR PROVIDER OF SERVICE IS REQUIRED. Use of the particular provider is required and the estimate is based on charges of the provider. If a particular provider is not mentioned, a provider will be required from a lender approved list.

| ITEM  NAME OF PROVIDER | ADDRESS OF PROVIDER | TELEPHONE | NATURE OF RELATIONSHIP |
|---|---|---|---|
| 803  Appraisal Repeated Use | | | Unaffiliated/Repeated Use |
| 804  Credit Repeated Use | | | Unaffiliated/Repeated Use |
| 810  Fidelity National Tax Service | 468 N. Rosemead Blvd., Pasadena, CA 91107 | 800-969-9724 | Unaffiliated/Used 100%/Tax |
| 811  First American Flood Data Service | 11902 Burnet Rd, Ste 200, Austin, TX 78758 | 800-447-1772 | Unaffiliated/Used 100%/Flood |
| 1101 Closing Agent Repeated Use | | | Unaffiliated/Repeated Use |
| 1108 Title Company Repeated Use | | | Unaffiliated/Repeated Use |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the Lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs", and the Consumer Handbook on ARM Mortgages, if applicable.

Applicant  Ira C. Thompson _____  Date _____     Applicant _____  Date _____

Applicant _____  Date _____     Applicant _____  Date _____

GFE (Rev. 7/03)

0000011985934604061000101

# EXHIBIT B

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Ameriquest Mortgage Company
Three Parklane Blvd., Suite 1001 West
Dearborn, MI 48126
(734)263-8730

[X] Preliminary    [ ] Final

Broker License:

Borrowers: Ira C. Thompson

Type of Loan: ADJUSTABLE RATE
Date: May 4, 2005

Address:
City/State/Zip:

Loan Number: 0119859346 - 5566

Property: 4188 Syracuse St., Dearborn Heights, MI 48125

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| (e) 10.819 % | $ 254,777.48 (e) | $ 106,627.76 (e) | $ 361,405.24 (e) |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | (e) $1,003.93 | 07/01/2005 | | | |
| 1 | (e) $994.37 | 06/01/2035 | | | |

**VARIABLE RATE FEATURE:**
[X] Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 4188 Syracuse St., Dearborn Heights, MI 48125

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:** You may obtain property insurance from anyone you want that is acceptable to Ameriquest Mortgage Company

**LATE CHARGES:** If a payment is late, you will be charged 5.000% of the overdue payment .

**PREPAYMENT:** If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.
**(e) = estimate**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
Borrower: Ira C. Thompson    Date

_____
Borrower    Date

_____
Borrower    Date

_____
Borrower    Date

TIL1 (Rev. 7/01)

00000119859346030675010I

**ORIGINAL COPY**

05/04/2005 7:43:50 AM

# EXHIBIT C

Ameriquest Mortgage Company
Three Parklane Blvd., Suite 1001 West
Dearborn, MI 48126

(734)283-8730

## BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

Ira C. Thompson

Date: June 14, 2005

Notice: [X] Delivered    [ ] Mailed

Loan Number: 0119859346 - 5566

Description of Credit Request:

4188 Syracuse St.
Dearborn Heights, MI 48125

[X] 1st Trust Deed/Mortgage    [ ] 2nd Trust Deed/Mortgage

[ ] Other: _____

Property Address: 4188 Syracuse St.

Dearborn Heights, MI 48125      County of WAYNE

### TYPE OF TRANSACTION:

[ ] Purchase    [X] Refinance    Other _____

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS: |
|---|---|
| [ ] Fixed Rate Loan  [X] Adjustable Rate Loan | [ ] Fixed Rate Loan  [X] Adjustable Rate Loan |
| Amount Financed: $ 106,627.76 | Amount Financed: $ 108,483.29 |
| Settlement Charges: $ 6,721.24 (Includes all Prepaid Finance Charges) | Settlement Charges: $ 5,020.01 (Includes all Prepaid Finance Charges) |
| Loan Amount: $ 112,499.00 | Loan Amount: $ 112,499.00 |
| Annual Percentage Rate: 10.819 % | Annual Percentage Rate: 12.435 %* |
| Term: 360 | Term: 360 |
| Initial Interest Rate: 10.200 % | Initial Interest Rate: 11.990 % |
| Margin: 6.500 % | Margin: 6.500 % |
| Prepayment Penalty: [X] YES [ ] NO | Prepayment Penalty: [X] YES [ ] NO |

Borrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based exclusively on information, statements, and representations (all material facts) which have been provided by the borrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change prior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. Borrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may require new loan documents to be executed by the borrower(s).

_____     _____
Borrower  Ira C. Thompson    Date      Borrower      Date

_____     _____
Borrower      Date      Borrower      Date

*These amounts may change due to any final adjustments made to the prepaid interest amount collected on your loan at funding.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any rights under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is: FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY, ROOM 4037, WASHINGTON DC, 20580.

777777777070700076765242717744400757150
76337446210733135436651274007560041537760
30010756003737700122323363675502444561007
00000119859346024430101

STMTCO (Rev. 3/99)

# EXHIBIT D

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

| | | |
|---|---|---|
| June 14, 2005 | Orange | CA |
| Date | City | State |

4188 Syracuse St., Dearborn Heights, MI 48125
Property Address

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 112,499.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  Ameriquest Mortgage Company.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 11.990 %. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
**(A) Time and Place of Payments**
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on   August 1, 2005 .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, July 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my payments at:    505 City Parkway West, Suite 100, Orange, CA 92868

or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $ 1,156.32. This amount may change.
**(C) Monthly Payment Changes**
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of,  July, 2007  and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding  six and one-half percentage point(s) (6.500%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

```
7777777707070700076765242717744400756140
67227557300733135436651274007560415377760
30010774524173756010010227367460255762007
05082139659346030453387
```

Initials: _____  _____  _____  _____

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **13.990** % or less than **11.990**%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One percentage point(s) 1.000%** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **17.990** % or less than **11.990** %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**
I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made Three (3) year(s) After the Date of this Note**
If I make a prepayment commencing on or after the Three (3) year anniversary of the date of this Note, I may make that prepayment, in full or in part, without the imposition of a prepayment charge by the Lender.

**(B) Prepayment Made Within Three (3) year(s) of the Date of this Note**
I agree to pay Lender a prepayment charge if I make a prepayment before the Three (3) year(s) anniversary of the date this Note is executed. The prepayment charge I will pay will be equal to one percent (1%) on the amount by which the total prepayment(s) within any 12-month period exceeds twenty percent (20%) of the original principal amount of the loan.

