**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| DEREK W. NELSON and | ) | |
| CHRISTOPHER E. ALMOND, | ) | 06 C 3422 (N.D.Ill.) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Originally 1:06-CV-154 (N.D.Ind.) |
| v. | ) | |
| | ) | Transferred for pre-trial proceedings |
| AMERIQUEST MORTGAGE COMPANY, | ) | to MDL No. 1715, Lead Case No. |
| DEUTSCHE BANK NATIONAL TRUST | ) | 05 C 7097) |
| COMPANY, as Trustee of AMERIQUEST | ) | |
| MORTGAGE SECURITIES, INC., Asset Backed | ) | Judge Marvin E. Aspen |
| Pass Through Certificates, Series 2006-R1 Under | ) | |
| the Pooling and Servicing Agreement Dated as of | ) | |
| February 1, 2006, Without Recourse, AMC | ) | |
| MORTGAGE SERVICES, INC., AMERICAN | ) | |
| HOME MORTGAGE SERVICING, INC., and | ) | |
| DOES 1-5, | ) | **JURY DEMANDED** |
| | ) | |
| Defendants. | ) | |

**THIRD AMENDED COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs Derek W. Nelson and Christopher E. Almond bring this action

against a "subprime" mortgage lender and its affiliates to rescind a mortgage and recover

statutory damages for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"),

and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226; and the Equal Credit

Opportunity Act ("ECOA").

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), and 15 U.S.C. §1640 (TILA).

1

Defendants transact business in the District and are deemed to reside here.

## PARTIES

3.     Plaintiffs Derek W. Nelson and Christopher E. Almond jointly own and reside in a home at 1215 W. Berry Street, Fort Wayne, IN 46802.

4.     Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Indiana.  Its registered agent is National Registered Agents, located at 320 Meridian Street, Indianapolis, IN 46204.

5.     Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

6.     Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

7.     Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

8.     Defendant AMC  Mortgage Services, Inc. is a foreign corporation which does business in Indiana.  Its registered agent is National Registered Agents, located at 320 Meridian Street, Indianapolis, IN 46204.

9.     Defendant AMC Mortgage Services, Inc., an affiliate of Ameriquest Mortgage Company, services loans originated by Ameriquest Mortgage Company, and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

10.     Defendant Ameriquest Mortgage Securities, Inc. ("AMS"), an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Indiana.  It

is the beneficial owner of some loans originated by Ameriquest Mortgage Company. It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

11.     Defendant Deutsche Bank National Trust Company ("Deutsche Bank") is a foreign corporation with its headquarters at 60 Wall Street, New York, NY 10005. It does business in Michigan. It is engaged in the business of, among other things, buying and holding title to "subprime" mortgage loans on Illinois properties.

12.     Defendant American Home Mortgage Servicing, Inc. is a foreign corporation which does business in Illinois and Indiana. Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. It services some loans originated by Ameriquest Mortgage Company, including plaintiffs', and claims an interest in such loans, including the right to receive payments thereunder. It is joined as a necessary party.

13.     In the event neither AMS nor Deutsche Bank own plaintiffs' loan, the actual owners are named as Does 1-5.

<u>**FACTS RELATING TO PLAINTIFFS**</u>

14.     Prior to October 21, 2005, plaintiffs applied for a mortgage with Ameriquest Mortgage Company. At all relevant times, plaintiffs spoke to Ameriquest employee Carmen Palacios Navarro.

15.     Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

16.     During the initial phone conversations, Ms. Navarro asked plaintiff Derek Nelson what Mr. Nelson thought was the estimated appraised value of plaintiffs' home. Mr. Nelson answered that the appraised value was probably between $110,000 and $120,000.

3

17.     Ms. Navarro then asked Mr. Nelson if plaintiffs would want to take out the full loan amount if the home appraised for $150,000.  Mr. Nelson replied that that would be wonderful but that he doubted that the house would appraise that high.  Ms. Navarro said that she would send out an appraiser to see about the value.

18.     Ameriquest arranged for Deborah A. Sterling to perform an appraisal of plaintiffs' property on October 17, 2005.  The appraisal report is attached as Exhibit I.

19.     On October 19, 2005, Ms. Navarro called plaintiffs and told Mr. Nelson that their appraised value had risen to $150,700.

20.     Plaintiffs had performed major repairs and renovations to the home since the time of their prior appraisal.  They were happy to hear that their renovations had raised the value of their home so significantly.

21.     Plaintiffs did not receive a copy of their appraisal report until between a week and two weeks after closing.

22.     When plaintiffs did finally see their appraisal report, they discovered that their appraised value was not actually $150,700, as Ms. Navarro had told them but exactly $150,000, as Ms. Navarro had suggested before the appraisal was conducted.

23.     The appraisal report also states that Deborah A. Sterling had previously appraised the house at $150,000 on September 1, 2003.  Exhibit I, page 8.  This statement is false.  Ms. Sterling had appraised the house in June, 2003 at approximately $84,000.

24.     In addition, prior to closing, Ms. Navarro told Mr. Nelson over the phone that she would set up an escrow account for plaintiffs' taxes and insurance, including flood insurance.

4

25. The loan was closed on October 21, 2005.

26. Plaintiffs signed or received (not necessarily prior to consummation) the following documents relating to the loan:

  a. A note, <u>Exhibit A</u>.

  b. A mortgage, <u>Exhibit B</u>;

  c. A settlement statement, <u>Exhibit C</u>.

  d. A Truth in Lending disclosure statement, <u>Exhibit D.</u>

  e. Two different notices of right to cancel, <u>Exhibits E and F</u>;

27. At the closing, Ameriquest undertook and contracted to provide a loan discount in exchange for a "loan discount" fee.  <u>Exhibit J</u>.

28. Plaintiffs paid the loan discount fee of $4,166.70.  <u>Exhibit C</u>, line 802. However, on information and belief, they did not receive a discounted interest rate.

29. Plaintiffs did receive an escrow account into which they paid $181.37 per month.  However, their escrow does not cover the flood insurance premium.

30. On information and belief, Deutsche Bank National Trust Company, N.A. holds legal title to plaintiffs' loan, as Trustee.  Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiffs' loan under Asset Backed Pass-Through Certificates, Series 2006-R1 under the Pooling & Servicing Agreement dated as of February 1, 2006 Without Recourse.

31. In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiffs' loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

32. On January 23, 2007, AMC Mortgage Services mailed plaintiffs a letter

stating that their flood insurance had lapsed.  Exhibit K.

33.     Plaintiffs had not received a monthly statement or an escrow statement since June 2006.  They trusted that their escrow account was covering their insurance requirements.

34.     In fact, Ameriquest did pay for the first year of plaintiffs' flood insurance out of closing costs.

35.     Plaintiffs have been forced to take out a separate flood insurance account, on top of the escrow account that they are still paying Ameriquest.

36.     In addition, defendants Ameriquest and AMC Mortgage Services, Inc., have a pattern and practice of retaliating against its customers who exercise their rights under federal credit protection statutes by filing, in order to assert their rights in good faith, a lawsuit against Ameriquest and its affiliates.

37.     Once a customer files suit, his/her account is "flagged," access to his or her on-line account is blocked, and he or she can no longer make payments via on line.  In addition, in many cases, AMC simply stops sending monthly statements to the customer.

38.     Next, when the customer calls AMC to inquire, they are no longer permitted to deal with a customer representative; they are informed that they must deal with the president's office, and their call is routed to the same.  Similarly, if they discover on-line that their account has been frozen, they are directed to call the President's office.  Customers then have a very difficult time getting through to anyone at the president's office.  Each time they call to inquire about their account or to make a payment, it takes between 15-60 minutes to get someone on the line.  Often, their call is dropped before they reach anyone but after they have

6

waited for several minutes, and they have no choice but to call back and start the waiting period over.

39.     When the customer finally gets someone at the President's office on the line, they are often informed that their account has been flagged because of their lawsuit and that the only way they can make a payment is over the phone, i.e., "check-by-phone" (debiting a checking account) and that they will be charged a $10.00 fee for making the payment this way. In fact, customers are then charged the $10.00 fee for making their payment in the only manner AMC permits due to their suit.

40.     After plaintiffs filed suit, Ameriquest and/or AMC stopped sending them monthly statements. They received their last statement in July, 2006. They were told by AMC that statements are only a courtesy and that AMC has no obligation to send out.

41.     After filing suit, Ameriquest and/or AMC froze their access to their on-line account. Plaintiffs attempted to access their on-line account after they stopped receiving monthly statements, and an on-line message and various customer representatives with AMC directed them to call the President's office.

42.     Since the time plaintiffs filed suit, plaintiffs' on-line access to their account has been frozen, Ameriquest and AMC only permitted and permits plaintiffs to make their payments via "check-by-phone," and AMC has charged them an extra fee of $10.00 each time plaintiffs have made a payment.

43.     In order to make a payment, plaintiffs have to call the President's office at Ameriquest and wait several minutes before a representative will speak with them. On information and belief, these phone calls are recorded.

7

44.     Plaintiffs have to wait 30-60 minutes on the phone per call to the President's office.  The representatives are often rude to plaintiffs because their account is flagged as having filed a lawsuit against Ameriquest and AMC.

45.     Plaintiffs have also experienced unusually long delays in the processing and posting of payments that were timely sent.

46.     All such servicing problems are the direct result of plaintiffs having filed suit against defendants.  Customers who do not file lawsuits do not experience these types of problems at all, to the same extent or with the same degree of regularity.

47.     Plaintiffs were later directed to make payments to Citi Residential Lending, Inc., and subsequently to American Home Mortgage Servicing, Inc.

## COUNT I - TILA

48.     Plaintiffs incorporate ¶¶ 1-47 above.  This claim is against all defendants, except AMC.

49.     Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23.  Section 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the**

creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction

9

**of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

## GROUND FOR RESCISSION

50.    In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiffs' right to cancel within three days.

51.    Ameriquest Mortgage Company provided only two copies of the federal notice of right to cancel to the plaintiffs, instead of the four required.

52.    The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel.

53.    Notice of rescission has been given to defendants.  A copy is attached as Exhibit G.

54.    The loan has not been rescinded.  Exhibit H.

55.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

56.    15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    A judgment voiding plaintiffs' mortgage, capable of recordation in

10

the public records, and binding on defendants;

       b.     Statutory damages for the underlying disclosure violation;

       c.     If appropriate, statutory damages for failure to rescind;

       d.     Attorney's fees, litigation expenses and costs;

       e.     Such other or further relief as the Court deems appropriate.

## COUNT II - ECOA

57.    Plaintiffs incorporate ¶¶ 1-47 above. This claim is against defendants AMC and Ameriquest.

58.    Plaintiffs were applicants within the meaning of 15 U.S.C. §1691a(b) and Regulation B (which defines "applicant" to include persons who have received credit).

