**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EDWARD SMITH and GAIL SMITH, | ) | |
| | ) | 06 C 2828 |
| Plaintiffs, | ) | |
| | ) | Judge Coar |
| v. | ) | Magistrate Judge Nolan |
| | ) | |
| AMERIQUEST MORTGAGE COMPANY, | ) | |
| DEUTSCHE BANK NATIONAL TRUST | ) | |
| COMPANY, as Trustee of AMERIQUEST | ) | Transferred to Judge Aspen for |
| MORTGAGE SECURITIES, INC., Asset Backed | ) | pretrial proceedings under MDL |
| Pass-Through Certificates, Series 2004-R10 under | ) | #1715, Lead Case # 07 C 7097 |
| the Pooling & Servicing Agreement dated as of | ) | |
| October 1, 2004, Without Recourse, AMERICAN | ) | |
| HOME MORTGAGE SERVICING, INC., and | ) | |
| DOES 1-5, | ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiffs Edward Smith and Gail Smith bring this action against a

"subprime" mortgage lender and its affiliates to rescind a mortgage for violation of the Truth in

Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board

Regulation Z, 12 C.F.R. part 226.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), and 15 U.S.C. §1640 (TILA).

Defendants transact business in the District and are deemed to reside here.

1

## PARTIES

3.      Plaintiffs Edward Smith and Gail Smith own and reside in a home at 7825 Kedvale Ave., Skokie, IL  60076.

4.      Defendant Ameriquest Mortgage Company is a foreign corporation which maintains offices in and does business in Illinois.  Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

5.      Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

6.      Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

7.      Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

8.      During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

9.      Defendant American Home Mortgage Servicing, Inc. is a foreign corporation which does business in Illinois.  Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

10.     Defendant American Home Mortgage Servicing, Inc. services some loans originated by Ameriquest Mortgage Company, including plaintiffs', and claims an interest in

2

such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

11.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005.  On information and belief it holds legal title to plaintiffs' loan, as trustee.

12.     Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Michigan. It is the beneficial owner of some loans originated by Ameriquest Mortgage Company, including plaintiffs.'  It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

## FACTS RELATING TO PLAINTIFFS

13.     Approximately two or three months prior to August 22, 2004, plaintiffs applied for a mortgage with Ameriquest Mortgage Company.  At all times relevant to the application process, plaintiffs spoke to Ameriquest employee Jino Cabrera.

14.     Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

15.     During the initial phone conversation, plaintiff Edward Smith told Mr. Cabrera that he would only agree to a fixed-rate loan.  Mr. Cabrera took plaintiffs' credit information over the phone, then told Mr. Smith that Ameriquest would give him a fixed-rate loan.

16.     On information and belief, Ameriquest also arranged for Price-Rite Appraisal, Inc., to perform an appraisal of plaintiffs' property.  The appraisal report is attached as Exhibit K.

17.     Plaintiffs did not receive a copy their appraisal report or instructions on

how to obtain a copy until obtaining current counsel. AMC Mortgage Services mailed plaintiffs' appraisal report for the first time upon request March 16, 2007.

18.     The appraisal report is dated September 1, 2004, more than a week after closing.

19.     Prior to closing, Mr. Cabrera told Mr. Smith over the phone that plaintiffs' appraisal value was $734,000. Plaintiffs had inherited the house from Mr. Smith's father and trusted Ameriquest's assessment.

20.     However, the appraisal report actually lists the appraised value as $760,000.

21.     Mr. Cabrera and/or Ameriquest then represented on plaintiffs' data integrity audit (Exhibit L) that plaintiffs' appraised value was $795,000.

22.     Furthermore, Mr. Cabrera and/or Ameriquest then represented on plaintiffs' pre-typed loan application (Exhibit M) that plaintiffs owned two houses at the same address, each valued at $800,000, for a total of $1,600,000 real estate owned!

23.     A current search on Zillow.com shows that the appraised value of plaintiffs' home is only approximately $375,630.

24.     The principal amount of the loan was $635,000 or 169% of the likely actual appraised value. Ameriquest's fabricated appraisal value of $795,000 on the data inegrity audit makes it appear that the loan-to-value ratio ("LTV") was exactly 80%, which is the LTV benchmark that is customary for the industry.

25.     Ameriquest intended to falsify the value of plaintiffs' home on the appraisal report and the application it prepared. It did so in order to increase the loan amount for which

plaintiffs appeared to qualify; this, in turn, increased Mr. Cabrera's commission and the lender's "points and fees," interest income and profits - the amount of each of which is to a substantial degree determined by the size of the loan.

26.     Most reputable lenders will not make a loan that exceeds 80% of the value of the home ("LTV"), at least not without also imposing expensive private mortgage insurance ("PMI").

27.     Mr. Cabrera and plaintiffs scheduled a closing for approximately one week before August 22, 2004 in plaintiffs' home.

28.     No closing agent ever showed up to plaintiffs' home.  Plaintiffs had to call Ameriquest to reschedule.

29.     The loan was finally closed on August 22, 2004.  The closing agent who came to plaintiffs' house told them that she was fairly new and in a hurry but that all they had to do was sign everything.

30.     The data integrity audit and the loan application were among hundreds of pages and scores of documents presented to plaintiffs at closing.  Under these circumstances, plaintiffs could not review each line for accuracy.  Plaintiffs were unaware of the contradictory appraised values listed in their documents until obtaining current counsel.

31.     The following are documents relating to the loan:

    a.      A note, Exhibit A;

    b.      A mortgage, Exhibit B;

    c.      A settlement statement, Exhibit C;

    d.      A list of "items to be paid off from loan proceeds," Exhibit D;

5

      e.      "Itemization of settlement charges," <u>Exhibit E</u>;

      f.      A Truth in Lending disclosure statement, <u>Exhibit F</u>;

      g.      A "summary of debts and disbursements," <u>Exhibit G</u>;

      h.      The three-day notice of right to cancel required by the Federal Reserve Board, <u>Exhibit H</u>.  All copies furnished were incomplete.

      i.      A purported "one week" notice of right to cancel used solely by Ameriquest and related companies, <u>Exhibit I</u>.

32.      In connection with the loan, plaintiffs were charged a "loan discount" of $17,310.10, although on information and belief, plaintiffs' interest rate was not "discounted." See <u>Exhibit C</u>, line 802, as well as <u>Exhibit O</u> in which Ameriquest explains the "loan discount."

33.      Approximately a month or two after closing, plaintiffs noticed that their documents listed an adjustable interest rate.

34.      Mr. Smith called Cabrera to protest, and Cabrera answered that Ameriquest never gives fixed interest rates.  Cabrera told  him not to worry because the interest rate wouldn't rise for two years and that then it would only rise once a year thereafter.

35.      However, plaintiffs' interest rate rises every six months.  <u>Exhibit A</u>.

36.      Defendant violated the Residential Mortgage License Act of 1987 and implementing regulations.  The purpose of the Act is to "protect Illinois consumers seeking residential mortgage loans and to ensure that the residential mortgage lending industry is operating fairly, honestly and efficiently, free from deceptive and anti-competitive practices." 205 ILCS 635/1-2(b)(2005).  The implementing regulations, at 38 Ill. Adm. Code 1050.1230 (2005), create an affirmative disclosure obligation <u>when the lender changes the borrowers' loan</u>

6

terms mid-stream:

> **§ 1050.1230 Changes Affecting Loans in Process.**
> **a) If it is determined that a borrower does not qualify for the loan amount, terms or program for which he or she applied and the costs of another recommended program would materially differ from the costs itemized on the Good Faith Estimate, the licensee immediately shall provide to the customer a written, and when possible, a verbal, plain-English explanation of any program the licensee recommends as one for which the borrower may be qualified. Such explanation shall include but not be limited to detailed information on costs to the borrower.**

The same regulations create an affirmative, general duty of good faith, defined as "honesty in fact in the conduct of the transaction." 38 Ill.Adm. Code 1050.1250(a)(2005). That duty is as follows: "[a]ny disclosure or action required by the Act or this Part shall be made in good faith." Id. Defendant did not provide or attempt to provide, prior to closing, any oral or written notice of the last minute change in plaintiffs' loan terms.

37.     Plaintiffs were later directed to make payments to AMC Mortgage Services, Inc., and then to Citi Residential Lending, Inc. Subsequently, plaintiffs were directed to make payments to American Home Mortgage Servicing, Inc.

38.     On information and belief, Deutsche Bank National Trust Company, N.A., holds legal title to plaintiffs' loan, as Trustee. Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiffs' loan under Asset Backed Pass-Through Certificates, Series 2004-R10 under the Pooling & Servicing Agreement dated as of October 1, 2004 Without Recourse.

39.     In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiffs' loan or Deutsche Bank National Trust Company, N.A., does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-5.

## COUNT I - TRUTH IN LENDING

40.  Plaintiffs incorporate paragraphs 1-39.  This claim is against all defendants.

## RIGHT TO RESCIND

41.  Because the transaction was secured by plaintiffs' home, and was not entered

into for purposes of the initial acquisition or construction of that home, it was subject to the right to

cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23.  Section 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

**(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer**

8

entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

> **(1)** The retention or acquisition of a security interest in the consumer's principal dwelling.

> **(2)** The consumer's right to rescind the transaction.

> **(3)** How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

> **(4)** The effects of rescission, as described in paragraph (d) of this section.

> **(5)** The date the rescission period expires. . . .

**(f)** <u>Exempt transactions.</u> **The right to rescind does not apply to the following:**

> **(1)** A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

> **(2)** A credit plan in which a state agency is a creditor.

## GROUNDS FOR RESCISSION

42.     In connection with the loan, Ameriquest Mortgage Company failed to provide the required disclosures of the plaintiffs' right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23,  for (without limitation) the reasons stated below.

