



Sketch by Apex IV Windows™

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Totals |
| GLA1 | First Floor | 1152.75 | 1152.75 |
| BSMT | Basement | 1152.75 | 1152.75 |
| P/P | Deck | 297.25 | |
| | Porch | 22.00 | 319.25 |
| GAR | Garage | 502.25 | 502.25 |
| OTH | Pole Barn | 1536.00 | 1536.00 |
| TOTAL LIVABLE | (rounded) | | 1153 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 26.5  x  43.5 | 1152.75 |
| 1 Area Total (rounded) | 1153 |





**COMPARABLE SALE #1**

371 N. Stine
Charlotte
Sale Date: 07/25/2002
Sale Price: $ 150,000



**COMPARABLE SALE #2**

7950 Mulliken
Charlotte
Sale Date: 06/27/2002
Sale Price: $ 144,000



**COMPARABLE SALE #3**

1385 Chester
Charlotte
Sale Date: 05/31/2002
Sale Price: $ 140,900





seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**   The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc. ) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc. ) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:**    If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**   1799 Glass Drive, Charlotte, MI 48813

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
|---|---|
| Signature: _Angela K. Oberlin_ | Signature: _____ |
| Name: Angela K. Oberlin | Name: _____ |
| Date Signed: 02/17/2003 | Date Signed: _____ |
| State Certification #: _____ | State Certification #: _____ |
| or State License #: 1201007190 | or State License #: _____ |
| State: MI | State: _____ |
| Expiration Date of Certification or License: 07/31/2004 | Expiration Date of Certification or License: _____ |
| | ☐ Did   ☐ Did Not Inspect Property |

# EXHIBIT M

APPRAISAL OF



LOCATED AT:

1799 Glass Dr.
Charlotte, MI 48813

FOR:

Washington Mutual Bank
1063 Technology Drive, 5th Floor
Glen Allen, VA 23059-4500

BORROWER:

MArk & Michelle Montgomery

AS OF:

October 15, 2004

BY:

Amanda Lawson
Washington Mutual Bank
1063 Technology Drive, 5th Floor
Glen Allen, VA 23059-4500

File Number:   10-04-0037

In accordance with your request, I have personally inspected and appraised the real property at:

1799 Glass Dr.
Charlotte, MI 48813

The purpose of this appraisal is to estimate the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property as of   October 15, 2004        is:

$150,000
One Hundred Fifty Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

| | | | | |
|---|---|---|---|---|
| Sales Price $ NA | Date of Sale NA | Description/$ amount of loan charges/concessions to be paid by seller NA | | |

**NEIGHBORHOOD**

Property rights appraised [X] Fee Simple [ ] Leasehold [ ] Map Reference 2000 — Census Tract 206

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| | Single family housing | | Condominium housing | |
|---|---|---|---|---|

Location [ ] Urban [X] Suburban [ ] Rural — Property values [ ] Increasing [X] Stable [ ] Declining — PRICE $(000) / AGE (yrs) / PRICE $(000) / AGE (yrs)

Built up [ ] Over 75% [X] 25-75% [ ] Under 25% — Demand/supply [ ] Shortage [X] In balance [ ] Over supply — Low 35 / 1 / NA / NA

Growth rate [ ] Rapid [X] Stable [ ] Slow — Marketing time [ ] Under 3 mos. [X] 3-6 mos. [ ] Over 6 mos. — High 400 / 100+ / NA / NA

Neighborhood boundaries Subject property is bordered by Otto Rd to the East, I69 to the West, Benton Rd to the West and E Vermontville Hwy to the North

Predominant 120 / 45 / NA / NA

**SITE**

Dimensions 380 x 290 — Site area 2.527 Acres — Shape Rectangular

Specific zoning classification and description Residential

Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal, attach description [ ] No zoning

Highest and best use of subject property as improved (or as proposed per plans and specifications): [X] Present use [ ] Other use, attach description.

Utilities Public / Other — Off-site Improvements / Type / Public / Private

Electricity [X] — Water [X] — Street Asphalt [X]

Gas [X] — Sanitary sewer [X] — Alley None

Are there any apparent adverse site conditions (easements, encroachments, special assessments, slide areas, etc.)? [ ] Yes [X] No If Yes, attach description.

