# APPENDIX 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| | Centralized before The Honorable Marvin E. Aspen |
| THIS DOCUMENT RELATES TO: *Eric Smith and Guillermina Yanong v. Ameriquest Mortgage Company, et al.*; Case No. 05 C 0648 | |

### DEFENDANT AMERIQUEST MORTGAGE COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT

Defendant Ameriquest Mortgage Company's ("Defendant"), by and through its attorneys, answers Plaintiffs Eric Smith's and Guillermina Yanong's ("Plaintiffs") Second Amended Complaint as follows.

### INTRODUCTION

1.     Plaintiffs Eric Smith and Guillermina Yanong bring this action against a "subprime" mortgage lender to rescind mortgages for violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), and implementing federal Reserve Board Regulation Z, 12 C.F.R. part 226.

**ANSWER:**     **Defendant admits that Plaintiffs have filed a lawsuit against it.  Defendant specifically denies that it violated the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and the Equal Credit Opportunity Act.  Defendant objects to the term "subprime" as vague.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of the term "subprime."  Defendant denies all remaining allegations in Paragraph 1.**

- 1 -

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), and 15 U.S.C. §1640 (Truth in Lending Act). Defendant does business in the District and is deemed to reside here.

**ANSWER:     Defendant does not contest subject matter jurisdiction.  Defendant denies the remaining allegations in Paragraph 2.**

## PARTIES

3.     Plaintiffs own and reside in a home at 1844 South 60th Court, Cicero, Illinois.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

4.     Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.  It is engaged in the business of originating "subprime" mortgages and makes more than 26 loans per year.

**ANSWER:     Defendant admits that Ameriquest Mortgage Company is a corporation, that it is incorporated in a state other than Illinois, that it has maintained offices and did business in Illinois.  Defendant does not object to service. Defendant objects to the term "subprime" as vague.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of the term "subprime."  Defendant denies the remaining allegations in this paragraph.**

5.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005. On information and belief it holds legal title to plaintiffs' loan, as trustee.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

- 2 -

6.       Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Michigan. It is the beneficial owner of some loans originated by Ameriquest Mortgage Company, including plaintiffs'. It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

**ANSWER:**     **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

7.       Defendant AMC Mortgage Services, Inc. ("AMC"), is a Delaware Corporation with its principal place of business in Orange, CA. It does business in Illinois. Its registered agent and office are National Registered Agents, Inc., 200 West Adams Street, Chicago, IL, 60606.

**ANSWER:**     **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

8.       Defendants Ameriquest and AMC are corporate affiliates.

**ANSWER:**     **Defendant objects to the term "affiliates" as vague.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

### FACTS RELATING TO PLAINTIFFS

9.       On February 20, 2002, plaintiffs obtained a mortgage loan from Ameriquest secured by their home at 1844 South 60th Court, Cicero, Illinois.

**ANSWER:**     **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

10.       Plaintiffs needed and used the loan proceeds for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**ANSWER:**     **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

BN 1330586v1

11.    The loan was closed on February 20, 2002.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

12.    On February 20, 2002, plaintiffs signed or received the following documents relating to the loan:

       a.    Note, <u>Exhibit A</u>;

       b.    Mortgage, <u>Exhibit B</u>;

       c.    A Truth in Lending disclosure statement, <u>Exhibit C</u>;

       d.    Two different notices of right to cancel, <u>Exhibits D and E</u>.;

       e.    A settlement statement on form HUD-1 A, <u>Exhibit F</u>.

**ANSWER:**    **The documents speak for themselves; therefore, no answer is required.  To the extent an answer is required, Defendant admits that Plaintiffs entered into a loan agreement with Ameriquest Mortgage Company.  Defendant denies that these documents constitute the entire loan file and that these documents constitute the fully integrated loan agreement with Plaintiffs.**

13.    Ownership of plaintiff's loan was later transferred to defendant Deutsche Bank. Deutsche Bank is the present holder of the loan.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

14.    Defendant Ameriquest subsequently transferred servicing of plaintiff's loan to defendant AMC. AMC was the final servicer of the loan.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

15.    On information and belief, Deutsche Bank National Trust Company, N.A. holds legal title to plaintiffs' loan, as Trustee. Ameriquest Mortgage Securities, Inc., is the beneficial

owner of plaintiffs' loan under Asset Backed Pass-Through Certificates, Series 2004-R3 under

the Pooling & Servicing Agreement dated as of April 1, 2004 Without Recourse.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

16.    In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiff's

loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is

rarely if ever shown of record), the actual owners are named as Does 1-5.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.**

## RIGHT TO RESCIND

17.    Because the transaction was secured by plaintiffs' home, and was not entered into

for purposes of the initial acquisition or construction of that home, it was subject to the right to

cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

**(a) Consumer's right to rescind.**

> **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

> **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

> **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, [fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the**

> rescission period shall be extended in accordance with section
> 125(f) of the Act. [15 U.S.C. §1635(f)]
>
> (4) When more than one consumer in a transaction has the
> right to rescind, the exercise of the right by one consumer shall
> be effective as to all consumers.
>
> (b) <u>Notice of right to rescind</u>. In a transaction subject to rescission, a creditor shall
> deliver 2 copies of the notice of the right to rescind to each consumer entitled to
> rescind. The notice shall be on a separate document that identifies the transaction
> and shall clearly and conspicuously disclose the following:
>
> > (1) The retention or acquisition of a security interest in the
> > consumer's principal dwelling.
> >
> > (2) The consumer's right to rescind the transaction.
> >
> > (3) How to exercise the right to rescind, with a form for that
> > purpose, designating the address of the creditor's place of
> > business.
> >
> > (4) The effects of rescission, as described in paragraph (d) of
> > this section.
> >
> > (5) The date the rescission period expires....
>
> (f) <u>Exempt transactions</u>. The right to rescind does not apply to the following:
>
> > (1) A residential mortgage transaction [defined in 15 U.S.C.
> > §1602(w) as one where a "security interest is created or
> > retained against the consumer's dwelling to finance the
> > acquisition or initial construction of such dwelling"].
> >
> > (2) A credit plan in which a state agency is a creditor.

ANSWER:    Defendant is without knowledge or sufficient information to form a belief as
to the truth of the allegations that the transaction was secured by Plaintiffs'
home and on that basis denies such allegation. Defendant denies that
Paragraph 17 accurately cites 12 C.F.R. § 226.23. Defendant denies the
allegations in Paragraph 17 insofar as they purport to make any allegation of
wrongdoing by Defendant under said statute. Defendant denies any liability
to Plaintiffs and denies that Plaintiffs may rescind their mortgage.
Defendant denies the remaining allegations in Paragraph 17.

## GROUND FOR RESCISSION

18.    The payment schedule is not fully and completely disclosed on <u>Exhibit D</u>.

ANSWER:    The document speaks for itself; therefore, no answer is required. To the
extent an answer is required, Defendant is without knowledge or information

sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.

19.    Exhibit F detracts from and obfuscates Exhibit E.   Exhibit F suggests that the consumer has seven days to rescind under TILA, which is not the case.  The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees, or the procedural protections of §1635. It also provides for a different method of counting days and requires actual receipt of the notice by Ameriquest within the specified time.

ANSWER:    The document speaks for itself; therefore, no answer is required.  To the extent an answer is required, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and on that basis denies such allegations.

20.    15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

ANSWER:    Because this paragraph states conclusions of law, no answer is required.  If any answer is required, Defendant denies any liability to Plaintiffs.

### VIOLATIONS ALLEGED

21.    The failure to fully and completely disclose the payment schedule violates 15 U.S.C. §1638 and 12 C.F.R. §226.28.

ANSWER:    Because this paragraph states conclusions of law, no answer is required.  If any answer is required, Defendant denies any liability to Plaintiffs.

22.    The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

**ANSWER:**    **Because this paragraph states conclusions of law, no answer is required. If any answer is required, Defendant denies any liability to Plaintiffs.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendant for:

  a.    A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendant;

  b.    Statutory damages for the underlying disclosure violation;

  c.    If appropriate, statutory damages for failure to rescind;

  d.    Attorney's fees, litigation expenses and costs.

  e.    Such other or further relief as the Court deems appropriate.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs' purported causes of action fail to state a claims upon which relief may be granted.

