# APPENDIX 31

VARGA BERGER LEDSKY HAYES & CASEY
PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

SANTA FE BUILDING
224 SOUTH MICHIGAN AVENUE
SUITE 350
CHICAGO, ILLINOIS 60604-2507

TELEPHONE: 312-341-9400
FACSIMILE: 312-341-2900

February 23, 2005

JONATHAN N. LEDSKY
(312) 341-9840

jledsky@vblhc.com

**VIA FACSIMILE & U.S. MAIL**

Mr. Al Hofeld
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois  60603

Re:     Notice of rescission, claim, and lien on behalf of Earl E. Key,
        7900 South Kimbark Avenue, Chicago, Illinois 60619,
        Ameriquest Mortgage Company loan dated May 18, 2002

Dear Al:

    We are in receipt of the attached letter (dated February 3, 2005) which your law firm served on the registered agent of our client Ameriquest Mortgage Company ("Ameriquest").  The letter seeks rescission of a loan made by Ameriquest to Earl E. Key.

    Ameriquest disagrees with the contentions articulated in your law firm's letter as to the alleged violations of the Truth in Lending Act.  Accordingly, Ameriquest declines the rescission request as to the bases asserted in the letter.

    If you wish to discuss the matter further, or if you wish a more detailed discussion of Ameriquest's position as to its compliance with the Truth in Lending Act, please do not hesitate to contact us.  Thank you.

Very truly yours,

Jonathan N. Ledsky

JNL:sto
Enclosure

# APPENDIX 32

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRETT WERTEPNY and          )
YVONNE WERTEPNY,            )
                            )
         Plaintiffs,        )
                            )
     -vs-                   )   No.  05 C 1402
                            )        Judge Nordberg
AMERIQUEST MORTGAGE COMPANY, )
WASHINGTON MUTUAL BANK, FA and )    Magistrate
AMC MORTGAGE SERVICES, INC., )      Judge Nolan
                            )
         Defendants.        )

        The Deposition of BRETT T. WERTEPNY, called by the

Defendants for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States District

Courts pursuant to the taking of depositions, taken before

Daniel M. Priscu, a C.S.R. within and for the County of

Cook, State of Illinois, at 224 South Michigan Avenue, Suite

350, Chicago, Illinois, on Monday, August 29, 2005,

commencing at the hour of 2:27 p.m.

WERTEPNY VS. AMERIQUEST

BRETT T. WERTEPNY, 08/29/05

---

Page 2

1 APPEARANCES:
  EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
2 BY: Mr. Al Hofeld, Junior
    120 South LaSalle Street, 18th Floor
3   Chicago, Illinois 60603
4     on behalf of the Plaintiffs;
5
  VARGA, BERGER, LEDSKY, HAYES & CASEY, PC
6 BY: Mr. Jonathan N. Ledsky
    Santa Fe Building
7   224 South Michigan Avenue, Suite 350
8     Chicago, Illinois 60604-2535
9       on behalf of the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1         I N D E X
2
3 BRETT T. WERTEPNY
4
5 Examined by Mr. Ledsky          4
6
7
8         E X H I B I T S
9     (Exhibits are attached.)
10
11 Plaintiff's Deposition Exhibit      Marked for I.D.
12
13 Deposition No. 1          110
14 Deposition No. 2          158
15 Deposition No. 3          163
16 Deposition No. 4          177
17
18
19
20
21
22
23
24

---

Page 4

1         (Witness sworn.)
2         BRETT T. WERTEPNY,
3 called as a witness herein, having first been duly sworn,
4 was examined and testified as follows:
5         EXAMINATION
6 BY MR. LEDSKY:
7    Q  Could you please state your full name for
8 the record.
9    A  Sure.  Brett Terry Wertepny.
10   Q  And where do you currently reside,
11 Mr. Wertepny?
12   A  2063 East Craig Drive in Des Plaines,
13 Illinois.
14   Q  And how long have you lived there?
15   A  I've lived there for about four and a half
16 years now.  I actually grew up in that house too.
17   Q  My name is Jonathan Ledsky, and I'm a
18 lawyer who represents the defendants in this
19 lawsuit, Ameriquest Mortgage Company.  Have you ever
20 had your deposition taken before?
21   A  Yes, I have.
22   Q  And when was that?
23   A  In 1991 for an incident with a company I
24 was with.  A man got injured, and I had to go in and

---

Page 5

1 was considered an expert on the machinery.
2    Q  What piece of machinery was that?
3    A  CNC lathe.
4    Q  What does CNC stand for?
5    A  Computer Numerical Control.
6    Q  And a lathe is a turning mechanism?
7    A  Yes.
8    Q  What is it made of?
9    A  It's a steel cutting machine.
10   Q  Is that the only time you've given a
11 deposition?
12   A  Yes.
13   Q  Is that the only time you've been involved
14 with a lawsuit?
15   A  Yes.  I'm sorry, no.
16      MR. HOFELD:  Objection, vague and
17 ambiguous, involved.
18 BY MR. LEDSKY:
19   Q  Have you ever been party to a lawsuit
20 before?
21   A  Yes.
22   Q  How many times?
23   A  Once.
24   Q  And what was that lawsuit?

---

**Page 6**

1    A  I was rear-ended in a car accident.

2    Q  Did you give your deposition in that

3 lawsuit?

4    A  No, I did not.

5    Q  Did you sue somebody in that accident or

6 were you sued?

7    A  I sued somebody.

8    Q  Did you have a lawyer?

9    A  Yes, I did.

10    Q  And who was that?

11    A  I can't recall.  This is back in '91, so I

12 do not remember.

13    Q  Do you recall what happened in the

14 lawsuit, how it was resolved?

15    A  I won a settlement.  I had a back injury,

16 a herniated disc and some pinched nerves.

17    Q  Let me just tell you the ground rules

18 today for the deposition today.  I'm going to ask

19 you some questions and hopefully you'll provide some

20 answers.

21        If there's ever a time a question doesn't

22 make sense to you, just let me know.  I'll try to rephrase

23 it.  You need to keep your answers verbal.  Shaking your

24 head one way or the other or guttural sounds are very hard

**Page 7**

1 for the court reporter to transcribe, so if the answer calls

2 for a yes or no, you have to state that for the record.  Do

3 you understand?

4    A  Yes, I do.

5    Q  If you ever need to take a break, let me

6 know.  We'll take a break.  Sometimes it gets hot in

7 here.  If you need to stretch your legs or get some

8 fresh air, that's fine.  Just tell us you need to

9 take a break.  Okay?

10    A  Very good.

11    Q  Are you under any medication that would

12 prevent you from telling the truth today?

13    A  Yes.

14    Q  Are you under any medication at all?

15    A  Yes, insulin.

16    Q  Are you a diabetic?

17    A  Yes.

18    Q  Will being on insulin prevent you from

19 sitting for this deposition today?

