EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE AMERIQUEST MORTGAGE CO. | ) | Lead Case No. 05 C 7097 |
| MORTGAGE LENDING PRACTICES LITIGATION | ) | |
| ——————————————————————— | ) | MDL No. 1715 |
| | ) | |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | Centralized before |
| ——————————————————————— | ) | The Hon. Marvin E. Aspen |

**JOINT DISCOVERY PLAN AND
[PROPOSED] SCHEDULING ORDER**

A conference of the parties was conducted pursuant to Federal Rule of Civil

Procedure 26(f) and this Court's July 23, 2009 Order, and attended by (a) members of the

Steering Committees for the Opt-Out Plaintiffs; (b) members of the Steering Committee for

the Third-Party Defendants, including Liaison Counsel for the Third-Party Defendants; and

(c) counsel for the Defendants, (collectively "Representative Counsel"). In accordance with

Rule 26(f), the parties hereby submit the following Joint Discovery Plan and Proposed

Scheduling Order and request that this Court enter an Order Adopting the Joint Discovery

Plan and Proposed Scheduling Order.

     **1.**     **Discovery.**

     (a)     Each Opt-Out Plaintiff's claim centers in large part on the

closing documents for the home mortgage loan which each Opt-Out Plaintiff

seeks to rescind (the "Loan Documents"). The relevant Loan Documents at

issue may be in the possession, custody, or control of any of the Opt-Out

Plaintiff(s), the Defendant(s), and/or the Third-Party Defendant(s). In addition

to the timing and protocols for the exchange of the Loan Documents between

the Defendants and the Third-Party Defendants which are set forth in this Court's July 23, 2009 order, the parties have agreed to exchange the Loan Documents in their respective possession, custody or control.

(b)     With respect to each opt-out claim, each Opt-Out Plaintiff who has not already done so shall have thirty (30) days from the date of this Scheduling Order to produce to the Defendants any Loan Documents in the Opt-Out Plaintiff's possession, custody, or control. Within fourteen (14) days of receipt of an Opt-Out Plaintiff's Loan Documents, or at the time set forth in the Court's July 23, 2009 order, whichever is later, the Defendant(s) shall provide the relevant Third-Party Defendant(s) with a copy of the Opt-Out Plaintiff's Loan Documents. Within twenty-eight (28) days of receipt of an Opt-Out Plaintiff's Loan Documents from that Opt-Out Plaintiff, Defendants shall produce to each Opt-Out Plaintiff who so requests copies of the relevant Loan Documents in its possession, as well as the Loan Documents, if any, that have been produced by that time by the relevant Third-Party Defendant(s). If Defendants receive Loan Documents from the relevant Third Party Defendant(s) at a later time, they shall produce them to that Opt-Out Plaintiff within fourteen (14) days of receipt from the Third-Party Defendant(s). (The timing and protocols for the exchange of the Loan Documents between the Defendants and the Third-Party Defendants, as well as for an exchange of any agreements between the Defendants and the Third-Party Defendants which those parties believe may govern the rights and obligations at issue, is governed by this Court's July 23, 2009 Order.) In addition, within 30 days of a

-2-

request for the same, the Defendants shall produce to the Opt-Out Plaintiffs such additional documents that the Opt-Out Plaintiffs reasonably require in order to prepare for, and participate in, the forthcoming mediation(s), provided that such documents are in Defendants' possession, custody, or control and not otherwise privileged.

(c)     With respect to each Opt-Out Plaintiff's claim, within fourteen (14) days of completion of the document exchange contemplated in this Court's July 23, 2009 Order, the Third-Party Plaintiffs shall identify to each Third-Party Defendant, by Bates number, any and all contracts upon which its claim against that Third-Party Defendant is based.     Within fourteen (14) days of receipt of that information, (and without conceding that the documents identified by the Defendants constitute a "contract" between the parties), the Third-Party Defendant(s) shall identify by Bates number any contract(s) or agreement(s) with the Third-Party Defendants relating to the corresponding plaintiff's or plaintiffs' loan.

(d)     The exchange described in Sections (b) and (c) above and in this Court's July 23, 2009 Order shall satisfy each party's obligations under Federal Rule of Civil Procedure 26(a).     No other discovery shall be conducted in this MDL proceeding with respect to Plaintiffs' opt-out claims and the corresponding Third Party claims, until the completion of mediation proceedings, as set forth in Section 2 below.

