**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| | (Centralized before The Honorable Marvin E. Aspen) |
| THIS DOCUMENT RELATES TO: | |
| BORROWER CLASS PLAINTIFFS' ACTIONS | |

## <u>TABLE OF CONTENTS</u>

Page

Table Of Authorities .............................................................................iii

I. INTRODUCTION ...........................................................................1

II. STATEMENT OF THE CASE ........................................................2

    1. The Parties' Claims And Defenses .........................................2

    2. The Hard Fought And Protracted Litigation ...........................4

    3. The Substantial Amount Of Discovery Class Plaintiffs Completed.......8

    4. The Parties' Arms-Length Negotiations In Mediation With Judge Weinstein ...........................................................................10

III. THE TERMS OF THE SETTLEMENT ........................................10

    1. Economic Relief ...................................................................10

        A. Settlement Fund ..............................................................10

        B. Distributuion Plan And Settlement Payments ..............11

        C. Foreclosure Prevention Services....................................12

        D. *Cy Pres* ...........................................................................13

    2. Notice And Administration ..................................................13

    3. Opt Out Opportunity And Right To Object ..........................14

    4. Release...................................................................................14

IV. ARGUMENT ..................................................................................15

    1. The Settlement Agreement Should Be Preliminarily Approved As Fair, Reasonable And Adequate....................................................15

        A. The Standard For Preliminary Approval Of Class Action Settlement Agreements....................................................16

        B. All Of The Factors Weigh In Favor Of Preliminary Approval...17

            a. The $22 Million Settlement Fund And Foreclosure Prevention Services Provide Significant Benefits To The Classes ...............................................................17

i

b. The Distribution Plan Is Fair And Adequate Because Class Members' Payments Are Based On The Relative Value Of Their Respective Claims .......................................19

c. Voluntary Settlement Of This Class Action Serves The Interests Of The Parties And The Court ..........................20

d. The Settlement Resulted From Extensive Arms-Length Negotiations And Is Not The Product Of Collusion ........22

e. The Factual Record Was Well Developed Through Independent Investigation.................................................23

f. The Proposed Notice To Class Members Is Adequate .....24

2. Each Settlement Class Meets Rule 23's Criteria And Can Be Preliminarily Certified For Settlement Purposes .................................................25

A. Rule 23(a) ...........................................................................26

a. Numerosity.................................................................26

b. Commonality ..............................................................27

c. Typicality ...................................................................29

d. Adequacy of Representation ................................30

B. Rule 23(b)(1)(B) ...................................................................30

C. Rule 23(b)(3) ........................................................................32

V. CONCLUSION ...........................................................................33

## <u>TABLE OF AUTHORITIES</u>

Page

**Cases**

*Amchem Products v. Windsor*,
    521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ................................. 30, 32

*Andrews v. Chevy Chase Bank*,
    545 F. 3d 570 (7th Cir. 2008) ................................................................. 6

*Arenson v. Whitehall Convalescent and Nursing Home, Inc.*,
    164 F.R.D. 659 (N.D. Ill. 1996) ............................................................ 27

*Armstrong v. Board of School Directors of the City of Milwaukee*,
    616 F.2d 305, (7th Cir.1980) ......................................................... 16, 17

*Boggess v. Hogan*,
    410 F. Supp. 433 (N.D. Ill. 1975) ......................................................... 16

*County of Suffolk v. Long Island Lighting Co.*,
    907 F. 2d. 1295 (2nd Cir. 1990) ........................................................... 31

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir.1974) ................................................................. 17

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) .......................................................................... 24

*Gammon v. GC Servs. Ltd. P'ship.*,
    162 F.R.D. 313 (N.D. Ill. 1995) ........................................................... 30

*Goldsmith v. Technology Solutions Co.*,
    No. 92 C 4374, 1995 WL 17009594, (N.D. Ill. Oct. 10, 1995) ..................... 16, 17

*Golon v. Ohio Sav. Bank*,
    98 C 7430, 1999 WL 965593, (N.D. Ill. Oct. 15, 1999) ............................... 33

*Gorsey v. I.M. Simon & Co.*,
    121 F.R.D. 135 (D.Mass. 1988) ........................................................... 27

*Hamm v. Ameriquest Mortg. Co.*,
    Nos. 05-3984, 06-3086, 2007 WL 3010973 (7th Cir. Oct. 17, 2007) ................... 21

*Handy v. Anchor Mortg. Corp.*,
    464 F.3d 760 (7th Cir. Sept. 29, 2006) ................................................... 21

*Haynes v. Logan Furniture*,
    503 F.2d 1161 (7th Cir. 1974) ............................................................. 33

iii

*Henry v. Cash Today, Inc.*
   199 F.R.D. 566 (S.D. Tex. 2000)..................................................................... 33

*Hernandez v. Midland Credit Mgmt., Inc.*,
   236 F.R.D. 406 (N.D. Ill. 2006)...................................................................... 27

*In re Agent Orange Product Liability Litigation*,
   818 F. 2d 179 (2nd Cir. 1987)......................................................................... 19

*In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation*,
   No. 05-CV-7097, 2006 WL 3227883, (N.D. Ill. Nov. 7, 2006) ..................... 6, 22

*In re Brand Name Prescription Drugs Antitrust Litigation*,
   No. 94 C 897, 1999 WL 639173, (N.D. Il. Aug. 17, 1999). ........................... 20

*In re General Motors Corp. Engine Interchange Litig.*,
   594 F.2d 1106 (7th Cir.1979) ......................................................................... 17

*In re McDonald's French Fries Litigation*,
   257 F.R.D. 669 (N.D. Ill. 2009)...................................................................... 22

*In re Mercedes-Benz Tele Aid Contract Litig.*,
   257 F.R.D. 46 (D.N.J. 2009)............................................................................. 3

*In re PaineWebber Ltd Partnerships Litigation*,
   171 F.R.D. 104 (S.D.N.Y. 1997) .................................................................... 19

*Isby v. Bayh,*
   75 F.3d 1191 (7th Cir.1996) ........................................................................... 17

*Jones v. Risk Management Alternatives, Inc.*,
   No. 02 C 9392, 2003 WL 21654365, (N.D. Ill. July 11, 2003) ...................... 26

*Keele v. Wexler*,
   149 F.3d 589 (7th Cir.1998) ........................................................................... 27

*Patterson v. General Motors Corp.*,
   631 F.2d 476 (7th Cir.1980) ........................................................................... 27

*Kremnitzer v. Cabrera & Rephen, P.C.*,
   202 F.R.D. 239 (N.D. Il. 2001)....................................................................... 29

*Mars Steel Corp. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*,
   834 F. 2d 677, 9 Fed. R. Serv. 3d (LCP) 909 (7th Cir. 1987) ........................ 23

*McCabe v. Crawford & Co.*,
   210 F.R.D. 631 (N.D. Ill. 2002)...................................................................... 26

*Murphy v. Ameriquest Mortgage Co.*,
   Case No. 04-CV-12651 (RWZ) (D. Mass) ................................................... 1, 9

*Ortiz v. Fibreboard Corporation,*
527 U.S. 815, 119 S. Ct. 2295 (1999)................................................................ 31

*Parker v. Risk Mgmt. Alternatives, Inc.,*
206 F.R.D. 211 (N.D. Ill. 2002)................................................................ 27, 29

*Parkinson v. Hyundai,*
258 F.R.D. 580 (C.D. Cal. 2008) ........................................................................ 3

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985)........................................................................................... 33

*Pierceall v. Ameriquest Mortgage Company, et al.*
Case No. 415620 (Superior Court of California, County of San Mateo) ........... 1, 8

*Rahim v. Sheahan,*
No. 99 C 0395, 2001 WL 1263493, (N.D. Ill. Oct. 19, 2001) ........................... 32

*Randolph v. Crown Asset Mgmt., LLC,*
254 F.R.D. 513 (N.D.Ill.2008)........................................................................... 27

*Ricci, et al. v. Ameriquest,*
Civil File No. 05-2546 (State of Minnesota District Court,
County of Hennepin)......................................................................................... 1, 8

*Sledge v. Sands,*
182 F.R.D. 255 (N.D. Ill. 1998)......................................................................... 30

*Steinberg v. Nationwide Mutual Ins. Co.,*
224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................................... 3

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
463 F.3d 646 (7th Cir. 2006) ......................................................................... 2, 17

**Statutes**

California Business & Professions Code §§ 17200 *et seq* ........................................... 3, 28

California Civil Code §§ 1750 *et seq* .......................................................................... 3, 29

**Other Authorities**

H. Newberg, A. Conte, Newberg on Class Actions §11.41 (4th ed. 2002) ............... passim

Manual for Complex Litig. (Fourth) (2004) ....................................................... 17, 24, 25

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... passim

v

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ASSENTED TO MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## I.      INTRODUCTION

The parties' settlement agreement ("Settlement") [Docket No. 3247], submitted to

the Court for preliminary approval, resolves 28 class actions consolidated in this MDL

proceeding against Ameriquest Mortgage Company and affiliated entities (collectively,

"Ameriquest") for alleged predatory mortgage lending and servicing practices. The

Settlement includes a $22 million Settlement Fund that provides for class member

payments and foreclosure prevention counseling services by a national non-profit

organization.

