**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT JEFFRESS and PAMELA JEFFRESS, | ) | |
| | ) | 06 C 3423 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Originally 2: 06 cv 102 (N.D. Ind.) |
| AMERIQUEST MORTGAGE COMPANY; | ) | Transferred to Jude Apsen for pre- trial |
| AMC MORTGAGE SERVICES, INC.; | ) | proceedings under MDL No.1715, |
| DEUTSCHE BANK NATIONAL TRUST | ) | Lead Case No. 05 C 07097 |
| COMPANY, N.A., as Trustee of AMERIQUEST | ) | |
| MORTGAGE SECURITIES, INC., Asset Backed | ) | |
| Pass Through Certificates, Series 2005-R7 Under | ) | |
| the Pooling and Servicing Agreement Dated as of | ) | |
| August 1, 2005, Without Recourse; AMERICAN | ) | |
| HOME MORTGAGE SERVICING, INC., and | ) | |
| JOHN DOES 1-100, | ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiffs bring this action against Ameriquest Mortgage Company and an affiliate to secure redress for predatory practices in making residential mortgage loans.  Plaintiffs allege violations of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA") and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA").

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331  (general federal question), 1337 (interstate commerce), and 15 U.S.C. §§1640 (TILA) and 1691e (ECOA).

3.      Each defendant does business in the District and is deemed to reside here.

## PARTIES

4.      Plaintiffs Scott Jeffress and Pamela Jeffress are husband and wife and reside in a home which they own at 3320 Willowdale Road, Portage, Indiana 46368, in Porter County.

5.      Defendant Ameriquest Mortgage Company ("Ameriquest") is a Delaware corporation with its principal offices in California.  It maintains offices in and does business in Indiana as well as Illinois.   Its registered agent and office are National Registered Agents, Inc., 320 Meridian St., Indianapolis, IN 46204, or 200 W. Adams, Chicago, IL 60606.

6.      Defendant Ameriquest is engaged in the business of originating "subprime" mortgages.

7.      Defendant Ameriquest makes more than 26 loans per year.  It is a  "creditor" as defined in TILA.

8.      During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

9.      Defendant AMC Mortgage Services, Inc. ("AMC") is a Delaware corporation with its principal place of business in California.  It does business in Indiana as well as Illinois.   Its registered agent and office are National Registered Agents, Inc., 320 Meridian St., Indianapolis, IN 46204, or 200 W. Adams, Chicago, IL 60606.

10.      Defendant AMC serviced loans originated by Ameriquest.  Borrowers such as plaintiffs were directed to make payments to AMC, which claimed, among other interests,

the right to payments under plaintiffs' loans.

11.     Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY 10005.  On information and belief it holds legal title to plaintiffs' loans, as trustee.

12.     Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Indiana.  It is the beneficial owner of some loans originated by Ameriquest Mortgage Company, including plaintiffs'.   It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

13.     Defendant American Home Mortgage Servicing, Inc. is a foreign corporation which does business in Illinois and Indiana.  Its registered agent and office are C.T. Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

14.     Defendant American Home Mortgage Servicing, Inc. services some loans originated by Ameriquest Mortgage Company, including plaintiff's, and claims an interest in such loans, including the right to receive payments thereunder.  It is joined as a necessary party.

15.     Defendants John Does 1-100 are other persons, as yet unknown to plaintiffs, that own or claim interests in plaintiffs' mortgage loans.

## DEFENDANTS' PRACTICES

16.     Ameriquest targets consumers for predatory, "subprime" loans. Ameriquest engages in a "bait and switch" scheme through which it lures borrowers with promises of favorable interest rates, monthly payments and/or loan terms, and then switches the terms at closing to less favorable ones.

17.     Ameriquest holds itself out, in advertising, as a mortgage company that can quickly arrange for and close mortgage refinancings in short order—with terms quoted over the

phone in as little as one business day, loan documents sent to a borrower shortly thereafter, and a closing taking place in a matter of weeks. These refinancings are most often completed for the purpose of "cashing out" equity built up in consumers' houses, in order to retire personal debts (on credit card accounts or other loans) or receive money for major personal expenses.

18.     In a mailing, Ameriquest promises that "your Ameriquest personal mortgage specialist will work with you to custom-tailor a loan with the terms and rates that work best for you" that Ameriquest "can tell you how much you qualify for in about a day," and that "we'll even do the paperwork for you!"   Another advertising letter sent to homeowners by Ameriquest reiterates this information, stating specifically that "we'll give you an answer in about 24 hours." A third advertising letter states that an Ameriquest representative "will work with you—one-on-one, start to finish—to custom-tailor a loan with terms and rates that work for you. We'll even do the paperwork. You can get a decision as soon as the next business day and your loan could be funded in as little as 30 days."

19.     A DVD Ameriquest sends to homeowners contains a thirty-minute "infomercial" style program. This includes several statements from Mary Jo Shelton, Ameriquest's vice-president for branch operations. Specifically, Ms. Shelton claims that Ameriquest employees are "trained to find ways to say yes, instead of no," and that Ameriquest wants to "create a lending solution that works for you, based on your needs and your situation." The DVD also states that an Ameriquest agent "will fill out the forms based on the information you provide. You'll be able to review the documents, and then sign." The infomercial also states that an Ameriquest agent would be with the borrower from the start of the refinancing process to the finish. Finally, the infomercial amplifies statements made in the mailing, emphasizing that a closing would usually take place in a matter of weeks, and stating specifically that "we can close your loan in days, not months."

20.     Ameriquest uses these representations as part of a scheme to systematically bait customers into residential mortgage loan transactions with promises of fixed interest rates, low interest rates, low or no fees, lower monthly payments compared to then current payments, no prepayment penalties, and/or the existence or absence of particular terms.  When the paperwork is presented to customers for signature at closing, the terms are contrary to the terms promised.  Frequently, borrowers are unaware that the terms of the mortgage documents do not match Ameriquest's prior representations.

21.     After presenting new or different loan terms, if the borrower becomes aware of the changes, Ameriquest engages in scare and pressure tactics to cause customers to proceed with the transaction anyway.  Ameriquest further uses their borrowers' concern about loan terms in the initial transaction as an opportunity to bait the hook for a second loan, by promising an early refinancing on better terms.  The refinance loans then capitalize finance charges, provide an excuse for new and additional points and other closing costs and provide an opportunity for Ameriquest to reap other additional hidden profits at their borrowers' expense.

22.     Ameriquest misleads the borrowers into signing loan documents without reading them by misrepresenting their contents and telling borrowers there is no need or time to read them and pressuring them to "just sign the papers."

23.     While Ameriquest purports to provide a three-day right of rescission, it fails to provide notice of this right in the legally mandated form with full information about the legal deadline for cancellation.  In many cases, Ameriquest fails to timely provide the legally required copies of the appropriate cancellation forms.

24.     Ameriquest also fails to timely deliver copies of various loan papers, including required disclosures under the Truth in Lending Act, until after the loan is consummated.

This prevents consumers from understanding the loan terms, including most importantly, the true cost of the loan.

25.     Ameriquest also has a uniform practice of removing certain documents, such as those relating to the prepayment penalty, before presenting the documents to the customer for signing.  For this reason and others, customers are systematically denied any meaningful opportunity to discover that there terms on the final documents do not match the prior representations.

26.     Ameriquest trains and encourages its loan officers, called Account Executives, to engage in any conduct necessary to close the greatest number of loans as quickly as possible and to maximize the total loan principal.  Ameriquest Account Executives  receive daily leads on new customers that are generated by software at Ameriquest's Orange, California, headquarters.  These leads target homeowners who are carrying both a mortgage and significant credit card and/or other consumer debt; persons who have mobile home mortgages; persons with less than perfect credit; and other financially-vulnerable persons.  These homeowners are solicited through repeated mailers, telephone calls, and/or personal visits by Ameriquest sales personnel, all inviting them to consolidate their debts or to obtain money for expenses, with false and misleading promises of more favorable loan terms and/or reduced monthly payments. Ameriquest profits by obtaining high fees upfront and high interest rates in the interim and often by selling its loan portfolios to other companies.

27.     Ameriquest systematically trains its sales personnel through standardized sales presentations (videos) developed under the control of corporate headquarters in Orange, California, as well as by use of the movie "Boiler Room" which depicts unethical and illegal high-pressure sales practices by a securities brokerage firm.  These videos demonstrate high-pressure

mortgage sales, while failing to train employees on the legal requirements and regulations for mortgage lending.

28.     Ameriquest also trains its sales personnel to routinely rush borrowers through the lengthy, complex documentation of the regulated closing process so as to divert the borrowers' attention from the documented terms of the loan.  Moreover, Ameriquest trains its Account Executives to overcome objections raised by borrowers at closing by offering immediate cash pending the closing of the loan and by assuring borrowers that they can refinance with better terms after improving their credit score, without disclosing that they could be subject to the prepayment penalty, higher interest rates and other fees if they did so.

29.     At all times relevant to this action, Ameriquest's uniform and fundamental business strategy with respect to the sale of home-secured loans has been to uniformly hold out to all prospective customers, through the use of misleading promotions and material omissions regarding loan terms, that refinancing and/or consolidating their debts with Ameriquest will be beneficial and will save them money when, in fact, it will not.  In addition, Ameriquest employs aggressive, misleading, and unfair high-pressure sales tactics to obfuscate loan terms both prior to closing and at closing, if and when customers question loan terms, in order to force the customers to close the loan.  Ameriquest makes loans in amounts so high in relation to the value of their homes that the resulting loan-to-value ratio (coupled with prepayment penalties and other restrictions) effectively strips their homes of equity and prevents the borrowers from refinancing their loans with Ameriquest's competitors.

30.     Because Ameriquest profits from the origination and "flipping" of loans and the subsequent sale of those loans to investment bankers and others as assets for mortgage-based securities, Ameriquest has little concern for the actual risk that the loans might default or with the

continued profitability of the loans after origination, except to the extent that Ameriquest can induce existing customers to refinance again and borrow more.

31.     Ameriquest routinely fails to provide required disclosures to borrowers prior to closing – including, but not limited to, the HUD-1 statement, Notice of Right to Cancel, a "good faith" Good Faith Estimate, settlement process information booklet and other disclosures required under TILA, thereby ensuring that borrowers have no meaningful opportunity to review them or to learn the true terms and costs of their loan transactions.

