**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715<br><br>Lead Case No. 05-cv-07097<br><br>(Centralized before The Honorable Marvin E. Aspen) |
| THIS DOCUMENT RELATES TO:<br><br>BORROWER CLASS PLAINTIFFS' ACTIONS | |

**JOINT DECLARATION OF CO-LEAD CLASS COUNSEL FOR PLAINTIFFS
IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

The undersigned, Gary Klein, Shennan Kavanagh, Kelly Dermody and Jill Bowman jointly declare as follows:

1.       We jointly represent the Borrower Class Plaintiffs in this matter. We have personal knowledge of the facts stated herein and could and would competently testify thereto if called to do so.

2.       On November 7, 2006, the Court appointed our law firms, Roddy Klein & Ryan ("RKR"), Lieff, Cabraser, Heimann & Bernstein ("LCHB") and James, Hoyer, Newcomer & Smiljanich, P.A. ("JHNS") as Co-Lead Class Counsel for all of the class actions transferred and consolidated into MDL 1715. [Docket No. 284].

3.       On December 4, 2009, the Borrower Class Plaintiffs and Ameriquest Mortgage Company; AMC Mortgage Services, Inc. (FKA Bedford Home Loans, Inc); Town & Country Credit Corporation; Olympus Mortgage Company (NKA Bedford Home Loans, Inc.); and Argent Mortgage Company, LLC (collectively, "Ameriquest" or "Settling Defendants") filed a Settlement Agreement (or "Settlement") to fully and finally resolve the class claims pending in this matter.  [Docket No. 3247]. A copy of the

Settlement Agreement is attached as Exhibit 1.[1] The Court preliminarily approved the Settlement on December 8, 2010. [Docket No. 3251]. A copy of the Preliminary Approval Order is attached as Exhibit 2.

4.      We make this joint declaration in support of the motion for final approval of the class action settlement in these consolidated matters.

5.      Each of the undersigned, and their firms, have extensive experience in prosecuting class actions, including wide experience in litigating consumer claims with respect to lenders and servicers of secured loans. See ¶¶32-39, infra.

6.      In addition to the undersigned, dozens of law firms, having brought 28 class action lawsuits in numerous states, also have agreed to participate in this process and support approval of the proposed Settlement. See Declarations of Counsel in Support of Application for Award of Attorneys' Fees and Costs, filed separately.

7.      In the sections that follow, Co-Lead Class Counsel explain the steps that were taken to prosecute these actions, beginning with early investigations and ending with the Court's preliminary approval of the Settlement. The Settlement has a quantifiable economic value of at least $22 million to the class and provides significant non-economic relief to homeowners throughout the country. It is, in the opinion of the undersigned, fair, reasonable and adequate and worthy of final approval.

---

[1] The Settlement Agreement has six Exhibits, available to the Court at Docket No. 3247. The only exhibit included in the Settlement Agreement attached to this declaration is Exhibit 1 - the Distribution Plan.

## HISTORY OF MDL 1715

a. **Formation**

8.      Beginning in 2004, numerous class actions and individual cases against Ameriquest were being filed across the country challenging alleged predatory lending and servicing practices.

9.      Each Co-Lead Class Counsel firm filed one or more class action complaints against Ameriquest and various of its affiliated entities ("Ameriquest").[2] RKR and JHNS filed the earliest state class actions in Massachusetts and California on November 5th and 30th 2004, respectively.[3] LCHB and RKR filed one of the earliest national class actions in New York on July 1, 2005.[4]

10.      Many of these class actions were well underway when the Judicial Panel on Multidistrict Litigation ("JPML") consolidated and transferred them by creating MDL 1715 on December 14, 2005. [Docket No. 1].

11.      The JPML continued to transfer later filed class and individual actions into the MDL for a period of time after its initial consolidation. Additional cases, having been filed in the Northern District of Illinois were administratively transferred.

---

[2] The Settlement includes Ameriquest Mortgage Company, AMC Mortgage Services, Inc., (FKA Bedford Home Loans, Inc.); Town & Country Credit Corporation; Olympus Mortgage Company (NKA Bedford Home Loans, Inc.); and Argent Mortgage Company, LLC.

[3] *Murphy, et al. v. Ameriquest Mortgage Co.*, Case No. 04-CV-12651 (RWZ) (D. Mass. 2004) (removed from state court) and *Burggraff, et. al.* v. *Ameriquest Mortgage Co.*, Case No. 04-cv-09715 (MMM) (C.D. Cal. 2004).

[4] *Williams et al v. Ameriquest Mortgage Company,* Case No. 05-cv-06189 (LTS) (S.D.N.Y. 2005).

12.     In response to virtually every filed case, Ameriquest hired a well-staffed and experienced corporate defense firm to provide a vigorous defense.

**b.     The Transferred Cases**

13.     In total, the JPML consolidated 28 class actions into MDL 1715,[5] (the "Consolidated Actions"), each alleging a variety of claims based on state, federal and common law relating to Ameriquest's lending practices and servicing conduct.

14.     Unlike many MDL proceedings, the transferred cases were not merely copycats of a single originally filed complaint, alleging a single type of common injury actionable on a single simple and common legal theory.  Rather each case was grounded in a unique set of legal theories and claims under some combination of federal, state and common law.

15.     In light of the variations among the Consolidated Actions, Co-Lead Class Counsel spent a significant amount of time analyzing each complaint to identify common causes of action among them to prepare a consolidated complaint to govern the class cases in the MDL. *See* Memorandum and Order, *In re Ameriquest Mortgage Co. Mortgage Lending Practices Litig.*, No. 05-CV-7097, 2006 WL 3227883, at *2 (N.D. Ill. Nov. 7, 2006) ("Case Management Order"), [Docket No. 284] (requiring master complaint to be filed by December 6, 2006).

16.     Co-Lead Class Counsel evaluated each Consolidated Action independently to determine the extent to which it included facts, causes of action and/or

---

[5] This does not include cases filed as class actions in which the class allegations were withdrawn following transfer.

sought remedies included in other cases so that the master complaint would meet the Seventh Circuit's standards for succinctness and clarity.[6]

17.     Co-Lead Class Counsel worked with other Class Counsel to evaluate the strengths and weaknesses of particular claims, including many claims grounded in state law, in order to eliminate non-meritorious and unnecessary claims and to present a coherent consolidated complaint on theories viable for class certification.

