IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | (Centralized before the Honorable Marvin E. Aspen) |

## REPORT OF PROFESSOR PATRICIA A. MCCOY
## IN SUPPORT OF SETTLEMENT AND DISTRIBUTION PLAN

1. I am the Connecticut Mutual Professor of Law at the University of Connecticut Law School. As described more fully in the discussion of my qualifications below, I am an expert in the area of financial services regulation and, in particular, state and federal regulation of the mortgage lending industry.

2. I was hired by Plaintiffs' counsel as a consultant in this matter. Prior to submission of the class settlement in this matter, I was asked to evaluate the claims at issue in this case to determine the relative strengths and weaknesses of each claim. More particularly, I evaluated the claims of class members in different classes to determine their relative likelihood of success on the merits for the purpose of formulating a reasonable distribution plan that recognizes the likely recovery of class members with different categories of claims.

**QUALIFICATIONS**

3. I have extensive expertise in financial services regulation and in state and federal regulation of the residential mortgage industry. I have published numerous scholarly works in both fields as detailed in my resume. I am the author of a leading treatise on federal banking regulation, titled BANKING LAW MANUAL: FEDERAL REGULATION OF FINANCIAL HOLDING COMPANIES, BANKS AND THRIFTS (Lexis 2d ed. 2000 & cum. supps.). In 2002, I served as the editor for and a contributor to another book, titled FINANCIAL MODERNIZATION AFTER

1

GRAMM-LEACH-BLILEY (Lexis 2002), which dealt with modernization of the financial services industry. In addition, I have published numerous articles and book chapters on subprime and nontraditional residential mortgages and their risks and regulation. Finally, in 2004, I served as a guest editor of a special symposium issue of *Housing Policy Debate*, then published by the Fannie Mae Foundation, on subprime home mortgage lending titled *Special Issue on Market Failures and Predatory Lending*, 15 HOUSING POL'Y DEBATE Issue 3 (2004).

My mortgage lending expertise builds on my broader expertise in federal banking and securities regulation, both in practice and as an academic. In practice, I handled complex banking, securities fraud, and discrimination cases at the law firm of Mayer, Brown, & Platt (now Mayer Brown LLP) in Washington, D.C., from 1984 to 1992, where I was a partner and earlier an associate. In that capacity, while representing nationally recognized accounting firms, I reviewed numerous residential loan files and internal lending controls in cases involving failed banks and savings and loan institutions.

Since 2002, I have served on several national boards in which I have reviewed and given advice on mortgage lending practices. From 2002 to 2004, I was a member of the Consumer Advisory Council of the Board of Governors of the Federal Reserve System and chaired the Council's Consumer Credit Committee, which studied developments in home mortgage lending and considered whether there was a need to amend the federal statutes and regulations governing that area, including the Truth in Lending Act, the Home Ownership Equity Protection Act, and the Real Estate Settlement Procedures Act. In 2006, I served on the Blue Ribbon Advisory Committee on Risk or Race of the Joint Center on Housing Studies at Harvard University and currently I sit on the Research Advisory Council of the Center for Responsible Lending. Both of these advisory committees have examined home lending practices. In Connecticut, through 2007, I sat on the board of directors and was Treasurer of the Connecticut Fair Housing Center, a non-profit organization that seeks to further equal access to housing and mortgage lending. In 2008, I was appointed to the Advisory Committee on the Ford Foundation Subprime Crisis Project, sponsored by the Harvard University Joint Center for Housing Studies.

Finally, other recent activities draw on my expertise on subprime and predatory lending. In 2008, I testified twice before the Senate Banking Committee and once before the House Financial Services Committee in Washington, D.C., on issues related to mortgage regulation and the financial crisis. In February 2008, I testified before the Committee of Banks of the Connecticut General Assembly on mortgage lending reform in the subprime industry. In July 2006, I testified in Atlanta, Georgia, before the Federal

Reserve Board at hearings on the Home Ownership and Equity Protection Act. I also helped design a national subprime mortgage database under the auspices of the Ford Foundation.

## SCOPE OF REVIEW

4. For the purposes of the report, I reviewed the class definitions for the settlement class, the Consolidated and Amended Complaint ("Complaint"), court decisions issued during the course of the case, and Defendants' answer to the complaint.

