1 **TRANSCRIBED FROM DIGITAL RECORDING**

2               IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION

4  IN RE:  AMERIQUEST MORTGAGE      ) Docket No. 05 C 7097
   COMPANY, MORTGAGE LENDING        )
5  PRACTICES LITIGATION             )
                                    ) Chicago, Illinois
6                                   ) July 29, 2010
                                    ) 10:23 o'clock a.m.
7

8               TRANSCRIPT OF PROCEEDINGS - Status
                BEFORE THE HONORABLE MORTON DENLOW
9

10 APPEARANCES:
   **For Plaintiffs:**
11

12 For Furgeson:           EDELMAN, COMBS, LATTURNER
                            & GOODWIN LLC
13                         BY:  MS. CATHLEEN M. COMBS
                                MS. CATHERINE ANNE CEKO
14                              MS. TARA L. GOODWIN
                           120 South LaSalle Street
15                         18th Floor
                           Chicago, Illinois  60603
16

17 For Terry:              THE LAW OFFICES OF DANIEL HARRIS
                           BY:  MR. DANIEL MARK HARRIS
18                              MR. ANTHONY P. VALACH, JR.,
                           150 North Wacker Drive
19                         Suite 3000
                           Chicago, Illinois  60606
20

21
                    LAURA LACIEN, CSR, RMR, FCRR, CRR
22                      Official Court Reporter
                   219 South Dearborn Street, Suite 1902
23                      Chicago, Illinois  60604
                           (312) 408-5032
24      **PLEASE NOTIFY OF CORRECT SPEAKER IDENTIFICATION**

25 NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS
   UNINTELLIGIBLE AND INAUDIBLE.

```
 1

 2   APPEARANCES:  (Continued)
     For Defendants:
 3
     For Ameriquest
 4      Mortgage:            BUCHALTER NEMER PC
                             BY:  MS. JOANNE N. DAVIES
 5                           18400 Von Karman Avenue
                             Suite 800
 6                           Irvine, California  92612

 7
     For Arnall:             DEWEY & LeBOEUF LLP
 8                           BY:  MR. VINCENT P. SCHMELTZ III
                             180 North Stetson Avenue
 9                           Suite 3700
                             Chicago, Illinois  60601
10

11   For Argent:             WINSTON & STRAWN LLP
                             BY:  MR. THOMAS JOSEPH WIEGAND
12                           35 West Wacker Drive
                             Chicago, Illinois  60601
13

14   For Third-Party Defendants:

15
     For Old Republic:       JOHNSTON & GREENE LLC
16                           BY:  MR. ANDREW ROBERT GREENE
                             542 South Dearborn Street
17                           Suite 1100
                             Chicago, Illinois  60605
18

19   For A American:         SANCHEZ DANIELS & HOFFMAN LLP
                             BY:  MR. HECTOR LADESMA
20                           333 West Wacker Drive
                             Suite 500
21                           Chicago, Illinois  60606

22

23

24

25
```

```
 1

 2    APPEARANCES:   (Cont'd)

 3
      For Third-Party Defendants:
 4
      For Schop and Pleskow:   CLAUSEN MILLER PC
 5                             BY:  MR. RICHARD M. KAPLAN
                               10 South LaSalle Street
 6                             Suite 1600
                               Chicago, Illinois  60603
 7

 8    For Title Source:        KARBAL, COHEN, ECONOMOU,
                                SILK & DUNNE LLC
 9                             BY:  MS. SARAH A. JOHNSON
                               150 South Wacker Drive
10                             Suite 1700
                               Chicago, Illinois  60606
11

12    For First American:      NEAL, GERBER & EISENBERG
                               BY:  MR. ROBERT RADASEVICH
13                             Two North LaSalle Street
                               Suite 1700
14                             Chicago, Illinois  60602

15
      For Nations Title:       McCORMACK LAW
16                             BY:  MR. DAVID C. McCORMACK
                               18875 Saratoga Court
17                             Brookfield, Wisconsin  53045

18
      For Mortgage
19      Information Services: RATHJE & WOODWARD LLC
                               BY:  MR. DEREK M. JOHNSON
20                             300 East Roosevelt Road
                               Suite 300
21                             Wheaton, Illinois  60187

22
      For Ticor Title:         BUTLER, RUBIN SALTARELLI & BOYD LLP
23                             BY:  MR. ALBERT E. FOWERBAUGH, JR.,
                               70 West Madison
24                             Suite 1800
                               Chicago, Illinois  60602
25
```

1

2  APPEARANCES:  (Cont'd)

3

   **For Third-Party Defendants:**

4

   For Netco, Inc.:          ATTORNEY AT LAW
5    (*via telephone*)       BY:  MR. STEVEN S. ELLIOTT
                             12 East Exchange Street
6                            8th Floor
                             Akron, Ohio  44310
7

8  For Cislo Title:          LAW OFFICE OF JEFFREY W. FINKE
                             BY:  MR. JEFFREY WAYNE FINKE
9                            55 West Wacker Drive
                             Suite 1400
10                           Chicago, Illinois  60601

11                           TOUHY, TOUHY, BUEHLER & WILLIAMS
                             BY:  MR. ROBERT E. WILLIAMS
12                           55 West Wacker Drive
                             14th Floor
13                           Chicago, Illinois  60601

14

15

16

17

18

19

20

21

22

23

24

25

1      (The following digitally recorded proceedings were had in
2  open court:)
3           THE COURT:  Okay.  Let's get the cast of thousands.
4           COURTROOM DEPUTY:  Okay, sir.  Are you still on the
5  line?
6           UNIDENTIFIED SPEAKER:  Yes, ma'am.
7           COURTROOM DEPUTY:  Okay.  I'm going to call the
8  case.
9           THE COURT:  Okay.
10          COURTROOM DEPUTY:  05 C 7097, Ameriquest Mortgage
11 Lending Practices Litigation.  Also, 04 C 7627, 05 C 5035 and
12 08 C 2475.
13          THE COURT:  Okay.  Let's try to do this in some kind
14 of organized fashion.
15          First of all, let me have all the plaintiffs to my
16 right and your left and all the defendants to my left and
17 your right.  So let's --
18          UNIDENTIFIED SPEAKER:  Judge, where would you like
19 the third-party defendants?
20          UNIDENTIFIED SPEAKER:  Out of the room.
21          UNIDENTIFIED SPEAKER:  Out of the room?
22          THE COURT:  Leave the third-party defendants on that
23 side, okay.
24          So -- okay.  Who is representing the plaintiffs in
25 05 C 7097?

```
 1              UNIDENTIFIED SPEAKER:  Is that Furgeson?

 2              THE COURT:  That's In Re: Ameriquest Mortgage

 3   Company.

 4              UNIDENTIFIED SPEAKER:  All of us.

 5              THE COURT:  Okay.

 6              UNIDENTIFIED SPEAKER:  Different plaintiffs.

 7              COURTROOM DEPUTY:  Can you just get a little closer

 8   to the microphone?

 9              THE COURT:  Okay.  So let's start with 04 C 7627,

10   the Furgeson plaintiffs, come up and identify yourselves.

11              MS. COMBS:  Good morning, your Honor.  Cathleen

12   Combs on behalf of the plaintiffs along with Catherine Ceko,

13   C-e-k-o, and Tara Goodwin.

14              THE COURT:  Ms. Combs, did you spell your last name?

15              MS. COMBS:  C-o-m-b-s.  Sorry.

16              THE COURT:  Okay.  And who are the defendants in

17   that case?  Is it -- I mean, do the defendants overlap in all

18   the cases?

19              MS. DAVIES:  Yes, your Honor.  I'm here on behalf of

20   the Ameriquest defendants.

21              THE COURT:  Okay.

22              MS. DAVIES:  We are defendants in the Furgeson,

23   Pintsak, Terry, and MDL cases.

24              THE COURT:  Go ahead and identify yourself then.

25              MS. DAVIES:  Joanne Davies, Buchalter Nemer, on
```

1  behalf of the Ameriquest defendants.

2         Your Honor, Mr. LeSage asked me to send his regards.

3  Unfortunately, his wife had surgery a few days ago.  He would

4  normally be attending this hearing but he's otherwise

5  unavailable.

6         THE COURT:  Okay.  Let me move then to the

7  plaintiffs in Pintsak, 05 C 5035.

8         MS. COMBS:  Again, Cathleen Combs, Catherine Ceko,

9  and Tara Goodwin.

10         THE COURT:  Okay.  And who are the plaintiffs in 08

11  C 2475, Terry versus Ameriquest?

12         MR. HARRIS:  Good morning, your Honor.  Daniel

13  Harris, H-a, double r, i-s.  Anthony Valach, V-a-l-a-c-h,

14  representing the Terry plaintiffs and also various plaintiffs

15  in the MDL case.

16         THE COURT:  Okay.  So who are just the defendants

17  and then we'll go into the third-party defendants?  So why

18  don't the attorneys who are here identify themselves as

19  either defendants or -- let's start with who is just a

20  defendant?  Is it just -- okay.

21         MS. DAVIES:  The Ameriquest defendants.

22         THE COURT:  Okay.  And that's Ms. Davies?

23         MS. DAVIES:  Yes.

24         THE COURT:  Is your firm lead counsel for the

25  defendants basically?

1          MS. DAVIES:  Yes.

2          THE COURT:  Okay.  Very good.

3          MR. SCHMELTZ:  Your Honor, Vincent Schmeltz from the

4    Dewey & LeBoeuf firm.  I represent Arnall, Dawn Arnall, and

5    The Estate of Roland Arnall in just the Terry case.

6          THE COURT:  Okay.  And spell your last name,

7    please.

8          MR. SCHMELTZ:  S-c-h-m, as in Mary, e-l-t-z.

9          THE COURT:  Okay.

10          MR. WIEGAND:  Good morning, your Honor.  Tom Wiegand

11   of Winston & Strawn, W-i-e-g-a-n-d.  I represent Argent

12   Mortgage which was another of the lenders.  They did the

13   wholesale lending rather than retail lending.

14          THE COURT:  Okay.  Any other defendants?  Okay.

15          Everybody else is a third-party defendant.  Okay.

16   So why don't we get a lineup of the third-party defendants?

17          MR. GREENE:  Good morning, your Honor.  Andy Greene

18   on behalf of Old Republic National Title Insurance Company.

19          MR. WILLIAMS:  Robert Williams on behalf of Cislo

20   Title Insurance Company.

21          MR. LADESMA:  Hector Ladesma on behalf of A American

22   Financial.

23          MR. KAPLAN:  Good morning, your Honor.  Richard

24   Kaplan, K-a-p-l-a-n, on behalf of two attorneys, Mr. Schop

25   and Mr. Pleskow, on two of the Harris cases.

1    MS. JOHNSON:  Sarah Johnson on behalf of third-party

2  defendant Title Source.

3    THE COURT:  Go ahead and spell your last name for

4  the record, please.

5    MS. JOHNSON:  J-o-h-n-s-o-n.

6    MR. RADASEVICH:  Good morning, your Honor.  Robert

7  Radasevich, R-a-d-a-s-e-v-i-c-h, on behalf of First American

8  Title Insurance and eight affiliated companies.

9    MR. McCORMACK:  Good morning.  David C. McCormack on

10  behalf of Nations Title Agency of Illinois, Nations Title

11  Agency of Missouri and Nations Title Agency of Michigan.

12    MR. JOHNSON:  Good morning, your Honor.  Derek

13  Johnson on behalf of third-party defendant Mortgage

14  Information Services.  J-o-h-n-s-o-n.

15    MR. FOWERBAUGH:  Good morning, your Honor.  Albert

16  Fowerbaugh, F-o-w-e-r-b-a-u-g-h, appearing on behalf of Ticor

17  Title Insurance company in the Terry versus Ameriquest matter

18  and on behalf of Ticor and eight other related entities owned

19  by Fidelity National Financial who are third-party defendants

20  in a number of the opt-out cases.

