**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE AMERIQUEST MORTGAGE CO. | ) | |
| MORTGAGE LENDING PRACTICES | ) | MDL No. 1715 |
| | ) | |
| _____ ) | | Lead Case No. 05 C 7097 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| Camille J. Grubek v. Argent Mortgage, et al., | ) | Centralized before The |
| Case No. 06 C 2639 (N.D. Ill.) | ) | Honorable Marvin E. Aspen |

**MOTION FOR LEAVE TO FILE ADDITIONAL AUTHORITY**
**IN SUPPORT OF RESPONSE TO MOTION TO DISMISS**

Plaintiff respectfully requests leave to file *Coleman v. Crossroads Lending Group, Inc. et al.*, 09-CV-0221 (D. Minn. 2010)as additional authority in further support of plaintiff's response in opposition to WMC's motion to modify statutory rescission procedures and dismiss this case if plaintiff fails to tender to WMC the amount of money it arbitrarily demanded. A copy is attached as *Exhibit 1*.

In *Coleman* the court examined a very similar situation to this case where the lender refused to provide rescission, plaintiff was forced to file a lawsuit to enforce her rights and even after the lawsuit was filed, the lender did not agree to tender until a year into the litigation (in this case, it was five years). The court held:

> Coleman has acted reasonably in attempting to effectuate rescission, but here efforts have been frustrated by First Commercial's conduct. Coleman first sent a notice of rescission in December 2008. Despite what it now admits was a facially obvious TILA violation, First Commercial refused to recognize Coleman's right to rescind, forcing Coleman to bring this lawsuit. First Commercial then unreasonably prolonged this litigation by failing to cooperate in discovery, rearguing issues that had already been decided, belatedly raising a borderline-frivolous argument against *any* award of attorney's fees (discussed below), and raising frivolous objections as to the *amount* of attorney's fees sought

by Coleman (also discussed below). It appears likely that, while First Commercial was engaging in these delaying tactics, Coleman's house was dropping in value, thus hampering Coleman's ability to make the full tender on which First Commercial now insists. It would not be fair for the consequences of First Commercial's delaying tactics to be visited solely upon Coleman. Thus, it is reasonable to require First Commercial to accept a monthly payment in lieu of a lump-sum tender of the full amount.

*Coleman* at p. 17-18.

In making the above holding, the court engaged in a detailed analysis as follows:

TILA is a consumer-protection statute that must be construed broadly in consumers' favor. *Rand Corp. v. Yer Song Moua*, 559 F.3d 842,845 (8th Cir. 2009). The plain language of § 1635(b) requires the lender to release its security interest *before* the borrower must tender any property to the lender, and § 1635(b) further requires the lender to meet its obligations within a specific (and short) period of time after receiving the notice of rescission. But § 1635(b) imposes no such specific requirements on the manner of the borrower's tender. Instead, § 1635(b) merely says that the borrower must tender "[u]pon the performance of the creditor's obligations under this section" without imposing a specific timeline.

The Court recognizes that it has the equitable discretion to alter both of these procedures. But the fact that Congress set forth a specific sequence for the parties' performance — first the lender's release of the security interest, and then the borrower's return of the funds — suggests that Congress thought that this sequence would usually be necessary to achieve the goals of TILA. *See Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992) (recognizing that TILA changed the common-law rules governing rescission to put the consumer in a much stronger bargaining position); *see also* Robert Murken, *Can't Get No Satisfaction? Revising How Courts Rescind Home Equity Loans under the Truth in Lending Act*, 77 Temp. L. Rev. 457, 490-91 (2004) (arguing that, given the plain language of § 1635(b) and the goals of TILA, courts should not routinely make the borrower's tender a condition precedent to rescission).
...
In keeping with the flexible and equitable nature of TILA's rescission remedy, numerous courts have recognized that they have the discretion to set up a payment plan for a borrower who cannot otherwise make a full tender. *See Palmer v. Wilson*, 502 F.2d 860, 862-63 (9th Cir. 1974) (inviting the district court on remand to "require the defendants to submit a proposed plan for repayment that is consistent both with the defendants' desire to recover the amount of principal loaned to the Palmers and with

2

the Palmers' current financial situation"); *In re Sterten*, 352 B.R. 380, 390 (Bankr. E.D. Pa. 2006) (ordering borrower to make monthly payments of $790 for a period of 302 months), *rev'd on other grounds by Sterten v. Option One Mortg. Corp.*, 479 F. Supp. 2d 479 (E.D. Pa. 2007); *In re Bell*, 314 B.R. 54, 61-62 (Bankr. E.D. Pa. 2004) (concluding that borrower should have a "reasonable time" for repayment under TILA even if that period exceeded the five-year period called for by the Bankruptcy Code); *Shepeard v. Quality Siding & Window Factory, Inc.*, 730 F. Supp. 1295, 1308 (D. Del. 1990) (ordering borrower to tender over $11,000 in monthly installments of $199); *Mayfield v. Vanguard Sav. & Loan Ass'n*, 710 F. Supp. 143, 149 (E.D. Pa. 1989) (ordering borrower to tender over $16,000 in monthly installments of $171); *Bookhart v. Mid-Penn Consumer Disc. Co.*, 559 F. Supp. 208, 212-13 (E.D. Pa. 1983) (ordering borrower to tender approximately $1,400 in monthly installments of $15).

*Id* at 14-15.

WHEREFORE, plaintiff respectfully requests leave to file *Coleman v. Crossroads Lending Group, Inc. et al.*, 09-CV-0221 (D. Minn. 2010)as additional authority in further support of plaintiff's response in opposition to WMC's motion to modify statutory rescission procedures and dismiss this case if plaintiff fails to tender to WMC the amount of money it arbitrarily demanded.

Respectfully submitted,


By: /s/   Keith J. Keogh

Keith J. Keogh
Ainat Margalit
KEOGH LAW, LTD.
101 N. Wacker Dr., Suite 605
Chicago, Il 60606
312.726.1092/ 312.726.1093 (fax)
*Counsel for Plaintiff*

3

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MARGARET J. COLEMAN,

          Plaintiff,

v.

CROSSROADS LENDING GROUP, INC.;
GREAT NORTHERN FINANCIAL GROUP,
INC.; and FIRST COMMERCIAL BANK,

          Defendants.

Case No. 09-CV-0221 (PJS/FLN)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Colleen Daly, THE LEGAL AID SOCIETY OF MINNEAPOLIS; Michael R. Fargione,
MID-MINNESOTA LEGAL ASSISTANCE; and Daniel R. Tyson, for plaintiff.

John F. Bonner, III and Kim A. Chapman, BONNER & BORHART LLP, for defendants
Crossroads Lending Group, Inc. and Great Northern Financial Group, Inc.

Charles B. Rogers, Joseph D. Roach, and Mark G. Schroeder, BRIGGS AND MORGAN,
P.A., for defendant First Commercial Bank.

