**EXHIBIT 5**

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 1

1          IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
               THIRD JUDICIAL DISTRICT AT ANCHORAGE
2    ─────────────────────────────────────────────────
3
     DONALD ELLIS and                 )
4    KEWANNA ELLIS,                   )
                                      )
5              Plaintiffs,            )
                                      )
6    vs.                              )
                                      )
7    ALYESKA TITLE GUARANTY AGENCY,   )
     VISTA REAL ESTATE, INC., ARGENT  )
8    MORTGAGE CO., LLC, LITTON LOAN   )
     SERVICING, SOUNDVIEW HOME LOAN   )
9    TRUST, DEUTSCHE BANK NATIONAL    )
     TRUST COMPANY, ALASKA STATE      )
10   MORTGAGE CO., JONATHAN RUF,      )
     KEITH FACER, HOLLI STROUD,       )
11   LANCE LOCKARD, GARY PATERNA,     )
     DON MURRAY, CERISE SANDERS,      )
12   SUSAN McCREADY, CHARLES          )
     CARLSON,                         )
13                                    )
               Defendants.            )
14   ─────────────────────────────────) Case No. 3AN-08-9154 CI
15

16   ─────────────────────────────────────────────────
               DEPOSITION OF DONALD ELLIS
17   ─────────────────────────────────────────────────
18
               Pages 1 - 103, inclusive
19
               February 24, 2010
20
               9:03 a.m.
21
22
          Taken by Counsel for Defendant Vista Real Estate
23                           at
               Offices of Jermain Dunnagan Owens
24               3000 A Street, Suite 300
                   Anchorage, Alaska
25

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 2

```
 1                    A P P E A R A N C E S
 2
      For Plaintiffs:
 3         TIMOTHY D. DOOLEY, ESQ.
           Law Office of Tim Dooley
 4         921 West Sixth Avenue, Suite 200
           Anchorage, Alaska 99501
 5
      For Defendant Vista Real Estate:
 6         PETER SANDBERG, ESQ.
           Sandberg Wuestenfeld Corey
 7         701 West Eighth Avenue, Suite 1100
           Anchorage, Alaska 99501
 8
      For Defendant Don Murray:
 9         KEVIN G. CLARKSON, ESQ.
           Brena Bell Clarkson
10         810 N Street, Suite 100
           Anchorage, Alaska 99501
11
      For Defendant Alyeska Title Guaranty Agency:
12         HOWARD S. TRICKEY, ESQ.
           Jermain Dunnagan Owens
13         3000 A Street, Suite 300
           Anchorage, Alaska 99503
14
      For Defendant Argent Mortgage Company:
15         DAVID T. McGEE, ESQ.
           Dorsey Whitney
16         1031 West Fourth Avenue, Suite 600
           Anchorage, Alaska 99501
17
      For Defendant Johnathan Ruf:
18         SCOTT A. SCHILLINGER, ESQ.
           Paul J. Nangle & Associates
19         101 Christensen Drive
           Anchorage, Alaska 99501
20
      For Jason Wooten:
21         JASON WOOTEN, PRO SE
           3030 Denali Street Suite 9
22         Anchorage, Alaska 99503
23
      Reported By:
24         DEIRDRE J.F. RADCLIFFE
           Shorthand Reporter
25
```

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 3

1                       I N D E X
2

EXAMINATION BY:                               PAGE
3

         Mr. Clarkson...........................4
4       Mr. Sandberg...........................6
         Mr. Trickey...........................50
5       Mr. McGee.............................66
         Mr. Schillinger......................80
6       Mr. Wooten...........................82
         Mr. Dooley..........................101
7

FURTHER EXAMINATION BY:

8

         Mr. Sandberg..........................87
9       Mr. Trickey...........................92
         Mr. McGee.............................98
10
11

EXHIBITS:

12

NO.    DESCRIPTION

13

1    Occupancy Agreement (1 page).....................23
14

2    U.S. Department of Housing and Urban Development
15     Settlement Statement (9 pages)...................25
16

3    Plaintiffs' Responses to Alyeska Title Guaranty
17    Agency's First Discovery Requests Propounded to
     Plaintiffs (8 pages)............................41
18

