# EXHIBIT 5

# Declaration of Shari Nestor, Escrow Professional
# Re: Blanket Closing Protection Letters      February 15, 2010

I, Shari Nestor, declare as follows:

**Qualifications**

    I started my career in the Title & Escrow Industry as an entry level employee (Policy Typist) and worked my way through the ranks (Escrow Receptionist, Escrow Secretary, Assistant Escrow Officer, Escrow Officer, Branch Manager, to Vice President of Escrow Operations) over a 30 year time period. (See Resume/CV attached).

    I currently provide temporary and contract employees, closing services, employee training, escrow audits and other services specifically directed to the Title & Escrow Industry in my capacity as President and Founder of **Professional Escrow Resources, LLC**.

**Materials Reviewed**

    I've reviewed the following materials in developing my opinion in this case:

1. Exhibit "Scott #9" Ticor Closing Protection Letter ("CPL") Log;
2. Exhibit "Scott #10" CPL Dated Friday, April 30, 2004;
3. Exhibit "Scott #12" Ticor CPL Log;
4. Exhibit "Scott #11" CPL Dated Tuesday, June 8, 2004;
5. Exhibit "Scott #15" CPL Dated Tuesday, May 18, 2004;
6. Exhibit "Scott #16" CPL Dated Tuesday, August 24, 2004;
7. Exhibit "Scott #17" CPL Dated Monday, November 22, 2004;
8. Exhibit "Scott #18" CPL Dated Wednesday, September 15, 2004;
9. Exhibit "Scott #19" CPL Dated Monday, January 31, 2005;
10. Exhibit "Scott #20" CPL Dated Tuesday, October 18, 2005;
11. Exhibit "Scott #21" CPL Dated Wednesday, February 22, 2006;
12. Exhibit "Scott #22" CPL Dated Tuesday, April 25, 2006;
13. Exhibit "Scott #27" Model CPL from American Land Title Association;
14. Exhibit "Scott #28" Model CPL from American Land Title Association;
15. Exhibit "Scott #29" Model CPL from American Land Title Association;
16. Exhibit "Scott #31" Model CPL from American Land Title Association;
17. Exhibit "Scott #30" ALTA discussion re: CPL forms);
18. Exhibit "Scott #32" Model CPL from American Land Title Association;

19. Exhibit "Scott #33" Master CPL Dated May 24, 1999, Fidelity National Title issuing to ABN AMRO Mortgage Group;
20. Exhibit "Scott #34" Master CPL Dated October 13, 2005, Fidelity National Title Issuing to Ameriquest Mortgage;
21. Exhibit "Scott #35" CPL Dated October 19, 2005 (Single Transaction);
22. Exhibit "Scott #36, 2-4-10" CPL Dated October 19, 2005;
23. Exhibit "Scott 41" AgentTRAX log for User Northwest Title & Escrow Corp.;
24. Viewed http://www.AgentTrax.com Website and Video "LetterTRAX How to create and maintain closing protection letters"
25. CPL printed 7/30/2003 from http://www.illinois.ticortitle.com/sections.placeorder/icl_letter.asp Website issued to Argent Mortgage Company, LLC

**Brief Summary of Dispositive Facts**

At issue in this matter is whether CPLs were issued to Ameriquest Mortgage Corporation by Ticor Title Insurance Company that cover loan transactions which occurred in 2004 through 2006. The claim of Ticor Title Insurance is that CPLs were not issued which cover the transactions and denies that it issued to Ameriquest Mortgage Corporation any blanket CPL. Ameriquest Mortgage asserts that blanket CPLs were issued and the documents produced by Ameriquest Mortgage reflect blanket CPLs including the CPL issued by Ticor Title Insurance Company, dated Tuesday, October 18, 2005, to Ameriquest Mortgage Company which is identified as *Exhibit "Scott #20"*, together other similar CPLs issued by Ticor Title Insurance to Ameriquest Mortgage Company.

