# EXHIBIT 6

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ROSE TERRY, et al.,

    Plaintiffs,

vs.　　　　　　　　　Case No. 1:08-cv-2475

AMERIQUEST MORTGAGE COMPANY, et al.,

    Defendants.

_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

The Videotaped Deposition of ETHAN POWSNER,

Taken at 300 Ottawa Avenue, N.W., Suite 700,

Grand Rapids, Michigan,

Commencing at 9:09 a.m.,

Friday, January 15, 2010,

Before Leisa M. Pastor, CSR-3500, RPR, CRR.

| | | |
|---|---|---|
| 1 | Q. | Is there a particular person in the Legal department |
| 2 | | that you recall was sort of the one pushing out the |
| 3 | | communication regarding Closing Protection Letters? |
| 4 | A. | The one -- the name I remember is at a seminar would |
| 5 | | be a -- or one of the company functions, Donald Cole. |
| 6 | Q. | And do you know how to spell his last name? |
| 7 | A. | C-o-l-e. |
| 8 | Q. | Do you know if he's still with the company? |
| 9 | A. | I believe he's still with the company. |
| 10 | Q. | Is there anyone else, other than Mr. Cole, that you |
| 11 | | can recall, who would have been responsible for |
| 12 | | issuing communications regarding Closing Protection |
| 13 | | Letters? |
| 14 | A. | There's another attorney, Alex Ricks. I don't know if |
| 15 | | it's R-i-c-k-s, or -- I believe it's -- finish the |
| 16 | | sentence -- R-i-x, I think it's R-i-c-k-s, but... |
| 17 | Q. | Do you know where Mr. Cole is based out of, his |
| 18 | | location? |
| 19 | A. | I'm not certain whether he's in California or in |
| 20 | | Jacksonville. |
| 21 | Q. | Okay, and how about Mr. -- is Alex a man or a woman, |
| 22 | | do you know? |
| 23 | A. | I thought it was a man. |
| 24 | Q. | Okay. |
| 25 | A. | But I'm not sure, either, whether he's in -- which -- |

Page 52

1. 2004, but I can't tell you whether it was 4, 5, or 6.
2. Q. And do you remember during that earlier time period in 2004 to 2006, in what context a conversation regarding Closing Protection Letters would have been raised?
5. A. No, other than general update.
6. Q. Do you have any specific recollection of the substance of any of the discussions regarding Closing Protection Letters at the conference or meetings that you attended?
10. A. The only -- I have a recollection, but I don't know where it came from.
12. Q. What's the recollection that you have?
13. A. You can't do blanket Closing Protection Letters, you meaning, people at my level or -- obviously below.
15. Q. And do you -- do you recall what time period you would have received that directly?
17. A. No.
18. Q. Do you know whether it was in 2004?
19. A. I don't -- I really don't remember when.
20. Q. Do you remember what the circumstance was that caused that directive to be issued?
22. A. No.
23. Q. Do you remember who issued that directive?
24. A. Someone in legal on a...
25. Q. Do you recall how that directive was communicated to

Page 60

```
 1       you?
 2  A.   That's the part I don't remember, whether it came at
 3       one of these conferences or whether it was an e-mail.
 4  Q.   Do you know whether that's a recent directive, or
 5       something that's been out there for a while?
 6            MR. FOWERBAUGH:  Well, objection, asked and
 7       answered, but...
 8  A.   It's not recent, it's -- I'd say it's a few years old.
 9  BY MS. DAVIES:
10  Q.   Okay.
11  A.   But I don't know how many.
12  Q.   If you needed to find out when that directive came
13       out, what would you do in order to find that out?
14  A.   Donald Cole's office.
15  Q.   You would call Donald Cole?
16  A.   I'd call his office.  I don't know if I'd get through
17       to him, but...
18  Q.   You were an operations manager for a while, within the
19       Fidelity brand of companies; isn't that correct?
20  A.   Yes.
21  Q.   And how did the responsibilities of an operation
22       manager differ from that of an agency manager?
23  A.   Substantially.
24  Q.   Can you just tell me generally what an operations
25       manager does?
```

```
 1    Q.    Okay.  And you would have expected to see a
 2          corresponding change in the form CPL used, sometime
 3          before or after that seminar?
 4    A.    Right.
 5    Q.    Do you recall where you were, what the location of
 6          where the seminar was?
 7    A.    They're almost always in Jacksonville.  But, I think
 8          -- I mean, one of the things I remember, and I now see
 9          in paragraph 2 here, is I remember a comment about
10          what happened -- about loss of or impairment of your
11          of funds in the course of collection or while on
12          deposit with the bank, due to bank failure or
13          insolvency.  I remember that topic being one of the
14          topics, I believe it was Donald Cole saying, we're
15          going to add this language to our CPLs, so that --
16          because, I guess it was at a time when banks were
17          failing, and it wasn't -- we weren't -- it wasn't our
18          risk.  We didn't want it to be our risk.
19    Q.    So then, it sounds like the seminar you went to may
20          have predated this letter; at least, this was October
21          of '05?
22    A.    Yes, it would -- yes, sounds like it.
23    Q.    Okay, do you remember any seminars happening-- was it
24          multiple seminars where changes in CPLs were
25          discussed, or is that one standing out in your mind?
```

