1   **TRANSCRIBED FROM DIGITAL RECORDING**

2                  IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4   IN RE AMERIQUEST MORTGAGE CO.      )  No. 05 C 7097
    MORTGAGE LENDING PRACTICES LITIGATION,)
5                                       )  Chicago, Illinois
    _____)  August 6, 2012
6                                          9:20 A.M.

7               TRANSCRIPT OF PROCEEDINGS - Motions
         BEFORE THE HONORABLE MORTON DENLOW, Magistrate Judge
8
    APPEARANCES:
9

10  For Plaintiff Holt:       THE BROOKS LAW FIRM
                              18110 Dixie Highway
11                            Suite 2N
                              Homewood, Illinois  60430
12                            BY:  MR. LLOYD J. BROOKS

13  For Third-Party Plaintiff BUCHALTER NEMER
    Ameriquest:               55 Second Street
14                            Suite 1700
                              San Francisco, California  94105
15                            BY:  MR. RANDALL L. MANVITZ

16  For Third-Party Defendant BUTLER, RUBIN, SALTARELLI & BOYD LLP
    Ticor:                    70 West Madison Street
17                            Suite 1800
                              Chicago, Illinois  60602
18                            BY:  MR. ANDREW DAVID SHAPIRO
                                   MR. JAMES E. SOJOODI

19

20               PAMELA S. WARREN, CSR, RPR
                      Official Court Reporter
21                 219 South Dearborn Street
                          Room 1928
22                 Chicago, Illinois   60604
                       (312) 294-8907

23
    **NOTE:  Please notify of correct speaker identification.**
24  **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
    **UNINTELLIGIBLE.**
25

1   (Proceedings held in open court:)

2    THE CLERK:  05 C 7097, In Re Ameriquest.

3    THE COURT:  Good morning, everybody.  Please state

4 your full names and spell your last names for the record.

5    MR. SHAPIRO:  Good morning, your Honor.  Andrew

6 Shapiro and Jim Sojoodi on behalf of the third-party defendants

7 Ticor Title of Illinois.

8    THE COURT:  Go ahead and spell your last names.

9    MR. SHAPIRO:  S-h-a-p-i-r-o and S-o-j-o-o-d-i.

10    THE COURT:  Okay.

11    MR. MANVITZ:  Randall Manvitz on behalf of Ameriquest

12 Mortgage Company.  M-a-n-v as in Victor i-t as in Tom z as in

13 zebra.

14    THE COURT:  Okay.

15    MR. BROOKS:  Good morning, your Honor.  Lloyd Brooks

16 on behalf of Geraldine Holt.  And Brooks is B-r double o-k-s.

17    MR. SHAPIRO:  And, Judge, we're here this morning on

18 my client's motion to compel certain Rule 30(b)(6) testimony

19 from third-party plaintiff Ameriquest.

20    THE COURT:  Please proceed.

21    MR. MANVITZ:  If I may, I just want to make sure we

22 have both issues on the docket because there is a -- Mr. Brooks

23 is here.

24    THE COURT:  Yeah, I have got two motions.

25    MR. MANVITZ:  Okay.

1          THE COURT:  Okay.  There is a motion for sanctions for

2    failure to appear for deposition, and there is Ticor's motion

3    for -- to compel.

4          MR. SHAPIRO:  And which one would you like to begin

5    with?

6          THE COURT:  Well, you started, so let's go for it.

7          MR. SHAPIRO:  All right.  Judge, just as a way of a

8    little background of the case, this case was recently

9    transferred from Judge Chang's courtroom to Judge Aspen's

10   courtroom to incorporate into the MDL.

11          The specific allegations in this case relate to third-

12   party claims from Ameriquest against my client Ticor related to

13   five -- 15 loans that Ameriquest made that my client issued

14   title insurance policies for.  The borrowers for those 15 loans

15   filed suit against Ameriquest for violations of the Truth in

16   Lending Act and consumer --

17          THE COURT:  You know, I'm pretty familiar with this.

18   I had Mr. Fowerbaugh in on --

19          MR. SHAPIRO:  Okay, great.

20          THE COURT:  -- previous settlement conferences, so I

21   have a pretty good understanding of what brings everybody here.

22          MR. SHAPIRO:  Okay.  Great.

23          The specifics of this motion, Judge, we filed -- or

24   served Rule 30(b)(6) deposition notices at the end of May

25   seeking -- and the witness testified about 28 topics.

1  Initially Ameriquest objected and refused to produce a witness

2  for 25 of the 28 topics.

3       We have had met and conferred since then and narrowed

4  the scope of the issues to eight topics.

5       There is really four topics because each topic has an

6  identical pair.

7       THE COURT:  Okay.  So why don't we take them topic by

8  topic.

9       MR. SHAPIRO:  Sure.

10      THE COURT:  And then I'll let --

11      MR. SHAPIRO:  Okay.

12      THE COURT:  -- opposing counsel respond.

13      MR. SHAPIRO:  And I think it -- I actually probably

14  makes sense to group the topics into two different groups.

15      The first group would be Topics 1 through 6.

16      THE COURT:  Okay.

17      MR. SHAPIRO:  And those -- that's seeking information

18  related to agreements between Ameriquest and the title

19  insurance agents Tristar, Northwest Title, and also

20  instructions from Ameriquest to those agents relating to --

21      THE COURT:  And you're going -- and you want to go

22  beyond just written instructions, is that what you want?

23      MR. SHAPIRO:  We want -- right, any kind of

24  instruction, whether it was written or whether it was oral --

25      THE COURT:  And there is no dispute that they are

1    providing you with anything that they had in writing.

