# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715<br><br>Lead Case No. 05-cv-07097<br><br>(Centralized before The Honorable Marvin E. Aspen)<br><br>Assigned to Magistrate Judge Daniel Martin |

**AMERIQUEST'S SUR-REPLY TO MOTION TO DISMISS MDL**

Instead of addressing the arguments in the Opposition, the Reply[1] misstates the facts at issue and procedural posture of the case and then builds on the misstatements to support the Motion.

**First,** the Reply seeks to rebut the assertion that common discovery exists for the title companies at issue by asserting that Ameriquest only claims common discovery exists for the 300-plus claims against Fidelity, not the claims involving the title companies. Reply at 2. This is incorrect and misstates the common discovery at issue. *See e.g.,* Opp. at p. 2, 3, 5, 6-7 (section titled "Common Discovery"). Each of the title companies or their agents executed the same form closing agent affidavit, closing instructions, and were paid for their services related to the closings as reflected on the same HUD-1 settlement statement form. Each title company was also required to provide a standard form closing protection letter ("CPL") per the uniform instructions. This Court has already analyzed the uniformity of the CPLs in the MDL and explained the benefits of coordinated discovery concerning the third-party defendants' practices. *Terry* Dkt. 782. As explained in the Opposition, Northwest Title (**57** closings), Superior (**88** closings), MIS (**80** closings), Tristar Title (**41** closings), and 11 third-party defendants with between **10 and 58** closings per company are also subject to common discovery about their closing policies and practices.[2]

---

[1] The Sur-Reply initially addresses the Reply filed by the four original moving parties, Fidelity, MIS, Northwest, and Superior, Dkt. 5132. and at p. 4 addresses the Reply filed by the joining parties, Dkt. 5131.

[2] Since Fidelity argued (and lost) the argument that there was "no common discovery" in the MDL, subsequent discovery has further disclosed the ruse Fidelity attempted to foist upon this Court and Ameriquest. Fidelity argued that there were no common closing protection letter practices. It asserted that Ameriquest's contention that a blank regarding line in a closing protection showed that it applied to all future loan transactions instead of just a single transaction was just a "new theory, apparently made-up specifically for the Terry lawsuit..." Dkt. No. 4367 at 5. And Fidelity initially prevailed on a motion for protective order to preclude the head of training regarding Fidelity's nationwide system for closing protection letters from testifying about this so-called made-up theory. But recently she testified that Fidelity's training group informed agents across the nation about 20,000 times per year in response to inquiries and in its training materials and seminars that leaving a blank in the regarding line shows that the Fidelity closing protection letter applies to all future transactions. Ex. A. Although Fidelity informed the Court (and Ameriquest) that only a designation like "All Transactions" could make a form be used as blanket (Dkt. 4367 at 8), this alleged practice was unheard of to the head of training and contradicts Fidelity's previously hidden but widely distributed memo explaining the practice exactly the same as Ameriquest's so-called "made-up" "theory." With Fidelity's attempt to hide this common practice now partially exposed, the Court's holding that common discovery exists and should proceed in the MDL is further supported.

**Second**, although buried at page 13 of the Motion, the Reply now asserts that the "most significant issue" is that it is a due process violation to allow discovery before the movants file motions to dismiss. This argument misstates the facts and the law. Movants have already filed a motion to dismiss and lost on the breach of contract and negligent misrepresentation claims. The Federal Rules of Civil Procedure prohibit successive 12(b)(6) motions. Fed. R. Civ. Proc. 12(g)(2). Further, movants have not identified a single motion that they could file which would make the discovery at issue moot. There is no motion that would preclude the discovery at issue because it is basic and necessary for all pending claims. As explained in the Opposition, the only reason movants have not filed answers is because they asked the Court to be relieved of the obligation because they did not want to file cross-claims against each other presumably in advance of the upcoming mediation. *See* Opp. at 13. Nothing is preventing them from filing an answer and this Court previously ordered them to do so.