**(C) Application of Funds**
I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**
If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and the Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A) Late Charges for Overdue Payment**
If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

Initials: _____

9.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.  **WAIVERS**
I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  **UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)     _____ (Seal)
Borrower   Ira C. Thompson                            Borrower

_____ (Seal)     _____ (Seal)
Borrower                                                       Borrower

7777777770707070007676524271774440075614D
672275573007331345265413741075SD41537760
30010772412737550102102773284602546631107
56562176691169106406308

# EXHIBIT E

# MORTGAGE

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated June 14, 2005
together with all Riders to this document.

(B) "Borrower" is Ira C. Thompson and Lisa M Thompson, His Wife

Borrower's address is 4188 Syracuse St., Dearborn Heights,MI 48125
. Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01
0119859346 - 5566

06/13/2005 5:43:35

AM6MI (0401)

Page 1 of 15          Initials: _____

VMP Mortgage Solutions, Inc. (800)521-7291

77777777070707000767652427177444400747141
77327557310733135436651274007560415377760
30010774241737560100107342477700056451107
0000011985994603015341701

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated June 14, 2005
The Note states that Borrower owes Lender one hundred twelve thousand four hundred
ninety-nine and 00/100                                              Dollars
(U.S. $ 112,499.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than July 1, 2035
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

AM6MI (0401)                    Page 2 of 16                    Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35   -

7777777070707000767652427177444400747141
7732755731072302452675136400756041537760
3001077424173756010010735356661047550107
00000119859346030134170

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County                                                             [Type of Recording Jurisdiction] of WAYNE                                                    [Name of Recording Jurisdiction]:
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 33046020365002                    which currently has the address of
4188 Syracuse St.                                                                          [Street]
Dearborn Heights                            [City], Michigan 48125              [Zip Code]
("Property Address"):

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials:_____

AM6MI (0401)                            Page 3 of 16                            Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35

7777777707070700076765242717744400747141
7732755731073313452664137410756041537760
3001077424173756010010734347760057551107
00000119659346030341703

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

0119859346-5566

06/13/2005 5:43:35

7777777707070700076765242717744400747141
77327557310733134436751274007560415377760
3001077424173756010010734246670147551107
000001198593460301341704

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials:_____

AM6MI (0401)          Page 5 of 16          Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35

777777770707070007676524271774440074 7141
773275573107321345266403751075604 1537760
300107742417375601001072425676015 7540007
0000011965934603013 11765

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

0119859346 - 5566

06/13/2005 5:43:35 -

7777777707070700076765242717744400747141
7732755731073313443665136410756041537760
3001077424173756010010734425777114754 1007
0000011965594603 01341708

Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _____

AM6MI (0401)                     Page 7 of 16                     Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35

77777777070707000767652427177444400747141
77327557310723124536651374400756041537760
30010774241737560010107243576601465500007
00000119859346030134170/

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code-violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward

0119859346-5566

06/13/2005 5:43:35     -

77777777070707000767652427177444007471141
77327557310722124427641375007560041537760
30010774241737560100107253467710575051007
00000119859346030131341705

the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance; and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Initials: _____

0119859346 - 5566

06/13/2005 5:43:35

7777777707070700076765242717744400747141
7732755731073202543664137510756041537760
30010774241737550100107342577710466540107
000001198593460301341709

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

Initials: _____

AM6MI (0401)　　　　　　　　　　Page 10 of 16　　　　　　　　　Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35

```
7777777707070700076765242717744400757150
77237556210723035526651375107560415377760
30010774241737560100107242577761156551107
0000011985934603013417710
```

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:_____

AM6MI (0401)                     Page 11 of 16                     Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35

7777777707070700076765242717744400757150
7723755621073313543665127400756041537760
3001077424173756010010724356760046451107
0000019859460391341711

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,

Initials:_____

**AM6MI** (0401)          Page 12 of 16          **Form 3023 1/01**

0119859346 - 5566

06/13/2005 5:43:35  --

7777777707070700076765242717744400757150
77237556210723024526751364007560415377760
30010774241737560100107252566711156440007
000001196599460301341712

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous

Initials: _____

AM6MI (0401)                    Page 13 of 16                    Form 3023 1/01

0119859346-5566

06/13/2005 5:43:35

7777777707070700076765242717744400757150
7723755621073313452664137410756041537760
3001077424173756010010172535766005654000 7
00000119859346030013417713

Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Initials:_____

AM6MI (0401)  Page 14 of 16  Form 3023 1/01

0119859346 - 5566

06/13/2005 5:43:35

7777777707070700076765242717744400757150
7723755621073313443675127400756041537760
3001077424173756010010172534661046551007
00000119859346030134714

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____          _____ (Seal)
                                          Ira C. Thompson                -Borrower


_____

_____          _____ (Seal)
                                          Lisa M Thompson                -Borrower


_____ (Seal)   _____ (Seal)
                     -Borrower                                 -Borrower


_____ (Seal)   _____ (Seal)
                     -Borrower                                 -Borrower


_____ (Seal)   _____ (Seal)
                     -Borrower                                 -Borrower

0119859346-5566

06/13/2005 5:43:35

777777770707070007676524271774400757150
7723755621073213452664037510756041537760
300107742417375601001073424771147450007
000001198593460301341715

**STATE OF MICHIGAN,**                    **County ss:**

Acknowledged before me in _____ County,

Michigan, on _____ by

        Day/Month/Year

_____

_____

_____


_____

Notary Public, State of Michgan,
County of
My Commission Expires
Acting in the County of


This instrument was prepared By:

        Ameriquest Mortgage Company

        Kristin McGrail

        Three Parklane Blvd., Suite 1001 West,Dearborn, MI 48126

7777777707070700076765242717744400757150
77237556210733134436651364107560415377760
300107742417375601001072435766115655110 7
       0000011985934603013417 16

400-16MI (12/03)                   0119859346 - 5566

06/13/2005 5:43:35 PM

BORROWER NAME:

LOAN NUMBER:   0119859346 - 5566

# LEGAL DESCRIPTION

```
7777777707070700076765242717744400757150
7723755621072312453665137400756041537760
3001077424173756010010725346760047550007
        00000119859346030134171 7
```

LGL3LTR (09/03)

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 14th day of June , 2005   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

4188 Syracuse St., Dearborn Heights, MI  48125
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of   **11.990 %**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of July, 2007 , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.   The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

   If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials_____

Loan Number:  0119859346 - 5566

7777777707070700076765242717744400756140
6722755730073313543665127400756041537760
3001077424173756010010716077773045463007
0000011985934603021503017

610-1 (Rev 1/01)                              Page 1 of 3                    06/13/2005 5:43:35 PM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and one-half** percentage points ( **6.500** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **13.990% or less than 11.990%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000** %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 17.990)% or less than 11.990)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_____

Loan Number: 0119859346 - 5566

7777777707070700076765242717744400756140
6722755730072302452675136400756041537760
30010774241737560100107061776730555562007
0000011985934603021903<br>
610-2 (Rev 1/01)                    Page 2 of 3

06/13/2005 5:43:35 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
Borrower Ira C. Thompson                    Borrower Lisa M Thompson