59.    By filing this lawsuit in good faith pursuant to the Consumer Credit Protection Act, plaintiffs were and are engaged in a statutorily protected activity.

60.    As a result of filing this lawsuit, plaintiffs have suffered and continue to suffer adverse actions at the hands of defendants. Ameriquest and AMC have, in ways detailed above and in other ways, taken retaliatory action against these and other plaintiffs and their accounts. These actions constitute "an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. § 202.2 (c)(1)(ii).

61.    A direct causal connection exists between plaintiffs' filing suit and defendants' subsequent treatment of their accounts, as detailed above.

62.    Plaintiffs were current and have remained current on their accounts throughout the time of defendants' adverse actions.

63.     As a result of defendants' conduct, plaintiffs have suffered actual damages and are entitled to recover actual damages as well as statutory damages, punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

        a.      Actual and statutory and punitive damages according to proof;

        b      Reasonable attorneys' fees and costs;

        c.      Injunctive relief, if the practices complained of have not ceased or do not cease immediately; and

        d.      Such other and further relief the court deems proper and just.

## COUNT III – BREACH OF CONTRACT

64.     Plaintiffs incorporate paragraphs 1-47.  This claim is against Ameriquest only.

65.     Defendant Ameriquest contracted and undertook to provide a discounted interest rate if plaintiffs paid a loan discount fee.  Exhibit K.

66.     Plaintiffs paid the fee (Exhibit C, line 802) but did not receive a discounted rate.

67.     Ameriquest thereby breached its agreement.

68.     Plaintiffs were damaged.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendant for:

        a.      Appropriate damages;

        b.      Costs.

        c.      Such other or further relief as the Court deems appropriate.

### COUNT IV – INDIANA DECEPTIVE CONSUMER SALES ACT

69.      Plaintiffs incorporate paragraphs 1–47.  This claim is against Ameriquest.

70.      After taking plaintiffs' credit information, Ameriquest represented that plaintiffs' escrow payments would cover their insurance.  However, Ameriquest only covered the first year of plaintiffs' flood insurance, then forced them to pay flood insurance separately out of their own pockets.  This bait-and-switch conduct violates the Indiana Deceptive Consumer Sales Act, Burns Ind. Code Ann. § 24-5-0.5-2 et seq.

71.      This act and representation were deceptive as to the subject matter of a consumer transaction, i.e., the terms of the loan and the costs to plaintiffs.

72.      Ameriquest has not cured or offered to cure its deceptive act and representation.

73.      Ameriquest's act and representation are incurable.

74.      Ameriquest's deceptive act and misrepresentation were willful.

75.      Plaintiffs suffered actual damages as the proximate result of Ameriquest's deceptive act and representation.  § 24-5-0.5-4(a).  Plaintiffs were promised that their escrow would include insurance, then were forced to pay for flood insurance separately eight months after the closing of their loan.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against Ameriquest for:

        a.      Actual damages;

      b.      Increased damages for willful conduct;

      c.      A voiding or limiting of Ameriquest's note and mortgage with plaintiffs.

      d.      Restitution;

      e.      Attorney's fees, costs and litigation expenses; and

      f.      Any other or further relief that the Court deems just.

## COUNT V – INDIANA DECEPTIVE CONSUMER SALES ACT

76.     Plaintiffs incorporate paragraphs 1–47. This claim is against Ameriquest.

77.     By producing a fraudulent, inflated appraisal of the plaintiffs' home, Ameriquest fraudulently induced plaintiffs to enter into a note and mortgage for a residential refinance loan, in violation of the Indiana Deceptive Consumer Sales Act, Burns Ind. Code Ann. § 24-5-0.5-2 et seq.

78.     These acts and representations were deceptive as to the subject matter of a consumer transaction, i.e., the terms of the loan, the cost of the loan and whether plaintiffs in fact qualified for the loan.

79.     Ameriquest has not cured or offered to cure its deceptive acts and representations.

80.     Ameriquest's act and representations are incurable deceptive acts and misrepresentations.

81.     Ameriquest's deceptive acts and misrepresentations were willful.

82.     Plaintiffs suffered actual damages as the proximate result of Ameriquest's deceptive acts and representations. § 24-5-0.5-4(a).

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against Ameriquest for:

      a.     Actual damages;

      b.     Increased damages for willful conduct;

      c.     A voiding or limiting of Ameriquest's note and mortgage with the Blackburns.

      d.     Restitution;

      e.     Attorney's fees, costs and litigation expenses; and

      f.     Any other or further relief that the Court deems just.

## COUNT VI – COMMON LAW FRAUD

83.    Plaintiffs incorporate paragraphs 1–47. This claim is against Ameriquest.

84.    Defendant represented that plaintiffs qualified for the loan based on the appraised value of plaintiffs' property and the amount of their income and assets.

.     85.    Defendant fraudulently inflated the value of plaintiffs' property. Therefore, the representations that plaintiffs qualified for the loan and could afford it were also false and fraudulent.

86.    The value of plaintiffs' property and the amount of their income and assets was information that was material to the terms of their transaction with defendant.

87.    At the time defendant falsified the and property value information, it knew that this representations was false.

88.    Defendant made the representation with the intent that it would be acted upon by plaintiffs.

15

89.     In reliance on defendant's representations, plaintiff closed on the loan with Ameriquest

90.     As a result of Ameriquest's inflated appraised value, plaintiffs have been injured in that they have been and will continue to be overcharged and are unable to refinance with another company.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendant for:

    a.      Actual and compensatory damages;

    b.      Punitive damages; and

    c.      Such other relief as the Court deems appropriate.

## COUNT VII - DAMAGES RESULTING FROM CIVIL CONSPIRACY

91.     Plaintiffs incorporate paragraphs 1-47.  This claim is against Ameriquest.

92.     Defendant combined and conspired with Sterling Realtors & Appraisers to arrange for and produce a fraudulent, appraised value for plaintiffs' property and to dramatically exaggerate plaintiffs' income and assets.

93.     Defendant and Sterling Realtors & Appraisers took concerted and overt actions to accomplish this fraudulent purpose.

94.     Among other things, defendant and Sterling Realtors & Appraisers conspired - out of excessive concern for their own fees, commissions and profits - to misrepresent, conceal and suppress the actual market value of plaintiffs' property, their income and assets.  They wanted to ensure that the loan would be approved, closed and funded.

95.     Plaintiffs were damaged as a result of defendants' conspiracy.  The

16

inflated appraisal has resulted in them being overcharged and prevents them from refinancing with a more reputable company.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor of and against defendant for:

a.    Actual damages;

b.    Incidental, consequential and special damages;

d.    Costs of litigation and expenses; and

e.    Such other or further relief as this Court deems appropriate.

Respectfully submitted,

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

**JURY DEMAND**

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

17

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on July 29, 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Jonathan N. Ledsky
jledsky@vbhlc.com

Craig Allen Varga
cvarga@vbhlc.com

Elizabeth Barry
ebarry@vbhlc.com

Bernard E. LeSage
blesage@buchalter.com

American Home Mortgage Servicing, Inc.
c/o Registered Agent
C.T. Corporation System
208 S. LaSalle St.
Suite 814
Chicago, IL 60604.

s/Daniel A. Edelman
Daniel A. Edelman

# EXHIBIT A

Loan Number: 0136721065 - 5639

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.**

October 21, 2005
Date

Orange
City

CA
State

1215 W BERRY ST APT 2, FORT WAYNE, IN 46802
Property Address

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 129,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is Ameriquest Mortgage Company.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 8.750 %. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
Beginning on December 1, 2005 and on the first day of every month thereafter through 11/01/2010, I will pay monthly payments of only the interest on the unpaid principal balance of the Note. Thereafter, I will make my monthly payments of principal and interest on the first day of every month beginning on 12/01/2010 until I have paid all of the principal and interest and any other charges described below that I may owe under this note. My monthly payments will be applied to interest before principal. If, on November 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at:    505 City Parkway West, Suite 100, Orange, CA 92868

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 940.63. This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of, November, 2008 and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.



Initials:_____

10/21/2005 11:19:42 AM

Loan Number: 0136721065 - 5639

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding five and one-half percentage point(s) (5.500%) to the Current Index  The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

(i) **Interest-Only Period.** The "interest-only period" is the period from the date of this Note through 11/01/2010.  For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay only the interest which accrues on the unpaid principal of my loan.  The result of this calculation will be the new amount of my monthly payment.

(ii) **Amortization Period.** The "amortization period" is the period after the interest-only period.  For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments  The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than 10.750 % or less than 8.750%.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One percentage point(s) 1.000%) from the rate of interest I have been paying for the preceding six months  My interest rate will never be greater than 14.750 % or less than 8.750 %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  PREPAYMENT PRIVILEGE**
I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section.  A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made Three (3.00) year(s) After the Date of this Note**
I will not have to pay a prepayment charge if I make a prepayment on the Three (3.00) year anniversary of the date this Note is executed, or at any time thereafter.

**(B) Prepayment Made Within Three (3.00) year(s) of the Date of this Note**
I will pay Lender a prepayment charge if, in any twelve (12) month period before the Three (3.00) year anniversary of the date this Note is executed, I prepay more than 20% of the original principal balance of this Note  The prepayment charge will be six (6) months interest, at the rate then in effect on this Note, on the amount in excess of 20% of the original principal balance that I prepay within such 12 month period.

**(C) Application of Funds**
I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**
If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6.  LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me.  If a refund reduces the principal, the reduction will be treated as a partial prepayment

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A) Late Charges for Overdue Payment**
If the Note Holder has not received the full amount of any monthly payment by the end of  fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 6.000% of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.  The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

Initials:

Loan Number: 0136721065 - 5639

**(D) No Waiver by Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**
I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:
Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by applicable law as of the date of this Security Instrument.
If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. OUR COPY** I/We acknowledge receipt of a signed copy of this Note.

Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Borrower DEREK W NELSON              Borrower CHRISTOPHER E ALMOND

_____ (Seal)      _____ (Seal)
Borrower                            Borrower



# EXHIBIT B

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 21, 2005
together with all Riders to this document.
(B) "Borrower" is CHRISTOPHER E. ALMOND AND DEREK W. NELSON

Borrower is the mortgagor under this Security Instrument.