43.     All copies of the official Federal Reserve Board notice of right to cancel delivered to plaintiffs were incomplete.

44.     The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of

TILA damages, attorney's fees or the procedural protections of §1635.

45.     Furthermore, the "one week" cancellation notice is misleading, as the period given is actually only six days long.

46.     Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

47.     Notice of rescission has been given to defendants.  A copy is attached as Exhibit J.

48.     The loan has not been rescinded.

49.     Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

50.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs requests that the Court enter judgment in favor of plaintiffs and against defendants for:

a.     A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b.     Statutory damages for the underlying disclosure violation;

c.     If appropriate, statutory damages for failure to rescind;

d.     Attorney's fees, litigation expenses and costs.

e.     Such other or further relief as the Court deems appropriate.

10

## COUNT II – BREACH OF CONTRACT

51.     Plaintiffs incorporate paragraphs 1-39.

52.     This claim is against Ameriquest only.

53.     Defendant Ameriquest contracted and undertook to provide a discounted interest rate if plaintiff paid a loan discount fee.  Exhibit K.

54.     Plaintiff paid the fee of $17,310.10 but did not receive a discounted rate. Exhibit C, Line 802.

56.     Ameriquest thereby breached its agreement.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendant for:

    a.     Appropriate damages;

    b.     Costs;

    c.     Such other or further relief as the Court deems appropriate.

## COUNT III  - ILLINOIS CONSUMER FRAUD ACT

57.     Plaintiff incorporates ¶¶ 1-39.  This claim is against Ameriquest only.

58.     Defendants violated §2 of the Consumer Fraud Act, 815 ILCS 505/2, by unfairly and deceptively:

    a.     Misrepresenting to plaintiffs the market value of their residential property;

    b.     Concealing the fact that, based on the inflated appraisal, plaintiff would receive a loan with an extremely high loan-to-value ratio;

    c.     Engaging in "bait and switch" practice, by promising a fixed-rate

11

loan after acquiring sufficient financial information to underwrite the loan, then switching plaintiffs to an adjustable-rate loan immediately prior to closing; and

   d.  Charging a "loan discount" fee, representing (<u>Exhibit O</u>) that the purpose of the fee was to purchase a reduction in the interest rate, then not decreasing plaintiffs' rate.

   59.  Defendant engaged in such conduct in the course of trade and commerce.

   60.  Defendant intended for plaintiffs to rely on their misrepresentations.

   61.  Plaintiffs would not have taken out the loan if they had reason to know that the appraisal was inflated or that they were borrowing at an extremely high loan-to-value ratio that would prevent them from refinancing in the future.

   62.  Plaintiffs were damaged as a result of defendant's conduct, in that (1) they were charged and paid excess points and fees and interest stemming from the inflated value and principal; (2) their options for refinancing again have been severely limited by the high-loan-to-value loan, due to the fact that the Ameriquest loan amount was based on a significantly inflated home value.

   WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendants for:

   a.  A judgment voiding their mortgage, capable of recordation in the public records, and binding on all defendants;

   b.  Appropriate compensatory and punitive damages;

   c.  Appropriate special damages; and

   d.  Such other or further relief as the Court deems appropriate.

## COMMON LAW FRAUD - COUNT IV

63.     Plaintiffs incorporate ¶¶ 1-39 above.  This claim is against Ameriquest only.

64.     Defendant represented to plaintiffs, based upon what they reported was the existing value of her home, that they qualified for a certain loan amount.  Ameriquest charged them points and fees and other interest based upon the loan amount supported by its appraised value.

65.     These representations were a material term of defendants' transaction with plaintiffs.

66.     Defendants' representations were false and fraudulent because they were based upon a materially false representation of the value of plaintiffs' home.

67.     Defendants made these representations intentionally, with knowledge and/or reckless ignorance of its falsity.

68.     Alternatively, defendants conduct was willful.

69.     Defendants' representations caused plaintiffs to rely on the misrepresentations to her detriment.

70.     Plaintiffs' reliance was justifiable.

71.     Substantial punitive damages are warranted.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendant for:

a.      actual and compensatory damages;

b.      punitive damages; and

c.      Such other or further relief as the Court deems appropriate.

13

## CIVIL CONSPIRACY - COUNT V

72.     Plaintiffs incorporate ¶¶ 1-39.  This claim is against Ameriquest only.

73.     Defendant combined with Price-Rite Appraisals, Inc., to intentionally inflate the appraised value and was aware that it was substantially inflated above the market value.

74.     Defendants acted in concert to take steps in furtherance of their common goal to inflate the appraised value of plaintiff's home.

75.     Among other things, defendants misrepresented, concealed and suppressed the true market value of plaintiffs' property.

76.     The value of the property and home was a material fact in the transaction.

77.     Defendant intended that plaintiffs would rely on their misrepresentation, concealment and suppression of this fact.

78.     Plaintiffs took out the loan, the principal amount of which and other material terms were based on the inflated appraised value arranged by Ameriquest and Price-Rite Appraisals, Inc.

79.     Defendants' conduct was willful.

80.     Substantial punitive damages are warranted.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendant for:

        a.     Actual damages;

        b.     Incidental, consequential and special damages;

        c.     Costs of litigation and expenses; and

        d.     Such other or further relief as this Court deems appropriate.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on September 8, 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Jonathan N. Ledsky
jledsky@vbhlc.com

American Home Mortgage Servicing, Inc.
c/o Registered Agent
C.T. Corporation System

Craig Allen Varga
cvarga@vbhlc.com

208 S. LaSalle St.
Suite 814
Chicago, IL 60604

Bernard LeSage
blesage@buchalter.com

s/Daniel A. Edelman
Daniel A. Edelman

T:\16890\Pleading\2nd Amended Complaint_Pleading.wpd

15

# EXHIBIT A

Loan Number: 0090978966 - 7302

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

ıIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| August 22, 2004 | Orange | CA |
|---|---|---|
| Date | City | State |

7825 Kedvale Ave, Skokie, IL 60076
Property Address

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 635,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is   Ameriquest Mortgage Company.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of  6.500 %. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on   October 1, 2004 .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, **September 1, 2034** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my payments at:   505 City Parkway West, Suite 100,  Orange, CA 92868

or at a different place if required by the Note Holder.
### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 4,013.64.  This amount may change.
### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first day of,  **September, 2006**  and on that day every  sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."
### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding  **five and one-quarter** percentage point(s) **(5.250%)** to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials: _____  _____  _____

0000000909788650300590301

*(Rev. 07/03)*

1 of 3

08/20/2004 3:54:08 PM

Loan Number: 0090978966 - 7302

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.500 %** or less than **6.500%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000%** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **12.500 %** or less than **6.500 %**.

**(…) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section without incurring a prepayment charge. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(B) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.



00000090578966030059030

Initials:

08/20/2004 3:54:08 PM

Loan Number: 0090978966 - 7302

9. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)        _____(Seal)
Borrower   Edward J Smith                              Borrower   Gail M Smith

_____(Seal)        _____(Seal)
Borrower                                              Borrower



0000009097896603005903003

# EXHIBIT B

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

　　　　　Ameriquest Mortgage Company
Prepared By:

Amanda Schley
5215 Old Orchard Rd., #
410,Skokie, IL 60077

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated August 22, 2004
together with all Riders to this document.
(B) "Borrower" is Edward J Smith and Gail M Smith

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT　　　　　Form 3014　1/01
08/20/2004 3:54:08　　　　　　　　　　　　　　　　　　　　　0090978966 - 7302

AM6IL (0311)
Page 1 of 15　　　　　　　　　　　　Initials: _____
　　　　　VMP Mortgage Solutions (800)521-7291

0000009097896503012616D1

Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated August 22, 2004

The Note states that Borrower owes Lender six hundred thirty-five thousand and 00/100

Dollars

(U.S. $ 635,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than September 1, 2034

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

AM6IL (0311)                              Page 2 of 15        Initials: _____        Form 3014  1/01

0090978966 - 7302

08/20/2004 3:54:08

0000009097896830312616602

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County                                                   [Type of Recording Jurisdiction]
of COOK                                        [Name of Recording Jurisdiction].

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 0                             which currently has the address of
7825 Kedvale Ave                                     [Street]
Skokie                          [City], Illinois 60076     [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

Initials: _____

AM6IL (0311)                     Page 3 of 15                             Form 3014 1/01
08/20/2004 3:54:08 PM                           0090978966-7302



0000009097899660301261603

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.
currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as selected
by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check,
provided any such check is drawn upon an institution whose deposits are insured by a federal agency,
instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15.
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future, but Lender is not obligated to apply such payments at the time such payments are
accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest
on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan
current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds
or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal
balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have
now or in the future against Lender shall relieve Borrower from making payments due under the Note and
this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due
under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be
applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be
applied first to late charges, second to any other amounts due under this Security Instrument, and then to
reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the
late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from
Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in
full. To the extent that any excess exists after the payment is applied to the full payment of one or more
Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be
applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the
Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under
the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a)
taxes and assessments and other items which can attain priority over this Security Instrument as a lien or
encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums
for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any,
or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in
accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at
any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and
Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow
Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.
Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay
the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for
any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver,

AM6IL (0311)       Page 4 of 15     Initials: _____     Form 3014 1/01



0090978966 - 7302

08/20/2004 3:54:08

00000090978966030126160 4

Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

0090978966 - 7302

08/20/2004  3:54:08



0000009097896030126160S

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

AM6IL (0311)   Page 6 of 15   Initials: _____   Form 3014  1/01

0090978966 - 7302

08/20/2004 3:54:08



0000000909789660301261606

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

AM6IL (0311)                    Page 7 of 15          Initials: _____          Form 3014   1/01

0090978966 - 7302

08/20/2004  3:54:08



0000009097896603012616O7

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.