**IMPROVEMENTS**

Source(s) used for physical characteristics of property: [ ] Interior and exterior inspection [X] Exterior inspection from street [ ] Previous appraisal files

[ ] MLS [X] Assessment and tax records [ ] Prior Inspection [ ] Property owner [ ] Other (Describe):

No. of Stories 1 — Type (Det./Att.) Detached — Exterior Walls Vinyl - Avg — Roof Surface Asphalt — Manufactured Housing [ ] Yes [X] No

Does the property generally conform to the neighborhood in terms of style, condition, and construction materials? [X] Yes [ ] No If No, attach description.

Are there any apparent physical deficiencies or conditions that would affect the soundness or structural integrity of the improvements or the livability of the property?

[ ] Yes [X] No If Yes, attach description.

Are there any apparent adverse environmental conditions (hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property? [ ] Yes [X] No If Yes, attach description.

**SALES COMPARISON ANALYSIS**

I researched the subject market area for comparable listings and sales that are the most similar and proximate to the subject property.

My research revealed a total of 3 sales ranging in sales price from $ 140,000 to $ 170,000.

My research revealed a total of 5 listings ranging in list price from $ 125,000 to $ 180,000.

The analysis of the comparable sales below reflects market reaction to significant variations between the sales and the subject property.

| FEATURE | SUBJECT | SALE 1 | +(-) $ Adjustment | SALE 2 | +(-) $ Adjustment | SALE 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 1799 Glass Dr Charlotte, MI 48813 | 2492 W Kalamo Charlotte, MI 48813 | | 2693 Needmore Charlotte, MI 48813 | | 2106 Hubbard Charlotte, MI 48813 | |
| Proximity to Subject | | 7.73 Miles | | 9.57 Miles | | 6.08 Miles | |
| Sales Price | $ NA | $ 168,000 | | $ 145,000 | | $ 143,000 | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 129.23 ☑ | | $ 132.78 ☑ | | $ 135.42 ☑ | |
| Data & Verif. Sources | | MLS# 100257 | | MLS# 97548 | | MLS# 106202 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conv None | | Conv None | | Conv None | |
| Date of Sale/Time | NA | 05/14/04 | | 05/10/04 | | 08/11/04 | |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Site | 2.527 Acres | 1.499 Acres | 3,000 | 2.099 Acres | 1,500 | 3.33 Acres | -1,500 |
| View | Average | Average | | Average | | Average | |
| Design (Style) | Ranch - Avg | Ranch - Avg | | Ranch - Avg | | Ranch - Avg | |
| Actual Age (Yrs.) | 18 Yrs | 10 Yrs | -4,000 | 26 Yrs | 4,000 | 20 Yrs | 1,000 |
| Condition | Average | Average | | Average | | Average | |
| Above Grade Room Count | Total 5 / Bdrms 3 / Baths 1.50 | Total 6 / Bdrms 3 / Baths 2.00 | -1,250 | Total 6 / Bdrms 3 / Baths 1.50 | | Total 6 / Bdrms 3 / Baths 1.00 | 1,250 |
| Gross Living Area | 1,096 Sq. Ft. | 1,300 Sq. Ft. | -4,080 | 1,092 Sq. Ft. | 80 | 1,056 Sq. Ft. | 800 |
| Basement and Finished Rooms Below Grade | Full/Walkout Unfinished | Full Finished | 2,000 / -4,000 | Full/Walkout Finished | -4,000 | Full Unfinished | 2,000 |
| Garage/Carport | 2 Att. Garage | 2 Att. Garage | | 2 Att. Garage | | 2 Att. Garage No Fireplace | 2,500 |
| Fireplace | Fireplace | Fireplace | | Fireplace | | None | 1,000 |
| Pole Barn | Pole Barn | None | 1,000 | None | 1,000 | None | 7,050 |
| Net Adj. (total) | | [X] + [ ] - $ 7,330 | | [X] + [ ] - $ 2,580 | | [X] + [ ] - $ 7,050 | |
| Adjusted Sales Price of Comparables | | Gross: 11.5% Net: -4.4% $ 160,670 | | Gross: 7.3% Net: 1.8% $ 147,580 | | Gross: 7.0% Net: 4.9% $ 150,050 | |
| Date of Prior Sales | | | | | | | |
| Price of Prior Sales | $ | $ | | $ | | None | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of the prior sales of subject and comparables: None

Summary of sales comparison and value conclusion: The three comparables are the most recent and most similar to the subject. Minor adjustments were made for Site ($3,000 per Acre), Age ($500 per Year), the number of Bed and Bath rooms, Gross Living Area ($20.00 per sq. ft.), the Basement being a Walkout and being Finished/Unfinished, the presence of a Fireplace and Central Air Conditioning.