2.    Plaintiffs' claims are barred by the applicable statute of limitations.

3.    Plaintiffs' claims are barred in whole or in part under the doctrine of estoppel, laches and/or waiver.

4.    Plaintiffs' claims are barred in whole or in part, on the ground that if any law was violated in any manner whatsoever, such violation, if any, was a direct and proximate result of the intervening and superseding actions on the part of other parties and/or persons or entities and not Defendant, and any such intervening or superseding action of said parties and/or persons or entities bars Plaintiffs' recovery.

5.    Defendant alleges that at all times relevant to this action Defendant acted within the course and scope of reasonable commercial standards and legitimate business transactions.

6.    Plaintiffs' claims are barred in whole or in part, because Plaintiffs would be unjustly enriched if allowed to recover on the Complaint.

7.    Defendant alleges that no officer, director, or managing agent of Defendant ratified the conduct alleged by Plaintiffs.

- 8 -

BN 1330586v1

8.      Plaintiffs' claims are barred by the doctrines of res judicata and collateral estoppel.

9.      Plaintiffs' claims are barred in whole or in part, because Plaintiffs misrepresented their credit, income or other information association with obtaining the loan.

10.      Plaintiffs' claims are barred or limited because pursuant to 15 U.S.C. § 1640(c) the violations alleged were not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

11.      Plaintiffs are not entitled to rescind the mortgage loan under the Truth in Lending Act, or to obtain any statutory damages because all required disclosures and notices were accurately and timely made, and even if the disclosures were inaccurate, the inaccuracies are within the applicable tolerances.

12.      Plaintiffs are not entitled to statutory damages, or actual damages for failure to rescind, because no alleged disclosure error is apparent on the face of the disclosure documents.

13.      If it should be deemed that Plaintiffs are entitled to rescission, any obligation on the part of the holder of the loan to rescind the mortgage loan at issue in this lawsuit and release the lien on the subject property must be conditioned upon Plaintiffs' reimbursement or other return to the holder of the loan of all funds disbursed on Plaintiffs' behalf in connection with the subject mortgage loan, less any finance charges, pursuant to 15 U.S.C. § 1605(b) and/or other rules of law or equity.  Any obligation on the part of the holder of the loan to rescind and to release any lien is conditioned upon Plaintiffs reimbursing or otherwise returning all funds disbursed on their behalf to the holder of the loan in connection with the subject loan, less any finance charges.

14.      Defendant alleges that it presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses. Defendant reserves its right to file an amended answer asserting additional defenses, and/or to file a counter or cross-complaint in the event that discovery indicates that either is appropriate.

BN 1330586v1

WHEREFORE, Defendant requests that this Court enter judgment in its favor and against

Plaintiffs, award Defendant its costs, and provide such further and additional relief as it deems

just and appropriate.

Respectfully submitted,

DATED: September 6, 2007

By: /s/ Bernard E. LeSage
    *Attorneys for Ameriquest Mortgage*
    *Company*

Bernard E. LeSage, Esq.
Sarah K. Andrus, Esq.
BUCHALTER NEMER, a P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

- 10 -

## CERTIFICATE OF SERVICE

I, Bernard E. LeSage, hereby certify that on this 6th day of September 2007, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: _____ /s/  Bernard E. LeSage _____

BN 1330586v1

# APPENDIX 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ERIC SMITH and GUILLERMINA YANONG, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 0648 |
| | ) | |
| AMERIQUEST MORTGAGE COMPANY, | ) | Judge Anderson |
| DEUTSCHE BANK NATIONAL TRUST and | ) | |
| AMC MORTGAGE SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DEUTSCHE BANK NATIONAL TRUST COMPANY'S
## ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

Defendant, Deutsche Bank National Trust Company ("Deutsche Bank"), by its attorneys, answers Plaintiffs' amended complaint as follows:

1.    Plaintiffs Eric Smith and Guillermina Yanong bring this action against a "subprime" mortgage lender to rescind a mortgages for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

**ANSWER:**    Deutsche Bank admits that Plaintiffs have filed a lawsuit against it. Deutsche Bank objects to the term "subprime" as vague. Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of the term "subprime." Ameriquest denies all remaining allegations in Paragraph 1. Ameriquest specifically denies that it violated the Truth in Lending Act, 15 U.S.C. § 1601, or implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

2.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), and 15 U.S.C. §1640 (Truth in Lending Act). Defendant does business in the District and is deemed to reside here.

**ANSWER:**    Deutsche Bank does not contest subject matter jurisdiction, personal jurisdiction, or venue. Deutsche Bank denies any remaining allegations in Paragraph 2.

3.    Plaintiffs own and reside in a home at 1844 South 60th Court, Cicero, Illinois.

**ANSWER:**     Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and, therefore, denies same.

4.     Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606. It is engaged in the business of originating "subprime" mortgages and makes more than 26 loans per year.

**ANSWER:**     Deutsche Bank objects to the term "subprime" as vague. Deutsche Bank is without knowledge or information sufficient to admit or deny the intended characterization of the term "subprime." Deutsche Bank admits that Ameriquest Mortgage Company is in the business of originating loans secured by mortgages and that it makes more than 26 loans per year. Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 and, therefore, denies same.

5.     Defendant Deutsche Bank National Trust Company ("Deutsche Bank") is a foreign corporation with its headquarters at 60 Wall Street, New York, NY 10005. It does business in Illinois. It is engaged in the business of buying "subprime" mortgage loans on Illinois properties.

**ANSWER:**     Deutsche Bank admits that it is a corporation incorporated in a state other than Illinois, that it is headquartered at 60 Wall Street, New York, New York 10005, and that it holds loans, secured by mortgages on Illinois properties. Deutsche Bank objects to the term "subprime" as vague. Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of the term "subprime." Deutsche Bank denies the remaining allegations in Paragraph 5.

6.     Defendant AMC Mortgage Services, Inc. ("AMC"), is a Delaware Corporation with its principal place of business in Orange, CA. It does business in Illinois. Its registered agent and office are National Registered Agents, Inc., 200 West Adams Street, Chicago, IL 60606.

**ANSWER:**     Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 and, therefore, denies same.

7.     Defendant Ameriquest and AMC are corporate affiliates.

**ANSWER:**     Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and, therefore, denies same.

8.     On February 20, 2002, plaintiffs obtained a mortgage loan from Ameriquest secured by their home at 1844 South 60th Court, Cicero, Illinois.

**ANSWER:**     Deutsche Bank admits that, on February 20, 2002, Plaintiff Guillermina Yanong obtained a loan, secured by a mortgage, with Ameriquest Mortgage Company.  Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the allegations that the loan was secured by Plaintiffs' home.  Deutsche Bank denies any remaining allegations in Paragraph 8.

9.     Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**ANSWER:**     Deutsche Bank is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and, therefore, denies same.

10.     The loan was closed on February 20, 2002

**ANSWER:**     Deutsche Bank admits the allegations in Paragraph 10.

11.     On February 20, 2002, plaintiffs signed or received the following documents relating to the loan:

a.     Note, Exhibit A;

b.     Mortgage, Exhibit B;

c.     A Truth in Lending disclosure statement, Exhibit C;

d.     Two different notices of right to cancel, Exhibits D and E;

e.     A settlement statement on form HUD-1A, Exhibit F.

**ANSWER:**     Deutsche Bank admits that, in connection with the loan transaction, either Plaintiff Guillermina Yanong alone or Plaintiffs collectively received and signed a note, a mortgage, a Truth in Lending disclosure statement, several copies of a notice of right to cancel, several copies of a document entitled "one week cancellation period," and a settlement statement.  Deutsche Bank

denies that Exhibit B is a complete copy of the mortgage. Ameriquest denies that Exhibit F is a copy of the settlement statement signed by Plaintiff Guillermina Yanong. Deutsche Bank affirmatively states that Exhibits A, C, D, and E, appear to be copies, reduced in size, of a portion of the documents received and signed by either Plaintiff Guillermina Yanong alone or Plaintiffs collectively. Deutsche Bank denies that Exhibits D and E constitute two different notices of right to cancel. Deutsche Bank denies the remaining allegations in Paragraph 11.

12.     Ownership of plaintiff's loan was later transferred to defendant Deutsche Bank. Deutsche Bank is the present holder of the loan.

**ANSWER:**     Deutsche Bank admits the allegations in Paragraph 12.

13.     Defendant Ameriquest subsequently transferred servicing of plaintiff's loan to defendant AMC. AMC is the present servicer of the loan.

**ANSWER:**     Deutsche Bank admits the allegations in Paragraph 13.

14.     Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a)     <u>Consumer's right to rescind.</u>

(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section. [fn]47

(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission

4

period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b)   <u>Notice of right to rescind.</u>  In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind.  The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f)   <u>Exempt transactions.</u>  The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

<u>ANSWER:</u>   Deutsche Bank is without knowledge or information sufficient to form a

belief as to the truth of the allegations that the transaction was secured by Plaintiffs' home.