20    A  No.

21    MR. HOFELD:  It may require a break.

22    MR. LEDSKY:  Fine.

23    THE WITNESS:  Yes.  If my sugar goes low,

24 I feel it.  That's why I have a pop here right now.

**Page 8**

1 BY MR. LEDSKY:

2    Q  Fair enough.  My earlier discussion is

3 two-fold.  If you need a break, let me know.  We'll

4 take it immediately.  Okay?

5    A  Okay.

6    Q  You said you grew up in the house you're

7 in now.  When did you stop living there full-time?

8    A  Oh, I want to say probably 20 years old

9 when I moved out.

10    Q  And when did you move back in?

11    A  In late '99 my father had passed away.

12    Q  And you moved in, what, to be with your

13 mother?

14    A  Correct.  She needed some help.

15    Q  What's your mother's name?

16    A  Yvonne.  Officially, it's Betty Yvonne

17 Wertepny, but she goes by Yvonne.

18    Q  And when were you put on title to the

19 property?  Do you know what that means?

20    A  Yes.  I want to say it was in '99 with

21 Citi Financial.

22    Q  When your father died did he have a will?

23    A  No, unfortunately.

24    Q  Did the house or any portion of the house

**Page 9**

1 pass to you upon your father's death?

2    A  No.

3    Q  So you say you acquired title in 1999 with

4 Citi Financial.  What do you mean by that?

5    A  I came in.  I purchased the house from my

6 mother.

7    Q  And what was the purchase price?

8    A  I don't know what she owed.  I want to say

9 it was somewhere in the area of about $50,000 was

10 what was owed on the house.

11    Q  You purchased the house for $50,000?

12    A  Correct.

13    Q  Was that its real value in 1999?

14    A  No.  It was worth more than that.

15    Q  Did you have an appraisal done in 1999?

16    A  Yes, I believe so.

17    Q  And do you recall what the appraisal said

18 the house was worth?

19    A  If I remember correctly, somewhere like

20 147 or 150, somewhere in that area.

21    Q  Did your mother retain an interest in the

22 house?

23    A  In what regard?

24    Q  Was she still listed as an owner on the

RIQUES WERTEPNY VS. AMERIQUEST

BRETT T. WERTEPNY, 08/29/05

---

Page 58

1 checking account.
2    Q  Do you still maintain accounts at Rosemont
3 Bank?
4    A  Yes, they're now U.S. Bank.
5    Q  Rosemont became U.S. Bank?
6    A  Yes. They've gone through four different
7 names. I'm still the same customer. They changed
8 four times.
9    Q  So did your mother have accounts at the
10 same bank you had?
11    A  No. It was Rosemont. She had the same
12 accounts at U.S. Bank in Des Plaines.
13    Q  What was the name of the bank that your
14 mother had gone to?
15    A  I think it was just called the Des Plaines
16 Bank. I think. I don't know.
17    Q  And she had accounts there in 1999?
18    A  Yes.
19    Q  And were you on them in 1999?
20    A  I think in late '99 is when we put my name
21 on it.
22    Q  And she had a savings and a checking
23 account there?
24    A  Yes.

---

Page 59

   Q  And did you inquire at this bank, Des
Plaines Bank, about as being a possible source of
financing in 1999?
   A  No.
   Q  So you might have looked at your bank,
Rosemont Bank, but not your mother's bank?
   A  Right.
   Q  And you said you weren't actively looking
for financing in 1999?
   A  No.
   Q  Why did you respond to some of these
telephone calls?
   A  Basically for doing some home improvement.
Instead of having to try to come up with cash
myself, I started to realize you could re-mortgage,
and, again, I'm brand new to owning a home at the
point, so I wasn't aware of what you could do on
equity and things of that nature, so it was all
brand new to me. I was used to paying rent in an
apartment.
   Q  And you said you're brand new to owning a
home, but before you had the Citi Financial loan,
did you have any title to the property?
   A  No.

---

Page 60

1    Q  So when you got the Citi Financial loan is
2 when you were put on the title?
3    A  Correct.
4    Q  But you were living with your mother and
5 sort of feeling like it was your home and you needed
6 to take care of it? That's what you're sort of
7 explaining?
8    A  Right. She was in her seventies at the
9 time. It's a big house, a big yard. I was coming
10 over on weekends and stuff. And she finally decided
11 that she wanted to sell the house, and she was going
12 to sell it below what I thought the market value was
13 because she couldn't fix it up. So that's when I
14 decided, you know, I need to move back home so I
15 could help fix the house up and get more money for
16 the house, which just provides for her for the rest
17 of her life.
18    Q  Do you remember what other companies you
19 might have responded to telephone calls other than
20 Citi Financial?
21    A  I mean, I may have talked to somebody on
22 the phone. Again, I wasn't actively looking, so I
23 wasn't that interested, so I wouldn't remember the
24 names or not. I would just be cordial on the phone

---

Page 61

1 and be done with it.
2    Q  And Citi Financial how did -- did they
3 give you possible credit terms over the telephone?
4 How is it that they interested you in a loan?
5    A  Well, I guess that the carrot put in front
6 of that donkey was the fact, well, you know, we
7 could refinance the house. You could get a few
8 things. I was like, boy, that gives you a clean
9 slate. I'm just moving into the house, and we could
10 fix the house up.
11    Q  And did they tell you what the credit
12 terms would be?
13    MR. HOFELD: Objection, vague and
14 ambiguous, credit terms.
15 BY MR. LEDSKY:
16    Q  Did you understand my question?
17    A  No.
18    Q  During that first telephone call did they
19 tell you what your monthly payment might be or what
20 the interest might be? Did they tell you anything
21 about what the credit terms might be?
22    A  In general, yes, but when you go to sit
23 down with them, they were a little bit different,
24 meaning that they generalized on the phone. And

---

BRETT T. WERTEPNY, 08/29/05      WERTEPNY VS. AMERIQUES

**Page 62**

1 once they get in and see what your credit report is,
2 then they gave me the monthly payments. At that
3 point I decided that those were -- I could make
4 those payments and with the cash back I could start
5 making improvements on the house and pay off a few
6 things.
7    Q Sometime after you had this telephone call
8 with Citi Financial you sat down with them?
9    A Yes.
10    Q Did they come to your house or did you go
11 there?
12    A I went to them.
13    Q You went to them?
14    A Yes.
15    Q And they already looked at your credit
16 report presumably?
17    A Yes.
18    Q And your mother's credit report, or just
19 yours?
20    A She's put on as co-borrower this last
21 time, but the last two times we refinanced her
22 signature I was told really meant nothing because of
23 her age and she never really established credit.
24 She had great credit but never had a credit card,

**Page 63**

1 things of that nature, so I'm the sole borrower of
2 it.
3       And they did check out her credit, but like I
4 said, I mean, she's never had credit cards in her life, so
5 she had excellent credit.
6    Q So Citi Financial quoted you a monthly
7 payment?
8    A Yes, correct.
9    Q And you decided you could make that
10 monthly payment?
11    A Yes.
12    Q How did you decide that?
13    A Looking at what I made, what my bills
14 were, you know, budgeting everything and realized
15 that it was very feasible for me to do that, clean
16 some things up, such as maybe a couple credit cards
17 and the opportunity of improving the house to
18 increase the value of it.
19    Q So you knew what you were bringing home on
20 a monthly basis; is that right?
21    A Yes.
22    Q You knew what some of your obligations
23 were on a monthly basis?
24    A Yes.