2.     **Mediation.**  As soon as practicable, after all of the following events have occurred:  (i) this Court has ruled on the Third-Party Defendants' Motion to Dismiss

-3-

Fifth Amended Consolidated Third-Party Complaint; (ii) at least 100 Opt-Out Plaintiffs have provided to the Defendants and the corresponding Third-Party Defendant(s) a numerical computation of the value of his or her rescission claim; (iii) the Defendant(s) have disclosed to the Third-Party Defendants the terms of any class action settlement, or the class action has been otherwise resolved; (iv) the time has passed for the Defendants to add any new Third-Party Claims; and (v) if the Third-Party Defendants' have sought leave to file a Sixth Amended Third-Party Complaint, the Court's ruling on any motion to dismiss that pleading; the parties, through their Representative Counsel, shall participate in a mediation designed to devise a procedure for settling the Opt-Out Plaintiffs' claims in a systematic way. Within twenty-one (21) days of the date of this Scheduling Order the parties, through their Representative Counsel, may provide to each other their proposal as to how such mediation should be structured.

WHEREFORE, the parties request that this Court enter an Order Adopting the Joint Discovery Plan.

Dated:  September 2 , 2009                    By:  Charles M. Delbaum

                                                  *Attorneys for Certain Opt-Out Plaintiffs*

                                                  Charles M. Delbaum
                                                  National Consumer Law Center
                                                  10th Floor
                                                  77 Summer Street
                                                  Boston, Massachusetts  01220
                                                  (617) 266-0313

-4-

BN 4346319v1

Dated:  September 2 , 2009          By____Daniel S. Blinn_____
                                       *Attorneys for Certain Opt-Out Plaintiffs*

                                    Daniel S. Blinn
                                    Consumer Law Group
                                    Suite 512
                                    35 Cold Spring Road
                                    Rocky Hill, Connecticut  06067
                                    (860) 571-0408

Dated:  September 2 , 2009          By____Thomas J. Wiegand_____
                                       *Attorneys for Argent Mortgage Company, LLC*

                                    Thomas J. Wiegand
                                    Winston & Strawn LLP
                                    35 West Wacker Drive
                                    Chicago, Illinois  60601-9703
                                    (312) 558-5947

Dated:  September 2 , 2009          By____Bernard E. LeSage_____
                                       *Attorneys for Ameriquest Mortgage Company;*
                                       *AMC Mortgage Services, Inc.; Town & Country*
                                       *Credit Corporation; Ameriquest Capital*
                                       *Corporation; Town & Country Title Services,*
                                       *Inc.; Ameriquest Mortgage Securities, Inc.;*
                                       *CitiFinancial Mortgage; CitiResidential*
                                       *Lending Inc.; Deutsche Bank National Trust*
                                       *Company, as Trustee; HSBC Mortgage*
                                       *Services Inc.; GMAC ResCap; Barclays*
                                       *Capital; US Bank, Litton Loan Servicing;*
                                       *Merrill Lynch Credit Corp.; Wells Fargo Bank,*
                                       *as Trustee; WM Specialty Mortgage LLC;*
                                       *Countrywide; Wilshire Credit Corp.; and Bank*
                                       *of NY Trust Co.*

                                    Bernard E. LeSage
                                    Sarah K. Andrus
                                    Buckalter Nemer, a Professional Corporation
                                    Suite 1500
                                    1000 Wilshire Boulevard
                                    Los Angeles, California  90017-2457
                                    (213) 891-5230

-5-

BN 4346319v1

September 2 , 2009                    By___David J. Chizewer_____
                                         *Liaison Counsel for Third-Party Defendants*

                                     David J. Chizewer
                                     Goldberg Kohn Bell Black
                                       Rosenbloom & Moritz, Ltd.
                                     Suite 3300
                                     55 East Monroe Street
                                     Chicago, Illinois  60603
                                     (312) 201-3938

---

**IT IS SO ORDERED.**


                                     _____
                                     The Honorable Marvin E. Aspen
                                     The Honorable Morton Denlow

BN 4346319v1

## CERTIFICATE OF SERVICE

I, Bernard E. LeSage, hereby certify that on this 2nd day of September 2009, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: /s/ Bernard E. LeSage