The parties reached this resolution after three years[1] of hard fought litigation

followed by two years of extensive arms-length mediation with the reputable JAMS

mediator Hon. Daniel Weinstein (Ret.). During this time, Ameriquest, like many

subprime lenders, went out of business. It transferred all of the class members' loans that

it serviced to unaffiliated third party servicing entities. In January 2006, Ameriquest paid

$325 million to resolve predatory lending claims brought against it by 49 states Attorneys

General. A portion of the putative class in the transferred cases accepted benefits under

that settlement and thereby released their claims.[2]

---

[1] The first filed class action against Ameriquest Mortgage Company was in November,
2004. *Murphy v. Ameriquest Mortgage Co.*, Case No. 04-CV-12651 (RWZ) (D. Mass).
This case, along with other then pending class actions (the "Consolidated Actions"), were
transferred and consolidated into MDL 1715 on December 14, 2005, with subsequently
filed actions transferred thereafter. On December 6, 2006, the Plaintiffs in the
Consolidated Actions filed a Borrowers' Consolidated Class Action Complaint
("CCAC") [Docket No. 325]. For settlement purposes, Class Plaintiffs filed a First
Amended and Consolidated Class Action Complaint ("FACC") [Docket No. 3245],
[Settlement, ¶VII].
[2] Others in the putative class accepted benefits in settlements of two statewide class
actions against Ameriquest, *Ricci, et al. v. Ameriquest*, Civil File No. 05-2546 (State of
Minnesota District Court, County of Hennepin) and *Pierceall v. Ameriquest Mortgage
Company, et al.* Case No. 415620 (Superior Court of California, County of San Mateo),

In evaluating the fairness of a proposed class action settlement, the most important factor the Seventh Circuit considers is the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citations omitted). While the Class Plaintiffs believe that they would have succeeded at class certification and on the merits of their claims at trial, Ameriquest's deteriorated financial condition created a significant risk that they would not be able to collect a judgment.

The relief provided here, payments from the Settlement Fund coupled with foreclosure prevention services, is appropriately tailored to the predatory lending and servicing claims raised in Class Plaintiffs' CCAC and the FACC. It also and meets and exceeds the standards of fairness promulgated by the Seventh Circuit and the Federal Rules of Civil Procedure. Accordingly, the Court should preliminarily approve the settlement so that class members can receive notice of their rights.

## II.     STATEMENT OF THE CASE

### 1.     The Parties' Claims And Defenses

The 28 class action complaints consolidated into the MDL ("Consolidated Actions") allege causes of action based on state, federal and common law for Ameriquest's predatory lending and servicing conduct. The most prevalent claims, common in the Consolidated Actions and alleged in both the CCAC and FACC are: (1) violations of the federal Truth in Lending Act ("TILA") [CCAC, ¶¶234-244], [FACC, ¶¶198-209]; (2) unjust enrichment from gains on predatory mortgage loans [CCAC, ¶¶265-267], [FACC, ¶¶223-225]; (3) breach of contract for allegedly charging borrowers

---

thereby releasing their claims.

2

"discount points" without actually providing either any discount in the interest rate or one commensurate with the amount of discount points the borrower paid [CCAC, ¶¶268-280], [FACC, ¶¶226-238]; (4) breach of contract for bait and switch practices, whereby Ameriquest purportedly promised to provide loans on specific terms and then changed those terms (to the detriment of the borrower) immediately prior to or on the closing date [CCAC, ¶¶281-285], [FACC, ¶¶239-243]; (5) breach of contract for overcharging default and delinquency related fees and costs in servicing borrowers loans [CCAC, ¶¶286-292], [FACC, ¶¶244-250]; (6) breach of the covenant of good faith and fair dealing for the discount points, bait and switch and servicing practices [CCAC, ¶¶293-296], [FACC, ¶¶256-259]; (7) declaratory and injunctive relief [CCAC, ¶¶297-301], [FACC, ¶¶260-264]; and (8) unfair and deceptive acts and practices in violation of California Business & Professions Code §§17200 *et seq*. and California Civil Code §§ 1750 *et seq*. [CCAC, ¶¶302-320], [FACC, ¶¶265-283].[3]

Ameriquest denies the allegations of all of the Consolidated Actions, Class Plaintiffs' CCAC, and Class Plaintiffs' FACC. Ameriquest denies that it has harmed the Class Plaintiffs or any of the individuals in the classes they seek to represent.

---

[3] In the alternative, Class Plaintiffs asserted a claim arising under each state's consumer protection act and/or unfair and deceptive trade practices act. [CCAC, ¶¶321-326], [FACC, ¶¶284-289]. However, courts routinely certify claims of nationwide classes under the law of the state in which the defendant is domiciled and from which the unlawful conduct emanated. *See, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 53-54 (D.N.J. 2009) (certifying, pursuant to a choice of law analysis, nationwide class for litigation purposes for consumer fraud statutory claims and for unjust enrichment and rejecting challenges to such certification based upon issues of reliance and ascertainable loss); *Steinberg v. Nationwide Mutual Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y. 2004) (certifying nationwide contract class); *Parkinson v. Hyundai*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (certifying nationwide class based on California law).

2.    **The Hard Fought And Protracted Litigation**

Beginning in 2004, numerous class and individual actions against Ameriquest were being filed across the country. All of these cases alleged that Ameriquest violated state, federal and/or common law consumer protections in originating and/or servicing borrowers' loans. The cases were at various litigation stages, with some deep into the discovery process, when the Judicial Panel on Multidistrict Litigation ("JPML") consolidated and transferred them into MDL 1715 on December 14, 2005. The JPML continued to transfer later filed class and individual actions into the MDL for a period of time after its initial consolidation.

Immediately after the establishment of MDL 1715, Roddy Klein & Ryan, Lieff, Cabraser, Heimann & Bernstein, LLP and James, Hoyer, Newcomer & Smiljanich, P.A. (now "Lead Class Counsel") filed motions for provisional certification of a rescission class and for a preliminary injunction on behalf of the Plaintiffs in the class actions. *See*, [Docket Nos. 10, 12] (filed on 01/11/2006); *see also*, supporting memoranda [Docket Nos.13 and 14]; declarations in support [Docket Nos. 60-74]; replies to Ameriquest's oppositions [Docket Nos. 75-77]; notice of supplemental authority [Docket No. 106]. By these motions, Plaintiffs sought to preserve individuals' rescission rights from lapsing or being released during the litigation and to require Ameriquest to send them notice of their rights. *Id*.  Rescission rights are extremely valuable to homeowners in foreclosure because exercising them voids the mortgage and the lender's ability to foreclose. *See*, *e.g.,* Plaintiffs' Memorandum Concerning Potential Foreclosures While Plaintiffs' Motion For Preliminary Injunction Is Pending. [Docket No. 32].

Ameriquest vigorously contested these motions. *See, e.g.,* [Docket Nos. 29-31; 33-42, 46-49] (memoranda, objections and declarations and request for judicial notice in opposition to Plaintiffs' motions); [Docket No. 107] (response to notice of supplemental authority).