32.     Ameriquest has designed its compensation system to reward its Account Executives for "upselling" customers' loans, providing incentives for Account Executives to aggressively sell products in order to increase the amounts loaned to the maximum permitted by Ameriquest's underwriting goals, irrespective of the amounts requested by borrowers or supported by the actual value of the home.

33.     Ameriquest's compensation scheme also rewards Account Executives based on quantity of loans closed per month. The minimum monthly quotas have risen consistently over time, reaching levels that are significantly higher than the number of loans closed by sales personnel at other mortgage companies. Given that Ameriquest's Account Executives must reach the minimum quotas in order to be paid at any reasonable rate and that the quotas are very high, Ameriquest's policy all but ensures that its Account Executives will systematically engage in unfair and deceptive tactics to meet company quotas, with company knowledge of this widespread practice.

34.     A recent report in the *Los Angeles Times* described allegations made against Ameriquest for various predatory mortgage practices, allegations that were supported by statements made by former Ameriquest employees. Ameriquest specifically uses telemarketing-style operations to make "cold calls" to homeowners offering to refinance their houses, with intense

pressure put on Ameriquest employees to bring in business; a failure to constantly bring in business would result, according to Mark Bomchill, a former Ameriquest employee, in an employee's termination.  Kenneth Kendall, another former Ameriquest employee, reported that Ameriquest does engage in the bait-and-switch scheme alleged here; specifically, he stated in the *Los Angeles Times* article that Ameriquest employees are trained to "promise certain interest rates and fees, only to change those rates at the time of the closing."

35.     Mr. Kendall's statement was made in connection with a lawsuit in California, Pierceall v. Ameriquest Mortgage Company, *et al*, No. 415620 (San Mateo Co. Super. Ct.)  Mr. Kendall specifically said that "he was given a script of things to say to customers over the telephone," and that, "at our branch, only management had the authority to control the price modeling matrix, which was used to set rates and points.  If the rates and points did not offer enough profit for Ameriquest, the loan application was put through again, until the rates and points were more favorable to Ameriquest.   At the instruction of management, I along with other Ameriquest employees were encouraged to use 'bait' and 'switch' tactics.  Employees would promise certain interest rates and fees, only to change those rates and fees at the time of closing."

36.     On information and belief, in the California litigation, Ameriquest acknowledged that in some states 40% of its customers had their annual percentage rates increased between the Good Faith Estimate and closing, and 34% had their note rates increased between the Good Faith Estimate and closing.  (If the points and fees are increased but the note rate is not, only the annual percentage rate would be increased.)

37.     Ameriquest utilizes a confusing and unfair variable interest rate structure, which provides only for an increase and not a decrease in the borrower's interest rate.

38.     Ameriquest has a misleading charge for "discount points" or a "discount

fee," amounting to hundreds or thousands of dollars added to the loan principal. However, Ameriquest does not, in fact, "discount" the interest rate in exchange for this fee.

39.     Ameriquest regularly imposes a prepayment penalty for the purpose and with the effect of preventing borrowers from refinancing on better terms with other lenders.

40.     Ameriquest imposes duplicative and excessive costs and closing fees in amounts designed to strip home equity and prevent borrowers from refinancing without incurring high costs.

41.     Ameriquest routinely fails to provide required disclosures, including required financial disclosures and the statutorily mandated notice of right to cancel, and circumvents statutory protections by failing to leave a true copy of completed loan documents in borrowers' possession with the effect that borrowers cannot review the loan terms.

42.     Finally, defendant AMC Mortgage Services, Inc., has a pattern and practice of retaliating against its customers who exercise their rights under federal credit protection statutes by filing, in good faith, a lawsuit against Ameriquest and its affiliates.

43.     Once a customer files suit, his/her account is "flagged," access to his or her on-line account is blocked, and he or she can no longer make payments via on line. In addition, in many cases, AMC stops sending monthly statements to the customer.

44.     Next, when the customer calls AMC to inquire, they are no longer permitted to deal with a customer representative; they are informed that they must deal with the president's office, and their call is routed to the same. Similarly, if they discover on-line that their account has been frozen, they are directed to call the President's office. Customers then have a very difficult time getting through to anyone at the president's office. Each time they call to inquire about their account or to make a payment, it takes between 15-60 minutes to get someone on the line.

Often, their call is dropped before they reach anyone but after they have waited for several minutes, and they have no choice but to call back and start the waiting period over.

45.     When the customer finally gets someone on the line, they are often informed that their account has been flagged because of their lawsuit and that the only way they can make a payment is over the phone, i.e., "check-by-phone" (debiting a checking account) and that they will be charged a $10.00 fee for making the payment this way.  In fact, customers are then charged the $10.00 fee for making their payment in the only manner AMC permits due to their suit.

46.     Under TILA, when a loan is secured by the borrower's home, and was not entered into for purposes of the initial acquisition or construction of that home, it is subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23.  Section 226.23 provides:

**(a) <u>Consumer's right to rescind.</u>**

> **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

> **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

> **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

47.    When borrowers inquire at closing about why they are not receiving their loans on the promised terms, they are often promised early refinancing on more favorable terms.

48.    By failing to disclose prior to the loan closing that the borrower would not receive loans on the terms originally promised, Ameriquest violated the ECOA, 15 U.S.C. §1691d.

49.    By failing to give borrowers complete and accurate information about their right to cancel the loan, Ameriquest violated TILA and Regulation Z, 15 U.S.C. §1635 and 12 C.F.R. §226.23.

50.     By "flagging" the accounts of customers who file lawsuits against them, making them wait an inordinate amount of time to speak with a representative, ceasing to send them statements, limiting them to one method of payment for which they are then charged extra, treating them rudely and by other retaliatory conduct, defendants Ameriquest and AMC violated and continue to violate 15 U.S.C. § 1691(a)(3) and 12 C. F. R. § 202.2(z).

51.     As a result, plaintiffs and the members of the class described below have been harmed and continue to incur damages and suffer harm.  Plaintiffs seek rescission, damages, restitution, a declaration of the right to rescind, attorneys fees, costs, and any other relief the Court deems proper.

## FACTS RELATING TO SCOTT JEFFRESS AND PAMELA JEFFRESS

52.     Prior to June 21, 2005, Scott Jeffress and Pamela Jeffress were solicited for a refinance mortgage loan by Ameriquest.

53.     During the initial phone contacts with plaintiffs Scott Jeffress and Pamela Jeffress, Ameriquest's  representative were promised an approximately 6.5% loan with lower payments than their current loan.

54.     During the initial communications with plaintiffs Scott Jeffress and Pamela Jeffress, Ameriquest obtained comprehensive financial information from or concerning plaintiffs, including information about their income, employment, property value, current mortgage loan, debts, and credit - information that was sufficient to underwrite a loan.

55.     Plaintiffs Scott Jeffress and Pamela Jeffress needed and used the loan for personal, family or household  purposes, namely, refinancing of prior debts incurred for such purposes.

56.     On or about June 21, 2005, Ameriquest closed the loan.

57.     Immediately prior to the closing, the terms of the loan were changed to the detriment of Scott Jeffress and Pamela Jeffress.  The annual percentage rate was increased from 9.261% to 10.145%.  The initial interest rate was changed from 6.990% to 8.990%.  The margin which governed future rate changes was increased from 6% to 6.25%.  The monthly payments were now higher than on plaintiffs' prior loan rather than lower.  These changed terms were reflected on Exhibit A.

58.     Scott Jeffress asked at closing why his interest rate had risen.  His loan officer, Willie Haddad, answered that the 8.99% figure was for Ameriquest's internal records, and that the Jeffresses should ignore it.

59.     The Jeffresses felt rushed to close.  Scott Jeffress was working in downtown Chicago until 5:00 pm, and closing took place in Ameriquest's office in Schererville, IN, which closed at 6:00.  Haddad introduced the Jeffresses to a female closing agent they hadn't met before and then left.  The closing agent pointed out where to sign but did not explain any of the documents.  The Jeffresses trusted Haddad, and didn't have a chance to review the documents more carefully until after closing.

60.     Among the documents presented to plaintiffs for signature at closing was a pre-printed loan applications that Haddad and/or Ameriquest had prepared in advance, Exhibit G. (The highly sensitive, personal information has been redacted from these documents for the public record.)

61.     The applications state that the Jeffresses' monthly income was $4,783.70.

62.     It also states that the Jeffresses' house was built in 1975, and that the Jeffresses had purchased the house for $120,000.

63.     These statements were false.  In fact, the Jeffresses' monthly income was

only approximately $3,800. Their house was built in 1967, and the Jeffresses purchased the house for only $80,000.

64. Plaintiffs provided truthful and accurate information concerning their income and assets to Ameriquest, including supporting documentation. Plaintiffs did not learn about the misinformation on their loan applications until after contacting their current attorneys.

65. Haddad and/or Ameriquest falsified the information in order to make it look like plaintiffs qualified for the loan, so that they could get their fees and commission.

66. On information and belief, in connection with this loan, Ameriquest or its agent performed or arranged for an appraisal of plaintiffs' property. The appraisal report is attached as <u>Exhibit H</u>.

67. Pamela Jeffress observed that the appraiser that came to their home parked in front and did not leave his vehicle.

68. During closing, Haddad also told the Jeffresses that the appraised value of their home was $140,000. However, <u>Exhibit H</u> actually lists the Jeffresses' appraised value as $147,500.

69. On information and belief, the house is worth significantly less.

70. Only four years earlier, American General Finance had appraised the Jeffresses' home at $110,000. The Jeffresses were surprised that the price had risen so significantly, but they trusted Haddad.

71. The Jeffresses were not provided with a copy of their appraisal report.

72. After obtaining current counsel, Scott Jeffress called Ameriquest to request a copy of his appraisal report. The Ameriquest employee who answered told Mr. Jeffress that he only had ninety days after closing in which to get a free copy of his appraisal report, and that

if he wanted it now Ameriquest would charge several hundred dollars.

73.     On information and belief, Ameriquest or its agent intentionally produced a fraudulent, inflated appraisal of plaintiffs' property, for the purpose of increasing the amount for which the plaintiffs' qualified and increasing the broker's fees and the lender's points, interest and profits.