18.     On December 6, 2006, the Plaintiffs in the Consolidated Actions ("Borrower Plaintiffs") filed a Borrowers' Consolidated Class Action Complaint ("CCAC") [Docket No. 325].[7] In general, the core claims in the CCAC and the FACC[8] coalesced around certain common practices:

(1) non-compliance with the federal Truth in Lending Act ("TILA") [CCAC, ¶¶234-244]; [FACC, ¶¶199-210];

---

[6] *See In re: Ocwen Loan Servicing, LLC Mortgage Servicing Litigation*, 491 F.3d 638, 648 (7th Cir. 2007) (affirming denial of motion to dismiss MDL master complaint but remanding on grounds that the complaint was too vague and unwieldy for the court to make a determination on preemption issues).

[7] Co-Lead Class Counsel also filed a Non-Borrower Class Action Complaint [Docket No. 323], to address Fair Credit Reporting Act claims. However, the Non-Borrower Class Plaintiffs, through counsel, reached an agreement with Ameriquest that the class allegations of the Non-Borrower Complaint should be dismissed in their entirety without prejudice, and that original individual counsel for each of the named Plaintiffs should take such further action in connection with their individual claims only as may be appropriate given the Supreme Court's decision in *Safeco Insurance Co. of America v. Burr*, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007); and the Seventh Circuit's decisions in *Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719 (7th Cir. 2008) and *Cavin v. Home Loan Center, Inc.*, 531 F.3d 526 (7th Cir. 2008). [Settlement, ¶V].

[8] For settlement purposes, Borrower Class Plaintiffs filed a First Amended and Consolidated Class Action Complaint ("FACC") [Docket No. 3245], [Settlement, ¶VII], which mirrors the CCAC.

(2) bait and switch practices, whereby Ameriquest purportedly promised to provide loans on specific terms and then changed those terms (to the detriment of the borrower) immediately prior to or on the closing date [CCAC, ¶¶281-285]; [FACC, ¶¶126-130; 240-244];

(3) allegedly charging borrowers "discount points" without actually providing either any discount in the interest rate or a discount commensurate with the cost of discount points the borrower paid [CCAC, ¶¶268-280, 293-296], [FACC, ¶¶226-238, 256-259];

(4) redundant, repetitive or excessive settlement charges [CCAC, ¶¶6, 112, 123-178]; [FACC, ¶¶7, 139-140, 147, 270]; and

(5) breach of contract for overcharging default and delinquency related fees and costs in servicing borrowers loans [CCAC, ¶¶286-292]; [FACC, ¶¶227-256].

19.     In addition to state common law claims for breach of contract, many complaints sought relief for alleged unfair and deceptive acts and practices, most commonly under the law of California, the state where Ameriquest did business. California Business & Professions Code §§17200 *et seq.* and California Civil Code §§ 1750 *et seq.* [CCAC, ¶¶302-320]; [FACC, ¶¶266-284].[9]

---

[9] In the alternative, Class Plaintiffs asserted a claim arising under each state's consumer protection act and/or unfair and deceptive trade practices act. [CCAC, ¶¶321-326]; [FACC, ¶¶284-289]. However, courts routinely certify claims of nationwide classes under the law of the state in which the defendant is domiciled and from which the unlawful conduct emanated. *See, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 53-54 (D.N.J. 2009) (certifying, pursuant to a choice of law analysis, nationwide class for litigation purposes for consumer fraud statutory claims and for unjust enrichment and rejecting challenges to such certification based upon issues of reliance and ascertainable loss); *Steinberg v. Nationwide Mutual Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y. 2004) (certifying nationwide contract class); *Parkinson v. Hyundai,* 258 F.R.D. 580, 598 (C.D. Cal. 2008) (certifying nationwide class based on California law).

20.     Many of the Consolidated Actions also included claims for declaratory relief and for injunctive relief in the form of business practice changes.  The importance of claims for declaratory and injunctive relief diminished once Ameriquest halted its business operations in 2007. *See* ¶¶52-56, *infra*.

21.     The common claims described above, extending across cases filed in many jurisdictions, ultimately formed the core of the claims being settled and was ultimately the basis for the distribution plan as described below.

22.     Ameriquest vigorously defended the claims in the CACC.   Ameriquest denied that it had harmed the Borrower Class Plaintiffs or any of the individuals in the classes they seek to represent.

**c.     <u>Size and Scope</u>**

23.     More than 60 lawyers from dozens of law firms across the country were involved in the Consolidated Actions. Several dozen lawyers were involved in the hundreds of individual cases that were transferred to the MDL.

24.     The docket, spanning over five years, currently consists of more than 3,500 entries.  Simply keeping track of filings in the MDL was a herculean task, requiring significant input of time from legal and administrative staff.

25.     In the Case Management Order, the Court trifurcated the actions consolidated in the MDL. ("We perceive three distinct types of cases: (1) borrower class actions, (2) non-borrower class actions under the Fair Credit Reporting Act (FCRA), and (3) individual, non-class suits."). Case Management Order, p. 6.

26.     The Case Management Order allowed individuals a period of time within which to opt-out of the class actions and many did so.  *Id.*; *see also* Docket Nos. 335,

340, 343-344, 352-353, 357-362, 368-369, 372, 772, 795, 1141, 1619- 1620, 1770, 1772, 1784-1785 (notices of opting-out of class actions).

27. As such, the litigation and mediation of the class actions and individual cases were pursued on separate tracks, with the exception that depositions would be shared.

**d. Appointment of Co-Lead Class Counsel**

28. After transfer, "multiple sets of plaintiffs' attorneys - as well as counsel for defendants - [] submitted several rounds of proposals for the organization and management of the class action and individual lawsuits comprising the [MDL]." Case Management Order, p. 1.

29. The Court adopted the undersigned's proposal and appointed RKR, LCHB and JHNS as Co-Lead Class Counsel. *Id*., pp. 3-5.