5. I also reviewed discovery documents relevant to my opinions in this matter including certain deposition testimony.

6. I am also familiar with other settlements between Ameriquest and various parties, including the multi-state coalition of Attorneys General with whom Ameriquest separately resolved an investigation early in this litigation.

7. This report is also based on review of relevant state and federal statutes, case law and legal treatises on claims similar to the class claims at issue here, and general legal knowledge of federal, state and common law remedies.

8. For the purpose of the declaration, I was not asked to review data on class size or on the amount of potential claims of class members. I understand that such work was done by another expert and will be separately submitted to the Court.

## ANALYSIS OF THE CLAIMS BY CLASS

9. Truth in Lending Act Claims ("TILA")

   a. Class One consists of individuals who actually rescinded their loans pursuant to TILA, 15 U.S.C. § 1635, prior to the date of Settlement in this matter.[1]

   b. The Truth-in Lending Act lays out circumstances in which borrowers may rescind their loans for a period of up to three years from the date of the transaction. 15 U.S.C. § 1635(f). 12 C.F.R. § 226.23(d). That

---

[1] In evaluating the claims at issue, I do not consider restrictions on class membership that do not affect the merits of the claim at issue. For example, each class excludes individuals who had released Ameriquest in a prior settlement. This does not affect the likelihood of success on the merits of those individuals who do have TILA rescission claims.

3

      right is extended to four years under Massachusetts law. M.G.L. c. 140D, § 10.

  c. Members of Class One actively sought the rescission remedy in light of claims that they had not been provided accurate material disclosures concerning their transactions as required by law.

  d. The claims at issue are typically straightforward because they are based on accuracy of disclosures within strict liability statutory scheme and regulations promulgated by the Federal Reserve Board. 12 C.F.R. § 226.1 *et seq*. Truth in Lending rescission claims are typically resolved on motions for summary judgment based on the accuracy of the underlying loan disclosures.

  e. The grounds for class member rescissions have generally been resolved favorably in the Seventh Circuit, on an individual basis, in other cases, including one involving Ameriquest as a Defendant: *Handy v. Anchor Mortg. Corp.*, 464 F.3d 760 (7th Cir. 2006); *Hamm v. Ameriquest Mortgage Corp.*, 506 F.3d 525 (7th Cir. 2007).

  f. I conclude that the Seventh Circuit decision in *Andrews v. Chevy Chase Bank*, 545 F.3d 570 (7th Cir. 2008) does not preclude a TILA rescission claim on behalf of a class of individuals who have actually rescinded their loan, but rather only precludes a claim for rescission on behalf of a class who have not otherwise exercised their right to rescind. The question of borrowers who have actually rescinded can obtain a class remedy is expressly left open by the Court of Appeals.

  g. In light of these factors, among others, I rate the likelihood of success on the merits for class claims on this issue at 70%.

## 10. Bait and Switch

  a. Members of Class Two are individuals whose loan documentation establishes that they were offered certain loan terms and then were delivered a loan on less advantageous terms.

  b. These claims are brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 ("CLRA"), on the basis that the practices at issue emanated from California, where the Ameriquest family of companies was based during the relevant time period.

  c. The CLRA is a state law that provides remedies for various unfair and deceptive acts and practices, including lending practices. The CLRA is

4

      commonly considered to be among the most consumer friendly consumer protection laws in the country.

  d. Among other things the CLRA provides remedies for "methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer". Cal. Civ. Code § 1770. This provision covers bait and switch claims of the type that were litigated in this case. See, e.g., Laster v. T-Mobile United States, Inc., 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005).

  e. The bait and switch claims here are supported by evidence grounded in early written loan disclosures of terms offered to Ameriquest borrowers but not delivered.

  f. I am aware of other cases asserting bait and switch claims against Ameriquest that were resolved by settlements approved in California and Minnesota. These issues were also central to resolution of the claims of the state Attorneys General.

  h. In light of these factors, among others, I rate the likelihood of success on the merits for class claims on this issue at 70%.