21    THE COURT:  Do we have everybody?

22    MR. ELLIOTT:  Your Honor, this is Attorney Steven

23  Elliott, your Honor -- good morning -- E-l-l-i-o-t-t, on

24  behalf of third-party defendant Netco, Inc., in the MDL

25  proceeding.

1       THE COURT:  Okay.  So -- I mean, these cases come

2  before me for the purpose of setting a settlement conference

3  and I just want to be sure that we work through a process and

4  set up a process so that we're not wasting a lot of time and

5  when you come in, we've got the right people here.  I can

6  devote enough time, you know, to resolve the case and that

7  all the legwork that needs to be done in advance is done in

8  advance.

9       So why don't I ask the lead plaintiffs' counsel,

10 Ms. Combs and Mr. Harris, I guess, you have two separate sets

11 of cases and they're going to be dealt with separately on

12 separate dates and then lead defense counsel to tell me what

13 you've done previously that has worked and what you're

14 suggesting as a process for going forward.  And then I will

15 invite whatever third-party defendants to try to tell me how

16 we think -- how they think we should structure your

17 involvement in this so we can make it effective.

18      So, Ms. Combs, why don't I start with you and tell

19 me --

20      MS. COMBS:  Thank you, your Honor.

21      Basically what we're dealing with is a bunch of

22 individual mortgage rescission cases and our side believes

23 that they really need to be dealt with, to a certain extent,

24 on an individual basis.  Each person has a different

25 situation.

1    However, what we have done so far is we've taken our

2  cases and we've put them into categories because some of the

3  people have paid off their mortgages.  Therefore, we don't

4  have any financing issues with respect to the rescission.

5  It's just a simple matter of negotiating dollar amounts.

6  Some of -- the three that were sent, the three individual

7  ones that were released from the MDL, we believe that those

8  should be dealt with obviously together and --

9    THE COURT:  Well, give me the categories.  The first

10  category you identified was a Paid Off category where there's

11  no outstanding mortgage.

12    MS. COMBS:  Well, the way we laid it out is we took

13  those who were paid off and then we looked at their claims

14  and so that if they were paid off but they had a certain

15  truth-in-lending -- the HAM truth-in-lending claim as opposed

16  to a three-day/seven-day loan, so we took those who were paid

17  off and then divided them into subcategories based on their

18  claims --

19    THE COURT:  Okay.

20    MS. COMBS:  -- and then made proposals for

21  settlement on a percentage basis.

22    THE COURT:  And has that been communicated now to

23  the defendants?

24    MS. COMBS:  It's been actually communicated to all

25  the defendants.

```
 1              THE COURT:  Including --

 2              MS. COMBS:  Ameriquest.  We can certainly forward --

 3              THE COURT:  Including the third-party defendants?

 4              MS. DAVIES:  No.  It's been served upon Buchalter.

 5              MS. COMBS:  We can certainly do that.  Again --

 6              THE COURT:  Okay.  When was this done?  When was

 7   this communicated?

 8              MS. DAVIES:  Last week, your Honor.

 9              THE COURT:  Okay.

10              MS. COMBS:  Your Honor, let me --

11              THE COURT:  And how many plaintiffs are we dealing

12   with now on the -- I'll call these the Edelman cases --

13              MS. COMBS:  Yeah.  You can call these the --

14              THE COURT:  -- with all due respect to you,

15   Ms. Combs.  He happened to put his name on the firm first

16   and --

17              MS. COMBS:  Yes.  He did.

18              THE COURT:  -- and I know that you're doing all the

19   work so it's really -- he's taking all the credit and you're

20   doing all the work.  It's not fair but --

21              MS. COMBS:  There are approximately 120.

22              THE COURT:  Okay.  So out of the 120, how many

23   different categories do you have?

24              MS. COMBS:  Okay.

25              THE COURT:  Because I think what's significant to me
```

1    in my experience in settling cases is that in advance of the

2    settlement conference, there could be an exchange of

3    settlement demands and settlement offers to see where you

4    stand.  What I don't want to do is come into a settlement

5    conference and find out that people are not prepared to make

6    an offer.  If you're not prepared to make an offer, that

7    means you either don't know enough or you're not interested

8    in settlement and I'm not going to conduct a settlement

9    conference in a situation where people say I don't know

10   enough or in a situation where people say I'm not interested.

11          So I need to know that you'd know enough to talk

12   and that you're interested in talking before I spend any time

13   talking with anybody.  You heard the way I deal with other

14   attorneys.  I'm not a big fan of wasting time, not a big fan

15   of wasting time.

16          MS. COMBS:  Your Honor, what we did is we made a

17   chart and we actually put a figure for the rescission value

18   and an offer, settlement offer, and a figure for the

19   attorneys' fees, a settlement offer, as kind of an opening

20   way of discussing and then we had them in various categories

21   based on what their current status is with respect to the

22   payoff of the Ameriquest loan and what the claims were and we

23   ended up with --

24          THE COURT:  So what's your ultimate demand here?

25   Did you get an ultimate demand?

1    MS. COMBS:  We didn't add it up.

2    THE COURT:  Oh.  You didn't add it up?

3    MS. COMBS:  No.  We did not add it up.

4    THE COURT:  Okay.  Is it a lot of money?

5    MS. COMBS:  Yeah.

6    MS. GOODWIN:  And it's complicated by the fact that

7    some people have open loans and may need relief like the loan

8    modification, some people are asking for a deed in lieu of

9    foreclosure so to try to put a dollar --

10   THE COURT:  Go ahead and identify yourself.

11   MS. GOODWIN:  I'm Tara Goodwin.  Sorry.  Cathy's

12   partner.

13   THE COURT:  Go ahead and spell your last name.

14   MS. GOODWIN:  G-o-o-d-w-i-n.

15   THE COURT:  The reason I ask you to state who you

16   are is in the event this gets written up, whoever is

17   transcribing it needs to know who is speaking so thank you.

18   MS. GOODWIN:  All right.  So for some of those, it's

19   harder to put a dollar amount because someone who wants the

20   deed in lieu, I don't know how you really value that.  But

21   some of them, that's all they're asking for is the deed in

22   lieu of foreclosure.

23   Some of them need a loan modification and it's hard

24   to tell what a servicer would allow.  You know, they have to

25   submit an application.  A lot of them have applications

1    pending.

2         THE COURT:  Okay.  And what's the degree of

3    authority that you would have at a settlement conference to

4    come in and deal without bringing the clients in?

5         MS. COMBS:  What we have been doing, in fact, in the

6    last couple of weeks is getting us the -- basically complete

7    authority, although we would have them available by phone.

8         THE COURT:  Okay.

9         MS. COMBS:  We've given them a range, the opening

10   offer, and we've gotten what we hope to be is, you know, the

11   bottom line from them.  We would ask them each to be

12   available by phone but we think that we would be able to deal

13   with it.  We'd have authority.  That's where -- we're half,

14   maybe halfway through.

15        THE COURT:  Ms. Davies, would that be an acceptable

16   procedure for you instead of bringing in 120 people to sit

17   here with me?

18        MS. DAVIES:  Yes, your Honor.  We're agreeable that

19   the plaintiffs wouldn't need to actually be physically

20   present and that telephone availability makes sense in this

21   situation with the number of plaintiffs.

22        THE COURT:  Okay.

23        MS. DAVIES:  We've counted.  I think there's 129,

24   130 loans.  It's actually 220 individuals who are associated

25   with those loans so it wouldn't be a large number of people

1  otherwise coming in.

2  THE COURT:  Okay.  Very good.

3  And I take it you have received their settlement

4  demand?

5  MS. DAVIES:  We did recently receive a settlement

6  demand.

7  THE COURT:  Okay.  And I did receive your

8  defendants' status conference statement suggesting some dates

9  out in October or thereabouts to give you time to evaluate

10 each of these loans.  Is that what you're saying?

11 MS. DAVIES:  That's correct, your Honor.  There are

12 several components that are really involved in being able to

13 have a successful settlement conference.  One of them is, is

14 we'd have to have an opportunity to review the demands, to

15 work with the servicers on getting updated payment histories

16 which are directly relevant to what the rescission

17 calculation would be.  There's also an issue with loan

18 modifications.  We've talked already to one of the major

19 servicers that we don't represent but who has indicated that

20 they're very much willing to work in good faith to try and

21 have a turnaround that would be within the time frame of what

22 we've suggested for the settlement conference.

23 We also want to give the third-party defendants an

24 opportunity to have time to get prepared so that they can

25 participate.  And once your Honor sets a date today, we'll

1    communicate that to them so they know what dates they're

2    working within.

3              THE COURT:  Okay.  So let me just hear from some of

4    the third parties in the Edelman cases to share with me some

5    thoughts, concerns, and approaches that the third-party

6    defendants would have to make their involvement a meaningful

7    involvement here.

8              MR. RADASEVICH:  Thanks, your Honor.  I'm Robert

9    Radasevich.  Again, I represent First American which is a

10   defendant in several dozen of the Edelman cases.

11             There have been a lot of different attempts at

12   mediation through the course of the MDL -- some successful;

13   some not.  We did a huge one for a long time in front of

14   Judge O'Connell where, from the third-party defendants'

15   perspective, it's rather ineffectual to have us in the room

16   while the plaintiff and the principal defendants are still

17   negotiating.  And there have been other batches of cases that

18   have been settled by the plaintiffs' lawyers and the

19   principal defendants, four figures, and they have then

20   reserved their rights to come back and talk to us about

21   participation from the third-party defendants.

22             From our perspective, we find that to be a more

23   efficient way to operate from the third-party defendants'

24   perspective even though I've got a bunch of the cases on the

25   Harris side.  I had one in the Terry case but that was

1   voluntarily dismissed.  I've got a couple of Harris cases in

2   the MDL.  But for us to sit around while they're doing

3   hundreds of cases -- and we have dozens or several -- doesn't

4   make a lot of sense.

5          So from our perspective, I think -- although I

6   haven't spoken to all my colleagues, I've spoken to a number

7   of them -- having the plaintiff and the principal defendants

8   walk through the majority of their mediation or settlement

9   discussions and then reach out to us about, okay, here's what

10  we think for you, First American, you've got 36 of these

11  loans, here's how they break out because how we view our

12  exposure is quite different than the way the defendants do

13  and the way we would put the plaintiffs in buckets again is

14  quite different than the way the plaintiffs would because we

15  do it on the basis of the types of claims that are brought

16  against the third-party defendants.

17         So in a nutshell, we'd like to sit on the sidelines

18  as much as we can until they arrive at a solution and come

19  back to us and say we'd like you to contribute and here is

20  less our negotiation with you.

21         THE COURT:  Well, I mean, from my perspective, I

22  mean, I think it's important, though, to involve the

23  third-party defendants.  I mean, I'd like you to see what the

24  plaintiffs' demand is.  I'd like you to see what the

25  defendants' offer is and I'd like you at the same time to be

1    evaluating in light of all that what you perceive your role

2    is.

3           And if possible, if possible what I have found most

4    effective, most effective is -- and I don't know how many

5    third-party defendants there are in any one case.  Are there

6    multiple?

7           MR. RADASEVICH:  There are multiple in most cases.

8    There are hundreds en masse.

9           THE COURT:  Okay.  You know, what I have found most

10   effective in dealing with third parties is if the defendants

11   themselves can come in and say -- or have an idea -- let's

12   say I know the third-party defendants are good for up to 25

13   percent or 50 pers -- you know, whatever the allocation is,

14   it makes it for an easier negotiation as opposed to them

15   coming in not knowing whether they're going to get a dime or

16   good participation.

17          So while I appreciate that you would like to stay on

18   the sidelines, I think it makes it more difficult to settle

19   because the plaintiffs really don't care where they get the

20   money from and the defendants don't really care how much

21   money the plaintiffs get as long as they know what they're

22   paying and the third parties don't really care as long as

23   they know what they're paying.  But until the third parties

24   have some involvement or give some indication to the

25   defendants, I find that it's more difficult at the end of the

1    day to just say, oh, go ahead, defendant, settle and not have

2    any idea what the third parties are going to contribute.