Plaintiff Margaret Coleman brought this action under the Truth-in-Lending Act ("TILA"),

as amended by the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C.

§ 1601 et seq.[1]  Coleman sought to rescind a $180,000 loan that was secured by her home.

Coleman also sought statutory damages and attorney's fees under TILA.

Last fall, Coleman brought a motion for partial summary judgment, seeking a declaration

that she is entitled to rescind the loan and an order requiring defendants to take the steps

necessary to effect rescission.  The Court granted Coleman's motion on December 10, 2009.

---

[1]Congress recently amended TILA.  *See* Dodd-Frank Wall Street Reform and Consumer
Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("the Act").  The parties completed
briefing before passage of the Act and have not contacted the Court to suggest that the Act
affects this case in any way.  Accordingly, the Court applies the pre-amendment version of TILA.

Thereafter the parties attempted to settle the remaining issues, including the amount of loan funds that Coleman is required to return as a result of the rescission and Coleman's entitlement to attorney's fees. After failing to reach a settlement, the parties waived a jury trial and agreed to submit their disputes to the Court on stipulated facts. Docket Nos. 51, 53, 55. Accordingly, based on the parties' stipulation and the record submitted at summary judgment, the Court makes the following findings of fact and conclusions of law.[2]

## I. FINDINGS OF FACT

1.      Coleman is in her late 60s and has lived in her St. Paul home for more than 37 years. Coleman Aff. ¶ 1.

2.      On February 1, 2006, Coleman entered into a note and mortgage with defendant Crossroads Lending Group, Inc. ("Crossroads") in the principal amount of $180,000 ("the Loan"). The Loan was secured by Coleman's home.

3.      On the day of closing, Crossroads assigned the Loan to defendant First Commercial Bank ("First Commercial"). Hawkins Aff. Exs. J, K, L. The assignment was pursuant to an agreement between Crossroads and First Commercial whereby First Commercial advanced money to Crossroads and Crossroads in return assigned its interest in mortgage notes to First Commercial. *See* Hawkins Aff. Ex. K. Before advancing funds to Crossroads for a particular loan, First Commercial would use a checklist to ensure that the loan met First Commercial's standards. Schornack Dep. 12. But First Commercial did not require any

_____

[2]The Court relies on the record submitted at summary judgment only to the extent that it contains uncontradicted evidence of additional facts. The Court does not resolve any factual disputes. Where the Court relies on the summary-judgment record, appropriate citations are provided; all other facts are drawn from the parties' stipulation [Docket No. 53].

independent proof — such as a pay stub — to verify the borrower's income. Schornack Dep. 16. Nor did First Commercial verify that the borrower had sufficient income to make the monthly payments. Schornack Dep. 18.

4.      The Loan carried an interest rate of 14.99 percent and an annual percentage rate of 16.413 percent. Hawkins Aff. Exs. C, E. Under the terms of the Loan, Coleman was to make monthly payments of $2,274.56 for approximately five years, with a balloon payment of $179,966.94 — just $33.06 less than the original amount of the loan — due on February 1, 2011. Hawkins Aff. Ex. E.

5.      Coleman alleges that she first learned of the amount of the monthly payments at the closing and told Thomas Whiteis, the vice-president of Crossroads who was conducting the closing, that she could not afford to make those monthly payments. Coleman Aff. ¶ 8. Coleman further alleges that Whiteis told her that he would arrange a different loan that she could afford and that, in the meantime, she would need to make only two monthly payments on the Loan. Coleman Aff. ¶ 8. Whiteis denies that he ever told Coleman that he would help arrange a new loan, but he claims that he did attempt to modify the Loan. Whiteis Aff. ¶ 4.

6.      Shortly before the closing, Coleman's home was appraised at $300,000. Hawkins Aff. Ex. A. At the time, Coleman owed about $95,000 on her first mortgage with Citi Financial and about $30,000 on junior-lien mortgages with the Housing and Redevelopment Authority of the City of St. Paul ("HRA"). Hawkins Aff. Exs. B, H, I. The junior-lien mortgages were security for three separate home-improvement loans that Coleman had obtained in 2000 and 2002 ("the HRA Loans").

7.     The HRA Loans would have been completely forgiven after a period of ten years from the date of origination provided that (a) Coleman had not sold, transferred, or otherwise conveyed (voluntarily or involuntarily) any portion of her interest in the home and (b) Coleman continued to use the home as her principal residence.

8.     In order for the Loan to be in a first-lien position on the Coleman home, the HRA Loans had to be either paid off or subordinated at the time of the closing on the Loan.

9.     No party to the Crossroads Loan transaction asked HRA whether it would subordinate the HRA Loans to the Loan.  Pursuant to its policy and practice, however, HRA would not have subordinated the HRA Loans to the Loan.

10.    At the closing, $29,819.50 of the Loan proceeds were distributed to HRA to pay off the HRA Loans.

11.    HRA will not reinstate the HRA Loans or refund the payoff amounts.

12.    About $6,000 of the Loan proceeds were applied toward Coleman's mortgage payments on the Loan itself.  Whiteis Aff. ¶ 5.  Coleman alleges that she told Whiteis to apply this money toward the two payments that she was supposed to make before Whiteis would arrange another loan.  Coleman Aff. ¶ 9.  (Again, defendants dispute that Whiteis offered to help Coleman arrange another loan.)  Coleman never made any other payments on the Loan.  Whiteis Aff. ¶ 5.

13.    Crossroads asserts that, in an attempt to work out an amicable solution, it never initiated foreclosure proceedings.  Whiteis Aff. ¶ 5.  But Coleman has submitted a certified copy of a "Notice of Pendency of Proceeding to Foreclose Mortgage" that was recorded by Crossroads in Ramsey County on November 9, 2007.  Second Hawkins Aff. Ex. P.

-4-

14.     Under TILA, a borrower is entitled to rescind certain mortgage-loan transactions up to three business days following the closing of the loan.  15 U.S.C. § 1635(a).  The lender must provide a clear and conspicuous written disclosure of this right to the borrower.  The disclosure must identify, among other things, the date on which the rescission period expires.  15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(b).  If a lender fails to provide the required disclosure, the borrower's right to rescind is extended up to three years following the closing.  15 U.S.C. §§ 1635(a), (f); 12 C.F.R. § 226.23(a)(3).  Defendants do not dispute that the Loan was subject to TILA.

15.     HOEPA provides an additional layer of consumer protection for certain high-cost mortgage loans.  *See* 15 U.S.C. § 1602(aa); 12 C.F.R. § 226.32(a).  There is no dispute that the Loan was subject to HOEPA.  *See* Compl. ¶ 59; Answer and Counterclaim ¶ 59.