4    Important Notice to Borrowers (1 page)...........55
19

5    Plaintiffs' Responses to Alyeska Title Guaranty
20    Agency's First Request for Production to
     Plaintiffs (8 pages)............................58
21

6    Addendum or Amendment to the Purchase and Sale
22    Agreement (7 pages).............................83
23

7    Note (2 pages)..................................100
24

8    Adjustable Rate Interest Only Note (3 pages)......100
25

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 4

1                    ANCHORAGE, ALASKA

2              WEDNESDAY, FEBRUARY 24, 2010

3                    9:03 A.M.

4                    -oOo-

5                 DONALD ELLIS,

6        deponent herein, being duly sworn upon

7        oath, was examined and testified as follows:

8                    EXAMINATION

9   BY MR. CLARKSON:

10      Q.    Would you state your full name for the record

11   and spell your last name?

12      A.    Donald Ellis, E-l-l-i-s.

13      Q.    Mr. Ellis, I'm here on behalf of my client, Don

14   Murray.

15            Have you ever met Don Murray?

16      A.    No.

17      Q.    Would you know him if you saw him?

18      A.    Yes.

19      Q.    You would know him if you saw him.  From

20   pictures in the paper?

21      A.    Yes.

22      Q.    From no other reason, though, than pictures in

23   the paper?

24      A.    No.

25      Q.    Do you know if your wife has ever met him?

ELLIS v. ALYESKA TITLE, ET AL.

1      Q.    What exactly did he say about cash flow?

2      A.    I don't specifically remember the exact wording,

3  but I know that the property could generate income for me

4  as the one on Valley Street would be able to.

5      Q.    So he said the property could generate income?

6      A.    Yeah.

7      Q.    Did he say anything else about the income?

8      A.    I don't think so at that time.

9      Q.    What happened next, after that?

10     A.    Went back to look at the property again, and I

11  think we talked more about how it could actually benefit

12  for making some money.

13     Q.    What did he say at that point?

14     A.    I think we talked about the rents, what it could

15  potentially bring in, and then the sale price.

16     Q.    And to the best you can remember, what exactly

17  was said?

18     A.    About?

19     Q.    About the three subjects you just listed for me.

20     A.    Oh, well, the rents, depending on what we would

21  be able to do, it would be anywhere between 14 to 15

22  hundred bucks a month that you should be able to get for

23  it because the -- based on the purchase price.  So really

24  it would kind of fluctuate depending on if we'd be able to

25  get into it.

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

1    Q.    In your opinion, is that number a pretty

2    reasonable rent for the --

3    A.    For the area, at the time --

4    Q.    At the time.

5    A.    At the time, yeah.

6    Q.    Actually, as long as we're talking about it,

7    what do you think the rental value is right now?

8    A.    Right now?

9    Q.    Yeah.

10    A.    What you could charge a month?

11    Q.    Yeah.

12    A.    You could probably get away with 1,350.

13    Q.    1,350?

14    A.    Yeah.

15    Q.    And it would be somewhere in between that for

16    the period between when you bought it and now?

17    A.    You mean --

18    Q.    I mean, has it been kind of just a downward

19    slope to 1,350, about?

20    A.    Yeah.  I would say -- I mean, I guess you can

21    charge whatever the market can bear, but I would say in

22    that area what I would be willing to pay would be between,

23    you know, 1,350 and maybe 12, just depending on, you know,

24    how the unit looks and all that kind of stuff.

25    Q.    Sure.  Did he say anything else to you about

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 32

1            And so you said that when the -- when you moved

2   into Unit B, the place, the tenant had trashed it; is that

3   right?

4      A.   Over the course of his staying there, yeah.

5      Q.   Do you contend that the costs for that are in

6   any way the fault of any party to this lawsuit?

7      A.   Unless the tenants are part of the lawsuit, no.

8      Q.   Were you able to rent out the area of the place

9   that you had previously been living?