A Closing Protection Letter ("CPL") is a form typically requested by a Mortgage Lender from a Title Insurance Company (the underwriter) for those transactions and real estate loan closings that are being conducted by an Agent of the Title Insurance underwriter. Title Agents are authorized by Title Insurance Companies to sell Title Insurance Policies. Many Agents sell Title Insurance Policies for more than one Underwriter and a CPL is typically requested by Mortgage Lenders on practically every loan closing transaction, including refinances.

CPLs originally were not title industry approved forms as they are now (see *Exhibits "Scott #27", "Scott #28", "Scott #29", "Scott #31", "Scott #32"*) but were forms requested by Mortgage Lenders to protect against unauthorized and fraudulent actions or failure of a Title Insurance Company's authorized and approved closing Agent to comply with the Lenders' closing instructions. Since CPLs came into use in the industry, the form commonly is the "Blanket" form of the CPL. A "Blanket" or "Master" CPL covers multiple transactions and real

estate loan closings. Single transaction limited liability CPLs offer similar protections given in the Blanket or Master CPL, but it's protections are limited to a specific real estate transaction.

The following facts have been obtained from documentation provided by counsel and I have relied upon them in consideration of this case:

1. My review of **Exhibits "Scott #9" & "Scott #12"** which are Ticor Title's Closing Protection Letter ("CPL") Logs, demonstrates that Ticor Title allowed unlimited access to the "User" ("User" being a Title Agent "employee") to issue CPLs to various Lenders in multiple States, thereby extending to those various Lenders all of the protections given in the CPLs. The logs show evidence that the CPLs refer sporadically to a particular property address and/or loan number. **Exhibit "Scott #12"** Ticor Title's CPL Log exclusively reflects the creation of CPLs by "User" Tristar1301 and the pattern remains unchanged from the different "Users" on **Exhibit "Scott #9"**. Both Logs show CPLs created in 2004, 2005 & 2006, with **Exhibit "Scott #12"** (Tristar1301 "User") showing CPLs also created in the years 2003 and 2007.
2. **Exhibits "Scott #10" & Scott #11"** are examples of CPLs that were issued from the Website to different Lenders that reference no particular loan, property or borrower. **Exhibits "Scott #15 & Scott #16"** are examples of CPLs that are directed to the attention of "Closing Letters", which presumes blanket coverage. **Exhibit "Scott #17"** is an example of a CPL where a reference number (TTC04-07960) is given and is directed to the attention of "Insurance Servicing" and **Exhibit "Scott #18"** is simply to the attention of an individual (presumably an individual employed by the Lender, Town & Country Credit). The varying ways in which the CPLs are addressed and referenced are further indications that no significance is attached to the manner in which the CPLs are addressed and referenced.
3. **Exhibit "Scott #20"** is a CPL issued to Ameriquest Mortgage Company, and resembles other CPLs reviewed. It is directed to the attention of "Closing Letters", which implies blanket coverage. The body of the CPL reads (in part) as follows: "When title insurance of Ticor Title Insurance Company (the "Company") is specified for your protection in connection with **closings** of real estate **transactions** in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the Company....hereby agrees to reimburse you for actual loss incurred by you in connection with such **closings** when conducted by an Issuing Agent..." [emphasis mine]. It is clear that the verbiage of the letter is, was and always has been intended to be blanket coverage inclusive of ALL (plural) **closings** of ALL real estate **transactions**. The CPL's verbiage is not written in the singular as it would be if a particular transaction had to be designated. It refers to plural (closings and transactions), as does the CPL to Encore Credit Corporation, ISA in **Exhibit "Scott #22"**.

4. The particular CPL Ameriquest Mortgage Company received from Ticor Title Insurance Company dated Tuesday, October 18, 2005, as well as the CPLs shown in **Exhibits "Scott #11, #15, #16, #17, #18, #19, #20, #21, #22, #33, #34, #36** and the **CPL printed 7/30/2003 from http://www.illinois.ticortitle.com/sections.placeorder/icl_letter.asp Website issued to Argent Mortgage Company, LLC** were derived from the American Land Title Association's Model "Closing Protection Letter – Regulatory Adopted 10-17-98 Section VI-2 (a)" (see **Exhibit "Scott #28"**). Ticor Title Insurance Company was a member of the American Land Title Association in October of 2005 when the CPL was created. This Model CPL has a Re: Line which says "Closing Protection Letter", equivalent to the "Re: Closing Letters" line on the CPL issued by Ticor Title Insurance to Ameriquest Mortgage Company (see **Exhibit "Scott #20"**).