Page 187

```
 1         reviewed in A1, 2, and 3, do you see anything in
 2         there, just based on your understanding, that directly
 3         would exclude a claim for a truth in lending
 4         violation?
 5                  MR. FOWERBAUGH: Again, I'm going to
 6         object. Since he testified he hadn't seen these or
 7         read these before today, object that it calls for a
 8         legal conclusion. But if you can answer the
 9         question...
10   A.    I don't know, I'm not sure how to answer that. If the
11         question is, could I come up with a reasonably good
12         argument that would include a truth in lending action
13         as not being excluded, I'm sure I could, because I'm
14         -- you know, been to law school. But I don't really
15         have any opinion as to whether or not this covers
16         truth in lending. I've never contemplated that type
17         of thing--
18   BY MS. DAVIES:
19   Q.    Okay.
20   A.    --or issue.
21   Q.    And you're not seeing anything on the face of 1, 2,
22         and 3 -- just simply in reviewing those -- that would
23         exclude that?
24   A.    I don't see any words that specifically exclude that.
25   Q.    Okay. Who do you think the person most knowledgeable
```

Page 196

1  in the Fidelity brand of companies, as to how a
2  Closing Protection Letter issued in 2003 is
3  interpreted by -- by Fidelity brand of companies?
4  A.  Well, it would be someone in the legal department, but
5  I couldn't name -- I mean, I would ask Donald Cole or
6  Alex Ricks--
7  Q.  Okay.
8  A.  --for their opinion, but I don't -- it could be one of
9  the claims attorneys who knows more, under them, you
10  know -- indirectly under them.
11  Q.  Is there any particular claims attorney, whose name
12  you can think of, that seems to kind of have a
13  specialty at Fidelity, dealing with Closing Protection
14  Letter claims?
15  A.  No, I cannot.
16  Q.  Okay, and would your answer, in terms of the person
17  most knowledgeable, be the same from 2003 all the way
18  to the present, you would go to Donald Cole or Alex--
19  A.  Well, they're still here.  A number of claims
20  attorneys were laid off last year sometime, as a
21  fallout from the Land America purchase.
22  Q.  Okay.
23  A.  So, I don't know if anyone who was laid off would have
24  been the person, back then, who's not now.  That's --
25  so -- I know it's not very helpful, but --

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | -- I mean the situation. |
| 3 | Q. | And is it your understanding, as a corporate designee, |
| 4 | | that 98 percent of all real estate transactions have a |
| 5 | | Closing Protection Letter? |
| 6 | | MR. FOWERBAUGH: Well, I'll object. That |
| 7 | | is not the topic that you asked for and he's being |
| 8 | | presented. |
| 9 | | MS. DAVIES: Fair enough. |
| 10 | | MR. FOWERBAUGH: The topic only relates to |
| 11 | | the testimony given in that case. |
| 12 | | MS. DAVIES: No, I understand. |
| 13 | BY MS. DAVIES: | |
| 14 | Q. | Let me rephrase my question. What methodology was |
| 15 | | relied upon to support the testimony that 98 percent |
| 16 | | of all real estate transactions have a Closing |
| 17 | | Protection Letter? |
| 18 | A. | It was based on my personal experience. |
| 19 | Q. | Prior to providing this testimony, did you obtain any |
| 20 | | data, separate from your personal experience, to |
| 21 | | support your testimony here? |
| 22 | A. | No. |
| 23 | Q. | And how many years, again, have you been working in |
| 24 | | the title industry? |
| 25 | A. | About 13. |

Page 243

PMK (Ticor) and Individual Deposition of Ethan Powsner  1/15/2010
Confidential - Attorneys' Eyes Only

```
 1    Q.    Okay.  So based on your 13 years of experience, your
 2          understanding is that 98 percent of all real estate
 3          transactions have a Closing Protection Letter?
 4    A.    98 -- yes.
 5    Q.    And is there anything that's changed, from when you
 6          provided this testimony, to today -- and we can switch
 7          to your individual capacity now -- that would change
 8          your estimate of how many Closing Protection Letters
 9          are issued in connection with real estate
10          transactions?  And I mean, what percentage?
11    A.    No, nothing's changed in my experience since then
12          which would prevent me from believing that -- well, it
13          says here 98 percent of the closings are -- have
14          Closing Protection Letters.
15                  MS. DAVIES:  Okay.  Why don't we take a
16          break, figure out if I have anymore questions.  But I
17          think, at least from my perspective, our questioning
18          is close to being completed.
19                  VIDEO TECHNICIAN:  The time now is 4:18 and
20          25 seconds p.m.  We are now off the record.
21                  (Recess taken at 4:18 p.m.)
22                  (On the record at 4:24 p.m.)
23                  VIDEO TECHNICIAN:  We're now back on the
24          record.  The time is 4:24 and 41 seconds p.m.  Please
25          continue.
```

Page 244