2         MR. SHAPIRO:  Well, I don't know if -- the way that

3    they phrase this formal written agreements.  Now we have some

4    drafts that they have produced, and we have -- so it is not

5    clear to me that that would fall within the scope of what they

6    have agreed to produce, but we think that they should have

7    someone to testify about drafts and fully executed.  We have an

8    agreement that's signed by one party, but not the other.  I

9    think that should fall within the scope of the topic.

10         THE COURT:  Uh-huh.

11         MR. SHAPIRO:  And the reason that it is -- it can't be

12    limited just to written agreements, for instance, is we have an

13    agreement that they have produced between one of the agents and

14    Ameriquest, signed by only the agents, that I think it is dated

15    February 2nd, 2006, kind of the end of the relevant time

16    period.  We don't have anything before that.

17         So we think that it is probable that there was some

18    kind of agreement before that.  We don't have a copy of it.  We

19    think we're entitled to get testimony about that and have them

20    investigate was there such an agreement.

21         THE COURT:  Okay.  I mean, under 30(b)(6), I mean, you

22    know, their obligation would be to designate somebody to do an

23    investigation and come back with the best that they could find.

24         MR. SHAPIRO:  Sure.

25         THE COURT:  There is no guarantees that they are going

1    to find anything or not find anything.  Okay.

2            So let me hear what the objection is to at least, you

3    know, doing the best that you can, appreciating that this was

4    many years ago and it may be difficult.

5            So go ahead and introduce yourself again.

6            MR. MANVITZ:  Just --

7            THE COURT:  Come closer to the microphone.

8            MR. MANVITZ:  Just to make sure, we filed an

9    opposition.  It was supposed to be delivered Fed Ex this

10   morning, a bench copy.  I don't know if the Court has --

11           THE COURT:  No.  No.

12           MR. MANVITZ:  Okay.

13           THE COURT:  Fed Ex hasn't arrived before 9:15 this

14   morning, so --

15           MR. MANVITZ:  I have a -- I have a bench copy.

16           THE COURT:  Argue it.

17           MR. MANVITZ:  Okay.

18           THE COURT:  Argue it.

19           MR. MANVITZ:  The -- dividing this into categories and

20   looking at the first category of agreements, the problem with

21   the agreements --

22           THE COURT:  Your name again?  Is it Mr. --

23           MR. MANVITZ:  Randall Manvitz.

24           THE COURT:  Manvitz, okay.

25           MR. MANVITZ:  The problem with the term agreements is

1    that we have asked them to be more specific.  Because any time

2    two employees agreed, it may be an agreement.  And we have

3    provided examples.

4           If two employees say, fax it to a certain fax number,

5    well, that could be an agreement.

6           THE COURT:  Well, what they are trying to find out is

7    when these people went out to close these loans, were they

8    acting at your direction or acting at somebody else's

9    direction?  How did that come down?  How did that come down?

10          Right, is that -- that's essentially it.

11          MR. SHAPIRO:  Well --

12          THE COURT:  So they are --

13          MR. SHAPIRO:  And that's --

14          THE COURT:  They are entitled to know how these came

15    down, that's all.

16          MR. SHAPIRO:  And if it was limited or if in the meet

17    and confer process there was such a limitation, we could

18    certainly do that.  And we have said, if there is any agreement

19    they want to identify in advance, we're happy to talk about

20    it.  But this is the first time we have ever heard that there

21    was an issue with an unsigned agreement or there was a written

22    agreement at issue.

23          If they want to provide an agreement and say, here's

24    the agreement, give us, you know -- have somebody testify about

25    the predecessor, that's fine.  But what we have been told is

1 we're not going to identify agreements.  That we have an

2 obligation, if we can't have someone prepare -- well, we have

3 an obligation to go out and search the ocean of email back-up

4 tapes for the possibility that there is some oral agreement out

5 there that --

6        THE COURT:  No.

7        MR. SHAPIRO:  -- of course we don't know of.

8        THE COURT:  That you're not going to have to do

9 because the amounts involved do not justify putting any party

10 through that expense.  Okay?

11        So if -- let's see.  If Ticor has certain documents

12 that they want them to be able to respond to or, you know, that

13 you want somebody to come and show up at the deposition to be

14 able to respond, you're going to need to give those to them in

15 advance.  They still need to do their homework on their side.

16 But, you know, this thing is not going to go on for 18 more

17 years, you know, in the course of discovery.

18        But, you know, to the extent that you have loan files

19 on these 15 files, Mr. Manvitz, I mean, whatever documentation

20 and whatever was in those loan files, you know, they should

21 have access to --

22        MR. MANVITZ:  Okay.

23        THE COURT:  -- and somebody should be prepared to talk

24 about how it came down and who was involved to the best that

25 you can do that.

1          MR. MANVITZ:  And that's certainly the plan.  We have

2     provided all -- we have produced all the loan files.  They have

3     all the loan and closing files.  And we have said, if there is

4     something in there you want someone prepared to talk about,

5     just tell us what it is, and we can have somebody prepared to

6     talk about it.

7          THE COURT:  I think that's a fair request.  I think

8     that's a fair request when you're dealing with 15 files.

9          MR. SHAPIRO:  Well, Judge, if I may, I think --

10          THE COURT:  Go ahead.

11          MR. SHAPIRO:  -- one issue is, you know, some of the

12     agreements may not be in the loan files, and that's really the

13     point.  We think that they should have to do some kind of

14     investigation or reasonable investigation to ask the people

15     that were involved, you know, were there other things that, you

16     know, wouldn't be in the loan file?  And then they will come

17     back and tell us what the response --

18          THE COURT:  I think, I think it is reasonable for them

19     to contact -- I mean, who are the people that went out and

20     actually did the closing, were they your employees?

21          MR. SHAPIRO:  No, they were not, Judge.

22          THE COURT:  Okay.  They are third parties?

23          MR. SHAPIRO:  Third-party title insurance agents.

24          THE COURT.  Okay.  So I think it is reasonable -- and

25     who directed them to go out and do the closings?