Moreover, movants' allegation that there is a due process violation by allowing discovery before a ruling on a motion to dismiss is without legal precedent. To the contrary, the general rule in this district is that discovery *should* proceed regardless of a pending 12(b)(6) motion. *Tamburo v. Dworkin,* 2010 WL 4867346 (N.D. Ill. Nov. 17, 2010) (discussing the history of the general rule and why discovery proceeds despite a filed or threatened 12(b)(6) motion). Rule 26 does not provide for a discovery stay because it would require the court to pre-judge the validity of a motion to dismiss and unless it is clear that the motion would be dispositive of all claims and in turn the need for any discovery, it is inappropriate to delay discovery. *See also Cohn v. Taco Bell Corp.*, 147 F.R.D. 154, 162 (N.D. Ill. 1993) (finding that "[M]otions to stay discovery are not favored and are rarely appropriate where the resolution of the dispositive motion may not dispose of the entire case."); *see also* Rule 56(f) (allowing discovery on an issue before a ruling on a summary judgment motion).

**Third**, the Reply contains grossly unsupported accusations such as a hanging before a fair trial, but the motion fails to support the overarching complaint that discovery is unduly burdensome. This is basic discovery such as requests for the applicable closing file; applicable

2

contracts, agency agreements, closing protection letters, and a statement of defenses. Movants avoid addressing the "burdensome" issue because Fidelity has now withdrawn its objection that the discovery is burdensome, and MIS has refused requests for MIS to state any objections to the discovery so the parties can attempt to resolve them pursuant to L.R. 37.2.

The moving parties also suggest that they do not know the basis for the claims and that they are frivolous. Reply at 4. But Ameriquest laid out its claims with exhaustive support the last time Fidelity made that assertion and the Court agreed that discovery and summary judgment motions should proceed in the MDL. Dkt. 4389 at 3-5; Terry Dkt. 782. One only needs to look at Fidelity's website to know that Fidelity and the other moving parties are aware of their exposure to the claims at issue. The website suggests they are for a lender's loss when borrower-plaintiffs' make claims against lenders arising from the settlement agents failing to properly date or distribute the Notice of Right to Cancel forms at the closing. Ex. B. This follows Fidelity informing its shareholders of an exposure in excess of $5 million in the MDL in its annual report. If third-party defendants really thought they had a solid defense to the third-party claims, they would embrace the opportunity to file a summary judgment motion on common issues, but instead, they are trying to avoid having to respond to the common issue summary judgment motions contemplated by the Court. *See* Terry Dkt. 782.

**Fourth**, the Reply misstates the record as to this Court's prior rulings involving *Terry* and their import to this case. Movants make the bold statement at footnote 5 that the Court is not familiar with *Terry* as if the Court did not read the 395 pages of briefs and exhibits explaining why third-party discovery should proceed in the MDL. This Court soundly rejected Fidelity's attempts to avoid coordinated discovery in the MDL about third-party practices. *See Terry* Dkt. 782. The moving parties then claims there can be no coordinated discovery with *Terry* because of Judge Chang's August 31, 2012 discovery deadline which was set before this Court's July 26, 2012 order transferring the *Terry* case to the MDL for coordinated discovery. Movants' argument that Judge Chang's August 31 date blocks the remainder of coordinated discovery in the MDL is ridiculous. *See* Reply at 7. The Order notes that discovery in the MDL will pick-up

3

where *Terry* left off. See Terry Dkt. 782 at 2. A discovery cut-off in *Terry* has no bearing on coordinated discovery in the MDL. This Court's transfer order explained that discovery about the interpretation of the Fidelity closing protection letters at issue over 200 times in the MDL and about 15 times in *Terry* should take place in the MDL, and it has not taken place in *Terry*. Accordingly, the Court appropriately agreed that the discovery should take place in the MDL.

**Fifth**, the Reply misstates the law allowing aggregation of claims and summarily contends that Ameriquest cannot meet the jurisdictional minimum by aggregating claims. Reply at fn. 6. But it is black letter law that the aggregation of all claims by a single plaintiff against a defendant is appropriate to meet the jurisdictional limit. *Wright & Miller: Federal Prac. & Proc.* § 3704, Aggregation of Claims-History and General Principles (2012) at 567 (stating that it is "well-settled" that a plaintiff can join multiple claims against a defendant and aggregate the damages to meet the jurisdictional limit) (citing at fn. 6 two pages of cases including nine from this district and Seventh Circuit).

**Sixth**, the Reply also misstates the continued role of the TILA claims. Addressing comity, movants claim that the TILA violations will not be at issue if the cases are transferred to state court but movants will argue that there was no TILA violation and therefore, Ameriquest's settlement was unreasonable, thus requiring the state court to analyze TILA. Comity does not weigh in favor of remand.