_____ (Seal)    _____ (Seal)
Borrower                                    Borrower


Loan Number:  0119859346 - 5566

```
77777777070707000076765242717744700756140
67227557300733134526641374107560 41537760
300107742417337560100107071 67662055562007
        00000119859346030 2150303
```

610-3 (Rev 1/01)                    Page 3 of 3                    06/13/2005 5:43:35 PM

# EXHIBIT F

# Ameriquest Mortgage Company

**Summary of Debts and Disbursements**
(Refinance Loans Only)

Borrower: Ira C. Thompson

Date: June 14, 2005
Branch:
Dearborn, MI

Loan Number: 0119859346 - 5566

### Fees

| | | | |
|---|---|---|---|
| Loan Discount Fee | 1.409 | $1,585.11 | Short to Close |
| Lender Retained Fees | | $1,311.00 | |
| Prepaid Interest | | $369.60 | |
| Fees Paid to Others | | $1,754.30 | Total Payoffs $107,028.24 |

Cash to Borrower $450.75

Total Points & Fees $5,020.01

| CREDITORS DEBTS | BALANCE | PAYOFFS | PAYMENTS |
|---|---|---|---|
| OPTION ONE MORTGAGE | $105,046.00 | $107,028.24 | |
| FIRST PREMIER BANK | $229.00 | | $20.00 |
| CITIFINANCIAL | $8,937.00 | | $263.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

7777777707070700076765242717744400757150
7633744621073313543665127400756041537760
300107742433737740122361262757400654453207
000001the59340020079010f

Total Payments: $283.00

D&D (Rev 01/02)

# EXHIBIT G

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

☐ Preliminary ☒ Final

LENDER: Ameriquest Mortgage Company
Three Parklane Blvd., Suite 1001 West
Dearborn, MI 48126
(734)283-8730

Broker License:

Borrowers: Ira C. Thompson

Type of Loan: ADJUSTABLE RATE
Date: June 14, 2005

Address: 4188 Syracuse St.
City/State/Zip: Dearborn Heights, MI 48125

Loan Number: 0119859346 - 5566

Property: 4188 Syracuse St., Dearborn Heights, MI 48125

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 12.435 % | $ 307,767.46 | $ 108,483.29 | $ 416,250.75 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,156.32 | 08/01/2005 | | | |
| 335 | $1,156.32 | 08/01/2007 | | | |
| 1 | $1,131.87 | 07/01/2035 | | | |

**VARIABLE RATE FEATURE:**
☒ Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 4188 Syracuse St., Dearborn Heights, MI 48125

**ASSUMPTION:** Someone buying this property ☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:** You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:** If a payment is late, you will be charged 5.000% of the overdue payment .

**PREPAYMENT:** If you pay off your loan early, you
☒ may ☐ will not have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
Borrower Ira C. Thompson          Date

_____
Borrower Lisa M. Thompson          Date

_____
Borrower          Date

_____
Borrower          Date

TIL1 (Rev 7/01)

7777777770707070007676524217744400757150
763374462107331354386512740075604153760
300107742241737560100147076155762364660107
00000176599346046576100F

**BORROWER COPY**

06/13/2005 5:54.05 PM

# EXHIBIT H

08/18/2008 16 50 FAX ☐ 006/007

# NOTICE OF RIGHT TO CANCEL

LENDER:  Ameriquest Mortgage Company

DATE:  June 14, 2005
LOAN NO.:  0119859346 - 5566
TYPE:  ADJUSTABLE RATE

BORROWER(S): Ira C. Thompson

ADDRESS:  4188 Syracuse St.
CITY/STATE/ZIP:  Dearborn Heights, MI 48125

PROPERTY:  4188 Syracuse St.
Dearborn Heights, MI 48125

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is

    ENTER DOCUMENT SIGNING DATE

    or
2. The date you received your Truth in Lending disclosures;
    or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN:  FUNDING
PHONE:  (714)834-3494
FAX:  (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

ENTER FINAL DATE TO CANCEL

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____          _____
SIGNATURE                                                      DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____          _____
BORROWER/OWNER Ira C. Thompson        Date      BORROWER/OWNER Lisa M Thompson      Date

_____          _____
BORROWER/OWNER                                Date      BORROWER/OWNER                                Date

7777777070707000767652427177444000757150
7633744621073313543665127400756041537760
3001075864373726012230727857743177540007
56000119659346040005010f

1064-NNC (Rev 11/03)

**BORROWER COPY**

06/13/2005 5:43:35 PM

# EXHIBIT I

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0119859346 - 5566          Borrower(s): Ira C. Thompson

Date: June 14, 2005

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.


_____          _____
Borrower/Owner  Ira C. Thompson           Date


_____          _____
Borrower/Owner  Lisa M Thompson           Date


_____          _____
Borrower/Owner                            Date


_____          _____
Borrower/Owner                            Date

---

## REQUEST TO CANCEL

I/We want to cancel loan #_____

_____          _____
Borrower/Owner Signature                  Date

---

7777777707070700076765242717744400757150
76337446210733135436651274007560415377B0
30010756043737760122307362746510757771107
00000119859346040226101

850 (10/00)

06/13/2005 5:54:05 PM

**BORROWER COPY**

# EXHIBIT J



P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free  (800) 430-5262
www.myamcloan.com

July 15, 2005


Ira C Thompson
4188 Syracuse St
Dearborn Heights, MI 48125-


Re:  Loan No: 0119859346
     Property: 4188 Syracuse St
              Dearborn Heights MI 48125


Dear Borrower(s):

As requested, enclosed is a copy of the Appraisal Report on the above
referenced property.  Please be advised that the Appraisal Report is
being sent to you on the following terms and conditions.  If you are
unable or unwilling to comply with all of the conditions set forth
below, please return the Appraisal Report to:
              AMC Mortgage Services, Inc.
                   P.O. Box 11000
                Santa Ana, CA 92711-1100
          Attention:  Customer Care Department


1.  The Appraisal Report is to be used solely for the purpose of
    evaluating your property in connection with your loan.

2.  You understand, acknowledge, and agree that the Appraisal Report
    is being provided by AMC without any representations or warranties
    as to its contents.

3.  You understand, acknowledge, and agree that intervening circum-
    stances may have rendered the information and assumptions contained
    in the Appraisal Report obsolete, incomplete, or even misleading.

4.  You understand, acknowledge, and agree that the Appraisal Report
    was prepared for the exclusive use of AMC, and that subsequent
    distribution was not contemplated when the Appraisal Report was
    commissioned, prepared, or delivered.

5.  You covenant and agree not to seek any damages or redress or to
    make any claims for damages, costs, expenses, or liabilities of
    any kind against the appraiser or arising out of your use of the
    Appraisal Report.