INDIANA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3015 1/01

10/21/2005 11:19:42                                                   0136721065-5639

AM6IN (0404)
Page 1 of 15                        Initials:_____
              VMP Mortgage Solutions, Inc. (800)521-7291

0000013672106503012716D1

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated October 21, 2005
The Note states that Borrower owes Lender one hundred twenty-nine thousand and 00/100
Dollars

(U.S. $ 129,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than November 1, 2035
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider    [ ] Condominium Rider           [ ] Second Home Rider
[ ] Balloon Rider            [ ] Planned Unit Development Rider   [x] 1-4 Family Rider
[ ] VA Rider                 [ ] Biweekly Payment Rider        [ ] Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:_____

Form 3015  1/01

AM6IN (0404)                Page 2 of 15

0136721065-5639
10/21/2005 11:19:42

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the

County                                                                              [Type of Recording Jurisdiction]
                                                                                    [Name of Recording Jurisdiction] :
of ALLEN

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 02-12-03-485-006.000-274          which currently has the address of
                                                                                    [Street]
1215 W BERRY ST APT 2
                                                              [City], Indiana 46802          [Zip Code]
FORT WAYNE

("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials: _____

Form 3015  1/01

AM6IN (0404)                          Page 3 of 15
10/21/2005 11:19:42                                        0136721065 - 5639


0000013672106503012716O3

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

Initials: _____

Form 3015 1/01

AM6IN (0404)

0136721065 - 5639

10/21/2005 11:19:42



for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or

Initials: _____

Form 3015 1/01

0136721065-5639

10/21/2005 11:19:42



0000013672106503012716 05

ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

Initials: _____

Form 3015 1/01

AM6IN (0404)

0136721065 -5639

10/21/2005 11:19:42



Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _____

Form 3015 1/01

0136721065-5639

10/21/2005 11:19:42



0000013672106503012716O7

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by any insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials: _____

Form 3015  1/01

AM6IN (0404)

0136721065 - 5639

10/21/2005  11:19:42



0000013672105503012716O8

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Initials:_____

Form 3015 1/01

AM6IN (0404)

0136721065 - 5639
10/21/2005 11:19:42



0000013672106503012716609

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless

Initials: _____

AM6IN (0404)                    Page 10 of 15                    Form 3015  1/01

0136721065-5639
10/21/2005 11:19:42



0000013672106503012716I0

Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or

Initials: _____

Form 3015 1/01

0136721065 - 5639

10/21/2005 11:19:42



cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Initials: _____

AM6IN (0404)                     Page 12 of 15                     Form 3015  1/01

0136721065 - 5639

10/21/2005 11:19:42



0000013672106503D1271612

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Valuation and Appraisement.** Borrower waives all right of valuation and appraisement.

Initials: _____

AM6IN (0404)                     Page 13 of 15                     Form 3015 1/01

0136721065 - 5639
10/21/2005 11:19:42



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                            DEREK W NELSON                  -Borrower


_____          _____ (Seal)
                                            CHRISTOPHER E ALMOND            -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                    -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                    -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                    -Borrower


AM6IN (0404)                      Page 14 of 15                    Form 3015  1/01
10/21/2005 11:19:42                         0136721065 - 5639


D000013672106503012716I4

**STATE OF INDIANA,**                    **County ss:**

On this _____ day of _____ , before me,

Day                                          Month/Year

the undersigned, a Notary Public in and for said county, personally appeared

_____

_____

_____

and acknowledged the execution of the foregoing instrument.

    WITNESS my hand and official seal.


My Commission Expires:




_____

Notary Public


This instrument was prepared by:
James Matusik
9602 Coldwater Road, Suite 104,Fort Wayne, IN 46825




00000136721065030127161S

400-15IN (4/02)                    Page 15 of 15                    0136721065 - 5639

10/21/2005 11:19:42 AM

# EXHIBIT C

| Settlement Statement<br>Optional Form for<br>Transactions without Sellers | U.S. Department of Housing<br>and Urban Development | OMB Approval No 2502-0491<br><br>File No.: 200D007BB666 |
|---|---|---|

| e & Address of Borrower:<br>ISTOPHER E ALMOND and DEREK W NELSON<br>W BERRY ST<br>FORT WAYNE, IN 46802 | Name & Address of Lender:<br>Ameriquest Mortgage<br>9602 Cold Water RD, Suite 6<br>FORT WAYNE, IN 46825 |
|---|---|
| Property Location:<br>1216 W BERRY ST<br>FORT WAYNE, IN 46802 | Settlement Agent: Mortgage Information Services, Inc.<br>Place of Settlement: 6801 Lake Plaza Drive Suite A101<br>Indianapolis, IN 46220 |
| Loan Number: 0136721065-5639 | Settlement Date: 10/21/2005<br>Fund Date: 10/28/2005 |

| L. Settlement Charges | | | | | | M. Disbursements to Others | |
|---|---|---|---|---|---|---|---|
| 800. Items Payable in Connection with Loan | | | | | | 1501. MORTGAGE PAYOFF | |
| 801. Loan Origination Fee % to | | | | | | to OPTION ONE MORTGAGE | $70,224.18 |
| 802. Loan Discount 3.23 % to Ameriquest Mortgage | | | | | $4,166.70 | 1502. TAX PAYOFF | |
| 803. Appraisal Fee | to Ameriquest Mortgage | | | | $300.00 | to ALLEN COUNTY TREASURER | $550.18 |
| 804. Credit Report | to | | | | | 1503. PAYOFF | |
| 805. Lender's Inspection Fee | to | | | | | to AMERICAN GENERAL FINANCE | $7,246.00 |
| 806. Mortgage Insurance Application | to | | | | | 1504. PAYOFF | |
| 807. Assumption Fee | to | | | | | to CHASE | $1,971.00 |
| 808. | to | | | | | 1505. PAYOFF | |
| 809. | to | | | | | to GEMB/LOWES | $1,084.00 |
| 810. Tax Related Service | to Ameriquest Mortgage | | | | $70.00 | 1506. PAYOFF | |
| 811. Search fee | to Ameriquest Mortgage | | | | $9.00 | to WELLS FARGO BANK | $4,716.00 |
| 812. Lenders Processing fee | to Ameriquest Mortgage | | | | $626.00 | 1507 | |
| 813. Warehouse Fee | to Ameriquest Mortgage | | | | $239.00 | to | |
| 814. | to | | | | | 1508 | |
| 817. Application Fee | to Ameriquest Mortgage | | | | $360.00 | to | |
| 900. Items Required by Lender to be Paid in Advance | | | | | | 1509. | |
| 901. Interest from 10/28/2005 to 11/1/2005 @ $30.92 /day | | | | | $123.68 | to | |
| 902. Mortgage Insurance Premium for months to | | | | | | 1510. | |
| 903. Hazard Insurance Premium for months to HUPE INSURANCE | | | | | $672.00 | to | |
| 904. | | | | | | 1511. | |
| 1000. Reserves Deposited with Lender | | | | | | 1512. | |
| 1001. Hazard insurance | | 8 months | @$89.67 | per month | $717.36 | to | |
| 1002. Mortgage insurance | | month | @ | per month | | 1513. | |
| 1003. City property taxes | | months | @ | per month | | to | |
| 1004. County property taxes | | 2 months | @$91.70 | per month | $183.40 | 1514 | |
| 1005. Assessment Taxes | | months | @ | per month | | to | |
| 1006. School property taxes | | months | @ | per month | | 1515. | |
| 1007. Other taxes | | months | @ | per month | | to | |
| 1008. Other taxes | | months | @ | per month | | 1516. | |
| 1009. | | months | @ | per month | | to | |
| 1010. | | months | @ | per month | | 1517 | |
| 1011. Aggregate Adjustment | to Ameriquest Mortgage | | | | | to | |
| 1100. Title Charges | | | | | | 1518. | |
| 1101. Settlement fee | to Mortgage Information Services | | | | $325.00 | to | |
| 1102. title or title search | to | | | | | 1519 | |
| examination | to Mortgage Information Services | | | | $275.00 | to | |
| 1103. title insurance binder | to Mortgage Information Services | | | | | 1520. TOTAL DISBURSED (enter on line 1603) | $85,791.36 |
| 1105. Document preparation | to Mortgage Information Services | | | | | | |
| 1106. AMC Closing Service | to SUNSET CLOSERS | | | | $250.00 | | |
| 1107. Attorney's fees | to | | | | | | |
| (includes above item numbers ) | | | | | | | |
| 1108. Title Insurance | to | | | | $322.50 | | |
| (includes above item numbers ) | | | | | | | |
| 1109. Lender's Coverage | $129,000.00/$322.50 | | | | | | |
| 1110. Owner's Coverage | $0.00/$0.00 | | | | | | |
| 1111. Courier Fee | to Mortgage Information Services | | | | $60.00 | | |
| 1112. Release Fee | to Mortgage Information Services | | | | $25.00 | | |
| 1113. | to | | | | | | |
| 1114. | to | | | | | | |
| 1115. | to | | | | | | |
| 1116. | to | | | | | | |
| 1117. | to | | | | | | |
| 1118. | to | | | | | | |
| 1119. | to | | | | | | |
| 1120. | to | | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | | | |
| 1201. Recording Fees: Deed ; Mortg $49.00; Rel | | | | | $49.00 | | |
| 1202. City/county tax/stamps: Deed ; Mortg | | | | | | N. NET SETTLEMENT | |
| 1203. State tax/stamps: Deed ; Mortg | | | | | | | |
| 1204. Tax certificates | to | | | | | | |
| 1205. | to | | | | | 1600 Loan Amount | $129,000.00 |
| 1206. | to | | | | | | |
| 1207. | to | | | | | 1601 Plus Cash/Check from Borrower | $0.00 |
| 1300. Additional Settlement Charges | | | | | | | |
| 1301. Survey | to | | | | | 1602. Minus Total Settlement Charges (Line 1400) | $8,773.64 |
| 1302. Pest Inspection | to | | | | | | |
| 1303. | to | | | | | 1603. Minus Total Disbursements to Others (Line 1520) | $85,791.36 |
| 1304. | to | | | | | | |
| 1305. | to | | | | | | |
| 1306. | to | | | | | 1604 Equals Disbursements to Borrower<br>(after expiration of any applicable rescission<br>period required by law) | $34,435.00 |
| 1307. | to | | | | | | |
| 1308. | to | | | | | | |
| 1400. Total Settlement Charges (enter on Line 1602) | | | | | $8,773.64 | | |

Borrower's Signatures

_____
CHRISTOPHER E ALMOND

_____
K W NELSON

/ Tasha Price          10/21/05
Settlement Agent          Date

# EXHIBIT D

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Ameriquest Mortgage Company
9602 Coldwater Road, Suite 104
Fort Wayne, IN 46825
(888)849-7125

Broker License:

Borrowers: DEREK W NELSON          CHRISTOPHER E ALMOND

Type of Loan: ADJUSTABLE RATE
Date: October 21, 2005

Address:        1215 W BERRY ST APT 2
City/State/Zip: FORT WAYNE, IN 46802

Loan Number: 0136721065 - 5639

Property:   1215 W BERRY ST APT 2, FORT WAYNE, IN 46802

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 10.087 % | $ 284,828.71 | $ 122,770.62 | $ 407,599.33 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 36 | $940.63 | 12/01/2005 | | | |
| 24 | $1,061.57 | 12/01/2008 | | | |
| 299 | $1,160.88 | 12/01/2010 | | | |
| 1 | $1,155.85 | 11/01/2035 | | | |

VARIABLE RATE FEATURE:
[X]   Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

SECURITY:     You are giving a security interest in the property located at: 1215 W BERRY ST APT 2, FORT WAYNE, IN 46802

ASSUMPTION:  Someone buying this property
[X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

PROPERTY INSURANCE:     You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

LATE CHARGES:   If a payment is late, you will be charged  5.000%  of the overdue payment .