AM6IL (0311)                    Page 8 of 15                    Form 3014 1/01

0090978966-7302

08/20/2004 3:54:08

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any

0090978966 - 7302

08/20/2004 3:54:08



0000009097896603012616 09

Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0090978966 - 7302

08/20/2004 3:54:08



0000000909789660301261610

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

AM6IL (0311)                 Page 11 of 15                 Initials: _____           Form 3014  1/01

0090978966 - 7302

08/20/2004  3:54:08          

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials:  _____

AM6IL (0311)    Page 12 of 15    Form 3014 1/01

0090978966 - 7302

08/20/2004 3:54:08

0000009097896603012 61612

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

AM6IL (0311)                    Page 13 of 15          Initials: _____          Form 3014   1/01

0090978966 - 7302

08/20/2004 3:54:08



0000009097896603012610613

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
Edward J Smith                    -Borrower

_____

_____ (Seal)
Gail M Smith                      -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                        -Borrower

AM6IL (0311)                    Page 14 of 15                    Form 3014   1/01
08/20/2004 3:54:08 PM                    0090978966 - 7302



0000009097896503012561614

STATE OF ILLINOIS,       County ss:

I, _____ a Notary
Public in and for said county and in said state, hereby certify that

_____

_____

_____

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing
instrument, appeared before me this day in person, and acknowledged that he/she/they signed
and delivered the said instrument as his/her/their free and voluntary act, for the uses and
purposes therein set forth.

    Given under my hand and official seal of this

My Commission Expires:

_____    _____
Notary Public



400-15IL (4/02)              Page 15 of 15              0090978986 - 7302

                                              08/20/2004 3:54:08 PM

BORROWER NAME:

LOAN NUMBER:   0090978966 – 7302

## LEGAL DESCRIPTION



00000090978966030126I6I6

LGL3LTR (09/03)

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 22nd day of August , 2004   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

7825 Kedvale Ave, Skokie, IL  60076

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  6.500 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of  September, 2006 , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.   The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

initials_____

Loan Number:  0090978966 - 7302


0000009097896603021503<u>0</u>1

610-1 (Rev 1/01)                              Page 1 of 3                              08/20/2004 3:54:08 PM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and one-quarter** percentage points ( **5.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.500%** or less than **6.500%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One(** **1.000** **%)** from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than **12.500**)% or less than **6.500**)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan Number:  0090978966 - 7302

Initials_____



0000009097898660302150302

610-2 (Rev 1/01)                Page 2 of 3

08/20/2004 3:54:08 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
Borrower Edward J Smith                    Borrower Gail M Smith


_____ (Seal)    _____ (Seal)
Borrower                                   Borrower


Loan Number:  0090978966 - 7302


0000009097896030215030

610-3 (Rev 1/01)                Page 3 of 3                08/20/2004 3:54:08 PM

# EXHIBIT C

| A. | | B. TYPE OF LOAN: |
|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | 1. ☐FHA 2.☐FmHA 3.☒CONV. UNINS. 4.☐VA 5.☐CONV. INS. |
| **SETTLEMENT STATEMENT** | | 6. FILE NUMBER: TTC04-05554    7. LOAN NUMBER: 0090978956 |
| | | 8. MORTGAGE INS CASE NUMBER: |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

           1.0   3.89    (TTC04-05554/PFD/TTC04-05554/10)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| EDWARD J. SMITH and GAIL M. SMITH 7825 KEDVALE AVE SKOKIE ,IL 60076 | | Ameriquest Mortgage Company 5215 Old Orchard Rd Ste 420 Skokie, Illinois 60077 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 7825 KEDVALE AVE SKOKIE, IL 60076 MyCounty County, Illinois | Tristar Title, LLC PLACE OF SETTLEMENT 1301 W 22nd St Ste 101 Oak Brook, Illinois 60523 | August 22, 2004 Disburse:08/29/04 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 281,336.82 | 403. | |
| 104. PAYOFF MORTGAGE to MOREQUITY | 294,685.75 | 404. | |
| 105. PAYOFF MORTGAGE to MORTGAGE LENDERS NETW | 50,486.81 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes     to | | 406. City/Town Taxes     to | |
| 107. County Taxes     to | | 407. County Taxes     to | |
| 108. Assessments     to | | 408. Assessments     to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 626,509.38 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 635,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes     to | | 510. City/Town Taxes     to | |
| 211. County Taxes     to | | 511. County Taxes     to | |
| 212. Assessments     to | | 512. Assessments     to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 635,000.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 626,509.38 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | (635,000.00) | 602. Less Reductions Due Seller (Line 520) | |
| **303. CASH ( FROM )( X TO ) BORROWER** | 8,490.62 | **603. CASH ( TO )( FROM ) SELLER** | 0.00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.
I HAVE CAREFULLY REVIEWED THE HUD-1 SETTLEMENT STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE AND ACCURATE STATEMENT OF ALL RECEIPTS AND DISBURSEMENTS MADE ON MY ACCOUNT OR BY ME IN THIS TRANSACTION. I FURTHER CERTIFY THAT I HAVE RECEIVED A COPY OF THE HUD-1 SETTLEMENT STATEMENT.

Borrower                                      Seller

       EDWARD J. SMITH

       GAIL M. SMITH

TO THE BEST OF MY KNOWLEDGE, THE HUD-1 SETTLEMENT STATEMENT WHICH I HAVE PREPARED IS A TRUE AND ACCURATE ACCOUNT OF THE FUNDS WHICH WERE RECEIVED AND HAVE BEEN OR WILL BE DISBURSED BY THE UNDERSIGNED AS PART OF THE SETTLEMENT OF THIS TRANSACTION.

       Tristar Title, LLC
       Settlement Agent

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE: TITLE 18 U.S. CODE SECTION 1001 & SECTION 1010.

L. SETTLEMENT CHARGES

| | | | PAID FROM BORROWERS FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL COMMISSION Based on Price $ @ 6.0000 % | | | | |
| Division of Commission (line 700) as Follows: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission Paid at Settlement | | | | |
| 704. | to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | |
| 801 Origination Fee % | | | | |
| 802 Discount 2.7260 % | to Ameriquest Mortgage Company | | 17,310.10 | |
| 803. Appraisal Fee | to | | | |
| 804. Credit Report | to | | | |
| 805. TAX SERVICE FEE | to AMERIQUEST MORTGAGE | | 70.00 | |
| 806. FLOOD SEARCH FEE | to AMERIQUEST MORTGAGE | | 16.00 | |
| 807. LENDERS PROCESSING FEE | to AMERIQUEST MORTGAGE | | 626.00 | |
| 808. ADMIN FEE | to AMERIQUEST MORTGAGE | | 239.00 | |
| 809. APPICATION FEE | to AMERIQUEST MORTGAGE | | 360.00 | |
| 810. STAFF APPRAISER FEE | to Ameriquest Mortgage Company | | 400.00 | |
| 811. | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | |
| 901. Interest From 08/29/04 to 09/01/04 @ $ 113.080000/day ( 3 days %) | | | 339.24 | |
| 902. Mortgage Insurance Premium for months to | | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | | |
| 904. | | | | |
| 905. | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | |
| 1001. Hazard Insurance months @ $ per month | | | | |
| 1002. Mortgage Insurance months @ $ per month | | | | |
| 1003. City/Town Taxes months @ $ per month | | | | |
| 1004. County Taxes months @ $ per month | | | | |
| 1005. Assessments months @ $ per month | | | | |
| 1006. months @ $ per month | | | | |
| 1007. months @ $ per month | | | | |
| 1008. months @ $ per month | | | | |
| **1100. TITLE CHARGES** | | | | |
| 1101. Settlement or Closing Fee to | | | | |
| 1102. Abstract or Title Search to | | | | |
| 1103. Title Examination to | | | | |
| 1104. Title Insurance Binder to | | | | |
| 1105. Document Preparation to Tristar Title, LLC | | | 3.00 | |
| 1106. Notary Fees to | | | | |
| 1107. Attorney's Fees to | | | | |
| (includes above item numbers: ) | | | | |
| 1108. Title Insurance to Ticor Title Insurance Company | | | 1,931.00 | |
| (includes above item numbers: ) | | | | |
| 1109. Lender's Coverage $ 635,000.00 | | | | |
| 1110. Owner's Coverage $ | | | | |
| 1111. | | | | |
| 1112. | | | | |
| 1113. | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ 63.00; Releases $ | | | 63.00 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | | |
| 1203. State Tax/Stamps: Revenue Stamps ; Mortgage | | | | |
| 1204. | | | | |
| 1205. | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | |
| 1301. Survey to | | | | |
| 1302. Pest Inspection to | | | | |
| 1303. 2003 TAXES to COOK COUNTY TREASURER | | | 2,748.48 | |
| 1304. | | | | |
| 1305. See addit'l disb. exhibit to | | | 257,231.00 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | 281,336.82 | |

Tristar Title, LLc
Settlement Agent

ertified to be a true copy.

he undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.
HAVE CAREFULLY REVIEWED THE HUD-1 SETTLEMENT STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE AND
CCURATE STATEMENT OF ALL RECEIPTS AND DISBURSEMENTS MADE ON MY ACCOUNT OR BY ME IN THIS TRANSACTION. I FURTHER CERTIFY
HAT I HAVE RECEIVED A COPY OF THE HUD-1 SETTLEMENT STATEMENT.