The assumption made on the Subject Property are based on information obtained from the Benton Township Assessor, it is assumed

Are the common elements completed? ☐ Yes ☐ No If No, describe status of completion: _____

Are any common elements leased to or by the Home Owners' Association? ☐ Yes ☐ No If yes, attach addendum describing rental terms and options.
Describe common elements and recreational facilities: _____

**CONDOMINIUM**

Project Information for Condominiums (if applicable)--Is the developer/builder in control of the Home Owners' Association (HOA)? ☐ Yes ☐ No
Provide the following information for all Condominium Projects:
Total number of phases _____ Total number of units _____ Total number of units sold _____
Total number of units rented _____ Total number of units for sale _____ Data Source(s) _____
Was the project created by the conversion of existing buildings into a condominium? ☐ Yes ☐ No If yes, date of conversion: _____
Project Type: ☐ Primary Residence ☐ Second Home or Recreational ☐ Row or Townhouse ☐ Garden ☐ Midrise ☐ Highrise ☐
Condition of the project, quality of construction, unit mix, etc.: _____

Are the common elements completed? ☐ Yes ☐ No If No, describe status of completion: _____

Are any common elements leased to or by the Home Owners' Association? ☐ Yes ☐ No If yes, attach addendum describing rental terms and options.
Describe common elements and recreational facilities: _____

PURPOSE OF APPRAISAL: The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report based on a quantitative sales comparison analysis for use in the mortgage finance transaction.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION
CONTINGENT AND LIMITING CONDITIONS: The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided any required sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

4. The appraiser has noted in the appraisal report any adverse conditions (such as, but not limited to, needed repairs, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, expressed or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

6. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

7. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the report to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal

2. I have researched and analyzed the comparable sales and offerings/listings in the subject market area and have reported the comparable sales in this report that are the best available for the subject property. I further certify that adequate comparable market data exists in the general market area to develop a reliable sales comparison analysis for the subject property.

3. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware, have considered these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them, and have commented about the effect of the adverse conditions on the marketability of the subject property. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

4. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

5. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or estimate of market value in the appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

6. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

7. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

8. I estimated the market value of the real property that is the subject of this report based on the sales comparison approach to value. I further certify that I considered the cost and income approaches to value, but, through mutual agreement with the client, did not develop them, unless I have noted otherwise in this report.

9. I performed this appraisal as a limited appraisal, subject to the Departure Provision of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in the place as of the effective date of the appraisal (unless I have otherwise indicated in this report that the appraisal is a complete appraisal, in which case, the Departure Provision does not apply).

10. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value. The exposure time associated with the estimate of market value for the subject property is consistent with the marketing time noted in the Neighborhood section of this report. The marketing period concluded for the subject property at the estimated market value is also consistent with the marketing time noted in the Neighborhood section.

11. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. I further certify that no one provided significant professional assistance to me in the development of this appraisal.

SUPERVISORY APPRAISER'S CERTIFICATION: If a supervisory appraiser signed the appraisal report, he or she certified and agrees that: I directly supervise the appraiser who prepared the appraisal report, have examined the appraisal report for compliance with the Uniform Standards of Professional Appraisal Practice, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 5 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

APPRAISER:

Signature: _Anthony L. Asher_
Name: _____
Company Name: _____
Company Address: _____

Date of Report/Signature: 10/18/2004
State Certification #: _____
or State License #: _____
State: _____
Expiration Date of Certification or License: _____

SUPERVISORY APPRAISER (ONLY IF REQUIRED):

Signature: _____
Name: _____
Company Name: _____
Company Address: _____

Date of Report/Signature: _____
State Certification #: _____
or State License #: _____
State: _____
Expiration Date of Certification or License: _____

ADDRESS OF PROPERTY APPRAISED:
1799 Glass Dr.
Charlotte, MI 48813

APPRAISED VALUE OF THE SUBJECT PROPERTY $ 150,000
EFFECTIVE DATE OF APPRAISAL/INSPECTION 10/15/2004

SUPERVISORY APPRAISER:
SUBJECT PROPERTY
[ ] Did not inspect subject property
[X] Did inspect exterior of subject property from street
[ ] Did inspect interior and exterior of subject property
COMPARABLE SALES

COM 1620 FT S & 870 FT W OF NE COR SEC. 32, W 290 FT, S 380 FT, E 290 FT, N 380 FT TO BEG.
SEC. 32, T3N R4W, BENTON TWP 1987



FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: October 15, 2004
Appraised Value: $ 150,000