Deutsche Bank denies that 12 C.F.R. §226.23(f)(2) states "(2) A credit plan in which a state agency is

a creditor." Deutsche Bank admits that the remaining allegations in Paragraph 14 contain a portion

of the text of 12 C.F.R. § 226.23. Deutsche Bank denies the allegations of Paragraph 14 insofar as

they purport to make any allegation of wrongdoing by Deutsche Bank under said statute. Deutsche

Bank denies the remaining allegations in Paragraph 14.

15.     The payment schedule is not fully and completely disclosed on <u>Exhibit D</u>.

**ANSWER:**     Deutsche Bank denies the allegations in Paragraph 15.

16.     <u>Exhibit F</u> detracts from and obfuscates <u>Exhibit E</u>. <u>Exhibit F</u> suggests that the consumer has seven days to rescind under TILA, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees, or the procedural protections of § 1635. It also provides for a different method of counting days and requires actual receipt of the notice by Ameriquest within the specified time.

**ANSWER:**     Deutsche Bank denies the allegations in Paragraph 16.

17.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

**ANSWER:**     Deutsche Bank admits that the allegations in Paragraph 17 contain the text of

15 U.S.C. §1635(g). Deutsche Bank denies the allegations in Paragraph 17 insofar as they purport to

make any allegation of wrongdoing by Deutsche Bank under said statute. Deutsche Bank denies the

remaining allegations in Paragraph 17.

18.     The failure to fully and completely disclose the payment schedule violates 15 U.S.C. § 1638 and 12 C.F.R. §226.28.

**ANSWER:**     Deutsche Bank denies the allegations in Paragraph 18.

19.     The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. § 226.23.

**ANSWER:**     Deutsche Bank denies the allegations in Paragraph 19.

## AFFIRMATIVE DEFENSES

Deutsche Bank states as its affirmative defenses as follows:

1.      Plaintiffs' claim for statutory damages, costs, and attorney's fees for any alleged Truth in Lending Act violation is barred by 15 U.S.C. § 1641.

2.      Plaintiffs' claim for statutory damages, costs, and attorney's fees for any alleged underlying Truth in Lending Act violation is barred by the one-year statute of limitations for statutory damages, costs, and attorney's fees under the Truth in Lending Act.

3.      Plaintiffs' purported cause of action fails to state a claim upon which relief may be granted.

4.      If it should be deemed that Plaintiffs are entitled to rescission, any obligation on the part of the holder of the loan to rescind the mortgage loan at issue in this lawsuit and release the lien on the subject property must be conditioned upon Plaintiffs' reimbursement or other return to the holder of the loan of all funds disbursed on Plaintiffs' behalf in connection with the subject mortgage loan, less any finance charges, pursuant to 15 U.S.C. § 1605(b) and/or other rules of law or equity.  Any obligation on the part of the holder of the loan to rescind and to release any lien is conditioned upon Plaintiff reimbursing or otherwise returning all funds disbursed on her behalf to the holder of the loan in connection with the subject loan, less any finance charges.

WHEREFORE, Defendant Deutsche Bank National Trust Company requests that this Court enter judgment in its favor and against Plaintiffs, Eric Smith and Guillermina Yanong, award Deutsche Bank National Trust Company its costs, and provide such further and additional relief as it deems just and appropriate.

Dated: January 4, 2006                     Respectfully submitted,

                                           **DEUTSCHE BANK NATIONAL TRUST
                                           COMPANY, Defendant**


                                           By:     s/Jonathan N. Ledsky
                                                   One of its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
Varga Berger Ledsky Hayes & Casey
224 South Michigan Avenue
Suite 350
Chicago, IL 60604
(312) 341-9400
(312) 341-2900 (facsimile)

## CERTIFICATE OF SERVICE

Jonathan N. Ledsky, an attorney, hereby certifies that a true and correct copy of the

foregoing **Defendant Deutsche Bank National Trust Company's Answer to Plaintiffs'**

**Amended Complaint** was served electronically upon counsel of record:

Daniel A. Edelman (courtecl@aol.com dedelman@edcombs.com)

Albert F Hofeld, III (ahofeld@edcombs.com)

by the filing of said document through the Court's electronic filing system this 4th day of January,

2006.



                                           s/Jonathan N. Ledsky

# APPENDIX 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC SMITH and GUILLERMINA YANONG, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05 C 0648 |
| v. | ) | |
| | ) | Judge Andersen |
| AMERIQUEST MORTGAGE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS

Defendant, Ameriquest Mortgage Company ("Ameriquest"), submits its response to Plaintiffs' first request for admissions.

### General Objections

1.     Ameriquest objects to the requests to the extent that they purport to seek information for the time period January 21, 2002, to the present, in that the time period is overly broad and seeks information which is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.

2.     Ameriquest objects to the requests as harassing, in that many requests duplicate the allegations of Plaintiff's complaint to which Ameriquest has already filed an answer.

### Requests for Admissions

1.     Plaintiff owns and resides in a home at 1844 South 60th Court, Cicero, Illinois, 60804.

**RESPONSE:**     Ameriquest further objects to the term "plaintiff" as vague, as there are two Plaintiffs in this action. Ameriquest cannot admit or deny the request. Ameriquest has made reasonable inquiry, and the information known or readily available is insufficient to enable Ameriquest to admit or deny the allegations in this request, as the allegations relate to facts exclusively within the knowledge of Plaintiffs.

2.      Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois.  Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

**RESPONSE:**          Ameriquest admits that it is a corporation incorporated in a state other than Illinois and that it does business in Illinois.  Ameriquest admits the allegations in the second sentence in this request.  Ameriquest denies any remaining allegations in this request.

3.      Ameriquest is engaged in the business of originating and servicing "subprime" mortgages and originates more than 26 loans per year.

**RESPONSE:**          Ameriquest further objects to the term "subprime" as vague.  Ameriquest admits that it is engaged in the business of originating and servicing loans, secured by mortgages, and that it originates more than 26 loans per year.  Ameriquest denies the remaining allegations in this request.

4.      Prior to February 20, 2002, plaintiff applied for a residential mortgage loan with Ameriquest, to be secured by her residence.

**RESPONSE:**          Ameriquest further objects to the terms "plaintiff" and "her" as vague, as there are two Plaintiffs in this action.  Ameriquest admits that Plaintiff Guillermina Yanong, prior to February 20, 2002, applied for a loan, to be secured by a mortgage.  Ameriquest cannot admit or deny the allegations in this request regarding residence.  Ameriquest has made reasonable inquiry, and the information known or readily available by Ameriquest is insufficient to enable it to admit or deny the allegations in this request regarding residence, as the allegations regarding residence relate to facts exclusively within the knowledge of Plaintiffs.  Ameriquest denies the remaining allegations in this request.

5.      Plaintiff used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**RESPONSE:**          Ameriquest further objects to the term "plaintiff" as vague, as there are two Plaintiffs in this action.  Ameriquest cannot admit or deny this request.  Ameriquest has made reasonable inquiry and the information known or readily available by Ameriquest is

insufficient to enable Ameriquest to admit or deny this request, as the allegations related to facts exclusively within the knowledge of Plaintiffs.

      6.     The loan was closed on February 20, 2002.

    **RESPONSE:**     Ameriquest admits the allegations in this request.

      7.     The documents described below are true and accurate reproductions of documents received by plaintiff in connection with the residential mortgage loan he received:

        a.     Note, <u>Exhibit A</u>;

        b.     Mortgage, <u>Exhibit B</u>;

        c.     A Truth in Lending disclosure statement, <u>Exhibit C</u>;

        d.     Two different notices of right to cancel, <u>Exhibits D and E</u>;

        e.     A settlement statement on form HUD-1A, <u>Exhibit F</u>;

    **RESPONSE:**     Ameriquest further objects to the term "plaintiff" and "he" as vague, as there are two Plaintiffs in this action.  Ameriquest admits that, in connection with the loan transaction, Plaintiff Guillermina Yanong alone or Plaintiffs collectively received and signed a note, a mortgage, a Truth in Lending disclosure statement, several copies of a notice of right to cancel, several copies of a document entitled "one week cancellation period," and a settlement statement. Ameriquest affirmatively states that Exhibits A, B, C, D, and E appear to be copies, some incomplete copies, of a portion of the documents received and signed by Plaintiffs.  Ameriquest denies that Exhibits D and E constitute two different notices of right to cancel.  Ameriquest denies the remaining allegations in this request.