**Page 6**

1    Q And you just factored in this proposed
2 monthly payment from the Citi Financial loan within
3 your monthly budget, and you decided you could
4 afford it?
5    A Yes.
6    Q Did you compare the monthly payment under
7 the Citi Financial loan to the payment that was
8 under your mother's current loan with the house?
9    A No. I compared it to what I had
10 previously paid in an apartment as my budgetary
11 numbers.
12    Q So was it lower or higher than what you
13 had paid for as an apartment?
14    A It was really as close as the same.
15    Q So you knew you could afford your
16 apartment rent before?
17    A Yes.
18    Q So you thought you could afford this
19 monthly payment?
20    A Yes.
21    Q Did you compare the interest rate with the
22 Citi Financial loan with what your mother's then
23 existing loan was for the house?
24    A No, I did not.

**Page 6**

1    Q Did you compare any terms from the Citi
2 Financial proposed loan to your mother's then
3 present loan?
4    A No, I did not.
5    Q You just compared it to what your sort of
6 monthly budget was and to your prior rent?
7    A Correct.
8    Q Did you do any other financial analysis?
9    A No.
10    Q And I presume you entered into that Citi
11 Financial loan?
12    A Yes, I did.
13    Q And how long did you have a loan with Citi
14 Financial?
15    A About two and a half years, I think, or
16 two years.
17    Q And then what happened?
18    A Then we received a phone call from
19 Ameriquest, a gentleman from Ameriquest, and he ha
20 talked to my mom and said that he could do better on
21 the rates. He had an office on Higgins. I don't
22 know if that's Park Ridge right there, Higgins and
23 Cumberland.
24       I went over. We spoke with him on the phone,

Page 66

1 went over and saw him and he said, yes, we can do better for
2 you. At that point in time the garage was ready to fall
3 down, and then I needed money to repair the garage. I
4 actually built a new one.
5    Q  Do you remember what this gentleman's name
6 was?
7    A  You know, I've got his card at home. I
8 don't remember his name off the top of my head. One
9 distinct thing I do remember is he played a guitar
10 and had a guitar in his office.
11    Q  So you had a kinship with him?
12    A  Yes, in a way.
13    Q  And did you enter into a loan with
14 Ameriquest?
15    A  Yes.
16    Q  Do you remember what year that was?
17    A  I thought it was 2001. I think.
18    Q  And was the rate lower?
19    A  Yes, it was a little bit lower.
20    Q  And you pulled some money out; is that
21 right?
22    A  Yes.
23    Q  So you paid off the Citi Financial loan,
24 and you got some money to yourself as well?

Page 67

1    A  Yes.
2    Q  Do you remember how much money that was?
3    A  I think the cash-out was about 32,000.
4    Q  And do you remember what you did with that
5 money?
6    A  $14,000 went into the garage, another
7 $6,000 for the driveway. Again, I gave my mom,
8 like, about $10,000 for any home improvements that
9 needed to be done when I wasn't around during the
10 day, such as we had the house painted on the inside
11 and the carpet cleaned, and a new furnace. I'm
12 trying to think of what else.
13       One of the other things we had done was a new
14 patio put in back. The stairs to the basement deteriorated.
15 Somebody would have gotten killed if they went down there.
16 We actually had somebody contracted to come in and do that,
17 a cousin came in and did them for us.
18    Q  And do you recall what the payments were
19 under this Ameriquest loan?
20    A  You mean the monthly payment?
21    Q  Was that payment a monthly payment?
22    A  Yes.
23    Q  Do you remember what it was?
24    A  900 and some dollars. I don't remember,

Page 68

1 945, or something like that, I think.
2    Q  And do you recall how that related to the
3 payment with the Citi Financial?
4    A  It was really close. I thought the Citi
5 Financial maybe was $100 more, but, again, I don't
6 remember right off the top of my head.
7    Q  Did you go through the same analysis
8 before you took out the Ameriquest loan that you had
9 done with the Citi Financial loan, about whether or
10 not you could afford to make the payments?
11    A  Yes.
12    Q  So you looked at how much money you were
13 making on a monthly basis and what your expenses
14 were on a monthly basis, and you factored in what
15 was the proposed payment under the Ameriquest loan?
16    A  Yes.
17    Q  And you determined you could afford it?
18    A  Yes.
19    Q  Did you do any other financial analysis?
20    A  No.
21    Q  And you thought that even though you had
22 taken out about $32,000 in cash, the Ameriquest
23 loan, it was still $100 cheaper than the Citi
24 Financial loan?

Page 69

1    A  Yes, if I remember right, yes.
2    Q  And that was why? Do you know why it was
3 cheaper, even though it was more money being
4 borrowed?
5    A  I believe it might have been the rate, or
6 I think maybe we went from a 15 year to a 30 year
7 loan because I'm pretty sure I thought financially
8 the Citi Financial was 15 and this was 30, which
9 stretches the payments out, made the payments
10 cheaper, but was able to give me the cash-out so I
11 could get the garage and the driveway done. Those
12 were the two main concerns.
13    Q  Do you remember if this Citi Financial or
14 the Ameriquest 2001 loan were fixed rate loans or
15 adjustable rate loans?
16    A  You know, at that time I don't think I
17 knew.
18    Q  Do you know what those terms mean?
19    A  Vaguely. I mean, I know a little bit more
20 about them now, but at that time I did not.
21    Q  You didn't know that a fixed rate loan
22 would mean that the rate doesn't change over the
23 life of the loan, an adjustable rate loan means that
24 the rate could adjust?