BN 4346319v1

# EXHIBIT B

## DECLARATION OF CATHLEEN M. COMBS

I declare under penalty of perjury under the laws of the United States and Illinois that the foregoing is true and correct:

1.  I am an attorney and named member of Edelman Combs Latturner & Goodwin, LLC.

2.  Our firm produced discovery for plaintiffs Marie Furgeson, Sergio Salazar, Guadalupe Salazar, Eric Smith, Guillermina Yanong, Nelson Jimenez, Melinda Jimenez, Gilbert Treadwell, Genelle Treadwell, Earl Key, Brett Wertepny, Castella Williams Harris, Delois Mills, William Pintsak, and Sandra Pintsak on the dates specified in our Opposition to Strike Certain Opt-Out Plaintiffs' Summary Judgment Motion.

Executed this 26th day of November, 2009.

_____
Cathleen M. Combs

# EXHIBIT C

Case 08-35674    Doc 28    Filed 08/31/09    Entered 09/02/09 09:12:52    Desc Main
                           Document       Page 1 of 1

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

IN RE:  Nelson Jimenez                    )
                                          )        Case No:      08-35674
                                          )
                                          )        Judge:  Black   (Joliet)
                                          )
                                          )        Chapter:     13
        Debtor(s).                        )

### ORDER MODIFYING CHAPTER 13 PLAN POST CONFIRMATION

THIS MATTER coming to be heard on the Motion of the DEBTORS to Modify the Chapter 13 Plan Post-Confirmation;

THE COURT, after due notice having been given and hearing thereon, having been fully advised of the matter, herein;

IT IS HEREBY ORDERED:

1. Modifying the Chapter 13 plan post-confirmation, to include language in section G of the model plan that directs all proceeds from Debtor's class action law suit against Ameriquest will be paid to the plan in the event that he is successful with the law suit. Specifically any and all proceeds will be in addition to the plan base as outlined in D.1

Date: _____        Judge: _____

                                                        8-31-09

Prepared by:
Chang & Carlin, LLP
1305 Remington Road, Suite C
Schaumburg, IL 60173
847-843-8600

# EXHIBIT D

# DECLARATION OF GUADALUPE SALAZAR

I declare under penalty of perjury under the laws of the United States and Illinois that the

foregoing is true and correct:

1. The proceeds from the home loan refinance with Ameriquest, which is the

basis of this lawsuit, were used to pay off my personal credit card debt

2. In my deposition, when I stated "business debts that I owed," I meant debts

that I owed to a business, namely to Sears credit card company.

3. I have never owned a business.

Executed this __17th__ day of November, 2009.

Guadalupe Salazar

# EXHIBIT E

## DECLARATION OF BRETT WERTEPNY

I declare under penalty of perjury under the laws of the United States and Illinois that the foregoing is true and correct:

1.     I am the owner of a business called Maximum CNC, Inc.

2.     Maximum CNC, Inc. is registered to my primary residential address, which is 2063 E. Craig Dr., Des Plaines, IL 60018.

3.     The majority of my business is in consulting, and takes place at my clients' places of business. I travel to clients' sites, and I assist them in learning how to use their own metal-cutting machinery more efficiently.

4.     I do not keep any metal-cutting machinery or at 2063 E. Craig Dr., Des Plaines, IL 60018, nor do I bring clients to 2063 E. Craig Dr., Des Plaines, IL 60018.

5.     I also testified to the nature of my business in a deposition by Ameriquest Mortgage Company's attorney on August 29, 2005, the transcript of which is attached to Certain Opt-Out Plaintiffs' Opposition to Motion to Strike Certain Opt-Out Plaintiffs' Summary Judgment Motion.

Executed this _19_ day of November, 2009.

_Brett W._

Brett Wertepny

EXHIBIT F

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRETT WERTEPNY and          )
YVONNE WERTEPNY,            )
                            )
          Plaintiffs,       )
                            )
          -vs-              )  No.  05 C 1402
                            )       Judge Nordberg
AMERIQUEST MORTGAGE COMPANY, )
WASHINGTON MUTUAL BANK, FA and )    Magistrate
AMC MORTGAGE SERVICES, INC., )      Judge Nolan
                            )
          Defendants.       )


          The Deposition of BRETT T. WERTEPNY, called by the

Defendants for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States District

Courts pursuant to the taking of depositions, taken before

Daniel M. Priscu, a C.S.R. within and for the County of

Cook, State of Illinois, at 224 South Michigan Avenue, Suite

350, Chicago, Illinois, on Monday, August 29, 2005,

commencing at the hour of 2:27 p.m.