On February 7, 2006, the Court instituted a motion and discovery stay pending further case reassignments and the JPML's completion of the "tag-along" process. The stay remained in place for over ten months, preventing the parties from going forward with further litigation. *See*, [Docket Nos. 283, 284, 342 (lifting stay on December 20, 2006)]. During this period, the Court resolved the motions filed prior to the stay.

On February 14, 2006, under the Court's instruction, Ameriquest and Class Plaintiffs entered into a Stipulation for Standstill (which the Court entered on February 21, 2006) [Docket No. 54]. The parties stipulated that borrowers who received blank Notices of Right to Cancel and/or received the wrong form of the Notice would retain their rescission rights that otherwise might have lapsed until the Court's decision on Class Plaintiffs' preliminary injunction motion. By the Stipulation, Ameriquest also agreed that it would stay certain then pending foreclosure proceedings on Named Plaintiffs' mortgages. [Docket 54, ¶6]. Under the Stipulation, Ameriquest agreed that if it chose to proceed to foreclosure, it would provide Class Counsel with 30 days notice of its intention to do so. *Id*.

The Court granted Plaintiffs' motion for temporary injunctive relief on May 30, 2006, requiring Ameriquest to send notice to borrowers in foreclosure advising them of possible rescission rights. [Docket Nos. 142, 143]; *see also*, [Docket Nos. 147 and 155]

5

(stipulations regarding the form of notice and bond requirement).[4] The parties contested

the scope of the Court's temporary injunction. [Docket No. 173] (Ameriquest's brief

arguing that it should not be required to send notice to borrowers whose loans originated

after January 23, 2006 because Ameriquest's practices would be monitored pursuant to

its agreement with the Attorneys General); [Docket No. 172, 192] (Plaintiffs' opposition

and reply, respectively).[5]

On November 7, 2006, the Court entered a case management order by which it

trifurcated the actions consolidated into the MDL. *In re Ameriquest Mortgage Co.*

*Mortgage Lending Practices litigation*, No. 05-CV-7097, 2006 WL 3227883, at *2 (N.D.

Ill. Nov. 7, 2006) ("Case Management Order") ("We perceive three distinct types of

cases: (1) borrower class actions, (2) non-borrower class actions under the Fair Credit

Reporting Act (FCRA), and (3) individual, non-class suits."); [Docket No. 284]. The case

management order allowed individuals a period of time within which to opt-out of the

class actions. *Id.*, *see also*, [Docket Nos. 335, 340, 343-344, 352-353, 357-362, 368-369,

372, 772, 795, 1141, 1619- 1620, 1770, 1772, 1784-1785] (notices of opting-out of class

actions). The Case Management Order further appointed the law firms of Roddy Klein &

Ryan, Lieff, Cabraser, Heimann & Bernstein, LLP and James, Hoyer, Newcomer &

---

[4] The Seventh Circuit found in September 2008 that a Truth in Lending declaratory judgment claim for borrowers seeking to rescind their loan cannot be certified. *Andrews v. Chevy Chase Bank*, 545 F. 3d 570, 571 (7th Cir. 2008). Immediately following the *Andrews* decision, the Court ordered the parties to brief the decision's impact, if any, on Class Plaintiffs' TILA claims. [Docket No. 2412]. The parties submitted competing briefs. [Docket Nos. 2457, 2458, 2459]. In their brief, Class Plaintiffs distinguished between a class of borrowers seeking a declaratory judgment that their loans are rescinded and the settlement TILA class – which consists of a borrowers who have already exercised their rescission rights and are seeking to enforce them. [Docket No. 2457]. This issue remained open when the parties began settlement negotiations.
[5] Over a year later, Class Plaintiffs moved to compel Ameriquest to comply with its agreement to stay the foreclosure on one of the Named Plaintiffs' mortgages, based on Ameriquest's alleged violation of the agreement. *See*, [Docket Nos. 911, 912, 913, 917, 919].

Smiljanich, P.A. as Co-Lead Class Counsel, created an Executive Committee to aid with the prosecution of the class cases and established an Individual Claims Steering Committee to coordinate the individual plaintiffs' cases. Case Management Order at *3-5.

On December 6, 2006, under the Court's Case Management Order, the class action Plaintiffs filed the CCAC. [Docket No. 325]; Case Management Order at *12. Ameriquest moved to dismiss the CCAC [Docket No. 391, 495 (Ameriquest's reply brief)] and filed a motion to compel Plaintiffs' to amend the CCAC to include individual claims. [Docket No. 378]. Both issues were thoroughly briefed. *See, e.g.*, [Docket Nos. 427, 424, 454, 496, 497, 609, 610]. In a memorandum opinion and order, the Court denied Ameriquest's Motion to Dismiss the CCAC in its entirety on April 23, 2007. [Docket No. 701]. Ameriquest ultimately withdrew its Motion to Compel. [Docket No. 813, Section I(B)]. Ameriquest then filed an answer to Class Plaintiffs' complaint on May 7, 2007. [Docket Nos. 757-762] (separate answers by each Ameriquest related entity).

On June 18, 2007, Class Plaintiffs filed a Motion for Leave to file a First Amended Consolidated Class Action Complaint. [Docket No. 835]. The motion sought to join Ameriquest's founder, Roland Arnall, to the class action. Mr. Arnall, through counsel, filed a motion to dismiss on September 21, 2007. [Docket Nos. 1138-1140]. The Court did not issue a ruling on this motion while the litigation was pending. As part of the settlement, Class Plaintiffs have agreed to withdraw the Motion for Leave to Amend. [Docket No. 835].[6] The parties were nearing the end of the discovery process when they

_____

[6] For settlement purposes the Plaintiffs will file, with Ameriquest's approval, a new

agreed to explore settlement possibilities. *See,* [Docket No. 1806] (parties' stipulation to stay the litigation in light of their mediation efforts, filed on December 19, 2007).

**3.     The Substantial Amount Of Discovery Class Plaintiffs Completed**

Class Plaintiffs undertook substantial formal and informal discovery in this case. The Court lifted the discovery stay on December 20, 2006. [Docket No. 342].[7] On December 27, 2006, Class Plaintiffs, through counsel, served a first set of document requests to each Ameriquest entity. In response to Plaintiffs' document requests, Ameriquest produced over 212,690 pages of loan files and other documents regarding company policies and procedures and corporate activities during the class period. Ameriquest further produced several terabytes of computerized data about class member loan files.

Class Counsel conducted approximately 15 depositions, including depositions of Ameriquest's employees, officers, directors and managing agents. They subpoenaed and received testimony from Ameriquest's former Presidents and CEOs, Kirk Langs and Wayne Lee, as well as other former Ameriquest employees.[8]

The parties had numerous disagreements regarding the scope or relevance of Plaintiffs' requested discovery, which were the subject of dozens of discovery

---

Borrowers' First Amended and Consolidated Class Action Complaint ("FACC") to consolidate additional later transferred class action cases.
[7] Class Plaintiffs filed several motions to lift the discovery stay. *E.g.*, [Docket No. 178]. Ameriquest opposed them. *E.g.*, [Docket No. 182].
[8] In addition, some of Co-Lead Counsel were involved in a parallel state action, *Ricci, et al. v. Ameriquest*, Civil File No. 05-2546 (State of Minnesota District Court, County of Hennepin), which was set for trial before it settled. Discovery in *Ricci*, as well as information Class Counsel had by virtue of the Attorneys' General action and another parallel state court action, *Pierceall v. Ameriquest Mortgage Company, et al*. Case No. 415620 (Superior Court of California, County of San Mateo), expanded Class Counsel's knowledge about the merits of Class Plaintiffs' case.

conferences and substantial discovery practice. *See, e.g.*, [Docket No. 1102] (Ameriquest's motion for leave to propound additional interrogatories and for a 60-day extension of the discovery cut-off date or court order obliging Class Plaintiffs to provide meaningful responses to Defendants' pending discovery requests); [Docket No. 1327] (Class Plaintiffs' motion to compel audits and whistleblower complaints). Other disputes included whether Class Plaintiffs could take the deposition of Dawn Arnall, Roland Arnall's wife, who was also a principal shareholder of Ameriquest. Ameriquest moved for a protective order to prevent Ms. Arnall's deposition. [Docket Nos. 1003-1007]. On August 16, 2007, Magistrate Judge Denlow held a motion hearing on Ameriquest's motion for a protective order precluding the deposition of Dawn Arnall and granted the motion without prejudice. [Docket No. 1012].