74.     The principal amount of the loan was $132,750, which is greater than the likely actual value of the home.

75.     Most reputable lenders will not make a loan that exceeds 80% of the value of the home ("LTV"), at least not without also imposing expensive private mortgage insurance ("PMI").

76.     Furthermore, plaintiffs Scott Jeffress and Pamela Jeffress were charged a "loan discount" fee of $4,678.11 (3.52% of the principal amount of the loan), but their interest rate was increased rather than decreased.

77.     Other fees charged included a $70 tax related fee, a $9 flood search fee, a $626 processing fee, a $239 warehouse fee, and a $360 "application fee" (deducted from the loan proceeds).  See Exhibit B.

78.     Ameriquest delivered to plaintiffs only one completed federal notice of right to cancel, instead of the four required by TILA (i.e., two per mortgagor).

79.     Plaintiffs Scott Jeffress and Pamela Jeffress received two, different and inconsistent notices of right to cancel, the three-day notice required by TILA (Exhibit C) and a "one week"  notice created and used only by Ameriquest (Exhibit D).

80.     Exhibit D is a form document regularly used by Ameriquest in the class members' transactions.

81. The "one week" notice detracts from and obfuscates the required notice in that it suggests that the consumer has one week to rescind under TILA, which is not the case. The provision of an ostensibly longer rescission period may cause a consumer to delay past the statutory three days, without recognizing that the extended period is purely contractual, without benefit of TILA damages, attorney's fees or the procedural protections of §1635.

82. Furthermore, it is misnamed, because it only gives six days to cancel, not a week. Ameriquest's own staff finds it necessary to prepare on a monthly basis a list of cancellation period expiration dates.

83. The provision of inconsistent and confusing notices of right to cancel violates 15 U.S.C. §1635 and 12 C.F.R. §226.23.

84. The loan imposed a prepayment penalty. See note, attached as Exhibit E, and mortgage, Exhibit F.

85. The Jeffresses were directed to make payments to AMC Mortgage Services, Inc., and then to Citi Residential Lending, Inc., and subsequently to American Home Mortgage Servicing, Inc.

86. After Scott and Pamela Jeffress filed this lawsuit, defendant AMC stopped sending them monthly statements.

87. Before filing suit, plaintiffs made their monthly payments on line. After filing suit, Ameriquest and/or AMC froze their access to their on-line account, and an on-line message directed them to call the President's office.

88. After the lawsuit was filed, defendant AMC only permitted and permits plaintiffs to make their payments via "check-by-phone," and AMC has charged them an extra fee each time plaintiffs have made a payment.

89.     In order to make a payment, plaintiffs have to call the President's office at Ameriquest and wait several minutes before a representative will speak with them.  On information and belief, these phone calls are recorded.

90.     On information and belief, Deutsche Bank National Trust Company, N.A. holds legal title to Scott and Pamela Jeffress's loan, as Trustee.  Ameriquest Mortgage Securities, Inc., is the beneficial owner of plaintiffs' loan under Asset Backed Pass Through Certificates, Series 2005-R7 Under the Pooling and Servicing Agreement Dated as of August 1, 2005, Without Recourse.

91.     In the event that Ameriquest Mortgage Securities, Inc., does not own plaintiffs' loan or Deutsche Bank National Trust Company, N.A. does not hold title, (actual ownership is rarely if ever shown of record), the actual owners are named as Does 1-100.

## COUNT I – TILA

92.     Plaintiffs Scott Jeffress and Pamela Jeffress incorporate all preceding paragraphs by reference.

93.     Defendant Ameriquest Mortgage Company violated TILA and Regulation Z by failing to provide notices of right to cancel that were clear, conspicuous or consistent with the forms and regulations of the Federal Reserve Board.

94.     Plaintiffs are entitled to rescind their loans and to recover statutory damages.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.     A judgment voiding plaintiffs' mortgages, capable of recordation in the public records;

b. Statutory damages for failure to rescind;

c. Attorney's fees, litigation expenses and costs of suit;

d. Such other or further relief as the Court deems proper.

### COUNT II - ECOA

95. Plaintiffs Scott Jeffress and Pamela Jeffress incorporate all preceding paragraphs by reference.

96. Plaintiffs Scott Jeffress and Pamela Jeffress were applicants within the meaning of 15 U.S.C. §1691a(b) and Regulation B (which defines "applicant" to include persons who have received credit).

97. Ameriquest violated 15 U.S.C. §1691(d) by refusing to grant credit to plaintiffs Scott Jeffress and Pamela Jeffress on the terms requested and/or promised and failing to provide plaintiffs with written notices of adverse action, within 30 days of application, stating the specific reasons for such action.

98. As a result of Ameriquest's conduct, plaintiffs Scott Jeffress and Pamela Jeffress have suffered actual damages, and are entitled to recover such actual damages as well as punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. Actual and statutory and punitive damages according to proof;

b. Reasonable attorneys' fees and costs; and

c. Such other and further relief the court deems proper and just.

### COUNT III - ECOA

99. Plaintiffs Scott Jeffress and Pamela Jeffress incorporate all preceding

paragraphs by reference. Their claims under this Count are against defendants Ameriquest and AMC.

100. Plaintiffs were applicants within the meaning of 15 U.S.C. §1691a(b).

101. By filing this lawsuit in good faith pursuant to the Consumer Credit Protection Act, plaintiffs were and are engaged in a statutorily protected activity.

102. As a result of filing this lawsuit, plaintiffs have suffered and continue to suffer adverse actions at the hands of defendants. Ameriquest and AMC have, in ways detailed above and in other ways, taken retaliatory action against these and other plaintiffs and their accounts. These actions constitute "an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. § 202.2 (c)(1)(ii).

103. A direct causal connection exists between plaintiffs' filing suit and defendants' subsequent treatment of their accounts, as detailed above.

104. Plaintiffs were current and have remained current on their accounts throughout the time of defendants' adverse actions.

105. As a result of defendants' conduct, plaintiffs have suffered actual damages and are entitled to recover actual damages as well as statutory damages, punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a. Actual and statutory and punitive damages according to proof;

b Reasonable attorneys' fees and costs;

c. Injunctive relief, if the practices complained of do not cease immediately; and

d.     Such other and further relief the court deems proper and just.

### COUNT IV – BREACH OF CONTRACT

106.   Plaintiffs incorporate all preceding paragraphs by reference.  This claim is against Ameriquest only.

107.   Defendant Ameriquest contracted and undertook to provide a discounted interest rate if plaintiffs paid a loan discount fee.

108.   However, no plaintiff received a discounted rate.

109.   Ameriquest thereby breached its agreement.

110.   Plaintiffs were damaged as a result.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendant for:

a.     Appropriate damages;

b.     Costs.

c.     Such other or further relief as the Court deems appropriate.

### COUNT V – INDIANA DECEPTIVE CONSUMER SALES ACT

111.   Plaintiffs Scott Jeffress and Pamela Jeffress incorporate all preceding paragraphs by reference.  This claim is against Ameriquest only.

112.   Ameriquest engaged in fraud, deceit and material misrepresentation, in violation of Indiana Deceptive Consumer Sales Act, Burns Ind. Code Ann. § 24-5-0.5-2 et seq. by engaging in "bait and switch" practices, by promising the Jeffresses 6.99% fixed interest rate after obtaining sufficient financial information to provide an accurate quote, then switching plaintiffs to a 8.99% fixed interest rate at the closing.

113.   The Jeffresses were induced to transact with Ameriquest by means of this

misrepresentation.

114.     These acts and representations were deceptive as to the subject matter of a consumer transaction, i.e., the terms of the loan and the cost of the loan.

115.     Ameriquest has not cured or offered to cure its deceptive acts and representations.

116.     Ameriquest's act and representations are incurable deceptive acts and misrepresentations.

117.     Ameriquest's deceptive acts and misrepresentations were willful.

118.     The Jeffresses suffered actual damages as the proximate result of Ameriquest's deceptive acts and representations.  § 24-5-0.5-4(a).

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against Ameriquest for:

a.     Actual damages;

b.     Increased damages for willful conduct;

c.     A voiding or limiting of Ameriquest's note and mortgage with the Jeffresses and Ms. Goods.

d.     Restitution;

e.     Attorney's fees, costs and litigation expenses; and

f.     Any other or further relief that the Court deems just.

## COUNT VI – INDIANA DECEPTIVE CONSUMER SALES ACT

119.     Plaintiffs incorporate all preceding paragraphs by reference.  This claim is against Ameriquest only.

120.     Defendants engaged in fraud, deceit and material misrepresentation, in

violation of the Indiana Deceptive Consumer Sales Act, Burns Ind. Code Ann. § 24-5-0.5-2 <u>et seq.</u> by producing and conspiring to produce an inflated, fraudulent appraisal of the Jeffresses' property, in order to make it look like plaintiffs qualified for a higher loan amounts and, thereby, to increase their own fees, commissions and profits.

121.    The Jeffresses were induced to transact with Ameriquest and sign for a mortgage with a high loan-to-value ratio by means of the misrepresentation that, based on the property value, they qualified for the loans.

122.    This representation was deceptive as to the subject matter of a consumer transaction, i.e., the terms of the loans, the cost of the loans, and whether the Jeffresses in fact qualified for the loan.

123.    Ameriquest has not cured or offered to cure its deceptive representation.

124.    Ameriquest's representation is an incurable misrepresentation.

125.    Ameriquest's deceptive act was willful.

126.    The Jeffresses suffered actual damages as the proximate result of Ameriquest's deceptive act and representation.  § 24-5-0.5-4(a).  Ameriquest's misrepresentation of plaintiffs' loan-to-value ratio caused the Jeffresses to enter a loan transaction with Ameriquest for which they did not qualify.  Consequently, they are effectively "trapped" in their current mortgage.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against Ameriquest for:

a.    Actual damages;

b.    Increased damages for willful conduct;

c.    A voiding or limiting of Ameriquest's note and mortgage with the Jeffresses and Ms. Goods.

       d.      Restitution;

       e.      Attorney's fees, costs and litigation expenses; and

       f.      Any other or further relief that the Court deems just.

## COUNT VII – INDIANA DECEPTIVE CONSUMER SALES ACT

127.    Plaintiffs Scott Jeffress, Pamela Jeffress, incorporate all preceding paragraphs by reference. This claim is against Ameriquest only.