30. The Court appointed the Miller, Faucher and Cafferty LLP law firm (now Miller Law, LLC) to serve as Liaison Counsel and created an Executive Committee consisting of three law firms to aid with the prosecution of the class cases. *Id*.

31. In addition, the Court established an Individual Claims Steering Committee, co-chaired by the National Consumer Law Center and the Consumer Law Group to coordinate the individual plaintiffs' cases. *Id*.

**SUMMARY OF CO-LEAD CLASS COUNSELS' QUALIFICATIONS**

32. Co-Lead Class Counsel consists of three nationally recognized law firms with the vast majority of their practice devoted to representing plaintiffs in class actions.

33. Roddy Klein & Ryan specializes in the representation of consumers in individual and class action cases against mortgage lenders, finance companies, debt

collectors, utilities, and others. The firm has obtained several hundred million dollars in restitution and debt forgiveness for consumers by successfully asserting claims under state and federal consumer protection laws on their behalf. The firm has also litigated and resolved dozens of groundbreaking consumer protection and civil rights class actions. A complete firm resume for RKR has previously been submitted to the Court in connection with Plaintiffs' Joint and Agreed Organization and Case Management Plan as Exhibit B, filed on June 13, 2006 [Docket No. 162-1]. *See also* http://www.roddykleinryan.com/.

34. RKR Partner Gary Klein is a nationally recognized expert on consumer law and class actions. Mr. Klein has testified frequently before both houses of Congress on consumer credit issues and the Bankruptcy and his legislative advocacy included successfully lobbying Congress in 1994 for passage of the Homeownership and Equity Protection Act (HOEPA) and organizing opposition to credit industry efforts to revise the nation's bankruptcy laws. He is a past director of the National Association of Consumer Bankruptcy Attorneys and of the American Bankruptcy Institute. Mr. Klein was a Senior Attorney and Director of the Center's Sustainable Homeownership Initiative at the National Consumer Law Center ("NCLC") for ten years. At NCLC, he was responsible for managing a wide range of grants and contracts, for writing many of NCLC's well known publications on consumer law, and for various consulting and advocacy projects. Mr. Klein also served as co-counsel or as a consultant in more than 200 class action and individual consumer cases. He is Co-Lead counsel in two other Multidistrict Litigation proceedings.

35. RKR attorney Shennan Kavanagh has been an associate at Roddy Klein & Ryan since 2003 and has devoted her entire career to representing low income and

9

financially struggling consumers in class actions and individual cases. In recent years, her practice focuses on challenges to unfair and discriminatory mortgage lending practices and on class actions involving lenders' abuses of the Bankruptcy Code. She is serving as the co-chair of the Boston Bar Association's class action committee and is a frequent speaker on consumer rights issues at local and national conferences. Ms. Kavanagh has trained lawyers in defending foreclosures and litigating predatory lending cases. Prior to joining RKR, Ms. Kavanagh was a legal services attorney at the Volunteer Lawyers Project, representing debtors in bankruptcy proceedings and at the Legal Advocacy and Resource Center, advising advised low-income individuals on a variety of consumer related issues.

36.     Lieff Cabraser Heimann & Bernstein, LLP (LCHB) is a sixty-plus attorney law firm that has represented plaintiffs nationwide since 1972. LCHB has offices in San Francisco, New York, and Nashville, and prosecutes cases on behalf of consumers, employees, investors, and patients, among others. Since 2003, the *National Law Journal* has selected LCHB as one of the top plaintiffs' law firms in the country. LCHB has served as counsel for plaintiffs in over forty-two $100 million-plus settlements and verdicts, including eleven cases in excess of $1 billion.  LCHB has been described by *The American Lawyer* as "one of the nation's premiere plaintiffs firms." A complete firm resume for LCHB has previously been submitted to the Court in connection with Plaintiffs' Joint and Agreed Organization and Case Management Plan as Exhibit A, filed on June 13, 2006 [Docket No. 162-1]. *See also* http://www.lieffcabraser.com/.

37.     Kelly M. Dermody is a partner in LCHB's San Francisco office.  She is a nationally-recognized consumer advocate, having served as court-appointed Co-Lead

10

Plaintiffs' Counsel in several national multi-district litigations and as Lead Plaintiffs' counsel in class actions on behalf of consumers. Ms. Dermody's work as Lead Plaintiffs' Counsel in a series of class actions challenging hospital overcharging of uninsured patients resulted in savings to class members of over $1 billion.  For this work, she was awarded the prestigious "California Lawyer Attorney of the Year (CLAY) Award," by *California Lawyer* in 2007. She has been recognized as a Northern California Super Lawyer," *Law & Politics*, 2004-2009; Top 100 Northern California Super Lawyers, *Law & Politics*, 2007 & 2009; Top 50 Female Northern California Super Lawyers, *Law & Politics*, 2007-2009; *The Best Lawyers in America* (2010); "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; "Top Women Litigators in California," San Francisco and Los Angeles *Daily Journal*, 2007; and California's "Top 20 Lawyers Under 40," *Daily Journal*, 2006.  Ms. Dermody has won a number of community awards, including the "Community Justice Award," Centro Legal de la Raza, 2008; "Community Service Award," Bay Area Lawyers for Individual Freedom, 2008; "Trial Lawyer of the Year Finalist," Public Justice Foundation, 2007; "Award of Merit," Bar Association of San Francisco, 2007; Consumer Attorney of the Year Finalist, Consumer Attorneys of California, 2006; and "Living the Dream Partner," Lawyers' Committee for Civil Rights of the San Francisco Bay Area, 2005.  Ms. Dermody is a Northern District of California Lawyer Representative to the Ninth Circuit Judicial Conference, Treasurer to the Board of Directors of the Bar Association of San Francisco, and Governing Council Member of the American Bar Association Labor and Employment Law Section.

38.     James, Hoyer, Newcomer & Smiljanich, P.A. has been actively engaged in complex, consumer-related litigation on behalf of defrauded consumers since its

11

inception in 1993. JHNS has been involved as lead or co-lead counsel in more than eighty national class action lawsuits. In each of these suits, the firm has represented a class of plaintiffs who alleged a fraudulent scheme conducted against consumers. This has included deceptive sales practices, discriminatory pricing, product liability and deceptive banking and credit card practices. A complete firm resume for JHNS has previously been submitted to the Court in connection with Plaintiffs' Joint and Agreed Organization and Case Management Plan as Exhibit C, filed on June 13, 2006 [Docket No. 162-1]. *See also,* http://www.jameshoyer.com/.