## 11. Discount Points

  a. The first group in the Discount Points class includes consumers who paid discount points to Ameriquest prior to February 3, 2003.

      i. These are claims brought pursuant to the CLRA and are similar to the bait and switch claims discussed above in paragraph 10.

      ii. I understand that for loans made prior to February 3, 2003, there is a factual dispute about whether borrowers received a rate discount of any kind in exchange for points paid.

      iii. I am aware that this issue was the subject of a regulatory action by the Massachusetts Division of Banks prior to 2004, in which Ameriquest agreed to make partial refunds to Massachusetts borrowers who paid discount points.

      iv. In light of the regulatory settlement on this issue, I believe that the factual issue would likely be resolved in favor of this group of Plaintiffs.

5

      v. In the absence of any discount, if factually correct, a court is likely to find that borrowers received no benefit for the discount points such that their payment is unfair and/or deceptive under the CLRA.

      vi. In light of these factors, I rate the likelihood of success on the merits for class claims on this issue at 70%.

b. The second group in the Discount Points class includes consumers who paid discount points to Ameriquest after February 3, 2003.

      i. These claims are also brought under the CLRA albeit on a different theory from group 1.

      ii. I understand that for loans made subsequent to February 3, 2003, borrowers are likely to have received an undisclosed rate discount associated with payment of discount points, based on a formula in Ameriquest's automated pricing system.

      iii. These borrowers claim that, because they were not informed of the amount of the rate discount received in exchange for the payment of discount points, they could not have evaluated the economic trade-off between payment of points and the lower rate.

      iv. Because borrowers, during the class period, typically paid off their loans quickly, it was rarely the right choice to pay points to Ameriquest in exchange for a lower rate. The rate discounts did not result in a periodic payment low enough to justify payment of points at closing. Moreover, the points were typically financed such that they drove up the effective cost of the loan.

      v. The lack of rate discount information prevented borrowers in this group from proper evaluation of the cost of early refinancing.

      vi. These claims are also brought under the CLRA and are uniform nationally. However, some borrowers may have received or still stand to receive an economic benefit associated with the rate discount received in exchange for payment of points.

      vii. In light of these factors, I rate the likelihood of success on the merits for class claims on this issue at 60%.

12. Wholesale Overcharges

   a. The members of Class 4 are individuals who received wholesale loans – originated for Ameriquest or Argent by a loan broker.

   b. These class members claim that their total prepaid finance charges were excessive. Among other things, these borrowers claim that they paid duplicate fees in light of duplication of work between loan brokers and Ameriquest or Argent.

   c. The underlying facts on these issues are disputed; however, I understand, among other things, that borrowers claim that the Ameriquest companies routinely allowed brokers to charge fees for underwriting loans even though brokers did not typically underwrite the loans.

   d. In addition, borrowers claim that broker origination fees and lender origination fees are duplicative and unfair.

   e. Further, minority borrowers claim that discretionary broker charges had a discriminatory impact.

   f. Classwide litigation on this issue has sometimes focused on whether lender paid broker fees are kickbacks within the meaning of RESPA, an issue on which Plaintiffs have largely been unsuccessful at the class certification stage, See, e.g., *Golan v. Ohio Sav. Bank,* 1999 WL 965593 (N.D. Ill. Oct. 15, 1999) (Pallmeyer, J.), *petition for rev. denied* (7th Cir. Nov. 16, 1999); *Buckley v. Firstar Home Mortgage,* U.S. Dist. LEXIS 21511 (N.D. Ill. Aug. 26, 1999) (Zagel, J.); *Hinton v. First Am. Mortgage,* 1998 WL 111668 (N.D. Ill. Mar. 4, 1998) (Plunkett, J.).

   g. The issues in the complaint here are different in that they focus on duplicative and/or excessive fees under the CLRA. These issues are more likely to be certifiable and successful under an unfairness standard.

   h. Claims under the Equal Credit Opportunity Act for the impact of wholesale lending pricing decisions have also met with some success at the motion to dismiss level. *Ramirez v. GreenPoint Mortg. Funding, Inc.,* No. C08-0369, 2008 WL 2051018 (N.D. Cal. May 13, 2008) (Henderson, J.); *Ware v. Indymac Bank, FSB,* 534 F. Supp. 2d 835 (N.D. Ill. 2008) (Bucklo, J.).

   i. In light of these factors, I rate the likelihood of success on the merits for class claims on this issue at 55%.