3              Can you just give your reaction to that,

4    Mr. Radasevich?

5              MR. RADASEVICH:  Your Honor -- Sure.  And perhaps

6    it's the unique form that we find ourselves in.  We used to

7    have 27 consolidated class actions.  Those were settled

8    between the plaintiffs and the defendants with no

9    involvements of third parties.  There are two or three

10   batches of --

11             THE COURT:  With no involvement by third parties of

12   any financial contribution?

13             MR. RADASEVICH:  Of any contribution -- any of them

14   in the discussions.

15             THE COURT:  Okay.

16             MR. RADASEVICH:  I was involved in a mediation

17   telephonically with Mr. LeSage two weeks ago.  I was on

18   vacation in the Keys.  I took them on a laptop looking at my

19   kids playing in the sand and that was a case where it was the

20   same thing.  We talked about the notion of doing a percentage

21   and at the end of an hour and a half or so, they went off,

22   settled their cases, then came back later on and said we've

23   now settled these for an average of "X" and I'm sure we're

24   going to have further discussions about those later on.

25   There's another group of cases resolved -- settled that --

1          THE COURT:  Are they still looking for a

2   contribution from your clients at this point?

3          MR. RADASEVICH:  You know what, I don't want to cast

4   aspersions about what's going to happen on settlement here

5   but some of the numbers that are reached in some of the other

6   settlements impact significantly the fervor with which

7   Ameriquest is going to come after individual third-party

8   defendants so we're going to have those discussions.  We

9   haven't even had them yet.

10          They're coming in on another motion to settle a

11   batch of about 73 cases handled by the BO plaintiffs, I think

12   it's called, again, with no involvement by the third-party

13   defendants until they're done because the third-party

14   defendants are an unruly batch, not that we mean to be, but

15   if there's 60 of them perhaps in the Edelman cases, it

16   becomes an extremely difficult thing to do.

17          We're not necessarily saying that ordinarily that

18   participation by third-party defendants doesn't make sense

19   but here it's worked several times where the third-party

20   defendants have been allowed to sit on the sidelines, wait to

21   see what happens and then we deal with Ameriquest.

22          THE COURT:  Okay.  Well, let me hear from any other

23   third-party defendants that wish to comment and provide some

24   input on how to proceed and what makes sense here.

25          You know, I want to do something that makes sense

1    for everybody but at the same time I want to engage in a

2    process that can lead to a resolution.

3         MR. GREENE:  Your Honor, Andy Greene, G-r-e-e-n-e,

4    on behalf of Old Republic National Title Insurance Company.

5         I agree with what counsel just said.  The only thing

6    I will add is that our cases are all in the MDL.  Your Honor

7    talked about not wasting time and having parties not coming

8    in with full information.

9         The third-party defendants, at least my client's

10   participation and knowledge, is pretty minimal for a case

11   that's reached this stage.  Discovery was very streamlined.

12   We've received -- we were supposed to receive most of the

13   loan files.  There are still some documents missing.  Really

14   only knowledge we have about many of the underlying claims

15   are what's in the complaint.

16        So to add to what counsel just said, we'd be coming

17   in to a mediation without nearly as much information as the

18   plaintiffs and defendants have which also, I think -- I also

19   sat through a mediation where we sat in a room for half the

20   day and cooled our heels and were eventually dismissed.  So

21   again, I just echo that perhaps our involvement at this point

22   isn't necessary.

23        THE COURT:  Okay.  Go ahead.

24        MR. KAPLAN:  Sorry, your Honor.  Richard Kaplan

25   again.  K-a-p-l-a-n.

1          Judge, we've got two third-party defendants, two

2    attorneys in two of Mr. Harris's cases, the Faust and

3    Thibodeau situation.  We've reached out and obtained some

4    settlements in similar cases; but since we have a very

5    limited exposure -- not exposure, but limited contact in

6    these cases, we've been relying on Ameriquest to pass along

7    information from the plaintiffs to us so I'm not sure -- we

8    certainly want to participate but I'm not sure what the best

9    procedure would be at this point.  We're only here because of

10   the two cases with Mr. Harris.

11          THE COURT:  I see.

12          MR. ELLIOTT:  Your Honor, this is Attorney Steve

13   Elliott on the phone here and I'm part of the MDL with the

14   Harris cases as well and I would echo what the last attorney

15   just said.

16          My knowledge of the case is minimal.  I have loan

17   files.  I have not received any communications that have

18   occurred between the plaintiffs and the defendants on this,

19   if any have; I don't even know.  So my knowledge at this

20   point -- and again, you know, discovery was stayed except for

21   the disclosure of the loan files and our closing files and I

22   have -- I represent Netco, Inc., which is -- there is one

23   plaintiff in the Harris firm that there were two loans that

24   were closed by one plaintiff.  So, again, a small amount.

25   And with my limited knowledge, I don't know how much I could

1  participate at this point.

2       But again, I am definitely willing to and would like

3  to hear information on offers and demands and things of that

4  sort that have been made between plaintiffs and defendants.

5       THE COURT:  Okay.  Anybody else wish to --

6  Mr. Fowerbaugh?

7       MR. FOWERBAUGH:  Yes.  Yes, your Honor.

8       COURTROOM DEPUTY:  Could you say -- spell your name,

9  please?

10      MR. FOWERBAUGH:  Certainly.  Again, it's Albert

11  Fowerbaugh, F-o-w-e-r-b-a-u-g-h.

12      I won't repeat but I will adopt the prior arguments.

13  I just wanted to -- in your Honor's decision on the process

14  of how to go forward with this, I would like to suggest or at

15  least have you keep in mind -- keep into consideration, try

16  to figure out a way that client representatives are not

17  unnecessarily brought in to the courthouse.  I understand and

18  appreciate the need to have decision-makers present at these

19  settlement discussions.  I just want to just sort of echo or

20  describe what happened in the Terry case.

21      And again, I do it only factually.  I cast no

22  aspersions because I think everything went fine but my client

23  representative flew in for the settlement conference in just

24  a month or so ago from California and the plaintiffs and

25  defendants spent the day discussing their case while as

1  third-party defendant we were waiting for sort of our turn to

2  get in there.

3       But as the nature of the discussions between

4  plaintiffs and defendants evolved, it was clear that my --

5  our role was not going to be coming up.  And so at the end of

6  the day, we were told we weren't going to be even -- you

7  know, we were sitting in the courtroom waiting and then we

8  were told go have lunch, don't come back.

9       THE COURT:  And that's why I'm having the status

10 today to figure out, trying to talk to you all to figure out

11 a process --

12      MR. FOWERBAUGH:  Yeah.

13      THE COURT:  -- that will be efficient and effective

14 because I don't want to engage in a process that doesn't

15 work.

16      MR. FOWERBAUGH:  And so far --

17      THE COURT:  I don't want this to be the first case I

18 didn't settle, you know.  I mean, just --

19      MR. FOWERBAUGH:  So far the process seems to be

20 working by the evidence of the prior mediation sessions has

21 been the plaintiffs and defendants together seeing if they

22 can reach a settlement.  And then if the defendants want to

23 pursue their third-party claims arising from those cases,

24 then this is a much more streamlined approach between

25 defendants and third-party defendants.

1          THE COURT:  Well, but then the case doesn't go away

2     until the deal is cut with the third parties; is that right?

3          MR. FOWERBAUGH:  I don't know how those are working.

4     I mean, I assume that the settlements between the plaintiffs

5     and defendants are not -- we have not seen anything to

6     suggest those have been contingent on resolution of

7     third-party claims.

8          THE COURT:  Well, but are the -- if there's still a

9     third-party action pending, then the case isn't over.

10          MS. DAVIES:  Your Honor, may I respond?

11          THE COURT:  Okay.  Go ahead, Ms. Davies.

12          MS. DAVIES:  Thank you, your Honor.

13          Just as background for purposes of the numbers of

14     people we're talking about here, there's approximately 85

15     third-party defendants associated with the Edelman firm cases

16     and 60 associated with the Harris firm cases.

17          Now for some of these, there are multiple

18     third-party defendants that are represented by the same

19     counsel so it doesn't necessarily mean there will be 85

20     different attorneys and 85 different client representatives.

21          For the other cases, the Ameriquest defendants

22     certainly have reserved their rights to pursue third-party

23     defendants for contribution and -- you know, I believe have

24     and/or we'll shortly be communicating those demands to the

25     third-party defendants that are involved in those particular

1    cases.

2            For the Harris firm cases and the Edelman firm

3    cases, we absolutely believe that third-party defendant

4    participation is necessary.  These cases --

5            THE COURT:  Because, because?

6            MS. DAVIES:  They're getting more -- they're

7    complex.  The resolutions that are being requested from the

8    plaintiffs' counsel is significant and ultimately getting an

9    agreement with plaintiff --

10           THE COURT:  Significant in terms of dollars?

11           MS. DAVIES:  Correct, your Honor.

12           And we believe that an agreement with plaintiffs is

13   going to need to factor in third-party defendants'

14   willingness to contribute to whatever those settlement

15   amounts are in advance of an agreement being finalized with

16   plaintiffs so we definitely see the need for third-party

17   defendants' participation.

18           I do understand Mr. Fowerbaugh's concern and I think

19   it's a fair concern because certainly there's a time period

20   that is spent certainly in the Terry case discussing things

21   with plaintiffs' counsel and defendants.

22           Now I do think there would be value.  I had read

23   your standing order in terms of having sort of this group

24   part of the settlement conference at the beginning.  It seems

25   like there would be value for at least counsel for

1    third-party defendants to be present for that potentially, if

2    that's something that your Honor seeks.  But having their ear

3    and being able to communicate with them throughout the

4    process seems to make sense.  Whether this is staggered in

5    terms of a morning/afternoon session or even two days side by

6    side, I don't know the right answer necessarily, but to

7    suggest that a settlement conference will be successful with

8    simply plaintiffs' and defendants' counsel without their

9    active participation at that time, I don't see that happening

10   in these two sets of cases.

11            THE COURT:  Okay.  Let me give Mr. Harris a chance

12   to talk about his cases and describe for me whether -- what

13   you've done and whether you're approaching this in the same

14   way as the Edelman firm or whether you've got a different way

15   of approaching it and -- how many cases do you have,

16   Mr. Harris, again?

17            MR. HARRIS:  Well, I guess 90 by household and I

18   guess there's other (unintelligible/coughing) loan.  I'm

19   not -- and I have a number of plaintiffs.  But 90 household

20   is approximately.

21            Daniel Harris, H-a double r i-s.

22            You asked at the beginning what's worked in the past

23   and not really much.  It's been years.  And one of the

24   reasons Ameriquest wants us to go after the Edelman firm --

25   and I'm not necessarily averse to that --

1          THE COURT:  Wants to, wants you --

2          MR. HARRIS:  Wants to handle our mediation after the

3    Edelman firm's mediation -- and I'm not necessarily averse to

4    that because I really am sort of -- I don't know how they're

5    planning to settle these cases.

6          One of the problems we've had in the past -- and

7    maybe this is something that can be dealt with -- is that

8    Ameriquest sometimes feels that it's improper to engage

9    settlement discussions outside the presence of a mediator.

10   And so you show up and then you hear something that's a

11   non-starter but it's right there -- that's the mediation

12   session or it's not something that actually can be

13   implemented.  Or, we've got a number of people, maybe about

14   half, where --

15         THE COURT:  Well, I mean, that's one of the reasons

16   I require that you exchange written proposals in advance so

17   that there are not going to be surprises --

18         MR. HARRIS:  Right.

19         THE COURT:  -- about what's on the table because

20   I've always felt in my own experience in settling cases the

21   most difficult thing to accomplish is to have a party make a

22   settlement proposal and have a defendant make a response.