16.     HOEPA requires lenders to make certain disclosures in writing at least three business days before a loan closes.  Specifically, the lender must disclose the annual percentage rate, the total amount to be borrowed, the amount of the regular monthly payment, the amount of any balloon payment, the potential consequences of entering into the loan, and the fact that the borrower is not required to go forward with the transaction.  15 U.S.C. § 1639(a), (b); 12 C.F.R. § 226.32(c).  These disclosures are deemed material, 15 U.S.C. § 1602(u), and the failure to provide them extends the borrower's right to rescind the transaction to three years after the closing, 15 U.S.C. § 1635(a), (f); 12 C.F.R. § 226.23(a)(3).

17.     Coleman alleges that she did not receive any documentation relating to the Loan until the closing and did not know how much the interest rate or the monthly payments would be until the closing.  Coleman Aff. ¶ 7.  Coleman also alleges that the Notice of Right to Cancel

incorrectly stated that the right expired on February 3, 2006, rather than the correct date of February 4, 2006. Hawkins Aff. Ex. F.

18.     On December 19, 2008, Coleman sent a rescission notice to Crossroads, First Commercial, and defendant Great Northern Financial Group, Inc. ("Great Northern"). Hawkins Aff. Ex. M. None of these defendants took any action to rescind the Loan or release the mortgage. Coleman then filed this action on January 30, 2009.

19.     Defendants filed an answer denying that Coleman had a right to rescind and a counterclaim for breach of contract and unjust enrichment. Docket No. 6. The parties then engaged in discovery. After granting defendants two extensions to respond to her interrogatories and requests for production of documents, Coleman was forced to bring a motion to compel. *See* Docket Nos. 13, 14. Magistrate Judge Franklin Noel granted the motion and awarded fees against defendants.[3] Docket No. 26.

20.     Despite defendants' wrongful failure to cooperate with discovery, Coleman timely filed a motion for summary judgment and secured a hearing date. Her initial brief in support of the motion was filed on October 23, 2009. Docket No. 27. On November 17, 2009, nearly a year after Coleman sent her notice of rescission, defendants filed a memorandum in which they acknowledged, for the first time, that Coleman had a continuing right to rescind the Loan as a result of the TILA and HOEPA violations.[4] Docket No. 30. The Court granted Coleman's

---

[3]Judge Noel ordered defendants to pay $2,763.75 in fees no later than October 2, 2009. According to Coleman, defendants have yet to comply with this order. Defendants are directed to comply with Judge Noel's order forthwith.

[4]Defendants' memorandum conceded that Coleman had a continuing right to rescind but did not identify which alleged violation gave rise to that right. At oral argument, defendants did
(continued...)

motion, ordered First Commercial to take any action necessary to terminate its security interest in

Coleman's home, and awarded Coleman $4,000 in statutory damages pursuant to 15 U.S.C.

§ 1640(a)(2)(A)(iv).[5]  Docket No. 39.

21.     After denying these violations for almost a year, First Commercial and Crossroads

now attempt to minimize these violations as mere technicalities.  The Court disagrees.  Requiring

three days' advance written disclosure of key information is a central pillar of HOEPA.  By

failing to comply with this requirement, Crossroads deprived Coleman of the opportunity to

consider the terms of the Loan in the peace and quiet of her own home, with the counsel of

trusted friends and family members, and without the confusion, time pressure, and intimidation

that any homeowner (particularly an elderly homeowner such as Coleman) may experience at a

closing.  Likewise, by failing to inform Coleman of the correct date on which her rescission right

expired after the closing, Crossroads deprived Coleman of an additional day on which she could

have exercised her right to get out of what appears to have been a bad loan.  Rather than having a

full six business days during which she could consider and discuss the wisdom of entering into

the Loan, Coleman was given only two days — and, contrary to the intent of Congress, those two

days were both *after* the loan had closed.

---

[4](...continued)
not dispute the Court's statement that both TILA and HOEPA were violated.  Docket No. 48 at
11.  Nor did defendants cite any evidence to contradict Coleman's claim that she did not receive
the required HOEPA disclosures at least three business days before the closing.  Under these
circumstances, the Court concludes that defendants have conceded both the TILA and the
HOEPA violations.

[5]At the time of the Court's order, the pertinent language was codified at
§ 1640(a)(2)(A)(iii).

Obviously it is not possible to know for certain whether Coleman would have chosen to go forward with the Loan if she had been given the required disclosures. But because Crossroads created this uncertainty by violating basic requirements of TILA and HOEPA, neither Crossroads nor First Commercial are in any position to claim the benefit of the doubt and argue that, had Crossroads made the required disclosures, Coleman would be in the same position that she is in now. The Court therefore rejects the notion that the TILA and HOEPA violations in this case were mere technicalities that had no effect on the outcome of the Loan transaction and did not affect Coleman's substantive rights.

## II.  CONCLUSIONS OF LAW

### A.  *The Amount of the Tender*

1.      *The amount of Coleman's tender obligation is $161,186.50.*

After rescinding a loan under TILA, the borrower must return any property received from the lender. *See* 15 U.S.C. § 1635(b). The parties agree that, to meet this obligation, Coleman must tender at least $131,367 to First Commercial. Docket No. 53 ¶ 11. This amount reflects, among other things, a credit for the $4,000 in statutory damages awarded by the Court. But the parties dispute whether Coleman must tender an additional $29,819.50, which is the amount that was disbursed to pay off the HRA Loans.

The Court finds this to be a close and difficult question. There is no question that, as a general rule, a proper tender includes amounts that were disbursed to third parties to pay off prior indebtedness. *See Powers v. Sims & Levin*, 542 F.2d 1216, 1220-21 (4th Cir. 1976); *Mayfield v. Vanguard Sav. & Loan Ass'n*, 710 F. Supp. 143, 148 (E.D. Pa. 1989); *Abbott v. Shaffer*, 564 F. Supp. 1200, 1208 (D. Utah 1983). But Coleman points out that she was not required to make any

-8-

payments on the HRA Loans — and, more importantly, that the HRA Loans would have been fully forgiven in 2012 so long as she remained in her home (as she apparently intends). The only reason to pay off the HRA Loans, Coleman argues, was to benefit First Commercial by putting it in a first-lien position. But because Coleman had substantial equity in her home at the time of the Loan, Coleman asserts, there was no reason why First Commercial had to be in a first-lien position. Under these circumstances, Coleman contends that she should not have to pay for First Commercial's unilateral decision to benefit itself by essentially refinancing nearly $30,000 of interest-free, fully forgivable debt at a rate of almost 15 percent.

Section 1635(b) sets forth the parties' respective obligations after rescission under TILA. The pertinent language states that, "[u]pon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value." This language could be read as an express grant of discretion to reduce the amount of tender where requiring the full amount would be "impracticable or inequitable." But the governing regulation makes clear that the "reasonable value" language refers to the return of property other than money:

> When the creditor has complied with [its obligations], the consumer shall tender the money or property to the creditor or, where *the latter* would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business.