10     A.   Once we moved out, yeah.

11     Q.   What did you rent that out for?

12     A.   1,050 for side A, and then my side was 1,050 as

13   well.  They were both 1,050.

14     Q.   And previously you had been renting out A but

15   not B?

16     A.   Yeah.

17     Q.   And has that continued?

18     A.   Renting both sides out?  Yeah.

19     Q.   Has the rental rate stayed the same?

20     A.   No.  Side B went down to 980.

21     Q.   Okay.  So it looks to me like you were able to,

22   through rental income, pay your mortgage on the Bitterroot

23   property during the three-year period; is that correct?

24     A.   Yeah.

25     Q.   And so were you using that 45,000 to pay your

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 33

1   mortgage or --

2      A.   Yeah.  It was roughly 600 or so a month to

3   offset the rents that were coming in versus money that was

4   in the bank for the cash back.

5      Q.   What was your plan if you were unable to sell

6   the Bitterroot place at the end of the three years?

7      A.   I guess there wasn't really a plan.  The whole

8   idea was to be able to sell it.  So that was the -- kind

9   of my reasoning, you know, talking with Keith.

10      Q.   So you didn't have a plan B?

11      A.   No.

12      Q.   What exactly did you and Keith talk about

13   regarding that subject?

14      A.   Just, as I stated earlier, you know, getting --

15   getting the cash back would help me for a three-year

16   period, and then afterwards I should be able to sell it

17   with no problems.  Because the market at that time was

18   going pretty strong, so there was really no concern like

19   oh, I'm not going to be able to sell this place.

20      Q.   Did Keith tell you the market was always going

21   to be strong?

22      A.   I don't know if that's -- were his exact words,

23   it's always going to be strong, but I mean, that's the --

24   that was the, you know, understanding, just that, you

25   know, based on it, I think everybody thought it was going

ELLIS v. ALYESKA TITLE, ET AL.

1    to be pretty strong.

2         Q.   So you're basing it just kind of in 2005 the

3    real estate market had been going strong and looked like

4    it was going to?

5         A.   Yeah.

6         Q.   Did you guys talk about anything else involving

7    appreciation of the property or depreciation or anything

8    else?

9         A.   I don't remember talking about appreciation,

10   depreciation.

11        Q.   So you bought it just -- I know a lot of people,

12   it's the same thing, but you bought it just assuming that

13   the prices would keep going up, and therefore, you would

14   be able to sell at the end of the ARM?

15        A.   Yes.

16        Q.   Is there anything else about that subject that

17   you discussed with Facer that we haven't already covered?

18        A.   No.   I mean, it was just pretty -- I think just

19   trying to reassure me that everything is going to be all

20   right.

21        Q.   Okay.   What did he say exactly?

22        A.   I don't know exactly.

23        Q.   As close as you can.

24        A.   You know, I just remember us talking about, you

25   know, it's going to be all right.   Things are going to

ELLIS v. ALYESKA TITLE, ET AL.

DONALD ELLIS
2/24/2010

Page 71

1    A.    That my rate would go up in three years.

2    Q.    Did that concern you?

3    A.    Not at first.

4    Q.    Why not?

5    A.    Because after you did the closing and

6  everything, it wasn't that big of deal.  Because I talked

7  with Keith and kind of got the reassurance that I'd be

8  able to sell the place and the market is strong and kind

9  of had my -- my fears or worries alleviated based on that.

10    Q.    Did you expect to still own the property in

11  three years?

12    A.    No.  I wanted to sell it.

13    Q.    So it was your expectation, if I can rephrase,

14  that you never would have to pay the increased rate on the

15  mortgage because you would have sold it by then?

16    A.    Yeah.  And in worst case, refinance.  But yeah.

17    Q.    Were you ever given any indication that you

18  would be allowed or able to refinance?

19    A.    Well, yeah, I mean, you talk to Jason and it's

20  like, you know, you got -- it's a pretty simple process.

21    Q.    What did Mr. Wooten or anyone else tell you

22  about the possibilities of refinancing?

23    A.    Just that you want to do it before your ARM is

24  up so that way you don't have to go through the higher

25  payment.