   The American Land Title Association also had available to its members in October of 2005 a Closing Protection Letter – Single Transaction Limited Liability Adopted 10/17/98 Section VI-2(c) (see **Exhibit "Scott #29"**). The fact that there did exist (and currently does exist) a separate single transaction limited liability closing protection letter that was available to Ticor Title Insurance Company that was not used or promoted to its Agents and their Lender customers, is more evidence that the intention of the CPL issued by Ticor Title Insurance Company to Ameriquest Mortgage was and is intended for the purposes of applying to all real estate closings and transactions by the Agent.

5. My review of **Exhibit "Scott #29" & "Scott 32"** shows that the language in these single transaction CPLs differs from the language used in the blanket CPLs, in that the language in these two Models are clearly single transaction specific. In my years of experience conducting thousands of real estate closings, I cannot recall an occasion where the single transaction CPL was used, nor did any Title Insurance underwriter suggest or encourage that a single transaction specific CPL be utilized.

6. I have reviewed **Exhibit "Scott #41"** which is a recent (2005 to the present time) AgentTRACK "User" log for Agent Northwest Title and Escrow Corp. This log also demonstrates that the "Re" lines are used sporadically (in the same way represented in the logs on **Exhibits "Scott #9 & #12"**).

## Conclusion

The basis for my conclusions(s) are premised upon my training, experience, education, knowledge of escrow and title industry standards and procedures, analysis and study in the field, through seminars and the facts of the case presented and the materials reviewed. My conclusion(s) are based upon a synthesis of the above.

I presently hold the following opinion(s) to a reasonable degree of professional certainty:

The Title Insurance Industry issues CPLs liberally and without scrutiny. There is no additional charge or cost associated with issuing a CPL. In the 1980's to the early 1990's (for example), it was typical that only one CPL was issued by a Title Insurance Underwriter for each Lender offering protection for each of their Agents. This form is known as a "blanket" or "master" CPL. Mortgage Lenders relied upon one active and current CPL for all of the real estate closings and transactions that closed with a particular Agent on behalf of a particular Underwriter. With the proliferation of Approved Attorney Closing Agents, Title Agencies and Mortgage Companies that came into existence in the 1990's, Lenders and Loan Processors began to lose track if a current CPL already existed. Most likely, its existence would be known only to the legal departments of the Underwriter and Mortgage Lender. This situation was exacerbated when many of the Approved Closing Attorneys or Title Agencies had multiple Title Insurance Underwriters to choose from. It became more expedient for the Loan Processor to request a CPL on each loan transaction, rather than to verify if a current CPL was already on file from the correct underwriter for the correct Agent.

It was never the intention of the various Title Insurance Underwriters to re-create a new CPL on each and every transaction. In fact, an Agent's request for a CPL to be issued to a Lender was initially met with resistance because there usually already existed a valid and enforceable CPL for that Agent and Lender. This response likely was a result of the Underwriter being inundated with multiple requests. Title Insurance Underwriters ultimately acquiesced to the requests from the Agent and Mortgage Lender customers because they understood that customer service trumped their legitimate reasons for not doing multiple CPLs when a single CPL sufficed to cover all future transactions.

Technology provided the Underwriter a workable solution, which is to have the Agent log onto the Underwriter's website and create the CPL without restraint. The Agent may issue the CPL to any Lender and has the option to customize the Letter to identify or reference a particular transaction. The ability to customize the CPL is a fairly new feature. It is my experience and observation that this feature was added to blanket CPLs in the early 2000's. This feature was accomplished by adding a field for the Agent to insert information on a "Re:" line of the letter. This field or "Re:" line was added to the blanket CPLs at the request of Mortgage Lenders so that the Mortgage Lender could tie the CPL to a transaction. The customizing of the Letter is at the discretion of the employee of the Agent, usually at the request of the Mortgage Lender, and does not in any way limit or enhance the protections offered the CPL. The form of the CPL has not changed. They were blanket CPLs in the past and continue to typically be blanket CPLs, notwithstanding the repeated issuance.