1          MR. SHAPIRO:  Well, that's the issue in the case.

2     That's one of the issues.

3          THE COURT:  Okay.

4          MR. SHAPIRO:  We think that it was Ameriquest that

5     directed them.

6          THE COURT:  Okay.

7          MR. MANVITZ:  Well --

8          THE COURT:  And do you have -- have you produced your

9     documents on -- as it is related to what your people, any

10    communications your people may have had with them?

11         MR. SHAPIRO:  I believe we have, yes, Judge.

12         THE COURT:  Okay.  Well, to the extent that both sides

13    have produced what they have with respect to what went out,

14    then the question is who is going to contact the person that

15    went out and ask that person what -- what instructions, if any,

16    did you receive?  Who is going to ask that question?  Have you

17    done that?

18         MR. SHAPIRO:  Well, I think what we -- what we're

19    seeking is to ask the Ameriquest people what -- you know, what

20    were the instructions that were given to the third-party title

21    insurance agents.

22         THE COURT:  Okay.  Well, and I think Ameriquest is

23    entitled to ask you what instructions, if any, you gave to

24    those people.  Right?

25         MR. SHAPIRO:  Well, I guess -- we had three

1  (unintelligible) 30(b)(6) depositions of our client.

2          THE COURT:  Okay.

3          MR. SHAPIRO:  I don't know if that falls within the

4  topic scope -- scope of topic.  I think it probably does.

5          THE COURT:  Okay.

6          MR. MANVITZ:  Well, and the response was --

7          THE COURT:  So --

8          MR. MANVITZ:  -- we don't know, and --

9          THE COURT:  Okay.

10         MR. MANVITZ:  So we have produced all of the loan

11 files and the closing files.  If there is some special

12 instruction, you would expect that it would be in the loan or

13 closing files.  We have written closing instructions --

14         THE COURT:  All right.

15         MR. MANVITZ:  -- for each of these loans.  And we have

16 produced the written closing instructions and said, you know,

17 tell -- we're happy to have --

18         THE COURT:  Okay.

19         MR. MANVITZ:  -- a witness prepared to talk about --

20         THE COURT:  Here's what --

21         MR. MANVITZ:  -- our closing instructions.

22         THE COURT:  Here's what I am going to suggest, here's

23 what I am going to suggest.  I'm going to suggest that a joint

24 letter go out from both of you to the individuals, to the

25 individuals who were actually sent out to perform the closing,

1    requesting of them that they provide any additional information

2    that they may have regarding instructions that they received

3    either from Ameriquest or from Ticor about these closings.

4              MR. SHAPIRO:  And, Judge, I think this may -- we -- we

5    have -- we have documents from those two agents.  They produced

6    documents.  They have been produced in the case.

7              THE COURT:  Is it just two people that are involved?

8              MR. SHAPIRO:  There is two different agents, yes.

9              THE COURT:  Okay.

10             MR. SHAPIRO:  Two different companies.  So maybe this

11   is our -- we have gotten, I think --

12             THE COURT:  Okay.

13             MR. SHAPIRO:  -- the documents that exist.  So I'm not

14   sure this is --

15             THE COURT:  Okay.

16             MR. SHAPIRO:  -- what --

17             THE COURT:  So then -- so then what's the missing

18   piece?

19             MR. MANVITZ:  (Unintelligible) we have learned is that

20   -- we tried to contact one of the agents.  And what we have

21   learned is that Ticor entered into an agreement with one of the

22   agents where the agent said, we're not allowed to cooperate

23   with you.  And so we believe it is within the scope of our

24   prior request, certainly relevant, that the -- there is

25   apparently some type of overarching settlement agreement

1    between Ticor and this Tristar Title Company.

2           So we need that agreement.  We believe it is

3    hindering -- well, it is hindering, at least according to this

4    representative of the -- former representative of Tristar, it

5    is hindering his ability to tell us his perspective.

6           THE COURT:  Okay.  Now who -- who is your person, who

7    is your person that was dealing with these 15 loans?  Is

8    there --

9           MR. MANVITZ:  We have --

10          THE COURT:  -- one person --

11          MR. MANVITZ:  -- had --

12          THE COURT:  -- or are there --

13          MR. MANVITZ:  No, there was no one particular person,

14   and we have a number of people.

15          Now we have -- we are prepared to produce the director

16   of vendor management -- former director of vendor management,

17   no longer an employee, and somebody who is in a like position

18   who has some overarching responsibilities.  And those

19   depositions will take place before the 30(b)(6).  And so they

20   have an opportunity to ask those two individuals --

21          THE COURT:  Well, it seems -- I mean, I would think it

22   is unlikely -- I mean, I would think it is unlikely, and maybe

23   it is, that those -- that the individuals who actually had the

24   contacts are there.

25          MR. SHAPIRO:  And that may be right, Judge.

```
1              THE COURT:  Okay.
2              MR. SHAPIRO:  We just want them to do that
3    investigation --
4              THE COURT:  All right.
5              MR. SHAPIRO:  -- and then tell us -- if that's the
6    answer, that's the answer.
7              THE COURT.  Okay.  So --
8              MR. SHAPIRO:  We're not --
9              THE COURT:  -- find out whether the people who were
10   responsible for those loans and responsible for those
11   communications are still there.  And, if not, you can provide
12   them with the last known address.  And if they want to --
13             MR. MANVITZ:  Well --
14             THE COURT:  -- depose them, then you're done.
15             MR. MANVITZ:  And they have -- that -- the specific
16   people who were involved in each loan, I believe -- well,
17   certainly we have given the loan file.  The loan file has that
18   information.  And they have never asked for it, the details, to
19   be able to contact individuals.  They are no longer -- those
20   individuals --
21             THE COURT:  All right.
22             MR. MANVITZ:  -- are no longer employed by --
23             THE COURT:  Right, I assume they are not.  I assume
24   they are not.
25             MR. MANVITZ:  And so if that's an endeavor where they
```

1    want to try to engage the individuals with these loan files --

2         THE COURT:  Well --

3         MR. MANVITZ:  -- I'm sure they --

4         THE COURT:  Okay.  So let's backtrack.  Let's

5    backtrack.  I mean, we're at the point now -- it sounds like

6    there were two people that were sent out to cover these 15

7    loans.