**Seventh**, the Reply is also confusing in that it infers that only 39 claims are at issue. *See* Reply at fn. 1. But disbanding the MDL would result in over 500 cases including 125 pending TILA claims being sent to federal courts around the nation or to the extent diversity is not met for a particular defendant, to state courts.

**Eighth**, the joinder parties were not addressed by name because they fall into the same category as the other moving parties. Common discovery about the closing practices and industry practices also apply to them. Likewise, two of the joining parties are Fidelity agents who will also be able to provide common discovery about closing protection letter practices and requirements.

4

DATED:  November 9, 2012

Respectfully submitted,

By: /s/  Randall L. Manvitz
*Attorneys for Third-Party Plaintiffs*
Randall Manvitz, Esq. (admitted *pro hac vice*)
BUCHALTER NEMER, A Professional Corporation
55 Second Street, Suite 1700
San Francisco, CA 94105
Telephone: (415) 227-0900

5

# Exhibit A

1    IN THE UNITED STATES DISTRICT COURT

       FOR THE NORTHERN DISTRICT OF ILLINOIS

2        EASTERN DIVISION

3

4   ROSE TERRY, et al.,

5     Plaintiffs,

          CASE NO.:  1:08-CV-2475

6   vs.

        Honorable Edmond E. Chang

7  AMERIQUEST MORTGAGE

   COMPANY, et al.,

8

    Defendants.

9

   _____

10

11

12       DEPOSITION OF

13       LORI ANN DRAKE

14  Taken on behalf of Defendant Ameriquest Mortgage Company

15

16   DATE TAKEN:  June 20, 2012

    TIME:     10:07 a.m.

17   PLACE:   First Choice Reporting & Video Services

        121 West Forsyth Street, Suite 820

18      Jacksonville, Florida  32202

19

20   Examination of the witness taken before:

21      Bobbie A. Umstead

      Registered Professional Reporter

22     Florida Professional Reporter

23

       - - -

24

25   2007-444193

1      A   At the time I don't know.

2      Q   So what did you do as a Tier 3 support for

3   agentTRAX?

4      A   Troubleshoot more issues and open up

5   enhancement requests or bug requests.

6      Q   Did you work with issuing agents at that time?

7      A   Very little.

8      Q   If they contacted you with a specific

9   technological issue, you might communicate with them?

10     A   Yes.

11     Q   Was that pretty much when you would

12   communicate with them?

13     A   Yes.

14     Q   And how long were you in the Tier 3 role?

15     A   Until 2010.

16     Q   And then what job title did you go to?

17     A   Business analyst.

18     Q   Did your job duties change from the

19   beginning-of-2006 through 2010 time period as a Tier 3

20   analyst?

21     A   Between 2006 and 2010, no.

22     Q   When you were contacted in the 2005 time

23   period about how to issue blanket closing protection

24   letters, what would you tell issuing agents?

25     A   That to issue a blanket letter, meaning to

1    cover all transactions, to leave the "Regarding" line

2    blank.

3       Q   And when was the first time that you started

4    giving that instruction?  Was it in the February 2005

5    time period?

6       A   Yes.

7       Q   And that instruction was commonly given to

8    issuing agents in the 2005 through 2006 time period?

9       A   Yes.

10       MR. FOWERBAUGH:  Objection.

11       THE WITNESS:  Sorry.

12       MR. FOWERBAUGH:  Objection, vague.  You say

13    commonly given to issuing agents.  You're not being

14    clear as to in what context.

15       But you can answer that question.  I guess you

16    already did.

17       THE WITNESS:  Sorry.

18    BY MR. MANVITZ:

19       Q   The instruction for issuing agents to issue

20    blanket closing protection letters with blanks in the

21    "Regarding" line, did that instruction continue through

22    the time that you issued -- the time that the nationwide

23    memo was generated?

24       I asked an incoherent question.

25       Was the instruction to issuing agents to issue

1    blanket closing protection letters with blanks in the

2    "Regarding" line commonly given from the February 2005

3    time period through at least July 2009 when the

4    nationwide memo was sent?

5        MR. FOWERBAUGH:  Objection to the

6    characterization of the message of the day.