CC002/020/C0N





P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

Appraisal Report Request Letter
Page 2

6.  You covenant and agree to indemnify, defend, and hold AMC, its
    shareholders, officers, directors, employees, affiliates, and
    agents harmless from and against any claims, costs, expenses,
    damages, or liabilities of any kind including reasonable attorney's
    fees incurred by AMC resulting from or arising out of your use of
    the Appraisal Report.

7.  You covenant and agree to keep the Appraisal Report confidential
    and not disclose, distribute, disseminate, copy, or otherwise
    reproduce or release the Appraisal Report or its contents to any
    person except as is strictly necessary for the evaluation or
    understanding of the Appraisal Report, in any manner to any person
    without first obtaining a written agreement of confidentiality
    similar in scope to this letter.

Please keep this letter with your other loan records.

Sincerely,

Customer Care Department


CC002/020/C0N

Also doing business as Delaware AMC Mortgage Services, Inc., in the states of Texas, Rhode Island, and New Hampshire.



Case: 1:05-cv-07097 Document #: 2905-2 Filed: 06/19/09 Page 57 of 71 PageID #:33165



## SUBJECT PHOTOGRAPH ADDENDUM



0119859346
240505

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower | THOMPSON | | | | | | |
| Property Address | 4188 SYRACUSE ST | | | | | | |
| City | DEARBORN HEIGHTS | County | WAYNE | State | MI | Zip Code | 48125 |
| Lender | AMERIQUEST MORTGAGE - DEARBORN | | | | | | |



FRONT OF
SUBJECT PROPERTY



REAR OF
SUBJECT PROPERTY

Master
bedroom

crawl space doors



STREET SCENE

PRECISE APPRAISALS, INC.

 **TEXT ADDENDUM**  File No. 240505

| | |
|---|---|
| Borrower: THOMPSON | |
| Property Address: 4188 SYRACUSE ST | County: WAYNE |
| City: DEARBORN HEIGHTS    State: MI | Zip Code: 48125 |
| Lender: AMERIQUEST MORTGAGE - DEARBORN | |

**Factors Affecting Marketability**

THE SUBJECT PROPERTY IS LOCATED IN A SINGLE FAMILY, RESIDENTIAL NEIGHBORHOOD IN THE CITY OF DEARBORN HEIGHTS. HOMES IN THIS AREA ARE OF AVERAGE QUALITY CONSTRUCTION AND VARY IN STYLE BETWEEN RANCH, BUNGALOW & 2 STORY DWELLINGS WITH MOST PROPERTIES DISPLAYING ADEQUATE EXTERIOR UPKEEP.

THE SURROUNDING AREA SUPPORTS A SMALL PERCENT OF MULTI FAMILY AND COMMERCIALLY   ONED PROPERTIES WHICH SERVICE THIS AREA WITH NO ADVERSE AFFECTS.  NO ADVERSE CONDITIONS AFFECTING MARKETABILITY OR VALUE WERE NOTED AT TIME OF INSPECTION. THIS AREA POSSESSES ADEQUATE RESIDENTIAL SUPPORT LINKAGES WITH TYPICAL PROXIMITY AND CONVENIENCE TO ALL OTHER SERVICES.

**Comments on Sales Comparison**

AFTER REVIEWING AVAILABLE MARKET DATA, THE APPRAISER HAS SELECTED TWO COMPARABLES WHICH EXCEED 6 MONTH SALES. ALTHOUGH DATED, COMPARABLES #1 & #3 WERE DEEMED RELIABLE DUE TO THEIR PROXIMITY NEAR THE SUBJECT AND SIMILAR STYLE. NO MARKET INDICATIONS OF ANY NEEDED TIME ADJUSTMENTS WERE EVIDENT, THEREFORE, NONE WERE IMPLEMENTED.

AFTER ADJUSTMENTS, ALL COMPARABLES CONTRIBUTED TO  VALUABLE POINTS OF COMPARISON AND WERE GIVEN EQUAL CONSIDERATION IN DETERMINING THE SUBJECT'S FINAL VALUE ESTIMATED.

NO KNOWN SALE OF THE SUBJECT PROPERTY HAS OCCURRED OVER THE LAST 36 MONTHS. NO LISTING OF THE SUBJECT PROPERTY HAS OCCURRED OVER THE LAST 12 MONTHS

A REASONABLE EXPOSURE TIME FOR THE SUBJECT PROPERTY WOULD BE UNDER 90 DAYS.

NON CONVENTIONAL MEANS OF FINANCING ARE TYPICAL OF PROPERTIES IN THE SUBJECT'S MARKET AREA AND PRICE RANGE WITH NO ADVERSE AFFECTS OF MARKETABILITY OR VALUE NOTED.

THE INTENT OF THIS APPRAISAL IS TO ASSIST THE AFOREMENTIONED LENDER IN EVALUATING THE SUBJECT PROPERTY FOR LENDING PURPOSES. THE ONLY INTENDED USER OF THIS REPORT IS THE CLIENT AND OR ASSIGNEES. APPRAISERS ARE REQUIRED TO BE LICENSED AND ARE REGULATED BY THE STATE OF MICHIGAN DEPARTMENT OF LABOR & ECONOMIC GROWTH, BUREAU OF OCCUPATIONAL & PROFESSIONAL REGULATIONS P.O. BOX 30018 LANSING, MICHIGAN 48909.

SCOPE OF APPRAISAL: THIS IS A SUMMARY APPRAISAL REPORT WHICH IS INTENDED TO COMPLY WITH THE REPORTING REQUIREMENTS SET FOURTH UNDER RULE 2-2 (B) OF THE UNIFORMED STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE FOR A SUMMARY APPRAISAL REPORT. AS SUCH, IT PRESENTS ONLY SUMMARY DISCUSSIONS OF DATA, REASONING AND ANALYSIS THAT WERE USED IN THE APPRAISAL PROCESS TO DEVELOP THE APPRAISER OPINION OF VALUE. SUPPORTING DOCUMENTATION THAT IS NOT PROVIDED WITH THE REPORT CONCERNING THE DATA, REASONING AND ANALYSIS IS RETAINED IN THE APPRAISER'S FILE. THE DEPTH OF DISCUSSION CONTAINED IN THIS REPORT IS SPECIFIC TO THE NEEDS OF THE CLIENT AND FOR THE INTENDED USE STATED IN THE REPORT.

TO DEVELOP THE OPINION OF VALUE, THE APPRAISER PERFORMED A COMPLETE APPRAISAL PROCESS, AS DEFINED BY THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE. THIS MEANS THAT NO DEPARTURES FROM THE UNIFORMED STANDARDS WERE INVOKED.