PREPAYMENT:  If you pay off your loan early, you
[X] may      [ ] will not      have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure

Borrower DEREK W NELSON _____  Date _____

Borrower CHRISTOPHER E ALMOND _____  Date _____

Borrower _____  Date _____

Borrower _____  Date _____

BORROWER COPY

# EXHIBIT E

# NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   October 21, 2005
LOAN NO.:   0136721065 - 5639
TYPE:   ADJUSTABLE RATE

BORROWER(S): DEREK W NELSON        CHRISTOPHER E ALMOND

ADDRESS:        1215 W BERRY ST APT 2
CITY/STATE/ZIP:   FORT WAYNE,IN 46802

PROPERTY:   1215 W BERRY ST APT 2
                FORT WAYNE, IN 46802

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

**ENTER DOCUMENT SIGNING DATE**

10-21-2005

    or
2.   The date you received your Truth in Lending disclosures;
    or
3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN: FUNDING
PHONE: (714)634-3494
FAX:    (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

**ENTER FINAL DATE TO CANCEL**

10-25-2005

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____        _____
SIGNATURE                               DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers

_____   _____        _____   _____
BORROWER/OWNER DEREK W NELSON     Date        BORROWER/OWNER CHRISTOPHER E ALMOND   Date


_____   _____        _____   _____
BORROWER/OWNER                    Date        BORROWER/OWNER                        Date

**BORROWER COPY**

## NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: October 21, 2005
LOAN NO.: 0136721065 - 5639
TYPE: ADJUSTABLE RATE

BORROWER(S): DEREK W NELSON     CHRISTOPHER E ALMOND

ADDRESS:     1215 W BERRY ST APT 2
CITY/STATE/ZIP:   FORT WAYNE, IN 46802

PROPERTY:   1215 W BERRY ST APT 2
             FORT WAYNE, IN 46802

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is

**ENTER DOCUMENT SIGNING DATE**
*10-21-2005*

     or

2. The date you received your Truth in Lending disclosures;
     or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN: FUNDING
PHONE: (714)634-3494
FAX: (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

**ENTER FINAL DATE TO CANCEL**
*10-25-2005*

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____     _____
SIGNATURE                                 DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers

_____   Date    _____   Date
BORROWER/OWNER DEREK W NELSON           BORROWER/OWNER CHRISTOPHER E ALMOND

_____   Date    _____   Date
BORROWER/OWNER                            BORROWER/OWNER

**BORROWER COPY**

Exhibit F

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0136721085 - 5639

Date: October 21, 2005

Borrower(s): DEREK W NELSON
CHRISTOPHER E ALMOND

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

Borrower/Owner  DEREK W NELSON _____  Date _____

Borrower/Owner  CHRISTOPHER E ALMOND _____  Date _____

Borrower/Owner _____  Date _____

Borrower/Owner _____  Date _____

## REQUEST TO CANCEL

I/We want to cancel loan # _____

Borrower/Owner Signature _____  Date _____



10/21/2005 11:19:42 AM

**BORROWER COPY**

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0136721065 - 5639      Borrower(s): DEREK W NELSON
Date: October 21, 2005                      CHRISTOPHER E ALMOND

You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason. This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you. No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

            Ameriquest Mortgage Company
            1600 S Douglass Rd Anaheim, CA 92806
            ATTN: Funding Department
            Phone: (714)541-9960
            Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.


_____    _____
Borrower/Owner  DEREK W NELSON        Date


_____    _____
Borrower/Owner  CHRISTOPHER E ALMOND    Date


_____    _____
Borrower/Owner                    Date


_____    _____
Borrower/Owner                    Date

## REQUEST TO CANCEL
I/We want to cancel loan #_____.

_____    _____
Borrower/Owner Signature             Date

10/21/2005 11:19:42 AM



BORROWER COPY

# EXHIBIT G

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
### 120 S. LaSalle Street, 18th floor
### Chicago, Illinois 60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
### Email: edcombs@aol.com
### www.edcombs.com

March 15, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Corporation
c/o registered agent
National Registered Agents
320 Meridian Street
Indianapolis, IN 46204

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents
320 Meridian Street
Indianapolis, IN 46204

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

Re:  Notice of rescission, claim and lien, Derrick W. Nelson and Christopher E. Almond , 1215 W. Berry Street, #2, Fort Wayne, IN 46802., loan of October 21, 2005

Ladies/ Gentlemen:

Each of the above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate

amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on March 15, 2006.

Daniel A. Edelman

7003 2260 0006 4740 8993

7003 2260 0006 4740 8986

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Rd.
Suite 1100
Orange, CA 92868

Ameriquest Mortgage Corporation
c/o National Registered Agents
320 Meridian St
Indianapolis, IN 46204

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X

B. Received by (Printed Name)    C. Date of Delivery
J.S 1PER MORZ    3-20

MAR 2 0 2006

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label)

7003 2260 0006 4740 8993

7003 2260 0006 4740 8986

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-



7003 2260 0006 4740 8382

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $

Postmark
Here

Sent To

Street, Apt. No.;
or PO Box No.

City, State, ZIP+4

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
   item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

1. Article Addressed to:

AMC Mortgage Services Inc.
c/o National Registered Agents
320 Pennsylvania Street
Indianapolis, IN 46204

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                              ☐ Agent
                                               ☐ Address

B. Received by (Printed Name)    C. Date of Delivery
J. Siper, NRAI                    3-20-0

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

7003 2260 0006 4740 8382

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-

# EXHIBIT H

Apr-04-06  12:14pm  From-                                              T-386  P 001/002  F-466



# AMERIQUEST
### MORTGAGE COMPANY

April 4, 2006                                        *Via Facsimile (312) 419-0379*
                                                     *and Federal Express*


Daniel A Edelman
Edelman, Combs, Latturner & Goodwin, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, IL 60603-3403


Re:    Borrower(s):                    *Derek W. Nelson and Christopher E. Almond*
       Ameriquest Loan Number Ending In: *xxxxxx1065*
       Property Address:               *1215 West Berry Street, Apartment 2*
                                        *Fort Wayne, Indiana 46802*


Dear Mr. Edelman:

      This letter is in response to your correspondence dated March 15, 2006 which purports to rescind the loan referenced above on the basis that Ameriquest Mortgage Company ("Ameriquest") did not comply with the Truth in Lending Act.

      Our review of your client's transaction confirms that all material disclosures were accurately provided to your client and that she executed the Lender's copy of the *Notice of Right to Cancel* to acknowledge her receipt of two (2) completed copies of the document. Accordingly, we respectfully deny your client's rescission request.

      Pursuant to your request, we are enclosing a copy of your client's account history from its inception to the present.

      We trust that this responds to your concerns.

Sincerely,

*Courtney Takahashi*

Courtney Takahashi
Regulatory Response Analyst II
Ameriquest Mortgage Company


Enclosures

cc:    Steve Taber, Esq.



# EXHIBIT I

File No. 05382DS Page #2

## FROM:

FORT WAYNE, IN 46804

Telephone Number:                    Fax Number:

# INVOICE

| INVOICE NUMBER |
| --- |
| 05382DS |

| DATE |
| --- |
| 10/17/2005 |

## TO:

KASEY
AMERIQUEST MORTGAGE COMPANY
9602 COLDWATER RD.
SUITE #104
FORT WAYNE, IN 46825
Telephone Number: 260-492-6179          Fax Number:
Alternate Number:                        E-Mail:

### REFERENCE

| | |
| --- | --- |
| Internal Order #: | 05382DS |
| Lender Case #: | |
| Client File #: | 0136721065 |
| Main File # on form: | 05382DS |
| Other File # on form: | 0136721065 |
| Federal Tax ID: | |
| Employer ID: | |

## DESCRIPTION

Lender: AMERIQUEST MORTGAGE COMPANY          Client: AMERIQUEST MORTGAGE COMPANY
Purchaser/Borrower: DEREK NELSON
Property Address: 1215 W. BERRY ST.
City: FORT WAYNE
County: ALLEN                        State: IN                    Zip: 46802-4335
Legal Description: W1/2 LOT #4 J M MILLERS ADD

## FEES

| | AMOUNT |
| --- | --- |
| Limited | 600.00 |
| **SUBTOTAL** | 600.00 |

## PAYMENTS

| | | | AMOUNT |
| --- | --- | --- | --- |
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| | | **SUBTOTAL** | |
| | | **TOTAL DUE** $ | 600.00 |

Appraiser   DEBORAH A. STERLING          Date   10/18/05

Form NIV5_SIG — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE
Sterling Realtors & Appraisers

File No. 05382DSI Page #3

## Listing Photo Page

| Borrower | DEREK NELSON | | | | |
|---|---|---|---|---|---|
| Property Address | 1215 W. BERRY ST. | | | | |
| City FORT WAYNE | | County ALLEN | | State IN | Zip Code 46802-4335 |
| Lender AMERIQUEST MORTGAGE COMPANY | | | | | |



### Listing 1
2501 WEBSTER ST.
Proximity to Subj.     1.20 miles
Current List Price     198,100
Days on Market         NOT DISCLOSED
GBA
Age/Year Built         1910



### Listing 2
901 W. WAYNE ST.
Proximity to Subj.     0.20 miles
Current List Price     169,900
Days on Market         NOT DISCLOSED
GBA
Age/Year Built         1900



### Listing 3
512 E. WASHINGTON BLVD.
Proximity to Subj.     1.09 miles
Current List Price     95,000
Days on Market         NOT DISCLOSED
GBA
Age/Year Built         1910

Form DLSTRNT.DM#C — *TOTAL for Windows* appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 05382DS  Page #4

## SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT

0136721065
File No. 05382DS

**SUBJECT**

| | |
|---|---|
| Property Address 1215 W. BERRY ST. | City FORT WAYNE   State IN   Zip code 46802-4335 |
| Legal Description W 1/2 LOT #4 J M MILLERS ADD | County ALLEN |
| Assessor's Parcel No. 92-3402-9004 | Tax Year 2004   R.E. Taxes $ 1,100.00   Special Assessments $ N/A |
| Neighborhood or Project Name N/A | Map Reference 18003   Census Tract 0021.00 |
| Borrower DEREK NELSON   Current Owner DEREK NELSON | Occupant ☒ Owner ☐ Tenant ☐ Vacant |
| Property rights appraised ☒ Fee Simple ☐ Leasehold   Project Type ☐ PUD ☐ Condominium | HOA $ N/A   /Mo. |
| Sales Price $ REFINANCE   Date of Sale N/A   Description and $ amount of loan charges/concessions to be paid by seller N/A | |
| Lender/Client AMERIQUEST MORTGAGE COMPANY   Address 9602 COLDWATER RD, SUITE #104, FORT WAYNE, IN 46825 | |
| Appraiser DEBORAH A. STERLING   Address 7530 OAK LANE, FORT WAYNE, IN 46804 | |

**NEIGHBORHOOD**

| Location | ☒ Urban | ☐ Suburban | ☐ Rural |
|---|---|---|---|

Predominant Single Family Occupancy: ☒ Owner  ☐ Tenant  ☐ Vacant (0-5%)

| | |
|---|---|
| Built up ☒ Over 75% ☐ 25-75% ☐ Under 25% | |
| Growth rate ☐ Rapid ☒ Stable ☐ Slow | |
| Property values ☐ Increasing ☒ Stable ☐ Declining | |
| Demand/supply ☐ Shortage ☒ In balance ☐ Over supply | |
| Marketing time ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. | |

Single family housing: PRICE $ (000) 30 Low, 45 High; AGE (yrs) 100 Low, 110 High; Predominant: PRICE 35, AGE 60

Predominant 2-4 Family Occupancy: ☐ Owner ☐ Tenant ☐ Vacant (0-5%) over 5%

2-4 family housing: PRICE $ (000) 35 Low, 90 High; AGE (yrs) 50 Low, 110 High; Predominant: PRICE 65, AGE 60

| | |
|---|---|
| Typical 2-4 family bldg. Type R-2 | |
| Typical rents $ 350 to $ 700 | No. stories 2   No. units 1   Age ____ yrs. |
| Est. neighborhood apt. vacancy 0-5 % | ☐ Increasing ☒ Stable ☐ Declining |
| Rent controls ☐ Yes ☒ No ☐ Likely   If yes or likely, describe | ☐ Increasing ☒ Stable ☐ Declining |

Present land use %: One family 70, 2-4 family 10, Multi-family 10, Commercial 10

Land use change ☒ Not likely ☐ Likely ☐ In process to:

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: THE NEIGHBORHOOD BOUNDARY IS SPRING STREET TO THE NORTH, CLINTON ST. TO THE EAST, TAYLOR ST. TO THE SOUTH, MECHANIC AVENUE TO THE WEST.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): SUBJECT IS LOCATED ON THE SOUTHWEST CENTRAL A HISTORICAL DISTRICT OF FORT WAYNE, 2 MILES TO THE CENTER OF TOWN. SCHOOLS AND SHOPPING WITHIN 1 MILE. SUBJECT'S NEIGHBORHOOD HAS A GOOD MIX OF HOUSING IN AGE, QUALITY AND DESIGN. SUBJECT HAS AVERAGE MARKET APPEAL, EMPLOYMENT AND MARKET ARE STABLE.

The following available listings represent the most current, similar, and proximate competitive properties to the subject property in the subject neighborhood. This analysis is intended to evaluate the inventory currently on the market competing with the subject property in the subject neighborhood and recent price and marketing time trends affecting the subject property. (Listings outside the subject neighborhood are not considered applicable). The listing comparables can be the rental or sale comparables if they are currently for sale.

| ITEM | SUBJECT | COMPARABLE LISTING NO. 1 | COMPARABLE LISTING NO. 2 | COMPARABLE LISTING NO. 3 |
|---|---|---|---|---|
| Address | 1215 W. BERRY ST. FORT WAYNE, IN | 2501 WEBSTER ST. FORT WAYNE, IN | 901 W. WAYNE ST. FORT WAYNE, IN | 512 E. WASHINGTON BLVD. FORT WAYNE, IN |
| Proximity to subject | | 1.20 miles | 0.20 miles | 1.09 miles |
| Listing price | $ | ☒ Unf. ☐ Furn. $ 198,100 | ☒ Unf. ☐ Furn. $ 169,900 | ☒ Unf. ☐ Furn. $ 95,000 |
| Approximate GBA | 2,032 | | | |
| Data source | INSPECTION | EXT. INSPECTION | EXT. INSPECTION | EXT. INSPECTION |
| # Units/Tot. rms./BR/BA | 3 / 8 / 4 / 3 | 2 / 13 / 4 / 2 | 3 / 10 / 3 / 3 | 3 / 11 / 3 / 3 |
| Approximate year built | 1926 | 1910 | 1900 | 1910 |
| Approx. days on market | N/A | NOT DISCLOSED | NOT DISCLOSED | NOT DISCLOSED |
| Comparison of listings to subject property: | THE COMPARABLE LISTING ARE LOCATED IN THE SOUTHWEST AND SOUTHCENTRAL SIDES OF TOWN. | | | |

Market conditions that affect 2-4 family properties in the subject neighborhood (including the above neighborhood indicators of growth rate, property values, demand/supply, and marketing time) and the prevalence and impact in the subject market area regarding loan discounts, interest buydowns and concessions, and identification of trends in listing prices, average days on market and any change over past year, etc.: CURRENTLY THE MARKET IS STABLE WITH LIGHTLY INCREASING PROPERTY VALUES. DEMAND AND SUPPLY SEEM TO BE IN ORDER, AVERAGE DAYS ON THE MARKET IS 110-140. THE LISTING TO SALES PRICE IS TYPICALLY 97%, AND SELLER CONCESSIONS ARE NOT COMMON IN THE MARKET PLACE.

**SITE**

| | |
|---|---|
| Dimensions 25 x 150 | Topography LEVEL |
| Site area 3,750   Corner lot ☒ No ☐ Yes | Size RECANTGULAR |
| Specific zoning classification and description R-1 RESIDENTIAL | Shape RECTANGULAR |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | Drainage AQUATE |
| Highest and best use as improved: ☒ Present use ☐ Other use (explain) | View RESIDENTIAL |
| | Landscaping AVERAGE |
| | Driveway STONE |
| | Apparent easements TYPICAL FOR THE AREA |

Utilities: Public / Other
- Electricity ☒ / 200 AMP
- Gas ☒
- Water ☒
- Sanitary sewer ☒
- Storm sewer ☒

Off-site improvements Type / Public / Private:
- Street ASPHALT ☒ ☐
- Curb/gutter CONCRETE ☒ ☐
- Sidewalk CONCRETE ☒ ☐
- Street lights POLE ☒ ☐
- Alley YES ☐ ☐

FEMA Special Flood Hazard Area ☐ Yes ☒ No
FEMA Zone X   Map Date 2/16/1995
FEMA Map No. 1800030260E

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): LEGAL DESCRIPTION, LOT DIMENSIONS AND AGE ARE FURNISHED BY THE ASSESSOR'S OFFICE. SEE ADDM. NO APPARCENT ADVERSE EASEMENTS OR ENCROACHMENTS NOTED. SUBJECTS SITE IS TYPICAL OF MANY OTHER SITES IN THIS AREA.

Sterling Realtors & Appraisers
Form SR3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT

File No. 05382DSI Page #5

| General description | | Exterior description | (Materials/condition) | Foundation | | Insulation (R-value if known) | |
|---|---|---|---|---|---|---|---|
| Units/bldgs. | 3 /1 | Foundation | CONCRETE BLK | Slab | NONE | Roof | |
| Stories | 2 | Exterior walls | WOOD/ALUM | Crawl space | NONE | ☒ Ceiling | |
| Type (det./att.) | DET | Roof surface | COMP. SHGL | Sump Pump | NONE | ☒ Walls | |
| Design (style) | 2-STY | Gutters & dwnspts. | NONE | Dampness | NONE NOTED | Floor | |
| Existing/proposed | EXISTING | Window type | WOD/DH | Settlement | NONE NOTED | None | |
| Under construction | NONE | Storm sash/Screens | YES/YES | Infestation | NONE NOTED | Adequacy | |
| Year Built | 1926 | Manufactured housing* | ☐ Yes ☒ No | Basement | 100 % of 1st floor area | Energy efficient items: | |
| Effective age(yrs.) | 25 | *(Complies with the HUD Manufactured Housing Construction and Safety Standards.) | | Basement finish | 0%-FIN | | |

| Units | Level(s) | Foyer | Living | Dining | Kitchen | Den | Family rm | Bedrooms | # Baths | Laundry | Other | Sq. ft/unit | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 1 | | 1 | | | 1 | 1 | | | 1,050 | 1,050 |
| 1 | 2 | | 1 | | 1 | | | 2 | 1 | | | 742 | 742 |
| 1 | 1&2 | | 1 | | 1 | | | 1 | 1 | | | 240 | 240 |

Improvements contain: 8 Rooms; 4 Bedroom(s); 3 Bath(s); 2,032 Square feet of GROSS BUILDING AREA

GROSS BUILDING AREA (GBA) IS DEFINED AS THE TOTAL FINISHED AREA (INCLUDING COMMON AREAS) OF THE IMPROVEMENTS BASED UPON EXTERIOR MEASUREMENTS.

| Surfaces | (Materials/condition) | Heating | YES | Kitchen equip. | (# / unit-cond.) | Attic | | Car Storage | No. Cars 1 |
|---|---|---|---|---|---|---|---|---|---|
| Floors | HDWD/CARPET/VYL | Type | GFA | Refrigerator | 3/3-GOOD | ☐ None | | Garage | ☐ |
| Walls | PLASTER | Fuel | | Range/oven | 3/3-GOOD | ☐ Stairs | | Carport | ☐ |
| Trim/Finish | PAINTED | Condition | AVG. | Disposal | 0/0 | ☐ Drop stair | | Attached | ☐ |
| Bath floor | VINYL | | | Dishwasher | 3/1-GOOD | ☒ Scuttle | | Detached | ☒ |
| Bath wainscot | VENEER/CERAMIC | Cooling | NONE | Fan/hood | 0/0 | ☐ Floor | | Adequate | ☐ |
| Doors | WOOD FLUSH | Central | | Compactor | 0/0 | ☐ Heated | | Inadequate | ☐ |
| | | Other | | Washer/dryer | 3/1-AVG. | ☐ Finished | | Offstreet | ☐ |
| | | Condition | | Microwave | 0/0 | ☐ Unfinished | | None | ☐ |
| Fireplace(s) NONE # | | | | Intercom | 0/0 | | | | |

Condition of the improvements, repairs needed, quality of construction, additional features, modernization, etc.: THE PROPERTY IS IN ABOVE AVERAGE CONDITION, AND ABOVE AVERAGE QUALITY OF CONSTRUCTION, NO MMEDIATE REPAIRS NEEDED. THE HOME HAS BEEN TOTALLY REMODELED AND UPDATED. HAS RESTORED HOME BACK TO ORGINAL DESIGN OR BETTER.