Borrower                                              Seller

EDWARD J. SMITH

GAIL M. SMITH

O THE BEST OF MY KNOWLEDGE, THE HUD-1 SETTLEMENT STATEMENT WHICH I HAVE PREPARED IS A TRUE AND ACCURATE ACCOUNT OF THE
UNDS WHICH WERE RECEIVED AND HAVE BEEN OR WILL BE DISBURSED BY THE UNDERSIGNED AS PART OF THE SETTLEMENT OF THIS
RANSACTION.

Tristar Title, LLc
Settlement Agent

ARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON
ONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE: TITLE 18 U.S. CODE SECTION 1001 & SECTION 1010.

{ TTC04-05554 / TTC04-05554 / 10 }

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

|                     |                                                     |
|---------------------|-----------------------------------------------------|
| Borrower:           | EDWARD J. SMITH and GAIL M. SMITH                   |
| Lender:             | Ameriquest Mortgage Company                         |
| Settlement Agent:   | Tristar Title, LLC                                  |
|                     | (630)954-4000                                       |
| lace of Settlement: | 1301 W 22nd St Ste 101                              |
|                     | Oak Brook, Illinois  60523                          |
| Settlement Date:    | August 22, 2004                                     |
| Disbursement Date:  | August 29, 2004                                     |
| Property Location:  | 7825 KEDVALE AVE                                    |
|                     | SKOKIE, IL 60076                                    |
|                     | MyCounty County, Illinois                           |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
EDWARD J. SMITH

_____
GAIL M. SMITH

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
Tristar Title, LLc
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

(TTC04-05554.PFD/TTC04-05554/10)

## ADDITIONAL DISBURSEMENTS EXHIBIT

Borrower: EDWARD J. SMITH and GAIL M. SMITH
Lender: Ameriquest Mortgage Company
Settlement Agent: Tristar Title, LLC
(630)954-4000
ace of Settlement: 1301 W 22nd St Ste 101
Oak Brook, Illinois 60523
Settlement Date: August 22, 2004
Disbursement Date: August 29, 2004
Property Location: 7825 KEDVALE AVE
SKOKIE, IL 60076
MyCounty County, Illinois

| PAYEE/DESCRIPTION | NOTE/REF NO | BORROWER | SELLER |
|---|---|---|---|
| BANK ONE | | 3,340.00 | |
| PAY ON ACCOUNT | | | |
| CHASE NA | | 1,955.00 | |
| PAY ON ACCOUNT | | | |
| CHASE NA | | 15,890.00 | |
| PAY ON ACCOUNT | | | |
| CITI | | 29,121.00 | |
| PAY ON ACCOUNT | | | |
| CITI | | 30,877.00 | |
| PAY ON ACCOUNT | | | |
| DISCOVER FINANCIAL SVC | | 6,078.00 | |
| PAY ON ACCOUNT | | | |
| DISCOVER FINANCIAL SVC | | 11,628.00 | |
| PAY ON ACCOUNT | | | |
| FIRST USA BANK | | 14,883.00 | |
| PAY ON ACCOUNT | | | |
| FLEET CC | | 13,481.00 | |
| PAY ON ACCOUNT | | | |
| FORD MOTOR CREDIT | | 5,384.00 | |
| PAY ON ACCOUNT | | | |
| GMAC | | 22,472.00 | |
| PAY ON ACCOUNT | | | |
| HB COMPUSA | | 4,628.00 | |
| PAY ON ACCOUNT | | | |
| F 'NARDS | | 4,683.00 | |
| . ON ACCOUNT | | | |
| MBNA AMERICA BANK NA | | 6,778.00 | |
| PAY ON ACCOUNT | | | |
| NTL COLGATE | | 1,585.00 | |
| PAY ON ACCOUNT | | | |
| PROVIDIAN FINANCIAL | | 36,903.00 | |
| PAY ON ACCOUNT | | | |
| PROVIDIAN FINANCIAL | | 135.00 | |
| PAY ON ACCOUNT | | | |
| SAMS CLUB MBGA | | 2,817.00 | |
| PAY ON ACCOUNT | | | |
| UNVL CITI | | 8,830.00 | |
| PAY ON ACCOUNT | | | |

(TTC04-05554.PFD/TTC04-05554/10)

ADDITIONAL DISBURSEMENTS EXHIBIT - Continued

| | | |
|---|---|---|
| HHLD BANK ^Y ON ACCOUNT | 6,243.00 | |
| _ CITI PAY ON ACCOUNT | 24,812.00 | |
| RNB-TGTVISA PAY ON ACCOUNT | 4,708.00 | |
| Total Additional Disbursements shown on Line 1305 | $ 257,231.00 | $ 0.00 |

(TTC04-05554.PFD/TTC04-05554/10)

# EXHIBIT D

### ITEMS TO BE PAID OFF FROM LOAN PROCEEDS

Borrower :  Edward J Smith
           Gail M Smith

Loan Number :  0090978966 - 7302

| Payee | | Amount |
|-------|---|--------|
| BANK ONE | (W) | $3,340.00 |
| CHASE NA | (W) | $1,955.00 |
| CHASE NA | (W) | $15,890.00 |
| CITI | (W) | $29,121.00 |
| CITI | (W) | $30,877.00 |
| DISCOVER FINANCIAL SVC | (W) | $6,078.00 |
| DISCOVER FINANCIAL SVC | (W) | $11,628.00 |
| FIRST USA BANK | (W) | $14,883.00 |
| FLEET CC | (W) | $13,481.00 |
| FORD MOTOR CR | (W) | $5,384.00 |
| G M A C | (W) | $22,472.00 |
| HB/COMPUSA | (W) | $4,628.00 |
| HB/MENARDS | (W) | $4,683.00 |
| MBNA AMERICA BANK NA | (W) | $6,778.00 |
| MOREQUITY | (W) | $294,685.75 |
| MORTGAGE LENDERS NETWO | (W) | $50,486.81 |
| NTL COLGATE | (W) | $1,585.00 |
| PROVIDIAN FINANCIAL | (W) | $36,903.00 |
| PROVIDIAN FINANCIAL | (W) | $135.00 |
| SAMS CLUB/MBGA | (W) | $2,817.00 |
| UNVL/CITI | (W) | $8,830.00 |
| COOK COUNTY TREASURER | (W) | $2,748.48 |
| HHLD BANK | (W) | $6,243.00 |
| RNB-TGTVISA | (W) | $4,708.00 |
| UNVL/CITI | (W) | $24,812.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total Wire:   $615,652.74

Loan Amount:            635,000.00

Cash/Check from
Borrower:

Borrower Proceeds:      $8,503.70

| Borrower  Edward J Smith | Date | Borrower  Gail M Smith | Date |
|---|---|---|---|

| Borrower | Date | Borrower | Date |
|---|---|---|---|

Title Company Representative Signature      Date

895-7UNV (2/2004)

0000009097889660307430707

# EXHIBIT E

**CLOSING INSTRUCTIONS**
## ITEMIZATION OF SETTLEMENT CHARGES

| Title Company/Attorney | Title Officer/Attorney | Phone Number | Order Number |
|---|---|---|---|
| TRISTAR TITLE, LLC | KELLY SLEETER | (630)954-4000 | TTC04- |

| Borrower(s) | Property Address |
|---|---|
| Edward J Smith  Gail M Smith | 7825 Kedvale Ave |
| | Skokie                    IL        60076 |
| | Loan Number: 0090978966 |

FROM: <u>Ameriquest Mortgage Company - Skokie, IL</u>    Phone No. <u>(847)583-8031</u>    Fax <u>(847)583-8522</u>
    Branch Name                              Branch Phone No.              Branch Fax Number

BELOW IS A LIST OF ALL SETTLEMENT CHARGES AND DISBURSEMENTS APPLICABLE TO THIS LOAN. YOU MUST USE THESE FIGURES TO PREPARE YOUR SETTLEMENT STATEMENT. YOU CANNOT DEVIATE FROM THESE FIGURES WITHOUT PRIOR WRITTEN AUTHORIZATION FROM VICE PRESIDENT OF LOAN OPERATIONS AND/OR ITS DIRECTORS .

| LINE NO. ON SETTLEMENT STATEMENT | PAYEE | AMOUNT |
|---|---|---|
| 801. Loan origination fee     % to | | |
| 802. Loan discount  2.726  % to  Ameriquest Mortgage Company | | $17,310.10 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | | $500.00 |
| 808. Yield Spread Premium to | | |
| 809. | | |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | | $70.00 |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | | $16.00 |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | | $626.00 |
| 813.Admin to Ameriquest Mortgage Company | | $239.00 |
| 814. Doc. Prep. Fee to | | |
| 815. Credit Report Fee to | | |
| 816. Origination Fee     % to | | |
| 817. Application Fee to  Ameriquest Mortgage Company | | $360.00 |
| 818. Underwriting Fee to | | |
| 819. Service Provider Fee to | | |
| 820. Processing Fee to | | |
| 821. Underwriting Fee to | | |
| 822. Appraisal Fee to | | |
| 901. Interest from 08/30/2004  to  09/01/2004  @  $113.08 per day | | $226.16 |
| 902. Mortgage insurance premium for          months to | | |
| 903. Hazard ins prem to | | $0.00 |
| 904. Flood ins prem  to | | |
| 1001. Hazard Insurance      months @ $     per month | | |
| 1002. Mortgage Insurance      months @ $     per month | | |
| 1003. Earthquake Ins     months @ $     per month | | |
| 1004. County prop. taxes     months @ $     per month | | |
| 1005. Annual assess.  months @ $     per month | | |
| 1006. Flood     months @ $     per month | | |
| 1007. Windstorm Ins     months @ $     per month | | |
| 1008. | | |
| 1101. Settlement or closing fee to | | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1105. Document preparation to  TRISTAR TITLE, LLC | | $3.00 |
| 1106. Notary fees to | | |
| 1107. Attorney's fees to | | |
| 1108. Title Insurance to  TRISTAR TITLE, LLC | | $1,931.00 |
| 1109. Lender's coverage | | |
| 1110. Owner's coverage          $ | $1,931.00 | |
| 1111. Settlement/Disbursement fee to | | |
| 1112. Escrow Fee to | | |
| 1201. Recording fees | | $63.00 |
| 1202. City/county tax/stamps | | |
| 1203. State tax/ stamps | | |
| 1204. State specific fee | | |
| 1301. Demand to | | |
| 1302. Pest Inspection to | | |
| 1303. Survey Fee | | |
| 1304. Staff Appraiser Fee | | |
| 1305. Reconveyance Fee to | | |
| 1306. | | |
| 1307. Property Val Fee to | | |
| 1308. Courier Fee | | |

*Any amounts appearing on these lines are prepaid finance charges and cannot be increased or added once loan documents have been prepared unless new loan documents are generated.