REAR VIEW OF
SUBJECT PROPERTY



STREET SCENE



COMPARABLE SALE #1

2492 W Kalamo
Charlotte, MI 48813
Sale Date: 05/14/04
Sale Price: $ 168,000



COMPARABLE SALE #2

2693 Needmore
Charlotte, MI 48813
Sale Date: 05/10/04
Sale Price: $ 145,000



COMPARABLE SALE #3

2106 Hubbard
Charlotte, MI 48813
Sale Date: 08/11/04
Sale Price: $ 143,000



********* INVOICE *********

File Number: 10-04-0037                          10/18/2004

Amanda Lawson
Washington Mutual Bank
1063 Technology Drive, 5th Floor
Glen Allen, VA 23059-4500

Borrower :         MArk & Michelle Montgomery

Invoice # :        10-04-0037
Order Date :       10/13/2004
Reference/Case # : 90-01290195-A
PO Number :

1799 Glass Dr.
Charlotte, MI 48813

|  |  |  |
|---|---|---|
|  | $ |  |
| Single Family Residence | $ | 200.00 |
|  | ----- | ----- |
| Invoice Total | $ | 200.00 |
| State Sales Tax @ 0% | $ | 0.00 |
| Deposit | ($ | 200.00 ) |
| Deposit | ($ | ) |
|  | ----- | ----- |
| Amount Due | $ | 0.00 |

Terms:  Due upon receipt

Please Make Check Payable To:

"The" Appraisal Company
972 Chads Way
Charlotte, MI 48813

Fed. I.D. #:

# EXHIBIT N

## Ameriquest Mortgage Company

Borrower Name: Michele M Montgomery

Tower Name: Mark A. Montgomery

Loan Number: 0093481703 - 5653

Property Address: 1799 GLASS DR
Charlotte, MI 48813

### UNDERSTANDING YOUR OPTIONS REGARDING
### INTEREST RATES AND DISCOUNT POINTS

The interest rate (or initial interest rate in the case of an adjustable rate mortgage) and discount points on your loan are related to each other. A "discount point" is a one-time fee that equals one (1) percent of the loan amount that lowers the interest rate of the loan. So, on a $100,000 loan, "1" discount point is $1,000. You can obtain a lower interest rate by taking a loan with additional discount points, or have fewer discount points in return for a higher interest rate.

Please ask about our current discount point/rate exchange ratio. The following is intended as an example to illustrate how our discount point/rate exchange works; it may not be reflective of the exchange ratio available at this time.

In this example, to reduce your interest rate by 1 percentage point, you would be charged an additional 1.6 discount points. The following example shows how your options work.



**STARTING LOAN TERMS SCENARIO***

**In this example, the base rate is 7% and points are 1.6%, which is $1,600:**

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 7% |
| Discount points: | 1.6% ($1,600) |



**LOWER RATE SCENARIO**

**To receive a lower interest rate, you can take a loan with an additional 1.6 discount points:**

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 6% |
| Discount points: | 3.2% ($3,200) |



**REDUCED DISCOUNT POINT SCENARIO**

**To reduce your discount points by 1.6, your interest rate would be 1 percentage point higher:**

| | |
|---|---|
| Loan amount: | $100,000 |
| Interest rate: | 8% |
| Discount points: | 0% (0) |

\* The terms of your loan may be different from the above example. Other factors influence rate, such as how much income documentation you provide and whether you elect to have a prepayment charge on your loan.

Think carefully about what you want to do and consult a financial advisor. A discount point lowers the interest rate but *not* necessarily the overall cost of the loan. A lower rate may be a good choice if you don't plan to sell or refinance for some time. On the other hand, you might not want to have additional discount points if you think you'll sell or refinance soon. Your account executive can give you more information about the options available to you and the exact terms of your loan.

# EXHIBIT O

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
### 120 S. LaSalle Street, 18th floor
### Chicago, Illinois 60603-3403
### (312) 739-4200
### (800) 644-4673
### (312) 419-0379 (FAX)
### Email: edcombs@aol.com
### www.edcombs.com

June 7, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
712 Abbott Road
East Lansing, MI 48823

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

        Re:    Notice of rescission, claim and lien, Michele M. Montgomery and
                 Mark A. Montgomery, 1799 Glass Drive, Charlotte, MI 48813, loan
                 of September 17, 2004

Ladies/Gentlemen:

        Each of the above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

        Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

        If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on June 7, 2006.

_____

Daniel A. Edelman