      8.     The payment schedule on <u>Exhibit C</u> does not expressly state the intervals at which plaintiffs are to make payments.

    **RESPONSE:**     Ameriquest denies the allegations in this request.

      9.     The payment schedule on <u>Exhibit C</u> does not expressly state that payments on the loan are to be made monthly.

    **RESPONSE:**     Ameriquest denies the allegations in this request.

3

10. The payment schedule on <u>Exhibit C</u> does not expressly state the day of the month that payments are due.

**<u>RESPONSE</u>:** Ameriquest denies the allegations in this request.

11. The 7-day right to cancel allegedly conferred by <u>Exhibit D and E</u> is not conferred by TILA.

**<u>RESPONSE</u>:** Ameriquest further objects to this request as vague. Subject to and without waiving its objections, Ameriquest affirmatively states that the "one week cancellation period" document which Plaintiffs received and signed, a copy of which is attached as Exhibit E to Plaintiffs' first discovery requests, provides a right to cancel to Plaintiffs. Ameriquest admits that the length of the right to cancel provided to Plaintiffs by the "one week cancellation period" document received and signed by Plaintiffs is greater than the right to cancel conferred by the federal Truth in Lending Act. Ameriquest denies the remaining allegations in this request.

12. The 7-day right to cancel allegedly conferred by <u>Exhibit D and E</u> does not offer or provide the same remedies as TILA.

**<u>RESPONSE</u>:** Ameriquest further objects to this request as vague. Subject to and without waiving its objections, Ameriquest affirmatively states that the "one week cancellation period" document which Plaintiffs received and signed, a copy of which is attached as Exhibit E to Plaintiffs' first discovery requests, provides a right to cancel to Plaintiffs. Ameriquest denies that Plaintiffs could not have cancelled his loan, within the applicable time-frame, under the "one week cancellation period" document which Plaintiffs received and signed, just as Plaintiffs could have cancelled the loan under the "notice of right to cancel" document which Plaintiffs received and signed. Ameriquest denies the remaining allegations in this request.

Dated:  August 5, 2005

**AMERIQUEST MORTGAGE COMPANY,**
**Defendant**

By:_____
One of its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
Varga Berger Ledsky Hayes & Casey
A Professional Corporation
224 South Michigan Avenue
Suite 350
Chicago, Illinois  60604
(312) 341-9400
(312) 341-2900 (facsimile)

## CERTIFICATE OF SERVICE

I, Jonathan N. Ledsky, an attorney, hereby certify that a true and correct copy of the

foregoing **Defendant's Response to Plaintiffs' First Request for Admissions,** was served upon:

Al Hofeld, Jr.
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois  60603

by messenger delivery, properly addressed and fully prepaid, this 5th day of August, 2005, on or

before the hour of 5:00 p.m.

_____
Jonathan N. Ledsky

# APPENDIX 15

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
## 120 S. LaSalle Street, 18th floor
## Chicago, Illinois 60603-3403
## (312) 739-4200
## (800) 644-4673
## (312) 419-0379 (FAX)
## Email: edcombs@aol.com
## www.edcombs.com

January 28, 2005

**BY MESSENGER**

Ameriquest Mortgage Corporation
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606

Re: Notice of rescission, claim and lien, Eric Smith and Guillermina Yanoung, 1844 South 60th Court, Cicero, Illinois, loan of February 20, 2002.

Ladies/ Gentlemen:

The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act, in that the payment schedule was not fully disclosed and borrowers were given two, different and confusing types of notices of right to cancel.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on.

_____
Daniel A. Edelman

# APPENDIX 16

# VARGA BERGER LEDSKY HAYES & CASEY

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

SANTA FE BUILDING
224 SOUTH MICHIGAN AVENUE
SUITE 350
CHICAGO, ILLINOIS 60604-2507

TELEPHONE: 312-341-9400
FACSIMILE: 312-341-2900

February 17, 2005

CRAIG A. VARGA
(312) 341-9820

cvarga@vblhc.com

**VIA FACSIMILE & U.S. MAIL**

Mr. Al Hofeld, Jr.
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603

> Re: Notice of rescission, claim and lien, Eric Smith and Guillermina Yanoung, 1844 South 60[th] Court, Cicero, Illinois, loan of February 20, 2002

Dear Al:

We are in receipt of the attached letter (dated January 28, 2005) which was served on our client Ameriquest Mortgage Company's registered agent on January 28, 2005. The letter seeks rescission of a loan made by Ameriquest to Eric Smith and Guillermina Yanoung.

We are also aware that on February 3, 2005, a lawsuit was filed on behalf of Eric Smith and Guillermina Yanoung against Ameriquest (Ameriquest's registered agent was served with the Complaint in that action on February 7, 2005). The filing of the suit less than a week after service of the rescission letter suggests an indifference to Ameriquest making any substantive review of the matter.

In any event, Ameriquest disagrees with the contentions made in the letter as to the alleged Truth in Lending Act violations. Accordingly, Ameriquest declines the rescission request as to the bases asserted in the letter. Ameriquest will further details its positions, as appropriate, within the context of the lawsuit which Mr. Smith and Ms. Yanoung have elected to initiate. Thank you.

Very truly yours,

Craig A. Varga

CAV:sto
Enclosure

# APPENDIX 17

```
                  IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION


     NELSON JIMENEZ and MELINDA JIMENEZ, )
                                         )
                          Plaintiffs,    )
                                         )
                     vs.                 )  No. 05C07097 RSP
                                         )
     AMERIQUEST MORTGAGE COMPANY,        )
     WASHINGTON MUTUAL BANK, FA, and     )
     AMC MORTGAGE SERVICES, INC.,        )
                                         )
                          Defendants.    )
```



        The deposition of NELSON JIMENEZ, called by the

Defendants for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before MARGARET R. BEDDARD, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand Reporter

of said state, at Suite 350, 224 South Michigan

Avenue, Chicago, Illinois, on the 30th day of August,

A.D. 2005, at 10:31 a.m.



NELSON JIMENEZ, 08/30/05     JIMENEZ vs. AMERIQUES

**Page 14**

1   Q. That was your first job in the United
2 States?
3   A. Yes.
4   Q. And what did you do at Ravenswood Hospital?
5   A. Housekeeping.
6   Q. And how long did you have that job?
7   A. Three to four years.
8   Q. And have you had any other jobs while in
9 the United States that you haven't mentioned yet?
10   A. Continental Bank doing nights. I probably
11 stayed there a year.
12   Q. You worked at Continental Bank at night?
13   A. Yeah.
14   Q. What did you do?
15   A. Doing cash letter packaging clerk.
16   Q. And what years did you work for Continental
17 Bank?
18   A. '80 or '81. Then after I do Ravenswood.
19   Q. What did a cash letter packaging clerk do?
20   A. We shipped like those personal checks. We
21 sort them, and we send them back to where they're
22 supposed to be sent. Those personal checks that
23 people issue, it's already been cashed. Then we just
24 sort them and send them to where it's supposed to go.

**Page 16**

1 for this job?
2   A. No.
3   Q. Did you work anywhere before working at
4 Continental Bank?
5   A. Here in America, no.
6   Q. So that was your first job?
7   A. Ravenswood and Continental, same time.
8   Q. Okay. And so you've had five jobs since
9 you've been in the United States by my count,
10 Continental Bank, Ravenswood, the Filipino
11 restaurant, and then two jobs at Chicago Read Mental
12 Health Center; is that correct?
13   A. I didn't include one. I work at Folled
14 Publishing Group. But it was part-time work.
15   Q. Folled?
16   A. Folled, F-o-l-l-e-d.
17   Q. Folled Publishing?
18   A. Yes.
19   Q. What did you do for them?
20   A. Less than six months back in '83, I think.
21   Q. What did you do there?
22   A. I do order picking. Order picking.
23   Q. What's order picking?
24   A. Order peeler. There's an order. You peel