# APPENDIX 33

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION


    BRETT WERTEPNY and              )
    YVONNE WERTEPNY,                )
                                    )
             Plaintiff,             )
                                    )
        -vs-                        )   No. 05 C 1404
                                    )
    AMERIQUEST MORTGAGE COMPANY,    )
    WASHINGTON MUTUAL BANK, FA and  )
    AMC MORTGAGE SERVICES, INC.,    )
                                    )
             Defendant.             )
```

COPY

The deposition of YVONNE WERTEPNY,

called by the Defendant for examination, taken

pursuant to the Federal Rules of Civil Procedure

of the United States District Courts pursuant to

the taking of depositions, taken before Barbara A.

Wichmann, C.S.R., R.D.R., a Notary Public within

and for the County of Cook, State of Illinois, at

2063 East Craig Drive, Des Plaines, Illinois, on

Friday, November 11, 2005, at the hour of

10:15 a.m.

- - - - - - - - - -

WERTEPNY VS. AMERIQUEST                                    YVONNE WERTEPNY, 11/11/05

---

Page 10

1    THE WITNESS: Oh, I forget all the time.
2 BY MR. LEDSKY:
3    Q.  Did he have an accountant, or did you
4 function as his accountant?
5    A.  No.  He had an accountant --
6        (Discussion off the record.)
7 BY MR. LEDSKY:
8    Q.  Maybe I should ask you this question,
9 Mrs. Wertepny.  Are you on any medication today?
10   A.  Am I on what?
11   Q.  Any medication today.
12   A.  Oh, yes.
13   Q.  Are you on any medication that would
14 affect your ability to tell the truth?
15   A.  No.
16   Q.  Are you on any medication that might
17 affect your ability to be able to remember what
18 happened in the past?
19       Are you on any pain killers?
20   A.  No, because I take them at my
21 discretion.  I got some, but. . . .
22   Q.  But you are not on them today; is that
23 correct?
24   A.  No.  It's temporary.

---

Page 11

1    Q.  What kind of billing did you handle for
2 your husband?
3    A.  Just regular billing with the gauges
4 that he sold.
5    Q.  You would send out the bills on behalf
6 of your husband?
7    A.  Yes.
8    Q.  And you would collect the money?
9    A.  Yes.  Well, they could come to the
10 house; he would collect it.  Didn't trust me.
11   Q.  Why didn't he trust you?
12   A.  No.  I'm kidding.
13       No.  Regular business.
14   Q.  Okay.  You dealt with a bank?
15   A.  Yes.
16   Q.  Did you have a bank account?
17   A.  Yes.
18   Q.  A business account?
19   A.  Yes.
20   Q.  And were you the person that would
21 communicate back and forth with the bank?
22   A.  Yes.
23   Q.  Did you guys have a line of credit for
24 the business?

---

Page 12

1    A.  Yes, he did.
2    Q.  Did you deal with the bank on the line
3 of credit?
4    A.  No.
5    Q.  How long have you owned this home?
6    A.  Since 1949.  Fifty-some years.
7        I can't add.
8    Q.  And did you buy it with your husband?
9    A.  Yes.
10   Q.  Do you now own the house yourself?
11   A.  No.
12   Q.  Who owns the house now?
13   A.  Brett Wertepny and me.  Joint.
14       And I can't. . . .
15   Q.  Why was it that your son is now part
16 owner of the house?
17   A.  My husband died.
18   Q.  And did he have a will?
19   A.  Yes.  He left it all to me.
20   Q.  And so you made a decision to give a
21 portion of the house to your son?
22   A.  Yes.  When we remortgaged.
23   Q.  When was that?
24   A.  Well, in 2003.

---

Page 13

1    Q.  Before 2003 did your son own any
2 interest in the house?
3    A.  I don't remember.
4        Isn't that something?
5    Q.  When your husband was alive, who paid
6 the household bills?
7    A.  Well, we did.
8    Q.  Did either one or the other of you have
9 the habit of paying those bills.
10   A.  Yes.
11   Q.  I meant was it one person, or was it
12 both of you?
13   A.  No.  Just me.
14   Q.  So you were the household bill payer?
15   A.  Yes.
16       Well, he furnished the money.
17   Q.  You wrote the checks?  Yes?
18   A.  Yes.  Took care of everything.
19   Q.  And how often would you pay bills?
20   A.  Pardon?
21   Q.  How often would you pay the monthly
22 bills?
23   A.  When they were due.
24   Q.  How often were they due?

---

WERTEPNY VS. AMERIQUEST — YVONNE WERTEPNY, 11/11/05

Page 26

1   A. Monthly.
2   Q. That is, they required monthly
3 payments?
4   A. Uh-huh.
5   Q. Yes?
6   A. Yes.
7   Q. Are you a newspaper reader?
8   A. Yes.
9   Q. Do you ever read the real estate
10 section of the newspaper?
11  A. No.
12  Q. Do you ever read the section that talks
13 about financial issues?
14  A. No.
15  Q. Do you ever look at the advertisements
16 for home loan lenders?
17  A. No.
18  Q. Do you know what points are in a home
19 loan?
20  A. Pardon?
21  Q. Do you know what points -- points are
22 in a home loan?
23  A. No.
24  Q. Do you know what prepayment penalties

Page 27

1 are?
2   A. Not any more, no.
3   Q. When you say not any more, you think at
4 one time you knew?
5   A. I used to know. I don't. . . .
6   Q. Did you used to know what points were
7 as well?
8   A. No.
9   Q. Do you know that certain loans have a
10 fixed interest rate and certain loans have an
11 adjustable interest rate?
12  A. Yes.
13  Q. How do you know that?
14  A. We had a fixed rate.
15  Q. When you say we had a fixed rate, what
16 does that mean? I'm sorry.
17  A. On all the mortgages except yours.
18  Q. When you say "yours," what do you mean?
19  A. You got adjustable.
20  Q. You mean the Ameriquest loan?
21  A. Yes.
22  Q. Okay. And you know that fixed rates
23 stay the same through the life of the loan?
24  A. Right.

Page 28

1   Q. And adjustable rates can move?
2   A. Yes.
3   Q. Okay.
4   A. Yes, yes, yes.
5   Q. Are you okay?
6   A. Yes. Had to bite my tongue.
7   Q. Since your husband died --
8   A. Pardon?
9   Q. Since your husband died, who has
10 handled the financial affairs of your house?
11  A. Brett and I both.
12  Q. And before your husband died, who
13 handled the financial affairs of the house?
14  A. I did.
15  MR. HOFELD: Just going to object to the
16 extent that was asked and answered.
17 BY MR. LEDSKY:
18  Q. And when did your husband die?
19  A. Oh, boy.
20   February 27th, 1997.
21  Q. Does your son Brett currently live
22 here?
23  A. Yes.
24  MR. HOFELD: Asked and answered. Objection.

Page 29

1 BY MR. LEDSKY:
2   Q. And when did he move into this house?
3   A. 1997.
4   Q. After your husband died?