**Page 38**

1　A　The '98 Durango was bought on credit.
2　Q　And the 2004 Durango?
3　A　That was bought on credit.
4　Q　Who did you finance the Durango from 1998
5　through?
6　A　I believe it was through Naperville Chevy.
7　I don't remember, but it was through the dealership.
8　Q　Through the dealership?
9　A　Yes.
10　Q　Did you call your agent at State Farm and
11　ask if they could provide financing?
12　A　Actually, at that point the dealerships
13　were giving about the same amount as what I had
14　previously thought the insurance company was, so I
15　stuck with the dealership.
16　Q　It's your understanding it was a better
17　deal?
18　A　About the same, yes.  It wasn't any better
19　or any worse.
20　Q　By this time were you aware that, for
21　example, your bank might lend you money to buy a
22　car?
23　A　Yes.  That's when the banks started to get
24　into this.  It wasn't a long time ago when they

**Page 39**

1　started it or when I became aware of it.
2　Q　Did you consider asking your bank for a
3　loan to buy the car?
4　A　No, I did not.
5　Q　Were you aware of what their interest rate
6　was?
7　A　No, I was not.
8　Q　Did you consider any other sources of
9　financing other than the dealership and possibly
10　your insurance agent?
11　A　No.
12　Q　When you bought the 2004 Durango on
13　credit, how did you obtain the credit?
14　A　That was from Mancari Dodge and that was
15　bought last year about this time.  And I financed it
16　through the dealership.
17　Q　Did you inquire from your insurance agent
18　about possibly financing the car through him?
19　A　At this time, no, I didn't.
20　Q　Any particular reason why not?
21　A　No.  I mean, I thought that their rates
22　were reasonable.
23　Q　And how did you assess -- strike that.
24　　Why did you believe their rates were

**Page 40**

1　reasonable?
2　A　To answer that, I guess I'm not a good
3　shopper, I guess, on top of that.  But I just went
4　in and they gave me a good trade-in value on my
5　previous vehicle.  I actually was not going to buy
6　the vehicle, but I had started my own business at
7　this point and needed it for the travel, and I also
8　needed the cargo space.  And the other vehicle was
9　starting to sour.
10　Q　Did you negotiate the price of the car?
11　A　A little bit, yes.  They had incentives.
12　Being the end -- you know, they were trying to get
13　2005's out, and at the end of 2004 they were giving
14　cash back incentives and things of that nature.
15　Q　How often were payments due under your
16　credit agreement to buy the 1998 Durango?
17　A　Monthly.
18　Q　And how about the 2004 Durango?
19　A　Monthly.
20　Q　I take it from your last comment you no
21　longer work for Mori Seiki?
22　A　Correct.
23　Q　When did you leave their employment?
24　A　June of last year.

**Page 41**

1　Q　And what did you do after working for Mori
2　Seiki?
3　A　I started my own business.
4　Q　I'm sorry.  June of 2004 you left?
5　A　Correct.
6　Q　And what is your own business?
7　A　It's called Maximum CNC, Incorporated.
8　Q　What does it do?
9　A　Process engineering, consulting
10　programming and training of CNC equipment.
11　Q　Can you put that in laymen's terms?  I
12　mean, you said before that you helped operate
13　machines.  Then you were sort of a foreman and then
14　you helped sell them.  What are you doing now?
15　A　What I do now is I help people program
16　their machines.  A lot of the machines on the market
17　now are getting very old, and the machine tool
18　companies do not have the support to back it up.  So
19　when they buy a piece of used equipment that's five,
20　six years old, ten years old, there's no one to help
21　teach them to program it.
22　　I go in to show operators how to operate the
23　machine, how to be more efficient, how to set them up.  I
24　sit down with some of the process engineers, look at their