In addition to the discovery conducted in the MDL, Class Counsel conducted a significant amount of discovery in several cases before they were transferred. For example, in *Murphy v. Ameriquest Mortgage Co.*, Case No. 04-CV-12651 (RWZ) (D.Mass), Ameriquest had produced documents before the case was transferred. Class Counsel also obtained informal discovery, such as borrower complaints through FOIA requests to state attorneys general. Prior to entering into this settlement, Class Counsel also reviewed a considerable amount of financial information regarding Ameriquest's assets, insurance policies, and revenue projections. Class Counsel was therefore well apprised of the strengths and weaknesses of their case as well as of the risks of pursing litigation before the parties entered into mediation.

9

4.      **The Parties' Arms-Length Negotiations In Mediation With Judge Weinstein**

On December 6, 2007 the parties began to pursue a settlement by mediation before an agreed-upon neutral: retired San Francisco Superior Court Judge Daniel Weinstein, at JAMS in San Francisco, California. The parties met with Judge Weinstein on more than 12 occasions in San Francisco and New York, and by phone. In addition to the sessions with Judge Weinstein, the parties engaged in dozens of hours of in-person meetings, conference calls, and other communications intended to further the process of settlement. Negotiations were at arms length, hard fought, and frequently acrimonious.

In May 2009, the parties reached an agreement in principal on the economic terms for the class. That agreement was contingent on additional data review, development of a process for identifying class members from available data and development of a Distribution Plan that considers the relative harm suffered by class members and the strengths and weaknesses of the claims of members of each class.

### III.      THE TERMS OF THE SETTLEMENT

1.      **Economic Relief**

A.      **Settlement Fund**

The Settlement provides a monetary fund of $22 million ("Settlement Fund"), which will be used for settlement payments to class members, foreclosure prevention services, notice and claims administration costs, service awards to Named Plaintiffs and attorneys' fees and costs approved by the Court. The Settlement Fund will *not* be used to pay any costs associated with resolving any other case or matter not resolved by the Settlement. Ameriquest will contribute these funds in three lump sum payments, commencing seven days following the date the Settlement is executed. No part of the

10

Settlement Fund will revert to Ameriquest unless the Settlement terminates. After final approval, interest accumulated on the $22 million will augment the fund for the benefit of the class.

### B.    Distribution Plan And Settlement Payments

Class Counsel has consulted with experts[9] and has carefully evaluated and compared the strengths, weaknesses, and relative merits of the claims of the several classes. Based on these evaluations, Class Counsel has developed a Distribution Plan to divide the economic relief available to class members in a way that recognizes the relative value of their claims. A copy of the Distribution Plan is attached to the Settlement as Exhibit 1. [Settlement, ¶IV(E)].

Under Class Plaintiffs' proposed Distribution Plan, the entire balance of the Settlement Fund (after deduction of notice and administration costs, attorneys fees, Named Plaintiffs Service Awards and foreclosure prevention services costs) will be divided *pro rata* and paid to Settlement Class Members who make timely and valid claims.  [Distribution Plan, ¶4(a)]. Each allowed claim will be assigned a payment amount based on the ratio between the number of points available on the claim (under a payment formula) and the total number of points assigned to all timely valid claims. *Id*.

The payment formula will be based on Ameriquest's loan level account data, which Class Plaintiffs' experts have used to calculate average putative damages. [Distribution Plan, ¶4(c)]. Class Plaintiffs' experts have also estimated the likelihood of recovery of damages on the legal theories available to members of each class. *Id*. The number of points assigned to each claim will be based on average putative damages

_____

[9] Class Plaintiffs intend to submit their expert reports with proceedings on final approval of the settlement.

11

associated with claims in that class, multiplied by the likelihood of recovery. *Id*. Each claim will be assigned points based on this formula for each class for which the claimant is a member.

### C. Foreclosure Prevention Services

In addition to settlement payments, $200,000 of the Settlement Fund will be used to provide foreclosure prevention counseling services to eligible class members. [Distribution Plan, ¶3]. Class Plaintiffs have designated Neighborhood Housing Services of Chicago ("NHS") to provide loan modification counseling to Settlement Class Members who currently have Ameriquest originated loans being serviced by a third party and who are sixty days or more delinquent in their payments. *Id*. NHS, a nonprofit organization established in 1975, is a charter member of Neighborworks America®, a network of 230 organizations across the United States that provide assistance to homeowners. NHS has extensive experience in providing effective foreclosure prevention counseling; for years, it has offered these kinds of services to homeowners in Chicago and across the country.[10]

The foreclosure prevention services will be provided by telephone through an 800 number on a national basis. [Distribution Plan, ¶3]. Foreclosure prevention counselors will provide the following services to eligible Settlement Class Members:

- communicate with class members about the servicer-specific loan modification options available to them, including options under the Home Affordable Modification Program ("HAMP"); and/or

- facilitate foreclosure avoidance by providing options counseling to homeowners who are delinquent on their mortgages; and/or

- act as an intermediary between Settlement Class Members and their

---

[10] *See*, www.nhschicago.org/Gateway/ (last viewed December 4, 2009).

12

respective loan servicers to ensure that all applications for loss mitigation relief are accurate and complete and submitted properly to servicing entities under the servicing entities' respective guidelines; and/or

- assist class members with any follow up issues that may arise in connection with their loss mitigation applications.

NHS's foreclosure prevention counseling services will be available to class members through the earlier of one year or the time the fund is expended. *Id*.

### D. *Cy Pres*

Any amounts left over in the Settlement Fund will be donated to one or more charities by way of an award in the nature of *cy pres*. [Settlement, ¶IV(D)]. Ameriquest will select the charities subject to Class Plaintiffs' approval. *Id*. The parties will submit any dispute relating to the selection of the *cy pres* recipient to Judge Daniel Weinstein, who will have sole authority to make a binding decision on whether the charity or charities is an appropriate recipient of Settlement Funds. *Id*.

### 2. <u>Notice And Administration</u>

The notice methodology the parties propose is commonly approved for national class action settlements and complies with Fed. R. Civ. P. 23(c)(2)(B). *See*, Section IV(1)(B)(f), *infra*. The Notice, along with a claim form, will be mailed by first class mail to the last known address of Settlement Class Members in Ameriquest's records. [Settlement, ¶X(C)(a)]. True and correct copies of Class Plaintiffs' proposed Mailed Notice and Claim Form are attached to the Settlement as Exhibits 3 and 7, respectively. Ameriquest records are the best available source of Settlement Class Members' addresses because it originated the mortgage loans at issue in this action on Settlement Class Members residences. The Settlement Administrator will promptly re-mail any notices returned by the Post Office with a forwarding address. [Settlement, ¶X(C)(d)].

13

The parties will also provide publication notice through one notice to be published in the nationally distributed publications of Parade magazine and USA Today. [Settlement, ¶X(C)(c)]. A true and correct copy of the Class Plaintiffs' proposed Publication Notice is attached to the Settlement as Exhibit 4. In addition, the Settlement Administrator and each Lead Class Counsel will provide a link on its website to a central site maintained by the Settlement Administrator to obtain downloadable and printable copies of the Settlement Agreement, the Notice and the Claim Form. [Settlement, ¶X(C)(b)].

**3.**      <u>**Opt Out Opportunity And Right to Object**</u>

After receiving notice, Class Plaintiffs will have an opportunity to exclude themselves from the Settlement or to object to its approval. [Settlement, ¶¶XI, XII]. The deadlines for filing opt out requests and objections will be conspicuously listed in the mailed and publication notices, as well as on the websites of the Settlement Administrator and Class Counsel. *E.g.,* Mailed Notice, at *1-2. The process for filing exclusions and objections is also explained in the mail and publication notices and the websites. *E.g.,* Mailed Notice, at *1-2. With regard to objections, the notices inform putative Settlement Class Members that the Final Approval Hearing will be the only opportunity for them to appear and have their objections be heard. [Settlement, ¶XII(C)]; *E.g.,* Mailed Notice, at *8. The Notices also inform Settlement Class Members who choose to participate in the Settlement that they will be bound by the release. [Settlement, ¶¶XI(D)]; *E.g.,* Mailed Notice, at *7.