128.    Defendants engaged in fraud, deceit and material misrepresentation, in violation of the Indiana Deceptive Consumer Sales Act, Burns Ind. Code Ann. § 24-5-0.5-2 et seq. by falsely inflating information about the Jeffresses' income in order to make it appear that plaintiffs qualified for a higher loan amount and, thereby, to increase their own fees, commissions and profits.

129.    The Jeffresses were induced to transact with Ameriquest and sign for mortgages by means of the misrepresentation that, based on their income, they qualified for the loans.

130.    This representation was deceptive as to the subject matter of a consumer transaction, i.e., the terms of the loan, the cost of the loan, and whether the Jeffresses in fact qualified for the loan.

131.    Ameriquest has not cured or offered to cure its deceptive representations.

132.    Ameriquest's representation is an incurable misrepresentations.

133.    Ameriquest's deceptive act was willful.

134.    The Jeffresses suffered actual damages as the proximate result of Ameriquest's deceptive act and representation. § 24-5-0.5-4(a).

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against Ameriquest for:

      a.      Actual damages;

      b.      Increased damages for willful conduct;

      c.      A voiding or limiting of Ameriquest's note and mortgage with the Jeffresses and Ms. Goods.

      d.      Restitution;

      e.      Attorney's fees, costs and litigation expenses; and

      f.      Any other or further relief that the Court deems just.

## <u>COUNT VIII – COMMON LAW FRAUD</u>

135.    Plaintiffs incorporate all preceding paragraphs by reference.  This claim is against Ameriquest only.

136.    Defendant represented that plaintiffs qualified for the loan based on the appraised value of plaintiffs' property and the amount of their income.

137.    Defendant fraudulently inflated the value of plaintiffs' property and the amount of their income.  Therefore, the representations that plaintiffs qualified for the loan and could afford it were also false and fraudulent.

138.    The value of plaintiffs' property and the amount of their income was information that was material to the terms of their transaction with defendant.

139.    At the time defendant falsified the property value and income information, it knew that these representations were false.

140.    Defendant made the representations with the intent that they would be acted upon by plaintiffs.

141.    In reliance on defendant's representations, plaintiffs closed on the loan.

142.    As a result of Ameriquest's inflated appraised value, plaintiffs have been

injured in that they have been and will continue to be overcharged and are unable to refinance with another company.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendant for:

        a.      Actual and compensatory damages;

        b.      Punitive damages; and

        c.      Such other relief as the Court deems appropriate.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

## <u>CERTIFICATE OF SERVICE</u>

   I, Daniel A. Edelman, hereby certify that on March 22, 2010, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Additional copies were sent via U.S. Mail to those parties without email addresses.

Craig Allen Varga
cvarga@vblhc.com

Jonathan N. Ledsky
jledsky@vblhc.com

Bernard E. LeSage
blesage@buchalter.com

American Home Mortgage Servicing, Inc.
c/o Registered Agent
C.T. Corporation System
208 S. LaSalle St.
Suite 814
Chicago, IL 60604


   <u>s/ Daniel A. Edelman</u>
   Daniel A. Edelman


*Attorneys for Plaintiffs*
Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
  & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\16275\Pleading\3rd Amended Complaint_Pleading.WPD

# EXHIBIT A

eriquest Mortgage Company
Indianapolis Blvd., Suite 100
nererville, IN 46375

9)865-6378

# BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS

ott G Jeffress

Date: June 21, 2005

Notice: [X] Delivered    [ ] Mailed

Loan Number: 0123705501 - 5570

Description of Credit Request:

20 Willowdale APT./UNIT road
rtage,IN 46368

[X] 1st Trust Deed/Mortgage    [ ] 2nd Trust Deed/Mortgage

[ ] Other: _____

operty Address: 3320 WILLOWDALE RD

Portage, IN 46368      County of PORTER

## YPE OF TRANSACTION:

[ ] Purchase    [X] Refinance    Other _____

| ORIGINAL LOAN TERMS REQUESTED | FINAL LOAN TERMS: |
|---|---|
| [ ] Fixed Rate Loan   [X] Adjustable Rate Loan | [ ] Fixed Rate Loan [X] Adjustable Rate Loan |
| Amount Financed: $ 126,228.60 | Amount Financed: $ 126,669.79    * |
| Settlement Charges: $ 7,252.40 (Includes all Prepaid Finance Charges) | Settlement Charges: $ 8,255.50 (Includes all Prepaid Finance Charges)   * |
| Loan Amount: $ 132,581.00 | Loan Amount: $   132,750.00 |
| Annual Percentage Rate: 9.261 % | Annual Percentage Rate: 10.145   %* |
| Term: 360 | Term: 360 |
| Interest Rate: 6.990 % | Initial Interest Rate: 8.990 % |
| Margin: 6.000 % | Margin: 6.250 % |
| Prepayment Penalty: [X] YES [ ] NO | Prepayment Penalty: [X] YES [ ] NO |

Borrower(s) and Ameriquest Mortgage Company hereby acknowledge that "Final Loan Terms" stated above are based exclusively on information, statements, and representations (all material facts) which have been provided by the borrower(s) which the Lender has relied upon to make this acknowledgement. These "Final Loan Terms" may change prior to loan settlement if Lender subsequently determines or becomes aware of any changes in these material facts. Borrower(s) also acknowledges that if the "Final Loan Terms" change due to a change of material facts, that Lender may require new loan documents to be executed by the borrower(s).

Borrower Scott G Jeffress    Date _____

Borrower _____ Date _____

Borrower _____ Date _____

Borrower _____ Date _____

*These amounts may change due to any final adjustments made to the prepaid interest amount collected on your loan at funding.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any rights under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the: FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY, ROOM 4037, WASHINGTON DC, 20580.



.0000123705501040460101

STMTCD (Rev. 3/89)

# EXHIBIT B

U.S. Department of Housing
and Urban Development

File No.: 200000724589

ent Statement

al Form for

tions without Sellers

| Name & Address of Lender: |
|---|
| Ameriquest Mortgage Company |
| 55 West 86th Avenue |
| Merrville, IN 46410 |

k Address of Borrower:
Jeffress and Pamela J Jeffress
Willowdale Rd.
e, IN 46368
y Location:

Settlement Agent: Mortgage Information Services, Inc.
Place of Settlement: 6801 Lake Plaza Drive Suite A101
Indianapolis, IN 46220

r      le Rd.
      '68

0123705S01-5570

Settlement Date: 6/21/2005
Fund Date: 6/28/2005

**M. Disbursements to Others**

| ttlement Charges | | | | 1501. Mortgage Payoff to AMER GEN FIN | $115,506.40 |
|---|---|---|---|---|---|
| et Payable in Connection with Loan | | | | | |
| n Origination Fee ¼ to | | $4,678.11 | | 1502. Tax Payoff to Porter County Treasurer | $483.63 |
| n Discount 3.524 % to Ameriquest Mortgage Company | | $350.00 | | 1503. Payoff to FNCC | $175.00 |
| aisal Fee to | | | | | |
| dit Report to | | | | 1504. Payoff to PROVIDIAN | $4,823.00 |
| der's Inspection Fee to | | | | | |
| rtgage Insurance Application to | | | | 1505. Payoff to CBUSA | $734.00 |
| sumption Fee to | | | | | |
| to | | | | 1506. Payoff to DMCCB | $2,005.00 |
| t Related Fee to Ameriquest Mortgage Company | | $70.00 | | | |
| arch Fee to Ameriquest Mortgage Company | | $9.00 | | 1507. Payoff to GEMBJCP | $807.00 |
| nders processing fee to Ameriquest Mortgage Company | | $626.00 | | | |
| arehouse fee to Ameriquest Mortgage Company | | $239.00 | | 1508. Payoff to MERRICK BK | $866.00 |
| plication Fee to Ameriquest Mortgage Company | | $360.00 | | 1509. | |
| ms Required by Lender to be Paid in Advance | | | | | |
| erest from 6/28/2005 to 7/1/2005 @ $32.70 /day | | $98.10 | | 1510. | |
| rtgage Insurance Premium for months to | | | | 1511. to | |
| ard Insurance Premium for months to | | | | | |
| eserves Deposited with Lender | | | | 1512. | |
| ard Insurance 11 months @$69.33 per month | | $762.63 | | | |
| rtgage Insurance month @ per month | | | | 1513. | |
| ity property taxes months @ per month | | | | | |
| unty property taxes 6 months @$71.86 per month | | $431.16 | | 1514. | |
| sessment Taxes months @ per month | | | | | |
| chool property taxes months @ per month | | | | 1515. | |
| ther taxes months @ per month | | | | | |
| ther taxes months @ per month | | | | 1516. | |
| months @ per month | | | | | |
| months @ per month | | | | 1517. | |
| ggregate Adjustment to Ameriquest Mortgage Company | | | | to | |
| Title Charges | | | | 1518. | |
| Settlement fee to Mortgage Information Services POC (L) $450.00 | | | | to | |
| Abstract or title search to | | | | 1519. | |
| Title examination to Mortgage Information Services | | $225.00 | | to | |
| Title insurance binder to Mortgage Information Services POC (L) $50.00 | | | | 1520. TOTAL DISBURSED (enter on line 1603) | $124,300.03 |
| Document preparation to Mortgage Information Services | | | | | |
| AMC Closing Service to | | | | | |
| Attor...      fees to | | | | | |
| ler    m numbers ) | | | | | |
| T    ce to Mortgage Information Services | | $332.50 | | | |
| les   item numbers ) | | | | | |
| Lender's Coverage $132,750.00/$332.50 | | | | | |
| Owner's Coverage $0.00/$0.00 | | | | | |
| Courier Fee to Mortgage Information Services POC (L) $50.00 | | | | | |
| Release Fee to Mortgage Information Services | | $25.00 | | | |
| to | | | | | |
| to | | | | | |
| to | | | | | |
| to | | | | | |
| to | | | | | |
| to | | | | | |
| Government Recording and Transfer Charges | | | | | |
| Recording Fees: Deed ; Mortg $49.00; Rel | | $49.00 | | | |
| City/county tax/stamps: Deed ; Mortg | | | | | |
| State tax/stamps: Deed ; Mortg | | | | **N. NET SETTLEMENT** | |
| Tax certificates to | | | | 1600. Loan Amount | $132,750.00 |
| to | | | | | |
| to | | | | 1601. Plus Cash/Check from Borrower | $0.00 |
| Additional Settlement Charges | | | | | |
| Survey to | | | | 1602. Minus Total Settlement Charges (Line 1400) | $8,255.50 |
| Pest Inspection to | | | | | |
| to | | | | 1603. Minus Total Disbursements to Others (Line 1520) | $124,300.03 |
| to | | | | | |
| to | | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | $194.47 |
| to | | | | | |
| . Total Settlement Charges (enter on Line 1602) | | $8,255.50 | | | |