39. Jill Bowman joined James Hoyer as a partner in 2003 and has acted as lead or co-lead counsel in a number of consumer class actions, including numerous mortgage related consumer class actions. In 2005, Ms. Bowman along with her partner, John A. Yanchunis, received the Chair's Honor Award from the Elder Law Section of the Florida Bar for pro-bono class action work done on behalf of 41,000 Florida nursing home residents obtaining $52 million dollars in new State funding required by federal law. Since joining James Hoyer, Ms. Bowman has committed her career to serving consumer fraud victims in Florida and throughout the Country and is regularly called on by the media to offer insight on consumer issues.

## AMERIQUEST HISTORY

a. **Size and Scope**

40. During a period of time while this litigation was pending, Ameriquest was the nation's largest privately held sub-prime lender, with more than 270 offices nationwide.

41. According to the 2003 and 2004 Mortgage Market Statistical Annuals, Ameriquest was the third largest subprime lender by volume during the period October 1999 through December 2003, with $61.8 billion in total originations during the period.

42. Based on estimates from an Ameriquest securitization-filing, Ameriquest had risen to be the top "direct to consumer" subprime mortgage originator in the United States and originated an estimated $16.84 billion in loans for the first 6 months of 2004, representing a 76% rise over the same period in 2003.

**b.** **Relationship of Subsidiaries**

43. Ameriquest Mortgage Company ("Ameriquest") is a privately-held Delaware corporation with its principal place of business in California.

44. AMC Mortgage Services, Inc. ("AMC") is a Delaware corporation with its principal place of business in California. It is a wholly-owned subsidiary of ACC Capital Holdings Corporation. AMC serviced most of the loans Ameriquest originated.

45. Ameriquest Mortgage Securities, Inc. is a Delaware corporation with a principal place of business in California. It held legal title to many of the loans Ameriquest originated.

46. Town & Country Credit Corporation is a Delaware corporation with a principal place of business in California. Town and Country is a wholly owned subsidiary of ACC Capital Holdings Corporation.

47. Argent Mortgage Co., LLC is a Delaware company with a principal place of business in California. Argent is a wholly-owned subsidiary of ACC Capital Holdings Corporation.

48.     ACC Capital Holdings Corporation is a privately-held Delaware corporation that has its principal place of business in California. ACC is a holding company and is the owner of Ameriquest and other Ameriquest entities.

**c.      Roland Arnall's Ownership**

49.     Roland Arnall ("Mr. Arnall") was the founder, Chairman of the Board and controlling shareholder of ACC Capital Holdings Corporation and all of the Ameriquest entities. He was a California citizen. Mr. Arnall's wife, Dawn Arnall, served as ACC's Chairman while this litigation was pending.

50.     On August 1, 2005, former President George W. Bush nominated Mr. Arnall to become the U.S. ambassador to the Netherlands. The Senate approved his nomination on February 9, 2006. He began his ambassadorship in March, 2006.

51.     Mr. Arnall passed away on March 17, 2008 in the midst of ongoing settlement negotiations.

**d.      Ameriquest's Business Wind Down**

52.     The subprime lending industry reached its peak in 2006. However, in 2007 the housing bubble burst and the subprime lending industry crashed. Most subprime lenders went out of business.

53.     Beginning in March, 2006, Ameriquest began shutting down its operations, including all of its 229 retail branches.

54.     In August 2007, Ameriquest transferred all of its servicing operations to Citigroup, Inc., which serviced loans under the name Citi Residential.

55.     In September 2007, Ameriquest, like many subprime lenders, stopped making loans and went out of business.

14

56.     Subsequently, Citigroup transferred Ameriquest-originated loans for servicing to a variety of third parties, including, without limitation, American Home Mortgage Servicing, Inc., and J.P. Morgan Chase.

## OTHER AMERIQUEST SETTLEMENTS

57.     Prior to or during this litigation, Ameriquest entered into other class and individual settlements in litigated matters under which certain of their borrowers released their claims. Borrowers who released their claims in any of the prior settlements were excluded from the settlement classes proposed here.

a.     **Attorneys General**

58.     In January 2006, Ameriquest and 49 states' Attorneys General announced a settlement that provided for $295 million in partial restitution to Ameriquest borrowers. ("AG Settlement"). *Available at*, http://www.ameriquestmultistatesettlement.com/.

59.     The AG Settlement resolved an investigation by the Attorneys General and/or banking and finance regulators of every state (except Virginia) and the District of Columbia into claims that Ameriquest and other affiliated companies had engaged in various unlawful mortgage lending practices from January 1, 1999 through December 31, 2005.

60.     The investigation and settlement included Ameriquest, ACC Capital Holdings Corp., Town and Country Credit Corp., and AMC Mortgage Services, Inc. (formerly doing business under the name Bedford Home Loans).

61.     The settlement was an "opt-in" settlement. It resolved only the claims of the state entities and the claims of those borrowers who chose to accept a payment and release their claims. The opt-in rate was approximately 65%, or 300,000 borrowers.

15

**b.** **Pierceall**

62.     In 2005, Ameriquest settled a private California state class action covering certain Ameriquest borrowers in four states: California, Texas, Alabama and Alaska. *Pierceall v. Ameriquest Mortgage Company, et al*. Case No. 415620 (Superior Court of California, County of San Mateo).

**c.** **Ricci**

63.     In 2008, Ameriquest settled a Minnesota state certified class action alleging violations of Minnesota's consumer fraud and deceptive trade practices acts. *Ricci, et al. v. Ameriquest Mortgage Company*, Court File No. 05-2546 (State of Minnesota District Court, County of Hennepin), *available at* http://www.riccisettlement.com/.

64.     The class consisted of Minnesota residents who had an Ameriquest loan between February 17, 1999 and September 17, 2008 that was secured by real property located in Minnesota.