7

13. **Servicing overcharges**

    a. The members of class 5 are individuals who paid more than $1000 dollars in default and delinquency charges to an Ameriquest company.

    b. The legal claims of these individuals are that they were subjected to excessive fees, late posting of payments resulting in unwarranted fees, and fees for work that was never completed.

    c. Similar claims against Fairbanks Capital Corporation resulted in a 55 million dollar settlement with the Federal Trade Commission and private litigants in 2005. *Curry v. Fairbanks Capital Corporation*, 03-10875-DPW (D. Mass.).

    d. As default and delinquency fees begin to exceed high thresholds such as $1,000, the likelihood that a portion of those fees is unwarranted or improper increases.

    e. In light of these factors, I rate the likelihood of success on the merits for class claims on this issue at 50%.

14. I understand that many class members fall into multiple classes and will be paid, based on a formula, for their damages in each class. This is typical of cases grounded in theories of lending abuses as there are often multiple factual theories and multiple claims in such cases.

15. I reserve the right to reevaluate my opinions based on changes in the law and/or factual underpinnings of the various claims.

*Patricia A. McCoy*
Patricia A. McCoy
University of Connecticut School of Law

# PATRICIA A. McCOY
University of Connecticut School of Law
Hartford, Connecticut
860/570-5056

## EMPLOYMENT

Connecticut Mutual Professor of Law, 2010. George J. & Helen M. England Professor of Law, University of Connecticut School of Law, 2006-2010. Director of the Insurance Law Center, 2009-present. Professor of Law, 2002-06. Visiting Professor, Spring 2000.

- Have taught Banking Regulation, Securities Regulation, Consumer Finance Law, Business Organizations, Retirement Security Law, Regulation of Mutual Funds, Cybercommerce Law.

- Dean Search Committee (search coordinator); Faculty Appointments Committee; Chair, Personnel Action Committee Working Subcommittee; Academic Support Committee; Computer Committee; University Senate.

- Guest Lecturer, Hong Kong Polytechnic University, June 2007.

Honorary Guest Professor, University of International Business and Economics, School of Insurance, Beijing, China, 2007-date. Co-Chair, Law and Economics Program, 2008-date.

Visiting Scholar, Massachusetts Institute of Technology, Department of Economics, 2002-2003.

- Focus on behavioral economics, public finance, and corporate finance.

Professor of Law, Cleveland-Marshall College of Law, Cleveland State University, 2001-2002. Associate Professor of Law with tenure, 1997-2001. Assistant Professor of Law, 1992-1997.

- Faculty member, Summer Law Institute in St. Petersburg, Russia, Summers 1995 and 2002. Taught Comparative Financial Services Regulation.

- Guest Lecturer, St. Petersburg State University, Moscow State University, and Volgograd State University, Russia, Spring 1994.

Partner, Mayer, Brown, Washington, D.C., 1991-1992. Associate, 1984-1990. Summer associate, Summer 1983.

- Specialized in complex banking, securities fraud, and general business law litigation at the trial and appellate levels. Represented numerous *pro bono* plaintiffs in housing and employment discrimination cases in conjunction with the Washington Lawyers' Committee for Civil Rights.

- Named Pro Bono Attorney of the Year for 1991-1992 by the District of Columbia Bar.

2/19/2010

Law Clerk to the late Hon. Robert S. Vance, United States Court of Appeals for the Eleventh Circuit, 1983-1984.

Summer associate, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Summer 1982.

Summer associate, U.S. Nuclear Regulatory Commission, Bethesda, Maryland, Summer 1981.

*Earlier positions*: Legal assistant, McCutchen, Doyle, Brown and Enersen, San Francisco, California (1979-1980); Legal assistant, Kansas Legal Services, Pottawatomi and Kickapoo Nations (1977-1979); Research analyst for U.S. Commissioner of Education Terrel H. Bell, Washington, D.C. (1974-1975); Intern, Rep. William Roy (D-Kan.), U.S. House of Representatives, Washington, D.C. (1974); Intern, Common Cause, Washington, D.C. (1973).

## EDUCATION

Case Western Reserve University. Non-degree course work in mathematics, probability, and statistical analysis, 1998-2002.

University of California (Berkeley) School of Law. J.D. 1983.

- *Industrial Relations Law Journal* (now the *Berkeley Journal of Employment and Labor Law*). Editor-in-Chief, 1982-1983; Managing Editor, 1981-1982.