23   Once you know what the proposal is and what the response is,

24   you have something to talk about.  But absent that --

25         MR. HARRIS:  Right.  So maybe -- one idea might be

1  to move up the dates on that.  One of the problems we have is

2  that these cases, besides being so many, are very

3  complicated.

4          Half of our people or half of our households have

5  got open loans.  And so what's probably going to have to

6  happen is we're talking about some sort of loan modification.

7  All we've been dealing with the -- with AHMSI who represents

8  the current servicer of many of these loans and, you know,

9  this is the same problem the secretary of The Treasury Henry

10 Paulsen tried to deal with to try and prevent the financial

11 meltdown unsuccessfully, trying to get the servicers to come

12 up with loan modifications.

13         So, I mean, they're willing but we need something

14 from them and we need simultaneously money from the other

15 defendants.  And we not only have in our case the Ameriquest

16 defendants, we have Mr. Schmeltz representing Dawn Arnall,

17 plus we have these third-party defendants.  And when you're

18 dealing with people trying to restructure their mortgage and

19 a payment schedule that they can live with getting it a few

20 days before is tough.

21         It would be nice if we had more time to deal with it

22 so people can sort of get their mind around how they'd have

23 to restructure their mortgage and there's cash fare.  One of

24 the problems you sometimes have is there may be a loan

25 modification but there's -- proposal but there's no cash.

1  So by the time you try and talk about the cash, well, the

2  situation has changed.  The loan modification fuddles by the

3  way.

4          THE COURT:  Who do we need at the table to engage in

5  the loan modification discussions with the clients, who needs

6  to be at the table for that?

7          MR. HARRIS:  Well, your Honor, let me just see if I

8  can answer that.

9          THE COURT:  Okay.

10         MR. HARRIS:  Simon Fleischmann of the Lord, Locke

11 firm represents AHMSI.  Now he has said to us -- and he

12 indicated he was going to be here but I don't see him but

13 he's generally very responsible --

14         UNIDENTIFIED SPEAKER:  Your Honor, he had a

15 conflict.

16         MR. HARRIS:  He's a very responsible person in

17 general.

18         UNIDENTIFIED SPEAKER:  Yes.

19         MR. HARRIS:  But they would implement any decisions

20 reached -- any loan modification agreements that are reached

21 with the plaintiffs and the assignees of the mortgages, which

22 is like Deutsche Bank as trustee or the trust, one of the --

23 that's another issue as to who exactly is the assignee but

24 the -- Ms. Davies here represents the assignees and one

25 thing --

1    THE COURT:  To the extent, to the extent -- excuse

2  me for interrupting you, Mr. Harris, but to the extent that

3  one of the important ingredients for a lot of these people is

4  a loan modification, but I think we need to have somebody at

5  the table that can be responsive to that request because if

6  there's not going to be a modification, the financial terms

7  may change.  If there is going to be a modification, there

8  may be a willingness to moderate the financial demands.  So

9  it seems to me, it seems to me that that particular

10  ingredient needs to be dealt with.

11    MS. DAVIES:  Your Honor, we do agree and one of the

12  things we've talked to plaintiffs' counsel about before is

13  that that's part of why we need some lead time for the

14  settlement conference is that we've suggested every loan you

15  want a loan modification for or some type of resolution with

16  regard to an existing loan, get it to us, we'll work on it,

17  we'll work with the servicers.  We represent some of the

18  servicers.  Some of the servicers we don't represent.

19    Mr. Fleischmann has indicated that he is ready,

20  willing, and able to participate at the settlement

21  conferences; and AHMSI does have quite a number -- not all,

22  but quite a number of the loans it's servicing.

23    When you're dealing with securitization, for the

24  most part, those -- pursuant to the agreements -- need to be

25  processed through the loan servicers so it is companies like

1  AHMSI that really need to take a look at them versus Deutsche

2  as trustee so that's a process that we think is workable.

3       Mr. Fleischmann has indicated that he'll work

4  closely with his client on turnaround times so that we can

5  meet the goals we have for the settlement conference.

6       THE COURT:  Well, are you in a position to provide

7  loan modifications currently without a settlement being

8  reached on the monetary terms?

9       MS. DAVIES:  I think they go hand-in-hand.  I don't

10  think they can be segregated out.  I think to the extent we

11  represent the clients, we'll have authority going into the

12  settlement conferences.  If we don't, hopefully we'll have

13  representatives from those servicers there who can make those

14  decisions.

15       MR. HARRIS:  Your Honor, we sued the assignees so --

16  I mean, that's part of the problem is that there is a -- and

17  that's one of the reasons you had the financial meltdown,

18  that is, between the assignees and the servicers, everybody

19  has got their rights, it's very complicated, and nobody can

20  seem to make a decision.

21       We've been trying to get loan modifications for

22  people and oftentimes -- you know, sometimes we'll get

23  offers.  A lot of times, you know, we'll say in all the

24  papers, well, wait for -- you know, you got everything, yeah,

25  wait three months.  Oh, he didn't send in his form.  No, we

1    actually did send it.  Well, too late now.  It's filed on

2    (unintelligible), you're going to have to resubmit the

3    process.

4         And the other problem we've had is Ameriquest -- and

5    understandably so -- we want to wrap everybody up.  So I'm

6    concerned that, you know, well, you know, you've got 90

7    households.  One guy, they lose a form for him and because of

8    that the whole thing becomes unraveled because it may be that

9    we're going to have -- we can't settle everybody all at once.

10   We're going to have to maybe do what we can and then do what

11   we can again and break it up in chunks because -- just

12   getting all the players together for one person is actually a

13   big complicated case.  I know that, you know, from the

14   perspective of a class action --

15        THE COURT:  Okay.  But it seems to me that with

16   respect to those who paid off their loans, then it's simply

17   an issue of money; is that correct?

18        MR. HARRIS:  Yes, your Honor, except -- if I could

19   add -- the problem we ran into -- and I don't know if I'm --

20   I mean, can I say what you told us before in terms of --

21        MS. DAVIES:  I don't know.  Well, that's kind of

22   rough.

23        THE COURT:  If it's a four-letter word, please

24   don't.

25        MR. HARRIS:  No.  I don't know that -- you know,

1   what I'm hearing is that they're not interested in dealing

2   with, all right, maybe they could resolve this person but

3   unless we've got everybody resolved, we don't want to talk

4   about anybody unless we -- unless the whole is tied up in a

5   bow, we want to -- you know, everything is up.

6           So, yes, you know, theoretically it ought to be

7   possible to resolve these sets of cases because we're just

8   talking about money but they don't want these other cases

9   hanging out there.

10          THE COURT:  Okay.

11          MR. HARRIS:  Is that fair?

12          MS. DAVIES:  I think what we learned through the

13  Terry mediation is that these cases are more likely to get

14  resolved if they're resolved in total with plaintiffs'

15  counsel.  We've had success as referenced in the status

16  report with the mediations that we've held so far in doing

17  that.

18          I think by trying to piecemeal it, I don't see that

19  being as a -- really going to likely lead to settlement.

20          THE COURT:  Well, how have you dealt with the loan

21  modification issues in these other cases?

22          MS. DAVIES:  The loan modifications have been coming

23  in across the board.

24          THE COURT:  They what?

25          MS. DAVIES:  Throughout the last few years, I would

1 say, and there have been agreed terms as to there's an offer

2 for a loan modification or plaintiffs had the opportunity to

3 take a $3,000 payment -- this is in the MDL that's been going

4 on -- and those have worked but that's resolution of the

5 case.

6        To do a loan modification and then separately ask

7 for attorneys' fees or damages separately, I don't see that

8 working. The cases need to be resolved completely in total

9 because it's all part of one picture.

10        THE COURT: Well, but how does somebody know what

11 they need in terms of money unless they know whether they're

12 getting a loan modification?

13        MS. DAVIES: Well, I think that --

14        THE COURT: Are you saying if somebody wants a loan

15 modification, they're not getting any money; is that your

16 position?

17        MS. DAVIES: I think those has happened over the

18 course. They've elected what they want, the loan

19 modification or the $3,000 which was what was on the table

20 before in the MDL and --

21        THE COURT: But these people opted out, right, or

22 not?

23        MS. DAVIES: Well, I mean, with the opt-outs. I

24 mean, that has been something that's been going on with the

25 opt-outs.

1          I think to address what Mr. Harris is saying, we

2   need to know what the loan mod demands are --

3          THE COURT:  What the what?

4          MS. DAVIES:  What their loan modification demands

5   are and have an opportunity to review those and make a

6   decision on those before we go to the settlement conference

7   because they may be asking for something and we may say,

8   okay, you can get this but guess what, it's going to impact

9   this over here.  It's --

10          THE COURT:  Well, how does somebody know -- I

11   mean -- you know, I want a loan at no percent interest over

12   40 years, will you modify my loan?  You may say no, that's

13   not available.  What's available?

14          MS. DAVIES:  Likely answer.

15          THE COURT:  Right.  So in order for somebody to know

16   what to ask for, they have to know what's in the ballpark.

17   You can't, you know -- I mean, interest rates are way down

18   now so are you offering three-and-three-quarter percent over

19   30 years now?

20          MS. DAVIES:  Yeah, the load mods --

21          THE COURT:  I mean, you can get that out in the

22   marketplace, I think, or 15 years.

23          I mean, I don't know what you're offering.  So if --

24   you have to put on the table, I think, what the potential

25   loan modifications are for somebody to react to it.

1          MR. HARRIS:  Your Honor, I mean, a part -- just to

2    build on what you said, if we get loan modification offers of

3    something, then we can say all right, given this, how much

4    more money is it, okay.  But for us to be -- we've made many

5    demands that have been ignored over the years and it's

6    pointless.  We need to know what they're offering and then we

7    can come back and say here's how much more.  We'll make the

8    demand.  We can give them straight monetary demand but

9    they're not going to like it.  And exactly what you're

10   saying, we need to hear loan modification proposals but I

11   think we're sort of mixing up two different points in terms

12   of -- I can see that for any particular person we'd like to

13   get everything wrapped up.

14          THE COURT:  I agree.

15          MR. HARRIS:  But what I'm concerned about and what

16   I've heard in the past is we're not going to settle with A

17   until you settle with -- until we've reached agreements with

18   B, C, D, and E.  Or we're not going to settle with A, B, C,

19   and D even though you got -- reached every agreement and so E

20   is on board.

21          I mean, that's kind of -- I can understand why they

22   do it.  I understand they don't want us to be litigating any

23   of these cases.  I mean, one of the things that sets us apart

24   from the other plaintiffs is we're in a jurisdiction where

25   the law is better and at least our firm has pursued claims

1  that other people have not pursued.  I don't want to get into

2  the details of this in public.  But nevertheless, I think

3  that, you know, whatever other people have done, that's

4  really -- you know, we stand to fall on our own merits and I

5  don't know that those persons are all that helpful.

6      THE COURT:  Okay.  Well, it may just be easier to

7  try a couple hundred cases than it is to settle them, I mean,

8  based on what you're talking about.

9      MR. HARRIS:  Well, summary judgment, right, that may

10  well be --

11      THE COURT:  No, no, no.  Trial, trial.  Let's go to

12  trial.  We don't have enough trials in this building.

13      MR. HARRIS:  I mean, we don't have to try a couple

14  hundred of them.  You probably could just do a few.

15      THE COURT:  Yeah.  Well, I think we should do that.

16  I think we should try a few cases and then everybody will

17  wake up and figure out what they want to do.  I mean, I don't

18  see how somebody knows what -- I mean, Ms. Davies, can you

19  respond to my suggestion about --

20      MS. DAVIES:  Yes.  May I respond?

21      THE COURT:  -- you letting people know what's in the

22  ballpark for a loan modification?