12 C.F.R. § 226.23(d)(3) (emphasis added); *see also* 12 C.F.R. pt. 226, supp. I (official comments to § 226.23(d)(3) explaining that "if building materials have already been incorporated

into the consumer's dwelling, the consumer may pay their reasonable value."); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565-66 (1980) (the Federal Reserve Board's interpretation of TILA is entitled to deference). The regulation thus draws a clear distinction between money and other forms of property, and permits the return of "reasonable value" only in the case of property, and not money. Thus, cases such as *Brown v. National Permanent Federal Savings & Loan Association*, 683 F.2d 444 (D.C. Cir. 1982) (per curiam), which Coleman cites, are inapposite because they concern the calculation of the "reasonable value" of property, not money.

Nevertheless, a handful of district-court cases involving the return of money hint that courts may reduce the amount of the tender if the disputed amounts were not disbursed at the request of the borrower. *See In re Williams*, 291 B.R. 636, 652 (E.D. Pa. 2003) (considering borrower's argument that she should not have to tender payment made to a third party because she was unaware of the reason for the payment, but ultimately rejecting the argument because borrower's deceased husband had handled the finances and thus borrower's lack of knowledge did not prove that the disbursement was not on her behalf); *Ray v. CitiFinancial, Inc.*, 228 F. Supp. 2d 664, 670 (D. Md. 2002) (suggesting that, on remand, the Bankruptcy Court might want to consider deducting "unwanted and unneeded" insurance charges from the tender amount). These cases do not cite any authority for this proposition, however, and there do not seem to be any cases in which a court has actually reduced the required tender on this basis.

In the absence of clearer authority, the Court finds guidance in *Stutzka v. McCarville*, 420 F.3d 757 (8th Cir. 2005). In *Stutzka*, the district court granted rescission of an $85,000 loan under Nebraska law. *Id.* at 761. The court also ordered the borrower — a blind and developmentally disabled widow — to return the $85,000 in principal. *Id.* The borrower

appealed, arguing that most of the principal had gone to paying off prior debts that were either

void (due to her lack of capacity) or unenforceable against her (because they were her deceased

husband's responsibility and could not be imputed to her). *Id.* The Eighth Circuit rejected the

borrower's argument that she should not be required to reimburse the lender for paying off the

allegedly void and unenforceable debts:

> A necessary consequence of the rescission remedy . . . was that the
> district court was obligated to require Gibilisco to return everything
> she had "gained" under the Popular mortgage. Because Gibilisco
> received benefits from the Popular mortgage in the form of relief
> from the U.S. Bank mortgage and from her husband's debts (i.e.,
> the lines of credit), she was required by Nebraska law to make
> restitution to Popular in order to return both parties to the status
> quo.
>
> Stutzka's argument that Gibilisco should not be required to return
> the $85,000 due to the invalidity of the underlying U.S. Bank
> obligations is unavailing. Stutzka contends that the U.S. Bank
> mortgage was void due to Gibilisco's lack of capacity to enter into
> it and that the lines of credit were obligations of Sam Gibilisco and
> thus could not be imputed to Carol. Whatever potential merit these
> assertions might have in a direct challenge to the underlying
> obligations, the fact remains that, at the time of the Popular
> mortgage, the U.S. Bank mortgage was valid and enforceable
> against Gibilisco and the lines of credit were valid and enforceable
> against her husband's estate because none of the obligations had
> been judicially challenged or set aside. Because Nebraska law
> makes clear that rescission seeks a return to the status quo *ex ante*
> the challenged instrument, . . . the district court did not abuse its
> discretion in ordering that Gibilisco repay the $85,000 to Popular.

*Id.* (footnote omitted). The Court further noted that, even if the borrower's assets would not have

been reachable in an action to recover on the lines of credit, the borrower had benefitted by being

relieved from any "potential liability" for her husband's debts. *Id.* at 761 n.3.

The facts in this case are analogous to those in *Stutzka*.  In this case, as in *Stutzka*, the borrower contends that she ultimately would not have been responsible for paying the underlying debts.  Nevertheless, as in *Stutzka*, "the fact remains that, at the time of the [Crossroads] mortgage, the [HRA liens were] valid and enforceable against [Coleman]" and thus Coleman gained the benefit of relief from those liens.  Likewise, although the HRA Loans might have been forgiven in the future, it is certainly true that Coleman had "potential liability" for those loans. *Stutzka* teaches that, under these circumstances, a borrower must tender the full amount of the principal in order to return the lender to the status quo before the transaction.

Although *Stutzka* concerned rescission under Nebraska law rather than TILA, the basic concepts are the same.[6]  Just as Nebraska law "makes clear that rescission seeks a return to the status quo *ex ante* the challenged instrument," *Stutzka*, 420 F.3d at 761, the goal of TILA is likewise a return to the status quo before the loan.  *See Fed. Deposit Ins. Corp. v. Hughes Dev. Co., Inc.*, 938 F.2d 889, 890 n.3 (8th Cir. 1991) (noting that borrower must restore lender to the status quo); *see also Am. Mortgage Network, Inc. v. Shelton*, 486 F.3d 815, 820 (4th Cir. 2007) ("The equitable goal of rescission under TILA is to restore the parties to the 'status quo ante.'"); *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 421 (1st Cir. 2007) ("Rescission [under TILA] essentially restores the status quo ante; the creditor terminates its security interest

---

[6]Notably, the borrower in *Stutzka* had also asserted claims under TILA.  The district court granted summary judgment against the borrower on those claims, but the Eighth Circuit reversed and remanded.  *Stutzka*, 420 F.3d at 761-63.  In so doing, the Eighth Circuit explained that, although the district court had already rescinded the mortgage under Nebraska law, the TILA claims were not moot because the borrower might be entitled to statutory damages and attorney's fees.  *Id.* at 763.  But nowhere did the Eighth Circuit suggest that the rescission remedy, and in particular the borrower's liability for the full amount of the loan principal, would have been different under TILA.

and returns any monies paid by the debtor in exchange for the latter's return of all disbursed

funds or property interests."); *Bustamente v. First Fed. Sav. & Loan Ass'n of San Antonio*, 619

F.2d 360, 365 (5th Cir. 1980) (stating that § 1635(b) "is designed to restore the parties to the

status quo as closely as possible").  The Court therefore concludes that Coleman's tender must

include the $29,819.50 that was disbursed to pay off the HRA Loans.

### B.  The Timing of the Tender

2.      *The Court will permit Coleman to tender in monthly installments, but further proceedings are required to determine an appropriate payment plan.*

The parties next dispute when and how Coleman must tender the required amount.