I have reviewed the AgentTrax.com website. This is the same website that is used by Agents for all Fidelity National Financial subsidiaries (Fidelity Title, Chicago Title, Ticor Title, etc.) to create CPLs for Mortgage Lenders. This website allows for flexibility of the Agents to input a reference number, borrower or property. There is no significance attached to identifying a particular property, borrower, or loan, therefore no rule or specific instruction is given to the "User" when creating the CPL. This option exists at the request of Mortgage Lenders to accommodate their ability to tie the CPL to a transaction.

The User has various entries to make on the Website to create the CPL. The Instructor on the video "LetterTRAX How to create and maintain closing protection letters" simply says when describing the "box" to create the "Re" line on the CPL *"The Regarding Agent File number field can be used to enter your file number and/or property address. There is no limit of characters in this field."* (see video @04:58-05:07) The "Demo" Letter created on the video "LetterTRAX How to create and maintain closing protection letters" shows no reference number, borrower or property (see video @08:14/09:34). This same video shows a "Welcome" Page for Users. In reference to LetterTRAX the User reads: *"For those closing states where a blanket CPL (meaning no transaction information is needed on the letter) is accepted, leave the Re: Agent File # field blanket to complete your letter."* (00:17). These examples are further clarification from Ticor Title Insurance Company's approved website that completion of the Re: (Agent File #) is optional and non essential.

Closing Protection Letters are not to be deemed by the recipient (in this case, Ameriquest Mortgage) to have been issued by the Agency being sanctioned in the CPL, but like the Title Policy itself, the guarantees are directly from the underwriter. In this case the underwriter is Ticor Title Insurance Company. The CPL includes assurances from Ticor Title to *"reimburse for actual loss incurred in connection with such closings when conducted by an Issuing Agent (an agent authorized to issue title insurance for the Company) when such a loss arises out of...... 2. Negligence of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings."* Ticor Title Insurance Company made a business decision to grant authority to their Agents to create a CPL as evidenced by the AgentTrax.com website. One of the protections given by Ticor Title Insurance Company in the CPL is negligence of the Issuing Agent in handling documents. If completion of the "Re: File Agent # "line were of any importance to the protections provided in the CPL (which for the reasons set forth above, it is not) this protection would include the manner in which their Agent completed the CPL. Ticor Title's position that their Agent filled out the CPL incorrectly and therefore Ameriquest Mortgage is denied the protections given in the Letter, is in direct contradiction to the intent of the CPL and exposes hypocrisy that devalues the worth of the stated purpose of the CPL to any entity or person to whom it is issued.

It is my opinion that Ticor Title cannot simultaneously offer the protection from negligence of their Agent in handling documents, and deny those same protections due to the alleged negligence of their Agent to complete the Letter properly.

In summary, *Exhibits "Scott #11, #15, #16, #17, #18, #19, #20, #21, #22, #33, #34, #36* and the *CPL printed 7/30/2003 from http://www.illinois.ticortitle.com/sections.placeorder/icl_letter.asp Website issued to Argent Mortgage Company, LLC* are all forms of blanket CPLs. Accordingly, all of the CPLs on the log for Ameriquest Mortgage are blanket CPLs.

1. I declare under penalty of perjury that the foregoing is true and correct.
2. Executed at Scottsdale, Arizona, this 15th day of February, 2010.