8         MR. SHAPIRO:  There were two companies.

9         THE COURT:  How many people?

10        MR. SHAPIRO:  I don't have that exact number.

11        MR. MANVITZ:  Multiple.

12        THE COURT:  Multiple.

13        MR. MANVITZ:  There were multiple title company

14   employees involved, and there were multiple people that

15   actually did the signing.  It appears they were often

16   employees --

17        THE COURT:  Employees of who?

18        MR. MANVITZ:  The title company.  Their agent.

19        MR. SHAPIRO:  Well, there is a dispute about that.

20        THE COURT:  There is a dispute as to whether they were

21   your employees?

22        MR. SHAPIRO:  Whether they were our employees?  I

23   don't think they were our employees.  I don't think that's what

24   Mr. Manvitz meant.

25        MR. MANVITZ:  The title company employees.

1        THE COURT:  Well, aren't you Ticor?

2        MR. SHAPIRO:  We're Ticor, yes.

3        I think there were -- the closers were third-party

4    closers, it is my understanding.

5        MR. MANVITZ:  The --

6        MR. SHAPIRO:  There is an issue -- the issue is whose

7    agent were they at the time they were closing these loans.

8        THE COURT:  Right, right.

9        MR. SHAPIRO:  You know, they may have been our agents

10   --

11       THE COURT:  Right.

12       MR. SHAPIRO:  -- for certain purposes and Ameriquest's

13   agent for other purposes, and that's really --

14       THE COURT:  Okay.

15       MR. SHAPIRO:  -- what we're trying to get to the

16   bottom of here.

17       THE COURT:  Okay.  Well, you know, I hope both sides

18   spend $300,000 figuring this out because the whole dispute

19   involves less than that I think.  So go ahead and spend as much

20   money -- I give you liberty to take as many depositions as you

21   want, and go ahead and spend all your client's money finding

22   out how these loans -- these loans went down.  Okay?

23       So you can take as many depositions as you want.  You

24   give them the names and let them go take as many depositions as

25   they want of these people.  But your only obligation is to give

1    them the names of the people.

2            And you're free to go out and take those

3    depositions --

4            MR. SHAPIRO:  And, Judge --

5            THE COURT:  -- so you can -- so you can find that out.

6            MR. SHAPIRO:  And --

7            THE COURT:  And then you'll have their representatives

8    give you the overarching policies and whatever else they can

9    do.  I'm not going to require them do anything beyond that.

10           MR. SHAPIRO:  Okay, Judge, we're not asking -- we're

11   not asking to depose all these -- we just wanted the -- the

12   company to investigate and see what the agreements and the

13   instructions were.  If they come back and say, well, no one is

14   here anymore, we don't have any, well, that's fine.

15   That's -- it is --

16           THE COURT:  So --

17           MR. SHAPIRO:  (Unintelligible) the investigation,

18   that's it.

19           THE COURT:  So go out and find out whether there Is

20   any more -- any of those people.

21           Ameriquest is shut down, okay?  Ameriquest is shut

22   down.  There is nobody there.  You have gotten the answer to

23   your question.  Okay?

24           MR. SHAPIRO:  Okay.

25           THE COURT:  I mean, what do you want -- what more do

1  you need?  Ameriquest is shut down.  So would it be a surprise

2  to you that there is nobody there that was engaged in

3  Ameriquest?  There is not an Ameriquest office there anymore.

4      MR. SHAPIRO:  Okay.  Well, if there is nobody left

5  that knows any of this information, then the 30(b)(6) will tell

6  us there is nobody here, we -- what you have is what we have,

7  and that's the end of it.  That's all we're asking for, Judge.

8      MR. MANVITZ:  Well, that's not what they have been

9  asking for.  They have been asking for us to go search back-up

10 tapes and search the ocean --

11     THE COURT:  You're not going to search back-up tapes.

12     MR. SHAPIRO:  Well, Judge, we never asked them to do

13 that.

14     THE COURT:  (Unintelligible).

15     MR. SHAPIRO:  You saw from the motion, we didn't ask

16 them to do that.

17     THE COURT:  Okay.  Well, I'm not sure what the dispute

18 is.  Okay?  Whoever your 30(b)(6) representative is should be

19 prepared to say whether or not he's -- that he or she has been

20 able to locate anything beyond the specific files of record and

21 whether or not they have any idea of who the people are that

22 were handling this and whether or not those people are still

23 employed.

24     And beyond that I don't know what else they need to

25 do.

1        MR. SHAPIRO:  Yeah, and, Judge, that's great.

2        THE COURT:  And be in a position, if they know, to

3   discuss the overarching policies that they had there.

4        MR. SHAPIRO:  And, Judge, that's all we're asking for.

5   I mean --

6        THE COURT:  That's all you're going to get.

7        MR. SHAPIRO:  That's fine.

8        THE COURT:  Okay?

9        MR. SHAPIRO:  Judge, can I just make one clar- -- one

10  point of clarification?  I assume that the witness will be

11  prepared -- should be prepared to discuss the written

12  agreements, draft or finalized that are in the production is a

13  (unintelligible) to specifically show all the different copies

14  of the different --

15       THE COURT:  Well --

16       MR. SHAPIRO:  -- agreements in advance?

17       THE COURT:  -- when you say be prepared to discuss

18  that, I mean, I expect him to be prepared to discuss that this

19  is the agreement that was contained in that file.  He had

20  no -- he or she had no personal contact in the drafting of it,

21  in the -- in the negotiating of it or its implementation

22  because the people that were involved in that are no longer

23  there, and that this all that we have been able to locate.