7        But you can answer the question.

8        THE WITNESS:  Yes.

9    BY MR. MANVITZ:

10       Q   And Heather Mahoney and Uquella Hawkins were

11   trained to provide that same instruction, that issuing

12   agents should leave blanks in the "Regarding" line if

13   they wanted to issue a blanket closing protection

14   letter?

15       A   Yes.

16       Q   And all the temps that worked on agentTRAX at

17   the help desk were also trained that issuing agents

18   should issue blanket closing protection letters by

19   leaving blanks in the "Regarding" line?

20       A   Yes.

21       Q   I understand you had a conversation with Don

22   Cole last month immediately before his deposition was

23   taken.  Was that the first time anyone ever informed you

24   that leaving blanks in the "Regarding" line was not the

25   appropriate method for issuing a blanket closing

1        THE WITNESS:  I do.

2        BY MR. MANVITZ:

3        Q   Would you consider it to be a large volume of

4    communications about how to issue blanket closing

5    protection letters?

6        A   I would consider it medium.

7        Q   It was a significant enough number that you

8    felt like clarification was necessary?

9        A   Yes.

10        Q   When you're talking about "medium," give me an

11    approximate number of communications that you were

12    receiving during a year about this issue.

13        A   Maybe a quarter of the user base.

14        Q   What does that mean?  When you say a quarter

15    of the user base, how big is the user base?

16        A   Oh, I don't know the exact number of users.

17    If there's approximately 80,000 agentTRAX users, then a

18    quarter of that would ask.

19        Q   Okay.  In a year?

20        A   Yes.

21        Q   And was that the case from when you started

22    working on agentTRAX in February 2005 through the July

23    of 2009 time period?

24        A   I would say that it was more so closer to 2005

25    than it was at the 2010 mark.

# Exhibit B



## Let the Rebound Begin in 2010!

By Lisa A. Tyler
*National Escrow Administrator*

*As we prepare for the predicted economic rebound this year, it is important to realize real estate fraud affects our industry in both good times and bad. Read this month's edition to find out about new types of fraud and what you can do to deter fraud in your own transactions.*

Did you know under the Truth in Lending Act if a borrower is not provided with the proper "Notice of Right to Cancel" in a residential refinance transaction then his/her three day rescission period extends to three years? Because of this, borrowers are using this type of regulatory relief to get out of legitimate debt. Read "Cancel Your Mortgage! Discover the Power of TILA!" to find out what you can do to protect the Company from future claims regarding the borrower's three day right to cancel a refinance transaction.

Read "First-Time Homebuyer's Credit Scam" to find out how one married couple attempted to use multiple last names to receive an $8,000 refund from the IRS. More importantly, find out what Mona Rodriguez, an escrow officer from Fidelity's Fresno, Calif. office did to stop it.

When a property owner dies without a probate or will it is difficult to determine who are the remaining heirs to the estate. Read "No Probate, No Will = No Closing" to find out why it is better to refer this type of transaction to our competitors.

## Articles

### Cancel Your Mortgage!
### Discover the Power of TILA!

*Borrowers who have fallen on hard times and let their mortgage payments lapse are relying on regulatory relief to help them stay in their homes. Law firms across the nation are advertising to homeowners through the Internet, billboards, radio and late-night television commercials urging them to contact these firms to cancel their mortgages, using a breach of the Truth in Lending Act (TILA) as the basis for cancellation.*

The various law firms' advertisements state the firms have solutions for keeping the homeowners in their homes at no additional cost to them. Some firms blatantly advertise to cancel the homeowners' mortgages altogether! Here are some examples of the ads:

> *"Regardless of your credit....regardless of your situation....you can cancel your mortgage debt using T.I.L.A."*
> *"The bank will want to settle with you because they know that every mortgage contract they make is loaded with T.I.L.A. Violations worth about $50,000 in fines!"*
> *"You can even collect these fines and discharge the mortgage and the bank is happy to do it!"*
> *"Cancel your mortgage...and keep your home!!"*

Once a homeowner answers the ad, the law firm employee asks the homeowner if he/she still owns the home and if the homeowner refinanced the property anytime during the past three years. If the homeowner answers affirmatively, the firm instructs the homeowner to bring a copy of the refinance closing papers to the law firm's office. The attorneys and paralegals then comb through the paperwork to look for violations of TILA. Specifically, they are looking to see if the homeowner received two copies of the "Three Day Notice of Right to Cancel" for each borrower and to see if the third business day is disclosed on the Notice. Under TILA, if those conditions are not met, the borrower has three years in which to rescind the transaction.