ALL INFORMATION PERTAINING TO THIS APPRAISAL REPORT WAS DERIVED AND OR VERIFIED THROUGH ONE OR MORE OF THE FOLLOWING SOURCES: FIELD INSPECTION, OFFICE DATA, ASSESSOR'S OFFICE, MULTI LISTING SERVICES, PUBLIC RECORD DATA  AND THE RESPECTIVE LISTING OFFICES AND AGENTS (WHEN AVAILABLE & APPLICABLE)

**SUPPLEMENTAL SALES 4 5 6 ADDENDUM**

0119859346

F2b No. 240505

| ITEM | SUBJECT | Comparable No. 4 | | Comparable No. 5 | | Comparable No. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 4188 SYRACUSE ST<br>DEARBORN HEIGHTS | 3926 ROOSEVELT<br>DEARBORN HEIGHTS | | 5378 VIVIAN<br>DEARBORN HEIGHTS | | | |
| Proximity to Subject | | 0.75 MI E | | 0.96 MI WSW | | | |
| Sales Price | $ REFINANCE | | 177,000 | $ | 149,000 | $ | |
| Price/Gross Liv. Area | $ 0 | $ 119.03 | | $ 108.70 | | $ | |
| Data and/or | PHY.INSPECTION | MLS#24055368 / BROKER | | MLS#24124957 / BROKER | | | |
| Verification Source | PUBLIC RECORDS | PUBLIC RECORDS | | PUBLIC RECORDS | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing | | CONVENTIONAL | | FHA 0 - CONCESS | | | |
| Concessions | | 82 D.O.M. | | 15 D.O.M. | | | |
| Date of Sale/Time | N/A | 9/10/2004 | | 12/10/2004 | | | |
| Location | SUBURB/RESID. | SUBURB/RESID. | | SUBURB/RESID. | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | | |
| Site | 4,800 / AVG | 10,000 / AVG | -1,000 | 5,000 / AVG | = | | |
| View | RESIDENTIAL | RESIDENTIAL | | RESIDENTIAL | | | |
| Design and Appeal | RANCH / AVG | RANCH / AVG | | COLONIAL / AVG | 5,000 | | |
| Quality of Construction | VINYL/AVG | VINYL / AVG | | BRICK-VINYL/AVG | -500 | | |
| Age | 62 YEARS | 50 YEARS | = | 48 YEARS | = | | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 5 3 1 | 6 3 1 | | 6 3 2 | -2,000 | | |
| Gross Living Area | 1,012 Sq. Ft. | 1,487 Sq. Ft. | -4,800 | 1,379 Sq. Ft. | -3,700 | Sq. Ft. | |
| Basement & Finished | BASEMENT | BASEMENT | | BASEMENT | | | |
| Rooms Below Grade | UNFINISHED | FINISHED | -2,000 | FINISHED | -2,000 | | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | | |
| Heating/Cooling | GFA/CENTRAL | GFA/NONE | 1,500 | GFA/CENTRAL | | | |
| Energy Efficient Items | UPD.WINDOWS | UPD.WINDOWS | | UPD.WINDOWS | | | |
| Garage/Carport | 1.0 GARAGE | 2.0 GARAGE | -1,000 | 2.0 GARAGE | -1,000 | | |
| Porch, Patio, Deck, | PORCH/PATIO | PORCH,PATIO | | PORCH | 1,500 | | |
| Fireplace(s), etc. | NONE | NONE | | NONE | | | |
| Fence, Pool, etc. | NONE | NONE | | NONE | | | |
| | UPD.AMENITIES | UPD.AMENITIES | | UPD.AMENITIES | | | |
| Net Adj. (total) | | + X - $ | -7,300 | + X - $ | -2,700 | + - $ | 0 |
| Adjusted Sales Price | | -4.12% Net | | -1.80% Net | | % Net | |
| of Comparable | | 5.82% Gro 169,700 | | 10.47% Gro 147,200 | | % Gro $ | |
| ITEM | SUBJECT | Comparable No. 4 | | Comparable No. 5 | | Comparable No. 6 | |
| Data, Price and Data | PRO/ASSESSOR OFF | MLS / PUBLIC RECORDS | | MLS / PUBLIC RECORDS | | | |
| Source for prior sales | NO OTHER SALE | NO ADDITIONAL SALES | | NO ADDITIONAL SALES | | | |
| within year of appraisal | LAST 36 MONTHS | LAST 12 MONTHS | | LAST 12 MONTHS | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sale of subject and comparables within one year of the date of appraisal:

_____

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):

PRECISE APPRAISALS, INC.

## LOCATION MAP ADDENDUM

0119859346
File No: 240505

| | |
|---|---|
| Borrower | THOMPSON |
| Property Address | 4188 SYRACUSE ST |
| City | DEARBORN HEIGHTS County WAYNE State MI Zip Code 48125 |
| Lender | AMERIQUEST MORTGAGE - DEARBORN |



Prepared by: S.C. Lester Co. Inc 248-020-6344

Scale: 2.57 miles

### COMPARABLE SALES INFORMATION

| | |
|---|---|
| Address 4007 ROSLYN RD | Address 3026 ROOSEVELT BLVD |
| Date of Sale 8/2/2004 Sale Price 147,000 | Date of Sale 9/30/2004 Sale Price 127,000 |
| Room Count - Total Rooms 6 Bedrooms 3 Baths 1 | Room Count - Total Rooms 6 Bedrooms 3 Baths 1 |
| Gross Living Area 1,026 | Gross Living Area 1,487 |
| Proximity to Subject 0.41 MI C | Proximity to Subject 0.75 MI E |
| Address 5890 GRINDLEY PARK ST | Address 5239 VIVIAN ST |
| Date of Sale 11/12/2004 Sale Price 182,000 | Date of Sale 12/10/2004 Sale Price 189,900 |
| Room Count - Total Rooms 8 Bedrooms 3 Baths 2.0 | Room Count - Total Rooms 6 Bedrooms 3 Baths 2.0 |
| Gross Living Area 1,213 | Gross Living Area 1,379 |
| Proximity to Subject 0.27 MI WNW | Proximity to Subject 0.86 MI WSW |
| Address 22018 E ROCHESTER DR | |
| Date of Sale 9/10/2004 Sale Price 165,000 | |
| Room Count - Total Rooms 7 Bedrooms 3 Baths 3 | |
| Gross Living Area 1,455 | |
| Proximity to Subject 0.71 MI SE | |

PRECISE APPRAISALS, INC.