Depreciation (physical, functional, and external inadequacies, etc.): THE ONLY DEPRECATION IS PHYSICAL, THE HOME HAS HAD AVERAGE CARE, AND IS IN GOOD TO AVERAGE CONDITION. NO FUNCTIONAL OR EXTERNAL OBSOLESCENCE NOTED. NOTHING REQUIRING IMMEDIATE REPAIR.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: NO ADVERSE ENVIRONMENTAL CONDITION OR EXTERNAL FACTORS WERE OBSERVED. HOMES BUILT PRIOR TO 1980 MAY CONTAIN LEAD-BASED PAINT.

## VALUATION ANALYSIS

ESTIMATED SITE VALUE ........................... = $ 20,000

ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS:

| | | | | |
|---|---|---|---|---|
| 2,032 | Sq. Ft. @ $ | 65.71 | = $ | 133,523 |
| 806 | Sq. Ft. @ $ | 10.00 | = $ | 8,060 |
| | Sq. Ft. @ $ | | = $ | |
| | Sq. Ft. @ $ | | = $ | |
| | Sq. Ft. @ $ | | = $ | |

Special Energy Efficient Items = $
Porches, Patios, etc. COV PH/DECK = $ 2,000
Total Estimated Cost New = $ 143,583

| | Physical | Functional | External | | |
|---|---|---|---|---|---|
| Less | 10 | | | | |
| Depreciation | 14,358 | | | = $ | 14,358 |

Depreciated Value of Improvements ........................ = $ 129,225
"As is" Value of Site Improvements ........................ = $ 1,500
INDICATED VALUE BY COST APPROACH ........................ = $ 150,725

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and, for HUD and VA, the estimated remaining economic life of the property): FIGURES FOR THE COST APPROACH WERE OBTAINED FROM THE MARSHALL AND SWIFT RESIDENTIAL COST HANDBOOK. SEE ATTACHED ADDENDUM FOR THE SQUARE FOOTAGE CALCULATIONS AND EXTERIOR DIMENSIONS. THE LAND VALUE IS NOT EXCESSIVE FOR THE AREA. THE REMAINING ECONOMIC LIFE IS ESTIMATED TO BE 50 YEARS.

**SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT**

File No. 05382DS] Page #6

At least three rental comparables should be reported and analyzed in this section. The rental comparables should represent the most current rental information on properties as similar and proximate to the subject property as possible. (This comparison is based on current rental data, therefore, the rental comparables typically are not the same comparables used in the sales comparison analysis.) The appraisal report should assure the reader that the units and properties selected as comparables are comparable to the subject property (both the units and the overall property) and accurately represent the rental market for the subject property (unless otherwise stated within the report).

| ITEM | SUBJECT | COMPARABLE RENTAL NO. 1 | COMPARABLE RENTAL NO. 2 | COMPARABLE RENTAL NO. 3 |
|---|---|---|---|---|
| Address | 1215 W. BERRY ST. FORT WAYNE, IN | 914 W. WAYNE ST. FORT WAYNE, IN | 1102 ROCKHILL ST. FORT WAYNE, IN | 1207 W. WASHINGTON BLVD. FORT WAYNE, IN |
| Proximity to subject | | 0.19 miles EXT. INSPECTION | 0.23 miles EXT. INSPECTION | 0.14 miles EXT. INSPECTION |
| Lease dates (if available) | MO TO MO | MONTHLY LEASES | MONTHLY LEASES | MONTHLY LEASES/OTHER |
| Rent survey date | N/A | N/A | N/A | N/A |
| Data source | OWNER | MLS #2508169 CONV. | MLS #2504043 CONV. | MLS #2407710 CONV. |
| Rent concessions | NONE NOTED | NONE NOTED 08/25/05 | NONE NOTED 04/01/05 | NONE NOTED 03/31/05 |
| Description of property-units, design, appeal, age, vacancies, and conditions | No. Units 3   No. Vac. Yr. Blt: 1926 2-STY AVERAGE APPEAL AVERAGE CONDITION | No. Units 4   No. Vac. 1   Yr. Blt: 1900 2-STY AVG. AVERAGE APPEAL 1 VACANCIES AVERAGE CONDITION | No. Units 4   No. Vac.   Yr. Blt:1925 2-STY AVE. AVERAGE APPEAL NO VACCANIES AVERAGE CONDITION | No. Units 4   No. Vac. 0   Yr. Blt: 1900 2-STY AVE. AVERAGE APPEAL NO VACCANIES AVERAGE CONDITION |

| Individual unit breakdown | Rm. Count | | | Size Sq. Ft. | Total Monthly Rent | Rm. Count | | | Size Sq. Ft. | Total Monthly Rent | Rm. Count | | | Size Sq. Ft. | Total Monthly Rent | Rm. Count | | | Size Sq. Ft. | Total Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tot | Br | Ba | | | Tot | Br | Ba | | | Tot | Br | Ba | | | Tot | Br | Ba | | |
| | 4 | 1 | 1 | 1,050 | | 5 | 2 | 1 | 1,331 | 750 | 4 | 1 | 1 | 424 | 399 | 5 | 1 | 1 | 1,350 | 550 |
| | 3 | 2 | 1 | 742 | | 5 | 2 | 1 | 768 | 525 | 4 | 1 | 1 | 424 | 399 | 4 | 1 | 1 | 1,120 | 450 |
| | 1 | 1 | 1 | 240 | | 2 | 1 | 1 | 281 | 350 | 4 | 1 | 1 | 425 | 399 | 3 | 1 | 1 | 415 | 395 |
| | | | | | | 2 | 1 | 1 | 281 | 340 | 4 | 1 | 1 | 425 | 399 | 3 | 1 | 1 | 415 | 350 |

| Utilities, furniture, and amenities included in rent | AVERAGE UNFUR LANDLORD PAYS ALL UTILITIES EXCEPT ELECTRIC NO OTHER AMENITIES | AVERAGE UNFURNISHED LANDLORD PAYS ALL UTILITIES NO OTHER AMENITIES | AVERAGE UNFURNISHED LANDLORD PAYS ALL UTILITIES NO OTHER AMENITIES | AVERAGE UNFURNISHED LANDLORD PAYS ALL UTILITIES EXCEPT ELECTRIC NO OTHER AMENITIES |
| Functional utility, basement, heating/cooling, project amenities, etc. | FUNCTIONAL UTILITY IS AVERAGE GFA/NONE NONE | FUNCTIONAL UTILITY IS AVERAGE GFA/NONE NONE | FUNCTIONAL UTILITY IS AVERAGE GAS RADIANT/NONE NONE | FUNCTIONAL UTILITY IS AVERAGE GFA/NONE NONE |

Analysis of rental data and support for estimated market rents for the individual subject units (including the adjustments used, the adequacy of comparables, rental concessions, etc.) THE COMPARABLE RENTALS ARE SIMALAR TO THE SUBJECT IN STYLE, APPEAL, QUALITY OF CONSTRUCTION. THE COMPARABLE RENTALS ARE A GOOD EXAMPLE OF MARKET RENTS IN THE AREA. THE COMPARABLE RENTALS ARE LOCATED ON THE NORTHEAST AND WEST CENTRAL SIDES OF TOWN. THE COMPARABLE RENTALS WERE THE CLOSEST, MOST SIMILAR, CONSIDERED THE BEST AVAILABLE, AND A GOOD INDICATION OF VALUE.

Subject's rent schedule. The rent schedule reconciles the applicable indicated monthly market rents to the appropriate subject unit, and provides the estimated rents for the subject property. The appraiser must review the rent characteristics of the comparable sales to determine whether estimated rents should reflect actual or market rents. For example, if actual rents were available on the sales comparables and used to derive the gross rent multiplier (GRM), actual rents for the subject should be used. If market rents were used to construct the comparables' rents and derive the GRM, market rents should be used. The total gross estimated rent must represent rent characteristics consistent with the sales comparable data used to derive the GRM. The total gross estimated rent is not adjusted for vacancy.

| Unit | LEASES Lease Date | | No. Units Vacant | ACTUAL RENTS | | | ESTIMATED RENTS | | |
|---|---|---|---|---|---|---|---|---|---|
| | Begin | End | | Per Unit Unfurnished | Furnished | Total Rents | Per Unit Unfurnished | Furnished | Total Rents |
| 1 | MAY 05 | MAY 06 | 0 | $ 260 | $ | $ 260 | $ 260 | $ | $ 260 |
| 1 | MAR 05 | MAR 06 | 0 | 500 | | 500 | 500 | | 500 |
| 1 | OWNER | | | 650 | | 650 | 650 | | 650 |
| 3 | | | | | | $ 1,410 | | | $ 1,410 |

Other monthly income (itemize) _____ $ _____   $ _____

Vacancy: Actual last year ___0___ % Previous year ___0___ % Estimated: 0-3 % $ _____ Annually   Total gross estimated rent $ 1,410

Utilities included in estimated rents: ☒ Electric ☐ Water ☐ Sewer ☐ Gas ☐ Oil ☒ Trash collection ☐

Comments on the rent schedule, actual rents, estimated rents (especially regarding differences between actual and estimated rents), utilities, etc.: THE SUBJECT AND COMPARABLES ARE ALL LOCATED ON THE SOUTHWEST & SOUTHWEST CENTRAL SIDES OF TOWN. ALL ARE SIMILAR IN SIZE, AGE, STYLE, CONDITION, & UTILITY. COMPARABLE #1 IS OVER 6 MONTHS OLD. USED DUE TO ITS LOCATION, AND SIMILARITY TO THE SUBJECT. NO ADJUSTMENT ON BASEMENTS, DUE TO THE AGE OF THE HOMES. THE BASEMENTS ARE BEING USED FOR MECHANICALS ONLY. THE COMPARABLES USED WERE CONSIDERED THE BEST AVAILABLE, AND A GOOD INDICATION OF VALUE.