Borrower Edward J Smith _____ Date _____    Borrower  Gail M Smith _____ Date _____

_____ Date _____    Borrower _____ Date _____

Title Company Representative Signature _____ Date _____

0000090978966307430706

# EXHIBIT F

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Ameriquest Mortgage Company
5215 Old Orchard Rd., # 410
Skokie, IL 60077
(847)583-8031

☐ Preliminary      ☒ Final

Broker License:

Borrowers: Edward J Smith    Gail M Smith

Type of Loan:  ADJUSTABLE RATE
Date:  August 22, 2004

Address:      7825 Kedvale Ave
City/State/Zip:  Skokie, IL 60076

Loan Number:  0090978966 - 7302

Property:    7825 Kedvale Ave, Skokie, IL  60076

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.306        % | $ 913,883.97 | $ 616,152.74 | $ 1,530,036.71 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $4,013.64 | 10/01/2004 | | | |
| 335 | $4,267.02 | 10/01/2006 | | | |
| 1 | $4,257.65 | 09/01/2034 | | | |

**VARIABLE RATE FEATURE:**
☒ Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**    You are giving a security interest in the property located at: 7825 Kedvale Ave, Skokie, IL  60076

**ASSUMPTION:**  Someone buying this property   ☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**    You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**    If a payment is late, you will be charged  5.000%  of the overdue payment .

**PREPAYMENT:**  If you pay off your loan early, you
☐ may   ☒ will not   have to pay a penalty.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____    _____    _____    _____
Borrower Edward J Smith          Date      Borrower Gail M Smith              Date

_____    _____    _____    _____
Borrower                         Date      Borrower                          Date

TIL1 (Rev. 7/01)

0000009097896030575010!

**ORIGINAL COPY**

08/20/2004 3:54:08 PM

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

☐ Preliminary  ☒ Final

LENDER: Ameriquest Mortgage Company
5215 Old Orchard Rd., # 410
Skokie, IL 60077
(847)583-8031

Broker License:

Borrowers: Edward J Smith   Gail M Smith

Type of Loan: ADJUSTABLE RATE
Date: August 22, 2004

Address:      7825 Kedvale Ave
City/State/Zip: Skokie, IL 60076

Loan Number: 0090978966 - 7302

Property:   7825 Kedvale Ave, Skokie, IL  60076

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.306  % | $ 913,883.97 | $ 616,152.74 | $ 1,530,036.71 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $4,013.64 | 10/01/2004 | | | |
| 335 | $4,267.02 | 10/01/2006 | | | |
| 1 | $4,257.65 | 09/01/2034 | | | |

**VARIABLE RATE FEATURE:**
☒ Your loan has a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**   You are giving a security interest in the property located at: 7825 Kedvale Ave, Skokie, IL  60076

**ASSUMPTION:**  Someone buying this property   ☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**     You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**   If a payment is late, you will be charged  5.000%  of the overdue payment .

**PREPAYMENT:**  If you pay off your loan early, you
☐ may  ☒ will not  have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____        _____        _____        _____
Borrower Edward J Smith        Date          Borrower Gail M Smith              Date

_____        _____        _____        _____
Borrower                       Date          Borrower                          Date

TIL1 (Rev. 7/01)


0000009097896603057501 01

**BORROWER COPY**

08/20/2004 3:54:08 PM

# EXHIBIT G

eriquest Mortgage Company

Summary of Debts and Disbursements
(Refinance Loans Only)

Date: August 22, 2004
Branch:
Skokie, IL

ower: Edward J Smith   Gail M Smith

Nt  : 0090978966 - 7302

| Fees | | |
|---|---|---|
| Discount Fee | 2.726 | $17,310.10 |
| er Retained Fees | | $1,311.00 |
| aid Interest | | $226.16 |
| Paid to Others | | $2,497.00 |

Short to Close

Total Payoffs   $605,152.04

Cash to Borrower   $8,503.70

l Points & Fees   $21,344.26

| CREDITORS DEBTS | BALANCE | PAYOFFS | PAYMENTS |
|---|---|---|---|
| BANK ONE | | $3,340.00 | |
| CHASE NA | | $1,955.00 | |
| CHASE NA | | $15,890.00 | |
| CITI | | $29,121.00 | |
| CITI | | $30,877.00 | |
| DISCOVER FINANCIAL SVC | | $6,078.00 | |
| DISCOVER FINANCIAL SVC | | $11,628.00 | |
| FIRST USA BANK | | $14,883.00 | |
| FIRST USA BANK N A | | | |
| FLEET CC | | $13,481.00 | |
| FORD MOTOR CR | | $5,384.00 | |
| FORD MOTOR CR | | | |
| G M A C | | $22,472.00 | |
| HB/COMPUSA | | $4,628.00 | |
| HB/MENARDS | | $4,683.00 | |
| MBNA AMERICA BANK NA | | $6,778.00 | |
| MOREQUITY | | $294,685.75 | |
| MORTGAGE LENDERS NETWO | | $50,486.81 | |
| NTL COLGATE | | $1,585.00 | |
| PROVIDIAN FINANCIAL | | $36,903.00 | |
| PROVIDIAN FINANCIAL | | $135.00 | |
| SAMS CLUB/MBGA | | $2,817.00 | |
| UNVL/CITI | | $8,830.00 | |
| US DEPT OF EDUCATION | | | |
| COOK COUNTY TREASURER | | $2,748.48 | |
| HHLD BANK | | $6,243.00 | |
| RNB-TGTVISA | | $4,708.00 | |
| UNVL/CITI | | $24,812.00 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |


0000009097896502047901011

Total Payments:   $0.00

D&D (Rev.01/02)

# EXHIBIT H

## NOTICE OF RIGHT TO CANCEL

LENDER:  Ameriquest Mortgage Company

DATE:  August 22, 2004
LOAN NO.:  0090978966 - 7302
TYPE:  ADJUSTABLE RATE

BORROWER(S): Edward J Smith    Gail M Smith

ADDRESS:        7825 Kedvale Ave
CITY/STATE/ZIP:  Skokie, IL 60076

PROPERTY:  7825 Kedvale Ave
           Skokie, IL  60076

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.  The date of the transaction, which is

   | ENTER DOCUMENT SIGNING DATE |
   | --- |
   | _____ |

    or
2.  The date you received your Truth in Lending disclosures; or
    or
3.  The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company         ATTN:  FUNDING
1600 S Douglass Rd                  PHONE: (714)634-3494
Anaheim, CA 92806                   FAX:    (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____
SIGNATURE                                  DATE

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____          _____
BORROWER/OWNER Edward J Smith      Date    BORROWER/OWNER  Gail M Smith      Date

_____          _____
BORROWER/OWNER                     Date    BORROWER/OWNER                    Date

Rev 01-04)

### LENDER COPY

00000090978966040000501011

08/20/2004 3:54:08 PM

## NOTICE OF RIGHT TO CANCEL

ʟENDER:   Ameriquest Mortgage Company

DATE:  August 22, 2004
LOAN NO.:   0090978966 - 7302
TYPE:   ADJUSTABLE RATE

BORROWER(S): Edward J Smith      Gail M Smith

ADDRESS:      7825 Kedvale Ave
CITY/STATE/ZIP:   Skokie,IL 60076

PROPERTY:   7825 Kedvale Ave
Skokie, IL  60076

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

<div style="border:1px solid">ENTER DOCUMENT SIGNING DATE</div>
;

or

2.   The date you received your Truth in Lending disclosures; 
or

3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company        ATTN:  FUNDING
1600 S Douglass Rd                 PHONE: (714)634-3494
Anaheim, CA 92806                  FAX:    (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must 
send the notice no later than MIDNIGHT of

<div style="border:1px solid">ENTER FINAL DATE TO CANCEL</div>

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____          _____
SIGNATURE                          DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____          _____     _____          _____
BORROWER/OWNER Edward J Smith       Date        BORROWER/OWNER  Gail M Smith        Date

_____          _____     _____          _____
BORROWER/OWNER                      Date        BORROWER/OWNER                      Date

(Rev 01/04)                     0000009097896604000050101

**BORROWER COPY**

08/20/2004 3:54:08 PM

## NOTICE OF RIGHT TO CANCEL

'˙ENDER:   Ameriquest Mortgage Company

DATE:  August 22, 2004
LOAN NO.:  0090978966 - 7302
TYPE:   ADJUSTABLE RATE

BORROWER(S): Edward J Smith        Gail M Smith

ADDRESS:        7825 Kedvale Ave
CITY/STATE/ZIP:   Skokie, IL 60076

PROPERTY:   7825 Kedvale Ave
                    Skokie, IL  60076

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
| --- |
| _____ |

:

   or
2.   The date you received your Truth in Lending disclosures; or
3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