**Page 15**

1   Q. For example, just so I understand what
2 you're saying, when I get my monthly check statement
3 from my bank, it has my negotiated checks -- or it
4 used to at least until about a year ago. Is that
5 what you're saying you did? You sorted checks and
6 then mailed these canceled checks back to the
7 customer?
8   A. No. We had bunch of them, boxes. It's
9 supposed to go to the bank, whoever owns that checks.
10   Q. How would you sort them?
11   A. We have one of those -- There's a number.
12 It was a long time ago. I stayed there a year. I
13 don't remember. I'm doing all night and then pull
14 out the checks that not belong there. Like put in
15 order. Then we send it to another department. They
16 just take care of the rest of it.
17   Q. You sorted them by what criteria?
18   A. Let's say those -- Let's say LaSalle Bank,
19 for example. People have checks by LaSalle Bank.
20 All LaSalle Bank -- We put all LaSalle here. Let's
21 say different -- All the checks that belong to
22 LaSalle goes here. Something like that.
23   Q. I see.
24     Okay. Did you have any special training

**Page 17**

1 up the order.
2   Q. You would get an order, and then you would
3 find the book in the warehouse to fill the order?
4   A. Yes.
5   Q. And what years did you do that?
6   A. '82 or '83.
7   Q. Okay. I met your wife outside.
8     Are you married?
9   A. Yes.
10   Q. Okay. And have you ever been married
11 before this time?
12   A. No.
13   Q. Okay. And do you have children?
14   A. Yes.
15   Q. How many?
16   A. Three.
17   Q. And what are their ages?
18   A. 18, 17, and 5.
19   Q. Okay. And they all live with you at home?
20   A. Yes.
21   Q. You said you've lived at this Lilac Drive
22 address in Romeoville for about three years; is that
23 correct?
24   A. We move in 2001. More than three years

**Page 18**

1  maybe. More than three years now.
2    Q. Okay. When did you move in?
3    A. February 2001. I don't remember the date.
4    Q. February 2001 is an approximate date?
5    A. Yeah.
6    Q. Okay. Did you buy the house then?
7    A. Yes.
8    Q. Okay. Had you ever owned property before
9  then?
10   A. Yes. I sold the old house to buy the new
11 one.
12   Q. Okay. How many houses have you owned?
13   A. What do you mean by that? At the same
14 time?
15   Q. I mean, you've mentioned two.
16   A. Yeah, two.
17   Q. Have you owned any other houses?
18   A. No.
19   Q. Have you owned additional property at any
20 time?
21   A. No.
22   Q. Have you owned property that you haven't
23 lived in?
24   A. No.

**Page 19**

1    Q. So you've owned two houses?
2    A. Yeah.
3    Q. Okay. And when did you buy the first
4  house?
5    A. That was in 1996.
6    Q. And where was that?
7    A. Here in Chicago. North side. Northwest
8  side.
9    Q. And what made you move from the northwest
10 side of Chicago to Romeoville?
11   A. We needed a bigger house, I believe,
12 because the one we got is smaller.
13   Q. Okay. Before you bought your first house
14 in 1996 did you look at various houses before you
15 decided on the one you bought?
16   A. Yes.
17   Q. What were some of the factors that went
18 into your decision to buy the particular house that
19 you bought rather than some of the other ones that
20 you had looked at?
21   A. The neighborhood, I believe. It's nearest
22 to the school.
23   Q. What school was that?
24   A. Smyser. The Smyser School.

**Page 20**

1    Q. Miser School?
2    A. Smyser, S-m-y-s-e-r. That's elementary
3  school.
4    Q. Is that a public school or a private
5  school?
6    A. Public.
7    Q. And why did you want to be near that
8  school?
9    A. Well, I think for convenience. Close to my
10 house. Close to where I work.
11   Q. Other than the neighborhood, was there
12 anything else that you were looking for in a
13 particular house?
14   A. No.
15   Q. Was price important to you?
16   A. Yeah, that's one too.
17   Q. And how did you decide how much you could
18 spend to buy a house?
19   A. We were a first-time buyer. You need only
20 about 5 percent.
21   Q. 5 percent for what?
22   A. Of the amount of the house you're looking
23 for.
24   Q. So you put a down payment of 5 percent?

**Page 21**

1    A. Yes.
2    Q. And you're going to borrow the rest?
3    A. Yes.
4    Q. Okay. And did you know how much a loan
5  would cost to borrow the rest?
6    A. Yes.
7    Q. And how did you know that?
8    A. Through reading. Through studying.
9    Q. What did you study?
10   A. I look at the magazines or any kind of
11 periodicals about how to -- how to buy a house.
12   Q. So you did your --
13   A. Stuff like that.
14   Q. You did your research before you did it?
15   A. Yeah.
16   Q. And so you had an idea of how much a loan
17 might cost you for the 95 percent that you were
18 borrowing?
19   A. Yes.
20   Q. Did you know that as a payment amount or as
21 an interest rate? How did you look at that?
22     Do you understand my question?
23   A. Can you repeat that?
24   Q. Sure. If there's ever a time that you

**Page 74**

1 $6,000 in one year. 5 to 6,000 a year.

2    Q. The value of your property went up?

3    A. No. The property tax. The tax that you

4 pay for the house.

5    Q. Oh, okay. So it went from about $2,000

6 when you bought the house to 5 or --

7    A. 5 to 6.

8    Q. 5 or 6 in one year?

9    A. Yes.

10    Q. Okay. And what did -- How did you learn

11 about that?

12    A. When I got the statement from Fifth Third

13 and they got the escrow. They said I still owed them

14 because the property changed. I had to pay them

15 this. But at that time I couldn't afford it, so I

16 decided to refinance it.

17    Q. Okay. And what did you do once you made

18 that decision to refinance?

19    A. At that time I'm going to be short if I pay

20 that property tax right away. If I refinance it,

21 that's going to lower my monthly payment, too.

22    Q. I understand that.

23      My question is, you decided you wanted to

24 refinance the loan; is that correct?

**Page 75**

1    A. Yeah.

2    Q. Okay. What did you do?

3    A. I had to get some money to pay the property

4 tax. I was going to be a little low then. I have to

5 refinance it.

6    Q. Did you attempt to refinance with

7 Fifth Third Bank?

8    A. Yeah, at first. But they giving me a

9 higher rate.

10    Q. What kind of rate did they offer you?

11    A. Something 8. 8 percent. Around there.

12    Q. 8 percent or higher?

13    A. Yeah.

14    Q. Okay. So what did you do next after you

15 decided not to refinance with Fifth Third?

16    A. I consider refinancing to another

17 company -- to another financing company.

18    Q. Did you approach other companies?

19    A. No.

20    Q. What did you do?

21    A. Just reading their brochure or what they

22 sent through the mail. I just read that.

23    Q. Do you ever look at the newspapers I think

24 on Fridays or on Sundays? There's a chart of people

**Page 76**

1 in the home section of people who offer

2 refinancings -- companies that offer refinancings.

3 Did you ever look at that?

4    A. Yes.

5    Q. To see what various interest rates were?

6    A. Yes.

7    Q. Okay. Did you contact your friend -- or

8 the person at Diamond Mortgage to see if they could

9 refinance?

10    A. Yeah. I tried the guy from mortgage --

11 from Diamond Mortgage. Yes, I did.

12    Q. And what did he do?

13    A. He checked my credit first.

14    Q. And what happened?

15    A. He told me I couldn't get a better rate

16 because of my credit -- those credit obligations.

17    Q. He couldn't get you a better rate than

18 what?

19    A. Than the average rate. It was supposed to

20 be around 6 percent. I always get about 2 percent

21 higher than 6.

22    Q. Okay. So could he -- Could he offer you

23 financing at Diamond Mortgage?

24    A. He tried. He said, "You're going to be

**Page 77**

1 higher. You're going to have to pay higher interest

2 rate."

3    Q. Okay. So what did you do then?

4    A. I called Ameriquest.

5    Q. You called Ameriquest?

6    A. Yes.

7    Q. And you had Ameriquest's telephone number

8 how?

9    A. Through the mail. I think they send me

10 through those ads.

11    Q. Before you called Ameriquest you said you

12 had contacted Fifth Third Bank; is that correct?

13    A. Yes.

14    Q. And you had contacted Diamond Mortgage; is

15 that correct?

16    A. Yes.

17    Q. Had you contacted anybody else before you

18 called Ameriquest in pursuit of a new loan?

19    A. Yeah, I believe so.

20    Q. Who had you called?

21    A. I called this guy. I don't remember this

22 guy, you know. But I called him, and he called back.