5   A. Yes.
6   Q. In 1997, was there a mortgage on the
7 house?
8   A. Yes.
9   Q. Do you know what a mortgage is?
10  A. Yes.
11  Q. What is a mortgage?
12  A. It's what you owe.
13  Q. Okay. There is a loan outstanding on
14 the house?
15  A. Yes.
16  Q. Do you remember what the balance might
17 have been in 1997?
18  A. Twenty thousand.
19  Q. Twenty thousand dollars?
20  A. Yes.
21  Q. Do you remember what the payment was?
22  A. God. No. No.
23  Q. And in 1997 before your husband died,
24 was your husband employed, or he had retired?

Page 30

1   A. Well, he -- how to put it?
2   Q. Just put it in your own words.
3   A. He had a stroke.
4      He was employed, but he couldn't work.
5   Q. He had a stroke sometime in 1997?
6   A. '96.
7   Q. And in 1996, were you still making home
8 loan payments?
9   A. Yes.
10   Q. And were you able to do so after your
11 husband had a stroke?
12   A. Yes.
13   MR. HOFELD: Objection. Vague.
14 BY MR. LEDSKY:
15   Q. Do you know what my question was?
16     You were able to make the payments,
17 correct?
18   A. Yes.
19   Q. Did you have insurance or savings --
20   A. No.
21   Q. -- or disability?
22   A. Just -- I had a little savings.
23   Q. Okay. And then when your husband died
24 in 1997, were you still able to make the payments?

Page 31

1   A. Yes.
2   Q. Was there a time where Brett started to
3 contribute to the household expenditures?
4   A. When he moved in.
5   Q. Do you remember what he contributed
6 when he moved in?
7   A. Never kept track of it.
8     He paid the house is one thing.
9   Q. He paid the home loan payment?
10   A. Yes, he did.
11   Q. You continued to be the person who
12 wrote the checks for household expenditures?
13   A. Yes.
14   Q. Did you write the checks for the home
15 loan?
16   A. No.
17   Q. Brett did that?
18   A. Yes.
19   Q. Do you remember if he wrote any other
20 checks for the home expenditures?
21   A. No.
22   Q. So you paid utilities?
23   A. I did. Yes.
24   Q. Okay.

Page 32

1   A. Had to.
2   Q. You paid for insurance?
3   A. Yes.
4   Q. What about property taxes?
5   A. Well, he -- it was half and half.
6   MR. HOFELD: I'm going to -- "insurance" is
7 vague.
8 BY MR. LEDSKY:
9   Q. I meant property insurance.
10   A. Yes. We paid half and half.
11   Q. Okay.
12   A. As -- I think.
13   Q. After Brett moved in, did you place him
14 on the title to the property?
15   MR. HOFELD: Objection. Vague.
16 BY THE WITNESS:
17   A. I don't remember when I did that. I do
18 not recall when we did that. It wasn't too long.
19 BY MR. LEDSKY:
20   Q. Did you know what I meant by my
21 question?
22   A. Yes.
23   Q. Did you ever make Brett an owner of the
24 property and record that statement with the

Page 33

1 Cook County Recorder of Deeds office?
2   A. No. We refinanced.
3   Q. Are we in Cook County here?
4   A. Yes.
5   Q. Okay.
6   A. We refinanced, remortgaged.
7     And that's when I put his name on it.
8   Q. Do you remember when that was?
9   A. Good Lord. No, I don't.
10   Q. Do you know why you put his name on it
11 when you refinanced?
12   A. For my protection.
13   Q. What protection was that?
14   A. Well, in case I couldn't pay anything;
15 you know, got sick or something.
16   Q. He would be obligated to pay?
17   A. Pardon?
18   Q. He would be obligated to pay?
19   A. Well, yes.
20   Q. Do you know why you refinanced?
21   A. Yes. Pay off his loans.
22   MR. HOFELD: Object to the lack of foundation
23 as to the particulars.
24

WERTEPNY VS. AMERIQUEST                                      YVONNE WERTEPNY, 11/11/05

Page 50

1 BY MR. LEDSKY:
2    Q. I was asking you previously,
3 Mrs. Wertepny, questions about the first loan that
4 you entered into with your son in approximately
5 1998 or 1999.
6    A. I think. Yes.
7    Q. Okay.
8    A. I'm not definitely sure.
9    Q. Was that the first loan you had ever
10 signed with your son --
11   A. Yes.
12   Q. -- of any kind whatsoever?
13   A. Yes.
14   Q. Was there a time that you and your son
15 entered into a second loan?
16   A. Well, we refinanced with you guys.
17   Q. You refinanced your home loan?
18   A. Yes.
19   Q. Okay. When was that?
20   A. Oh, boy. I don't remember.
21   Q. Do you remember what the circumstances
22 were --
23   A. No.
24   Q. -- with regard to the refinanced loan?

Page 51

1    A. No.
2    Q. Do you remember -- okay.
3       Do you remember how either you or your
4 son heard of Ameriquest Mortgage Company?
5    A. No. I don't recall.
6    Q. Did you receive a telephone call from
7 Ameriquest Mortgage Company?
8    A. I don't remember.
9    Q. Okay.
10   A. I don't.
11   Q. Do you remember why you refinanced your
12 loan?
13   A. We wanted to do some remodeling, build
14 a garage.
15   Q. So you wanted to get cash out again; is
16 that correct?
17   A. Yes.
18   Q. And do you remember if you solicited
19 possible loan terms from several companies at that
20 time?
21   MR. HOFELD: Objection. Leading question.
22 BY THE WITNESS:
23   A. I don't know. I don't remember.
24

Page 52

1 BY MR. LEDSKY:
2    Q. Okay.
3    A. I really don't.
4    MR. LEDSKY: Do you need to take a break,
5 ma'am?
6    THE WITNESS: Okay.
7    MR. LEDSKY: Let's do that.
8    MR. HOFELD: Want to take a break?
9    THE WITNESS: Yeah.
10        (Recess taken from 11:12 until
11        11:32 a.m.)
12 BY MR. LEDSKY:
13   Q. Before we took a break, Mrs. Wertepny,
14 I was asking you about the second loan that you
15 did with your son. And I believe you said it was
16 with Ameriquest; is that correct?
17   A. You know, I really don't remember.
18   Q. Okay. Do you know if you've had one or
19 more than one loan with Ameriquest?
20        (Brief interruption.)
21 BY MR. LEDSKY:
22   Q. I was asking you about before -- before
23 the doorbell rang if you remember that you've had
24 one loan with Ameriquest, or more than one loan

Page 53

1 with Ameriquest.
2    A. Just one, I think. I'm not sure. My
3 mind, lately.
4    Q. Are you having trouble remembering
5 things?
6    A. No. Just stuff like this. You don't
7 keep track of it, you know?
8       But like I said, I could get my stubs.
9    Q. How many loans have you entered into
10 with your son Brett?
11   A. Two, I think.
12   Q. Do you know if you've had a loan with
13 Ameriquest Mortgage Company?
14   A. Before?
15   Q. Have you ever had a loan with
16 Ameriquest Mortgage Company.
17   A. No. This one.
18   Q. This one, meaning what?
19   A. The only one.
20   Q. The one that is the subject of this