**Page 42**

1  piece and tell them how to route that piece through their
2  shop.
3      Q  So you're providing consulting services?
4      A  Yes.
5      Q  How many people are employed by your
6  company?
7      A  Just me.
8      Q  And is there a reason why you left Mori
9  Seiki and started your own business?
10      A  Yes.  The opportunity for what I'm doing
11  is so great.  I would have many, many phone calls
12  while working for Mori Seiki and Yamazen for help in
13  this area, and I finally realized that there was an
14  actual market for me to go out there because no one
15  could train on this older equipment.
16          No one has the skill levels.  The skill level
17  has gone way down in my field, and people were willing to
18  pay my company for my time, but my company wasn't willing to
19  pay me that type of money, so I decided to go out on my own.
20      Q  Does your company, Maximum CNC, Inc., have
21  a line of credit?
22      A  No, I don't.  What I do -- I don't have
23  very much overhead because it's more of a teaching
24  thing.  I have had to buy software, and I do have

**Page 43**

1  credit with some companies to buy bearings and parts
2  and stuff like that.
3      Q  What companies have given you credit?
4      A  Mori Seiki.
5      Q  And do you negotiate terms of that credit?
6  How does that work?
7      A  No.  I call them up with a part, and they
8  tell me whether it's available, how much it's going
9  to cost, and I purchase the part and I pass that
10  charge on to the customer.
11      Q  So when you say they give it to you on
12  credit, you mean you don't have to pay them right
13  away?
14      A  I shouldn't have said it that way.  I do
15  employ a credit card when I call them up, so at the
16  time of purchase I do provide them -- it's a debit
17  card from the business.
18      Q  You said you had bought used equipment on
19  credit; is that correct?
20      A  Yes.
21      Q  How many times have you bought used
22  equipment on that credit?
23      A  Oh, maybe five or six times, yes, maybe
24  eight.

**Page 44**

1      Q  And who provided you credit under those
2  instances?
3      A  Well, that was my own personal credit
4  card, like a Visa.
5      Q  Did you ever buy used equipment without
6  using a credit card but obtained the equipment on
7  credit?
8      A  No.
9      Q  You said you had bought some furniture
10  once on credit.  Was that using a credit card or was
11  that a credit agreement?
12      A  That one was a credit agreement.  I do not
13  know if it was Wickes.  It could have been Wickes.
14  It's been a while.
15      Q  Do you remember when that was,
16  approximately?
17      A  I want to say that it was probably in
18  early, like, '91.
19      Q  And do you recall how you obtained the
20  credit?
21      A  I think I applied at Wickes for the
22  credit.  And when I went in, I looked at the
23  furniture, and then they said, well, we can finance
24  it for you.  I said, okay, great.

**Page 45**

1      Q  And did you investigate alternate sources
2  of financing?
3      A  No.  The only thing I think I looked at at
4  that point was the interest rate on a credit card
5  and the interest rate of what they were going to
6  charge me, knowing the interest rate on the credit
7  card was outrageous.
8      Q  So you compared what they were offering
9  you compared to a credit card and decided what they
10  were offering you was lower?
11      A  Yes.
12      Q  Other than the cars and this furniture,
13  have you ever -- and other than a home purchase and
14  a refinancing, have you ever purchased anything else
15  on credit?
16      A  No.
17      Q  You said you've had credit cards since the
18  early '80s; is that correct?
19      A  Yes.
20      Q  Do you recall how many credit cards you've
21  had approximately?
22      A  It can't be anymore than ten, and I've
23  closed quite a few of them too.
24      Q  Do you typically run balances or do you

# EXHIBIT G

NOV-19-2009 13:55 From:
Case: 1:05-cv-07097 Document #: 3228-2 Filed: 11/20/09 Page 22 of 22 PageID #:37416
To:3124190379    2/2

NOV-19-2009  13:37          ECLG LLC                                    3124190379    P.02

## DECLARATION OF CASTELLA HARRIS JONES,
### f/k/a CASTELLA WILLIAMS HARRIS

I declare under penalty of perjury under the laws of the United States and Illinois that the foregoing is true and correct:

1.  I use my home phone number to arrange appointments for cutting hair for my business, Stella's Hair Salon.

2.  However, I do not cut hair or run Stella's Hair Salon out of my primary residence, which is 6922 S. Winchester Ave., Chicago, IL 60636.

3.  Instead, I work for other businesses cutting hair at their own premises.

Executed this ___19th___ day of November, 2009.

Castella Harris Jones,
f/k/a Castella Williams Harris