**4.**      <u>**Release**</u>

The release is appropriately tailored to the claims raised in the FACC. In

14

exchange for Settlement benefits, participating Settlement Class Members will release Ameriquest and its affiliated entities from all claims, causes of actions, or liabilities which they may or did have during the Class Period that relate to or arise from the matters that were alleged or asserted, or could have been alleged or asserted in the FACC and/or the Consolidated Actions. [Settlement, ¶VIII(A)].

Importantly, the release will have no effect on borrowers' statutory or common law foreclosure claims and defenses they may raise in response to an actual or threatened judicial or non-judicial foreclosure of any loan originated by Ameriquest or one of its affiliates. [Settlement Agreement, VIII(C)].

## IV.    ARGUMENT

**1.    <u>The Settlement Agreement Should Be Preliminarily Approved As Fair, Reasonable And Adequate</u>**

The Settlement Agreement that the parties have presented to the Court for preliminary approval represents a fair and reasonable resolution of this dispute and is worthy of notice to, and consideration by, the Settlement Class Members.  It will provide financial and other relief to class members and will relieve the parties of the burden of litigation.

In order to begin the approval process, Class Plaintiffs request, with the assent of Ameriquest, that the Court enter the Proposed Order certifying the Settlement Classes, preliminarily approving the Settlement Agreement, providing for notice to the classes, scheduling the final approval hearing, and establishing the Settlement Fund. The Proposed Order also sets suggested deadlines for opt outs, objections, and the return of claim forms.

### A. The Standard For Preliminary Approval Of Class Action Settlement Agreements

Under Fed. R. Civ. P. 23(e)(1)(C), a court may approve a class action settlement if it is "fair, adequate, and reasonable, and not a product of collusion." There is usually an initial presumption of fairness when a proposed class settlement "is the product of arm's-length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced." H. Newberg, A. Conte, Newberg on Class Actions §11.41 (4th ed. 2002); *Goldsmith v. Technology Solutions Co.*, No. 92 C 4374, 1995 WL 17009594, at *3 (N.D. Ill. Oct. 10, 1995); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975).

As the Seventh Circuit recognizes, courts generally favor settlements of class actions:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, 'there is an overriding public interest in favor of settlement.' Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir.1980)(citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

District court review of a class action settlement proposal is a two-step process. At the preliminary approval stage, the question for this Court is whether the settlement falls well within the "range of possible approval," and is sufficiently fair, reasonable and adequate to warrant dissemination of notice apprising class members of the proposed settlement and to establish procedures for a final settlement hearing under Rule 23(e).

Newburg, *supra*, at §11.41. If the district court preliminarily approves a class action

settlement, it then proceeds to the second step in the review process, the fairness hearing.

Manual for Complex Litigation (Fourth) §21.633 (2004).

In assessing the fairness, reasonableness and adequacy of a settlement, courts

consider the following factors: (1) the strength of the case for plaintiffs on the merits,

balanced against the amount offered in settlement; (2) the defendants' ability to pay; (3)

the complexity, length and expense of trial; (4) the presence of collusion in reaching a

settlement and (5) the stage of the proceedings and the amount of discovery completed.

*Armstrong*, 616 F.2d at 314, (citations omitted); *Synfuel Techs., Inc.,* 463 F.3d at 653; *In

re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1132 (7th Cir.1979)

(citations omitted); *Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir.1996). Of these

considerations, the first is most important. *Synfuel Techs., Inc.,* 463 F.3d at 653.

### B.      All Of The Factors Weigh In Favor Of Preliminary Approval

#### a.      The $22 Million Settlement Fund And Foreclosure Prevention Services Provide Significant Benefits To The Classes

First and foremost, the economic relief provided under the Settlement, which

consists of a $22 million Settlement Fund, is substantial in light of Ameriquest's financial

condition at the time of settlement. *Goldsmith,* at *5 (approving settlement with a

monetary fund representing a portion of the damages that could reasonably have been

proven for the class), *quoting*, *Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974)

("The fact that a proposed settlement may only amount to a fraction of the potential

recovery does not, in and of itself, mean that the proposed settlement is grossly

inadequate and should be disapproved."). The Settlement Fund will be used for payments

to Settlement Class Members (based on the distribution plan explained below), notice and

claims administration costs, service awards to Named Plaintiffs and reasonable attorneys fees and costs approved by the Court. [Settlement, ¶IV ("Settlement Relief")]. It provides a significant benefit to the Settlement Class Members because individual homeowners are unlikely to spend the time and money necessary to recover their alleged damages from a defunct company. Additionally, a significant number of class members are likely to be unaware that their rights may have been violated.

In addition to this monetary consideration, NHS, a nationally recognized and experienced housing counseling service organization, will provide counseling to class members who are still in their Ameriquest originated loans who need foreclosure and loan modification assistance. Section III(1)(c), *supra*. This service is a much-needed benefit, as Ameriquest has transferred the servicing of the class members' loans several times and many borrowers do not have established relationships with their new servicers. Moreover, it has been widely publicized that homeowners are experiencing great difficulty communicating with their mortgage servicers about loan modification options and foreclosure avoidance.[11] Therefore, the housing counseling services available to class members trying to keep current on their loans substantially bolsters the economic relief under the Settlement.

The significant economic benefit to the classes, coupled with the foreclosure prevention services, demonstrate that the proposed Settlement is fair, reasonable, and

---

[11] *E.g.*, NY Times: Judges' Frustration Grows With Mortgage Servicers, by John Collins Rudolf (Sept. 3, 2009), *available at* http://www.nytimes.com/2009/09/04/business/economy/04wells.html?_r=1&scp=1&sq= Loan%20modification%20Wells%20Fargo&st=cse (quoting a bankruptcy judge who ordered a Wells Fargo senior executive to attend a bankruptcy hearing to explain why it denied a loan modification to a debtor. Judge Haines lamented that debtors problems applying for loan modifications are, "[t]he kind of story I….and other bankruptcy judges around the country are hearing over and over and over again.").

appropriate, particularly in light of Ameriquest's financial condition. *See*, Declaration of

Gary Klein, ("Klein Decl.") ¶¶14, 18; Declaration of Kelly Dermody, ("Dermody Decl.")

¶¶5-7; and Declaration of Jill Bowman ("Bowman Decl.") ¶¶3-7, in support of

preliminary approval attached hereto as Exhibits 1, 2 and 3.

> **b.      The Distribution Plan Is Fair And Adequate Because Class
> Members' Payments Are Based On The Relative Value Of
> Their Respective Claims**

The Distribution Plan Class Plaintiffs propose is fair, reasonable and adequate.

*See*, Newberg, §12:35 (approval of distribution plan of a settlement fund is "governed by

the same standards of review applicable to approval of the settlement as a whole: [it]

must be fair, reasonable and adequate.") (quotation and citations omitted). "As a general

rule, a plan of allocation that reimburses class members based on the type and extent of

their injuries is reasonable." *Id*. It is also appropriate to factor in the likelihood of success

of class members' respective claims in calculating a payment formula. *In re Agent

Orange Product Liability Litigation*, 818 F. 2d 179, 183 (2nd Cir. 1987). A distribution

plan is adequate if counsel has properly apprised themselves on the merits of the claims

and the distribution plan reflects this information. *In re PaineWebber Ltd Partnerships

Litigation*, 171 F.R.D. 104, 132 (S.D.N.Y. 1997), *aff'd*, 117 F. 3d 721 (2nd Cir. 1997).

Class Plaintiffs' proposed *pro rata* Distribution Plan squarely fits within these

parameters. First, it considers the type of claim and extent of the damages. The value of

each Settlement Class Members' claim will be based on average putative damages

associated with claims in that class multiplied by the claims' likelihood of recovery.