Borrower's Signatures

Scott G Jeffress
_____

Pamela J Jeffress
_____

*Casey Hill*
Settlement Agent

06/21/05
Date

# EXHIBIT C

# NOTICE OF RIGHT TO CANCEL

Ameriquest Mortgage Company

DATE: June 21, 2005
LOAN NO.: 0123705501 - 5570
TYPE: ADJUSTABLE RATE

ROWER(S): Scott G Jeffress

RESS: 3320 Willowdale APT./UNIT road
/STATE/ZIP: Portage,IN 46368

PERTY: 3320 WILLOWDALE RD
Portage, IN 46368

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal
under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the
wing events occurs last:

1. The date of the transaction, which is

   **ENTER DOCUMENT SIGNING DATE**

   6-21-05

   or
2. The date you received your Truth in Lending disclosures;
   or
3. The date you received this notice of your right to cancel.

u cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we
ive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your
e has been cancelled, and we must return to you any money or property you have given to us or anyone else in
nection with this transaction.

may keep any money or property we have given you until we have done the things mentioned above, but you must
offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its
sonable value. You may offer to return the property at your home or at the location of the property. Money must be
rned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your
r, you may keep it without further obligation.

**OW TO CANCEL**

y        ide to cancel this transaction, you may do so by notifying us in writing, at:

Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806

ATTN: FUNDING
PHONE: (714)634-3494
FAX: (800)664-2256

u may use any written statement that is signed and dated by you and states your intention to cancel, or you may use
s notice by dating and signing below. Keep one copy of this notice because it contains important information about
ur rights.

you cancel by mail or telegram, you must
end the notice no later than MIDNIGHT of

**ENTER FINAL DATE TO CANCEL**

6-24-05

r MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver
our written notice to cancel some other way, it must be delivered to the above address no later than that time.
WISH TO CANCEL

_____        _____
SIGNATURE                      DATE

e undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the
deral Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and
eform Act of 1980 (Public Law 96-221).

ach borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____        _____        _____        _____
ORROWER/OWNER Scott G Jeffress   Date        BORROWER/OWNER PAMELA J JEFFRESS   Date

_____        _____        _____        _____
ORROWER/OWNER                    Date        BORROWER/OWNER

                                             **LENDER COPY**

84-Nbu. (Rev 11/00)

0000012370550104000050101

06/21/2005 11:17:07 AM

# EXHIBIT D

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0123705501 - 5570          Borrower(s): Scott G Jeffress
Date: June 21, 2005

You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason. This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make. To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you. No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends. You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan. The written statement must be signed and dated by any one borrower. Your request ust be delivered to:

> Ameriquest Mortgage Company
> 1600 S Douglass Rd Anaheim, CA 92806
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____          _____
Borrower/Owner  Scott G Jeffress          Date


_____          _____
Borrower/Owner  PAMELA J JEFFRESS         Date


_____          _____
Borrower/Owner                            Date


_____          _____
Borrower/Owner                            Date

---

### REQUEST TO CANCEL

I/We want to cancel loan #_____

_____          _____
Borrower/Owner Signature                  Date

---

06/21/2005 11:17:07 AM

**LENDER COPY**

00000123705501040422D101

L50 (10/00)

# EXHIBIT E

Loan Number: 0123705501 - 5570

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

‸ OTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY ؟AYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE ؟AXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

June 21, 2005
Date

City

State

3320 WILLOWDALE RD, Portage, IN 46368
Property Address

**BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 132,750.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **8.990 %.** This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**PAYMENTS**
**(A) Time and Place of Payments**
    I will pay principal and interest by making payments every month.
    I will make my monthly payments on the first day of each month beginning on **August 1, 2005 .**
    I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, July 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is ‥d the "Maturity Date."
    ‥ make my payments at:     **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
    Each of my initial monthly payments will be in the amount of U.S. $ **1,067.19.**  This amount may change.
**(C) Monthly Payment Changes**
    Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

‥. **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
    The interest rate I will pay may change on the first day of, **July, 2008** and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
    If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
    Before each Change Date, the Note Holder will calculate my new interest rate by adding **six and one-quarter** percentage point(s) (**6.250%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials:

Loan Number: 0123705501 - 5570

**)** **Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **10.990** % or less than **8.990**%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One percentage point(s) **1.000**% from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **14.990** % or less than **8.990** %.

**)** **active Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**F)** **Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**
I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made Three (3.00) year(s) After the Date of this Note**
I will not have to pay a prepayment charge if I make a prepayment on the Three (3.00) year anniversary of the date this Note is executed, or at any time thereafter.

**(B) Prepayment Made Within Three (3.00) year(s) of the Date of this Note**
I will pay Lender a prepayment charge if, in any twelve (12) month period before the Three (3.00) year anniversary of the date this Note is executed, I prepay more than 20% of the original principal balance of this Note. The prepayment charge will be six (6) months interest, at the rate then in effect on this Note, on the amount in excess of 20% of the original principal balance that I prepay within such 12 month period.

**(C) Application of Funds**
I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**
If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any r loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may oose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A) Late Charges for Overdue Payment**
If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.



Initials: ___

06/21/2005 11:17:07 AM

Loan Number: 0123705501 - 5570

## OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

ral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment f a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written greement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement etween us regarding this Note or the instrument which secures this Note, must be in a signed writing to be egally enforceable.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
Borrower   Scott G Jeffress                                     Borrower


_____ (Seal)        _____ (Seal)
Borrower                                                        Borrower

# EXHIBIT F

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

——————————————————— [Space Above This Line For Recording Data] ———————————————————

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated June 21, 2005 together with all Riders to this document.
(B) "Borrower" is SCOTT G. JEFFRESS AND PAMELA J. JEFFRESS

Borrower is the mortgagor under this Security Instrument.

INDIANA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3015  1/01

06/21/2005 11:17:07                                          0123705501 - 5570

AM6IN (0404)
Page 1 of 15          Initials:_____
VMP Mortgage Solutions, Inc. (800)521-7291

0000012370550103012716D1

(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200 Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated June 21, 2005
The Note states that Borrower owes Lender one hundred thirty-two thousand seven
hundred fifty and 00/100                                                    Dollars
(U.S. $ 132,750.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than July 1, 2035
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

AM6IN (0404)                          Page 2 of 15                          Form 3015  1/01

0123705501-5570
06/21/2005 11:17:07


0000012370550103D1271602

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County                                                                                        [Type of Recording Jurisdiction]
of PORTER                                                                        [Name of Recording Jurisdiction] :
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 08-00292846                                which currently has the address of
3320 WILLOWDALE RD                                                                                          [Street]
Portage                                                        [City], Indiana 46368                    [Zip Code]
("Property Address");

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials: _____

AM6IN (0404)                         Page 3 of 15                         Form 3015  1/01
06/21/2005 11:17:07                                            0123705501-5570



0000012370550103012716 03

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

Initials: _____

AM6IN (0404)    Page 4 of 15    Form 3015 1/01

0123705501-5570

06/21/2005 11:17:07



0000012370550103012716D4

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or

Initials: 

0123705501-5570

06/21/2005 11:17:07

ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

Initials: _____ 

AM6IN (0404)                     Page 6 of 15                     Form 3015  1/01

0123705501-5570
06/21/2005  11:17:07

Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.



AM6IN (0404)                            Page 7 of 15                            Form 3015 1/01

0123705501-5570
06/21/2005 11:17:07

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by any insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials: _____

AMSIN (0404)  Page 8 of 15  Form 3015 1/01



0000012370550103012716G8

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Initials: _____

AM6IN (0404)  Page 8 of 15  Form 3015 1/01

0123705501 - 5570

06/21/2005 11:17:07



Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless



Initials: _____

AM6IN (0404)                    Page 10 of 15                    Form 3015 1/01

Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or

AM6IN (0404)                    Page 11 of 16                    Initial: _____                    Form 3015 1/01

0123705501-5570

06/21/2005 11:17:07


0000012370550103012716111

cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

AM6IN (0406)                     Page 12 of 16                Initials: _____            Form 3015  1/01

0123705501 - 5570
06/21/2005 11:17:07



Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Valuation and Appraisement. Borrower waives all right of valuation and appraisement.

AM6IN (0404)                    Page 13 of 15          Initials:_____          Form 3015 1/01

0123705501-5570
06/21/2005 11:17:07


0000012370550103012713813

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____     _____ (Seal)
                                     Scott G Jeffress              -Borrower

_____

_____     _____ (Seal)
                                     PAMELA J JEFFRESS             -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                                  -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                                  -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                                  -Borrower

AM6IN (0404)                    Page 14 of 15              Form 3015 1/01
06/21/2005 11:17:07                       0123705501-5570

# EXHIBIT G

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower" as applicable. Co-Borrower information must also be provided ( and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☐ FHA | ☐ Conventional ☐ USDA/Rural Housing Service | ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount | Interest Rate | No. of Months | Amortization Type: | |
|---|---|---|---|---|
| $ 132,750.00 | 8.990 % | 360 | ☐ Fixed Rate ☐ GPM | ☐ Other (explain): ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) | No. of Units |
|---|---|
| 3320 WILLOWDALE RD, Portage, IN  46368 | 1 |

| Legal Description of Subject Property (attach description if necessary ) | Year Built |
|---|---|
| | 1975 |

| Purpose of Loan | ☐ Purchase ☐ Construction  X Refinance ☐ Construction-Permanent | ☐ Other (explain): | Property will be: X Primary Residence  ☐ Secondary Residence  ☐ Investment |
|---|---|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| 1997 | $ 120,000.00 | $ 0.00 | | Cost: $ 0.00 |

| Title will be held in what Name(s) SCOTT G. JEFFRESS AND PAMELA J. JEFFRESS | Manner in which Title will be held | Estate will be held in: X Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