**THE MDL CLASS LITIGATION**

**a.** **Litigation Stay**

65.     On February 7, 2006, the Court instituted a motion and discovery stay pending further case reassignments and the JPML's completion of the "tag-along" process. *See*, [Docket Nos. 283, 284, 342 (lifting stay on December 20, 2006)]. During this period, the Court resolved Plaintiffs' motions filed prior to the stay. *See*, Section b, *supra*.

**b.**     __Standstill Agreement__

66.     Immediately after the establishment of MDL 1715, Co-Lead Class Counsel filed motions for provisional certification of a rescission class and for a preliminary injunction on behalf of the Plaintiffs in the class actions. *See*, [Docket Nos. 10, 12] (filed on 01/11/2006); *see also* supporting memoranda [Docket Nos.13 and 14]; declarations in support [Docket Nos. 60-74]; replies to Ameriquest's oppositions [Docket Nos. 75-77]; notice of supplemental authority [Docket No. 106].

67.     By these motions, Borrower Class Plaintiffs sought to preserve individuals' rescission rights from lapsing or being released during the litigation and to require Ameriquest to send them notice of their rights. *Id*.  Rescission rights are extremely valuable to homeowners in foreclosure because exercising them voids the mortgage and the lender's ability to foreclose. *See, e.g.* Plaintiffs' Memorandum Concerning Potential Foreclosures While Plaintiffs' Motion For Preliminary Injunction Is Pending. [Docket No. 32].

68.     Ameriquest vigorously contested these motions. *See, e.g.* [Docket Nos. 29-31; 33-42, 46-49] (memoranda, objections and declarations and request for judicial notice in opposition to Plaintiffs' motions); [Docket No. 107] (response to notice of supplemental authority).

69.     On February 14, 2006, under the Court's instruction, Ameriquest and Class Plaintiffs entered into a Stipulation for Standstill (which the Court entered on February 21, 2006) [Docket No. 54]. The parties stipulated that borrowers who received blank Notices of Right to Cancel and/or received the wrong form of the Notice would retain their rescission rights that otherwise might have lapsed until the Court's decision

17

on Borrower Class Plaintiffs' preliminary injunction motion. By the Stipulation, Ameriquest also agreed that it would stay certain then-pending foreclosure proceedings on Named Plaintiffs' mortgages. [Docket No. 54, ¶6]. Under the Stipulation, Ameriquest agreed that if it chose to proceed to foreclosure, it would provide Co-Lead Class Counsel with 30 days notice of its intention to do so. *Id.*

70.     The Court granted Plaintiffs' motion for temporary injunctive relief on May 30, 2006, requiring Ameriquest to send notice to borrowers in foreclosure advising them of possible rescission rights. [Docket Nos. 142, 143]; *see also* [Docket Nos. 147 and 155] (stipulations regarding the form of notice and bond requirement).[10] The parties then contested the scope of the Court's temporary injunction. [Docket No. 173] (Ameriquest's brief arguing that it should not be required to send notice to borrowers whose loans originated after January 23, 2006 because Ameriquest's practices would be monitored pursuant to its agreement with the Attorneys General); [Docket No. 172, 192] (Plaintiffs' opposition and reply, respectively).[11] The Court resolved these issues in favor of the Plaintiffs.

---

[10] The Seventh Circuit found in September 2008 that a Truth in Lending declaratory judgment claim for borrowers seeking to rescind their loan cannot be certified. *Andrews v. Chevy Chase Bank*, 545 F. 3d 570, 571 (7th Cir. 2008). Immediately following the *Andrews* decision, the Court ordered the parties to brief the decision's impact, if any, on Class Plaintiffs' TILA claims. [Docket No. 2412]. The parties submitted competing briefs. [Docket Nos. 2457, 2458, 2459]. In their brief, Class Plaintiffs distinguished between a class of borrowers seeking a declaratory judgment that their loans are rescinded and the settlement TILA class – which consists of a borrowers who have already exercised their rescission rights and are seeking to enforce them. [Docket No. 2457]. This issue remained open when the parties began settlement negotiations.

[11] Over a year later, Class Plaintiffs moved to compel Ameriquest to comply with its agreement to stay the foreclosure on one of the Named Plaintiffs' mortgages, based on Ameriquest's alleged violation of the agreement. *See* [Docket Nos. 911, 912, 913, 917, 919].

18

71.     Based on the notice provisions of the Court's order on temporary injunctive relief and on publicity related to this matter, Co-lead Counsel was contacted by hundreds of borrowers in ensuing months.  Each borrower was carefully screened and evaluated for relevant evidence on the claims at issue.  Over the course of the litigation, by agreement, Ameriquest and Borrower Class Plaintiffs expanded the Standstill Agreement to include dozens of borrowers facing foreclosure who contacted the offices of one of Co-Lead Counsel, resulting in additional foreclosure stays in communities across the country.

**c.     Motion To Dismiss Proceedings**

72.     Ameriquest moved to dismiss the CCAC and filed a motion to compel Plaintiffs' to amend the CCAC to include individual claims. [Docket No. 378]. Both issues were thoroughly briefed. *E.g.*, [Docket Nos. 380, 427, 454].

73.     In a memorandum opinion and order, the Court denied Ameriquest's Motion to Dismiss the CCAC in its entirety on April 23, 2007. [Docket No. 701]. Ameriquest ultimately withdrew its Motion to Compel. [Docket No. 813].

74.     Ameriquest then filed an answer to Borrower Class Plaintiffs' complaint on May 7, 2007. [Docket Nos. 757-762] (separate answers by each Ameriquest related entity).

**d.     Discovery**

75.     The Court lifted the discovery stay on December 20, 2006. [Docket No. 342].[12]

---

[12] Class Plaintiffs filed several motions to lift the discovery stay. *E.g.*, [Docket No. 178]. Ameriquest opposed them. *E.g.*, [Docket No. 182].

76.     Class Plaintiffs undertook substantial formal and informal discovery in this case. On December 27, 2006, Class Plaintiffs, through counsel, served a first set of document requests to each Ameriquest entity.

77.     In response to Plaintiffs' document requests, Ameriquest produced over 212,690 pages of loan files and other documents regarding company policies and procedures and corporate activities during the class period. Ameriquest further produced several terabytes of computerized data about class member loan files.