Ludwig Maximilians University (University of Munich) and Bavarian Film Academy, Germany. Graduate studies, 1976-1977.

- German Marshall Fund (Deutscher Akademischer Austauschdienst) Scholar.

Oberlin College. B.A. 1976, Government.

## PUBLICATIONS

### *Editorships and Research Appointments*

Member, Editorial Advisory Board, *The Journal of Accounting, Economics and Law – A Convivium*.

Adjunct Research Scholar, National State Attorneys General Program, Columbia Law School.

Member, Editorial Advisory Board, Cambridge Series on Law, Finance, and Economics, Oxford University Press.

Symposium Co-Guest Editor, *Special Issue on Market Failures and Predatory Lending*, 15 HOUSING POL'Y DEBATE Issue 3 (2004).

## Books

THE SUBPRIME VIRUS (Oxford University Press, forthcoming 2010) (with Kathleen C. Engel).

FINANCIAL MODERNIZATION AFTER GRAMM-LEACH-BLILEY (Patricia A. McCoy ed., Lexis 2002).

BANKING LAW MANUAL: FEDERAL REGULATION OF FINANCIAL HOLDING COMPANIES, BANKS AND THRIFTS (Lexis 2d ed. 2000 & cumulative supplements), available on LEXIS.

Editor for 1996-2000 Releases for BARRY STUART ZISMAN, BANKS AND THRIFTS: GOVERNMENT ENFORCEMENT AND RECEIVERSHIP (Lexis 1991).

## Book Chapters

*Federal Preemption, Regulatory Failure and the Race to the Bottom in US Mortgage Lending Standards*, in THE PANIC OF 2008 (Lawrence Mitchell, ed., Edward Elgar Press, forthcoming 2010).

*The Impact of Predatory Lending Laws: Policy Implications and Insights* (with Raphael Bostic, Kathleen C. Engel, Anthony Pennington-Cross and Susan Wachter) in BORROWING TO LIVE: CONSUMER AND MORTGAGE CREDIT REVISITED 138 (Nicolas P. Retsinas & Eric S. Belsky eds., Joint Center for Housing Studies of Harvard University and Brookings Institution Press, 2008), working paper version at http://www.jchs.harvard.edu/publications/finance/understanding_consumer_credit/papers/ucc08-9_bostic_et_al.pdf.

*The Legal Infrastructure of Subprime and Nontraditional Mortgage Lending* (with Elizabeth Renuart), in BORROWING TO LIVE: CONSUMER AND MORTGAGE CREDIT REVISITED 110 (Nicolas P. Retsinas & Eric S. Belsky eds., Joint Center for Housing Studies of Harvard University and Brookings Institution Press, 2008), working paper version at http://www.jchs.harvard.edu/publications/finance/understanding_consumer_credit/papers/ucc08-5_mccoy_renuart.pdf.

*The Moral Hazard Implications of Deposit Insurance: Theory and Practice*, in 5 CURRENT DEVELOPMENTS IN FINANCIAL AND MONETARY LAW 417 (International Monetary Fund, 2008), https://www.internationalmonetaryfund.org/external/np/seminars/eng/2006/mfl/pam.pdf.

*From Credit Denial To Predatory Lending: The Challenge Of Sustaining Minority Homeownership*, in SEGREGATION: THE RISING COSTS FOR AMERICA (James H. Carr & Nandinee Kutty, eds., Routledge, 2008) (with Kathleen C. Engel).

*Predatory Lending and Community Development at Loggerheads*, in FINANCING LOW-INCOME COMMUNITIES (Julia Rubin, ed., Russell Sage Foundation, 2007) (with Kathleen C. Engel), working paper version available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=687161.

*Predatory Lending Practices: Definition and Behavioral Implications*, in PREDATORY LENDING: WHY THE POOR PAY MORE FOR FINANCIAL SERVICES (Greenwood Press 2004, Gregory Squires ed.).

3

*The Law and Economics of Remedies for Predatory Lending*, in FEDERAL RESERVE SYSTEM, CHANGING FINANCIAL MARKETS & COMMUNITY DEVELOPMENT 155 (2001) (with Kathleen C. Engel).

Contributor, AMERICAN NATIONAL BIOGRAPHY (Oxford University Press 1999) (biography of former SEC chairman William Cary).