23      MS. DAVIES:  Loan modifications are very loan

24  specific so the borrowers have to fill out a financial

25  application and provide their data and then those have been

1  reviewed on a hardship basis.  What do they qualify based on
2  the programs each individual servicer has.  That's something
3  that we are committed to making sure to the extent we have
4  any control over what happens before the settlement
5  conference so that we will come into the settlement
6  conference with absolute concrete numbers.  We're willing to
7  do a loan modification for you.  We're not willing to do one
8  for you and then the terms are --
9          THE COURT:  Well, I want that information
10  transmitted before the settlement conference; not coming in
11  for the first time finding out what your position is.
12          MS. DAVIES:  Well, I think to the extent we have
13  that information prior to the settlement conference, that's
14  something that we can consider doing as part of the exchange
15  of letters as you were mentioning.
16          THE COURT:  Right, because I -- I mean, my
17  preference is that you have this exchange of settlement
18  proposals and then the lawyers can still talk before they
19  come see me.  You know, I don't think -- I mean, I agree with
20  Mr. Harris that the conversations should not only take place
21  in the presence of a judge or a mediator.  I mean, you know,
22  these are important cases that need to be talked about and we
23  cannot nursemaid you through every step of the process.
24          MR. HARRIS:  Your Honor, I think it may be helpful
25  if there were some required exchange between Ameriquest and

1    third-party defendants before.  I mean, everything shouldn't

2    happen, as has been the practice, just in your presence.  And

3    when we're outside your presence, it would be impermissible

4    for us to talk about this.  We don't even want to get into

5    the subject until we're in the presence of the judge.

6            So there ought to be deadlines prior to a settlement

7    conference, your Honor, in which people are required to

8    articulate their settlement positions.  We're happy to do

9    that.  And I also don't think it should be a situation where

10   unless we're prepared to settle all our clients' cases at

11   once, we can't talk about settling any of them.

12           THE COURT:  Okay.  Let me ask Ms. Davies, do you --

13   would you have any objection with respect to any matter in

14   which a third party is a potential third-party defendant with

15   sharing with that third-party defendant what your proposal is

16   to the plaintiff for that or those matters?

17           MS. DAVIES:  You know, your Honor, I understand and

18   can see that that makes some sense and I think in the Terry

19   litigation we did something along those lines.

20           We would certainly also like an opportunity, as

21   Mr. Harris suggested, of doing a settlement demand letter to

22   third-party defendants that they can respond to as well.

23   That's what we did before --

24           THE COURT:  Right.

25           MS. DAVIES:  -- and that seemed to work so we at

1     least knew sort of where we were coming in.

2           You know, obviously, our letter is somewhat

3     responsive to what plaintiffs are doing and that has a large

4     role on what settlement demand we would be making on the

5     third-party defendant so I don't know if there needs to be

6     sort of a staggered time frame to do that.

7           I understand generally the demand goes out 21 days

8     before the settlement conference with the response seven

9     days.

10          THE COURT:  Well, I want to push the dates up

11    because -- you know, I want to be sure there's enough time

12    that, you know, whatever is on the table is on the table.

13    And if the third-party defendants have said we'll contribute,

14    you know, 50 cents on the dollar or 25 cents on the dollar or

15    zero, but you have some idea before you come in as to what

16    you might expect from the third-party defendants.

17          Is that reasonable to the third-party defendants to

18    receive a -- to, first of all, see what the plaintiffs are

19    requesting and find out what Ameriquest is prepared to offer

20    and then have them ask you for your contribution?

21          MR. FOWERBAUGH:  Your Honor, again, this is Albert

22    Fowerbaugh.  I'm a third -- I represent a third-party

23    defendant in the Terry case.

24          That essentially was the process.  I'll let the

25    other counsel, Mr. Harris and Ms. Davies, address this issue

1  more in depth.  One of the issues that complicated that was

2  some of the information in the plaintiffs' settlement demand

3  was deemed Confidential/Attorneys' Eyes Only so I only

4  received a copy of the demands based on some, you know,

5  assurances, which I was happy to give, of keeping it very

6  confidential so that may pose a -- I don't know if that will

7  pose an issue on a wider basis.

8         THE COURT:  Okay.  Well, why should anything be

9  Attorneys' Eyes Only at this point, I mean?

10        MR. FOWERBAUGH:  I'll let them address that in a

11 minute.

12        The one thing I want to -- at least as to the

13 scheduling and how this would move forward, I want to

14 address.  There are a very large number of cases that are

15 encompassed in just these two groups of the Edelman cases, if

16 you will, and the Harris groups of cases.  Unlike the Terry

17 case, which is not part of the MDL where there has been, I'll

18 say, vigorous discovery --

19        MR. HARRIS:  More depositions, your Honor, than the

20 whole MDL class action.

21        MR. FOWERBAUGH:  There has been -- I mean, there has

22 been an order regarding the exchanging of loan files and

23 claim files.  My client have received some files.  There have

24 been changes to the third-party complaint regarding changes

25 of parties to whom the third -- you know, changes to the

1    identity of third-party defendants in the cases, meaning

2    appellee who was identified as a third-party defendant

3    earlier may have gotten the file but the actual third-party

4    defendant has not gotten the file.

5              So there are going to be many instances where we

6    have the third-party defendants -- I can speak for my clients

7    only but I assume this is the case -- have not yet gotten the

8    files.

9              The cases span a great number of states and at least

10   from my -- my client is a title insurance company so my

11   client's role primarily is indemnity either through a title

12   insurance policy or an alleged closing protection letter.

13   Our clients, the underwriters, have not been alleged to have

14   engaged in any of the conduct itself giving rise to the

15   plaintiffs' claims but are alleged to be essentially

16   vicariously or contractually liable for those parties'

17   conduct.

18             So the issue of various state laws will come into

19   play not only for the cause of action but some states have

20   state-mandated forms of title policy and closing protection

21   letters which may be different from forms used by the same

22   entity in other states.

23             So while we can respond to -- and I don't know the

24   exact number but I think in the Harris cases, my clients as a

25   total may have -- I don't know -- probably about 40, maybe 20

1  or 40 of the loans, most of them are within the Terry case

2  but others for other underwriters in other states.

3       We would, in many regards, have to respond -- or

4  many of our arguments may have to be done on a loan-by-loan

5  basis.  And when we're talking about my clients, the sort

6  of -- all the Fidelity National Financial, they have a

7  healthy chunk of the title insurance business so we're going

8  to be dealing with a large number of cases.  That's going to

9  be very time intensive.  And I don't want to try to hold this

10  up; but for us to respond to a demand involving 40, 50 cases

11  is not going to be an easy thing, frankly, for me to do.

12       MR. HARRIS:  Your Honor, if I might make a

13  suggestion.

14       THE COURT:  Go ahead.

15       MR. HARRIS:  -- it might be useful for you to set

16  deadlines as to when we're going to make our demand,

17  Ameriquest makes his demand on the third-party defendants,

18  they come back to us with some proposals including loan

19  modification and then we have another conference, lawyers --

20  something like this, there's a settlement conference in which

21  we schedule a settlement conference for those cases in which

22  it's been completed rather than have -- include in the

23  settlement conference those cases in which, for whatever

24  reason, there aren't -- there's a loan modification proposal,

25  the third-party defendant doesn't want to respond or

1  whatever, I mean, rather than just go right from this to an

2  automatic settlement conference.

3        THE COURT:  Okay.  But the other question I have of

4  Ms. Davies based on, you know, your own experience in dealing

5  with this, I mean, it appears in a large number of cases,

6  even the plaintiffs were able to resolve things and you

7  reserved your rights against the third parties in some

8  instances.

9        Can you just explain to me why that is not a good

10  idea here or whether it is a good idea here?

11        MS. DAVIES:  Your Honor, I think as you can hear

12  from plaintiffs' counsel, these are going to be far more of

13  the loan-level type mediations.

14        THE COURT:  What do you mean by that?

15        MS. DAVIES:  I think the other mediations were able

16  to be conducted on a global concept in terms of what the

17  plaintiffs globally would be able to do or willing to accept

18  and I think these particular cases are going to be far more

19  loan-level intensive.

20        THE COURT:  Okay.  Well, if they're going to be far

21  more loan-level intensive, is your client prepared to settle

22  them on a less-than-global basis?

23        MS. DAVIES:  I think -- I mean, I guess -- I can't

24  predict what's going to happen at the settlement conference.

25  Clearly our clients' goal is to settle all of them within a

1  reasonable time frame together.  You know, there's -- there

2  are factors of attorneys' fees, et cetera, that really make

3  it more viable if settlement is done not piecemeal but

4  collectively.

5      THE COURT:  But I understand.  But there may be

6  situations -- I mean, if we're talking about loan

7  modifications -- I mean, it's one thing to write somebody a

8  check and then give you a release.  I mean, that's -- we can

9  all do that and, you know, that's really not an issue.

10      Why don't you get involved in the loan modification

11  and what's done there.  You know, you sort of lose control

12  over that.  And whether it can be done or can't be done and

13  whether these people qualify or whether their financial

14  circumstances change, or whatever, or they end up selling the

15  house in the meantime, I mean, those are all the kinds of

16  factors that you can't just sit there and know for sure that

17  it's going to be done or not done.  And I don't want to

18  engage in a process that, you know, we figure out, okay, we

19  could settle all the ones where the loans are paid off or we

20  could settle, you know, half of those where loan

21  modifications are involved.  But for one reason or another,

22  the other half don't look like they're going to go and then

23  you come and your client says, well, we're not interested.  I

24  mean, that doesn't seem like it's fair to the Court, fair to

25  the parties, fair to the people involved to engage in that

1    kind of process.

2              MR. WIEGAND:  Your Honor, if I might, Tom Wiegand.

3    I represent Argent Mortgage.

4              COURTROOM DEPUTY:  Can you spell your last name,

5    please?

6              MR. WIEGAND:  W-i-e-g-a-n-d.

7              COURTROOM DEPUTY:  Thank you.

8              MR. WIEGAND:  A concern -- I've got some knowledge

9    of that mediation.

10             THE COURT:  Which mediation?

11             MR. WIEGAND:  The Terry mediation.  I've been

12   involved in that case at the time representing the separate

13   party and --

14             THE COURT:  And who did that one?

15             MS. DAVIES:  Magistrate Denlow -- I mean Mason.  I'm

16   sorry.

17             UNIDENTIFIED SPEAKER:  Mason.

18             THE COURT:  Mason.

19             MS. DAVIES:  And Judge O'Connell.

20             MR. WIEGAND:  And O'Connell prior to that.

21             THE COURT:  Okay.

22             MR. WIEGAND:  Your Honor, that is a single case

23   involving now 13 or 14 plaintiffs.  If all 13 and 14

24   plaintiffs don't settle, the case still goes forward.  The

25   thought of saving attorneys' fees, you know, is out the

1  window. And so if there is a legitimate basis to want all of

2  them to settle, it doesn't mean that they can only possibly

3  settle that way but there is a legitimate reason --

4          THE COURT:  Well, I appreciate that.

5          MR. WIEGAND:  -- why defendants would want --

6          THE COURT:  And the Court would want them settled

7  also.

8          But what I'm saying is, what I'm saying is to not

9  resolve those that can be resolved on satisfactory monetary

10  terms or loan modification terms because one or two may have

11  some difficulty.  You know, it would be unfortunate.  It

12  would be an unfortunate waste of time and energy.  It may

13  result in you offering less, you know, in other words,

14  because you're still going to incur significant attorneys'

15  fees so therefore, you know, we're going to offer less unless

16  we can get the whole package resolved, I mean.

17          MR. WIEGAND:  That kind of discussion makes sense.

18          MS. DAVIES:  Right.  And to say that if one or two

19  somehow can't be resolved that it would hold up the great

20  progress made on the others, I don't see that happening.  But

21  I think to suggest that we would go in and resolve one-eighth

22  and have seven-eighths remaining, that I don't see resulting

23  in resolution of the cases.