Coleman has secured a reverse mortgage and has offered to tender the $62,756.81 in proceeds

and to give a note for the remainder, which she would pay off in monthly installments of $200.[7]

Docket No. 64 at 7.  First Commercial contends that this is not a "legally sufficient" tender and

asks the Court to require Coleman to pay the full amount no later than December 10, 2010.

In arguing that Coleman's tender is not "legally sufficient," First Commercial ignores the

fact that TILA explicitly gives the Court discretion to change the procedures by which the parties

effect rescission.  *See* 15 U.S.C. § 1635(b) ("The procedures prescribed by this subsection shall

apply except when otherwise ordered by a court.").  Indeed, the case for allowing Coleman to

---

[7]First Commercial argues that, by closing on the reverse mortgage, Coleman has "purposely and inexcusably" frustrated the relief sought by First Commercial.  The Court disagrees.  As Coleman accurately points out, the Court decided months ago that First Commercial's security interest was void and ordered First Commercial to take all necessary steps to release it.  Coleman then properly sought a way to meet her tender obligation.  She should not have to wait in limbo indefinitely while First Commercial seeks a second bite at the apple.  Although, as discussed below, the Court has decided to allow First Commercial to regain its status as a secured creditor, this is due to new information about the current value of Coleman's home and its effect on her ability to tender.

tender over a period of time is stronger than the case for permitting First Commercial to retain its security interest until Coleman completes her tender. TILA is a consumer-protection statute that must be construed broadly in consumers' favor. *Rand Corp. v. Yer Song Moua*, 559 F.3d 842, 845 (8th Cir. 2009). The plain language of § 1635(b) requires the lender to release its security interest *before* the borrower must tender any property to the lender, and § 1635(b) further requires the lender to meet its obligations within a specific (and short) period of time after receiving the notice of rescission. But § 1635(b) imposes no such specific requirements on the manner of the borrower's tender. Instead, § 1635(b) merely says that the borrower must tender "[u]pon the performance of the creditor's obligations under this section" without imposing a specific timeline.

The Court recognizes that it has the equitable discretion to alter both of these procedures. But the fact that Congress set forth a specific sequence for the parties' performance — first the lender's release of the security interest, and then the borrower's return of the funds — suggests that Congress thought that this sequence would usually be necessary to achieve the goals of TILA. *See Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992) (recognizing that TILA changed the common-law rules governing rescission to put the consumer in a much stronger bargaining position); *see also* Robert Murken, *Can't Get No Satisfaction? Revising How Courts Rescind Home Equity Loans under the Truth in Lending Act*, 77 Temp. L. Rev. 457, 490-91 (2004) (arguing that, given the plain language of § 1635(b) and the goals of TILA, courts should not routinely make the borrower's tender a condition precedent to rescission). Notwithstanding Congress's apparent intent, though, courts have frequently conditioned rescission on the borrower's prior tender in order to protect the lender. If courts can

readily alter the statutory scheme to protect lenders, then surely courts also have the authority to alter the statutory scheme to protect borrowers — who, after all, are the persons whom the statute is intended to protect.

In keeping with the flexible and equitable nature of TILA's rescission remedy, numerous courts have recognized that they have the discretion to set up a payment plan for a borrower who cannot otherwise make a full tender. *See Palmer v. Wilson*, 502 F.2d 860, 862-63 (9th Cir. 1974) (inviting the district court on remand to "require the defendants to submit a proposed plan for repayment that is consistent both with the defendants' desire to recover the amount of principal loaned to the Palmers and with the Palmers' current financial situation"); *In re Sterten*, 352 B.R. 380, 390 (Bankr. E.D. Pa. 2006) (ordering borrower to make monthly payments of $790 for a period of 302 months), *rev'd on other grounds by Sterten v. Option One Mortg. Corp.*, 479 F. Supp. 2d 479 (E.D. Pa. 2007); *In re Bell*, 314 B.R. 54, 61-62 (Bankr. E.D. Pa. 2004) (concluding that borrower should have a "reasonable time" for repayment under TILA even if that period exceeded the five-year period called for by the Bankruptcy Code); *Shepeard v. Quality Siding & Window Factory, Inc.*, 730 F. Supp. 1295, 1308 (D. Del. 1990) (ordering borrower to tender over $11,000 in monthly installments of $199); *Mayfield v. Vanguard Sav. & Loan Ass'n*, 710 F. Supp. 143, 149 (E.D. Pa. 1989) (ordering borrower to tender over $16,000 in monthly installments of $171); *Bookhart v. Mid-Penn Consumer Disc. Co.*, 559 F. Supp. 208, 212-13 (E.D. Pa. 1983) (ordering borrower to tender approximately $1,400 in monthly installments of $15).

First Commercial cites *Federal Deposit Insurance Corp. v. Hughes Development Co.*, 938 F.2d 889 (8th Cir. 1991), for the proposition that the *only* appropriate tender is a lump-sum

payment of the full amount within a "reasonable time," which First Commercial interprets to mean no more than a year after rescission. First Commercial reads too much into *Hughes*. In *Hughes*, the district court ordered the borrowers to tender the $100,000 loan principal within one year, failing which the mortgage holder would be permitted to foreclose. *Id.* at 890. During the year, the borrowers offered to settle for $10,000, some property, and a note for $66,000. *Id.* at 890 n.2. The mortgage holder rejected that offer and the borrowers' home eventually went into foreclosure. *Id.* at 890. After some further proceedings, the borrowers appealed. Notably, however, the borrowers did not appeal the requirement that they tender within a year, and the propriety of that time period was therefore not before the Eighth Circuit. Instead, the borrowers argued (among other things) that their settlement offer had satisfied their tender obligation. The Eighth Circuit rejected that argument in a brief footnote. *Id.* at 890 n.3. Obviously, then — and contrary to First Commercial's argument — the Eighth Circuit did not address the scope of a district court's discretion to relieve a borrower from having to tender the entire amount of the loan immediately upon rescission, as that issue was not before the court. Instead, the Eighth Circuit simply held that an offer to pay less than the full amount within a year does not satisfy a court order to pay the full amount within a year. *Hughes* thus provides little support for First Commercial's argument.[8]

The Court finds that, in this case, permitting Coleman to pay her tender obligation in monthly installments is the most appropriate remedy. As First Commercial acknowledges, the

_____

[8]First Commercial further misconstrues *Hughes* by taking its discussion of unjust enrichment out of context. That discussion had nothing to do with TILA; it concerned the propriety of the district court's decision, under Minnesota law, to vacate the foreclosure sale. *Hughes*, 938 F.2d at 891.

-16-

goal of rescission is to return the parties to the status quo before the Loan. This goal applies to Coleman as well as to First Commercial. TILA, it must be remembered, is supposed to be broadly construed to protect consumers such as Coleman. *Rand Corp. v. Yer Song Moua*, 559 F.3d 842, 845 (8th Cir. 2009); *see also Celona v. Equitable Nat'l Bank*, 98 B.R. 705, 707 (E.D. Pa. 1989) ("The purpose of [TILA] is to establish a strong national policy of protecting consumers whose residences may be jeopardized by operation of a security interest acquired by creditors."). Rendering Coleman homeless would not serve the goal of returning her to the status quo before the Loan; after all, before the Loan, she was living in her long-time home, and she had a considerable amount of equity in that home.