_____
Shari Nestor

## LITIGATION SUPPORT
*(Escrow, Settlement Agent)*

**SHARI NESTOR**
4902 East Karen Drive, Scottsdale, AZ 85254
Contact Telephone (602) 622-5569
Fax Telephone (602) 569-5588



E-Mail: Shari@ProfessionalEscrowResources.com
Company Web Site: www.ProfessionalEscrowResources.com

---

## QUALIFICATIONS

*Founder and President of* **Professional Escrow Resources, LLC**, **Shari Nestor** *has over 30 years experience in the area of Title, Escrow, Marketing & Sales of Real Estate Related Services, Loan Processing and Real Estate Development. Ms. Nestor has created curricula and taught classes to Real Estate Agents, Mortgage and Commercial Lending Officers and Escrow Personnel. She has created and/or assisted in creating training manuals for office staff. Additionally Shari Nestor has written and implemented Marketing Plans and authored articles for industry related newsletters. She has assisted her staff and co-workers in their career pathing to achieve their professional and personal goals. Notary Public in Arizona for more than 28 years. Notary Public in California for 4 years.*

## TEACHING & TRAINING SEMINARS & CURRICULM

- <u>Understanding the Escrow Process</u>, *written and presented by* **Shari Nestor** – *Fidelity National Title Insurance for Real Estate Agents in the Community, 1988 - 1990.*
- <u>The Closing Process</u>, *written and presented by* **Shari Nestor** – *Saturday Classes for Cendant Relocation Services, September/October 1995.*
- <u>Revised "Understanding the Escrow Process"</u>, *written and presented by* **Shari Nestor** – *Various local Real Estate Offices including Prudential Arizona Realty; Coldwell Banker Success, Realty Executives, 1995-1996.*

Page 1 of 6

- *Peer Training Skills Employee Course*, First American Title 1998.
- *Comparing Eagle Policy to Plain Language & Standard Policies*, prepared and taught by **Shari Nestor** - First American Title Insurance 1999.
- *Explanation of Endorsements*, classes prepared and presented by **Shari Nestor** to Commercial Lenders (including Arizona Business Bank, National Bank), 2006.
- *Seminar on Proposed Uniform Closing Instructions*, written and presented by **Shari Nestor** – Professional Escrow Resources, at Orange Tree Golf Resort attended by Presidents and Escrow Operation Managers of various Title Companies in Arizona, April 2008.
- *Training Seminar on Proposed Uniform Closing Instructions*, written and presented by **Shari Nestor** for Escrow Personnel of Arizona Title Agency, June 2008.
- *Mastering The Art of Oral Presentation*, full day Seminar by **Michael D. Schwartz, Esq.** Los Angeles County, Ca Prosecutor. Multimedia program designed to teach and develop oral presentation skills and techniques in the Expert Witness context including how to deliver successful presentations to judges, juries and clients including presentations to inform, pursued and rebut. February 28, 2009; Refresher Course October 2009 (7 CPE Credit hours- Consulting Services Curriculum).
- *The Jury*, **Edi M.O. Faal, Esq.** The focus of the Presentation was on the jury – the make-up of the jury, their backgrounds and how it affects his selection, how he studies and prepares, what he looks for in experts, and how he communicates – all as it relates to expert witnesses.
- *The Use of Experts in High Profile Cases*, **Thomas A. Mesereau, Jr., Esq.** Spoke on his experience in using experts in high profile cases; what he looks for and what he expects in an expert witness. February 27, 2009.
- *Legal Ramifications for Expert Witnesses*, **Lewis J. Soffer, Esq.** Discussed his case for *Lambert v. Carneghi* as it was presented before the California Court of Appeal. He presented the facts of the case, the results and what they may mean for experts.
- *A View of Experts From the Criminal Court*, The **Honorable Allen J. Webster, Jr.** Judge of the Los Angeles Superior Court provided a look at what he sees in experts day in and day out – their preparation, demeanor, consistency, how they deal with cross-examination and prosecution. February 27, 2009.
- *A View From the Federal Bench*, Presentation by **The Honorable David O. Carter** of the US District Court for the Central District of California. This Class focused on selected federal rules of evidence and procedures, Daubert and other federal rules, what they mean and how they differ, and what it all means for experts. February 27, 2009.
- *Loan Modifications and Workouts*, **Bahar Schippel, Esq. Snell & Wilmer LLP and Bill Kastin, Esq. Snell & Wilmer, LLP,** Presenters, April 2009.
- *National Notary Association*, Certified and Background Screened – Notary Signing Agent.