24       I mean, I don't know what else there --

25       MR. SHAPIRO:  Well, what about the company's position

1  as to the terms of the agreement and how --

2          THE COURT:  Well, that -- I mean, to the extent that

3  there was a policy and what this meant, yes.

4          MR. SHAPIRO:  Okay.

5          THE COURT:  Then if it was a form agreement, yes.

6          MR. MANVITZ:  And if there is some agreement you care

7  about, you're going to let us know what it is.

8          MR. SHAPIRO:  Well --

9          THE COURT:  If there is specific agreements -- I mean,

10  if there is -- yes, I think it is only fair to say, look, we

11  want to be sure, in particular, that somebody is prepared to

12  talk about this document or that document because you -- you

13  have -- a 30(b)(6) witness is coming in and wasn't involved.

14          MR. SHAPIRO:  Sure.

15          THE COURT:  Was not involved.

16          MR. SHAPIRO:  We can do that, Judge.

17          THE COURT:  Okay.  Does that cover all eight topics

18  or --

19          MR. SHAPIRO:  I think that's six of the eight.

20          THE COURT:  Okay.  So what are the last two?

21          MR. SHAPIRO:  Seven and eight relate to reviews and

22  investigations that Ameriquest had conducted into Tristar,

23  Northwest Title's compliance with their instructions.

24          THE COURT:  Okay.  Whether there was a later

25  investigation that took place?

1          MR. SHAPIRO:  That's right.

2          THE COURT:  Okay.  What about that?

3          MR. MANVITZ:  And the issue again is -- well, the

4    scope of the request is whether there is a review, any type of

5    review --

6          THE COURT:  Well --

7          MR. MANVITZ:  -- (unintelligible) investigation --

8          THE COURT:  -- obviously, obviously, you know, in

9    preparation for litigation they decide to sue you, they decide

10   to sue your client, so the attorneys made the decision that you

11   screwed up from their standpoint.  Right?

12         MR. SHAPIRO:  We're not looking for privileged

13   communications, Judge.

14         THE COURT:  Okay.  So you're looking for non-work

15   product, non-attorney client communications that were not made

16   in anticipation of litigation as to what somebody determined

17   that Tristar or Northwest Title did what they were supposed to

18   do.

19         MR. SHAPIRO:  For the 15 loans.

20         THE COURT:  For the 15 loans.  Okay?

21         MR. MANVITZ:  And so we have asked -- again any

22   instruction relating to those loan?  Because if there is some

23   instruction in the closing file, you tell us what you want --

24         THE COURT:  No.

25         MR. MANVITZ:  -- what it is (unintelligible) --

1    THE COURT:  It relates to the instructions for which

2  you're seeking to hold them liable.

3    MR. MANVITZ:  In closing, you know, the closing -- the

4  written closing instructions, we can be prepared to address

5  those.

6    THE COURT:  Well, to the extent, to the extent that

7  you're seeking to hold them liable for something, they want to

8  know what investigation, if any, took place to make somebody

9  believe that they did something wrong, other than attorney-

10  client or work product.

11    In other words, if somebody -- if there is documents

12  or reports in the file saying, look, we -- you know, we had

13  spoken to Ticor and specifically told Ticor to do X, and they

14  did Y, and, you know, then they want to know about that.

15    MR. MANVITZ:  And we have sought that limiter of what

16  top -- what instructions?  Any instruction or the instructions

17  that are relevant to the case?

18    THE COURT:  No, let's limit it to things that are

19  relevant to the case.  That would be -- would make it helpful.

20    MR. MANVITZ:  And so --

21    THE COURT:  That would make it helpful.

22    MR. MANVITZ:  And so the -- you know, from our

23  perspective the notice of right to cancel issue is what the

24  plaintiffs were seeking and closing protection letters is

25  another thing we're seeking indemnity with respect to.  And so

23

```
1   -- but closing protection letters are covered by another topic,

2   another 30(b)(6) topic, instructions with respect to closing

3   protection letters.  So that's why we have asked for clarity as

4   to what specifically they are seeking.

5       THE COURT:  Well, I'll give you the clarity.  To the

6   extent that you're seeking to hold Ticor liable on things that

7   they messed up on as it relates to closing protection letters

8   or -- what was the other thing?

9       MR. MANVITZ:  Notice of right to cancel.

10      THE COURT:  Notice of right to cancel.  If you are

11  holding -- seeking to hold Ticor liable for that, then if there

12  was any investigation or any reports done to make somebody

13  think that Ticor should have been held liable, they are

14  entitled to know about it, with the exclusion of attorney-

15  client and work product.

16      MR. SHAPIRO:  And, Judge, also that includes the

17  written closing instructions that they have already agreed to

18  produce a witness on, I suspect.  Is that right?

19      THE COURT:  I would believe so, yes.  Okay.

20      MR. SHAPIRO:  Okay.  I think that that resolves our

21  motion to compel.

22      THE COURT:  Okay.  So the motion to compel 30(b)(6)

23  testimony is granted in part and denied in part as stated in

24  open court.

25      Okay.  And if you need to order to a transcript to
```

```
 1    figure out what we did, order a transcript.
 2              MR. SHAPIRO:  Okay.
 3              THE COURT:  Okay.
 4              MR. SHAPIRO:  Thanks, Judge.
 5              THE COURT:  Okay.  But are -- is everybody on the same
 6    page here?
 7              MR. MANVITZ:  I believe so.
 8              THE COURT:  We'll find out.  We'll find out.
 9              Okay.  That takes care of that motion.  Now --
10              MR. MANVITZ:  There is one additional issue that was
11    raised in our opposition.  The deposition of Claudia Graham.
12    Claudia Graham is, we believe, centrally relevant to the case
13    because this case focuses on whether the letters that we have
14    are single transaction closing protection letters or multiple
15    transaction closing protection letters.
16              THE COURT:  And who is Claudia Graham?  Who does she
17    work for?
18              MR. MANVITZ:  Claudia Graham is an employee of one of
19    the Fidelity companies, Ticor.  She's a Ticor employee.  Ticor
20    no longer exists in its former state.
21              But she has been a 30(b)(6) witness for them.  She is
22    an attorney.  She has been a 30(b)(6) witness for them on the
23    claims process for determining whether a closing protection
24    letter applies.
25              And Judge Chang's recent order noted these -- he's
```