Fidelity National Financial - Fraud Insights eNewsletter - Volume 5 Issue 1     Page 2 of 7



**Incredible Escrow Training!**

*It's the National Escrow Administration Team to the rescue!*

Whether it is figuring out the new HUD form, a question about a transaction or deterring fraud – we can help! Our 2010 escrow training events are under way, arming you with knowledge and powerful tools so you can be a Superhero in the industry! Be sure to register for an event in your area through the Company's Intranet at home.fnf.com.

If you have a heroic story to share, please submit the details to settlement@fnf.com. If your story is selected for a future edition of *Fraud Insights* the hero in the story will receive a $1,000 reward from the Company as well as a letter of recognition.

If the attorney finds less than two copies for each borrower or incomplete notices in the loan package, the attorney writes an accusatory letter to the lender quoting the Act and declaring the homeowner's right to cancel the mortgage.

The letter usually reads something like this...

*"To this date, lender has never provided borrowers with true, complete, accurate or timely documents as required. Only after such provision has been done can the three day right to cancel period begin. If the required full disclosures have not been provided then the period in which to cancel is extended for up to three years or until lender moves to foreclose. The records thus far evidence that borrowers have requested to cancel within the stipulated three year time period, while still waiting to receive all TILA disclosures as required by federal law, the same of which have never been received."*

The borrower signs the letter and sends it to the mortgage company, who then forwards the document to the settlement agent who accepted responsibility for delivery of the notice at the time the loan documents were received."

The settlement agent's role is to oversee the signing and delivery of the notices pursuant to the lender's written instructions. The lender relies on the settlement agent to have a clear understanding of the disclosure requirements and how the right of rescission works. Failure to provide the proper disclosures and follow the rescission requirements could provide a borrower with the ability to claim his/her loan is invalid. If the lender suffers a loss due to the borrower's claim and they think the loss was the responsibility of the settlement agent, pursuant to their instructions, the settlement agent might have to share in any losses.

The three day right of rescission clock does not start ticking until after all three factors have taken place; that is, until the signing is completely finished. The three day rescission period runs when the last of three triggering events occurs. The three events are:

1. consummation of the signing;
2. delivery by the lender of the notice to the borrower of the right to rescind; and
3. delivery by the lender to the borrower of the "material disclosures."

Material disclosures are the various disclosures the lender must give the borrower such as the Truth in Lending statement.

In order to protect the Company from future claims, settlement agents are directed to use the "Borrower's Affidavit" to obtain the borrower's sworn statement that they received the two completed copies of their notice of right to cancel at the signing ceremony. The Company can then use their sworn testimony as our first line of legal defense in future claims.



---

**BORROWER'S AFFIDAVIT**

State of _____
County of _____

I hereby certify, under penalty of perjury, that I have received two (2) completed copies of the Notice of Right to Cancel along with a copy package containing all loan documents.

_____     _____
Borrower                                                              Date

State of _____
County of _____
Subscribed and sworn to (or affirmed) before me on this day of _____
20___, by _____
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____     (Seal)

---

Needless to say our offices all over the nation are receiving attorneys' letters. If they come to us directly from the attorney, we file the letter and wait to see if we are contacted by our insured, the lender. If the lender contacts the branch, they should be directed to put their potential claim in writing and send it to the claims office as indicated on their final policy of title insurance.

## First-Time Homebuyer's Credit Scam

*The Mexican custom of using the paternal grandmother's maiden name is used in the United States to circumvent the First-Time Homebuyer's Credit laws*

In Mexico the father's surname does not suffice on legal documents, men must include their mother's maiden name. The reason is simple and practical: There are so many Hispanics with the same surnames that they need to include their mother's maiden name to legally separate their identities.

A few months ago Mona Rodriguez from Fidelity's Fresno, Calif. operation closed a short sale transaction for Antonio Sandoval Abrica. Mr. Abrica owned the property as his sole and separate property. He sold the property for $90,000 to an investor. There was approximately $206,500 owed to the current lien holder, but they agreed to a short pay amount of $84,000.

The investor returned a month later and opened a new transaction with Mona for the sale of the same property. The buyer in the new transaction was Maria Aguilar Sandoval, a married woman, as her sole and separate property. She was purchasing the property for