## SKETCH ADDENDUM

0119859346
File No: 240505

| | |
|---|---|
| Borrower / Client | THOMPSON |
| Property Address | 4188 SYRACUSE ST |
| City | DEARBORN HEIGHTS |
| County | WAYNE |
| State | MI |
| Zip Code | 48125 |
| Lender | AMERIQUEST MORTGAGE - DEARBORN |

25.8'

| KITCHEN | BEDROOM |
|---|---|
| BATH | BEDROOM |
| LIVING ROOM | BEDROOM |

10.7'
2.2'
25.8'
12.1'
24.1'
29.0'

Sketch by Apex IV™
Comments:

### AREA CALCULATIONS SUMMARY

| Code | Description | Size | Net Totals |
|---|---|---|---|
| GLA1 | First Floor | 1011.74 | 1011.74 |
| | | | |
| | TOTAL LIVABLE (rounded) | | 1012 |

### LIVING AREA BREAKDOWN

| | Breakdown | | Subtotals |
|---|---|---|---|
| First Floor | | | |
| | 25.6 x 36.2 | | 926.72 |
| | 2.2 x 25.5 | | 56.10 |
| | 1.2 x 24.1 | | 28.92 |
| | | | |
| 3 Calculations Total (rounded) | | | 1012 |

PRECISE APPRAISALS, INC.

 

0119859346

240505

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than, the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analyses, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form. I certify that, to the best of my knowledge and belief: The statements of fact contained in this report are true and correct. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limited conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

4. I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have made a personal inspection of the property that is the subject of this report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. No one provided significant professional assistance to the person signing this report.

If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED: 4188 SYRACUSE ST      DEARBORN HEIGHTS    MI    48125

| APPRAISER: | SUPERVISORY APPRAISER |
|---|---|
| Signature: *Noah Lenk* | Signature: |
| Name: NOAH LENK | Name: |
| Date Signed: 5/5/2005 | Date Signed: |
| State Certification #: | State Certification #: |
| or State License #: 1201069327   MI | or State License #: |
| Expiration Date of Certification or License: 07/31/2005 | Expiration Date of Certification or License: |

Page 2 of 2

PRECISE APPRAISALS, INC.

  **Statement of Limiting Conditions**  

0119859346
File #: 240505

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in the market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

### STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantee, express or implied, regarding the determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous waste, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

PRECISE APPRAISALS, INC.



COMPARABLES PHOTOGRAPH ADDENDUM
0119859346
240505

| Borrower | THOMPSON | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4188 SYRACUSE ST | | | | | | |
| City | DEARBORN HEIGHTS | County | WAYNE | State | MI | Zip Code | 48125 |
| Lender | AMERIQUEST MORTGAGE - DEARBORN | | | | | | |



**COMPARABLE SALE # 1**
4007 TULANE ST
DEARBORN HEIGHTS
Date of Sale : 8/2/2004
Sale Price : 147,000
Sq. Ft. : 1,026
$ / Sq. Ft. : 143.27



**COMPARABLE SALE # 2**
3980 GRINDLEY PARK ST
DEARBORN HEIGHTS
Date of Sale : 11/12/2004
Sale Price : 162,000
Sq. Ft. : 1,211
$ / Sq. Ft. : 133.77



**COMPARABLE SALE # 3**
23019 BROOKSIDE DR
DEARBORN HEIGHTS
Date of Sale : 9/10/2004
Sale Price : 165,000
Sq. Ft. : 1,455
$ / Sq. Ft. : 113.40

PRECISE APPRAISALS, INC.



COMPARABLES 4 5 6 PHOTOGRAPH ADDENDUM

0119859346
240505

| Borrower | THOMPSON | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4188 SYRACUSE ST | | | | | | |
| City | DEARBORN HEIGHTS | County | WAYNE | State | MI | Zip Code | 48125 |
| Lender | AMERIQUEST MORTGAGE - DEARBORN | | | | | | |



**COMPARABLE SALE # 4**
3826 ROOSEVELT
DEARBORN HEIGHTS
Date of Sale : 9/10/2004
Sale Price : 177,000
Sq. Ft. : 1,487
$ / Sq. Ft. : 119.031607



**COMPARABLE SALE # 5**
5379 VIVIAN
DEARBORN HEIGHTS
Date of Sale : 12/10/2004
Sale Price : 149,900
Sq. Ft. : 1,379
$ / Sq. Ft. : 108.701958

**COMPARABLE SALE # 6**

Date of Sale :
Sale Price :
Sq. Ft. :
$ / Sq. Ft. :

PRECISE APPRAISALS, INC.

SUMMARY APPRAISAL    **UNIFORM RESIDENTIAL APPRAISAL REPORT**    0119859346
Property Description    File No. 240505

| Property Address 4188 SYRACUSE ST | City DEARBORN HEIGHTS | State MI | Zip Code 48125 |
|---|---|---|---|

Legal Description 33E365B S 1/2 OF LOT 365 GRINDLEY PARK SUB T2S R10E L34 P72 TO 74 WCR    County WAYNE
Assessor's Parcel No. 33046020365002    Tax Year 2004   R.E. Taxes $ 2,599.92 Special Assessments $   1.32
Borrower THOMPSON    Current Owner THOMPSON    Occupant: [X] Owner [ ] Tenant [ ] Vacant
Property rights appraised [X] Fee Simple [ ] Leasehold   Project Type [ ] PUD [ ] Condominium (HUD/VA only) HOA$ N/A /Mo.
Neighborhood or Project Name N/A    Map Reference SMSA-2160    Census Tract 5727
Sale Price $ REFINANCE   Date of Sale N/A   D   $   /   NONE KNOWN
Lender/Client AMERIQUEST MORTGAGE - DEARBORN    Address 3 PARKLANE BLVD W SUITE 1001 DEARBORN MI 48126
Appraiser NOAH LENK / PRECISE APPRAISALS, INC.    Address 347 MYSTIC VALLEY ROCHESTER HILLS, MI 48307

| Location | [ ] Urban | [X] Suburban | [ ] Rural | Predominant | Single family housing | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | occupancy | PRICE $(000) AGE (yrs) | One family 90 | [X] N [ ] Likely |
| Growth rate | [ ] Rapid | [X] Stable | [ ] Slow | [X] Owner | 100 Low NEW | 2-4 family | [ ] In process |
| Property value | [ ] Increasing | [X] Stable | [ ] Declining | [ ] Tenant | 250 High 90 | Multi-family 5 | To: |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | [ ] Vacant (0-5%) | Predominant | Commercial 5 | |
| Marketing time | [X] Under 3 Mos. | [ ] 3-6 Mos. | [ ] Over 6 Mos. | [ ] Vacant (over 5%) | 150 50 | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.
Neighborhood boundaries and characteristics: THE SUBJECT PROPERTY IS NORTH OF VAN BORN, SOUTH OF CARLYSLE, EAST OF TELEGRAPH AND
WEST OF MONROE. THE SURROUNDING AREAS SHARE SIMILAR MARKET APPEAL.
Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):
SEE ADDENDUM

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time
-- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):
PROPERTY VALUES IN THE SUBJECT'S MARKET AREA ARE CONSIDERED TO BE STABLE TO SLIGHTLY INCREASING. LOCAL MARKET CONDITIONS EXHIBIT A
HEALTHY SUPPLY / DEMAND RELATIONSHIP WITH MOST PROPERTIES SELLING WITHIN 90 DAYS. CONVENTIONAL FINANCING IS AVAILABLE AT RATES & TERMS
THAT PURCHASERS FIND ACCEPTABLE. SELLERS DO NOT TYPICALLY NEGOTIATE A SALE WITH FINANCE RELATED CONCESSIONS.