File No. 05382DSI Page #7

## SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT

The undersigned has recited three recent sales of properties most similar and proximate to the subject property and has described and analyzed these in this analysis. If there is a significant variation between the subject and comparable properties, the analysis includes a dollar adjustment reflecting the market reaction to those items or an explanation supported by the market data. If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus (-) adjustment is made, thus reducing the adjusted sales price of the comparable property; if a significant item in the comparable property is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the adjusted sales price of the comparable. [t] Sales Price / Gross Monthly Rent]

| ITEM | | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|---|
| Address | | 1215 W. BERRY ST. FORT WAYNE | 914 W. WAYNE ST. FORT WAYNE, IN | | 1102 ROCKHILL ST. FORT WAYNE, IN | | 1207 W. WASHINGTON BLVD. FORT WAYNE, IN | |
| Proximity to subject | | | 0.19 miles | | 0.23 miles | | 0.14 miles | |
| Sales price | $ | REFIANCE | ☒ Unf. ☐ Furn. $ 184,900 | | ☒ Unf. ☐ Furn. $ 150,000 | | ☒ Unf. ☐ Furn. $ 135,000 | |
| Sales price per GBA | $ | 54.24 | $ 69.46 | | $ 88.34 | | $ 40.91 | |
| Gross monthly rent | $ | 1,410.00 | $ 1,500.00 | | $ 825.00 | | $ 800.00 | |
| Gross mo. rent mult. (t) | | 185.30 | 123.27 | | 181.82 | | 168.75 | |
| Sales price per unit | $ | | $ | | $ | | $ | |
| Sales price per room | $ | | $ | | $ | | $ | |
| Data and/or | | N/A | MLS #2508169 | | MLS #2504043 | | MLS #2407710 | |
| Verification Sources | | N/A | EXT. INSPECTION | | EXT. INSPECTION | | EXT. INSPECTION | |
| ADJUSTMENTS | | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or financing concessions | | CONV. NONE NOTED | CONV. NONE NOTED | | CONV. NONE NOTED | | CONV. NONE NOTED | |
| Date of sale/time | | | 08/21/05 | | 04/01/05 | | 03/31/05 | |
| Location | | URBAN/AVG. | URBAN/AVG. | | URBAN/AVG. | | URBAN/AVG. | |
| Leasehold/Fee Simple | | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | | 25 x 150 | 34 x 150 | | 65 x 68 | | 50 x 100 | |
| View | | RESIDENTIAL | RESIDENTIAL | | RESIDENTIAL | | RESIDENTIAL | |
| Design and appeal | | 2-STY | 2-STY | | 2-STY | | 2-STY | |
| Quality of construction | | WOD/ALM/AVG. | WOD/AVG. | | BRK/CONC/GD | -2,000 | BRK/GOOD | -2,000 |
| Age | | 103 YRS. | 105 YRS. | | 80 YRS. | | 105 YRS. | |
| Condition | | ABOVE AVG. | ABOVE AVG. | | ABOVE AVG. | | AVERAGE | +10,000 |
| Gross Building Area | | 2,032 Sq. ft. | 2,662 Sq. ft. | -3,200 | 1,698 Sq. ft. | +1,700 | 3,300 Sq. ft. | -6,300 |

| Unit breakdown | No. of units | Rm. count Tot Br Ba | No. Vac. | No. of units | Rm. count Tot Br Ba | No. Vac. | No. of units | Rm. count Tot Br Ba | No. Vac. | No. of units | Rm. count Tot Br Ba | No. Vac. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 4 1 1 | 0 | A | 5 1 1 | 0 | A | 4 1 1 | 0 | A | 5 1 1 | 0 |
| | 1 | 3 2 1 | 0 | B | 4 1 1 | 0 | B | 4 1 1 | 0 | B | 4 1 1 | 0 |
| | 1 | 4 1 1 | 0 | C | 2 1 1 | 0 | C | 4 1 1 | 0 | C | 3 1 1 | 0 |
| | | | | D | 2 1 1 | 0 | D | 4 1 1 | 0 | C | 3 1 1 | 0 |

| | SUBJECT | COMP. 1 | | COMP. 2 | | COMP. 3 | |
|---|---|---|---|---|---|---|---|
| Basement description | FULL | PART | | FULL | | FULL | |
| Functional utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/cooling | GFA/NONE | GFA/NONE | | RADIANT/NONE | | GFA/NONE | |
| Parking on/off site | 1 CAR DET | NONE | +1,000 | NONE | +1,000 | 2 CAR DET | -1,000 |
| Project amenities and fee (if applicable) | NO FIREPLACE COV PH/ENCLPH | 1-FIREPLACE COVPH/NONE | -1,500 +1,000 | 1-FIREPLACE COV PH/NONE | -1,500 +1,000 | 1-FIREPLACE COV PH/DECK | -1,500 +1,000 |
| Net Adj. (total) | | ☐ + ☒ - $ 2,700 | | ☒ + ☐ - $ 200 | | ☒ + ☐ - $ 200 | |
| Adjusted sales price of comparable | | $ 182,200 | | $ 150,200 | | $ 135,200 | |

Comments on sales comparison (including reconciliation of all indicators of value as to consistency and relative strength and evaluation of the typical investor's/purchaser's motivation in that market): ALL OF THE COMPS, LIKE THE SUBJECT PROPERTY, ARE OF SIMILAR AGE, DESIGN AND APPEAL AND LOCATED IN THE EITHER ON THE SOUTHWEST OR SOUTH CENTRAL SIDES OF TOWN.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data | NONE KNOWN | NONE KNOWN | NONE KNOWN | NONE KNOWN |
| Source for prior sales | N/A | N/A | N/A | N/A |
| within year of appraisal | CNTY/MLS | CNTY/MLS | CNTY/MLS | CNTY/MLS |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: SUBJECT PROPERTY IS NOT LISTED. RESEARCHED BACK 36 MONTHS ON SUBJECT AND COMPARABLES.

Total gross monthly estimated rent $ 760.00 X gross rent multiplier (GRM) 185.30 = $ 140,828 INDICATED VALUE BY INCOME APPROACH
Comments on income approach (including expense ratios, if available, and reconciliation of the GRM) LEASE AGREEMENTS ON TWO UNITS. THIRD UNIT IS OWNER OCCUPIED.

| INDICATED VALUE BY SALES COMPARISON APPROACH | $ 150,000 |
|---|---|
| INDICATED VALUE BY INCOME APPROACH | $ 140,828 |
| INDICATED VALUE BY COST APPROACH | $ 150,725 |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections, or conditions listed below ☐ subject to completion per plans and specifications.
Comments and conditions of appraisal: NO LIABILITY IS ASSUMED FOR ANY STRUCTURAL DEFICIENCIES, IF ANY.

Final reconciliation: MOST WEIGHT GIVEN TO THE MARKET APPROACH DUE TO TE AGE OF THE HOMES WHICH MAKES THE COST APPROACH LESS RELIABLE. DUE TO LACK OF RENTAL DATA. THE INCOME APPROACH IS NOT APPROPRIATE. THE MARKET APPROACH IS GENERALLY CONSIDERED THE MOST APPROPRIATE INDICATOR OR RESIDENTIAL VALUE.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 09/03 ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 10/17/05 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 150,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature ☐ Did ☐ Did Not |
| Name DEBORAH A. STERLING | Name Inspect Property |
| Date Report Signed 10/18/05 | Date Report Signed |
| State Certification # INDIANA LICENSED RESIDENTIAL State IN | State Certification # State IN |
| Or State License # LR#49400061 State IN | Or State License # State |

Freddie Mac Form 72 10-94     PAGE 4 OF 4     Fannie Mae Form 1025 10-94

Form SR3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 05382DS  Page #8

# RECERTIFICATION OF VALUE

File No.:  05382DS

Client:  AMERIQUEST MORTGAGE COMPANY

Borrower:  DEREK NELSON

On  09/10/03 , the property situated at  1215 W. BERRY ST., FORT WAYNE, IN 46802-4335

was appraised by  DEBORAH A. STERLING
and valued at $  150,000

I have reviewed the appraisal, inspected the property, and reviewed recent sales as shown on the attached supplemental data page of the appropriate FNMA/FHLMC appraisal form.

It is my opinion that the value of the subject property:

☐ has INCREASED since the effective date of the original appraisal.

☒ has remained STABLE since the effective date of the original appraisal.

☐ has DECREASED since the effective date of the original appraisal.

Signature
Name  DEBORAH A. STERLING
Date Signed  12/14/03
State Certification #  INDIANA LICENSED RESIDENTIAL  State  IN
Or State License #  LR#49400061  State  IN

Signature
Name
Date Signed
State Certification #  State
Or State License #  State

Sterling Realtors & Appraisers
Form RECVALUE — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Operating Income Statement
### One- to Four-Family Investment Property and Two- to Four-Family Owner-Occupied Property

File No. 05382DS| Page #9

Property Address

Street **1215 W. BERRY ST.**  City **FORT WAYNE**  State **IN**  Zip Code **46802-4335**

**General Instructions:** This form is to be prepared jointly by the loan applicant, the appraiser, and the lender's underwriter. The applicant must complete the following schedule indicating each unit's rental status, lease expiration date, current rent, market rent, and the responsibility for utility expenses. Rental figures must be based on the rent for an "unfurnished" unit.

| | Currently Rented | Expiration Date | Current Rent Per Month | Market Rent Per Month | Utility Expense | Paid By Owner | Paid By Tenant |
|---|---|---|---|---|---|---|---|
| Unit No. 1 | Yes ☐ No ☐ | | $ | $ | Electricity | ☐ | ☐ |
| Unit No. 2 | Yes ☐ No ☐ | | $ | $ | Gas | ☐ | ☐ |
| Unit No. 3 | Yes ☐ No ☐ | | $ | $ | Fuel Oil | ☐ | ☐ |
| Unit No. 4 | Yes ☐ No ☐ | | $ | $ | Fuel (Other) | ☐ | ☐ |
| Total | | | $ | $ | Water/Sewer | ☐ | ☐ |
| | | | | | Trash Removal | ☐ | ☐ |

The applicant should complete all of the income and expense projections and for existing properties provide actual year-end operating statements for the past two years (for new properties the applicant's projected income and expenses must be provided). This Operating Income Statement and any previous operating statements the applicant provides must then be sent to the appraiser for review, comment, and/or adjustments next to the applicant's figures (e.g. Applicant/Appraiser 288/300). If the appraiser is retained to complete the form instead of the applicant, the lender must provide to the appraiser the aforementioned operating statements, mortgage insurance premium, HOA dues, leasehold payments, subordinate financing, and/or any other relevant information as to the income and expenses of the subject property received from the applicant to substantiate the projections. The underwriter should carefully review the applicant's/appraiser's projections and the appraiser's comments concerning those projections. The underwriter should make any final adjustments that are necessary to more accurately reflect any income or expense items that appear unreasonable for the market. (Real estate taxes and insurance on these types of properties are included in PITI and not calculated as an annual expense item.) Income should be based on the current rents, but should not exceed market rents. When there are no current rents because the property is proposed, new, or currently vacant, market rents should be used.