### HOW TO CANCEL

'˙ou decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquage Mortgage Company          ATTN:  FUNDING
1600 S Douglass Rd                            PHONE: (714)634-3494
Anaheim, CA 92806                            FAX:      (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must
send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |
| _____ |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
I WISH TO CANCEL

_____               _____
SIGNATURE                                              DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

---

BORROWER/OWNER Edward J Smith          Date          BORROWER/OWNER Gail M Smith          Date

BORROWER/OWNER          Date          BORROWER/OWNER          Date

Ji    Rev-01/04)

0000009097896604000050101

**BORROWER COPY**

08/20/2004 3:54:08 PM

## NOTICE OF RIGHT TO CANCEL

LENDER: Ameriquest Mortgage Company

DATE: August 22, 2004
LOAN NO.: 0090978966 - 7302
TYPE: ADJUSTABLE RATE

BORROWER(S): Edward J Smith    Gail M Smith

ADDRESS: 7825 Kedvale Ave
CITY/STATE/ZIP: Skokie, IL 60076

PROPERTY: 7825 Kedvale Ave
Skokie, IL 60076

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is | ENTER DOCUMENT SIGNING DATE | ;

or

2. The date you received your Truth in Lending disclosures;

or

3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company          ATTN: FUNDING
1600 S Douglass Rd                   PHONE: (714)634-3494
Anaheim, CA 92806                    FAX:    (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must     | ENTER FINAL DATE TO CANCEL |
send the notice no later than MIDNIGHT of

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____          _____
SIGNATURE                                 DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____          _____
BORROWER/OWNER Edward J Smith    Date     BORROWER/OWNER Gail M Smith    Date

_____          _____
BORROWER/OWNER    Date                    BORROWER/OWNER    Date

(Rev 01/04)    0000009097896040000050101

**BORROWER COPY**

08/20/2004 3:54:08 PM

## NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:  August 22, 2004
LOAN NO.:   0090978966 - 7302
TYPE:   ADJUSTABLE RATE

BORROWER(S): Edward J Smith      Gail M Smith

ADDRESS:      7825 Kedvale Ave
CITY/STATE/ZIP:   Skokie, IL 60076

PROPERTY:   7825 Kedvale Ave
Skokie, IL  60076

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.   The date of the transaction, which is

> **ENTER DOCUMENT SIGNING DATE**
> _____ ;

or

2.   The date you received your Truth in Lending disclosures;

or

3.   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN:  FUNDING
PHONE: (714)634-3494
FAX:      (800)664-2256

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

> **ENTER FINAL DATE TO CANCEL**
> _____

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____
SIGNATURE

_____
DATE.

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____       _____
BORROWER/OWNER Edward J Smith      Date      BORROWER/OWNER  Gail M Smith      Date

_____       _____
BORROWER/OWNER      Date      BORROWER/OWNER      Date

It:      Rev 01/04)
0000009097896060400050101

**BORROWER COPY**

08/20/2004 3:54:08 PM

# EXHIBIT I

## ONE WEEK CANCELLATION PERIOD

Loan Number: 0090978966 - 7302          Borrower(s): Edward J Smith
Date: August 22, 2004                                          Gail M Smith

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____          _____
Borrower/Owner  Edward J Smith                                   Date

_____          _____
Borrower/Owner  Gail M Smith                                        Date

_____          _____
Borrower/Owner                                                             Date

_____          _____
Borrower/Owner                                                             Date

---

### REQUEST TO CANCEL

I/We want to cancel loan #_____.

_____          _____
Borrower/Owner Signature                                           Date

---

08/20/2004 3:54:08 PM

850 (10/00)

**LENDER COPY**

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0090978966 - 7302          Borrower(s): Edward J Smith
Date: August 22, 2004                                          Gail M Smith

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

> Ameriquest Mortgage Company
> 1600 S Douglass Rd Anaheim, CA 92806
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____          _____
Borrower/Owner  Edward J Smith                         Date

_____          _____
Borrower/Owner  Gail M Smith                              Date

_____          _____
Borrower/Owner                                                       Date

_____          _____
Borrower/Owner                                                       Date

---

## REQUEST TO CANCEL

I/We want to cancel loan #_____.

_____          _____
Borrower/Owner Signature                                      Date

---

0000009097896604042220101

08/20/2004 3:54:08 PM

**BORROWER COPY**

B50 (10/90)

## ONE WEEK CANCELLATION PERIOD

Loan Number: 0090978966 - 7302          Borrower(s): Edward J Smith
Date: August 22, 2004                               Gail M Smith

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

>     Ameriquest Mortgage Company
>     1600 S Douglass Rd Anaheim, CA 92806
>     ATTN: Funding Department
>     Phone: (714)541-9960
>     Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.


_____          _____
Borrower/Owner  Edward J Smith                                     Date


_____          _____
Borrower/Owner  Gail M Smith                                        Date


_____          _____
Borrower/Owner                                                          Date


_____          _____
Borrower/Owner                                                          Date

---

### REQUEST TO CANCEL

I/We want to cancel loan #_____.


_____          _____
Borrower/Owner Signature                                          Date


0000009097896040422010         08/20/2004 3:54:08 PM

850 (10/00)                                                    **BORROWER COPY**

## ONE WEEK CANCELLATION PERIOD

Loan Number: 0090978966 - 7302          Borrower(s): Edward J Smith
Date: August 22, 2004                                      Gail M Smith

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

> Ameriquest Mortgage Company
> 1600 S Douglass Rd Anaheim, CA 92806
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

Borrower/Owner  Edward J Smith          Date

Borrower/Owner  Gail M Smith          Date

Borrower/Owner          Date

Borrower/Owner          Date

---

### REQUEST TO CANCEL

I/We want to cancel loan #_____

Borrower/Owner Signature          Date

---

0000009097896604220101

BS0 (10/00)

08/20/2004 3:54:08 PM

**BORROWER COPY**

## ONE WEEK CANCELLATION PERIOD

Loan Number: 0090978966 - 7302          Borrower(s): Edward J Smith
Date: August 22, 2004                              Gail M Smith

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.** This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.** No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request must be delivered to:

Ameriquest Mortgage Company
1600 S Douglass Rd Anaheim, CA 92806
ATTN: Funding Department
Phone: (714)541-9960
Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

---

Borrower/Owner  Edward J Smith                     Date

---

Borrower/Owner  Gail M Smith                        Date

---

Borrower/Owner                                            Date

---

Borrower/Owner                                            Date

---

## REQUEST TO CANCEL

I/We want to cancel loan #_____

Borrower/Owner Signature                              Date

---

0000000909789660404220101

08/20/2004 3:54:08 PM

**BORROWER COPY**

850 (10/00)

# EXHIBIT J

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
## 120 S. LaSalle Street, 18th floor
## Chicago, Illinois 60603-3403
## (312) 739-4200
## (800) 644-4673
## (312) 419-0379 (FAX)
## Email: edcombs@aol.com
## www.edcombs.com

May 2, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606.

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

> Re: Notice of rescission, claim and lien, Edward Smith and Gail Smith, 7825 Kedvale Ave., Skokie, IL 60076, loan of August 22, 2004

Ladies/Gentlemen:

Each of the above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on May 2, 2006.

_____

Daniel A. Edelman

# EXHIBIT K



P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

March 16, 2007

Edward J. Smith
Gail M. Smith
7825 Kedvale Avenue
Skokie, IL 60076

Re:                    Loan Number 0090978966
Property Address:      7825 Kedvale Avenue
                       Skokie, IL 60076

Dear Mr. and Mrs. Smith:

This letter is in response to the telephone conversation received in the Office of the
President on March 15, 2007, regarding the above referenced loan.

As requested, enclosed is a copy of the Appraisal Report on the above referenced
property. The Appraisal Report is being sent to you under the following terms and
conditions. If you are unable or unwilling to comply with all of the conditions set forth
below, please return the Appraisal Report to:

    AMC Mortgage Services, Inc.
    Attn: Service Relations, Loan Research
    P.O. Box 11000
    Santa Ana, CA 92711-1000

1.  The Appraisal Report is to be used solely for the purpose of evaluating your property
    in connection with your loan.

2.  You understand, acknowledge, and agree that the Appraisal Report is being provided
    by AMC Mortgage Services, Inc., (AMC) without any representations or warranties
    as to its contents.

3.  You understand, acknowledge, and agree that intervening circumstances may have
    rendered the information and assumptions contained in the Appraisal Report
    obsolete, incomplete, or even misleading.

4.  You understand, acknowledge, and agree that the Appraisal Report was prepared for
    the exclusive use of AMC, and that subsequent distribution was not contemplated
    when the Appraisal Report was commissioned, prepared, or delivered.

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have
received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes
only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.
Also doing business as Delaware AMC Mortgage Services, Inc., in the states of Texas, Rhode Island, and New Hampshire.



5. You covenant and agree not to seek any damages or redress or to make any claims for damages, costs, expenses, or liabilities of any kind against the appraiser or arising out of your use of the Appraisal Report.

6. You covenant and agree to indemnify, defend, and hold AMC, its shareholders, officers, directors, employees, affiliates, and agents harmless from and against any claims, costs, expenses, damages, or liabilities of any kind including reasonable attorney's fees incurred by AMC resulting from or arising out of your use of the Appraisal Report.

7. You convene and agree to keep the Appraisal Report confidential and not disclose, distribute, disseminate, copy, or otherwise reproduce or release the Appraisal Report or its contents to any person except as is strictly necessary for the evaluation or understanding of the Appraisal Report, in any manner to any person without first obtaining a written agreement of confidentiality similar in scope to this letter.

Please keep this letter with your other loan records.

If you have any further questions regarding this matter, please call me at (866) 461-0913, extension 35163, Monday through Friday, 7 a.m. to 4 p.m., Pacific Time.