23 But then after that I decided not to deal anymore.

24 Then that's it.

NELSON JIMENEZ, 08/30/05

JIMENEZ vs. AMERIQUES[T]

**Page 78**

1 Q. So you called one other person?
2 A. About financing, yes. And he called back.
3 I didn't have a chance to talk to him because I was
4 thinking it might be --
5 Q. How did you get his name?
6 A. Through the ad too. Through the mail.
7 Q. Okay. So Ameriquest was the fourth company
8 that you contacted?
9 A. More likely, yes.
10 Q. Could there have been others?
11 A. I don't remember. But there's a lot of
12 people calling my house about refinancing. I don't
13 remember them all.
14 Q. So you spoke to people who had called your
15 house?
16 A. Yes.
17 Q. And did you discuss specifics with any of
18 them -- you know, what they could do for you?
19 A. Yeah. They tell you lower my monthly
20 payment and stuff like that.
21 Q. Why was it you called Ameriquest?
22 MR. HOFELD: Objection. Asked and answered. He
23 testified why.
24 MR. LEDSKY: I know.

**Page 79**

1 BY MR. LEDSKY:
2 Q. But you said you got a lot of ads in the
3 mail, is that right, for companies that would
4 refinance you?
5 A. Yes.
6 Q. Okay. Why did you select Ameriquest to
7 call?
8 A. I believe it's a good financing company.
9 Q. And why did you believe that?
10 A. Maybe through their -- You see them on TV.
11 Or like Ditech.com. I thought those were good
12 companies.
13 Q. Do you remember who you spoke to that first
14 time you called them?
15 A. I think -- I talked to a lady at first, but
16 I don't remember.
17 Q. And what -- Do you remember what you said
18 to her and what she said to you?
19 A. I think I told her I'm interested to get a
20 loan -- a refinancing loan.
21 Q. And what did she say to you?
22 A. I think she took some information, my name,
23 address. Something like that.
24 Q. Did you give her any credit information?

**Page 80**

1 A. Yeah. They asked where I work or something
2 like that, how much I earn.
3 Q. Did you tell her why you wanted to
4 refinance?
5 A. They didn't ask me why I refinance. When
6 they look at your credit, they can tell that you need
7 to refinance.
8 Q. And why did you believe at this time that
9 you did need to refinance?
10 A. Because you're paying too much every month.
11 We want to lower down our monthly payments.
12 Q. When you say you wanted to lower your
13 monthly payments, did you want to lower your payments
14 involving your house or lower your monthly payments
15 involving all of your obligations?
16 A. I believe including the credit cards, yeah.
17 Q. So it was more than just your house
18 payment?
19 A. Yes.
20 Q. So you wanted to lower your credit card
21 payments as well?
22 A. Yes.
23 Q. So your intention was to pay some of these
24 credit card companies so that those payments would be

**Page 81**

1 lower?
2 A. Yes.
3 Q. Did you convey that -- Did you tell that to
4 the lady during the first Ameriquest telephone call?
5 A. I don't remember.
6 Q. Okay. Did you have a second telephone
7 conversation with someone at Ameriquest?
8 A. Maybe so. I think, yeah. Marcus probably,
9 yeah.
10 Q. Who?
11 A. Marcus Gonzalez.
12 Q. Who's Marcus Gonzalez?
13 A. He's the one who went to our house to have
14 our closing done.
15 Q. Okay. After this first telephone
16 conversation with the lady do you remember a second
17 telephone conversation?
18 A. Yeah. They probably -- This guy probably
19 call asking -- to let us know that we have to come to
20 your house at this time and be there so we can close,
21 I believe.
22 Q. Okay. Do you think there were
23 conversations between the time you spoke to the lady
24 and the time you arranged for the date for your loan

Page 162

Q. You agree that this is the letter that you received from them?

A. Yes.

Q. Have you received more than one letter -- more than one advertisement letter from the Edelman firm?

A. This is the only one.

Q. And what did you do when you received this letter, if anything?

A. It mentioned Ameriquest.

Q. So what did you do, if anything?

A. I just followed what the letter said.

Q. What's the letter say? Did you call them? Did you write to them?

A. I believe I called them.

Q. You called the Edelman firm?

A. Yes.

Q. Do you remember who you spoke to?

A. I don't remember.

Q. Do you remember if it was a man or a woman?

A. We send the documents. The documents that we had we send to them.

Q. Before you had received this advertisement letter in the mail had you contacted any lawyer with

Page 163

regard to Ameriquest?

A. No.

Q. Had you expressed any disappointment to Ameriquest with any aspect of your loan?

A. No.

Q. Had you thought about filing a lawsuit against Ameriquest before receiving this advertisement letter from this law firm?

A. No.

Q. If you could turn to Exhibit 1, page 179. These are the documents that you produced. This page 179 appears to be a loan statement; is that correct?

A. Yes.

Q. And how often do you receive these from Ameriquest -- or from AMC Mortgage Services?

A. Every month.

Q. Okay. If I'm looking at this one, this one's dated April 5, 2005; is that correct?

A. Yes.

Q. I just picked this one. Although there are many just like it; is that correct?

A. Page 179?

Q. Yes.

Page 164

1  I mean, if you look through the documents
2  that your attorney's produced to me, there are many
3  different loan statements that have been produced; is
4  that correct?
5      A. Yes.
6      Q. This one says that your monthly payment
7  amount is $1,551.84; is that correct?
8      A. Yes.
9      Q. And yet it looks like under the column --
10 or the section Activity Since Your Last Statement
11 that your last payment was for $1,600.
12     Do you see that?
13     A. Yes.
14     Q. Okay. When I reviewed many of these loan
15 statements -- monthly loan statements, it looks to me
16 that you've at times, and not infrequently at times,
17 paid more than what's required under the loan.
18     A. I always put extra.
19     Q. You always put extra; is that right?
20     A. Yes.
21     Q. And my question is to you why?
22     A. Well, you put more on your principal. It
23 may help to lower my interest computation every
24 month.

Page 165

1      Q. And how do you know if you put extra that
2  it goes to principal and not interest?
3      A. Because the scheduled payments is 1551. If
4  I added more, the rest then would go to principal.
5      Q. And you know that to be true?
6      A. Yes.
7      Q. Okay. And how long have you been making
8  payments in an amount greater than required?
9      A. Many times. Most of the time, I believe.
10     Q. And did you do this before you even --
11 before you had a loan with Ameriquest? Did you do
12 this with other loans as well?
13     A. Yes.
14     Q. And how do you decide whether to pay more
15 than is required or not?
16     A. Well, it will help to save us money. It
17 will help to lower our interest payment.
18     Q. And do you recall where you learned that?
19     A. Through reading.
20     Q. Are you in the habit of reading information
21 about consumer finance?
22     A. I guess so, yes.
23     Q. And what do you read?
24     A. I rely on the newspaper most of the time.

# APPENDIX 18

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NELSON JIMENEZ and MELINDA JIMENEZ, )
                                    )
                  Plaintiffs,       )
                                    )
          vs.                       )   NO. 05 C 1009
                                    )
AMERIQUEST MORTGAGE COMPANY,        )
WASHINGTON MUTUAL BANK, FA, and     )
AMC MORTGAGE SERVICES, INC.,        )
                                    )
                  Defendants.       )

The deposition of MELINDA JIMENEZ, called by the

Defendants for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before MARGARET R. BEDDARD, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand Reporter

of said state, at Suite 350, 224 South Michigan

Avenue, Chicago, Illinois, on the 1st day of

September, A.D. 2005, at 10:31 a.m.

JIMENEZ VS. AMERIQUEST

MELINDA JIMENEZ, 09/01/05

Page 70

1 you make more money than you were going to pay out;
2 is that right?
3 A. Yes.
4 Q. And you went through that analysis before
5 you went through with the loan?
6 A. Yes.
7 Q. Okay. And did you ever think -- Did you
8 ever evaluate whether the loan itself was reasonably
9 priced versus what you could do elsewhere?
10 A. No, we didn't.
11 Q. Okay. Did you have an idea that the loan
12 was reasonably priced?
13 A. Yes.
14 Q. How did you know that?
15 A. About the interest rate? That it's kind of
16 low.
17 Q. So you had a sense that the interest rate
18 was low and that it was -- the loan was a good deal?
19 A. Yes.
20 Q. Okay. And you had a lawyer, right? You
21 had a lawyer at that time to help you with the house
22 purchase?
23 A. Yes.
24 Q. And did the lawyer -- I don't want to know

Page 71

1 what the lawyer told you.
2 But did the lawyer give you any advice
3 about the loan and whether it was reasonably priced?
4 A. No, he didn't.
5 Q. He didn't.
6 Okay. Did you ever get another loan on
7 this property in Chicago?
8 A. Another loan?
9 Q. Yes.
10 A. No.
11 Q. Just that one?
12 A. Just one.
13 Q. Okay. You then bought a house, is that
14 right, in Romeoville?
15 A. Yes.
16 Q. And that year was when?
17 A. 2000.
18 Q. 2000?
19 A. Yes.
20 2001.
21 Q. 2001?
22 A. Yes.
23 Q. Okay. What made you decide to sell the
24 house -- You sold the house, right? You sold the

Page 72

1 house in Chicago?
2 A. Yeah, we did.
3 Q. What made you decide to sell the house in
4 Chicago and buy a house in Romeoville?
5 A. Because we looked for a bigger place.
6 Q. Anything else?
7 A. We wanted to get out of Chicago.
8 Q. Okay. Anything else?
9 A. That's it.
10 Q. Okay. Why did you want to leave Chicago?
11 A. People are saying about the kids it's
12 better to be in suburbs.
13 Q. Okay. And did you have a price range for
14 this house?
15 A. Yes.
16 Q. What was that?
17 A. Not more than 200.
18 Q. 200,000?
19 A. Yes.
20 Q. All right. And how did you select that
21 price range?
22 A. The realtor give us -- Well, he told us
23 that -- about our income. We could qualify to that
24 price.