21 lawsuit?
22   A. Yes.
23   Q. And you presently have a loan with
24 Ameriquest?

# APPENDIX 34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRETT WERTEPNY and YVONNE WERTEPNY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 1402 |
| AMERIQUEST MORTGAGE COMPANY, | ) ) | Judge Nordberg |
| Defendant. | ) ) | |

## DEFENDANT'S RULE 26(a)(1) DISCLOSURES

Defendant Ameriquest Mortgage Company ("Defendant"), by its attorneys, submits its Rule 26(a)(1) disclosures:

(A)    The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information:

**Response:**    Defendant directs Plaintiffs to the persons identified in the documents produced in conjunction with these Rule 26(a)(a)(1) disclosures.

(B)    A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings:

**Response:**    Defendant produces documents with Bates-stamped Nos. A-00001 – A-00130.

(C)    A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injuries suffered:

**Response:**    Defendant claims no damages.

(D)    For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**Response:**   Defendant did not purchase insurance, other than a title insurance policy,

affording Ameriquest coverage for the defense of this lawsuit.

Dated:  August 5, 2005                    **AMERIQUEST MORTGAGE COMPANY,**
                                          **Defendant**


By:_____
                         One of its Attorneys


Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
Varga Berger Ledsky Hayes & Casey
A Professional Corporation
224 South Michigan Avenue
Suite 350
Chicago, Illinois  60604
(312) 341-9400

## CERTIFICATE OF SERVICE

I, Jonathan N. Ledsky, an attorney, hereby certifies that a true and correct copy of the

foregoing **Defendant's Rule 26(a)(1) Disclosures** was served upon:

Al Hofeld
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois  60603

via messenger delivery service this 5th day of August, 2005, on or before the hour of 5:00 p.m.


_____
Jonathan N. Ledsky

2

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Prepared By:Ameriquest Mortgage Company

Matthew Jacobsmeyer
1750 Howe Ave., Suite
640B,Sacramento, CA 95825

———————————————[Space Above This Line For Recording Data]———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated May 8, 2003
together with all Riders to this document.
(B) "Borrower" is Yvonne Wertepny and Brett Wertepny, in joint tenancy

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

0047675335 - 7346

ILLINOIS – Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014 1/01

-6(IL) (0005)
Page 1 of 15          Initials BW  Y.W.
VMP MORTGAGE FORMS - (800)521-7291          05/09/2003 5:42:29 PM

Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated May 8, 2003
The Note states that Borrower owes Lender one hundred seventy-nine thousand nine
hundred fifty and 00/100                                             Dollars
(U.S. $179,950.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than June 1, 2033

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H). "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

0047675335 - 7346
Initials: BW

-6(IL) (0005)          Page 2 of 16      05/09/2003 5:42:29   Form 3014  1/01

(F) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County [Type of Recording Jurisdiction] of COOK [Name of Recording Jurisdiction]:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 09-33-408-009                                which currently has the address of
2063 East Craig Drive                                                                              [Street]
DES PLAINES                                          [City], Illinois 60018                    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0047675335 - 7346
Initials: _BW_

-6(IL) (0005)                        Page 3 of 15    05/09/2003 5:42:29 PM Form 3014  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

0047575335-7346
Initials: ___

-6(IL) (0005)          Page 4 of 15     05/09/2003 5:42:29     Form 3014  1/01

A-00011

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (1) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (2) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

0047675335 - 7346
Initials: BW

-6(IL) (9904).01        Page 6 of 15        05/09/2003  5:42:29        Form 3014    3/99

A-00012

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

0047575335 -7346
Initials: BW

-6(IL) (0005)                    Page 6 of 15      05/09/2003 5:42:29      Form 3014  1/01
Y.W.

A-00013

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

0047675335 - 7346
Initials: BW

-6(IL) (0005)     Page 7 of 15     05/09/2003 5:42:29     Form 3014  1/01

A-00014

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

0047675335 - 7346

Initials: BW

-6(IL) (0005)      Page 8 of 15      05/09/2003 5:42:29      Form 3014  1/01

Y,W,

A-00016

(d) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender



A-00017

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.





**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

0047675335 - 7346
Initials: BW

Ⓜ-6(IL) (0005)    Page 11 of 15    05/09/2003 5:42:29    Form 3014  1/01

Y. W.

A-00018

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0047675335 - 7346
Initials: BW

-6(IL) (0005)          Page 12 of 15          05/09/2003 5:42:29          Form 3014  1/01

B. W.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

A-00020

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _Brett W Wby_____ (Seal)
                                     Brett Wertepny              -Borrower

_____     _Yvonne Wertepny_____ (Seal)
                                     Yvonne Wertepny             -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                   -Borrower

0047675335 - 7346

-6(IL) (0005)          Page 14 of 15 05/09/2003 5:42:29 PM Form 3014  1/01

STATE OF ILLINOIS,       County ss:

I, _Stacey Richmond_ _____ a Notary
Public in and for said county and in said state, hereby certify that

_Brett Wertepny + Yvonne Wertepny_ _____

_____

_____

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing
instrument, appeared before me this day in person, and acknowledged that he/she/(they) signed
and delivered the said instrument as his/her/(their) free and voluntary act, for the uses and
purposes therein set forth.

    Given under my hand and official seal of this

My Commission Expires: _8-25-2004_

                _Stacey Richmond_
           Notary Public