[Distribution Plan, ¶4(c)]. Settlement Class Members' allowed claims will be assigned a

payment amount. [Distribution Plan, ¶4(a)]. The payment amounts will be based on the

ratio between the number of points available on the claim under a formula and the total number of points assigned to all timely valid claims. *Id*.

Next, Class Counsel formulated the Distribution Plan based on expert evaluation of the likelihood of success of each claim. *Id*. Finally, Class Counsel litigated this case for three years and conducted substantial amounts of discovery such that they are well apprised of the merits of Class Plaintiffs' claims. Sections II(2)&(3), *supra*.

The Northern District of Illinois has endorsed the type of *pro rata* distribution method Class Plaintiffs propose here:

> [Defendant] possesses data for millions of brand name prescription drug purchases for the time period in question, including information on 99% of the class members, and represented to us that it is capable of measuring each class member's drug purchases as a percentage of all class members' purchases for the relevant time period. We think this method will provide the most accurate measure of the damages suffered by each class member and, for this reason, we endorse the pro rata distribution method.

*In re Brand Name Prescription Drugs Antitrust Litigation*, No. 94 C 897, 1999 WL 639173, at *4 (N.D. Il. Aug. 17, 1999). For all of these reasons, the Distribution Plan is fair, reasonable and adequate.

### c. Voluntary Settlement Of This Class Action Serves The Interests Of The Parties And The Court

As discussed above, there is an overriding public interest in settling class action litigation. Section IV(1)(A)*, supra.* "By their very nature, because of the uncertainties of outcome, difficulties of proof, and length of litigation, class action suits lend themselves readily to compromise." Newberg, §11.41 (citations omitted).

Similarly, settlement of this particular case is appropriate. As an initial matter, this litigation has already been lengthy (3 years, with a docket consisting of over 3,200 entries) and expensive. For example, Class Counsel and Ameriquest engaged in a costly

20

discovery process, with Class Counsel taking numerous depositions requiring travel to Southern California and Ameriquest producing hundreds of thousands of documents and volumes of electronic data. S*ee*, Section II(3), *supra*. Significant resources have been necessary to properly prosecute and defend this case. Indeed, in addition to three law firms acting as Co-Lead Counsel, the Court appointed an Executive Committee to assist in representing the Class Plaintiffs. Further litigation of this case would create an unnecessary burden on the parties and the Court and, in light of the risk (discussed below), would not result in greater benefit to the class than the Settlement provides.

Most importantly, the fact that Ameriquest is out of business presents a significant risk that Class Plaintiffs would not be able to collect a judgment even if they prevailed at trial, which is uncertain. Newberg, §11.50 ("[c]ollectibility of a judgment is also a factor bearing on the reasonableness of a settlement in relation to the defendants' ability to withstand a greater one.") (citations omitted). Although Class Plaintiffs believe their claims are valid, they understand that success on the merits is by no means assured and that this Settlement would resolve the conflicts underlying this class action without the necessity, time and expense of a protracted trial. For example, the Seventh Circuit's *Andrews* decision (*supra* 3 n.2) foreclosed on Class Plaintiffs' ability to certify a class of borrowers with TILA rescission rights they have not exercised. In addition, while some Seventh Circuit decisions came down during the course of the litigation that supported Class Plaintiffs' claims,[12] other decisions illustrate the risk Class Plaintiffs would have

---

[12] *E.g.*, *Handy v. Anchor Mortg. Corp.*, 464 F.3d 760 (7th Cir. Sept. 29, 2006) (holding that use of the wrong form of notice of right to cancel fails to meet the requirements of the TILA and therefore gives rise to an extended right to rescind); *Hamm v. Ameriquest Mortg. Co.*, Nos. 05-3984, 06-3086, 2007 WL 3010973 (7th Cir. Oct. 17, 2007) (holding that failing to explicitly state the payment period in a TILA disclosure and providing an

faced in further litigation, particularly at the class certification stage.[13] Moreover, the JPML transferred a variety of class actions raising multiple and sometimes inconsistent legal theories, complicating the possibility of certifying a uniform class of borrowers.

The value of the benefits class members will receive under this Settlement is enhanced by the fact that the benefits will be provided now, without the delay, burden and risks of further litigation. In particular, the housing counseling services available under the Settlement will create more value to the class the sooner they are instituted, as many individuals are at the risk of foreclosure.

<blockquote>
d.     **The Settlement Resulted From Extensive Arms-Length Negotiations And Is Not The Product Of Collusion**
</blockquote>

The Court recognized Class Counsels' ability to lead this case at the outset of the litigation. *In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation*, No. 05-CV-7097, 2006 WL 3227883, at *3 (N.D. Ill. Nov. 7, 2006) (appointing Class Counsel as Co-Lead Counsel). As a leading treatise on class action jurisprudence explains, "…decisions indicate that the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." Newberg, §11.51. *See also*, Section IV(1)(A), *supra* (there is an initial presumption of fairness when a settlement has been negotiated in arms-length by experienced counsel).

The requirement that a settlement be fair is designed to protect against collusion

---

overshadowing one week rescission right notice along with the TILA mandated three-day rescission right notice violates the TILA).

[13] *See, e.g., In re McDonald's French Fries Litigation*, 257 F.R.D. 669, 673-74 (N.D. Ill. 2009) (refusing to certify national class, noting that numerous courts in the 7th Circuit have found material conflicts among the fifty states' laws raised in the litigation and have denied class certification.).

among the parties. *Mars Steel Corp. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 834 F. 2d 677, 684, 9 Fed. R. Serv. 3d (LCP) 909 (7th Cir. 1987) (approved settlement upon finding of no "hanky-panky" in negotiations). There usually is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's-length negotiations. Newberg, §11.42. The 3-year duration of the litigation, followed by 2 years of highly contested settlement negotiations, the excellent result for the class in spite of the significant procedural and substantive hurdles Class Plaintiffs faced, the hard-fought, arms-length course of negotiations, and the participation of the Honorable Daniel Weinstein (Ret.), an experienced mediator, are all testaments to the non-collusive nature of the settlement. The Settlement Agreement was the result of arm's-length negotiations by experienced class action lawyers. *E.g.*, Klein Decl., ¶¶2-11, 13; Dermody Decl., pp. 2-5; Bowman Decl.¶¶3, 8.

### e. The Factual Record Was Well Developed Through Independent Investigation

As discussed in Sections II(2)&(3), *supra*, the 3-year litigation was lengthy, hard fought and involved heavy motion practice. *See also*, [Settlement, ¶II ("Discovery Completed")]. The discovery process was thorough and included both formal and informal discovery. *Id.* The parties were well apprised of the strengths and weaknesses of their claims and defenses at the time they entered into settlement negotiations. Klein Decl., ¶17; Dermody Decl., ¶3; Bowman Decl., ¶4. Class Counsel continued to obtain information relevant to their case during the settlement negotiations, such as information relating to Ameriquest's financial condition. [Settlement, ¶II]. Class Counsel will also obtain confirmatory discovery about Ameriquest's current financial condition. [Settlement, ¶XVI].

23

**f.      The Proposed Notice To Class Members Is Adequate**

Under Federal Rule of Civil Procedure 23(c)(2), class members are entitled to notice of any proposed settlement and an opportunity to object or opt out before it is finally approved by the Court.  Manual for Complex Litig. (Fourth) § 21.31 (2004). Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974), *quoting, Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

The Notice the parties propose here is clear and straightforward, providing putative class members with enough information to evaluate whether to participate in the Settlement, as well as directions on how to seek further information. The Notice contains all of the information required by Rule 23(c)(2)(B)(i)-(vii). Mailed Notice, p. 3 (nature of the action); pp. 3-4 (class definitions); pp. 2-3 (summary of the class claims and defenses); p. 8 (ability to enter an appearance); p. 7 (exclusion rights); p. 8 (objection rights); and p. 7 (binding effect of a class judgment on members under Rule 23(c)(3)).

Notice will be provided by both mail and publication. Mailed notice, along with a claim form, will be sent by first class mail postage prepaid to the last known addresses of Settlement Class Members as contained in Ameriquest's records. [Settlement, ¶X(C)(a)]. The Settlement Administrator will promptly re-mail any notices returned by the Post Office with a forwarding address. [Settlement, ¶X(C)(d)].