Source of Down Payment, Settlement Charges and/or Subordinate Financing (expla in)

## III. BORROWER INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (Include Jr. or Sr. if applicable) |
|---|---|
| Scott G Jeffress | |

| Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|
| | | 09/13/1961 | 12 | | | | |

| X Married ☐ Separated | ☐ Unmarried (Include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. 0  ages | ☐ Married ☐ Separated | ☐ Unmarried (Include single, divorced, widowed) | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|---|---|

| Present Address (street, city, state, ZIP) X Own ☐ Rent  8 No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent  No. Yrs. |
|---|---|
| 3320 Willowdale, Apt. road  Portage,IN 46368 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent  No. Yrs. |
|---|---|
| *** SEE ADDENDUM *** | |

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|

| Name & Address of Employer | ☐ Self Employed | Yrs. on this job | Name & Address of Employer | ☐ Self Employed | Yrs. on this job |
|---|---|---|---|---|---|
| NORTHWESTERN UNIVERSITY | | 5  Yrs. employed in this line of work/profession | | | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| MGR OF IP DEPT | | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

0123705501

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04
Page 1 of 4

Initials: _____

| Borrower's cell (219)741-9363 | Borrower's pager |
|---|---|
| Co-Borrower's cell | Co-Borrower's pager |

VMP ®-21N (0305)     VMP Mortgage Solutions (800)521-7291

0000012370550106059060601

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income* | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 4,783.70 | $ | $ 4,783.70 | Rent | $ 0.00 | |
| Overtime | 0.00 | | 0.00 | First Mortgage (P&I) | 0.00 | $ 1,067.19 |
| Bonuses | 0.00 | | 0.00 | Other Financing (P&I) | 0.00 | 0.00 |
| Commissions | 0.00 | | 0.00 | Hazard Insurance | 50.00 | 69.33 |
| Dividends/Interest | 0.00 | | 0.00 | Real Estate Taxes | 81.17 | 71.86 |
| Net Rental Income | 0.00 | | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| **Total** | $ 4,783.70 | $ | $ 4,783.70 | **Total** | $ 131.17 | $ 1,208.38 |

\* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| B/C | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.    Completed ☐ Jointly ☒ Not Jointly

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|
| **Description** | | **LIABILITIES** | | | |
| Cash deposit toward purchase held by: | $ 0.00 | Name and address of Company | | $ Payment/Months | |
| List checking and savings accounts below | | *** SEE ADDENDUM *** | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| Vested 401k Retirement - Aggregated | | | | | |
| | | Acct. no. | | | |
| | | Name and address of Company | | $ Payment/Months | |
| Acct. no. | $ 17,000.00 | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| Checking/Savings - Aggregated | | | | | |
| | | Acct. no. | | | |
| | | Name and address of Company | | $ Payment/Months | |
| Acct. no. | $ 0.00 | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| | | Acct. no. | | | |
| | | Name and address of Company | | $ Payment/Months | |
| Acct. no. | $ | | | | |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| | | Acct. no. | | | |
| | | Name and address of Company | | $ Payment/Months | |
| Acct. no. | $ | | | | |
| Stocks & Bonds (Company name/number & description) / 0 | $ 0.00 | | | | |
| | | Acct. no. | | | |
| | | Name and address of Company | | $ Payment/Months | |
| Life insurance net cash value | $ 0.00 | | | | |
| Face amount: $ 0.00 | | | | | |
| **Subtotal Liquid Assets** | $ 17,000.00 | | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 156,000.00 | Acct. no. | | | |
| | | Name and address of Company | | $ Payment/Months | $ |
| Vested interest in retirement fund | $ 0.00 | | | | |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | | |
| Automobiles owned (make and year) | | | | | |
| | | Acct. no. | | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | | $ | |
| | | **Total Monthly Payments** | | $ 611.00 | |
| **Total Assets a.** | $ 173,000.00 | Net Worth (a minus b) ▶ | $ 155,642.00 | **Total Liabilities b.** | $ 17,358.00 |

-21N (0305)

00000123705501060599060 2

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 3320 WILLOWDALE RD Portage,IN 46368 | SFR | $ 156000 | $ 0 | $ 0 | $ 0 | $ 131 | $ 0 |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 156000 | $ 0 | $ 0 | $ 0 | $ 131 | $ 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. | Purchase price | $ 0.00 |
| b. | Alterations, improvements, repairs | 0.00 |
| c. | Land (if acquired separately) | 0.00 |
| d. | Refinance (incl. debts to be paid off) | 0.00 |
| e. | Estimated prepaid items | 2,312.10 |
| f. | Estimated closing costs | 1,825.29 |
| g. | PMI, MIP, Funding Fee | 0.00 |
| h. | Discount (if Borrower will pay) | 4,678.11 |
| i. | Total costs (add items a through h) | 8,815.50 |
| j. | Subordinate financing | 0.00 |
| k. | Borrower's closing costs paid by Seller | 560.00 |
| l. | Other Credits (explain) | 0.00 |
| | | 0.00 |
| | | 0.00 |
| | | 0.00 |
| m. | Loan amount (exclude PMI, MIP, Funding Fee finance d | 132,750.00 |
| n. | PMI, MIP, Funding Fee financed | 0.00 |
| o. | Loan amount (add m & n) | 132,750.00 |
| p. | Cash from/to Borrower (subtract j, k, l & o from i) | -124,494.50 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|---|
| a. | Are there any outstanding judgments against you? | | X | | |
| b. | Have you been declared bankrupt within the past 7 years? | | X | | |
| c. | Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. | Are you a party to a lawsuit? | | X | | |
| e. | Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. | Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. | Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. | Is any part of the down payment borrowed? | | X | | |
| i. | Are you a co-maker or endorser on a note? | | X | | |
| j. | Are you a U.S. citizen? | X | | | |
| k. | Are you a permanent resident alien? | | X | | |
| l. | Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. | Have you had an ownership interest in a property in the last three years? (1) What type of property did you own -- principal residence (PR), second home (SH), or investment property (IP)? (2) How did you hold title to the home -- solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) the property will be occupied as indicated herein; (6) the property will be occupied as indicated herein; Lender, its any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER** ☐ I do not wish to furnish this information.

| Ethnicity: | ☐ Hispanic or Latino | X Not Hispanic or Latino |
|---|---|---|
| Race: | ☐ American Indian or Alaska Native ☐ Native Hawaiian or Other Pacific Islander | ☐ Asian ☐ Black or African American X White |
| Sex: | ☐ Female | X Male |

**CO-BORROWER** ☐ I do not wish to furnish this information.

| Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
|---|---|---|
| Race: | ☐ American Indian or Alaska Native ☐ Native Hawaiian or Other Pacific Islander | ☐ Asian ☐ Black or African American ☐ White |
| Sex: | ☐ Female | ☐ Male |

**To be Completed by Interviewer**
This application was taken by:

☐ Face-to-face interview
☐ Mail
X Telephone
☐ Internet

| Interviewer's Name (print or type) | Willie Haddad |
|---|---|
| Interviewer's Signature | Date |
| Interviewer's Phone Number (incl. area code) | (219)865-6378 |

Name and Address of Interviewer's Employer

222 Indianapolis Blvd., Suite 100
Schererville,IN 46375

0123705501
VMP ®-21N (0306)
Page 3 of 4
0000012370550106059906 03
Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>Jeffress, Scott G | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | | X | |

0123705501



VMP-21N (0305)

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

# EXHIBIT H

# RealEC Electronic Invoice

| FROM: | | INVOICE NUMBER |
|---|---|---|
| Provider Name: Joseph E. Solan | | 6051970-130929185 |

**FROM:**
Provider Name: Joseph E. Solan
Attn: Staff Appraisal Department
Address 1:1600 South Douglass Road
Address 2:
City: Anaheim    State: CA   Zip: 92806
Telephone Number: 866-854-0502    Fax Number:
E-Mail: staffappraiser2ameriquest.net

**TO:**
Client Name:Ameriquest Mortgage Company
Attn.: Schererville, Indiana Branch
Address 1:222 Indianapolis Boulevard, Suite 100
Address 2:
City: Schererville    State: IN   Zip: 46375
Telephone Number: 219-322-6300    Fax Number:
Alternate Number    E-Mail:

Instructions:

Comments:

**INVOICE NUMBER**
6051970-130929185
**DATE**
06/20/2005
**REFERENCE**
Internal Order #:    6051970-130929185
Lender Case #:    0123705501
Client File #:    0123705501
Main File # on form:    0123705501
Other File # on form:
Federal Tax ID:
Employer ID:

**PAYMENT TERMS**
Net Days:
Due Date:
Instructions:

## DESCRIPTION

Lender: Ameriquest Mortgage Company    Client: Ameriquest Mortgage Company
Purchaser/Borrower: JEFFRESS, Scott & Pamela
Property Address: 3320 Willowdale Road
City: Portage
County: Portage    State: IN    Zip: 46368-4749
Legal Description: Willowdale Unit 4, Lot 7, Block 2 ....

| FEES | AMOUNT |
|---|---|
| 6/13/2005  RE: FNMA 1004 Appraisal Report | 350.00 |
| **SUBTOTAL** | 350.00 |

| PAYMENTS | | | AMOUNT |
|---|---|---|---|
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| Check #: | Date: | Description: | |
| | | **SUBTOTAL** | |
| | | **TOTAL DUE** | $    350 |

File No. 0123705501 | Page #1

# INVOICE

**FROM:**
Joseph Solan
Ameriquest Mortgage Company
1600 South Douglass Road
Anaheim, CA 92806

Telephone Number: 866-854-0502        Fax Number:

| INVOICE NUMBER |
| --- |
| 6051970-130929185 |

| DATE |
| --- |
| 06/20/2005 |

**TO:**
Ameriquest Mortgage Company
1600 South Douglass Road
Anaheim, CA 92806

Telephone Number: 866-854-0502   .
Alternate Number:                        E-Mail: staffappraiser@ameriquest.net

| REFERENCE | |
| --- | --- |
| Internal Order #: | 6051970-130929185 |
| Lender Case #: | 0123705501 |
| Client File #: | 0123705501 |
| Main File # on form: | 0123705501 |
| Other File # on form: | |
| Federal Tax ID: | |
| Employer ID: | |