78.     Co-Lead Class Counsel conducted approximately 15 depositions, including depositions of Ameriquest's employees, officers, directors and managing agents. They subpoenaed and received testimony from Ameriquest's former Presidents and CEOs, Kirk Langs and Wayne Lee, as well as other former Ameriquest employees.[13]

79.     The parties had numerous disagreements regarding the scope or relevance of Plaintiffs' requested discovery, which were the subject of dozens of discovery conferences and substantial discovery practice. *See, e.g.* [Docket No. 1102] (Ameriquest's motion for leave to propound additional interrogatories and for a 60-day extension of the discovery cut-off date or court order obliging Class Plaintiffs to provide meaningful responses to Defendants' pending discovery requests); [Docket No. 1327] (Class Plaintiffs' motion to compel audits and whistleblower complaints).

---

[13] In addition, some of Co-Lead Class Counsel were involved in a parallel state action, *Ricci, et al. v. Ameriquest*, Civil File No. 05-2546 (State of Minnesota District Court, County of Hennepin), which was set for trial before it settled. Discovery in *Ricci*, as well as information Co-Lead Class Counsel had by virtue of the Attorneys' General action and another parallel state court action, *Pierceall v. Ameriquest Mortgage Company, et al.* Case No. 415620 (Superior Court of California, County of San Mateo), expanded Co-Lead Class Counsel's knowledge about the merits of Class Plaintiffs' case.

80. Other disputes included whether Borrower Class Plaintiffs could take the deposition of Dawn Arnall, Roland Arnall's wife, who was also a principal shareholder of Ameriquest. Ameriquest moved for a protective order to prevent Ms. Arnall's deposition. [Docket Nos. 1003-1007].

81. On August 16, 2007, Magistrate Judge Denlow held a motion hearing on Ameriquest's motion for a protective order precluding the deposition of Dawn Arnall and granted the motion without prejudice. [Docket No. 1012].

82. In addition to the discovery conducted in the MDL, Co-Lead Class Counsel conducted a significant amount of discovery in several cases before they were transferred. For example, in *Murphy v. Ameriquest Mortgage Co.*, Case No. 04-CV-12651 (RWZ) (D. Mass), Ameriquest had produced documents before the case was transferred.

83. Co-Lead Class Counsel also obtained informal discovery, such as borrower complaints, through FOIA requests to state attorneys general. Co-Lead Class Counsel also interviewed numerous Ameriquest borrowers and former Ameriquest employees, many of whom provided valuable information as "whistle-blowers". In addition, Co-Lead Counsel interviewed numerous appraisers, loan brokers and settlement service providers who provided valuable information about Ameriquest's formal and informal lending practices.

84. Prior to entering into this settlement, Co-Lead Class Counsel also reviewed a considerable amount of financial information regarding Ameriquest's assets, insurance policies, and revenue projections.

21

85. Co-Lead Class Counsel was therefore well apprised of the strengths and weaknesses of their case as well as of the risks of pursing litigation before the parties entered into mediation.

**e.    Claims Against Roland Arnall**

86. On June 18, 2007, Class Plaintiffs filed a Motion for Leave to file a First Amended Consolidated Class Action Complaint. [Docket No. 835]. The motion sought to join Ameriquest's founder, Roland Arnall, to the class action.

87. Mr. Arnall, through counsel, filed a motion to dismiss on September 21, 2007. [Docket Nos. 1138-1140]. The Court did not issue a ruling on this motion while the litigation was pending. As part of the Settlement, Class Plaintiffs will not proceed on the Motion for Leave to Amend.

**THE MDL CLASS SETTLEMENT**

**a.    History of Negotiations**

88. On December 6, 2007 the parties began to pursue a settlement by mediation before an agreed-upon neutral: retired San Francisco Superior Court Judge Daniel Weinstein, at JAMS in San Francisco, California. Judge Weinstein's Declaration supporting approval of the Settlement ("Weinstein Dec.") was filed separately on April 7, 2010. [Docket No. 3505].

89. At this time, the parties were nearing the end of the discovery process. *See* [Docket No. 1806] (parties' stipulation to stay the litigation in light of their mediation efforts, filed on December 19, 2007).

90.     During the two and a half years of settlement negotiations, the parties met with Judge Weinstein on more than 12 occasions in San Francisco and New York, and by telephone.  *See* Weinstein Dec., ¶4.

91.     In addition to the sessions with Judge Weinstein, the parties engaged in dozens of hours of in-person meetings, conference calls, and other communications intended to further the process of settlement. *See* Weinstein Dec., ¶ 5.

92.     Negotiations were at arms' length, hard fought, and frequently acrimonious. *See* Weinstein Dec., ¶¶ 6, 7.

93.     During negotiations, Co-Lead Class Counsel obtained substantial information about the deteriorating economic condition of Ameriquest and related companies and of the nature and timing of transfers into and out of the Ameriquest companies.  That information has been confirmed in a declaration to be filed with the Court for in camera review.

94.     During negotiations, Co-Lead Class Counsel also reviewed various formally and informally obtained information about the liability of certain third party entities including, without limitation, Roland and Dawn Arnall.  Later on, Co-Lead Class Counsel reviewed the feasibility of claims against the Estate of Roland Arnall.  Among other things, Co-Lead Class Counsel reviewed legal and factual issues associated with fraudulent transfer claims against the Arnalls and other persons and corporations. Co-Lead Class Counsel ultimately concluded that pursuing these claims, rather than settling, would not enhance the value of class claims.

95.     During negotiations, Co-Lead Class Counsel also attempted to engage servicers to whom Ameriquest loans were transferred during the negotiations in order to

23

obtain relief for class members in the form of negotiated loan restructurings. Ultimately, in light of the complicated transfer agreements and the legal protections available to the transferees, Co-Lead Class Counsel concluded that settlements with servicers were infeasible and/or legally unenforceable.  At the same time, Plaintiffs investigated the value of claims against purchasers of and investors in Ameriquest-originated mortgages and concluded that in light of available defenses, including those of holders in due course, such claims were not legally viable for a class of affected individuals.  Instead, claims against servicers, loan purchasers and investors, including those for loan modification relief, are expressly preserved by the settlement in the event of foreclosure. [Settlement Agreement, ¶ VIII.C.]