*Special Factors Making Small Post-Socialist Economies Susceptible to Bank System Risk*, in GLOBAL TRENDS AND CHANGES IN EAST EUROPEAN BANKING 171 (Ewa Miklaszewska ed., 1998) (with Catherine D. Toth).

*Emerging Theories of Liability for Outside Counsel and Independent Outside Auditors of Financial Institutions*, in EMERGING ISSUES IN THE "NEW" BUSINESS OF BANKING (Practising Law Institute 1992).

### Articles and Monographs

*Securitization and Systemic Risk Amid Deregulation and Regulatory Failure*, 41 CONN. L. REV. 1327 (2009) (with Andrey D. Pavlov and Susan Wachter).

*Local Anti-Predatory Lending Laws: The Effect of Legal Enforcement Mechanisms*, 60 J. ECON. & BUS. 47-66 (2008) (with Raphael Bostic, Kathleen C. Engel, Anthony Pennington-Cross and Susan Wachter) (peer reviewed), full working paper version available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1005423.

*The Home Mortgage Disclosure Act: A Synopsis and Recent Legislative History*, 29 J. REAL ESTATE RESEARCH 381-397 (2007) (peer reviewed), available at http://cbeweb-1.fullerton.edu/finance/journal/papers/abstract/forth/accepted/JRER_SI(0703S02R1)_5.htm.

*Rethinking Disclosure in a World of Risk-Based Pricing*, 44 HARV. J. LEGIS. 123 (2007), available at http://www.law.harvard.edu/students/orgs/jol/vol44_1/mccoy.pdf.

- Article formed basis of Louise Story and Vikas Bajaj, *As Woes Grow, Mortgage Ads Keep Up Pitch*, NEW YORK TIMES, Aug. 25, 2007, at A1.

*Turning a Blind Eye: Wall Street Finance Of Predatory Lending*, 75 FORDHAM L. REV. 2039 (2007) (with Kathleen C. Engel), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=910378.

- Named Best Professional Paper of 2007 by the American College of Consumer Financial Services Lawyers.

*A Behavioral Analysis of Predatory Lending*, 38 AKRON L. REV. 725 (2005), available at http://www.uakron.edu/law/lawreview/docs/McCoy384.pdf.

4

*Predatory Lending: What's Wall Street Got to Do with It?*, 15 HOUSING POL'Y DEBATE 715 (2004) (with Kathleen C. Engel).

*A Tale of Three Markets Revisited*, 82 TEX. L. REV. 439 (Dec. 2003) (with Kathleen C. Engel).

*Realigning Auditors' Incentives*, 35 CONN. L. REV. 989 (2003).

*A Tale of Three Markets: The Law and Economics of Predatory Lending*, 80 TEX. L. REV. 1255 (2002) (with Kathleen C. Engel).

- Termed "groundbreaking" and "required reading for any policy analyst interest in the subject of predatory lending." James H. Carr, *New Industry Developments, in* CHANGING FINANCIAL MARKETS AND COMMUNITY DEVELOPMENT 170, 172 (Federal Reserve System 2001).

- Front page of the *Wall Street Journal* cited the article's suitability proposal and called suitability a "promising approach" that is "worth exploring." David Wessel, *An Inner-City Predator Needs a New Leash*, WALL ST. J., Apr. 19, 2001, at A1.

*The CRA Implications of Predatory Lending*, 29 FORDHAM URB. L.J. 1571 (2002) (with Kathleen C. Engel).

YEAR 2000 READINESS FOR BANKS AND THRIFTS (Matthew Bender 2000).

*Technology Shifts and the Law: Year 2000 Readiness for Banks and Thrifts*, 19 ANN. REV. BANKING L. 153 (2000).

*Musings on the Seeming Inevitability of Global Convergence in the Regulation of Banking Law*, 7 CONN. INS. L.J. 433 (2000-2001).

THE DEMISE OF THE COMMON-LAW DOCTRINE IN D'OENCH, DUHME (Matthew Bender 1998).

*Levers of Law Reform: Public Goods and Russian Banking*, 30 CORNELL INT'L L.J. 45 (1997).

*A Political Economy of the Business Judgment Rule in Banking: Implications for Corporate Law*, 47 CASE W. RES. L. REV. 1 (1996).