24          THE COURT:  Okay.  We've got an attorney who arrived

25  late.  Do you want to identify yourself for the record?

```
 1              MR. FINKE:  Me?

 2              THE COURT:  Go ahead, yeah.

 3              MR. FINKE:  Jeffrey Finke.  I represent one --

 4              THE COURT:  Go ahead and spell your last name.

 5              MR. FINKE:  F-i-n-k-e.

 6              THE COURT:  Okay.

 7              MR. FINKE:  I represent one third-party defendant in

 8   the Edelman case with one loan transaction.

 9              THE COURT:  Okay.

10              MR. FINKE:  And I'm listening through this elaborate

11   process --

12              THE COURT:  Go ahead.  Go ahead and spell your last

13   name for the record, Mr. Finke.  Spell your last name for the

14   record.

15              MR. FINKE:  F-i-n-k-e.

16              THE COURT:  Okay.

17              MR. FINKE:  I'm listening to this elaborate process

18   and we're simply not in a position to spend a huge amount of

19   time when we have one loan transaction, so.

20              THE COURT:  Okay.  And who is your client?

21              MR. FINKE:  Cislo Title Company.  It's a tiny

22   out-of-state closing company.

23              THE COURT:  Okay.  Very good.  Thank you.

24              MR. FINKE:  All right.

25              MR. RADASEVICH:  Your Honor, one point of
```

1    clarification from third-party --

2            COURTROOM DEPUTY:  Can you state your name, please?

3            MR. RADASEVICH:  Robert Radasevich, First American.

4            -- from third-party defendants' perspective, we

5    don't have anything to do with the loan modifications.  We

6    are largely underwriters and closing agents.  And in the

7    Terry case, there was vigorous discovery.  My clients were

8    involved in that before we were voluntarily dismissed and so

9    we had information.  In the MDL cases, we really don't.

10           And so closing protection letters which are a vital

11   part of the Ameriquest claims, they're available on some

12   files; they're not available on a great number of other files

13   not from lack of trying.  We've been looking for them,

14   everybody has been looking for them.  Sometimes they just

15   don't exist.

16           So given -- and given some of the complexities that

17   Mr. Fowerbaugh talked about, from the third-party defendants'

18   perspective, it's almost easier for us to address these on a

19   global basis than opposed to Mr. Harris' approach of a

20   loan-by-loan basis because we don't have enough, frankly,

21   knowledge to do it on a loan-by-loan basis at this point.

22   So from our perspective --

23           THE COURT:  So if you get 40 loans and Ameriquest

24   came to you and said, okay, with respect to those 40 loans,

25   we are asking you for "X" dollars to contribute, you're

1    saying that would be an easier analysis for you and --

2          MR. RADASEVICH:  A much easier analysis, your Honor.

3    At that point, we're horse trading and we're prepared to do

4    that.  We don't have the -- we don't have enough knowledge as

5    to a lot of intricacies of the underlying transactions to get

6    into them one on one but we could do a cost of defense

7    analysis based upon global numbers.

8          THE COURT:  Is that true of all the other

9    third-party defendants?  In other words, would the

10   third-party defendants be in a position where they would be

11   prepared to make some kind of settlement offer or

12   contribution to Ameriquest to resolve this on a global basis

13   as opposed to a one-by-one basis?

14         MR. KAPLAN:  Judge, Richard Kaplan again.

15   K-a-p-l-a-n.

16         I think it's really going to depend upon the number

17   of cases.  I've got two separate third-party defendants on

18   two separate cases and I don't think that will work, that --

19   you know, 40 case -- take a percentage, wrap everything up on

20   the 40 cases is going to work.  I don't even know --

21         THE COURT:  But would your client be willing to

22   respond on those two cases to say what you're willing to

23   contribute, if anything?

24         MR. KAPLAN:  I'm sure, Judge.  But, you know,

25   without the information as to, first of all, whether or not a

1    loan modification is even applicable to my two cases or my

2    clients' two cases, whether it's accepted by the plaintiff,

3    therefore, changing the monetary demand that Ameriquest might

4    make on my client who satisfied a different amount to the

5    plaintiff, I wouldn't know.

6          I mean, if Ameriquest were to call us up and say

7    we're going to -- we're trying to settle the "X" case, we

8    need, you know, $50,000, $100,000, whatever it is, whatever

9    number it would be, I wouldn't know whether or not -- I'd

10   have to know everything that had taken place beforehand.  I

11   also don't have the benefit of the documentation as counsel

12   prior to my speaking indicated so it would be very difficult

13   for me to do that.

14         THE COURT:  Okay.  Well, let me address Ms. Davies

15   for a second.  I mean, at this point in time you have

16   received settlement demands from the Edelman firm, is that

17   correct, with respect to all of their cases?

18         MS. DAVIES:  Yes.

19         THE COURT:  Okay.

20         MS. DAVIES:  I believe so.  I mean, I haven't

21   cross-checked but --

22         THE COURT:  Not all?

23         MS. COMBS:  No.  We're still having trouble

24   getting --

25         MS. DAVIES:  But there's only remaining four or

1    five.

2         MS. CEKO:  There's an initial proposal for each

3    but --

4         COURTROOM DEPUTY:  Can you state your name, please?

5         THE COURT:  Yeah.

6         MS. CEKO:  I'm sorry.  Catherine Ceko, C-e-k-o.

7         There's an initial proposal made for each of our

8    cases but we don't have actual client authority for all of

9    them yet.

10        MS. DAVIES:  And the proposal doesn't really have

11   any of the loan modification documentation.  That's a

12   follow-up that would need to happen.  So it's proposals in

13   principal but we would need the backup documentation to

14   evaluate those people who are still in their homes who want

15   some type of modification.

16        THE COURT:  So what are you telling the Edelman firm

17   as it relates to those who are interested in loan

18   modification, that the door is open and that you're prepared

19   to have that process go forward?

20        MS. DAVIES:  Absolutely.  We're saying get it to us

21   as quick as you can, we'll coordinate with servicers on

22   getting it to them so that they can review them and we'll

23   work as hard as we can to get the answers to those loan

24   modifications before the date scheduled for the settlement

25   conference.

1    UNIDENTIFIED SPEAKER:  We have been continuously

2  updating but we will do whatever is necessary to get it.

3    UNIDENTIFIED SPEAKER:  We've submitted the

4  applications already is what she's trying to say.  We're just

5  not getting answers.  We've submitted dozens of them, you

6  know, that we have no answer to.

7    MS. DAVIES:  I haven't been a part of that process

8  to be able to speak to it but I would encourage them to

9  forward them to me if they haven't gotten answers on some and

10  I did get some on my Blackberry yesterday evening after we

11  talked yesterday afternoon.

12    THE COURT:  Okay.  Well, Mr. Edelman, where do you

13  stand in terms of your settlement demands?  I mean,

14  Mr. Harris.  Mr. Harris.  I'm sorry.

15    MR. HARRIS:  We made demands in the Terry case.  We

16  could make demands.  Give us a date.  We'll make demands to

17  everybody.

18    THE COURT:  On a plaintiff-by-plaintiff basis?

19    MR. HARRIS:  We'll give specific.  We're not going

20  to make loan modification proposals on a

21  plaintiff-by-plaintiff basis but we'll put monetary demands.

22  We'll give them a chart with numbers.

23    THE COURT:  Okay.

24    MR. HARRIS:  We've already sent them -- we already

25  calculated the rescission amounts for everybody.

1           THE COURT:  Okay.  With respect to any of your

2   clients, will any of your clients be seeking loan

3   modifications?

4           MR. HARRIS:  Oh, yes.  I mean, we're talking --

5   right; and they've submitted applications, most of them, who

6   in their position have and we're waiting to hear back and

7   some of them are negotiating and it is true that if we could

8   wrap up the other part of it together, it would be better.

9   We could include the loan modification and the rest of the

10  settlement for any particular person who can do it.

11          THE COURT:  Okay.  Has anybody received any response

12  on any loan modification requests?

13          MR. HARRIS:  We have.  Oh, yeah, we have.  There

14  have been some.  There have been some.

15          MS. COMBS:  Those who've moved out of the loan

16  monetary (unintelligible) --

17          MR. HARRIS:  Right, right.  There have been some.

18          MS. COMBS:  -- to, oh, this is just a matter of

19  negotiating dollars.

20          MR. HARRIS:  Right, right.  They've reserved their

21  rights.

22          THE COURT:  Okay, okay.  So to the extent that loan

23  modifications have gone forward and have been accepted, then

24  they have been moved from the loan modification category to

25  just a monetary category.  Is that what you're saying?

1    MR. HARRIS:  Right, right.  And we've given up a

2  claim against AHMSI so -- as part of a loan modification.

3    THE COURT:  Okay.

4    MR. HARRIS:  And, your Honor, just to clarify, I

5  don't think -- it's possible that we could discuss a sub-set

6  of people and reach a tentative understanding as to that

7  sub-set of people subject to trying to work out things for

8  the larger group down the line.  It just may be easier to

9  segment this rather than treat it as one global whole that

10  has to be done in one afternoon.

11    It may be that if you can -- if we can focus on

12  certain people and reach tentative awareness as to them, I

13  can understand why they would want peace as part of a deal --

14  and we can talk about other people later -- but at least we

15  will have made some progress rather than in a situation where

16  we've made no progress.

17    THE COURT:  Okay.  Well, but what I sense from

18  Ms. Davies is she'd prefer to come in and see if she can wrap

19  the whole thing up --

20    MS. DAVIES:  Correct.

21    THE COURT:  -- and see if, in the course of a day,

22  we can wrap the whole thing up.

23    But if we can't, I mean, you know -- I mean, we may

24  discuss it by category.  In other words, there may be

25  settlement approaches as it relates to different categories;

1    but at the end of the day, she'd like to talk about all the

2    categories and see which ones we can wrap up and which ones

3    we can't rather than coming in and saying, okay, we're only

4    going to talk about a certain category of cases today.  Is

5    that --

6              MS. DAVIES:  That's correct, your Honor.

7              THE COURT:  Is that fair?

8              MS. DAVIES:  Yes.

9              THE COURT:  Okay.  That doesn't mean that you're

10   going to foreclose the possibility.  Let's say if we settled

11   75 percent of the cases and still had problems with 25,

12   you're not saying that you'd walk out the door and say no

13   deal unless we got the other 25.

14             MS. DAVIES:  I think we're open to that, your

15   Honor.

16             THE COURT:  Okay.  But what I hear you saying is,

17   look, if all we're going to get done today is 10 percent or

18   20 percent, it may not be -- that may not be in our interest

19   to settle at that point --

20             MS. DAVIES:  Right.

21             THE COURT:  -- is that a fair statement?

22             MS. DAVIES:  Yes, your Honor.

23             THE COURT:  Okay.

24             MS. COMBS:  You could also --

25             THE COURT:  Go ahead and identify yourself again for

1    the record.

2          MS. COMBS:  Catherine Combs.  Your Honor --

3          THE COURT:  Come up, come on over a little closer to

4    the microphone if you would.

5          MS. COMBS:  It will be important to actually have

6    exchanges -- more than one exchange -- of numbers before we

7    get in before you because there's no reason why we can't

8    start talking about these things now.

9          THE COURT:  I love that.  I love that.  I'm a big

10   fan of exchanging numbers.  Okay.

11         MR. HARRIS:  Your Honor, if you could put that --

12         THE COURT:  Okay.  Let me --

13         MR. HARRIS:  If you could put that in the form --

14         UNIDENTIFIED SPEAKER:  Yeah.  I know.

15         THE COURT:  If what?

16         MR. HARRIS:  If you can put that in the form of an

17   order, your Honor, that we're mandated to exchange numbers --

18         THE COURT:  Yeah.

19         MR. HARRIS:  -- and then have another conference so

20   that before we take up your time for settlement conference,

21   you could be sure that that process has actually happened

22   despite --

23         THE COURT:  Well, what I do is I require copies of

24   the settlement proposals to be sent to me at the same time as

25   you send them to the other side so I can see that, you know,

1    there is some progress being made.  Okay.

2        MR. HARRIS:  Right.  But you may want to just have

3    sort of a safety-check conference beforehand because

4    oftentimes -- because they've had so many people they have to

5    deal with, despite their best efforts to comply with all

6    sorts of deadlines, they -- someone might fall between the

7    cracks and if we had a time beforehand, we could avoid that.