Coleman has acted reasonably in attempting to effectuate rescission, but her efforts have been frustrated by First Commercial's conduct. Coleman first sent a notice of rescission in December 2008. Despite what it now admits was a facially obvious TILA violation, First Commercial refused to recognize Coleman's right to rescind, forcing Coleman to bring this lawsuit. First Commercial then unreasonably prolonged this litigation by failing to cooperate in discovery, rearguing issues that had already been decided, belatedly raising a borderline-frivolous argument against *any* award of attorney's fees (discussed below), and raising frivolous objections as to the *amount* of attorney's fees sought by Coleman (also discussed below). It appears likely that, while First Commercial was engaging in these delaying tactics, Coleman's house was dropping in value, thus hampering Coleman's ability to make the full tender on which First Commercial now insists.[9] It would not be fair for the consequences of First Commercial's

---

[9]Coleman asserts, and First Commercial apparently does not dispute, that her home was recently appraised at $162,000 — much less than the $300,000 appraised value from 2006.

delaying tactics to be visited solely upon Coleman. Thus, it is reasonable to require First Commercial to accept a monthly payment in lieu of a lump-sum tender of the full amount.

Without any information about Coleman's monthly income or expenses, however, the Court cannot responsibly exercise its discretion to set up a payment plan. The Court will therefore proceed as follows: The parties will be ordered to meet and confer concerning an appropriate payment plan, which they can then submit to the Court. In participating in this meeting and (hopefully) in agreeing to a payment plan, First Commercial will not be waiving its argument that a payment plan is not an appropriate remedy. First Commercial may, if it wishes, pursue that argument on appeal after the Court enters final judgment.

To aid the parties in their discussions regarding the payment plan, the Court observes that the goal of the payment plan should be to enable Coleman to remain in her house while repaying the balance of the Loan as soon as practicable. The Court also observes that, depending on the length of the repayment period, it may be appropriate to require Coleman to pay some amount of interest on the outstanding amount. *See In re Sterten*, 352 B.R. at 390 (creating a payment plan and requiring the borrower to pay interest). In the Court's view, the interest rate, if any, should be no more than necessary to compensate First Commercial for inflation; the Court will not impose a rate that would permit First Commercial to realize a profit on the illegal loan.

If the parties are unable to agree, Coleman will be required to submit evidence of her monthly income and expenses to the Court. First Commercial may then submit relevant evidence of Coleman's monthly income and expenses.[10] In addition, the parties should submit evidence of

---

[10]As the parties have already had a full opportunity to engage in discovery and First Commercial could reasonably have anticipated that Coleman's monthly income and expenses

(continued...)

a reasonable interest rate — that is, an interest rate that would protect First Commercial against inflation, but would protect Coleman from having First Commercial profit on the illegal loan. The Court will then fashion an appropriate payment plan.

In light of the Court's decision to permit Coleman to pay her tender in monthly installments, the Court also finds that First Commercial should be permitted to obtain a security interest in Coleman's home. At the time of Coleman's summary-judgment motion, the Court believed that Coleman would likely be able to meet all or nearly all of her tender obligation by obtaining a reverse mortgage and would be able to pay any outstanding balance in a relatively short amount of time. As that has not proved to be the case, and as the Court will be requiring First Commercial to wait a number of years for the return of the full principal, it is only fair that First Commercial be given a security interest in Coleman's home. The Court will direct the parties to submit a proposed order that will accomplish this result, which the Court will then incorporate into its final order setting the payment plan.

To be clear, the Court will not order that First Commercial's interest take priority over the interest of Wells Fargo, the reverse-mortgage holder. It would be inequitable for the Court to subordinate Wells Fargo's interest to that of First Commercial. Wells Fargo is not before this Court and, more importantly, Wells Fargo, unlike First Commercial, did not make an illegal loan. While First Commercial attempts to distance itself from the TILA and HOEPA violations in this case, it is clear from the record that First Commercial was involved in Crossroads' loan-origination process and did nothing to ensure compliance with TILA and HOEPA. Moreover,

---

[10](...continued)
might be relevant in this case, the Court will not reopen discovery.

-19-

First Commercial unreasonably refused to recognize Coleman's right to rescind for nearly a year and unreasonably prolonged this litigation. First Commercial is not entitled to a priority position over Wells Fargo.

### C. Attorney's Fees

3.     *Coleman is entitled to recover $90,165.75 in attorney's fees from First Commercial and Crossroads.*

Coleman moves for a fee award of $90,165.75.[11] TILA provides for an award of attorney's fees and costs to a victim of a TILA violation who brings a successful lawsuit. 15 U.S.C. § 1640(a)(3). "[A]n award of fees is mandatory once a TILA violation has been established, with the amount of the fees being committed to the district court's discretion." *Stutzka v. McCarville*, 243 Fed. Appx. 195, 197 (8th Cir. 2007). In recognition of the mandatory nature of fee awards under TILA, the Court previously granted Coleman's motion for summary judgment on her entitlement to fees. Docket No. 39 ¶ 6. During the summary-judgment proceedings, First Commercial did not argue that Coleman is not entitled to fees. Now, however, First Commercial argues that, because Coleman has been represented by attorneys working pro bono and by a nonprofit legal-services organization, she is not entitled to recover fees.

Even assuming that First Commercial has not waived this argument by failing to raise it earlier, it is plainly meritless. First Commercial bases its argument on the statutory language of TILA's fee-shifting provision, which provides for the recovery of fees by the "person" with respect to whom TILA was violated. 15 U.S.C. § 1640(a)(3). Because Coleman's counsel are not "person[s]" with respect to whom TILA was violated, First Commercial argues, they cannot

---

[11]Coleman initially requested $85,881.75; in her reply brief, she also requests an additional $4,284.00 for the preparation of the brief.

seek fees on their own behalf. And because Coleman has not incurred any fees, First Commercial contends, a fee award would be an impermissible windfall.