## *EXPERIENCE*

*2007 - Current*
**PROFESSIONAL ESCROW RESOURCES, LLC/Founder & President**
*The concept for Professional Escrow Resources was conceived by Shari Nestor in 2007. The Company's vision and purpose is to be a support to Escrow Service Providers by being a ready resource for Escrow Personnel on Demand, training of new and existing escrow personnel, closing services and mini and/or sub escrows.* **Professional Escrow Resources, LLC** *is the industry's partner and a resource in any market.*

*May 2006 to January 2007*
**PIONEER TITLE AGENCY/Vice President/Escrow Department**
*Pioneer Title Agency opened their first branch in Maricopa County in Scottsdale Arizona on May 1, 2006. Ms. Nestor was recruited to be the Escrow Administrator for Maricopa County with the additional responsibilities of Sales and Marketing for all of Maricopa County. The daily operation of the Escrow Department, including recruiting and training of all escrow personnel, putting into place all accounting procedures and management of the entire escrow process and files fell under her responsibilities as Escrow Administrator.*

*April 2002 to May 2006*
**ARIZONA TITLE AGENCY/Vice President/Branch Manager**
*Opened and managed Arizona Title Agency's Paradise Valley Branch Office. Her responsibilities included the processing of all Real Estate transactions, i.e. residential, commercial, refinance, land acquisitions, hard money lending, personal financing secured by real property, and any and all transactions requiring an escrow agent.*

*May 1992 to October 2001*
**FIRST AMERICAN TITLE INSURANCE COMPANY/ Branch Manager/Sr. Escrow Officer**
*The first year of her career with* **First American Title**, *Ms. Nestor was employed as a* **part time** *Escrow Officer at the Esplanade Residential Branch. The only transactions being processed in the branch at that time were the refinances of loans on real property by financial institutions. Within a few months of Ms. Nestor electing to work* **full time,** **First American Title** *offered her the position of Branch Manager. She accepted the position and the focus of the branch immediately changed from a branch that processed refinances to high end residential resale transactions, with a small amount of commercial transactions. The marketing of commercial transactions was limited primarily due to conflict with the existing next door office of a* **First American Title Commercial Branch**. *The retention of profit at the Esplanade Residential Branch increased from 25-30% to an average of 49% retention.*

*The Esplanade Office was located at 2525 East Camelback Rd, in Phoenix at the Esplanade Towers. Operating just down the street was yet another* **First American Title** *Branch Office located at 2929 East Camelback. When the lease at the Esplanade Office expired and the escalating costs to renew the lease were considered, together with the close proximity of the other two branch offices, the "2929 East Camelback Branch" and*

the "Esplanade Residential Branch" merged and operated out of the 2929 East Camelback location. Ms. Nestor took over as Manager of the combined offices in January 1997 until her departure from **First American Title** in October 2001. The office was known as the Biltmore Branch of **First American Title** and it dominated the market in the territory.

*April 1991 to May 1992*
Ms. Nestor made a decision to stay home with her newborn son, born in April of 1991.

*June 1990 to April 1991*
**GRAND CANYON TITLE AGENCY/Branch Manager/Commercial Escrow Officer**
Ms. Nestor was hired as Grand Canyon Title's only Commercial Escrow Officer and co-managed their Biltmore Branch Office together with a Residential Branch Manager.

*February 1985 to June 1990*
**FIDELITY NATIONAL TITLE INSURANCE/Branch Manager/Sr. Commercial Escrow Officer**
Prior to accepting the position with **Fidelity National Title** Ms. Nestor had been a full time stay at home mother to her two older sons for the previous 4 years. Ms. Nestor was hired as an assistant to Bonnie McCoid, **Fidelity National Title's** Commercial Escrow Officer and Main Office Branch Manager. The 2nd week on the job, Ms. McCoid left for vacation and the closing of an 11 million dollar commercial transaction became the responsibility of Ms. Nestor. Shari Nestor was promoted to a Branch Manager 1 ½ years later, with her primary Customer base generating commercial transactions. During her employment with **Fidelity National Title,** Ms. Nestor was transferred to 4 different branches as Manager the following 3 years. **Fidelity Title's** administration believed that Shari Nestor's physical location was not a consideration for the Customers, due to their demonstrated loyalty. Shari Nestor felt that the instability had a negative impact on her career and resigned.