1  agreed the claims process is relevant because the -- Ticor

2  would determine whether a letter is a single transaction versus

3  multiple transaction, both at the beginning when the letter is

4  issued and at the end when there was a claim made -- claims

5  made.

6      And so we want to know their analysis of whether a

7  letter is a single transaction versus multiple transactions.

8  And we have now found someone that has made that

9  determination.  And she's made the determination in the normal

10  course of her duties about whether a -- the exact same closing

11  protection letter that's at issue in our case, how it applies.

12      And she's testified as a 30(b)(6) witness on that

13  topic in another case just within, I believe, the last year.

14      THE COURT:  It is a beautiful thing.  It is very

15  beautiful.

16      MR. MANVITZ:  Yes.  And so we have sought her

17  deposition, and the --

18      THE COURT:  Well, what did she say in that other case?

19      MR. MANVITZ:  Actually she said a number of things.

20  And that's why we -- we'd like to ask her about those -- her

21  prior testimony.

22      THE COURT:  Well, do you have a transcript of it?

23      MR. MANVITZ:  We do.

24      THE COURT:  So what do you need to ask her?  She's

25  testified.

1          MR. MANVITZ:  Well, the subjects were -- some were

2   overlapping and some were different.  And so we need to focus

3   her on the exact issues in our case.

4          But at least she has the knowledge, we believe she has

5   the knowledge --

6          THE COURT:  Oh, this is another case --

7          MR. MANVITZ:  -- to be able to respond.

8          THE COURT:  -- in which you were not involved?

9          MR. MANVITZ:  Correct.

10         THE COURT:  Okay.

11         MR. MANVITZ:  Completely, completely different case --

12         THE COURT:  Okay.

13         MR. MANVITZ:  -- with the exact same form of closing

14  protection letter.  And that form of closing protection letter

15  has been a hot issue in this case.  We have sought information

16  about it.  And they don't, from our perspective, they don't

17  have the information about it, and so we found someone who

18  likely does.

19         THE COURT:  All right.  So now you want to depose her,

20  and they don't want you to be able to depose her?

21         MR. MANVITZ:  Correct.

22         THE COURT:  Okay.

23         MR. SHAPIRO:  Well, I don't know that that's totally

24  accurate, Judge.

25         THE COURT:  Okay.

1      MR. SHAPIRO:  If I can step up.

2      THE COURT:  Okay.  Mr. Manvitz, are you done?

3      MR. MANVITZ:  Yes.

4      MR. SHAPIRO:  First of all, I guess he's asking for a

5  motion to compel but hasn't really filed a motion.  So if you

6  want to go --

7      THE COURT:  Yeah.

8      MR. SHAPIRO:  -- over that procedural hurdle, I can

9  continue to --

10      THE COURT:  Well, rather than fly him back from

11  California, let's try to cover it today.

12      MR. SHAPIRO:  Sure.  The issue is that Judge Chang

13  initially denied their request for any discovery about the

14  claims process probably more than a year ago.

15      In July 19th at a hearing he revisited that decision

16  and decided that he would allow certain narrow claim specific

17  discovery, specifically our -- Ticor's presenting a Rule

18  30(b)(6) witness on the claims, process, procedure, and I think

19  responding to any, you know, interrogatories that related to

20  that topic that have already been propounded.  And we have

21  agreed to make that 30(b)(6) witness available.  We're going to

22  provide a date today or tomorrow.

23      THE COURT:  Is that Ms. Graham or somebody else?

24      MR. SHAPIRO:  Who is going to be the 30(b)(6)

25  witness?

```
 1              THE COURT:  Right.

 2              MR. SHAPIRO:  I'm not -- I don't know that I know that

 3    right now.

 4              THE COURT:  Okay.

 5              MR. SHAPIRO:  But that's -- so we're going to give

 6    them that witness.  That's all that Judge Chang ordered.

 7              On Wednesday, for the first time, Mr. Manvitz sent us

 8    an email saying, we'd also like to depose Claudia Graham.  We

 9    said, we don't have a deposition notice yet.  And we think that

10    Judge Chang's order is narrow, so tell us why you think Claudia

11    Graham's deposition falls within the scope of that order.  And

12    we haven't heard anything.

13              So we said we would consider the request after we hear

14    why Ameriquest thinks it falls within the narrow scope of Judge

15    Chang's ruling.  But we haven't gotten a response.  And I think

16    for you to be able to, you know, really be able to get to the

17    bottom of this issue, you need to look at Judge Chang's ruling

18    and analyze it and see if you think it fits inside or outside

19    of that ruling.

20              THE COURT:  Okay.

21              MR. SHAPIRO:  So I think this is not ripe yet.  That's

22    what I am saying.

23              THE COURT:  So do you think it fits inside or

24    outside?

25              MR. SHAPIRO:  I think it fits outside.  I don't -- I
```

1  think Judge Chang said, take a 30(b)(6) witness. You'll get

2  the company position on this.