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owner's Association (HOA)? [ ] Yes [X] No
Approximate total number of units in the subject project N/A    Approximate total number of units for sale in the subject project N/A
Describe common elements and recreational facilities: N/A

| Dimensions 40X120 | | Topography FLAT, ABOVE ROAD GRADE |
|---|---|---|
| Site area 4,800 SQUARE FEET | Corner Lot [ ] Yes [X] No | Size CONFORMING TO AREA NORM |
| Specific zoning classification and description R-1 ONE FAMILY RESIDENTIAL DISTRICT | | Shape ESSENTIALLY RECTANGULAR |
| Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning | | Drainage APPEARS ADEQUATE |
| Highest & best use as improved: [X] Present use [ ] Other use (explain) | | View RESIDENTIAL |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | |
|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | CONCRETE | [X] | | Landscaping TYPICAL FOR AREA |
| Gas | [X] | | Curb/gutter | CONCRETE | [X] | | Driveway Surface CONCRETE PAVED/AVERAGE |
| Water | [X] | | Sidewalk | CONCRETE | [X] | | Apparent easements TYPICAL UTILITIES |
| Sanitary sewer | [X] | | Street lights | YES, IN AREA | [X] | | FEMA Special Flood Hazard Area [ ] Yes [X] No |
| Storm sewer | [X] | | Alley | NONE NOTED | | | FEMA Zone C   Map Date 5/2/1983 |
| | | | | | | | FEMA Map No. 260221 0001 B |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): THE SUBJECT'S SITE IS
TYPICAL FOR THE AREA IN TERMS OF SIZE & APPEAL. THERE ARE NO READILY APPARENT, ADVERSE EASEMENTS, ENCROACHMENTS, CONDITIONS OR
SPECIAL ASSESSMENTS. THIS LOT IS A SUITABLE SETTING FOR IMPROVEMENTS.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units 1 | Foundation CONC.BLOCK | Slab NO | Area Sq. Ft. 1,012 | Roof UNK [ ] |
| No. of Stories 1.00 | Exterior Walls VINYL | Crawl Space NO | % Finished 0 | Ceiling CNCLD [X] |
| Type (Det./Att.) DETACHED | Roof Surface ASPH.SHNGL | Basement 100% | Ceiling OPEN-JOIST | Walls CNCLD [X] |
| Design (Style) RANCH | Gutters & Dwnspts. ALUMINUM | Sump Pump NO | Walls CONCRETE | Floor N/A |
| Existing/Proposed EXISTING | Window Type DOUBLE HUNG | Dampness NONE APPRNT | Floor CONCRETE | None N/A |
| Age (Yrs.) 52 | Storm/Screens COMBINATION | Settlement NONE APPRNT | Outside Entry NO | Unknown N/A |
| Effective Age (Yrs.) 15 | Manufactured House NO | Infestation NONE APPRNT | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | X | | 1,012 |
| Level 1 | | 1 | | NOOK | 1 | | | 3 | 1 | | | 1,012 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains: 6 Rooms; 3 Bedroom(s); 1.0 Bath(s); 1,012 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | AMENITIES | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|
| Floors | CARP/VINYL/AVG | Type GFA | Refrigerator [ ] | None [ ] | Fireplace(s) # ( ) N/A | None [ ] | |
| Walls | PLASTER/AVG. | Fuel N.GAS | Range/Oven [ ] | Stairs [ ] | Patio CONC. [X] | Garage # of cars | |
| Trim/Finish | PNTD.SFTWD/AVG. | Condition AVG | Disposal [X] | Drop Stair [ ] | Deck N/A | Attached [ ] | |
| Bath Floor | CERAMIC/AVG | COOLING | Dishwasher [X] | Scuttle [X] | Porch CONC. [X] | Detached 14X20 VINYL | |
| Bath Wainscot | CERAMIC/AVG | Central YES | Fan/Hood [X] | Floor [ ] | Fence CYCL [X] | Built-in N/A | |
| Doors | WOOD/AVG | Other N/A | Microwave [X] | Heated [ ] | Pool N/A | Carport N/A | |
| | | Condition AVG | Washer/Dryer [ ] | Finished [ ] | | Driveway CONCRETE | |

Additional features (special energy efficient items, etc.): PORCH, PATIO, FENCE, CENTRAL AIR AND A ONE CAR DETACHED GARAGE.

Condition of the improvements, depreciation (physical, functional and external), repairs needed, quality of construction, remodeling/additions, etc.:
IN THE OPINION OF THE APPRAISER, NO PHYSICAL, FUNCTIONAL OR EXTERNAL INADEQUACIES WERE NOTED AT TIME OF INSPECTION. THE SUBJECT
PROPERTY IS OF AVERAGE QUALITY CONSTRUCTION AND DISPLAYS ADEQUATE UPKEEP & MAINTENANCE WITH NO NEEDED REPAIRS AT THE TIME OF
INSPECTION.
Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site,
or in the immediate vicinity of the subject property: THERE ARE NO OR APPARENT KNOWN ENVIRONMENTAL CONDITIONS THAT WOULD NEGATIVELY
IMPACT THE VALUE OF THE SUBJECT PROPERTY.

Freddie Mac Form 70   6-93     PAGE 1 OF 2     Fannie Mae Form 1004   6-93
PRECISE APPRAISALS, INC.

0119859346
File No. 240505

### Valuation Section

| | | |
|---|---|---|
| ESTIMATED SITE VALUE . . . . . . . . . . . . . . . . . . . . . . = $ | 45,000 | Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): MARSHALL & SWIFT RESIDENTIAL COST HANDBOOK WAS USED AS A GUIDELINE. LAND VALUE IS TYPICAL OF THE SUBJECT'S MARKET AREA AND HAS BEEN DERIVED BY ABSTRACTION. SQUARE FOOTAGE CALCULATIONS WERE DERIVED FROM ACTUAL OUTER PROPERTY MEASUREMENTS. PHYSICAL DEPRECIATION WAS BASED ON THE MODIFIED AGE/LIFE METHOD AND HAS BEEN CALCULATED AS FOLLOWS: 1970=21%. ESTIMATED REMAINING ECONOMIC LIFE IS 55 YEARS. |

| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | | | |
|---|---|---|---|---|
| Dwelling | 1,012 Sq. Ft. @ | 77.50 = $ | 78,400 | |
| B | 1,012 Sq. Ft. @ | 20 = | 20,200 | |
| PORCH,PATIO,FENCE,CENTRAL AIR | | = | 10,000 | |
| G /C | 280 Sq. Ft. @ | 20 = | 5,600 | |
| Total Estimated Cost New . . . . . . . . . . = $ | | | 114,240 | |
| Less | Physical | Functional | External | |
| Depreciation | 24,500 | 0| 0 = $ | 24,500 |
| Depreciated Value of Improvements . . . . . . = $ | | | 89,700 | |
| "As-is" Value of Site Improvements . . . . . . . . . . . = $ | | | 15,000 | |
| INDICATED VALUE BY COST APPROACH . . . . . . . . . = $ | | | 150,000 | |