### Annual Income and Expense Projection for Next 12 months

| Income (Do not include income for owner-occupied units) | By Applicant/Appraiser | Adjustments by Lender's Underwriter |
|---|---|---|
| Gross Annual Rental (from unit(s) to be rented) | $ | $ |
| Other Income (include sources) | + | + |
| Total | | |
| Less Vacancy/Rent Loss | – ( %) | – ( %) |
| Effective Gross Income | $ | $ |

**Expenses (Do not include expenses for owner-occupied units)**

Electricity

Gas

Fuel Oil

Fuel _____ (Type - _____ )

Water/Sewer

Trash Removal

Pest Control

Other Taxes or Licenses

Casual Labor
    This includes the costs for public area cleaning, snow removal, etc., even though the applicant may not elect to contract for such services.

Interior Paint/Decorating
    This includes the costs of contract labor and materials that are required to maintain the interiors of the living unit.

General Repairs/Maintenance
    This includes the costs of contract labor and materials that are required to maintain the public corridors, stairways, roofs, mechanical systems, grounds, etc.

Management Expenses
    These are the customary expenses that a professional management company would charge to manage the property.

Supplies
    This includes the costs of items like light bulbs, janitorial supplies, etc.

Total Replacement Reserves - See Schedule on Pg. 2

Miscellaneous

Total Operating Expenses          $               $

Freddie Mac
Form 998 Aug 88

Fannie Mae
Form 216 Aug 88

File No. 05382DS| Page #10

## Replacement Reserve Schedule

Adequate replacement reserves must be calculated regardless of whether actual reserves are provided for on the owner's operating statements or are customary in the local market. This represents the total average yearly reserves. Generally, all equipment and components that have a remaining life of more than one year-such as refrigerators, stoves, clothes washers/dryers, trash compactors, furnaces, roofs, and carpeting, etc. - should be expensed on a replacement cost basis.

| Equipment | | Replacement Cost | | Remaining Life | | | | | | By Applicant/ Appraiser | Lender Adjustments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stoves/Ranges | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| Refrigerators | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| Dishwashers | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| A/C Units | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| C. Washer/Dryers | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| HW Heaters | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| Furnace(s) | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| (Other) | @ | $ | ea. / | Yrs. x | | Units = | $ | | | | $ |
| Roof | @ | $ | / | Yrs. x | One Bldg. = | | | | | $ | $ |

### Carpeting (Wall to Wall)

Remaining Life

| (Units) | Total Sq. Yds. @ $ | Per Sq. Yd. / | Yrs. = | $ | $ |
|---|---|---|---|---|---|
| (Public Areas) | Total Sq. Yds. @ $ | Per Sq. Yd. / | Yrs. = | $ | $ |

**Total Replacement Reserves. (Enter on Pg. 1)** $ _____ $ _____

## Operating Income Reconciliation

$ _____ - $ _____ = $ _____ / 12 = $ _____
Effective Gross Income — Total Operating Expenses — Operating Income — Monthly Operating Income

$ _____ - $ _____ = $ _____
Monthly Operating Income — Monthly Housing Expense — Net Cash Flow

(Note: Monthly Housing Expense includes principal and interest on the mortgage, hazard insurance premiums, real estate taxes, mortgage insurance premiums, HOA dues, leasehold payments, and subordinate financing payments.)

### Underwriter's Instructions for 2-4 Family Owner-Occupied Properties

- If Monthly Operating Income is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Monthly Operating Income is a negative number, it must be included as a liability for qualification purposes.

- The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total Monthly Housing Expense for the subject property to the borrower's stable monthly income.

### Underwriter's Instructions for 1-4 Family Investment Properties

- If Net Cash Flow is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Net Cash Flow is a negative number, it must be included as a liability for qualification purposes.

- The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total monthly housing expense for the borrower's primary residence to the borrower's stable monthly income.

Appraiser's Comments (including sources for data and rationale for the projections)

DEBORAH A. STERLING
Appraiser Name

Appraiser Signature    10/18/05
Date

Underwriter's Comments and Rationale for Adjustments

Underwriter Name    Underwriter Signature    Date

Freddie Mac
Form 998 Aug 88

Fannie Mae
Form 216 Aug 88

Form INC — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 05382DSI Page #11

## Subject Photo Page

| Borrower/Client | | | | | |
|---|---|---|---|---|---|
| Property Address | | | | | |
| City FORT WAYNE | | County ALLEN | | State IN | Zip Code 46802-4335 |
| Lender AMERIQUEST MORTGAGE COMPANY | | | | | |



**Subject Front**

1215 W. BERRY ST.

| | |
|---|---|
| Sales Price | REFIANCE |
| Gross Living Area | |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3 |
| Location | URBAN/AVG. |
| View | RESIDENTIAL |
| Site | 25 x 150 |
| Quality | WOD/ALM/AVG. |
| Age | 103 YRS. |



**Subject Rear**



**Subject Street**

File No. 05382DS| Page #12|

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client DEREK NELSON | |
| Property Address 1215 W. BERRY ST. | |
| City FORT WAYNE | County ALLEN | State IN | Zip Code 46802-4335 |
| Lender AMERIQUEST MORTGAGE COMPANY | |



**Comparable**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Comparable**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Comparable**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

Form PIC3x5.CR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Supplemental Addendum

File No. 05382DS Page #13

| | |
|---|---|
| Borrower/Client | DEREK NELSON |
| Property Address | 1215 W. BERRY ST. |
| City FORT WAYNE | County ALLEN | State IN | Zip Code 46802-4335 |
| Lender | AMERIQUEST MORTGAGE COMPANY |

File No. 05382DS

File No. 05382DSI Page #14

## Location Map

| Borrower/Client | DEREK NELSON | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1215 W. BERRY ST. | | | | | |
| City | FORT WAYNE | County | ALLEN | State | IN | Zip Code 46802-4335 |
| Lender | AMERIQUEST MORTGAGE COMPANY | | | | | |



Form MAP.LOC — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 05382DSI Page #15

## Building Sketch (Page - 1)

| | | | | |
|---|---|---|---|---|
| Borrower/Client | DEREK NELSON | | | |
| Property Address | 1215 W. BERRY ST. | | | |
| City | FORT WAYNE | County ALLEN | State IN | Zip Code 46802-4335 |
| Lender | AMERIQUEST MORTGAGE COMPANY | | | |



Sketch by Apex IV™

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1016.0 | 1016.0 |
| GLA2 | Second Floor | 1016.0 | 1016.0 |
| BSMT | Basement | 806.0 | 806.0 |
| P/P | Cov Ph | 214.0 | |
| | Encl Ph | 96.0 | 310.0 |
| GAR | Garage | 320.0 | 320.0 |
| | | | |
| Net LIVABLE Area | (Rounded) | | 2032 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 0.5 x | 2.0 x 2.0 | 2.0 |
| | 2.0 x 42.0 | 84.0 |
| | 6.0 x 26.0 | 156.0 |
| 0.5 x | 2.0 x 2.0 | 2.0 |
| | 5.0 x 60.0 | 300.0 |
| | 4.0 x 62.0 | 248.0 |
| | 4.0 x 56.0 | 224.0 |
| Second Floor | | |
| 0.5 x | 2.0 x 2.0 | 2.0 |
| | 2.0 x 42.0 | 84.0 |
| | 6.0 x 26.0 | 156.0 |
| 0.5 x | 2.0 x 2.0 | 2.0 |
| | 5.0 x 60.0 | 300.0 |
| | 4.0 x 62.0 | 248.0 |
| | 4.0 x 56.0 | 224.0 |
| 14 Items | (Rounded) | 2032 |

# EXHIBIT J

**Ameriquest Mortgage Company**

Borrower Name: DEREK W NELSON

Loan Number: 0136721065 - 5639

Borrower Name: CHRISTOPHER E ALMOND

Property Address:  1215 W BERRY ST APT 2
FORT WAYNE, IN  46802

## UNDERSTANDING YOUR OPTIONS REGARDING
## INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other.  A "discount point" is a one-time fee that equals one (1) percent of the loan amount that lowers the interest rate of the loan.  So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio.  The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points.  The following example shows how your options work.







\* The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor.  A discount point lowers the interest rate but *not* necessarily the overall cost of the loan.  A lower rate may be a good choice if you don't plan to sell or refinance for some time.  On the other hand, you might not want to have additional discount points if you think you'll sell or refinance soon.  Your mortgage specialist can give you more information about the options available to you and the exact terms of your loan.



0000013672106504059301 01

# EXHIBIT K



# AMC
## MORTGAGE SERVICES

P.O. Box 11056
Orange, CA 92856-8165
Phone (877) 389-3175  Fax (714) 973-3303

January 23, 2007

Loan #: 0136721065

DEREK W NELSON
CHRISTOPHER E ALMOND
1215 W BERRY ST APT 2
FORT WAYNE IN 46802

Property:  1215 W BERRY ST APT
FORT WAYNE IN 46802

| | |
|---|---|
| Coverage Amount: | $ 149,000.00 |
| Effective Date | : 11/19/2006 |
| Expiration Date | : 11/19/2007 |
| Flood Zone | : AE |
| Community # | : 180003 |
| Panel Nbr | : 0145 F |
| Map Date | : |

Dear Customer:

Please help us.  About a month ago you were notified that we have not received a policy from your flood insurance company for the property location shown above.  Please contact your insurance agent at once and have a policy sent to us.  Your loan number should be included on the policy.

Please note that we need to receive a policy each year.  The policy should include your loan number and mailed to the address above.

We require flood insurance for property that is located in a Special Flood Hazard Area (SFHA), as shown on maps published by the Federal Emergency Management Agency (FEMA).

We conducted a flood review using maps published by FEMA, and have determined that your property is located in a SFHA.  Based on the location, you are required by the terms of your mortgage to maintain flood insurance on the property location shown above.

If you wish to contest this flood insurance requirement, please provide written factual evidence, as to why flood insurance in not required on the property, from a community official, registered engineer, or surveyor for review by our flood zone determination company.  If the subsequent determination indicates that the property is in a Special Flood Hazard Area, only a Letter of Map Amendment (LOMA) or Map Revision (LOMR) from FEMA will be acceptable to change the original determination.

Should you be unable to provide the necessary flood insurance information on this property, we have the right to purchase coverage to protect our interest at your expense.  Because this coverage will be provided without detailed underwriting information, the cost may be much higher than the amount you would pay through the National Flood Insurance Program (NFIP).  **The coverage amount may not be sufficient to protect your full equity in the property in the event of a loss.  Also, it does not provide coverage for your personal property or the contents of the dwelling.  The premium may be considerably higher than your old policy.**  Unless we hear from you or your agent, we may purchase insurance coverage on the property.  If there is a lapse in coverage provided by your insurance company, you will be responsible for any premium charged.

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

Should you have any questions regarding this matter, please do not hesitate to contact our Insurance Service Center at (877) 389-3175.

Sincerely,

INSURANCE DEPARTMENT



Also doing business as Delaware AMC Mortgage Services, Inc., in the states of Texas, Rhode Island, and New Hampshire.

P6004-01 - RL - FL