Sincerely,

Matthew P. Johnson
Office of the President
AMC Mortgage Services, Inc.

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

Also doing business as Delaware AMC Mortgage Services, Inc., in the states of Texas, Rhode Island, and New Hampshire.





COMPLETE SUMMARY APPRAISAL REPORT OF
THE PROPERTY LOCATED AT
7825 N. KEDVALE AVE.
SKOKIE, IL

as of
SEPTEMBER 1, 2004

for
AMERIQUEST
5215 OLD ORCHARD, SUITE 425
SKOKIE, IL, 60077

by
Price-Rite Appraisal, Inc.
3616 West Diversey Avenue
Chicago, IL 60647

Case: 1:05-cv-07097 Document #: 3092-2 Filed: 09/08/09 Page 75 of 94 PageID #:35187

Sep-17-06 12:59pa From-WEST QUEST MORTGAGE 8475836181 8475838181 T-004 P.004/012 F-433

UNIFORM RESIDENTIAL APPRAISAL REPORT

SUBJECT IS BOUNDED BY OLD ORCHARD RD. TO THE NORTH, KEDZIE AVE. TO THE EAST, TOUHY AVE. TO THE SOUTH AND CENTRAL AVE. TO THE WEST.

SUBJECT IS LOCATED IN THE SOUTHEASTERN SECTION OF SKOKIE. AREA IS COMPRISED OF A VARIETY OF STYLES AND SIZE SINGLE AND MULTI FAMILY RESIDENCES. MOST AMENITIES ARE IN CLOSE PROXIMITY.

GENERAL MARKET CONDITIONS ARE STABLE. CONVENTIONAL FINANCING IS READILY AVAILABLE AT CURRENT RATES. FINANCING CONCESSIONS ARE NOT TYPICAL.

BASEMENTS OR ENCROACHMENTS WERE NOTED.

Price-Rite Appraisal, Inc.

Sep-17-04  12:40pm  From-AMERIQUEST MORTGAGE 8476838161     8476838161     T-054  P.008/012  F-433

| Borrower/Client | SMITH |
| Property Address | 7511 N. KEDVALE AVE. |
| City | SKOKIE | County | COOK | State | IL | Zip Code |
| Lender/Client | AMERIQUEST |

**ADDENDUM**

ALL THE COMPARABLES USED IN THIS REPORT WERE CHOSEN BECAUSE THEY OFFERED THE BEST AND MOST MEANINGFUL DATA TO MAKE GOOD COMPARABLES WITH THE SUBJECT PROPERTY. NO MORE MEANINGFUL SALES COULD BE FOUND.

COMPARABLES 1 - 3 HAVE MORE GROSS LIVING AREA THAN SUBJECT PROPERTY.

COMPARABLES 1 - 3 HAVE 2 CAR GARAGES.

ALL COMPARABLES WERE GIVEN EQUAL CONSIDERATION IN THE FINAL ESTIMATE OF VALUE.

FOR LACK OF DATA THE SIX MONTH DATE OF SALE AND OR THE ONE MILE RADIUS GUIDELINES WAS EXCEEDED.

NO ADJUSTMENT WAS MADE FOR THE NUMBER OF ROOMS OR BEDROOMS BECAUSE OF VARYING SIZE OR USE.

NO ADJUSTMENT WAS MADE FOR DESIGN DUE TO SIMILAR FUNCTIONAL UTILITY.

CONDITIONS OF APPRAISAL:

THE SUBJECT PROPERTY IS APPRAISED IN FEE SIMPLE TITLE AND ASSUMES NO LIENS OR ENCUMBRANCES OTHER THAN NORMAL EASEMENTS AND USE RESTRICTIONS. THIS APPRAISAL REPORT IS A SUMMARY APPRAISAL REPORT PREPARED IN COMPLIANCE WITH USPAP. ADDITIONALLY, I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF, THAT THE REPORTED ANALYSES, OPINIONS AND CONCLUSIONS WERE DEVELOPED, AND PREPARED IN CONFORMITY WITH THE REQUIREMENTS OF THE CODE OF PROFESSIONAL ETHICS AND THE STANDARDS OF PROFESSIONAL PRACTICE OF USPAP. THIS ADDENDUM SHOULD BE CONSIDERED AN INTEGRAL PART OF THIS REPORT AND IS ESSENTIAL TO ANY DECISION MAKING RELATED TO THE SUBJECT PROPERTY. THE APPRAISAL REPORT HAS BEEN PREPARED FOR AND ITS SUBSEQUENT CLIENTS AND FOR THE PURPOSE OF MORTGAGE FINANCING UNLESS OTHERWISE STATED IN THE REPORT.

ADDITIONAL COMMENTS:

APPRAISALS THAT CONTAIN THE APPRAISER'S OR SUPERVISORY APPRAISER'S DIGITAL SIGNATURE ARE UTILIZED FOR TRANSMISSION OF THE REPORT VIA E-MAIL. THESE SIGNATURES ARE PASSWORD PROTECTED AND THE APPRAISAL CAN NOT BE ALTERED BY ANYONE OTHER THAN AUTHORIZED PERSONNEL.

THE DIGITAL PHOTOS USED IN THIS REPORT HAVE NOT BEEN ENHANCED OR ALTERED IN ANY WAY AND SOME DIGITAL PHOTOS USED FOR COMPARABLES WERE IN THE LIBRARIES AND OR THE MULTIPLE LISTING SERVICE OF NORTHERN ILLINOIS.

Price-Rite Appraisal, Inc.

HPR-3-2007 04:06P FROM:COUNTRYSIDE DENTAL 8476736956 TO:13124190329 P.7/13

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.*

---

## STATEMENT OF LIMITING CONDITIONS AND APPRAISING CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**  The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

HPR-3-2001  04:06P  FROM:COUNTRYSIDE DENTAL    8476736956              TO:13124190379   P.8'13

Sep-17-04  12:40pm  From-AMERIQUEST MORTGAGE 8476830191          8476830151          T-004  P.008/012  F-433

## APPRAISER'S CERTIFICATION:    The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions described in this form.

4. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

## SUPERVISORY APPRAISER'S CERTIFICATION:    The supervisory appraiser agrees that I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED:    2518 N. SODVAL AVE. SKOKIE, IL

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
|---|---|
| Signature: _Gregory L. Daly_ | Signature: _____ |
| Name: GREG DALY (IL) | Name: _____ |
| Date Signed: September 2, 2004 | Date Signed: _____ |
| State Certification #: 156.0001343 | State Certification #: _____ |
| or State License #: _____ | or State License #: _____ |
| State: IL | State: _____ |
| Expiration Date of Certification or License: 09/30/2005 | Expiration Date of Certification or License: _____  ☐ Did  ☐ Did Not Inspect Property |

Freddie Mac Form 439  6-93                                    Page 6 of 6                                    Fannie Mae Form 1004B  6-93

Price-Rite Appraisal, Inc.

Sep-17-04   12:41pm   From-AMERIQUEST MORTGAGE  8476838181          8476838181          T-064  P.008/012  F-438



Price-Rite Appraisal, Inc.



Price-Rite Appraisal, Inc.

HPR-3-2007  04:07P FROM:COUNTRYSIDE DENTAL  8476736956  TO:13124190379  P.11/13

Sep-17-04  12:42pm  From-ARGENT MORTGAGE  8475938161  8475938161  T-004  P.011/012  F-499



PHOTOGRAPH ADDENDUM

FRONT VIEW OF
SUBJECT PROPERTY

REAR VIEW OF
SUBJECT PROPERTY

STREET SCENE OF
SUBJECT PROPERTY

Price-Rite Appraisal, Inc.



# EXHIBIT L

**Ameriquest Mortgage Company**          **DATA INTEGRITY AUDIT**

Loan Number: **0090978966 - 7302**                    Borrower Name: **Edward J Smith**
Branch: **Skokie, IL**                    Code: **7302**          Loan Program: **Standard 2/28 Fixed/Adj**

| Type | Description | Loan Data |
|------|-------------|-----------|
| LEGAL | Lien Position: | **First Mortgage** |
| | Borrower 1 Name (F/M/L): | **Edward J Smith** |
| | Borrower 2 Name (F/M/L): | **Gail M Smith** |
| | Property Address: | **7825 Kedvale Ave** |
| | Property City State Zip: | **Skokie,   IL   60076** |
| | Loan Amount: | **635,000.00** |
| | Interest Rate: | **6.500** |
| | First Payment Date: | **October 1, 2004** |
| | Maturity Date: | **September 1, 2034** |
| | Payment Term: | **360** |
| | Amortization Term: | **360** |
| | P&I Payment: | **4,013.64** |
| | Prepayment Penalty: | **N** |
| | ARM Months 1st Adj: | **24** |
| | Margin: | **5.250** |
| | ARM Cap Period: | **2.000** |
| | ARM Cap Life: | **6** |
| COMPLIANCE | Borrower 1 SSN: | **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** |
| INTERNAL WORKSHEETS | Mo. Escrow Pmt. Amount: | |
| | Total Monthly Payment: | **4,288.64** |
| | Withhold Amount: | **0.00** |
| | Credit Grade: | **6A** |
| | Fast Trac: | **N** |
| | Quick Credit: | **N** |
| | Loan Purpose: | **Refi-Cash Out** |
| CREDIT | Mailing Address: | **7825 Kedvale Ave** |
| | Mailing City State Zip: | **Skokie,IL 60076** |
| | Home Phone: | **(847)673-5623** |
| | Sales Price: | **0.00** |
| APPRAISAL | Property Type: | **SFR** |
| | Appraised Value: | **795,000.00** |
| | LTV: | **80.000** |
| | No. of Units: | **1** |