Page 73

1 Q. Who was the realtor?
2 A. The same Gene Villmel.
3 Q. The same gentleman who helped you with the
4 first house purchase?
5 A. Yes.
6 Q. Okay. And he gave you an idea of how much
7 of a loan you could qualify for given your income?
8 A. Yes.
9 Q. Did he also give you an estimate of what
10 the payment would be?
11 A. He did.
12 Q. He did?
13 A. Yes.
14 Q. And that estimate was a monthly payment, or
15 how often was the payment going to be due?
16 A. Monthly.
17 Q. Do you remember what that estimate was?
18 A. 1,400.
19 Q. 1,400?
20 A. Yes.
21 Q. Do you know if that was going to include
22 taxes and insurance?
23 A. Yes.
24 Q. Okay. Did he tell you how much you could

Page 82

1   A. Yes.
2   Q. And did you think they were reasonable?
3   A. Yes.
4   Q. Okay. And how did you determine that they
5 were reasonable?
6   A. Because we could afford a monthly payment.
7   Q. Did you compare the interest rate or the
8 other terms of the loan to what you might be able to
9 get elsewhere?
10   A. No, we didn't.
11   Q. Did you compare the interest rate or the
12 terms of the loan to what your friends or relatives
13 were borrowing money to buy homes for?
14   A. I think, yeah. My relatives.
15   Q. Okay. Did you understand my question? I
16 was asking if you sort of compared your loan and
17 interest rate to what other people you knew were
18 getting?
19   A. Yeah.
20   Q. Okay. And you think you did?
21   A. Yes.
22   Q. To relatives?
23   A. Yeah.
24   Q. Who were buying houses or getting loans at

Page 83

1 the same time?
2   A. My relatives?
3   Q. Yes.
4   A. Not at the same time. What they got for
5 their house. I asked them what interest rate, and
6 they're saying 7, 7.5, so I figured we had a good
7 deal.
8   Q. And when did they buy their house?
9   A. 19 -- I can't remember.
10   Q. Sometime just before yours?
11   A. Yeah.
12   Q. Okay. What was the name of your relatives
13 who had bought this house just before you did?
14   A. Oh, you're talking about my present house,
15 right?
16   Q. Yes, in Romeoville.
17   A. I was thinking about the second -- the
18 first one.
19   Q. Okay. I'm sorry.
20   So before you bought the first one you had
21 talked to some relatives and compared loan terms and
22 interest rates?
23   A. Yes.
24   Q. Okay. And before you bought this second

Page 84

1 house had you talked with anybody comparing what you
2 had been offered through Diamond Mortgage to what
3 anybody else might have gotten elsewhere?
4   A. No.
5   Q. Okay. I mean, the interest rate wasn't
6 much different being offered by Diamond Mortgage for
7 this Romeoville house than had been offered when you
8 bought the house in Chicago a few years earlier?
9   A. Yes.
10   Q. Did that have any impact on you, that the
11 interest rate hadn't changed much?
12   A. No.
13   Q. Did you know whether or not interest rates
14 were generally going down or going up?
15   A. Sometimes I heard about it's going to go
16 down. You know, just hearsay.
17   Q. Do you know if your husband studies these
18 things?
19   A. Yeah, he did.
20   Q. He does?
21   A. Yeah.
22   Q. So did you understand that he had compared
23 the interest rate being offered by Diamond Mortgage
24 for this second house to what you might be able to

Page 85

1 get elsewhere?
2   A. Yeah, he did.
3   Q. Okay. And you were confident that he had
4 done that?
5   A. Yeah.
6   Q. Okay. Did you ever -- Do you understand
7 when you borrow money to buy a house that you sign a
8 document that entitles the loan company to take your
9 house if you fail to make payments?
10   A. Yes.
11   Q. Okay. Do you understand that's called a
12 mortgage?
13   A. Yes.
14   Q. Okay. You pledge your house as collateral
15 for the loan so if you don't pay the loan they can
16 take the property?
17   A. Yes.
18   Q. And you understand that?
19   A. Yes.
20   Q. Okay. Have you ever -- Since you bought
21 your house in Romeoville have you ever pledged your
22 house as collateral any other time?
23   A. You mean refinancing?
24   Q. Refinancing. That's one time, yes.

Page 86

1      Have you ever refinanced?
2      A. Yes.
3      Q. How many times have you refinanced the
4 house in Romeoville?
5      A. Two times.
6      Q. Two times?
7      A. Yes.
8      Q. Have you ever gotten what's called a line
9 of credit or an equity line of credit for your house
10 in Romeoville?
11      A. Equity line of credit? No, I'm not sure.
12      Q. Have you ever gotten what's called a second
13 mortgage loan? Do you know what a second mortgage
14 loan is?
15      A. No.
16      Q. Okay. Where you have a loan that's
17 existing, and instead of just paying it off you get
18 another loan and that lender just puts another
19 mortgage on the property. He's just second in line
20 to the first lender.
21      A. Yeah.
22      Q. Have you ever done that with your property
23 in Romeoville?
24      A. Yes.

Page 87

1      Q. Okay.
2      A. I think.
3      Q. Okay. And do you remember how many times?
4      A. I'm not sure.
5      Q. Have you done it once?
6      A. Once.
7      Q. Okay. Tell me, when did you do that?
8      A. 2002.
9      Q. And who was it with?
10      A. Bank One.
11      Q. Okay. You said you think you've refinanced
12 your house twice, right?
13      A. Yeah. But I'm not sure if it's refinancing
14 with Bank One.
15      Q. Okay.
16      A. But we're refinancing with Ameriquest, yes.
17 I'm not sure about Bank One.
18      Q. All right. But you think you've --
19      When was the Ameriquest loan?
20      A. Ameriquest loan? They refinance our
21 existing loan from other mortgage company.
22      Q. Okay. When was that?
23      A. When? 2002, December.
24      Q. December 2002?

Page 88

1      A. Yes.
2      Q. Okay. What about this Bank One loan?
3      A. Bank One? I think it's 2001.
4      Q. 2001?
5      A. Yeah. We just borrowed money.
6      Q. Okay. And so you bought the house in
7 Romeoville in 2001, right?
8      A. Yes.
9      Q. Using Diamond Mortgage?
10      A. Yes.
11      Q. And then you might have gotten a loan using
12 the house with Bank One?
13      A. I'm not sure.
14      Q. Okay. And then you remember also a loan
15 with Ameriquest?
16      A. Yeah, I remember that.
17      Q. Okay. Do you remember any other loan
18 involving your house?
19      A. No.
20      Q. Do you remember a line of credit currently
21 with your house?
22      A. Yes.
23      Q. You do have a line of credit now?
24      A. Yes.

Page 89

1      Q. That's after the Ameriquest loan?
2      A. Yes.
3      Q. Okay. And who's that with?
4      A. Chase.
5      Q. Chase?
6      A. Yes.
7      Q. And how did you get that?
8      A. Chase -- From Bank One. They gave us an
9 offer through the mail.
10      Q. Do you remember when that loan was taken
11 out -- or that line of credit?
12      A. Say it again.
13      Q. When was that line of credit obtained?
14      A. July.
15      Q. Of what year?
16      A. This year.
17      Q. So this is rather recently?
18      A. Yeah.
19      Q. Okay. I'm going to refer now to the loan
20 with Bank One, not this recent one, but the one
21 before.
22      A. Okay.
23      Q. Do you remember that one at all?
24      A. Yes.