```
OFFICIAL SEAL
STACEY RICHMOND
Notary Public - State of Illinois
My Commission Expires 8-25-2004
```

400-15IL (4/02)          Page 15 of 15          0047675335 - 7346

                                    05/09/2003 5:42:29 PM

A-00022

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published In the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 8th day of May , 2003   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2063 East Craig Drive, DES PLAINES, IL  60018
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of  6.750 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of June, 2005  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials _BW_
_Y. W._

Loan Number:  0047675335 - 7346

610-1 (Rev 1/01)                    Page 1 of 3

05/08/2003 5:42:29 PM

A-00023

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding five and one-quarter percentage points ( 5.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.750% or less than 6.750%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( 1.000 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 12.750)% or less than 6.750)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials *BW*
*Y. W,*

Loan Number: 0047675335 - 7346

510-2 (Rev 501)                    Page 2 of 3

05/09/2003 5:42:29 PM

A-00024

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Brett Wtty_ (Seal)    _Yvonne Wertepny_ (Seal)
Borrower Brett Wertepny          Borrower Yvonne Wertepny

_____ (Seal)    _____ (Seal)
Borrower                          Borrower

Loan Number: 0047675335 - 7346

810-3 (Rev 1/01)          Page 3 of 3

05/09/2003 5:42:29 PM

A-00025

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Ameriquest Mortgage Company
1750 Howe Ave., Suite 640B
Sacramento, CA 95825
(916)921-7634

☐ Preliminary    ☒ Final

Broker License:

Borrowers: Brett Wertepny

Type of Loan:  ADJUSTABLE RATE
Date:  May 8, 2003

Address:  2063 East Craig Drive
City/State/Zip:  DES PLAINES, IL 60018

Loan Number: 0047675335 - 7346

Property:  2063 East Craig Drive, DES PLAINES, IL 60018

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.181 % | $ 246,479.95 | $ 171,688.68 | $ 420,168.63 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|
| 359 | $1,167.16 | 07/01/2003 | | | |
| 1 | $1,158.19 | 06/01/2033 | | | |

**VARIABLE RATE FEATURE:**
☒ Your loan has a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**    You are giving a security interest in the property located at:  2063 East Craig Drive, DES PLAINES, IL  60018

**ASSUMPTION:**  Someone buying this property  ☒ cannot assume the remaining balance due under original terms.
☐ may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**    You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**   If a payment is late, you will be charged  6.000%  of the overdue payment .

**PREPAYMENT:**  If you pay off your loan early, you
☒ may  ☐ will not  have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| _Brett Wertz_ | 5-13-03 | _Yvonne Wertepny_ | 5/13/03 |
|---|---|---|---|
| Borrower Brett Wertepny | Date | Borrower Yvonne Wertepny | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

TIL1 (Rev. 7/01)          **Original**

05/09/2003 5:42:29 PM

A–00026

Settlement Statement
Optional Form for
Transactions without Sellers

U.S. Department of Housing
&Urban Development

OMB Approval No. 2502-0491

WLI

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Brett Wortepny | Ameriquest Mortgage Company |
| | 1750 Howe Ave., Suite 940B |
| 2063 East Craig Drive    DES PLAINES,IL 60018 | Sacramento, CA 95825 |
| Property Location: (if different from above) | Settlement Agent: |
| 2063 East Craig Drive, DES PLAINES, IL  60018 | Place of Settlement: |

**L.    Settlement Charges**

| 800.  Items Payable in Connection with Loan | | Loan Number: 0047675335 - 7346 | Settlement Date: Estimated 05/15/2003 |
|---|---|---|---|
| 801. Loan origination fee    % to | | | |
| 802. Loan discount  3.284  % to  Ameriquest Mortgage Company | $5,009.56 | **M.  Disbursement to Others** | |
| 803. Appraisal fee to  STANDARD APPRAISAL | $350.00 | 1501. AMRQST MRT | $125,126.85 |
| 804. Credit report to | | | |
| 805. Inspection fee to | | 1502. USBANK        (W) | $12,371.55 |
| 806. | | | |
| 807. | | 1503. | |
| 808. Yield Spread Premium to | | | |
| 809. | | 1504. | |
| 810. Tax Related Service Fee to  Ameriquest Mortgage | $35.00 | | |
| 811. Flood Search Fee to  Ameriquest Mortgage Company | $16.00 | 1505. | |
| 812. Lenders Processing Fee to  Ameriquest Mortgage | $625.00 | | |
| 813.Admin to Ameriquest Mortgage Company | $239.00 | 1506. | |
| 814. Doc. Prep. Fee to | | | |
| 815. Credit Report Fee to | | 1507. | |
| 816. Origination Fee    % to | | | |
| 817. Application Fee to  Ameriquest Mortgage Company | $360.00 | 1508. | |
| 818. Underwriting Fee to | | | |
| 819. Service Provider Fee to | | 1509. | |
| 820. Processing Fee to | | 1510. | |
| 821. Underwriting Fee to | | | |
| 822. Appraisal Fee to | | 1511. | |
| 900.  Items Required by Lender to be Paid in Advance | | | |
| 901. Interest from 05/16/2003  to  06/01/2003  @  $33.28  per day | $565.76 | 1512. | |
| 902. Mortgage insurance premium for       months to | | | |
| 903. Hazard ins prem to | | 1513. | |
| 904. Flood ins prem to | | | |
| 1000.  Reserves Deposited with Lender | | 1514. | |
| 1001. Hazard insurance    months @ $    per month | | | |
| 1002. Mortgage insurance    months @ $    per month | | 1515. | |
| 1003. City property taxes    months @ $    per month | | | |
| 1004. County prop. taxes    months @ $    per month | | | |
| 1005. Annual assess.    months @ $    per month | | 1520. TOTAL DISBURSED (enter on line 1603) | $137,498.40 |
| 1006. Flood    months @ $    per month | | | |
| 1007.       months @ $       per month | | | |
| 1008. | | | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee to  MIS | $450.00 | | |
| 1102. Abstract or title search to  MIS | $225.00 | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | Total Wire:    $46,721.83 | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
| 1108. Title Insurance to  MIS | $500.00 | | |
| 1109. Lender's coverage    $ | | | |
| 1110. Owner's coverage    $ | | | |
| 1111. Settlement/Disbursement fee to | | | |
| 1112. Escrow Fee to | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees | $70.50 | | |
| 1202. City/county tax/stamps | | **N.  NET SETTLEMENT** | |
| 1203. State tax/ stamps | | | |
| 1204. State specific fee | | | |
| 1205. State specific fee | | 1600. Loan Amount | 179,950.00 |
| 1300. Additional Settlement Charges | | 1601. Plus Cash/Check from Borrower | |
| 1301. Demand to | | | |
| 1302. Pest inspection to | | 1602. Minus Total Settlement Charges (line 1400) | $9,481.82 |
| 1303. Survey Fee to | | | |
| 1304. | | 1603. Minus Total Disbursements to Others (line 1520) | $137,498.40 |
| 1305. Reconveyance Fee to  MIS | $75.00 | | |
| 1306. | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period) | $32,969.78 |
| 1307. Apprs'l/Prop Val Fee to | | | |
| 1308. Courier Fee to | $80.00 | | |
| 1400. Total Settlement Charges (enter on line 1602) | $9,481.82 | | |

Borrower(s) Signature(s):

x  _Brett Worty_

Approved for Funding By:          Approved:          Branch:  Sacramento, CA 95825

# APPENDIX 35

IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRETT WERTEPNY and )
YVONNE WERTEPNY, )
       )
        Plaintiffs, )
       )
     v. )    No. 05 C 1402
       )
AMERIQUEST MORTGAGE COMPANY, )    Judge Nordberg
       )
        Defendant. )

## DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant Ameriquest Mortgage Company ("Defendant") answers Plaintiffs' complaint as

follows:

1.      Plaintiffs Brett Wertepny and Yvonne Wertepny bring this action against a

"subprime" mortgage lender to rescind a mortgage for violation of the Truth in Lending Act, 15

U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R.

part 226.

**ANSWER:**     Defendant admits that Plaintiffs have filed a lawsuit against it. Defendant

objects to the term "subprime" as vague. Defendant is without knowledge or information sufficient

to form a belief as to the truth of the intended characterization of the term "subprime." Defendant

denies all remaining allegations in Paragraph 1. Defendant specifically denies that it violated the

Truth in Lending Act, 15 U.S.C. § 1601, or implementing Federal Reserve Board Regulation Z, 12

C.F.R. part 226.

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal

question), 1337 (interstate commerce), and 15 U.S.C. §1640 (TILA). Defendant does business in the

District and is deemed to reside here.

**ANSWER:**     Defendant does not contest subject matter jurisdiction, personal jurisdiction,

or venue. Defendant denies any remaining allegations in Paragraph 2.