The Settlement Administrator will also provide publication notice of the Settlement through one notice to be published in two national periodicals, Parade

24

Magazine and USA Today, or as otherwise ordered by the Court, not later than thirty (30) days after the Court enters the Preliminary Approval Order. [Settlement, ¶X(C)(c)].

In addition, the Settlement Administrator and each Lead Class Counsel will provide a link on its website to a central site maintained by the Settlement Administrator to obtain downloadable and printable copies of the Settlement Agreement, the Notice and the Claim Form. [Settlement, ¶X(C)(c)].

The notice scheme the parties propose is consistent with the due process requirements incorporated in Rule 23(c)(2)(B). Rule 23's advisory committee note states that the "mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." Fed. R. Civ. P. 23(d)(2) advisory committee's note. (*citing*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (additional citations omitted).

2.    **Each Settlement Class Meets Rule 23's Criteria And Can Be Preliminarily Certified For Settlement Purposes**

For settlement purposes only, the parties have agreed that the Court may make preliminary findings and enter an order granting provisional certification of the Settlement Classes and appoint Class Plaintiffs and Class Counsel as representatives of the Settlement Classes. [Settlement, ¶VI(B)]. "The validity of use of a temporary settlement class is not usually questioned." Newberg, §11:22. The Manual for Complex Litigation explains the benefits of settlement classes:

> Settlement classes—cases certified as class actions solely for settlement—
> can provide significant benefits to class members and enable the
> defendants to achieve final resolution of multiple suits. (citation omitted).
> Settlement classes also permit defendants to settle while preserving the
> right to contest the propriety and scope of the class allegations if the

25

settlement is not approved and, in Rule 23(b)(3) actions, to withdraw from the settlement if too many class members opt out. An early settlement produces certainty for the plaintiffs and defendants and greatly reduces litigation expenses.

Manual, §21.612.

For settlement purposes only, the Settlement Classes are submitted for Certification pursuant to Rule 23(b)(1)(B) and (b)(3) of the Federal Rules of Civil Procedure. [Settlement, ¶VI(B)]. They are defined in the Settlement at paragraph VI, and are entitled: Class 1 ("TILA Rescission Class"); Class 2 ("Bait and Switch Class"); Class 3 ("Discount Points Class"); Class 4 ("Wholesale Borrower Class"); and Class 5 ("Loan Servicing Class"). The sheer number and complexity of the Class cases transferred here by the MDL panel necessitated the relatively large number of Classes. However, the Settlement Classes all meet all of the requirements of Fed. R. Civ. P. 23(a) and 23(b)(1) and (b)(3).

### A.    Rule 23(a)

#### a.    Numerosity

Each of the Settlement Classes as defined meets Rule 23(a)'s numerosity requirement.  According to Ameriquest's data, Class 1 contains approximately 280 individuals. Class 2 contains approximately 162,000 individuals. Class 3 contains approximately 320,000 individuals. Class 4 contains approximately 313,500 individuals. Class 5 contains approximately 33,200 individuals. Each of these classes  clearly is sufficiently numerous. *Jones v. Risk Management Alternatives, Inc*., No. 02 C 9392, 2003 WL 21654365 at *2 n.3, (N.D. Ill. July 11, 2003) (Aspen, J.) (certifying class, noting that defendants did not contest numerosity where the class consisted of 1,500 individuals); *see also*, *McCabe v. Crawford & Co*., 210 F.R.D. 631, 643 (N.D. Ill. 2002) (a class of forty

26

or more is generally sufficient to establish numerosity). Joinder of all of the individuals in Each Settlement Class would be impracticable. *See, e.g., Gorsey v. I.M. Simon & Co.,* 121 F.R.D. 135, 138 (D.Mass. 1988) (800 to 900 member class made joinder impracticable). *Randolph v. Crown Asset Mgmt.*, LLC, 254 F.R.D. 513, 517 (N.D.Ill.2008) (finding that joinder of hundreds of lawsuits is impractical).

### b.　　Commonality

Commonality exists where a class possesses common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "Absolute commonality" is not required; commonality is satisfied if plaintiffs can demonstrate that a "common nucleus of operative fact" exists among the proposed class members. *Parker v. Risk Mgmt. Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002). The commonality standard is "quite low." *Hernandez v. Midland Credit Mgmt., Inc.*, 236 F.R.D. 406, 411 (N.D. Ill. 2006). A plaintiff may ordinarily satisfy the commonality requirement by showing that there is "at least one question of law or fact common to the class." *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 164 F.R.D. 659, 663 (N.D. Ill. 1996). Class certification will not be defeated solely because there are some factual variations among the grievances of the class members. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir.1998); *Patterson v. General Motors Corp.*, 631 F.2d 476, 481 (7th Cir.1980).

The questions of law and fact in this litigation are substantially identical among the Settlement Class Members within their respective classes, as follows:

- **"TILA Rescission Class" (Class 1):** Every member of Class 1 requested rescission of their Ameriquest loan based on Ameriquest's alleged failure to provide them with the loan disclosures under the TILA or state disclosure laws. [Settlement, ¶VI(A)]; [CCAC, ¶¶234-244]; [FACC, ¶¶160-167, 198-209]. Class 1 also alleges this conduct is unfair and deceptive in violation of California law. [FACC, ¶¶266-274].

27

- **"Bait and Switch Class" (Class 2):** Every member of Class 2 either received an annual percentage rate ("APR") that was higher than what Ameriquest pre-closing written disclosures provided, received a loan with a prepayment penalty when Ameriquest's pre-closing written disclosures did not provide for one and/or received a variable rate loan when Ameriquest's pre-closing written disclosures stated they would receive a fixed rate. [Settlement, ¶VI(A)]; *see, e.g.*, [CCAC, ¶¶5, 93-97, 185(c)]; [FACC¶¶168-173]. Every member of Class 2 alleges that this conduct is unfair and deceptive under California law and constitutes breach of contract and breach of the covenant of good faith and fair dealing. [CCAC, ¶¶281-285]; [FACC, ¶¶239-243, 266-274].

- **"Discount Points Class" (Class 3):** Every member of Class 3 paid discount points. [Settlement, ¶VI(A)]; *see, e.g.*, [CCAC, ¶¶5-6, 92, 102-105, 198-206]; [FACC, ¶¶174-181]. They all allege that Ameriquest failed to provide them with agreed-upon discounted rates (or necessary information about the discounted rates), in breach of their loan contracts and in breach of the covenant of good faith and fair dealing. [CCAC, ¶¶268-280]; [FACC, ¶¶226-238]. Class 3 also alleges this conduct is unfair and deceptive in violation of California law. [FACC, ¶¶266-274].

- **"Wholesale Class" (Class 4):** Every member of Class 4 paid brokers' fees or settlement charges totaling more than 3% of their funded loan amount, which they claim is unfair and deceptive under California law and constitutes a breach of contract. [Settlement, ¶VI(A)]; *see also*, [FACC, ¶¶182-189]; [FACC, ¶¶266-274].

- **"Loan Servicing Class" (Class 5):** Every member of Class 5 paid default related fees, such as a late fee, legal fee, phone pay NSF fee, bad check NSF fee, appraisal and inspection fees and recoverable corporate advance, which they claim constitutes a breach of contract. [Settlement, ¶VI(A)]; [CCAC, ¶¶90, 118-122, 224-231]; *see also*, [FACC, ¶¶190-196]. Class 5 also alleges this conduct is unfair and deceptive in violation of California law. [FACC, ¶¶266-274].

Because all of the conduct at issue in Class Plaintiffs' FACC either occurred in California by virtue of the centralized business practices of Ameriquest or was based in policies and procedures that originated from Ameriquest's home offices in California, all of the Class Plaintiffs allege that Ameriquest's origination and servicing conduct violates the California Business & Professions Code §§ 17200 *et seq.* and the California Civil

Code §§ 1750 *et seq.* [CCAC, ¶¶302-320]; [FACC, ¶¶266-274]; *supra* 3 n.2 (citing cases showing that courts routinely certify claims of nationwide classes under the law of the state in which the defendant is domiciled and from which the unlawful conduct emanated).