## DESCRIPTION

Lender: Ameriquest Mortgage Company            Client: Ameriquest Mortgage Company
Purchaser/Borrower: JEFFRESS, Scott & Pamela
Property Address: 3320 Willowdale Road
City: Portage
County: Portage                        State: IN            Zip: 46368-4749
Legal Description: Willowdale Unit 4, Lot 7, Block 2 ....

| FEES | AMOUNT |
| --- | --- |
| 6/13/2005  RE: FNMA 1004 Appraisal Report | 350.00 |
| | |
| **SUBTOTAL** | 350.00 |

| PAYMENTS | AMOUNT |
| --- | --- |
| Check #:          Date:          Description: | |
| Check #:          Date:          Description: | |
| Check #:          Date:          Description: | |
| **SUBTOTAL** | |
| **TOTAL DUE** | $        350.00 |

Ameriquest-- Joseph Solan


File No. 0123705501 Page #2

# UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. 0123705501

**SUBJECT**

| | |
|---|---|
| Property Address 3320 Willowdale Road | City Portage | State IN | Zip Code 46368-4749 |

Legal Description  Willowdale Unit 4, Lot 7, Block 2.....
County Portage

| Assessor's Parcel No. 08-000292846 | | Tax Year 2004 | R.E. Taxes $ 870.82 | Special Assessments $ N/A |

Borrower JEFFRESS, Scott & Pamela    Current Owner JEFFRESS, Scott & Pamela    Occupant ☒ Owner  ☐ Tenant  ☐ Vacant

Property rights appraised ☒ Fee Simple  ☐ Leasehold    Project Type ☐ PUD  ☐ Condominium (HUD/VA only)  HOA $ N/A  /Mo.

Neighborhood or Project Name  Portage    Map Reference 3300S - 560DE    Census Tract 23844 - 05D5.02

Sale Price $ REFINANCE    Date of Sale 6/17/05    Description & $ amount of loan charges/concessions to be paid by seller  None known.

Lender/Client  Ameriquest Mortgage Company    Address 1600 South Douglass Road, Anaheim, CA 92806

Appraiser  Joseph E. Solan Jr.    Address 1600 South Douglass Road, Anaheim, CA 92806

**NEIGHBORHOOD**

| Location | ☐ Urban ☒ Suburban ☐ Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|
| Built up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | PRICE $(000) | AGE (yrs) | One family 75 | ☒ Not likely ☐ Likely |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow | ☒ Owner | 110 Low 15 | | 2-4 family 10 | ☐ In process |
| Property values | ☐ Increasing ☒ Stable ☐ Declining | ☐ Tenant | 165 High 65 | | Multi-family 5 | To: Not applicable. |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply | ☒ Vacant (0-5%) | Predominant | | Commercial 5 | |
| Marketing time | ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. | ☐ Vac.(over 5%) | 135 38 | | Open 5 | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:  Central Avenue to the north, McCool Road to the east, U.S. Route #6 to the south, and County Line Road to the west.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):  The subject is located approximately 35 miles southeast of Chicago's Loop in Portage in Northwest Indiana. Children attend local grade schools and a central high school. Local shopping and services are nearby. The subject has typical access to employment centers and average market appeal. Expressway access within several miles. Neighborhood comprised with homes of varied age, style, design and construction.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):  Subject market stable and reasonably active. Current rate financing most prevalent. Sales concessions and interest buydowns seldom seen. Financing in area is predominantly conventional, however, all types of financing are available. According to the  MLS,marketing time for homes sold in the subject's market is typically 3 to 6 months when properties are competitively priced, stable.

**PUD**

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)? ☐ Yes ☐ No

Approximate total number of units in the subject project  N/A    Approximate total number of units for sale in the subject project  N/A

Describe common elements and recreational facilities:  Not applicable.

**SITE**

| Dimensions  150 x 110 x 32 x 120 (Approximately) | | Topography | Relatively level |
|---|---|---|---|
| Site area  10,465 Square Feet +/- | Corner Lot ☐ Yes ☒ No | Size | Larger than the majority |
| Specific zoning classification and description  R-1 One-Family Residential | | Shape | Irregular |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | Drainage | Appears adequate |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain)  None. | | View | Residential |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | Landscaping | Typical of neighborhood |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | 100 amp rep. / OH | Street | Asphalt | ☒ | ☐ | Driveway Surface | Brick |
| Gas | ☒ | | Curb/gutter | Concrete | ☒ | ☐ | Apparent easements Normal PUE of Record only | |
| Water | ☒ | | Sidewalk | Concrete | ☒ | ☐ | FEMA Special Flood Hazard Area ☐ Yes ☒ No | |
| Sanitary sewer | ☒ | | Street lights | Overhead | ☒ | ☐ | FEMA Zone  Zone C    Map Date  6/1/1982 | |
| Storm sewer | ☒ | | Alley | None | ☐ | ☐ | FEMA Map No.  1802020015B | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.):  No adverse or unfavorable conditions, factors, encroachments, or encroachments noted. Site landscaping typical of the other neighborhood properties.

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | Conc. Block | Slab | No | Area Sq. Ft. | N/A-Crawl | Roof | ☐ |
| No. of Stories | 1.5 | Exterior Walls | Vinyl Siding | Crawl Space | Yes - 100% | % Finished | N/A-Crawl | Ceiling | Average ☒ |
| Type (Det./Att.) | Detached | Roof Surface | Comp. Shgle. | Basement | No | Ceiling | N/A-Crawl | Walls | ☐ |
| Design (Style) | Expanded | Gutters & Dwnspts. | None | Sump Pump | No | Walls | N/A-Crawl | Floor | ☐ |
| Existing/Proposed | Existing | Window Type | Insulated | Dampness | None noted | Floor | N/A-Crawl | None | ☐ |
| Age (Yrs.) | 38 | Storm/Screens | Screens | Settlement | None noted | Outside Entry | N/A-Crawl | Unknown | ☐ |
| Effective Age (Yrs.) | 15 | Manufactured House | No | Infestation | None noted | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | N/A-Crawl |
| Level 1 | X | 1 | | 1 | | | | 2 | 1 | X | | 1,170 |
| Level 2 | | | | | | 1 | | 1 | 1 | | | 636 |

Finished area above grade contains:     6 Rooms;     3 Bedroom(s);     2 Bath(s);     1,806  Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Carpet, Tile | Type | FWA | Refrigerator | ☒ | None | ☐ | Fireplace(s) # | ☐ | None | ☐ |
| Walls | Drywall, Panel | Fuel | Gas | Range/Oven | ☒ | Stairs | ☒ | Patio | ☒ | Garage | # of cars |
| Trim/Finish | Wood / Stained | Condition | Average | Disposal | ☐ | Drop Stair | ☐ | Deck  Open (2) | ☒ | Attached | ☐ |
| Bath Floor | Vinyl Tile | COOLING | | Dishwasher | ☒ | Scuttle | ☒ | Porch  Balcony | ☒ | Detached | ☐ |
| Bath Wainscot | Fiberglass | Central | Yes | Fan/Hood | ☒ | Floor | ☐ | Fence  Chain Link | ☒ | Built-in | 2 - Frame |
| Doors | 6-Panel Wood | Other | Window | Microwave | ☒ | Heated | ☐ | Pool | ☐ | Carport | ☐ |
| All Materials Average Condition | | Condition | Average | Washer/Dryer | ☒ | Finished | ☐ | Frame Shed | ☒ | Driveway | Side |

Additional features (special energy efficient items, etc.):  Open front and also rear wood decks, chain link fenced yard, rear 2nd floor open wood balcony, ceiling paddle fans, 2nd floor den with a kitchenette facility.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.:  No functional obsolescence, accepted market style and floor plan. No external obsolescence observed or measured. Physical depreciation the result of wear and tear. The original front main floor 2 bedrooms have had the separating wall removed and a large owner bedroom was the result (not typical of the area housing), minimal cost to restore to the  original 2 bedrooms, no functional obsolescence measured.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property:  No adverse substances observed in the dwelling, on the site, or in the immediate vicinity of the subject property. Subject built prior to 1978, possibility of lead based paint in use.

Form UA2 --- "TOTAL for Windows" appraisal software by a la mode, inc. --- 1-800-ALAMODE



File no. 0123705501  Page #3

# UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. 0123705501

**Valuation Section**

| | | |
|---|---|---|
| ESTIMATED SITE VALUE | = $ | 30,000 |

**ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS:**

| | | |
|---|---|---|
| Dwelling 1,808 Sq. Ft. @ $ 75.75 | = $ | 136,805 |
| Sq. Ft. @ $ | = | |
| | | |
| Garage/Carport 636 Sq. Ft. @ $ 6.00 | = | 3,816 |
| Total Estimated Cost New | = $ | 140,621 |
| Less Physical Functional External | | |
| Depreciation 28,124 | = $ | 28,124 |
| Depreciated Value of Improvements | = $ | 112,497 |
| "As-Is" Value of Site Improvements | = $ | 10,000 |
| INDICATED VALUE BY COST APPROACH | = $ | 152,497 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): Appraiser estimates the remaining economic life of the subject to be 60 years.
SEE ATTACHED ADDENDUM