96.     In May 2009, the parties reached an agreement in principal on the economic terms for the class. That agreement was contingent on additional data review, development of a process for identifying class members from available data and development of a Distribution Plan that considers the relative harm suffered by class members and the strengths and weaknesses of the claims of members of each class.

97.     The parties' settlement discussions culminated in a proposal by Judge Weinstein in May, 2009. Weinstein Dec., ¶8. Judge Weinstein's proposal was based on his consideration of the parties' respective confidential mediation submissions and extensive negotiations that he oversaw. *Id*. Judge Weinstein's proposal was in a range that he believed reasonably reflected the parties' factual, legal and financial positions, and took into consideration the risks and costs of litigation. *Id*.

b.     **Settlement Benefits**

*Economic Relief*

98.     The Settlement provides a monetary fund of $22 million ("Settlement Fund"), which will be used for settlement payments to class members, foreclosure prevention services, notice and claims administration costs, service awards to Named Plaintiffs and attorneys' fees and costs approved by the Court.

99.     The Settlement Fund will *not* be used to pay any costs associated with resolving any other case or matter not resolved by the Settlement. This is not a claims-made settlement and there is no reversion of funds to Ameriquest.

100.     Ameriquest will contribute these funds in three lump sum payments, commencing seven days following the date the Settlement is executed. After final approval, interest accumulated on the $22 million will augment the fund for the benefit of the class.

101.     Under Class Plaintiffs' proposed Distribution Plan, the entire balance of the Settlement Fund (after deduction of notice and administration costs, attorneys fees, Named Plaintiffs Service Awards and foreclosure prevention services costs) will be divided *pro rata* and paid to Settlement Class Members who made valid claims. [Distribution Plan, ¶4(a)].

102.     Each allowed claim will be assigned a payment amount based on the ratio between the number of points available on the claim (under a payment formula) and the total number of points assigned to all timely valid claims. *Id.*

103.    The payment formula is based on Ameriquest's loan level account data, which Class Plaintiffs' experts have used to calculate average putative damages. [Distribution Plan, ¶4(c)].

104.    Class Plaintiffs' experts have also estimated the likelihood of recovery of damages on the legal theories available to members of each class. *Id*. The number of points assigned to each claim will be based on average putative damages associated with claims in that class, multiplied by the likelihood of recovery. *Id*. Each claim will be assigned points based on this formula for each class for which the claimant is a member.

### *Foreclosure Prevention Services*

105.    In addition to settlement payments, $200,000 of the Settlement Fund will be used to provide foreclosure prevention counseling services to eligible class members. [Distribution Plan, ¶3].

106.    Class Plaintiffs have designated Neighborhood Housing Services of Chicago ("NHS") to provide loan modification counseling to Settlement Class Members who currently have Ameriquest originated loans being serviced by a third party and who are sixty days or more delinquent in their payments. *Id*.

107.    NHS, a nonprofit organization established in 1975, is a charter member of Neighborworks America®, a network of 230 organizations across the United States that provide assistance to homeowners.  NHS has extensive experience in providing effective foreclosure prevention counseling; for years, it has offered these kinds of services to homeowners in Chicago and across the country.[14]

---

[14] *See* www.nhschicago.org/Gateway/ (last viewed April 1, 2010).

108.    The foreclosure prevention services will be provided by telephone through an 800 number on a national basis. [Distribution Plan, ¶3]. Foreclosure prevention counselors will provide the following services to eligible Settlement Class Members:

- communicate with class members about the servicer-specific loan modification options available to them, including options under the Home Affordable Modification Program ("HAMP"); and/or

- facilitate foreclosure avoidance by providing options counseling to homeowners who are delinquent on their mortgages; and/or

- act as an intermediary between Settlement Class Members and their respective loan servicers to ensure that all applications for loss mitigation relief are accurate and complete and submitted properly to servicing entities under the servicing entities' respective guidelines; and/or

- assist class members with any follow up issues that may arise in connection with their loss mitigation applications.

109.    NHS's foreclosure prevention counseling services will be available to class members through the earlier of one year or the time the fund is expended. *Id*.

### *Cy Pres*

110.    Any amounts left over in the Settlement Fund will be donated to one or more charities by way of an award in the nature of *cy pres*.  [Settlement, ¶IV(D)]. Though the Settlement Fund is expected to be fully distributed to cover the Settlement Payments, including *pro rata* payments to class members, the *cy pres* provision is in place in the event that some issued checks are not cashed and to deal with any small residues that arise in connection, for example, with payments of interest on the fund after distribution is made.

111.    The parties will propose an organization to be the *cy pres* recipient under the Settlement for the Court's approval.

c.     **The Basis for the Distribution Plan**

112.    Co-Lead Class Counsel has consulted with experts and has carefully evaluated and compared the strengths, weaknesses, and relative merits of the claims of the several classes.

113.    Ameriquest provided substantial loan level account data to the Settlement Administrator and made it available to Class Plaintiffs and their experts for research and review to value the economic consequences of certain Ameriquest business practices on borrowers.

114.    Co-Lead Class Counsel used Winnemac Consulting, a Chicago-based consulting group with expertise in analytical methods, to estimate the harm to class members in the various classes outlined in the Settlement Agreement and FACC.

115.    A true and correct copy of Plaintiffs' Expert's analysis is attached hereto as Exhibit 3.  That analysis forms part of the basis for the distribution plan submitted to the Court.

116.    Co-Lead Class Counsel separately engaged University of Connecticut School of Law Professor Patricia A. McCoy, a widely recognized expert in state and federal financial services regulations, to evaluate the respective merits of the various claims at issue.

117.    Professor McCoy's analysis is attached hereto as Exhibit 4.  That analysis also forms part of the basis for the Distribution Plan.

118.    Based on these evaluations, Co-Lead Class Counsel has developed a Distribution Plan to divide the economic relief available to class members in a way that recognizes the relative value of their claims. A copy of the Distribution Plan is attached

28

to the Settlement as Exhibit 1. [Settlement, ¶IV(E)]. Under the distribution formula, after deductions of amounts allowed by the Court for attorney's fees and costs, administration costs and class representative service payments, each allowed Claim will be assigned a payment amount based on the ratio between the number of points available on the claim (under the formula described in the distribution plan) and the total number of points assigned to all timely valid Claims.

119.    Co-Lead Class Counsel believes that this formula fairly represents the economic injury associated with the different practices forming the basis of the FACC and is therefore the fairest possible way to divide the limited funds available for settlement.

**d.      Basis for Attorneys' Fee and Expenses and Named Plaintiffs' Service Awards**

120.    As set forth in Co-Lead Class Counsel's separately submitted memorandum in support of their request for attorneys' fees and expenses, and Named Plaintiffs' service awards, as well as the supporting declarations of Co-Lead Class Counsel and other class counsel who are being paid in this matter, the amount of attorneys fees are well below counsel's combined lodestar accumulated during the five and half years of litigating and negotiating the Settlement of this MDL.

121.    The amount of attorneys' fees and expenses and named Plaintiffs' service awards are well within the Seventh Circuit's standards for reasonableness and are appropriate in light of counsel's vigorous prosecution of MDL 1715, the complexities of the litigation, and the high quality and experience of both Co-Lead and other class counsel in this case.

122.     Additionally, the lodestar amounts set forth in Co-Lead Counsel's declarations do not include all of the work necessary to finally resolve this case, including without limitation, responding to class member inquiries about the Settlement, working with borrowers and Neighborhood Housing Services to ensure loan modifications are effectuated and ensuring the final administration and distribution of settlement payments to class members is completed consistent with the Settlement.  Co-Lead Class Counsel conservatively estimates that each firm, RKR, LHCB and JHNS, will have to spend an additional 100 hours ensuring this Settlement is properly effectuated.

123.     Likewise, the service award payments to the named Plaintiffs are appropriate in light of the time and effort they spent representing the class.

**e.     Preliminary Approval**

124.     On December 4, 2009, Borrower Class Plaintiffs, through Co-Lead Class Counsel, filed a motion seeking preliminary approval of the Settlement. [Docket No. 3248].

125.     The Court preliminarily approved the Settlement on December 8, 2009. [Docket No. 3255]. Among other things, the Court's Preliminary Approval Order: (1) preliminarily certified the Settlement Classes set forth in the Settlement, (2) approved the proposed form of notice and method of providing notice, (3) set forth processes by which class members could file claims, opt out, or object to the Settlement, and (4) set a Fairness Hearing date of April 15, 2010.

126.     The parties have complied with all aspects of the Preliminary Approval Order.

127.    On December 11, 2009, as required under the Class Action Fairness Act ("CAFA"), Ameriquest served notice of the Settlement on the United States Attorney General and each state's Attorney General. [Docket No. 3269]. After receiving the CAFA notice, none of the federal or state officials raised any objections to the Settlement.

128.    After receiving notice, nearly 24% of the class filed claims. *See* Affidavit of Settlement Administrator Concerning Notification, ¶¶5, 10, ("Administrator Affidavit") filed on April 5, 2010. [Docket No. 3495]. This claims rate is notable in that it is higher than the average claims rate for settlements of this kind and that, because of the lengthy duration of the litigation, many potential class members may have been difficult to locate because they have moved.

129.    In contrast, a relatively nominal number of class members (442) requested exclusion from Settlement. Administrator Affidavit, ¶9.

130.    After over 714,000 class members received notice, only five individuals (joint borrowers being treated as a single individual) objected to the Settlement. Three of these individuals, after obtaining further information about the Settlement from Co-Lead Class Counsel, withdrew their objections. [Docket Nos. 3486, 3487, 3494]. The other objections were resolved or are additionally addressed as described in the separately filed declaration of Annika Martin and in Class Plaintiffs' memorandum in support of their Motion for Final Approval. Regardless of their respective resolutions, Co-Lead Class Counsel maintains that each objection was void of any legal or factual merit.

131.    The high claims rate, small number of opt-outs and the handful of later-withdrawn or frivolous objections are a strong indication that the Settlement is fair, reasonable and adequate and worthy of final approval.

31

## CONCLUSION

132.    Each of the undersigned has years of experience representing consumers in mortgage lending cases and in prosecuting class claims. This experience contributed, during settlement negotiations, to an awareness both of the extent of counsel's settlement leverage and the needs of our clients and the class. Co-Lead Class Counsel believed, and continue to believe, that our clients had claims that would have ultimately prevailed in much of the litigation and, in some cases, on a class-wide basis. However, Co-Lead Class Counsel are aware that the outcome in each of our cases was uncertain and that such outcome would have been achieved, if at all, only after many more years of arduous litigation with the attendant risk of drawn-out appeals and the possibility that Ameriquest's deteriorated financial condition would preclude it from being able to pay any judgment obtained in this case.

133.    Furthermore, Co-Lead Class Counsel are aware that, during the likely period of litigation, due to the nature of the loans at issue, many thousands and perhaps tens of thousands of the class members in the Consolidated Cases would have lost their homes due to their inability to make payments. Having lost their homes, many of these individuals would be difficult or impossible to locate.

134.    Co-Lead Class Counsel entered into the Settlement only after consultation with each of their clients who are serving as Named Plaintiffs in this matter. Co-Lead Class Counsel received the authorization or affirmation of each of their clients to proceed with the Settlement.  These individuals were apprised of all of the details of the Settlement, asked questions about its terms, and ultimately endorsed it.

Respectfully submitted,
Plaintiffs' Co-Lead Class Counsel


*/s/ Gary Klein*
Gary Klein
*/s/ Shennan Kavanagh*
Shennan Kavanagh
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA 02111-2810
Telephone: (617) 357-5500 ext. 15
Facsimile: (617) 357-5030

*/s/ Kelly M. Dermody*
Kelly M. Dermody
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008


*/s/ Jill Bowman*
Jill Bowman
Terry Smiljanich
JAMES, HOYER, NEWCOMBER
& SMILJANICH, P.A.
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, FL 33609
Telephone: (813) 286-4100
Facsimile: (813) 286-4174


Dated: April 8, 2010

33