*The Notional Business Judgment Rule In Banking*, 44 CATH. U.L. REV. 1031 (1995).

Co-author with John Pearson, *Footprints of a Just Man: The Case Law of Judge Robert S. Vance*, 42 ALA. L. REV. 987 (1991).

## Book Review

Review, *International Banking* by Michael P. Malloy, 12 THE TRANSNAT'L LAWYER 129 (1999).

5

## *Online, Newsletter, and Newspaper Publications*

Op Ed, *Another View: The Best Way to Protect Borrowers*, THE NEW YORK TIMES DEALBOOK, March 8, 2010.

*Of Loan Modifications And Writedowns* (February 2, 2010), commissioned by the Harvard University Joint Center for Housing Studies, available at http://www.jchs.harvard.edu/.

*Accounting for Subprime Losses: The Impact of FAS 157*, EY FACULTY CONNECTION, Issue 20 (Dec. 2007) (with Amy Dunbar), available at http://www.ey.com/global/content.nsf/US/EY_Faculty_Connection_(Issue_20).

Interview panelist in *Perspectives on Assessing CRA's Impact, Effectiveness, and Applicability for the Future*, CR (COMMUNITY REINVESTMENT) REPORT (Fed. Res. Bank of Cleveland, Summer 2007), available at http://www.clevelandfed.org/CommAffairs/CR_Reports/CRReport_summer07.pdf.

Guest Author (with Kathleen C. Engel), *Credit Slips* blog, Dec. 11-15, 2006, www.creditslips.org/.

Op Ed titled *Mortgage rate disparities hurt borrowers, communities* in THE PLAIN DEALER (Cleveland), Sept. 29, 2006 (with Kathleen C. Engel).

*Banking on Bad Credit: New Research on the Subprime Home Mortgage Market*, published online in the Proceedings of the Third Federal Reserve System Conference (titled "Promises and Pitfalls: As Consumer Finance Options Multiply, Who Is Being Served and at What Cost?), 2005, available at http://www.chicagofed.org/cedric/files/2005_conf_discussant_session1_mccoy.pdf.

## OTHER PROFESSIONAL ACTIVITIES

James W. Cooper Fellow, Connecticut Bar Foundation, 2009.

Adviser, Congressional Oversight Committee on TARP (headed by Elizabeth Warren).

Adviser, Obama Transition Team, 2008.

Adviser, Obama Presidential Campaign, 2007-2008.

Member, Advisory Committee on Ford Foundation Subprime Crisis Project, Harvard University Joint Center for Housing Studies, 2008 (advising on study of the boom and bust of the subprime market).

Member, Blue Ribbon Committee, Harvard University Joint Center for Housing Studies, 2006-2007 (advising on study titled *Race or Risk: From Dueling Data to Systemic Solutions*, funded by the Ford Foundation).

Member, Demos: A Network for Ideas and Action, The Debt and Assets Working Group,

January 2006 (sponsored by the Rockefeller Foundation).

Program Chair, Association of American Law Schools, Section on Financial Institutions and Consumer Financial Services, 2005.

Member, Research Committee, Center for Responsible Lending, Washington, D.C., 2005-present.

Consultant, Subprime Mortgage Database Project (in tandem with the National Consumer Law Center, funded by the Ford Foundation), 2004-present.

Member, Consumer Advisory Council, Federal Reserve Board of Governors, 2002-2004. Chair, Consumer Credit Committee, 2004-2005.

- Advised Federal Reserve governors and staff on needed reforms to federal consumer protection laws and regulations on home mortgages, credit cards, other consumer loans, real estate settlement procedures, credit reporting, lending discrimination, community reinvestment, financial privacy, and home mortgage data reporting.

Director, Connecticut Bar Foundation, 2008-date. Member, Audit and Finance Committees.

Director, Insurance Marketplace Standards Association, 2003-2008. Member, Audit Committee.

Director and Treasurer, Connecticut Fair Housing Center, 2004-2007. Member, Executive Committee.

Member, Research Working Group, National Consumer Law Center, 2003-2004.

Chair, Association of American Law Schools, Section on Financial Institutions and Consumer Financial Services, 2000-2001; Program Chair, 2006.

Consultant, Ohio Public School Finance Reform Project, 1999-2000.

Consultant on Bulgarian banking reforms for Chemonics International, Sofia, Bulgaria, May 1997.

Commentator on the draft of Part I of the Russian Civil Code under the auspices of the Institute for Reform in the Informal Sector (IRIS), University of Maryland, Spring 1994.

Director, Washington Council of Lawyers, 1986-1992.

Member, District of Columbia Bar (admitted 1984).

7

## TESTIMONY AND EXPERT REPORTS

Testified before the Subcommittee on Securities, Insurance, and Investment of the U.S. Senate Committee on Banking, Housing, and Urban Affairs at hearing titled "Securitization of Assets: Problems and Solutions," October 7, 2009, Washington, D.C.

Expert for defendant title insurance company in *Rubin v. Coppenger et al.*, No. CV-2006-07-4229 (Summit County, Ohio, Court of Common Pleas): filed expert report in mortgage fraud case.

Testified before the Subcommittee on Domestic Monetary Policy and Technology of the U.S. House Committee on Financial Services at hearing titled "Regulatory Restructuring: Safeguarding Consumer Protection and the Role of the Federal Reserve," July 16, 2009, Washington, D.C.

Expert for defendant title insurance company in *Countrywide Home Loans, Inc. vs. LandAmerica American Title Company et al.*, Cause No. 07-14386-I (Dallas County, Texas, District Court: 162d Jud. District): provided background consultation in mortgage fraud case.

Expert for defendant title insurance company in bankruptcy proceeding titled *Credit Suisse Financial Corporation, et al. v. Parish Marketing & Development Corporation, et al.*, C.A. 0:08-cv-01038-DWF-SRN, Claim #F34052233, F34052083, and F34052229 (D. Minn.): provided background consultation in mortgage fraud case.

Testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs at hearing titled "Consumer Protections in Financial Services: Past Problems, Future Solutions," March 3, 2009, Washington, D.C.

Expert witness for defendant title insurance companies in *Countrywide Home Loans, Inc. v. National Land Title of Tarrant, Inc. et al.*, Cause No. 06-11971-H (Dallas County, Texas, District Court: 160th Jud. District) and related litigation: filed expert report in mortgage fraud case.

Testified before the Committee on Banks, Connecticut General Assembly, in hearing on mortgage lending bills, February 28, 2008.

Expert witness for defendant title insurance companies in *Ohio Savings Bank v. Commonwealth Land Title Insurance Co. et al.*, Cause No. 2006-32092 (Harris County, Texas, District Court: 295th Jud. District): filed expert report in mortgage fraud case.

Expert witness for defendant title insurance company in *ABN AMRO Mortgage Group, Inc. v. The Mortgage Zone, Inc.*, Case No. 05-74150 (E.D. Mich.): filed expert report in predatory mortgage lending case.

Expert witness for defendant title insurance company in *ABN-AMRO Mortgage Group, Inc. v. New Partners Mortgage Company*, Case No. 1:05 CV 1167 (N.D. Ohio): filed expert report in predatory mortgage lending case.

Expert witness for plaintiffs in *State of Connecticut v. Approved Mortgages, Inc. et al.*, Docket No. HHD-X09-CV-05-40097378-S (Connecticut Superior Ct., Jud. District of Hartford): testified at expert deposition in predatory mortgage lending case.

Expert witness for plaintiff in *Devlin v. Northeast Mortgage Corp.*, original Docket No. X01-CV-03-0178670-S (Connecticut Superior Ct., Jud. District of Waterbury), later transferred to U.S. Bankruptcy Court: testified at expert deposition in predatory mortgage lending case.

Testified before the Federal Reserve Board in hearings on the Home Ownership Equity and Protection Act, Atlanta, Georgia, July 11, 2006.

Expert witness for plaintiffs in *State of Connecticut v. GRZ, LLC*, Docket No. CV 03 0829985S (Connecticut Superior Ct., Jud. District of Waterbury Complex Litigation): filed expert report and testified at expert deposition in predatory mortgage lending case.

Expert witness for plaintiff in *Heaton v. Monogram Credit Card Bank of Georgia*, Civil Action No: 98-1823 c/w 99-2603 Section: "J" (1) (U.S. District Court for the Eastern District of Louisiana): filed expert report in challenge to a claim of federal preemption by a credit card bank.

9