8        THE COURT:  I've never seen lawyers let anything

9    fall between the cracks in all my years.

10       MR. HARRIS:  This is a very unusual case, your

11   Honor.

12       THE COURT:  Well, it would be a first that a lawyer

13   would drop a ball or let something fall between the cracks.

14   It's unheard of, really.

15       Okay.  So let me try to set some dates and -- so,

16   Mr. Harris -- I mean, I think it's important, I think it's

17   important that the settlement proposals provide as much

18   information as you can so that -- you know, just picking

19   numbers out of mid air and throwing them at somebody is not

20   my idea of a settlement proposal.  It's not my idea of a

21   settlement proposal so I expect there to be thoughtful and

22   enough information that somebody can thoughtfully respond.

23   Okay.

24       So has Ms. Combs given you a settlement proposal to

25   which you can thoughtfully respond?

1    MS. DAVIES:  I think we're going to need more

2  information with respect to those plaintiffs where they're

3  seeking loan modifications.  We don't have that detail yet or

4  at least I don't have it.  If it's been forwarded directly to

5  servicers, I'd ask her to forward a copy of that to me.

6    THE COURT:  Okay.  And what I want is if there's a

7  problem, I don't want to find out for the first time when you

8  show up in court that, you know, we had a problem with this

9  and, therefore, Judge, we didn't do anything for 60 days like

10  those lawyers you saw earlier, you know, where we set up, you

11  know, go ahead and have an inspection and, you know, two

12  months later I find out that they didn't do the inspection;

13  no, we talked in the meantime.  You know, it's just -- it's

14  not the way to practice law and I don't expect it to be

15  practiced that way here.

16    MR. HARRIS:  Your Honor, I have on my computer a

17  draft 20-page memorandum sort of summarizing our legal

18  theories and evidence not over much detail.  I just wanted to

19  make sure that that's within the realm of possibility in

20  terms of being able to give them.  I hope it's not too long

21  for your Honor.  I think it's easier.

22    THE COURT:  Well, I mean, here's my view, here's my

23  view:  I'm here to help you settle a case but I don't bring

24  my checkbook to a settlement conference; and even if I did,

25  it wouldn't do you any good.

1          So the party you have to convince are the clients on

2   the other side and their attorneys and therefore whatever you

3   want to provide to them that you think would be helpful for a

4   decision-maker to consider in deciding whether to write your

5   clients a check, provide it, provide it, you know.  Okay.

6   I'll look at it but I'm not bringing my checkbook.

7          MR. HARRIS:  I hear you.

8          THE COURT:  Okay.  So if it's helpful, go ahead.  Go

9   ahead.

10          MS. DAVIES:  Your Honor, if I may, we do have one

11  issue with respect to the Terry case.

12          THE COURT:  And that's Mr. Harris?

13          MS. DAVIES:  Yes.  That's Mr. Harris' case.

14          There's a cause of action in that case that is

15  unique to that case that's not involved in any of the other

16  MDL cases.

17          THE COURT:  He always brings unique causes of

18  action.  You know, he's a very creative lawyer and always

19  been known for that so it doesn't surprise me.

20          MS. DAVIES:  In connection with that cause of

21  action, there has been confidential Attorneys' Eyes Only

22  information that's been produced which Mr. Fowerbaugh was

23  alluding to that was included in the last settlement demand.

24          So we would just request that to the extent

25  Mr. Harris wants the Court to see that -- and we're agreeable

1  with that -- that there just be some sort of provision or

2  carveout where the only people getting Terry Attorneys' Eyes

3  Only information are the people who are involved in that case

4  and have signed off onto the protective order in that

5  particular case because it doesn't relate to anyone else's

6  causes of action in the MDL.

7        MR. HARRIS:  If I could just clarify that, your

8  Honor.  I would like to send it to you and to Ms. Davies and

9  to Mr. Schmeltz and for them to take the responsibility of

10  transmitting it to anybody else on the relevant cases rather

11  than -- I don't want it on me.

12        THE COURT:  Okay.  Does that make sense to you,

13  Ms. Davies?

14        MS. DAVIES:  That's fine.  Yeah.  That's fine.

15        THE COURT:  Okay.  On that basis, it can be done.

16        MS. DAVIES:  Okay.

17        THE COURT:  Okay.  So how soon can you get your

18  settlement proposal to them, Mr. Harris?

19        UNIDENTIFIED SPEAKER:  Your Honor, we would like 21

20  days to get -- you know, all the information together, all

21  the authority and enough information for them including the

22  loan mods.

23        THE COURT:  Okay.

24        MR. HARRIS:  And that would be fine for me, too,

25  your Honor.

1          THE COURT: Okay. So, Donna -- plaintiffs'

2  settlement demands with copies to the Court within 21, what

3  is that?

4          COURTROOM DEPUTY: August 19th.

5          THE COURT: Okay. Now, Ms. Davies, here's a

6  question I have for you: Having received those demands, can

7  you make an offer before you send something to the third

8  parties and get a response or would you want to go to them

9  first and get some indication of what they're prepared to do

10  before you make a response to plaintiffs?

11          MS. DAVIES: Yeah. I think we'd like to be able to

12  have an opportunity to talk to the third parties about that

13  and we're also going to need an opportunity to work with the

14  servicers on getting that --

15          THE COURT: Right.

16          MS. DAVIES: -- side of it dealt with as well.

17          THE COURT: Okay. How long will it take you to make

18  a settlement proposal to the various third parties assuming

19  you receive the plaintiffs' demand on the 19th?

20          And do the plaintiffs have any objection to your

21  demands being forwarded to anybody that the defendant wants

22  to send it to and whatever form she wants to send it?

23          UNIDENTIFIED SPEAKER: We have no objection.

24          MR. HARRIS: No, your Honor, as long as -- right.

25  As long as she's the one sending it, no.

1          THE COURT:  So, Ms. Davies, it will be up to you, I

2    mean, to forward what you want to forward to them and how you

3    want to forward it.

4          How much time after August 19th?

5          MS. DAVIES:  I know in speaking to Mr. Fleischmann

6    who is AHMSI's counsel that he thought 30 days would probably

7    be the shortest time period that his client would be able to

8    review loan modification proposals and I think we're going to

9    need to know those answers before we can go to third-party

10   defendants and suggest what we think makes sense for a

11   settlement proposal and their contribution.

12         So I would say, you know, give us 30 days to hear

13   back on the servicers and then maybe another week after that

14   to propose something to third parties.

15         THE COURT:  Okay.  So, Donna, let's give her a date

16   six weeks out for --

17         COURTROOM DEPUTY:  Okay.

18         THE COURT:  -- defendants to make a settlement

19   demand on the third parties.

20         MR. KAPLAN:  Judge, may I ask a question?

21         THE COURT:  Yes, sir.

22         MR. KAPLAN:  Richard Kaplan, K-a-p-l-a-n.

23         Are the third-party defendants to receive the

24   plaintiffs' demand as well?

25         MS. DAVIES:  Yes.

1        THE COURT:  Well, I mean, I just want to say --

2        MR. KAPLAN:  I mean, are they going to pass it along

3   to us?

4        MS. DAVIES:  Yes, yes.  With the -- to the extent

5   there's Attorneys' Eyes Only information in the Terry case,

6   that will have to be redacted out but --

7        THE COURT:  Right.  Okay.

8        MS. DAVIES:  -- other than that --

9        THE COURT:  Okay, because I think it's productive

10  that you see what they're facing so that you can respond in

11  the light of what they have to deal with.

12        Does that make sense to everybody?

13        MR. KAPLAN:  Oh, no.  Perfect sense that we get

14  their demand and their proposed -- you know, proposal to the

15  third-party defendants at the same time.

16        THE COURT:  Okay.

17        COURTROOM DEPUTY:  September 30th.

18        MS. GOODWIN:  Your Honor, Tara Goodwin.

19        I was wondering if the order could possibly say that

20  the servicers are required to be here on September 30th.

21  That would be very helpful.

22        THE COURT:  No.  That's not a date.  That's not a

23  date for in court.

24        MS. GOODWIN:  I'm sorry.

25        THE COURT:  That's a date for the defendants to

1  forward to the third parties their settlement proposal.

2  Okay.

3          Having received a settlement proposal on September

4  30th, what is a reasonable amount of time for the third

5  parties to respond to Ameriquest?

6          MR. KAPLAN:  Judge, how about the people who have

7  the most the cases?

8          UNIDENTIFIED SPEAKER:  Well, I don't know if --

9          THE COURT:  Because the ones that have the most

10  cases are really talking about global so they're not

11  really -- they're not really going to go --

12          MR. RADASEVICH:  Assuming what we get from

13  Ameriquest, since we don't know exactly what we're going to

14  get, if we could have 21 days, I'm sure that would be

15  adequate time.  I have about 40 or 50 of these in both

16  cases.

17          THE COURT:  Okay.  So would 21 days --

18          MR. FOWERBAUGH:  Your Honor, Albert Fowerbaugh.  I

19  would just sort of maybe round that up.  Maybe make note

20  of -- because, again, I have probably over a hundred of the

21  cases in the two sets.  And if it's a global letter demand,

22  that's one thing.  I don't know what the form is.  I don't

23  know if it's going to be "X" percent of what they pay or --

24          THE COURT:  Right.  Well, I'm going to give you 21

25  days because you're a quick study -- and I can just -- I know

1    that from prior dealings, prior dealings.

2            MR. FOWERBAUGH:  It's been a long time.

3            COURTROOM DEPUTY:  October 21st.

4            MR. GREENE:  Your Honor, Andy Greene --

5            THE COURT:  Yes.

6            MR. GREENE:  -- on behalf of Old Republic.

7            Just to clarify, it's not in the order thing that

8    every third-party defendant is included in that global

9    settlement?

10           THE COURT:  That is correct.  I mean, it's my

11   understanding that, for example, Mr. Finke, indicated he only

12   has one client and one little piece of the action and really

13   doesn't want to spend a lot of time on this so he wants it

14   globally but it's a one-shot deal, you know, but there may be

15   others that have two or three and they may have proposals

16   that differ for each case.

17           But I think what's important here -- I mean, if it's

18   going to work is Ameriquest has to have a sense of what they

19   might be expecting in the way of contributions from the third

20   parties.  So when they then forward their offer to the

21   plaintiffs, they will have a sense of what it is likely that

22   they can receive and what it is that the servicers are going

23   to be doing.  Is that fair?  Okay.

24           Having received -- so that's the third-party

25   defendants' response to Ameriquest and, once again, copies to

1    the Court of all of these.

2            Then how soon thereafter could you respond to the

3    plaintiffs?

4            MS. DAVIES:  Two weeks.

5            THE COURT:  That's very ambitious but I like your

6    ambitions.  That's fine.  I mean, if you can --

7            COURTROOM DEPUTY:  November 4th.

8            THE COURT:  Okay.  Does this process seem to make

9    sense in terms of leading to something that would ultimately

10   be productive rather than trying to rush it and not

11   accomplish a lot?  I see a lot of heads shaking in the

12   affirmative.

13           MR. HARRIS:  Yes, your Honor.

14           THE COURT:  Okay.

15           UNIDENTIFIED SPEAKER:  Yes, your Honor.

16           MR. HARRIS:  Maybe after the November 4th date, we

17   could schedule another conference like this so we can make

18   sure that this plan has actually been implemented.

19           THE COURT:  Okay.  And so what if we -- and I really

20   don't need everybody here.  I mean, let me just have the

21   lead -- the lead counsel and one or two of the lead

22   third-party attorneys, would that make sense, just to --

23   I mean, the ones that you most need information from.  Do I

24   have any of volunteers for the third parties?  Mr.

25   Fowerbaugh, you look like --

1          UNIDENTIFIED SPEAKER:  We have a liaison.

2          THE COURT:  Oh.  Who is the liaison counsel?

3          UNIDENTIFIED SPEAKER:  Not here.

4          UNIDENTIFIED SPEAKER:  (Unintelligible) if we're

5    talking about settlement probably isn't the one to go.  Mr.

6    Fowerbaugh (unintelligible).

7          UNIDENTIFIED SPEAKER:  I think Rudy should be here,

8    too.

9          THE COURT:  I think so, too.  I mean, he stepped up

10   first if I recall, right?

11         Does that work for you, Mr. Radasevich?

12         MR. RADASEVICH:  Yes.

13         THE COURT:  Okay.  So why don't we say November

14   11th, November 11th for a status?

15         COURTROOM DEPUTY:  It's a holiday.

16         UNIDENTIFIED SPEAKER:  Is that a holiday, your

17   Honor?

18         THE COURT:  Yeah.  Is that a holiday?

19         UNIDENTIFIED SPEAKER:  Yes.

20         THE COURT:  Okay.  Donna?

21         COURTROOM DEPUTY:  The 18th.  Do you want the week

22   after?

23         THE COURT:  How about the 16th?

24         COURTROOM DEPUTY:  The 16th?

25         THE COURT:  16th.

```
 1          COURTROOM DEPUTY:  November 16th at 10:15.

 2          THE COURT:  Thank you.

 3          Okay.  And should we carve out -- assuming we're on

 4  course, should we carve out a tentative settlement conference

 5  date assuming we're on course?

 6          MR. HARRIS:  Your Honor, I guess there probably

 7  should be separate dates for the --

 8          THE COURT:  Right, right, right, right.

 9          MR. HARRIS:  Okay.

10          THE COURT:  Okay.  So what if we set aside a couple

11  dates in early December, in early December?  You know, Donna

12  is threatening to bail out on me in a month or so.  She's not

13  going to be here.  She's going to retire after --

14          COURTROOM DEPUTY:  38.

15          THE COURT:  -- 38 years with the Court, so.

16          UNIDENTIFIED SPEAKER:  Wow.

17          UNIDENTIFIED SPEAKER:  Wow.

18          UNIDENTIFIED SPEAKER:  Your Honor, if I may, you

19  know, we -- I did not come today with knowledge of my

20  clients' December availability so I'm not sure exactly what

21  dates a representative would or wouldn't be available.  We

22  can certainly tentatively set dates but I can check with him

23  on.

24          THE COURT:  Okay.  Donna, let's set it the week of

25  December of 6th.  Does that make sense?
```

1    COURTROOM DEPUTY:  Yeah.  You have that whole week

2  available.

3    THE COURT:  Okay.  I have that whole week available.

4    So why don't we start with the Edelman cases on the

5  entire day of December 6th and 7th, half day on the 7th.

6  Okay.  I'll give you the -- well, what's been the experience?

7  I mean, usually I settle them in half a day so I really don't

8  want to make an exception here but I think I may have to, you

9  know.

10    Okay.  How much time have the judges and mediators

11  spent with you to make something happen?

12    MS. COMBS:  Your Honor, I don't think it really

13  helps us at all because basically, you know, with talks

14  between the defendants in Ameriquest, we want at least that,

15  several days --

16    THE COURT:  Two days?  I mean --

17    MS. COMBS:  At least, at least several days but had

18  no interaction at all so I don't think that we have an

19  experience.

20    THE COURT:  Oh.  You don't have an experience?

21    MS. DAVIES:  In mediations, we just resolve -- were

22  accomplished in a day.  I think maybe setting it for two days

23  right after each other might be reasonable.

24    If I may, if it's agreeable with the Court, if we

25  can have the start date be a Tuesday versus a Monday --

1          THE COURT:  Okay.

2          MS. DAVIES:  -- that would be appreciated.

3          COURTROOM DEPUTY:  Okay.  So that would be December

4   7th at 10:30 and that's for the Edelman group.

5          THE COURT:  Well, you know, Donna, I think we'll

6   just start them at 9:00 o'clock and we won't set any statuses

7   that week.

8          COURTROOM DEPUTY:  Okay.

9          THE COURT:  Okay.  So we'll start you December 7th

10   at 9:00 o'clock and December 8th at 9:00 o'clock for the

11   Edelman cases.  And do the Harris cases the 9th and 10th --

12          MR. HARRIS:  Thank you, your Honor.

13          THE COURT:  -- at 9:00 and December 10 at 9:00,

14   okay.

15          Now if you want to keep those dates, then you have

16   to do your homework.  If you don't do your homework when you

17   come in here on November 16th, I will give those dates away

18   if it doesn't look like you're ready, so.

19          And then after -- then assuming you do your homework

20   and you've made your exchanges by November 4th, Ms. Combs'

21   suggestion that you try to continue the process before you

22   show up on December 7th is certainly something I'm going to

23   encourage to see how much progress you can make on your own

24   but we can talk about that and you know -- so I really do

25   want to encourage the attorneys to reach out to one another

1    if there's a problem.

2           If there's things going well -- I mean, if you

3    settle on your own, that's okay, too.  You know, I mean --

4           MR. KAPLAN:  Judge, Rich Kaplan again.  Would it be

5    possible for plaintiffs or Ameriquest to advise the

6    third-party defendants if we are going to appear as to a

7    timetable?  I mean, if I show up at 9:00 o'clock on December

8    9th and we don't get to my cases until 3:00 in the afternoon,

9    I assume there would be some sort of scheduling as to the

10   cases.

11          THE COURT:  Well, you know, I don't think I'm going

12   to necessarily require all of the third-party defendants to

13   show up.  I mean, I just don't think that that's going to be

14   realistic.  I think if there's a few that really are going to

15   make a difference, make it or break it kind of thing, I'm

16   going to leave it to the defendants to advise me as to who

17   they really need to be there to make it happen because it's

18   largely going to be up to you as to whether it happens; is

19   that right?

20          MS. DAVIES:  I believe that's a fair assessment,

21   your Honor.

22          THE COURT:  Okay.  So if they say, look, we are not

23   going to be able to make a deal unless somebody who is there

24   with 40 or 50 cases is also there as a third party or

25   whatever, or it may be that Mr. Finke's case is the one

1  that's holding everything up, you know, his client could be

2  the stumbling block, then you tell Mr. Finke that he has to

3  show up.  Okay?

4          MS. DAVIES:  That sounds reasonable.

5          THE COURT:  I mean, does that sound reasonable to

6  third-party defendants?

7          MR. KAPLAN:  Yes, sir.

8          THE COURT:  Okay.

9          MR. JOHNSON:  Your Honor, Derek Johnson,

10 J-o-h-n-s-o-n, on behalf of Mortgage Information Services,

11 third-party defendant.

12          With regard to the conferences in December, would

13 the Court have any objection if we chose to appear by

14 teleconference?

15          THE COURT:  My experience is if it's not important

16 for your client to be here, it's not important enough for me

17 to be here so let your client figure out whether it's

18 important or not for them to be here.

19          MR. JOHNSON:  Okay.  Thank you.

20          THE COURT:  Okay.  That's my approach.  I mean, if

21 it's an important case, your client should be here.  I want

22 to look your client in the eyes and hear from them.

23          It's just too easy on a phone call when you pick up

24 the phone and tell your client, well, the judge is

25 recommending this to say well, you know, I don't care.

1          MR. JOHNSON:  Fair enough.

2          THE COURT:  If he wants to say I don't care, I want

3  him to say it to me; not to you.  Okay.

4          Anything else?

5          MR. ELLIOTT:  Your Honor, I apologize.  I might have

6  been the only one that missed this.  The November 16th date

7  for the status conference --

8          THE COURT:  Right.

9          MR. ELLIOTT:  -- this is Attorney Steve Elliott,

10  third-party defendant, Netco, Inc. -- is that for everyone or

11  was there just somebody selected from the third-party

12  defendants?

13          THE COURT:  No.  A few representatives volunteered,

14  volunteered.

15          MR. ELLIOTT:  Okay.

16          THE COURT:  Mr. Fowerbaugh, Mr. Radasevich, they

17  gladly volunteered.  Do we have the right two people, do you

18  think?

19          MS. DAVIES:  Yes.  I do think --

20          THE COURT:  They just stand out in the crowd, what

21  can I tell you.

22          MR. FOWERBAUGH:  Your Honor, we'll be -- Mr. Albert

23  Fowerbaugh again -- happy to attend.  I just want it clear

24  that, you know, we just represent our own clients and we can

25  certainly communicate to them.

 1          THE COURT:  No.  I understand, I understand.  But,

 2    you know, I'm trying to get a sense of which third parties

 3    are going to make a difference as to whether or not these

 4    cases settle and which ones, while it will be helpful, are

 5    not going to be make it or break it.  Okay.

 6          MS. GOODWIN:  Your Honor, Tara Goodwin.

 7          Now my point that I was trying to make a little

 8    prematurely, it might good if the order said that at least

 9    the big major servicer, that counsel for them has to appear

10    that date because they're a big part in a lot of these cases.

11          THE COURT:  Are they parties?

12          MS. GOODWIN:  Yeah.  He's a defendant.

13          THE COURT:  Okay.  And what's their name?

14          MS. GOODWIN:  And they didn't come today.

15          THE COURT:  What's their name?

16          MS. DAVIES:  I think Mr. Fleischmann represents --

17          MS. GOODMAN:  AHSMI.

18          MS. DAVIES:  -- AHSMI.  It's American Home Mortgage

19    Servicing, Inc., I think.

20          THE COURT:  Okay.  Well, I don't like to put it in

21    the order itself.  I mean, will you please --

22          MS. DAVIES:  I'll communicate with them.

23          THE COURT:  -- communicate that their involvement is

24    extremely important, that we expect somebody here?

25          MS. GOODWIN:  Chase is the other one that has quite

1    a large number.

2              THE COURT:  Who?

3              MS. GOODWIN:  Chase.

4              THE COURT:  Are they parties?

5              MS. GOODWIN:  Yes.

6              UNIDENTIFIED SPEAKER:  Yes.

7              THE COURT:  Okay.  So, I mean, we need to know that

8    the process is moving forward because from your standpoint,

9    the more people that move into just the money category the

10   easier it is to settle perhaps, perhaps, depending upon what

11   the demand --

12             UNIDENTIFIED SPEAKER:  I think it gets less

13   complicated.

14             THE COURT:  It gets less complicated.

15             UNIDENTIFIED SPEAKER:  Yes.

16             THE COURT:  Okay.  Very good.

17             UNIDENTIFIED SPEAKER:  Very good.

18             UNIDENTIFIED SPEAKER:  Thank you, your Honor.

19             THE COURT:  So we'll try to get Chase and AHMSI.

20             UNIDENTIFIED SPEAKER:  Yes.  I know we represent

21   JPMorgan Chase with some degree.  I don't know if the entity

22   that you're mentioning is a different entity so we'll see.

23             THE COURT:  Okay.

24             UNIDENTIFIED SPEAKER:  We'll talk.

25             UNIDENTIFIED SPEAKER:  Okay.

1        THE COURT:  Okay.  Very good.

2        UNIDENTIFIED SPEAKER:  Thank you, your Honor.

3        THE COURT:  Okay.  Thank you.

4        UNIDENTIFIED SPEAKER:  Thank you, your Honor.

5        UNIDENTIFIED SPEAKER:  Thank you, your Honor.

6        UNIDENTIFIED SPEAKER:  Thank you, your Honor.

7        UNIDENTIFIED SPEAKER:  Thank you, your Honor.

8        UNIDENTIFIED SPEAKER:  Thank you.

9    (Which concluded the digitally recorded proceedings in

10   the above-entitled matter.)

11

12              C E R T I F I C A T E

13       I hereby certify that the foregoing is a

14   transcription of proceedings transcribed from digital

15   proceedings held before the Honorable Morton Denlow on July

16   29, 2010.

17

18   /s/Laura LaCien

19   _____          August 10, 2010
     Laura LaCien                           Date
20   Official Court Reporter

21

22

23

24

25