There are several problems with First Commercial's argument. First, in contrast to some other fee-shifting statutes, TILA's fee-shifting provision does not require a party to personally incur attorney's fees before a court may award them. Instead, the provision provides for an award of "the costs of the action, together with a reasonable attorney's fee . . . ." 15 U.S.C. § 1640(a)(3). *Cf. United States v. Claro*, 579 F.3d 452, 466-67 (5th Cir. 2009) (declining to award paralegal fees for voluntary services of claimant's wife because they were not "incurred" within the meaning of the relevant statute).[12] There is thus no statutory basis for First Commercial's argument.[13]

Second, and more importantly, the Supreme Court long ago rejected a similar argument against awarding fees under Title VII. *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 70 n.9 (1980); *see also Blum v. Stenson*, 465 U.S. 886, 895 (1984) (holding that prevailing parties under 42 U.S.C. § 1988 are entitled to have fees calculated according to prevailing market rates

---

[12]Courts award fees to nonprofit counsel even under fee-shifting statutes that incorporate an "incurred" requirement. *See Cornella v. Schweiker*, 728 F.2d 978, 985-87 (8th Cir. 1984). In *Claro*, the Fifth Circuit described this practice as an "exception" to the "incurred" requirement. 579 F.3d at 466. Thus, First Commercial would be on shaky ground even if TILA required that the fees be "incurred."

[13]Perhaps recognizing this weakness in its argument, First Commercial places great weight on the wording of the Court's summary-judgment order, which states that "First Commercial Bank is ordered to pay plaintiff's reasonable costs and attorneys fees incurred to bring this action to enforce her right to rescind." Docket No. 39 ¶ 6. First Commercial cannot reasonably read this language to be a ruling on the issue of whether fees may be awarded when the plaintiff is represented pro bono, as this issue was not before the Court at summary judgment. First Commercial also seems to believe that this order restricts Coleman to recovering only fees for work performed before the order's entry. This argument is without merit.

-21-

regardless of whether the party received free representation). The fee-shifting provision of Title VII grants courts the discretion to "allow the prevailing party, . . . a reasonable attorney's fee . . . as part of the costs . . . ." 42 U.S.C. § 2000e-5(k). There is no material difference between the language or the purpose of these fee-shifting provisions that would justify awarding fees to pro bono attorneys under Title VII but denying fees under TILA. Both provisions serve to vindicate important public-policy interests and ensure private enforcement of their respective statutory schemes. Indeed, as Coleman points out, the justification for awarding fees under TILA is even stronger because TILA mandates an award of fees, whereas an award under Title VII is discretionary.

Finally, First Commercial's argument flies in the face of the nearly unanimous weight of authority that a party may recover fees under TILA notwithstanding her representation by a nonprofit legal-services organization. *See, e.g., Kessler v. Assocs. Fin. Servs. Co. of Haw., Inc.*, 639 F.2d 498, 499 (9th Cir. 1981); *Manning v. Princeton Consumer Disc. Co.*, 533 F.2d 102, 106 (3d Cir. 1976); *Sellers v. Wollman*, 510 F.2d 119, 123 (5th Cir. 1975); *Graham v. Bank of Damascus, Inc.*, 528 F. Supp. 596, 599 (W.D. Va. 1981); *In re Johnson*, 13 B.R. 185, 189 (Bankr. M.D. Tenn. 1981).

First Commercial cites a handful of cases to the contrary, but most of them predate *New York Gaslight Club* and *Blum. See, e.g., Engle v. Shapert Constr. Co.*, 443 F. Supp. 1383, 1389 (M.D. Pa. 1978). *In re Pittman*, 165 B.R. 586 (Bankr. D. Md. 1994) appears to be the sole post-*Blum* case suggesting that nonprofit legal-services organizations are not entitled to fees under TILA. But the totality of *Pittman*'s analysis of the issue is as follows: "This plaintiff has not offered any proof as to his attorney's fee. Because he is represented by the Legal Aid Bureau, he

may not be required to pay a counsel fee." *Id.* at 588. It is not clear whether the court meant to hold that the plaintiff was not entitled to recover fees; the court went on to grant the plaintiff's motion for summary judgment in part without saying anything further about fees. Assuming that the court was actually denying fees (as opposed to leaving the issue for later resolution), this summary treatment of the issue, bereft of citation to authority, is not persuasive.

First Commercial also cites several cases for the proposition that it is the plaintiff, and not his or her attorney, who is entitled to recover fees under TILA. *See Zeisler v. Neese*, 24 F.3d 1000, 1001 (7th Cir. 1994); *Freeman v. B&B Assocs.*, 790 F.2d 145, 148 (D.C. Cir. 1986). But both *Zeisler* and *Freeman* involved attorneys who asked for an award of fees after their clients had waived their right to seek fees. *Zeisler*, 24 F.3d at 1002; *Freeman*, 790 F.2d at 148. As Coleman has not waived her right to seek fees in this case, these cases are irrelevant. The Court therefore rejects First Commercial's argument that Coleman cannot recover fees because she is represented by a nonprofit legal-services organization.

In the alternative, First Commercial argues that Coleman's fee request is unreasonably large and should be significantly reduced. Having witnessed the progress of this case and the conduct of counsel, the Court strongly disagrees.

The appropriate starting point for calculating a fee award is the lodestar — the number of hours reasonably expended multiplied by a reasonable hourly rate. *See Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1672 (2010) (describing the lodestar method as "the guiding light of our fee-shifting jurisprudence" (citation and quotations omitted)); *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 150 (3d Cir. 2009) (applying lodestar method in TILA case); *cf. Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) ("The standards set forth in this opinion are

generally applicable in all cases in which Congress has authorized an award of fees to a
'prevailing party.'").  First Commercial argues that the Court should instead apply the twelve-
factor test articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.
1974).  But the Supreme Court has repeatedly criticized the *Johnson* test — most recently in
*Perdue*, in which the Court observed that the *Johnson* test gives little guidance to district courts
and produces disparate results by basing the fee calculation on subjective factors.  *Perdue*, 130
S. Ct. at 1671-72.  The Court will therefore begin by calculating the lodestar.

Coleman's attorneys request rates ranging from $210 per hour to $400 per hour, with the
bulk of the time (approximately 255 out of about 325 hours) billed at $275 per hour or less.  The
attorneys billing at $400 and $375 per hour have both been practicing law for over thirty years
and have extensive relevant experience in litigation and real-estate law.  *See* Fargione Aff. ¶¶ 2-
3; Tyson Aff. ¶¶ 2-4.  Amber Hawkins, who bills at $275 per hour and put the most time into this
case, has 11 years of experience in consumer-credit and mortgage-foreclosure cases.  Docket
No. 23 ¶ 2.

The Court disagrees with First Commercial's argument that the requested rates are too
high because this action did not require much legal skill.  Having endured a great deal of poor
lawyering in TILA cases, the Court is grateful to have had the assistance of Coleman's
knowledgeable, experienced, and ethical counsel in this case.  The Court is satisfied that the
requested rates are reasonable.  *See Rand Corp. v. Yer Song Moua*, No. 07-2544 (8th Cir.
Apr. 29, 2009) (order granting $121,142.50 in attorney's fees on appeal in TILA case, which
included work billed at $400 per hour for attorney with thirty years' experience).

-24-

The Court also finds that the number of hours expended — approximately 325 — is reasonable. This case was actively litigated, and much of that litigation was caused by First Commercial's unreasonable behavior. Coleman had to file a motion to compel discovery and a motion for summary judgment due to First Commercial's recalcitrance. After prevailing on summary judgment, Coleman participated in multiple rounds of settlement discussions before Judge Noel. And Coleman has now briefed a number of legal issues — some for the second time, as a result of First Commercial's attempts to relitigate issues that it had already lost — to aid the Court in making its final determination.

In disputing the reasonableness of the fees sought by Coleman, First Commercial makes a number of arguments that are absurd. Prominent among those arguments is First Commercial's contention that because its violation of TILA was so obvious, this litigation could have been resolved with little or no discovery. Yet in its answer, First Commercial *denied* that it had violated TILA. If the TILA violation was as obvious as First Commercial now claims, then First Commercial and its attorneys should be sanctioned under Fed. R. Civ. P. 11 for denying that violation in the answer. It gets worse: After answering, First Commercial continued to refuse to acknowledge its supposedly obvious violation of TILA, forcing Coleman to bring a summary-judgment motion. And yet First Commercial now objects to having to pay for the time that Coleman's attorney spent traveling to and appearing at the hearing on that motion — a motion that was in large part necessitated by First Commercial's wrongful refusal to acknowledge its supposedly obvious TILA violation.

In short, First Commercial's unreasonable conduct both necessitated and prolonged this litigation. In contrast, Coleman and her counsel have acted reasonably and efficiently to bring

-25-

this matter to a conclusion.  The Court therefore finds that the lodestar is properly calculated at $90,165.75.

The Court further finds that there is no reason to reduce this fee to account for the results obtained.  Coleman has prevailed on both her TILA and HOEPA claims.  With the exception of her argument regarding the HRA Loans, she has won all of the relief that she sought.[14]  It is not necessary or appropriate to reduce her fee award under these circumstances.  *See Shrader v. OMC Aluminum Boat Grp., Inc.*, 128 F.3d 1218, 1220 (8th Cir. 1997) ("When a plaintiff obtains substantial relief and the lawsuit consists of closely related claims, the award is not reduced because plaintiff did not prevail on every argument asserted.").  Coleman's motion for attorney's fees is granted.

## D.  Remaining Issues

4.       *Crossroads is jointly and severally liable for the $4,000 in statutory damages and for attorney's fees.*

First Commercial asks that Crossroads be held jointly and severally liable for the $4,000 in statutory damages and for attorney's fees.  Although Crossroads informed the Court that it intended to file a substantive response to that request [Docket No. 63], it never did so.  The Court is unaware of any reason why Crossroads, as the originator of the illegal Loan, should not be jointly and severally liable with First Commercial for damages and attorney's fees.  *See* 15 U.S.C. § 1640(a) (imposing liability for statutory damages and attorney's fees on the "creditor"); 15 U.S.C. § 1602(f) (defining "creditor" to be "the person to whom the debt arising from the

---

[14]First Commercial makes an odd argument that the requested fee award is inequitable because it is disproportionate to Coleman's required tender amount.  The Court cannot understand how the amount of the borrower's tender has anything to do with the reasonableness of the attorneys' fees sought by the borrower.  The one has nothing to do with the other.

consumer credit transaction is initially payable on the face of the evidence of indebtedness").[15]

The Court notes, however, that it has already ordered that the statutory damages be offset against

Coleman's required tender.  Docket No. 39 ¶ 5.  Thus, it will be up to First Commercial to seek

contribution from Crossroads.

     5.    *Great Northern does not appear to be liable to any party.*

The parties have not addressed Great Northern's liability, and Great Northern has not

filed a brief.[16]  It appears that no party is seeking to impose liability on Great Northern, but the

Court cannot be sure.  Accordingly, the parties are directed to inform the Court whether Great

Northern may be dismissed from this action.

ORDER

Based the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

---

[15]First Commercial has never contended that, as the assignee of the illegal loan, it cannot be held liable for fees and damages under TILA.  In fact, by arguing that Crossroads should be *jointly* liable for fees and damages, First Commercial has implicitly conceded that it may be held liable for fees and damages under TILA.

[16]Great Northern's presence in this case may be explained by the fact that the underlying Loan documents at times suggest that Great Northern was the creditor.  So far as the record reveals, Great Northern was owned by one of the principals of Crossroads and would often refer borrowers that did not meet its underwriting criteria to Crossroads.  Whiteis Dep. 9, 12; Bach Dep. 17-18.  Confusingly, the TILA disclosure statement provided to Coleman at the closing identifies the creditor as Great Northern.  Hawkins Aff. Ex. E.  Likewise, the Notice of Right to Cancel provided to Coleman instructed her to send any rescission notice to Great Northern.  Hawkins Aff. Ex. F.  In addition, a Great Northern employee was responsible for sending required HOEPA disclosures on behalf of Crossroads.  Bach Dep. 24.

1. Plaintiff Margaret Coleman must tender $161,186.50 to defendant First Commercial Bank. The tender shall be made in monthly installments in an amount to be determined.

2. No later than 21 days from the date of this Order, plaintiff and defendant First Commercial Bank must meet and confer in an attempt to structure an appropriate payment plan for the tender.

3. If the parties agree on a payment plan, they must submit a proposed order to the Court incorporating the terms of their agreement. The proposed order must include language granting First Commercial Bank a security interest in Coleman's home that is subordinate to any currently existing security interests.

4. If the parties are unable to agree on a payment plan, Coleman must, no later than 35 days from the date of this Order, serve and file evidence of her monthly income and expenses, evidence of a reasonable interest rate, and a proposed order that includes language granting First Commercial Bank a security interest in Coleman's home that is subordinate to any currently existing security interests. No later than 42 days from the date of this Order, First Commercial Bank may submit evidence of Coleman's monthly income and expenses, evidence of a reasonable interest rate, and a proposed order that includes language granting First Commercial Bank a security interest in Coleman's home that is subordinate to any currently existing security interests.

5. Plaintiff's motion for attorney's fees [Docket No. 57] is GRANTED. Defendants Crossroads Lending Group, Inc. and First Commercial Bank are jointly and severally liable to plaintiff for $90,165.75 in attorney's fees.

6.      Plaintiff may move for additional attorney's fees after the Court enters a final judgment in this matter.  *See* Fed. R. Civ. P. 54(d)(2); D. Minn. L.R. 54.3.

7.      Defendant Crossroads Lending Group, Inc. is jointly and severally liable for the $4,000 in statutory damages awarded pursuant to the Court's December 10, 2009 Order [Docket No. 39].

8.      No later than 21 days from the date of this Order, the parties must inform the Court, in writing, whether defendant Great Northern Financial Group, Inc. may be dismissed from this action.

Dated: November  9, 2010                               s/Patrick J. Schiltz

                                                        Patrick J. Schiltz
                                                        United States District Judge

-29-