*May 1981 to February 1985*
Ms. Nestor stayed home with her two eldest boys born June 1, 1981 and October 24, 1983.

*1979-1981*
**MINNESOTA TITLE AGENCY/Escrow Officer/Branch Manager**
**USLIFE TITLE AGENCY/Escrow Officer**

*1977-1979*
**TRANSAMERICA TITLE INSURANCE COMPANY (SAN DIEGO, CA)/Escrow Secretary/Assistant Escrow Officer/Escrow Officer/Branch Manager**
Shari Nestor moved to San Diego, CA from Phoenix in 1977 and obtained an entry level position at **Transamerica Title Insurance Company.** She was quickly promoted to Assistant Escrow Officer, then Escrow Officer. Ms. Nestor (then known as Shari Capell) requested to manage an office for **Transamerica Title's Hillcrest Office**. Ms. Nestor (nee Capell) had no experience at this time managing and had never handled a

*"Commercial"* transaction. *In 1978 the Hillcrest Branch of* **Transamerica Title** *was a* **Commercial Br**anch Office. *Her time at that particular branch lasted only 2 weeks, however she was transferred to* **Transamerica Title's College Branch** *as Branch* **Manager**. **The** *College Branch was a slow producing residential office situated directly between* **Southe**ast San Diego (low-end homes) and the more upscale community of Del Cerro. *Ms. Nestor stayed at the College Branch of* **Transamerica Title Insurance Company** *as Br*anch Manager until she moved back to Phoenix 1 ½ years later. *When she left* **Transam**erica Title *there was a substantial increase in the Real Estate Agent and Broker Customers from Southeast San Diego, and strong penetration into the Del Cerro market. At that time, Shari Capell (Nestor) was the youngest Branch Manager for* **Transamerica** *Title Insurance Company in San Diego County and when she left San Diego her Bran*ch was the Number 1 Branch in the County.

### 1975-1977
**DEL WEBB RE**ALTY MANAGEMENT/Secretary to Marv Todd/Vice President of **Property Manag**ement

### 1974
**HOLLIDAY &** ASSOCIATES/Secretary to Al Holliday Owner of Court Reporting **Firm**

### 1971-1974
**LAWYERS TIT**LE OF ARIZONA/Escrow Receptionist
**ARIZONA TITL**E/Escrow Receptionist

### 1970-1971
**FIRST ARIZO**NA TITLE (subsequently USLIFE TITLE, subsequently ATI TITLE) /
**Policy Typist - T**itle Department

## EDUCATION

- *Graduated from Paradise Valley High School, Phoenix, Arizona*
- *Attended Phoenix College, Phoenix, Arizona*
- *Arizona Real Estate School, Arizona Real Estate License - Obtained her Real Estate License in 1975 - Moved to San Diego, CA & License was deactivated (Returned to Arizona in 1979 and regained Real Estate License which was never activated due to her career in Escrow & Title - conflict of interest)*
- *Graduate TimeMax Mind Masters Institute 1998, Mesa, Arizona*
- *Management Seminar (Personnel & Employment Issues), Department of Development & Training, First American Title, April 8, 1994, Phoenix, Arizona*
- *Workshop <u>Creating Your Marketing Action Plan</u>, Sales & Marketing, First American Title, January 1995, Phoenix, Arizona*
- *Workshop <u>Developing Your Unique Selling Proposition</u>, Sales & Marketing, First American Title, January 1995, Phoenix, Arizona*

## *PROFESSIONAL ORGANIZATIONS*

*Arizona Escrow Association*
*American Escrow Association*
*Affiliate Member of Mortgage Bankers Association*
*San Diego Escrow Association 1977-1979*
*CREW - Arizona Chapter of Women in Commercial Real Estate 1985-1990*
*National Notary Association*
*FEWA – Forensic Expert Witness Association*

## *PERSONAL GOALS & INTERESTS*

*Family, friends, the community.*
*Enjoy playing golf, sports, reading, (biographies and non-fiction) current events.*
*Currently a volunteer for Crisis Pregnancy Center*