3  　　　　　　THE COURT: Yeah.

4  　　　　　　MR. SHAPIRO: And if Ms. Graham -- I'm not sure that

5  she was involved -- if she was involved in this, you know, we

6  would have to investigate and figure out what the company's

7  position is, and then he'll get that information through a

8  30(b)(6) witness.

9  　　　　　　THE COURT. Mr. Manvitz.

10  　　　　　　MR. MANVITZ: We didn't know about Claudia Graham

11  before. Ticor has been representing that they do think that

12  they would be able to find a 30(b)(6) witness.

13  　　　　　　THE COURT: Get a little closer to the microphone.

14  　　　　　　MR. MANVITZ: Ticor has represented that they did not

15  believe -- well, they were not able to find a 30(b)(6) witness,

16  and that's why the delay in getting the 30(b)(6) deponent

17  scheduled. So we have been asking and reminding them. They

18  have an order. And we have propounded the 30(b)(6) notice in

19  2010.

20  　　　　　　THE COURT: Well --

21  　　　　　　MR. MANVITZ: And --

22  　　　　　　THE COURT: -- did your 30(b)(6) request cover this

23  area for which you now think Ms. Graham is a knowledgeable

24  person?

25  　　　　　　MR. MANVITZ: Yes. And --

1    THE COURT:  And so if that's the case, if that's the

2    case, I'm going to -- because I agree with Mr. Shapiro, it

3    would be unfair for me to just sort of jump in and do something

4    with Judge Chang's ruling that hasn't been done.  But -- but I

5    do think it would be appropriate that if you have made the

6    request in a 30(b)(6), and they respond that they didn't have

7    anybody at that time, and you now believe and you have a basis

8    for believing that Ms. Graham is knowledgeable and she's still

9    employed by Ticor or, you know, Mr. Shapiro's client, that you

10   should talk.  And if that's the case, I'm going to recommend to

11   Mr. Shapiro that she be made available without the necessity

12   for further motions and whatever because at one point in time

13   you took the position that you didn't have anybody, and it

14   turns out now that you do.  I think it would be only be fair to

15   present that person.

16       If, on the other hand, the -- there was never a

17   request in this area and this is sort of coming out of left

18   field and Judge Chang said you can only depose in center field

19   and not left field, then it is a different -- different

20   matter.  But --

21       MR. SHAPIRO:  Judge, we will be giving them a 30(b)(6)

22   witness on this -- these topics that Judge Chang ordered us to

23   do that.  So I think that will cover this.

24       But if not, I'm sure Mr. Manvitz will bring it back,

25   and we'll discuss and try and --

1      THE COURT:  Right.

2      MR. SHAPIRO:  -- come to a --

3      THE COURT:  And particularly if it turns out that

4  Ms. Graham is going to be your 30(b)(6) representative, it

5  would be -- it would be unfortunate if she then has to come

6  back another time.  So --

7      MR. SHAPIRO:  Understood.

8      THE COURT:  So I'm not going to rule.  I'm just

9  telling you what I think good practice would represent there.

10 Okay?

11     MR. MANVITZ:  And what we have suggested is if Claudia

12 Graham is not the 30(b)(6), then we should have it on

13 consecutive days.  They are all going to be in Jacksonville.

14 We can probably finish Claudia Graham in four hours.

15 It's -- would be just an extension of the 30(b)(6).

16     THE COURT:  I would just -- you know, lawyers work out

17 the ways lawyers should work these things out.

18     MR. SHAPIRO:  Thanks, Judge.

19     THE COURT:  Does that cover everything on that motion?

20     MR. SHAPIRO:  It does, Judge.

21     THE COURT:  Okay.  Well, Mr. Brooks has been eminently

22 patient here, so -- let's -- let's move on to the second

23 motion.

24     MR. BROOKS:  Good morning once again.  For the record

25 it is Lloyd Brooks on behalf of Geraldine Holt.

1    THE COURT.  Mr. Manvitz, is this your motion here?

2    MR. MANVITZ:  Yes.  And I don't believe there has been

3    an opposition filed.

4    THE COURT.  All right.  I mean, my practice is -- I

5    don't want oppositions filed.  I want you to get up, be a

6    lawyer, and argue the thing, you know, which both sides have

7    done well.  So go ahead.

8    Otherwise what's the point of being a lawyer if you

9    can't say anything in court, it all has to be in paper?

10    MR. MANVITZ:  We sought the deposition of a

11    Ms. Geraldine Holt.  We did it at a time that was convenient to

12    Ms. Holt in Chicago.  I believe she lives in L.A. -- or excuse

13    me -- in Hollywood.  And so we offered to take the deposition

14    there.  They wanted to do it in Chicago.  So we scheduled the

15    time it was convenient for them.

16    THE COURT:  And she's an attorney?

17    MR. MANVITZ:  She's an attorney.  She is a bankruptcy

18    lawyer.  And I believe that she also works in some type of

19    accounting industry.  I don't know exactly what.

20    But she has, as I understand, traditionally had an

21    office in Hollywood and an office in Chicago.  And as you can

22    see from Pacer, she's an active bankruptcy lawyer in Chicago.

23    So we sought her deposition because she filed, on her

24    own behalf, a Chapter 7 petition for bankruptcy and did not

25    disclose the claim against Ameriquest.

1    And from our perspective she doesn't have standing to

2    pursue the claim.  And there is a great judicial estoppel

3    argument.  The claim against Ameriquest was pending at the time

4    of her Chapter 7 petition.  So we'd like to explore the whys

5    and the details along --

6         THE COURT:  Here, I have read your motion.  I mean,

7    here's what concerns me.  Mr. Brooks, there was an email from

8    you, there was an email from you to Mr. Manvitz saying on June

9    4th, 2012, this is to confirm that Ms. Holt is voluntarily

10   dismissing her claim against all defendants.  I will prepare

11   the appropriate documentation tomorrow.

12        What happened?

13        MR. BROOKS:  Your Honor, my client remains perfectly

14   willing and has instructed me to voluntarily dismiss the case.

15        The only issue we have is this.  Mr. Manvitz has

16   informed us, and I believe it was by email -- I don't have all

17   the exhibits to the motion with me, but -- so I'm not sure if

18   Mr. Manvitz attached this particular email -- where he

19   indicated to me that his client wouldn't object to the

20   dismissal as long as my client agreed to reimburse his entire

21   trip to Chicago.

22        And I asked him, well, what were the expenses?  And he

23   did respond with a figure.  But I asked to see the back up

24   because my client is going to want to know.  And my

25   understanding from conversation with Mr. Manvitz was, this

1  wasn't the only reason he came to Chicago, so there was an

2  issue of what would be fair, if anything, for my client to pay

3  for not appearing at the dep.

4          THE COURT:  Okay.

5          MR. BROOKS:  I never got that, and so we did not file

6  voluntary dismissal because my understanding was his client was

7  going to object if -- if we had not already agreed to pay

8  (unintelligible).

9          THE COURT:  Okay.  Mr. Manvitz, how much was the

10  amount of money?  What are we talking about?

11         MR. MANVITZ:  The out-the-pocket costs alone, a

12  reasonable amount because the hotel was more than what I would

13  consider reasonable because of the summer travel season, a

14  reasonable amount is $1200.

15         THE COURT:  Including airfare and hotel?

16         MR. MANVITZ:  Correct.

17         THE COURT:  Okay.  And did you have other business

18  here?

19         MR. MANVITZ:  No.

20         THE COURT:  Okay.

21         MR. MANVITZ:  And this is the first time that I have

22  heard that they are waiting for some information from me.

23  We -- as you can tell from my emails, we're jumping up and down

24  in my emails --

25         THE COURT:  Right.

1      MR. MANVITZ:  -- please respond, please respond,

2 please respond.

3      Two months later and (unintelligible).

4      THE COURT:  Okay.  What would your clients consider to

5 be a reasonable amount?

6      MR. BROOKS:  You know, honestly, your Honor, I do not

7 know.  I have not sat down with her or called her and said,

8 what figure would you pay because we were waiting to hear from

9 Mr. Manvitz on that issue.  I don't know if she'd agree to pay

10 anything, to be honest with you.  But I wanted the opportunity

11 to try to work it out.  If she was going to agree to pay

12 something, pay that, and we do the voluntary leave to dismiss,

13 and then everything goes away.

14      So I would love that opportunity to then sit down with

15 my client or call her and find if out if she'd agree.

16      THE COURT:  Well, here's what I am going to do.  What

17 I am going to do is if you will consent to my jurisdiction on

18 -- well, no, you don't have to -- forget that.

19      If you will stipulate on the record right now that

20 you're prepared to dismiss this case with prejudice subject to

21 the parties working out a reasonable reimbursement for out-of-

22 pocket expenses, and I'm going to say not to exceed $1200, not

23 to exceed $1200, and if you have any dispute, Judge Denlow will

24 resolve it, I'll be happy to do that.

25      What I don't want is for Mr. Manvitz to have to come

1    back again and -- and not have the case dismissed and have this

2    thing go on.

3         MR. BROOKS:  And I have no problem with that.  I

4    would -- with using your Honor's suggestion.

5         MR. MANVITZ:  So stipulate.

6         THE COURT:  Okay.  So the parties having stipulated of

7    record, the -- who is the case before right now?  Is this Judge

8    Aspen?

9         MR. MANVITZ:  Yes.

10         MR. BROOKS:  Yes.

11         THE COURT:  The Court recommends to Judge Aspen --

12    we'll do a short -- I guess we have to do a report and

13    recommendation, a short report and recommendation.  Based on

14    the stipulation of the parties made in open court that this

15    case be dismissed with prejudice subject to the issue of the

16    reimbursement of Ameriquest out-of-pocket expenses, not to

17    exceed $1200, to be resolved by the parties within 14 days or

18    Judge Denlow will resolve it.

19         Does that give everybody enough time?

20         Not to exceed $1200.

21         MR. BROOKS:  Yes, your Honor.

22         THE COURT:  Okay.  So --

23         MR. MANVITZ:  But the only caveat that there is a

24    third-party issue pending, and so the scope of the stipulation

25    and dismissal will be limited to the first party action, the

1  plaintiff against Ameriquest Mortgage.

2          THE COURT:  Okay.  Well, can you write that up?  I

3  mean, write up -- before you leave, write up a form of the

4  stipulation.  And here's what we'll do.  You know, I'll get my

5  law clerk to sit with you.  We'll draft the stipulation, and

6  you'll sign it before you leave.  Okay?

7          Emily, can you work with them to draft the

8  stipulation?

9          And then we'll give it to Judge Aspen.  And you can

10  put whatever language you want and -- I want you to leave

11  having that done.  Okay?

12          So, I mean, why don't you go with them back to your

13  office.  You both have a few minutes?

14          MR. MANVITZ:  Yes.

15          MR. BROOKS:  Yes, your Honor.

16          THE COURT:  Emily, go work that out.  Okay.

17          MR. SHAPIRO:  Thank you, your Honor.

18          MR. BROOKS:  Thank you, your Honor.

19      (Which concluded the proceedings in the above-entitled

20  matter.)

21

22

23

24

25

1                       CERTIFICATE

2        I HEREBY CERTIFY that the foregoing is a true, correct

3 and complete transcript of the proceedings had at the hearing

4 of the aforementioned cause on the day and date hereof.

5

6 */s/Pamela S. Warren*             August 8, 2012
  Official Court Reporter                Date
7 United States District Court
  Northern District of Illinois
8 Eastern Division

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25