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4188 SYRACUSE ST DEARBORN HEIGHTS | 4007 TULANE ST DEARBORN HEIGHTS | | 3980 GRINDLEY PARK ST DEARBORN HEIGHTS | | 23019 BROOKSIDE DR DEARBORN HEIGHTS | |
| Proximity to Subject | | 0.41 MI E | | 0.23 MI ENE | | 0.71 MI SE | |
| Sales Price | $ REFINANCE | $ | 147,000 | $ | 162,000 | $ | 165,000 |
| Price/Gross Liv. Area | 0$ | 143.27 | | 133.77 | | 113.40 | |
| Data and/or Verification Source | PHY.INSPECTION PUBLIC RECORDS | MLS #24072550 / BROKER PUBLIC RECORDS | | MLS #24127186 / BROKER PUBLIC RECORDS | | MLS #24059113 / BROKER PUBLIC RECORDS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ A | DESCRIPTION | +(-)$ A | DESCRIPTION | +(-)$ A |
| Sales or Financing Concessions | | FHA 0 - CONCESS 9 D.O.M. | | CONVENTIONAL 26 D.O.M. | | CONVENTIONAL 117 D.O.M. | |
| Date of Sale/Time | N/A | 8/2/2004 | | 11/12/2004 | | 9/10/2004 | |
| Location | SUBURB/RESID. | SUBURB/RESID. | | SUBURB/RESID. | | SUBURB/RESID. | |
| L IF S | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 4,800 / AVG | 7,680 / AVG | = | 9,900 / AVG | -1,000 | 16,642 / AVG | -1,500 |
| View | RESIDENTIAL | RESIDENTIAL | | RESIDENTIAL | | RESIDENTIAL | |
| Design and Appeal | RANCH / AVG | RANCH / AVG | | RANCH / AVG | | RANCH / AVG | |
| Q C | VINYL/AVG | BRICK / AVG | -1,000 | BRICK / AVG | -1,000 | BRK-ALUM/AVG | -500 |
| Age | 62 YEARS | 48 YEARS | | 44 YEARS | = | 49 YEARS | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade | T B B | T B B | | T B B | | T B B | |
| Room Count | 5 3 1 | 6 3 1 | = | 6 3 1.5 | -1,000 | 7 3 2 | -2,000 |
| Gross Living Area | 1,012 Sq. Ft. | 1,026 Sq. Ft. | = | 1,211 Sq. Ft. | -2,000 | 1,455 Sq. Ft. | -4,400 |
| Basement & Finished | BASEMENT | BASEMENT | | BASEMENT | | BASEMENT | |
| Rooms Below Grade | UNFINISHED | UNFINISHED | | UNFINISHED | | UNFINISHED | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | GFA/CENTRAL | GFA/CENTRAL | | GFA/CENTRAL | | GFA/CENTRAL | |
| Energy Efficient Item | UPD.WINDOWS | UPD.WINDOWS | | UPD.WINDOWS | | UPD.WINDOWS | |
| Garage/Carport | 1.0 GARAGE | 2.0 GARAGE | -1,000 | 2.0 GARAGE | -1,000 | 2.0 GARAGE | -1,000 |
| Porch, Patio, Deck, Fireplace(s), etc. | PORCH,PATIO NONE | PORCH,PATIO NONE | | PORCH,PATIO NONE | | PORCH,DECK FIREPLACE | -1,000 |
| Fence, Pool, etc. | NONE UPD.AMENITIES | NONE UPD.AMENITIES | | NONE UPD.AMENITIES | | NONE UPD.AMENITIES | |
| Net Adj. (total) | | + X - | $ -2,000 | + X - | $ -5,000 | + X - | $ -10,400 |
| Adjusted Sales Price of Comparable | | -1.36 % Net 1.36 % Grs | $ 145,000 | -3.70 % Net 3.70 % Grs | $ 156,000 | -6.30 % Net 6.30 % Grs | $ 164,600 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): SEE ADDENDUM

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| D ,P , D | PRD/ASSESSOR OFF | MLS / PUBLIC RECORDS | MLS / PUBLIC RECORDS | MLS / PUBLIC RECORDS |
| S | NO OTHER SALE | NO ADDITIONAL SALES | NO ADDITIONAL SALES | NO ADDITIONAL SALES |
| | LAST 36 MONTHS | LAST 12 MONTHS | LAST 12 MONTHS | LAST 12 MONTHS |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: NO OTHER SALES OF COMPARABLE PROPERTIES WITHIN THE LAST 12 MONTHS. SEE ADDENDUM REGARDING SUBJECTS SALE/LISTING HISTORY.

| | | |
|---|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = $ | | 150,000 |
| INDICATED VALUE BY INCOME APPROACH (I. A )E M R $ N/A M , G R M N/A = $ N/A | | |

T X * *

Conditions of Appraisal: THE APPRAISER ASSUMES A MARKETABLE TITLE AND THAT ALL EQUIPMENT ASSOCIATED WITH THE IMPROVEMENTS ARE IN WORKING ORDER.

Final Reconciliation: GREATEST WEIGHT WAS GIVEN TO THE SALE COMPARISON APPROACH SINCE IT REFLECTS THE BEHAVIOR OF THE MARKET IN THIS AREA. THE COST APPROACH SUPPORTS THIS VALUE WHILE THE INCOME APPROACH WAS NOT UTILI ED DUE TO THE LACK OF RELIABLE RENTAL DATA.

T

F M F 439/F M F 1004B (R 8/93 )

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 05/05/2005 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 150,000

| APPRAISER: | | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|---|
| Signature | | Signature | ☐ Did ☐ Did Not Inspect Property |
| Name NOAH LENK | | Name | |
| Date Report Signed 05/05/2005 | | Date Report Signed — | |
| State Certification # | State | State Certification # | State |
| Or State License # 1201066327 | State, MI | Or State License # | State |

# EXHIBIT K

AFH/AG

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
### 120 S. LaSalle Street, 18th floor
### Chicago, Illinois 60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
### www.edcombs.com

October 2, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Re:     Notice of rescission, claim and lien, Ira C. Thompson, 4188 Syracuse St., Dearborn Heights, MI 48125, loan of June 14, 2005

Ladies/Gentlemen:

The above client hereby gives notice that he rescinds the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on October 2, 2006.

Daniel A. Edelman