_____          _____
Branch Manager                              Date



0000009097896602048301O1

INTEG2 (Rev 3/96)

# EXHIBIT M

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☒ the income or assets of a person other than the "Borrower" including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☒ Conventional ☐ Other (explain): ☐ FHA ☐ USDA/Rural Housing Service | Agency Case Number | Lender Case Number 0090978966 |
|---|---|---|---|

| Amount $635,000.00 | Interest Rate 6.500 % | No. of Months 360 | Amortization Type: | ☐ Fixed Rate ☒ GPM | ☐ Other (explain): ☐ ARM (type): |
|---|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) 7825 Kedvale Ave, Skokie, IL 60076 | No. of Units 1 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) | Year Built 1940 |
|---|---|

| Purpose of Loan | ☐ Purchase ☒ Refinance ☐ Construction ☐ Construction-Permanent ☐ Other (explain): | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | | | | | |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| 1990 | $500,000.00 | $ 350,000.00 | | Cost: $ 0.00 |

| Title will be held in what Name(s) Edward J Smith and Gail M Smith | Manner in which Title will be held | Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) | |
|---|---|

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) Edward J Smith | Co-Borrower's Name (include Jr. or Sr. if applicable) Gail M Smith |
|---|---|

| Social Security Number | Home Phone (incl. area code) | DOB(MM/DD/YYYY) | Yrs. School 16 | Social Security Number | Home Phone (incl. area code) | DOB(MM/DD/YYYY) | Yrs. School 16 |
|---|---|---|---|---|---|---|---|

| ☒ Married ☐ Separated | ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. 5 ages 24,22,21,19,12 | ☒ Married ☐ Separated | ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no. 5 ages 12,19,21,22,24 |
|---|---|---|---|---|---|

| Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 15 No. Yrs. 7825 Kedvale Ave Skokie,IL 60076 | Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 15 No. Yrs. 7825 Kedvale Ave Skokie,IL 60076 |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|

| Name & Address of Employer ☒ Self Employed Countryside Dental Supply | Yrs. on this job 8 | Name & Address of Employer ☒ Self Employed Countryside Dental Supply | Yrs. on this job 8 |
|---|---|---|---|
| | Yrs. employed in this line of work/profession | | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business Owner | Business Phone (incl. area code) (847)673-5654 | Position/Title/Type of Business Co-Owner | Business Phone (incl. area code) |
|---|---|---|---|

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

0090978966

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04
Page 1 of 4

VMP®-21N (0306)       VMP Mortgage Solutions (800)521-7291       Initials: _____

| Borrower's cell | Borrower's pager |
|---|---|
| Co-Borrower's cell | Co-Borrower's pager |

0000009097896060599080 1

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 0.00 | $ 0.00 | $ 0.00 | Rent | $ 0.00 | |
| Overtime | 12,583.33 | 12,583.33 | 25,166.66 | First Mortgage (P&I) | 2,199.00 | $ 4,013.64 |
| Bonuses | 0.00 | 0.00 | 0.00 | Other Financing (P&I) | 562.00 | 0.00 |
| Commissions | 0.00 | 0.00 | 0.00 | Hazard Insurance | 83.33 | 83.33 |
| Dividends/Interest | 0.00 | 0.00 | 0.00 | Real Estate Taxes | 191.67 | 191.67 |
| Net Rental Income | 0.00 | 0.00 | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | $ 12,583.33 | $ 12,583.33 | 25,166.66 | Total | $ 3,036.00 | $ 4,288.64 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| | Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|---|
| B/C | | | $ |
| | *** SEE ADDENDUM *** | | $ |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [ ] Jointly [X] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ 0.00 | LIABILITIES | | |
| | | Name and address of Company | $ Payment/Months | |
| List checking and savings accounts below | | *** SEE ADDENDUM *** | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| ested 401k Retirement - Aggregated | | | | |
| | | Acct. no. | | |
| | $ | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | 0.00 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| Checking/Savings - Aggregated, | | | | |
| | | Acct. no. | | |
| | $ | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | 900.00 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| Vested 401k Retirement - Aggregated | | | | |
| | | Acct. no. | | |
| | $ | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | 0.00 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| Checking/Savings - Aggregated | | | | |
| | | Acct. no. | | |
| | $ | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | 900.00 | | | |
| Stocks & Bonds (Company name/number & description) /0 '0 | $ 0.00 0.00 | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ 0.00 | | | |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | 1,800.00 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 1,600,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| | | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 0.00 | |
| Total Assets a. | $ 1,800.00 | Net Worth (a minus b) ► $ 1,800.00 | Total Liabilities b. | $ 0.00 |

0090978966

VMP-21N (0305)

Freddie Mac Form 65 01/04
Fannie Mae 1003 01/04

0000000097896060590980 2

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 7825 Kedvale Ave Skokie, IL 60076 | H SFR | $ 800000 | 293000 | $ 0 | 2199 | 275 | $ 0 |
| 7825 Kedvale Ave Skokie, IL 60076 | H SFR | 800000 | 50198 | 0 | 562 | 1 | 0 |
| | Totals | $ 0 | $ 343198 | $ 0 | $ 2761 | $ 276 | $ 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. | Purchase price | $ 0.00 |
| b. | Alterations, improvements, repairs | 0.00 |
| c. | Land (if acquired separately) | 0.00 |
| d. | Refinance (incl. debts to be paid off) | 601,553.00 |
| e. | Estimated prepaid items | 226.16 |
| f. | Estimated closing costs | 2,136.00 |
| g. | PMI, MIP, Funding Fee | 0.00 |
| h. | Discount (if Borrower will pay) | 17,310.10 |
| i. | Total costs (add items a through h) | 621,225.26 |
| j. | Subordinate financing | |
| k. | Borrower's closing costs paid by Seller | 0.00 |
| l. | Other Credits (explain) | 0.00 |
| | | 0.00 |
| | | 0.00 |
| | | 0.00 |
| | | 0.00 |
| m. | Loan amount (exclude PMI, MIP, Funding Fee financed) | 635,000.00 |
| n. | PMI, MIP, Funding Fee financed | 0.00 |
| o. | Loan amount (add m & n) | 635,000.00 |
| p. | Cash from/to Borrower (subtract j, k, l & o from i) | -13,774.74 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|---|
| a. | Are there any outstanding judgments against you? | | X | | X |
| b. | Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. | Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. | Are you a party to a lawsuit? | | X | | X |
| e. | Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | X |
| f. | Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | X |
| g. | Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| h. | Is any part of the down payment borrowed? | | X | | X |
| i. | Are you a co-maker or endorser on a note? | | X | | X |
| j. | Are you a U.S. citizen? | X | | X | |
| k. | Are you a permanent resident alien? | | X | | X |
| l. | Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | X | |
| m. | Have you had an ownership interest in a property in the last three years? | X | | X | |
| | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| | (2) How did you hold title to the home - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER [ ] I do not wish to furnish this information. | CO-BORROWER [ ] I do not wish to furnish this information. |
|---|---|
| **Ethnicity:** [ ] Hispanic or Latino [X] Not Hispanic or Latino | **Ethnicity:** [ ] Hispanic or Latino [X] Not Hispanic or Latino |
| **Race:** [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [X] White | **Race:** [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [X] White |
| **Sex:** [ ] Female [X] Male | **Sex:** [X] Female [ ] Male |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) Jino Cabrera | Name and Address of Interviewer's Employer Ameriquest Mortgage Company. |
|---|---|---|
| [ ] Face-to-face interview | Interviewer's Signature | Date | 5215 Old Orchard Rd.. # 410 |
| [ ] Mail | | Skokie.IL 60077 |
| [X] Telephone | Interviewer's Phone Number (incl. area code) | |
| [ ] Internet | (714)541-9960 | |

0090978966

VMP-21N (0305)

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>Smith, Edward J | Agency Case Number: |
|---|---|---|
| | Co-Borrower:<br>Smith, Gail M | Lender Case Number:<br>0090978966 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | | X | |

0090978966

 -21N (0305)


0000009097896060605990804

Page 4 of 4

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

# EXHIBIT N





About Zestimate™ values and accuracy - © 2007 NAVTEQ | © 2007 GlobeXplorer and Suppliers | © 2007 Proxix

| Sort by: | Status | Price | Zestimate* | Bd | Ba | Size** | Offered by |
|---|---|---|---|---|---|---|---|
| | Your result 7825 Kedvale Ave -- | -- | $375,630 | -- | 1.0 | 1,247 | -- |
| | 7811 Karlov Ave For Sale | $449,900 | $440,979 | 4 | 3.0 | 1,875 | Owner |
| | 7811 Keeler Ave Recently Sold | $715,000 | $696,458 | -- | 2.0 | 1,288 | |
| | 7828 Keeler Ave Recently Sold | $365,000 | $411,257 | -- | 1.5 | 1,400 | -- |

◀ 1 - 3 ▶ of 3 results

© 2006-2007 Zillow.com, All Rights Reserved

# EXHIBIT O

**Ameriquest Mortgage Company**

Borrower Name: Edward J Smith

Loan Number: 0090978966 - 7302

Borrower Name: Gail M Smith

Property Address: 7825 Kedvale Ave
Skokie, IL 60076

### UNDERSTANDING YOUR OPTIONS REGARDING
### INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other. A "discount point" is a one-time fee that equals one (1) percent of the loan amount that lowers the interest rate of the loan. So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio. The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points. The following example shows how your options work.






\* The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor. A discount point lowers the interest rate but *not* necessarily the overall cost of the loan. A lower rate may be a good choice if you don't plan to sell or refinance for some time. On the other hand, you might not want to have additional discount points if you think you'll sell or refinance soon. Your account executive can give you more information about the options available to you and the exact terms of your loan.