# APPENDIX 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NELSON JIMENEZ and MELINDA JIMENEZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 1009 |
| | ) | |
| AMERIQUEST MORTGAGE COMPANY, | ) | Judge Moran |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant Ameriquest Mortgage Company ("Ameriquest") states the following as its

Answer to Plaintiffs' Complaint:

1.     Plaintiffs Nelson Jimenez and Melinda Jimenez bring this action against a
"subprime" mortgage lender to rescind a mortgage for violation of the Truth in Lending Act, 15
U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R.
part 226.

**ANSWER:**     Ameriquest admits that Plaintiffs have filed a lawsuit against it.  Ameriquest

objects to the term "subprime" as vague.  Ameriquest is without knowledge or information

sufficient to form a belief as to the truth of the intended characterization of the term "subprime."

Ameriquest denies all remaining allegations in Paragraph 1.  Ameriquest specifically denies that it

violated the Truth in Lending Act, 15 U.S.C. § 1601, or implementing Federal Reserve Board

Regulation Z, 12 C.F.R. part 226.

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal
question), 1337 (interstate commerce), and 15 U.S.C. §1640 (Truth in Lending Act).  Defendant
does business in the District and is deemed to reside here.

**ANSWER:**     Ameriquest does not contest subject matter jurisdiction, personal jurisdiction,

or venue.  Ameriquest denies any remaining allegations in Paragraph 2.

3.     Plaintiffs are husband and wife and own and reside in a home at 270 Lilac Drive,
Romeoville, IL  60446.

**ANSWER:** Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4. Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606. It is engaged in the business of originating "subprime" mortgages and makes more than 26 loans per year.

**ANSWER:** Ameriquest admits that it is a corporation, that it is incorporated in a state other than Illinois, and that it maintains offices and does business in Illinois. Ameriquest admits the allegations in the second sentence in Paragraph 4. Ameriquest objects to the term "subprime" as vague. Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of "subprime." Ameriquest admits that it engaged in the business of originating loans secured by mortgages and originates more than 26 loans per year. Ameriquest denies the remaining allegations in Paragraph 4.

5. On December 19, 2002, plaintiffs obtained a mortgage loan from Ameriquest.

**ANSWER:** Ameriquest admits the allegations in Paragraph 5.

6. Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**ANSWER:** Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.

7. The loan was closed on December 19, 2002.

**ANSWER:** Ameriquest admits the allegations in Paragraph 7.

8. On December 19, 2002, plaintiffs signed or received the following documents relating to the loan:

    a.      Note, Exhibit A;

    b.      Mortgage, Exhibit B;

    c.      A Truth in Lending disclosure statement, Exhibit C;

d.  Two different notices of right to cancel, <u>Exhibits D and E</u>;

e.  A settlement statement on form HUD-1A, <u>Exhibit F</u>.

**ANSWER:**  Ameriquest admits that, in connection with the loan transaction, Plaintiffs received and signed a note, mortgage, a HUD-1 settlement statement, a Truth in Lending disclosure statement, a notice of right to cancel, and a document entitled "one week cancellation period." Ameriquest affirmatively states that Exhibits A, B, C, D, E, and F appear to be poor copies of incomplete and unsigned portions of the documents received by Plaintiffs. Ameriquest denies that Exhibits D and E constitute two different notices of right to cancel. Ameriquest denies the remaining allegations in Paragraph 8.

9.  Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a)  <u>Consumer's right to rescind.</u>

(1)  In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transaction described in paragraph (f) of this section.[fn]47

(2)  To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed or telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3)  The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

    (4)    When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b)    <u>Notice of right to rescind</u>.  In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind.  The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

    (1)    The retention or acquisition of a security interest in the consumer's principal dwelling.

    (2)    The consumer's right to rescind the transaction.

    (3)    How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

    (4)    The effects of rescission, as described in paragraph (d) of this section.

    (5)    The date the rescission period expires . . .

(f)    <u>Exempt transactions</u>.  The right to rescind does not apply to the following:

    (1)    A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

    (2)    A credit plan in which a state agency is a creditor.

<u>ANSWER:</u>    Ameriquest is without knowledge or information sufficient to form a belief as to the truth of the allegations that the transaction was secured by Plaintiffs' home.  Ameriquest denies that 12 C.F.R. § 226.23(f)(2) states "(2) A credit plan in which a stage agency is a creditor."  Ameriquest admits that the remaining allegations in Paragraph 9 contain a portion of the text of 12 C.F.R. § 226.23.  Ameriquest denies the allegations of Paragraph 9 insofar as they purport to make any allegation of wrongdoing by Ameriquest under said statute.  Ameriquest denies the remaining allegations in Paragraph 9.

10.    The payment schedule is not fully and completely disclosed in <u>Exhibit D</u>.

<u>ANSWER:</u>    Ameriquest denies the allegations in Paragraph 10.

4

11.    Exhibit F detracts from and obfuscates Exhibit E.

ANSWER:    Ameriquest denies the allegations in Paragraph 11.

12.    Exhibit F suggests that the consumer has seven days to rescind under TILA, starting from December 17, 2002, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, which in plaintiffs' case was from December 19, 2002 through December 23, 2002, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees, or the procedural protections of §1635. It also provides for a different method of counting days and requires actual receipt of the notice by Ameriquest within the specified time. As a result of this and the earlier commencement date, the "one week" period expired December 24, 2002, only one day after the statutory period.

ANSWER:    Ameriquest denies the allegations in Paragraph 12.

13.    15 U.S.C. §1635(g) provides:

Additional relief

In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.

ANSWER:    Ameriquest admits that the allegations in Paragraph 13 contain the text of 15 U.S.C. § 1635(g). Ameriquest denies the allegations of Paragraph 13 insofar as they purport to make any allegation of wrongdoing by Ameriquest under said statute. Ameriquest denies the remaining allegations in Paragraph 13.

14.    The failure to fully and completely disclose the payment schedule violates 15 U.S.C. §1638 and 12 C.F.R. §226.28.

ANSWER:    Ameriquest denies the allegations in Paragraph 14.

15.    The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

ANSWER:    Ameriquest denies the allegations in Paragraph 15.

## AFFIRMATIVE DEFENSES

Defendant Ameriquest states as its affirmative defenses as follows:

1.     Plaintiffs' claim for statutory damages, costs, and attorney's fees for any alleged underlying Truth in Lending Act violation is barred by the one-year statute of limitations for statutory damages, costs and attorney's fees under the Truth in Lending Act.

2.     Plaintiffs' purported cause of action fails to state a claim upon which relief may be granted.

3.     If it should be deemed that Plaintiffs are entitled to rescission, any obligation on the part of Ameriquest to rescind the mortgage loan at issue in this lawsuit and release the lien on the subject property must be conditioned upon Plaintiffs' reimbursement or other return to Ameriquest of all funds disbursed on Plaintiffs' behalf in connection with the subject mortgage loan, less any finance charges, pursuant to 15 U.S.C. § 1605(b) and/or other rules of law or equity. Any obligation on the part of Ameriquest to rescind and to release any lien is conditioned upon Plaintiffs reimbursing or otherwise returning all funds disbursed on their behalf to Ameriquest in connection with the subject loan, less any finance charges.

WHEREFORE, Defendant Ameriquest Mortgage Company requests that this Court enter judgment in its favor and against Plaintiffs, Nelson S. Jimenez and Melinda Jimenez, award Ameriquest Mortgage Company its costs, and provide such further and additional relief as it deems just and appropriate.

Dated: April 13, 2005

Respectfully submitted,

AMERIQUEST MORTGAGE COMPANY,
Defendant

_____
One of Its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
VARGA BERGER LEDSKY HAYES & CASEY
224 South Michigan Avenue, Suite 350
Chicago, Illinois 60604
(312) 341-9400

## CERTIFICATE OF SERVICE

Jonathan N. Ledsky, an attorney, hereby certifies that a true and correct copy of the

foregoing Defendant's Answer to Plaintiff's Complaint was served upon:

Al Hofeld, Jr.
Edelman, Combs & Latturner, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603

by placing same in the United States mail chute located at 224 South Michigan Avenue, Chicago,

Illinois 60604, properly addressed and postage fully prepaid, this 13th day of April, 2005, on or

before the hour of 5:00 p.m.

_____
Jonathan N. Ledsky

Shared/Ortega/Pleadings/AMQ-Jimenez Answer to Complaint.jnl

7