3.      Plaintiffs own and reside in a home at 2063 Craig Drive, Des Plaines, IL 60018.

**ANSWER:**    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4.      Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois. Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606. It is engaged in the business of originating "subprime" mortgages and makes more than 26 loans per year.

**ANSWER:**    Defendant admits that it is a corporation, that it is incorporated in a state other than Illinois, and that it maintains offices and does business in Illinois. Defendant admits the allegations in the second sentence in Paragraph 4. Defendant objects to the term "subprime" as vague. Defendant is without knowledge or information sufficient to form a belief as to the truth of the intended characterization of "subprime." Defendant admits that it is engaged in the business of originating loans secured by mortgages and that it originates more than 26 loans per year. Defendant denies the remaining allegations in Paragraph 4.

5.      Prior to May 8, 2003, plaintiffs applied for a mortgage with Ameriquest.

**ANSWER:**    Defendant admits that, prior to May 8, 2003, Plaintiffs applied for a loan, to be secured by a mortgage. Defendant denies the remaining allegations in Paragraph 5.

6.      Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

**ANSWER:**    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.

7.      The loan was closed on May 8, 2003.

**ANSWER:**    Defendant denies the allegations in Paragraph 7.

8.      On May 8, 2003, plaintiffs signed or received the following documents relating to the loan:

    a.      Note, <u>Exhibit A</u>, signed by Brett Wertepny;

    b.      Mortgage, <u>Exhibit B</u>;

2

    c.    A Truth in Lending disclosure statement, <u>Exhibit C</u>;

    d.    Two difference notices of right to cancel, <u>Exhibits D and E</u>;

    e.    A settlement statement on form HUD-1A, <u>Exhibit F</u>.

**ANSWER:**    Defendant admits that, in connection with the loan transaction, Plaintiffs received and signed a note, a mortgage, a Truth in Lending disclosure statement, a notice of right to cancel, a document entitled "one week cancellation period," and a settlement statement. Defendant affirmatively state that Exhibits A, B, C, D, E, and F appear to be copies, in some instances, unsigned and incomplete copies, of a portion of the documents received by Plaintiff. Defendant denies that Plaintiffs received a notice of right to cancel with blank boxes for the document signing date and final date to cancel. Defendant denies that Exhibits D and E constitute two different notices of right to cancel. Defendant denies the remaining allegations in Paragraph 8.

    9.    Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a)    <u>**Consumer's right to rescind.**</u>

    **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

    **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

    **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative**

proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b)    Notice of right to rescind.  In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind.  The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f)    Exempt transactions.  The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations that the transaction was secured by Plaintiffs' home.  Defendant denies that 12 C.F.R. § 226.23(f)(2) states "(2) A credit plan in which a stage agency is a creditor." Defendant admits that the remaining allegations in Paragraph 9 contain a portion of the text of 12 C.F.R. § 226.23.  Defendant denies the allegations of Paragraph 9 insofar as they purport to make any allegation of wrongdoing by Defendant under said statute.  Defendant denies the remaining allegations in Paragraph 9.

10.    The payment schedule is not fully and completely disclosed on Exhibit C.

**ANSWER:**     Defendant denies the allegations in Paragraph 10.

11.     <u>Exhibit D</u> is not completed and thus does not clearly and conspicuously disclose the right to rescind.

**ANSWER:**     Defendant denies the allegations in Paragraph 11.

12.     <u>Exhibit E</u> detracts from and obfuscates <u>Exhibit D</u>. <u>Exhibit E</u> suggests that the consumer has seven days to rescind under TILA, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees, or the procedural protections of §1635. It also provides for a different method of counting days and requires actual receipt of the notice by Ameriquest within the specified time.

**ANSWER:**     Defendant denies the allegations in Paragraph 12.

13.     15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

**ANSWER:**     Defendant admits that the allegations in Paragraph 13 contain the text of 15 U.S.C. § 1635(g). Defendant denies the allegations of Paragraph 13 insofar as they purport to make any allegation of wrongdoing by Defendant under said statute. Defendant denies the remaining allegations in Paragraph 13.

14.     The failure to fully and completely disclose the payment schedule violates 15 U.S.C. §1638 and 12 C.F.R. §226.28.

**ANSWER:**     Defendant denies the allegations in Paragraph 14.

15.     The failure to delivery completely filled-out copies of the notice of right to cancel, and the provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

**ANSWER:**     Defendant denies the allegations in Paragraph 15.

## AFFIRMATIVE DEFENSES

Defendant states as its affirmative defenses as follows:

1.      Plaintiffs' claim for statutory damages, costs, and attorney's fees for any alleged underlying Truth in Lending Act violation is barred by the one-year statute of limitations for statutory damages, costs and attorney's fees under the Truth in Lending Act.

2.      Plaintiffs' purported cause of action fails to state a claim upon which relief may be granted.

3.      If it should be deemed that Plaintiffs are entitled to rescission, any obligation on the part of Defendant to rescind the mortgage loan at issue in this lawsuit and release the lien on the subject property must be conditioned upon Plaintiffs' reimbursement or other return to Defendant of all funds disbursed on Plaintiffs' behalf in connection with the subject mortgage loan, less any finance charges, pursuant to 15 U.S.C. § 1605(b) and/or other rules of law or equity.  Any obligation on the part of Defendant to rescind and to release any lien is conditioned upon Defendant reimbursing or otherwise returning all funds disbursed on their behalf to Defendant in connection with the subject loan, less any finance charges.

WHEREFORE, Defendant Ameriquest Mortgage Company requests that this Court enter judgment in its favor and against Plaintiffs Brett Wertepny and Yvonne Wertepny, award Ameriquest Mortgage Company its costs, and provide such further and additional relief as it deems just and appropriate.

Dated:  April 29, 2005                    Respectfully submitted,

                                          AMERIQUEST MORTGAGE COMPANY,
                                          **Defendant**

                                          _____
                                          One of Its Attorneys

Craig A. Varga
Jonathan N. Ledsky
Jaime S. Roginski-Kord
VARGA BERGER LEDSKY HAYES & CASEY
224 South Michigan Avenue, Suite 350
Chicago, Illinois 60604
(312) 341-9400

## CERTIFICATE OF SERVICE

Jonathan N. Ledsky, an attorney, hereby certifies that a true and correct copy of the

foregoing Defendant's Answer to Plaintiffs' Complaint was served upon:

Al Hofeld, Jr.
Edelman, Combs & Latturner, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603

by placing same in the United States mail chute located at 224 South Michigan Avenue, Chicago,

Illinois 60604, properly addressed and postage fully prepaid, this 29th day of April, 2005, on or

before the hour of 5:00 p.m.

_____
Jonathan N. Ledsky

Shared/Ortega/Pleadings/AMQ-Wertepny Answer to Plaintiffs' Complaint.

7

# APPENDIX 36

# EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
## 120 S. LaSalle Street, 18th floor
## Chicago, Illinois 60603-3403
## (312) 739-4200
## (800) 644-4673
## (312) 419-0379 (FAX)
## Email: edcombs@aol.com
## www.edcombs.com

February 16, 2005

**BY MESSENGER**

Ameriquest Mortgage Corporation
c/o registered agent
National Registered Agents
200 W. Adams
Chicago, IL 60606

> Re: Notice of rescission, claim and lien, Brett Wertepny and Yvonne Wertepny, 2063 Craig Drive, Des Plaines, IL 60018, loan of March 8, 2003

Ladies/ Gentlemen:

The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to 15 U.S.C. §1641(d).

Finally, please provide an account history so that we may compute the appropriate amount to be tendered.

Sincerely,

Daniel A. Edelman

cc: clients

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document hand-delivered to the addressees on February 16, 2005.

_____
Daniel A. Edelman