### c.    Typicality

Typicality exists where the claim involves the same "event, practice or course of conduct that gives rise to the claim of the other class members, and if the claims are based on the same legal theory." *Parker v. Risk Management Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002); *see also*, Fed.R.Civ.P. 23(a)(3).   Commonality and typicality are often treated together because the analyses of each are often interrelated. *See, e.g., Parker*, 206 F.R.D. at 213; *see also*, *Kremnitzer v. Cabrera & Rephen, P.C.*, 202 F.R.D. 239, 241 (N.D. Il. 2001) ("Typicality, the third requirement, is closely related to the question of commonality."). "Typicality is established when there is a 'sufficient relationship . . . between the injury to the named plaintiff and the conduct affecting the class,' and the claims of the named plaintiff and those of the class 'are based on the same legal theory.'" Newberg, §3.13.

For virtually the identical reasons discussed in the preceding section, this element is also met. All of the Named Plaintiffs' have one or more claims that are typical of those of the Settlement Class Members. Like those of Settlement Class Members, the Named Plaintiffs' predatory lending and/or serving claims all arise out of the same origination and servicing conduct in which Ameriquest allegedly engaged. The Named Plaintiffs and Settlement Class Members were all affected in the same ways by Ameriquest's conduct, as defined in the five classes.

29

### d.    Adequacy of Representation

Adequacy requires the representative of a class to provide fair and adequate representation of the class. Fed. R. Civ. P. 23(a)(4). Courts in the Northern District of Illinois have broken this requirement down into three elements: (1) the representative cannot have interests antagonistic to the class; (2) the representative must have a sufficient interest in the outcome of the litigation; and (3) counsel for the representative must have appropriate experience, qualifications, and competency. *Sledge v. Sands*, 182 F.R.D. 255, 259 (N.D. Ill. 1998); *Gammon v. GC Servs. Ltd. P'ship.*, 162 F.R.D. 313, 317 (N.D. Ill. 1995).

Here, none of the Named Plaintiffs has interests that are antagonistic to or in conflict with the classes they seek to represent and their alleged injuries are identical to those suffered by class members. *See*, *Amchem Products v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2251, 138 L.Ed.2d 689 (1997) (courts look simply at whether the representatives' interests are in any way antagonistic to or in conflict with those of the class members). In addition, it is undisputed that Class Counsel, appointed by the Court to prosecute the Consolidated Actions, are active practitioners with substantial experience in consumer law and class action litigation. *E.g.*, Klein Decl., ¶¶2-11; Dermody Decl., pp. 2-5; Bowman Decl., ¶8, and Exhibit A to Bowman Decl.

### B.    Rule 23(b)(1)(B)

Class action is appropriate under Fed. R. Civ. P. 23(b)(1)(B) if prosecuting separate actions by or against individual class members would create a risk of, "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede their ability to protect their interests." Certification under Rule 23(b)(1)(B) is appropriate in limited fund cases, like this one, where the fund is inadequate to satisfy the total of the aggregated claims. *Ortiz v. Fibreboard Corporation*, 527 U.S. 815, 838, 119 S. Ct. 2295 (1999). In *Ortiz*, the Supreme Court held that certification of a mandatory settlement class under (b)(1)(B) requires the plaintiffs to show that "…the fund is limited by more than the agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing the conflicting interests of class members."[14] *Ortiz*, 527 U.S. 816.

This case is clearly appropriate for (b)(1)(B) certification. There is a limited fund that will not satisfy the aggregate of Settlement Class Members' claims because of Ameriquest's deteriorated financial condition. [Settlement, ¶III(E)(3) ("Plaintiffs agree to settle this class action…considering, among other things…[Ameriquest's] financial circumstances and the risk the Class could obtain little or no relief if the proceedings did not resolve.")].

Moreover, in addition to the discovery already completed, Class Plaintiffs will obtain confirmatory discovery about Ameriquest's financial condition. Ameriquest will provide a declaration or affidavit under penalty of perjury, confirming under oath to Lead Class Counsel and subject to *in camera* inspection by the Court, the current financial condition of: Ameriquest Mortgage Company; AMC Mortgage Services, Inc. (FKA Bedford Home Loans, Inc); Town & Country Credit Corporation; Olympus Mortgage

---

[14] It is important to note that the Supreme Court's standard is based on the fact that Rule 23(b)(1)(B) automatically binds class members. Here, the parties agreed that every Class Plaintiff retains an opt out right, regardless of (b)(1)(B) certification. Courts can allow opt outs in (b)(1) classes under their equitable powers. *E.g. County of Suffolk v. Long Island Lighting Co.*, 907 F. 2d. 1295, 1305 (2nd Cir. 1990) (finding no abuse of discretion by the district court in permitting an opt-out right in a (b)(1)(B) "limited fund" class action.).

Company (NKA Bedford Home Loans, Inc.); and Argent Mortgage Company, LLC. [Settlement, ¶XVI]. Finally, as discussed in Sections III(1)(b) and IV(1)(B)(b), *supra*, the Distribution Plan addresses in detail the differences in the damages suffered under each claim, as well as between individuals within each claim.[15]

### C.     Rule 23(b)(3)

To determine whether the action meets 23(b)(3)'s requirements the Court must consider: (1) the interest of the individual class members in controlling the litigation; (2) the extent and nature of any pending litigation involving the same matters; (3) the desirability of concentrating the litigation of all the members' claims in the forum in which the class action was commenced; and (4) the management difficulties that may be encountered in a class action. *Rahim v. Sheahan*, No. 99 C 0395, 2001 WL 1263493, at *16 (N.D. Ill. Oct. 19, 2001). As an initial matter, the difficulties of managing a class action are vitiated by this Settlement.  When "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

A class action is the superior method of resolving large scale claims if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Products, Inc., et al. v. Winsor, et al.*, 521 U.S. 591, 615, 117 S.Ct. 2231 (1997).

---

[15] Class Plaintiffs expect to file declarations of two of their experts, one who evaluated the likelihood of success of their claims and the second who analyzed Ameriquest's loan level data to identify class members, at the time of final approval.

In this case the aggregate claims of the class are primarily comprised of calculable and limited actual damages in amounts that make it uneconomic for individuals to pursue these claims on their own. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (a class action is the superior method of proceeding when it allows the plaintiffs to pool claims that would be uneconomical to litigate individually).

It is thus unlikely that individual homeowners would invest the time and expense necessary to seek relief through litigation. In determining the best available method for resolving a dispute, the Court may consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture,* 503 F.2d 1161 1164-65 (7th Cir. 1974). In fact, in this case many class members may be unaware of their claims or may not understand their rights. *See*, *Henry v. Cash Today, Inc*. 199 F.R.D. 566, 574 (S.D. Tex. 2000) (class action superior where financially strapped borrowers unaware of their rights). Many others would not have access to competent counsel.

Predominance is satisfied "when there exists generalized evidence that proves or disproves an element on a simultaneous, class-wide basis, ... [since s]uch proof obviates the need to examine each class member's individual position." *Golon v. Ohio Sav. Bank*, 98 C 7430, 1999 WL 965593, at *4 (N.D. Ill. Oct. 15, 1999). The predominance element has clearly been met here because the claims of the class members, the circumstances under which these claims arise, and the method of proving damages are identical.

### V.    CONCLUSION

The proposed class action settlement is fair, reasonable, and adequate. For the foregoing reasons, Class Plaintiffs respectfully request that the Court approve the

33

Settlement on a preliminary basis so that notice may be sent.  Class Plaintiffs request that

the Court confer with the parties to set a hearing for final approval of the Settlement and

to set appropriate deadlines for various settlement requirements.

/s/ Gary Klein
Gary Klein
Shennan Kavanagh
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA 02111-2810

Kelly M. Dermody
Rachel Geman
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

Jill Bowman
Terry Smiljanich
JAMES, HOYER, NEWCOMER
    & SMILJANICH, P.A.
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, FL 33609

*Plaintiffs' Co-Lead Counsel*

Marvin A. Miller
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603

*Plaintiffs' Liaison Counsel*

DATED:        December 4, 2009.

34