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 3320 Willowdale Road Portage, Indiana | 5604 Birch Avenue Portage, Indiana | 2442 Niagara Street Portage, Indiana | 5030 Central Avenue Portage, Indiana |
| Proximity to Subject | | 0.08 miles | 3.27 miles | 1.71 miles |
| Sales Price | $ REFINANCE | $ 129,900 | $ 154,400 | $ 157,500 |
| Price/Gross Living Area | $ N/A ☐ | $ 68.22 ☐ | $ 99.87 ☐ | $ 81.44 ☐ |
| Data and/or | Interview | MLS #119368 | MLS #121714 | MLS #116426 |
| Verification Source | Inspection | Assessor Data | Assessor Data | Assessor Data |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION +(−)$ Adjust. | DESCRIPTION +(−)$ Adjust. | DESCRIPTION +(−)$ Adjust. |
| Sales or Financing Concessions | | FHA Mortgage No Concession | CON Mortgage No Concession | CON Mortgage No Concession |
| Date of Sale/Time | | 1/13/05 | 5/11/05 | 12/27/04 |
| Location | Suburban | Suburban | Suburban | Suburban |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Site | 10,465 Sq Feet +/− | 12,000 Sq. Feet 0 | 10,160 Sq. Feet 0 | 33,880 Sq. Feet −6,000 |
| View | Residential | Residential | Residential | Residential |
| Design and Appeal | Expanded/Avg. | Ranch/Avg. | Ranch/Average | Cape Cod/Avg. |
| Quality of Construction | Avg./Vinyl Sdg. | Avg./Vinyl Sdg. | Avg./Brk+Vinyl | Avg./Stn+Vinyl |
| Age | 38 | 43 | 17 | 65 |
| Condition | Average | Below Average +5,000 | Good −5,000 | Average |
| Above Grade Room Count | Total 6 Bdrms 3 Baths 2 | Total 8 Bdrms 4 Baths 2 0 | Total 6 Bdrms 3 Baths 2 0 | Total 7 Bdrms 3 Baths 1.5 +500 |
| Gross Living Area | 1,808 Sq. Ft. | 1,904 Sq. Ft. 0 | 1,546 Sq. Ft. +2,600 | 1,934 Sq. Ft. 0 |
| Basement & Finished Rooms Below Grade | Crawl Space N/A-Crawl | Crawl Space N/A-Crawl | Crawl Space N/A-Crawl | Basement −5,000 RecRm, BR −3,500 |
| Functional Utility | Average | Average | Average | Average |
| Heating/Cooling | GFWA/CAC | GFWA/CAC | GFWA/CAC | GFWA/CAC |
| Energy Efficient Items | Basic | Basic | Basic | Basic |
| Garage/Carport | 2 Blt-In Garage | 2 Det. Garage | 2 Att. Garage | No Garage +5,000 |
| Porch, Patio, Deck, Fireplace(s), etc. | Decks, Balcony No Fireplace | Deck No Fireplace +3,000 | Deck, Gazebo Fireplace −2,000 | Porch, Deck No Fireplace −2,000 |
| Fence, Pool, etc. | Fence Drive | Fence Drive | Fence Drive | No Fence +1,000 Drive |
| Net Adj. (total) | | ☒ + ☐ − $ 8,000 | ☐ + ☒ − $ 4,400 | ☐ + ☒ − $ 10,000 |
| Adjusted Sales Price of Comparable | | $ 137,900 | $ 150,000 | $ 147,500 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): Few similar found in the immediate neighborhood that offer similar above grade improved living area, size, modernization, or size and therefore sales were taken from competing neighborhoods offering similar size and utility properties, even though some are of a different style. Due to the appraisal problem involved the distance between the subject and competing type sales is greater than typical, acceptable, and the sales also considered relevant. The value range indicated supports the conclusion of value arrived at for the subject.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | None noted MLS Data Public Records | None noted MLS Data Public Records | None noted MLS Data Public Records | None noted MLS Data Public Records |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: Except for the above, there are no other known or reported sales or listings of the subject or the comparable properties in the past 36 month period.

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH | $ 147,500 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier N/A | = $ N/A |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans & specifications.
Conditions of Appraisal: No requirements. No personal property items are included in the subject appraised value conclusion. The square footage of the comparable properties from the MLS is approximate.
Final Reconciliation: Income Approach not used due to lack of adequate market rental data. Cost Approach given secondary weight, sets the upper limit of value. Sales Comparison Analysis Approach given the most weight, considered the most relevant and reliable value indicator in this appraisal problem.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA form 1004B (Revised 6/93 ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF June 17, 2005
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 147,500

| APPRAISER: Indiana Certified Residential Appraiser | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature | Signature | ☐ Did ☐ Did Not Inspect Property |
| Name Joseph E. Soliaro Jr. | Name | |
| Date Report Signed June 20, 2005 | Date Report Signed | |
| State Certification # CR69100746 State IN | State Certification # State | |
| Or State License # State | Or State License # State | |

Freddie Mac Form 70 6/93    PAGE 2 OF 2    Fannie Mae Form 1004 6-93

 s of Professional Appraisal Practi

File No. 0[23705501] Page #4
File No. 0123705501

| Borrower/Client | JEFFRESS, Scott & Pamela | | | | |
|---|---|---|---|---|---|
| Property Address | 3320 Willowdale Road | | | | |
| City Portage | | County Portage | State IN | Zip Code 46368-4749 | |
| Lender | Ameriquest Mortgage Company | | | | |

## EXPLANATORY NOTES

### APPRAISAL DEVELOPMENT AND REPORTING PROCESS

This is a Summary Appraisal REport which is intended to comply with the reporting requirements set forth under Standards Rule 2-2 (b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal report. As such, it presents only summary discussion of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation that is not provided with the report concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of the discussion contained in this report is specific to the needs of the client and for the intended use stated in the report. The appraiser is not responsible for unauthorized use of this report.

To develop the opinion of value, the appraiser performed a complete appraisal process, as defined by the Uniform Standards of Professional Appraisal Practice. This means that no departures from Standard 1 were invoked.

## COST APPROACH COMMENTS

The estimated site value is based on a review of recorded land sales, a review of neighborhood land assessed values, or accepted land valuation techniques, including the allocation method and extraction method. Land/Improvement ratio is typical for the area.

Physical depreciation is calculated using the effective age/economic life. Cost data from the Marshall and Swift Cost Service and appraisers' records.

## STATEMENT OF EXCLUSIVITY

This appraisal report has been prepared for the exclusive benefit of the appraiser's client and for lending purposes only. It may not be used ore relied upon by any other party. Any party who uses or relies upon any information in this report without the preparer's written consent, does so at their own risk. This appraisal was ordered by Willie Haddad of Ameriquest Mortgage Company in Schererville, Indiana.

LEGAL DESCRIPTION

The complete legal description to be supplied by the lender.




**Building Sketch (Page - 1)**

| Borrower/Client | JEFFRESS, Scott & Pamela | | | | |
|---|---|---|---|---|---|
| Property Address | 3320 Willowdale Road | | | | |
| City | Portage | County | Portage | State | IN |
| Lender | Ameriquest Mortgage Company | | | | |

Zip Code 46368-4749



| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 1170.45 | 1170.45 |
| GLA2 | Second Floor | 635.80 | 635.80 |
| GAR | Garage | 635.80 | 635.80 |
| TOTAL LIVABLE (rounded) | | | 1806 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 28.9 x 40.5 | | 1170.45 |
| Second Floor | | |
| 22.0 x 28.9 | | 635.80 |
| 2 Calculations Total (rounded) | | 1806 |

Comments:

File No. 01237055011 Page #6

## Location Map

| Borrower/Client | JEFFRESS, Scott & Pamela | | | | | |
|---|---|---|---|---|---|---|
| Property Address 3320 Willowdale Road | | | | | | |
| City Portage | | County Portage | | State IN | | Zip Code 46368-4749 |
| Lender Ameriquest Mortgage Company | | | | | | |





File No. 0123705501 | Page #7

## Subject Interior Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client  JEFFRESS, Scott & Pamela | | | |
| Property Address  3320 Willowdale Road | | | |
| City  Portage | County  Portage | State  IN | Zip Code  46368-4749 |
| Lender  Ameriquest Mortgage Company | | | |



**Subject Interior**

| | |
|---|---|
| 3320 Willowdale Road | |
| Sales Price | REFINANCE |
| Gross Living Area | 1,806 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Suburban |
| View | Residential |
| Site | 10,465 Sq Feet +/- |
| Quality | Avg./Vinyl Sdg. |
| Age | 38 |



**Subject Interior**





**Subject Interior**



Form PIC3x5.SI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE




File No. 0123705501 | Page #8

## Subject Photo Page

| | |
|---|---|
| Borrower/Client | JEFFRESS, Scott & Pamela |
| Property Address | 3320 Willowdale Road |
| City | Portage | County | Portage | State | IN | Zip Code | 46368-4749 |
| Lender | Ameriquest Mortgage Company |



### Subject Front

| | |
|---|---|
| 3320 Willowdale Road | |
| Sales Price | REFINANCE |
| Gross Living Area | 1,806 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Suburban |
| View | Residential |
| Site | 10,465 Sq Feet +/- |
| Quality | Avg./Vinyl Sdg. |
| Age | 38 |



### Subject Rear



### Subject Street



Form PIC3x5.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0123705501 Page #9

| Borrower/Client | JEFFRESS, Scott & Pamela | | | |
|---|---|---|---|---|
| Property Address | 3320 Willowdale Road | | | |
| City Portage | | County Portage | State IN | Zip Code 46368-4749 |
| Lender Ameriquest Mortgage Company | | | | |



### Comparable 1

5604 Birch Avenue
| | |
|---|---|
| Proximity | 0.08 miles |
| Sale Price | 129,900 |
| Living Area | 1,904 |
| Rooms | 8 |
| Bedrooms | 4 |
| Baths | 2 |
| Location | Suburban |
| View | Residential |
| Site | 12,000 Sq. Feet |
| Construction | Avg./Vinyl Sdg. |
| Age | 43 |



### Comparable 2

2442 Niagara Street
| | |
|---|---|
| Proximity | 3.27 miles |
| Sale Price | 154,400 |
| Living Area | 1,546 |
| Rooms | 6 |
| Bedrooms | 3 |
| Baths | 2 |
| Location | Suburban |
| View | Residential |
| Site | 10,160 Sq. Feet |
| Construction | Avg./Brk+Vinyl |
| Age | 17 |





### Comparable 3

5030 Central Avenue
| | |
|---|---|
| Proximity | 1.71 miles |
| Sale Price | 157,500 |
| Living Area | 1,934 |
| Rooms | 7 |
| Bedrooms | 3 |
| Baths | 1.5 |
| Location | Suburban |
| View | Residential |
| Site | 33,880 Sq. Feet |
| Construction | Avg./Stn+Vinyl |
| | 65 |



**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

> *Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**   The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

---

Ameriquest- - Joseph Solan
Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0123705501] Page #11

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.  I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2.  I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3.  I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4.  I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5.  I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6.  I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7.  I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8.  I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9.  I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that:
I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 3320 Willowdale Road, Portage, IN 46368-4749

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: Joseph E. Solarek | Name: |
| Date Signed: June 20, 2005 | Date Signed: |
| State Certification #: CR69100746 | State Certification #: |
| or State License #: | or State License #: |
| State: IN | State: |
| Expiration Date of Certification or License: 1/1/2006 | Expiration Date of Certification or License: |

☐ Did    ☐ Did Not Inspect Property

Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE